# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

PORT HAMILTON REFINING AND
TRANSPORTATION, LLLP

       Petitioner,

    v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

       Respondent.

Case No.: _____

## PETITION FOR REVIEW

Pursuant to Section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1), Federal Rule of Appellate Procedure 15(a), and Third Circuit Rule 15.1, Port Hamilton Refining and Transportation LLLP ("PHRT") hereby respectfully petitions the United States Court of Appeals for the Third Circuit for review of final agency action taken by the United States Environmental Protection Agency ("EPA") on November 16, 2022, which is attached as Exhibit A:

> Letter from Joseph Goffman, Acting Assistant Administrator of the Office of Air and Radiation to representatives of PHRT, Julie Domike and Thomas V. Eagan, and Attachments 1-2[1].

---

[1] Attachment 3 to EPA's November 16, 2022 decision contains "Confidential Business Information" PHRT will file a motion to file Attachment No. 3 under seal once the Clerk of Court has opened the case.

EPA's November 16, 2022 decision ["the Decision"] purports to require PHRT to go through Prevention of Significant Deterioration ("PSD") permitting prior to restarting or "beginning actual construction" at its refinery located at 1 Estate Hope, Christiansted, St. Croix, U.S. Virgin Islands (the "Refinery"). EPA's November 16, 2022 decision reversed EPA's earlier decision issued to the Refinery's previous owner on the same permitting issue four years prior. *See* Letter from William L. Wehrum, Assistant Administrator of the Office of Air and Radiation, to Limetree Bay Terminals, *Limetree Bay Terminals, St. Croix, U.S. Virgin Islands – Permitting Questions* (April 5, 2018) (Ex. B). The Decision is contrary to law, beyond EPA's authority, and arbitrary and capricious.

This Court has jurisdiction and is a proper venue for this action pursuant to 42 U.S.C. § 7607(b)(1).

Date: January 13, 2023

Respectfully submitted,

Andrew C. Simpson
V.I. Bar No. 451
ANDREW C. SIMPSON, PC
2191 Church St., Ste. 5
Christiansted, VI 00820
340.719.3900
asimpson@coralbrief.com
www.coralbrief.com

*Counsel for Port Hamilton Refining and Transportation LLLP*

*Of Counsel:*

Matthew W. Morrison
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036
202.663.8036
matthew.morrison@pillsburylaw.com

Co-Counsel for Port Hamilton Refining
and Transportation LLLP

Julie R. Domike
BABST|CALLAND
505 9th St. NW
Suite 602
Washington, DC 20004
jdomike@babstcalland.com
202.853.3453

Gary E. Steinbauer
BABST|CALLAND
Two Gateway Center
Pittsburgh, PA 15222
412.394.6590
gsteinbauer@babstcalland.com

Co-Counsel for Port Hamilton Refining
and Transportation LLLP

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Federal Rules of Appellate Procedure 15(c) and 25, I certify

that on January 13, 2023, I served copies of the foregoing petition for review,

with exhibits, the docketing statement, and the corporate disclosure statement

upon the following via U.S. Priority Mail:

     Michael S. Regan
     Administrator
     U.S. Environmental Protection Agency
     1200 Pennsylvania Avenue, N.W.
     Washington, D.C. 20460

     Correspondence Control Unit
     Office of General Counsel (2311)
     U.S. Environmental Protection Agency
     1200 Pennsylvania Avenue, N.W.
     Washington, D.C. 20460

     Merrick B. Garland
     Attorney General of the United States
     U.S. Department of Justice
     950 Pennsylvania Avenue, N.W.
     Washington, D.C. 20530

     Todd S. Kim
     Assistant Attorney General
     U.S. Department of Justice
     Environmental and Natural Resources Division
     950 Pennsylvania Avenue, N.W.
     Washington, D.C. 20530
     (also served via email: todd.kim@usdoj.gov)

     Respectfully submitted,

     /s/ Andrew C. Simpson
     Andrew C. Simpson

# Exhibit A



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

November 16, 2022

OFFICE OF
AIR AND RADIATION

*VIA ELECTRONIC MAIL- JDomike@babstcalland.com; TEagan@rascoklock.com*

Julie R. Domike, Esq.
Babst Calland, Attorneys at Law
505 9th Street NW, Suite 700
Washington, D.C. 20004

Thomas V. Eagan, Esq.
Rasco Klock Perez & Nieto
2555 Ponce de Leon Boulevard, Suite 600
Coral Gables, Florida 33134

Dear Ms. Domike and Mr. Eagan:

In late December 2021, West Indies Petroleum Limited (WIPL) and Port Hamilton Refining and Transportation, LLLP (PHRT) submitted questions to the U.S. Department of Justice (DOJ) regarding the refinery located at 1 Estate Hope, Christiansted, St. Croix, U.S. Virgin Islands (the Refinery). One of the questions submitted concerned whether WIPL and PHRT could use existing permits to restart the Refinery and, if not, what is needed to restart the Refinery. Today's letter, and accompanying Attachments 1, 2, and 3, provide EPA's response to WIPL/PHRT's question with respect to the Clean Air Act's Prevention of Significant Deterioration (PSD) permit program. As described below, EPA has concluded that WIPL/PHRT is required to apply for and receive a final and effective PSD permit prior to restarting the Refinery or beginning actual construction as defined in 40 CFR 52.21(b)(11).

Background

In the Limetree Bay Refining bankruptcy proceeding, EPA wrote a letter dated September 24, 2021 to all potential Refinery bidders, which was placed in the reading room. The letter stated, among other things, that "[a] prospective purchaser may also be required to obtain a [PSD] permit under the Clean Air Act to restart the refinery," and noted that "EPA has required PSD permits for restarting long-dormant facilities that qualify as major stationary sources."

On March 2, 2022, EPA sent you a letter that, among other things, provides a brief history of the PSD permits previously issued for the Refinery and indicates that the Agency expects to follow up with a separate letter regarding additional PSD permitting issues. On March 22, 2022, EPA sent you a letter stating that, based on currently available information, "there are strong indicators to suggest that the Refinery must obtain a PSD permit prior to startup of Refinery operations." The March 22, 2022, letter also sought additional information from you to inform EPA's final determination as to PSD applicability. The letter further stated that "[b]ecause a PSD permit may be required prior to startup of the refinery operations or of any refinery unit(s), EPA strongly recommends that you not proceed with any such actions while EPA continues to evaluate PSD applicability."

PHRT provided an initial response to EPA on July 15, 2022, and a corrected response on July 27, 2022 (collectively, PHRT's "July letter"). PHRT asserted in its July letter that it is under no obligation to delay resumption of refining operations pending EPA's evaluation of PSD permitting applicability. EPA sent you an interim response on August 23, 2022, indicating that EPA was reviewing PHRT's responses to the questions in EPA's March 22, 2022, letter and reiterating that EPA strongly recommends that PHRT not resume refinery operations while EPA continues to evaluate PSD applicability.

Discussion and Conclusion

EPA has completed its review of the information in PHRT's July letter and closely examined the facts and circumstances of the Refinery since it was shut down by HOVENSA in February 2012. EPA's examination was informed by the Agency's long-standing Reactivation Policy, as articulated in *In the Matter of Monroe Electric Generating Plant Entergy Louisiana, Inc.,* Proposed Operating Permit, Petition No. 6-99-2 (June 11, 1999) (*Monroe*) and other Agency and judicial decisions on reactivation of shutdown sources. EPA is continuing to apply the Reactivation Policy, as described in *Monroe*, because it remains an appropriate method for determining whether the reactivation of a stationary source qualifies as the construction of a new source under the PSD regulations.

Based on EPA's analysis of the specific factors in the Reactivation Policy, we conclude that the Refinery was permanently shut down in 2012 and that restarting the Refinery qualifies as construction of a new major stationary source under the federal PSD permitting regulations applicable in the U.S. Virgin Islands. EPA's detailed consideration of the *Monroe* factors in Attachment 1 describes how the facts and circumstances of the Refinery's history since 2012 demonstrate that the Refinery was permanently shut down. This attachment also demonstrates that emissions from the restarted Refinery will exceed the PSD applicability thresholds for multiple New Source Review-regulated pollutants.

In addition, Attachment 2 contains a detailed explanation as to why EPA is continuing to apply the Reactivation Policy, including a demonstration of how the Policy has been, and continues to be, supported by the federal PSD regulations. Attachment 3 supplements Attachment 1 with additional facts that are germane to the Reactivation Policy analysis but cannot be included in a public document because the facts are claimed to be Confidential Business Information.

For the reasons discussed in these attachments, the Refinery must apply to EPA for, and receive, a final effective PSD permit for these pollutants prior to restarting or beginning actual construction at the Refinery, as defined in 40 CFR 52.21(b)(11). The PSD permit application should include, among other information, analyses of air quality impacts, environmental justice, and Best Available Control Technology.

If you have any questions, please contact either Joseph Siegel (212-637-3208; siegel.joseph@epa.gov) or Liliana Villatora (212-637-3218; villatora.liliana@epa.gov) of the EPA Region 2 Office of Regional Counsel.

Sincerely,

Joseph Goffman
Principal Deputy Assistant Administrator

**ATTACHMENT 1**

**Application of EPA's Reactivation Policy Permanent Shutdown Factors to the Port Hamilton Refining and Transportation LLLP Refinery[1]**

## I.    Introduction

The U.S. Environmental Protection Agency ("EPA") provides its assessment in this Attachment of the applicability of the Clean Air Act's Prevention of Significant Deterioration ("PSD") Program at 42 U.S.C. § 7475 and its implementing regulations at 40 C.F.R. 52.21 to the Refinery at 1 Estate Hope in Christiansted, St. Croix, U.S. Virgin Islands (the "Refinery"). EPA concludes that the proposed restart of the Refinery qualifies as construction of a new major stationary source under applicable PSD permitting regulations, as interpreted by EPA and applied through the Agency's Reactivation Policy, described below. Based on this conclusion, and EPA's analysis of the Refinery's increase in emissions (*See* Section IV, below) using information from PHRT and the previous owners, PHRT must apply for and obtain a final effective PSD permit prior to restarting the Refinery or beginning actual construction of the Refinery, as defined in 40 C.F.R. 52.21(b)(11). The PSD permit application should include, among other information, analyses of air quality impacts, environmental justice, and Best Available Control Technology.

In 1999, the EPA Administrator issued a Clean Air Act Title V Order articulating how the PSD requirements may apply to reactivation of shutdown sources. *In the Matter of Monroe Electric Generating Plant Entergy Louisiana, Inc.,* Proposed Operating Permit, Petition No. 6-99-2 (June 11, 1999) ("*Monroe*"). In the *Monroe* Order, the Administrator indicated that "EPA has a well-established policy that reactivation of a permanently shut down facility will be treated as operation of a new source for purposes of PSD review" ("Reactivation Policy"), citing to five prior Agency determinations on reactivation dating back to 1978.[2]

As discussed in Section III, below, determinations under EPA's Reactivation Policy require a detailed examination of the facts and circumstances related to a shutdown source and application of six factors set out in the Reactivation Policy. Because Reactivation Policy analyses are fact-sensitive, this discussion begins with detailed background information in Section II followed by an assessment under the Reactivation Policy in Section III and an analysis of emissions increases at the Refinery in Section IV.

---

[1] References to PHRT throughout this Attachment should be understood to include both PHRT and West Indies Petroleum Limited ("WIPL") as purchasers of the Refinery in the bankruptcy proceeding.

[2] On December 2, 2020, EPA criticized the Reactivation Policy and stated that the Agency would not follow it in the context of an action to issue a final Plantwide Applicability Limit (PAL) permit to Limetree Bay Refinery, LLC and Limetree Bay Terminals, LLC (Limetree). That action did not become final and effective. Even if the December 2020 action had taken effect and rescinded the Reactivation Policy, for the reasons described in Attachment 2, the Policy reflects the EPA's current views and the Agency intends to continue following it.

## II.   Background

### A.  History of Refinery Shutdown and Attempts at Startup

The facility's unusual history over approximately the last decade provides factual support for EPA's determination that the Refinery is a new source. As discussed in detail below in Section III, the evidence indicates that HOVENSA's initial intention in 2012, when it ceased operations, was to permanently shut down the Refinery and convert it to an oil storage terminal.[3] However, at the urging of the U.S. Virgin Islands Government, HOVENSA instead sought to find a buyer. It took nearly four years after the February 2012 shutdown, and a bankruptcy proceeding, before HOVENSA did so. Limetree Bay Terminals, LLC and/or its corporate parent or associated business entities acquired the Refinery in January 2016 with the option – but without the obligation - to rehabilitate and restart the Refinery.[4]  Limetree Bay Terminals, LLC later transferred certain of the Refinery assets to Limetree Bay Refining, LLC. [5]

On February 1, 2018, approximately two years after Limetree's[6] purchase, Limetree informed EPA of its intention to produce refined petroleum products that would meet new marine fuel standards ("MARPOL project") by January 1, 2020 and sought EPA's view[7] on whether restarting the shutdown Refinery would require a PSD permit under EPA's Reactivation Policy.[8] EPA responded on April 5, 2018 in a letter from then Assistant Administrator William Wehrum ("EPA's 2018 letter") which stated that, based on the information provided by Limetree, the Refinery "was not permanently shut down and should not be considered a 'new source' for purposes of PSD applicability." The information regarding the restart of the Refinery has changed substantially since that statement and EPA no longer supports this view. Further, EPA's 2018 letter sent a clear message that since EPA did not have all the specifics regarding Limetree's plans, a final determination would be left for a later time.

EPA also expressed the view that the Refinery had not permanently shut down in EPA's 2020 response to public comments on Limetree's application for a Plantwide Applicability Limit Permit.[9]  However, this view was also not reflected in a final EPA determination.  On February 3, 2021, both Limetree and environmental organizations filed petitions for review of EPA's final Plantwide Applicability ("PAL") permit with the EPA Environmental Appeals Board ("EAB").

---

[3] *See, e.g.*, *Fourth Amended Agreement Between the USVI, HOVENSA, Hess Oil VI Corp, and PDVSA* (April 3, 2013), transmitted as enclosure to Letter from Governor John P. de Jongh, U.S. Virgin Islands, to Honorable Shawn-Michael Malone, President, U.S. Virgin Islands Legislature (July 12, 2013), available at https://stthomassource.com/legacy_files/userfiles/file/2013%20July/07132013-HOVENSA%20AGREEMENT%20DOCUMENTS.pdf.

[4] See Section III.B.3, below, for a discussion of the absence of an obligation to rehabilitate the Refinery.

[5] Complaint, *Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC, Civ. A. No. 1:21-cv-264* (D.Ct. USVI July 12, 2021), at https://www.justice.gov/opa/press-release/file/1411231/download.

[6] Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC are collectively referred to in this Attachment as "Limetree."

[7] Limetree approached EPA with this question because the federal PSD regulations at 40 C.F.R. 52.21 apply to the Refinery since the U.S. Virgin Islands does not have an approved territorial PSD program.  Instead, EPA Region 2 implements the federal PSD requirements in the territory.  40 C.F.R. 52.2779.

[8] Letter from LeAnn Johnson Koch, Perkins Coie, to John Filippelli, EPA Region 2 (Feb. 1, 2018).

[9] EPA Plantwide Applicability Limit Permit for Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC, PAL permit No. EPA-PAL-VI001/2019, Response to Comments (Dec. 2, 2020).

The EPA's regulations at 40 C.F.R. Part 124 provide that a permit doesn't become effective if a party files a timely request for EAB review.  On March 25, 2021, EPA withdrew "the [Limetree] PAL permit and its administrative record in its entirety, including the Agency's response to comments."[10]  As a result, the EAB remanded the PAL permit for further action within EPA. Thus, EPA has not issued a final determination on PSD applicability for the Refinery until today.

Limetree informed EPA that it began planning for construction activities at the site in late 2017[11] and then initiated construction in mid-2018. After approximately three years of planning and intensive physical rehabilitation of the Refinery, and spending approximately $4.1 billion[12] using over 4,000 workers,[13] Limetree's attempted restart in late 2020 was accompanied by significant noncompliance.

An examination of Limetree's failed restart and accompanying noncompliance is instructive in EPA's Reactivation Policy factors analysis because the facts underscore that the Refinery needed more time before restarting (*See* Section III.A, below, on the *Monroe* factor related to the length of time the facility was shut down). In particular, Limetree made several unsuccessful attempts to start up the Refinery beginning in the last quarter of 2020, but repeated problems at the Refinery resulted in several startups and shutdowns and, finally, complete cessation of operations.

During the months immediately following the 2020 startup, the Refinery experienced significant violations of its Clean Air Act Title V permit and the Clean Air Act's New Source Performance Standards ("NSPS") Subpart Ja requirements, including the following: (1) the Refinery caused a large cloud of steam and light hydrocarbons from Vacuum Tower #3 on December 8, 2020 that resulted in the temporary evacuation of some employees and the mobilization of the Refinery's fire department; and (2) Hydrogen Sulfide ("$H_2S$") concentrations at Flare #8 exceeded the NSPS limit of 162 ppmv including levels higher than 5,000 ppmv for a number of hours in December 2020 and 20,000 ppmv for at least 5 hours on January 25, 2021.[14] Ambient $H_2S$ and sulfur dioxide ("$SO_2$") levels modeled based on $H_2S$ measured in gas combusted in the flare during some periods in January 2021 were at least as high as the levels that later led EPA to issue an emergency order under the Clean Air Act, discussed below.

