**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

---

PORT HAMILTON REFINING AND
TRANSPORTATION, LLLP,

*Petitioner*,

*v.*

No. 23-1094

U.S. ENVIRONMENTAL
PROTECTION AGENCY,

*Respondent.*

---

**MOTION FOR LEAVE TO INTERVENE OF LIMETREE BAY
TERMINALS, LLC D/B/A OCEAN POINT TERMINALS**

Pursuant to Federal Rules of Appellate Procedure 15(d) and 27, Limetree Bay Terminals, LLC ("LBT"), doing business as Ocean Point Terminals ("OPT"), respectfully moves to intervene as a respondent in the above-captioned case. OPT has consulted with counsel for Port Hamilton Refining and Transportation, LLLP ("PHRT" or "Petitioner") and Respondent United States Environmental Protection Agency ("EPA"). Counsel advised that EPA does not oppose OPT's intervention and Petitioner opposes OPT's intervention.

OPT has an interest in ensuring that the Petitioner's refinery (the "Refinery") restarts and operates, and does so in a safe manner with appropriate air emissions

controls in place.  OPT previously owned the Refinery and now operates an adjacent petroleum storage business (the "Terminal").  For historic reasons that pre-date Petitioner's ownership, OPT is party to an air permit, consent decree, emergency order, and joint stipulation governing operations of the Refinery.  Yet OPT is presently without the legal authority to control Refinery operations.  So long as these documents govern the Refinery, OPT therefore has a direct interest in the aligning the environmental control and performance requirements at Petitioner's Refinery, especially those imposed by Clean Air Act permitting.  That interest cannot be adequately represented by either party.  OPT also has an interest in ensuring that the Court's decision is based on an accurate understanding of the history and present operations of the Refinery and OPT's neighboring facility.  OPT therefore respectfully requests that the Court allow it to intervene on behalf of Respondent EPA, and proposes to file its brief on the same day that EPA's brief is due (April 12, 2023) so as to not interfere with the expedited briefing schedule.

In support of this motion, OPT states the following:

## I.    INTRODUCTION

1.    Petitioner seeks review of EPA's determination that it must obtain a Clean Air Act Prevention of Significant Deterioration ("PSD") permit before restarting the Refinery.

2.    Due to the prior historic connection between the Refinery and OPT's Terminal, OPT holds a separate Clean Air Act permit (the "Title V Permit") that applies to OPT's own operations at the Terminal, as well as to some of the Refinery's assets.  OPT and Petitioner also jointly own certain assets that provided services to both the Refinery and Terminal.  *See* Ex. A, Mark Chavez Decl. ¶¶ 2, 18, Ex. 1 (Title V Permit).

3.    The Refinery and Terminal were originally owned and operated as a single facility by HOVENSA L.L.C. ("HOVENSA").  In 2011, HOVENSA entered into a consent decree to resolve alleged violations of the Clean Air Act.  *See* Ex. A, Chavez Decl. ¶¶ 3-4, Ex. 2 (Consent Decree).[1]  HOVENSA later idled the Refinery and Terminal.

4.    HOVENSA filed for bankruptcy in 2015 and the bankruptcy court approved the sale of certain Refinery and Terminal assets to LBT (now known as OPT).  *See* Ex. A, Chavez Decl. ¶¶ 5, 7, Ex. 3 (Bill of Sale) & Ex. 4 (First Modification) at 1; *see also In re HOVENSA L.L.C.*, No. 1:15-bk-10003 (D.V.I. Dec. 1, 2015), ECF No. 394 (order approving sale).  In connection with the sale, LBT agreed to assume HOVENSA's liabilities under the Consent Decree and become a

---

[1] *United States & U.S. Virgin Islands v. HOVENSA L.L.C.*, No. 1:11-cv-00006 (D.V.I. Apr. 19, 2011), ECF No. 5-1 (the "Consent Decree").

party to the Consent Decree, subject to exceptions.  *See* Ex. 4, First Modification at 1-5.

