## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

| | | |
|---|---|---|
| PORT HAMILTON REFINING AND TRANSPORTATION, LLLP, | ) ) ) | |
| *Petitioner,* | ) ) | |
| v. | ) ) | Case No. 23-1094 |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | ) ) ) | |
| *Respondent.* | ) | |

## MOTION OF THE ST. CROIX ENVIRONMENTAL ASSOCIATION, SIERRA CLUB AND CENTER FOR BIOLOGICAL DIVERSITY TO INTERVENE AS RESPONDENT

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for the three non-profit organizations seeking to intervene in this case, St. Croix Environmental Association, Sierra Club, and Center for Biological Diversity, states none of these organizations are owned by a parent corporation and that no publicly held corporation owns 10% or more of the stock of any of these organizations.

February 13, 2023

Respectfully submitted,

s/Michael Ray Harris
Michael Ray Harris
Associate Professor of Law
Environmental Justice Clinic
Vermont Law & Graduate School
PO Box 96, 164 Chelsea Street
South Royalton, VT 05068
(802) 831-1364 (main)
(802) 831-1631 (fax)
mrharris@vermontlaw.edu
*Counsel for Movant-Respondent-Intervenors St. Croix Environmental Association, Sierra Club, and Center for Biological Diversity*

## STATEMENT OF RELATED CASES

This case has not been heard before this Court previously. St. Croix Environmental Association, Sierra Club, and Center for Biological Diversity are not aware of any proceedings that are or may be related to this case.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................... i

STATEMENT OF RELATED CASES .......................................................................... ii

TABLE OF CONTENTS ........................................................................................... iii

TABLE OF AUTHORITIES ...................................................................................... iv

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 3

    A.  The Clean Air Act .......................................................................................... 3

    B.  The Refinery .................................................................................................. 5

    C.  The Community .............................................................................................. 8

    D.  The 2020 Restart ............................................................................................ 8

    E.  The Movants ................................................................................................... 9

ARGUMENT ........................................................................................................... 11

    A.  Standard for Intervention in Petition for Review Proceedings ................ 11

    B.  Movants meet the standard for intervention even under Rule 24 ........... 12

CONCLUSION ........................................................................................................ 17

CERTIFICATE OF COMPLIANCE .......................................................................... 19

CERTIFICATE OF THIRD CIRCUIT BAR MEMBERSHIP ...................................... 20

CERTIFICATE OF SERVICE ................................................................................... 21

# TABLE OF AUTHORITIES

## Cases

*American Farm Bureau Federation v. U.S. EPA* ................................................... 13, 17

*California Dump Truck Owners Association v. Nichols* ......................................... 13

*Chemours Co. v. Administrator, U.S. EPA* ............................................................ 13

*Dimond v. District of Columbia* ........................................................................... 16

*Donaldson v. United States* ................................................................................. 13

*Fund for Animals Inc. v. Norton* .......................................................................... 16

*Int'l Union, United Auto Aerospace & Agr. Implement Workers of Am. AFL-CIO, Local 283 v. Scofield* ......................................................................................... 12

*Kleissler v. U.S. Forest Serv* ........................................................... 12, 13, 16, 17

*Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.* ...................... 15

*Pennsylvania. v. President* ............................................................................. 12, 15

*San Juan County v. United States* ......................................................................... 13

*Sierra Club, Inc. v. EPA* ....................................................................................... 12

*Syngenta Seeds, Inc. v. Cnty. of Kauai* ................................................................. 13

*Texas v. U.S. Dep't of Energy* ............................................................................... 12

*Trbovich v. United Mine Workers* .................................................................... 15, 16

*Utah Ass'n of Counties v. Clinton* ........................................................................ 16

*WildEarth Guardians v. Nat'l Park Serv* ............................................................. 13

## Statutes

42 U.S.C. §§ 7470 et seq. ............................................................................................ 3

42 U.S.C. § 7473 ............................................................................................................ 4

42 U.S.C. §§ 7475 ...................................................................................................... 1, 3

42 U.S.C. § 7475(a)(3) .................................................................................................. 4

42 U.S.C. § 7475(a)(4) .................................................................................................. 4

42 U.S.C. § 7479(l) ........................................................................................................ 4

42 U.S.C. § 7479(1) ........................................................................................................ 4

42 U.S.C. §§ 7503 .......................................................................................................... 3

42 U.S.C. § 7607(b)(1) .................................................................................................. 2

