# United States Court of Appeals for the Third Circuit

## CASE NO. 23-1094

---

PORT HAMILTON REFINING AND TRANSPORTATION, LLLP

PETITIONER,

VS.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

RESPONDENT.

---

## PRINCIPAL BRIEF OF PORT HAMILTON REFINING AND TRANSPORTATION, LLLP

On review from the November 16, 2022 Determination
of the Environmental Protection Agency

Andrew C. Simpson
ANDREW C. SIMPSON, P.C.
2191 Church St., Ste. 5
Christiansted, VI  00820
340-719-3900
asimpson@coralbrief.com
www.coralbrief.com

## CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF FINANCIAL INTEREST PURSUANT TO FED. R. APP. P. 26.1

Port Hamilton Refining and Transportation, LLLP has no parent company and no other publicly owned company owns more than 10% of its membership units. It knows of no other publicly held company that holds a financial interest in the outcome of this proceeding.

# TABLE OF CONTENTS

**Page**

JURISDICTION ........................................................................................ 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................... 2

STATEMENT OF RELATED CASES AND PROCEEDINGS ................. 4

BACKGROUND ...................................................................................... 4

I.     The Prevention of Significant Deterioration Program .................... 4

II.    EPA's ersatz reactivation policy ..................................................... 5

III.   EPA's 2018 Determination. ............................................................ 9

IV.    EPA's 2022 Determination. .......................................................... 12

SUMMARY OF ARGUMENT ............................................................. 13

STANDING ........................................................................................... 15

ARGUMENT ......................................................................................... 16

      A.     EPA's application of the PSD requirements to a refinery
             that was not newly constructed, and did not undergo a
             statutorily defined "major modification" is contrary to law. 17

      B.     EPA's application of its Reactivation Policy is inconsistent
             with the agency's own regulations. ....................................... 20

      C.     EPA's ersatz Reactivation Policy is legally unsupported..... 23

      D.     EPA's 2022 Determination lacks an adequate factual
             basis. ..................................................................................... 26

            i.     The length of time of refinery shutdown and the
                  amount of capital expensed to restart the
                  refinery. ....................................................................... 29

            ii.    Failure to continuously demonstrate concrete
                  plans to restart the refinery and the cause of the
                  shut down. .................................................................. 35

            iii.   The refinery's permits, maintenance and
                  inspections during its hot idle ..................................... 40

E.    EPA's 2022 Determination failed to consider important aspects of the problem. ..........................................................43

F.    The 2022 Determination Represents EPA's Definitive Position on Whether Port Hamilton Has to Go Through PSD Before Restarting...........................................................53

G.    The 2022 Determination Has the Status of Law with the Expectation of Immediate Compliance .................................55

H.    The 2022 Determination Has an Immediate Impact on the Day-to-Day Operations of Port Hamilton ............................56

I.    The 2022 Determination involves a pure question of law that does not require further factual development .............57

J.    Immediate judicial review would speed Port Hamilton's ability to restart ...................................................................58

CONCLUSION AND RELIEF REQUESTED.........................................59

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ams. Disabled for Accessible Pub. Transp. v. Skinner,*
  882 F.2d 1184 (3rd Cir. 1989)...............................................43

*Anspach v. Cty. Of Philadelphia, Dep't of Pub. Health,*
  503 F.3d 256 (3d Cir. 2007) ..................................................23

*Appalachian Power Co. v. E.P.A.*
  208 F.3d 1015 (D.C. Cir. 2000) ...........................................56

*Bennett v. Spear,*
  520 U.S. 154 (1997) ...............................................................51

*Biden v. Texas,*
  597 U.S. __, 142 S. Ct. 2528 (2022) .....................................51

*Chevron U.S.A. Inc. v. E.P.A,*
  45 F.4th 380 (D.C. Cir. 2022) ...............................................18

*Clemens v. ExecuPharm Inc.,*
  48 F.4th 146 (3d Cir. 2022)...................................................15

*Connecticut Nat. Bank v. Germain,*
  503 U.S. 249 (1992) ...............................................................17

*Del. Dep't of Nat. Res. & Envtl. Control v. E.P.A.,*
  785 F.3d 1 (D.C. Cir. 2015) ...........................................44, 45

*Donovan v. Adams Steel Election, Inc.,*
  766 F.2d 804 (3d Cir. 1986) ..................................................27

*Exxon Corp. v. F.T.C.,*
  588 F.2d 895 (3d Cir. 1978) ..................................................52

*F.C.C. v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ...............................................................48

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ................................................................ 52

*Gonzales v. Carhart,*
   550 U.S. 124 (2007) ................................................................ 17

*Harrison v. PPG Industries, Inc.,*
   446 U.S. 578 (1980) ................................................................ 54

*Harvard Secured Creditors Liquidation Trust v. I.R.S.,*
   568 F.3d 444 (3d Cir. 2009) ................................................... 22

*Haw. Electric v. E.P.A.,*
   723 F.2d 1440 (9th Cir. 1984) ................................................ 56

*Her Majesty the Queen in Right of Ontario,*
   912 F.2d 1531 (D.C. Cir. 1990) ............................................. 52

*HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n,*
   141 S. Ct. 2172 (2021) ........................................................... 52

*Horn v. Thoratec Corp.,*
   376 F.3d 163 (2004) ................................................................ 48

*Minard Run Oil Co. v. U.S. Forest Serv.,*
   670 F.3d 236 (3d Cir. 2011) ............................................ 52, 53

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins.,*
   463 U.S. 29 (1983) .......................................................... 26, 43

*Nat'l Ass'n of Trailer Owners, Inc. v. Day,*
   299 F.2d 137 (D.C. Cir. 1962) ............................................... 47

*Nat'l Parks Conservation Ass'n v. E.P.A.,*
   803 F.3d 151 (3d Cir. 2015) ................................................... 25

*Ocean Cty. Landfill v. E.P.A.,*
   631 F.3d 652 (3d Cir. 2011) ................................................... 53

*Oran v. Stafford,*
   226 F.3d 275 (3d Cir. 2000) ................................................... 23

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) ................................................................. 19

*In re Philadelphia Newspapers, LLC*,
   599 F.3d 298 (3d Cir. 2010) ................................................. 22

*Renewable Fuels Ass'n v. E.P.A.*,
   948 F.3d 1206 (10th Cir. 2020) ........................................... 52

*Roosevelt Campobello Intern. v. E.P.A.*,
   684 F.2d 1034 (1st Cir. 1982) .............................................. 56

*Shane Meat Co., Inc. v. U.S. Dep't of Def.*,
   88 F.2d 334 (3d Cir. 1986) ................................................... 26

*Sierra Club v. E.P.A.*,
   926 F.3d 844 (D.C. Cir. 2019) ............................................. 18

*Sierra Club v. E.P.A.*,
   972 F.3d 290 (3d Cir. 2020) ................................................ 25

*Smiley v. Citibank (South Dakota), N.A.*,
   517 U.S. 735 (1996) .............................................................. 48

*Star Enterprise v. E.P.A.*,
   235 F.3d 139 (3d Cir. 2000) ................................................ 54

*TSG Inc. v. E.P.A.*,
   538 F.3d 264 (3d Cir. 2008) ................................................ 55

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
   578 U.S. 590 (2016) .............................................................. 52

*Univ. of Med. and Dentistry of N.J. v. Corrigan*,
   347 F.3d 57 (3d Cir. 2003) ................................................... 53

*Util. Air Regul. Group v. E.P.A.*,
   573 U.S. 302 (2014) .............................................................. 17

*Valdiviezo-Galdamez v. Attorney Gen. of the United States*,
   663 F.3d 582 (3d Cir. 2011) ...................................... 26, 27, 28

*W. Virginia v. E.P.A.*,
  597 U.S. __, 142 S. Ct. 2587 (2022) ..................................................... 17

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ........................................................................... 51

## Statutes and Codes

United States Code
  Title 5 Section 553 ............................................................................ 6
  Title 5 Section 706(2)(A) ................................................................. 48
  Title 40 Section 7475(a) ................................................................... 13
  Title 42 Section 7411(a) .............................................................. 5, 19
  Title 42 Section 7470 ....................................................................... 20
  Title 42 Section 7475(a) .............................................................. 5, 18
  Title 42 Section 7479(1) ............................................................ 18, 19
  Title 42 Section 7501 ....................................................................... 20
  Title 42 Section 7603 ....................................................................... 47
  Title 42 Section 7607(d)(9)(A) ....................................................... 25

Administrative Procedure Act
  5 U.S.C. § 551 et. seq. ................................................................. 6, 51

Clean Air Act
  42 U.S.C. § 7401 et. seq. ............ 1, 2, 5, 6, 13, 16, 17, 23, 47, 49, 51, 54

Clean Water Act
  33 U.S.C. § 1251 et. seq. ................................................................. 40

## Rules and Regulations

Code of Federal Regulations
  Title 40 Section 52 ........................................................................... 57
  Title 40 Section 52.21(b)(7)(i) ......................................................... 20
  Title 40 Section 52.21(b)(11) ........................................... 12, 21, 54, 55

Federal Rules of Evidence
  Rule 201 ........................................................................................... 23

Other Authorities

Juliet Eilperin & Darryl Fears, *Controversial St. Croix Refinery Ceases Operations Given 'Extreme Financial Constraints,'* Wash. Post (June 21, 2021, 5:24 P.M.) ............................................................................. 45

*Merriam-Webster Online Dictionary* ........................................................ 21

*New Oxford American Dictionary* ............................................................ 22

U.S. Virgin Islands, Bureau of Economic Research, *U.S. Virgin Islands Economic Impact: Closing of Limetree Bay Refinery* (Oct. 13, 2021), https://usviber.org/document/economic-impacts-of-the-limetree-bay-closing ................................................................................................... 57

## JURISDICTION

In accordance with Section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1) (2018), this Court has jurisdiction to review the final agency action described in the U.S. Environmental Protection Agency's ("EPA's") November 16, 2022 determination ("2022 Determination") that Port Hamilton Refining and Transportation, LLC ("Port Hamilton") must obtain a permit issued under the Prevention of Significant Deterioration ("PSD") provisions of the Clean Air Act, 42 U.S.C. §§ 7460-7492, before resuming operations at the St. Croix refinery (or "refinery").