Limetree then indicated it would again operate the facility in February 2021 to begin production and commercial sales.  In February and May 2021, the Refinery experienced a flare rainout on two occasions, which resulted in oil droplets raining on local residential areas, causing

---

[10] Administrator Michael S. Regan, *Withdrawal of Plantwide Applicability Limit Permit No. EPA-PAL-VIOO1/2019* (March 25, 2021), at https://www.epa.gov/sites/default/files/2021-04/documents/withdrawal_decision_applicability.limit_.permit.signed.pdf.

[11] In late 2017, Limetree informed EPA of its plans to take advantage of favorable market conditions that it expected would result from the new MARPOL fuel requirements, which became effective on January 1, 2020.

[12] *In re: Limetree Services, LLC*, Case No. 21-32351, U.S. Bankruptcy Court, Southern District of Texas, Declaration of Mark Shapiro, Senior Managing Director for GlassRatner Advisory & Capital Group LLC, Chief Restructuring Officer for Limetree (July 13, 2021).

[13] Statement of Bob Weldzius, Senior Vice President of Refining at Limetree Refinery, EPA Public Hearing Transcript, Plantwide Applicability Limit Public Hearing, Nov. 8, 2019.

[14] Complaint, *Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC, Civ. A. No. 1:21-cv-264* (D.Ct. USVI July 12, 2021), at https://www.justice.gov/opa/press-release/file/1411231/download.

widespread contamination including contamination of vegetable gardens and cisterns used by residents for drinking water and other household water needs. In addition, on two occasions, each lasting multiple days in April and May 2021, the Refinery emitted $H_2S$, $SO_2$, and/or uncombusted hydrocarbons at levels that had immediate and significant adverse impacts on downwind residents and required multiple public health advisories, the closure of schools and government offices, and the mobilization of the Virgin Islands National Guard and Fire Service.[15] The incidents caused nausea and headaches among residents and a recommendation by the U.S. Virgin Islands Department of Planning and Natural Resources ("DPNR") to residents with allergies, asthma and other respiratory ailments to evacuate or remain indoors.

The health and environmental impacts during the Refinery's brief periods of operation between late December 2020 and approximately May 14, 2021 were of such grave concern, and so far outside the bounds of compliance, that EPA took the unusual step of exercising emergency powers under the Clean Air Act by issuing an order on May 14, 2021 under Section 303 of the Clean Air Act, 42 U.S.C. § 7603 ("Section 303 Order") based on the imminent and substantial endangerment to public health or welfare, or the environment, on St. Croix.  The Section 303 Order to Limetree required, *inter alia*, the suspension of operations of the refinery. EPA had previously issued such an order requiring a facility to shut down only approximately four times in the history of the Clean Air Act.

After ceasing operations in May 2021, Limetree announced in June 2021 that it would not restart. The Refinery ended up in a second bankruptcy proceeding, which resulted in PHRT's ownership of the Refinery.  PHRT's $62 million bid for a Refinery that had recently invested $4.1 billion raises questions about the physical, financial and regulatory viability of the facility. The Refinery has now been shut down for an additional eighteen months. EPA's understanding is that restarting the Refinery would require significant construction and other physical activities that are in addition to the substantial capital and operational investments that Limetree completed before it attempted to restart the refining operations. As discussed in Section III.E, below, the advanced state of corrosion, systemic lack of maintenance, and deficiencies before the 2020 startup of the Refinery, indicate the need for additional construction activity.

The May 14, 2021 Section 303 Order required Limetree to hire independent auditors to conduct both an environmental compliance audit and process area audits and submit a plan including a schedule for implementing corrective measures identified in audit reports produced by the auditors.  The audit reports were submitted to EPA on June 24 and 25, 2021. In addition to EPA's administrative Section 303 Order, on July 12, 2021, the U.S. Department of Justice filed a civil action against Limetree under Section 303 of the Clean Air Act, as well as a Joint Stipulation between the United States and Limetree, which the bankruptcy court later ordered PHRT to become a party to as a condition of the purchase of the Refinery. The Joint Stipulation requires, *inter alia*, submittal of the required plan and a schedule for implementation of all corrective measures set forth in the audit reports, as specified in EPA's Section 303 Order. The plan must be submitted by no later than ninety days prior to any restart of the Refinery or any refinery process unit. It has not yet been submitted to EPA.

---

[15] *Id.*

The audit reports submitted to EPA on June 24 and 25, 2021, contain additional facts that are germane to the Reactivation Policy analysis but are claimed to be Confidential Business Information ("CBI"). As such, Attachment 3, Additional Facts Claimed to be Confidential Business Information, provides further information.

Due to the unusual history at the Refinery, EPA made clear both during the Limetree bankruptcy proceeding and after PHRT assumed ownership that PSD permit requirements might apply to the restart of the Refinery. A September 24, 2021 letter from EPA to all potential bidders in the bankruptcy proceeding, which was placed in the bankruptcy case reading room, made clear that a PSD permit may be required and explained that "EPA has required PSD permits for restarting long-dormant facilities that qualify as major stationary sources."[16]  On March 2, 2022, the U.S. Department of Justice alerted PHRT to the September 24, 2021 letter again.[17] Also on March 22, 2022, EPA informed PHRT via letter that, based on currently available information, "there are strong indicators to suggest that the Refinery must obtain a PSD permit prior to startup of Refinery operations."[18] The letter also sought additional information from PHRT on past and future changes at the Refinery to evaluate the issue further before making a final determination as to PSD applicability. PHRT provided an initial response to EPA on July 15, 2022 and a corrected response on July 27, 2022 ("PHRT's July letter").[19]  The response is claimed to be CBI. As such, additional information from the response can be found in Attachment 3, Additional Facts Claimed to be Confidential Business Information.

## B. Continuing Air Quality Impacts

In addition to the acute impacts on the St. Croix community between late 2020 and May 14, 2021, there are potential longer-term air quality impacts. The long shutdown period since 2012 has resulted in uncertainty about the Refinery's impact on the National Ambient Air Quality Standards ("NAAQS") upon restart because there have been changes in air quality planning requirements since February 2012. After HOVENSA's last pre-shutdown air quality analysis was conducted, EPA promulgated several new or revised health-based NAAQS: 1-hour $SO_2$, 1-hour $NO_2$, and 8-hour ozone NAAQS, and 24-hour and annual $PM_{2.5}$ NAAQS and PSD increments. Further, there are no existing air quality demonstrations to assess attainment of any of the new or revised NAAQS that include projected emissions from the Refinery (which, upon startup, would be by far the largest emitter on the island) because the Refinery was shut down and not considered during the EPA designations process. Therefore, EPA does not have any information on the air quality impacts from the Refinery related to the new or revised health-based NAAQS or $PM_{2.5}$ PSD increments, other than some ambient data that measured violations of the 1-hour $SO_2$ NAAQS prior to the facility's 2012 shutdown. Due to the high level of emissions from any Refinery, and the physical configuration of this particular facility as well as

---

[16] Letter from Dore La Posta, EPA, to All Potential Buyers of Limetree Bay Refinery, September 24, 2021.

[17] Letter from Myles E. Flint, II, U.S. Department of Justice, to Julie R. Domike and Thomas Eagan, March 2, 2022.

[18] Letter from Liliana Villatora, US EPA, to Julie R. Domike and Thomas Eagan, March 22, 2022.

[19] Letter from Julie R. Domike and Thomas Eagan, Counsel for PHRT, to Suilin Chan and Joseph Siegel, EPA, July 27, 2022.

the prevailing trade winds, there are uncertainties about whether the Refinery would cause or contribute to violations of new or revised NAAQS and PSD increments.[20]

### C. The St. Croix Community and Environmental Justice

In addition to the acute impacts from the rainout of oily mist, the $H_2S$ and $SO_2$ exceedance incidents, the longer-term air quality impacts from the Refinery and lack of air quality demonstrations related to the new NAAQS, the vulnerable community neighboring the Refinery has already experienced manifold health and environmental impacts over decades from multiple sources including HOVENSA and Limetree. In addition, impacts from climate change-related storm events will increase the vulnerability of the community.

Even before the Refinery rained oil on homes and cisterns in the nearby community and exposed the residents to an oily mist and high levels of $H_2S$, $SO_2$, and uncombusted hydrocarbons, EPA determined that the community near the Refinery is particularly vulnerable as a predominantly low-income and minority population that experiences environmental and other burdens. In September 2019, EPA issued an environmental justice analysis along with the draft PAL permit. The analysis stated that the area of south-central St. Croix, where the Refinery is located, is an industrialized area with a large residential population. There are several schools, a hospital, and other locations that include sensitive populations. Even without the Refinery's emissions, the community is burdened by several nearby complex environmental challenges including the St. Croix Renaissance Industrial park that was reported to cause health issues due to irritants from Red Mud, odor from sources in the area that resulted in the closing of nearby schools, fires from the Anguilla landfill, proximity to a wastewater treatment plant, noise and traffic issues associated with the Henry E. Rohlsen Airport, and emissions from large ships docked at the coast.

The industrialized nature of southern central St. Croix, in the vicinity of the Refinery, stands in contrast to the rest of the island of St. Croix and even more broadly, the rest of the U.S. Virgin Islands, which is not as industrialized. The island of St. Croix was severely damaged during Hurricanes Maria and Irma in 2017, leaving many areas surrounding the Refinery's location, as well as the rest of St. Croix, in much need of environmental recovery.

### III.    Analysis of Reactivation Policy Factors - Refinery Restart

Sections I and II, above, provide important factual context for EPA's Reactivation Policy analysis presented in this Section which concludes that the Refinery was permanently shut down and that restart of the units needs to be evaluated as if the source were new. In prior EPA analyses, whether a shutdown is considered permanent depends in part on the intent of the owner or operator at the time of shutdown, based on all the facts and circumstances. *Monroe* at 8. After two years, however, there is a presumption that the shutdown is permanent, unless the facts and

---

[20] EPA advised PHRT that it must comply with ongoing Regional Haze obligations under Clean Air Act §§ 169A and 169B and 40 C.F.R. 51.308 and "notify EPA 60 days in advance of startup and resumption of operation of refinery process units and provide required information." Letter from Paul Simon, Acting Regional Counsel, EPA Region 2, to Julie R. Domike and Tom V. Eagan, Attorneys for PHRT, *Re: Questions Regarding Refinery Restart* (March 2, 2022).

circumstances rebut this presumption by indicating a continuing intent to reopen by the owner. The six factors that EPA has examined in prior situations where a source has been shut down or dormant for more than 2 years to evidence the continuing validity of the original intent not to permanently shut down are:

A.  Length of time the facility has been shut down
B.  Time and capital needed to restart
C.  Evidence of intent and concrete plans to restart
D.  Cause of the shutdown
E.  Status of permits
F.  Maintenance and inspections during shutdown

When EPA analyzes these factors, "no single factor is likely to be conclusive in the Agency's assessment" and the final determination will often involve a judgment regarding whether the owner's actions at the facility during shutdown support or refute any express statements regarding the owner's or operator's intentions. *Monroe* at 9.

EPA's consideration of the six factors in the context of the facts and circumstances of the Refinery lead EPA to the conclusion that the 2012 shutdown was permanent. The facts and circumstances include, among others, the shutdown by HOVENSA in 2012, the project to refurbish the Refinery by Limetree beginning in 2018, the failed attempts to restart the Refinery in late 2020 and 2021, non-operation since that time, and the need for PHRT to continue to refurbish the refinery before it can be operated again. While some factors point more strongly in the direction of permanent shutdown than others, when taken together, the factors in this case lead EPA to the conclusion that the Refinery was permanently shut down and thus would constitute a new source upon restart by PHRT.

The analysis that follows includes some information that either did not exist in 2012 or did not become known to EPA until after issuance of EPA's 2018 letter and the Response to Comments ("RTC") supporting EPA's December 2, 2020 final PAL permit which was later withdrawn by Administrator Regan on March 25, 2021. With this new information, including a cost of $4.1 billion using 4,000 workers over several years, 8.5 years of shutdown prior to an attempted startup that substantially endangered human health and the environment, a total of over 11 years before the new owners plan to restart, and long-term systemic maintenance failures at the Refinery, among others, the balance of factors support a conclusion that the Refinery was permanently shut down in 2012.

### A.  <u>Length of time the facility has been shut down and time and capital to restart</u>

The first two factors, length of time the facility has been shut down and the time and capital to restart, are so interconnected in this matter that they are discussed together in this subsection. As noted above, the Refinery was shut down from February 2012 until the last quarter of 2020, followed by several months of failed attempts to restart and significant noncompliance in 2020-21, resulting in the May 2021 shutdown and EPA's Section 303 Order in addition to a subsequent judicial enforcement action and Joint Stipulation. The Refinery has not resumed operations to date. Therefore, the Refinery was shut down initially for over 6 years

before actual construction began, unable to restart for over 8.5 years after HOVENSA's shutdown and, as of today, unable to restart in its present physical condition, which is over 10.5 years since HOVENSA's shutdown in 2012. At a July 14, 2022 U.S. Virgin Islands Legislature hearing, PHRT testified that the company hopes to restart the Refinery in the second quarter of 2023,[21] which would be 11.25 years after the 2012 shutdown.  However, even apart from the PSD permitting question, EPA questions the feasibility of starting the refinery on this timetable because of, among other things, the need for PHRT to address other significant environmental compliance requirements prior to restart.[22] These facts strongly favor a finding that there was a permanent shutdown.

An important guiding principle articulated in *Monroe* is that shutdowns of more than two years are presumed to be permanent. In particular, after two years of not operating, "it is up to the facility owner or operator to rebut the presumption" to avoid treatment as a new source by demonstrating a continuous intent to restart. EPA has consistently applied the two-year presumption. *See, e.g.*, *Noranda Lakeshore Mines*, Memo from John Seitz, Director, Stationary Source Compliance Division, OAQPS, to David Howekamp, Director, Air Mgt. Div. Reg. IX (May 27, 1987); *Watertown Power Plant, South Dakota*, Memo from John B. Rasnic, Director Stationary Source Compliance Division, OAQPS, to Douglas M. Skie, Chief, Air Programs Branch (Nov. 19, 1991); *PSD and NSPS Applicability to a Reactivated Source*, Memo from Director, Division of Stationary Source Enforcement, to Stephen A. Dvorkin, Chief, General Enforcement Branch, Reg. 2 (Sept. 6, 1978).[23]

Limetree provided factual information in a letter dated February 1, 2018, which the EPA considered before sending its 2018 letter indicating that the Refinery was not permanently shut down. Much of the information provided to EPA was either incorrect at the time or became outdated over time. For example, with respect to the length of the shutdown, the Limetree letter stated that the Refinery would begin producing refined petroleum products, specifically MARPOL compliant fuel, by January 1, 2020.[24] EPA was also informed by Limetree in meetings that restart would take place in late 2019 so that Limetree could be ready to sell the compliant fuel on January 1, 2020 when the new standards became effective.  The EPA's 2018 view that the Refinery was not permanently shut down did not contemplate that Limetree wouldn't attempt to start up until late 2020, one year later than expected, and would still not be able to start up in compliance as of today, nor did it contemplate $4.1 billion in costs for physical

---

[21] Statement of Charles Chambers, Representative of Port Hamilton Refining and Transportation, Before the 34th Legislature of the U.S. Virgin Islands Committee on Economic Development and Agriculture (July 14, 2022).

[22] *See also*, Section III.E, below, which presents information on deficiencies that existed at the Refinery before the 2020 startup as well as the advanced state of corrosion and systemic lack of maintenance at the Refinery.

[23] In addition, as discussed in Attachment 2, Region 2 applied the 2-year presumption when it objected to the Title V operating permit issued by NYSDEC to the Greenidge Station in Dresden, New York, *Letter from Judith A. Enck, Regional Administrator, to Honorable Basil Seggos, EPA Review of Proposed Title V Operating Permit for Greenidge Station Permit ID: 8-5736-00004/00017* (Dec.7, 2015), determining that the facility owner must rebut the presumption after placing the facility in protective lay-up for five years. Region 2 also instructed NYSDEC that two years after a shutdown of the Caithness plant, it was the permit applicant's obligation to fill information gaps related to whether the shutdown was permanent. *Letter from Suilin Chan, Chief, Permitting Section, to Alfred Carlacci, Air Pollution Control Engineer (Sept. 19, 2017).*

[24] Letter from LeAnn Johnson Koch, Perkins Coie, to John Filippelli, EPA Region 2 (Feb. 1, 2018). The MARPOL standards became effective on January 1, 2020 and Limetree had also informed EPA that it wanted to be an early entrant into the market for compliant fuel.

and operational changes necessary to restart the Refinery. These additional facts present a more compelling basis for finding a permanent shutdown than the facts that were known to EPA in 2018.