5.      In 2016 the U.S. Virgin Island Department of Planning and Natural Resources ("VIDPNR"), which has delegated authority to issue Title V permits, approved the transfer of HOVENSA's Title V permit for the Refinery and Terminal (the "Title V Permit") to LBT.  *See* Ex. 1 at 3-4.

6.      Under the Clean Air Act, all "permittees" can be held responsible for complying with the terms of the permit, and the Title V Permit specifies that "[a]ny permit noncompliance constitutes a violation of the Federal Clean Air Act and the Virgin Islands Rules and Regulations and is grounds for enforcement action; for permit termination revocation and reissuance, or modification; or for denial of a permit renewal application."  Ex.1 ¶ 8.3.1 (citing VIRR 12-09-206-71(a)(7)(A)).

7.      In 2018, LBT transferred some of HOVENSA's refining assets that are subject to the Consent Decree to a separate but related entity, Limetree Bay Refining, LLC ("LBR").  *See* Chavez Decl. ¶ 5; Ex. 3; Ex. 4 at 5.

8.      LBT and LBR operated their separate, adjacent facilities under the Title V Permit.  *See* Chavez Decl. ¶ 6.

9.      In 2021, the United States District Court for the District of the Virgin Islands entered the First Modification of the Consent Decree under which both LBR and LBT became subject to the Consent Decree.  *See* Ex. 4.[2]

10.     In February 2021, the Refinery restarted operations under LBR's ownership.  *See* Ex. A, Chavez Decl., Ex. 5 (Emergency Order) ¶ 31.[3]

11.     In May 2021, EPA issued an emergency shutdown order ("Emergency Order") for the Refinery under Section 303 of the Clean Air Act jointly to LBR and LBT.  Ex. 5 at 1.  This Emergency Order alleged that "[s]ince February 1, 2021, at least four incidents have occurred at the Facility that have each had an immediate and significant health impact on multiple downwind communities."  *Id.* ¶ 33.

12.     The Emergency Order explicitly noted that the Refinery's "Title V operating permit . . . is currently issued to" LBT and "covers the Facility's Refinery Operations."  *Id.* ¶ 8.

13.     The Emergency Order frequently refers to LBT and LBR collectively as "Limetree."  *See, e.g.*, *id.* at 1.

14.     The Emergency Order directs that LBT "shall ensure all Refinery Operations cease until the termination of this Order."  *Id.* ¶ 115.

---

[2] *United States & United States Virgin Islands v. HOVENSA L.L.C.*, No. 1:11-cv-00006 (D.V.I. Dec. 30, 2021), ECF No. 42.
[3] *United States v. Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC*, No. 1:21-cv-00264 (D.V.I. July 12, 2021), ECF No. 2-1.

15.    The Emergency Order specifies that "[n]o change in the ownership of the facility affected by this Order or the ownership or corporate status of Respondents shall in any way alter, diminish, or otherwise affect the responsibilities of Respondents under this Order." *Id.* ¶ 3.

16.    On July 12, 2021, the United States filed suit against LBR and LBT to enforce the Emergency Order. *United States v. Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC*, No. 1:21-cv-00264 (D.V.I. July 12, 2021), ECF No. 1. Simultaneously with the filing of that complaint, the United States filed a Joint Stipulation signed by LBT and LBR setting conditions on restarting the Refinery. Ex. A, Chavez Decl., Ex. 6 (Joint Stipulation).[4]

17.    In July 2021, LBR filed for bankruptcy. *In re Limetree Bay Services, LLC et al.*, No. 21-32351 (Bankr. S.D. Tex.).

18.    In January 2022, substantially all of LBR's assets, including Refinery assets subject to the Consent Decree, Emergency Order, Joint Stipulation, and covered by the Title V Permit, were sold in a bankruptcy auction to an unrelated entity and the Petitioner in this case, PHRT. Ex. A, Chavez Decl., Ex. 7 (Sale Order).[5]

---

[4] *United States v. Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC*, No. 1:21-cv-00264 (D.V.I. July 12, 2021), ECF No. 2.
[5] *In re Limetree Bay Services, LLC et al.*, No. 21-32351 (Bankr. S.D. Tex. Dec. 21, 2021), ECF No. 977.