## Regulations

40 C.F.R §§ 51.165 ........................................................................................................ 3

40 C.F.R §§ 51.166 ........................................................................................................ 3

40 C.F.R. § 51.166(w)(1)(i)-(ii) .................................................................................... 4

40 C.F.R §§ 52.21 .......................................................................................................... 3

40 C.F.R. § 52.21(b)(1)(i)(a) ........................................................................................ 4

40 C.F.R. § 52.21(m)(3) ................................................................................................ 4

40 C.F.R. § 52.21(aa)(6)(iii) ......................................................................................... 4

40 C.F.R §§ 52.24 .......................................................................................................... 3

# Federal Register Notices

67 Fed. Reg. 80,186 ............................................................................................. 4

67 Fed. Reg. at 80,285 ...................................................................................... 4

# Rules

Fed R. App. P. 15(d) ......................................................................................... 11

Fed. R. Civ. P. 24(a)(2) ............................................................................. 12, 15

Pursuant to Rules 15(d) and 27 of the Federal Rules of Appellate Procedure and 3d Cir. L.A.R. 27.0 (2011), the St. Croix Environmental Association, Sierra Club, and Center for Biological Diversity (collectively, "Environmental Movants" or "Movants") hereby move for leave to intervene as Respondents in the above-captioned case. This Motion is supported by the arguments below, as well as the Declaration of Jennifer Valiulis (Valiulis Decl.), the Declaration of Jane Williams (Williams Decl.), the Declaration of Miyoko Sakashita (Sakashita Decl.), the Declaration of Beecher Cotton (Cotton Decl.), and the Declaration of Ariela Hayes (Hayes Decl.).

Counsel for Environmental Movants contacted counsel for Petitioner Port Hamilton Refining and Transportation LLLP (PHRT), and Respondent United States Environmental Protection Agency (EPA), regarding their clients' positions on this motion. Counsel for Petitioner advised that PHRT "opposes your proposed intervention, but [would] consent to an amicus brief filed by the St. Croix Environmental Association, the Sierra Club and the Center for Biological Diversity." Counsel for Respondent advised that the "United States does not oppose the relief requested in a motion seeking to intervene in this matter."

## INTRODUCTION

On November 16, 2022, EPA provided a determination regarding the applicability of the federal Clean Air Act's (CAA) Prevention of Significant Deterioration (PSD) Program, 42 U.S.C. § 7475, to PHRT's oil refinery located at 1 Estate Hope in Christiansted, St. Croix, U.S. Virgin Islands (the "Refinery"). *See* Petition for Review at Ex. A, *Port Hamilton Refining & Trans. v. EPA*, No. 23-

1094 (3d Cir. Jan. 13, 2023) (hereinafter, "PSD Determination").[1] In that determination, EPA concluded that PHRT's proposed restart of the Refinery qualifies as construction of a new major stationary source under applicable PSD permitting regulations and EPA's longstanding Reactivation Policy. PSD Determination at A1, 22-3. Based on its analysis of the history of the Refinery, and an analysis of the Refinery's increase in air pollution emissions, EPA concluded that PHRT must apply for and obtain a final PSD permit before restarting the Refinery or beginning actual construction. *Id.*

On January 13, 2023, PHRT filed a Petition for Review of EPA's determination under the CAA applicable judicial review provisions, 42 U.S.C. § 7607(b)(1). Environmental Movants now seek to intervene because their members have a substantial interest in the operation of, and the applicability of the CAA to, the Refinery on St. Croix. Specifically, members reside on the island and have experienced significant impacts from the Refinery's past non-compliance with the CAA, particularly in the aftermath of the most recent attempt to restart the facility in 2020-21. The Refinery has spewed pollution—specifically droplets of oil and noxious fumes—directly into nearby neighborhoods, creating public health and property harms to Movants' members and their families in the areas on St. Croix where they reside, attend school, work, and recreate. Movants' interests will undeniably continue to be adversely affected if the refinery is allowed to restart absent compliance with the PSD program, something PHRT wants to do this year. Unfortunately,

---

[1] The PSD Determination consists of three parts: a cover letter; Attachment 1, the actual determination; and Attachment 2, an affirmation of EPA's longstanding Reactivation Policy. In citing to this determination, Movants will do so as "PSD Determination at A1, XX-XX" or "PSD Determination at A2, XX-XX" to clarify which part of the document is being referenced.