On January 20, 2023, the Court requested that the parties brief whether EPA's 2022 Determination was a final agency action. The parties did so in briefs submitted on February 3, 2023, and both parties agree that the 2022 Determination was a final agency action. On February 6, 2023, the parties were ordered to address this issue in the merits briefs to be filed with the Court. In accordance with that order, Port Hamilton addresses this issue in Section IV of the Argument section of this brief.

On January 13, 2023, Port Hamilton timely filed a petition for review with this Court.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Under the Clean Air Act, only newly constructed refineries and refineries that undergo certain major modifications must comply with the PSD requirements of the Clean Air Act. EPA insists that the St. Croix refinery must obtain a new PSD permit not because it is undergoing new construction or a major modification. Rather, EPA wants to treat the decades-old refinery as "new" because the refinery is seeking to resume operations after an extended period of not processing refined products. Is it contrary to law for EPA to attempt to expand the scope of PSD requirements to a refinery not covered by the plain language of the statute?

2.     When an agency determines that an entity is not subject to a regulatory program, it cannot subsequently change that determination unless it discovers new facts or information sufficient to justify the change. In 2018, EPA determined that even under its extra-statutory expansion of the PSD requirements, the St. Croix refinery still was not subject to the PSD standards. Did EPA act in an arbitrary and capricious manner in 2022 when it used essentially the same facts it had in 2018

and reached the exact opposite conclusion, requiring the refinery to comply with the PSD standards for new construction?

3.    An agency is permitted to change, or even reverse, a prior agency action, but its ability to do so is significantly constrained if a party has acted in reliance upon the prior action. In reliance upon EPA's 2018 Determination, Port Hamilton made a $62 million purchase and then spent more than that amount to maintain the refinery's readiness to resume operations, only to have that earlier decision reversed in EPA's 2022 Determination. Should this Court vacate EPA's reversal of its 2018 Determination because it violates Port Hamilton's protected reliance interests and should therefore be vacated?

4.    An agency action is final, providing the Court with jurisdiction to review the action, if it marks the consummation of the agency's decision-making process and is one by which rights or obligations have been determined, or from which legal consequences will flow. EPA's 2022 Determination prohibits Port Hamilton from resuming operations at the refinery without first going through a multi-year PSD permitting process. Was EPA's 2022 Determination a final agency action, providing this Court with jurisdiction to review that action?

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This proceeding has not been before this court previously. Petitioner is not aware of any other case or proceeding that is in any way related, completed, pending or about to be presented before this court or any other court or agency, territorial, state, or federal forum.

## BACKGROUND

This proceeding arises because EPA unjustifiably reversed long-standing authority it had provided to the St. Croix refinery to resume operations under its existing environmental permits.

## I.   THE PREVENTION OF SIGNIFICANT DETERIORATION PROGRAM

The PSD program requires operators of "major emitting source[s]" of pollution in attainment areas—areas that meet federal ambient air quality standards—to obtain a permit from the state or EPA before "constructing" a "major emitting facility" that is expected to cause a significant net emission increase of certain types of common air

pollutants. *See* 42 U.S.C. § 7475(a). "Constructing," in this context, is statutorily defined to include a "modification." 42 U.S.C. § 7411(a).[1]

EPA does not claim that the resumption of refining operations at the St. Croix refinery falls within the statutory definition of "modification." Instead, EPA claims that the refinery should be treated as "new" and thus subject to the PSD permitting requirements because of EPA's tortured interpretation of the phrase "construction is commenced after August 7, 1977." *Id.* § 7475(a). According to EPA, the St. Croix refinery was shut down, and its resumption of operations of the facility is equivalent to "commencing construction."

## II.    EPA'S ERSATZ REACTIVATION POLICY

EPA was not content with following Congress' mandate requiring the agency to apply PSD requirements to *only* newly constructed refineries and refineries that undergo major modifications (as Congress had defined the terms within the Clean Air Act). *See id.* § 7411(a)(1), (4) (defining the terms "new source" of stationary emissions and

---

[1] Section 7411(a)(4) defines a "modification" as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."

"modification"). In EPA's view, "new construction" should also mean "old construction" if the old construction was shut down for some undefined period of time. But EPA did not go back to Congress and ask it to amend the law. Nor did EPA use the Administrative Procedure Act—with its notice and public comment requirements—to adopt a regulation giving an expansive definition of "new construction" that included "old construction."[2] *See* 5 U.S.C. § 553. Instead, EPA has simply informally adopted its own interpretation of the law that it will not submit to regulatory review.

It would be a misnomer to refer to this unwritten rule as a "policy." It has never been formally adopted by EPA, and it can be discerned only by reviewing case-specific Agency decisions related to whether PSD permit requirements apply to the reactivation of an air emission source that has been shut down. *See generally* Appx.-78, Ex. D[3] at 4-12

---

[2] This is not to suggest that such a regulation would be an appropriate interpretation of the Clean Air Act.

[3] Port Hamilton is filing with this brief an appendix consisting of exhibits that are either: listed by the United States as being part of the Administrative Record (Exhibits A, C, D, and F); other official government records (Exhibits H, I, J, K and L); part of Port Hamilton's argument on reliance interests (Exhibits A, C, D, E and N); or part of Port Hamilton's jurisdictional argument on final agency action (Exhibits A, B, and F).

("November 2020 EPA Response to Comments on the Clean Air Act Plantwide Applicability Limit Permit for the Limetree Bay Terminal and Limetree Bay Refining" or "2020 Response to Comments"). Indeed, the last official EPA pronouncement related to the "policy" until the 2022 Determination was a repudiation of it as evidenced in its 2020 Response to Comments:

> [T]he Agency has determined it is not appropriate to continue applying the Reactivation Policy because the policy was not well-grounded in the NSR [(New Source Review)] regulations, and it is not supported by the current NSR regulations. In addition, the Reactivation Policy is difficult to follow and can produce inconsistent results based on subjective judgments about how to weigh the various factors against each other.

*Id.* at 6. Despite this repudiation of the ersatz policy, EPA nevertheless elected to apply the unwritten—now repudiated—policy to Port Hamilton.

The policy provides that an air emission source that is shut down for two or more years is *presumed* to be permanently shut down and can be subject to PSD permitting requirements upon restart. *See In the Matter of Monroe Elec. Generating Entergy Louisiana, Inc.*, Proposed Operating Permit, Petition No. 6-99-2 (June 11, 1999). The policy further provides, however, that this presumption of a permanent shutdown after

7

two years can be rebutted, such that an idled or temporarily shut down refinery may resume operation within the parameters of its existing permits. *Id.* Indeed, EPA has concluded that shutdowns lasting eight to ten years do not necessarily require PSD permits to resume operations. *See* Argument II.A.i, *infra*.

Ultimately, EPA's judgment on whether a refinery permanently shut down "depends on the intent[ion] of the owner or operator at the time of shut[ ]down based on all facts and circumstances." *In re Monroe* at 9. To ascertain the owner or operator's intent, EPA may examine factors such as: (1) the amount of time the facility has been out of operation; (2) the reason for the shutdown; (3) the statements made by the owner or operator concerning their intent; (4) the cost and time required to reactivate the facility; (5) the status of permits; and (6) the ongoing maintenance and inspections that have been conducted during the shutdown. *Id.* at 8-9. However, "no single factor is likely to be conclusive" in EPA's assessment, and "the final determination will often involve a judgement as to whether the owner's or operator's actions at the facility during shut[ ]down support or refute any express statements regarding the owner's or operator's intentions." *Id.* at 9. Owners and operators also may "preserve their ability

to reopen without a new source permit" if they "continuously demonstrate concrete plans to resume operations at the facility sometime in the reasonably foreseeable future." *Id.*

## III.   EPA'S 2018 DETERMINATION.

The St. Croix refinery (the "refinery") was opened in 1966. In 2012, after almost five decades of operation, a previous owner of the refinery, HOVENSA, LLC ("Hovensa"), decided to idle it due to an economic downturn. Four years later, in January 2016, Hovensa sold the still-idled refinery to Limetree Bay Terminals, LLC, which later conveyed the refinery to an affiliate, Limetree Bay Refining, LLC ("Limetree Bay"). *See* Appx.-64, Ex. B (Chambers' First Decl.) at ¶3. Throughout this entire period, Hovensa maintained the refinery in an idled state and continued to operate certain parts of the refinery, including its gas turbines and wastewater treatment plant. *Id.* Between 2012 and 2016, Hovensa spent roughly $400 million on maintaining and inspecting the facility, keeping its permits (including payment of permit fees) to ensure that the refinery would be able to resume operations. *See* Appx.-78, Ex. D at 11.

On April 5, 2018, EPA issued a determination to Limetree Bay stating that resuming operations from its idled status "[would] not result

in the facility being viewed as a new stationary source under EPA's current so-called Reactivation Policy." *See* Appx.-69, Ex. C at 1 (2018 Determination). EPA's 2018 Determination meant the refinery could resume operations without the need to first obtain a new PSD permit.