The failed attempts to run the facility from late 2020 through May 2021 indicate that the Refinery was not in adequate condition to start up in late 2020 and thus the length of time of the shutdown should be viewed as longer than 8.5 years.  In a rush to begin refining operations, Limetree restarted without adequate staffing and with significant operational problems that affected multiple units such as the coker, flare #8, knockout drum, pressure safety valve, flame scanners and amine regeneration unit. [25]

Both the length of time that the Refinery has been shut down and the capital needed to make physical and operational changes to restart it are extraordinary and do not support a claim that the refinery was merely temporarily idled and adequately maintained to enable a quick return to refining petroleum products.  As noted above, it took Limetree roughly three years of planning and intensive physical rehabilitation of the Refinery at a cost of approximately $4.1 billion using over 4,000 workers to start up and briefly operate in a manner that was fraught with operational problems and non-compliant.

By contrast, in another matter, EPA considered the "limited time and capital" necessary to restart a power plant in South Dakota "with only a few weeks of work" after nine years on cold standby an important factor in determining that the plant had not been permanently shut down. Memorandum from John B. Rasnic to Douglas M. Skie, *Applicability of PSD to Watertown Power Plant, South Dakota* (Nov. 19, 1991).

EPA also determined that a roaster leach acid plant in Arizona was permanently shut down based on a number of factors including the significant amount of time that elapsed since the shutdown, failure to maintain an operating permit, removal of the plant from the emissions inventory, and "the time and capital that must be invested in the rehabilitation of the plant in order to make it operable." While a number of the Reactivation Policy factors other than costs and time to restart were significant in the roaster leach acid plant example, it is notable that EPA considered only "several hundred thousand dollars worth of work" and the facility's inability to "come on line for approximately four months" as weighing in favor of a permanent shutdown. Memorandum from John S. Seitz, Director, Stationary Source Compliance Division, EPA, to David P. Howekamp, Director, EPA Reg. 9, *Reactivation of Noranda Lakeshore Mines, RLA Plant and PSD Review* (May 27, 1987). The time and cost necessary to restart the roaster leach acid plant pales in comparison to the time and costs at the Refinery.

While refineries might take more time and capital to restart after a period of dormancy than other kinds of facilities, the U.S. District Court in California determined that a cost between $28 and $180 million to reactivate a refinery over a period of six to eighteen months "slightly favors finding a permanent shutdown."  *Communities for a Better Environment (CBE) v. CENCO Refining*, 179 F. Supp. 2d 1128, 1146 (C.D. Cal. 2001).

---

[25] Section 303 Order.

The cost and time required for the Refinery startup, which continues to accrue because it still hasn't successfully restarted, is significantly out of step with prior Reactivation Policy decisions. To offer some further perspective on costs, one of HOVENSA's stated reasons for the shutdown in 2012 was a loss of $1.3 billion over three years.[26] This figure suggests that, even for a refinery, $4.1 billion in startup costs is a significant sum of money. It far exceeds the costs that supported a determination of permanent shutdown in prior matters.

Limetree's expenditure of $4.1 billion using 4,000 workers over three years of planning and construction activities plus at least 8.5 years of shutdown would have, by itself, been sufficient for EPA to determine that the two factors -- length of shutdown and costs of startup -- strongly refute any expressed intent of the owners to not permanently shut down. But the Refinery's inability to restart in late 2020 without causing an imminent and substantial endangerment to public health or welfare, or the environment, indicates that the actual length of the shutdown was, in effect, longer than 8.5 years because the Refinery was not ready to start up in compliance. When these facts are considered in light of the additional planned restart in 2023, more than 11 years will have passed since HOVENSA's shutdown. These facts and circumstances lead EPA to conclude that the cost and time factors are so significant that they weigh heavily in the six-factor analysis.

## B.    Evidence of Intent and Lack of Concrete Plans to Restart

Consistent with the Reactivation Policy, another factor in assessing whether a shutdown is permanent is the intent of the owner/operator, who must "continuously demonstrate concrete plans to restart the facility sometime in the reasonably foreseeable future." *Monroe* at 9. Thus, any break in that intent is sufficient to find that this factor points to a permanent shutdown. However, the threshold inquiry relates to the intent of the owner or operator "at the time of the shutdown." *Monroe* at 9. Once the Agency finds that the owner or operator "has no real plan to restart a particular facility," this finding, by itself, is sufficient to conclude that the shutdown was permanent and the owner's or operator's initial intention cannot be overcome by pointing to more recent efforts. *Id*. We look to subsequent actions only to assess "the continuing validity of the original intent not to permanently shut down." *Id*.

HOVENSA announced on January 18, 2012 its intention to shut down the Refinery citing significant losses after having "explored all available options to keep the Refinery operating."[27] After shutting the Refinery down in February 2012, HOVENSA stated in an April 26, 2012 letter to EPA that "currently, HOVENSA has no plans to restart the process units at its facility."[28] This statement, by itself, is an indication that HOVENSA lacked concrete plans in April 2012 to restart the Refinery.

There is further evidence, beyond the initial statements, as discussed in more detail below, that reveals HOVENSA's lack of the requisite intent to restart the facility sometime in the

---

[26] Press Release, *HOVENSA Announces Closure of St. Croix Refinery* (Jan. 18, 2012).
[27] Hess Press Release, *Hess Announces Charge Related to Closure of HOVENSA Joint Venture* Refinery (Jan. 18, 2012).
[28] Letter from Kathleen C. Antoine, Environmental Director, to Steve Riva, Chief, Air Programs Permitting Section, Cessation of Operation of $SO_2$ Monitoring Stations (April 26, 2012).

reasonably foreseeable future. This evidence falls into two categories. First, in negotiations with the U.S. Virgin Islands Government during approximately a period of one year after the 2012 shutdown, HOVENSA demonstrated its initial intention to permanently shut down the Refinery by converting it to an oil storage terminal. Second, later filings in 2015 proceedings offer evidence of HOVENSA's intention back in 2012. In addition, as discussed below, the transfer of assets from HOVENSA to Limetree did not include concrete plans to restart the Refinery. Many of these facts were not provided to EPA in the February 1, 2018 letter from Limetree requesting EPA's concurrence that the MARPOL project should not require a PSD permit under the Reactivation Policy. Instead, Limetree's representations to EPA led to the statement in the EPA's 2018 response letter that "neither [Limetree] nor HOVENSA made any statements to any party or issued any press release indicating any intent not to restart the plant in the future."

1. Negotiations Between HOVENSA and the Government of the U.S. Virgin Islands after 2012 Shutdown

Negotiations between the U.S. Virgin Islands Government and HOVENSA during approximately the first year post-shutdown demonstrate HOVENSA's intention to convert the Refinery to an oil storage terminal. On July 12, 2013, Governor John P. de Jongh, Jr. sent a letter to the President of the U.S. Virgin Islands Legislature that advocated for ratification of the "Fourth Amendment Agreement" with HOVENSA. The letter provides the history of HOVENSA's actions and intentions related to the Refinery. In particular, the letter states as follows:

Not only did [HOVENSA] shutter the St. Croix Refinery last year, but one of its parent companies, Hess Corporation, has publicly announced its intention to exit the Refinery business altogether, and the other, Venezuela's national oil company has indicated no interest in making new investments in the Refinery. Although HOVENSA has not publicly admitted it, it seems all but certain that, under its current ownership, the St. Croix Refinery will never reopen.[29]

The Governor's letter also discusses the "concession agreement" between HOVENSA and the U.S. Virgin Islands Government which dates back to the 1960s and was on its third iteration at the time of the shutdown. The Governor explains that HOVENSA wanted to be relieved of certain responsibilities related to the Refinery under its existing concession agreement with the U.S. Virgin Islands Government and so HOVENSA proposed "drastic modifications" to the agreement that would "essentially mothball the Refinery while allowing the company to operate an oil terminal business." *Id.* at 2.

The Governor's letter confirms that HOVENSA did not have concrete plans to either operate or sell the Refinery. In particular, the Governor states that "on August 6, 2012, I informed HOVENSA and the public of the Government's position: The company must either restart the Refinery or sell it to someone who will." *Id.* at 3.

---

[29] Letter from John P. de Jongh, Jr., Governor, USVI, to Honorable Shawn-Michael Malone, President, 30th Legislature, USVI, *Transmittal of Legislation Ratifying the Fourth Amendment to the HOVENSA Concession Agreement* (July 12, 2013).

At some point between August 2012 and December 2012, under pressure from the Governor, HOVENSA agreed to put the Refinery up for sale[30] but only on conditions unacceptable to the Governor because if the Refinery did not sell, HOVENSA would "shed most of its obligations under the existing Concession Agreement and still operate its oil storage terminal business." *Id*. Concerned that HOVENSA would not have sufficient incentive to sell the Refinery under such terms, the Governor rejected that offer and the parties "remained at impasse from mid-December 2012 to late January 2013," when they agreed to terms that would have significant consequences for HOVENSA if it didn't sell the Refinery including "resumed Concession Agreement obligations, a substantial repayment of deferred taxes, a limited revenue-producing oil terminal, and a lawsuit." *Id*. at 5.  As the Governor states in his letter to the Legislature, "this is not the original course that HOVENSA and its owners wanted, but it is the best course for the long term interest of our community." *Id*. at 7. In short, the Governor's letter reflects that his goal of having either HOVENSA or another party operate the Refinery was not shared by HOVENSA at the time of the Refinery shutdown and for much of 2012.

Consistent with the Governor's characterization of HOVENSA's intent, HOVENSA made clear its intention to permanently shut down the Refinery when it signed an agreement with the Governor regarding the future of the Refinery. The April 3, 2013 Fourth Amended Agreement, signed by HOVENSA, Hess, Petroleos de Venezuela, S.A ("PDVSA"), and the Governor includes "whereas" clauses that reveal HOVENSA's intentions prior to entering into the Agreement:

> "WHEREAS, HOVENSA desires to convert the Oil Refinery and Related Facilities to an oil storage terminal operation; and

> WHEREAS, the Government believes that the economic well-being of the U.S. Virgin Islands depends on continued refining operations at the Oil Refinery and Related Facilities and prefers that said facilities be sold to a new owner who will resume refining operations; and

> WHEREAS, in the interest of reaching a mutually acceptable resolution of the situation….

> NOW, THEREFORE, the Government, HOVENSA, HOVIC and PDVSA VI hereby agree to enter into this Fourth Amendment Agreement, which temporarily suspends certain of the parties' contractual obligations under the Concession Agreement to facilitate a sale of the Oil Refinery and Related Facilities…."

*Fourth Amendment Agreement Between the USVI, HOVENSA, Hess Oil VI Corp, and PDVSA* (April 3, 2013).

---

[30] HOVENSA sent a letter to EPA's enforcement program on December 3, 2012 related to potential modifications to an existing consent decree with EPA. In the letter, HOVENSA refers to its negotiations with the U.S. Virgin Islands Government and indicated that "the Government's stated position is to have the refinery operations reopened or sold, in view of its economic importance to the Virgin Islands. To accommodate the possibility of a sale process, HOVENSA is requesting that certain provisions to the Consent Decree be placed in a standstill mode for a period of 24 months." Letter from Brian K. Lever, HOVENSA, to John Fogarty, EPA (Dec. 3, 2012).

This Agreement reveals the contrast between HOVENSA's desire to cease refining petroleum products and convert the facility to an oil storage terminal and the Government's desire for HOVENSA to sell the Refinery to ensure resumption of refining operations. Not only did HOVENSA lack concrete plans to restart the Refinery but, prior to pressure from the Governor, it lacked concrete plans to sell the Refinery and intended to convert it to an oil storage terminal.

Members of the legislature confirmed their understanding of HOVENSA's intention to convert the Refinery to an oil storage terminal. Nine Senators of the U.S. Virgin Islands legislature proposed a resolution on August 7, 2013[31] "to encourage HOVENSA to find a new owner for its Refinery property on St. Croix" because "HOVENSA, rather than engaging in aggressive efforts to obtain a buyer for the Refinery, proposes to substitute an oil storage business in place of the oil refining business, maintaining that it is not a breach of contract." *Thirtieth Legislature of the U.S. Virgin Islands, Bill No. 30-0186, A Resolution to Encourage HOVENSA to find a new owner for its Refinery Property on St. Croix (Aug. 7, 2013).*

The Government of the U.S. Virgin Islands hired Duff & Phelps, LLC, a consulting firm, to evaluate HOVENSA's 2012 proposed revisions to the concession agreement along with options for the facility. Duff & Phelps produced a report for the U.S. Virgin Islands that discusses a 2011 agreement between HOVENSA, HESS, HOVIC, and PDVSA to "transition the facility into an oil storage terminal, a process estimated to take approximately 18 months, putting completion of the conversion process in the second half of 2013."[32] Duff & Phelps' report references three options in response to HOVENSA's concession agreement modification request: (1) full acceptance [of HOVENSA's request], in which the U.S. Virgin Islands "accepts the proposed modifications to the Concession Agreement and HOVENSA proceeds <u>with full conversion of the site to an import/export oil terminal</u>" (emphasis added); (2) interim acceptance with HOVENSA's commitment to restart or sell the Refinery; or (3) outright rejection.[33] The Duff & Phelps report is further evidence that HOVENSA was requesting a permanent conversion to an oil terminal.

Limetree provided some information in its February 1, 2018 letter to EPA and accompanying timeline indicating that HOVENSA left the door open for a potential return to service of the Refinery. EPA has considered this information in its examination of the 2012 period and concludes that the overwhelming evidence is that HOVENSA's stated intention and objective was to convert the Refinery to an oil storage facility. HOVENSA lacked sufficient concrete plans for a return to service to overcome the evidence of its intention in 2012 to convert the Refinery to an oil storage terminal. Additional evidence of this intention is contained in documents from proceedings after the 2012 timeframe, discussed below.

---

[31] The U.S. Virgin Islands Legislature later ratified the Agreement. *Fourth Amendment Agreement, dated April 3, 2013, as ratified by the Legislature of the U.S. Virgin Islands on November 4, 2013 and approved by the Governor of the U.S. Virgin Islands on November 4, 2013, as Act No. 7566.*
[32] Duff & Phelps, LLC, *Highest and Best Use of the HOVENSA Refinery*, at 4 (Aug. 3, 2012), at https://stthomassource.com/legacy_files/userfiles/file/Duff%20&%20Phelps%20-%20HOVENSA%20Highest%20and%20Best%20Use%20Report.pdf.
[33] *Id.* at 8.

2.   Later Proceedings that Reflect HOVENSA's Intent Regarding the Planned Conversion

Further confirmation that, at the time of the shutdown, HOVENSA did not intend to either restart or sell the facility as a Refinery can be found in a petition filed by HOVENSA in 2015 under Chapter 11 of the U.S. Bankruptcy Code. A sworn certification of the "HOVENSA proposed Chief Restructuring Officer" states as follows:

> [I]immediately after the idling of the Refinery in February 2012, HOVENSA…approached the [government of the U.S. Virgin Islands] and proposed certain amendments to the Concession Agreement intended to facilitate operations as a storage terminal…. Former Governor of the USVI, John de Jongh, Jr., rejected this request and insisted that HOVENSA either restart and operate the Refinery or conduct a sale process to sell the business to a purchaser that would engage in Refinery operations.

*In re: HOVENSA LLC, Debtor*, Certification of Thomas E. Hill In Support of Chapter 11 Petition and First Day Motions, Case No. 1:15-bk-10003-MFW, District Court of the U.S. Virgin Islands Bankruptcy Division, St. Croix Division, at 25 (Sept. 15, 2015).

In a separate action in 2015, Claude E. Walker, Acting Attorney General of the U.S. Virgin Islands, filed a Complaint against Hess Corp., one of the two joint owners of HOVENSA, for damages related to the shutdown.  The Complaint alleges that "as part of the closure announcement, Hess Corp. representatives affirmed their intent to convert the Refinery into an oil-storage terminal business in direct violation of the law and the Agreement [with the U.S. Virgin Islands]." *Government of the United States Virgin Islands v. Hess Corporation*, Complaint, Superior Court of the U.S. Virgin Islands, Division of St. Croix (Sept. 14, 2015). The Complaint further states that, "to achieve Hess Corp's goal of converting the Refinery into an oil storage facility, Hess Corp proposed a series of drastic alterations to the Third Extension Agreement it claimed to be necessary to make the terminal operation viable." *Id*.

While the record of HOVENSA's initial intent to close the refinery makes it unnecessary to look beyond the first year post-shutdown, there were discussions about the conversion to an oil storage facility as late as 2015.  A sworn declaration of Joel H. Holt, co-counsel for the Government of the U.S. Virgin Islands indicates that for the three years following the January 2012 closure announcement, the U.S. Virgin Islands Government negotiated various proposals with Hess regarding the future use of the Refinery. One such proposal was offered in a June 5, 2015 meeting in which Hess and PDVSA met with the Government of the U.S. Virgin Islands "to outline a potential sale of the Refinery as an oil storage facility." *In re: HOVENSA, LLC, Debtor*, *Declaration of Joel H. Holt*, District Court, U.S. Virgin Islands Bankruptcy Division, St. Croix, U.S. Virgin Islands, Case No. 15-100003 (Nov. 29, 2015).