19.    Effective August 8, 2022, LBT adopted the trade name Ocean Point Terminals ("OPT").  Chavez Decl. ¶ 13.

20.    The Refinery remains shut down following the issuance of the Emergency Order, and PHRT wishes to restart operations at the Refinery.  *See* Petitioner's Motion to Expedite Appeal ¶ 7 (Jan. 27, 2023), ECF No. 9-1.

21.    In November 2022, EPA wrote a letter explaining that Petitioner "is required to apply for and receive a final and effective" PSD permit "prior to restarting the Refinery or beginning actual construction."  Letter from Joseph Goffman, Principal Deputy Assistant Adm'r, Off. Of Air & Radiation, EPA, to Julie R. Domike and Thomas V. Eagan (Nov. 16, 2022), at 1 (the "Letter").[6]  That Letter is the subject of PHRT's petition.

22.    A PSD permit is a separate Clean Air Act permit issued by EPA.  A PSD permit is required when constructing or modifying a major stationary air source.  As part of the permitting process, EPA must determine that the permitted operations are using the best available controls and will not cause or contribute to unacceptable air pollution, and imposes detailed limits and monitoring conditions to ensure that the facility is operated as represented.  42 U.S.C. § 7475.  Once issued, its conditions also become ongoing obligations under a Title V operating permit.

---

[6] Petition for Review, Ex. A (Jan. 13, 2023) ECF No. 1-3.

*See* 40 C.F.R. § 70.2; *see also Nucor Steel-Ark. V. Pruitt*, 246 F. Supp. 3d 288, 295-96 (D.D.C. 2017) (summarizing the PSD and Title V permit programs).

23.　　The Letter provides an analysis of EPA's decision, which includes a lengthy discussion of the operations of the Refinery during the time (prior to PHRT's ownership) when the Refinery was owned by OPT and subsequently owned and operated by LBR. ECF No. 1-3 at 10-13. The Letter improperly does not distinguish between OPT and LBR and instead refers to them collectively as "Limetree." *Id.* at 10 n.6.

24.　　The Letter references EPA's prior determination that "Limetree" could restart the Refinery without a PSD permit under the same Reactivation Policy that EPA applied to Petitioner in the Letter.

25.　　On January 13, 2023, PHRT filed a petition for review of the Letter in this Court.

26.　　OPT agrees that PHRT must hold all necessary air permits before PHRT restarts the Refinery.

## II.　ARGUMENT

1.　　The Title V Permit, Consent Decree, Emergency Order, and Joint Stipulation all impose requirements on the Refinery's operations and air emissions. *See* Exs. 1, 2, 4, 5, 6. As the Title V Permit permittee and a party to the Consent Decree, Emergency Order, and Joint Stipulation, OPT has an interest in ensuring

Petitioner's operations are subject to appropriate air emission controls.  In addition, OPT's business interests are connected to the safe and durable restart and operation of the Refinery, which is immediately adjacent to the Terminal and has historically been the Terminal's biggest customer.  *See* Chavez Decl. ¶ 18.  As part of the PSD permitting process, EPA must determine that the Refinery is using the best available air pollution controls and will not cause or contribute to unacceptable air pollution, and EPA will impose detailed limits and monitoring conditions to ensure that the Refinery is operated as represented.  *See* 42 U.S.C. § 7475.  So long as the Consent Decree, Emergency Order, and Joint Stipulation exist in their current form, OPT has an interest in Petitioner's obligations aligning with these documents.  OPT therefore has a direct interest in the outcome of this case.  Because the Letter discusses historic operations of the Refinery, OPT also has an interest in ensuring this Court's decision is based on an accurate understanding of past and present operations at the Terminal and neighboring Refinery.

2.    OPT's direct and substantial interests in this case cannot be adequately represented by either party.  Petitioner's interest diverges from OPT's because PHRT is interested in the expedited restart of the Refinery without further permitting or controls on its air emissions.  EPA's interest diverges from OPT's because EPA is sitting in the role of regulator and would be adverse to OPT should it seek to

enforce the provisions in the Consent Decree, Emergency Order, and Joint Stipulation against OPT.