PHRT's only interest here is bringing online a refinery it has spent millions of dollars to acquire. Likewise, EPA appears primarily interested in the sanctity of its administrative process. EPA's regulatory position on restarting the Refinery has changed several times since the Refinery was permanently shut down in 2012, and overall the agency's record is five decades of uneven, and mostly absent, regulatory supervision. As a result, Movants seek intervention to vindicate their longstanding advocacy within EPA's permitting process and assure that the concerns of those who are facing public health and safety threats from the impending restart of an unreliable, non-compliant facility are heard by the Court as it considers the legal status and future of the Refinery.

## BACKGROUND

### A.      The Clean Air Act.

Congress amended the CAA in 1977 to expand and strengthen provisions governing preconstruction review of impacts on air quality. This process, known as New Source Review ("NSR"), requires new major stationary sources of air pollution, as well as existing major sources undertaking major modifications, to obtain preconstruction permits. NSR permits impose strict requirements and limitations on a facility's operation. 42 U.S.C. §§ 7475, 7503; 40 C.F.R §§ 51.165, 51.166, 52.21, 52.24.

The CAA establishes separate requirements for major sources located in "clean air" attainment areas and those located in areas that have failed to attain national air quality standards. In "clean air" areas like St. Croix—where the objective is the prevention of significant deterioration of air quality—Part C of Title I of the Act, 42 U.S.C. §§ 7470–7492, specifies that no "major emitting facility" may begin construction or undertake major modifications without

first demonstrating that emissions from construction or operation of the facility will not exceed applicable limitations. 42 U.S.C. § 7475(a)(3). Additionally, the PSD program requires installation of the best available control technology ("BACT") prior to construction or modification. *Id*. § 7475(a)(4). PSD permittees must also conduct a detailed "analysis of ambient air quality in the area." 40 C.F.R. § 52.21(m)(3).

Certain existing major stationary sources may apply for a Plantwide Applicability Limit (PAL) permit, which has a 10-year duration. 67 Fed. Reg. 80,186 (Dec. 31, 2002). A PAL permit sets plantwide emissions limits, in tons per year, for regulated air pollutants. Among other conditions, PAL permits are only available "for any **existing** major stationary source," and for non-major modifications. 40 C.F.R. § 51.166(w)(1)(i)-(ii) (emphasis added). Furthermore, "emissions associated with units that were . . . shutdown" must be "subtracted" from the plantwide emissions limit. 67 Fed. Reg. at 80,285; 40 C.F.R. § 52.21(aa)(6)(iii).

In contrast, new "major emitting facilities" are subject to the PSD program. 42 U.S.C. § 7479(1). If a facility falls within any one of 28 listed industrial categories, which includes petroleum refineries, then it is a major source if it emits at least 100 tons per year of any regulated pollutant. *See* 42 U.S.C. §§ 7473 and 7479(l); 40 C.F.R. § 52.21(b)(1)(i)(a). EPA requires these facilities, if deemed to be a new source, to apply for and obtain a PSD permit to prevent increases in harmful emissions. Environmental Protection Agency, *Prevention of Significant Deterioration Basic Information*, www.epa.gov/nsr/prevention-significant-deterioration-basic-information (last visited February 7, 2023). A PSD permit requires the applicant to have an "installation of the 'best available control technology,' an air quality analysis,

an additional impacts analysis, and public involvement." *Id.* Part of the process for receiving a permit requires the applicant to conduct an analysis focused on the impact the emissions from a polluting source will have on nearby communities. Robert J. Martineau, Jr. & David P. Novello, *The Clean Air Act Handbook* 137-138 (2004 2nd edition).

## B.    The Refinery.

Originally constructed by Hess Oil Virgin Islands Company in 1966, the Refinery was owned until 2015 by Hovensa, LLC ("Hovensa"), a joint venture between Hess Corporation ("Hess") and Petroleos de Venezuela. *See* Matthew P. Johnson, *Black Gold of Paradise: Negotiating Oil Pollution in the US Virgin Islands, 1966–2012*, ENVIRONMENTAL HISTORY 24 (2019) at 766-792. Between 1987 and 2008, the Refinery released approximately as much petroleum into the groundwater as four times that of the 1989 Exxon Valdez spill, with "approximately 95 percent of recoverable petroleum products [being] recovered" amounting to 42 million gallons of petroleum product. *Hovensa Cleanup Comes to 42 Million Gallons So Far*, ST. CROIX SOURCE (March 9, 2008); Valiulis Decl. ¶ 15.