EPA repeated and reinforced the 2018 Determination in 2020 when it responded to comments on another type of permit being proposed for the St. Croix refinery. *See* Appx-78, Ex. D. In the response, EPA Administrator Andrew Wheeler announced the Agency would no longer be applying its Reactivation Policy. *Id.* at 9. ("EPA no longer believes that the Reactivation Policy is an appropriate policy, and the Agency is not required to apply it to any source, including the Limetree Bay facility."). Administrator Wheeler went on to find that it would have reached the same conclusion as the 2018 Determination if the policy were still in effect. *Id.* at 12 ("Considering the totality of the circumstances, were EPA

to apply the Reactivation Policy, EPA would continue to find the presumption of permanent shutdown has been rebutted in this case.").[4]

Armed with these assurances and support from EPA, Limetree Bay subsequently resumed operations at the St. Croix refinery in September 2020, and operated the refinery until May 2021, when it was again idled. This initial resumption of operations would have been impossible had the refinery not been maintained in an idled state since 2012 or if EPA had taken a position that the refinery had not been in an idled state since 2012.

In reliance upon EPA's 2018 Determination and EPA's subsequent public statements and actions, Port Hamilton purchased the St. Croix refinery in January 2022, with plans to resume operations at the refinery from its idled status as soon as practicable, targeting the end of 2023. *See* Appx-21, Ex. A. at 10.

---

[4] On March 25, 2021, EPA Administrator Michael Regan withdrew the Plantwide Applicability Limit Permit for the St. Croix refinery. Letter from Admin. Michael Regan to Gov. Albert Bryan, Jr. (Mar. 25, 2021); *see* U.S. Env't Prot. Agency, Notice of Withdrawal of Plantwide Applicability Limit Permit for Limetree Bay Terminals, LLC (Mar. 25, 2021). Although EPA indicated that it was also withdrawing the permit's administrative record, EPA did not specifically reinstate its Reactivation Policy.

## IV.   EPA'S 2022 DETERMINATION.

On November 16, 2022, EPA brought Port Hamilton's restart plans to a screeching halt. Citing its ersatz Reactivation Policy, the Agency issued a letter stating that Port Hamilton would have to obtain a PSD permit prior to resuming operations at the refinery. *See* Appx-21, Ex. A at 3. Openly reversing its 2018 Determination, the agency "conclude[d] that the refinery was permanently shut down in 2012" and that resuming operations at the refinery qualifies as construction of a new major stationary source under the federal PSD permitting regulations applicable in the U.S. Virgin Islands." *Id.* EPA was unequivocal in its decision: "The refinery must apply to EPA for, and receive, a final and effective PSD permit for these pollutants prior to [resuming operations] at . . . the refinery as defined in" 40 C.F.R. pt. 52.21(b)(11). *Id.* at 4.

Until the 2022 Determination was issued, Port Hamilton was moving forward with plans to resume operations at the refinery from its idled status. Appx-64, Ex. B at ¶11. The 2022 Determination, however, prohibits Port Hamilton from performing necessary work to resume operations at the refinery without first obtaining a PSD permit. Appx-21, Ex. A at 5. Based on past precedent, obtaining such a permit from EPA

is likely to be a two-to-three-year process, typically followed by an additional year or so to undertake final preparations to prepare for resuming operations at the refinery. *See* Appx-315, Ex. N ¶10 (Del Valle Decl.). EPA also asserts that these steps must occur sequentially—one must apply for—and obtain—the permit before construction work can begin. *See* Appx-21, Ex. A. Consequently, under EPA's approach, the St. Croix refinery could not resume operations at until 2026 or later, assuming EPA would issue the PSD permit it contends is needed to resume operations at the refinery. Appx-315, Ex. N ¶10.

## SUMMARY OF ARGUMENT

EPA has no discretion to pursue approaches that are facially inconsistent with the Congressional mandates of the Clean Air Act and other environmental statutes. Yet that is exactly what EPA has done at the St. Croix refinery. In an illegal effort to expand the scope of the PSD program, EPA attempts to characterize as "new" a refinery that has been in existence for almost sixty years, most recently in an idle mode awaiting the resumption of operations. But the plain language of the statute prohibits such an expansion. Under 40 U.S.C. § 7475(a), the PSD program unambiguously applies only to either (a) a newly constructed

13

refinery or (b) a refinery that undergoes a major modification that results in net increase in regulated emissions. The St. Croix refinery is neither. The origins of what EPA refers to as its "so-called policy" are what one would expect from an ultra vires undertaking—it does not exist in a separate document, and its concepts never went through public notice and comment following publication in the Federal Register. Instead, its ephemeral existence resides only in case-specific, subjective determinations EPA has made over the years based on speculating about the intentions of the owners or operators of an idled or shut down facility. As EPA itself recognized only a few years ago when it abandoned the policy, such speculative and subjective endeavors are inevitably fraught with inconsistencies.

That prediction turned out to be quite prescient, as EPA last fall reversed its earlier determination that the St. Croix refinery could restart without going through the burdensome and time-consuming PSD permitting process. Based on essentially the same set of facts, EPA did an abrupt about-face and admonished the refinery not to resume operations before embarking on a multi-year permitting process to secure the same PSD permit the Agency determined was unnecessary only four

years earlier. Indeed, EPA had not only authorized the restart of the refinery, it also subsequently oversaw a prior owner as it pursued a restart EPA had authorized.

When Port Hamilton purchased the St. Croix refinery less than two years later, it did so confident that EPA would honor the positions it had taken from the application of its clandestine policy. EPA had definitively determined in 2018 that PSD permitting would not be necessary, and in 2020 EPA confirmed that determination while pulling the plug on future use of what it recognized as a flawed and subjective policy. Now EPA asserts that it had put a marker down to all prospective buyers that it might revive its Reactivation policy for the next purchaser of the refinery, Port Hamilton justifiably relied on the clearer and more definitive agency proclamations. EPA cannot negate those reliance interests, particularly with an inconsistently applied internal policy that is not permitted by the statute.

## STANDING

To satisfy Article III standing requirements, a petitioner must show that (1) he or she has suffered an injury that is concrete, particularized, and actual or imminent, (2) the injury was caused by the defendant, and

(3) the injury would likely be redressed by the requested judicial relief. *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 152 (3d Cir. 2022).

Here, Port Hamilton has suffered concrete, particularized, actual, and imminent injury. If EPA's new PSD determination is let stand, Port Hamilton would have to endure delays and the loss of substantial refinery revenue for two to three years. *See* Appx-64, Ex. B, (Chambers Decl.) at ¶15. The length of the delay, coupled with the uncertainty inherent in the outcome of any PSD permitting process, also jeopardizes Port Hamilton's plans to resume operations and threatens its very existence. This injury is a direct consequence of EPA's actions; it can be redressed only if the 2022 Determination is vacated by this Court.

## ARGUMENT

**Issue I:** Under the Clean Air Act, newly constructed refineries and refineries that undergo certain major modifications must comply with PSD requirements. EPA insists the refinery must obtain a new PSD permit not because it is new construction or has undergone a qualifying major modification. Rather, EPA is treating the St. Croix refinery as "new" construction because it is seeking to recommence refining operations after an extended period of not processing refined products. EPA's attempt to expand the PSD requirements to a refinery that is not covered by the plain statutory language is contrary to law.

**A.** ***EPA's application of the PSD requirements to a refinery that was not newly constructed, and did not undergo a statutorily defined "major modification" is contrary to law.***

Before even considering EPA's application of the ersatz Reactivation Policy, it is necessary to return to First Principles: What does the statute say?

> [I]n interpreting a statute a court should always turn first to one cardinal canon before all others. [The U.S. Supreme Court has] stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, the first canon is also the last: judicial inquiry is complete.

*Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-254 (1992) (internal citations and quotations omitted). *See also*, *Gonzales v. Carhart*, 550 U.S. 124, 152 (2007) (stating that when "interpreting statutory texts courts use the ordinary meaning of terms unless context requires a different result").

An agency must point to "clear congressional authorization" for the authority it claims. *See Util. Air Regul. Group v. E.P.A.*, 573 U.S. 302, 324 (2014); *see also W. Virginia v. E.P.A.*, 597 U.S. __, 142 S. Ct. 2587 (2022). Agencies may exercise discretion only in the interstices created by statutory silence or ambiguity; even then, they must always give effect

to the "unambiguously expressed intent of Congress." *Util. Air Regul. Grp.*, 573 U.S. at 326.

In enacting the Clean Air Act, Congress was clear and unambiguous regarding the circumstances under which EPA could require compliance with the PSD program: when a major emitting facility is either (1) newly constructed, or (2) goes through a major modification that results in a significant increase in net emissions of certain regulated pollutants. 42 U.S.C. §§ 7475(a), 7479(1). The 2022 Determination contravenes Congress's unambiguous instruction.[5]

---

[5] Petitioner is not challenging EPA's "Reactivation Policy." The ersatz policy is an EPA-created exception to its determination that a shutdown refinery must go through a new PSD permitting process as if it were a newly constructed refinery. Petitioners are challenging the EPA's application of 42 U.S.C. § 7475(a) to the St. Croix refinery on the grounds that the statute does not apply to the St. Croix refinery. Further, Petitioner is also challenging EPA's application of that policy to justify its 2022 Determination. *See Chevron U.S.A. Inc. v. E.P.A*, 45 F.4th 380 (D.C. Cir. 2022) (holding that EPA letter to operator in response to operator's request for guidance as to whether platforms remained subject to Clean Air Act once decommissioning began was a local or regional applicable action, thus venue was not proper under the Act in U.S. Court of Appeals for the District of Columbia); *see also Sierra Club v. E.P.A.*, 926 F.3d 844 (D.C. Cir. 2019) (holding that U.S. Court of Appeals for the District of Columbia was improper venue because language of challenged order was confined to a particular permit and plant, EPA did not publish any findings that the order was based on a determination that had a nationwide scope or effect, and EPA's order applied to a single permit renewal for a single local plant).