3.   Limetree Lacked Concrete Plans to Restart Upon Purchase of the Assets in Bankruptcy

14

On December 1, 2015, Kenneth E. Mapp, the Governor of the U.S. Virgin Islands, sent a letter to the President of the Legislature of the U.S. Virgin Islands which transmitted for ratification the Operating Agreement between the Government of the U.S. Virgin Islands and Limetree upon HOVENSA's transfer of the Refinery and terminal assets to Limetree.[34] The transmittal letter makes clear that the Agreement was for Limetree to "refurbish, restart, and operate an oil storage terminal at the Facilities, [and] explore available options for resuming petroleum processing operations at the Facilities" (emphasis added).[35]

The Agreement provides that Limetree had between 18 and 36 months to evaluate the prospects of a Refinery restart and if, by the end of the evaluation no restart is planned, Limetree could deconstruct those portions of the Refinery that are not necessary for operation of the terminal. The plan for "dismantling" the Refinery was to be implemented by Limetree at their expense, and the proceeds from sale of the structures, fixtures, equipment and machinery, up to $5 million plus 50% of proceeds above $5 million, would go to Limetree.[36] The language of this Agreement is inconsistent with concrete plans to restart the Refinery in the reasonably foreseeable future.

**C.    Cause of the Shutdown**

As stated above, at the time of the shutdown, Hess was exiting the refining business and PDVSA did not want to make further investments in the Refinery.[37] In addition to the $1.3 billion in losses suffered by HOVENSA over three years, the press release at the time of closure stated that:

> [Losses] were projected to continue.  These losses have been caused primarily by weakness in demand for refined petroleum products due to the global economic slowdown and the addition of new refining capacity in emerging markets. In the past three years, these factors have caused the closure of approximately 18 refineries in the United States and Europe…. In addition, the low price of natural gas in the United States has put HOVENSA, an oil-fueled Refinery, at a competitive disadvantage.[38]

With losses projected to continue, the low price of natural gas in the United States, weakened demand, Hess Corporation's announcement of its intention to exit the Refinery business altogether, and PDVSA's indication of no interest in making new investments in the Refinery, the causes of the shutdown do not appear to be consistent with formulating concrete

---

[34] Operating Agreement By and Among The Government of the U.S. Virgin Islands and Limetree Bay Terminals, LLC (Dec. 1, 2015), available at https://stthomassource.com/legacy_files/userfiles/file/0%202015/12%20December%202015/LIMETREEBAY_AGREEMENT-SPEC_SESSION-12_17-2.pdf.

[35] Id.

[36] Id. at 31-32.

[37] Letter from John P. de Jongh, Jr., Governor, USVI, to Honorable Shawn-Michael Malone, President, 30th Legislature, USVI, *Transmittal of Legislation Ratifying the Fourth Amendment to the HOVENSA Concession Agreement* (July 12, 2013).

[38] Hess Press Release, *Hess Announces Charge Related to Closure of HOVENSA Joint Venture* Refinery (Jan. 18, 2012).

plans to restart. They are, however, consistent with HOVENSA's intent to convert the facility to an oil storage terminal and abandonment of the refining business.

### D.    Status of permits

EPA is aware that HOVENSA, and later Limetree and PHRT, maintained at least some of their environmental permits, including their Clean Air Act Title V permit. HOVENSA indicated in a February 7, 2012 letter to DPNR that it retained the permits so that the process units could be operated in the future, "without obtaining new source permits that would likely impose unsustainable burdens on any resumption of operations at the refinery."[39] The status of permits is the *Monroe* factor which, at first glance, appears potentially most consistent with a determination that the Refinery was not permanently shut down in 2012. This factor was emphasized when EPA responded to public comments on the PAL permit in 2020 and sent its 2018 letter based on the facts provided at the time by Limetree.  But in light of changed circumstances and new information related to the other factors, EPA is revisiting this factor as well.  A more detailed review of the structure of the permits, and subsequent developments, suggests that this factor does not as compellingly support a determination that the Refinery was not permanently shut down as EPA had previously indicated.

First, the Title V permit, existing PSD permit[40] and Clean Water Act permit include conditions for the utilities shared by the Refinery and the terminal. The additional information, regarding the planned conversion of the Refinery to an oil storage terminal, which was not provided to EPA by Limetree before EPA's 2018 letter was issued, and which EPA did not previously consider, sheds new light on the permits. HOVENSA depended upon each of these permits for its planned conversion of the facility to an oil storage terminal.[41] For example, in the February 7, 2012 letter to DPNR, referenced above, HOVENSA stated that it "believes that a Title V permit will be needed even if only oil storage terminal operations remain at the site." Therefore, HOVENSA, and later Limetree, needed to retain those permits for continuation of the terminal business. Moreover, HOVENSA's stated desire to avoid future New Source Review (NSR) permitting does not demonstrate concrete plans to restart or overcome their other actions that speak to a permanent shutdown.

While HOVENSA left the door open to future refinery operations by maintaining some of its permits, its August 31, 2012 Territorial Pollution Discharge Elimination System (TPDES) permit renewal application to DPNR reflects its primary objective, to convert the Refinery to an oil storage terminal. The application requests that the renewed permit include three different operating scenarios. Although the permit application states that "no new facility refining operations are planned for the renewed permit," the first operating scenario in the application

---

[39] Letter from Brian K. Lever, HOVENSA, to Alicia K. Barnes, Commissioner, U.S. Virgin Islands Department of Planning and Natural Resources (Feb. 7, 2012).

[40] There is nothing required of a facility owner or operator to maintain a PSD permit because the permit continues to be in effect indefinitely.  Rather, the owner or operator would have to make an affirmative request to EPA to rescind the permit.

[41] EPA also notes that the RCRA permit for the facility is unrelated to whether or not the refinery operates in the future.

reflects HOVENSA's request to retain the flexibility to refine "if future market conditions warrant." The other two operational scenarios requested by HOVENSA reflect its real intention for the Refinery in 2012 and beyond. The second operational scenario "covers the transition period" of 18-24 months, starting from January 2012 during which remaining refining operations were being idled at the facility and reflects HOVENSA's intention to undergo "the conversion to Operation Scenario III (Terminal Only Operations)." The third operational scenario description in the permit renewal application states that "after completion of all steps required to idle refining operations, the facility will operate as a terminal-only facility." While HOVENSA left open the door in its permit application to the possibility of refining if future market conditions change, the permit application demonstrates concrete plans to convert the refinery to an oil storage terminal.

Second, the Clean Water Act permit has not been maintained. In a May 25, 2022 letter to Limetree and PHRT, EPA expressed concern that neither Limetree Bay Terminals nor PHRT have appropriate Territorial Pollutant Discharge Elimination Systems (TPDES) permit coverage for discharges from their respective industrial activities.[42] After PHRT failed to address EPA's concern, EPA sent PHRT another letter dated August 22, 2022 stating that, "to date, the DPNR has not received a TPDES application from PHRT, and has not issued a TPDES permit to PHRT. As a result, PHRT does not have coverage under any TPDES permit for either the process wastewater treatment plant, or for any regulated storm water outfalls associated with its industrial activities, as required by 40 C.F.R. 122.26(b)."[43] The letter further states that the disposal of the amine purge waste planned by PHRT "is not authorized by any applicable TPDES permit, and therefore, if it were to occur, would be a violation of Section 301 of the CWA."

### E.    Maintenance and Inspections During Shutdown

Limetree did provide maintenance records to EPA in 2018, which are referenced in EPA's 2018 letter. They were also relied upon in the 2020 PAL RTC document, which expressed the view that the Refinery had not been permanently shut down. EPA noted in the 2018 letter as important the "over $400 million to maintain the restart capability of the Refinery, which included removing residual material from equipment, retaining control room operability, and conducting other process equipment mothballing activities" and maintenance of "critical Refinery equipment, such as compressors, pumps, utilities, wastewater treatment units" and a "timeline of significant maintenance activities."[44]

---

[42] Letter from Virginia Wong, Chief, EPA Region 2 Clean Water Regulatory Branch, to Mark Chavez, Limetree Bay Terminals, LLC and Julie R. Domike and Tom V. Eagan, PHRT (May 25, 2022).
[43] Letter from Virginia Wong, Chief, EPA Region 2 Clean Water Regulatory Branch, to Thomas V. Eagan, PHRT (Aug. 22, 2022).
[44] EPA's 2018 Letter at 3. Limetree's February 1, 2018 letter states that part of the $400 million was for removal of "residual hydrocarbon materials from units and tanks ('sludge disposal')." EPA's understanding is that, given the high costs associated with sludge removal and disposal, a significant portion of the $400 million shutdown costs must have involved recovery and disposal of hazardous waste catalyst material and was therefore not strictly for purposes of ongoing maintenance but also to avoid contamination from existing units and tanks.

However, a closer review of the underlying maintenance records now leads EPA to a different conclusion. EPA's 2018 letter relied on Limetree's representations that HOVENSA maintained critical refinery equipment. The 2018 letter indicated that Limetree's representations are demonstrated in a general "list of critical equipment and the timeline of significant maintenance activities performed at the refinery" that were provided to EPA.  But prior to the EPA 2018 letter, the Agency did not consider the underlying logs and records that Limetree transmitted to EPA on January 26, 2018.[45]

EPA's review of the logs and records reveals poor maintenance of the Refinery by HOVENSA between 2012 and 2016 and minimal maintenance by Limetree in 2016 and 2017. Among the documents provided by Limetree are records referred to as "refining rounds" which include identification of numerous failing structures including heavy corrosion on tanks at Beavon Units 1 and 2, heavy corrosion on top of oxidation tanks, failing fireproofing, structural steel supports in need of repair, and rust at risk of falling on personnel.  Other than a plan to barricade areas where rust was at risk of falling, it isn't clear from the records that the failing structures identified in the "refining rounds" records were remediated. In fact, there is little evidence of follow-up after an inspection discovered a problem. And according to the 2013 Maintenance Activity Progress Report, by May 6, 2013, no additional work hours were spent at the Refinery by HOVENSA, and there are no Maintenance Activity Progress Reports for subsequent years. After May 2013, there were walk-throughs but little evidence of maintenance, and as the years progressed, there were fewer and fewer logs. This represents inadequate maintenance for a large Refinery subject to corrosion from its location near saltwater.

Even if more robust maintenance occurred than is evident from EPA's more recent review of the underlying records, it is clear that this Refinery was not in a condition that allowed it to resume refining quickly, either at the initial shutdown or when Limetree purchased the assets. Under the Reactivation Policy, a facility should be maintained in a state of readiness to resume operations. EPA previously determined that a facility that is well maintained with periodic testing of the equipment "to ensure quick reactivation" so that a plant could be brought back online "with only a few weeks of work" could arguably overcome deficits in the other factors. See *Watertown Power Plant, South Dakota*, Memo from John B. Rasnic, Director Stationary Source Compliance Division, OAQPS, to Douglas M. Skie, Chief, Air Programs Branch (Nov. 19, 1991). But the significant time and money required to bring the Refinery back into service (*see* Section III.A, above) leads EPA to conclude that the Refinery was not well-maintained to enable a quick restart and supports the determination that the Refinery was permanently shut down.

Inadequate maintenance is also evident from Limetree's failed startup of the Refinery. As stated in Section III.A, above, EPA's Section 303 Order reflects that Limetree started up the Refinery without adequate staffing and with significant operational problems that affected multiple units. The audit reports stemming from the Section 303 Order also contain additional

---

[45] Limetree referred to these logs and records in its Feb. 1, 2018 letter. Letter from LeAnn Johnson Koch, Perkins Coie, to John Filippelli, EPA Region 2 (Feb. 1, 2018), citing to Jan. 26, 2018 submission (*see* Tab 8, 2013 Maintenance Records, Refinery Rounds, East SRU of Jan. 26, 2018 submission).

facts that are germane but are claimed as Confidential Business Information. As such, Attachment 3, Additional Facts Claimed as Either Confidential Business Information or Subject to the Federal Rules of Evidence, Rule 408, provides further information.

Inadequate maintenance, in part, also led to the dangers posed by a May 2021 incident, which was addressed by OSHA in a Stipulation and Agreed Order with Limetree with attached Citation and Notification of Penalty.[46] The Citation and Notification of Penalty includes numerous counts related to maintenance including, among others, the following:[47]

1. Limetree failed to correct deficiencies outside of acceptable limits found on the Coke drums (D-8501/2/3/4), including bulging Coke drums and stainless-steel clad liners on the internal surfaces of Coke drums without corrosion protection.
2. Limetree failed to repair significant pitting on the Flare Knockout Drum (D-7941) before further use or in a safe and timely manner, "which can result in catastrophic failure of vessel and exposure to fire, toxic[s] and hazards."
3. Limetree did not have adequate safety, operating, maintenance and emergency procedures in place prior to the introduction of hazardous chemicals. In particular, Limetree "failed to develop and implement written operating procedures to manage and address abnormal coke drum conditions." Such failures prior to startup "can result in operator errors, catastrophic incidents and expose employees to fire, toxic and explosion hazards."
4. Limetree also "failed to establish and implement written procedures to maintain the on-going integrity of process equipment."
5. Limetree failed to complete the following items prior to startup:
   a. Restore missing cladding on internal surfaces of Coke drums
   b. Correct corrosion under insulation on Coke drums
   c. Correct pitting on Blowdown Drum Overhead Separator (D-8513)
   d. Restore pressure vessel fireproofing
6. Limetree failed to correct corrosion on flanges and bolts, inspect insulated piping for SUI and label all process piping.

Insufficient maintenance continued after Limetree filed for Bankruptcy. A smoldering fire broke out at the Refinery's coke piles on August 4, 2022, which was not suppressed until August 26, 2022.  The likely cause of the fire was poor maintenance. According to PHRT, the contractor that had maintained the coke piles "left the site abruptly" when Limetree filed for Bankruptcy[48] in July 2021, and there is no indication that steps were taken by PHRT to properly maintain the coke pile when it assumed ownership in January 2022.  Proper maintenance of the coke piles should have included, among other things, water spraying combined with turning of the coke and air circulation via fans, and inspections.  Such steps could have prevented the fire.

---

[46] Citation and Notification of Penalty, Limetree Bay Refining, LLC., Inspection No. 1521774, U.S Dep't of Labor, Occupational Safety & Health Admin. (Nov. 8, 2021).

[47] *Id*. at 24 and 27-30.

[48] Information Response Letter from Thomas V. Eagan, Counsel to PHRT, to Dwayne Harrington, US EPA, *Request for Information Pursuant to Section 104(e) of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) received on August 18, 2022*, Sept. 1, 2022.

PHRT provided EPA with a plan on August 27, 2022 to begin maintenance activities.[49] It therefore appears that for approximately one year, no maintenance was performed at the coke piles.

In response to the coke fire, EPA performed an inspection of the Refinery pursuant to Section 112(r)(1) of the Clean Air Act (CAA), 42 U.S.C. § 7412(r)(1), between September 20 and September 26, 2022 ("112(r) inspection"). The 112(r) inspection revealed that the facility does not have a preventative maintenance program nor does it undergo formal process unit inspections.  The inspectors observed conditions demonstrating a "systemic lack of maintenance" upon touring the following process units: #5 Crude Unit; #6 Crude Unit: #3 Vacuum Unit; Anhydrous Ammonia Drum; Amine Units; LPG Unit #3; Delayed Coker Unit; Coker Supply Tank 8501. The inspectors noted corrosion at all process units including "extreme corrosion in many cases to a degree resulting in extreme deterioration (exfoliation)" that "severely compromised integrity and operability."[50] Also significant to the maintenance factor is the inspection report's finding that "many process components appear [to] not have been adequately inspected or maintained for <u>significant</u> periods (emphasis added)."

The lack of inspection and maintenance for significant periods of time, the advanced state of corrosion found during the 112(r) inspection, and the OSHA findings, reflect that the Refinery was not properly maintained even prior to PHRT's ownership.  In addition, the change in ownership from Limetree to PHRT should have been done in a manner that provided a smooth transition to avoid problems like the coke fire. While a change in ownership of a facility doesn't, by itself, render a stationary source subject to PSD permitting, it "represents further attenuation" in time and, perhaps more importantly, the circumstances surrounding the change in ownership may be probative of whether the shutdown was permanent. Letter to Robert T. Connery, Esq., Holland & Hart, from EPA, Region 9, *Supplemental PSD Applicability Determination Cyprus Cas Grande Corporation Copper Mining and Processing Facilities* (Nov. 6, 1987). The circumstances surrounding the change from Limetree to PHRT that shows the dire state and poor maintenance of the facility at the time of transfer is reflected in the $62 million purchase price for a Refinery that had recently seen $4.1 billion invested. All of the circumstances surrounding both the transfer from HOVENSA to Limetree and Limetree to PHRT, including lack of maintenance evidenced in part by the time and cost already expended to restore the Refinery and the inability to resume operation without significant noncompliance indicate that the Refinery was permanently shut down.

### F.  <u>Conclusion of Reactivation Policy Factor Analysis</u>

While "no single factor is likely to be conclusive in the Agency's assessment," *Monroe* at 9, the length of time the Refinery has been shut down and the time and capital needed to put the Refinery in a condition to restart are so out of step with past decisions that they weigh heavily in EPA's analysis. A cost of $4.1 billion using 4,000 workers over several years, and then an

---

[49] Fermin Rodriguez, VP & Refinery Manager, PHRT, *Coke Dome Smoldering Event Status*, Aug. 27, 2022.
[50] Many of the inspectors' observations were documented with photographs referenced in the inspection report. These photos have been claimed as CBI.

attempted startup that caused an imminent and substantial endangerment to public health or welfare or the environment is far from the "limited time and capital" and "a few weeks of work" that one would expect from a plant that had not been permanently shut down. Memorandum from John B. Rasnic to Douglas M. Skie, *Applicability of PSD to Watertown Power Plant, South Dakota* (Nov. 19, 1991).