## Standing

3.     Because OPT is moving "to intervene as defendants and seek the same relief as the federal government," it "need not demonstrate Article III standing." *Commonwealth of Pennsylvania v. President United States of Am.*, 888 F.3d 52, 57 (3d Cir. 2018); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, n.6 (2020).

4.     Even if OPT was required to show Article III standing to intervene, OPT satisfies each of the three elements: (1) injury-in-fact, (2) causation, and (3) redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

5.     The "injury-in-fact element is not Mount Everest. The contours of the requirement, while not precisely defined, are very generous, requiring only that claimant allege some specific, identifiable trifle of injury." *Long v. Se. Pa. Transp. Auth.*, 903 F.3d 312, 322 (3d Cir. 2018) (original alteration omitted) (citation omitted).  Petitioner's requested relief threatens OPT with at least three separate "concrete and particular[]" and "actual or imminent" injuries sufficient for Article III standing, *Lujan*, 504 U.S. at 560: (1) increased legal exposure from Refinery operations, (2) increased risk to OPT's business and reputation, and (3) increased costs associated with the Refinery's air emissions.

6.    The first injury stems from the very unusual circumstances of the intertwined prior operating history of the Refinery and Terminal operations, and distinguishes this case from many where a third party seeks to intervene. Specifically, OPT is party to the Consent Decree, Joint Stipulation, Emergency Order, and Title V Permit, which collectively impose a number of requirements on operations and air emissions, both prior to and after the restart of the Refinery.  Exs. 1, 2, 4, 5, 6.  Indeed, many of the obligations under the Joint Stipulation are triggered *by* the restart of the Refinery.  *See, e.g.*, Ex. 6, Joint Stipulation ¶¶ 4-9.

7.    If Petitioner were to obtain relief from this Court that allowed it to restart the Refinery without any similar limitations or requirements on Petitioner imposed by a PSD permit, OPT—rightly or wrongly—faces increased legal risk for Petitioner's actions or inactions, even though OPT does not have operational control over the Refinery.  *See* 42 U.S.C. § 7413(b); *Wheelabrator Balt., L.P. v. Mayor & City Council*, 449 F. Supp. 3d 549, 557 (D. Md. 2020) ("Noncompliance with a Title V permit constitutes a violation of the CAA . . . and may subject the permit holder to an enforcement action, permit revocation or revision, or denial of an application for permit renewal."); *see also* Ex. 1, Title V Permit ¶ 8.3.1 (citing VIRR 12-09-206-71(a)(7)(A)).  The Clean Air Act includes significant financial penalties and injunctive relief for violations, and OPT could also face legal expenses, reputational damage, and operational difficulties—all of which constitute injuries-in-fact for

purposes of Article III. *See Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1300 (3d Cir. 1996); *Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 163 (3d Cir. 2017) ("[W]here a plaintiff alleges financial harm, standing 'is often assumed without discussion.'" (citation omitted)). The Consent Decree also contains stipulated penalties for non-compliance. *See* Ex. 2, Consent Decree ¶¶ 149-78; Ex. 4, First Modification ¶¶ 33, 41, 46, 47.

8.     Given that OPT is presently a defendant in a pending Clean Air Act enforcement action regarding the last time the Refinery was restarted—as a result of its status as Title V permittee—this harm is imminent and concrete. *See* Chavez Decl. ¶ 10; *Pennsylvania*, 930 F.3d at 562 ("Plaintiffs need not 'demonstrate that it is literally certain that the harms they identify will come about.' Instead, '[a]n allegation of future injury may suffice if . . . there is a substantial risk that the harm will occur.'") (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) and *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

9.     This harm will be lessened if the Court denies Petitioner's petition. The PSD permitting process allows EPA to impose appropriate limitations on Petitioner's operations, and take into account the existing obligations under the Consent Decree and Joint Stipulation, as well as the history of Refinery operations, when determining appropriate controls on Petitioner's operations and emissions at the Refinery. *See Pennsylvania*, 930 F.3d at 564-65 (recognizing standing where