In 2011, Hovensa settled allegations by EPA and the U.S. Department of Justice that it violated the CAA by making emissions-increasing modifications to the Refinery without first obtaining preconstruction permits or installing required pollution control devices. Valiulis Decl. ¶ 15; *see also Nation's Second Largest Refinery to Pay More Than $5.3 Million Penalty for Clean Air Act Violations / Smog- and asthma-causing emissions to be cut by 8,500 tons per year*, EPA News Release (Jan. 26, 2011), *available at https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/2e3*

*21f78933fa2e685257824005812cd.html* (last visited Feb. 9, 2023). Hovensa agreed to pay a civil penalty and entered a consent decree requiring the installation of $700 million of new pollution control and monitoring technology. EPA then acknowledged that "[h]igh concentrations of SO2 and NOx, two key pollutants emitted from refineries, can have adverse impacts on human health, and are significant contributors to acid rain, smog, and haze." Valiulis Decl. ¶ 14. The consent decree also required Hovensa to "set aside nearly $4.9 million for projects to benefit the environment of the U.S. Virgin Islands." *Id.*

Rather than implement the required pollution controls and pay for mitigating the damage it has caused to the Virgin Islands' environment, in early 2012, Hovensa shut down the Refinery because it was no longer profitable. Valiulis Decl. ¶ 16; *see also* Motion to Expedite Appeal at 1, *Port Hamilton Refining & Trans. v. EPA*, No. 23-1094 (3d Cir. Jan. 27, 2023) (hereinafter, "Motion to Expidite"). In its 2011 Annual Report, Hess, part owner of the Hovensa joint venture, acknowledged that "as a result of Hovensa's decision to shut down its refinery, which was announced in January 2012, Hovensa believes that it will not be required to make material capital expenditures pursuant to this consent decree." *Hess Corporation 2011 Annual Report* at 39, *available at http://media.corporate-ir.net/media_files/irol/10/101801/hess_2011_ar_site/site/pdfs/Hess_AR_2011.pdf* (last visited Feb. 9, 2023). Subsequently, Hovensa repeatedly and publicly expressed intentions to shut down the refining operations and operate the facility as a long-term oil storage terminal. *See* PSD Determination at A1, 10-15.

In December 2015, Hovensa sold the Refinery to Limetree Bay Terminals, LLC ("Limetree"). *See id*. at A1, 2; Valiulis Decl. ¶ 17. Initially, Limetree communicated its intention to operate the facility as an oil storage terminal and to potentially dismantle part of the refinery and sell off the scrap metal. In 2016, Limetree reopened part of the facility for oil storage and announced a 10-year storage lease agreement with China Petroleum & Chemical Corp. *See Fast Track: Limetree Bay Will Be Ready To Re-Open Oil Terminal In April!*, VIRGIN ISLANDS FREE PRESS (Jan. 22, 2016).

Years later, Limetree decided to restart oil refinery operations. *See* PSD Determination at A1, 2; Valiulis Decl. ¶¶ 17, 18. In fall 2018, Limetree initiated meetings with EPA to discuss plans for expansion/modification of the facility, targeting January 2020 as a restart date. *See* Valiulis Decl. ¶¶ 17, 18. On November 26, 2018, nearly seven years after the Refinery ceased operations, Limetree applied for a PAL permit. *Id.* at ¶ 18. Limetree's permit application relied on an April 5, 2018 letter from former EPA Assistant Administrator William Wehrum that concluded the Refinery should be treated as the reactivation of an "idled" facility, rather than a "new source." *Id.* On September 20, 2019, EPA Region 2 issued a draft PAL permit to Limetree, proposing plant-wide emissions limits for sulfur dioxide, nitrogen oxides, volatile organic compounds, carbon monoxide, particulate matter, particulate matter 10, and particulate matter 2.5. Valiulis Decl. ¶ 18. The PAL permit and Wehrum letter went against the longstanding EPA Reactivation Policy and PSD preconstruction permitting regulations.