In recently concluding that Port Hamilton would require a PSD permit, EPA stated that the "proposed restart of the refinery qualifies as construction of a *new* major stationary source under applicable PSD permitting regulations." Appx-21, Ex. A at 5 (emphasis added). A refinery constructed in 1966 is by no means new.[6]

EPA's application of its Reactivation Policy creates a legal fiction that the St. Croix refinery became a "new" facility for purposes of PSD when the refinery's units were put into a warm idle mode. EPA lacks the authority to expand the scope of the PSD program to apply it to emission units at the St. Croix refinery that are neither new nor modified. *See Perez v. Mortg. Bankers Ass'n,* 575 U.S. 92, 97 (2015) (Absence of notice-and-comment in issuing guidance or interpretive rules means they "do not have the force and effect of law and are not accorded that weight in the adjudicatory process.").

---

[6] Although EPA has not asserted that the idling of St. Croix refinery should be considered a "major modification" for purposes of PSD, such argument would fail anyway. That's because, for existing facilities, a "modification" is defined as any physical or operational change that "increases the amount" of air pollutant emitted by the source. *Id.* §§ 7479(1), 7411(a)(4).

**B.    *EPA's application of its Reactivation Policy is inconsistent with the agency's own regulations.***

In its November 2020 Response to Comments, EPA acknowledged that the "Reactivation Policy is undermined by other provisions of the [PSD and Nonattainment New Source Review ("NNSR")][7] regulations." Appx-78, Ex. D at 8. EPA recognized that the PSD and New Source Review ("NSR") regulations define "new emissions unit" as an emissions unit "that is (or will be) *newly* constructed and that has e*xisted* for less than [two] years," *id.* (emphasis supplied) (citing 40 C.F.R. pt. 52.21(b)(7)(i)), whereas the refinery's emission units "have clearly existed for more than [two] years and are not *newly constructed*." *Id.* (emphasis added) (internal quotations removed). Therefore, "[u]nder the plain language of this provision, the emission units at [the refinery] are existing emissions . . . [and] [i]t would be an *odd result* to treat a major stationary source made up entirely of *existing* emission units as *new* for

---

[7] The PSD permitting program applies to new and modified major sources of emissions in areas of the United States that are in attainment with the applicable National Ambient Air Quality Standards ("NAAQS"), 42 U.S.C. §§ 7470-7492, whereas the "Nonattainment New Source Review" or "NNSR" program applies to new and modified major sources of emissions in areas that are not in attainment with the NAAQS, 42 U.S.C. §§7501-7509a. Both the PSD and NNSR programs are considered parts of EPA's overall New Source Review ("NSR") program.

purposes of determining NSR applicability." *Id.* (emphasis added) (internal citations omitted). These inconsistencies were what led EPA to conclude that it "no longer believes that the Reactivation Policy is an appropriate policy, and [EPA] is not required to apply it to any source, including" the refinery. *Id.* at 9.[8]

EPA now maintains that its Reactivation Policy allows it to treat an existing plant such as the refinery as "new," even if the facility is nearly 60 years old. While acknowledging the best place to look to determine what is "new" is "the plain meaning of the term," *id.* at 29, EPA reaches for meanings that are obscure. Specifically, EPA concedes the common dictionary meaning of "new" means "having recently come

---

[8] Indeed, EPA's own regulations lack any requirement for a facility to obtain a PSD permit prior to resuming operations; the obligation kicks in only for commencing construction of unit that is new or about to undertake a major modification that will increase emissions above a certain amount. In this context, the regulations define "begin actual construction" to mean, "in general, initiation of physical on-site construction activities on an emissions unit which are of a permanent nature. Such activities include, but are not limited to, installation of building supports and foundations, laying underground pipework and construction of permanent storage structures." 40 C.F.R. pt. 52.21(b)(11). Here, the refinery engaged in no such preparatory activities related to construction or modification of its existing units. Consequently, the refinery's resumption of operations of its *existing* units falls outside of the regulatory definition of "beginning actual construction," which would otherwise trigger PSD review.

into existence" (*Merriam-Webster Online Dictionary*) or "not existing before; made, introduced, or discovered recently or now for the first time" (*New Oxford American Dictionary*), but argues that there could be other permissible readings (e.g., "made or become fresh"). *Id.* EPA's creative suggestion is undermined, however, by well-established canons of statutory construction that require courts to accept the plain meaning of a word or phrase absent clear evidence that another interpretation was intended. *See In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010) (holding that when courts cannot determine whether statutory language is unambiguous, they must "read the statute in its ordinary and natural sense.") (quoting *Harvard Secured Creditors Liquidation Trust v. I.R.S.,* 568 F.3d 444, 451 (3d Cir. 2009)).

EPA also suggests that, while a "modification" triggering PSD permitting typically means "a change in the method of operation," it could also signal that a unit has become "new." Appx-21, Ex. A at 33. But EPA's logic—that modifying a decades-old unit makes it "new"—is flawed and nonsensical. *Id.* It also exposes the myth EPA is trying to perpetuate through its Reactivation Policy: an existing, decades-old, idled plant is somehow considered to be "new." *Id.*

EPA argues that the 2020 Response to Comments revoking the Reactivation Policy is no longer in effect because it was not final agency action, and the PAL permit was never issued. Appx-21, Ex. A at 28-29. And even if the PAL permit had taken effect on March 25, 2021, EPA withdrew not only the PAL permit but the administrative record supporting the PAL permit in its entirety. *See id.* at 29 n.4. But withdrawing the administrative record does not address whether EPA lost all confidence in the logic and fairness of the Policy in 2020. The fact remains that EPA abandoned its ersatz Reactivation Policy.[9]

## C.     *EPA's ersatz Reactivation Policy is legally unsupported.*

EPA's two-year presumption of permanent closure lacks a legal foundation in the Clean Air Act and its implementing regulations. As EPA has admitted, the two-year presumption a policy the Agency created

---

[9] If this Court allows EPA to withdraw the responses it provided to the public regarding the Limetree Bay PAL permit, Port Hamilton respectfully requests that this Court take judicial notice of those responses. *See Anspach v. Cty. Of Philadelphia, Dep't of Pub. Health*, 503 F.3d 256, 273 n.11 (3d Cir. 2007) (a public record may be considered "not for the truth of its contents, but rather as evidence of the information" that was relevant to the dispute."); *see also Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) ("Federal Rule of Evidence 201 permits a court to take judicial notice of facts that are not 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'").

was based on a provision of the PSD program that excluded temporary emissions (i.e., construction-related emissions for two years or less). *See* R. B-13 (October 9, 1979, Letter from EPA to Shell Engineering & Associates). It defies logic for EPA to apply a policy governing the exclusion of temporary emissions to a policy governing when a facility will be considered a "new source" after shutting down and subsequently resuming operations.

The history of the two-year presumption rule helps explain EPA's failure to cite "any specific regulatory provision of the NSR program to support its position on source reactivation." Appx-69, Ex. C at 3 n.2 (internal quotations removed). Port Hamilton agrees with EPA that "it would be better to apply an approach that is more consistent with the text of the existing regulations, provides more certainty, and is simpler for permitting agencies and permitees to understand and follow." Appx-78, Ex. D at 6.

**Issue II:** When an agency determines that an entity is not subject to a regulatory program, it cannot subsequently change that determination unless it discovers new facts or information sufficient to justify the change. In 2018, EPA determined that even under its extra-statutory expansion of the PSD requirements the St. Croix refinery still was not subject to the PSD standards. EPA acted arbitrarily and capriciously in 2022 when it used essentially the same facts it had in 2018 and reached the exact opposite

conclusion and required the refinery to comply with the new construction PSD standards.

EPA's 2022 Determination has all the hallmarks of an arbitrary and capricious agency action. The agency applied an informal agency policy that was never published in the Federal Register, leaving Port Hamilton to speculate how EPA may apply it to the St. Croix refinery. From 2012 through mid-2021, however, EPA was steadfast and clear about one thing—no PSD permit would be required to restart the St. Croix refinery. It was not until late 2021 that EPA began to signal that the refinery might have to go through PSD permitting, and late 2022 before EPA announced it had, in fact, changed its mind about the application of this informal policy. *See* Appx-21, Ex. A at 9.

Courts will not uphold agency action where, as here, it "is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law." *See* 42 U.S.C. § 7607(d)(9)(A)); *see also Nat'l Parks Conservation Ass'n v. E.P.A.*, 803 F.3d 151, 153 (3d Cir. 2015). Courts in this Circuit have found agency action to arbitrary and capricious, for example, where an agency offers "only a conclusory statement which fail[s] to articulate a rational basis for its conclusion" or where it "entirely fail[s] to consider

an important aspect of the problem." *Sierra Club v. E.P.A.*, 972 F.3d 290, 298 (3d Cir. 2020) (internal quotations omitted).

### D.    EPA's 2022 Determination lacks an adequate factual basis.

An agency action is arbitrary and capricious where, as here, the agency fails to "articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983). Courts must consider "whether the [agency's] decision was based on a consideration of the relevant factors and whether there [was] . . . a clear error of judg[e]ment." *Shane Meat Co., Inc. v. U.S. Dep't of Def.*, 88 F.2d 334, 337 (3d Cir. 1986). This consideration is necessary because the "[f]ailure of the agency to address an important aspect of the issue under [its] consideration may be fatal to its conclusion." *Id.* Moreover, if an agency incorporates additional requirements to a statutory term that are inconsistent with its prior decisions, the agency must announce a "principled reason" for adopting those inconsistent requirements. *Valdiviezo-Galdamez v. Attorney Gen. of the United States*, 663 F.3d 582, 608 (3d Cir. 2011) (holding that federal agency acted

arbitrarily when it revised a definition without providing a "principled reason" for its new definition).