In addition, HOVENSA, which shut the Refinery down, did not continuously demonstrate concrete plans to restart the Refinery. It had no concrete plans to restart the Refinery at the time of shutdown in February 2012 and lacked the requisite intent for the better part of a year following the shutdown. Not only did HOVENSA lack concrete plans to refine product in the future, it intended to convert the Refinery into an oil storage terminal. Once an owner or operator has no real plan to restart a particular facility, "such owner or operator cannot overcome this suggestion that the shutdown was intended to be permanent" by later pointing to more recent efforts at restart. *Monroe* at 9. Therefore, HOVENSA's lack of intent to restart at the time of shutdown and soon thereafter is, by itself, sufficient to determine that there was an intent to permanently shut down the Refinery in 2012. In addition, the period of transition from HOVENSA to Limetree during the bankruptcy proceeding is another period when concrete plans to restart the refinery were lacking as restarting the Refinery was optional.

The evidence regarding the cause of the shutdown provides no indication that the Refinery would one day operate again. To the contrary, in addition to statements soon after the shutdown that HOVENSA had no plans to restart the Refinery, HOVENSA's two parent companies were either exiting the refining business or unwilling to invest additional funds into the Refinery after losing $1.3 billion. Moreover, HOVENSA's decision to shut down was also due to its competitive disadvantage as an oil-fueled refinery compared to gas-fueled refineries in other parts of the United States that could rely on cheaper natural gas for their energy needs.

The maintenance and inspections during shutdown were viewed by EPA upon issuance of EPA's 2018 letter and the 2020 RTC to favor a finding that the 2012 shutdown was not permanent, but a close examination of the facts to-date suggests otherwise. Despite some efforts by HOVENSA to maintain some of the refining equipment, there have been significant lapses in maintenance that led to severe incidents of air pollution, the Section 303 Order, the OSHA Citation and, most recently, a smoldering fire at the coke domes and discovery of systemic lack of maintenance for significant periods of time. While the retention of Refinery permits by HOVENSA, and HOVENSA's statements about them, might be seen as being suggestive of an intention to restart the facility, this factor does not as compellingly support an intention to restart considering that such permits were necessary for continued operation of the oil storage terminal.

On balance, the six factors point convincingly in favor of a finding that the Refinery was permanently shut down in 2012. Even viewing the status of permits as representing an intention to restart, the Refinery's history with respect to the other factors is so compelling that EPA concludes there was a permanent shutdown.

**IV.**    **The Refinery is a New Major Stationary Source and Exceeds the PSD Major Stationary Source and/or Significant Thresholds for Multiple PSD Pollutants**

As discussed in the analysis above, HOVENSA permanently shut down the Refinery in February 2012.  In the event of a Refinery restart or actions at the Refinery that "begin actual construction," as defined in 40 C.F.R. 52.21(b)(11), EPA would treat the Refinery as a new source.  The determination of PSD applicability is therefore based on how the PSD regulations apply to new sources.

A "major stationary source" is any source belonging to a list of 28 source categories which emits, or has the potential to emit, 100 tons per year or more of any regulated NSR pollutant, or any other source which emits, or has the potential to emit, such pollutants in amounts equal to or greater than 250 tons per year. 40 C.F.R. 52.21(b)(1)(i).  A stationary source generally includes all pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under common control.  40 C.F.R. 52.21(b)(5) and (b)(6). Since petroleum refineries are on the list of 28 source categories, if the potential to emit of any regulated NSR pollutant exceeds 100 tons/year, the source is considered a major stationary source and a PSD permit is required. Once a source is a major stationary source, a PSD permit is required not only for pollutants exceeding the 100 tons/year threshold but for any pollutant that has a potential to emit over the "significant" level in 40 C.F.R. 52.21(b)(23).

After purchasing the HOVENSA assets in 2016, Limetree applied for an Authority to Construct permit for the MARPOL Project from the U.S. Virgin Islands Department of Planning and Natural Resources (DPNR) in April 2018.  In its application, Limetree provided the source's projected actual emissions which exceeded the 100 tons/year major source threshold for multiple regulated NSR pollutants and/or the "significant" levels in 40 C.F.R. 52.21(b)(23)(i).[51]  In a July 14, 2022 statement to the U.S. Virgin Islands Legislature, Charles Chambers, the lead principal of PHRT and Chief Executive Officer of West Indies Petroleum Limited, stated a commitment to "restarting of the refinery at 180-thousand barrels per day of production."[52] At the levels of production in both the DPNR permit and Charles Chambers' statement, the Refinery is a major stationary source and, therefore, PHRT is required to apply for and obtain a final and effective PSD permit prior to restarting the Refinery or beginning actual construction, as defined in 40 C.F.R. 52.21(b)(11). Based upon the emissions associated with the MARPOL permit application and factoring in the production rate in Charles Chambers' statement,[53] PHRT must submit a PSD permit application to EPA for multiple PSD pollutants, including but not limited to $SO_2$, NOx, VOC, $PM_{2.5}$, $PM_{10}$, PM, $H_2SO_4$ and CO.

---

[51] It is likely that the potential to emit for these pollutants would be higher than the projected actual emissions.

[52] Statement from Charles Chambers, Representative of Port Hamilton Refining and Transportation, Before the 34th Legislature of the U.S. Virgin Islands, Committee on Economic Development and Agriculture (July 14, 2022), at https://www.legvi.org/committeemeetings/Committee%20on%20Economic%20Development%20and%20Agricultu re/July%2014,%202022/Charles%20Chambers%20PHRT%20Testimony.pdf.

[53] This conclusion assumes a refinery design and operation substantially consistent with what Limetree proposed in the MARPOL permit application. PHRT will have to examine the applicability of all PSD pollutants when it prepares its application. While Limetree did not provide estimates for greenhouse gases in its MARPOL permit application, it is highly likely that the Refinery will also require PSD review for greenhouse gases.

PHRT's July 2022 response to EPA's March 22, 2022 letter contains additional facts that are germane to the PSD applicability analysis but are claimed to be CBI. As such, Attachment 3 provides further information.

**ATTACHMENT 2**

**<u>Affirmation of EPA's Long-Standing Reactivation Policy</u>**

<u>Introduction:</u>

As discussed in Attachment 1, EPA is continuing to apply its long-standing policy on the applicability of the Clean Air Act's Prevention of Significant Deterioration (PSD) regulations to the reactivation of permanently shut down sources ("Reactivation Policy" or "Policy"). See, *In the Matter of Monroe Electric Generating Plant Entergy Louisiana, Inc.,* Proposed Operating Permit, Petition No. 6-99-2 (June 11, 1999) (*Monroe*). The *Monroe* Order provides the most complete articulation of the Reactivation Policy that EPA has consistently applied over three decades.  This policy is grounded on an interpretation that a major stationary source that has permanently shut down is subject to the PSD regulations at 40 C.F.R. 52.21 as a new major stationary source upon restart. *See* Discussion, Section 2, below. EPA developed the factors in the Reactivation Policy to provide a way to determine whether a source that has been in "an extended condition of inoperation"[1] was permanently shut down.

<u>Discussion:</u>

1.    *The Reactivation Policy Is Still Applied by EPA and Remains Appropriate*

EPA is continuing to apply the Reactivation Policy, as described in the *Monroe* Order, because it remains an appropriate method for determining whether the reactivation of a stationary source qualifies as the construction of a new source under the PSD regulations. Although EPA recently questioned the merit of continuing to apply the Reactivation Policy, EPA did not make a final decision to stop following the Policy.  In this document, EPA reaffirms its intention to continue applying the Reactivation Policy.

On December 2, 2020, EPA criticized the Reactivation Policy and stated that the Agency would not follow it in the context of an action to issue a final Plantwide Applicability Limit (PAL) permit to Limetree Bay Refinery, LLC and Limetree Bay Terminals, LLC (Limetree).[2] The associated response to comments (RTC) stated that "EPA no longer believes that the Reactivation Policy is an appropriate policy, and the Agency is not required to apply it to any source, including the Limetree Bay facility."[3] However, this position was not maintained in any final EPA decision.  On February 3, 2021, both Limetree and environmental organizations filed petitions for administrative review of EPA's final PAL permit with the EPA Environmental Appeals Board (EAB). In such circumstances, the EPA's regulations at 40 C.F.R. Part 124 provide that a permit decision does not become final and effective until the conclusion of administrative review proceedings under Part 124.  On March 25, 2021, EPA withdrew "the [Limetree] PAL permit and its administrative record in its entirety, including the Agency's

---

[1] *Monroe* at 7.
[2] EPA Plantwide Applicability Limit Permit for Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC, PAL permit No. EPA-PAL-VI001/2019, Response to Comments, pp. 106-111 (Dec. 2, 2020).
[3] *Id.* at 111.

response to comments." [4] As a result, the EAB dismissed the petitions for review and no final permit decision was issued by EPA. Thus, the 2020 EPA statements regarding the Reactivation Policy contained in the RTC document were not part of a final action by EPA.

Even if this December 2020 action had taken effect and rescinded the Reactivation Policy, that Policy reflects the EPA's current views. The withdrawal of the PAL permit was based in part on EPA's desire to reconsider the statements in the RTC regarding the Reactivation Policy, but it was not necessary for the Administrator to articulate this reason at the time. After further consideration, for the reasons discussed below, EPA intends to continue following the Reactivation Policy to identify sources that have permanently shut down and that the Agency will classify as a new stationary source if they seek to restart. The EPA has applied the factors in that Policy in this case to determine that reactivation of the refinery now owned by Port Hamilton Refining and Transportation LLLP[5] constitutes construction of a new stationary source that requires a PSD permit.[6]

2.    *Basis for the Reactivation Policy in the New Source Review Regulations*

The PSD regulations provide that "no new major stationary source or major modification … shall begin actual construction" without a PSD permit. 40 C.F.R. 52.21(a)(2)(iii). Although the PSD regulations contain a lengthy definition of the term "major modification,"[7] the regulations contain no definition of the terms "new major stationary source" or "new source," which are used throughout 40 C.F.R. 52.21.[8] Absent a detailed definition in the New Source Review (NSR) regulations, one should look to the plain meaning of the term. The first meaning of the term "new" in Webster's online dictionary is "having recently come into existence."[9] Likewise, the first meaning in the New Oxford American Dictionary is "not existing before; made, introduced, or discovered recently or now for the first time."[10] But the word "new" is also used to convey the concept of a renewal, as reflected in Webster's additional meanings of "beginning the resumption or repetition of a previous act or thing" or "made or become fresh." Similarly, Oxford's second and third meanings are "already existing, but seen, experienced, or acquired recently or now for the first time" and "just beginning or beginning anew and regarded as better than what went before." In the RTC document for the Limetree PAL, EPA argued that Webster's first meaning was the best reading in the context of the NSR provisions, but the RTC document did not demonstrate that other meanings are not permissible or appropriate in this context as well.

---

[4] Administrator Michael S. Regan, *Withdrawal of Plantwide Applicability Limit Permit No. EPA-PAL-VIOO1/2019* (March 25,  2021), at https://www.epa.gov/sites/default/files/2021-04/documents/withdrawal_decision_applicability.limit_.permit.signed.pdf.
[5] This reference to Port Hamilton Refining and Transportation, LLLP (PHRT) should be understood to include both PHRT and West Indies Petroleum Limited ("WIPL") as purchasers of the Refinery in the bankruptcy proceeding.
[6] *See* Attachment 1.
[7] 40 C.F.R. 52.21(b)(2).
[8] EPA's PSD regulations do define the term "construction" in section 52.21(b)(8) as "any physical change or change in the method of operation (including fabrication, erection, installation, demolition, or modification of an emissions unit) that would result in a change in emissions."
[9] <https://www.merriam-webster.com/dictionary/new>.
[10]  New Oxford American Dictionary, Third Edition, p. 1180, Oxford University Press (2010).

The Reactivation Policy does not establish a definition of "new major stationary source" or "new source," but is grounded on a long-standing interpretation of these phrases that incorporates elements of each of the meanings of "new" described above to include the restart of a major stationary source that previously ceased operations on a permanent basis.  An existing source or unit that has permanently shut down has effectively ceased to exist for purposes of air quality management.  If a source that was permanently shut down resumes operations, from the perspective of the airshed, this source has newly come into existence after its air pollutant emissions permanently stopped.[11]  Similarly, if a source that was previously in existence is substantially rehabilitated by its owner, the source has been made or become fresh – it is like new.  Even more so when a second or third owner acquires a dormant facility for the first time and refurbishes it.  By contrast, when an existing source has only shut down temporarily, it has not ceased to exist and may be capable of resuming its activities without substantial time and effort.  EPA thus does not interpret the term "new stationary source" to include any resumption or repetition of a previous act or thing,[12] but only such a resumption that follows a permanent shutdown.[13]

This interpretation of the NSR regulations is also grounded on the premise that a stationary source that has permanently ceased operating no longer has a baseline level of actual emissions, that such baseline emissions are zero.  The absence of any baseline emissions is a key characteristic of a new source.  From 1978 to 2002, this interpretation was supported by NSR regulations that generally defined baseline emissions to include emissions over the last two years but placed the burden on sources to show that another period should be used to determine baseline emissions.  These provisions were amended in 2002 to enable most existing sources to use any 24-month period in the last 10 years to determine the baseline level of emissions for existing emissions units.[14]  However, consistent with agency's understanding of "new source" described above, the existing sources subject to this provision were not intended to include sources that permanently shut down.  Although the 2002 rulemaking did not add any definition of "existing major stationary source" that excluded permanently shut down sources, the 2002 rule carried forward the principle that a permanently shut down source has no baseline emissions and should thus be treated as a new one.

EPA reflected this principle in the text of a provision in the NSR regulations that enables major stationary sources to establish Plantwide Applicability Limits (PALs).  A PAL provides an alternative applicability test of major NSR permitting requirements, on a pollutant-by-pollutant basis, such that a source can make changes without triggering major NSR requirements if the total source-wide emissions remain below the PAL level established by the permitting authority.  In general, this level is determined by adding a significant emission rate in 40 C.F.R.

[11] While much of the equipment at the stationary source may not be distinct from that which existed before (as in a new edition), resuming the emissions that have ceased for a significant period time can impact air quality in a manner that is distinct from the conditions that existed while the source was in a prolonged shutdown.  Air quality management decisions may have been based on the premise that the source was no longer in existence.

[12] Under this reading, a source that restarts after a routine turn-around for maintenance is not a "new" source by virtue of resuming a previous act.

[13] Applying the factors discussed in section 7 below, this may include, for example, a circumstance where the resumption of the same activity requires a more substantial investment in time, staffing, and capital than a routine maintenance turn-around.

[14] *See* 40 C.F.R. 52.21(b)(48)(ii).

52.21(b)(23) to the baseline actual emissions demonstrated in a specific 24-month-period for a given NSR pollutant.  In this context, 40 C.F.R. 52.21(aa)(6)(i) of the PSD regulations says the following: "Emissions associated with units that were permanently shut down after this 24-month [baseline] period must be subtracted from the PAL level."  The PAL provisions use the same definition of baseline actual emissions that was created in 2002, so the 24-month period in 40 C.F.R. 52.21(aa)(6)(i) for setting the PAL level is the same 24-month period selected from within the 10-year lookback period for determining baseline actual emissions.  Thus, if an emissions unit is permanently shut down after the 24-month period that is used for determining the baseline emissions that form part of the PAL, the emissions from the permanently shut down unit cannot be counted as part of the baseline emissions in this context.  For example, if a source selected a 24-month period that was 9-10 years prior to the PAL permit application but permanently shut down a unit three or four years before the PAL permit application, the emissions from that unit would be subtracted from the baseline.[15]  This PAL regulatory provision thus codified the principle that an emissions unit that has been "permanently shut down" has no baseline emissions.  By requiring that emissions from such a unit be subtracted from the PAL level, the regulation requires quantifying the emissions from a permanently shut down unit as zero.

While EPA's 2002 rule did not add a definition of "new major stationary source" or use the term "permanent shutdown" in another provision that would provide meaning to a "new source," the PAL provision codified the central premise of EPA's pre-2002 interpretation that a permanently-shutdown source is tantamount to a new one.  If a single emissions unit that is permanently shut down has no baseline emissions, then by extension, if all of the emissions units at a facility are permanently shut down, the baseline emissions from the entire facility are zero, matching a key characteristic of a new source.

3.   *Reactivation Policy Supports the Goals of the NSR Program*

Declining to treat a source that has "permanently shut down" as an existing source furthers an important balance that Congress struck in enacting the NSR program.  The act requires that new facilities be designed to incorporate the best available pollution control technology but does not require existing facilities to upgrade their pollution controls until it is cost-effective to do so in conjunction with other upgrades or changes to the facility.  This balance has been discussed in U.S. Court of Appeals decisions that have examined the legislative history of the NSR provisions in the Clean Air Act (CAA).  In one opinion, the District of Columbia Circuit stated that "the statutory scheme intends to 'grandfather' existing industries; but the provisions concerning modifications indicate that this is not to constitute a perpetual immunity from all standards under the PSD program." *Ala. Power Co. v. Castle*, 636 F.2d 323, 400 (D.C. Cir. 1979).  The Seventh Circuit made the following observation: "[c]onsistent with its balanced approach, Congress chose not to subject existing plants to the requirements of NSPS and PSD. … But Congress did not permanently exempt existing plants from these requirements." *Wisconsin Electric Power Co. v. Reilly*, 893 F.3d 901, 909 (7th Cir. 1990)

---

[15] Since the significant emission rates are fixed for all sources, as specified in 40 C.F.R. 52.21(b)(23), and the baseline is source-specific and therefore variable, a reduction in a PAL for a permanently shut down unit is essentially a reduction in the baseline.