"[t]hat risk would be reduced to some extent if petitioners received the relief they seek" (quoting *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007))). For example, the Consent Decree, as modified, includes provisions clearly intended to apply to Refinery operations and provisions to incorporate those requirements into air permits. Ex. 4, First Modification ¶ 30. OPT could also participate in the permitting process to help ensure appropriate air emission controls. *See* 42 U.S.C. § 7475(a)(2). OPT therefore has a significant interest in whether this Court upholds EPA's determination that Petitioner must undergo the PSD permitting process before restarting the Refinery, as that action can redress its injury—or, prevent that injury from occurring in the first place by aligning PHRT's permit obligations with those included in the Consent Decree and Joint Stipulation. *See Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002) (quoting *Lujan*, 504 U.S. at 561-62).

10.    As to the second injury, OPT's operations and reputation are tied to the operations of the Refinery due to the historic connection between the two facilities that predate PHRT's ownership and the fact that the facilities are adjacent to one another. *See* Chavez Decl. ¶¶ 15-18. "As a matter of law, reputational harm is a cognizable injury in fact." *NCAA v. Governor of New Jersey*, 730 F.3d 208, 220 (3d Cir. 2013), *abrogated on other grounds by Murphy v. NCAA*, 138 S. Ct. 1461 (2018). PHRT's Refinery and OPT's Terminal were originally operated for many years as a single facility with a single set of permits by HOVENSA. The two facilities

continued to share common ownership until the Refinery was sold to LBR. Despite rebranding and a division of ownership, the operations of the Refinery have been associated with OPT. *See* Chavez Decl. ¶¶ 3, 15-16. Indeed, the Letter at issue here does not distinguish between OPT and prior Refinery owner LBR and instead improperly refers to them collectively as "Limetree." ECF No. 1-3 at 10 n.6. Any future air emissions incidents at the Refinery will therefore risk reputational harm to OPT despite the fact that it does not own or operate the Refinery.

11.    In addition, the Refinery has historically been the biggest customer of OPT's terminal business, and the two adjacent facilities share jointly owned assets that have provided services for both facilities. *See* Chavez Decl. ¶ 18. OPT's business interests will be injured by any future air compliance issues at the Refinery, including any additional problems with a future restart. *See Am. Farm Bureau Fed'n v. U.S. EPA*, 792 F.3d 281, 293 (3d Cir. 2015) ("[P]alpable economic injuries have long been recognized as sufficient to lay the basis for standing . . ." (citing *Sierra Club v. Morton*, 405 U.S. 727, 733-34 (1972))).

12.    Given that the prior restart of the Refinery resulted in EPA issuing the Emergency Order, this is a very real and imminent concern, particularly as Petitioner has indicated that it desires to restart the Refinery this year. ECF No. 9-1 ¶ 7. OPT therefore has an interest in ensuring that the Refinery restarts and operates in a safe

manner and is not forced to once again shut down. *See Pennsylvania*, 930 F.3d at 564-65.

13.    The third injury is the most concrete and straightforward:  PSD permits place limits on air emissions.  Excess air emissions from a neighboring facility will make it more difficult to retain employees, potentially harm OPT's employees, and increase medical costs and insurance rates for OPT.  *See* Chavez Decl. ¶ 20; *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 90 (4th Cir. 2013) (alleging increased costs of providing health coverage).  This injury will be directly caused by the additional emissions from the Refinery, and would be redressed by this Court's decision that PHRT must apply for a PSD permit limiting the Refinery's emissions.  In addition, any future incidents at the Refinery, similar to those alleged in the Emergency Order, could increase OPT's insurance costs and pose health risks to its employees.  *See* Chavez Decl. ¶ 20.  *See also Pennsylvania*, 930 F.3d at 564 (recognizing fiscal injury as a result of increased medical services costs).