### C.    The Community.

EPA has determined that the community near the refinery—where many members and supporters of the Environmental Movants reside, work, or attend school—is a particularly vulnerable community. PSD Determination at A1, 6. It is an economically-disadvantaged community of color that experiences environmental and other burdens. *Id.*; Valiulis Decl. ¶ 9. The area of south-central St. Croix, where the refinery is located, is an industrialized area with a large residential population. *Id.* Even without the Refinery's emissions and other environmental hazards, the community is burdened by many other environmental problems, including: the St. Croix Renaissance Industrial Complex from which irritants from Red Mud have caused health issues; odors from sources in the area that have closed schools; fires in a nearby landfill; noise and traffic from the nearby international airport; and emissions from large ships docked off the coast. *Id.*

### D.    The 2020 Restart.

When the Refinery began preparations to restart in late 2020 and commenced refining activity in February 2021, the community of St. Croix was severely impacted by the Refinery's operation. *Id.* at A1, 3-4; Valiulis Decl. ¶ 22; Cotton Decl. at ¶¶ 6-9; Hayes Decl. at ¶¶ 10-12. In February and May of 2021, oil from the Refinery fell from the sky, spreading contamination onto people's homes, gardens, and local drinking water resources. Cotton Decl. at ¶¶ 6-9; Hayes Decl. at ¶¶ 10-12. These incidents created large impacts on the nearby community which resulted in the closure of schools and government offices; mobilization of the Virgin Islands National Guard and Fire Service; produced noxious odors; and increased the occurrence of headaches and

nausea. Hundreds of people called and emailed the EPA to complain about the Refinery and the damage it was causing in their community. Alexis Benveniste & Fredreka Schouten, *St. Croix refinery that rained oil on neighborhoods is shutting down indefinitely.* CNN, *available at* www.cnn.com/2021/06/21/business/limetree-bay-shutdown/index.html (last visited February 7, 2023).

The Refinery's operation created major CAA violations that resulted in massive health and environmental impacts on the surrounding areas. Because of the sheer volume of CAA violations and health impacts to the St. Croix community, EPA used emergency measures under Section 303 of the CAA to shut down the Refinery. PSD Determination at A1, 4. Later, EPA reviewed maintenance logs of the Refinery from 2012-2017 and discovered numerous signs of inadequate maintenance which resulted in the Refinery's disastrous reopening in 2020. *Id.* at A1, 17-19. In May of 2021, EPA reversed their prior statement from 2018 and stated that the Refinery would need a PSD permit if operations were to continue. *See* Motion to Expedite at 5.

**E.    The Movants.**

Environmental Movants have a lengthy history of participation in EPA's permitting process for the Refinery. *See* Valiulis Decl. at ¶¶ 26-32; Sakashita Decl. at ¶¶ 15-19; Williams Decl. at ¶ 3. In 2018, after PHRT's predecessor, Limetree, sought a PAL permit to restart the facility, it was the Movants and their members that opposed the permit application. Valiulis Decl. at ¶¶ 26-28. Movants worked with residents of St. Croix to petition EPA to reconsider, to participate in public hearings, and to submit formal comments objecting to EPA's draft permit. *See* Valiulis Decl. at ¶¶ 26-32. After EPA issued the PAL

permit on December 2, 2020, Movants filed a petition for review of the decision with EPA's Environmental Appeals Board. *See* Valiulis Decl. at ¶ 30. It was not until after that petition for review was filed that EPA changed direction and aligned itself with the interests of the Movants by voluntarily vacating the PAL permit.

Movant St. Croix Environmental Association (SEA) was founded in 1986, and became a 501(c)(3) nonprofit organization in 1994. SEA's mission is to promote the conservation of St. Croix's environmental resources, provide education, and engage in advocacy for environmentally responsible actions that benefit St. Croix. SEA's efforts are focused on environmental conservation, education, and advocacy, and it elevates community concerns about environmental issues on St. Croix, especially the environmental justice community that has been predominantly and disproportionately impacted by unhealthy environmental conditions. One of SEA's key initiatives has been to advocate for clean air and to reduce air and water pollution generated by the Refinery during its 55 years of existence under various ownership.

Movant Sierra Club is a national nonprofit organization with 63 chapters and over 800,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Sierra Club is concerned about the environmental and climate impacts of refining, particularly where refining operations threaten to exacerbate air and water pollution in already overburdened communities.