In the 2022 Determination, EPA argues that "the proposed [resumption of] operations at of the Refinery qualifies as construction of a new major stationary source" for purposes of PSD regulations because it had been "permanently shut down." Appx-21, Ex. A at 5-6. EPA makes this assertion even though it consistently claimed—in its 2018 Decision, its 2020 Response to Comments, and a 2021 Joint Stipulation[10]—that the refinery was neither shut down nor a new stationary source for purposes of PSD regulations. *See* Ex C (2018 Determination); *see* Appx-78, Ex. D (2020 Response to Comments); *see* Appx-194, Ex. E (Joint Stipulation). EPA lacks a "principled reason" for its abrupt about-face, which therefore should be vacated as arbitrary and capricious. *See Valdiviezo-Galdamez*, 663 F.3d at 608; *Donovan v. Adams Steel Election, Inc.*, 766 F.2d 804, 807 (3d Cir. 1986) (stating that it is "settled that where an agency departs

---

[10] As discussed in Section III of the Argument, after a series of environmental incidents forced a temporary closure of the refinery in 2021, Limetree Bay and EPA entered into a joint stipulation describing what Limetree Bay needed to do before resuming operations; obtaining a new PSD permit was notably absent from the listed requirements. See Appx-194, Ex. E (Joint Stipulation).

from established precedent without announcing a principled reason for such a reversal, its action is arbitrary, and an abuse of discretion.").

EPA's 2022 Determination reversed the agency's two prior decisions. The first reversal was of EPA's conclusion, in its 2020 Response to Comments, that it "no longer believe[d] that the Reactivation Policy is an appropriate policy." Appx-78, Ex. D at 9. The second reversal was of EPA's 2018 Determination, specific to the St. Croix refinery, in which it decided that PSD permitting was not required for the refinery to resume operations. *See* Appx-69, Ex. C. Neither of these reversals in the 2022 Determination, however, came with "principled reason[s]" to justify the Agency's new perspectives on the very same facility. *See Valdiviezo-Galdamez*, 663 F.3d at 608.

EPA attempts to legitimize its backtracking by suggesting it is supported by "some information that either did not exist in 2012 or did not become known to EPA until after issuance of EPA's 2018 letter and the [2020] Response to Comments . . . supporting EPA's December 2020 final PAL permit." Appx-21, Ex. A at 11. In doing so, EPA looks to the six Reactivation Policy factors it used when it made its 2018 Determination. As explained in Section III of Background, however, this evaluation does

little to offer any new, meaningful information. Rather, as discussed below, the Agency's 2022 Decision for the most part simply reinterprets the same set of facts that supported its 2018 Determination.

### i. *The length of time of refinery shutdown and the amount of capital expensed to restart the refinery.*

Applying its Reactivation Policy, EPA first assesses the length in time of the refinery's "shut[ ]down" and the amount of capital its operators expensed to resume its operations. *Id.*; *see also In the Matter of Monroe Electric Generating Plant Entergy Louisiana, Inc.*, Proposed Operating Permit, Petition No. 6-99-2 at 8 (June 11, 1999) ("Shut[ ]downs of more than two years . . . are presumed to be permanent.")). Both of these considerations, applied to Port Hamilton and the St. Croix refinery, reflect a clear intention for the refinery to resume operations.

As a threshold matter, it' important to underscore the fact that the St. Croix refinery was never shut down; it remained in a "hot idle" state between 2012 and 2020, when it resumed operations. Indeed, maintaining a hot idle cost approximately $3 million per month—money that Port Hamilton would have saved if it had in fact shut down the refinery. *See* Appx-64, Ex. B at ¶14. Moreover, the prompt resumption of

operations would have been impossible had the refinery not been maintained in an idled state since 2012. Appx-315, Ex. N ¶6.

In its 2018 Determination, EPA acknowledged that Hovensa "idle[d] the [R]efinery" between 2012 and the 2016 sale to Limetree Bay Terminals. Appx-69, Ex. C at 4. According to EPA, this was evidenced by the fact that "the terminal . . ., wastewater treatment plant, and power generation" continued to operate during this time-period. *Id.* However, EPA's 2022 Determination attempts to distance itself from the 2018 Determination by contending that its "2018 view that the refinery was not permanently shut down did not contemplate that [Limetree Bay] wouldn't attempt to start up until late 2020, one year later than expected" and did not "contemplate [the] $4.1 billion in costs for physical and operational changes necessary to [resume operations at] the refinery." Appx-21, Ex. A at 12-13. Yet EPA never explains how a delay in 2020 of less than a year in resuming operations from idling that began in 2012 could justify overturning the Agency's 2018 Determination.

EPA also claimed that Port Hamilton's $62 million bid for a refinery that had seen as much as $4.1 billion in investment "raises questions about the physical, financial and regulatory viability of the facility." *Id.*

at 8. Apparently, this is because "EPA's understanding is that restarting the refinery would require significant construction and other physical activities that are in addition to the substantial capital and operational investments that Limetree completed before it attempted to restart the refining operations." *Id.* However, the amount Port Hamilton may have initially paid for the refinery is not indicative of the total amount the new owners expected to add to their new investment. Port Hamilton understood that maintaining the plant in a hot idle mode and making preparations to resume operations would likely require substantial additional costs.

EPA's other efforts to manufacture a justification for its reversal are equally unavailing. First, EPA asserts the refinery was "shut down initially for 6 years before actual construction" and was "unable to [resume operations] for over 8.5 years after [the 2012] shutdown." *Id.* at 11. But that assertion overlooks the fact that the refinery always remained in a "hot idle" mode, and that uninterrupted operation of its terminal, wastewater treatment plant, and power generation units constituted partial operation of the refinery. *See* Appx-69, Ex. C at 4. EPA also states that Limetree Bay made "several unsuccessful attempts to

start up the refinery[,] beginning in the last quarter of 2020, but repeated problems at the refinery resulted in . . . complete cessation of operations." The agency itself has recognized the inaccuracy of this assertion, however, having acknowledged that Limetree Bay resumed "production and commercial sales" by February of 2021. Appx-21, Ex. A at 7.

Second, EPA posits that Limetree Bay's "failed attempts to run the facility from late 2020 through 2021 indicate the refinery was not in adequate condition to start up in late 2020." Appx-21, Ex. A at 13. But whatever conditions existed in late 2020 were known to the Agency when it concluded in November of 2020 that, "[c]onsidering the totality of the circumstances . . . the presumption of permanent shutdown [was] . . . rebutted." Record E-03 at 12. Moreover, EPA's Reactivation Policy focuses on the intentions of the facility to restart, which in this case were evidenced by Limetree Bay's substantial investments to resume operations.

Assuming the validity of EPA's Reactivation Policy as "an appropriate method for determining whether the reactivation" of a facility qualifies as a "construction of a new source under the PSD regulations," Appx-21, Ex. A at 3, over forty years of inconsistent PSD

determinations demonstrate the flaws in EPA's approach of determining new sources. The Policy's fallibility, as EPA acknowledges in its 2018 Determination and 2020 Response to Comments, is a consequence of being derived "from a *series* of EPA site-specific determinations and guidance issued over the course of many years." Appx-69, Ex. C at 3 n.2 (emphasis added).

For example, EPA's inconsistent determinations in the 1980s and 1990s found facilities shut down for as much as eight, nine, ten and even eleven years to *not* require PSD permits to resume operations. *See, e.g.,* Appx-256, Ex. H (Port Reading) (facility shut down for eight years not a "new source"); *see* Appx-259, Ex. I (Watertown) (facility shut down for nine years not a "new source"); *see* Appx-269, Ex. J (Noranda Lakeshore Mines) (facility shut down for ten years not a "new source"); *see also* Appx-280, Ex. L at 2 (Policy Determinations Regarding PSD Questions) (Source shut down for 11 years would not be subject to the PSD program if the owner demonstrates that the shutdown was not intended to be permanent). The inconsistency in the agency's subjective approach is perhaps best exemplified by its Elba Island Terminal determination, issued only one year after the Agency's decision in *Monroe Entergy*, where

the agency determined that a facility shut down for *18 years* before it resumed operations was not a "new source" required to obtain a PSD permit. *See* Appx-273, Ex. K at 2 (Elba Island) (observing that the Agency's conclusion that "a facility commercially inactive for 18 years is not a new source definitely extends the Reactivation Policy presumptive rebuttal provision to its limits").

Also unavailing are EPA's attempts to reframe Limetree Bay's investments made over the years to ensure a resumption of operations. Looking back at the same substantial investments that EPA found persuasive in 2020 to find an intent to restart the refinery, EPA in its 2022 Determination EPA now attempts to suggest were not in line with what it would be expected for a restart. *See* Appx-21, Ex. A at 12. But EPA has recognized that such expenditures are often necessary to ensure a smooth resumption of operations. *See* Ex D at 12 (a "presumption of permanent shut[ ]down would be rebutted in this case by evidence showing that the source *continued* to operate in part and that the owners invested *substantial sums* in maintenance of the idled portions of the facility").

It strains all credulity to suggest Limetree Bay's substantial investments toward a *restart* are, today, evidence of an intent to *shut down* a facility, particularly since EPA knows the refinery had operating losses of "$1.3 billion over three years" before it was idled in 2012. Appx-21, Ex. A at 14.