(internal citations and quotations omitted) (WEPCO).  As the WEPCO court observed, a motivation for subjecting a source to PSD when it was modified was because this was a cost-effective time to improve pollution controls. *Id.* Members of the House of Representatives recognized that "[b]uilding control technology into new plants at time of construction will plainly be less costly then [sic] requiring retrofit when pollution control ceilings are reached." H.R. Rep. No. 294, 95th Cong., 1st Sess. 185, *reprinted in* 1977 U.S. Code Cong. & Admin. News at 1264.  Further, Judge Boggs of the Sixth Circuit, in a dissenting opinion, cited legislative history to support the following observation: "The purpose of the 'modification' rule is to ensure that pollution control measures are undertaken when they can be most effective, at the time of new or modified construction." *See* 116 Cong. Rec. 32,918 (remarks of Sen. Cooper), *reprinted in* 1 Senate Committee on Public Works, *A Legislative History of the Clean Air Act Amendments of 1970* (1974), at 260." *National–Southwire Aluminum Co. v. EPA,* 838 F.2d 835, 843 (6th Cir.) (Boggs, J., dissenting), *cert. denied,* 488 U.S. 955, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988).  Citing this observation, the Seventh Circuit in the WEPCO case noted that Judge Boggs argued that the shutting down of voluntarily installed pollution control equipment, not required by regulation, at an existing plant should not be considered a modification because it would not afford the utility an opportunity for "effective placement of new control technology."  893 F.2d at 809.  In contrast, where a source is doing much more to resume operation of an entire facility, undertaking substantial capital investment to restart after a "permanent" shutdown, this is an opportune time to cost-effectively upgrade pollution control technology.  The Seventh Circuit in WEPCO also made the following observation:

> The legislative history suggests and courts have recognized that in passing the Clean Air Act Amendments, Congress intended to stimulate the advancement of pollution control technology. *See, e.g.,* S.Rep. No. 91–1196, 91st Cong., 2d Sess. 17 (1970) ("Standards of performance should provide an incentive for industries to work toward constant improvement in techniques for preventing and controlling emissions from stationary sources...."); *Duquesne Light Co. v. EPA,* 698 F.2d 456, 475 (D.C. Cir.1983); *Alabama Power,* 636 F.2d at 372; *ASARCO,* 578 F.2d at 327; *United States v. SCM Corp.,* 667 F.Supp. 1110, 1126–27 (D.Md.1987). The development of emissions control systems is not furthered if operators could, without exposure to the standards of the 1977 Amendments, increase production (and pollution) through the extensive replacement of deteriorated generating systems.

893 F.3d at 909-10.  Likewise, the development of emissions control systems would be frustrated if a permanently shut down source was allowed to restart after making substantial investments in rehabilitating the facility without also improving the air pollution controls.

4.    *Origin and Purpose of the Reactivation Policy*

Recognizing these goals of the NSR program, EPA developed the Reactivation Policy to provide a framework for determining whether a dormant source that seeks to resume operating was permanently shut down and should be classified as new.  EPA has applied this policy

consistently since the late 1970s,[16] shortly after the NSR program was created in the 1977 amendments to the Clean Air Act.  In the 1999 *Monroe* order that best sums up the policy, the Administrator explained that "reactivation of facilities that have been in an extended condition of inoperation may trigger PSD requirements as 'construction' of either a new major stationary source or a major modification of an existing one.  *Monroe* at 7.  At the time of this order, and continuing today, EPA's PSD regulation defined the term "construction" as "any physical change or change in the method of operation (including fabrication, erection, installation, demolition, or modification of an emissions unit) that would result in a change in [actual] emissions."[17]  Because of the use of the conjunction "or" in this definition, it has long been the case that a change in the method of operation may by itself qualify as construction, regardless of whether there is also a physical change to the equipment at a source.  So, a change at a facility from a condition of permanent inoperation to a state of operation is a change in the method of operation that qualifies as construction.[18]  As the Administrator stated in the *Monroe* order, "[w]here facilities are reactivated after having been permanently shutdown, operation of the facility will be treated as operation of a <u>new</u> source."  *Id.* (emphasis in original).

While labeled a policy, the Agency's approach has been grounded on the legal interpretation described above that a restart of a permanently shut down facility qualifies as construction of a new source.  EPA has applied this interpretation in guidance letters and memoranda, as well as formal adjudications.  For example, the *Monroe* order was an adjudication by the EPA Administrator of a petition requesting that the Agency object to a Title V permit on the grounds that it lacked an applicable requirement based on NSR.

To determine whether a shutdown is permanent, a key criterion that has been a part of the Reactivation Policy from the beginning is the presumption that shutdown that lasting for more than two years is permanent.  This two-year time period was supported by the text of the NSR regulations in effect when the Policy was first developed.  EPA regulations have long-defined the term "actual emissions" as of a particular date to mean "in general … the average rate in tons per year, at which the unit actually emitted the pollutant during a consecutive 24-month period which precedes the particular date and which is representative of normal source operation." 40 C.F.R. 52.21(b)(21)(ii).[19]  Before 2002, this definition of actual emissions was used to determine

---

[16] See <https://www.epa.gov/nsr/reactivation-shutdown-source>.

[17] 40 C.F.R. 52.21(b)(8) (2021) (omitting the term "actual" before emissions); 40 C.F.R. 52.21(b)(8) (1998) (including the term "actual").  The term "actual" was removed in the 2002 revisions to the NSR regulations.  67 Fed. Reg.  80186, 80190, 80276 (Dec. 31, 2002).

[18] When arguing that that the definition of "construction" undermined the Reactivation Policy, the Limetree PAL RTC document failed to consider that this definition of "construction" includes a "change in the method of operation." *See*, RTC at 110.  The  RTC also discussed terms in this definition that suggest a distinction between a new creation of an emissions unit ("fabrication" and "erection") and an emission unit that is already in existence. ("modification").  *Id.*  However, this merely illustrates how the definition of construction applies to both the construction of a new source and modification of an existing one.  The terms in the parenthesis in the definition of "construction" do not demonstrate that construction requires a physical change.  The language in the definition before these terms in parenthesis plainly includes a change in the method of operation by itself.

[19] This definition remains in the regulations for other purposes, but after 2002, the term "baseline actual emissions" was established for use in determining NSR applicability to existing sources.

the baseline emissions[20] before a change at an existing stationary source that must be evaluated to determine if it qualifies as a major modification.  Based on this language in the regulation, the emissions of an existing source prior to a change was generally[21] based on the average rate of emissions over the two-year period prior to the change.   Thus, an existing source that had been shut down for more than two years would generally not have any baseline emissions, just like a new source.  This reasoning supported the idea that restarting an existing source that has been shut down for more than two years is analogous to constructing a new source for PSD applicability purposes because both would have an emissions baseline of zero.

Finding this interpretation of the NSR regulations to be permissible and reasonable, one federal district court issued a preliminary injunction against the restart of a stationary source on the basis of the Reactivation Policy.  *Communities for a Better Environment (CBE) v. CENCO Refining*, 179 F. Supp. 2d 1128, 1143-48 (C.D. Cal. 2001).   In its opinion, the Central District of California wrote the following:

> [Petitioner] CBE makes a strong showing that the Reactivation Policy is a reasonable interpretation of Clean Air Act regulations that does not conflict with any terms of the NSR program. NSR regulations indicate that for a long-dormant facility (at least those shutdown for two years or more), the emissions baseline for determining whether it has undergone an emissions increase subject to NSR will be zero. Therefore, such a facility is subject to NSR upon restart, assuming the requisite increase in emissions over the zero baseline.

*Id*. at 44.  Based on this reasoning, the court followed the Reactivation Policy and issued a preliminary injunction against the restart of a refinery that hadn't operated for five years, stating that a cost of between $28 and $180 million to reactivate a refinery over a period of six to eighteen months "slightly favors finding a permanent shutdown."  *Id.* at 1146.

Another key element of the Reactivation Policy since its inception in the late 1970s is that the presumed permanence of a shutdown lasting more than two years can be rebutted by an owner/operator with evidence that it did not intend to permanently shut down.  This concept can also be tied to text in the regulatory definition of actual emissions.  As previously stated, this definition says that "in general" the rate of actual emissions is the average over the 24-months preceding the change "which is representative of normal source operation."  The next sentence in the definition says that "[t]he Administrator shall allow the use of a different time period upon a determination that it is more representative of normal source operation."  40 C.F.R. 52.21(b)(21)(ii).  Thus, under this definition, the use of the previous two years of emissions to determine the actual emissions as of a particular date is rebuttable.  A source could show that another time period, earlier than the preceding two years, is more representative of normal source

---

[20] While there was no PSD regulatory definition of "baseline" associated with the definition of actual emissions before the 2002 rule, the baseline actual emissions concept was discussed in the preamble to the 1980 New Source Review regulations. *See, e.g.*, 45 Fed. Reg. 52676, 52680 (Aug. 7, 1980).

[21] However, as discussed below, the owner or operator of a source had the opportunity to use emissions from a period before the last two years if it could demonstrate that the emissions during this time period were more representative of its normal operations.

operation.  Likewise, under the Reactivation Policy, EPA has essentially considered whether a shutdown source can show that its emissions from a different period, (when it was still operating more than 2 years prior to its planned restart), are more "representative of normal source operation" and use those emissions to demonstrate that the source is an existing source, rather than a new source with a zero baseline.

The presumption in the Policy that a shutdown lasting two years is permanent was also grounded on the time period for emissions that EPA considered temporary, which is the converse of permanent. To implement a provision in the regulations that exempted temporary emissions, EPA's general approach has been to consider emissions lasting for less than two years to be temporary and eligible for that exemption.  Letter from William A. Spratlin, Jr., P.E., Chief, Air Support Branch, Air and Hazardous Materials Division, EPA, to Harvey D. Shell, Shell Engineering and Associates (Oct. 9, 1979) ("Spratlin letter"), at https://www.epa.gov/sites/default/files/2015-07/documents/m90678.pdf.  This letter cited a provision then in section 52.21(k) of the PSD regulations, as of June 19, 1978, that exempted temporary emissions from the PSD air quality impact analysis.[22]  The Spratlin letter explained that EPA's approach for applying this exemption was generally to consider emissions occurring for less than two years in one location to be temporary.  *See,* 43 Fed. Reg. 26388, 26394 (June 19, 1978).  Extending this idea, the absence of emissions from a shutdown facility for up to two years could also generally be considered temporary, while the absence of emissions for a longer period would be regarded as permanent.

5.    *Revisions to PSD Regulations in the 2002 NSR Reform Rule and Codification of the Permanent Shutdown Criterion*

Although EPA completed a major revision of its NSR regulations in 2002 that changed the method for determining baseline emissions, this revision did not remove the basis for EPA's interpretation that construction of a "new stationary source" includes the restart of a source that was permanently shut down.

The 2002 revisions to the PSD regulations, created a new definition of "baseline actual emissions" for use in determining NSR applicability for modification of an existing source, while retaining for other purposes the existing definition of "actual emissions" that had previously been used to determine baseline emissions. The definition of "baseline actual emissions" that applies today gives existing source owners or operators the discretion to select a period other than the last 24 months to determine the baseline emission rate, without having to show that the selected period is representative of normal source operations.  The new definition gave owners and operators of most existing sources the discretion to choose any 24-month period within the preceding 10 years, which EPA determined to be the length of a normal business cycle for most types of sources based on a study. 67 Fed. Reg. 80186, 80191-92, 80199-200 (Dec. 31, 2002); *see also, New York v. EPA*, 443 F.3d 3, 25–26 (D.C. Cir. 2005).

Based on the new definition of "baseline actual emissions," the Limetree PAL RTC argued that the Reactivation Policy no longer served the purpose that it did under the pre-NSR

---

[22] This provision is now located in 40 C.F.R. 52.21(i)(3).

Reform regulations, when existing sources could seek to establish baseline emissions by demonstrating that emissions during a period before the last 24 months were more representative of normal operations. The RTC asserted that it was inconsistent with the baseline approach in the current regulations to presume that a facility that was idled for the last two years had permanently shut down and that "the idling of the refinery portions of the facility may be viewed to have occurred in the normal course of the 10-year business cycle upon which EPA based the baseline provision in the 2002 rule." RTC at 110.

However, this change to the approach for determining the baseline emissions of an existing source does not alter the fundamental premise of the Reactivation Policy that a stationary source that has permanently shut down qualifies as a new source upon seeking to restart. The idea that construction of a new stationary source results from restarting a facility that was permanently shut down is grounded on the plain meaning of the word "new" and the definition of "construction," as discussed above. The "permanent shutdown" of a stationary source eliminates its status as an existing source under the NSR regulations. If an existing source ceases operations temporarily, such a source would reasonably continue to be classified as an existing source. Resuming operations after a temporary shutdown may be part of a normal business cycle, but resuming operations after a permanent shutdown is not. Completely ceasing operations at a source for an extended period of time is an exceptional circumstance. It is not "business as usual" to permanently stop utilizing the product of a large capital investment. A central purpose of the 2002 rule was to recognize that "a source's operations over a business cycle cover a range of operating (and emissions) levels—not simply a single level of utilization. The new procedure recognizes that market fluctuations are a normal occurrence in most industries, and that a source's operating level (and emissions) does not remain constant throughout a source's business cycle." 67 Fed. Reg. at 80199. A permanently shut down source has no variation in utilization level. Instead, it has a zero operating level and zero emissions, which goes beyond the range associated with normally occurring market fluctuations.

EPA did not say anything in the 2002 NSR reform rule that indicated the Agency intended to abandon the core premise of the Reactivation Policy that a permanent shutdown terminates the status of an existing source as such. To the contrary, in this same action, EPA added the words "permanently shut down" to its PSD regulations for the first time, and made clear that emissions from a unit that has permanently shut down must be subtracted from baseline emissions when establishing a PAL. As discussed above, although the addition of this language was in a context other than defining a "new major stationary source," the principle has broader relevance. Section 52.21(aa)(6)(i) of the PSD regulations has said the following since 2002: "Emissions associated with units that were permanently shut down after this 24-month period must be subtracted from the PAL level." In the PAL section of the preamble to the 2002 Reform Rule, EPA elaborated on the application of this provision as follows:

> The key determination to be made is whether an emissions unit is "permanently shut down." This issue is discussed in the Administrator's response to a petition objecting to an operating permit for a facility in Monroe, Louisiana. See *Monroe Electric Generating Plant,* Petition No. 6–99–2 (Adm'r 1999).

67 Fed. Reg. 80186, 80208-09 n. 30 (Dec. 31, 2002). EPA went on to explain that whether or not a shutdown should be treated as permanent should be based on the principles from the Reactivation Policy.  EPA wrote the following:

> [W]e explained in our 'reactivation policy' that whether or not a shutdown should be treated as permanent depends on the intention of the owner or operator at the time of shutdown based on all facts and circumstances. Shutdowns of more than 2 years, or that have resulted in the removal of the source from the State's emissions inventory, are presumed to be permanent. In such cases it is up to the facility owner or operator to rebut the presumption.

*Id*.  Thus, rather than undermining the Reactivation Policy that EPA applied prior to 2002, the NSR Reform rule actually expanded application of the Policy from permanent shutdown of entire facilities, in the context of identifying a new source, to determining whether an individual unit has been permanently shut down and if so, to require that such unit's emissions be subtracted from the PAL level.  The language in the preamble to the 2002 rule in no way rejects or limits *Monroe*.  In fact, the preamble cites to *Monroe* as the basis for applying the permanent shutdown concept to the new PAL regulatory architecture, and the 2002 rule codifies in the PAL regulations a principle that supports classifying a permanently shut down source as a new one when it is reactivated. As discussed above, if the emissions of a single emissions unit that has been permanently shut down are effectively counted as zero, then by extension, if all of the emissions units at a facility are permanently shut down, then the baseline emissions from the entire facility is zero, just like a new source.

    In addition, the definition of "actual emissions" was not removed from the NSR regulations in 2002 and continues to apply in several contexts under the NSR program that relate to the Reactivation Policy.  Paragraph (b)(21)(i) of 40 C.F.R. 52.21 states that the original definition of "actual emissions" in that subsection applies except when EPA is "calculating whether a significant emissions increase has occurred" or when "establishing a PAL," and in those excepted circumstances the definitions in 40 C.F.R. 52.21(b)(41) (projected actual emissions) and 40 C.F.R. 52.21(b)(48) (baseline actual emissions) apply.  The preamble to the 2002 rule explained further that the new definition of "baseline actual emissions," including the methodology in 40 C.F.R. 52.21(b)(48) is to be used "for three specific purposes involving <u>existing emissions units</u> as follows:

- For modifications, to determine a modified unit's pre-change baseline actual emissions as part of the new actual-to-projected-actual applicability test
- For netting, to determine the pre-change actual emissions of an emissions unit that underwent a physical or operational change within the contemporaneous period. You may select separate baseline periods for each contemporaneous increase or decrease.
- For PALs, to establish the PAL level."