14.    Petitioner's additional air emissions could also make it more challenging for OPT to receive PSD permits for its own operations in the future.  *See Nucor Steel-Ark.*, 246 F. Supp. 3d at 296, 303 ("[C]onsumption of the PSD increment is a concrete and particularized harm that qualifies as an injury" because "once the baseline concentration of a given pollutant has been set in a particular region, any facility constructed thereafter that increases the ambient concentration

of that pollutant 'consumes' a portion of the PSD increment, leaving less of the increment available for subsequent new facilities in the region to use."). OPT is in the process of reviewing its air permits, as required by regulators. *See* Chavez Decl. ¶ 22. The facility is currently making changes to its on-site power generation and could be seeking new or additional air permits related to these changes. *Id.* ¶ 23. *See also* ECF No. 1-3 at 13-14 (noting uncertainties about whether Refinery would cause or contribute to violations of PDS increments).

15.    Moreover, excess air emissions are the "very injury" the Clean Air Act "intended to prevent." *See Long*, 903 F.3d at 323 ("[w]hen one sues under a statute alleging 'the very injury the statute is intended to prevent,' and the injury 'has a close relationship to a harm traditionally providing a basis for a lawsuit in English or American courts,' a concrete injury has been pleaded." (alteration in original) (citation omitted)).

16.    To the extent it is required to demonstrate standing, OPT has therefore met its burden.

### Intervention as of Right

17.    A motion to intervene "must be filed within 30 days after the petition for review is filed and must contain a concise statement of the interest of the moving party and the grounds for intervention." Fed. R. App. P. 15(d).

18.    Because Rule 15(d) does not provide standards governing intervention, "appellate courts have turned to the rules governing intervention in the district courts under [Federal Rule of Civil Procedure] 24." *Sierra Club, Inc. v. EPA*, 358 F.3d 516, 517-18 (7th Cir. 2004); *see Bldg. & Constr. Trades Dep't v. Reich*, 40 F.3d 1275, 1282 (D.C. Cir. 1994).  Under Rule 24, a motion to intervene as of right turns whether:

> (1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected or impaired, as a practical matter by the disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation.

*In re Cmty. Bank of N. Va.*, 418 F.3d 277, 314 (3d Cir. 2005) (quoting *Harris v. Pernsley*, 820 F.2d 592, 596 (3d Cir. 1987)); *see also Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 969 (3d Cir. 1998).  The "polestar for evaluating a claim for intervention is always whether the proposed intervenor's interest is direct or remote." *Kleissler*, 157 F.3d at 972.

19.    This motion is timely because it has been filed within 30 days of the filing of the petition for review.  *See* Fed. R. App. P. 15(d).

20.    The same concrete and cognizable interests that establish standing, discussed above, also satisfy the second and third factors of the intervention test. *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1076 (D.C. Cir. 1998) (satisfying constitutional standing requirements demonstrates a legally protected interest for

purposes of Rule 24(a)).  OPT has a direct and substantial interest in this case as the Title V Permittee, party to the Consent Decree, Emergency Order, and Joint Stipulation, and a business whose operations would be directly impacted by air emissions or an emissions incident at the Refinery.  *See supra* II (Standing); *see also* Decl. ¶¶ 14-24.  OPT therefore has a direct, immediate, and substantial interest in this case that may be impaired by its disposition.

21.    This Court previously allowed lumber companies to intervene in a case in which environmental plaintiffs challenged an agency action permitting substantial tree cutting to occur.  *Kleissler*, 157 F.3d at 973.  Like the intervenors in *Kleissler*, OPT has an economic and reputational stake in this litigation.  As previously explained, OPT could incur additional operational costs or experience reputational harms if Petitioner restarts the Refinery without adhering to appropriate limits on its operations and air emissions.  There is a very real possibility that the decision in this case could result in additional enforcement actions to which OPT is made a defendant purely by virtue of its status as Title V Permittee (as shown by the Emergency Order itself) or party to the Consent Decree, Emergency Order, or Joint Stipulation.  Such actions would have a direct effect on the profitability of OPT.  So long as the Title V Permit, Consent Decree, Emergency Order, or Joint Stipulation exist in their current state, OPT therefore has an interest in the outcome of this case.