Movant Center for Biological Diversity (Center) is a non-profit organization dedicated to preserving, protecting, and restoring biodiversity, native species, ecosystems, and public lands. The Center has over 89,000 active members, each of whom shares a commitment to support the Center's work conserving biodiversity and ecosystems. The Center's members and staff regularly use and visit the coastal Caribbean areas—including St. Croix—to scuba, boat, fish, walk, take photographs, research and view birds, sea turtles, marine mammals, corals, and other species, and engage in other recreational pursuits. Center members have spiritual, scientific, professional, aesthetic, and/or recreational interests in Virgin Islands' wildlife and habitat. The Center has an extensive campaign and environmental law practice that seeks to address air pollution, and specifically greenhouse gas pollution, from fossil fuel sources. This has included policy advocacy for stricter CAA rules and limits on greenhouse gas pollution. The Center's work has included litigation to regulate air pollution and to compel state and federal governments to examine the environmental impacts of air pollution. The Center's work also includes advocating for environmental justice, and efforts to curb air and water pollution in overburdened environmental justice communities. Since at least 2019 the Center has opposed the restart of the Refinery. Center members' environmental interests will be harmed by air pollution and other environmental damage from restarting the Refinery.

## ARGUMENT

### A.    Standard for Intervention in Petition for Review Proceedings.

Federal Rule of Appellate Procedure 15(d) provides for intervention in a direct appellate review of an agency order. Rule 15(d) simply requires the

movant to provide "a concise statement of its interest and the grounds for intervention." Fed. R. App. P. 15(d). However, some appellate courts have recognized that policies supporting district court intervention under Federal Rule of Civil Procedure 24, while not binding in cases originating in the court of appeals, may inform their intervention inquiries. *Sierra Club, Inc. v. EPA*, 358 F.3d 516, 517–18 (7th Cir. 2004); *see also Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. AFL-CIO, Local 283 v. Scofield*, 382 U.S. 205, 217 n.10 (1965); *Texas v. U.S. Dep't of Energy*, 754 F.2d 550, 552 (5th Cir. 1985).

Here, requirements for intervention under Federal Rule of Civil Procedure 24(a)(2) are met since: (1) this motion is timely; (2) movants have interests in the litigation; (3) the litigation may impair or impede the movants' ability to protect their interests; and (4) existing parties do not adequately represent the movants' interest. *See Pennsylvania v. President,* 888 F.3d 52, 57 (3d Cir. 2018); *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 969 (3rd Cir. 1998).[2]

## B. Movants Meet the Standard for Intervention Even Under Rule 24.

First, Environmental Movants meet the timeliness requirement because this motion is being filed within the 30-day period following PHRT's filing of the Petition for Review on January 13, 2023. Moreover, given the early stage

---

[2] The Third Circuit has not imposed a requirement that intervenors seeking to intervene must establish Article III standing. *See, e.g., Pennsylvania*, 888 F.3d at 57 n. 2 (*"*Because the Little Sisters moved to intervene as defendants and seek the same relief as the federal government, they need not demonstrate Article III standing). However, were such a standing requirement to apply, for reasons discussed below Movants' satisfy the injury in fact, causation, and redressability requirements under *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).

of the proceeding prior to any briefing, Movants' participation will not prejudice any other party.

Second, the Environmental Movants have "significantly protectable" interests relating to the subject matter of the petition. *Donaldson v. United States*, 400 U.S. 517, 531 (1971). Although Federal Rule of Civil Procedure 24 does not precisely detail what interest a party must have to intervene as a matter of right, if the interest is "specific to [the intervenor], is capable of definition, and will be directly affected in a substantially concrete fashion by the relief sought," intervention should be granted. *See, e.g.*, *Kleissler*, 157 F.3d at 972.

Several courts, including this one, have recognized a prospective intervenor's specific environmental interests is a legally protectable interest under Rule 24(a). Order on Motion to Intervene, *Chemours Co. v. Administrator, U.S. EPA*, No. 22-2287 (3d Cir. Feb. 6, 2023); *WildEarth Guardians v. Nat'l Park Serv.,* 604 F.3d 1192, 1198 (10th Cir. 2010); *San Juan County v. United States*, 503 F.3d 1163, 1199 (10th Cir. 2007) (en banc)); *American Farm Bureau Fed'n v. EPA*, 278 F.R.D. 98, 106 (M.D. Pa. 2011); *California Dump Truck Owners Association v. Nichols*, 275 F.R.D. 303, 306–07 (E.D. Cal. 2011); and *Syngenta Seeds, Inc. v. Cnty. of Kauai*, Civ. No. 14-00014BMK, ECF No. 54 (D. Haw. Apr. 23, 2014).