### ii.    *Failure to continuously demonstrate concrete plans to restart the refinery and the cause of the shut down.*

The second and third factors of the Reactivation Policy require EPA to determine whether a facility "continuously demonstrate[d] concrete plans to [resume operation of] the facility sometime in the reasonably foreseeable future" and to determine the "reason for the [facility's] shutdown." *In re Monroe* at 9. All three owners—Hovensa, Limetree Bay, and Port Hamilton—each advanced such restart plans. In 2018, EPA agreed, determining from its review of the existing information "that both [Limetree Bay and Hovensa] displayed a continuous intent to restart the refinery," and that the refinery "was not permanently shut down and should not be considered a 'new source' for purposes of PSD applicability." Appx-69, Ex. C at 2. Yet when EPA reversed course in its 2022 Determination, it failed to point to any newly uncovered facts to support the position that Hovensa or Limetree Bay lacked concrete plans to

35

continue operating the refinery. Rather than presenting statements and demonstrations from the refinery operators regarding their intentions regarding the resumption of operations, EPA speculates about the previous operators' intentions by reinterpreting press releases, negotiation records, and unrelated correspondence, all of which has been available to the agency since 2012.

For example, EPA argues that Hovensa lacked the requisite intent to resume operations at the facility because (1) Hovensa evidenced its lack of intent to continue the plant operations when it entered into agreements with the U.S. Virgin Islands government and Petroleos de Venezuela, S.A ("PVDSA") following the refinery's closure; (2) Hovensa filed Chapter 11 bankruptcy proceedings in 2015; and (3) a letter Limetree Bay sent to the Governor of the U.S. Virgin Islands stated that it intended to "refurbish, resume operations at, and operate an oil storage terminal . . . [and explore available options for resuming petroleum operations in the facility]." *See* Appx-21, Ex. A at 14. Not only does this information fail to show an intent to shut down refinery operations, but it was readily available at the time of EPA's 2018 Determination.

Although Hovensa initially contemplated the prospect of using part of the refinery for fuel storage after it idled the refinery in January 2012, it was clear under an agreement with the U.S. Virgin Islands (the "Concession Agreement") that Hovensa was required to continue operating the facility or find an alternative owner who would do so. *See* Appx-288, Ex. M (July 12, 2013, Letter from the Governor of the U.S. Virgin Islands to President of U.S. Virgin Islands Legislature); *see also* Appx-21, Ex. A at 6 n.3. Subsequently, Hovensa and the U.S. Virgin Islands amended the Concession Agreement to reflect the company's intention to sell the facility to another entity that would continue refinery operations. *See* Appx-288, Ex. M.

The history of frequent and regular activities undertaken by Hovensa and Limetree Bay towards the refinery's resumption of operations further belies any suggestion that these entities intended to permanently shut down the facility. Hovensa and Limetree Bay engaged in monthly walk-throughs, extensive maintenance, and continued correspondence with EPA and U.S. Virgin Islands Department of Planning and Natural Resources ("VIDPNR") to preserve their permits, all of which were strong indicators of their objective to maintain the

refinery's ability to resume operations. *See generally* Appx-236, Ex. G (Hovensa/Limetree Bay Timeline Demonstrating Intent to Restart). EPA even acknowledged that the "timeline" Limetree Bay provided the Agency "included evidence of continuous intent by [Hovensa] and [Limetree Bay] to restart the facility. Appx-69, Ex. C at 4.

The intention to restart was also clear from Hovensa's February 21, 2012, announcement "that it had completed the final idling of all refinery units [and] informed the [U.S. Virgin Islands] government of its plans to retain permits and implement maintenance procedures on the equipment so that it could restart the refinery." *Id.* Over the subsequent years, Hovensa "spent over $400 million to maintain the restart capability of [its] [r]efinery [operations], which included residual material from the equipment, retaining control room operability, and conducting other equipment mothballing activities." *Id.*

In contrast, Hovensa's initial thoughts about using the refinery as a storage terminal for a brief period of time underscores the unreliability of using intent as an indicator of idling vs shutdown. *See* Record E-03 at 10. EPA acknowledged as much by conceding that Hovensa's statements were "simply a statement about the facts on the ground after the

[R]efinery operations were idled while the other operations were not . . . [and] does not appear in any way to define [Hovensa's] permanent plans for the facility." *Id.; see also* Record E-03 at 7 (EPA recognizes that an owner's statements "may be made for other reasons, such as for the purpose of business negotiations, and the cause of a shutdown may be multifaceted or simply unknowable."). Furthermore, EPA understood that "factors, such as [the] owner statements and cause of the shutdown, are highly dependent on the interpretation of the regulator and invite speculation." *Id.* at 7. This helps explain why, in 2020, EPA confirmed its earlier determination that Hovensa and Limetree Bay "demonstrated a continuous intent" to resume operations, *id.* at 9, only to have EPA, just two years later completely reverse course. *See* Appx-21, Ex. A at 21.

EPA can easily synthesize statements made by various participants of the refinery's decade-long saga, but, at bottom, the agency does not *know* the subjective intent of the owner's intentions unless the owner or operator makes its intention clear to the agency. What is left for EPA is nothing more than cherry-picked statements by the prior owners, aided by extensive hindsight speculation. Ultimately, as EPA has recognized, the Reactivation Policy is "difficult to apply and can lead to inconsistent

results[] [because of the] subjective judgments of those applying the [P]olicy." Appx-78, Ex. D at 7.

### iii.    *The refinery's permits, maintenance and inspections during its hot idle*

The last two factors concern the status of the facilities' permits and the maintenance and inspections undertaken during the facility's shutdown. *In re Monroe* at 9.

In terms of permits, Hovensa, Limetree Bay, and Port Hamilton all held permits to operate the St. Croix refinery. EPA acknowledges that the refinery's permits "at first glance, appear[] potentially most consistent with the determination that the refinery was not permanently shut down in 2012." Appx-21, Ex. A at 20. But then EPA tries to walk back from that conclusion, alleging that "in light of changed circumstances and new information related to the other factors . . . a more detailed review of the structure of the permits, and subsequent developments, suggest that" this factor does not "compellingly support a determination that the refinery was not permanently shut down." *Id.* Specifically, EPA alleges that, although the refinery maintained its Title V operating permit, its existing PSD permit, and its Clean Water Act permit for the utilities shared by the refinery and the terminal, Hovensa's

40

"stated desire to avoid future New Source Review (NSR) permitting [did] not demonstrate concrete plans to restart or overcome other actions that speak to a permanent shut[]down." *Id.* This is a *non sequitur.* Even under EPA's ill-defined Policy, it is Hovensa's actions to keep the refinery fully permitted and well-maintained for a restart that evidence its intent not to permanently shut down, rather than whether the company might want to avoid PSD for an unmodified, existing facility.

Additionally, EPA attempts to include extraneous information concerning air quality impacts in its assessment of facility owners' intention to remain open. It states that "there are uncertainties about whether the refinery would cause or contribute to violations of new or revised [National Ambient Air Quality Standards ("NAAQS")] and PSD increments." *Id.* at 9. The Agency further notes "there are no existing air quality demonstrations to assess attainment of any of the new or revised NAAQs that include projected emissions from the refinery." *Id.* But at no point does the agency explain how any of this information is relevant to Limetree Bay's or Port Hamilton's intent to resume operations, or even how it would be of any relevance to Hovensa's intent nearly a decade earlier.

EPA even suggests that "the vulnerable community neighborhood the refinery has already experienced manifold health and environmental impacts over decades from multiple sources[,] including from" Hovensa and Limetree Bay. *Id.* at 10. Again, lacking any genuine support for its new view on PSD permit status, EPA highlights important but irrelevant matters to the question of the owners' intent that the refinery to remain operational.

EPA also suggests Hovensa's Territorial Pollution Discharge Elimination System (TPDES) permit renewal application to the [Virgin Islands Department of Planning and Natural Resources] reflects Hovensa's primary objective, to convert the refinery to an oil storage terminal. *Id.* at 20. Even if this were true, which it is not as discussed above, this factor of the Reactivation Policy is to determine the *status* of facility's permits, not the scope or terms of those permits. EPA offers no evidence to refute a finding that Hovensa and Limetree Bay maintained all the necessary permits to continue operations at the refinery. In fact, EPA concedes that Hovensa, Limetree Bay, and Port Hamilton maintained the necessary permits from the U.S. Virgin Islands Department of Planning and Natural Resources. *Id.*

Although EPA acknowledges Limetree Bay "provide[d] maintenance records to EPA in 2018, which are referenced in EPA's 2018 letter," it now argues it did not consider "the underlying logs and records that [Limetree Bay] transmitted to EPA on January 26, 2018," three months prior to the 2018 Determination. Appx-21, Ex. A. at 21-22. Yet EPA's 2020 Response to Comments appreciated the owners' efforts to properly maintain the refinery for restart. *See* Appx-78, Ex. D at 11 (noting that the "$400 million spent on maintenance by Hovensa" demonstrated the "magnitude of . . . investment in maintenance of the facility," which "evidence[d] an intent by the owners to restart the facility."). EPA's efforts to recharacterize these same logs and records as evidence of *poor* maintenance of the refinery by Hovensa and Limetree Bay between 2012 and 2017 are unpersuasive and do little to counter the undisputed fact that the refinery remained in a hot idle mode.

**E.    *EPA's 2022 Determination failed to consider important aspects of the problem.***

The 2022 Determination is also arbitrary and capricious because it has "entirely failed to consider an important aspect of the problem." *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also Ams. Disabled for Accessible Pub. Transp. v. Skinner*, 882 F.2d 1184, 1201 (3rd Cir. 1989).