67 Fed. Reg. 80185, 80196 (Dec. 31, 2002) (emphasis added).

Thus, 40 C.F.R. 52.21(b)(48) was added to calculate the baseline emissions for modifications to existing sources, not for determining NSR applicability for new sources. And even at existing sources, 40 C.F.R. 52.21(b)(48) does not apply in all contexts.

For purposes other than those described above, the pre-NSR Reform formulation of "actual emissions" and its presumption of using the 24-month period preceding the particular date applies. For example, the "baseline concentration" used to determine compliance with PSD increments continues to be based on the definition of actual emissions in section (b)(21), which is used to determine the emissions from sources in existence on the applicable minor source baseline date with noted exception. 40 C.F.R. 52.21(b)(13)(i)(a). The preamble to the 2002 reform rule further explains that, when determining the "existing source's contribution to the amount of increment consumed," the contribution should be "based on that source's actual emissions rate from the 2 years immediately preceding the date of the change." *Id*.

Furthermore, to support the different applicability tests for new and existing emissions units in section 52.21(a)(2)(iv), the definition of baseline actual emissions in paragraph (b)(48) specifies a different method for establishing the baseline emissions for existing and new emissions units. The discretion to select any consecutive 24-month period in the last 10 years applies only to existing emissions units.[23] Under the definition of "emissions unit," a new emissions unit is one that "is (or will be) newly constructed and that has existed for less than 2 years from the date such emissions unit first operated." 40 C.F.R. 52.21(b)(7)(i).[24] For new emissions units, "the baseline actual emissions for purposes of determining the emissions increase that will result from the initial construction and operation of such unit shall equal zero; and thereafter, for all other purposes, shall equal the unit's potential to emit." 40 C.F.R. 52.21(b)(48)(iii). Consistent with the discussion above for a new stationary source, an emissions unit that is proposed to be restarted after a permanent shutdown qualifies as one that "will be newly constructed" and thus should be classified as a "new emissions unit" under these provisions.[25] Furthermore, the baseline actual emissions from such a new emissions unit would

---

[23] In creating the architecture for the 10-year lookback, the preamble to the 2002 rule presumed that an existing source must have some level of utilization representative of normal operations. 67 Fed. Reg. 80185, 80200 (Dec. 31, 2002) ("We believe that use of a fixed 10-year look back period provides the desired clarity and certainty to the process of selecting an appropriate utilization/emissions level that is representative of a source's normal operation.").

[24] This definition of new emissions unit was not created to identify a new stationary source. EPA gave a specific meaning to "new emissions unit" in paragraph (b)(7)(i) to apply the different applicability calculation approaches set forth in 40 C.F.R. 52.21(a)(2)(iv) for modification of existing sources. For this approach, a "new emissions unit" needed to be separately addressed in the definition of "baseline actual emissions" in paragraph (b)(48). An emissions unit is plainly "part of a stationary source." 40 C.F.R. 52.21(b)(7). It is not an entire stationary source.

[25] The Limetree PAL RTC document cited the phrase "newly constructed" in the definition of "new emissions unit" and concluded without explanation that none of the units at the Limetree refinery were "newly constructed." This neglected to consider that the definition of "construction" includes physical changes and changes in the method of operation. The RTC did not demonstrate that a "newly operated" unit that had permanently shut down could not qualify as a new emissions unit under this definition. Although these units at the Limetree refinery had "existed" in one sense for more than two years, they ceased to "exist" for purpose of the NSR regulation when the units permanently shut down. It is thus consistent with these definitions in the PSD regulations to classify a unit that permanently shut down as "new" or "newly constructed" when it restarts.

be zero, as applicable to determining the emissions increase that will result from initial construction and operation of such unit.

Considering the full contours of the 2002 rulemaking, it is apparent that the discretion to select any 24-month period in the past 10 years in the context of definition of "baseline actual emissions" adopted in 2002 has limited applicability in the NSR program. This provision was only intended to apply to an existing unit at an existing source, not a new unit added to an existing source or to an entire source that had permanently shut down and no longer qualified as existing. In 2002, the method for determining baseline emissions changed only for existing sources. The approach for determining PSD applicability for new sources was not altered, and EPA has continued to look to the still active definition of "actual emissions" in section (b)(21) to inform its consideration of whether a source is presumed to be permanently shut down.

EPA continued to apply the Reactivation Policy after these revisions to the regulations in 2002. In 2005, EPA Region 5 executed a Consent Agreement and Final Order in which the respondent agreed that its facility was permanently shut down "as defined by" the Reactivation Policy and that the facility "will be considered a new source if restarted by Respondent." *In the Matter of: Lesaffre Yeast Corporation Milwaukee, Wisconsin, Respondent*, 2007 WL 9797862, at 3. In addition, in 2015, EPA Region 2's Regional Administrator issued an objection to a New York State Department of Environmental Protection (NYSDEC) Title V permit, articulating EPA's view that the facility had been permanently shut down and was a new major stationary source under EPA's Reactivation Policy. Letter from Judith A. Enck, Regional Administrator, to Honorable Basil Seggos, NYSDEC, *EPA Review of Proposed Title V Operating Permit for Greenidge Station* (Dec. 7, 2015).

The Limetree PAL RTC document places undue significance on the assumption that no EPA headquarters office provided guidance on the application of the Reactivation Policy after the 2002 rule, until Limetree proposed restarting the HOVENSA refinery in the Virgin Islands. This is incorrect. For example, EPA headquarters provided considerable review and guidance to Region 2 in its drafting of the 2015 objection to NYSDEC's Title V permit. Moreover, since it is generally the responsibility of Regional Offices to address case-specific matters of this nature in the appropriate states and territories, it was not necessary or expected for EPA headquarters to provide written guidance in every case. After the Reactivation Policy was clearly articulated in the 1999 *Monroe* order and referenced in the 2002 rule preamble, additional written guidance from headquarters was generally not needed. More significant is the absence from 2002 to 2020 of any request from EPA headquarters that the Regional Offices stop applying the Reactivation Policy, especially after the 2002 rule preamble referenced the *Monroe* order as a guide to determining whether a unit had permanently shut down.

6. *Continued Textual Support for a Two-Year Presumption*

The 2002 NSR Reform rule changes do not preclude EPA from continuing to presume that the shutdown of a stationary source is permanent if it has lasted for more than two years. This continues to be supported by the EPA's approach for identifying temporary emissions and

the continued applicability of the definition of actual emissions for several purposes, including identifying the emissions to be included in air quality impact analyses under the PSD program.

As discussed above, EPA has previously supported the presumption that a shutdown lasting more than 2 years is permanent by referencing EPA's policy of presuming that "temporary" emissions are those that occur for less than 2 years at one location. The "temporary" emissions exemption referenced in the 1979 Spratlin letter remains in effect today, at 40 C.F.R. 52.21(i)(3). In addition, the PSD regulations exempt portable stationary sources from PSD permitting if a source previously received a PSD permit and the new location of the source would be "temporary." 40 C.F.R. 52.21(i)(1)(viii)(a). After the 1979 Spratlin letter described above, EPA finalized the proposed rulemaking that was referenced in that letter. In the preamble to that final rule, EPA continued to generally consider temporary emissions in the context of these exemptions to be less than two years. 45 Fed. Reg. 52676, 52728 (Aug. 7, 1980) (emphasis added). EPA continues today to generally consider as temporary, stationary source emissions lasting for less than 2 years at one location.[26] Nothing in the 2002 NSR reform rule altered this conception of emissions that are temporary. Thus, it is still rational to extend this idea to presume that a shutdown is "permanent" if emissions stop for more than the period of time that EPA generally considers temporary in the context of stationary source operation.

In addition, the emissions of sources over the most recent two-year period of time continues to be the foundation for addressing air quality-related NSR requirements after determining that a permit is required, including making the showing that construction of a new source or modification will not cause or contribute to a violation of the National Ambient Air Quality Standards or PSD increment. 40 C.F.R. 52.21(k). At the same time EPA adopted the definition of "baseline actual emissions," the Agency said the following in the preamble to the 2002 rule: "If you determine that the modification of your source is a major modification, you must revert to using the existing definition of 'actual emissions' to determine your source's actual emissions on a particular date to satisfy all other NSR permitting requirements, including any air quality analyses (for example, compliance with NAAQS, PSD increments, AQRVs) and the amount of emissions offsets required." 67 Fed. Reg. at 80196. EPA further stated that the new longer lookback for baseline actual emissions "does not affect the way in which a source's ambient air quality impacts are evaluated," including "actual operating factors averaged over the most recent 2 years of operation." 67 Fed. Reg. at 80202. EPA's most recent modeling guidance reiterates that the 2002 NSR Reform Rule intended the original definition of "actual emissions" at 40 C.F.R. 52.21(b)(21) and its two-year presumption to apply to emissions rates used for

---

[26] EPA has recently applied the two-year temporary emissions concept in the context of PSD permits for Outer Continental Shelf Sources under 40 C.F.R. Part 55. *See*, Vineyard Wind Fact Sheet and Statement of Basis, at https://www.epa.gov/sites/default/files/2021-06/documents/vineyard-wind-1-llc-fs-sob.pdf; South Fork Draft Permit Fact Sheet (2021), at https://www.epa.gov/system/files/documents/2021-07/south-fork-draft-permit-fs.pdf; Anadarko Petroleum Preliminary Determination and Statement of Basis (Nov. 2016), at https://www.epa.gov/sites/default/files/2016-11/documents/2016_11_14_preliminary_determination_bob_douglas.pdf; and Anadarko Preliminary Determination and Statement of Basis (March 23, 2011), at https://www.epa.gov/sites/default/files/2015-08/documents/anadarko-pd-032311.pdf.

source impact analyses.[27]  Under other provisions that apply to PSD modeling, the most recent two-year period is the starting point for determining the emissions of nearby sources included in background. 40 C.F.R. Part 51, Appendix W (Table 8-2), as revised in 2017.[28] Further, as mentioned above, the baseline emissions for calculating increment consumption is based on the definition of "actual emissions." 40 C.F.R. 52.21(b)(13)(i)(a).[29]  Considering that the most recent two years of emissions is the starting point when modeling impacts on ambient air quality, it continues to be appropriate to presume that emissions that have ceased prior to that time frame have permanently stopped, while enabling sources to rebut this presumption and show that the shutdown was not permanent.

The two-year presumption is also a reasonable threshold to guide EPA in considering when a presumption should be applied and when it should not, which ensures consistent implementation of the Reactivation Policy. The Policy does not say that a shutdown lasting less than two years cannot be permanent, rather only that the presumption does not apply in that case. Two years is a long time for a source to be shut down, and for most sources that are shut down for two years or longer there is no question about the shutdown being permanent.  In cases where there is a question, that is where it is appropriate to apply the criteria and determine whether the presumption has been rebutted.

### 7. *Reactivation Policy Factors*

Under the Reactivation Policy, EPA has looked to the intent of the owner or operator to determine whether a shutdown is permanent.  *Monroe* at 8.   Based on the considerations described above, EPA presumes that a shutdown of more than two years is permanent, but the owner or operator of a facility can rebut this presumption by demonstrating that it maintained a continuous intent to restart the facility based on relevant facts, including activities undertaken during the time of the shutdown.  *Monroe* at 8-9.  EPA has examined the following factors in prior Reactivation Policy decisions to assess the intent of the owner/operator of a stationary source:

- Length of time the facility has been shut down
- Time and capital needed to restart.
- Evidence of intent and concrete plans to restart
- Cause of the shutdown

---

[27] EPA Memorandum, Guidance for Ozone and Fine Particulate Matter Permit Modeling, at 18 n. 16 (July 29, 2022), at https://www.epa.gov/system/files/documents/2022-07/Guidance_for_O3_PM25_Permit_Modeling.pdf.

[28] 82 Fed. Reg. 5182, 5220 (Jan. 17 2017).

[29] This has not changed since EPA's 1980 PSD regulations. The preamble to these regulations states that "increment calculations will generally be based on actual emissions as reflected by normal source operation for a period of two years….In EPA's judgment, two years represents a reasonable period for assessing actual source operation….The two-year period of concern should generally be the two years preceding the date as of which increment consumption is being calculated, provided that the two-year period is representative of normal source operation. The reviewing authority has discretion to use another two-year period, if the authority determines that some other period of time is more typical of normal source operation than the two years immediately preceding the date of concern." 45 Fed. Reg. 52676, 52718 (Aug. 7, 1980); *see also*, EPA Draft New Source Review Workshop Manual, at C.69 (Oct. 1990), available at https://www.epa.gov/sites/default/files/2015-07/documents/1990wman.pdf.

- Status of permits
- Maintenance and inspections during shutdown

No single factor in this list is conclusive and the final determination will often involve a judgment regarding the owner's intent. *Monroe* at 9.

The Limetree PAL RTC document criticized these aspects of the Policy. It argued that the focus on the intent of the owner or operator is not grounded in the NSR regulations and that the Policy can produce inconsistent results based on subjective judgments about how to weigh the various factors against each other. Upon further review, EPA does not find these to be persuasive grounds against continuing to follow the Reactivation Policy.

As illustrated above, the NSR regulations support the interpretation that construction of a new source or new emissions unit occurs upon restarting a source or emissions unit that was permanently shut down. While the regulations do not define the term "permanently shut down," the ordinary meaning of the term "permanent" includes consideration of intent. The New Oxford American Dictionary defines permanent as "lasting or intended to last or remain unchanged indefinitely." [30] Thus, it is rational to consider the intent[31] of the owner or operator of a stationary source when assessing whether a stationary source shutdown is permanent. While this question of intent is an inherently subjective one, the factors listed above that EPA has used to determine that the source maintained a continuous intent are based on objective facts. The two-year presumption in the Reactivation Policy lends further objectivity to the determination. EPA recognizes that it is not ideal to base regulatory decisions on a subjective consideration such as intent, and that this can lead to differences of opinion as to how to weigh those factors. However, the risk of inconsistent outcomes is minimized when such a judgment is based on objective facts, as reflected in the list above. Further, a more objective bright line test based solely on duration or some other factor would limit the flexibility afforded by the existing framework that allows for consideration of several case-specific factors in reaching a reasoned conclusion.

In this regard, the Reactivation Policy has served its function effectively for decades and remains a rational approach for distinguishing between new sources and existing ones in circumstances involving the shutdown of a stationary source. EPA thus intends to continue applying the Reactivation Policy to serve this function under the NSR program.

Conclusion:

EPA is continuing to apply its NSR Reactivation Policy, as described in the *Monroe* Order, because it remains an appropriate method for determining whether the reactivation of a stationary source qualifies as the construction of a new source under the PSD regulations. The

---

[30] New Oxford American Dictionary, Third Edition, p. 1305, Oxford University Press (2010).

[31] The primary definition of "permanent" in Webster's online dictionary is "continuing or enduring without fundamental or marked change." But Webster's also provides a "Kid's Definition" of permanent that reads as follows: "lasting or intended to last for a very long time: not temporary or changing." <https://www.merriam-webster.com/dictionary/permanent>.

Policy has been and continues to be consistent with the PSD regulations at 40 C.F.R. 52.21, including after revisions to these regulations in 2002. Notwithstanding the absence of a regulatory definition of "new stationary source," this term is reasonably read to include restarting a stationary source that was "permanently shut down." This interpretation furthers the goals of the Clean Air Act's statutory scheme for the New Source Review program. EPA has consistently applied the Reactivation Policy for over three decades and has issued formal adjudications on the basis of the policy and the supporting interpretation of law. One federal District Court found the Reactivation Policy to be grounded on a permissible interpretation of the NSR regulations and based a preliminary injunction on it. The basis for this interpretation in the EPA NSR regulations was not altered by the 2002 revisions to these NSR regulations, which expanded the application of the policy to additional contexts and displayed no intent by EPA to change the policy.

# Exhibit B

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

WASHINGTON, D.C.  20460

April 5, 2018

OFFICE OF
AIR AND RADIATION

Ms. LeAnn Johnson Koch
Perkins Coie
700 13th Street, NW
Suite 600
Washington, D.C.  20005-3960

Re: Limetree Bay Terminals, St. Croix, U.S. Virgin Islands – Permitting Questions

Dear Ms. Johnson Koch:

This is in response to your February 1, 2018, letter to the U.S. Environmental Protection Agency's (EPA) Region 2 Office, in which you sought EPA's concurrence on three New Source Review (NSR) permitting questions pertaining to the Limetree Bay Terminals (LBT) facility in St. Croix, U.S. Virgin Islands (USVI). In your letter, you specifically asked whether EPA concurs with LBT that:

> (1) restarting some of the idled refinery units as part of the "MARPOL Project"[1] (to produce fuel compliant with the maritime sulfur regulations taking effect January 2020) will not result in the facility being viewed as a new stationary source under EPA's current so-called Reactivation Policy;
>
> (2) the MARPOL Project and another LBT project to produce Renewable Diesel Fuel are independent and should not be considered a single project for purposes of applicability under the Prevention of Significant Deterioration (PSD) regulations; and
>
> (3) the addition of a deeper water loading configuration (Single Point Mooring or SPM) should be considered a modification to an existing emissions unit (i.e., the dock system and associated loading terminal) and not a new emissions unit for the PSD applicability analysis.