22.    In addition to the three harms traceable to Petitioner's requested relief, it is worth noting that OPT faces a real and concrete risk to its economic and reputational interests from the Court's decision itself.  The Letter at issue here includes a lengthy discussion of the operations of the Refinery during the time when it was owned by OPT and subsequently owned and operated by LBR, improperly fails to distinguish between OPT and LBR, and instead refers to them collectively as "Limetree."  ECF No. 1-3 at 10-13 & n.6.  As a result, there is a very real possibility that without OPT's involvement, the Court's decision could misconstrue OPT's past actions, call into question the legality of the prior restart of the Refinery under the same policy that underlies Petitioner's challenge here, or otherwise inadvertently impact OPT's business.

23.    With respect to the fourth factor, OPT's interest is not adequately represented by existing parties.  Petitioner's interests are clearly not aligned with OPT's, as Petitioner is interested in restarting the Refinery without seeking a PSD permit or being subject to related limits on its air emissions or other restrictions on its operations.

24.    Nor can EPA adequately represent OPT's interests.  "[W]hen an agency's views are necessarily colored by its view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it, the burden" of demonstrating this factor "is comparatively light."  *Kleissler*, 157

F.3d at 972.  An "intervenor need only show that representation may be inadequate, not that it is inadequate."  *Id.* (quoting *Conservation Law Found. of New England, Inc. v. Mosbacher*, 966 F.2d 39, 44 (1st Cir. 1992)).  This Court has previously allowed third party permit holders to intervene in a similar case in which plaintiffs challenged the U.S. Army Corps of Engineers' decision to issue permits for intervenor's project.  *See, e.g.*, Order Granting Motion to Intervene, *Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs*, No. 17-1533 (3d Cir. Mar. 16, 2017), ECF No. 003112565510.

25.    Other circuits have likewise recognized that a government agency charged with serving the public interest cannot adequately represent narrower interests of private companies.  *See Dimond v. District of Columbia*, 792 F.2d 179, 192-93 (D.C. Cir. 1986); *Crossroads Grassroots Pol'y Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 321 (D.C. Cir. 2015) ("[W]e look skeptically on government entities serving as adequate advocates for private parties."); *Nat'l Farm Lines v. ICC*, 564 F.2d 381, 384 (10th Cir. 1977) ("[T]he governmental agency is seeking to protect not only the interest of the public but also the private interest of the petitioners in intervention, a task which is on its face impossible."); *Driftless Area Land Conservancy v. Huebsch*, 969 F.3d 742, 748-49 (7th Cir. 2020) (for purposes of intervention, private "companies cannot be forced to rely entirely on their regulators to protect their investment" (emphasis omitted)).

26.    OPT's interests are distinct from EPA's regulatory interests.  EPA's overarching interests are in the proper administration and implementation of the agency's Reactivation Policy and of the Clean Air Act.  *E.g.*, *Nat'l Parks Conservation Ass'n v. U.S. EPA*, 759 F.3d 969, 977 (8th Cir. 2014); *cf. United States v. Union Elec. Co.*, 64 F.3d 1152, 1170 (8th Cir. 1995).  Unlike OPT, EPA will not face financial hardship or regulatory liability related to the operations of the Refinery.  *See* Chavez Decl. ¶¶ 19-24.  Indeed, the very existence of a pending Clean Air Act enforcement action to which OPT is a defendant and the Refinery is the subject confirms that OPT's interests cannot be adequately represented by EPA.  *See also Kleissler*, 157 F.3d at 973-74.  If OPT is not allowed to intervene in this case, it will have no other means of representing its interests including to correct any misstatements regarding past or present operations.

27.    OPT's participation will also be helpful to the Court.  OPT is in a better position than either party to discuss the details of the past and present operations of the Refinery and the complex history regarding the Refinery, its owners, and their respective legal obligations.  Given that these historic operations are discussed at length in the Letter at issue here, they may become directly relevant to the Court's determination.  As this Court has previously noted, the

> early presence of intervenors may serve to prevent errors from creeping into the proceedings, clarify some issues, and perhaps contribute to an amicable settlement. Postponing intervention in the name of efficiency until after the original parties have forged an agreement or have

litigated some issues may, in fact, encourage collateral attack and foster inefficiency. In other words, the game may already be lost by the time the intervenors get to bat in the late innings.