Here, Movants have vested substantial time and resources into assuring that EPA and the Refinery comply with the CAA to protect public health and the environment. It was the Movants that challenged EPA's unlawful decision in 2020 to allow the Refinery to restart without a PSD permit. *See* Valiulis Decl. at ¶¶ 26-32. After EPA subsequently withdrew the PAL permit, Movants

continue to press EPA to issue a determination of PSD applicability, which it finally did on November 16, 2022. *See id.* at ¶¶ 31, 32.

More importantly, Movants' members live on St. Croix and are on the front line of experiencing significant impacts to their health from the Refinery's operation. *Id.* at ¶ 33; Cotton Decl. at ¶¶ 6-16; Hayes Decl at ¶¶ 6-18. As EPA acknowledges, the Refinery has a long history of emitting harmful emissions into the surrounding community. *See, e.g.* PSD Determination at A1, 3-4. Residents have been impacted for decades. Cotton Decl. at ¶¶ 6-16; Hayes Decl at ¶¶ 6-18. This was exacerbated in 2020 when Limetree began startup activities, and the impacts rose to a crescendo following the commencement of oil refining activities in February 2021. Oil and hazardous substances literally rained down on residents. Many suffered personal injuries and property damage. Valiulis Decl at ¶ 33; Cotton Decl. at ¶¶ 6-16. Many others remain concerned about the long-term health impacts from these events, which constituted clear violations of the CAA. Cotton Decl. at ¶¶ 17, 18; Hayes Decl at ¶¶ 17, 18. Movants also have protectable interests in the environment and wildlife in the region that benefit from the regulation of the Refinery's pollution to meet PSD standards. Sakashita Decl. at ¶ 23.

In short, Environmental Movants have an interest in preventing future operation of the Refinery without a PSD permit. If PHRT has its way and restarts under its current, outdated permit in 2023, Movants and their members will have yet another major source of air pollution on St. Croix, one with a history of CAA violations and endangering public health and the environment.

Third, a decision by this Court that overturns EPA's determination that PHRT must obtain a PSD permit would be a major blow to Environmental

Movants' goals. The Movants' health and environmental interests are substantially and directly affected by EPA's decision challenged in this case. EPA's November 16, 2022 PSD Determination means that appropriate and effective air quality standards and pollution control technologies would be required before the Refinery could restart. In contrast, restarting the shuttered facility under outdated and inadequate old permits would increase air pollution and thus harm Movants' interests. The extensive violations that occurred when the last restart of the Refinery occurred in 2020-21 are directly related to numerous deficiencies in the maintenance and upkeep of the Refinery since it was shut down in 2012. PSD Determination at A1, 17-20. Indeed, even $4.1 billion in work on the Refinery before 2021 by Limetree failed to bring the facility into compliance. *Id.* at A1, 3. Moreover, EPA has found that "in addition to the acute impacts on the St. Croix community between late 2020 and May 14, 2021, there are potential longer-term air quality impacts [if the Refinery restarts]." *Id.* at A1, 5-6.

Environmental Movants can meet the requirements of Federal Rule of Civil Procedure 24(a)(2) by showing that "their interests **<u>might</u>** become affected or impaired, as a practical matter, by the disposition of the action" in their absence. *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 368 (3d Cir. 1995). Here, Movants exceed this bar. A decision by this Court vacating EPA's November 16, 2022, PSD determination would impair Environmental Movants interests' in avoiding future impacts to public health and the environmental on St. Croix from operation of the Refinery. *Pennsylvania,* 888 F.3d at 59.

Finally, the burden of establishing inadequacy of representation is "minimal." *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972).

Environmental Movants need not show with certainty that existing parties will inadequately represent their interests. That such representation "may be" inadequate is sufficient. *Id.* Although there is a "rebuttable presumption" of adequacy when one party is a government agency, "[w]hen an agency's views are necessarily colored by its view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it, the burden is comparatively light." *Kleissler*, 157 F.3d at 972. The government, of course, must represent "the public interest generally," and thus "may not view that interest as coextensive with the intervenor's particular interest." *Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1254 (10th Cir. 2001). Indeed, courts have regularly recognized the inadequacy of "governmental representation" of the interests of private parties. *See, e.g.*, *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986) (intervention motion fell "squarely within the relatively large class of cases . . . recognizing the inadequacy of government representation of the interests of private parties"); *Fund for Animals Inc. v. Norton*, 322 F.3d 728, 836 (D.C. Cir. 2003) (government would not give the necessary "primacy" to interests of impacted private party).