Specifically, EPA has failed to consider the devastating effects its Determination will have on the regional and local economy surrounding the refinery. Nowhere in its 2022 Determination, or in its subsequent letter of January 5, 2023, does it address these impacts. *See Del. Dep't of Nat. Res. & Envtl. Control v. E.P.A.*, 785 F.3d 1, 11 (D.C. Cir. 2015) (holding that courts will reverse agency actions that do not "engage the arguments raised" before the agency).

Many of these impacts are described in an October 13, 2021, report from the U.S. Virgin Islands Bureau of Economic Research ("VIBER"), which analyzed the repercussions of the refinery's hardships since 2012. *See* U.S.V.I. Bureau of Econ. Rsch., U.S. Virgin Islands Economic Impact: Closing of Limetree Bay Refinery (Oct. 13, 2021) (hereinafter "VIBER Report"). VIBER noted that the refinery "supported a total of 800 jobs, $112 million in wages, $1.8 billion in sales, and $644 million of [the U.S. Virgin Islands'] gross domestic product." *Id.* at 3.

Furthermore, VIBER contended that, while the refinery directly made a "substantial economic contribution, it [also] played an arguably valuable role in supporting many jobs, incomes, and businesses

44

elsewhere in the economy through [its] supply chain activities and household spending of earned income." *Id.* at 6.

U.S. Virgin Islands Governor Albert Bryan also has repeatedly emphasized the impact of the refinery on the territory's economy. When Limetree Bay idled refinery operations in May 2021, Governor Bryan specifically predicted a loss of "indirect employment such as trucking and support services . . . and that some laid-off workers could lose their homes." Juliet Eilperin & Darryl Fears, *Controversial St. Croix Refinery Ceases Operations Given 'Extreme Financial Constraints,'* Wash. Post (June 21, 2021, 5:24 P.M.), https://www.washingtonpost.com/climate-environment/2021/06/21/limetree-bay-refinery.

**Issue III:** An agency is permitted to change, or even reverse, a prior agency action, but its ability to do so is significantly constrained if a party has acted in reliance upon the prior action. Port Hamilton made a $62 million purchase, and then spent more than that same amount in the process of preparing the refinery to resume operations, in reliance upon EPA's 2018 Determination, only to have that decision reversed in EPA's 2022 Determination. EPA's reversal of its 2018 Determination violated Port Hamilton's protected reliance interests and therefore should be vacated.

When Port Hamilton acquired the St. Croix refinery in early 2022, it did so in reliance upon EPA's statements and actions demonstrating that a PSD permit would not be needed to resume operations at the refinery. First and foremost, Port Hamilton relied upon EPA's 2018 Determination, which indicated that Port Hamilton could use the refinery's existing operating permits without going through PSD. EPA unequivocally asserted that "resuming operations at of the [R]efinery's idled units . . . should *not* be treated as a new stationary source." Appx-21, Ex. A at 3 (emphasis added).

Second, Port Hamilton's reliance was further buttressed by EPA's 2020 Response to Comments on Limetree Bay's request for a plant-wide emission standard at the St. Croix refinery, which confirmed the Agency's 2018 Determination and called for an abandonment of the Reactivation Policy given its inherent flaws. *See* Appx-78, Ex. D at 12; *see also* Appx-69, Ex. C at 3 n.2. EPA found that Limetree Bay's "continued" operation of the refinery, its investment of "substantial sums in maintenance of the idled portions" of the refinery, and its continued holding of permits "governing the operation of the idled equipment"—the same operational

46

permits Port Hamilton holds to this day—rebutted a presumption that the refinery may have shut down. Appx-78, Ex. D at 12.

Third, in May 2021, due to a series of environmental incidents that caused pollutants to be released into nearby communities, EPA issued an order pursuant to section 303 of the CAA, which required the refinery's compliance within 60 days. *See* Appx-194, Ex. E at 2 (Joint Stipulation); *see* 42 U.S.C. § 7603. EPA then filed a complaint in the U.S. District Court for the Virgin Islands, alleging Limetree Bay had failed to comply with the CAA by operating the refinery poorly, leading to the environmental incidents. The 2021 Joint Stipulation that stayed EPA's complaint specified what Limetree Bay needed to do before resuming operations at the refinery; obtaining a new PSD permit was notably missing from the list of requirements. *See* Appx-194, Ex. E.

Fourth and finally, Port Hamilton's reliance interests were confirmed by EPA's actions in authorizing Limetree Bay to restart the refinery without a PSD permit. In purchasing the refinery, Port Hamilton therefore justifiably relied on the Agency's pronouncements and actions—a reliance interest that EPA violated by reversing its decision, which further renders EPA's 2022 Determination arbitrary and

capricious. Furthermore, it is inexcusable for EPA to wait four years to revisit its prior determination, too. See *Nat'l Ass'n of Trailer Owners, Inc. v. Day*, 299 F.2d 137, 139-40 (D.C. Cir. 1962) ("[I]f there is to be any stability and fairness in administrative proceedings . . . [agencies' reconsideration] power must be exercised both within a reasonable time after the issuance of a final departmental decision and without subjecting the parties affected by any undue or unnecessary hardships.").

"[W]hen . . . [an agency's] new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests," such interest must be examined by the Court. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). This is because a "[s]udden and unexplained change . . . or change that does not take account of legitimate reliance on prior interpretation . . . may be arbitrary, capricious [or] an abuse of discretion." *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996); 5 U.S.C. § 706(2)(A). Accordingly, although an agency's initial interpretation is not instantly carved in stone, an agency may only "change its course [when] it can justify its change with a reasoned analysis." *Horn v. Thoratec Corp.*, 376 F.3d 163, 179 (2004). The rationale

EPA offers rings hollow because it focuses on whether it provided fair notice of its reversal, rather than whether its reversal is justified in the first place given Port Hamilton's reliance interests.

EPA first states that, before Port Hamilton purchased the refinery, EPA placed a letter in a bankruptcy "reading room" to let any prospective purchaser of the refinery know that it "*may* also be required to obtain a [PSD] permit under the Clean Air Act to restart the refinery." Appx-21, Ex. A at 9 (emphasis added). That is the extent of what EPA offers in terms of prior notice to Port Hamilton prior to its purchase of the refinery. This statement, however, falls far short of stating that a PSD permit would be required; a purchaser could readily agree that such a permit might be required if the purchaser, prior to resuming refining operations, were to modify any unit in a way that would be considered a 'major modification' under the PSD regulations.

Grasping at straws, EPA asserts that the "2018 [Determination] sent a clear message that since EPA did not have all the specifics regarding [Limetree Bay's plans], a final determination would be left for a later time." Appx-21, Ex. A at 6; *see* Ex C at 9. However, the 2018 Determination *was* definitive, and EPA's acquiescence with Limetree

Bay's 2020 resumption of refinery operations without a PSD permit confirmed such. Until the 2022 Determination, EPA never changed its views. *See* Appx-69, Ex. C at 3 ("Therefore, applying the criteria of the current Reactivation Policy, *we have determined that* [Prior Owner's refinery] was not shut down and should not be considered a 'new source' for purposes of PSD applicability.") (Emphasis added.)

EPA first provided Port Hamilton some notice of its potential change in position in a March 2022 letter, but even there EPA spoke only of a *potential* PSD applicability to the refinery. *See* Appx-21, Ex. A at 9. And by that time it was too late; Port Hamilton already had justifiably relied on the Agency's words and deeds and completed its purchase of the refinery.

Port Hamilton justifiably relied upon EPA when it invested more than $62 million to purchase the plant and invested even more than that amount to make the plant fully operational. EPA cannot nullify that reliance interest by second-guessing its own earlier determination regarding the application of PSD to the idled facility.

**Issue IV:** An agency action is final, providing the Court with jurisdiction to review the action, if it marks the consummation of the agency's decision-making process and is one by which rights or obligations have been determined, or from which legal consequences will flow.

EPA's 2022 Determination prohibits Port Hamilton from resuming operations at the refinery without first going through a multi-year PSD permitting process. EPA's 2022 Determination was a final agency action, providing this Court with jurisdiction to review that action.

Section 307(b) provides for judicial review of any action undertaken by the Administrator under specifically enumerated provisions of the Act and of "*any other final action* of the Administrator." (Emphasis added.) The Supreme Court has held that the phrase "final action" has the same meaning under section 307(b)(1) that it has under the Administrative Procedure Act. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). Under both the Clean Air Act and the Administrative Procedure Act, agency action is considered final for purposes of judicial review if it (1) "marks the consummation of the agency's decision[-]making process," and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997); *Biden v. Texas*, 597 U.S. __, 142 S. Ct. 2528, 2544-45 (2022). Ultimately, the "core question" is whether the agency has completed its decision-making process and whether the result of that process will

51

directly affect the parties. *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).[11]

The phrase "final agency action" is given "a pragmatic definition." *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 249 (3d Cir. 2011), as amended (Mar. 7, 2012) (quoting *Exxon Corp. v. F.T.C.*, 588 F.2d 895, 901-02 (3d Cir. 1978); *see also U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599 (2016) (holding that courts take a "pragmatic" approach to this inquiry). This Court has identified five specific, pragmatic considerations that can assist in determining whether agency action is final:

(1)    whether the decision represents the agency's definitive position on the question;
(2)    whether the decision has the status of law with the expectation of immediate compliance;
(3)    whether the decision has immediate impact on the day-to-day operations of the party seeking review;

---

[11] Because the finality inquiry is a pragmatic one, it does not matter that the 2018 Determination has not been published in the Federal Register; publication in the Federal Register is not a requirement for evaluating whether agency action is final. *See, e.g., Her Majesty the Queen in Right of Ontario*, 912 F.2d 1531 (D.C. Cir. 1990) (holding that two letters issued by EPA were "final action" even though they were not published in the Federal Register); *Renewable Fuels Ass'n v. E.P.A.*, 948 F.3d 1206, 1214 (10th Cir. 2020) (similarly reviewing final agency action that was not published in the Federal Register), *rev'd sub nom.* on other grounds, *HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172 (2021).