In addition to the foregoing inquiries, you previously sought EPA guidance regarding when emission decreases from a project can be considered within the NSR applicability analysis.

---

[1] MARPOL is the International Convention for the Prevention of Pollution from Ships.

Based on EPA's review of your submitted analyses and supporting documents, we concur that: (1) restarting of the refinery's idled units for the MARPOL Project should not be treated as a new stationary source under the current Reactivation Policy; (2) the MARPOL Project and the Renewable Diesel Fuel Project are independent of each other and therefore separate projects for PSD applicability; and (3) constructing the SPM would be considered a modification to an existing emissions unit rather than a new emissions unit. Discussion on each of these issues is provided below, along with information to address your previous question regarding accounting of emission decreases within the NSR applicability analysis.

Restarting Refinery Units and the Current Reactivation Policy

The current policy on the reactivation of sources provides that a major stationary source that has been idled for 2 or more years is presumed to be permanently shut down. *See In the Matter of Monroe Electric Generating Plant Entergy Louisiana, Inc.*, Proposed Operating Permit, Petition No. 6-99-2 (June 11, 1999). That policy states that if a source is permanently shut down, upon reactivation it is considered a "new" stationary source for purposes of PSD review. Accordingly, PSD applicability would be based on the reactivated source's potential to emit.

Importantly, however, this 2-year presumption is rebuttable. EPA will not consider the shutdown to have been permanent upon the owner or operator of the source making a demonstration that, at the time of the shutdown, and continuously throughout the shutdown period, they intended to restart the facility. Among the factors that EPA in the past has considered in evaluating the owner or operator's intent are:

- Length of time the facility has been shut down and concrete plans for restart;
- Statements by the owner or operator of intent;
- The cause of the shutdown;
- Status of permits, including but not limited to Clean Air Act operating permits, acid rain permits and other required permits, and emission inventory;
- Maintenance and inspections during shutdown; and
- Time and capital needed to restart.

In evaluating these factors, no single factor is likely to be conclusive in determining intent. Instead, EPA generally has considered the totality of all such factors and the relevant supporting documentation in evaluating whether there was a continuous intent to restart the facility.[2]

In the case of LBT's facility in St. Croix, our review of the information you have submitted leads us to conclude that both LBT and HOVENSA displayed a continuous intent to restart the refinery operations. Therefore, applying the criteria of the current Reactivation Policy, we have determined that LBT's St. Croix facility was not permanently shut down and should not be considered a "new source" for purposes of PSD applicability.

---

[2] As this description indicates, the current Reactivation Policy has been derived from a series of EPA site-specific determinations and guidance issued over the course of many years. Further, EPA has not cited any specific regulatory provisions of the NSR program to support its position on source "reactivation." We are applying the current Reactivation Policy to resolve the LBT issue, but we intend to reconsider the policy in the near future.

LBT's facility in St. Croix was previously owned by HOVENSA until 2016, at which time LBT purchased the refinery and terminal operations. As LBT explains, an economic downturn caused HOVENSA to idle the refinery operations in 2012. Nevertheless, since that time, the terminal operations, wastewater treatment plant, and power generation have continued to operate at this location. Even before HOVENSA announced, on February 21, 2012, that it had completed the final idling of all refinery units, HOVENSA had informed the USVI government of its plans to retain its permits and implement maintenance procedures on their equipment so that it could restart the refinery. LBT represents that over the next several years, HOVENSA spent over $400 million to maintain the restart capability of the refinery operations, which included removing residual material from equipment, retaining control room operability, and conducting other process equipment mothballing activities.

LBT provided EPA with a timeline and supporting information that included evidence of this continuous intent by HOVENSA and LBT to restart the facility. The supporting information included company statements, press releases, and various correspondence from 2011 through 2017. LBT also confirmed that HOVENSA and LBT maintained all environmental permits in active status and submitted timely renewal applications. Further, LBT stated that these companies continued to comply with the Refinery MACT, NSPS Subpart J, and all of the applicable RCRA regulations while the refinery units were idled. LBT represents that the companies maintained critical refinery equipment, such as compressors, pumps, utilities, wastewater treatment units in working order and conducted multiple walkthrough inspections at the plant, activities that are necessary for a restart. In order to demonstrate that the maintenance activities were performed, LBT provided a list of critical equipment and the timeline of significant maintenance activities performed at the refinery. LBT also represents that neither it nor HOVENSA made any statements to any party or issued any press release indicating any intent *nor* to restart the plant in the future.

## Project Aggregation – Renewable Diesel Project and Refinery Restart (MARPOL Project)

The term "project aggregation" describes the process of grouping "nominally separate changes that are sufficiently related based on established criteria ... into a single common project for the purpose of determining PSD applicability."[3] More specifically, the emissions of the nominally separate changes are combined for the purposes of determining whether a "significant emissions increase" – referred to as "Step 1" of the NSR applicability test – will occur from the project. EPA's project aggregation policy aims to ensure the proper permitting of modifications that involve multiple physical and/or operational changes. Where the projects at issue are more reasonably deemed to constitute a single project for purposes of NSR, a source will not be allowed to circumvent major NSR by seeking to permit the individual activities separately under minor source NSR.

---

[3] Letter from Stephen Page, Director, Office of Air Quality Planning and Standards, to David Isaacs, Vice President, Government Policy, Semiconductor Industry Association (August 26, 2011). (SIA Letter)

LBT plans to construct the Renewable Diesel Project and the MARPOL Project at the current plant site in late 2018. Given that these projects will begin close in time to one another, LBT has sought EPA's concurrence that these projects should not be aggregated (i.e., considered to be a single project) for the purposes of the PSD applicability analyses. LBT representatives have been clear in statements to EPA that, while they are pursuing the Renewable Diesel Project and the MARPOL projects concurrently, they are separate and distinct projects. Based upon EPA's review of all the information LBT provided, we concur that the two projects are independent of each other and, therefore, should not be aggregated for purposes of PSD applicability.

In analyzing whether the two LBT projects at issue here should be aggregated, we have followed our current policy on project aggregation, which takes into account indicia of relatedness among the individual actions at a source in order to determine whether the activities, in the aggregate, are one physical or operational change as those terms are used in the statute and regulations.[4] Our policy on aggregation outlines an approach relying upon case-specific factors (*e.g.*, timing, funding, and the company's own records) and the relationship between nominally separate changes.

As explained in your letter, the MARPOL Project involves restarting certain existing refinery units to process crude oil, heavy fuel oil, and petroleum intermediates into refined petroleum products. This project will involve restarting a crude unit, a reformer, two naphtha hydrotreating units, a coker unit, two distillate hydrotreating units, an isomerization unit, and two sulfur recovery plants. These units will be configured to produce low-sulfur fuels (i.e., gasoline, diesel, and fuel oil) and are scheduled to begin operation just before January 2020, when the relevant MARPOL amendments and EPA implementing regulations take effect. LBT represents that the economic viability of the MARPOL Project depends on the value generated from converting petroleum crude into refined petroleum products and market advantages that may exist due to an anticipated market shortfall of MARPOL-compliant marine fuel in 2020.

Your letter explains that the proposed Renewable Diesel project will convert vegetable, animal, and recycled cooking oils into renewable diesel fuel. This project involves building a feedstock pretreatment train and a new hydrogen unit to convert the oils into diesel compounds, and repurposing an existing hydrotreating unit (previously used for the hydrotreating of petroleum liquids) as the reactor for the conversion. LBT represents that the Renewable Diesel Project will produce fuel meeting the requirements of the Renewable Fuel Standard (RFS) and California's Low Carbon Fuel Standard (LCFS) programs, and that the fuel could be blended with transportation fuel sold in the United States to generate Renewable Identification Numbers (RINs) under the RFS as well as LCFS credits. Further, LBT suggests that the renewable diesel fuel may be eligible for a federal blender's tax credit. According to LBT, the economic viability of the Renewable Diesel Project depends heavily on the future value of converting vegetable, animal, and recycled cooking oils into renewable fuel, as well as the value of RINs, LCFS, and other tax credits. Significantly, none of these factors relate to the MARPOL project.

---

[4] While EPA issued a revised policy on project aggregation in 2009, the policy has been stayed and is currently under reconsideration by the Agency. *See* 74 FR 2376 (January 15, 2009), 74 FR 7193 (Feb. 13, 2009), 75 FR 27643 (May 18, 2010). *See* 75 FR 19570-71 (April 15, 2010) for a collection of memoranda that provide examples of EPA's current approach to project aggregation.

LBT has shown that each of these two projects is technically distinct and does not depend on the other in terms of decision-making and timing, interaction between units, the process technologies used, feedstocks involved, or products produced. LBT stated that the MARPOL Project will be fully self-contained as the selected units are inspected, reconditioned as needed, and restarted. More specifically, LBT maintains that the raw materials, piping, process equipment, and material transfer systems for each project will be completely unshared and independent of the other project. LBT represents that the construction of one project does not necessitate or otherwise influence the construction of the other project.

LBT has demonstrated to our satisfaction that the economic viability of each project stands on its own, such that the Renewable Diesel Project could proceed on its own financial merits, regardless of the future of the MARPOL Project, and vice versa. In particular, LBT noted the unique opportunity presented to timely and economically reconfigure the idled hydrotreating equipment and the current availability of renewable fuel and tax credits as proof of lack of economic dependency between the Renewable Diesel and MARPOL Projects. Each project's feasibility is based on its own set of incentives and market realities and does not depend on the other project going forward.

We note that the one thing that may be considered to be common to both projects is the potential for shared utilities. However, sharing utilities does not in and of itself mean that activities at a source are functionally or economically dependent on one another. Since both projects will produce fuel gas, the power and steam required to operate each project can be generated from fuel gas produced by either the renewable diesel unit or the MARPOL refining unit, and in some cases the projects may combust fuel oil, so neither project is dependent on the other project for steam or power generation. In addition, LBT stated that each project will rely on the existing wastewater treatment and water production facilities at the terminal. LBT maintains there is no appreciable cost benefit that the Renewable Diesel Project will receive by virtue of the MARPOL Project because the utilities are already in operation as part of the ongoing terminal operations.

Single Point Mooring – Modification to an Existing Emission Unit

LBT also seeks a determination that the addition of a single point mooring (SPM) project to its existing marine loading/unloading system should be considered a modification to an existing unit at the facility rather than a new unit pursuant to the PSD regulations. In your letter, you explain that the existing marine loading/unloading system consists of ten marine docks, each of which can load and unload multiple petroleum products. According to LBT, the proposed SPM addition would "extend from the jetty on the seabed for approximately 5,800 feet to a Pipeline End Manifold" that would be connected to a buoy via a flexible hose, and the buoy would load/unload crude oil onto ships via two floating hoses.

Based on the information provided by LBT, EPA believes that the addition of the SPM is reasonably considered to be an extension of the existing marine loading terminal. Therefore, EPA concludes that the SPM should be treated as a modification of the existing marine terminal emissions unit.

The definition of "emissions unit" in the PSD regulations does not speak to how broadly or narrowly to consider the scope of an emissions unit at a stationary source, nor does it address how to treat a new emissions point, such as the SPM, that is added to an existing stationary source with existing emission units. The definition at 40 CFR §52.21 (b)(7) states:

*Emissions unit* means any part of a stationary source that emits or would have the potential to emit any regulated NSR pollutant and includes an electric utility steam generating unit as defined in paragraph (b)(31) of this section. For purposes of this section, there are two types of emissions units as described in paragraphs (b)(7)(i) and (ii) of this section:

(i) A new emissions unit is any emissions unit that is (or will be) newly constructed and that has existed for less than 2 years from the date such emissions unit first operated.

(ii) An existing emissions unit is any emissions unit that does not meet the requirements in paragraph (b)(7)(i) of this section. A replacement unit, as defined in paragraph (b)(33) of this section, is an existing emissions unit.

This regulatory language can be reasonably interpreted to provide that multiple pieces of related process equipment (or emission points) comprise a single emissions unit.

Prior EPA determinations interpreting the PSD regulations provide specific guidance on this question. Those determinations illustrate that ascertaining the proper scope of an "emissions unit" often requires very case- and fact-intensive analyses. For instance, in a letter to the Semiconductor Industry Association, EPA confirmed that it was appropriate to treat an entire semiconductor fabrication building, or "fab," as one emissions unit.[5] EPA based this decision on the "interconnected nature of the 'tools' in the fab" and the systems that deliver materials and manage discharges. The letter also pointed out that fab units could be located in adjoining buildings if they are "physically connected, integrated, and operated" in a continuous and consolidated manner, and that it may be more appropriate to treat physically separated operations as a separate emissions unit. In that letter, EPA also referenced other determinations by EPA Regions, in which the Regional office provided rationale for why grouping related processes and equipment into a single emissions unit made sense given the circumstances.[6]

In analyzing the SPM project, we note that the existing marine terminal currently loads and unloads crude oil in addition to other petroleum products. Based on the information provided in LBT's recent permit application to the Virgin Islands Department of Planning and Natural Resources, the SPM will load and unload only crude oil. Since LBT is currently loading and

---

[5] SIA Letter.

[6] Letter from Judith M. Katz, Region III, U.S. EPA, to John M. Daniel, Director, Air Program Coordination, Commonwealth of Virginia, Department of Environmental Quality, (November 30, 2000); Letter from Douglas M Skie, Region VIII, U.S. EPA, to Brad Beckham, Director, Air Pollution Control Division, Colorado Department of Health (February 6, 1990).

unloading crude oil at the existing marine terminal, the proposed SPM would not change the nature of the pollutant-emitting activity occurring at the terminal. Furthermore, the SPM will be physically connected to the existing marine loading terminal by way of an underwater piping system and will be completely integrated with the loading and storage operations at the existing terminal. Consequently, the SPM and current marine terminal appear to share the same interconnectedness that EPA previously found persuasive in its analysis of semiconductor fabs, which supports treating LBT's proposed SPM and the existing terminal as a single emissions unit.

We also note that state agency permit actions have also reflected the flexibility within the definition of emissions unit. There are several examples of state permitting agencies treating multiple marine loading berths/docks as a single emissions unit in the context of Title V permits.[7] Thus, the treatment of multiple loading docks or berths as a single emissions unit is not unusual.

Finally, in other correspondence LBT has informed EPA that it will be installing a vapor capture and collection system at the existing marine terminal, although LBT has indicated the system will not be used to reduce emissions that occur while loading ships at the SPM. Instead, LBT has indicated it intends to comply with the submerged loading requirements[8] when the ships are loaded at the SPM, and that the control of emissions from the existing docks will help offset the emission increases from the operation of the SPM. We note that, in the context of the PSD program, a BACT determination for a major modification is focused on each emissions unit. However, this approach does not foreclose a determination that different emission points within an emissions unit can have distinct BACT requirements due to technical or economic feasibility or other factors considered under a BACT review. Consequently, for LBT to install a vapor recovery system at the existing loading berths and apply a different control strategy for the SPM emission point does not necessitate that the SPM be treated as a separate emissions unit under the PSD program. EPA views the proposed SPM and the new vapor control system as being part of the overall integrated loading/unloading operation at the terminal, and views this operation as an integrated emissions unit for PSD purposes.

Consideration of Emission Decreases from the Project

While not specifically raised in your February 1, 2018 letter, LBT previously asked EPA whether, under the NSR applicability procedures (e.g., 40 CFR §52.21(a)(2)), emission decreases may be taken into account when a "significant emissions increase" calculation of projects which involve only existing units is undertaken at Step 1 of the NSR applicability analysis. As you should be aware, EPA has recently clarified that emission decreases from a project are to be considered at Step 1. This applies not only to existing emission units for but all categories of projects. *See* Project Emissions Accounting Under the New Source Review Preconstruction Permitting Program (March 13, 2018).

---

[7] *See, e.g.*, Indiana Department of Environmental Management, Part 70 Operating Permit, BP Products North America, Inc. – Whiting Business Unit (December 14, 2006); Commonwealth of Virginia, Department of Environmental Quality, Federal Operating Permit, TransMontaigne Operating Company, L.P. – Norfolk Terminal (April 7, 2014). EPA is also aware of analogous non-marine loading activities, such as truck loading racks, being treated as a single emissions unit.

[8] 46 CFR 153.282.

Conclusion

EPA's responses contained within this letter are based on the information LBT has provided EPA through letters and emails pertaining to your permitting questions. Since EPA does not have emissions information and other specifics regarding your planned projects, EPA is not providing any final determination on the applicability of the PSD regulations to your projects. A final determination on PSD applicability will be made on the basis of the information provided in your application and supporting materials. Finally, nothing in this letter's discussion of PSD policies should be interpreted to reflect EPA's views on the applicability or requirements of any other programs, including the New Source Performance Standards and the National Emissions Standards for Hazardous Air Pollutants.

If you have any questions about this letter, please contact Anna Marie Wood in the Office of Air Quality Planning and Standards at (919) 541-3604 or wood.anna@epa.gov.

Sincerely,

William L. Wehrum
Assistant Administrator

cc: Alexander Dominguez
David Harlow
John Filippelli
Bill Harnett
Peter D. Lopez
Peter Tsirigotis
Anna Marie Wood

8