*Kleissler*, 157 F.3d at 974.

OPT will endeavor to coordinate with EPA to avoid duplicative briefing and to ensure that its participation will be of assistance to the Court. OPT proposes to file its intervention brief on the same day that EPA's brief is due (April 12, 2023) so as to not interfere with the expedited briefing schedule.

## III.    CONCLUSION

For the reasons set forth above, this Court should grant OPT leave to intervene as a respondent in this case.


Date: February 10, 2023                        Respectfully submitted,

                                                               */s/ Corinne Snow*

                                                               Corinne Snow
                                                                    *Counsel of Record*
                                                                    New York Bar No. 5364633
                                                               VINSON & ELKINS LLP
                                                               1114 Avenue of the Americas
                                                               32nd Floor
                                                               New York, NY 10036
                                                               Phone: (212) 237-0157
                                                               Email: csnow@velaw.com

*Counsel for Movant Limetree Bay Terminals, LLC d/b/a Ocean Point Terminals*

## CERTIFICATE OF COMPLIANCE

1.      This motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2) because it contains 4960 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and 27(d)(2).

2.      This motion complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.


February 10, 2023            *s/ Corinne Snow*
                            Corinne Snow
                                *Counsel of Record*
                                New York Bar No. 5364633
                            VINSON & ELKINS LLP
                            1114 Avenue of the Americas
                            32nd Floor
                            New York, NY 10036
                            Phone: (212) 237-0157
                            Email: csnow@velaw.com

                            *Counsel for Movant Limetree Bay*
                            *Terminals, LLC d/b/a Ocean Point Terminals*

## **CERTIFICATE OF ADMISSION TO THE BAR**

I certify that Corinne V. Snow, Counsel of Record for Movant-Intervenor

Limetree Bay Terminals, LLC d/b/a Ocean Point Terminals, is a member in good

standing of the bar of the United States Court of Appeals for the Third Circuit.

February 10, 2023              *s/ Corinne Snow*
                              Corinne Snow
                                 *Counsel of Record*
                                 New York Bar No. 5364633
                              VINSON & ELKINS LLP
                              1114 Avenue of the Americas
                              32nd Floor
                              New York, NY 10036
                              Phone: (212) 237-0157
                              Email: csnow@velaw.com

                              *Counsel for Movant Limetree Bay*
                              *Terminals, LLC d/b/a Ocean Point Terminals*

## <u>LOCAL RULE 27.3 CERTIFICATE</u>

Pursuant to Local Rule 27.3, I certify that I contacted counsel for Petitioner and Respondent to ascertain their positions on the relief requested in this motion. Counsel advised that the Respondent does not oppose this motion and that the Petitioner opposes the relief requested in this motion.

February 10, 2023

*s/ Corinne Snow*
Corinne Snow
    *Counsel of Record*
    New York Bar No. 5364633
VINSON & ELKINS LLP
1114 Avenue of the Americas
32nd Floor
New York, NY 10036
Phone: (212) 237-0157
Email: csnow@velaw.com

*Counsel for Movant Limetree Bay*
*Terminals, LLC d/b/a Ocean Point Terminals*

## **CERTIFICATE OF SERVICE**

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that on February 10, 2023, I electronically filed the foregoing *Motion for Leave to Intervene of Limetree Bay Terminals, LLC d/b/a Ocean Point Terminals*, together with its exhibits and a Corporate Disclosure Statement, with the Clerk of the Court for the U.S. Court of Appeals for the Third Circuit by using the appellate CM/ECF system, and served copies of the foregoing via the Court's CM/ECF system on all ECF-registered counsel.

February 10, 2023

*s/ Corinne Snow*
Corinne Snow
   *Counsel of Record*
   New York Bar No. 5364633
VINSON & ELKINS LLP
1114 Avenue of the Americas
32nd Floor
New York, NY 10036
Phone: (212) 237-0157
Email: csnow@velaw.com

*Counsel for Movant Limetree Bay Terminals, LLC d/b/a Ocean Point Terminals*