Here, EPA will primarily be focused on defending its decisional **process** since 2018. PHRT will undoubtedly point to EPA's changed permitting stance regarding the oil refinery over the past few years. *See* Motion to Expedite at 1-2. Similarly, PHRT will attack the continued validity of the agency's Reactivation Policy. EPA's defense may thus differ from Movant's interests in addressing the relevant context of the continued threats the Refinery continues to pose to the people of St. Croix, including Environmental Movants' members. These are vital considerations relevant to the Court's disposition of

the instant Petition, and Movants have a unique and indispensable perspective on them that is wholly distinct from EPA's procedural arguments. Absent Movants' intervention, their interests may not be fully presented to the Court.

In fact, although EPA's interests in this litigation overlap with Movants' interests now, this Court has observed that "it is not realistic to assume that the agency's programs will remain static or unaffected by unanticipated policy shifts." *Kleissler*, 157 F.3d at 974. The divergence of interests over time "may lead EPA to settle or otherwise resolve this litigation in a matter unfavorable to [Movants'] interests, or may dissuade EPA from appealing a decision that adversely affects Movants' interests." *Am. Farm Bureau Fed'n*, 278 F.R.D. at 111. Movants should be granted intervention to protect their interests throughout the course of this litigation and any further appeals, even if EPA's application of the Reactivation Policy to the Refinery changes.

## CONCLUSION

For these reasons, the motion to intervene should be granted.

February 13, 2023

Respectfully submitted,

s/Michael Ray Harris
Michael Ray Harris
Associate Professor of Law
Environmental Justice Clinic
Vermont Law & Graduate School
PO Box 96, 164 Chelsea Street
South Royalton, VT 05068
(802) 831-1364 (main)
(802) 831-1631 (fax)
mrharris@vermontlaw.edu

Rajeev Venkat (admission pending)
Student Attorney
Environmental Justice Clinic

Vermont Law & Graduate School
PO Box 96, 164 Chelsea Street
South Royalton, VT 05068
(802) 831-1364 (main)
(802) 831-1631 (fax)
RajeevVenkat@vermontlaw.edu

*Counsel for Movant-Respondent-Intervenors St. Croix Environmental Association, Sierra Club, and Center for Biological Diversity*

## CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND TYPE STYLE REQUIREMENTS AND LENGTH LIMITS

Pursuant to Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6), I certify that Cambria, a proportionally spaced serif font, in size 14, in plain, roman style type, with italics for emphasis and case names, was used for this brief. Pursuant to Federal Rule of Appellate Procedure 27(d)(2), I further certify that this motion is 4,539 words, excluding the accompanying documents authorized by Rule 27(a)(2)(B), which is within the word limit of 5,200 words.

February 13, 2023                          Respectfully submitted,

s/Michael Ray Harris
Michael Ray Harris
Associate Professor of Law
Environmental Justice Clinic
Vermont Law & Graduate School
PO Box 96, 164 Chelsea Street
South Royalton, VT 05068
(802) 831-1364 (main)
(802) 831-1631 (fax)
mrharris@vermontlaw.edu

## CERTIFICATE OF THIRD CIRCUIT BAR MEMBERSHIP

### 3d Cir. L.A.R. 28.3(d) Bar Membership Certification

Pursuant to Third Circuit Local Rule of Appellate Procedure 28.3(d), Proposed Intervenors St. Croix Environmental Association, Sierra Club, and Center for Biological Diversity hereby certify that Michael R. Harris is a member of the bar of this Court.

February 13, 2023

Respectfully submitted,

<u>s/Michael Ray Harris</u>
Michael Ray Harris
Associate Professor of Law
Environmental Justice Clinic
Vermont Law & Graduate School
PO Box 96, 164 Chelsea Street
South Royalton, VT 05068
(802) 831-1364 (main)
(802) 831-1631 (fax)
mrharris@vermontlaw.edu

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Appellate Procedure 25(c)(2) and Local Appellate Rule 27.2, I certify that this Motion to Intervene and accompanying Motion Appendix was filed electronically through the court's docketing system. All parties to this case are Filing Users and are served electronically by the Notice of Docket Activity.

February 13, 2023

Respectfully submitted,

s/Michael Ray Harris
Michael Ray Harris
Associate Professor of Law
Environmental Justice Clinic
Vermont Law & Graduate School
PO Box 96, 164 Chelsea Street
South Royalton, VT 05068
(802) 831-1364 (main)
(802) 831-1631 (fax)
mrharris@vermontlaw.edu