(4)    whether the decision involves a pure question of law that does not require further factual development; and

(5)    whether immediate judicial review would speed enforcement of the relevant act.

*Minard Run Oil Co.,* 670 F.3d at 249 (citing *Univ. of Med. and Dentistry of N.J. v. Corrigan*, 347 F.3d 57, 69 n.7 (3d Cir. 2003)); *see also Ocean Cty. Landfill v. E.P.A.*, 631 F.3d 652, 655 (3d Cir. 2011).[12] Each of these factors supports the conclusion that the 2022 Determination was a final agency action.

## F.    *The 2022 Determination Represents EPA's Definitive Position on Whether Port Hamilton Has to Go Through PSD Before Restarting*

When EPA issued the 2022 Determination to Port Hamilton, the Assistant Administrator of EPA's Office of Air and Radiation communicated that the Agency had reached its decision after completing a "detailed" evaluation of whether the refinery would require a PSD permit. *See* Appx-21, Ex. A at 3. EPA was unequivocal in the 2022

---

[12] In *Ocean County Landfill*, this Court held that a "common control" determination made by EPA in an air permitting matter was not final agency action. 631 F.3d 652, 655. More specifically, this Court held that EPA's determination was merely an "intermediate step" and the state air permitting authority may opt to reject EPA's determination. *Id.* at 655-56. Unlike the determination made by EPA in *Ocean County Landfill*, the 2022 Determination has an immediate impact on the day-to-day operations at the St. Croix refinery and the determination was made by the agency directly responsible for issuing the air permit at issue.

Determination, stating "*EPA has concluded that* [Port Hamilton] *is required to apply for and receive a final and effective PSD permit prior to resuming operations* at the refinery or beginning actual construction as defined in 40 C.F.R. 52.21(b)(11)." *Id.* at 1 (emphasis added).

This Court has found similar determinations by EPA to constitute final agency action. *See, e.g., Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 587 (1980) (EPA's applicability determination deemed final agency action because, "short of an enforcement action, EPA has rendered its last word on the matter"); *Star Enterprise v. E.P.A.,* 235 F.3d 139, 145 (3d Cir. 2000) (EPA's determination that gas turbines at a refinery were subject to regulation under the New Source Performance Standards of the Clean Air Act was final agency action, reflecting the "consummation of the agency's decision[-]making process").

Here, EPA acknowledges that its 2022 Determination was the consummation of its internal deliberations and decision-making process. As stated in the 2022 Determination, Appx-21, Ex. A at 2-3:

EPA has completed its review . . . and closely examined the facts and circumstances of the refinery since it was shut down . . . . Based on EPA's analysis of the specific factors in the Reactivation Policy, we

54

conclude that the refinery was completely shut down in 2012 and that resuming operations at the refinery qualifies as construction of a new major stationary source under federal PSD permitting regulations.

## G. *The 2022 Determination Has the Status of Law with the Expectation of Immediate Compliance*

The 2022 Determination leaves no room for ambiguity as to its legal import:

> [T]he refinery *must* apply to EPA for, and receive, a final effective PSD permit for these pollutants prior to resuming operations at or beginning actual construction at the refinery, as defined in 40 CFR 52.21(b)(11). The PSD permit application should include, among other information, analyses of air quality impacts, environmental justice, and Best Available Control Technology.

*Id.* at 4 (emphasis added). This language is not advisory. If Port Hamilton were now to resume operations at the refinery without a PSD permit, it would be subject to an immediate enforcement action by EPA.

The 2022 Determination reflects the reality that "rights or obligations have been determined" and "legal consequences will flow" from EPA's decision. *See TSG Inc. v. E.P.A.,* 538 F.3d 264, 267 (3d Cir. 2008) (finding legal consequences where petitioner was obligated to abide by a particular hazardous air pollutant control standard); *Haw. Electric v. E.P.A.*, 723 F.2d 1440, 1442 (9th Cir. 1984) (EPA's decisions impacting

even "*interim* step[s] in the PSD permitting process," such as EPA's actions on a permit application, can constitute final agency action because they have "immediate legal consequences.") (emphasis added).

The 2022 Determination does what all agency final actions do—"[i]t commands, it requires, it orders, and it dictates." *Appalachian Power Co. v. E.P.A.* 208 F.3d 1015, 1023 (D.C. Cir. 2000) (holding that EPA guidance has legal consequences and is therefore reviewable as final agency action). Withholding judicial review in such cases would "force a party . . . to comply with an agency ruling that it believes unlawful." *Roosevelt Campobello Intern. v. E.P.A.*, 684 F.2d 1034, 1040 (1st Cir. 1982).

## H.    *The 2022 Determination Has an Immediate Impact on the Day-to-Day Operations of Port Hamilton*

EPA's conclusion that the St. Croix refinery must go through a PSD permit process before it can be restarted has had immediate, concrete, and costly consequences for Port Hamilton. To comply with EPA's PSD regulations, Port Hamilton must delay the resumption of operations of its refinery for two to three years, model its potential future emissions, and assess and install controls for the Best Available Control Technology ("BACT") for each of the units to be restarted. *See generally* 40 C.F.R. pt. 52 (PSD regulatory requirements); *see also* Appx-21, Ex. A at 4.

Left undisturbed, the 2022 Determination means Port Hamilton

likely would have to wait until 2026 or later before resuming operations.

This possible delay, coupled with the uncertainty of the PSD permitting

process outcome, jeopardizes Port Hamilton's plans to resume the

refinery's operations and threatens its very existence. An extended

schedule also adds substantial costs which may render this project

uneconomical. If the resumption of operations is delayed, Port Hamilton

may have to abandon its plans and shut down and dismantle the refinery,

which would devastate the local economy and eliminate jobs and tax

revenue. *See* Appx-64, Ex. B (Chambers Decl.) at ¶¶12, 14-15; *see also*

U.S. Virgin Islands, Bureau of Economic Research, *U.S. Virgin Islands*

*Economic Impact: Closing of Limetree Bay Refinery* (Oct. 13, 2021),

https://usviber.org/document/economic-impacts-of-the-limetree-bay-

closing.

## I.    *The 2022 Determination involves a pure question of law that does not require further factual development*

The basic facts and circumstances behind the idling of the St. Croix

refinery are not in dispute. While Port Hamilton may take issue with

EPA's *characterization* of certain events or its omission of other

important facts in the 2022 Determination—including its attachments—

Port Hamilton's disagreements derive more from misplaced conclusions EPA reaches based on that history. No further factual development will alter the EPA's conclusion.

### J.    *Immediate judicial review would speed Port Hamilton's ability to restart*

The St. Croix refinery is at a crossroads. If Port Hamilton is able to resume operations—as EPA repeatedly agreed to allow in the past—the refinery would bring back additional workers to expeditiously support operations, subject to the safety and environmental requirements of its operating permit issued by the U.S. Virgin Islands Department of Planning and Natural Resources. *See* Appx-203, Ex. F (U.S. Virgin Islands Department of Planning and Natural Resources "VIDPNR" Permit). If Port Hamilton is unable to proceed with its plan, however, the refinery will, at best, delay operations for years or, at worst, commence the closure and dismantling of this important energy provider and economic contributor. *See supra* VIBER Report. Given the terms of the 2022 Determination, the fate of the St. Croix refinery now depends entirely on access to, and the outcome of, judicial review.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, this Court should vacate the 2018 Determination.

Date: February 24, 2023                    Respectfully submitted,

                                           /s/ Andrew C. Simpson
                                           Andrew C. Simpson
                                           V.I. Bar No. 451
                                           ANDREW C. SIMPSON, PC
                                           2191 Church St., Ste. 5
                                           Christiansted, VI 00820
                                           340.719.3900
                                           asimpson@coralbrief.com
                                           www.coralbrief.com

# COMBINED CERTIFICATIONS

I hereby certify that:

## BAR MEMBERSHIP

I am a member in good standing of the bar of this Court.

## WORD COUNT AND TYPE FACE

This brief complies with the type-volume limitation of Fed. R. App. P. 32. It contains fewer than 12,500 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii);

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point, Century Schoolbook font.

## VIRUS CHECK

I certify that ESET NOD32 Antivirus, version 9.1.2063.0, with its virus signature database updated through February 25, 2023, was run on the electronic file and that no virus was detected.

## SERVICE

On February 24, 2023, I served the Response to Requested Briefing on Final Agency Action by using the Court's electronic filing system, which will deliver a Notice of Filing to:

HEATHER E. GANGE
U.S. Department of Justice
Environment and Natural
Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Telephone No: (202) 514-4206
Heather.Gange@usdoj.gov

*Counsel for Respondent*

Corinne Snow
VINSON & ELKINS LLP
1114 Avenue of the Americas
32nd Floor
New York, NY 10036
Phone: (212) 237-0157
Email: csnow@velaw.com

*Counsel for proposed intervener*
*Limetree Bay Terminals, LLC*

Michael Ray Harris
Associate Professor of Law
Environmental Justice Clinic
Vermont Law & Graduate School
PO Box 96, 164 Chelsea Street
South Royalton, VT 05068
(802) 831-1364
mrharris@vermontlaw.edu

*Counsel for proposed intervenors*
*St. Croix Environmental Association,*
*Sierra Club, and Center for Biological Diversity*

/s/ Andrew C. Simpson
As to all certifications

61