# United States Court of Appeals for the Third Circuit

## CASE NO. 23-1094

———————————————

PORT HAMILTON REFINING AND TRANSPORTATION, LLLP

PETITIONER,

VS.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

RESPONDENT.

———————————————

## APPENDIX OF
## PORT HAMILTON REFINING AND TRANSPORTATION, LLLP

On review from the November 16, 2022 Determination
of the Environmental Protection Agency

Andrew C. Simpson
ANDREW C. SIMPSON, P.C.
2191 Church St., Ste. 5
Christiansted, VI  00820
340-719-3900
asimpson@coralbrief.com
www.coralbrief.com

## NOTE TO THIS APPENDIX

Port Hamilton is filing in this Appendix exhibits that are either: listed by the United States as being part of the Administrative Record (Exhibits A, C, D, and F); other official government records (Exhibits H, I, J, K and L); part of Port Hamilton's argument on reliance interests (Exhibits A, C, D, E, and N); or part of Port Hamilton's jurisdictional argument on final agency action (Exhibits A, B, and F).

## TABLE OF CONTENTS

Certified Index of the Record ....................................................... 1

Petition for Review ..................................................................... 17

Exhibit A  2022 Determination (The "Decision in Question") ............... 21

Exhibit B  Chambers' Declaration ........................................... 64

Exhibit C  2018 Determination .............................................. 69

Exhibit D  2020 Response to Comments ................................. 78

Exhibit E  Joint Stipulation ................................................. 194

Exhibit F  U.S. Virgin Islands Department of Planning and
Natural Resources "VIDPNR" Permit ........................................ 203

Exhibit G  Hovensa and Limetree Bay Timeline Demonstrating
Intent to Restart ..................................................................... 236

Exhibit H  EPA Port Reading letter ........................................ 256

Exhibit I  EPA Watertown letter ............................................ 259

Exhibit J  EPA Noranda Lakeshore Mines letter .......................... 269

Exhibit K  EPA Elba Island letter ........................................... 273

Exhibit L  Policy Determinations Regarding PSD
Questions ............................................................................. 280

Exhibit M  July 12, 2013 Letter from the Governor
of the U.S. Virgin Islands ......................................................... 288

Exhibit N  Declaration of Eduardo G. Del Valle
with attachment ..................................................................... 315

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

PORT HAMILTON REFINING
AND TRANSPORTATION, LLLP
     Petitioner,

v.

U.S. ENVIRONMENTAL
PROTECTION AGENCY,

     Respondent.

)
)
)
)
)
)
)
)
)
)

Case No. 23-1094

-------------------------------------------------------------------------------------------

## CERTIFIED INDEX TO THE ADMINISTRATIVE RECORD

   I, Scott Mathias, am Director of the Air Quality Policy Division of the Office of Air Quality Planning and Standards within the Office of Air and Radiation for the United States Environmental Protection Agency (EPA).

   I certify that the attached index lists the documents constituting the administrative record for EPA's letter determination, dated November 16, 2022, that Port Hamilton Refining and Transportation, LLLP, together with West Indies Petroleum Limited, was required to apply for and receive a final and effective Prevention of Significant Deterioration permit prior to restarting, or beginning actual construction as defined in 40 CFR 52.21(b)(11), at the refinery located at 1 Estate Hope, Christiansted, St. Croix, U.S. Virgin Islands.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 21st day of February 2023 at Research Triangle Park, North Carolina.

*Scott Mathias*

Scott Mathias
Office of Air Quality Planning and Standards
U.S. Environmental Protection Agency

# LIST OF DOCUMENTS IN THE ADMINISTRATIVE RECORD FOR PHRT's ACTION

### A.    Decision Document

A-01 Letter from Joseph Goffman to Julie R. Domike and Thomas V. Eagan concluding that West Indies Petroleum Limited (WIPL) and Port Hamilton Refining and Transportation, LLLP (PHRT) are required to apply for and receive a final and effective PSD permit prior to restarting the Refinery or beginning actual construction as defined in 40 CFR 52.21(b)(11) (Nov. 16, 2022).

A-02 Attachment 1 to the November 16, 2022 Letter, "Application of EPA's Reactivation Policy Permanent Shutdown Factors to the Port Hamilton Refining and Transportation LLLP Refinery".

A-03 Attachment 2 to the November 16, 2022 Letter, "Affirmation of EPA's Long-Standing Reactivation Policy".

NOTE: See also Section J, Document J-01, below, for Attachment 3 to the November 16, 2022 Letter.

### B.    EPA communications Re: reactivation policy

B-01 EPA Memorandum, Guidance for Ozone and Fine Particulate Matter Permit Modeling (Jul. 29, 2022).

B-02 EPA letter from William Wehrum to LeAnn Johnson Koch "Re: Limetree Bay Terminals, St. Croix, U.S. Virgin Islands - Permitting Questions" (Apr. 5, 2018).

B-03 Letter from Judith A. Enck, EPA Region 2, to Basil Seggos, New York Department of Environmental Conservation, Re: EPA Review of Proposed Title V Operating Permit for Greenidge Station Permit ID: 8-5736-00004/00017 (Dec. 7, 2015).

B-04 EPA letter from R. Douglas Neeley to Ronald Methier "Re: Southern LNG, Inc., Elba Island Terminal, Savannah Georgia Draft Air Quality Permit and PSD Preliminary Determination" (Dec. 13, 2000).

B-05 In the Matter of Monroe Electric Generating Plant Entergy Louisiana, Inc., Proposed Operating Permit, Petition No. 6-99-2 (Jun. 11, 1999).

B-06 Memorandum from John B. Rasnic to Douglas M. Skie, Applicability of PSD to Watertown Power Plant, South Dakota (Nov. 19, 1991).

B-07 EPA Draft New Source Review Workshop Manual (Oct. 1990).

B-08 Letter from David P. Howekamp, Director, Air Mgt. Div., Region IX, to Robert T. Connery, Holland & Hart (Nov. 6, 1987).

B-09 Memo from John S. Seitz, Director, Stationary Source Compliance Div., OAQPS, to David P. Howekamp, Director, Air Mgt. Div., Region IX (May 27, 1987).

B-10 Memo from Edward E. Reich, Director, Stationary Source Enforcement Div., to William

B-11 K. Sawyer, General Enforcement Branch, Region II (Aug. 8, 1980).

B-12 Record of Phone Call, Roger Pfaff to Rich Biondi (Jun. 18, 1980).

B-13 Letter from William A. Spratlin, Jr., P.E., Chief, Air Support Branch, Air and Hazardous Materials Division, EPA, to Harvey D. Shell, Shell Engineering and Associates (Oct. 9, 1979).

B-14 Memo from Edward E. Reich, Director, Div. of Stationary Source Enforcement, to Stephen A. Dvorkin, Chief, General Enforcement Branch, Region II (Sept. 6, 1978).

B-15 Memo from Edward Reich to James McDonald (Nov. 2, 1977).

## C.    **Federal Register Notices/Congressional Records**

C-01 82 Fed. Reg. 5182 (Jan. 17, 2017).

C-02 67 Fed. Reg. 80186 (Dec. 31, 2002).

C-03 45 Fed. Reg. 52676 (Aug. 7, 1980).

C-04 43 Fed. Reg. 26388 (June 19, 1978).

C-05 H.R. Rep. No. 294, 95th Cong., 1st Sess. 185, reprinted in 1977 U.S. Code Cong. & Admin. News.

## D.    **Bankruptcy-related documents**

D-01 In re: Limetree bay Services, LLC, et al., No 21-32351, EFC No. 977, Order (I) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (II) Authorizing the Debtors to Perform Under the Asset Purchase Agreement, (III) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief (Bankr. S.D. Tex. Dec. 21, 2021).

D-02 In re: Limetree Bay Services, LLC, et al., Case No. 21-32351, Joint Stipulation between the United States and Limetree Allowing Occupational Health and Safety Administration to issue a Citation and Notification of Penalty pursuant to Inspection 1521774 (Bankr. S.D. Tex. Nov. 8, 2021).

D-03 Letter from Dore La Posta, EPA Region 2, to All Potential Buyers of Limetree Bay Refinery (Sept. 24, 2021).

D-04 In re: Limetree Services, LLC, et al., Case No. 21-32351, U.S. Bankruptcy Court, Southern District of Texas, Declaration of Mark Shapiro, Senior Managing Director for GlassRatner Advisory & Capital Group LLC, Chief Restructuring Officer for Limetree (Bankr. S.D. Tex. Jul. 12, 2021).

D-05 In re: Limetree Services, LLC, et al. Case No. 21-32351, Notice of Designation of Winning Bid and Back-Up Bid, Elizabeth A. Green, Baker & Hostetler LLP (Bank. S.D. Tex Dec. 18, 2018).

D-06 In re: HOVENSA, LLC, Debtor, Declaration of Joel H. Holt, Case No. 15-100003 (Bankr. Dist. U.S.V.I. Nov. 29, 2015).

D-07 In re: HOVENSA LLC, Debtor, Certification of Thomas E. Hill In Support of Chapter 11 Petition and First Day Motions, Case No. 1:15-bk-10003 (Bankr. Dist. U.S.V.I. Sept. 15, 2015).

### E.    EPA PSD Permits and Plantwide Applicability Limit Permitting Documents

E-01 Administrator Michael S. Regan, Withdrawal of Plantwide Applicability Limit, Permit No. EPA-PAL-VI001/2019 (Mar. 25, 2021).

E-02 Final EPA Plantwide Applicability Limit Permit for Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC, PAL permit No. EPA-PAL-VI001/2019 (Dec. 2, 2020).

E-03 Response to Comments on the Draft PAL Permit issued by EPA on September 30, 2019 to Limetree Bay Terminal and Limetree Bay Refining, EPA-PAL-VI001/2019 (Dec. 2, 2020).

E-04 Transcript of November 8, 2019 Public Hearing on the Draft Plantwide Applicability Limit.

E-05 Draft Plantwide Applicability Limit Permit, to Limetree Bay Terminal and Limetree Bay Refining (Sept. 20, 2019).

E-06 Final EPA Environmental Justice Analysis Re: Draft Plantwide Applicability Limit Permit, EPA-PAL-VI001/2019 (Sept. 19, 2019).

E-07 Letter from John Filippelli, EPA, to Darius Sweet, CEO, Limetree Bay Terminals, LLC, "Re: Transfer of PSD Permits from HOVENSA, LLC to Limetree Bay Terminals, LLC" (Nov. 5, 2018).

E-08 Letter from Darius Sweet, CEO, Limetree Bay Terminals, LLC, to John Filippelli, EPA, "Re: Request to Transfer HOVENSA PSD Permits," (Oct. 3, 2018).

E-09 Final Revised PSD Permit and attachments issued by EPA to HOVENSA for its Gas Turbine 13, located in St. Croix, United States Virgin Islands (USVI) (last revised on August 17, 2011).

E-10 Final Revised PSD and attachments issued by EPA to HOVENSA for its FCCU, Sulfuric Acid Plant, Process Heaters, Tail Gas Treatment Systems and VOC Fugitive Emissions Sources (NOx Converter Heater replacement at refinery's sulfuric acid plant), located in St. Croix, USVI (last revised May 9, 2011).

E-11 Final Revised PSD Permit and attachments issued by EPA to HOVENSA for its Gas Turbine 10, located in St. Croix, USVI (last revised on August 15, 2007).

**F.       USVI Department of Planning and Natural Resources Permit Documents**

F-01 U.S. Virgin Islands Department of Planning and Natural Resources (DPNR), Revised Authority to Construct and Permit to Operate for Limetree Bay Terminals, LLC/Limetree Bay Refining, LLC, Permit (MARPOL Project, Revised) STX-924-AC-PO-20 (May 8, 2020) (received by EPA on June 30, 2020).

F-02 Letter from Brian K. Lever and Darius Sweet, Limetree Bay Refining, LLC, to Kathlyn Worrell-George, Director, DPNR, "Updated Title V Permit Renewal Application" (Jul. 17, 2019).

F-03 Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC, Title V Minor Modification Update/Renewal Application (partially redacted due to confidential business information claims) (July 2019).

F-04 DPNR, Authority to Construct for Limetree Bay Terminals, LLC/Limetree Bay Refining Operating, LLC, Permit (MARPOL Project) STX-924-AC-18 (Jun. 18, 2018).

F-05 Application for Authority to Construct permit for the MARPOL Project, Limetree Bay Terminals, to the U.S. Virgin Islands Department of Planning and Natural Resources (DPNR) (Apr. 13, 2018).

F-06 DPNR, Administrative Permit Amendment: Change of Title V Permittee Name from HOVENSA to Limetree Bay Terminals, LLC, Part 70 Operating Permit issued to HOVENSA, LLC, STX-TV-003-10 (effective July 1, 2010) (Mar. 15, 2016).

F-07 DPNR, Part 70 Operating Permit issued to HOVENSA, LLC, STX-TV-003-10 (effective July 1, 2010).

F-08 DPNR, Territorial Pollution Discharge Elimination System (TPDES), Cover Page, Permit No. VI0000019 Final, Issued to HOVENSA, LLC (Feb. 22, 2008).

F-09 DPNR, Authorization to Discharge Under the USVI Territorial TPDES, Permit No. VI0000019, Issued to HOVENSA, LLC (Feb. 22, 2008).

G.    **Emails from LeAnn Johnson Koch, Counsel to Limetree Bay Terminals, LLC, to Umesh Dholakia, EPA Region 2, Re: Maintenance Records Files (Jan. 26 and 30, 2018) (attachment of zip folder)**

G-01 Index of Maintenance Records – January 26, 2018.

G-02 Tab 1 – List of Critical Equipment Maintained – January 26, 2018.

G-03 Tab 2 – 07-26-11 Anti-Cannibalization Procedure for Equipment 34A-0205.

G-04 Tab 3 – 02-22-12 Chemical Cleaning Schedule.

G-05 Tab 4 – 2013 YTD Safety Walkthrough List.

G-06 Tab 5 – 01-16-13 Refinery Rounds #1 Powerhouse – Report.

G-07 Tab 6 – 01-13-16 Refinery Rounds #4 Platformer – Report.

G-08 Tab 7 – 01-16-13 Equipment Preservation Checklist.

G-09 Tab 8 – 01-24-13 Refinery Rounds East SRU Complex – Report.

G-10 Tab 9 – 01-24-13 Refinery Rounds West SRU Complex – Report.

G-11 Tab 10 – 01-28-13 Refinery Rounds Area 2 – Report.

G-12 Tab 11 – 01-11-13 Equipment Preservation Checklist.

G-13 Tab 12 – 02-07-13 Refinery Rounds Area 1 – Report.

G-14 Tab 13 – 02-28-13 Terminal Action Log – Coker Dome.

G-15 Tab 14 – 07-15-13 7000 FCC Pressure Vessel Piping Inspection Checklist.

G-16 Tab 15 – 06-26-13 Anti Cannibalization Exception for GT 4 and GT 5.

G-17 Tab 16 – 07-29-13 C7101 Centrifugal Compressor Inspection Checklist.

G-18 Tab 17 – 08-16-13 C4451A Centrifugal Compressor Inspection Checklist.

G-19 Tab 18 – 10-01-13 C8501 Centrifugal Compressor Inspection Checklist.

G-20 Tab 19 – 12-06-13 Marine Terminal Safety Walkthrough Dock #7 – Report.

G-21 Tab 20 – 2013 Maintenance Activity Progress Report.

G-22 Tab 21 – 12-13-13 Centrifugal Compressor Inspection Checklist.

G-23 Tab 22 – 01-09-14 Centrifugal Compressor Inspection Checklist.

G-24 Tab 23 – 2014 HSSE Walkthrough Event List.

G-25 Tab 24 – 03-06-14 Terminal Action Log P & U.

G-26 Tab 25 – 03-20-14 Terminal Action Log 1 & 2 SRU.

G-27 Tab 26 – 05-01-14 Equipment Preservation Checklist.

G-28 Tab 27 – 05-06-14 Critical Compressor Preservation Log (Reciprocating).

G-29 Tab 28 – 05-06-14 Critical Compressor Preservation Log (Centrifugal).

G-30 Tab 29 – 05-19-14 Anti Cannibalization Exception for GT 4 and GT 5.

G-31 Tab 30 – 05-22-14 Terminal Action Log SRU 3 & 4.

G-32 Tab 31 – 06-12-14 Centrifugal Compressor Inspection Checklist.

G-33 Tab 32 – 07-11-14 Terminal Action Log 3 CDU.

G-34 Tab 33 – 07-25-14 OSBL Control Room Inspection Report.

G-35 Tab 34 – 07-28-14 OSBL Control Room Inspection Report.

G-36 Tab 35 – 08-04-14 OSBL Control Room Inspection Report.

G-37 Tab 36 – 10-13-14 Centrifugal Compressor Inspection Checklist.

G-38 Tab 37 – 12-05-14 Critical Compressor Preservation Log (Reciprocating).

G-39 Tab 38 – 12-11-14 Critical Compressor Preservation Log (Centrifugal).

G-40 Tab 39 – 08-01-15 Centrifugal Compressor Inspection Checklist.

G-41 Tab 40 – 2015 HSSE Walkthrough Event List.

G-42 Tab 41 – 01-22-15 Terminal Action Log Tank 6851, Penex Unit and Powerhouse.

G-43 Tab 42 – 02-12-15 Terminal Action Log Area 3 & 4.

G-44 Tab 43 – 03-05-15 Equipment Preservation Checklist.

G-45 Tab 44 – 2016 HSSE Walkthrough Event List.

G-46 Tab 45 - 1-28-16 Terminal Action Log Area 5 FCC.

G-47 Tab 46 – 03-16-17 Leadership Walkthrough Area 9 Report.

G-48 Tab 47 – 10-18-17 Hot Work Permit and Related Documents (LBT Internal).

G-49 Tab 48 – 10-19-17 Hot Work Permit and Related Documents (LBT Internal).

G-50 Tab 49 – 10-20-17 Hot Work Permit and Related Documents (LBT Internal).

G-51 Tab 50 – 11-03-17 Hot Work Permit and Related Documents (LBT Internal).

G-52 Tab 51 – 11-04-17 Hot Work Permit and Related Documents (LBT Internal).

G-53 Tab 52 – 11-12-17 Hot Work Permit and Related Documents (LBT Internal).

G-54 Tab 53 – 12-05-17 Hot Work Permit and Related Documents (LBT Internal).

G-55 Tab 54 – 12-15-17 Hot Work Permit and Related Documents (LBT Internal).

G-56 Tab 55 – 01-17-18 LBT Inter Office Correspondence Re: #5 crude unit.

### H.    Email from LeAnn Johnson Koch, Counsel to Limetree Bay Terminals, LLC, to Umesh Dholakia, EPA Region 2, Re: LBT Restart/reactivation related zip file (Jan. 5, 2018) containing list of unzipped documents with attachments

H-01 Letter from LeAnn Johnson Koch, Counsel to Limetree Bay Terminals, LLC, to Umesh Dholakia, EPA Region II, Limetree Bay Terminal (LBT) Follow Up Information Letter explaining the Zip file to EPA (Jan. 3, 2018).

H-02 Tab A – Press Release, HOVENSA to Close Some Units and Reduce Capacity (Jan. 26, 2011).

H-03 Tab B – Press Release, HOVENSA Announces Closure of St. Croix Refinery (Jan. 18, 2012).

H-04 Tab C – Letter from VIDPNR Commissioner, Alicia Barnes, to HOVENSA CEO, Brian K. Lever, requesting information related to closure (Jan. 20, 2012).

H-05 Tab D - (See Section E-06)

H-06 Tab E – Letter from Brian K. Lever, HOVENSA, to Alicia K. Barnes, Commissioner, U.S. Virgin Islands Department of Planning and Natural Resources, Re: the shutdown of refining operations (Feb. 7, 2012).

H-07 Tab F – Press Release, HOVENSA Completes Refinery Closure – Reuters News (Feb. 21, 2012).

H-08 Tab G – Letter from Myles Flint, II, US Department of Justice, to Julie Domike, Kilpatrick Townsend & Stockton, LLP, and Daniel Joseph, Counsel for HOVENSA, LLC (Mar. 23, 2012).

H-09 Tab H – Letter from Julie R. Domike, Counsel for HOVENSA, LLC, to Myles E. Flint, II, U.S. Department of Justice (Apr. 19, 2012).

H-10 Tab I – Letter from William L. Wehrum, Counsel for HOVENSA, LLC, to Raymond Werner, EPA Region 2 (Aug. 24, 2012).

H-11 Tab J – Letter from John Fogarty, EPA Office of Civil Enforcement, to Brian Lever, HOVENSA CEO (Oct. 5, 2012).

H-12 Tab K – Letter from Brian Lever, HOVENSA CEO, to John Fogarty, EPA Office of Civil Enforcement (Dec. 3, 2012).

H-13 Tab L – Kilpatrick Townsend, counsel to HOVENSA, letter to Myles E. Flint, II, USDOJ (Mar. 15, 2013).

H-14 Tab M – HOVENSA's CD-Related Semi-Annual Report to DOJ/EPA (Jul. 31, 2013).

H-15 Tab N – Transmittal of Legislation Ratifying Fourth Amendment to Concession Agreement between USVI Governor and HOVENSA (Jul. 12, 2013).

H-16 Tab O – HOVENSA's Summary of Comments to VIDPNR's Revisions to Water Quality Standards (Jul. 22, 2014).

H-17 Tab P – HOVENSA's CD Related Semi-Annual Report to DOJ/EPA (Jul. 29, 2014).

H-18 Tab Q – Franklin Quow, HOVENSA Counsel, Response to EPA's December 24, 2014 Administrative Complaint (Jan. 22, 2015).

H-19 Tab R – HOVENSA's CD-Related Semi-Annual Report to DOJ/EPA (Jul. 21, 2015).

H-20 Tab S – Operating Agreement between USVI Government and Limetree Bay Terminals (Dec. 1, 2015).

H-21 Tab T – Letter from Latham and Watkins, counsel to HOVENSA/Limetree, to USDOJ and EPA (Mar. 22, 2016).

H-22 Tab U – HOVENSA's CD Related Semi-Annual Report to DOJ/EPA (Jul. 22, 2016).

H-23 Tab V – HOVENSA's CD Related Semi-Annual Report to DOJ/EPA (Jul. 25, 2017).

H-24 Tab W – HOVENSA's TPDES Permit Renewal Application to VIDPNR (Aug. 31, 2012).

H-25 Tab X – Cover Letter, HOVENSA's CAA title V Permit Renewal Application to VIDPNR (Dec. 19, 2014).

## I.    Other Documents

I-01 Letter from Jean Regna, EPA Region 2, to Thomas V. Eagan and Julie R. Domike, Counsel to PHRT (Oct. 21, 2022).

I-02 Inspection Report Re: PHRT, EPA Region 2, Clean Air Act Section 112(r) General Duty Clause Inspection (Sept. 20-26, 2022) (note: photographs claimed as CBI are redacted).

I-03 Response Letter from Thomas V. Eagan, Counsel to PHRT, to Dwayne Harrington, US EPA, "Re: Request for Information Pursuant to Section 104(e) of the Comprehensive Environmental Response, Compensation and Liability Act received on August 18, 2022" (Sept. 1, 2022).

I-04 Status Report from Fermin Rodriguez, VP & Refinery Manager, PHRT, Coke Dome Smoldering Event (Aug. 27, 2022).

I-05 Letter from Joseph Siegel, Attorney, EPA Region 2, to Julie R. Domike and Thomas V. Eagan, Counsel to PHRT (Aug. 23, 2022).

I-06 Letter from Virginia Wong, EPA Region 2, to Thomas V. Eagan, Counsel to PHRT (Aug. 22, 2022).

I-07 Letter from Julie R. Domike and Thomas Eagan, Counsel to PHRT, to Suilin Chan and Joseph Siegel, EPA Region 2 (Jul. 27, 2022).

I-08 Statement from Charles Chambers, Representative of Port Hamilton Refining and Transportation, Before the 34th Legislature of the U.S. Virgin Islands, Committee on Economic Development and Agriculture (Jul. 14, 2022).

I-10 Letter from Virginia Wong, EPA Region 2, to Mark Chavez, Limetree Bay Terminals, LLC, and Julie R. Domike and Tom V. Eagan, Counsel to PHRT, "Re: Territorial Pollutant Discharge Elimination System (TPDES) permits" (May 25, 2022).

I-11 Letter from Liliana Villatora, EPA Region 2, to Julie R. Domike and Thomas Eagan, Counsel to PHRT, "Re: the refinery's air permitting requirements" (Mar. 22, 2022).

I-12 Letter from Myles E. Flint, II, U.S. Department of Justice, to Julie R. Domike and Thomas Eagan, Counsel to PHRT, "Re: Questions Regarding Refinery Restart" (Mar. 2, 2022).

I-13 Letter from Paul Simon, EPA Region 2, to Julie R. Domike and Tom V. Eagan, Counsel to PHRT, "Re: Questions Regarding Refinery Restart" (Mar. 2, 2022).

I-14 First Modification to the Consent Decree, *United States & U.S. Virgin Islands v. HOVENSA L.L.C.*, No 1:11-cv-00006, ECF No. 42 (Entered, D.V.I. Dec. 30, 2021).

I-15 Complaint, U.S. v. Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC, Civ. A. No. 1:21-cv-264 (D.Ct. USVI Jul. 12, 2021).

I-16 Join Stipulation, U.S. v. Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC, Civ. A. No. 1:21-cv-264 (D.Ct., USVI Jul. 12, 2021)

I-17 In the Matter of Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC, Clean Air Act Emergency Order, CAA-02-2021-1003, issued by EPA Region 2 (May 14, 2021).

I-18 Second Modification to the Consent Decree, *United States & U.S. Virgin Islands v. HOVENSA L.L.C.*, No 1:11-cv-00006, ECF No. 22-3 (Filed, D.V.I. Apr. 26, 2021).

I-19 Fact Sheet, Statement of Basis, Draft Outer Continental Shelf Preconstruction and Operating Air Permit, issued by EPA to Vineyard Wind, LLC (2021).

I-20 Draft Permit Fact Sheet, Outer Continental Shelf Preconstruction Air Permit, issued by EPA to South Fork Wind, LLC (2021).

I-21 Statement of Bob Weldzius, Senior Vice President of Refining at Limetree Refinery, EPA Public Hearing Transcript, Plantwide Applicability Limit Public Hearing (Nov. 8, 2019).

I-22 Letter from LeAnn Johnson Koch, counsel to Limetree Bay Terminals, LLC, to John Filippelli, EPA Region 2, "Re: Limetree Bay Terminals, LLC – Permitting Questions," with redacted Tab A claimed as Confidential Business Information (Feb. 1, 2018).

I-23 Email from LeAnn Johnson Koch, Limetree Bay Terminals, LLC, to John Filippelli, EPA Region 2, transmitting the Feb. 1, 2018 letter and the confidentiality waiver (Feb. 1, 2018).

I-24 Email from LeAnn Johnson Koch to Umesh Dholakia, EPA Region 2, confirming that an email was sent on Jan 26, 2018 containing the link for the Leapfile (Jan. 27, 2018).

I-23 Index to Maintenance Records Submitted to EPA (Jan. 26, 2018).

I-24 Email from LeAnn Johnson Koch to Umesh Dholakia, EPA Region 2, providing a status update on the items identified by Mr. Dholakia on a January 25, 2018 email (Jan. 25, 2018).

I-26 Letter from Suilin Chan, EPA Region 2, to Alfred Carlacci, Air Pollution Control Engineer (Sept. 19, 2017).

I-27 Preliminary Determination and Statement of Basis, Outer Continental Shelf Air Permit, issued by EPA to Anadarko Petroleum Inc., Noble Bob Douglas Drilling Project (Nov. 2016).

I-28 Operating Agreement By and Among The Government of the U.S. Virgin Islands and Limetree Bay Terminals, LLC (Dec. 1, 2015).

I-29 Letter from Kenneth E. Mapp, Governor, U.S. Virgin Islands, to Neville James, President, Thirty-First Legislature of the Virgin Islands (Dec. 1, 2015), transmitting, Operating Agreement By and Among The Government of the U.S. Virgin Islands and Limetree Bay Terminals, LLC (Dec. 1, 2015)

I-30 Complaint, Government of the United States Virgin Islands v. Hess Corporation, Superior Court of the U.S. Virgin Islands, Division of St. Croix (Sept. 14, 2015).

I-31 Bill No. 30-0186, A Resolution to Encourage HOVENSA to Find a New Owner for its Refinery Property on St. Croix, Thirtieth Legislature of the U.S. Virgin Islands (Aug. 7, 2013).

I-32 Fourth Amended Agreement Between the USVI, HOVENSA, Hess Oil VI Corp, and PDVSA (April 3, 2013), transmitted as enclosure to Letter from Governor John P. de Jongh, U.S. Virgin Islands, to Honorable Shawn-Michael Malone, President, U.S. Virgin Islands Legislature (Jul. 12, 2013).

I-33 Letter from John P. de Jongh, Jr., Governor, USVI, to Shawn-Michael Malone, President, 30th Legislature, USVI, Transmittal of Legislation Ratifying the Fourth Amendment to the HOVENSA Concession Agreement (Jul. 12, 2013).

I-34 Report by Duff & Phelps, LLC, Highest and Best Use of the HOVENSA Refinery (Aug. 3, 2012).

I-35 Letter from Kathleen C. Antoine, Environmental Director, HOVENSA LLC, to Steve Riva, EPA Region 2, Cessation of Operation of SO2 Monitoring Stations (Apr. 26, 2012).

I-3 Press Release, HOVENSA Announces Closure of St. Croix Refinery (Jan. 18, 2012).

I-37 Press Release, Hess Announces Charge Related to Closure of HOVENSA LLC Joint Venture Refinery (Jan. 18, 2012).

I-38 Letter from Kevin Bricke, EPA Region 2, to Kathleen C. Antoine, HOVENSA LLC Environmental Director (Aug. 17, 2011).

I-39 Consent Decree, *United States & U.S. Virgin Islands v. HOVENSA L.L.C.*, No 1:11-cv-00006, ECF No. 5-1 (D.V.I. Apr. 19, 2011).

I-40 Email from Kevin Bricke, EPA Region 2, to Kathleen C. Antoine, Environmental Director, HOVENSA LLC (May 9, 2011).

I-41 Preliminary Determination and Statement of Basis, Outer Continental Shelf Air Permit, issued by EPA to Anadarko Petroleum Corporation, (Mar. 23, 2011).

I-42 Letter from Walter E. Mugdan, EPA Region 2, to Kathleen C. Antoine, HOVENSA LLC Environmental Director (Aug. 15, 2007).

I-43 Letter from EPA Region 9 to Robert T. Connery, Esq., re Supplemental PSD Applicability Determination Cyprus Cas Grande Corporation Copper Mining and Processing Facilities (Nov. 6, 1987).

I-44 *New* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/new.

I-45 *New* Oxford American Dictionary, Third Edition, p. 1180, Oxford University Press (2010).

**J.** **Documents With Information Claimed as Confidential Business Information (CBI) or Determined to be CBI**

J-01 Attachment 3, "Additional Facts, which are Claimed to be Confidential Business Information," of Letter from Joseph Goffman to Julie R. Domike and Thomas V. Eagan (Nov. 16, 2022).

J-02 PHRT Phase 2 Activity Report (Oct. 31, 2022).

J-03 Photographs, contained in EPA Region 2 Inspection Report, Clean Air Act Section 112(r) CAA General Duty Clause Inspection - PHRT (Sept. 20-26, 2022).

J-04 Letter from Julie R. Domike and Thomas Eagan, Counsel to PHRT, to Suilin Chan and Joseph Siegel, EPA Region 2, "Re: Correspondence to PHRT from Liliana Villatora of EPA…dated March 22, 2022," with Exhibits #3 & 4 (July 15, 2022, as corrected on July 27, 2022).

J-05 Exhibit #1A, Table of Physical Changes to Units and Operation Phase, attached to Letter from Julie R. Domike and Thomas Eagan, Counsel to PHRT, to Suilin Chan and Joseph Siegel, EPA Region 2, "Re: Correspondence to PHRT from Liliana Villatora of EPA…dated March 22, 2022" (Jul. 15, 2022).

J-06 Exhibit #1B, Table of Potential to Emit of Units, attached to Letter from Julie R. Domike and Thomas Eagan, Counsel to PHRT, to Suilin Chan and Joseph Siegel, EPA Region 2, "Re: Correspondence to PHRT from Liliana Villatora of EPA…dated March 22, 2022" (Jul. 15, 2022).

J-07 Exhibit #2, Table of Unit Throughput and Utilization Rates, attached to Letter from Julie R. Domike and Thomas Eagan, Counsel to PHRT, to Suilin Chan and Joseph Siegel, EPA Region 2, "Re: Correspondence to PHRT from Liliana Villatora of EPA…dated March 22, 2022" (Jul. 15, 2022).

J-08 PHRT Phase 2 Activity Report (Jul. 5, 2022).

J-09 PHRT Phase 2 Activity Report (May 23, 2022).

J-10 PHRT Phase 2 Activity Report (May 2, 2022).

J-11 PHRT Phase 2 Activity Report (Apr. 25, 2022).

J-12 Letter from Julie R. Domike, Counsel to PHRT, to Myles E. Flint, II, USDOJ, "Re: Responses to Questions Regarding PHRT Purging and Restart Proposal" (Feb. 23, 2022).

J-13 PHRT Phase 2 Activity Report (Feb. 21, 2022).

J-14 PHRT Proposal to the USEPA and USDOJ for the Restart of Limetree Bay Refinery Operations (Jan. 20, 2022).

J-15 Transmittal letter and Draft Flare Systems Audit Report: Limetree Bay Refinery (submitted as final report) (Jun. 25, 2021).

J-16 Environmental Compliance Audit: Limetree Bay Refinery (Jun. 25, 2021).

J-17 Transmittal email and Delayed Coker Audit: Limetree Bay Refinery (Jun. 24, 2021).

J-18 Amine and Sulfur Recovery Unit Process Audit Report: Limetree Bay Refinery (June 2021).

J-19 Shutdown Cash Cost Summary ($MM), Tab A of Letter from LeAnn Johnson Koch, Limetree Bay Terminals, LLC, to John Filippelli, EPA Region 2, "Re: Limetree Bay Terminals, LLC – Permitting Questions" (Feb. 1, 2018).

**<u>CERTIFICATE OF SERVICE</u>**

I, Heather E. Gange, hereby certify that on this 22nd day of February 2023, I

electronically filed the foregoing with the Clerk of Court using the ECF system, which effected

service on counsel of record for all parties.

<div style="margin-left:40%">

      /s/ Heather E. Gange

HEATHER E. GANGE
U.S. Department of Justice
Environmental Defense Section
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C.  20044
Tel.:  (202) 514-4206
Fax:  (202) 514-8865
Heather.Gange@usdoj.gov

</div>

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

| | |
|---|---|
| PORT HAMILTON REFINING AND TRANSPORTATION, LLLP<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>Respondent. | Case No.: _____ |

## PETITION FOR REVIEW

Pursuant to Section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1), Federal Rule of Appellate Procedure 15(a), and Third Circuit Rule 15.1, Port Hamilton Refining and Transportation LLLP ("PHRT") hereby respectfully petitions the United States Court of Appeals for the Third Circuit for review of final agency action taken by the United States Environmental Protection Agency ("EPA") on November 16, 2022, which is attached as Exhibit A:

> Letter from Joseph Goffman, Acting Assistant Administrator of the Office of Air and Radiation to representatives of PHRT, Julie Domike and Thomas V. Eagan, and Attachments 1-2[1].

---

[1] Attachment 3 to EPA's November 16, 2022 decision contains "Confidential Business Information" PHRT will file a motion to file Attachment No. 3 under seal once the Clerk of Court has opened the case.

EPA's November 16, 2022 decision ["the Decision"] purports to require PHRT to go through Prevention of Significant Deterioration ("PSD") permitting prior to restarting or "beginning actual construction" at its refinery located at 1 Estate Hope, Christiansted, St. Croix, U.S. Virgin Islands (the "Refinery"). EPA's November 16, 2022 decision reversed EPA's earlier decision issued to the Refinery's previous owner on the same permitting issue four years prior. *See* Letter from William L. Wehrum, Assistant Administrator of the Office of Air and Radiation, to Limetree Bay Terminals, *Limetree Bay Terminals, St. Croix, U.S. Virgin Islands – Permitting Questions* (April 5, 2018) (Ex. B). The Decision is contrary to law, beyond EPA's authority, and arbitrary and capricious.

This Court has jurisdiction and is a proper venue for this action pursuant to 42 U.S.C. § 7607(b)(1).

Date: January 13, 2023

Respectfully submitted,

Andrew C. Simpson
V.I. Bar No. 451
ANDREW C. SIMPSON, PC
2191 Church St., Ste. 5
Christiansted, VI 00820
340.719.3900
asimpson@coralbrief.com
www.coralbrief.com

*Counsel for Port Hamilton Refining and Transportation LLLP*

2

*Of Counsel:*

Matthew W. Morrison
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036
202.663.8036
matthew.morrison@pillsburylaw.com

Co-Counsel for Port Hamilton Refining
and Transportation LLLP

Julie R. Domike
BABST|CALLAND
505 9th St. NW
Suite 602
Washington, DC 20004
jdomike@babstcalland.com
202.853.3453

Gary E. Steinbauer
BABST|CALLAND
Two Gateway Center
Pittsburgh, PA 15222
412.394.6590
gsteinbauer@babstcalland.com

Co-Counsel for Port Hamilton Refining
and Transportation LLLP

2

## **CERTIFICATE OF SERVICE**

Pursuant to Federal Rules of Appellate Procedure 15(c) and 25, I certify

that on January 13, 2023, I served copies of the foregoing petition for review,

with exhibits, the docketing statement, and the corporate disclosure statement

upon the following via U.S. Priority Mail:

    Michael S. Regan
    Administrator
    U.S. Environmental Protection Agency
    1200 Pennsylvania Avenue, N.W.
    Washington, D.C. 20460

    Correspondence Control Unit
    Office of General Counsel (2311)
    U.S. Environmental Protection Agency
    1200 Pennsylvania Avenue, N.W.
    Washington, D.C. 20460

    Merrick B. Garland
    Attorney General of the United States
    U.S. Department of Justice
    950 Pennsylvania Avenue, N.W.
    Washington, D.C. 20530

    Todd S. Kim
    Assistant Attorney General
    U.S. Department of Justice
    Environmental and Natural Resources Division
    950 Pennsylvania Avenue, N.W.
    Washington, D.C. 20530
    (also served via email: todd.kim@usdoj.gov)

                            Respectfully submitted,

                            /s/ Andrew C. Simpson
                            Andrew C. Simpson

# EXHIBIT A



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

November 16, 2022

*VIA ELECTRONIC MAIL- JDomike@babstcalland.com; TEagan@rascoklock.com*

Julie R. Domike, Esq.
Babst Calland, Attorneys at Law
505 9th Street NW, Suite 700
Washington, D.C. 20004

Thomas V. Eagan, Esq.
Rasco Klock Perez & Nieto
2555 Ponce de Leon Boulevard, Suite 600
Coral Gables, Florida 33134

Dear Ms. Domike and Mr. Eagan:

In late December 2021, West Indies Petroleum Limited (WIPL) and Port Hamilton Refining and Transportation, LLLP (PHRT) submitted questions to the U.S. Department of Justice (DOJ) regarding the refinery located at 1 Estate Hope, Christiansted, St. Croix, U.S. Virgin Islands (the Refinery). One of the questions submitted concerned whether WIPL and PHRT could use existing permits to restart the Refinery and, if not, what is needed to restart the Refinery. Today's letter, and accompanying Attachments 1, 2, and 3, provide EPA's response to WIPL/PHRT's question with respect to the Clean Air Act's Prevention of Significant Deterioration (PSD) permit program. As described below, EPA has concluded that WIPL/PHRT is required to apply for and receive a final and effective PSD permit prior to restarting the Refinery or beginning actual construction as defined in 40 CFR 52.21(b)(11).

Background

In the Limetree Bay Refining bankruptcy proceeding, EPA wrote a letter dated September 24, 2021 to all potential Refinery bidders, which was placed in the reading room. The letter stated, among other things, that "[a] prospective purchaser may also be required to obtain a [PSD] permit under the Clean Air Act to restart the refinery," and noted that "EPA has required PSD permits for restarting long-dormant facilities that qualify as major stationary sources."

1

On March 2, 2022, EPA sent you a letter that, among other things, provides a brief history of the PSD permits previously issued for the Refinery and indicates that the Agency expects to follow up with a separate letter regarding additional PSD permitting issues. On March 22, 2022, EPA sent you a letter stating that, based on currently available information, "there are strong indicators to suggest that the Refinery must obtain a PSD permit prior to startup of Refinery operations." The March 22, 2022, letter also sought additional information from you to inform EPA's final determination as to PSD applicability. The letter further stated that "[b]ecause a PSD permit may be required prior to startup of the refinery operations or of any refinery unit(s), EPA strongly recommends that you not proceed with any such actions while EPA continues to evaluate PSD applicability."

PHRT provided an initial response to EPA on July 15, 2022, and a corrected response on July 27, 2022 (collectively, PHRT's "July letter"). PHRT asserted in its July letter that it is under no obligation to delay resumption of refining operations pending EPA's evaluation of PSD permitting applicability. EPA sent you an interim response on August 23, 2022, indicating that EPA was reviewing PHRT's responses to the questions in EPA's March 22, 2022, letter and reiterating that EPA strongly recommends that PHRT not resume refinery operations while EPA continues to evaluate PSD applicability.

Discussion and Conclusion

EPA has completed its review of the information in PHRT's July letter and closely examined the facts and circumstances of the Refinery since it was shut down by HOVENSA in February 2012. EPA's examination was informed by the Agency's long-standing Reactivation Policy, as articulated in *In the Matter of Monroe Electric Generating Plant Entergy Louisiana, Inc.,* Proposed Operating Permit, Petition No. 6-99-2 (June 11, 1999) (*Monroe*) and other Agency and judicial decisions on reactivation of shutdown sources. EPA is continuing to apply the Reactivation Policy, as described in *Monroe*, because it remains an appropriate method for determining whether the reactivation of a stationary source qualifies as the construction of a new source under the PSD regulations.

Based on EPA's analysis of the specific factors in the Reactivation Policy, we conclude that the Refinery was permanently shut down in 2012 and that restarting the Refinery qualifies as construction of a new major stationary source under the federal PSD permitting regulations applicable in the U.S. Virgin Islands. EPA's detailed consideration of the *Monroe* factors in Attachment 1 describes how the facts and circumstances of the Refinery's history since 2012 demonstrate that the Refinery was permanently shut down. This attachment also demonstrates that emissions from the restarted Refinery will exceed the PSD applicability thresholds for multiple New Source Review-regulated pollutants.

In addition, Attachment 2 contains a detailed explanation as to why EPA is continuing to apply the Reactivation Policy, including a demonstration of how the Policy has been, and continues to be, supported by the federal PSD regulations. Attachment 3 supplements Attachment 1 with additional facts that are germane to the Reactivation Policy analysis but cannot be included in a public document because the facts are claimed to be Confidential Business Information.

For the reasons discussed in these attachments, the Refinery must apply to EPA for, and receive, a final effective PSD permit for these pollutants prior to restarting or beginning actual construction at the Refinery, as defined in 40 CFR 52.21(b)(11). The PSD permit application should include, among other information, analyses of air quality impacts, environmental justice, and Best Available Control Technology.

If you have any questions, please contact either Joseph Siegel (212-637-3208; siegel.joseph@epa.gov) or Liliana Villatora (212-637-3218; villatora.liliana@epa.gov) of the EPA Region 2 Office of Regional Counsel.

Sincerely,

Joseph Goffman
Principal Deputy Assistant Administrator

3

**ATTACHMENT 1**

**Application of EPA's Reactivation Policy Permanent Shutdown Factors to the Port Hamilton Refining and Transportation LLLP Refinery[1]**

I.     **Introduction**

The U.S. Environmental Protection Agency ("EPA") provides its assessment in this Attachment of the applicability of the Clean Air Act's Prevention of Significant Deterioration ("PSD") Program at 42 U.S.C. § 7475 and its implementing regulations at 40 C.F.R. 52.21 to the Refinery at 1 Estate Hope in Christiansted, St. Croix, U.S. Virgin Islands (the "Refinery"). EPA concludes that the proposed restart of the Refinery qualifies as construction of a new major stationary source under applicable PSD permitting regulations, as interpreted by EPA and applied through the Agency's Reactivation Policy, described below. Based on this conclusion, and EPA's analysis of the Refinery's increase in emissions (*See* Section IV, below) using information from PHRT and the previous owners, PHRT must apply for and obtain a final effective PSD permit prior to restarting the Refinery or beginning actual construction of the Refinery, as defined in 40 C.F.R. 52.21(b)(11). The PSD permit application should include, among other information, analyses of air quality impacts, environmental justice, and Best Available Control Technology.

In 1999, the EPA Administrator issued a Clean Air Act Title V Order articulating how the PSD requirements may apply to reactivation of shutdown sources. *In the Matter of Monroe Electric Generating Plant Entergy Louisiana, Inc.,* Proposed Operating Permit, Petition No. 6-99-2 (June 11, 1999) ("*Monroe*"). In the *Monroe* Order, the Administrator indicated that "EPA has a well-established policy that reactivation of a permanently shut down facility will be treated as operation of a new source for purposes of PSD review" ("Reactivation Policy"), citing to five prior Agency determinations on reactivation dating back to 1978.[2]

As discussed in Section III, below, determinations under EPA's Reactivation Policy require a detailed examination of the facts and circumstances related to a shutdown source and application of six factors set out in the Reactivation Policy. Because Reactivation Policy analyses are fact-sensitive, this discussion begins with detailed background information in Section II followed by an assessment under the Reactivation Policy in Section III and an analysis of emissions increases at the Refinery in Section IV.

---

[1] References to PHRT throughout this Attachment should be understood to include both PHRT and West Indies Petroleum Limited ("WIPL") as purchasers of the Refinery in the bankruptcy proceeding.

[2] On December 2, 2020, EPA criticized the Reactivation Policy and stated that the Agency would not follow it in the context of an action to issue a final Plantwide Applicability Limit (PAL) permit to Limetree Bay Refinery, LLC and Limetree Bay Terminals, LLC (Limetree). That action did not become final and effective. Even if the December 2020 action had taken effect and rescinded the Reactivation Policy, for the reasons described in Attachment 2, the Policy reflects the EPA's current views and the Agency intends to continue following it.

APPX-25

## II.    **Background**

### A.  **History of Refinery Shutdown and Attempts at Startup**

The facility's unusual history over approximately the last decade provides factual support for EPA's determination that the Refinery is a new source. As discussed in detail below in Section III, the evidence indicates that HOVENSA's initial intention in 2012, when it ceased operations, was to permanently shut down the Refinery and convert it to an oil storage terminal.[3] However, at the urging of the U.S. Virgin Islands Government, HOVENSA instead sought to find a buyer. It took nearly four years after the February 2012 shutdown, and a bankruptcy proceeding, before HOVENSA did so. Limetree Bay Terminals, LLC and/or its corporate parent or associated business entities acquired the Refinery in January 2016 with the option – but without the obligation - to rehabilitate and restart the Refinery.[4]  Limetree Bay Terminals, LLC later transferred certain of the Refinery assets to Limetree Bay Refining, LLC.[5]

On February 1, 2018, approximately two years after Limetree's[6] purchase, Limetree informed EPA of its intention to produce refined petroleum products that would meet new marine fuel standards ("MARPOL project") by January 1, 2020 and sought EPA's view[7] on whether restarting the shutdown Refinery would require a PSD permit under EPA's Reactivation Policy.[8] EPA responded on April 5, 2018 in a letter from then Assistant Administrator William Wehrum ("EPA's 2018 letter") which stated that, based on the information provided by Limetree, the Refinery "was not permanently shut down and should not be considered a 'new source' for purposes of PSD applicability." The information regarding the scope of the restart of the Refinery has changed substantially since that statement and EPA no longer supports this view. Further, EPA's 2018 letter sent a clear message that since EPA did not have all the specifics regarding Limetree's plans, a final determination would be left for a later time.

EPA also expressed the view that the Refinery had not permanently shut down in EPA's 2020 response to public comments on Limetree's application for a Plantwide Applicability Limit Permit.[9]  However, this view was also not reflected in a final EPA determination.  On February 3, 2021, both Limetree and environmental organizations filed petitions for review of EPA's final Plantwide Applicability ("PAL") permit with the EPA Environmental Appeals Board ("EAB").

---

[3] *See, e.g.*, *Fourth Amended Agreement Between the USVI, HOVENSA, Hess Oil VI Corp, and PDVSA* (April 3, 2013), transmitted as enclosure to Letter from Governor John P. de Jongh, U.S. Virgin Islands, to Honorable Shawn-Michael Malone, President, U.S. Virgin Islands Legislature (July 12, 2013), available at https://stthomassource.com/legacy_files/userfiles/file/2013%20July/07132013-HOVENSA%20AGREEMENT%20DOCUMENTS.pdf.

[4] See Section III.B.3, below, for a discussion of the absence of an obligation to rehabilitate the Refinery.

[5] Complaint, *Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC, Civ. A. No. 1:21-cv-264* (D.Ct. USVI July 12, 2021), at https://www.justice.gov/opa/press-release/file/1411231/download.

[6] Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC are collectively referred to in this Attachment as "Limetree."

[7] Limetree approached EPA with this question because the federal PSD regulations at 40 C.F.R. 52.21 apply to the Refinery since the U.S. Virgin Islands does not have an approved territorial PSD program.  Instead, EPA Region 2 implements the federal PSD requirements in the territory.  40 C.F.R. 52.2779.

[8] Letter from LeAnn Johnson Koch, Perkins Coie, to John Filippelli, EPA Region 2 (Feb. 1, 2018).

[9] EPA Plantwide Applicability Limit Permit for Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC, PAL permit No. EPA-PAL-VI001/2019, Response to Comments (Dec. 2, 2020).

The EPA's regulations at 40 C.F.R. Part 124 provide that a permit doesn't become effective if a party files a timely request for EAB review.  On March 25, 2021, EPA withdrew "the [Limetree] PAL permit and its administrative record in its entirety, including the Agency's response to comments."[10]  As a result, the EAB remanded the PAL permit for further action within EPA. Thus, EPA has not issued a final determination on PSD applicability for the Refinery until today.

Limetree informed EPA that it began planning for construction activities at the site in late 2017[11] and then initiated construction in mid-2018. After approximately three years of planning and intensive physical rehabilitation of the Refinery, and spending approximately $4.1 billion[12] using over 4,000 workers,[13] Limetree's attempted restart in late 2020 was accompanied by significant noncompliance.

An examination of Limetree's failed restart and accompanying noncompliance is instructive in EPA's Reactivation Policy factors analysis because the facts underscore that the Refinery needed more time before restarting (*See* Section III.A, below, on the *Monroe* factor related to the length of time the facility was shut down). In particular, Limetree made several unsuccessful attempts to start up the Refinery beginning in the last quarter of 2020, but repeated problems at the Refinery resulted in several startups and shutdowns and, finally, complete cessation of operations.

During the months immediately following the 2020 startup, the Refinery experienced significant violations of its Clean Air Act Title V permit and the Clean Air Act's New Source Performance Standards ("NSPS") Subpart Ja requirements, including the following: (1) the Refinery caused a large cloud of steam and light hydrocarbons from Vacuum Tower #3 on December 8, 2020 that resulted in the temporary evacuation of some employees and the mobilization of the Refinery's fire department; and (2) Hydrogen Sulfide ("$H_2S$") concentrations at Flare #8 exceeded the NSPS limit of 162 ppmv including levels higher than 5,000 ppmv for a number of hours in December 2020 and 20,000 ppmv for at least 5 hours on January 25, 2021.[14] Ambient $H_2S$ and sulfur dioxide ("$SO_2$") levels modeled based on $H_2S$ measured in gas combusted in the flare during some periods in January 2021 were at least as high as the levels that later led EPA to issue an emergency order under the Clean Air Act, discussed below.

Limetree then indicated it would again operate the facility in February 2021 to begin production and commercial sales.  In February and May 2021, the Refinery experienced a flare rainout on two occasions, which resulted in oil droplets raining on local residential areas, causing

---

[10] Administrator Michael S. Regan, *Withdrawal of Plantwide Applicability Limit Permit No. EPA-PAL-VIOO1/2019* (March 25, 2021), at https://www.epa.gov/sites/default/files/2021-04/documents/withdrawal_decision_applicability.limit_.permit.signed.pdf.

[11] In late 2017, Limetree informed EPA of its plans to take advantage of favorable market conditions that it expected would result from the new MARPOL fuel requirements, which became effective on January 1, 2020.

[12] *In re: Limetree Services, LLC*, Case No. 21-32351, U.S. Bankruptcy Court, Southern District of Texas, Declaration of Mark Shapiro, Senior Managing Director for GlassRatner Advisory & Capital Group LLC, Chief Restructuring Officer for Limetree (July 13, 2021).

[13] Statement of Bob Weldzius, Senior Vice President of Refining at Limetree Refinery, EPA Public Hearing Transcript, Plantwide Applicability Limit Public Hearing, Nov. 8, 2019.

[14] Complaint, *Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC, Civ. A. No. 1:21-cv-264* (D.Ct. USVI July 12, 2021), at https://www.justice.gov/opa/press-release/file/1411231/download.

widespread contamination including contamination of vegetable gardens and cisterns used by residents for drinking water and other household water needs. In addition, on two occasions, each lasting multiple days in April and May 2021, the Refinery emitted $H_2S$, $SO_2$, and/or uncombusted hydrocarbons at levels that had immediate and significant adverse impacts on downwind residents and required multiple public health advisories, the closure of schools and government offices, and the mobilization of the Virgin Islands National Guard and Fire Service.[15] The incidents caused nausea and headaches among residents and a recommendation by the U.S. Virgin Islands Department of Planning and Natural Resources ("DPNR") to residents with allergies, asthma and other respiratory ailments to evacuate or remain indoors.

The health and environmental impacts during the Refinery's brief periods of operation between late December 2020 and approximately May 14, 2021 were of such grave concern, and so far outside the bounds of compliance, that EPA took the unusual step of exercising emergency powers under the Clean Air Act by issuing an order on May 14, 2021 under Section 303 of the Clean Air Act, 42 U.S.C. § 7603 ("Section 303 Order") based on the imminent and substantial endangerment to public health or welfare, or the environment, on St. Croix.  The Section 303 Order to Limetree required, *inter alia*, the suspension of operations of the refinery. EPA had previously issued such an order requiring a facility to shut down only approximately four times in the history of the Clean Air Act.

After ceasing operations in May 2021, Limetree announced in June 2021 that it would not restart. The Refinery ended up in a second bankruptcy proceeding, which resulted in PHRT's ownership of the Refinery.  PHRT's $62 million bid for a Refinery that had recently invested $4.1 billion raises questions about the physical, financial and regulatory viability of the facility. The Refinery has now been shut down for an additional eighteen months. EPA's understanding is that restarting the Refinery would require significant construction and other physical activities that are in addition to the substantial capital and operational investments that Limetree completed before it attempted to restart the refining operations. As discussed in Section III.E, below, the advanced state of corrosion, systemic lack of maintenance, and deficiencies before the 2020 startup of the Refinery, indicate the need for additional construction activity.

The May 14, 2021 Section 303 Order required Limetree to hire independent auditors to conduct both an environmental compliance audit and process area audits and submit a plan including a schedule for implementing corrective measures identified in audit reports produced by the auditors.  The audit reports were submitted to EPA on June 24 and 25, 2021. In addition to EPA's administrative Section 303 Order, on July 12, 2021, the U.S. Department of Justice filed a civil action against Limetree under Section 303 of the Clean Air Act, as well as a Joint Stipulation between the United States and Limetree, which the bankruptcy court later ordered PHRT to become a party to as a condition of the purchase of the Refinery. The Joint Stipulation requires, *inter alia*, submittal of the required plan and a schedule for implementation of all corrective measures set forth in the audit reports, as specified in EPA's Section 303 Order. The plan must be submitted by no later than ninety days prior to any restart of the Refinery or any refinery process unit. It has not yet been submitted to EPA.

---

[15] *Id.*

4

The audit reports submitted to EPA on June 24 and 25, 2021, contain additional facts that are germane to the Reactivation Policy analysis but are claimed to be Confidential Business Information ("CBI"). As such, Attachment 3, Additional Facts Claimed to be Confidential Business Information, provides further information.

Due to the unusual history at the Refinery, EPA made clear both during the Limetree bankruptcy proceeding and after PHRT assumed ownership that PSD permit requirements might apply to the restart of the Refinery. A September 24, 2021 letter from EPA to all potential bidders in the bankruptcy proceeding, which was placed in the bankruptcy case reading room, made clear that a PSD permit may be required and explained that "EPA has required PSD permits for restarting long-dormant facilities that qualify as major stationary sources."[16]  On March 2, 2022, the U.S. Department of Justice alerted PHRT to the September 24, 2021 letter again.[17] Also on March 22, 2022, EPA informed PHRT via letter that, based on currently available information, "there are strong indicators to suggest that the Refinery must obtain a PSD permit prior to startup of Refinery operations."[18] The letter also sought additional information from PHRT on past and future changes at the Refinery to evaluate the issue further before making a final determination as to PSD applicability. PHRT provided an initial response to EPA on July 15, 2022 and a corrected response on July 27, 2022 ("PHRT's July letter").[19]  The response is claimed to be CBI. As such, additional information from the response can be found in Attachment 3, Additional Facts Claimed to be Confidential Business Information.

### B.  Continuing Air Quality Impacts

In addition to the acute impacts on the St. Croix community between late 2020 and May 14, 2021, there are potential longer-term air quality impacts. The long shutdown period since 2012 has resulted in uncertainty about the Refinery's impact on the National Ambient Air Quality Standards ("NAAQS") upon restart because there have been changes in air quality planning requirements since February 2012. After HOVENSA's last pre-shutdown air quality analysis was conducted, EPA promulgated several new or revised health-based NAAQS: 1-hour $SO_2$, 1-hour $NO_2$, and 8-hour ozone NAAQS, and 24-hour and annual $PM_{2.5}$ NAAQS and PSD increments. Further, there are no existing air quality demonstrations to assess attainment of any of the new or revised NAAQS that include projected emissions from the Refinery (which, upon startup, would be by far the largest emitter on the island) because the Refinery was shut down and not considered during the EPA designations process. Therefore, EPA does not have any information on the air quality impacts from the Refinery related to the new or revised health-based NAAQS or $PM_{2.5}$ PSD increments, other than some ambient data that measured violations of the 1-hour $SO_2$ NAAQS prior to the facility's 2012 shutdown. Due to the high level of emissions from any Refinery, and the physical configuration of this particular facility as well as

---

[16] Letter from Dore La Posta, EPA, to All Potential Buyers of Limetree Bay Refinery, September 24, 2021.

[17] Letter from Myles E. Flint, II, U.S. Department of Justice, to Julie R. Domike and Thomas Eagan, March 2, 2022.

[18] Letter from Liliana Villatora, US EPA, to Julie R. Domike and Thomas Eagan, March 22, 2022.

[19] Letter from Julie R. Domike and Thomas Eagan, Counsel for PHRT, to Suilin Chan and Joseph Siegel, EPA, July 27, 2022.

the prevailing trade winds, there are uncertainties about whether the Refinery would cause or contribute to violations of new or revised NAAQS and PSD increments.[20]

### C.  The St. Croix Community and Environmental Justice

In addition to the acute impacts from the rainout of oily mist, the $H_2S$ and $SO_2$ exceedance incidents, the longer-term air quality impacts from the Refinery and lack of air quality demonstrations related to the new NAAQS, the vulnerable community neighboring the Refinery has already experienced manifold health and environmental impacts over decades from multiple sources including HOVENSA and Limetree. In addition, impacts from climate change-related storm events will increase the vulnerability of the community.

Even before the Refinery rained oil on homes and cisterns in the nearby community and exposed the residents to an oily mist and high levels of $H_2S$, $SO_2$, and uncombusted hydrocarbons, EPA determined that the community near the Refinery is particularly vulnerable as a predominantly low-income and minority population that experiences environmental and other burdens. In September 2019, EPA issued an environmental justice analysis along with the draft PAL permit.  The analysis stated that the area of south-central St. Croix, where the Refinery is located, is an industrialized area with a large residential population. There are several schools, a hospital, and other locations that include sensitive populations. Even without the Refinery's emissions, the community is burdened by several nearby complex environmental challenges including the St. Croix Renaissance Industrial park that was reported to cause health issues due to irritants from Red Mud, odor from sources in the area that resulted in the closing of nearby schools, fires from the Anguilla landfill, proximity to a wastewater treatment plant, noise and traffic issues associated with the Henry E. Rohlsen Airport, and emissions from large ships docked at the coast.

The industrialized nature of southern central St. Croix, in the vicinity of the Refinery, stands in contrast to the rest of the island of St. Croix and even more broadly, the rest of the U.S. Virgin Islands, which is not as industrialized. The island of St. Croix was severely damaged during Hurricanes Maria and Irma in 2017, leaving many areas surrounding the Refinery's location, as well as the rest of St. Croix, in much need of environmental recovery.

### III.    Analysis of Reactivation Policy Factors - Refinery Restart

Sections I and II, above, provide important factual context for EPA's Reactivation Policy analysis presented in this Section which concludes that the Refinery was permanently shut down and that restart of the units needs to be evaluated as if the source were new. In prior EPA analyses, whether a shutdown is considered permanent depends in part on the intent of the owner or operator at the time of shutdown, based on all the facts and circumstances. *Monroe* at 8. After two years, however, there is a presumption that the shutdown is permanent, unless the facts and

---

[20] EPA advised PHRT that it must comply with ongoing Regional Haze obligations under Clean Air Act §§ 169A and 169B and 40 C.F.R. 51.308 and "notify EPA 60 days in advance of startup and resumption of operation of refinery process units and provide required information." Letter from Paul Simon, Acting Regional Counsel, EPA Region 2, to Julie R. Domike and Tom V. Eagan, Attorneys for PHRT, *Re: Questions Regarding Refinery Restart* (March 2, 2022).

6

circumstances rebut this presumption by indicating a continuing intent to reopen by the owner. The six factors that EPA has examined in prior situations where a source has been shut down or dormant for more than 2 years to evidence the continuing validity of the original intent not to permanently shut down are:

A.  Length of time the facility has been shut down
B.  Time and capital needed to restart
C.  Evidence of intent and concrete plans to restart
D.  Cause of the shutdown
E.  Status of permits
F.  Maintenance and inspections during shutdown

When EPA analyzes these factors, "no single factor is likely to be conclusive in the Agency's assessment" and the final determination will often involve a judgment regarding whether the owner's actions at the facility during shutdown support or refute any express statements regarding the owner's or operator's intentions. *Monroe* at 9.

EPA's consideration of the six factors in the context of the facts and circumstances of the Refinery lead EPA to the conclusion that the 2012 shutdown was permanent.  The facts and circumstances include, among others, the shutdown by HOVENSA in 2012, the project to refurbish the Refinery by Limetree beginning in 2018, the failed attempts to restart the Refinery in late 2020 and 2021, non-operation since that time, and the need for PHRT to continue to refurbish the refinery before it can be operated again.  While some factors point more strongly in the direction of permanent shutdown than others, when taken together, the factors in this case lead EPA to the conclusion that the Refinery was permanently shut down and thus would constitute a new source upon restart by PHRT.

The analysis that follows includes some information that either did not exist in 2012 or did not become known to EPA until after issuance of EPA's 2018 letter and the Response to Comments ("RTC") supporting EPA's December 2, 2020 final PAL permit which was later withdrawn by Administrator Regan on March 25, 2021.  With this new information, including a cost of $4.1 billion using 4,000 workers over several years, 8.5 years of shutdown prior to an attempted startup that substantially endangered human health and the environment, a total of over 11 years before the new owners plan to restart, and long-term systemic maintenance failures at the Refinery, among others, the balance of factors support a conclusion that the Refinery was permanently shut down in 2012.

A.  <u>**Length of time the facility has been shut down and time and capital to restart**</u>

The first two factors, length of time the facility has been shut down and the time and capital to restart, are so interconnected in this matter that they are discussed together in this subsection. As noted above, the Refinery was shut down from February 2012 until the last quarter of 2020, followed by several months of failed attempts to restart and significant noncompliance in 2020-21, resulting in the May 2021 shutdown and EPA's Section 303 Order in addition to a subsequent judicial enforcement action and Joint Stipulation. The Refinery has not resumed operations to date. Therefore, the Refinery was shut down initially for over 6 years

7

before actual construction began, unable to restart for over 8.5 years after HOVENSA's shutdown and, as of today, unable to restart in its present physical condition, which is over 10.5 years since HOVENSA's shutdown in 2012. At a July 14, 2022 U.S. Virgin Islands Legislature hearing, PHRT testified that the company hopes to restart the Refinery in the second quarter of 2023,[21] which would be 11.25 years after the 2012 shutdown.  However, even apart from the PSD permitting question, EPA questions the feasibility of starting the refinery on this timetable because of, among other things, the need for PHRT to address other significant environmental compliance requirements prior to restart.[22] These facts strongly favor a finding that there was a permanent shutdown.

An important guiding principle articulated in *Monroe* is that shutdowns of more than two years are presumed to be permanent. In particular, after two years of not operating, "it is up to the facility owner or operator to rebut the presumption" to avoid treatment as a new source by demonstrating a continuous intent to restart. EPA has consistently applied the two-year presumption. *See, e.g.*, *Noranda Lakeshore Mines*, Memo from John Seitz, Director, Stationary Source Compliance Division, OAQPS, to David Howekamp, Director, Air Mgt. Div. Reg. IX (May 27, 1987); *Watertown Power Plant, South Dakota*, Memo from John B. Rasnic, Director Stationary Source Compliance Division, OAQPS, to Douglas M. Skie, Chief, Air Programs Branch (Nov. 19, 1991); *PSD and NSPS Applicability to a Reactivated Source*, Memo from Director, Division of Stationary Source Enforcement, to Stephen A. Dvorkin, Chief, General Enforcement Branch, Reg. 2 (Sept. 6, 1978).[23]

Limetree provided factual information in a letter dated February 1, 2018, which the EPA considered before sending its 2018 letter indicating that the Refinery was not permanently shut down. Much of the information provided to EPA was either incorrect at the time or became outdated over time. For example, with respect to the length of the shutdown, the Limetree letter stated that the Refinery would begin producing refined petroleum products, specifically MARPOL compliant fuel, by January 1, 2020.[24] EPA was also informed by Limetree in meetings that restart would take place in late 2019 so that Limetree could be ready to sell the compliant fuel on January 1, 2020 when the new standards became effective.  The EPA's 2018 view that the Refinery was not permanently shut down did not contemplate that Limetree wouldn't attempt to start up until late 2020, one year later than expected, and would still not be able to start up in compliance as of today, nor did it contemplate $4.1 billion in costs for physical

---

[21] Statement of Charles Chambers, Representative of Port Hamilton Refining and Transportation, Before the 34th Legislature of the U.S. Virgin Islands Committee on Economic Development and Agriculture (July 14, 2022).
[22] *See also*, Section III.E, below, which presents information on deficiencies that existed at the Refinery before the 2020 startup as well as the advanced state of corrosion and systemic lack of maintenance at the Refinery.
[23] In addition, as discussed in Attachment 2, Region 2 applied the 2-year presumption when it objected to the Title V operating permit issued by NYSDEC to the Greenidge Station in Dresden, New York, *Letter from Judith A. Enck, Regional Administrator, to Honorable Basil Seggos, EPA Review of Proposed Title V Operating Permit for Greenidge Station Permit ID: 8-5736-00004/00017* (Dec.7, 2015), determining that the facility owner must rebut the presumption after placing the facility in protective lay-up for five years. Region 2 also instructed NYSDEC that two years after a shutdown of the Caithness plant, it was the permit applicant's obligation to fill information gaps related to whether the shutdown was permanent. *Letter from Suilin Chan, Chief, Permitting Section, to Alfred Carlacci, Air Pollution Control Engineer (Sept. 19, 2017)*.
[24] Letter from LeAnn Johnson Koch, Perkins Coie, to John Filippelli, EPA Region 2 (Feb. 1, 2018). The MARPOL standards became effective on January 1, 2020 and Limetree had also informed EPA that it wanted to be an early entrant into the market for compliant fuel.

APPX-32

and operational changes necessary to restart the Refinery. These additional facts present a more compelling basis for finding a permanent shutdown than the facts that were known to EPA in 2018.

The failed attempts to run the facility from late 2020 through May 2021 indicate that the Refinery was not in adequate condition to start up in late 2020 and thus the length of time of the shutdown should be viewed as longer than 8.5 years.  In a rush to begin refining operations, Limetree restarted without adequate staffing and with significant operational problems that affected multiple units such as the coker, flare #8, knockout drum, pressure safety valve, flame scanners and amine regeneration unit. [25]

Both the length of time that the Refinery has been shut down and the capital needed to make physical and operational changes to restart it are extraordinary and do not support a claim that the refinery was merely temporarily idled and adequately maintained to enable a quick return to refining petroleum products.  As noted above, it took Limetree roughly three years of planning and intensive physical rehabilitation of the Refinery at a cost of approximately $4.1 billion using over 4,000 workers to start up and briefly operate in a manner that was fraught with operational problems and non-compliant.

By contrast, in another matter, EPA considered the "limited time and capital" necessary to restart a power plant in South Dakota "with only a few weeks of work" after nine years on cold standby an important factor in determining that the plant had not been permanently shut down. Memorandum from John B. Rasnic to Douglas M. Skie, *Applicability of PSD to Watertown Power Plant, South Dakota* (Nov. 19, 1991).

EPA also determined that a roaster leach acid plant in Arizona was permanently shut down based on a number of factors including the significant amount of time that elapsed since the shutdown, failure to maintain an operating permit, removal of the plant from the emissions inventory, and "the time and capital that must be invested in the rehabilitation of the plant in order to make it operable." While a number of the Reactivation Policy factors other than costs and time to restart were significant in the roaster leach acid plant example, it is notable that EPA considered only "several hundred thousand dollars worth of work" and the facility's inability to "come on line for approximately four months" as weighing in favor of a permanent shutdown. Memorandum from John S. Seitz, Director, Stationary Source Compliance Division, EPA, to David P. Howekamp, Director, EPA Reg. 9, *Reactivation of Noranda Lakeshore Mines, RLA Plant and PSD Review* (May 27, 1987). The time and cost necessary to restart the roaster leach acid plant pales in comparison to the time and costs at the Refinery.

While refineries might take more time and capital to restart after a period of dormancy than other kinds of facilities, the U.S. District Court in California determined that a cost between $28 and $180 million to reactivate a refinery over a period of six to eighteen months "slightly favors finding a permanent shutdown."  *Communities for a Better Environment (CBE) v. CENCO Refining*, 179 F. Supp. 2d 1128, 1146 (C.D. Cal. 2001).

---

[25] Section 303 Order.

9

The cost and time required for the Refinery startup, which continues to accrue because it still hasn't successfully restarted, is significantly out of step with prior Reactivation Policy decisions. To offer some further perspective on costs, one of HOVENSA's stated reasons for the shutdown in 2012 was a loss of $1.3 billion over three years.[26] This figure suggests that, even for a refinery, $4.1 billion in startup costs is a significant sum of money. It far exceeds the costs that supported a determination of permanent shutdown in prior matters.

Limetree's expenditure of $4.1 billion using 4,000 workers over three years of planning and construction activities plus at least 8.5 years of shutdown would have, by itself, been sufficient for EPA to determine that the two factors -- length of shutdown and costs of startup -- strongly refute any expressed intent of the owners to not permanently shut down. But the Refinery's inability to restart in late 2020 without causing an imminent and substantial endangerment to public health or welfare, or the environment, indicates that the actual length of the shutdown was, in effect, longer than 8.5 years because the Refinery was not ready to start up in compliance. When these facts are considered in light of the additional planned restart in 2023, more than 11 years will have passed since HOVENSA's shutdown. These facts and circumstances lead EPA to conclude that the cost and time factors are so significant that they weigh heavily in the six-factor analysis.

## B.    Evidence of Intent and Lack of Concrete Plans to Restart

Consistent with the Reactivation Policy, another factor in assessing whether a shutdown is permanent is the intent of the owner/operator, who must "continuously demonstrate concrete plans to restart the facility sometime in the reasonably foreseeable future." *Monroe* at 9. Thus, any break in that intent is sufficient to find that this factor points to a permanent shutdown. However, the threshold inquiry relates to the intent of the owner or operator "at the time of the shutdown." *Monroe* at 9. Once the Agency finds that the owner or operator "has no real plan to restart a particular facility," this finding, by itself, is sufficient to conclude that the shutdown was permanent and the owner's or operator's initial intention cannot be overcome by pointing to more recent efforts. *Id.* We look to subsequent actions only to assess "the continuing validity of the original intent not to permanently shut down." *Id.*

HOVENSA announced on January 18, 2012 its intention to shut down the Refinery citing significant losses after having "explored all available options to keep the Refinery operating."[27] After shutting the Refinery down in February 2012, HOVENSA stated in an April 26, 2012 letter to EPA that "currently, HOVENSA has no plans to restart the process units at its facility."[28] This statement, by itself, is an indication that HOVENSA lacked concrete plans in April 2012 to restart the Refinery.

There is further evidence, beyond the initial statements, as discussed in more detail below, that reveals HOVENSA's lack of the requisite intent to restart the facility sometime in the

---

[26] Press Release, *HOVENSA Announces Closure of St. Croix Refinery* (Jan. 18, 2012).
[27] Hess Press Release, *Hess Announces Charge Related to Closure of HOVENSA Joint Venture* Refinery (Jan. 18, 2012).
[28] Letter from Kathleen C. Antoine, Environmental Director, to Steve Riva, Chief, Air Programs Permitting Section, Cessation of Operation of $SO_2$ Monitoring Stations (April 26, 2012).

APPX-34

reasonably foreseeable future. This evidence falls into two categories. First, in negotiations with the U.S. Virgin Islands Government during approximately a period of one year after the 2012 shutdown, HOVENSA demonstrated its initial intention to permanently shut down the Refinery by converting it to an oil storage terminal. Second, later filings in 2015 proceedings offer evidence of HOVENSA's intention back in 2012. In addition, as discussed below, the transfer of assets from HOVENSA to Limetree did not include concrete plans to restart the Refinery. Many of these facts were not provided to EPA in the February 1, 2018 letter from Limetree requesting EPA's concurrence that the MARPOL project should not require a PSD permit under the Reactivation Policy. Instead, Limetree's representations to EPA led to the statement in the EPA's 2018 response letter that "neither [Limetree] nor HOVENSA made any statements to any party or issued any press release indicating any intent not to restart the plant in the future."

1. Negotiations Between HOVENSA and the Government of the U.S. Virgin Islands after 2012 Shutdown

Negotiations between the U.S. Virgin Islands Government and HOVENSA during approximately the first year post-shutdown demonstrate HOVENSA's intention to convert the Refinery to an oil storage terminal. On July 12, 2013, Governor John P. de Jongh, Jr. sent a letter to the President of the U.S. Virgin Islands Legislature that advocated for ratification of the "Fourth Amendment Agreement" with HOVENSA. The letter provides the history of HOVENSA's actions and intentions related to the Refinery. In particular, the letter states as follows:

> Not only did [HOVENSA] shutter the St. Croix Refinery last year, but one of its parent companies, Hess Corporation, has publicly announced its intention to exit the Refinery business altogether, and the other, Venezuela's national oil company has indicated no interest in making new investments in the Refinery. Although HOVENSA has not publicly admitted it, it seems all but certain that, under its current ownership, the St. Croix Refinery will never reopen.[29]

The Governor's letter also discusses the "concession agreement" between HOVENSA and the U.S. Virgin Islands Government which dates back to the 1960s and was on its third iteration at the time of the shutdown. The Governor explains that HOVENSA wanted to be relieved of certain responsibilities related to the Refinery under its existing concession agreement with the U.S. Virgin Islands Government and so HOVENSA proposed "drastic modifications" to the agreement that would "essentially mothball the Refinery while allowing the company to operate an oil terminal business." *Id*. at 2.

The Governor's letter confirms that HOVENSA did not have concrete plans to either operate or sell the Refinery. In particular, the Governor states that "on August 6, 2012, I informed HOVENSA and the public of the Government's position: The company must either restart the Refinery or sell it to someone who will." *Id*. at 3.

---

[29] Letter from John P. de Jongh, Jr., Governor, USVI, to Honorable Shawn-Michael Malone, President, 30th Legislature, USVI, *Transmittal of Legislation Ratifying the Fourth Amendment to the HOVENSA Concession Agreement* (July 12, 2013).

At some point between August 2012 and December 2012, under pressure from the Governor, HOVENSA agreed to put the Refinery up for sale[30] but only on conditions unacceptable to the Governor because if the Refinery did not sell, HOVENSA would "shed most of its obligations under the existing Concession Agreement and still operate its oil storage terminal business." *Id*. Concerned that HOVENSA would not have sufficient incentive to sell the Refinery under such terms, the Governor rejected that offer and the parties "remained at impasse from mid-December 2012 to late January 2013," when they agreed to terms that would have significant consequences for HOVENSA if it didn't sell the Refinery including "resumed Concession Agreement obligations, a substantial repayment of deferred taxes, a limited revenue-producing oil terminal, and a lawsuit." *Id*. at 5.  As the Governor states in his letter to the Legislature, "this is not the original course that HOVENSA and its owners wanted, but it is the best course for the long term interest of our community." *Id*. at 7. In short, the Governor's letter reflects that his goal of having either HOVENSA or another party operate the Refinery was not shared by HOVENSA at the time of the Refinery shutdown and for much of 2012.

Consistent with the Governor's characterization of HOVENSA's intent, HOVENSA made clear its intention to permanently shut down the Refinery when it signed an agreement with the Governor regarding the future of the Refinery. The April 3, 2013 Fourth Amended Agreement, signed by HOVENSA, Hess, Petroleos de Venezuela, S.A ("PDVSA"), and the Governor includes "whereas" clauses that reveal HOVENSA's intentions prior to entering into the Agreement:

> "WHEREAS, HOVENSA desires to convert the Oil Refinery and Related Facilities to an oil storage terminal operation; and

> WHEREAS, the Government believes that the economic well-being of the U.S. Virgin Islands depends on continued refining operations at the Oil Refinery and Related Facilities and prefers that said facilities be sold to a new owner who will resume refining operations; and

> WHEREAS, in the interest of reaching a mutually acceptable resolution of the situation….

> NOW, THEREFORE, the Government, HOVENSA, HOVIC and PDVSA VI hereby agree to enter into this Fourth Amendment Agreement, which temporarily suspends certain of the parties' contractual obligations under the Concession Agreement to facilitate a sale of the Oil Refinery and Related Facilities…."

*Fourth Amendment Agreement Between the USVI, HOVENSA, Hess Oil VI Corp, and PDVSA* (April 3, 2013).

---

[30] HOVENSA sent a letter to EPA's enforcement program on December 3, 2012 related to potential modifications to an existing consent decree with EPA. In the letter, HOVENSA refers to its negotiations with the U.S. Virgin Islands Government and indicated that "the Government's stated position is to have the refinery operations reopened or sold, in view of its economic importance to the Virgin Islands. To accommodate the possibility of a sale process, HOVENSA is requesting that certain provisions to the Consent Decree be placed in a standstill mode for a period of 24 months." Letter from Brian K. Lever, HOVENSA, to John Fogarty, EPA (Dec. 3, 2012).

This Agreement reveals the contrast between HOVENSA's desire to cease refining petroleum products and convert the facility to an oil storage terminal and the Government's desire for HOVENSA to sell the Refinery to ensure resumption of refining operations. Not only did HOVENSA lack concrete plans to restart the Refinery but, prior to pressure from the Governor, it lacked concrete plans to sell the Refinery and intended to convert it to an oil storage terminal.

Members of the legislature confirmed their understanding of HOVENSA's intention to convert the Refinery to an oil storage terminal. Nine Senators of the U.S. Virgin Islands legislature proposed a resolution on August 7, 2013[31] "to encourage HOVENSA to find a new owner for its Refinery property on St. Croix" because "HOVENSA, rather than engaging in aggressive efforts to obtain a buyer for the Refinery, proposes to substitute an oil storage business in place of the oil refining business, maintaining that it is not a breach of contract." *Thirtieth Legislature of the U.S. Virgin Islands, Bill No. 30-0186, A Resolution to Encourage HOVENSA to find a new owner for its Refinery Property on St. Croix (Aug. 7, 2013)*.

The Government of the U.S. Virgin Islands hired Duff & Phelps, LLC, a consulting firm, to evaluate HOVENSA's 2012 proposed revisions to the concession agreement along with options for the facility. Duff & Phelps produced a report for the U.S. Virgin Islands that discusses a 2011 agreement between HOVENSA, HESS, HOVIC, and PDVSA to "transition the facility into an oil storage terminal, a process estimated to take approximately 18 months, putting completion of the conversion process in the second half of 2013."[32] Duff & Phelps' report references three options in response to HOVENSA's concession agreement modification request: (1) full acceptance [of HOVENSA's request], in which the U.S. Virgin Islands "accepts the proposed modifications to the Concession Agreement and HOVENSA proceeds <u>with full conversion of the site to an import/export oil terminal</u>" (emphasis added); (2) interim acceptance with HOVENSA's commitment to restart or sell the Refinery; or (3) outright rejection.[33] The Duff & Phelps report is further evidence that HOVENSA was requesting a permanent conversion to an oil terminal.

Limetree provided some information in its February 1, 2018 letter to EPA and accompanying timeline indicating that HOVENSA left the door open for a potential return to service of the Refinery. EPA has considered this information in its examination of the 2012 period and concludes that the overwhelming evidence is that HOVENSA's stated intention and objective was to convert the Refinery to an oil storage facility. HOVENSA lacked sufficient concrete plans for a return to service to overcome the evidence of its intention in 2012 to convert the Refinery to an oil storage terminal. Additional evidence of this intention is contained in documents from proceedings after the 2012 timeframe, discussed below.

---

[31] The U.S. Virgin Islands Legislature later ratified the Agreement. *Fourth Amendment Agreement, dated April 3, 2013, as ratified by the Legislature of the U.S. Virgin Islands on November 4, 2013 and approved by the Governor of the U.S. Virgin Islands on November 4, 2013, as Act No. 7566.*

[32] Duff & Phelps, LLC, *Highest and Best Use of the HOVENSA Refinery*, at 4 (Aug. 3, 2012), at https://stthomassource.com/legacy_files/userfiles/file/Duff%20&%20Phelps%20-%20HOVENSA%20Highest%20and%20Best%20Use%20Report.pdf.

[33] *Id.* at 8.

13

2.   <u>Later Proceedings that Reflect HOVENSA's Intent Regarding the Planned Conversion</u>

Further confirmation that, at the time of the shutdown, HOVENSA did not intend to either restart or sell the facility as a Refinery can be found in a petition filed by HOVENSA in 2015 under Chapter 11 of the U.S. Bankruptcy Code. A sworn certification of the "HOVENSA proposed Chief Restructuring Officer" states as follows:

> [I]immediately after the idling of the Refinery in February 2012, HOVENSA…approached the [government of the U.S. Virgin Islands] and proposed certain amendments to the Concession Agreement intended to facilitate operations as a storage terminal…. Former Governor of the USVI, John de Jongh, Jr., rejected this request and insisted that HOVENSA either restart and operate the Refinery or conduct a sale process to sell the business to a purchaser that would engage in Refinery operations.

*In re: HOVENSA LLC, Debtor*, Certification of Thomas E. Hill In Support of Chapter 11 Petition and First Day Motions, Case No. 1:15-bk-10003-MFW, District Court of the U.S. Virgin Islands Bankruptcy Division, St. Croix Division, at 25 (Sept. 15, 2015).

In a separate action in 2015, Claude E. Walker, Acting Attorney General of the U.S. Virgin Islands, filed a Complaint against Hess Corp., one of the two joint owners of HOVENSA, for damages related to the shutdown.  The Complaint alleges that "as part of the closure announcement, Hess Corp. representatives affirmed their intent to convert the Refinery into an oil-storage terminal business in direct violation of the law and the Agreement [with the U.S. Virgin Islands]." *Government of the United States Virgin Islands v. Hess Corporation*, Complaint, Superior Court of the U.S. Virgin Islands, Division of St. Croix (Sept. 14, 2015). The Complaint further states that, "to achieve Hess Corp's goal of converting the Refinery into an oil storage facility, Hess Corp proposed a series of drastic alterations to the Third Extension Agreement it claimed to be necessary to make the terminal operation viable." *Id*.

While the record of HOVENSA's initial intent to close the refinery makes it unnecessary to look beyond the first year post-shutdown, there were discussions about the conversion to an oil storage facility as late as 2015.  A sworn declaration of Joel H. Holt, co-counsel for the Government of the U.S. Virgin Islands indicates that for the three years following the January 2012 closure announcement, the U.S. Virgin Islands Government negotiated various proposals with Hess regarding the future use of the Refinery. One such proposal was offered in a June 5, 2015 meeting in which Hess and PDVSA met with the Government of the U.S. Virgin Islands "to outline a potential sale of the Refinery as an oil storage facility." *In re: HOVENSA, LLC, Debtor*, *Declaration of Joel H. Holt*, District Court, U.S. Virgin Islands Bankruptcy Division, St. Croix, U.S. Virgin Islands, Case No. 15-100003 (Nov. 29, 2015).

3.   <u>Limetree Lacked Concrete Plans to Restart Upon Purchase of the Assets in Bankruptcy</u>

On December 1, 2015, Kenneth E. Mapp, the Governor of the U.S. Virgin Islands, sent a letter to the President of the Legislature of the U.S. Virgin Islands which transmitted for ratification the Operating Agreement between the Government of the U.S. Virgin Islands and Limetree upon HOVENSA's transfer of the Refinery and terminal assets to Limetree.[34] The transmittal letter makes clear that the Agreement was for Limetree to "refurbish, restart, and operate an oil storage terminal at the Facilities, [and] <u>explore available options</u> for resuming petroleum processing operations at the Facilities" (emphasis added).[35]

The Agreement provides that Limetree had between 18 and 36 months to evaluate the prospects of a Refinery restart and if, by end of the evaluation no restart is planned, Limetree could deconstruct those portions of the Refinery that are not necessary for operation of the terminal. The plan for "dismantling" the Refinery was to be implemented by Limetree at their expense, and the proceeds from sale of the structures, fixtures, equipment and machinery, up to $5 million plus 50% of proceeds above $5 million, would go to Limetree.[36] The language of this Agreement is inconsistent with concrete plans to restart the Refinery in the reasonably foreseeable future.

### C.  Cause of the Shutdown

As stated above, at the time of the shutdown, Hess was exiting the refining business and PDVSA did not want to make further investments in the Refinery.[37] In addition to the $1.3 billion in losses suffered by HOVENSA over three years, the press release at the time of closure stated that:

> [Losses] were projected to continue.  These losses have been caused primarily by weakness in demand for refined petroleum products due to the global economic slowdown and the addition of new refining capacity in emerging markets. In the past three years, these factors have caused the closure of approximately 18 refineries in the United States and Europe…. In addition, the low price of natural gas in the United States has put HOVENSA, an oil-fueled Refinery, at a competitive disadvantage.[38]

With losses projected to continue, the low price of natural gas in the United States, weakened demand, Hess Corporation's announcement of its intention to exit the Refinery business altogether, and PDVSA's indication of no interest in making new investments in the Refinery, the causes of the shutdown do not appear to be consistent with formulating concrete

---

[34] Operating Agreement By and Among The Government of the U.S. Virgin Islands and Limetree Bay Terminals, LLC (Dec. 1, 2015), available at
https://stthomassource.com/legacy_files/userfiles/file/0%202015/12%20December%202015/LIMETREEBAY_AGREEMENT-SPEC_SESSION-12_17-2.pdf.
[35] *Id*.
[36] *Id*. at 31-32.
[37] Letter from John P. de Jongh, Jr., Governor, USVI, to Honorable Shawn-Michael Malone, President, 30th Legislature, USVI, *Transmittal of Legislation Ratifying the Fourth Amendment to the HOVENSA Concession Agreement* (July 12, 2013).
[38] Hess Press Release, *Hess Announces Charge Related to Closure of HOVENSA Joint Venture* Refinery (Jan. 18, 2012).

plans to restart. They are, however, consistent with HOVENSA's intent to convert the facility to an oil storage terminal and abandonment of the refining business.

### D.    Status of permits

EPA is aware that HOVENSA, and later Limetree and PHRT, maintained at least some of their environmental permits, including their Clean Air Act Title V permit. HOVENSA indicated in a February 7, 2012 letter to DPNR that it retained the permits so that the process units could be operated in the future, "without obtaining new source permits that would likely impose unsustainable burdens on any resumption of operations at the refinery."[39] The status of permits is the *Monroe* factor which, at first glance, appears potentially most consistent with a determination that the Refinery was not permanently shut down in 2012. This factor was emphasized when EPA responded to public comments on the PAL permit in 2020 and sent its 2018 letter based on the facts provided at the time by Limetree.  But in light of changed circumstances and new information related to the other factors, EPA is revisiting this factor as well.  A more detailed review of the structure of the permits, and subsequent developments, suggests that this factor does not as compellingly support a determination that the Refinery was not permanently shut down as EPA had previously indicated.

First, the Title V permit, existing PSD permit[40] and Clean Water Act permit include conditions for the utilities shared by the Refinery and the terminal. The additional information, regarding the planned conversion of the Refinery to an oil storage terminal, which was not provided to EPA by Limetree before EPA's 2018 letter was issued, and which EPA did not previously consider, sheds new light on the permits. HOVENSA depended upon each of these permits for its planned conversion of the facility to an oil storage terminal.[41] For example, in the February 7, 2012 letter to DPNR, referenced above, HOVENSA stated that it "believes that a Title V permit will be needed even if only oil storage terminal operations remain at the site." Therefore, HOVENSA, and later Limetree, needed to retain those permits for continuation of the terminal business. Moreover, HOVENSA's stated desire to avoid future New Source Review (NSR) permitting does not demonstrate concrete plans to restart or overcome their other actions that speak to a permanent shutdown.

While HOVENSA left the door open to future refinery operations by maintaining some of its permits, its August 31, 2012 Territorial Pollution Discharge Elimination System (TPDES) permit renewal application to DPNR reflects its primary objective, to convert the Refinery to an oil storage terminal. The application requests that the renewed permit include three different operating scenarios. Although the permit application states that "no new facility refining operations are planned for the renewed permit," the first operating scenario in the application

---

[39] Letter from Brian K. Lever, HOVENSA, to Alicia K. Barnes, Commissioner, U.S. Virgin Islands Department of Planning and Natural Resources (Feb. 7, 2012).

[40] There is nothing required of a facility owner or operator to maintain a PSD permit because the permit continues to be in effect indefinitely.  Rather, the owner or operator would have to make an affirmative request to EPA to rescind the permit.

[41] EPA also notes that the RCRA permit for the facility is unrelated to whether or not the refinery operates in the future.

APPX-40

reflects HOVENSA's request to retain the flexibility to refine "if future market conditions warrant." The other two operational scenarios requested by HOVENSA reflect its real intention for the Refinery in 2012 and beyond.  The second operational scenario "covers the transition period" of 18-24 months, starting from January 2012 during which remaining refining operations were being idled at the facility and reflects HOVENSA's intention to undergo "the conversion to Operation Scenario III (Terminal Only Operations)." The third operational scenario description in the permit renewal application states that "after completion of all steps required to idle refining operations, the facility will operate as a terminal-only facility."  While HOVENSA left open the door in its permit application to the possibility of refining if future market conditions change, the permit application demonstrates concrete plans to convert the refinery to an oil storage terminal.

Second, the Clean Water Act permit has not been maintained. In a May 25, 2022 letter to Limetree and PHRT, EPA expressed concern that neither Limetree Bay Terminals nor PHRT have appropriate Territorial Pollutant Discharge Elimination Systems (TPDES) permit coverage for discharges from their respective industrial activities.[42] After PHRT failed to address EPA's concern, EPA sent PHRT another letter dated August 22, 2022 stating that, "to date, the DPNR has not received a TPDES application from PHRT, and has not issued a TPDES permit to PHRT. As a result, PHRT does not have coverage under any TPDES permit for either the process wastewater treatment plant, or for any regulated storm water outfalls associated with its industrial activities, as required by 40 C.F.R. 122.26(b)."[43]  The letter further states that the disposal of the amine purge waste planned by PHRT "is not authorized by any applicable TPDES permit, and therefore, if it were to occur, would be a violation of Section 301 of the CWA."

### E.    Maintenance and Inspections During Shutdown

Limetree did provide maintenance records to EPA in 2018, which are referenced in EPA's 2018 letter.  They were also relied upon in the 2020 PAL RTC document, which expressed the view that the Refinery had not been permanently shut down. EPA noted in the 2018 letter as important the "over $400 million to maintain the restart capability of the Refinery, which included removing residual material from equipment, retaining control room operability, and conducting other process equipment mothballing activities" and maintenance of "critical Refinery equipment, such as compressors, pumps, utilities, wastewater treatment units" and a "timeline of significant maintenance activities."[44]

---

[42] Letter from Virginia Wong, Chief, EPA Region 2 Clean Water Regulatory Branch, to Mark Chavez, Limetree Bay Terminals, LLC and Julie R. Domike and Tom V. Eagan, PHRT (May 25, 2022).
[43] Letter from Virginia Wong, Chief, EPA Region 2 Clean Water Regulatory Branch, to Thomas V. Eagan, PHRT (Aug. 22, 2022).
[44] EPA's 2018 Letter at 3. Limetree's February 1, 2018 letter states that part of the $400 million was for removal of "residual hydrocarbon materials from units and tanks ('sludge disposal')." EPA's understanding is that, given the high costs associated with sludge removal and disposal, a significant portion of the $400 million shutdown costs must have involved recovery and disposal of hazardous waste catalyst material and was therefore not strictly for purposes of ongoing maintenance but also to avoid contamination from existing units and tanks.

However, a closer review of the underlying maintenance records now leads EPA to a different conclusion. EPA's 2018 letter relied on Limetree's representations that HOVENSA maintained critical refinery equipment. The 2018 letter indicated that Limetree's representations are demonstrated in a general "list of critical equipment and the timeline of significant maintenance activities performed at the refinery" that were provided to EPA.  But prior to the EPA 2018 letter, the Agency did not consider the underlying logs and records that Limetree transmitted to EPA on January 26, 2018.[45]

EPA's review of the logs and records reveals poor maintenance of the Refinery by HOVENSA between 2012 and 2016 and minimal maintenance by Limetree in 2016 and 2017. Among the documents provided by Limetree are records referred to as "refining rounds" which include identification of numerous failing structures including heavy corrosion on tanks at Beavon Units 1 and 2, heavy corrosion on top of oxidation tanks, failing fireproofing, structural steel supports in need of repair, and rust at risk of falling on personnel.  Other than a plan to barricade areas where rust was at risk of falling, it isn't clear from the records that the failing structures identified in the "refining rounds" records were remediated. In fact, there is little evidence of follow-up after an inspection discovered a problem. And according to the 2013 Maintenance Activity Progress Report, by May 6, 2013, no additional work hours were spent at the Refinery by HOVENSA, and there are no Maintenance Activity Progress Reports for subsequent years. After May 2013, there were walk-throughs but little evidence of maintenance, and as the years progressed, there were fewer and fewer logs. This represents inadequate maintenance for a large Refinery subject to corrosion from its location near saltwater.

Even if more robust maintenance occurred than is evident from EPA's more recent review of the underlying records, it is clear that this Refinery was not in a condition that allowed it to resume refining quickly, either at the initial shutdown or when Limetree purchased the assets. Under the Reactivation Policy, a facility should be maintained in a state of readiness to resume operations. EPA previously determined that a facility that is well maintained with periodic testing of the equipment "to ensure quick reactivation" so that a plant could be brought back online "with only a few weeks of work" could arguably overcome deficits in the other factors. See *Watertown Power Plant, South Dakota*, Memo from John B. Rasnic, Director Stationary Source Compliance Division, OAQPS, to Douglas M. Skie, Chief, Air Programs Branch (Nov. 19, 1991). But the significant time and money required to bring the Refinery back into service (*see* Section III.A, above) leads EPA to conclude that the Refinery was not well-maintained to enable a quick restart and supports the determination that the Refinery was permanently shut down.

Inadequate maintenance is also evident from Limetree's failed startup of the Refinery. As stated in Section III.A, above, EPA's Section 303 Order reflects that Limetree started up the Refinery without adequate staffing and with significant operational problems that affected multiple units. The audit reports stemming from the Section 303 Order also contain additional

---

[45] Limetree referred to these logs and records in its Feb. 1, 2018 letter. Letter from LeAnn Johnson Koch, Perkins Coie, to John Filippelli, EPA Region 2 (Feb. 1, 2018), citing to Jan. 26, 2018 submission (*see* Tab 8, 2013 Maintenance Records, Refinery Rounds, East SRU of Jan. 26, 2018 submission).

facts that are germane but are claimed as Confidential Business Information. As such, Attachment 3, Additional Facts Claimed as Either Confidential Business Information or Subject to the Federal Rules of Evidence, Rule 408, provides further information.

Inadequate maintenance, in part, also led to the dangers posed by a May 2021 incident, which was addressed by OSHA in a Stipulation and Agreed Order with Limetree with attached Citation and Notification of Penalty.[46] The Citation and Notification of Penalty includes numerous counts related to maintenance including, among others, the following:[47]

1. Limetree failed to correct deficiencies outside of acceptable limits found on the Coke drums (D-8501/2/3/4), including bulging Coke drums and stainless-steel clad liners on the internal surfaces of Coke drums without corrosion protection.
2. Limetree failed to repair significant pitting on the Flare Knockout Drum (D-7941) before further use or in a safe and timely manner, "which can result in catastrophic failure of vessel and exposure to fire, toxic[s] and hazards."
3. Limetree did not have adequate safety, operating, maintenance and emergency procedures in place prior to the introduction of hazardous chemicals. In particular, Limetree "failed to develop and implement written operating procedures to manage and address abnormal coke drum conditions." Such failures prior to startup "can result in operator errors, catastrophic incidents and expose employees to fire, toxic and explosion hazards."
4. Limetree also "failed to establish and implement written procedures to maintain the on-going integrity of process equipment."
5. Limetree failed to complete the following items prior to startup:
   a. Restore missing cladding on internal surfaces of Coke drums
   b. Correct corrosion under insulation on Coke drums
   c. Correct pitting on Blowdown Drum Overhead Separator (D-8513)
   d. Restore pressure vessel fireproofing
6. Limetree failed to correct corrosion on flanges and bolts, inspect insulated piping for SUI and label all process piping.

Insufficient maintenance continued after Limetree filed for Bankruptcy. A smoldering fire broke out at the Refinery's coke piles on August 4, 2022, which was not suppressed until August 26, 2022. The likely cause of the fire was poor maintenance. According to PHRT, the contractor that had maintained the coke piles "left the site abruptly" when Limetree filed for Bankruptcy[48] in July 2021, and there is no indication that steps were taken by PHRT to properly maintain the coke pile when it assumed ownership in January 2022. Proper maintenance of the coke piles should have included, among other things, water spraying combined with turning of the coke and air circulation via fans, and inspections. Such steps could have prevented the fire.

---

[46] Citation and Notification of Penalty, Limetree Bay Refining, LLC., Inspection No. 1521774, U.S Dep't of Labor, Occupational Safety & Health Admin. (Nov. 8, 2021).

[47] *Id*. at 24 and 27-30.

[48] Information Response Letter from Thomas V. Eagan, Counsel to PHRT, to Dwayne Harrington, US EPA, *Request for Information Pursuant to Section 104(e) of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) received on August 18, 2022*, Sept. 1, 2022.

PHRT provided EPA with a plan on August 27, 2022 to begin maintenance activities.[49] It therefore appears that for approximately one year, no maintenance was performed at the coke piles.

In response to the coke fire, EPA performed an inspection of the Refinery pursuant to Section 112(r)(1) of the Clean Air Act (CAA), 42 U.S.C. § 7412(r)(1), between September 20 and September 26, 2022 ("112(r) inspection"). The 112(r) inspection revealed that the facility does not have a preventative maintenance program nor does it undergo formal process unit inspections.  The inspectors observed conditions demonstrating a "systemic lack of maintenance" upon touring the following process units: #5 Crude Unit; #6 Crude Unit: #3 Vacuum Unit; Anhydrous Ammonia Drum; Amine Units; LPG Unit #3; Delayed Coker Unit; Coker Supply Tank 8501. The inspectors noted corrosion at all process units including "extreme corrosion in many cases to a degree resulting in extreme deterioration (exfoliation)" that "severely compromised integrity and operability."[50] Also significant to the maintenance factor is the inspection report's finding that "many process components appear [to] not have been adequately inspected or maintained for <u>significant</u> periods (emphasis added)."

The lack of inspection and maintenance for significant periods of time, the advanced state of corrosion found during the 112(r) inspection, and the OSHA findings, reflect that the Refinery was not properly maintained even prior to PHRT's ownership.  In addition, the change in ownership from Limetree to PHRT should have been done in a manner that provided a smooth transition to avoid problems like the coke fire. While a change in ownership of a facility doesn't, by itself, render a stationary source subject to PSD permitting, it "represents further attenuation" in time and, perhaps more importantly, the circumstances surrounding the change in ownership may be probative of whether the shutdown was permanent. Letter to Robert T. Connery, Esq., Holland & Hart, from EPA, Region 9, *Supplemental PSD Applicability Determination Cyprus Cas Grande Corporation Copper Mining and Processing Facilities* (Nov. 6, 1987). The circumstances surrounding the change from Limetree to PHRT that shows the dire state and poor maintenance of the facility at the time of transfer is reflected in the $62 million purchase price for a Refinery that had recently seen $4.1 billion invested. All of the circumstances surrounding both the transfer from HOVENSA to Limetree and Limetree to PHRT, including lack of maintenance evidenced in part by the time and cost already expended to restore the Refinery and the inability to resume operation without significant noncompliance indicate that the Refinery was permanently shut down.

### F.  <u>Conclusion of Reactivation Policy Factor Analysis</u>

While "no single factor is likely to be conclusive in the Agency's assessment," *Monroe* at 9, the length of time the Refinery has been shut down and the time and capital needed to put the Refinery in a condition to restart are so out of step with past decisions that they weigh heavily in EPA's analysis. A cost of $4.1 billion using 4,000 workers over several years, and then an

---

[49] Fermin Rodriguez, VP & Refinery Manager, PHRT, *Coke Dome Smoldering Event Status*, Aug. 27, 2022.
[50] Many of the inspectors' observations were documented with photographs referenced in the inspection report. These photos have been claimed as CBI.

attempted startup that caused an imminent and substantial endangerment to public health or welfare or the environment is far from the "limited time and capital" and "a few weeks of work" that one would expect from a plant that had not been permanently shut down. Memorandum from John B. Rasnic to Douglas M. Skie, *Applicability of PSD to Watertown Power Plant, South Dakota* (Nov. 19, 1991).

In addition, HOVENSA, which shut the Refinery down, did not continuously demonstrate concrete plans to restart the Refinery. It had no concrete plans to restart the Refinery at the time of shutdown in February 2012 and lacked the requisite intent for the better part of a year following the shutdown. Not only did HOVENSA lack concrete plans to refine product in the future, it intended to convert the Refinery into an oil storage terminal. Once an owner or operator has no real plan to restart a particular facility, "such owner or operator cannot overcome this suggestion that the shutdown was intended to be permanent" by later pointing to more recent efforts at restart. *Monroe* at 9. Therefore, HOVENSA's lack of intent to restart at the time of shutdown and soon thereafter is, by itself, sufficient to determine that there was an intent to permanently shut down the Refinery in 2012. In addition, the period of transition from HOVENSA to Limetree during the bankruptcy proceeding is another period when concrete plans to restart the refinery were lacking as restarting the Refinery was optional.

The evidence regarding the cause of the shutdown provides no indication that the Refinery would one day operate again. To the contrary, in addition to statements soon after the shutdown that HOVENSA had no plans to restart the Refinery, HOVENSA's two parent companies were either exiting the refining business or unwilling to invest additional funds into the Refinery after losing $1.3 billion. Moreover, HOVENSA's decision to shut down was also due to its competitive disadvantage as an oil-fueled refinery compared to gas-fueled refineries in other parts of the United States that could rely on cheaper natural gas for their energy needs.

The maintenance and inspections during shutdown were viewed by EPA upon issuance of EPA's 2018 letter and the 2020 RTC to favor a finding that the 2012 shutdown was not permanent, but a close examination of the facts to-date suggests otherwise. Despite some efforts by HOVENSA to maintain some of the refining equipment, there have been significant lapses in maintenance that led to severe incidents of air pollution, the Section 303 Order, the OSHA Citation and, most recently, a smoldering fire at the coke domes and discovery of systemic lack of maintenance for significant periods of time. While the retention of Refinery permits by HOVENSA, and HOVENSA's statements about them, might be seen as being suggestive of an intention to restart the facility, this factor does not as compellingly support an intention to restart considering that such permits were necessary for continued operation of the oil storage terminal.

On balance, the six factors point convincingly in favor of a finding that the Refinery was permanently shut down in 2012. Even viewing the status of permits as representing an intention to restart, the Refinery's history with respect to the other factors is so compelling that EPA concludes there was a permanent shutdown.

IV.     **The Refinery is a New Major Stationary Source and Exceeds the PSD Major Stationary Source and/or Significant Thresholds for Multiple PSD Pollutants**

As discussed in the analysis above, HOVENSA permanently shut down the Refinery in February 2012.  In the event of a Refinery restart or actions at the Refinery that "begin actual construction," as defined in 40 C.F.R. 52.21(b)(11), EPA would treat the Refinery as a new source.  The determination of PSD applicability is therefore based on how the PSD regulations apply to new sources.

A "major stationary source" is any source belonging to a list of 28 source categories which emits, or has the potential to emit, 100 tons per year or more of any regulated NSR pollutant, or any other source which emits, or has the potential to emit, such pollutants in amounts equal to or greater than 250 tons per year. 40 C.F.R. 52.21(b)(1)(i).  A stationary source generally includes all pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under common control.  40 C.F.R. 52.21(b)(5) and (b)(6). Since petroleum refineries are on the list of 28 source categories, if the potential to emit of any regulated NSR pollutant exceeds 100 tons/year, the source is considered a major stationary source and a PSD permit is required. Once a source is a major stationary source, a PSD permit is required not only for pollutants exceeding the 100 tons/year threshold but for any pollutant that has a potential to emit over the "significant" level in 40 C.F.R. 52.21(b)(23).

After purchasing the HOVENSA assets in 2016, Limetree applied for an Authority to Construct permit for the MARPOL Project from the U.S. Virgin Islands Department of Planning and Natural Resources (DPNR) in April 2018.  In its application, Limetree provided the source's projected actual emissions which exceeded the 100 tons/year major source threshold for multiple regulated NSR pollutants and/or the "significant" levels in 40 C.F.R. 52.21(b)(23)(i).[51]  In a July 14, 2022 statement to the U.S. Virgin Islands Legislature, Charles Chambers, the lead principal of PHRT and Chief Executive Officer of West Indies Petroleum Limited, stated a commitment to "restarting of the refinery at 180-thousand barrels per day of production."[52] At the levels of production in both the DPNR permit and Charles Chambers' statement, the Refinery is a major stationary source and, therefore, PHRT is required to apply for and obtain a final and effective PSD permit prior to restarting the Refinery or beginning actual construction, as defined in 40 C.F.R. 52.21(b)(11). Based upon the emissions associated with the MARPOL permit application and factoring in the production rate in Charles Chambers' statement,[53] PHRT must submit a PSD permit application to EPA for multiple PSD pollutants, including but not limited to $SO_2$, NOx, VOC, $PM_{2.5}$, $PM_{10}$, PM, $H_2SO_4$ and CO.

---

[51] It is likely that the potential to emit for these pollutants would be higher than the projected actual emissions.

[52] Statement from Charles Chambers, Representative of Port Hamilton Refining and Transportation, Before the 34th Legislature of the U.S. Virgin Islands, Committee on Economic Development and Agriculture (July 14, 2022), at https://www.legvi.org/committeemeetings/Committee%20on%20Economic%20Development%20and%20Agricultu re/July%2014,%202022/Charles%20Chambers%20PHRT%20Testimony.pdf.

[53] This conclusion assumes a refinery design and operation substantially consistent with what Limetree proposed in the MARPOL permit application. PHRT will have to examine the applicability of all PSD pollutants when it prepares its application. While Limetree did not provide estimates for greenhouse gases in its MARPOL permit application, it is highly likely that the Refinery will also require PSD review for greenhouse gases.

PHRT's July 2022 response to EPA's March 22, 2022 letter contains additional facts that are germane to the PSD applicability analysis but are claimed to be CBI. As such, Attachment 3 provides further information.

**ATTACHMENT 2**

**Affirmation of EPA's Long-Standing Reactivation Policy**

Introduction:

As discussed in Attachment 1, EPA is continuing to apply its long-standing policy on the applicability of the Clean Air Act's Prevention of Significant Deterioration (PSD) regulations to the reactivation of permanently shut down sources ("Reactivation Policy" or "Policy"). See, *In the Matter of Monroe Electric Generating Plant Entergy Louisiana, Inc.,* Proposed Operating Permit, Petition No. 6-99-2 (June 11, 1999) (*Monroe*). The *Monroe* Order provides the most complete articulation of the Reactivation Policy that EPA has consistently applied over three decades. This policy is grounded on an interpretation that a major stationary source that has permanently shut down is subject to the PSD regulations at 40 C.F.R. 52.21 as a new major stationary source upon restart. *See* Discussion, Section 2, below. EPA developed the factors in the Reactivation Policy to provide a way to determine whether a source that has been in "an extended condition of inoperation"[1] was permanently shut down.

Discussion:

    1.    *The Reactivation Policy Is Still Applied by EPA and Remains Appropriate*

EPA is continuing to apply the Reactivation Policy, as described in the *Monroe* Order, because it remains an appropriate method for determining whether the reactivation of a stationary source qualifies as the construction of a new source under the PSD regulations. Although EPA recently questioned the merit of continuing to apply the Reactivation Policy, EPA did not make a final decision to stop following the Policy. In this document, EPA reaffirms its intention to continue applying the Reactivation Policy.

On December 2, 2020, EPA criticized the Reactivation Policy and stated that the Agency would not follow it in the context of an action to issue a final Plantwide Applicability Limit (PAL) permit to Limetree Bay Refinery, LLC and Limetree Bay Terminals, LLC (Limetree).[2] The associated response to comments (RTC) stated that "EPA no longer believes that the Reactivation Policy is an appropriate policy, and the Agency is not required to apply it to any source, including the Limetree Bay facility."[3] However, this position was not maintained in any final EPA decision. On February 3, 2021, both Limetree and environmental organizations filed petitions for administrative review of EPA's final PAL permit with the EPA Environmental Appeals Board (EAB). In such circumstances, the EPA's regulations at 40 C.F.R. Part 124 provide that a permit decision does not become final and effective until the conclusion of administrative review proceedings under Part 124. On March 25, 2021, EPA withdrew "the [Limetree] PAL permit and its administrative record in its entirety, including the Agency's

---

[1] *Monroe* at 7.
[2] EPA Plantwide Applicability Limit Permit for Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC, PAL permit No. EPA-PAL-VI001/2019, Response to Comments, pp. 106-111 (Dec. 2, 2020).
[3] *Id.* at 111.

response to comments." [4] As a result, the EAB dismissed the petitions for review and no final permit decision was issued by EPA. Thus, the 2020 EPA statements regarding the Reactivation Policy contained in the RTC document were not part of a final action by EPA.

Even if this December 2020 action had taken effect and rescinded the Reactivation Policy, that Policy reflects the EPA's current views. The withdrawal of the PAL permit was based in part on EPA's desire to reconsider the statements in the RTC regarding the Reactivation Policy, but it was not necessary for the Administrator to articulate this reason at the time. After further consideration, for the reasons discussed below, EPA intends to continue following the Reactivation Policy to identify sources that have permanently shut down and that the Agency will classify as a new stationary source if they seek to restart. The EPA has applied the factors in that Policy in this case to determine that reactivation of the refinery now owned by Port Hamilton Refining and Transportation LLLP[5] constitutes construction of a new stationary source that requires a PSD permit.[6]

2. *Basis for the Reactivation Policy in the New Source Review Regulations*

The PSD regulations provide that "no new major stationary source or major modification … shall begin actual construction" without a PSD permit. 40 C.F.R. 52.21(a)(2)(iii). Although the PSD regulations contain a lengthy definition of the term "major modification,"[7] the regulations contain no definition of the terms "new major stationary source" or "new source," which are used throughout 40 C.F.R. 52.21.[8] Absent a detailed definition in the New Source Review (NSR) regulations, one should look to the plain meaning of the term. The first meaning of the term "new" in Webster's online dictionary is "having recently come into existence."[9] Likewise, the first meaning in the New Oxford American Dictionary is "not existing before; made, introduced, or discovered recently or now for the first time."[10] But the word "new" is also used to convey the concept of a renewal, as reflected in Webster's additional meanings of "beginning the resumption or repetition of a previous act or thing" or "made or become fresh." Similarly, Oxford's second and third meanings are "already existing, but seen, experienced, or acquired recently or now for the first time" and "just beginning or beginning anew and regarded as better than what went before." In the RTC document for the Limetree PAL, EPA argued that Webster's first meaning was the best reading in the context of the NSR provisions, but the RTC document did not demonstrate that other meanings are not permissible or appropriate in this context as well.

---

[4] Administrator Michael S. Regan, *Withdrawal of Plantwide Applicability Limit Permit No. EPA-PAL-VIOO1/2019* (March 25, 2021), at https://www.epa.gov/sites/default/files/2021-04/documents/withdrawal_decision_applicability.limit_.permit.signed.pdf.

[5] This reference to Port Hamilton Refining and Transportation, LLLP (PHRT) should be understood to include both PHRT and West Indies Petroleum Limited ("WIPL") as purchasers of the Refinery in the bankruptcy proceeding.

[6] *See* Attachment 1.

[7] 40 C.F.R. 52.21(b)(2).

[8] EPA's PSD regulations do define the term "construction" in section 52.21(b)(8) as "any physical change or change in the method of operation (including fabrication, erection, installation, demolition, or modification of an emissions unit) that would result in a change in emissions."

[9] <https://www.merriam-webster.com/dictionary/new>.

[10]  New Oxford American Dictionary, Third Edition, p. 1180, Oxford University Press (2010).

The Reactivation Policy does not establish a definition of "new major stationary source" or "new source," but is grounded on a long-standing interpretation of these phrases that incorporates elements of each of the meanings of "new" described above to include the restart of a major stationary source that previously ceased operations on a permanent basis.  An existing source or unit that has permanently shut down has effectively ceased to exist for purposes of air quality management.  If a source that was permanently shut down resumes operations, from the perspective of the airshed, this source has newly come into existence after its air pollutant emissions permanently stopped.[11]  Similarly, if a source that was previously in existence is substantially rehabilitated by its owner, the source has been made or become fresh – it is like new.  Even more so when a second or third party acquires a dormant facility for the first time and refurbishes it.  By contrast, when an existing source has only shut down temporarily, it has not ceased to exist and may be capable of resuming its activities without substantial time and effort.  EPA thus does not interpret the term "new stationary source" to include any resumption or repetition of a previous act or thing,[12] but only such a resumption that follows a permanent shutdown.[13]

This interpretation of the NSR regulations is also grounded on the premise that a stationary source that has permanently ceased operating no longer has a baseline level of actual emissions, that such baseline emissions are zero.  The absence of any baseline emissions is a key characteristic of a new source.  From 1978 to 2002, this interpretation was supported by NSR regulations that generally defined baseline emissions to include emissions over the last two years but placed the burden on sources to show that another period should be used to determine baseline emissions.  These provisions were amended in 2002 to enable most existing sources to use any 24-month period in the last 10 years to determine the baseline level of emissions for existing emissions units.[14]  However, consistent with agency's understanding of "new source" described above, the existing sources subject to this provision were not intended to include sources that permanently shut down.  Although the 2002 rulemaking did not add any definition of "existing major stationary source" that excluded permanently shut down sources, the 2002 rule carried forward the principle that a permanently shut down source has no baseline emissions and should thus be treated as a new one.

EPA reflected this principle in the text of a provision in the NSR regulations that enables major stationary sources to establish Plantwide Applicability Limits (PALs).  A PAL provides an alternative applicability test of major NSR permitting requirements, on a pollutant-by-pollutant basis, such that a source can make changes without triggering major NSR requirements if the total source-wide emissions remain below the PAL level established by the permitting authority.  In general, this level is determined by adding a significant emission rate in 40 C.F.R.

---

[11] While much of the equipment at the stationary source may not be distinct from that which existed before (as in a new edition), resuming the emissions that have ceased for a significant period time can impact air quality in a manner that is distinct from the conditions that existed while the source was in a prolonged shutdown.  Air quality management decisions may have been based on the premise that the source was no longer in existence.

[12] Under this reading, a source that restarts after a routine turn-around for maintenance is not a "new" source by virtue of resuming a previous act.

[13] Applying the factors discussed in section 7 below, this may include, for example, a circumstance where the resumption of the same activity requires a more substantial investment in time, staffing, and capital than a routine maintenance turn-around.

[14] *See* 40 C.F.R. 52.21(b)(48)(ii).

APPX-50

52.21(b)(23) to the baseline actual emissions demonstrated in a specific 24-month-period for a given NSR pollutant.  In this context, 40 C.F.R. 52.21(aa)(6)(i) of the PSD regulations says the following: "Emissions associated with units that were permanently shut down after this 24-month [baseline] period must be subtracted from the PAL level."  The PAL provisions use the same definition of baseline actual emissions that was created in 2002, so the 24-month period in 40 C.F.R. 52.21(aa)(6)(i) for setting the PAL level is the same 24-month period selected from within the 10-year lookback period for determining baseline actual emissions.  Thus, if an emissions unit is permanently shut down after the 24-month period that is used for determining the baseline emissions that form part of the PAL, the emissions from the permanently shut down unit cannot be counted as part of the baseline emissions in this context.  For example, if a source selected a 24-month period that was 9-10 years prior to the PAL permit application but permanently shut down a unit three or four years before the PAL permit application, the emissions from that unit would be subtracted from the baseline.[15]  This PAL regulatory provision thus codified the principle that an emissions unit that has been "permanently shut down" has no baseline emissions.  By requiring that emissions from such a unit be subtracted from the PAL level, the regulation requires quantifying the emissions from a permanently shut down unit as zero.

While EPA's 2002 rule did not add a definition of "new major stationary source" or use the term "permanent shutdown" in another provision that would provide meaning to a "new source," the PAL provision codified the central premise of EPA's pre-2002 interpretation that a permanently-shutdown source is tantamount to a new one.  If a single emissions unit that is permanently shut down has no baseline emissions, then by extension, if all of the emissions units at a facility are permanently shut down, the baseline emissions from the entire facility are zero, matching a key characteristic of a new source.

3.    *Reactivation Policy Supports the Goals of the NSR Program*

Declining to treat a source that has "permanently shut down" as an existing source furthers an important balance that Congress struck in enacting the NSR program.  The act requires that new facilities be designed to incorporate the best available pollution control technology but does not require existing facilities to upgrade their pollution controls until it is cost-effective to do so in conjunction with other upgrades or changes to the facility.  This balance has been discussed in U.S. Court of Appeals decisions that have examined the legislative history of the NSR provisions in the Clean Air Act (CAA).  In one opinion, the District of Columbia Circuit stated that "the statutory scheme intends to 'grandfather' existing industries; but the provisions concerning modifications indicate that this is not to constitute a perpetual immunity from all standards under the PSD program." *Ala. Power Co. v. Castle*, 636 F.2d 323, 400 (D.C. Cir. 1979).  The Seventh Circuit made the following observation: "[c]onsistent with its balanced approach, Congress chose not to subject existing plants to the requirements of NSPS and PSD. … But Congress did not permanently exempt existing plants from these requirements." *Wisconsin Electric Power Co. v. Reilly*, 893 F.3d 901, 909 (7th Cir. 1990)

---

[15] Since the significant emission rates are fixed for all sources, as specified in 40 C.F.R. 52.21(b)(23), and the baseline is source-specific and therefore variable, a reduction in a PAL for a permanently shut down unit is essentially a reduction in the baseline.

4

(internal citations and quotations omitted) (WEPCO).  As the WEPCO court observed, a motivation for subjecting a source to PSD when it was modified was because this was a cost-effective time to improve pollution controls. *Id.* Members of the House of Representatives recognized that "[b]uilding control technology into new plants at time of construction will plainly be less costly then [sic] requiring retrofit when pollution control ceilings are reached." H.R. Rep. No. 294, 95th Cong., 1st Sess. 185, *reprinted in* 1977 U.S. Code Cong. & Admin. News at 1264.  Further, Judge Boggs of the Sixth Circuit, in a dissenting opinion, cited legislative history to support the following observation: "The purpose of the 'modification' rule is to ensure that pollution control measures are undertaken when they can be most effective, at the time of new or modified construction." *See* 116 Cong. Rec. 32,918 (remarks of Sen. Cooper), *reprinted in* 1 Senate Committee on Public Works, *A Legislative History of the Clean Air Act Amendments of 1970* (1974), at 260." *National–Southwire Aluminum Co. v. EPA,* 838 F.2d 835, 843 (6th Cir.) (Boggs, J., dissenting), *cert. denied,* 488 U.S. 955, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988).  Citing this observation, the Seventh Circuit in the WEPCO case noted that Judge Boggs argued that the shutting down of voluntarily installed pollution control equipment, not required by regulation, at an existing plant should not be considered a modification because it would not afford the utility an opportunity for "effective placement of new control technology."  893 F.2d at 809.  In contrast, where a source is doing much more to resume operation of an entire facility, undertaking substantial capital investment to restart after a "permanent" shutdown, this is an opportune time to cost-effectively upgrade pollution control technology.  The Seventh Circuit in WEPCO also made the following observation:

> The legislative history suggests and courts have recognized that in passing the Clean Air Act Amendments, Congress intended to stimulate the advancement of pollution control technology. *See, e.g.,* S.Rep. No. 91–1196, 91st Cong., 2d Sess. 17 (1970) ("Standards of performance should provide an incentive for industries to work toward constant improvement in techniques for preventing and controlling emissions from stationary sources...."); *Duquesne Light Co. v. EPA,* 698 F.2d 456, 475 (D.C. Cir.1983); *Alabama Power,* 636 F.2d at 372; *ASARCO,* 578 F.2d at 327; *United States v. SCM Corp.,* 667 F.Supp. 1110, 1126–27 (D.Md.1987). The development of emissions control systems is not furthered if operators could, without exposure to the standards of the 1977 Amendments, increase production (and pollution) through the extensive replacement of deteriorated generating systems.

893 F.3d at 909-10.  Likewise, the development of emissions control systems would be frustrated if a permanently shut down source was allowed to restart after making substantial investments in rehabilitating the facility without also improving the air pollution controls.

4.    *Origin and Purpose of the Reactivation Policy*

Recognizing these goals of the NSR program, EPA developed the Reactivation Policy to provide a framework for determining whether a dormant source that seeks to resume operating was permanently shut down and should be classified as new.  EPA has applied this policy

5

consistently since the late 1970s,[16] shortly after the NSR program was created in the 1977 amendments to the Clean Air Act. In the 1999 *Monroe* order that best sums up the policy, the Administrator explained that "reactivation of facilities that have been in an extended condition of inoperation may trigger PSD requirements as 'construction' of either a new major stationary source or a major modification of an existing one. *Monroe* at 7. At the time of this order, and continuing today, EPA's PSD regulation defined the term "construction" as "any physical change or change in the method of operation (including fabrication, erection, installation, demolition, or modification of an emissions unit) that would result in a change in [actual] emissions."[17] Because of the use of the conjunction "or" in this definition, it has long been the case that a change in the method of operation may by itself qualify as construction, regardless of whether there is also a physical change to the equipment at a source. So, a change at a facility from a condition of permanent inoperation to a state of operation is a change in the method of operation that qualifies as construction.[18] As the Administrator stated in the *Monroe* order, "[w]here facilities are reactivated after having been permanently shutdown, operation of the facility will be treated as operation of a new source." *Id.* (emphasis in original).

While labeled a policy, the Agency's approach has been grounded on the legal interpretation described above that a restart of a permanently shut down facility qualifies as construction of a new source. EPA has applied this interpretation in guidance letters and memoranda, as well as formal adjudications. For example, the *Monroe* order was an adjudication by the EPA Administrator of a petition requesting that the Agency object to a Title V permit on the grounds that it lacked an applicable requirement based on NSR.

To determine whether a shutdown is permanent, a key criterion that has been a part of the Reactivation Policy from the beginning is the presumption that shutdown that lasting for more than two years is permanent. This two-year time period was supported by the text of the NSR regulations in effect when the Policy was first developed. EPA regulations have long-defined the term "actual emissions" as of a particular date to mean "in general … the average rate in tons per year, at which the unit actually emitted the pollutant during a consecutive 24-month period which precedes the particular date and which is representative of normal source operation." 40 C.F.R. 52.21(b)(21)(ii).[19] Before 2002, this definition of actual emissions was used to determine

---

[16] See <https://www.epa.gov/nsr/reactivation-shutdown-source>.

[17] 40 C.F.R. 52.21(b)(8) (2021) (omitting the term "actual" before emissions); 40 C.F.R. 52.21(b)(8) (1998) (including the term "actual"). The term "actual" was removed in the 2002 revisions to the NSR regulations. 67 Fed. Reg. 80186, 80190, 80276 (Dec. 31, 2002).

[18] When arguing that that the definition of "construction" undermined the Reactivation Policy, the Limetree PAL RTC document failed to consider that this definition of "construction" includes a "change in the method of operation." *See*, RTC at 110. The RTC also discussed terms in this definition that suggest a distinction between a new creation of an emissions unit ("fabrication" and "erection") and an emission unit that is already in existence. ("modification"). *Id.* However, this merely illustrates how the definition of construction applies to both the construction of a new source and modification of an existing one. The terms in the parenthesis in the definition of "construction" do not demonstrate that construction requires a physical change. The language in the definition before these terms in parenthesis plainly includes a change in the method of operation by itself.

[19] This definition remains in the regulations for other purposes, but after 2002, the term "baseline actual emissions" was established for use in determining NSR applicability to existing sources.

6

the baseline emissions[20] before a change at an existing stationary source that must be evaluated to determine if it qualifies as a major modification. Based on this language in the regulation, the emissions of an existing source prior to a change was generally[21] based on the average rate of emissions over the two-year period prior to the change. Thus, an existing source that had been shut down for more than two years would generally not have any baseline emissions, just like a new source. This reasoning supported the idea that restarting an existing source that has been shut down for more than two years is analogous to constructing a new source for PSD applicability purposes because both would have an emissions baseline of zero.

Finding this interpretation of the NSR regulations to be permissible and reasonable, one federal district court issued a preliminary injunction against the restart of a stationary source on the basis of the Reactivation Policy. *Communities for a Better Environment (CBE) v. CENCO Refining*, 179 F. Supp. 2d 1128, 1143-48 (C.D. Cal. 2001). In its opinion, the Central District of California wrote the following:

> [Petitioner] CBE makes a strong showing that the Reactivation Policy is a reasonable interpretation of Clean Air Act regulations that does not conflict with any terms of the NSR program. NSR regulations indicate that for a long-dormant facility (at least those shutdown for two years or more), the emissions baseline for determining whether it has undergone an emissions increase subject to NSR will be zero. Therefore, such a facility is subject to NSR upon restart, assuming the requisite increase in emissions over the zero baseline.

*Id*. at 44. Based on this reasoning, the court followed the Reactivation Policy and issued a preliminary injunction against the restart of a refinery that hadn't operated for five years, stating that a cost of between $28 and $180 million to reactivate a refinery over a period of six to eighteen months "slightly favors finding a permanent shutdown." *Id.* at 1146.

Another key element of the Reactivation Policy since its inception in the late 1970s is that the presumed permanence of a shutdown lasting more than two years can be rebutted by an owner/operator with evidence that it did not intend to permanently shut down. This concept can also be tied to text in the regulatory definition of actual emissions. As previously stated, this definition says that "in general" the rate of actual emissions is the average over the 24-months preceding the change "which is representative of normal source operation." The next sentence in the definition says that "[t]he Administrator shall allow the use of a different time period upon a determination that it is more representative of normal source operation." 40 C.F.R. 52.21(b)(21)(ii). Thus, under this definition, the use of the previous two years of emissions to determine the actual emissions as of a particular date is rebuttable. A source could show that another time period, earlier than the preceding two years, is more representative of normal source

---

[20] While there was no PSD regulatory definition of "baseline" associated with the definition of actual emissions before the 2002 rule, the baseline actual emissions concept was discussed in the preamble to the 1980 New Source Review regulations. *See, e.g.*, 45 Fed. Reg. 52676, 52680 (Aug. 7, 1980).

[21] However, as discussed below, the owner or operator of a source had the opportunity to use emissions from a period before the last two years if it could demonstrate that the emissions during this time period were more representative of its normal operations.

operation.  Likewise, under the Reactivation Policy, EPA has essentially considered whether a shutdown source can show that its emissions from a different period, (when it was still operating more than 2 years prior to its planned restart), are more "representative of normal source operation" and use those emissions to demonstrate that the source is an existing source, rather than a new source with a zero baseline.

The presumption in the Policy that a shutdown lasting two years is permanent was also grounded on the time period for emissions that EPA considered temporary, which is the converse of permanent. To implement a provision in the regulations that exempted temporary emissions, EPA's general approach has been to consider emissions lasting for less than two years to be temporary and eligible for that exemption.  Letter from William A. Spratlin, Jr., P.E., Chief, Air Support Branch, Air and Hazardous Materials Division, EPA, to Harvey D. Shell, Shell Engineering and Associates (Oct. 9, 1979) ("Spratlin letter"), at https://www.epa.gov/sites/default/files/2015-07/documents/m90678.pdf.  This letter cited a provision then in section 52.21(k) of the PSD regulations, as of June 19, 1978, that exempted temporary emissions from the PSD air quality impact analysis.[22]  The Spratlin letter explained that EPA's approach for applying this exemption was generally to consider emissions occurring for less than two years in one location to be temporary.  *See,* 43 Fed. Reg. 26388, 26394 (June 19, 1978).  Extending this idea, the absence of emissions from a shutdown facility for up to two years could also generally be considered temporary, while the absence of emissions for a longer period would be regarded as permanent.

5.    *Revisions to PSD Regulations in the 2002 NSR Reform Rule and Codification of the Permanent Shutdown Criterion*

Although EPA completed a major revision of its NSR regulations in 2002 that changed the method for determining baseline emissions, this revision did not remove the basis for EPA's interpretation that construction of a "new stationary source" includes the restart of a source that was permanently shut down.

The 2002 revisions to the PSD regulations, created a new definition of "baseline actual emissions" for use in determining NSR applicability for modification of an existing source, while retaining for other purposes the existing definition of "actual emissions" that had previously been used to determine baseline emissions. The definition of "baseline actual emissions" that applies today gives existing source owners or operators the discretion to select a period other than the last 24 months to determine the baseline emission rate, without having to show that the selected period is representative of normal source operations.  The new definition gave owners and operators of most existing sources the discretion to choose any 24-month period within the preceding 10 years, which EPA determined to be the length of a normal business cycle for most types of sources based on a study. 67 Fed. Reg. 80186, 80191-92, 80199-200 (Dec. 31, 2002); *see also, New York v. EPA*, 443 F.3d 3, 25–26 (D.C. Cir. 2005).

Based on the new definition of "baseline actual emissions," the Limetree PAL RTC argued that the Reactivation Policy no longer served the purpose that it did under the pre-NSR

---

[22] This provision is now located in 40 C.F.R. 52.21(i)(3).

Reform regulations, when existing sources could seek to establish baseline emissions by demonstrating that emissions during a period before the last 24 months were more representative of normal operations. The RTC asserted that it was inconsistent with the baseline approach in the current regulations to presume that a facility that was idled for the last two years had permanently shut down and that "the idling of the refinery portions of the facility may be viewed to have occurred in the normal course of the 10-year business cycle upon which EPA based the baseline provision in the 2002 rule." RTC at 110.

However, this change to the approach for determining the baseline emissions of an existing source does not alter the fundamental premise of the Reactivation Policy that a stationary source that has permanently shut down qualifies as a new source upon seeking to restart. The idea that construction of a new stationary source results from restarting a facility that was permanently shut down is grounded on the plain meaning of the word "new" and the definition of "construction," as discussed above. The "permanent shutdown" of a stationary source eliminates its status as an existing source under the NSR regulations. If an existing source ceases operations temporarily, such a source would reasonably continue to be classified as an existing source. Resuming operations after a temporary shutdown may be part of a normal business cycle, but resuming operations after a permanent shutdown is not. Completely ceasing operations at a source for an extended period of time is an exceptional circumstance. It is not "business as usual" to permanently stop utilizing the product of a large capital investment. A central purpose of the 2002 rule was to recognize that "a source's operations over a business cycle cover a range of operating (and emissions) levels—not simply a single level of utilization. The new procedure recognizes that market fluctuations are a normal occurrence in most industries, and that a source's operating level (and emissions) does not remain constant throughout a source's business cycle." 67 Fed. Reg. at 80199. A permanently shut down source has no variation in utilization level. Instead, it has a zero operating level and zero emissions, which goes beyond the range associated with normally occurring market fluctuations.

EPA did not say anything in the 2002 NSR reform rule that indicated the Agency intended to abandon the core premise of the Reactivation Policy that a permanent shutdown terminates the status of an existing source as such. To the contrary, in this same action, EPA added the words "permanently shut down" to its PSD regulations for the first time, and made clear that emissions from a unit that has permanently shut down must be subtracted from baseline emissions when establishing a PAL. As discussed above, although the addition of this language was in a context other than defining a "new major stationary source," the principle has broader relevance. Section 52.21(aa)(6)(i) of the PSD regulations has said the following since 2002: "Emissions associated with units that were permanently shut down after this 24-month period must be subtracted from the PAL level." In the PAL section of the preamble to the 2002 Reform Rule, EPA elaborated on the application of this provision as follows:

> The key determination to be made is whether an emissions unit is "permanently shut down." This issue is discussed in the Administrator's response to a petition objecting to an operating permit for a facility in Monroe, Louisiana. See *Monroe Electric Generating Plant,* Petition No. 6–99–2 (Adm'r 1999).

9

67 Fed. Reg. 80186, 80208-09 n. 30 (Dec. 31, 2002). EPA went on to explain that whether or not a shutdown should be treated as permanent should be based on the principles from the Reactivation Policy. EPA wrote the following:

> [W]e explained in our 'reactivation policy' that whether or not a shutdown should be treated as permanent depends on the intention of the owner or operator at the time of shutdown based on all facts and circumstances. Shutdowns of more than 2 years, or that have resulted in the removal of the source from the State's emissions inventory, are presumed to be permanent. In such cases it is up to the facility owner or operator to rebut the presumption.

*Id.* Thus, rather than undermining the Reactivation Policy that EPA applied prior to 2002, the NSR Reform rule actually expanded application of the Policy from permanent shutdown of entire facilities, in the context of identifying a new source, to determining whether an individual unit has been permanently shut down and if so, to require that such unit's emissions be subtracted from the PAL level. The language in the preamble to the 2002 rule in no way rejects or limits *Monroe*. In fact, the preamble cites to *Monroe* as the basis for applying the permanent shutdown concept to the new PAL regulatory architecture, and the 2002 rule codifies in the PAL regulations a principle that supports classifying a permanently shut down source as a new one when it is reactivated. As discussed above, if the emissions of a single emissions unit that has been permanently shut down are effectively counted as zero, then by extension, if all of the emissions units at a facility are permanently shut down, then the baseline emissions from the entire facility is zero, just like a new source.

In addition, the definition of "actual emissions" was not removed from the NSR regulations in 2002 and continues to apply in several contexts under the NSR program that relate to the Reactivation Policy. Paragraph (b)(21)(i) of 40 C.F.R. 52.21 states that the original definition of "actual emissions" in that subsection applies except when EPA is "calculating whether a significant emissions increase has occurred" or when "establishing a PAL," and in those excepted circumstances the definitions in 40 C.F.R. 52.21(b)(41) (projected actual emissions) and 40 C.F.R. 52.21(b)(48) (baseline actual emissions) apply. The preamble to the 2002 rule explained further that the new definition of "baseline actual emissions," including the methodology in 40 C.F.R. 52.21(b)(48) is to be used "for three specific purposes involving <u>existing emissions units</u> as follows:

- For modifications, to determine a modified unit's pre-change baseline actual emissions as part of the new actual-to-projected-actual applicability test
- For netting, to determine the pre-change actual emissions of an emissions unit that underwent a physical or operational change within the contemporaneous period. You may select separate baseline periods for each contemporaneous increase or decrease.
- For PALs, to establish the PAL level."

67 Fed. Reg. 80185, 80196 (Dec. 31, 2002) (emphasis added).

Thus, 40 C.F.R. 52.21(b)(48) was added to calculate the baseline emissions for modifications to existing sources, not for determining NSR applicability for new sources. And even at existing sources, 40 C.F.R. 52.21(b)(48) does not apply in all contexts.

For purposes other than those described above, the pre-NSR Reform formulation of "actual emissions" and its presumption of using the 24-month period preceding the particular date applies.  For example, the "baseline concentration" used to determine compliance with PSD increments continues to be based on the definition of actual emissions in section (b)(21), which is used to determine the emissions from sources in existence on the applicable minor source baseline date with noted exception.  40 C.F.R. 52.21(b)(13)(i)(a).  The preamble to the 2002 reform rule further explains that, when determining the "existing source's contribution to the amount of increment consumed," the contribution should be "based on that source's actual emissions rate from the 2 years immediately preceding the date of the change." *Id.*

Furthermore, to support the different applicability tests for new and existing emissions units in section 52.21(a)(2)(iv), the definition of baseline actual emissions in paragraph (b)(48) specifies a different method for establishing the baseline emissions for existing and new emissions units.  The discretion to select any consecutive 24-month period in the last 10 years applies only to existing emissions units.[23]  Under the definition of "emissions unit," a new emissions unit is one that "is (or will be) newly constructed and that has existed for less than 2 years from the date such emissions unit first operated."  40 C.F.R. 52.21(b)(7)(i).[24] For new emissions units, "the baseline actual emissions for purposes of determining the emissions increase that will result from the initial construction and operation of such unit shall equal zero; and thereafter, for all other purposes, shall equal the unit's potential to emit."  40 C.F.R. 52.21(b)(48)(iii).  Consistent with the discussion above for a new stationary source, an emissions unit that is proposed to be restarted after a permanent shutdown qualifies as one that "will be newly constructed" and thus should be classified as a "new emissions unit" under these provisions.[25] Furthermore, the baseline actual emissions from such a new emissions unit would

---

[23] In creating the architecture for the 10-year lookback, the preamble to the 2002 rule presumed that an existing source must have some level of utilization representative of normal operations. 67 Fed. Reg. 80185, 80200 (Dec. 31, 2002) ("We believe that use of a fixed 10-year look back period provides the desired clarity and certainty to the process of selecting an appropriate utilization/emissions level that is representative of a source's normal operation.").

[24] This definition of new emissions unit was not created to identify a new stationary source. EPA gave a specific meaning to "new emissions unit" in paragraph (b)(7)(i) to apply the different applicability calculation approaches set forth in 40 C.F.R. 52.21(a)(2)(iv) for modification of existing sources.  For this approach, a "new emissions unit" needed to be separately addressed in the definition of "baseline actual emissions" in paragraph (b)(48).  An emissions unit is plainly "part of a stationary source."  40 C.F.R. 52.21(b)(7).  It is not an entire stationary source.

[25] The Limetree PAL RTC document cited the phrase "newly constructed" in the definition of "new emissions unit" and concluded without explanation that none of the units at the Limetree refinery were "newly constructed."  This neglected to consider that the definition of "construction" includes physical changes and changes in the method of operation.  The RTC did not demonstrate that a "newly operated" unit that had permanently shut down could not qualify as a new emissions unit under this definition.  Although these units at the Limetree refinery had "existed" in one sense for more than two years, they ceased to "exist" for purpose of the NSR regulation when the units permanently shut down.  It is thus consistent with these definitions in the PSD regulations to classify a unit that permanently shut down as "new" or "newly constructed" when it restarts.

be zero, as applicable to determining the emissions increase that will result from initial construction and operation of such unit.

Considering the full contours of the 2002 rulemaking, it is apparent that the discretion to select any 24-month period in the past 10 years in the context of definition of "baseline actual emissions" adopted in 2002 has limited applicability in the NSR program.  This provision was only intended to apply to an existing unit at an existing source, not a new unit added to an existing source or to an entire source that had permanently shut down and no longer qualified as existing.  In 2002, the method for determining baseline emissions changed only for existing sources.  The approach for determining PSD applicability for new sources was not altered, and EPA has continued to look to the still active definition of "actual emissions" in section (b)(21) to inform its consideration of whether a source is presumed to be permanently shut down.

EPA continued to apply the Reactivation Policy after these revisions to the regulations in 2002.  In 2005, EPA Region 5 executed a Consent Agreement and Final Order in which the respondent agreed that its facility was permanently shut down "as defined by" the Reactivation Policy and that the facility "will be considered a new source if restarted by Respondent." *In the Matter of: Lesaffre Yeast Corporation Milwaukee, Wisconsin, Respondent*, 2007 WL 9797862, at 3.  In addition, in 2015, EPA Region 2's Regional Administrator issued an objection to a New York State Department of Environmental Protection (NYSDEC) Title V permit, articulating EPA's view that the facility had been permanently shut down and was a new major stationary source under EPA's Reactivation Policy. Letter from Judith A. Enck, Regional Administrator, to Honorable Basil Seggos, NYSDEC, *EPA Review of Proposed Title V Operating Permit for Greenidge Station* (Dec. 7, 2015).

The Limetree PAL RTC document places undue significance on the assumption that no EPA headquarters office provided guidance on the application of the Reactivation Policy after the 2002 rule, until Limetree proposed restarting the HOVENSA refinery in the Virgin Islands.  This is incorrect.  For example, EPA headquarters provided considerable review and guidance to Region 2 in its drafting of the 2015 objection to NYSDEC's Title V permit.  Moreover, since it is generally the responsibility of Regional Offices to address case-specific matters of this nature in the appropriate states and territories, it was not necessary or expected for EPA headquarters to provide written guidance in every case.  After the Reactivation Policy was clearly articulated in the 1999 *Monroe* order and referenced in the 2002 rule preamble, additional written guidance from headquarters was generally not needed. More significant is the absence from 2002 to 2020 of any request from EPA headquarters that the Regional Offices stop applying the Reactivation Policy, especially after the 2002 rule preamble referenced the *Monroe* order as a guide to determining whether a unit had permanently shut down.

6. *Continued Textual Support for a Two-Year Presumption*

The 2002 NSR Reform rule changes do not preclude EPA from continuing to presume that the shutdown of a stationary source is permanent if it has lasted for more than two years. This continues to be supported by the EPA's approach for identifying temporary emissions and

the continued applicability of the definition of actual emissions for several purposes, including identifying the emissions to be included in air quality impact analyses under the PSD program.

As discussed above, EPA has previously supported the presumption that a shutdown lasting more than 2 years is permanent by referencing EPA's policy of presuming that "temporary" emissions are those that occur for less than 2 years at one location. The "temporary" emissions exemption referenced in the 1979 Spratlin letter remains in effect today, at 40 C.F.R. 52.21(i)(3). In addition, the PSD regulations exempt portable stationary sources from PSD permitting if a source previously received a PSD permit and the new location of the source would be "temporary." 40 C.F.R. 52.21(i)(1)(viii)(a). After the 1979 Spratlin letter described above, EPA finalized the proposed rulemaking that was referenced in that letter. In the preamble to that final rule, EPA continued to generally consider temporary emissions in the context of these exemptions to be less than two years. 45 Fed. Reg. 52676, 52728 (Aug. 7, 1980) (emphasis added). EPA continues today to generally consider as temporary, stationary source emissions lasting for less than 2 years at one location.[26] Nothing in the 2002 NSR reform rule altered this conception of emissions that are temporary. Thus, it is still rational to extend this idea to presume that a shutdown is "permanent" if emissions stop for more than the period of time that EPA generally considers temporary in the context of stationary source operation.

In addition, the emissions of sources over the most recent two-year period of time continues to be the foundation for addressing air quality-related NSR requirements after determining that a permit is required, including making the showing that construction of a new source or modification will not cause or contribute to a violation of the National Ambient Air Quality Standards or PSD increment. 40 C.F.R. 52.21(k). At the same time EPA adopted the definition of "baseline actual emissions," the Agency said the following in the preamble to the 2002 rule: "If you determine that the modification of your source is a major modification, you must revert to using the existing definition of 'actual emissions' to determine your source's actual emissions on a particular date to satisfy all other NSR permitting requirements, including any air quality analyses (for example, compliance with NAAQS, PSD increments, AQRVs) and the amount of emissions offsets required." 67 Fed. Reg. at 80196. EPA further stated that the new longer lookback for baseline actual emissions "does not affect the way in which a source's ambient air quality impacts are evaluated," including "actual operating factors averaged over the most recent 2 years of operation." 67 Fed. Reg. at 80202. EPA's most recent modeling guidance reiterates that the 2002 NSR Reform Rule intended the original definition of "actual emissions" at 40 C.F.R. 52.21(b)(21) and its two-year presumption to apply to emissions rates used for

---

[26] EPA has recently applied the two-year temporary emissions concept in the context of PSD permits for Outer Continental Shelf Sources under 40 C.F.R. Part 55. *See*, Vineyard Wind Fact Sheet and Statement of Basis, at https://www.epa.gov/sites/default/files/2021-06/documents/vineyard-wind-1-llc-fs-sob.pdf; South Fork Draft Permit Fact Sheet (2021), at https://www.epa.gov/system/files/documents/2021-07/south-fork-draft-permit-fs.pdf; Anadarko Petroleum Preliminary Determination and Statement of Basis (Nov. 2016), at https://www.epa.gov/sites/default/files/2016-11/documents/2016_11_14_preliminary_determination_bob_douglas.pdf; and Anadarko Preliminary Determination and Statement of Basis (March 23, 2011), at https://www.epa.gov/sites/default/files/2015-08/documents/anadarko-pd-032311.pdf.

source impact analyses.[27]  Under other provisions that apply to PSD modeling, the most recent two-year period is the starting point for determining the emissions of nearby sources included in background. 40 C.F.R. Part 51, Appendix W (Table 8-2), as revised in 2017.[28] Further, as mentioned above, the baseline emissions for calculating increment consumption is based on the definition of "actual emissions." 40 C.F.R. 52.21(b)(13)(i)(a).[29]  Considering that the most recent two years of emissions is the starting point when modeling impacts on ambient air quality, it continues to be appropriate to presume that emissions that have ceased prior to that time frame have permanently stopped, while enabling sources to rebut this presumption and show that the shutdown was not permanent.

The two-year presumption is also a reasonable threshold to guide EPA in considering when a presumption should be applied and when it should not, which ensures consistent implementation of the Reactivation Policy. The Policy does not say that a shutdown lasting less than two years cannot be permanent, rather only that the presumption does not apply in that case. Two years is a long time for a source to be shut down, and for most sources that are shut down for two years or longer there is no question about the shutdown being permanent.  In cases where there is a question, that is where it is appropriate to apply the criteria and determine whether the presumption has been rebutted.

### 7.    *Reactivation Policy Factors*

Under the Reactivation Policy, EPA has looked to the intent of the owner or operator to determine whether a shutdown is permanent.  *Monroe* at 8.   Based on the considerations described above, EPA presumes that a shutdown of more than two years is permanent, but the owner or operator of a facility can rebut this presumption by demonstrating that it maintained a continuous intent to restart the facility based on relevant facts, including activities undertaken during the time of the shutdown.  *Monroe* at 8-9.  EPA has examined the following factors in prior Reactivation Policy decisions to assess the intent of the owner/operator of a stationary source:

- Length of time the facility has been shut down
- Time and capital needed to restart.
- Evidence of intent and concrete plans to restart
- Cause of the shutdown

---

[27] EPA Memorandum, Guidance for Ozone and Fine Particulate Matter Permit Modeling, at 18 n. 16 (July 29, 2022), at https://www.epa.gov/system/files/documents/2022-07/Guidance_for_O3_PM25_Permit_Modeling.pdf.
[28] 82 Fed. Reg. 5182, 5220 (Jan. 17 2017).
[29] This has not changed since EPA's 1980 PSD regulations. The preamble to these regulations states that "increment calculations will generally be based on actual emissions as reflected by normal source operation for a period of two years….In EPA's judgment, two years represents a reasonable period for assessing actual source operation….The two-year period of concern should generally be the two years preceding the date as of which increment consumption is being calculated, provided that the two-year period is representative of normal source operation. The reviewing authority has discretion to use another two-year period, if the authority determines that some other period of time is more typical of normal source operation than the two years immediately preceding the date of concern." 45 Fed. Reg. 52676, 52718 (Aug. 7, 1980); *see also*, EPA Draft New Source Review Workshop Manual, at C.69 (Oct. 1990), available at https://www.epa.gov/sites/default/files/2015-07/documents/1990wman.pdf.

- Status of permits
- Maintenance and inspections during shutdown

No single factor in this list is conclusive and the final determination will often involve a judgment regarding the owner's intent. *Monroe* at 9.

The Limetree PAL RTC document criticized these aspects of the Policy. It argued that the focus on the intent of the owner or operator is not grounded in the NSR regulations and that the Policy can produce inconsistent results based on subjective judgments about how to weigh the various factors against each other. Upon further review, EPA does not find these to be persuasive grounds against continuing to follow the Reactivation Policy.

As illustrated above, the NSR regulations support the interpretation that construction of a new source or new emissions unit occurs upon restarting a source or emissions unit that was permanently shut down. While the regulations do not define the term "permanently shut down," the ordinary meaning of the term "permanent" includes consideration of intent. The New Oxford American Dictionary defines permanent as "lasting or intended to last or remain unchanged indefinitely." [30] Thus, it is rational to consider the intent[31] of the owner or operator of a stationary source when assessing whether a stationary source shutdown is permanent. While this question of intent is an inherently subjective one, the factors listed above that EPA has used to determine that the source maintained a continuous intent are based on objective facts. The two-year presumption in the Reactivation Policy lends further objectivity to the determination. EPA recognizes that it is not ideal to base regulatory decisions on a subjective consideration such as intent, and that this can lead to differences of opinion as to how to weigh those factors. However, the risk of inconsistent outcomes is minimized when such a judgment is based on objective facts, as reflected in the list above. Further, a more objective bright line test based solely on duration or some other factor would limit the flexibility afforded by the existing framework that allows for consideration of several case-specific factors in reaching a reasoned conclusion.

In this regard, the Reactivation Policy has served its function effectively for decades and remains a rational approach for distinguishing between new sources and existing ones in circumstances involving the shutdown of a stationary source. EPA thus intends to continue applying the Reactivation Policy to serve this function under the NSR program.

Conclusion:

EPA is continuing to apply its NSR Reactivation Policy, as described in the *Monroe* Order, because it remains an appropriate method for determining whether the reactivation of a stationary source qualifies as the construction of a new source under the PSD regulations. The

---

[30] New Oxford American Dictionary, Third Edition, p. 1305, Oxford University Press (2010).

[31] The primary definition of "permanent" in Webster's online dictionary is "continuing or enduring without fundamental or marked change." But Webster's also provides a "Kid's Definition" of permanent that reads as follows: "lasting or intended to last for a very long time: not temporary or changing." <https://www.merriam-webster.com/dictionary/permanent>.

Policy has been and continues to be consistent with the PSD regulations at 40 C.F.R. 52.21, including after revisions to these regulations in 2002.  Notwithstanding the absence of a regulatory definition of "new stationary source," this term is reasonably read to include restarting a stationary source that was "permanently shut down."  This interpretation furthers the goals of the Clean Air Act's statutory scheme for the New Source Review program.  EPA has consistently applied the Reactivation Policy for over three decades and has issued formal adjudications on the basis of the policy and the supporting interpretation of law.  One federal District Court found the Reactivation Policy to be grounded on a permissible interpretation of the NSR regulations and based a preliminary injunction on it.  The basis for this interpretation in the EPA NSR regulations was not altered by the 2002 revisions to these NSR regulations, which expanded the application of the policy to additional contexts and displayed no intent by EPA to change the policy.

# EXHIBIT B

**UNITED STATES COURT OF APPEALS**

**FOR THE THIRD CIRCUIT**

|  |  |
|---|---|
| PORT HAMILTON REFINING AND TRANSPORTATION, LLLP<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>Respondent. | Case No.: 23-1094 |

## DECLARATION OF CHARLES CHAMBERS

I, Charles Chambers, hereby declare as follows:

1.      I am over 18 years of age, of sound mind, and competent to make this Declaration. I have personal knowledge of the facts set forth in this Declaration. I am making this Declaration in St. Croix, U.S. Virgin Islands.

2.      I serve as Port Hamilton Refining and Transportation, LLLP's ("Port Hamilton") Principal, and have served in this role for since Port Hamilton's formation in January 2022.

3.      In late 2011, HOVESNA, LLC ("HOVESNA") decided to idle its St. Croix refinery due to an economic downturn. In January 2016, HOVESNA sold the refinery to Limetree Bay Terminals, LLC, which later conveyed the refinery operations to Limetree Bay Refining, LLC (the "Prior Owner").

4.      On April 5, 2018, the U.S. Environmental Protection Agency ("EPA") issued a determination to the Prior Owner stating that the refinery could be restarted without obtaining a

1



preconstruction permit under the Prevention of Significant Deterioration (PSD) program under the Clean Air Act. EPA reinforced this determination in 2020.

5.      On May 8, 2020, the Virgin Islands Department of Planning and Natural Resources (the "DPNR") revised a permit issued to the Prior Owner authorizing certain construction activities and operations at the refinery. Port Hamilton now holds this operating permit, which remains valid.

6.      EPA did not object to the DPNR's revised operating permit on the grounds that a new PSD permit would be required before operations could be restarted.

7.      The Prior Owner subsequently restarted the St. Croix refinery in September of 2020 under the air permit issued by the DPNR. The refinery continued operations until May of 2021, when EPA issued an order to the Prior Owner requiring it to cease refinery operations after incidents occurred that resulted in the release of excess pollutants.

8.      EPA filed a lawsuit against the Prior Owner in July 2021 concerning EPA's May 2021 order, and this lawsuit has been stayed pursuant to a Joint Stipulation in which EPA agreed to several conditions that must be satisfied prior to restarting the refinery. These conditions do not include obtaining a PSD permit.

9.      Later in 2021, the Prior Owners filed for Chapter 7 bankruptcy. On September 24, 2021, EPA issued a letter to all prospective bankruptcy bidders regarding various environmental issues at the refinery. The letter indicated that a new PSD permit might be necessary depending on the configuration of a restart, but it did not indicate that it considered the refinery to have been, at any time, permanently shutdown such that it would require a successful bidder to obtain new PSD permits before the refinery could be restarted.



10.     Port Hamilton purchased the St. Croix refinery in January 2022, with plans to restart the refinery as soon as practicable. Port Hamilton relied on EPA's 2018 and 2020 determinations regarding its ability to restart the refinery without going through a PSD process.

11.     Port Hamilton was moving forward with plans to restart the refinery by the end of 2023 until November 16, 2022, when EPA notified Port Hamilton that it now "conclude[s] that the Refinery was permanently shut down in 2012 and that restarting the Refinery qualifies as construction of a new major stationary source under the federal PSD permitting regulations applicable in the U.S. Virgin Islands."

12.     Port Hamilton objected to EPA's reversal and asked EPA to reconsider its new position, which Port Hamilton explained was jeopardizing its efforts to secure additional funding needed to continue supporting the restart of the refinery.

13.     After receiving the November 16, 2022 EPA letter, Port Hamilton offered a compromise to EPA and repeatedly and urgently requested a meeting to discuss its compromise proposal.  EPA has rejected Port Hamilton's offer of compromise.

14.     Port Hamilton currently spends approximately $3 million per month to keep the refinery in a safe standby mode.

15.     Port Hamilton would have to spend approximately $30 million in additional costs to keep the refinery viable during the typical appellate review timeline of roughly 10 months.

16.     The St. Croix refinery is the only refinery of a significant size that could restart and add as much as 180,000 barrels per day of capacity in a little over a year, which would put downward pressure on price spikes across the United States due to fuel shortages.



3

17.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date: January 27, 2023

Charles Chambers

4

# EXHIBIT C



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

April 5, 2018

OFFICE OF
AIR AND RADIATION

Ms. LeAnn Johnson Koch
Perkins Coie
700 13th Street, NW
Suite 600
Washington, D.C. 20005-3960

Re: Limetree Bay Terminals, St. Croix, U.S. Virgin Islands – Permitting Questions

Dear Ms. Johnson Koch:

This is in response to your February 1, 2018, letter to the U.S. Environmental Protection Agency's (EPA) Region 2 Office, in which you sought EPA's concurrence on three New Source Review (NSR) permitting questions pertaining to the Limetree Bay Terminals (LBT) facility in St. Croix, U.S. Virgin Islands (USVI). In your letter, you specifically asked whether EPA concurs with LBT that:

> (1) restarting some of the idled refinery units as part of the "MARPOL Project"[1] (to produce fuel compliant with the maritime sulfur regulations taking effect January 2020) will not result in the facility being viewed as a new stationary source under EPA's current so-called Reactivation Policy;
>
> (2) the MARPOL Project and another LBT project to produce Renewable Diesel Fuel are independent and should not be considered a single project for purposes of applicability under the Prevention of Significant Deterioration (PSD) regulations; and
>
> (3) the addition of a deeper water loading configuration (Single Point Mooring or SPM) should be considered a modification to an existing emissions unit (i.e., the dock system and associated loading terminal) and not a new emissions unit for the PSD applicability analysis.

In addition to the foregoing inquiries, you previously sought EPA guidance regarding when emission decreases from a project can be considered within the NSR applicability analysis.

---

[1] MARPOL is the International Convention for the Prevention of Pollution from Ships.

Based on EPA's review of your submitted analyses and supporting documents, we concur that: (1) restarting of the refinery's idled units for the MARPOL Project should not be treated as a new stationary source under the current Reactivation Policy; (2) the MARPOL Project and the Renewable Diesel Fuel Project are independent of each other and therefore separate projects for PSD applicability; and (3) constructing the SPM would be considered a modification to an existing emissions unit rather than a new emissions unit. Discussion on each of these issues is provided below, along with information to address your previous question regarding accounting of emission decreases within the NSR applicability analysis.

Restarting Refinery Units and the Current Reactivation Policy

The current policy on the reactivation of sources provides that a major stationary source that has been idled for 2 or more years is presumed to be permanently shut down. *See In the Matter of Monroe Electric Generating Plant Entergy Louisiana, Inc.*, Proposed Operating Permit, Petition No. 6-99-2 (June 11, 1999). That policy states that if a source is permanently shut down, upon reactivation it is considered a "new" stationary source for purposes of PSD review. Accordingly, PSD applicability would be based on the reactivated source's potential to emit.

Importantly, however, this 2-year presumption is rebuttable. EPA will not consider the shutdown to have been permanent upon the owner or operator of the source making a demonstration that, at the time of the shutdown, and continuously throughout the shutdown period, they intended to restart the facility. Among the factors that EPA in the past has considered in evaluating the owner or operator's intent are:

- Length of time the facility has been shut down and concrete plans for restart;
- Statements by the owner or operator of intent;
- The cause of the shutdown;
- Status of permits, including but not limited to Clean Air Act operating permits, acid rain permits and other required permits, and emission inventory;
- Maintenance and inspections during shutdown; and
- Time and capital needed to restart.

In evaluating these factors, no single factor is likely to be conclusive in determining intent. Instead, EPA generally has considered the totality of all such factors and the relevant supporting documentation in evaluating whether there was a continuous intent to restart the facility.[2]

In the case of LBT's facility in St. Croix, our review of the information you have submitted leads us to conclude that both LBT and HOVENSA displayed a continuous intent to restart the refinery operations. Therefore, applying the criteria of the current Reactivation Policy, we have determined that LBT's St. Croix facility was not permanently shut down and should not be considered a "new source" for purposes of PSD applicability.

---

[2] As this description indicates, the current Reactivation Policy has been derived from a series of EPA site-specific determinations and guidance issued over the course of many years. Further, EPA has not cited any specific regulatory provisions of the NSR program to support its position on source "reactivation." We are applying the current Reactivation Policy to resolve the LBT issue, but we intend to reconsider the policy in the near future.

2

LBT's facility in St. Croix was previously owned by HOVENSA until 2016, at which time LBT purchased the refinery and terminal operations. As LBT explains, an economic downturn caused HOVENSA to idle the refinery operations in 2012. Nevertheless, since that time, the terminal operations, wastewater treatment plant, and power generation have continued to operate at this location. Even before HOVENSA announced, on February 21, 2012, that it had completed the final idling of all refinery units, HOVENSA had informed the USVI government of its plans to retain its permits and implement maintenance procedures on their equipment so that it could restart the refinery. LBT represents that over the next several years, HOVENSA spent over $400 million to maintain the restart capability of the refinery operations, which included removing residual material from equipment, retaining control room operability, and conducting other process equipment mothballing activities.

LBT provided EPA with a timeline and supporting information that included evidence of this continuous intent by HOVENSA and LBT to restart the facility. The supporting information included company statements, press releases, and various correspondence from 2011 through 2017. LBT also confirmed that HOVENSA and LBT maintained all environmental permits in active status and submitted timely renewal applications. Further, LBT stated that these companies continued to comply with the Refinery MACT, NSPS Subpart J, and all of the applicable RCRA regulations while the refinery units were idled. LBT represents that the companies maintained critical refinery equipment, such as compressors, pumps, utilities, wastewater treatment units in working order and conducted multiple walkthrough inspections at the plant, activities that are necessary for a restart. In order to demonstrate that the maintenance activities were performed, LBT provided a list of critical equipment and the timeline of significant maintenance activities performed at the refinery. LBT also represents that neither it nor HOVENSA made any statements to any party or issued any press release indicating any intent *not* to restart the plant in the future.

## Project Aggregation – Renewable Diesel Project and Refinery Restart (MARPOL Project)

The term "project aggregation" describes the process of grouping "nominally separate changes that are sufficiently related based on established criteria … into a single common project for the purpose of determining PSD applicability."[3] More specifically, the emissions of the nominally separate changes are combined for the purposes of determining whether a "significant emissions increase" – referred to as "Step 1" of the NSR applicability test – will occur from the project. EPA's project aggregation policy aims to ensure the proper permitting of modifications that involve multiple physical and/or operational changes. Where the projects at issue are more reasonably deemed to constitute a single project for purposes of NSR, a source will not be allowed to circumvent major NSR by seeking to permit the individual activities separately under minor source NSR.

---

[3] Letter from Stephen Page, Director, Office of Air Quality Planning and Standards, to David Isaacs, Vice President, Government Policy, Semiconductor Industry Association (August 26, 2011). (SIA Letter)

LBT plans to construct the Renewable Diesel Project and the MARPOL Project at the current plant site in late 2018. Given that these projects will begin close in time to one another, LBT has sought EPA's concurrence that these projects should not be aggregated (i.e., considered to be a single project) for the purposes of the PSD applicability analyses. LBT representatives have been clear in statements to EPA that, while they are pursuing the Renewable Diesel Project and the MARPOL projects concurrently, they are separate and distinct projects. Based upon EPA's review of all the information LBT provided, we concur that the two projects are independent of each other and, therefore, should not be aggregated for purposes of PSD applicability.

In analyzing whether the two LBT projects at issue here should be aggregated, we have followed our current policy on project aggregation, which takes into account indicia of relatedness among the individual actions at a source in order to determine whether the activities, in the aggregate, are one physical or operational change as those terms are used in the statute and regulations.[4] Our policy on aggregation outlines an approach relying upon case-specific factors (*e.g.*, timing, funding, and the company's own records) and the relationship between nominally separate changes.

As explained in your letter, the MARPOL Project involves restarting certain existing refinery units to process crude oil, heavy fuel oil, and petroleum intermediates into refined petroleum products. This project will involve restarting a crude unit, a reformer, two naphtha hydrotreating units, a coker unit, two distillate hydrotreating units, an isomerization unit, and two sulfur recovery plants. These units will be configured to produce low-sulfur fuels (i.e., gasoline, diesel, and fuel oil) and are scheduled to begin operation just before January 2020, when the relevant MARPOL amendments and EPA implementing regulations take effect. LBT represents that the economic viability of the MARPOL Project depends on the value generated from converting petroleum crude into refined petroleum products and market advantages that may exist due to an anticipated market shortfall of MARPOL-compliant marine fuel in 2020.

Your letter explains that the proposed Renewable Diesel project will convert vegetable, animal, and recycled cooking oils into renewable diesel fuel. This project involves building a feedstock pretreatment train and a new hydrogen unit to convert the oils into diesel compounds, and repurposing an existing hydrotreating unit (previously used for the hydrotreating of petroleum liquids) as the reactor for the conversion. LBT represents that the Renewable Diesel Project will produce fuel meeting the requirements of the Renewable Fuel Standard (RFS) and California's Low Carbon Fuel Standard (LCFS) programs, and that the fuel could be blended with transportation fuel sold in the United States to generate Renewable Identification Numbers (RINs) under the RFS as well as LCFS credits. Further, LBT suggests that the renewable diesel fuel may be eligible for a federal blender's tax credit. According to LBT, the economic viability of the Renewable Diesel Project depends heavily on the future value of converting vegetable, animal, and recycled cooking oils into renewable fuel, as well as the value of RINs, LCFS, and other tax credits. Significantly, none of these factors relate to the MARPOL project.

---

[4] While EPA issued a revised policy on project aggregation in 2009, the policy has been stayed and is currently under reconsideration by the Agency. *See* 74 FR 2376 (January 15, 2009), 74 FR 7193 (Feb. 13, 2009), 75 FR 27643 (May 18, 2010). *See* 75 FR 19570-71 (April 15, 2010) for a collection of memoranda that provide examples of EPA's current approach to project aggregation.

LBT has shown that each of these two projects is technically distinct and does not depend on the other in terms of decision-making and timing, interaction between units, the process technologies used, feedstocks involved, or products produced. LBT stated that the MARPOL Project will be fully self-contained as the selected units are inspected, reconditioned as needed, and restarted. More specifically, LBT maintains that the raw materials, piping, process equipment, and material transfer systems for each project will be completely unshared and independent of the other project. LBT represents that the construction of one project does not necessitate or otherwise influence the construction of the other project.

LBT has demonstrated to our satisfaction that the economic viability of each project stands on its own, such that the Renewable Diesel Project could proceed on its own financial merits, regardless of the future of the MARPOL Project, and vice versa. In particular, LBT noted the unique opportunity presented to timely and economically reconfigure the idled hydrotreating equipment and the current availability of renewable fuel and tax credits as proof of lack of economic dependency between the Renewable Diesel and MARPOL Projects. Each project's feasibility is based on its own set of incentives and market realities and does not depend on the other project going forward.

We note that the one thing that may be considered to be common to both projects is the potential for shared utilities. However, sharing utilities does not in and of itself mean that activities at a source are functionally or economically dependent on one another. Since both projects will produce fuel gas, the power and steam required to operate each project can be generated from fuel gas produced by either the renewable diesel unit or the MARPOL refining unit, and in some cases the projects may combust fuel oil, so neither project is dependent on the other project for steam or power generation. In addition, LBT stated that each project will rely on the existing wastewater treatment and water production facilities at the terminal. LBT maintains there is no appreciable cost benefit that the Renewable Diesel Project will receive by virtue of the MARPOL Project because the utilities are already in operation as part of the ongoing terminal operations.

Single Point Mooring – Modification to an Existing Emission Unit

LBT also seeks a determination that the addition of a single point mooring (SPM) project to its existing marine loading/unloading system should be considered a modification to an existing unit at the facility rather than a new unit pursuant to the PSD regulations. In your letter, you explain that the existing marine loading/unloading system consists of ten marine docks, each of which can load and unload multiple petroleum products. According to LBT, the proposed SPM addition would "extend from the jetty on the seabed for approximately 5,800 feet to a Pipeline End Manifold" that would be connected to a buoy via a flexible hose, and the buoy would load/unload crude oil onto ships via two floating hoses.

Based on the information provided by LBT, EPA believes that the addition of the SPM is reasonably considered to be an extension of the existing marine loading terminal. Therefore, EPA concludes that the SPM should be treated as a modification of the existing marine terminal emissions unit.

The definition of "emissions unit" in the PSD regulations does not speak to how broadly or narrowly to consider the scope of an emissions unit at a stationary source, nor does it address how to treat a new emissions point, such as the SPM, that is added to an existing stationary source with existing emission units. The definition at 40 CFR §52.21 (b)(7) states:

> *Emissions unit* means any part of a stationary source that emits or would have the potential to emit any regulated NSR pollutant and includes an electric utility steam generating unit as defined in paragraph (b)(31) of this section. For purposes of this section, there are two types of emissions units as described in paragraphs (b)(7)(i) and (ii) of this section:

>> (i) A new emissions unit is any emissions unit that is (or will be) newly constructed and that has existed for less than 2 years from the date such emissions unit first operated.

>> (ii) An existing emissions unit is any emissions unit that does not meet the requirements in paragraph (b)(7)(i) of this section. A replacement unit, as defined in paragraph (b)(33) of this section, is an existing emissions unit.

This regulatory language can be reasonably interpreted to provide that multiple pieces of related process equipment (or emission points) comprise a single emissions unit.

Prior EPA determinations interpreting the PSD regulations provide specific guidance on this question. Those determinations illustrate that ascertaining the proper scope of an "emissions unit" often requires very case- and fact-intensive analyses. For instance, in a letter to the Semiconductor Industry Association, EPA confirmed that it was appropriate to treat an entire semiconductor fabrication building, or "fab," as one emissions unit.[5] EPA based this decision on the "interconnected nature of the 'tools' in the fab" and the systems that deliver materials and manage discharges. The letter also pointed out that fab units could be located in adjoining buildings if they are "physically connected, integrated, and operated" in a continuous and consolidated manner, and that it may be more appropriate to treat physically separated operations as a separate emissions unit. In that letter, EPA also referenced other determinations by EPA Regions, in which the Regional office provided rationale for why grouping related processes and equipment into a single emissions unit made sense given the circumstances.[6]

In analyzing the SPM project, we note that the existing marine terminal currently loads and unloads crude oil in addition to other petroleum products. Based on the information provided in LBT's recent permit application to the Virgin Islands Department of Planning and Natural Resources, the SPM will load and unload only crude oil. Since LBT is currently loading and

---

[5] SIA Letter.

[6] Letter from Judith M. Katz, Region III, U.S. EPA, to John M. Daniel, Director, Air Program Coordination, Commonwealth of Virginia, Department of Environmental Quality, (November 30, 2000); Letter from Douglas M Skie, Region VIII, U.S. EPA, to Brad Beckham, Director, Air Pollution Control Division, Colorado Department of Health (February 6, 1990).

unloading crude oil at the existing marine terminal, the proposed SPM would not change the nature of the pollutant-emitting activity occurring at the terminal. Furthermore, the SPM will be physically connected to the existing marine loading terminal by way of an underwater piping system and will be completely integrated with the loading and storage operations at the existing terminal. Consequently, the SPM and current marine terminal appear to share the same interconnectedness that EPA previously found persuasive in its analysis of semiconductor fabs, which supports treating LBT's proposed SPM and the existing terminal as a single emissions unit.

We also note that state agency permit actions have also reflected the flexibility within the definition of emissions unit. There are several examples of state permitting agencies treating multiple marine loading berths/docks as a single emissions unit in the context of Title V permits.[7] Thus, the treatment of multiple loading docks or berths as a single emissions unit is not unusual.

Finally, in other correspondence LBT has informed EPA that it will be installing a vapor capture and collection system at the existing marine terminal, although LBT has indicated the system will not be used to reduce emissions that occur while loading ships at the SPM. Instead, LBT has indicated it intends to comply with the submerged loading requirements[8] when the ships are loaded at the SPM, and that the control of emissions from the existing docks will help offset the emission increases from the operation of the SPM. We note that, in the context of the PSD program, a BACT determination for a major modification is focused on each emissions unit. However, this approach does not foreclose a determination that different emission points within an emissions unit can have distinct BACT requirements due to technical or economic feasibility or other factors considered under a BACT review. Consequently, for LBT to install a vapor recovery system at the existing loading berths and apply a different control strategy for the SPM emission point does not necessitate that the SPM be treated as a separate emissions unit under the PSD program. EPA views the proposed SPM and the new vapor control system as being part of the overall integrated loading/unloading operation at the terminal, and views this operation as an integrated emissions unit for PSD purposes.

Consideration of Emission Decreases from the Project

While not specifically raised in your February 1, 2018 letter, LBT previously asked EPA whether, under the NSR applicability procedures (e.g., 40 CFR §52.21(a)(2)), emission decreases may be taken into account when a "significant emissions increase" calculation of projects which involve only existing units is undertaken at Step 1 of the NSR applicability analysis. As you should be aware, EPA has recently clarified that emission decreases from a project are to be considered at Step 1. This applies not only to existing emission units for but all categories of projects. *See* Project Emissions Accounting Under the New Source Review Preconstruction Permitting Program (March 13, 2018).

---

[7] *See, e.g.*, Indiana Department of Environmental Management, Part 70 Operating Permit, BP Products North America, Inc. – Whiting Business Unit (December 14, 2006); Commonwealth of Virginia, Department of Environmental Quality, Federal Operating Permit, TransMontaigne Operating Company, L.P. – Norfolk Terminal (April 7, 2014). EPA is also aware of analogous non-marine loading activities, such as truck loading racks, being treated as a single emissions unit.

[8] 46 CFR 153.282.

Conclusion

EPA's responses contained within this letter are based on the information LBT has provided EPA through letters and emails pertaining to your permitting questions. Since EPA does not have emissions information and other specifics regarding your planned projects, EPA is not providing any final determination on the applicability of the PSD regulations to your projects. A final determination on PSD applicability will be made on the basis of the information provided in your application and supporting materials. Finally, nothing in this letter's discussion of PSD policies should be interpreted to reflect EPA's views on the applicability or requirements of any other programs, including the New Source Performance Standards and the National Emissions Standards for Hazardous Air Pollutants.

If you have any questions about this letter, please contact Anna Marie Wood in the Office of Air Quality Planning and Standards at (919) 541-3604 or wood.anna@epa.gov.

Sincerely,

William L. Wehrum
Assistant Administrator

cc: Alexander Dominguez
    David Harlow
    John Filippelli
    **Bill Harnett**
    Peter D. Lopez
    Peter Tsirigotis
    Anna Marie Wood

# EXHIBIT D



# U. S. Environmental Protection Agency
# Region 2 Office

# Response to Comments

# On the Clean Air Act
# Plantwide Applicability Limit Permit
# for the

# Limetree Bay Terminal and Limetree Bay Refining
# St. Croix, U.S. Virgin Islands

# November 2020

**ENCLOSURE II**

**Limetree Bay Refining and Limetree Bay Terminals, St. Croix, U.S. Virgin Islands
Plantwide Applicability Limits (PAL) Permit – November 2020**

**Response to Comments**

**Table of Contents**

**Comments from Limetree Bay Refining and Limetree Bay Terminals**        **Page**

General Comments …………………………………………………………………  3 - 11

Section I Plantwide Applicability Limits ……………………………………….. 12 - 14

Section II General Permit Conditions ……………………………………………. 15 - 23

Section III Monitoring Methods …………………………………………………. 24 - 27

Section IV Specific Monitoring Requirements ………………………………….. 28 - 50

Section V Testing ……………………………………………………………….. 51 - 54

Section VII Reporting and Notifications ………………………………………... 55 - 56

Section VIII Ambient Monitoring ……………………………………………….. 57 - 87

**Comments from Citizens/Environmental Groups**

Air Quality, Ecosystems, Environmental Justice, and Public Health & Safety……… 88 - 105

Reactivation ………………………………………………………………………… 106 - 114

2

=======================================================================
**Comments from Limetree Bay Refining and Limetree Bay Terminals –**
**General Comments**
=======================================================================

**Comment No. 1.**
The public hearing exhibited that there is widespread support for the issuance of the PAL permit and one member of the public expressed concerns based on the previous owner's operations. The few questions raised about the draft PAL permit during the public availability session and hearing were largely related to the previous owner's operations. EPA did not make clear in the public notice, the draft PAL permit, during the public availability session, or during the public hearing, that Limetree Bay will be operating at a lower throughput than the previous owner, will be installing controls and making operational changes not in place when the refinery last operated, or that the PAL requires substantial emissions reductions relative to the previous owner's allowable emissions. These material omissions from the record may have addressed some public concerns and should be taken into account when reviewing the public comments.

**Response 1**
EPA received comments both supporting the issuance of the Plantwide Applicability Limit ("PAL")[1] Permit and requesting to deny the PAL permit. The number of comments for or against a permit is not relevant to the Agency's final permit decision. EPA did explain in the Announcement of Public Comment Period and Fact Sheet that the PAL permit would limit emissions increases to levels that do not trigger PSD requirements. We note that the PAL limits are not established based on changes in allowable emissions. See also EPA Responses to Comments 109(c) and 114(b). Rather, the regulations at 40 CFR § 52.21 only provide for "Actuals PALs," which are determined by adding the baseline actual emissions as defined in 40 CFR § 52.21(b)(48) to the significant level for the PAL pollutant under 40 CFR § 52.21(b)(23).  In addition, the PAL permit does not address any throughput limits, installation of controls or the previous owner's allowable emissions, so addressing them in a Public Notice or Public Hearing would not be appropriate.

**Comment No. 2.**
The introductory paragraph to the draft PAL permit summarizes the draft PAL permit requirements. The language is not always entirely consistent with the underlying PAL language as noted in the comments below. To clarify that the introductory paragraph does not contain binding PAL terms and conditions, Limetree Bay suggests adding a sentence at the end of the introductory paragraph along the following lines: "The applicable permit terms and conditions are set forth below."

**Response 2**
The introductory paragraph does contain binding terms and conditions.  The commenter did not provide an explanation of how the first paragraph of the PAL permit is inconsistent with other conditions in the permit or identify the specific language that would create a conflict. Therefore, EPA declines to include a blanket statement suggesting that the first paragraph doesn't include applicable permit terms and conditions. However, EPA did make a change to Condition II.A of the permit based

---

[1] The final Plantwide Applicability Limit permit is for seven pollutants. However, for ease of reading, EPA uses the abbreviation "PAL" throughout this document to include both the singular use of the term (one PAL pollutant) and the plural use of the term (two or more PAL pollutants). For example, the term "PAL permit" refers to all seven pollutants covered by the permit.

on another comment submitted by the same commenter (see EPA Response to Comment 5, below) which would have resulted in an inconsistency with the last sentence of the draft permit's first paragraph had the sentence been retained. Therefore, EPA has deleted the last sentence in the first paragraph, of the permit, since the language is more precisely covered in Condition II.A but retained the remaining terms in the first paragraph.

**Comment No. 3. Idled Units**
The draft PAL permit should reflect that units that are idle on the effective date of the draft PAL permit are not required to comply with the requirements of the draft PAL permit until they resume operation. For example, if the permit would require compliance with monitoring, testing, recordkeeping or reporting requirements within 6 months of the effective date of the draft PAL permit, the Condition should be revised to require monitoring, compliance testing, recordkeeping, or reporting, within 6 months after the effective date of the permit or 6 months after restart of the unit, whichever is later. See, for example, Conditions IV.C.2. (FCCU); V. (Performance Tests); VI. (Recordkeeping); and VII. (Reporting and Notifications), including VII.A.4. (Semi-Annual Monitoring Report).

**Response 3**
EPA's intent is not to require the Permittee of an idle unit to begin complying with the testing, monitoring, recordkeeping or reporting upon the effective date of this permit. The PAL regulation does not address the timing of testing, monitoring, recordkeeping or reporting for units that are idle at the time of permit issuance. A reasonable benchmark for setting a time period for the idle units can be derived from both 40 CFR § 52.21(aa)(12)(vi)(c), which requires validation testing within 6 months of permit issuance, and other Clean Air Act (CAA or Act) requirements, for example, the New Source Performance Standards, 40 CFR Part 60, which provides 180 days after startup for performance testing. EPA therefore agrees that any testing requirements will apply within 6 months of restarting operation of an idle unit. However, note that any monitoring, recordkeeping or reporting of an idle unit will be required upon restarting such a unit. EPA has added a new Condition N to Section II to address this comment.

**Comment No. 4. Validation, Re-validation, Stack and Performance Testing**
The draft PAL permit would require validation, re-validation, stack, and performance testing, but the terms are not defined. The draft PAL permit should clarify that validation testing and re-validation testing are not synonymous with stack or performance testing. Only emissions units relying on an emission factor are required to be performance tested under 40 CFR § 52.21(aa)(12)(vi)(c), and only where it is technically practicable.

It is not technically practicable to performance test all of the emissions units in Table W within 6 months of the effective date of the permit because the refinery is currently shutdown, will be restarting, will have numerous obligations upon restart including other requirements to perform testing. Therefore, the PAL should require performance testing to be completed within one year after the effective date of the permit or restart of the unit, whichever is later. See, for example, Conditions III.A.3.c. (Emission Factors); Section V. (Performance Tests) and Table W (Stack Tests Required to Develop Unit Specific Pollutant Emission Factors).

In addition, the term "performance test" should be defined as referring to the testing required in Section V. References to "stack" tests and testing should be replaced with "performance" tests and

4

testing in Conditions IV.C.2. and IV.C.3. (FCCU), Table C (FCCU); V. (Performance Tests) and Table W (Stack Tests Required to Develop Unit Specific Pollutant Emission Factors). In addition, "stack test data" should be replaced with "stack or performance test data" in Conditions III.E.I. (General Requirements for Emission Factor-Monitored Emissions Units/Pollutants); IV.D.2. (Heaters); IV.E. (Compressors); IV.F. (Boilers); IV.G. (Gas Turbines); IV.H.3. (SRU Incinerators); IV.J. (Sulfuric Acid Plants); and IV.K.2. (Delayed Coker Steam- Vent).

**Response 4**

EPA finds no need to define the terms "performance test," stack test data," or "stack or performance test data" in the permit as requested by Limetree since these are terms of common usage that are made clear by the context within the specific conditions of the PAL permit that contain them. In addition, the PAL regulation distinguishes between the information that must undergo validation testing, 40 CFR § 52.21(aa)(12)(vi)(c), and the data that must be re-validated, 40 CFR § 52.21(aa)(12)(ix). However, we agree that re-validation and validation are not synonymous with stack or performance testing. As a clarification, note that data validation or re-validation is an analyte- and sample-specific process that extends the evaluation of data beyond method, procedural, or contractual compliance (i.e., data verification) to determine the analytical quality of a specific data set.  All data used to establish the PAL pollutant's emissions must be validated or re-validated through performance testing or other scientifically valid means approved by EPA. A stack test, also referred to in EPA regulations as a performance or source test, measures the amount of a specific regulated pollutant, pollutants, or surrogates being emitted; demonstrates the capture efficiency of a capture system; or determines the destruction or removal efficiency of a control device used to reduce emissions at facilities subject to the requirements of the Clean Air Act. Stack testing is an important tool used to determine a facility's compliance with emission limits or capture or control efficiencies established pursuant to the Act.

40 CFR § 52.21(aa)(12)(vi)(c) is the basis for requiring validation testing of significant emission units within 6 months of permit issuance. Specifically, 40 CFR § 52.21(aa)(12)(vi)(c) states that "if technically practicable, the owner or operator of a significant emissions unit that relies on an emission factor to calculate PAL pollutant emissions shall conduct validation testing to determine a site-specific emission factor within 6 months of PAL permit issuance." The New Source Performance Standards, 40 CFR Part 60, to which Limetree's emission units are subject also requires performance testing within 180 days after startup. EPA finds no basis to grant a blanket extension of testing by 6 months in the PAL permit. In the context of validation testing pursuant to 40 CFR § 52.21(aa)(12)(vi)(c), Limetree is not prohibited from bringing to EPA's attention, for EPA's consideration and approval, "technically impracticable" situations that prevent Limetree from complying with validation testing provisions of the PAL permit.

**Comment No. 5.  "Modification" and "Modified"**

The terms "modification," "modified", "modified unit(s)", "modification to a unit", "modified major emission unit", "new or modified future units", "emissions units modified", appear throughout the permit. There are no definitions of these terms. The permit should clarify that "unit" means "emissions unit" and "modify" means a physical change or change in the method of operation of the emissions unit that results in an increase in emissions of a PAL pollutant consistent with the provisions of Section 111(a)(4) of the Clean Air Act. In addition, the reference to "modified future units" should be removed.  Future units that are modified would be covered by the modification provisions for existing units. See, for example, Condition I (Plantwide Applicability Limits); III.A.

5

and III.B. (General Permit Conditions); V. (Performance Tests); VII.A.4. (Semi-Annual Report); VIII.B.8. (Ambient Air Monitoring Requirements).

**Response 5**

No change to Condition I is needed since EPA merely described generally how emissions from all emission units (including newly added or modified units) shall be added to demonstrate compliance. Condition II.A has been changed to reduce confusion about the distinction between a unit and a source, while remaining consistent with the language of 40 CFR § 52.21(aa)(1)(ii), as follows: "Any physical change or change in the method of operation at the source, including construction of a new emissions unit, which occurs during the effective period of this PAL permit shall not be considered a major modification under 40 CFR § 52.21(b)(2)(i) or have to be approved through the PSD program for a particular PAL pollutant provided that the source continues to comply with the PAL for that particular pollutant through the terms delineated in this permit and the permittee maintains total source-wide emissions below the applicable PAL limit established in Table I-1." The permit has also been changed to track the terminology in the PAL provisions of 40 CFR § 52.21(aa) so that the first time the term "emission unit" is used, it is defined in a parenthetical as "unit." The terms "modify" and "modification" and derivatives thereof in Conditions III.A, III.B, V, and VII.A.4 are included with respect to changes at a "unit" rather than the "source" and are therefore distinct from, and not inconsistent with, Condition II.A or 40 CFR § 52.21(aa)(1)(ii) and do not require a definition.  The use of the term "modify" and "modifies" in Condition VIII.B.8 reflect the reality that modifications to the PAL permit or changes in the units could impact the efficacy of the ambient monitoring plan and are also distinct from, and not inconsistent with, Condition II.A or 40 CFR § 52.21(aa)(1)(ii). The term "future units" is not included in the draft permit, so EPA has not made any changes in the final permit; the term "new" units is used in the permit to address future units.  However, we do agree that new units that later undergo changes will be governed by permit conditions for existing units that undergo changes.

**Comments No. 6a, 6b and 6c Emission Factor Errors**

**Comment 6a - Rounding of Emission factors Has Not Been Done Consistently**

Rounding of emission factors has not been done consistently throughout the draft PAL permit. In addition, the rounding is inconsistent with actual test data, AP-42, and other published emission factors used to establish the PAL. The rounding is inconsistent with the baseline calculations used in the PAL permit application, which are used to derive the PAL. See, for example Section IV: Table B-2 (Flare Gas Monitoring); Table D-2 (Heaters – unit Specific Emission Factors based on Stack Tests/AP-42); Table E (Heaters – Default Emission Factors in lb/MMBtu); Table G (Compressors – Default Emission Factors in lb/MMBtu); Table I (Boilers – Default Emission Factors in lb/MMBtu); and Table J-3 (Gas Turbines – Default Emission Factors).

**Response 6a**

EPA rounded the emission factors to a higher or a lower number in the PAL permit calculation methodologies based on the potential to emit estimates which appear to have resulted in inconsistencies between some of the baseline calculations and the permit calculation methodologies. EPA agrees with the comment that all factors should be rounded to a higher or a lower number in a consistent manner. Therefore, EPA has revised the emission factors to address the rounding inconsistencies by accepting the emission factors proposed by the permittee in the conditions noted in the comment.

**Comment 6b Updates to AP-42 or other default calculation methodologies**

There are numerous references in the draft PAL permit that require Limetree Bay to adopt new emission factors or calculations methodologies associated with AP-42 updates. If, in the context of periodic review of information EPA publishes a new AP 42 factor or otherwise, determines that one of the predictive emission factor equations used to establish the PAL in the draft PAL permit issued to Limetree Bay is erroneous, this must be addressed through the process established by 40 CFR § 52.21(aa)(8)(ii)(*a*)(*1*) and the references should be deleted. Accordingly, the provisions in the following Conditions should be deleted. See, for example, Conditions IV.A.2. (Flares); IV.B.1. and 2 (Tanks); IV.H.3. (SRU Incinerators); IV.H.5. (Beavon Units Cooling Towers); IV.N.1. and 2 (Local Sales Rack and Service Station); IV.O.2. (Marine Loading Operations and Thermal Oxidizer Control); IV.P.2. (Material Handling); and IV.Q.2 (Road Traffic).

**Response 6b**

EPA agrees with the comment that if any new or updated emission factors or calculation methodologies for AP-42 become available, such changes will need to be addressed through the process established by 40 CFR § 52.21(aa)(8)(ii)(*a*)(*1*). This process requires the reopening of the PAL permit to address such changes. Therefore, the provisions in the following Conditions are deleted. Conditions IV.A.2 (Flares); IV.B.1 and 2 (Tanks); IV.H.3 (SRU Incinerators); IV.H.5 (Beavon Units Cooling Towers); IV.N.1 and 2 (Local Sales Rack and Service Station); IV.O.2 (Marine Loading Operations and Thermal Oxidizer Control); IV.P.2 (Material Handling); and IV.Q.2 (Road Traffic). EPA has added a new general condition (II.M)) to clarify this issue. The reason for deleting these provisions is that if we base a PAL level on an old emission factor but determine compliance under the PAL permit through calculations using a new emission factor, there will be inconsistencies in the calculations which will lead to uncertainty about whether or not the PAL level has been exceeded. As a result, it is important to use the same emission factor for both calculation of the PAL level and to demonstrate compliance with the PAL. Therefore, if EPA or the Permittee seeks to incorporate a new AP-42 emission factor into the permit requirements, EPA will need to reopen the PAL permit under 40 CFR § 52.21(aa)(8)(ii)(*a*)(*1*) to correct the baseline and PAL level.

**Comment 6c   Changes in Emission factors**

Conditions in the draft PAL permit require calculation of emissions using prescribed emission factors, consistent with the emission factors used to establish the PAL, "unless more representative emission factors become available." If a more representative emission factor becomes available or an emission factor is changed by rounding, the changed emission factor would have to be used both to calculate emissions and to modify the PAL for consistency in the application of the emission factors. See, for example: Conditions II.M. (General Permit Conditions Site-Specific Emission Factors); III.A.3. (Emission Factors); III.E. (General Requirements for Emission Factor-Monitored - Emissions Units/Pollutants); IV.D.2 for process heaters listed in Table D-2 (Heaters – unit Specific Emission Factors based on Stack Tests/AP- 42); IV.E. (Compressors); Table F (Compressors – Unit Specific Emission Factors based on Stack Tests); IV.F. (Boilers); IV.G. (Gas Turbines); IV.H.2. (Sulfur Recovery Units (SRU), Beavon Units, Incinerators, Sulfur Pits); IV.H.3. (SRU Incinerators); and IV.M.1. (Oily Wastewater Collection System and Treatment Plant).

**Response 6c**

Emission factors can either be derived in a manner that is specific to a particular unit on site or from tables in AP-42. There is a preference for site- and unit-specific emission factors but, if the specific emission factors aren't available, AP-42 is the best general representation of emission factors for a particular class of units. EPA agrees with the comment that if a more representative AP-42 emission

factor becomes available, the changed emission factor would have to be used both to calculate emissions and to modify both the PAL baseline and PAL limit, for consistency in the application of the emission factors. AP-42 emission factors are not site-specific and represent a general emission factor for a class of units.  Since they are not site-specific, an update to an AP-42 emission factor, which could lead to either a higher or lower estimate of emissions, does not represent a change in the operation or efficiency of a site-specific unit.  Therefore, to ensure equivalency between the baseline and the permittee's demonstration of compliance with the PAL limits in Condition I, it would be necessary for EPA to reopen the PAL permit pursuant to 40 CFR § 52.21(aa)(8)(ii)(*a*)(*1*) should the permittee or EPA seek to adjust the baseline and PAL limits based on the changes in the AP-42 emission factors.  EPA has added a new general condition (II.M) to clarify this issue. EPA has a different view with respect to emission factors that are specific to a particular site and emission unit (site/unit-specific).  A site/unit-specific emission factor represents the most accurate picture of emissions from a particular emissions unit at the time the unit is tested. Therefore, the site/unit-specific emission factor that was used to calculate emissions for purposes of the baseline was an accurate representation of that particular unit at that time.  Assuming that there is an updated site/unit-specific factor generated after PAL permit issuance, the updated factor doesn't reflect an error in the factor used for purposes of the baseline.  Rather, it reflects some change in the efficiency or operation of the unit over time.  Therefore, unlike updates to AP-42 emission factors, there is no basis to update the PAL baseline for changes in site/unit-specific emission factors after PAL permit issuance because site/unit-specific factors, whether they are used for the baseline or the PAL limits, in most cases, will be the best representation of the actual baseline.

**Comment No. 7.  Regulatory References**
Throughout the draft PAL permit, EPA has selectively incorporated the applicable PAL regulations, leaving out flexibilities built into the regulations and modifying other regulatory references making them more stringent than the regulations. The draft PAL permit should accurately reflect the applicable regulations. See, for example, Condition I. (Plantwide Applicability Limits); II.A. (Physical Changes), II.B. (PAL Renewal), II.D. (Monitoring of Emissions); II.E. (Monitoring Systems); II.F. and II.G. (Recordkeeping and Reporting); II.I. (PAL Implementation and Enforcement); II.L. (Maximum Potential Emissions); II.M. (PAL Limits); and III. (Monitoring Methods).

**Response 7**
The commenter cites to conditions of the PAL without any explanation of how the language of those conditions restricts the flexibility of the PAL. EPA disagrees with the comment that it has selectively incorporated applicable regulations, leaving out flexibilities built into the regulations. The regulation citations are provided as references and the language in the provisions cited by the commenter merely summarizes the regulatory requirements; the regulatory provisions speak for themselves. Note that many of the conditions in sections IV through VII amplify the regulatory requirements with more specific language. EPA has made no change to the permit conditions in response to this comment.

**Comment No. 8.  Common Stack**
Where emissions from more than one source are emitted from a single stack, the PAL permit should make clear that validation, performance and stack testing of emissions units may be conducted on the combined stack. See, for example, Condition VI.D. (Heaters), IV.F. (Boilers), and V. (Performance Tests). See, for example, #3 Vac Unit heaters H-4201 and H- 4202; #3 Platformer heaters H-4451

through H-4454; (4 Platformer heaters – H5451 through H- 5454; Boilers 8 and 9; and Sulfuric Acid Plant Heaters H-7801, H-7802 and R-7801.

**Response 8**
EPA agrees with the comment that where emissions from more than one unit are emitted from a single stack, the validation, performance and stack testing of emission units may be conducted on the combined stack.  In the event that the permittee wants to exercise this option, rather than testing units individually, the test must be conducted with all units vented to the same stack operating simultaneously at the time of testing.  EPA added Condition II.O to address this comment.

**Comment No. 9.  New Stack Test Results**
The draft PAL permit should be revised to reflect that if there is a change in the stack test results, and there is a physical change or change in the method of operations at the source, Limetree Bay should use the new stack test results to determine compliance with the PAL. If, however, there is no physical change or change in the method of operation, and there is a statistically significant difference, then the PAL(s) should be re-set.  See, for example, Condition II.M. (General Permit Conditions), IV.C.1. (FCCU monitoring for $NO_x$, CO and $SO_2$), and IV.C.2. (FCCU monitoring for PM, $PM_{10}$, $PM_{2.5}$ and VOC).

**Response 9**
Condition VII.A.7 of the PAL permit requires that the Permittee report any such changes or updates in its semi-annual reports to EPA for review.  The commenter has not provided sufficient explanation about why the PAL should be "reset" in some circumstances and not others. It is more effective for Limetree to request a permit reopening as the need arises rather than delineating all the possible circumstances in the permit.  It is not unusual for sources to request permit changes from EPA when circumstances dictate the need for a change. This comment is raised again in a slightly different context in Comment No. 29. See also EPA Response to Comments 6c and 29.  EPA has made no change to any permit conditions in response to this comment.

**Comment No. 10. Weekly Calculations to Determine Monthly Emissions**
Various conditions in the draft PAL permit require Limetree Bay to calculate emissions "at a minimum, on a weekly basis." Each of these conditions should be revised to clarify that emissions calculations are required on a monthly basis. Because the prescribed frequency of calculating source-wide actual emissions is monthly, a requirement to perform more frequent emissions calculations is unnecessary in order to demonstrate compliance with the PAL. See, for example, Condition III.E.1. (General Requirements for Emission Factor-monitored Emissions Units/Pollutants); IV.A.2. (Flares); Table B-2 (Flare Gas Monitoring); IV.B and IV.B.1 (Tanks); IV.C.2 (FCCU monitoring for PM, $PM_{10}$, $PM_{2.5}$ and VOC); IV.D.3 (Heaters – fuel flow rate and fuel heat content); IV.E. (Compressors); IV.F. (Boilers); and IV.G. (Gas Turbines).

**Response 10**
The comment concerns the frequency of calculation rather than the frequency of monitoring.  EPA agrees with the commenter that there is no need to perform the calculation on a weekly basis given that the PAL limits in Section I of the PAL are established on a 12-month rolling basis. However, EPA will continue to require monitoring of the parametric data and CEMS data with the frequency specified in Sections III and IV of the permit. EPA clarified this issue in Condition III.E.1. (General Requirements for Emission Factor-monitored Emission Units/Pollutants); Table IV-A-2, previously

named Table B-2 (Flare Gas Monitoring); Conditions IV.B and IV.B.1 (Tanks); Condition IV.C.2 (FCCU monitoring for PM, $PM_{10}$, $PM_{2.5}$ and VOC); Condition IV.D.3 (Heaters – fuel flow rate and fuel heat content); Condition IV.E. (Compressors); Condition IV.F. (Boilers); and Condition IV.G. (Gas Turbines). See also EPA Response to Comment 33, below.

**Comment No. 11. Conflicting PAL Emissions Calculation Language**

Many Conditions similar to Condition IV.B.3 contain the following language: "The 12- month total…shall be calculated monthly by adding the emissions for the current month to the sum of the monthly emissions for the previous 11 consecutive months." This is inconsistent with the general monitoring provisions of the draft PAL permit in Section III.D.2, which contains language to cover the first 11 months after issuance. Because this concept is adequately covered by the general monitoring provisions in Section III.D.2. (Calculation Procedures), we recommend that the language regarding the calculation where it appears in Section IV be deleted.

**Response 11**

EPA agrees with the comment that the draft permit contained many conditions similar to the language, "The 12-month total….shall be calculated monthly…..for the previous 11 months." in Sections III and IV.  Further, the Section IV conditions' language appears to be redundant with the Section I condition: "Total plantwide emissions, based on a 12-month rolling total, shall not exceed the emission limits in Table I-1.  The Permittee, starting from the effective date of this permit, shall sum the actual emissions of each emission unit  ("unit") across the entire plant by PAL pollutant every month, including the emission units in the Appendix to this permit and any newly added units, to demonstrate compliance with the Table I-1 limits.  For each month during the first eleven (11) months from the PAL effective date, the Permittee shall add the emissions from each emission unit for the current month to the sum of the preceding monthly emissions since the PAL effective date to demonstrate compliance with the PAL listed in Table I-1."

EPA has therefore deleted all references to the 12-month rolling calculation related language from Section III Conditions E2 and Section IV Conditions B3, C3, D3, E, F, G, H2, H5b, J2, K2, L3, N2, O3, P3, Q3, R4 and S3 because Condition I already requires that "each" emission unit be summed to calculate the monthly and annual emissions.

**Comment No. 12.  Specification in Monitoring Method**

In Condition IV.D.2. (and others), the parenthetical referring to using the best, most current data available, is either ambiguous or unduly constraining and must be revised or deleted. The parenthetical should say "e.g." instead of "i.e." and should include continuous emissions monitoring system ("CEMS"), parametric emissions monitoring system ("PEMS"), and continuous parameter monitoring system ("CPMS"). Otherwise, the parenthetical could be construed as prohibiting the use of continuous monitoring data or data from performance tests other than "stack test data." which would be inconsistent with using the best and most accurate data available. See, for example, Condition IV.D.2. (Heaters); IV.E. (Compressors); IV.F. (Boilers) IV.G. (Gas Turbines); and IV.H.3 (Sulfur Recovery Units (SRU), and IV.J.2.b (Sulfuric Acid Plants).

**Response 12**

EPA agrees that the parenthetical, as well as the other language after the phrase "using the Default Emission factors in Table…," introduces ambiguity.  This ambiguity could result in practical enforceability problems. In addition, restricting the emission factor to the default AP-42 emission factors in the referenced tables for units without unit-specific factors is reasonable because the AP-42

10

factors were used to establish the baseline and PAL level.  This will ensure consistency between the baseline/PAL level and the measurements of compliance with Section I of the PAL permit. Therefore, EPA has revised Condition IV.D.2. (Heaters); IV.E. (Compressors); IV.F. (Boilers) IV.G. (Gas Turbines); IV.H.3 (Sulfur Recovery Units (SRU), and IV.J.2.b (Sulfuric Acid Plants) to remove the ambiguity and constraints.  For example, Condition IV.D.2 now states: "For a heater unit with site-specific emission factors in Table D-2 (renamed IV-D-2), emissions shall be determined using the emission factors listed in Table D-2. For units without site-specific emission factors for any pollutant, emissions shall be determined using the Default Emission factors in Table E (renamed IV-D-3)."  EPA has similarly revised conditions in IV.E. (Compressors); IV.F. (Boilers) IV.G. (Gas Turbines); IV.H.3 (Sulfur Recovery Units (SRU), and IV.J.2.b (Sulfuric Acid Plants).

**Comment No. 13. Table numbering**
Limetree Bay requests that EPA renumber the tables by referencing the section in which they appear, e.g., Table R will become Table VI.P.1.

**Response 13**
EPA agrees to update the Table numbering.

**Comment No. 14. Redundancy**
Redundant language in the draft PAL permit is also a general problem, where numerous provisions are repeated more than one time. This creates the risk, as with this particular provision, of inconsistency. See, for example, Condition II.F. and II.G. are redundant of Sections VI and VII.

**Response 14**
EPA agrees to remove the redundancy in Conditions II.F & G because the same language is in Section VI and VII, respectively.  EPA has therefore revised Conditions II.F and II.G to be generic while retaining the language in Section VI and VII.

11

==========================================================================
**Comments from Limetree Bay Refining and Limetree Bay Terminals –
Section I – Plantwide Applicability Limits**
==========================================================================

### Comment No. 15. The PAL Permit Can Supersede Some Emissions Limits

Condition I of the draft PAL permit contains a table of "PAL Limits" by pollutant based on a 12-month rolling total. The last sentence in Condition I says, "[t]his condition does not supersede any applicable emission limits contained in any other federal or state permit or applicable regulation," which is incorrect. Pursuant to 40 CFR § 52.21(aa)(1)(ii)(*c*), the limits in EPA-issued PSD permits for purposes of ensuring non-applicability of substantive PSD requirements with respect to certain pollutants ("(r)(4) limits") are eliminated by the issuance of the PAL permit. See also, 40 CFR § 52.21(aa)(9)(v), referencing "emission limitations that had been established pursuant to paragraph (r)(4) of this section, but were eliminated by the PAL in accordance with the provisions in paragraph (aa)(1)(ii)(*c*)." See, also, *Technical Support Document for the Prevention of Significant Deterioration (PSD) and Nonattainment Area New Source Review (NSR): Reconsideration* (EPA-456/R-03-005), U.S. EPA, Oct. 30, 2003, at pp. 90-91, noting that "[m]any commenters opposed eliminating synthetic minor limits when a PAL is created," while others supported this provision.

EPA, while finalizing the rule, responded as follows:

"We agree with the commenters who supported eliminating synthetic minor limits for sources under a PAL, and we are not changing the final rules in this regard. We agree with commenters that maintaining (r)(4) limits under the PAL would preclude use of the PAL for sources that would otherwise elect to participate in a PAL, resulting in less use of the PAL provisions and ultimately less environmental benefit. We also agree with the commenter who stated that the PAL serves the same purpose as the (r)(4) limits do, which is to avoid circumvention of major NSR permitting." *Id.* Attachment 1 to this comment letter includes a list of the (r)(4) limits in EPA-issued PSD permits that will be eliminated as a result of the issuance of the PAL permit. This is not an exhaustive list. The PAL should reflect that U.S. Virgin Island Department of Planning and Natural Resources ("DPNR") issued synthetic minor limits may also be removed consistent with 40 CFR § 52.21(aa)(1)(ii)(*c*).

### Response 15
EPA agrees that the last sentence of Section I does not accurately reflect the language of the PAL regulation. Therefore, EPA has added the following phrase to the last sentence of Condition I: "except as provided under paragraph 40 CFR § 52.21(aa)(1)(ii)(c) of the PAL regulation." Any revisions to the PSD or state-issued permits that reflect the lifting of the (r)(4) restrictions will be handled through separate permit actions. Although the exception has been added at the end of Condition I, we note that EPA did not review the list of conditions in Attachment 1 of the commenter's comment letter to determine whether the listed conditions qualify for deletion from other Limetree permits. Limetree will need to submit a separate application to EPA and the DPNR requesting such a review after the issuance of the Final PAL Permit.

### Comment No. 16. The NO$_X$ PAL Is Too Low
Table A incorrectly lists the NO$_X$ PAL as 5,231 tons per year. The correct NO$_X$ PAL is 5,594 tons per year. Attachment 2 to this letter includes the correct NO$_X$ PAL calculations.

APPX-90

Limetree Bay's review of the docket suggests EPA's calculation of the NO$_X$ PAL was as follows:

6,617 tons per year (Limetree Bay proposal, November 26, 2018)

153 (adjustment for incorrect emission factor)

6,464 tons per year (Limetree Bay proposal, May 8, 2019)

1,080 (EPA adjustment for units permanently shut down, August 14, 2019)

This NO$_X$ PAL calculation reflects two separate calculation errors. First, as correctly noted by EPA in its letter to Limetree Bay dated August 14, 2019, Limetree Bay used an incorrect NO$_X$ emission factor for eleven emissions units in its initial PAL permit application submitted on November 26, 2018, and this use of an incorrect NO$_X$ emission factor caused Limetree Bay's initial proposed NO$_X$ PAL of 6,617 tons per year to be too high by 153 tons per year.  Limetree Bay subsequently provided a corrected NO$_X$ PAL calculation to EPA as part of the supplement to the PAL permit application submitted on May 8, 2019. See, docket item EPA- R02-OAR-2019-0551-0008.  In this supplement, Limetree Bay proposed a corrected NO$_X$ PAL of 6,464 tons per year (*i.e.,* 6,617 tons per year minus 153 tons per year). However, EPA's calculation double-counts the adjustment required to correct this error, which causes EPA's NO$_X$ PAL calculation to be low by 153 tons per year.  Second, as correctly noted by EPA in its letter to Limetree Bay dated August 14, 2019, Limetree Bay permanently shut down six emissions units subsequent to submittal of the PAL permit application on November 26, 2018, and the contributions of these emissions units must be excluded from the PAL calculation. However, the 1,080 tons per year value listed in the EPA letter of August 14, 2019, is incorrect. The total baseline actual NO$_X$ emissions from these six combustion units, as documented in Table C-5 of the PAL permit application, and Attachment 2 to this letter, is 870 tons per year (2009-2010 baseline period).  This error causes EPA's NO$_X$ PAL calculation to be low by 210 tons per year.

**Response 16**
Based on EPA's review of Limetree's May 30, 2019 letter to the VIDPNR, EPA's August 14, 2019 letter to Limetree and the explanation provided in Limetree's comment on the NOx PAL level, EPA agrees that the draft PAL permit's NOx PAL of 5,231 tpy contains two errors that need to be corrected. In Limetree's PAL application, the PAL for NOx was proposed as 6617 tpy based on the 2009-2010 24-month baseline period.  The first error pertains to the deduction of NOx emissions associated with the permanent shutdown of six emission units in July 2019. 40 CFR § 52.21(aa)(6)(i) requires that "emissions associated with units that were permanently shut down" after the baseline period "must be subtracted from the PAL level." The six units emitted 870 tpy of NOx during the PAL baseline years of 2009-2010, therefore, EPA should have reduced the PAL by 870 tpy. However, EPA inadvertently subtracted 1080 tpy of NOx, incorrectly using Limetree's NOx emissions during 2004-2005. The final NOx PAL has therefore been increased by an additional 210 tpy (should have deducted only 870 tpy instead of 1080 tpy) to address the first error.

The second error pertains to the deduction of 153 tpy from the NOx baseline due to Limetree's use of the wrong emission factor, in its application, for calculating baseline emissions of 11 combustion units. EPA deducted 153 tpy twice while recalculating the NOx baseline which resulted in a PAL in the draft permit that was 153 tpy lower than it should have been. It was first deducted when EPA sent its August 14, 2019 letter to Limetree and then it was deducted again when the final baseline and PAL numbers were being established at the time of issuing the draft PAL permit. EPA is therefore

adding back to the PAL 153 tpy for the 11 combustion units and 210 tpy for the six permanently shut down units (total increase of 363 tpy) and has reset the NOx PAL at the correct level of 5594 tpy.

**Comment No. 17. Reference to Modified unit(s)**
Condition I refer unnecessarily to "modified unit(s)" because those units are already listed in the Appendix.

**Response 17** – EPA agrees with the comment that the Appendix already includes all units that might be modified in the future and, as such, it would be redundant to use both "Appendix" and "modified units" as terms in Condition I. EPA has revised the condition and removed the reference to "modified units" from Condition I. In addition, EPA has added the following sentence to the end of Condition III.B to ensure that modified units retain the name originally used in the Appendix: "In the event of a modification to a unit, the Permittee shall retain the name of the unit as it appeared in the Appendix to this permit upon permit issuance."

14

===================================================================
**Comments from Limetree Bay Refining and Limetree Bay Terminals –
Section II – General Permit Conditions**
===================================================================

**Comment No. 18. Condition II.A.: Physical Change or Change in the Method of Operation**
Condition II.A. of the draft PAL permit suggests that, during the term of the PAL permit, the only changes that are not subject to the applicability provisions of 40 CFR § 52.21(a)(2)(iv) and to PSD review requirements at 40 CFR § 52.21(j) through (r) are "[a]ny physical change or change in the method of operation of existing emissions sources and/or construction of new emissions sources." This provision could be construed to exclude projects that do not involve physical or operational changes to underlying regulation, but the rule language refers to any physical change or change in the method of operation of the stationary source. Accordingly, this condition of the draft PAL permit must be revised to cover all types of projects at the major stationary source, consistent with the underlying regulation at 40 CFR §§ 52.21(a)(2)(iv)(*a*), (a)(2)(v), (b)(2)(iv), and (aa)(1)(ii)(*a*).

**Response 18**
To more closely track the language of 40 CFR § 52.21(aa)(1)(ii), EPA has clarified Condition II.A. to reflect that any physical change in or change in the method of operation at the "major stationary source" -- rather than "emissions sources" – that complies with the conditions of the PAL permit and the PAL regulatory provisions, and maintains the emissions below the PAL level would not be a major modification for the PAL pollutant. See EPA Response to Comment 5. We have also added a parenthetical in the first sentence of the first paragraph of the PAL permit to define the "major stationary source comprising a refinery and related terminal operation" as "the source."

**Comment No. 19.**
Both the introductory paragraph of the draft PAL permit and Condition II.A appear to say that, in the event of non-compliance by Limetree Bay with any requirement of the draft PAL permit, including Section VIII relating to ambient air and meteorological monitoring networks, projects at the major stationary source may be subject to the applicability provisions of 40 CFR § 52.21(a)(2)(iv) and to PSD review requirements at 40 CFR § 52.21(j) through (r). The reference to ambient air and meteorological monitoring networks is inconsistent with the underlying regulation at 40 CFR §§ 52.21(a)(2)(iv)(*a*), (a)(2)(v), (b)(2)(iv), and (aa)(1)(ii)(*a*), which expressly provide for non-applicability of the cited requirements without regard to ambient air and meteorological monitoring. As EPA notes, the ambient air monitoring is unrelated to demonstrating compliance with the PAL limits.

Limetree Bay suggests this condition be revised as follows:
Any physical change or change in the method of operation ~~of existing emissions sources and/or construction of new emissions sources at this plant which occur(s)~~ at this stationary source for which actual construction begins during the effective period of this PAL permit shall not be subject to the PSD requirements at 40 CFR § 52.21(a)(2)(iv) or 52.21(j) through (r) for a particular pollutant provided that the source continues to comply with the PAL for that particular pollutant through the terms delineated in ~~this permit~~ Sections I through VII of this permit and the permittee maintains total source-wide emissions below the applicable PAL ~~limit~~ established in Table A (40 CFR § 52.21(aa)(1)(ii)).

**Response 19**

Condition II.A is intended to track the PAL regulatory language.  Therefore, EPA has adjusted the language to more closely approximate the language of 40 CFR § 52.21(aa)(1)(ii). The language in 40 CFR § 52.21(aa)(1)(ii) does not include the phrase "for which actual construction begins" or the citations offered by the commenter.  Therefore, we have not included them in the revised Condition II.A.  EPA disagrees with the comment that reference to any non-compliance with Section VIII relating to ambient air and meteorological monitoring is inconsistent with the PAL regulation (see EPA Response to Comments 108-110).  40 CFR § 52.21(aa)(1)(ii) makes clear that PAL permittees must meet the requirements of paragraphs (aa)(1) through (15) to ensure that physical changes and changes in the method of operation at the major stationary source are not major modifications for the PAL pollutant. Among the provisions in paragraphs (aa)(1) through (15) is 40 CFR § 52.21(aa)(7) which specifies the contents of the PAL including "any other requirements that the Administrator deems necessary to implement and enforce the PAL."  40 CFR § 52.21(aa)(7) (x). The ambient monitoring conditions in Section VIII of this permit are necessary to implement EPA's discretionary authority under 40 CFR § 52.21(aa)(8)(ii)(*b*)(*3*) to reopen and reduce the PAL, if necessary, to avoid a NAAQS violation.  EPA would not, as a matter of course, exercise the 40 CFR § 52.21(aa)(7) provision to include ambient monitoring requirements in a PAL permit. However, there are unique circumstances with respect to this particular facility that require ambient monitoring.  See, for example, EPA Response to Comment 106.

**Comment No. 20. Condition II.B.: PAL Renewal**

Condition II.B. of the draft PAL permit suggests the PAL permit might expire even if Limetree Bay has submitted a timely and complete application to renew the PAL permit. Similarly, the introduction to the draft PAL permit indicates that the PAL permit is effective for 10 years until surrendered or expired.  To clarify both, Condition II.B. should be revised to be consistent with the underlying regulation at 40 CFR §§ 52.21(aa)(7)(iii) and (aa)(10)(ii). Limetree Bay suggests this condition of the draft PAL permit be revised to read as follows:

If the Permittee applies to renew this PAL permit in accordance with 40 CFR §52.21(aa)(10), the PAL shall not expire at the end of the PAL effective period. It shall remain in effect until a revised PAL permit is issued by the EPA. If the Permittee ~~applies~~ does not timely submit a complete application to renew the PAL ~~permit~~ in accordance with the procedures of 40 CFR § 52.21(aa)(10), the PAL permit shall expire and the permittee shall be subject to the requirements of 40 CFR § 52.21(aa)(9).

**Response 20**

EPA has revised the language in Condition II.B to eliminate ambiguity and more closely track the language of 40 CFR § 52.21(aa)(7)(iii), (aa)(9) and (aa)(10). The revised language is as follows: "If the Permittee applies to renew this PAL permit before the end of the PAL effective period and in accordance with the timing and other requirements of 40 CFR §52.21(aa)(10), the PAL shall not expire at the end of the PAL effective period and shall remain in effect until a revised PAL permit is issued by the EPA. If the Permittee does not timely submit a complete application to renew the PAL permit in accordance with the procedures of 40 CFR § 52.21(aa)(10), the PAL permit shall expire at the end of the PAL effective period and the permittee shall be subject to the requirements of 40 CFR § 52.21(aa)(9)."

16

**Comment No. 21. Condition II.D.: Monitoring of Emissions**

Condition II.D. would require Limetree Bay to monitor all emissions in accordance with the monitoring requirements in the permit and 40 CFR § 52.21(aa)(12) and to use the calculation procedures in Section IV of this permit to convert monitoring system data to monthly emissions and annual emissions based on a 12-month rolling total. Condition II.D. is redundant of the specific monitoring requirements in Section III and IV and should be deleted.

**Response 21**

EPA agrees to revise Condition II.D to eliminate the duplicative monitoring requirements of Conditions III and IV. However, EPA finds it necessary to add reference to 40 CFR § 52.21(aa)(12) in Condition III.A to also eliminate any ambiguity associated with this deletion. The second sentence of Condition III.A now reads as follows: "The Permittee shall comply with 40 CFR § 52.21(aa)(12) and use one of the following four general monitoring approaches, in order…"  [See also Response to Comment 22 regarding changes to Condition II.D.]

**Comment No. 22.**

40 CFR § 52.21(aa)(12) states that "[e]ach PAL permit must contain enforceable requirements for the monitoring system that accurately determines <u>plantwide emissions</u> of the PAL pollutant in terms of mass per unit of time or $CO_2e$ per unit of time."  Ambient air monitoring for environmental justice ("EJ") impacts is not monitoring Limetree Bay's plantwide emissions of PAL pollutants to determine the facility's compliance with its PAL limits and is not measuring mass per unit of time. Rather, it is monitoring the ambient concentration of emissions of certain PAL pollutants from all sources in the vicinity of the monitor. Therefore, the monitoring requirements in Section VIII, may not legally be included in a PAL permit as more fully described in Section VIII.

If Condition II.D does not get deleted, it should at a minimum be revised as follows to make clear that ambient air monitoring is not required under 40 CFR § 52.21 and to add Section III, which also adds monitoring requirements:

The Permittee shall monitor all emissions units in accordance with the monitoring requirements in ~~this permit and~~ 40 CFR § 52.21(aa)(12) and shall use the calculations procedures in <u>Sections III and</u> IV of this permit to convert monitoring system data to monthly emissions and annual emissions based on a 12-month rolling total.

**Response 22 –** EPA does not agree with the commenter's statement that the ambient monitoring conditions in Section VIII of the permit may not be legally included in a PAL permit.  See EPA Response to Comments 19 and 108-110 for discussion of EPA's legal authority to include ambient monitoring.  However, EPA agrees with the commenter that 40 CFR § 52.21(aa)(12) concerns emissions monitoring requirements rather than ambient monitoring requirements and that the calculation procedures referenced in Section III of the permit are also applicable to Condition II.D.  As such, Condition II.D has been revised to clarify that the monitoring requirements refer to emissions monitoring, as follows:

> II.D. The Permittee shall monitor all units in accordance with the emission monitoring requirements in this permit and 40 CFR §52.21(aa)(12) and shall use the calculation procedures in Section III and IV of this permit to convert emissions monitoring system data to monthly emissions and annual emissions based on a 12-month rolling total.

17

**Comment No. 23. Condition II.E.: Monitoring Systems**

Condition II.E. states that Limetree Bay's failure to implement and use a monitoring system that meets the requirements of <u>this permit</u> and 40 CFR § 52.21(aa)(12) renders the PAL permit invalid. This statement is incorrect. Section 52.21(aa)(12) requires monitoring using mass balance calculations, CEMS, CPMS or PEMS and emission factors <u>to determine compliance with the PAL limits</u> on a mass per unit of time or CO₂e per unit of time basis. It does not speak to implementation of monitoring.

In addition, failing to perform **ambient air monitoring**, as required by Section VIII, which is not a method used to determine compliance with the PAL, would not render the PAL invalid. Condition II.E. should be revised as follows:

Failure to ~~implement and~~ use a monitoring system or method that meets the requirements of ~~this permit and~~ 40 CFR § 52.21(aa)(12) shall render the PAL permit invalid (40 CFR § 52.21(aa)(12)(i)(*d*)).

**Response 23**

EPA's intent for Condition II.E is to require that the permittee must use an emission monitoring system, comprised of unit-specific emission monitoring requirements as specified in the permit. We have added the term "emission" before "monitoring system" to clarify the purpose of 40 CFR § 52.21(aa)(12) which is to monitor emissions and deleted the word "implement" to avoid redundancy with the word, "use." For those emission units for which monitoring systems are not specified, the permittee must use a system that meets 40 CFR § 52.21(aa)(12). Since the emission monitoring provisions of the permit carry out 40 CFR § 52.21(aa)(12), the permittee must meet the unit-specific monitoring requirements in the permit or risk being subject to 40 CFR § 52.21(aa)(12)(i)(*d*). Thus, EPA has retained the language requiring the permittee to "meet the requirements of this permit." EPA has clarified the condition to address this comment. EPA agrees that the language of 40 CFR § 52.21(aa)(12) refers to emissions monitoring rather than ambient monitoring, and therefore EPA has revised the language to address the comment, EPA does not agree that the permittee's failure to comply with the ambient monitoring will have no consequences for the validity of the PAL permit. 40 CFR § 52.21(aa)(1)(ii) requires permittees to comply with the requirements in paragraphs (aa)(1) through (15), and with the PAL permit, to retain the flexibilities of the PAL permit. Ambient monitoring conditions are included in the PAL permit pursuant to 40 CFR § 52.21(aa)(7) (see EPA Response to Comment 19, above) and therefore compliance with the ambient monitoring conditions is required.

**Comment No. 24. Conditions II.F. and II.G., Recordkeeping and Reporting**

Section II.F is redundant with Section VI, and Section II.G. is redundant with Section VII and both should be deleted. In the alternative, if these are retained, the following changes should be made. Section II.F. would require Limetree Bay to retain the records as required by the permit and in accordance with 40 CFR § 52.21(aa)(13) for a period of 5 years from the date of record. Records of ambient air monitoring pursuant to Section VIII are not requirements of 40 CFR § 52.21(aa)(13). Therefore, the 5-year recordkeeping and reporting requirements do not apply to Section VIII. Condition II.F and II.G. should be revised as follows:

The Permittee shall retain the records as required by ~~this permit and~~ 40 CFR § 52.21(aa)(13) for a period of at least 5 years from the date of record. The records may be retained in an electronic format.

18

The Permittee shall submit the reports required in Sections I-VII of this permit ~~pursuant to this permit~~ to the permitting authority (EPA Region 2) in accordance with 40 CFR § 52.21(aa)(14) and at the address in Section VII of this PAL permit. The reports may be submitted in an electronic format.

In the alternative, the permit conditions should make clear that the recordkeeping and reporting under 40 CFR §§ 52.21(aa)(13) and (14) do not apply to Section VIII.

**Response 24**
The commenter has not demonstrated any inconsistency between Condition II.F and Section VI or Condition II.G and Section VII. In addition, Conditions II.F and II.G contain language that is not in Sections VI or VII (e.g., making electronic format permissible). Therefore, EPA has retained the language.  In addition, EPA does not agree that recordkeeping requirements in 40 CFR § 52.21(aa)(13) should not be applied to the ambient monitoring conditions in Section VIII because 40 CFR § 52.21(aa)(13) requires recordkeeping "necessary to determine compliance with <u>any</u> requirement of paragraph (aa) of this section," (emphasis added) which includes 40 CFR § 52.21(aa)(1)(ii) and 40 CFR § 52.21(aa)(7)(x). See EPA Responses to Comments 19 and 23, above. The generic reporting requirements referenced in Condition II.G of the draft PAL permit, and the more detailed requirements in Section VII, are specific to emission monitoring and do not include reporting requirements for ambient monitoring which remain in Section VIII to ensure enforceability of the conditions in Section VIII.

**Comment No. 25. Condition II.I., PAL Implementation and Enforcement**
Condition II.I. of the draft PAL permit is not authorized by the PAL provisions and must be removed. This Condition would give EPA unfettered authority during the term of the PAL permit to impose, without any administrative safeguards, any other conditions that it deems necessary to implement and enforce the PAL permit. The rule provision cited by EPA as purportedly providing a basis for this unauthorized condition is 40 CFR § 52.21(aa)(7)(x). This provision does not provide EPA with authority unilaterally to impose additional conditions, at some unspecified future date. Rather, the cited provision provides EPA with narrow authority to include, in the PAL permit at the time of issuance, other requirements that EPA deems necessary to implement and enforce the PAL permit.

EPA's authority under the PSD rule to impose additional requirements, subsequent to initial issuance of the PAL permit, is circumscribed by the conditions for reopening in 40 CFR § 52.21(aa)(8)(ii), which is reflected in Condition II.H. of the draft PAL permit. Otherwise, this provision would effectively enable EPA to circumvent Limetree Bay's opportunity for review under 40 CFR § 124.19.

**Response 25**
EPA agrees that 40 CFR § 52.21(aa)(7)(x) is intended to apply at the time of permit issuance.  EPA has deleted Condition II.I.

**Comment No. 26. Condition II.K.: Joint and Several Liability**
Condition II.K., states that Limetree Bay Refining and Limetree Bay Terminal are "jointly and severally liable" for non-compliance with any condition of this permit. EPA does not have legal authority to impose "joint and several" liability under the Clean Air Act and there is no authority

19

cited by EPA. Rather, the permit is issued to the owners and operators and the owners and operators are required to comply with the permit and are responsible for any failure to comply.

**Response 26**
Without adopting the commenter's view on joint and several liability, EPA has revised Condition II.K (Renamed as II.J) because we do not see the need to address joint and several liability in the PAL permit. Therefore, the language of Condition II.J now reads: "Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC, are each required to comply with all conditions in this permit."

**Comment No. 27. Condition II.L.: Maximum Potential Emissions**
Condition II.L., mis-states 40 CFR § 52.21(aa)(12)(vii). A source owner or operator must record and report maximum potential emissions without considering enforceable emission limitations or operational restrictions for an emissions unit during any period of time that there is no monitoring data, unless another method for determining emissions during such periods is specified in the PAL permit. The permit condition should be revised to match the regulation.

For PAL compliance purposes, the Permittee shall record and report the maximum potential emissions without considering enforceable emission limitations or operational restrictions ~~or use of a control device~~ for an emissions unit during any period of time when there are no monitoring data <u>unless another method for determining emissions during such periods is specified in the PAL permit</u> (40 CFR § 52.1(aa)(l 2)(vii)).

Using default maximum potential to emit ("PTE") in most cases as this permit currently provides would grossly overstate actual emissions and produce an inaccurate emissions calculation. For this reason, EPA has promulgated alternative missing data provisions and a missing data provision was included in the Capitol Power PAL permit, EPA-R3-PAL-001. Consistent with 40 CFR § 52.21(aa)(12)(vii), Limetree Bay proposes adding the following language to Condition II.L.:

"Limetree Bay may use missing data substitution procedures set forth in Table II.L. or other means approved by EPA where data from the monitoring method specified in the PAL permit is missing or invalid."

20

| # | Type of missing monitoring data | Procedure for replacing missing data |
|---|---|---|
| 1 | CEMS/CPMS | Data missing for 10% or less of the operating hours in a given month. No data substitution procedures are needed to compute the monthly emissions rate. Use monthly average emissions rate and hours of operation to calculate monthly emissions. In the event that the CEMS/CPMS is inoperable for more than ten percent (10%) of the operating hours in the month, the Permittee shall calculate an average of the five (5) highest hourly emission rates monitored from the emission unit or stack in the month. |
| 2 | Fuel Usage or Throughput Data | Data missing for 10% or less of the operating hours in a given month. No data substitution procedures are needed to compute the monthly total. Use monthly average fuel usage or throughput and hours of operation to calculate monthly emissions. In the event that the fuel usage or throughput data is unavailable for more than ten percent (10%) of the operating hours in the month, the Permittee shall substitute with the maximum monthly fuel usage for the given unit/units during the preceding 12-month period taking into account best engineering estimates of operational rates of the affected unit/units. |
| 3 | Parameters determined based on periodic sampling and analysis | Missing data shall be filled using the maximum test result from the preceding four valid test results of the same type. |
| 4 | Initial 60 days of operation after idled emissions unit startup or a new emissions unit startup | For the first 60 days after startup of an idled emissions unit or a new emissions unit, use best engineering estimates for any data that cannot reasonably be measured or obtained according to the requirements of this subpart. |
| 5 | Missing data, not covered in another section of this table | Use an analogous data substitution method set forth in 40 CFR Part 98 or other credible evidence. |

**Response 27**

40 CFR §52.21(aa)(12)(vii) provides discretion to the permitting authority to specify another method in the permit for determining emissions during periods when there is no monitoring data. The commenter is correct that we exercised discretion in the Capitol Power Project to include missing data provisions like the ones included in the commenter's table. However, we decline to exercise that discretion here because of differences between the Limetree and Capitol Power facilities and because the commenter has not demonstrated that the methods are appropriate for this particular facility. Compared to Limetree, the Capitol Power Plant permit has far fewer emission units (over 200 at the Limetree facility and approximately half a dozen at the Capitol Power Plant) and, therefore, the level of complexity that could result from the alternative methods at a refinery presents practical enforceability concerns that one would be less likely to expect at a power plant. By requiring the owner or operator to record and report maximum potential emissions without considering enforceable emission limitations or operational restrictions during periods without monitoring data, 40 CFR §52.21(aa)(12)(vii) creates a simple, unambiguous and environmentally protective approach to missing data.  Although alternative methods can be approved by EPA, they are done so on a case-by-case basis. This Permittee did not propose alternative methods, with support for those alternatives, in its permit application and has not provided any information in the comment to demonstrate that the approaches used in the Capitol Power Project PAL would be practically enforceable and technically sound at its refinery. While EPA has not adopted the commenter's complex substitution procedures, we have deleted the phrase, "or use of a control device" from Condition II.L (now renamed II.K) since that language is not in 40 CFR §52.21(aa)(12)(vii) and is covered by the phrase, "without considering enforceable emission limitations or operational restrictions," which is in the permit and 40 CFR §52.21(aa)(12)(vii).

**Comment No. 28. Condition II.M.: PAL Limits**

Condition II.M. of the draft PAL permit is ambiguous in three respects and must be revised to improve clarity as to what is required.

The first sentence of Condition II.M. refers to certain emission factors "that were used to establish the PAL pollutant," but no emission factors were used to establish the PAL pollutants. The PAL pollutants are established only by the list of pollutants in the first column of Table A in Condition I of the draft PAL permit. Limetree Bay suggests revising this clause to refer to emission factors "that are used to demonstrate ongoing compliance with the PAL in Condition I."

Condition II.M. must be revised to remove ambiguity regarding the meaning of the term "re-validated." Emission factors are intended to provide a quantitative representation of long-term average relationships between emission rates and activity levels for emissions units of a particular class.  The results of an individual performance test at an individual unit cannot be expected to match precisely the emission factor for that class of emissions unit, and a test result that varies from the emission factor cannot be said categorically to invalidate the emission factor. Limetree Bay suggests that data used to establish a PAL, such as an emission factor, shall be deemed to be re-validated if the difference between the initial data and the validation data is not statistically significant. If the validation data is not statistically different from the initial data, then no update to the emission factor derived from the initial data is required. If the validation data are statistically different from the initial data, then the PAL shall be updated using the validation data-based emission factor. Limetree Bay suggests the use of a 95 percent confidence level to determine if a validation data-based emission factor statistically differs from the data or factor used to establish the PAL.   The updated emission factor shall be used to 1)

administratively update the PAL in accordance with 40 CFR § 52.21(aa)(8)(ii); and 2) used to determine future emissions for that emissions unit for purposes of determining compliance with the applicable PAL.

The third sentence of this condition, which pertains to operational parameter ranges, is not authorized by 40 CFR § 52.21(aa)(12)(ix) and is redundant with Condition III.A.3.b of the draft PAL permit. Condition II.M must be revised to delete the unauthorized and redundant third sentence.

The following language must be deleted:
The units where such testings have occurred must be operated within the range of the operational parameters established during the performance tests. (40 CFR § 52.21(aa)(12)(ix)).

**Response 28**
EPA agrees with the comment that the first sentence of Condition II.M. of the Draft PAL Permit is incorrect as stated. The emission factors were not used to establish the PAL pollutants, but to estimate the baseline actual emissions which, in turn, were used to establish the PAL limits in tons/year for the pollutants. EPA has therefore changed the first sentence of Condition II.M (renamed II.L) as follows:

"All site-specific emission factors that were used to establish the PAL pollutant limits in Table I-1 and demonstrate ongoing compliance with the PAL in Table I-1 after permit issuance must be re-validated through performance testing or other scientifically valid means approved by the EPA."

EPA reviewed the comment related to the ambiguity regarding the term "revalidated" in Condition II.M. EPA agrees that an emission factor would provide an average relationship between emission rates and activity levels for emissions units of a particular class of emission units, e.g., boilers. An emission factor developed or validated during individual performance tests conducted at different times for the same unit would not exactly match every time a test is conducted. There would be some variation in the resulting emission factor from one performance test to another. EPA therefore agrees that the use of a 95 percent confidence level to determine if a validation data-based emission factor statistically differs from the data or factor used to establish the PAL is reasonable. However, if the validation data are statistically different from the initial data – less than 95% confidence level – then the PAL shall be updated using the validation data-based emission factor. The updated emission factor shall be used to determine future emissions for that emissions unit for purposes of determining compliance with the applicable PAL. EPA will consider, on a case by case basis, whether an adjustment to the PAL level is warranted as a result of validation testing. See EPA Response to Comment 6c. EPA revised Condition II.M (renamed Condition II.L) to address this comment.

EPA agrees that the third sentence of Condition II.M (now Condition II.L), "The units where such testings have occurred must be operated within the range of the operational parameters established during the performance tests," is not a requirement of 40 CFR § 52.21(aa)(12)(ix). That sentence has been deleted from the condition.

===================================================================
**Comments from Limetree Bay Refining and Limetree Bay Terminals –**
**Section III – Monitoring Methods**
===================================================================

**Comment No. 29.**
Condition III.A.3.c of the draft PAL permit must be revised to remove ambiguity regarding the meaning of the term "validation" to be used in the event that the results of a unit- specific performance test are determined to invalidate the emission factor previously used. Emissions rates at each individual unit in a class of emissions units vary with time. Emission factors are intended to provide a quantitative representation of long-term average relationships between emission rates and activity levels for emissions units of a particular class. The results of an individual performance test at an individual unit cannot be expected to match precisely the emission factor for that class of emissions unit, and a test result that varies from the emission factor cannot be said categorically to invalidate the emission factor, as suggested in Limetree Bay's comment # 28 on II.M.

**Response 29**
EPA agrees with the comment that, "emissions rates at each individual unit in a class of emission units vary with time. Emission factors are intended to provide a quantitative representation of long-term average relationships between emission rates and activity levels for emission units of a particular class. The results of an individual performance test at an individual unit cannot be expected to match precisely the emission factor for that class of emissions unit...." However, for site-specific emission factors for an emission unit, as discussed above in EPA Response to Comment 28, updated site-specific emission factors are the best representation of a particular unit at the time of the test. Therefore, an updated site-specific emission factor for an emission unit should be used by the permittee for purposes of determining compliance with Condition I of the permit.  As discussed above in EPA response to Comment 28, data used to establish a PAL, such as an emission factor, shall be deemed to be re-validated if the difference between the initial data and the validation data is not statistically significant. We can apply the same approach for validation testing to determine a site-specific factor within 6 months. If the validation data is not statistically different from the initial data, then no update to the emission factor derived from the initial data is required. If the validation data are statistically different from the initial data, then the PAL shall be updated using the validation data-based emission factor. It does not appear that the commenter is asking for a change to the draft permit language in Condition III.A.3.c, however, EPA revised the condition to clarify the validation testing for existing, modified and new units.  EPA also added a new Condition III A.3.d to define a statistically significant difference as less than 95% confidence level. In the event that validation testing produces a result that is statistically significant, i.e., less than 95% confidence level of the prior emission factor, the updated emission factor shall be reported in the semi-annual report as required by Condition VII.A.7 and used for determining future emissions for that emission unit for purposes of determining compliance with the applicable PAL. EPA made changes to Condition III.A.3.c and added Condition III.A.3.d to clarify this issue.

**Comment No. 30**.
In addition, and separately, this condition in the draft PAL permit must be revised in order to be consistent with the underlying regulation at 40 CFR § 52.21(aa)(12)(vi)(*c*). Specifically, the condition must be revised to clarify that testing is not required for those emissions units and

pollutants for which testing within the specified timeframe is not practicable or for which EPA determines testing is not required.

**Response 30**

EPA agrees that subsection 40 CFR § 52.21(aa)(12)(vi)(*c*) includes the terms "if technically practicable" and "unless the Administrator determines that testing is not required." However, the presumption is that validation testing shall be conducted to determine a site-specific emission factor for a unit within 6 months of PAL permit issuance. EPA will, however, review and determine, on a case by case basis, a request to either exempt or delay the testing of a particular unit based on a demonstration by the Permittee of technical practicability. EPA has added a new condition, III.A.3.e, to the final permit to address this comment.

**Comment No. 31.**

Condition III.B of the draft PAL permit, to the extent that it could be construed to apply to existing emissions units listed in the Appendix to the draft PAL permit other than in situations where the unit has been modified in a manner that would require a change in monitoring approach, is not authorized by the PAL provisions of the PSD rule, is inappropriate, and is inconsistent with Condition III.A of the draft permit. To be consistent with Condition III.A of the draft PAL permit, Limetree Bay suggests this condition be revised to read as follows:

For ~~each new and modified unit and other monitoring changes at the units already~~ (1) any new emissions unit that is not included in the Appendix to this permit; (2) any modification to an emissions unit listed in the Appendix to this permit that requires a change in monitoring; and (3) any future monitoring changes to emissions units listed in the Appendix to this permit, the Permittee shall, in accordance with the semi-annual report requirements of Section VII of this Permit, submit to EPA the specific monitoring method for that emissions unit, including formulas and calculation methods, along with a proposed amendment to the Appendix to this permit.

**Response 31**

EPA agrees to clarify its intent to apply Condition III.B to emissions units contemplated in Condition III.A. Therefore, EPA has revised Condition III.B accordingly.

**Comment No. 32**.

Condition III.E of the draft PAL permit inappropriately, and without authority in the underlying regulation, would require calculations of actual emissions using emission factors for all "emissions units that do not use CEMS or CPMS/PEMS." This would appear to include emissions units for which mass balance calculations are used pursuant to Condition III.A.4 of the draft PAL permit. Condition III.E must be revised to clarify that calculations of actual emissions using emission factors are required only for emissions units and pollutants for which CEMS, CPMS, PEMS, and mass balance calculations are not in use.

**Response 32**

Pursuant to 40 CFR § 52.21(aa)(12)(ii)(*a*), mass balance calculations are acceptable for activities using coatings or solvents. Therefore, EPA agrees with the comment and has revised the language of Condition III.E as follows:

"The emissions units that do not use CEMs, CPMS/PEMS or mass balance calculations to monitor emissions shall use emission factors to calculate the actual emissions on a monthly basis according to the requirements below."

**Comment No. 33**.

Condition III.E.1 of the draft PAL permit, which would require Limetree Bay to "record the operational data necessary to calculate emissions of the PAL pollutants, at a minimum, on a weekly basis," is inconsistent with the underlying regulation at 40 CFR §§ 52.21(aa)(7)(vi) and (aa)(13)(i), is inappropriate, and would conflict with numerous other provisions of the draft PAL permit. For example, Condition IV.Q of the draft PAL permit would require recording the mileage of each vehicle "on a monthly basis." This monthly recording is sufficient to satisfy the requirement for calculating monthly emissions from vehicle from plant roads; more frequent documentation of vehicle mileage is superfluous, as intra-month records would be of no use in calculating monthly emissions, and thus a more frequent recordkeeping requirement would be arbitrary and capricious. Condition III.E.1 of the draft PAL permit must be revised to require recordkeeping as necessary to perform monthly emission calculations as mandated by 40 CFR § 52.21(aa)(13)(i). Condition III.E.2., to the extent that it contemplates reliance on "weekly" data per Condition III.E.1., must be revised on the same basis.

**Response 33**

EPA first notes that Condition III.E.1 in the draft permit (now changed to III.E) is a general condition and as such any unit-specific monitoring frequency requirements will supersede this general condition. Weekly monitoring and recording of emissions is not inconsistent with 40 CFR § 52.21(aa)(7)(vi) which requires the permittee to "convert the monitoring system data to monthly emissions and annual emissions based on a 12-month rolling total" (emphasis added). Thus, the conversion is to monthly and annual emissions, but the regulation does not prescribe the frequency of monitoring and recording. Even if it did specify that the monitoring and recording is to be performed monthly, 40 CFR §52.21(aa)(7) specifies the "minimum" requirements for the contents of the PAL permit so EPA could nonetheless require weekly recording. We do note some lack of clarity in the language of Condition III.E.1 in the draft permit regarding the distinction between calculation and monitoring/recording. As such, EPA has revised Condition III.E.1 (now III.E) as follows:

"The Permittee shall perform monthly calculations using the best available emission factor based on stack or performance test data, vendor information, design/engineering calculations, or literature. Unless a different time period is required in Section IV of this permit, the Permittee shall monitor and record, at a minimum on a monthly basis, the operational data necessary to calculate monthly and annual emissions of the PAL pollutants."

**Comment No. 34.**

Condition III.E.3 of the draft PAL permit must be deleted because it is redundant of Conditions III.A.3. and V of the draft PAL permit. If Condition III.E.3. is retained, it should cross-reference Condition V as Condition III.A.3. does, by including the language "in accordance with Section V of this PAL permit", including the extension of the 6-month deadline to complete testing in Comment No. 4.

**Response 34**

EPA agrees that Condition III.E.3 is redundant of Condition III.A.3 because III.A.3 also applies to new units, modified units that require a monitoring change, and future monitoring changes to units listed in the Appendix to this permit. EPA has therefore deleted Condition III E.3.

===================================================================
**Comments from Limetree Bay Refining and Limetree Bay Terminals –
Section IV – Specific Monitoring Requirements**
===================================================================

**Comment No. 35.**

To the extent that Conditions IV.A and IV.A.1 of the draft PAL permit would require use of CEMS to determine SO2 emissions from open flares other than the LPG flare, Conditions IV.A and IV.A.1 of the draft PAL permit, including Table B-1, must be revised to eliminate such requirement. It is not feasible to use a CEMS to quantify emissions from an open flare because the SO2 emissions are created in the open atmosphere and are never present in a pipe or duct as would be required by Performance Specification 2 in appendix B to 40 CFR part 60.

The appropriate monitoring to determine SO2 emissions from open flares other than the LPG flare is the monitoring already required by 40 CFR § 60.107a(e). EPA may not require redundant and unnecessary monitoring as such requirement would be an arbitrary and capricious use of EPA's authority. "SO2 emissions of the gases being flared" are already regulated under NSPS Subpart Ja. NSPS Subpart Ja (40 CFR § 60.107a(e)) requires monitoring for SO2 emissions, flow, heat content and speciation of the gases flared. If the LPG flare is returned to service, SO2 emissions would be calculated using an emission factor as specified in the rule because the flare gases would meet the definition of "inherently low in sulfur," and would not be subject to continuous monitoring requirement. 40 CFR § 60.107a(b).

**Response 35**

The PAL regulations do not limit the PAL permit monitoring conditions to only the monitoring methods set forth in the New Source Performance Standards.  Therefore, EPA does not agree that any conditions that are not identical to the NSPS requirements are arbitrary and capricious. However, EPA agrees that SO2 emissions from an open flare must be monitored by calculations as required in NSPS Subpart Ja, 40 CFR § 60.107a(e), since such emissions are not exhausted through a pipe or duct. With regard to the LPG flare, Limetree is correct that 40 CFR § 60.107a(b) provides for an exemption from the otherwise applicable monitoring requirements if the fuel gases meet the criteria in 40 CFR § 60.107a to be considered "inherently low in sulfur." Because SO2 emissions may be monitored via calculation instead of CEMS, EPA has revised Conditions IV.A. and IV.A.1 to clarify that CEMS are not required to monitor SO2 emissions from an open flare or LPG flare (if the fuel gas meets the exemption in 40 CFR § 60.107a(b)).

**Comment No. 36.**

Table B-1 of Condition IV.A. of the draft PAL permit should be removed because it is redundant of the text of IV.A and includes the same errors as Condition IV.A.  If it remains in the PAL permit it must be revised to 1) list the affected facility/flare by name, which includes the FCCU Low Pressure Flare, FCCU High Pressure Flare, LPG Flare, and Flares 2, 3, 5, 6 and 7, as each of the flares is an affected facility under NSPS Subpart Ja; 2) revise the heading of the second column in Table B-1 to say "Parameter" rather than "Pollutant" because although H2S concentration of flared gases is required to be monitored to determine SO2 emissions from the flares, H2S is the parameter being monitored, not the "pollutant"; 3) revise the parameter for the flares to be "H2S" rather than "SO2" and the monitoring by to be "CPMS" rather than "CEMS", because as discussed above, SO2 emissions from open flares cannot be monitored with a CEMS; and 4) revise the LPG Flare to "not applicable" because the flare gases would meet the definition

of "inherently low in sulfur." Below is an updated and corrected Table B-1, to correct errors as reflected in red font.

**Response 36**

EPA retains Table B-1 as a summary table for the requirements in Condition IV.A. However, EPA agrees with the changes to Table B-1 as suggested by Limetree: 1) List the name of each flare and its affected facility/location the same way such information was provided in the application by Limetree; 2) Replace "Pollutant" with "Parameter" to avoid confusion that SO2 is the criteria pollutant being monitored; 3) Change the parameter monitored from "SO2" to "H2S" and "CEMS" to "CPMS." This change is appropriate as explained in Response 35 that SO2 emissions from an open flare cannot be monitored by a CEMS. Table B-1, which was revised as discussed above, has been renamed "Table IV-A-1."

**Comment No. 37.**

Condition IV.A.2 of the draft PAL permit, relating to monthly emissions calculations for flares, provides as follows:

The NOx, CO, PM/PM10/PM2.5, and VOC emissions shall be calculated on a monthly basis using the emission factors described in AP-42, Volume I, Chapter 13.5 except where there is a site-specific emission factor in Table B-2, below. In the event that the methodology in AP-42 is superseded by a more recent edition or editions of AP-42, the permittee shall use the most recent edition to calculate the NOx, CO, PM, PM10, PM2.5, and VOC emissions.

The second sentence of this provision is inappropriate both because it is ambiguous and because it would create inconsistencies between the calculation methods used to establish the PALs and those used for compliance demonstration. It is ambiguous because it is unclear whether the purported requirement to use a new emission factor, which EPA has unilaterally selected without a required rulemaking process, subsequent to issuance of the PAL permit, is applicable to a flare and pollutant for which there is a site-specific emission factor listed in Table B-2 of the draft PAL permit.

**Response 37**

This comment is addressed in EPA Response to Comments 6b and 6c and the general conditions added to the permit in Conditions II.M and II.N. Consistent with EPA's Response to Comments 6b and 6c, EPA has deleted the last sentence of Condition IV.A.2.

**Comment No. 38. Table B-2 of Condition IV.A. Proposed Modifications**

The second row of Table B-2 of the draft PAL permit (SO2) must be deleted because it is superfluous and potentially misleading. No condition of the draft PAL permit suggests use of an emission factor approach to calculate actual SO2 emissions from the flares (with the exception of the LPG flare); instead, as discussed above, monitoring of flare gas composition will be used to determine SO2 emissions pursuant to Conditions IV.A and IV.A.1 of the draft PAL permit, which should refer to NSPS Subpart Ja and RSR monitoring requirements.

In the third through eighth rows of Table B-2 of the draft PAL permit, the following language appears in the fourth column: Monitor heat input to flare and other parameters necessary to calculate emissions, at a minimum, on a weekly basis.

This language is ambiguous and must be revised to clarify that only monitoring, not emissions calculations, is required at a frequency greater than once per month. As provided by Condition I

and Condition II.D of the draft PAL permit, emission calculations are required on a monthly basis. Because the prescribed frequency of calculating source-wide actual emissions is monthly, a requirement to perform more frequent emissions calculations for flares would be arbitrary, capricious, and unjustified.

We suggest the following:

Monitor heat input to flare and other parameters at a minimum, on a weekly basis, necessary to calculate monthly emissions.

In the last row of Table B-2 of the draft PAL permit, the proposed emission factor for VOC must be removed. VOC emissions must instead be calculated based on flare gas speciation and a 98 percent destruction efficiency.

**Response 38**
EPA agrees with the comment that the SO2 emissions from a flare will be calculated in accordance with the NSPS Subpart Ja requirements. As explained in Response 35, SO2 emissions from open flares are appropriately calculated by continuous monitoring and recording of the sulfur concentration in the gas discharged to the flare, as required in NSPS Part 60, Subpart Ja. Therefore, the second row of Table B-2 (which has been renamed Table IV-A-2) is revised to include the NSPS citation. EPA agrees with Limetree that the language in the "Monitoring Parameters" column of Table B-2 (which has been renamed Table IV-A-2) can be read as requiring Limetree to monitor and calculate emissions on a weekly basis. EPA hereby clarifies that the "Monitoring Parameters" column of Table B-2 (renamed Table IV-A-2) for NOx, CO, PM, PM10, PM2.5 and VOC is intended to require Limetree to monitor these pollutants weekly and to calculate the emissions on a monthly basis. EPA has revised this column accordingly.

With regard to the emission factor for VOC, EPA agrees that speciation of a sample of the flare gas will provide more accurate information about the chemical constituents of the flare gas to be combusted. Regarding the assumption of a 98% destruction efficiency, which is achievable when the flares are operated and maintained in compliance with the applicable flaring requirements in 40 CFR § 60.18(b) and with good air pollution control practices for minimizing emissions, EPA agrees this assumption is appropriate provided that Limetree complies with these applicable flaring requirements for the duration of the relevant monitoring periods. EPA revised Table B-2 as discussed above and renamed it as "Table IV-A-2."

**Comment No. 39.**
Condition IV.B.1. would require the calculation of VOC emission from each tank "at a minimum, on a weekly basis". As provided by Condition I. and Condition II.D. of the draft PAL permit, emission calculations are required on a monthly basis. Because the prescribed frequency of calculating source-wide actual emissions is monthly, a requirement to perform more frequent emissions calculations for flares would be arbitrary, capricious, and unjustified.

We suggest the following changes to Condition IV.B.1.:
The VOC emissions from each tank's working and standing losses as well as roof landing and filling losses shall be calculated, ~~at a minimum on a weekly basis~~, using the methodology in the most recent edition of AP-42, Chapter 7.

**Response 39**

EPA does not agree that weekly calculations would be arbitrary and capricious. However, as discussed in EPA Response to Comments 10 and 33, there is a distinction between the frequency of calculation and the frequency of monitoring and recording and we agree that calculations under Condition IV.B.1. should be consistent with that in Condition II.D requiring monthly emission calculation. Therefore, EPA revised Condition IV.B.1 to require monthly calculation of VOC emissions.

**Comment No. 40**

To the extent that the last sentence of Condition IV.B.1. of the draft PAL permit would require supersession of the predictive emission factor equations used to determine baseline actual VOC emissions and to use the most recent edition of AP-42, Chapter 7, it is inappropriate because it would create arbitrary inconsistencies between the calculation methods used to establish the PAL and those used for compliance demonstration. If, in the context of periodic review of information it publishes in AP-42 or otherwise, EPA determines that one of the predictive emission factor equations used to establish the PAL in the PAL permit issued to Limetree Bay is erroneous, this must be addressed through the process established by 40 CFR § 52.21(aa)(8)(ii)(*a*)(*1*). Accordingly, the last sentence of Condition IV.B.1. of the draft PAL permit must be omitted from the final permit.

**Response 40**

EPA agrees with this comment that the same calculation method should, in this case, be used for establishing the PAL and demonstrating compliance with the PAL. If necessary, any AP-42 revised emission factors will need to be addressed pursuant to the process established by 40 CFR § 52.21(aa)(8)(ii)(*a*)(*1*). EPA, therefore, deleted the last sentence of Condition IV.B.1. See also EPA response to comments 6b and 6c and the general conditions added to the permit in Conditions II.M and II.N.

**Comment No. 41.**

In Condition IV.B.2., EPA would require the use of AP-42, Chapter 11 for CO and PM emissions. The emission factor used to demonstrate compliance should match the method in the permit application, which used David C. Trumbore vapor correlations for asphalts, as published in 1999 Environmental Progress Vol 18, "Estimates of Air Emissions from Asphalt Storage Tanks and Truck Loading", Asphalt Technology Laboratory. Owens Corning, Summit, IL. Limetree Bay suggests the following changes to Condition IV.B.2.:

The CO and PM emissions from each tank storing asphaltic materials shall be calculated monthly using the procedures in the most recent edition of AP-42, Chapter 11 as published by David C. Trumbore et all (1999). Otherwise, the CO and PM limits in the PAL permit need to match the method prescribed by EPA.

**Response 41**

EPA agrees that the emission factor used to calculate Limetree's actual emissions for establishing the PAL should, in this case, also be used to demonstrate compliance with the PAL. This emission factor was listed in Appendix B-11 of the PAL application. EPA revised Condition IV.B.2 to state that the CO and PM emissions from each tank shall be calculated according to AP-42.

**Comment No. 42.**

Condition IV.B.4. of the draft PAL permit prescribes the use of a true vapor pressure value in excess of 11.1 psia in calculating actual VOC emissions from floating roof tanks. This Condition should be removed because it could result in underestimating actual emissions, contrary to the requirements of 40 CFR § 52.21(aa)(7)(iv).

**Response 42**

EPA agrees with Limetree that although a true vapor pressure value of 11.1 psia was used in calculating the actual VOC emissions from floating roof tanks as presented in the PAL application, restricting Limetree to use a vapor pressure of 11.1 psia or higher could result in underestimating the emissions to be reported by Limetree. Therefore, EPA removed this permit condition and added new language into Condition IV.B related to actual vapor pressure. The vapor pressure of the liquid being transferred should be used in calculating the VOC emissions.

**Comment No. 43.**

The title of Section IV.C. of the draft PAL permit should be revised to clarify that this section applies only to the FCCU Catalyst Regenerator (STK-7501). Conditions IV.C.1-3. of the draft PAL permit prescribe testing, monitoring, recordkeeping, and emissions calculation requirements for a single emissions unit, the FCCU catalyst regenerator. The FCCU is a large process unit that includes multiple emissions units. Emissions units other than the FCCU catalyst regenerator are covered by other sections of the draft PAL permit, such as equipment leaks, which are covered by Condition IV.L. of the draft permit, and catalyst handling activities, which are covered by Condition IV.P. of the draft permit.

**Response 43**

EPA agrees with Limetree that the permit should label emission units with as much detail as possible to avoid confusion, especially when the FCCU is a large process unit with components subject to different applicable requirements. EPA has revised the condition to clarify that this section applies only to the FCCU Catalyst Regenerator.

**Comment No. 44.**

Condition IV.C.1. and Table C of the draft PAL permit, relating to calculation of emissions of NOX, CO, and SO2 from the FCCU catalyst regenerator, must be revised to allow determination of exhaust gas flow rate using the methods required by 40 CFR §§ 63.1564(b) and 63.1573. These calculation methods have been established by U.S. EPA as an alternative to correlations based on FCCU feed rate.

**Response 44**

The permit does not specify any method to determine the exhaust flow rate and volume. EPA accepts Limetree suggestion to specify the methods in the NESHAP regulations.  EPA added the provision allowing the permittee to determine exhaust flow rate using the methods in 40 CFR § 63.1564(b) and 40 CFR § 63.1573 and deleted reference to the FCCU feed rate from Table C because the commenter's suggested method is more accurate. Table C has been renamed to "Table IV-C-1."

**Comment No. 45.**

Condition IV.C.3. and Table C of the draft PAL permit, relating to calculation of emissions of PM, PM10, PM2.5, and VOC from the FCCU catalyst regenerator, must allow, in the alternative,

the determination of exhaust gas flow rate using the methods in 40 CFR §§ 63.1564(b) and 63.1573. In addition, with respect to PM, PM10, and PM2.5, these conditions must allow, in the alternative, emissions calculations based on coke burn rate in the catalyst regenerator, consistent with the requirements in the facility's title V operating permit.

**Response 45**
Consistent with EPA's response in Response 44, EPA revised Condition IV.C.3 and Table C to allow determination of exhaust gas flow rate using the methods in 40 CFR §§ 63.1564(b) and 63.1573. EPA also revised Condition IV.C.3 and Table C to allow for alternative calculation methods based on coke burn rate, consistent with the PSD permit. The revised Table C has been renamed to "Table IV-C-1."

**Comment No. 46.**
With respect to PM10 and PM2.5, the conditions must be revised to allow the use of particle size fractions, in conjunction with filterable PM stack test results, to determine site-specific emission factors. Specifically, because U.S. EPA has not developed or approved a test method for emissions of filterable PM10 or filterable PM2.5 from wet stacks, and has expressly prohibited the use of Method 201A for this purpose, the particle size fractions listed in Table 5-2 of U.S. EPA's *Emissions Estimation Protocol for Petroleum Refineries* may be applied. These particle size fractions, which were used to calculate baseline actual emissions from the FCCU catalyst regenerator and to establish the PALs for PM10 and PM2.5, are 0.97 for filterable PM10 and 0.80 for filterable PM2.5.

**Response 46**
EPA agrees with the comment that since EPA has not developed test methods for emissions of filterable PM10 or filterable PM2.5 from wet stacks and is not allowing Method 201 for this purpose, the particle size fractions provided by this comment and also used in estimating the baseline actual emissions from FCCU catalyst regenerator should be used to calculate the emissions for the PAL compliance purposes. Therefore, EPA revised Condition IV.C.3 accordingly. Based on comments 45 and 46, EPA has also provided alternate emissions calculation methods for PM, PM10, PM2.5 and VOC in Condition IV.C.2.

**Comment No. 47.**
In Table D-2 of Condition IV.D. of the draft PAL permit, emission factors for H-4455 (NOX), H-8501A (CO) and H-8501B (CO and PM) are incorrectly rounded. Limetree Bay suggests that the emission factors remained as proposed in the submitted PAL application, as these are the emission factors used in the calculation of the baseline actual emissions. Below is an updated and corrected Table D-2 to correct errors as reflected in red font.

**Response 47**
For the same rationale given in Response 38 above, EPA accepts Limetree request not to round off the emission factors for H-4455 (NOX), H-8501A (CO) and H-8501B (CO and PM) in Table D-2 of Condition IV.D. EPA accepted the corrected Table D-2 emission factors and has revised the permit accordingly. As per EPA Response to Comment 13, the revised Table D-2 has been renamed as "Table IV-D-2." See also EPA Response to Comment 6a.

**Comment No. 48.**

For Table E of Condition IV.D., Limetree Bay proposes to use AP-42 emission factors, as published in AP-42, Chapter 1.4, Tables 1.4-1 and 1.4-2 to reduce discrepancies in rounding. For Fuel Gas, AP-42 prescribes dividing the proposed emission factors in Tables 1.4-1 and 1.4-2, depicted in units of pounds per million standard cubic feet (lb/MMscf), by 1,020 British thermal units per standard cubic feet (Btu/scf). For No. 6 Fuel Oil, AP-42 prescribes dividing the proposed emission factors in Tables 1.3-1 and 1.3-2, depicted in units of pounds per thousand gallons (lb/Mgal), by the fuel heat input in units of million British thermal units per thousand gallons (MMBtu/Mgal). Furthermore, for No. 6 Fuel Oil, the emission factors can be simplified into a single row because the sulfur content is included as part of the affected pollutant emission factor, as applicable.  This approach ensures accurate SO2 emission calculations based on the fuel actual sulfur content. Limetree provided an updated and corrected Table E to address rounding issues and other errors with this comment.

**Response 48**

Limetree's proposal to use emission factors as published in AP-42, Chapter 1.4, Tables 1.4-1 and 1.4-2 to reduce discrepancies in rounding is acceptable because these are EPA published emission factors. EPA accepts the updated and corrected Table E (Condition IV.D emission factors) and has revised the permit accordingly. As per EPA Response to Comment 13, the revised Table E has been renamed as "Table IV-D-3."

**Comment No. 49.**

In Table F of Condition IV.E., the draft PAL permit contains an emission factor based on the higher of two stack tests for NOx and CO lbs/MMBtu, as conducted in 2009 and 2010, rather than the average of the two tests, which was used to determine baseline actual emissions. Table F should be corrected to use the average to be consistent with the calculated baseline actual emissions and to be representative of the actual emissions from the compressors. If EPA determines that one of the emission factors used to establish the PAL in the PAL permit issued to Limetree Bay is erroneous, this must be addressed through the process established by 40 CFR § 52.21(aa)(8)(ii)(*a*)(*1*). Below is a revised Table F reflecting such changes as depicted in red font.

**Response 49**

As explained in Response to Comment 40, EPA agrees that the same emission calculation method used to establish the PAL should generally be used to demonstrate compliance with the PAL. EPA accepts the updated and corrected Table F (Condition IV.E emission factors) and has revised the permit accordingly. As per EPA Response to Comment 13, the revised Table F has been renamed as "Table IV-E-1."

**Comment No. 50.**

Table G of Condition IV.E. contains the following errors and should be corrected as follows: (1) 4SRB and 4SLB are defined as spark ignition rich/lean burn and should be 4 stroke rich/lean burn; (2) the header "lb/MMBtu" in the second column is redundant and confusing and should be repositioned; (3) second and fourth row should list ≥ and not > 90% load, according to AP-42, Volume I, Chapter 3.2, Tables 3.2-2 and 3.2-3; and (4) certain emission factors were rounded up, Limetree Bay considers that the emission factors should remain as published in AP- 42 and not arbitrarily rounded.  See revised Table G, below with changes depicted in red font.

**Response 50**

EPA accepts Limetree's correction to defining "SRB" as "Spark Ignition 4 Stroke Rich Burn" and "SLB" as "Spark Ignition 4 Stroke Lean Burn" since it clarifies the types of engines Limetree uses at its plant. EPA has also corrected several typographical errors in Table G (now Table IV-E-2) and made minor adjustments consistent with AP-42, in particular, repositioning of "lb/MMBtu" in the second column, replacing " >" with " ≥" according to AP-42 in the second and fourth rows, and replacing rounded off AP 42 emission factors with original AP-42 values. As per EPA Response to Comment 13, the revised Table G has been renamed as "Table IV-E-2."

**Comment No. 51.**

For Table I of Condition IV.F., Limetree Bay proposes to use AP-42 emission factors, as published in AP-42, Vol. I, Chapter 1.4, Tables 1.4-1 and 1.4-2 to reduce discrepancies in rounding. For Fuel Gas, AP-42 prescribes dividing the proposed emission factors in Tables 1.4-1 and 1.4-2, depicted in units of pounds per million standard cubic feet (lb/MMscf), by 1,020 British thermal units per standard cubic feet (Btu/scf). For No. 6 Fuel Oil, AP-42 prescribes dividing the proposed emission factors in Tables 1.3-1 and 1.3-2, depicted in units of pounds per thousand gallons (lb/Mgal), by the fuel oil heat input in units of million British thermal units per thousand gallons (MMBtu/Mgal). Furthermore, for No. 6 Fuel Oil, the emission factors can be simplified into a single row because the sulfur content is included as part of the affected pollutant emission factor, as applicable. This approach ensures accurate SO2 emission calculations based on the fuel actual sulfur content. Below is an updated and corrected Table I to address rounding issues and other errors, as reflected in red font.

**Response 51**

Limetree's proposal in its comment to use the methods, units, factors, etc. as stated in AP-42, is accepted because these are EPA published emission factors. EPA accepts the updated and corrected Table I (Condition IV.F emission factors) and has revised the permit accordingly. As per EPA Response to Comment 13, the revised Table I has been renamed as "Table IV-F-2."

**Comment No. 52.**

Table J-3 of Condition IV.G. needs to be corrected for rounding issues in the emission factors and other errors, as shown below. Limetree Bay considers that the emission factors should remain as published in AP-42, Volume I, Chapter 3.1 and not arbitrarily rounded. For Distillate Oil, the emission factors can be simplified because the sulfur content is included as part of the affected pollutant emission factor, as applicable. For Fuel Gas/LPG, NSPS Ja has been added, as applicable. See revised Table J-3, below, with changes indicated in red font.

**Response 52**

For the same rationale given in Response 38 above, EPA accepts Limetree's request not to round off the emission factors in Table J-3 and replace them with those from AP-42, Volume I, Chapter 3.1 which includes the simplified emission factors for distillate oil and NSPS Ja for fuel gas/LNG. See also EPA Response to Comment 6a. EPA accepts the updated and corrected Table J-3 (Condition IV.G emission factors) and has revised the permit accordingly. As per EPA Response to Comment 13, the revised Table J-3 has been renamed as "Table IV-G-3."

**Comment No. 53.**
Section IV.H. of the draft PAL permit should be re-titled to "Sulfur Recovery Units (SRUs)" to reference only Sulfur Recovery Units because the regulated emissions points differ, but all are part of the SRUs.

**Response 53**
Condition IV.H, in the draft permit, titled "Sulfur Recovery Units (SRU), Beavon Units, Incinerators, Sulfur Pits." Based on the review of the application and the process flow diagram in the application, EPA notes that the sulfur recovery process area includes sulfur recovery units and other units listed in the condition title of the draft permit. In order to clarify that the emission units listed in the title of Condition IV.H are not separate emission units but are all part of the sulfur recovery plant , EPA revised the title of this condition to "Sulfur Recovery Plants (Sulfur Recovery Units, Beavon units, Incinerators, Sulfur Pits, Cooling Towers)," the same way Limetree has titled Section 6.3.4.3 of the PAL application for the sulfur recovery plants.

**Comment No. 54.**
Condition IV.H.1. of the draft PAL permit should be removed because it is inaccurate (as will be explained below) and redundant of Condition IV.H.3. with respect to the units being monitored, the methods, and the parameters.

**Response 54**
EPA reviewed Conditions IV.H.1 and IV.H.3. and agrees with the comment that IV.H.1 and IV.H.3 both refer to Sulfur Recovery Units and Beavon Units. Based on further review of the comments 55 and 56, EPA has deleted condition IV.H.1. and replaced it with the condition for SO2 monitoring requirements only for the Sulfur Recovery Units.

**Comment No. 55.**
Condition IV.H.2. of the draft PAL permit would require monitoring of "SO2 emissions for the sulfur recovery units and Beavon units using the CEMS." This provision must be revised to clarify, consistent with 40 CFR §§ 60.102a(f) and 60.106a(a), that SO2 CEMS are required only for a sulfur recovery plant with an oxidation control system or a reduction control system followed by incineration. The Beavon unit at the West Sulfur Recovery Plant is a reduction control system not followed by incineration; when the Beavon unit is in operation, no SO2 is emitted from the West Sulfur Recovery Plant, and use of an SO2 CEMS would be arbitrary, capricious, and inappropriate.

**Response 55**
EPA's requirement of SO2 emissions monitoring in Condition IV.H.2 was not arbitrary and capricious. It was based on the information Limetree provided in Section 6 – Proposed PAL Calculation Procedures – of the PAL application; Table 6-1 states that SO2 would be monitored from the East and West Sulfur Recovery Areas with the SO2 CEMS. However, EPA agrees that SO2 monitoring with a CEM is not a requirement for a Beavon unit at the West Sulfur Recovery Area because it is a reduction unit not followed by an incinerator. EPA recognizes that a Beavon Unit is a sulfur recovery device and would not have SO2 emissions except during malfunction, process overflow or maintenance shutdown. Therefore, instead of imposing the SO2 CEM requirement, the existing SO2 monitoring requirement from the Prevention of Significant Deterioration (PSD) Permit should continue to apply. EPA revised Condition IV.H.2 of the draft permit (now Condition IV.H.1 due to the deletion of the former Condition IV.H.1) by deleting

the SO2 CEM requirement and stating that monitoring of SO2 emissions from the East and West sulfur recovery areas shall be conducted in accordance with the 1997 PSD Permit. The PAL Permit includes the calculation procedures that are required to be used to calculate the SO2 emissions from those sulfur recovery areas. Table L-1 is also deleted after the revision since SO2 CEMS is the only requirement in this table. Table L-2 is now renamed "Table IV-H-1".

**Comment No. 56.**
Condition IV.H.4. should be titled "West Side Beavon Unit" to reflect that only the West Side Sulfur Plant has a Beavon Unit that would require the calculation in Condition IV.H.4. The Beavon unit at the West Side Sulfur Recovery Plant is a reduction control system not followed by incineration.

**Response 56**
Condition IV.H.4 in the draft permit is titled "Beavon Units (aka tail gas units)," reflecting the units listed in Limetree PAL application. The application lists baseline emissions for East Side Beavon Unit and West Side Beavon Unit. Limetree made the decision to permanently shut down the East Side Beavon Unit recently in response to the Consent Decree requirements so EPA agrees with this comment and has revised the Condition IV.H.4 title to "West Side Beavon Unit (aka tail gas unit)." Since Condition IV.H.1 is deleted, Condition IV.H.4 now becomes Condition IV.H.3.

**Comment No. 57.**
In Condition IV.H.4, NOX, PM, PM10 and PM2.5 come only from the RGG heater(H-1061) and should be calculated based on Condition IV.D.2 and IV.D.3, not the method in Condition IV.H.4. The heater is routed through the Beavon stack (T-1061).

**Response 57**
Based on the review of Condition IV.H.4 and Appendix B-7, EPA agrees that the equation described in Condition IV.H.4 will only apply to the calculation of CO and VOC from the Beavon Unit. The PAL application did not state that the source of NOx, PM, PM10 and PM2.5 emissions from the Beavon Unit was the RGG Heater (H-1061) which vents through the Beavon stack. Pursuant to Limetree's clarification, EPA has adjusted the language in Condition IV.H.4 (now IV.H.3) to make clear that emissions of NOx, PM, PM10, PM will be calculated based on Conditions IV.D.2 and IV.D.3, which are the permit conditions for heaters.

**Comment No. 58.**
In the equation provided in this condition of the draft PAL permit, Limetree Bay requests the term "tail gas maximum rate" be renamed as "tail gas flow rate" to clarify that it is the actual value, not the maximum design value, that is used to calculate actual emissions.

**Response 58**
EPA agrees with this comment because Condition I of the PAL permit requires the summing of "actual emissions of each emission unit" at the facility. Thus, the emissions at this unit should be based on the amount of flow during the period when the unit operated (the tail gas' actual flow rate) rather than the maximum flow rate. EPA revised the equation in Condition IV.H.4 to reflect "tail gas flow rate."

**Comment No. 59.**

The first sentence of Condition IV.H.5. of the draft PAL permit would require that Limetree Bay "monitor … drift loss factor." This requirement must be deleted, both because it is not technically feasible and because, even if it were technically feasible, it would conflict with the second sentence of this condition of the draft PAL permit, which provides that Limetree Bay "shall assume drift at 0.005% of the flow rate" for purposes of calculating emissions.

**Response 59**

EPA agrees with the comment that since this permit condition contains an equation that already assumes a drift loss factor of 0.005%, it is unnecessary to require monitoring of the drift loss factor.  Limetree used the same equation in the baseline actual emissions calculation with the 0.005% drift loss factor which EPA relied upon to establish the PAL. It is appropriate to use the same assumption (i.e., drift loss factor) to determine compliance with the PAL. EPA revised Condition IV.H.5 to delete the drift loss monitoring requirement but retained the 0.005% flow rate assumption.  Condition IV.H.5. has become IV.H.4.

**Comment No. 60.**

Condition IV.H.6. of the draft PAL permit would require that Limetree Bay monitor the hours of venting from the sulfur pits and provides an equation to be used for calculating emissions. Limetree Bay requests two clarifications in this condition of the draft PAL permit. First, the condition should be revised to clarify that the monitoring and calculation are required only for periods of direct venting to atmosphere from a sulfur pit, not to those periods when the exhaust from a sulfur pit is routed back into the process. Second, Limetree Bay requests the term "maximum venting" be renamed as "direct venting hours" to clarify that it is the actual number of hours of venting during a year, not the maximum number of hours in a year, that is used to calculate actual emissions.

**Response 60**

EPA agrees that the equation is not applicable to hours when the exhaust from all sulfur pits are routed back into the process because there will be no emissions of PM, PM10 and PM2.5 at those times. EPA has revised Condition IV.H.6. to require monitoring only for periods of direct venting to the atmosphere. We are also changing the language "MV=Maximum Venting" to "DV= Direct Venting Hours per year/pit.  Condition IV.H.6 has become IV.H.5.

**Comment No. 61.**

Table L-2 is incorrect. There are two sulfur pits on the East Side (one each for SRUs 3 and 4) and one on the West (SRUs 1 and 2). There should be a single column in the Table for SRUs 1 and 2. See revised Table L-2, below, with changes indicated in red font. (Table L-2 not included here)

**Response 61**

Table L-2 provides an emission factor for each sulfur pit that is associated with an SRU. The draft PAL permit contains four emission factors, one for SRUs 1, 2, 3, and 4; respectively. Limetree commented that this table is incorrect because the facility only has one sulfur pit for SRUs 1 and 2 (West Side) and two sulfur pits for SRUs 3 and 4 (East Side). EPA reviewed Table B-8 of Appendix B of the PAL permit application again and confirmed that there is only one sulfur pit on the West Side (SRUs 1 and 2). Therefore, EPA agrees with the comment that only

one emission factor is needed for SRUs 1 and 2. EPA revised Table L-2 to address this concern and renamed it as Table IV-H-1.

**Comment No. 62.**

Condition IV.I.2. of the draft PAL permit would require that Limetree Bay calculate actual emissions of SO2, CO, and VOC from each Platformer catalyst regeneration vent based on each unit's design capacity, prescribed emission factors, and "weekly hours of utilization." This condition of the draft PAL permit must be revised in order to remove ambiguity, to resolve internal inconsistencies, and to provide for accurate determination of actual emissions. Specifically, the reference to "weekly hours of utilization" must be revised to "annual hours of venting," because the prescribed emission factors are representative of only the infrequent and brief periods of venting during catalyst regeneration events (typically once every 2 years), not all periods of Platformer unit operation. In addition, the "Operating Hours" term in the prescribed equations must be revised in the same fashion and for the same reason.

**Response 62**

Section 6.3.4.6 (Platformer Vents) of the PAL application describes the emission calculation procedures for Platformer Vents while Table B-12 of Appendix B of the PAL application provides PTE calculations. These sections of the PAL permit did not specify whether the platformer vents were associated with catalyst regeneration, were continuous vents, or release emissions frequently. As such, the draft permit requires monitoring of weekly hours of utilization. Since Limetree clarifies that the vents are for catalyst regeneration, EPA agrees that the unit operation would not be continuous, and emissions would be infrequent. EPA therefore revised Condition IV.I.2 from "weekly hours of utilization" to "annual hours of venting" for purposes of calculation and also revised Condition IV.I.1 to require monitoring whenever the platformers are vented.

**Comment No. 63.**

Condition IV.J.2. of the draft PAL permit and Table N should be deleted in their entirety, as they are redundant; the sulfuric acid plant heaters are refinery fuel gas-fired process heaters (H-7801, H-7802, and R-7801, which vent through a common stack STK-7801) that are also covered by Conditions IV.D.2. and IV.D.3. using the factors in Table E. In the alternative, if this condition and Table N are not deleted, they must be revised in several respects. Fir st, it must be clarified that Conditions IV.D.2. and IV.D.3. of the draft PAL permit do not apply with respect to the heaters. Second, all references to the use of the emission factors in Table N of the draft PAL permit to calculate emissions from the heaters must be deleted, as these factors are not in any way representative of actual emissions from the sulfuric acid plant heaters. (Incidentally, the emission rates shown in Table N of the draft PAL permit are the emission rates measured at the sulfuric acid plant process stack during a performance test conducted in May 1998.)

**Response 63**

EPA developed Condition IV.J.2 based on its review of Section 6.3.4.7 and Table 1 of the Appendix B-13 of the PAL permit application, which was not explicit regarding how the heaters' emissions and the process emissions are routed. EPA did not include in Condition IV.D. the process heaters (H-7801, H-7802 and R-7801 and vented through STK 7801) but intended to include those heaters in Condition IV.J.2. Based on Limetree clarification, the sulfuric acid plant heaters are process heaters that fire fuel gas; as such, they are covered under Conditions IV.D.2 and 3 as well as Table E. Therefore, to avoid redundancy, EPA agrees that Condition IV.J.2 and

Table N can be deleted. EPA revised Table M-1 (now Table IV-J-1) to indicate the stack (STK-7802) to which the sulfuric acid process emissions – SO2 - are vented. EPA also revised Condition IV.J.1 to add requirements that the emissions from these heaters shall be calculated based on the default emission factors in Table E of Condition IV.D. It should be noted that Table E has been renamed as Table IV-D-3.

**Comment No. 64.**

Condition IV.L.1. of the draft PAL permit must be revised to provide for monitoring in accordance with either 40 CFR §§ 60.592 or 60.592a. Requiring adherence to the less stringent monitoring requirements of 40 CFR § 60.592 for a process unit that is subject to 40 CFR § 60.592a would be arbitrary, capricious, and inappropriate.

**Response 64**

EPA inadvertently omitted reference to 40 CFR § 60.592a. Condition IV.L.1 of the draft permit requires monitoring of process fugitive emissions in accordance with 40 CFR § 60.592. However, since this condition covers different process equipment that could be subject to either 40 CFR § 60.592 or § 60.592a, EPA agrees with Limetree that both of these NSPS requirements need to be listed in Condition IV.L.1.  EPA therefore revised Condition IV.L.1 to require compliance with 40 CFR § 60.592 for process equipment subject to 40 CFR Part 60, Subpart GGG and with § 60.592a for process equipment subject to 40 CFR Part 60, Subpart GGGa.

**Comment No. 65.**

Conditions IV.L.2. and IV.L.3. of the draft PAL permit must be revised to clarify that these provisions are not applicable to compressor seals or other equipment equipped with a closed vent system to capture and route emissions from leaks to a process or fuel gas system or to a flare or other control device, consistent with 40 CFR §§ 60.592a, 60.482-4a(c), and 60.482-3a(h).

**Response 65**

Conditions IV.L.2. and IV.L.3. apply to process fugitive emissions.  EPA understands that fugitive emissions are emissions that are not captured or routed back to the process or are emitted from sealed equipment. Therefore, EPA has revised Condition IV.L.2 as requested by Limetree to include reference to 40 CFR §§ 60.592a, 60.482-4a(c), and 60.482-3a(h). Revision to Condition IV.L.3 is not necessary because it refers back to Condition IV.L.2.

**Comment No. 66.**

In order to improve clarity, Limetree Bay requests that Condition IV.L.2.b. of the draft PAL permit be revised to clarify the meaning of the term "unmonitored." Without clarification, this term could be construed as including components that are subject to instrumental monitoring requirements (i.e., "monitored components") but were not monitored during a particular time period. The term "unmonitored," as defined in the PAL permit application and as used in the draft PAL permit, includes only components that are not subject to instrumental monitoring requirements such as components in heavy liquid service and other components that are exempt from monitoring requirements.

**Response 66**

EPA agrees with this comment because the intent of IV.L.2 is to distinguish components that are subject to monitoring from those that are not for purposes of emissions calculations.

**Comment No. 67.**

Condition IV.L.3. must be revised to delete the reference to Table P and to refer instead to Condition IV.L.2. because only Condition IV.L.2. of the draft PAL permit provides the methodologies for calculating monthly emissions from monitored and unmonitored components.

**Response 67**

EPA has deleted Condition IV.L.3 because, in order to comply with Condition I of the PAL permit, the permittee must determine monthly emissions from emission units addressed in Condition II.L. EPA also renamed Table P as Table IV-L-1.

**Comment No. 68.**

In the fourth row of Table P of the draft PAL permit, the emission factor for VOC from valves in heavy liquid service must be changed to 0.0005 lb/hr/component. This is consistent with the emission factor used to calculate baseline actual emissions from equipment leaks and to establish the PAL for VOC, and with U.S. EPA's most current Protocol for Equipment Leak Emission Estimates published emission factor. In addition, in the eighth row of this table, the control efficiency for connectors in heavy liquid service should be 0% rather than 30%.

**Response 68**

This is a typographical error. EPA corrected the emission factor for valves in heavy liquid service from 0.005% to 0.0005% and the connectors' control efficiency from 30% to 0%.

**Comment No. 69.**

The first sentence of Condition IV.M.1. of the draft PAL permit must be revised to clarify that the requirements for monitoring of "process drains and junction boxes within the Oily Wastewater Collection System" are separate and distinct from the requirements for monitoring of "variable parameter input data including but not limited to stream flows and compositions for the Advance Wastewater Treatment Plant."  The former requirements relate only to process drains, for which emissions will be calculated in accordance with Condition IV.M.2. The latter requirements relate only to emissions from the Advanced Wastewater Treatment Plant, for which emissions will be calculated in accordance with Conditions IV.M.3. and IV.M.4. As written, this draft permit condition could be construed to suggest that the "variable parameter input data" are among the items that must be visually inspected.

**Response 69**

EPA intended Condition IV.M.1 to have two separate requirements for monitoring – one for the oily wastewater collection system and the other for the Advanced Wastewater Treatment Plant – because they are very different systems.  In order to provide clarification sought by this comment, EPA changed Condition IV.M.1 so that the requirements for the oily wastewater system and the Advanced Wastewater Treatment Plant are clearly separate.

**Comment No. 70.**

Condition IV.M.1. of the draft PAL permit would require weekly and monthly observations and monitoring. Both references should be removed and replaced with monitoring in accordance with NESHAP Subpart FF, in accordance with the frequencies specified in 40 CFR §§ 61.346-354. The PAL does not necessitate imposing redundant monitoring in order to ensure compliance with the PAL and monitoring in accordance with NESHAP Subpart FF is adequate to demonstrate compliance.

**Response 70**

EPA authority under the PAL provisions of 40 CFR § 52.21 are not limited to the requirements in the NESHAP. Limetree is subject to the NESHAP Subpart FF monitoring frequency requirements for the wastewater area of the plant in addition to the PAL permit requirements. Although the draft PAL permit did not include reference to NESHAP Subpart FF, compliance with either NESHAP Subpart FF or the language in the draft permit would provide sufficient monitoring of the oily wastewater collection system and treatment plant. Therefore, EPA agrees with the comment to impose the NESHAP Subpart FF requirements instead of the monitoring requirements in Condition IV.M.1 of the draft PAL permit for monitoring this wastewater processing and treatment area.  EPA revised Condition IV.M.1 to require compliance with the monitoring provisions of NESHAP Subpart FF and deleted the original language.

**Comment No. 71.**

Conditions IV.M.2. and IV.M.3. of the draft PAL permit would require that Limetree Bay determine fugitive VOC emissions from certain equipment and activities associated with wastewater treatment. Limetree Bay suggests deleting the word "fugitive" from each of these conditions of the draft PAL permit in order to clarify that all emissions, including both fugitive and non-fugitive, must be quantified.

**Response 71**

EPA agrees with this comment that clarification is needed to ensure that both fugitive and non-fugitive VOC emissions from wastewater area activities need to be determined.  As Conditions IV.M.3 and IV.M.4 (commenter mistakenly pointed to Conditions IV.M.2 and IV.M.3) are written in the draft permit, they might imply that only fugitive emissions need to be determined. EPA revised Conditions IV.M.3. and IV.M.4. to address this comment by deleting the word "fugitive" as appropriate.

**Comment No. 72.**

Condition IV.O.1. of the draft PAL permit must be revised to clarify that monitoring of vapor pressure and molecular weight of materials loaded and monitoring of ambient conditions are required only if Limetree Bay elects to calculate VOC emissions from the marine loading operations using a method other than the default emission factors in Table Q as provided by Condition IV.O.2. In addition, Condition IV.O.1. of the draft PAL permit must be revised to clarify that Limetree Bay can use vapor pressure and molecular weight data for materials loaded based on Safety Data Sheets rather than on-site sampling and analysis.

**Response 72**

Based on the review of the pertinent Section 6.3.4.12 (Marine Loading) of the PAL application that provides the calculation procedures for the emissions from this area and Table B-20 of the Appendix B of the permit application, EPA agrees with this comment that vapor pressure and molecular weight data in Condition IV.O.1 are only needed if the permittee chooses to calculate emissions based on the first option provided in Condition IV.O.2, specifically, using the procedures outlined in Chapter 5.2 of AP-42.  If the more representative option is the second option in Condition IV.O.2, using the default emission factors in Table Q (renamed as "Table IV-O-1"), then the permittee would need to monitor and record the throughput in gallons from the loading area and use that amount in calculating the VOC emissions.  EPA also agrees with the comment that if the first option is more representative, vapor pressure and molecular weight

data from the Material Safety Data Sheet would be an acceptable practice for obtaining these data. It would not be necessary for Limetree to repeat similar sampling and analysis on-site to obtain such data. EPA revised Condition IV.O.1 accordingly.

**Comment No. 73.**
To the extent that the second sentence of Condition IV.O.2. of the draft PAL permit would require supersession of the predictive emission factor equations used to determine baseline actual VOC emissions and to establish the VOC PAL listed in Table A of the draft PAL permit, it is inappropriate because it would create arbitrary inconsistencies between the calculation methods used to establish the VOC PAL and those used for compliance demonstration. If, in the context of periodic review of information it publishes in AP-42 or otherwise, EPA determines that one of the predictive emission factor equations used to establish the VOC PAL in the PAL permit issued to Limetree Bay is erroneous, this must be addressed through the process established by 40 CFR § 52.21(aa)(8)(ii)(*a*)(*1*). Accordingly, the second sentence of Condition IV.O.2. of the draft PAL permit must be omitted from the final permit.

**Response 73**
EPA agrees with the comment that the AP-42-based procedures and emission factors that Limetree used in calculating the baseline actual emissions to establish the PAL should continue to be used in calculating the future emissions for compliance with the PAL. The permittee will not be required to use the revised AP-42 procedures or factors for emission calculations to demonstrate compliance unless the permit is reopened under 40 CFR § 52.21(aa)(8)(ii)(*a*)(*1*) to revise the PAL to include the new emission factor. See also EPA Response to Comments 6b and 6c and the general conditions added to the permit in Sections II.M and II.N. EPA deleted the second sentence of Condition IV.O.2 to eliminate the requirement to use the most recent edition of the AP-42.

**Comment No. 74.**
Condition IV.O.4. of the draft PAL permit must be revised to allow for use of the best, most current data available, such as unit-specific emission factors based on unit-specific performance testing.

**Response 74**
Condition IV.O.4 (now IV.O.3) pertains to thermal oxidizer emission calculations. Since the oxidizer is a new unit and did not exist during the baseline years, it is normal practice for the Permittee to use the manufacturer's provided equation and emission factors to initially calculate the VOC PTE emissions as Limetree did in this case. However, it would also be appropriate for the permittee to develop a unit-specific emission factor based on the best and most current data available after the thermal oxidizer begins operation as Limetree commented here. A unit-specific factor will be more representative of the unit's actual emissions. Therefore, EPA revised Condition IV.O.4 (now IV.O.3) to provide this option.

**Comment No. 75.**
In condition IV.O.4., the equation term "GL" should be corrected to units of thousand gallons per day (Mgal) for the units in the proposed equation to balance.

**Response 75**

While using the term "GL" (gallons) to determine VOC emissions is not incorrect, EPA agrees that using Mgal (thousand gallons) would help balance the equation without further conversion. Therefore, EPA changed "GL" to "Mgal" in the equation in Condition IV.O.4. (Now IV.O.3)

**Comment No. 76.**

The equation provided in Condition IV.O.4 allows for the calculation of NOx, CO, PM, PM10, PM2.5 and SO2 emissions from the thermal oxidizer, the condition needs to be revised, to incorporate the appropriate equation for VOC emissions.

**Response 76**

EPA reviewed this comment and the Appendix B of the PAL application and agrees that an equation for VOC emission calculation needs to be added because it was inadvertently omitted from the draft permit. The equation for calculating the emissions for other pollutants in Condition IV.O.4 (now IV.O.3) remains unchanged.

**Comment No. 77.**

Condition IV.P.1. would require moisture content monitoring for Coke, Sulfur and FCC Catalyst and any other solids handling on a weekly basis. Based on process knowledge Limetree Bay believes that monthly monitoring should be sufficient to accurately estimate emissions of particulates from these activities, and requests condition IV.P.1. to remove the requirement for weekly monitoring, which will be unduly burdensome.

**Response 77**

EPA reviewed the PM PTE from this area as provided in Appendix B (B-21, B-22 and B-23) of the PAL application and notes that the PM emissions from this solids handling area is a small fraction of the total PM since this activity occurs only on an as-needed basis. Therefore, EPA finds it acceptable to monitor the moisture content from the material handling area on a monthly basis.  EPA revised Condition IV.P.1 to change weekly monitoring to monthly monitoring for the moisture content.

**Comment No. 78.**

Condition IV.P.1. would require monitoring of moisture content, pile areas and wind speed, which are needed to calculate emissions using the equations in AP-42, Chapter 13.2, even though Condition IV.P.2. allows use of the default emission factors in Tables R, S & T. We request that Condition IV.P.1. be amended so that Permittee is not required to collect this information if it does not rely on the equations in AP-42, Chapter 13.2.

**Response 78**

Condition IV.P. – Material Handling - gives an option to Limetree to either use AP-42 method or the default emission factors. If Limetree uses the default emission factors provided in the PAL permit, there is no need to monitor moisture content, pile areas or wind speed. Monitoring of these parameters is only required if Limetree were to use the equations outlined in AP-42, Volume I, Chapter 13.2.  EPA agrees that Condition IV.P.1 needs clarification on the requirements of these monitoring choices. EPA revised Condition IV.P.1 accordingly.

**Comment No. 79.**
Condition IV.P.2. of the draft PAL permit must be revised to allow the use of the emission factor and control efficiency used to calculate baseline actual emissions of PM, PM10, and PM2.5 from wind erosion at the sulfur stockpiles to establish the PALs for these pollutants listed in Table A of the draft PAL permit. As referenced in Appendix B-21 of the PAL permit application, the emission factor for sulfur stockpiles is 3.5 lbs per acre per day and the control efficiency is 30 to 50 percent, based upon data provided in *Development of Emission Factors for Fugitive Dust Sources* (EPA-450/3-74-037), U.S. EPA, June 1974, and CHEER (Coal Handling Emissions Evaluation Roundtable) Workshop, TNRCC (May 16, 1995). If EPA has determined that this emission calculation methodology is not acceptable, the PALs listed in Table A of the draft PAL permit must be revised to reflect the emission calculation methodology prescribed by EPA.

**Response 79**
EPA agrees that the methodology used in calculating the baseline actual emissions and establishing the PAL should be used to demonstrate compliance with the PAL in this case. EPA confirmed that the uncontrolled emission factor and the corresponding control efficiency and wind erosion loss used to calculate baseline actual emissions of PM, PM10, and PM2.5 at the sulfur stockpiles and to establish the PAL for these pollutants were listed in Appendix B-21 of the PAL application as 3.5 lbs/acre/day and 30-50%, respectively. Based on EPA's review of Appendix B-21 of the PAL application which lists the PTE for all pollutants, the calculation method and the emission factor/control efficiency used for the baseline particulate emissions calculations were based on the publication referenced in this comment. Therefore, EPA agrees that these references: 1) Development of emission Factors for Fugitive Dust Sources (*Sources* (EPA-450/3-74-037), U.S. EPA, June 1974; and 2) Coal Handling Emissions Evaluation Roundtable (CHEER) Workshop, TNRCC (May 16, 1995) should be added as alternative methods for the calculation of PM, PM10 and PM2.5 emissions associated with the handling of Coke, Sulfur and FCC catalyst in Condition IV.P.2.  EPA revised Condition IV.P.2 to allow the use of those data to be consistent with Limetree's method in estimating the baseline emissions.

**Comment No. 80.**
Condition IV.P.2. of the draft PAL permit must be revised to allow the use of the control efficiency used to calculate baseline actual emissions of PM, PM10, and PM2.5 from sulfur conveyors and to establish the PALs for these pollutants listed in Table A of the draft PAL permit. As referenced in Appendix B-21 of the PAL permit application, the control efficiency for rain covers on conveyors is 50 percent, based upon data provided in CHEER (Coal Handling Emissions Evaluation Roundtable) Workshop, TNRCC (May 16, 1995). If EPA has determined that this emission calculation methodology is not acceptable, the PALs listed in Table A of the draft PAL permit must be revised to reflect the emission calculation methodology prescribed by EPA.

**Response 80**
EPA agrees that the methodology used in calculating the baseline actual emissions and establishing the PAL should be used to demonstrate compliance with the PAL in this case. EPA confirmed that the control efficiency used to calculate the baseline actual and PTE emissions of PM, PM10, and PM2.5 for the rain covers on sulfur conveyors and to establish the PAL for these pollutants was listed in Appendix B-21 of the PAL application as 50%.  Based on the review of the calculation method and the emission factor/control efficiency used for the PTE and the baseline particulate emissions calculations (Appendix B-21), EPA revised Condition IV.P.2 to

allow the use of those data to be consistent with Limetree's method in estimating the baseline emissions.

**Comment No. 81.**

Condition IV.P.2. of the draft PAL permit must be revised to allow the use of the control efficiency used to calculate baseline actual emissions of PM, PM10, and PM2.5 from coke conveyors and to establish the PALs for these pollutants listed in Table A of the draft PAL permit. As referenced in Appendix B-22 of the PAL permit application, the control efficiency for full enclosures is 90 percent, based upon data provided in CHEER (Coal Handling Emissions Evaluation Roundtable) Workshop, TNRCC (May 16, 1995). If EPA has determined that this emission calculation methodology is not acceptable, the PALs listed in Table A of the draft PAL permit must be revised to reflect the emission calculation methodology prescribed by EPA.

**Response 81**

EPA agrees that the methodology used in calculating the baseline actual emissions and establishing the PAL should be used to demonstrate compliance with the PAL in this case. EPA confirmed that the control efficiency used to calculate baseline actual emissions of PM, PM10, and PM2.5 from coke conveyors with full enclosures and to establish the PALs for these pollutants was listed in Appendix B-22 of the PAL application as 90%. Based on the review of the calculation method and the emission factor/control efficiency used for the PTE and the baseline particulate emissions calculations (Appendix B-22), EPA revised Condition IV.P.2 to allow the use of those data to be consistent with Limetree's method in estimating the baseline emissions.

**Comment No. 82.**

Condition IV.P.2. of the draft PAL permit must be revised to allow the use of an emission factor based on exhaust gas flow and concentration to calculate emissions of PM, PM10, and PM2.5 from dust collectors associated with coke handling operations, consistent with the approach used to calculate baseline actual emissions of and to establish the PALs for these pollutants listed in Table A of the draft PAL permit. As referenced in Appendix B-22 of the PAL permit application, the assumed exhaust gas concentration for the dust collectors currently in place is 0.005 grains per dry standard cubic foot of exhaust. If EPA has determined that this emission calculation methodology is not acceptable, the PALs listed in Table A of the draft PAL permit must be revised to reflect the emission calculation methodology prescribed by EPA.

**Response 82**

EPA agrees that the methodology used in calculating the baseline actual emissions and establishing the PAL should be used to demonstrate compliance with the PAL in this case. EPA reviewed Appendix B-22 of the PAL application and confirmed that the emission factor used to calculate the emissions of and to establish the PALs for PM, PM10, and PM2.5 from dust collectors associated with coke handling operations was 0.005 grains per dry standard cubic foot of exhaust gas. Based on EPA's review of the calculation method and the emission factor/control efficiency used for the PTE and the baseline particulate emissions calculations as they appear in Appendix B-22, EPA agrees to include in Table S (which EPA renamed as Table IV-P-2) 0.005 grains per dry standard cubic foot of exhaust gas as the emission factor for the dust collectors. EPA revised Condition IV.P.2 to allow the use of those data to be consistent with Limetree's method in estimating the baseline emissions.

**Comment No. 83.**

To the extent that the third sentence of Condition IV.P.2. of the draft PAL permit would require supersession of the predictive emission factor equations used to determine baseline actual emissions and to establish a PAL listed in Table A of the draft PAL permit, it is inappropriate because it would create arbitrary inconsistencies between the calculation methods used to establish the PALs and those used for compliance demonstration. If, in the context of periodic review of information it publishes in AP-42 or otherwise, EPA determines that one of the predictive emission factor equations used to establish a PAL in the PAL permit issued to Limetree Bay is erroneous, this must be addressed through the process established by 40 CFR § 52.21(aa)(8)(ii)(*a*)(*1*). Accordingly, the third sentence of Condition IV.P.2. of the draft PAL permit must be omitted from the final permit.

**Response 83**

EPA agrees that procedures and factors based on AP-42 that Limetree used for calculating the baseline actual emissions on which the PAL was based should generally continue to be used in calculating the future emissions for demonstrating compliance with the PAL. Updated AP-42 procedures or factors should only be required via the process stipulated in 40 CFR § 52.21(aa)(8)(ii)(*a*)(*1*) and Condition II.N of this permit. See also EPA Response to Comments 6b and 6c and the general conditions added to the permit in Conditions II.M and II.N. EPA revised Condition IV.P.2 by deleting the sentence beginning with "In the event that the methodology in AP-42 is superseded…"

**Comment No. 84.**

Table S of Condition IV.P. the draft PAL permit should specify a control efficiency of 50 percent, rather than 75 percent, for the dropping of coke into ships, consistent with the emission calculation methodology used to determine baseline actual emissions and to establish the PALs listed in Table A of the draft PAL permit. The 75 percent control efficiency listed in the second row of Table S of the draft PAL permit is correct with respect to the other coke handling activities listed in that row.

**Response 84**

EPA did not differentiate dropping of coke into ships from the other coke handling activities when establishing a 75% control efficiency requirement in Table S. Based on Limetree's comment, and a review of the PAL application, a 50% control efficiency (as opposed to 75%) was used in calculating the baseline actual emissions and establishing the PAL for this activity. Therefore, EPA agrees with this comment that the same control efficiency should be used in demonstrating compliance with the PAL. EPA revised the control efficiency for coke dropping into the ships from 75 to 50 percent in Table S and renamed it "Table IV-P-2."

**Comment No. 85.**

Condition IV.Q.1. of the draft PAL permit must be revised to clarify that only the vehicles owned or leased by Limetree Bay and operated on the premises, rather than all vehicles "at the source," are subject to the requirement for monitoring of mileage. Vehicles other than those owned or leased by Limetree Bay, such as supplier delivery trucks and vehicles operated by consultants, are not a part of the Limetree Bay stationary source, as that term is defined at 40 CFR §§ 52.21(b)(5)-(6), both because they are not in the same industrial grouping as Limetree Bay and because they are neither under the control of Limetree Bay nor under the control of persons under common control with Limetree Bay. In addition, even if vehicles other

than those owned or leased by Limetree Bay were considered to be a part of the Limetree Bay stationary source, the fugitive emissions from operation of those vehicles would not be quantifiable and thus would not be counted pursuant to 40 CFR § 52.21(aa)(4)(i)(*d*).

**Response 85**

The comment has highlighted for EPA some ambiguity in the draft permit. EPA intended that only the vehicles owned or leased by Limetree should be subject to the requirement in Condition IV.Q.1 although it was not explicitly noted in the draft permit. Therefore, without opining on the commenter's view of 40 CFR § 52.21, EPA agrees to revise Condition IV.Q.1. to make our intention clear by applying the requirement in the condition only to vehicles owned or leased by the Permittee.

**Comment No. 86.**

To the extent that the second sentence of Condition IV.Q.2. of the draft PAL permit would require supersession of the predictive emission factor equations used to determine baseline actual emissions and to establish a PAL listed in Table A of the draft PAL permit, it is inappropriate because it would create arbitrary inconsistencies between the calculation methods used to establish the PALs and those used for compliance demonstration.  If, in the context of periodic review of information it publishes in AP-42 or otherwise, EPA determines that one of the predictive emission factor equations used to establish a PAL in the PAL permit issued to Limetree Bay is erroneous, this must be addressed through the process established by 40 CFR § 52.21(aa)(8)(ii)(*a*)(*1*). Accordingly, the second sentence of Condition IV.Q.2. of the draft PAL permit must be omitted from the final permit.

**Response 86**

EPA agrees with the comment that the procedures and factors based on AP-42 that Limetree used for calculating the baseline actual emissions on which the PAL was based should continue to be used in calculating the future emissions for demonstrating compliance with the PAL. Updated AP-42 procedures or factors should only be required via the process stipulated in 40 CFR § 52.21(aa)(8)(ii)(*a*)(*1*) and Condition II.N of this permit.  Therefore, EPA has deleted the second sentence of Condition IV.Q.2.

**Comment No. 87.**

Condition IV.R.1. must be revised to resolve the following issues. Limetree Bay may not be able to obtain ingredients for a paint or thinner, because vendor specifications may be proprietary. In any event, only the VOC specification is relevant for calculating VOC emissions. Thus, "and ingredients" in Condition IV.R.1. should be replaced with "VOC content."

**Response 87**

The requirement for Limetree to monitor and record the amount of VOC emissions from paints or thinners was EPA's intention in Condition IV.R.1 of the draft permit. Requiring Limetree to monitor the "ingredients" of the paint and thinners as opposed to "VOC content" was an inadvertent error since ingredients in a paint/thinner can be regarded as proprietary. In addition, knowing the ingredients in the paints or thinners does not automatically reveal their VOC contents which are the data needed to calculate the associated VOC emissions. Therefore, EPA agrees with this comment that the VOC content of the paint or thinner is the parameter needed to calculate the VOC emissions rather than the general term "ingredients."  EPA revised the condition to replace "ingredients" with "VOC content" in Condition IV.R.1.

**Comment No. 88.**

Conditions IV.R.1. and IV.R.2. require the Permittee to record container size, number of containers, paint or thinner type and ingredients. Emissions from painting constitute a tiny fraction of VOC emissions from the source-approximately 0.1% of the VOC PAL. Accordingly, a lower degree of accuracy in determining emissions from the source does not materially affect the overall accuracy of the monitoring proposed nor is it likely to affect compliance with the PALs in any material fashion. There are hundreds of paint containers present in the facility, numerous small or larger paint jobs and requiring tracking for each of these paint containers and paint jobs is a burdensome task given the level of emissions this emissions source represents.

We request that the following be added to Condition IV.R.3 (as depicted in red font), which we believe is authorized by 40 CFR § 52.21(aa)(12)(i)(*c*) (allowing alternate monitoring approaches), 40 CFR § 52.21(aa)(12)(vii) (allowing use another method to determine emissions if no monitoring data is available) and 40 CFR § 52.21(aa)(8)(A) (establish default values where the correlation between a monitored value and a PAL pollutant rate cannot be established): The Permittee shall calculate the VOC emissions from painting performed at the source monthly by summing up the amount of VOC contained within the paints and thinners that are consumed. In lieu of using consumed paint, the Permittee may use the amount of paint issued by the warehouse to calculate VOC emissions from painting performed at the source.

**Response 88**

EPA agrees with this comment that tracking the amount of paint used from each paint container in the facility during each paint job is a burdensome task given the level of emissions (mainly in the form of fugitives) from this activity compared with the VOC PAL. Limetree proposes to monitor the number of paint containers provided by its warehouse to calculate the VOC emissions from painting performed at the facility. EPA finds Limetree's proposed alternative method for monitoring VOC emissions from painting reasonable and acceptable. However, the language proposed by Limetree is insufficient as an enforceable permit condition because the requirements on when and how VOC emissions from the paints and thinners must be calculated need to be specified. EPA revised Condition IV.R.3. as follows: The Permittee shall calculate the VOC emissions from painting performed at the source monthly by summing the amount of VOC contained within the paints and thinners that are consumed. In lieu of using consumed paint, the Permittee may use the total amount of paint and/or thinner containers issued by the warehouse and all other paint and/or thinner distribution location at the source to calculate VOC emissions from painting performed at the source assuming all emissions occur upon a container's issuance in that month.

**Comment No. 89.**

The last sentence of Condition IV.S.2. is not correct, since VOC does not result from fuel combustion.  Condition IV.S.2. should be revised as follows:

"The Permittee shall calculate the SO2, NOx, CO, PM, and VOC emissions from fire training by using the emission factors published in "Calculation Methods for Criteria Air Pollutant Emission Inventories," Brooks Air Force Base, TX, July 1994. The VOC attributable to the quantity of FireFOAM used shall be added to the amount of VOC resulting from fuel combustion released from the fuel being used in fire training."

**Response 89**

EPA agrees with the comment that VOC emissions do not occur from combustion during the Fire Drills/Training but just from the fuels being used during the training.  EPA has therefore revised Condition IV.S.2. as follows: "The Permittee shall calculate the SO2, NOx, CO, PM, and VOC emissions from fire training by using the emission factors published in "Calculation Methods for Criteria Air Pollutant Emission Inventories," Brooks Air Force Base, TX, July 1994. The VOC attributable to the quantity of FireFOAM used shall be added to the amount of VOC released from the fuel being used during fire training."

**Comments from Limetree Bay Refining and Limetree Bay Terminals –
Section V – Testing**

==================================================================

**Comment No. 90.**
Condition V. of the draft PAL permit provides as follows:
"The Permittee shall conduct stack tests to determine unit-specific emission factor(s) for the process/emission units listed in Table W within 180 days of the effective date of this permit for the major emission units. For new and modified major emissions units, the stack test shall be conducted within 180 days after startup. A major emissions unit, as defined in 40 CFR § 52.21(aa)(2)(iv), is any emissions unit that has the potential to emit 100 tons per year or more of any PALs pollutant which includes but is not limited to those listed in Table W. The stack tests shall be conducted to establish the unit-specific emission factors as stated in Table W. These emission factors shall supersede any factor that was developed prior to the effective date of this permit." Condition V., including Table W, of the draft PAL permit must be revised in several respects in order to remove ambiguity, resolve internal inconsistencies, and to ensure the requirements of the underlying rule regarding error correction at 40 CFR § 52.21(aa)(8)(ii)(1) are not circumvented, as set forth below in Comments #91-99.

**Response 90**
No response is needed to address this comment since it merely asks EPA to review Comments 91 to 99.

**Comment No. 91**
The deadline for testing in the first sentence must be changed to six months after issuance of the PAL permit, consistent with Condition III.A.3.c. of the draft PAL permit and the underlying regulation at 40 CFR § 52.21(aa)(12)(vi)(*c*).

**Response 91**
Commenter is correct that 40 CFR § 52.21(aa)(12)(vi)(*c*) requires site-specific emission factor validation testing within 6 months of PAL permit issuance. EPA incorporated this requirement into the PAL permit via Condition III.A.3.c which states that validation testing would be performed within 6 months of the PAL permit issuance. In order to be consistent with testing time-line requirements in the other parts of this permit, EPA agrees with this comment to revise the deadline for testing requirement from "within 180 days" to "within 6 months" as stated in Condition III.A.3.c of the draft PAL permit. EPA revised the first sentence of Condition V accordingly.

**Comment No. 92.**
The second sentence of this condition of the draft PAL permit must be revised to clarify that only new and modified major emissions units listed in Table W will be subject to stack testing requirements, and only with respect to the PAL pollutant for which the emissions unit is classified as "major."

**Response 92**

EPA requires that any emission unit - an existing, a modified or a new unit with a major source PTE will need to be tested to verify the emission factors used in establishing and complying with the PAL. The stack testing requirement is not limited to a modified or new emission unit but to each emission unit classified as "major" for the PAL pollutant(s) it emits.  EPA revised Condition V so that the first sentence applies to the existing units listed in the Table in Condition V and the sentence referenced in the comment applies to new and modified units.

**Comment No. 93.**

The second sentence of this condition of the draft PAL permit must also be revised to clarify the meaning of the term "modified," as this term is not defined in the underlying PSD regulation at 40 CFR § 52.21.

**Response 93**

EPA hereby clarifies that the term "modified" with reference to the testing requirements in Condition V means any change at an existing emission unit that will result in a change to the emission factor being used to calculate the emissions of a PAL pollutant.

**Comment No. 94.**

This condition of the draft PAL permit must be revised to clarify the meanings of the terms "determine" and "establish" in the context of emission factors developed pursuant to this condition, to clarify the purposes for which previously established emission factors are superseded and the timing of such supersession.

**Response 94**

For consistency, the term "establish" is deleted and replaced with "determine" in the revised Condition V.  However, EPA has not added a definition of the term "determine' because the term speaks for itself. The timing of the test has been clarified (See EPA Response to Conditions 91-92) and the timing of the reporting of any new emission factor is addressed in Section VII.A. Further, Condition V is changed to state that any unit-specific emission factor developed will supersede the previous emission factor from the month following the testing.

**Comment No. 95.**

To the extent that this condition of the draft PAL permit is intended to require supersession of (*i.e.*, to invalidate) the emission factor used to determine baseline actual emissions and to establish a PAL listed in Table A of the draft PAL permit, as amended, it must be revised to provide for reopening the permit to correct the erroneous PAL calculation as required by 40 CFR § 52.21(aa)(8)(ii)(*1*) and Condition II.H. of the draft PAL permit. See also, comments on III.A.3.c.

**Response 95**

EPA agrees that should any emission factor used previously to determine baseline actual emissions and establish a PAL (and listed in Table A of the PAL permit, now Table I-1) is invalidated by the validation stack testing, the PAL permit would be reopened to reflect the updated emission factor as required by 40 CFR § 52.21(aa)(8)(ii)(*1*) and Condition II.H of the draft PAL permit.  EPA added a statement to Condition V to that effect. See also EPA Response to Comment 6c regarding the circumstances under which an updated emission factor will lead to reopening a PAL.

**Comment No. 96.**

The title of Table W should be changed to "Stack or Performance Tests Required to Develop Unit Specific Pollutant Emission Factors" to include performance testing.

**Response 96**

Although the terms "stack test" and "performance test" may have the same meaning and at times are used interchangeably, for clarification purposes EPA revised the title of Table W to "Performance Tests Required to Develop Unit Specific Pollutant Emission Factors" and renumbered Table was Table V-1.

**Comment No. 97.**

For sixteen separate emissions units, Condition V. and Table W of the draft PAL permit would require Limetree Bay to conduct stack testing for SO2 and to determine unit specific emission factors using the results of such testing. However, for each of the sixteen referenced emissions units, the method used by Limetree Bay to determine baseline actual SO2 emissions and the method proposed by Limetree Bay for determining monthly SO2 emissions during the term of the PAL permit is essentially a set of mass balance calculations: The sulfur content of each fuel is determined, such as by continuous monitoring to determine H2S concentration in refinery fuel gas or periodic laboratory analysis to determine sulfur content of fuel oil, and the calculation assumes 100 percent of sulfur is converted to SO2.

Testing to measure SO2 emissions from any of the sixteen referenced emissions units would be unduly burdensome, would provide no useful information, and thus would be arbitrary and capricious. If the purpose of the testing would be to determine the unit specific fraction of sulfur that is actually converted to SO2 (i.e., to determine an SO2 emission factor in units such as lbs SO2 per lb of sulfur in fuel combusted), that would provide no useful information because Limetree Bay has conservatively proposed to assume 100 percent conversion. If the purpose of the testing is to make a one-time measurement of SO2 emission rate (i.e., to determine an SO2 emission factor in units such as lbs SO2 per gallon of fuel oil burned), that would provide no useful information because the resulting emission factor would be inherently less accurate than the monitoring and calculation approaches proposed by Limetree Bay and required by Condition of the draft PAL permit. For these reasons, Limetree Bay requests deletion of all requirements for stack testing with respect to SO2 emissions.

**Response 97**

EPA agrees with Limetree's proposal to use the mass balance equation and conservatively assume 100 percent conversion of fuel sulfur to SO2 emissions because it is a more conservative method to determine SO$_2$ emissions than to measure SO$_2$ emissions via stack testing, and it is approvable under 40 CFR § 52.21(aa)(12)(i)(*c*). EPA therefore deleted the requirements for stack testing with respect to SO2 emissions in Table W (renumbered as Table V-1) and added a requirement that the permittee must use a 100% conversion of fuel sulfur to SO2.

**Comment No. 98.**

The third row of Table W of the draft PAL permit must be revised to correct the description provided for source IDs. H-202, C-200A and C-200C, which are depicted as "Penex – Hot Oil Heaters." This description must be revised to clarify that source ID. H-202 is a hot oil heater, while C-200A and C-200C are the unit compressor engines (i.e., stationary reciprocating internal combustion engines used to drive compressors).

**Response 98**

EPA reviewed the source ID descriptions in Appendix B and C of the PAL permit application and agrees with Limetree that correction is needed as described. EPA revised Table W (renumbered as Table V-1) accordingly.

**Comment No. 99.**

The seventeenth row of Table W of the draft PAL permit must be revised because it includes errors and groups the East and West Sulfur Recovery Plants. This row should be 1) split into two rows, to include West Sulfur Recovery Plant and the East Sulfur Recovery Plant. References to H-1031, H-4761 and Process units 1020, 1040, 4740 and 4750 from the source ID column must be deleted. Limetree Bay does not recognize source ID H-1031, no such ID exists at the facility. The East Sulfur Recovery Plant heater H-4761 has been converted to a steam heater, therefore no longer a source of air pollution. Process Units 1030, 1040, 4740 and 4750 are the facility area coding for the Sulfur Recovery Plants, and do not represent discrete stack(s) from which stack test may be conducted. Below is an updated and corrected version of Table W, with changes reflected in red font.

**Response 99**

Based on the clarification Limetree provided about the equipment layout and utilization in this comment, EPA agrees that correction to Table W is warranted. EPA revised Table W (renumbered as Table V-1) accordingly. Note that the commenter appears to have inadvertently referenced process unit "1020" in the third sentence of the comment instead of unit "1030." There is no process unit 1020 in Table W of the draft permit but EPA has deleted reference to process unit 1030 in the final permit.

**Comment No. 100.**

Under "Section VI. Records Keeping" this comment simply states – "See General Comments"

**Response 100**

This comment asks to review the general comments – see responses to Comments 3 to Comment 14 that are related to General Comments.

**Comments from Limetree Bay Refining and Limetree Bay Terminals**
**Section VII – Reporting and Notifications**

**Comment No. 101.**
Condition VII.A. (Semi-Annual Report) should align with the Title V semi-annual reports, which are submitted on August 31 (for the period January 1-June 30) and February 28 (for the period July 1-December 31) of each year.

**Response 101**
EPA finds it acceptable to align the reporting period of the semi-annual reports required in the PAL permit with that of the semi-annual reporting requirement specified in Condition 8.13.1 of Limetree title V permit. This change only affects when both reports are due. What must be covered in the two reports remains unchanged. This alignment will allow for more efficient use of resources at Limetree, EPA and DPNR, for compiling and reviewing the reports, respectively. In addition, this alignment will alleviate any confusion on the reporting timeframe when the PAL permit requirements are rolled into Limetree Title V permit. EPA revised Condition VII.A accordingly.

**Comment No. 102.**
Condition VII.A.3. must be revised to remove the reference to Section V, because Section V does not contain any "unit-specific determinations."

**Response 102**
EPA agrees to delete reference to Section V, and to Section IV as well, to be consistent with the language of the PAL provision at 40 CFR § 52.21(aa)(14)(i)(*c*).

**Comment No. 103.**
The certification required by Condition VII.A.6. and VII.B.4. should be consistent with the language in the Title V compliance certification, i.e., qualified based on information and belief formed after reasonable inquiry, the statements and information in the document are true, accurate, and complete.

**Response 103**
While EPA recognizes the efficiency in aligning the reporting periods of the PAL and title V permits, we also recognize that the two permits are issued under separate processes, under different legal authorities, by different permitting authorities, and for different purposes. The PAL provision at 40 CFR § 52.21(aa)(14)(i)(g) and 40 CFR § 52.21(aa)(14)(ii)(d) provide the specific language that must be included in the signed statement. This language is identical to the language included in the draft PAL permit. Therefore, EPA has not made a change to these conditions.

**Comment No. 104.**
Condition VII.B. of the draft PAL permit would require reporting of "any deviations or exceedance of the PAL emissions limits" within two working days.

With respect to reporting of an exceedance of a PAL, this condition of the draft PAL permit must be revised to clarify that the deadline is based on when Limetree Bay becomes aware of the exceedance. This will occur only after the calculations of monthly and rolling 12-month total emissions have been completed pursuant to Condition II.D. and Sections III. and IV. of the draft PAL permit. In addition, two-days is not a reasonable period of time. If there is an exceedance of a PAL, the company will need time to verify before reporting, and the regulations require "prompt" reporting. The Capitol Power Plant PAL permit requires reporting of PAL deviations in the Title V semi-annual compliance certifications, compared to the two days given to Limetree Bay. There is no reasonable basis to treat Limetree Bay and Capital Power differently for purposes of deviation reporting. Like Capitol Power, Limetree Bay should be able to report exceedances of limits in the PAL "promptly" in accordance with the Title V permit. (See Section 7 of the Capitol Power PAL permit, EPA-R3-PAL-001).

With respect to other deviations, such as a deviation from a monitoring requirement, like Capitol Power, Limetree Bay should be able to report deviations other than exceedances of the PAL in its Title V compliance certifications.

**Response 104**
The PAL provision at 40 CFR § 52.21(aa)(14)(ii) states that "deviation reports shall be submitted within the same limits prescribed by the applicable program implementing 40 CFR § 70.6(a)(3)(iii)(B)." The 2-day reporting requirement in the draft PAL permit is consistent with the deviation reporting requirements pursuant to VI Rule 206-71(5)(B)(i) to ensure that deviations resulting from emergency or upset conditions are promptly reported to DPNR. However, EPA agrees that for purposes of reporting PAL exceedances, 2 days might not provide sufficient time because the Permittee becomes aware of the exceedance only after calculating monthly emissions and time is needed to verify the accuracy of the data and emissions. Therefore, EPA revised Condition VII.B. to require the Permittee to report any PAL exceedance within 15 days of the end of the month in which the PAL is exceeded.

**Comment No. 105.**
In Condition VII.C., the language should be modified to state that the re-validation test results should be included in the next semi-annual report submitted at least three months after completion of the test.

**Response 105**
EPA disagrees with this comment. 40 CFR §52.21(aa)(14)(iii) clearly states, "[t]he owner or operator shall submit to the Administrator the results of any re-validation test or method within 3 months after completion of such test or method." The commenter has provided no reason to deviate from the regulatory requirement and allow the re-validation test results to be included in the next semi-annual report submitted at least three months after completion of the test. In order to clarify that reporting will be required for both validation and revalidation testing, EPA revised Condition VII.C. and added the term, "validation," to the condition and added the term, "revalidation," to Section V.

**Comments from Limetree Bay Refining and Limetree Bay Terminals –
Section VIII – Ambient Air Monitoring Requirements**

**Comment No. 106**

EPA has proposed to require extensive ambient monitoring in the draft PAL permit. EPA claims that these requirements are "necessary to assure continued operational compliance with the public health standards once the facility begins to operate" and "will ensure compliance with the health-based NAAQS in a community highly impacted by multiple complex environmental burdens." EPA also claims that requiring monitoring will "meet EPA's obligation under Executive Order (EO) 12898 to ensure that the permit does not cause a disproportionately high and adverse human health or environmental effects on the community." (emphasis added). EPA's conclusions are not supported by the EJ air modeling results, historical air monitoring data, or the law and these costly and burdensome ambient monitoring requirements must be removed from the PAL.

**Response 106**

EPA does not agree with Limetree's assertion that EPA's conclusions with respect to the ambient air monitoring conditions are not supported by (1) the EJ air modeling results, (2) historical air monitoring data, or (3) the law. EPA has provided detailed responses on these issues in EPA's Response to Comment 107 (with respect to EJ air modeling results), Response to Comments 108 -110 (with respect to the law), and Response to Comment 114 (with respect to historical air monitoring data). In addition, EPA provides, below, an overview of the circumstances that led to the ambient monitoring requirements in the PAL permit.

Historically, five ambient monitors were installed and operated by the former owner, HOVENSA (also HOVIC and Hess Oil prior to that) well before the facility ceased operating in 2012 because EPA had modeled violations of the 24-hour SO2 NAAQS. Even prior to that, HOVENSA operated the ambient monitors because it requested a source specific variance to the sulfur limits. The existing PSD permit requires Limetree to operate the five ambient monitors. While Limetree may plan to use lower sulfur fuel, the issue today is that EPA promulgated a new SO2 NAAQS based on a 1-hour average which is stricter than the 24-hour SO2 NAAQS that was previously violated when HOVENSA was operating under its existing permits.

The available ambient data shows that had HOVENSA continued operation as they had been historically, there would have been violations of the new 1-hour SO2 NAAQS. See Table in EPA Response to Comment 108(d) and Air Quality System summary report. Therefore, the request to operate the ambient monitors is based on information that demonstrated reasons for significant concern. Further, EPA agreed to allow the shutdown of the ambient monitors when HOVENSA ceased operations with the understanding that the monitors would be restarted if the refinery restarted operations (see April 2012 letter from HOVENSA to Steve Riva and reply back from Ray Werner in May 2012.) The existing PSD permit requires Limetree to operate the five SO2 monitors.

Since the HOVENSA facility tended to emit more than 2000 tpy of SO2, it would have been a candidate source that needed to be modeled to determine whether the area should be designated as an attainment or nonattainment area for the 1-hour SO2 NAAQS under Round 3 designation process. Since the HOVENSA facility ceased operating during this time, the facility was not included in the assessment. As a result, the facility's impacts on the 1-hour SO2 NAAQS designation are uncertain. These are among the reasons why EPA required Limetree to perform a modeling analysis for SO2. EPA also included NO2 and PM2.5 in the required modeling analysis because of new short-term standards for those pollutants that were not previously assessed in HOVENSA modeling.

However, the modeling analysis did not resolve the uncertainties about the ambient impacts from the facility. Because of flaws in Limetree's EJ modeling, EPA is exercising its authorities under Sections 114 and 165 of the Clean Air Act and Section 40 CFR § 52.21(aa)(8)(ii)(*b*)(*3*) and 40 CFR § 52.21(aa)(7)(x) of the PAL provisions to require ambient monitoring. These authorities are discussed more fully in EPA's Response to Comments 108(a) and (b), 110(b), and 111(b), among other responses. The largest flaw in the modeling analysis is the lack of technically creditable short-term emission rates for SO2, NO2 and PM2.5. As explained in the September 19, 2019 Environmental Justice Analysis for the Limetree Bay Terminal (EPA-Limetree EJ Analysis), the short-term emission rates were based on inaccurate assumptions. They were not based on actual measured short-term emission rates or calculated based on maximum short-term process rates and appropriate emission factors such as those found in AP-42. According to Limetree, the actual measured short-term emission rates from each unit were not archived by HOVENSA and thus were not available for the calculation of the actual short-term emission rates as inputs to the model.

Further, the modeling analysis did not account for the variability in short term emission rates or the variability in emission increases at different units. The model did not assess the worst-case short-term emission rate at any given unit at any given time. Limetree acknowledges that the emission rate in the model assumes uniform emissions. A uniform emission rate for multiple emission units is not representative of actual operating scenarios. While the variability of emission rates under a PAL, by itself, would not trigger a concern sufficient to require ambient monitoring, the absence of technically creditable short-term emission rates for the modeling analysis gives us insufficient confidence that Limetree's maximum impacts will meet the NAAQS for SO2, NO2 and PM2.5. See also EPA Response to Comments 113(c) and (d). While such a showing is not expressly required by the PAL provisions to support issuance of a PAL, as discussed in more detail in EPA Response to Comment 108, under 40 CFR § 52.21(aa)(8)(ii)(*b*)(*3*), the reviewing authority has the discretion to "reduce the PAL if [it] determines that a reduction is necessary to avoid causing or contributing to a NAAQS or PSD increment violation." Given the historic conditions in this area, EPA needs to be prepared to invoke this authority if Limetree Bay actions under the PAL were to cause or contribute to a violation. Since Limetree has not provided modeling sufficient to demonstrate that EPA will not need to invoke this authority in the future, EPA is exercising authority described in more detail in Response to Comment 108 to require post-operation monitoring in the form of a network of continuous ambient monitors to capture Limetree's maximum impacts under various operating scenarios and various meteorological conditions.

Since the emission scenarios vary, so does the location of the maximum impacts. The location of maximum impact also varies due to different meteorological conditions such as different wind

directions. Therefore, a network of monitors is needed to assess the air quality concentrations that covers a wide area. Requiring ambient monitoring at five separate locations is consistent with the number of locations operated by the former owner, HOVENSA. Five SO2 monitors have been in operation since the late 1970's and some monitors were relocated over time due to various requirements. EPA sees no justification to cease operation of these ambient air monitors with the facility operating again and the revised SO2 NAAQS in place. In addition, EPA is requiring two ambient monitors for NO2 and one for PM2.5 because there are new short-term NAAQS for these pollutants that were never assessed in previous modeling analyses for HOVENSA.

In addition, the claim that historical monitoring does not support the need to continue the ambient monitoring is incorrect. In fact, the historical measurements are a key reason why EPA believes these monitors must continue in this case. In 2010, when the 1-hour SO2 NAAQS was first promulgated, the Station 1 monitor measured a violation of the 1-hour SO2 NAAQS. In 2011, Stations 2 and 3 measured exceedances of the 1-hour average SO2 NAAQS. Further, while the NAAQS was not yet in effect, EPA noted that in 2008 and 2009, the years immediately preceding the promulgation, violations or exceedances were measured at the same stations. It is concerning that the violations and exceedances were measured during the same 2-year period used for the baseline actual emission (BAE) calculations for the PAL. The violations/exceedances could very well be repeated when the facility is restarted. Therefore, EPA has reasons to be concerned and thus has determined that safeguards are necessary to alert us to any potential NAAQS exceedance or violation.

EPA disagrees with the commenter's claim that the ambient monitoring requirement is "extensive." Post-operational monitoring often comprises several ambient monitors surrounding the facility. In some cases, there are up to twelve monitors (e.g., Lovett Power Generating station in New York). The prior owners and operators of the refinery, HOVENSA, HOVIC, and Hess Oil have all conducted ambient monitoring beginning back in 1979. In this case, only eight monitors (5-SO2; 2-NO2; 1-PM2.5) are required at approximately the same five locations as previously sited. To minimize the cost, EPA is largely allowing the use of the existing infrastructure for installing the ambient monitors. To maximize the cost effectiveness and efficiency in the use of the monitors, EPA is allowing Limetree to relocate an existing ambient monitor at Station 2 to the "Peak" location, instead of adding a new monitor at the "Peak." The proximity between Stations 2 and 3 suggests that the measurements would likely be redundant.

Just after HOVENSA ceased operating the refinery, the company submitted a request to EPA Region 2 on April 26, 2012 to shut down the five ambient monitors that were required as a condition of the PSD permit. This request included a commitment to resume the ambient monitors in the event that the refinery restarts. As stated by HOVENSA, "if the process units were to start up again, we would of course resume the operation of all 5 stations prior to startup of the first process unit."

On May 30, 2012, EPA agreed to allow the refinery to shut down the ambient monitors and relax this PSD permit condition on the premise that the monitors would be restarted if the refinery restarted. Any reduced effort would not only break a commitment made by HOVENSA when they requested to shut down the monitors on April 26, 2012 but also would be a violation of the refinery's PSD permit. And it would deepen the serious concerns already expressed and

submitted in public comments by many members of the community about impacts to their health from the facility (see EPA Response to Comments 116, 118-120, 126 and 128).

**Comment No. 107**

The EJ air modeling and analysis of air monitoring data demonstrated that there would not be an adverse impact on nearby communities and that the NAAQS would not be exceeded. Although EPA acknowledges that the modeling did not indicate that there would be an adverse impact from the permit, it nevertheless is requiring extensive monitoring. As such, the monitoring exceeds EPA's authority in conjunction with an EJ analysis under EO 12898 because it is based on an inaccurate characterization of the EJ status in nearby communities. In effect, EPA does not properly consider the EJ air quality modeling analysis and existing monitoring data that demonstrate ambient impacts do not exceed the NAAQS.

**Response 107**

The comment states that EPA has exceeded its authority under Executive Order 12878. However, EPA is exercising its authorities under Sections 114 and 165 of the Clean Air Act and Section 40 CFR § 52.21(aa)(8)(ii)(b)(3) and 40 CFR § 52.21(aa)(7)(x) of the PAL provisions to require ambient monitoring. These authorities are discussed more fully in EPA's Response to Comments 108(a) and (b), 110(b), and 111(b), among other responses. Moreover, EPA disagrees that the Limetree EJ modeling analysis and air monitoring data demonstrated that there would not be an adverse impact on nearby communities and that the analysis showed that the NAAQS would be protected. Further, the sentence to which the commenter refers (regarding EPA acknowledging the model results) is taken out of context. EPA did not state that the modeling indicated there would be no adverse impact. Rather, EPA was only reiterating the written words made in the Limetree EJ modeling report. This does not constitute an approval of the modeling analysis. EPA cannot rely on Limetree's EJ modeling for assuring compliance with the NAAQS given the flaws and uncertainties in Limetree's EJ modeling that EPA identified in the EPA-Limetree EJ Analysis. See also EPA Response to Comment 106.

The Limetree EJ modeling analysis contained several uncertainties which prevent EPA from relying on the results for SO2, NO2 and PM2.5. It is also unclear how the commenter could conclude that the ambient monitors showed compliance when they have been shut down since 2012. In addition, the SO2 ambient monitors that were in operation prior to the shutdown showed exceedances and violations of the 1-hour SO2 NAAQS from 2008 to 2011, as stated in the EPA-Limetree EJ Analysis. See also EPA Response to Comment 106. Therefore, the requirement to conduct ambient monitoring is not only consistent with EPA's authorities under the Clean Air Act and regulations, as discussed above, but is necessary due to the already environmentally burdened low income and minority communities surrounding the facility.

Regarding the commenter's claim that EPA based its decision on an inaccurate characterization of the EJ status in the nearby community, EPA provided several examples of disproportionate and adverse environmental burdens experienced by the nearby community and used information from the 2010 census provided in the FEMA report that showed a vast percentage of the population in the south central section of the island to be low income and minority in comparison to the rest of the island.

**Limetree Comment No. 108. There is no legal basis for ambient monitoring.**

**Comment No. 108(a)**
There is no legal basis for the monitoring. Ambient monitoring is not legally authorized by the rules governing PAL permits
**Response 108(a)**
We disagree that there is no legal basis for the ambient air quality monitoring in the PAL permit. The PAL provision in 40 CFR § 52.21(aa) neither prohibits nor requires the permitting authority to include ambient monitoring in the permit, but EPA has discretion under the Clean Air Act and the regulations at 40 CFR § 52.21 to require ambient monitoring in this circumstance.

The PAL provision in 52.21(aa) states that the PAL permit "must contain, at a minimum" certain information such as the effective date and expiration date, renewal procedures, monitoring, calculation, record-keeping and reporting requirements, along with "<u>any other requirements that the Administrator deems necessary to implement and enforce the PAL</u>." 40 CFR § 52.21(aa)(7)(x) (emphasis added). One of the subsections of the PAL provisions that EPA has discretion to implement and enforce is 40 CFR § 52.21(aa)(8)(ii)(b)(3), which provides that the reviewing authority can "reduce the PAL if [it] determines that a reduction is necessary to avoid causing or contributing to a NAAQS or PSD increment violation." Given the historic conditions in this area, EPA needs to be prepared to invoke this authority if Limetree Bay actions under the PAL cause or contribute to violation. The PAL provisions at 40 CFR § 52.21(aa) do not expressly say that Limetree must demonstrate that its actions under the PAL will not cause or contribute to a violation in order to qualify for a PAL. However, the historic conditions in this area motived EPA to assess this question before issuing the PAL in this case. As discussed in EPA Response to Comment 106, the modeling performed by Limetree leaves significant uncertainty that makes it impossible for EPA to know at this time if the facility will cause or contribute to a NAAQS exceedance. Ongoing uncertainty of this nature would frustrate EPA's ability to implement its authority under section 40 CFR § 52.21(aa)(8)(ii)(b)(3) of the PAL provision. Thus, we are applying the broad authority under 40 CFR § 52.21(aa)(7)(x) to establish these ambient monitoring conditions because we consider them necessary to implement and enforce the PAL in the manner described in 40 CFR § 52.21(aa)(8)(ii)(b)(3), if appropriate circumstances arise for doing so.

The Clean Air Act also provides EPA with legal authority to require ambient monitoring. Pursuant to CAA Section 165(a)(7), a permit under Title I, Part C of the Clean Air Act cannot be issued unless the owner and operator of a major emitting facility agrees to "conduct such monitoring as may be necessary to determine the effect which emissions from any such facility may have, or is having, on air quality." In addition, under Section 114 of the Clean Air Act, "Congress has vested in EPA certain investigatory and enforcement authority, without spelling out precisely how this authority was to be exercised in all the myriad circumstances that might arise in monitoring matters relating to clean air." *Dow Chem. Co. v. United States*, 476 U.S. 227, 106 (1986). The D.C. Circuit, in *Alabama Power Co. v. Costle*, 636 F.2d 323, 371 (D.C. Cir. 1979), held that "Section 114 grants the Administrator broad authority to require monitoring by any source that in his judgment is necessary to carry out his responsibilities under the Act. This includes an authority to require post-construction monitoring." In addition, the Third Circuit has held that, under Section 114, "EPA is statutorily empowered to require . . . any person . . . to . . . submit to inspections, <u>monitoring</u>, and emissions sampling, and 'provide such other information as the Administrator may reasonably require.' *United States v. EME Homer City Generation,*

*L.P.*, 727 F.3d 274, 289 (3d Cir. 2013) (emphasis added). Indeed, "Section 114 . . . appears to expand, not restrict, EPA's general powers to investigate. Nor is there any suggestion in the statute that the powers conferred by this section are intended to be exclusive." *Dow Chem. Co.*, 476 U.S. 227, 234 (1986); *see also Ass'n of Irritated Residents v. E.P.A.*, 494 F.3d 1027, 1036 (D.C. Cir. 2007) (holding that, under Section 114(a), "EPA may require a facility subject to the Clean Air Act to take actions to facilitate implementation of the Act or to determine whether the facility is in compliance."). And courts have widely upheld EPA's authority to act under Section 114(a)(1)(C). *See, e.g., Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544, 561 (D.C. Cir. 2015) (upholding an EPA rule because, in pertinent part, it "was enacted pursuant to EPA's statutory authority under Section 114(a)(1)(C), permitting the agency to require the installation, use, and maintenance of monitoring equipment.").

EPA's promulgation of the PAL portion of 40 CFR § 52.21 neither explicitly nor implicitly takes away the Agency's authority inherent in Section 114 of the Clean Air Act. It also doesn't rewrite the statutory requirement under Section 165(a)(7) of the Act for "such monitoring as may be necessary to determine the effect" of emissions from the source on air quality. In fact, as discussed below, there is a recognition in the PAL provisions at 40 CFR § 52.21(aa) and the preamble to the NSR Reform rule, which contains the PAL provisions, that circumstances exist under which the permitting authority should ensure that the NAAQS and PSD increments are not adversely impacted by the PAL.

As discussed above, 40 CFR § 52.21(aa)(8)(b)(3) allows the permitting authority to reduce the PAL if "a reduction is necessary to avoid causing or contributing to a NAAQS or PSD increment violation." EPA, as the permitting authority, would be unable to learn of a NAAQS or increment violation without the requisite ambient monitoring and, as a result, could not achieve the clear purpose of this provision – to ensure that a PAL does not cause a NAAQS or increment violation. EPA stated in the Technical Support Document (TSD) for the 2002 Final NSR Reform rule that:

> *We believe reviewing authorities are in the best position to determine whether there is a need to reduce the PAL for air quality reasons and therefore the final rules give the reviewing authority the discretion to do so.* TSD at I-7-45.

40 CFR § 52.21(aa)(8)(b)(1) also allows the permitting authority to "reduce the PAL to reflect newly applicable Federal requirements." If a new, more stringent, NAAQS were promulgated, it would be considered a federal requirement and EPA would analyze whether the PAL needs to be reduced. Just as in this case, where there were new, more stringent, NAAQS promulgated for SO2, NO2, and PM2.5, ambient monitoring would be appropriate if modeling left too much uncertainty about whether the new federal requirement could be met. Therefore, the language in 40 CFR § 52.21(aa)(8)(b)(1) further confirms that post-operational ambient monitoring is not inconsistent with the PAL provisions. In this case, the modeling conducted by Limetree left significant uncertainty about the NAAQS due to the lack of accurate emissions data. See EPA Response to Comment 106.

The preamble to the NSR Reform rule, which contains the PAL provisions, establishes the importance of protecting the NAAQS during PAL permitting when the PAL results in eliminating restrictions previously taken at the facility to avoid PSD applicability. The preamble states that:

*An actuals PAL may eliminate enforceable permit limits you may have previously taken to avoid the applicability of major NSR to new or modified emissions units.... Before removing the limits, your reviewing authority should make sure that you are meeting all other regulatory requirements and that the removal of the limits does not adversely impact the NAAQS or PSD increments.* 67 Fed. Reg. 80196, 80210 (Dec. 31, 2002) (emphases added).

This is precisely the case with Limetree because it seeks to eliminate restrictions currently contained in two of HOVENSA's PSD permit modifications, issued in 2007 and 2011.[2] See Limetree Comments, Attachment I. Among the conditions that Limetree seeks to eliminate are limitations on PM2.5 emissions in the GT-10 2007 PSD permit. Limetree states in its comments that, "pursuant to 40 CFR § 52.21(aa)(1)(ii)(*c*), the limits in EPA-issued PSD permits for purposes of ensuring non-applicability of substantive PSD requirements with respect to certain pollutants (i.e., (r)(4) limits) are eliminated by the issuance of the PAL permit."

As EPA acknowledges in EPA Response to Comment 15, the PAL regulation at 40 CFR § 52.21(aa)(ii)(c) does provide for relaxing previously enforceable limitations under 40 CFR § 52.21(r)(4). Since significant uncertainty remained after Limetree performed the modeling analysis, as discussed in EPA Response to Comment 106, ambient monitoring is warranted consistent with the statement referenced above from the preamble to the 2002 NSR reform rule. Lifting the PM10 restrictions only serves to increase the level of uncertainty about whether the PM2.5 NAAQS will be violated as a result of impacts from Limetree. See Response to Comment 106 regarding uncertainty in the modeling and discussion below regarding the need for ambient monitors for SO2 and NO2.

In addition, as noted earlier, in Response to Comment 106, the PSD permit for the facility requires five monitoring stations for SO2. Issuance of the PAL does not relieve Limetree of this PSD permit requirement. Given the stricter 2010 short-term SO2 standard and the results of the modeling analysis, there is too much uncertainty about whether emissions from the facility will exceed the NAAQS and thereby endanger the environmental justice community. This heightens the importance of the PSD permit condition, based on EPA's Clean Air Act authority, that requires Limetree to run the five monitoring stations.

The 2002 rule preamble also recognizes that the permitting authority has discretion "to take into account measures necessary to prevent a violation of a NAAQS or PSD increment, and to prevent an adverse impact on an AQRV in a Federal Class I area," upon renewal of a PAL. 67 Fed. Reg. 80220. The preamble defers to the reviewing authority's existing programs for addressing air quality issues and allows the reviewing authority to "request air quality modeling for any changes if it believes that the changes under the PAL may affect the NAAQS and PSD increment." See also 2002 Technical Support Document for NSR Reform rule, Response to Comment 7.4.3, 4.4. EPA, not the United States Virgin Islands (USVI), is the reviewing authority for this PAL permit. Even where the PAL is renewed at a level less than 80% of the original PAL, the reviewing authority can determine that the PAL levels are "inconsistent with the levels necessary to achieve the NAAQS." 67 Fed. Reg. 80209. The reviewing authority may also "adjust the PAL level at its discretion based on air quality needs" for SIP planning purposes,

---

[2] HOVENSA's PSD permit and modifications can be found at https://www.epa.gov/caa-permitting/caa-permits-issued-epa-region-2.

67 Fed. Reg. at 80217, which EPA could do in conjunction with the USVI through their SIP process.

It does not follow that EPA can take air quality into account upon lifting restrictions on some pollutants when issuing the initial PAL permit, during a permit renewal, or when adjusting a PAL at its discretion, but not include ambient monitoring requirements in a PAL permit, consistent with our Clean Air Act statutory and regulatory authorities, when we have cause for concern about air quality (an issue of special importance in an environmental justice community).

There are numerous occasions where either pre- or post-permit monitoring requirements are imposed on an applicant for a major source. Often, data from a representative state monitoring network may act as a surrogate for these requirements. However, in this case there is no existing ambient monitoring data available for NAAQS assessments that may be used and, therefore, without these conditions in the permit, EPA would be unable to determine whether it would be appropriate to adjust the PAL under 52.21(aa)(8)(ii)(b) to protect the NAAQS.

**Comment No. 108(b)**
As set forth in greater detail in response to Section VIII (Ambient Air Monitoring Requirements) of the draft PAL permit, ambient monitoring required under 42 U.S.C. § 7410(a)(2)(B) for purposes of demonstrating compliance with the National Ambient Air Quality Standards (NAAQS) is required to be performed by the state or territory. The state or territory may delegate that obligation to a "local or regional government, agency, or instrumentality," but it may not delegate that responsibility to a regulated entity and the state or territory is ultimately responsible for "ensuring adequate implementation" of, among other things, ambient air quality. The same is true for the United States (US). The Clean Air Act does not authorize the US to delegate the state's ambient air monitoring obligations to a regulated entity.

**Response 108(b)**
The Clean Air Act provision cited in the comment relates to required elements that states must include in their SIPs under Section 110 of the Clean Air Act. This requirement upon the states does not supplant Region 2's authority under 40 CFR § 52.21(aa)(7)(x) to impose "any other requirements that the Administrator deems necessary to implement and enforce the PAL," such as ambient monitoring to protect the NAAQS under 40 CFR § 52.21(aa)(8)(i)(b)(3). The provision cited by the commenter also doesn't supplant EPA's authority under Clean Air Act Sections 165(a)(7) and 114 to require ambient monitoring for specific sources that may pose a health threat to the local community.

A "PAL Permit" is defined as the "major NSR permit, the minor NSR permit, or the State operating permit under the program that is approved into the State Implementation Plan, or the title V permit issued by the Administrator that establishes a PAL for a major stationary source." 40 CFR § 52.21(aa)(2)(ix). Since EPA is not the minor source permitting authority in the USVI, the USVI implementation plan is disapproved with respect to PSD, and 40 CFR § 52.21 is incorporated into the applicable implementation plan, by the process of elimination, Limetree's PAL is a "major NSR permit" under 40 CFR § 52.21. It therefore falls under the "Prevention of Significant Deterioration program", which is defined in 40 CFR § 52.21(b)(43) as "the EPA-implemented major source preconstruction permit program[.]" The definition also provides that "[a]ny permit issued under such a program is a major NSR permit." As a permit issued under 40

CFR § 52.21, the PAL is a permit under Part C of the Clean Air Act and must not interfere with attainment or maintenance of the NAAQS. See, e.g., CAA Section 165(a)(3) (emissions from construction or operation must not cause or contribute to a NAAQS exceedance); CAA Section 165(a)(7) (the owner and operator of a major emitting facility agrees to "conduct such monitoring as may be necessary to determine the effect which emissions from any such facility may have, or is having, on air quality."); see also EPA's May 1987 *Ambient Monitoring Guidelines for Prevention of Significant Deterioration*, Section 2.1 (making clear that "EPA has discretion in requiring postconstruction monitoring data under section 165(a)(7) of the Clean Air Act . . . . Examples of when a permit granting authority may require postconstruction monitoring data may include:…b. Source impact is uncertain or unknown - Factors such as complex terrain, fugitive emissions, and other uncertainties in source or emission characteristics result in significant uncertainties about the projected impact.")

EPA disagrees with Limetree's contention that it is the responsibility of the USVI to install ambient monitors necessary to carry out this provision of the PAL regulation. Even in jurisdictions where a complete ambient monitoring network is in place, if a particular facility could be the primary cause of a NAAQS or increment exceedance, the permitting authority would retain its discretion to require the facility to conduct additional monitoring of its potential impacts in the locations of concern, as EPA is requiring here.

There is a distinction between the source's responsibility for its specific impacts and a state's responsibility under Section 110 of the Clean Air Act to address NAAQS violations. Thus, in addition to addressing a violation pursuant to the PAL provision at 40 CFR § 52.21(aa)(8)(ii)(b)(3), there are other options to address a NAAQS or increment violation, if one occurs, through the State Implementation Plan (SIP) process. For example, it is possible that a limited number of specific units could be responsible for a NAAQS violation, and we could address that violation through the SIP without reducing the PAL. The response to a violation would be tailored to the particular situation. However, the USVI's involvement in addressing a future violation of NAAQS in no way limits EPA's authority to require ambient monitoring in a permit to obtain information necessary to determine whether to exercise authority to adjust a PAL to address a source's specific impacts.

**Comment No. 108(c)**
On November 12, 2019 the United States issued a grant to the US Virgin Islands to re-establish, operate, and maintain an air monitoring network to monitor ambient air concentrations of PM2.5 but not the other air pollutants that the US has sought to delegate to Limetree Bay. See U.S. Environmental Protection Agency, EPA Awards $412,101 to the U.S. Virgin Islands to Improve Air Quality (Nov. 12, 2019), https://www.epa.gov/newsreleases/epa-awards-412101-us-virgin-islands-improve-air-quality-0.

**Response 108(c)**
EPA is not seeking to delegate responsibility to Limetree for an air monitoring network for any of the pollutants. The funding provided to the USVI for PM 2.5 ambient monitoring is a separate issue that is independent of this permit action.[3] And whether or not EPA funds a monitoring network for other pollutants in the USVI is also unrelated to this permit action. See also discussion, above, in EPA Response to Comment 108(b) regarding the distinction between the

---

[3] The only connection is that Limetree used the measured data from the existing PM2.5 ambient monitor in Bethlehem Village for their modeling analysis to account for background concentrations.

ambient monitoring program required in SIPs under Section 110 of the Clean Air Act and source-specific concerns. EPA's purpose in Section VIII of the PAL permit is to apply its authorities under the Clean Air Act Sections 114 and 165 and the PAL provisions at 40 CFR § 52.21(aa)(8)(ii)(b)(3) and 40 CFR § 52.21(aa)(7)(x) to require ambient monitoring that will provide ambient data specific to the environmental justice community near the facility rather than impose an overall Island-wide monitoring network.

**Comment No. 108(d)**

In addition, EPA has asked Limetree Bay to perform ambient air monitoring at Station 1, where there are no residential dwellings nearby. Both of these facts support a conclusion that EPA clearly is trying to delegate ambient monitoring requirements to Limetree Bay, rather than requiring monitoring for EJ reasons.

**Response 108(d)**

EPA proposed to retain the ambient monitor at Station 1 since it is downwind of a prevailing wind direction and measures concentrations most often for both SO2 and NO2. This monitor's location is still defined as ambient air and the monitor's operation is a required part of the refinery's PSD permit for SO2. Historical measurement at this monitor has shown elevated concentrations and violations of the 1-hour 75 ppb SO2 NAAQS while HOVENSA was operating, including during the baseline years used for setting the PAL (see table 6c, included below). Therefore, it is imperative to resume the operation of this monitor for SO2 and add a monitor for the NO2 standard, so that all the averaging times of the health-based standards for those pollutants are evaluated to ensure air quality protection in the prevailing downwind direction. Although there were no residences in the specific area of Station 1, the likely extent of an SO2 or NO2 violation includes areas with residences and any violations of the SO2 or NO2 standard at this monitor would also represent air quality concerns for nearby residential areas. Thus, the reason for requiring Station 1 is due to the facility's specific maximum impacts in the prevailing wind direction and it is not a substitute for either an SO2 or NO2 monitoring network for the Virgin Islands.[4]

---

[4] This monitor is also upwind of the Sandy Point Wildlife Refuge and provides an indicator of air quality trends from Limetree in that direction (see RTC # for further details on the endangered species and coral.)

| Table 6c. Monitoring Site Design Value History Site level for Sulfur Dioxide 1 Hr NAAQS for 2004 through 2013 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| AQS Data Query: | 5/8/2014 Last Updated: | 5/13/2014 | | | | | | | |
| Site | 2004 Design Value (ppb)[1,2] | 2005 Design Value (ppb)[1,2] | 2006 Design Value (ppb)[1,2] | 2007 Design Value (ppb)[1,2] | 2008 Design Value (ppb)[1,2] | 2009 Design Value (ppb)[1,2] | 2010 Design Value (ppb)[1,2] | 2011 Design Value (ppb)[1,2] | 2012 Design Value (ppb) |
| 780100006 | 128 | 114 | 88 | | | 79 | 80 | 72 | 53 |
| 780100011 | 58 | 49 | 50 | 46 | 57 | 40 | 46 | 38 | 34 |
| 780100013 | 35 | 35 | 38 | 34 | 33 | 23 | 25 | 29 | 25 |
| 780100014 | 10 | 16 | 19 | 19 | 13 | 9 | 9 | 10 | |
| 780100015 | 9 | 15 | 18 | 18 | 13 | 9 | 9 | 9 | 8 |

1. The level of the 1-hour NAAQS for sulfur dioxide is 75 parts per billion (ppb) calculated as the 3-year average of the 99th percentile of the annual distribution of daily maximum 1-hour average concentrations

2. The design values shown here are computed for the latest design value period using Federal Reference Method or equivalent data reported by States, Tribes, and local agencies to EPA's Air Quality System (AQS) as of 05/08/2014. Concentrations flagged by States, Tribes, and local agencies as exception events (e.g., high winds, wildfires, volcanic eruptions, construction) and concurred by the associated EPA Regional Office are not included in the calculation of these design values.

Note: When design values are used in a regulatory action, they are based on the latest information and valid data available at the time of that action, not the values published here.

**Comment No. 108(e)**

If the US is not seeking to delegate the Virgin Islands' ambient air monitoring obligations under 42 U.S.C. § 7410 to Limetree Bay, EPA should have explained to the public that the ambient air monitoring being imposed under Section VIII is unrelated to Limetree Bay's compliance with the PAL permit since it will monitor ambient air concentrations from all sources against national ambient air quality standards, rather than the PALs.

**Response 108(e)**

Limetree Bay could comply with all of the conditions in the PAL permit and the unit-specific monitoring, recordkeeping, and reporting requirements and yet the ambient monitors could still detect an exceedance and/or violation of the NAAQS. The detected exceedance and/or violation of the NAAQS would not represent a violation of the PAL permit, but may justify an adjustment of the PAL. The monitoring data is needed to implement 40 CFR § 52.21(aa)(8)(ii)(b) of the PAL provisions. The specific locations of the ambient monitors in the PAL permit were selected to coincide with Limetree's maximum impacts and is not being used as a replacement for a monitoring network for the USVI. EPA explained to the public in the EJ report and at the public availability session that the locations of the ambient monitors were selected specifically from the perspective of Limetree's impacts as the primary source to the prevailing downwind location (Station 1), residential areas (Stations 3, 4, and 5), and areas where peak impacts are projected. EPA explained that the meteorological monitor, which is site-specific to Limetree, is also required so that wind data is collected that may be used to further assess analytical studies regarding the sources of elevated concentrations. The ambient monitors are located in Limetree's maximum impact areas. However, in the unlikely event that another source on the Island could cause or contribute to a violation or exceedance at those monitors, there are analytical methods that may be used to further determine the origin of those measured monitored concentrations such as source apportionment modeling, back trajectories, or chemical mass balance methods. See also EPA's response to comment 108(a)-(d), which explains why the monitoring stations and conditions in Section VIII of the PAL permit are specific to Limetree and not designed for general air quality monitoring on St. Croix.

**Limetree Comment No. 109. The proposed Monitoring Requirements are not authorized by PAL rules and are inconsistent with previous EPA PAL permits**

**Comment No. 109(a)**

The only monitoring requirements EPA is authorized to impose in a PAL permit are those that are necessary for "accurately determin[ing] plantwide emissions of the PAL pollutant in terms of mass per unit of time." 40 CFR § 52.21(aa)(12)(i)(*a*). The ambient monitoring requirements proposed by Region 2 are entirely unrelated to this purpose and are, therefore, not within EPA's authority in a PAL permit.

**Response 109(a)**

EPA disagrees with the assertion that ambient monitoring requirements are not within EPA's authority. While the commenter is correct that 40 CFR § 52.21(aa)(12)(i)(*a*) refers to monitoring of plantwide emissions, EPA is not asserting authority for the ambient monitoring conditions under that provision. Rather, EPA is exercising its authority for the ambient monitoring conditions under section 40 CFR § 52.21(aa)(8)(ii)(b)(3) and 40 CFR § 52.21(aa)(7)(x) of the PAL provisions, and Sections 114 and 165 of the Clean Air Act. These authorities are discussed more fully in EPA's Response to Comments 108(a) and (b), 110(b), and 111(b), among other responses.

**Comment No. 109(b)**

Moreover, the issuance of a PAL permit by EPA pursuant to 40 CFR § 52.21(aa) is not an action that has the potential to cause disproportionately high and adverse human health or environmental effects on minority or low-income populations because, by definition, the PAL does not authorize new emissions.

**Response 109(b)**

Pursuant to EPA Region 2's Interim Environmental Justice Policy, the Region should apply EO 12898 to "permitting decisions that include new major permits, significant permit modifications, or major permit renewals." EPA Region 2 Interim Environmental Justice Policy at 26 (Dec. 2000). The PAL is a permit issued under 40 CFR § 52.21 and Part C of the Clean Air Act. As such, and as discussed in more detail in EPA Response to Comment 108(b), the permit is a major permit and its issuance is an action evaluated under EO 12898. The EPA Environmental Appeals Board (EAB) has determined that the EJ Executive Order applies to permits under 40 CFR § 52.21. See, e.g*., In re Zion Energy, LLC*, 9 E.A.D. 701, 706 (EAB 2001); *In re Knauf Fiber Glass, GmbH*, 8 E.A.D. 121, 127 (EAB 1999). Failure to address environmental justice in a permit under 40 CFR § 52.21 can result in a remand to the permitting authority. In carrying out its responsibilities under the Executive Order, EPA is given considerable deference:

> *The Board has recognized that the Executive Order on Environmental Justice does not dictate any particular outcome in a permit decision; rather, the order gives permitting authorities broad discretion to determine how best to implement its mandate within the confines of existing law. See In re Pio Pico, 16 E.A.D. 56, 91 n.30 (EAB 2013); see also U.S. EPA, Plan EJ 2014 Progress Report (Feb. 2013), available at http://www.epa.gov/environmentaljustice/; 78 Fed. Reg. at 27,222 (noting that each permit and community is different and that each EPA regional office has the insight and experience to develop strategies tailored to the particular communities and needs within the region).*

*In Re Energy Answer Arecibo, LLC (Arecibo Puerto Rico Renewable Energy Project)*, 16 E.A.D. 294, 326 (2014).

The PAL might not authorize new emissions on an annual average basis, but the PAL does authorize increases in the short-term emission rate at different units as long as the annual PAL is not exceeded. This has implications for the 1-hour NO2, 1-hour SO2, and 24-hour PM2.5 NAAQS, which are all considered short-term NAAQS. These NAAQS were never assessed in previous modeling analyses for HOVENSA. Furthermore, the existing ambient data during HOVENSA's operation, including during the baseline years for establishing the PAL, showed exceedances and violations of the NAAQS for SO2. Therefore, the monitoring requirement is necessary to alert EPA to any possible exceedance or violation. EPA and DPNR would then evaluate the situation to consider the options for mitigating the problem including, among other things, action under 52.21(aa)(8)(ii)(b). This will also help ensure protection of the environmental justice community.

**Comment No. 109(c)**
Further, the PAL permit will reduce allowable emissions of SO2, NOx, and PM2.5 by 77% compared to what the facility would be allowed to emit in the absence of the PAL. The PAL is being issued as a means of reducing the administrative burden and increasing regulatory certainty for a facility that agrees not to make changes that would increase actual emissions. *See, generally,* 67 *Fed. Reg.* 80186 at pp. 80206-80208. Operating the Limetree Bay facility with a PAL permit will be more environmentally protective, not less, because the PAL permit will prohibit serial, insignificant emissions increases which are currently allowed because the facility is not subject to a PAL. *See, ibid* at p. 80206; *see, also, New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005). Because the PAL does not authorize new emissions, the ambient air monitoring is not required to determine emissions associated with the PAL. The PAL is being used as a vehicle to impose monitoring obligations for reasons wholly unrelated to the PAL. (Based on the PTE calculations and the proposed PAL limits, the PAL permit will reduce allowable emissions of SO2 by 88%, NOx emissions by 69%, and PM2.5 emissions by 67%, equal to a total reduction of 77% for these three pollutants.)

**Response 109(c)**
The magnitude of emission reductions claimed by the commenter doesn't paint a complete picture – for example, when the commenter compares Limetree's allowable emissions to HOVENSA's allowable emissions. The actual emission rates are not reduced by the percentage provided in the comment. The PAL was set based on the 2009-2010 annual average actual BAE. Further, there is no information regarding the impacts to the 2010 short term NAAQS from these annual mass-based limits. In addition, the emission rates proposed are still high in comparison to other major sources. See also EPA Response to Comment 114. As discussed in Response to Comment 108, the monitoring is related to the PAL because it provides information to enable EPA to assess whether adjustments may be needed to the PAL in the future.

**Comment No. 109(d)**
When EPA promulgated the PAL provisions, the agency explicitly considered and rejected including in the rule a requirement for air quality impacts analysis:

We agree with the commenters that requirements to evaluate ambient impacts would be likely to conflict with the goal of operational flexibility and minimal administrative burden, especially for small changes under the PAL. Moreover, we believe that we can rely on the reviewing authority's existing programs for addressing air quality issues resulting from changes under your PAL. As a result, the final PAL rules do not explicitly require modeling or other types of ambient impact assessments. *Technical Support Document for the Prevention of Significant Deterioration and Nonattainment Area New Source Review Regulations*, Nov. 2002, at p. I-7-57.

**Response 109(d)**
A review of the referenced section of the Technical Support Document (TSD) clarifies that the EPA was responding to comments concerned with the circumstances under which <u>changes</u> at the facility, after the PAL permit issuance, would trigger ambient air quality review. See *Technical Support Document for the Prevention of Significant Deterioration and Nonattainment Area New Source Review Regulations*, Nov. 2002, at pp. I-7-55-57. This is confirmed by the phrase "from changes under your PAL" in the TSD language cited by the commenter. The ambient monitoring conditions in Limetree's PAL permit do not require that the Permittee wait to make changes under its PAL until after ambient monitoring is completed. Thus, EPA is not restricting the operational flexibility or adding administrative burden with this permit action. Limetree will be able to make the physical and operational changes under this PAL without having to analyze the applicability of PSD or undertake any additional analysis of data gathered by the ambient monitors. Of course, Limetree should still consult with VIDPNR to determine whether a minor NSR permit might be necessary to authorize any physical or operational changes.

The rule also allows EPA to reopen the PAL under 40 CFR § 52.21(aa)(8)(ii)(b) if the agency believes that the NAAQS or increment are threatened. We do not have sufficient information regarding compliance with these NAAQS. In fact, with respect to SO2, the information we have shows that the NAAQS were violated while the refinery was in operation especially in the final years prior to shut down when the BAE were calculated. Since there were measured violations in the baseline years, Region 2 needs measured ambient data to determine whether or not the NAAQS will be violated in the location of Limetree's maximum impacts so that we can take further action to address the NAAQS problem. Without the data, EPA would not be able to effectuate the purposes of 40 CFR § 52.21(aa)(8)(ii)(b), which is designed to protect the NAAQS and increment. Otherwise, this language of the PAL provisions would be rendered meaningless. 40 CFR § 52.21(aa)(7)(x) makes clear that EPA has discretionary authority to add the ambient monitoring requirement to ensure implementation of 40 CFR § 52.21(aa)(8)(ii)(b). See also EPA Response to Comment 108(a) and (b).

Further, the quotes state that the reviewing authority may rely on its existing programs for addressing the air quality issues. In this case, the reviewing authority is carrying out its authority under Section 114 and Part C of the Clean Air Act to address the air quality issues and its responsibilities under the EO 12898.

**Comment No. 109(e)**
Until now, where EPA has acted as the PAL permitting authority (in the case of the Capitol Power Plant PAL permit), the agency has continued to implement and abide by its findings from 2002, i.e., that the PAL does not authorize emissions increases that weren't otherwise allowed and that ambient air quality impact assessment is unnecessary and inappropriate:

*With regard to emissions of PM10 and NO2 (as addressed through a NOx PAL) authorized by this permitting action, EPA has also determined that this permitting action will not have disproportionately high and adverse human health or environmental effects on minority or low-income populations, because it does not affect the level of CAA protection provided to human health or the environment. This permitting action ensures that emissions of PM10 and NO2 from the [facility] will not impact continued compliance with applicable NAAQS. NAAQS are national health-based standards that have been set at a level such that their attainment and maintenance will protect public health and welfare, including sensitive individuals, with an adequate margin of safety. See CAA § 109(b). Numerous health studies and comments from experts and the public are used in determining the NAAQS level that will be protective of public health.*

**Response 109(e)**

Environmental justice analyses under EO 12898 are site specific. The permit matter referenced above, the Capitol Power Plant PAL, is much different than Limetree's. An EJ assessment for the Capitol Power Plant PAL permit concluded that there was no disproportionately high or adverse human health or environmental effects on a minority or low-income community. In Limetree's case, EPA concluded that there is a minority and low-income community that has been burdened by disproportionately high and adverse human health or environmental effects. See EPA-Limetree EJ Analysis. In addition, Limetree's emissions are an order of magnitude greater for each pollutant,[5] which poses greater risk to the NAAQS. As such, EPA cannot conclude that the operation of the refinery under the PAL will assure compliance with the NAAQS in the EJ community. In the Capitol Power Plant Permit, there was a comprehensive existing ambient monitoring network that would continue operating after issuance of that PAL and that EPA could rely on as representative of the specific impacts of the Capitol Power Plant, so that the Agency could apply the 52.21(aa)(8)(ii)(b) requirements as needed to protect the NAAQS. In Limetree's case, without the ambient monitoring, EPA will not have sufficient information to know whether Limetree's specific impacts will cause violations of the NAAQS. In the response to comments for the Capitol Power Plant PAL, EPA noted the monitoring network in the District of Columbia is far more concentrated than most other networks nationwide. Even in states that have a complete monitoring network, EPA can require a source-specific post-permit ambient monitoring requirement because not all networks will be effective for measuring local impacts from a specific source where there is concern. EPA's intention is not to use the Limetree ambient monitors as a substitute for an Island-wide network.

**Comment No. 109(f)**

The agency's prior determination in the Capitol Power Plant PAL permit states that de minimis emissions increases authorized under a PAL do not affect compliance with the NAAQS. Therefore, again, it appears that EPA is using the PAL as a vehicle to require ambient air monitoring where none is warranted or legally required.

*EPA notes that the PALs established in this permit require that total emissions may only increase in amounts below the NSR significant emission levels. Those significant emission thresholds have been set at a level that represents de minimis emission increases that EPA has determined not to affect compliance with the NAAQS. Since the emission limits in the permit are set such that only de minimis increases in emissions may occur, this permitting action will protect air quality in the*

---

[5] The emissions in the Capitol Power Plant PAL permit are a fraction of the emissions in this case. The Capitol's PAL is for 248 tons per year of NOx in comparison to Limetree's 5,594 tons per year of NOx. The Capitol's PAL is for 42 tons per year of PaM10 in comparison to Limetree's 412 tons per year.

*region by ensuring compliance with the applicable NAAQS. Fact Sheet – Capitol Power Plant – EPA Draft Permit Number EPA-R3-PAL-001*, Aug. 2012, at p. 23.

**Response 109(f)**

While EPA initially established the Significant Emission Rates in 1980 with air quality impacts in mind, it is important to consider this comment in the context of EO 12898 and the site-specific analysis performed for Limetree's permit. Related to EPA's concerns for the community referenced in EPA's Response to Comment 109(e) and the EPA-Limetree EJ Analysis, EPA is also concerned due to the combination of the magnitude of Limetree's emissions (which are much larger than the Capitol's emissions), the promulgation of the 2010 short-term NAAQS, revised PM2.5 NAAQS, and the environmental justice community on St. Croix. Further, Limetree's baseline emissions are considerably greater than those of the Capitol project and, therefore, they pose a greater threat to the NAAQS. This, in part, led Region 2 to require the ambient monitoring. See also EPA Response to Comment 109(b).

**Limetree Comment No. 110. The Responsibility for Performing Ambient Monitoring and the Authority to Determine NAAQS Compliance Belong to DPNR**

**Comment No. 110(a)**

In addition to the EJ modeling data, which demonstrates that operation of the Limetree Bay facility will not adversely affect nearby communities, it is worth noting that both site-specific ambient SO2, NO2, and PM2.5 monitoring data and air quality modeling analyses have demonstrated that the entirety of St. Croix is in compliance with the NAAQS.

**Response 110(a)**

First, as stated earlier, while the model calculated impacts over the entirety of St. Croix, the model results are inaccurate since the emission data used to calculate those impacts are flawed. See EPA Response to Comment 106. Second, the SO2 ambient monitors did not show compliance with the 1-hour SO2 NAAQS. See EPA Response to Limetree Comment 108(d). In addition, the monitors have been shut down since 2012. There are no operating NO2 ambient monitors in St. Croix. If the commenter is referring to the two NO2 ambient monitors operated by HOVENSA between 2006 to 2009, these were not evaluated for the 1-hour NO2 NAAQS since they were no longer operational at the time of promulgation of the 1-hour NO2 NAAQS in 2010. Moreover, these were also considered "background" monitors and not located in Limetree's predicted maximum impact location of the 1-hour NO2 NAAQS nor in the prevailing wind direction at Station 1. In addition to not being in Limetree's predicted maximum impact location, the two NO2 monitors were voluntarily installed by HOVENSA and were not reviewed or approved by EPA for regulatory purposes. We do not have certified data to conclude that there were no violations of the 1-hour NO2 NAAQS. There is a PM2.5 ambient monitor in Bethlehem Village, however it is not located in Limetree's predicted maximum impact location for the 24-hour PM2.5 NAAQS. As discussed above, the ambient monitors required in the PAL permit are specific to the areas of predicted maximum impact from the facility and located in nearby residential communities. See also EPA Response to Comment 114(c).

**Comment No. 110(b)**

As EPA has repeatedly acknowledged, compliance with the NAAQS are not requirements applicable to owners and operators of individual stationary sources such as the Limetree Bay facility. A NAAQS by itself does not impose any obligation on Limetree Bay. Instead, the

measures contained in each state's or territory's EPA-approved implementation plan are applicable requirements. The Clean Air Act provides that EPA sets the NAAQS, but the states and territories then determine how best to attain and maintain the NAAQS within their boundaries. See 4 U.S. Envt'l Protection Agency, Order Responding to Issues Raised in Nov. 24, 2008 Petition, and Denying Request for Objection to Permit, (Dec. 14, 2009), www.epa.gov/sites/production/files/2015- 08/documents/ekpc_dale_response2008.pdf.

Accordingly, obligations with respect to both ambient monitoring and preconstruction review programs to attain and maintain NAAQS compliance fall upon DPNR, not individual regulated entities. State implementation plans must:

> " . . .
> (B) provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to—
> (i) monitor, compile, and analyze data on ambient air quality, and
> (ii) upon request, make such data available to the Administrator;
> (C) include a program to provide for … regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program as required in parts C and D of this subchapter.
> (42 U.S.C. § 7410(a)(2), listing minimum requirements of implementation plans.)
> These requirements are implemented in 12 VIRR § 206-31, which is a part of the approved implementation plan for the Virgin Islands."

**Response 110(b)**
EPA agrees that, under Section 110 of the Clean Air Act, the states and territories determine how best to attain and maintain the NAAQS. However, this does not supplant the requirements in the Clean Air Act that pertain to the obligations upon individual sources to ensure that their emissions do not cause exceedances of the NAAQS. This is a key function of Clean Air Act, Title I, Part C and, as previously stated, Sections 165(a)(7) and 165(e)(1) of the Clean Air Act as well as the regulations at 40 CFR § 52.21 make clear that individual sources have this obligation. EPA is the permitting authority for PALs issued in the Virgin Islands because the Virgin Island's State Implementation Plan is disapproved with respect to PSD and, instead, the PSD regulation at 40 CFR § 52.21 is applicable. We also note that in the event that an ambient monitor measures impacts that are consistent with an exceedance or violation of the NAAQS, Limetree is not subject to liability under the permit conditions. Rather, EPA's awareness of the exceedance or violation of the NAAQS will enable EPA to take further action, such as reopening and reducing the PAL under 40 CFR § 52.21(aa)(8)(ii)(b)(3) or taking action under the State Implementation Plan. See also Response to Comments 108 and 109 regarding EPA's authority to require the ambient monitors and the site-specific, EJ-driven context for the PAL permit conditions on ambient monitoring.

**Comment No. 110(c)**
In DPNR's most recent Air Monitoring Network Plan, dated 2017, DPNR states that, based on population, 40 CFR Part 58 does not require monitoring in the US Virgin Islands for CO, O3, NO2, PM10 and PM2.5. Based on sources, 40 CFR Part 58 does not require monitoring in the US Virgin Islands for SO2, and Pb.

**Response 110(c)**

EPA is not requiring the US Virgin Islands to perform ambient monitoring based on population; rather, EPA is invoking its authorities under the Clean Air Act to require source specific monitoring at the Limetree facility. See EPA Responses to Comments 108(a) and (b) and 110(b).

**Comment No. 110(d)**

Unlike Region 3 in the Capitol Power PAL permit, Region 2 would require Limetree Bay to perform ambient air monitoring, usurping DPNR's authority to determine appropriate ambient monitoring requirements under the guise of issuing a PAL permit for de minimis increases in emissions from existing sources.

**Response 110(d)**

The VIDPNR retains authority to establish a USVI monitoring network. In addition, the VIDPNR will have a critical role in inspecting, evaluating the measured data and acting upon the data as has been the case since the late 1970s when the ambient monitors were first installed and operated by the refinery. Therefore, we are not usurping DPNR's authority. And, as discussed in Response to Comments 108, 109 and 110(b), above, EPA is the permitting authority for this PAL and has discretion to require ambient monitoring.

**Limetree Comment No. 111. The Monitoring Requirements exceed the scope of an EJ analysis**

**Comment No. 111(a)**

Until now (in particular, in the Capitol Power Plant permit), EPA has specifically rejected suggestions that EO 12898 allows EPA to impose ambient monitoring obligations in conjunction with issuance of a PAL permit:

[T]he commenters state that there is no site-specific monitoring data for PM10 or NO2 that supports the conclusion that the increase authorized by the PAL permit will not impact continued compliance with the National Ambient Air Quality Standards (NAAQS). The comments suggest that, under the Executive Order, EPA must conduct site-specific ambient monitoring before the Agency may issue the permit, to ensure "continued" compliance with the NAAQS.
*
*

[W]hile the emissions levels authorized by the PAL provide for a de minimis increase in emissions above the levels recently emitted by the facility, which were used to calculate the baseline emissions rate, the PAL permit is not allowing emissions increases over the current permitted levels and actually ensures that emissions will remain at a level far below their currently permitted levels. Accordingly, the level of emissions authorized by the PAL is more protective of human health, including that of minority and low-income populations, than the emissions levels that the [facility] could emit under its current permit.

With regard to any increase of emissions over the recent emissions levels that may occur after the PAL is issued, we reiterate that the "de minimis" levels upon which the PALs are based correspond to an increase in ambient concentrations that is very small relative to the NAAQS. As noted above, the NAAQS are set at a level that is protective of all public health, and the "de minimis" emission levels are set at a level much lower than that, at a level that has been determined to have an insignificant effect on NAAQS compliance. Therefore, EPA believes there is little to be gained from requiring the collection of monitoring data for the [facility] prior

to issuing this permit, primarily because the PAL will be more protective of air quality than if the facility simply continued operating as allowed under its current permit. At most, the PAL is allowing only de minimis emissions increases above actual emission levels, which as explained in the Fact Sheet and the responses above, should have an insignificant impact on the NAAQS. There is no other information or data that would indicate a need to go beyond the requirements of the existing federal regulations to conduct a more detailed analysis of the impact of those increases, particularly when [the facility] would be able to emit far more emissions absent the PALs. *Response to Comments – Capitol Power Plant – EPA Permit Number EPA-R3-PAL-001*, Jan. 2013, at pp. 8-9.

**Response 111(a)**
The comment suggests that EPA is asserting EO 12898 as its basis for imposing ambient monitoring conditions in the PAL permit. As stated in prior responses to the Permittee's comments, EPA is exercising its authorities under Sections 114 and 165 of the Clean Air Act and Section 40 CFR § 52.21(aa)(8)(ii)(b)(3) and 40 CFR § 52.21(aa)(7)(x) of the PAL provisions to require ambient monitoring. EO 12898 is, in part, the impetus for exercising these authorities. In addition, it should be noted that the EO does not prescribe what to do if there is a low income or minority community that is already disproportionately and adversely effected by environmental burdens. The remedy in each case is unique since the environmental factors are unique in each case. In this case, there is no information that would allow EPA to conclude that the NAAQS are protected and, therefore, the ambient monitoring conditions are an appropriate, and legally supportable, remedy.

As the commenter notes, Region 3 stated that there was no other information or data in that permit action that would indicate a need to conduct a more detailed analysis of the impact of the increases from the Capitol Power Plant PAL. Thus, with the Capitol Power Plant PAL, EPA left open the possibility that circumstances could arise in subsequent PAL permits in which there is information or data indicating greater concern and the need for ambient data in the context of the Environmental Justice Executive Order. See EPA Response to Comment 106 as to why the need exists here under the Executive Order. Each EJ analysis, and the measures taken in response to that analysis, is unique to the specific project. See U.S. EPA, Plan EJ 2014 Progress Report (Feb. 2013), available at http://www.epa.gov/environmentaljustice/; see also 78 Fed. Reg. at 27,222 (noting that each permit and community is different and that each EPA regional office has the insight and experience to develop strategies tailored to the particular communities and needs within the region).

Region 2 offers two examples of post-operation ambient monitoring undertaken as a result of an EJ analysis.[6] First, EPA issued a PSD permit to AES Puerto Rico (https://www.epa.gov/sites/production/files/2015-08/documents/aes102920011.pdf) that contained post-operational ambient monitoring requirements due to a possible NAAQS violation noted during the permit review process. We included the ambient monitoring requirements in AES's permit even though we had already determined that the facility's impacts were below the significant impact levels and, therefore, AES was not itself causing or contributing to the possible NAAQS violation. AES installed and operated an ambient $SO_2$ monitor post-

---

[6] New Jersey's Department of Environmental Protection has also added ambient monitoring into its minor source permit for a proposed Saint Lawrence Cement facility in Camden, NJ because of the degree of uncertainty in estimating some of the $PM$-10 emissions from the facility.

operational and provided EPA with the measured data in a similar manner to the requirements in Limetree's PAL permit.

Second, in processing the PSD permit for the Energy Answers Arecibo, LLC facility in Puerto Rico (https://www.epa.gov/sites/production/files/2015-08/documents/energy_answers_final_permit_april_20141.pdf), the permittee conducted modeling for lead in the environmental justice review even though lead was not an attainment pollutant in the area where the facility proposed to construct and, therefore, the pollutant was not subject to PSD review. Energy Answers also wasn't subject to nonattainment review for lead because their emissions fell below the major source threshold for lead. Although Energy Answers determined that their impacts were far less than the NAAQS, the facility agreed to install ambient monitors for lead along with conducting a health risk assessment based on concerns under EO 12898. In both of these cases the EAB upheld the Region's environmental justice analysis. See also Responses to Comments 109(b)-(f) and 110.

**Comment No. 111(b)**
Additionally, the EAB has recognized the adequacy of an EJ analysis based on available monitoring and modeling data, in the Avenal Power Center decision 15 EAB 385, (EAB, August 18, 2011). In that decision, the EAB states that if the permitting agency cannot reach a determinative conclusion in an EJ analysis because of a lack of available data, the Agency is not required to collect additional data in order to address its obligations under the EO. With respect to the Limetree Bay EJ analysis, there is an abundance of available data, including recent air modeling analyses and site-specific monitoring data that Region 2 can utilize in the EJ analysis. Therefore, there is no basis under the EO and EJ analysis to require the collection of additional air quality monitoring data.

**Response 111(b)**
As the EPA Plan 2014 states, "EPA recognizes that each permit and community is different, and that each EPA regional office has the insight and experience to develop strategies tailored to the particular communities and needs within that region." The lack of data issue in *Avenal* is a different situation than this case and cannot be equated. Petitioners in *Avenal* challenged EPA's determination that "background levels of hourly NO2 in the general area surrounding the facility are not disproportionately high as compared to communities throughout California. *Avenal Power Center*, 15 E.A.D. 385, 399 (EAB 2011). The petitioners argued that EPA should have reached a determinative outcome even in the face of insufficient data, and the Board disagreed. *Id*. at 402. In this permit action, Region 2 has already determined that the South-Central St. Croix community experiences a disproportionate burden. Having found a disproportionate burden, Region 2 has discretion as to how to address the burden. Given EPA's authorities under Sections 114 and 165 of the Clean Air Act and Section 40 CFR § 52.21(aa)(8)(ii)(b)(3) and 40 CFR § 52.21(aa)(7)(x) of the PAL provisions, Region 2 can address the disproportionate burden by requiring ambient monitoring. The EAB will defer to the permit issuer's expertise in the environmental justice analysis. *Id*. at 403. Moreover, the EAB noted in *Avenal* that the Agency intended to site an ambient NO2 monitor in the vicinity of the proposed facility to gather more information about local NO2 concentrations. *Id*. at 403 n.24. In light of Region 2's finding that there is in fact a disproportionate burden in South-Central St. Croix, EPA's incorporation of ambient monitoring requirements in the PAL permit is reasonable and justified. EPA needs the data to ensure that Limetree's operation under the PAL permit does not contravene the NAAQS and jeopardize the public health of the environmental justice community. Moreover, EPA has

authority under Clean Air Act Sections 165(a)(7) and 114, as well as 40 CFR § 52.21(aa)(7)(x), to require ambient monitoring. See also discussion in response to comment 109(b), above, regarding the EAB's deference to the permitting authority in decision-making under EO 12898.

**Comment No. 112**

The Monitoring Requirements are not based on an accurate characterization of the existing air quality burden in nearby communities. Region 2's rationale for requiring ambient monitoring is also not based on an accurate characterization of the existing air quality burden in nearby communities. Region 2 states that "(t)he industrial nature of this part of St. Croix, compared to other parts of the Island and the rest of the US Virgin Islands, has potentially resulted in a disproportionate burden on these low income and minority residents in the vicinity of Limetree" (emphasis added). Region 2 provides no data that demonstrates there are adverse or disproportionate air quality burdens (i.e., NAAQS exceedances) in these communities. However, Region 2 then states that ambient SO2, NO2, and PM2.5 monitoring requirements are "consistent with EPA's obligations under EO 12898, in light of the burden already experienced by the nearby low income and minority populations" (emphasis added). Region 2 is basing these costly and burdensome monitoring requirements simply on their belief that there may be an adverse and disproportionate burden in the area, even though air quality modeling and ambient monitoring data demonstrate there is no adverse burden in the area. This is an unsupported and arbitrary assumption by Region 2 without any factual basis.

**Response 112**

The commenter's reference to EPA's language ("has potentially resulted in a disproportionate burden") is from the Fact Sheet. The Fact Sheet discusses EPA's process in conducting the environmental justice analysis and states that the industrial nature of the Island "potentially resulted" in a disproportionate burden on the low income and minority residents. This is, in part, why EPA went forward with an environmental justice analysis, including the modeling. The EAB has "encouraged permit issuers to examine any "superficially plausible" claim that a minority or low-income population may be disproportionately affected by a particular facility." *In re EcoEléctrica, LP*, 7 E.A.D. 56, 69 n.17 (EAB 1997) (citing *In re Chem. Waste Mgmt*., 6 E.A.D. 66, 75 (EAB 1995); *In re Envotech, L.P.*, 6 E.A.D. 260, 280 (EAB 1996)); *see also In re Shell Gulf of Mex., Inc. & Shell Offshore, Inc.*, 15 E.A.D. 103, 148 (EAB 2010).

After examining all of the information and data at the end of the process, EPA concluded that there was indeed a disproportionate burden. This is reflected in the EPA-Limetree EJ Analysis wherein the term "potentially" is not used. As stated in the EPA-Limetree EJ Analysis, the environmental burden in Region 2's analysis is not limited to the status of the NAAQS which showed violations, but to the multitude of environmental burdens experienced by the community nearby such as the St. Croix Renaissance Industrial park that was recently reported to cause health issues due to irritants from Red Mud, odor complaints from sources in the area that resulted in the closing of nearby schools, fires from the Anguilla landfill, proximity to a waste water treatment plant, noise and traffic issues associated with the nearby Henry E. Rohlsen Airport, and emissions from large ships docked at its coast. This kind of multi-factor analysis of all the environmental burdens, not just air quality related burden, is how Region 2 has conducted all of its environmental justice analyses under the Clean Air Act. In fact, EPA's screening tool under EO 12898, EJ Screen,[7] includes a wide variety of multi-media environmental indicators to

---

[7] EPA did not use EJ Screen in this case because the data does not exist for it in the Virgin Islands. However, EPA was still able to conduct a multi-factor analysis specifically tailored for St. Croix.

assess the environmental burden on the community. All of these factors lead to the conclusion that that the South-Central St. Croix area experiences a disproportionately high and adverse environmental burden.

**Comment No. 113. The Monitoring Requirements do not properly consider the EJ air quality modeling analysis**

**Comment No. 113(a)**

Limetree Bay voluntarily performed an extensive EJ modeling analysis for the 1-hr SO2 and NO2 NAAQS, and the 24-hr and annual PM2.5 NAAQS, at and under Region 2's direction. See email from Annamaria Colecchia to Mark Podrez dated 5/16/2019, EPA-R02-OAR-2019-0551-0063, transmitting EPA's comments on Limetree Bay's proposed modeling protocol; see also email from Mark Podrez to Annamaria Colecchia dated 6/17/2019, EPA-R02-OAR-2019-0551-0068, transmitting the modeling results and Environmental Justice Analysis Air Modeling Report, dated June 2019, EPA-R02-OAR-2019-0551-0060. That modeling analysis was based on procedures recommended by EPA for the 1-hr SO2 NAAQS Designation modeling and evaluated impacts not only in nearby communities, but at all ambient air locations on St. Croix. The EJ modeling analysis demonstrated there would not be any NAAQS exceedances nor adverse impacts at any location in St. Croix.

In the EPA-Limetree EJ Analysis, Region 2 notes that deriving short term actual emission rates (required for the 1-hr and 24-hr modeling analyses) from the annual PAL limits "requires a number of assumptions which leads to uncertainty in the outcome". Therefore, Region 2 effectively dismisses the modeling analysis conclusions and believes that the "uncertainty" in the modeling analysis warrants imposing the extensive ambient monitoring requirements. But these limitations were known going in and EPA developed the modeling protocol with these limitations in mind. The fact that the modeling results do not support EPA's monitoring goals does not justify calling them uncertain and abandoning them.

**Response 113(a)**

Region 2 required the modeling analysis as a condition of our December 28, 2018 completeness determination because we had concerns about the environmental justice community on St. Croix and needed the modeling analysis to properly carry out our responsibilities under the EJ Executive Order. Region 2 is required to carry out the EJ Executive Order for any permit that we issue under 40 CFR § 52.21. See EPA Response to Comments 109(b) and 116. Prior to issuing the completeness determination, Limetree had indicated a willingness to conduct the modeling analysis. EPA's completeness determination stated that EPA reserves the right to ask for information demonstrating that the PAL permit, if issued, would meet, among other things, Executive Order requirements. Region 2 agrees that EPA provided assistance to Limetree in the modeling analysis. Region 2 has always provided guidance to all applicants in order to obtain the most technically sound air quality analysis that is in accordance with Agency policy and regulations. In this case, Limetree understood from the outset that due to the different operational configurations it would be difficult to capture all worst-case scenarios given the nature of a PAL. But we agreed to attempt an analysis that was representative of at least the most plausible operating configuration, that is, the operating configuration used by HOVENSA during the baseline years because it would at least provide a general idea of the impact locations.

EPA suggested using hourly heat input rates measured by the CEMs and applying a professional engineering calculation for determining a plausible short-term emission rate for each unit. EPA suggested this possibility because it is a method found in 40 CFR § 51, Appendix W, Table 8-2. However, Limetree later informed EPA that they did not have hourly heat input rates measured by the CEM for each unit because HOVENSA had not archived much of the short-term data. As a result, Limetree only had very limited data from a limited number of units. Therefore, Limetree proposed, as the only alternative, to extrapolate from long-term rates to hourly rates for a few units and then further extrapolate this data to represent other units. This extrapolation is problematic because extrapolating from one unit to another leads to inaccuracies since emission rates are not uniform from one unit to the next. This is in addition to any operational variation that Limetree will have under the PAL.

Without the short-term data, Limetree could not provide the magnitude of the worst-case impacts. EPA had expected to receive, in the development of the protocol, all the data necessary to run the model. Since the data was missing, EPA entertained other methods to determine the actual hourly emission rate. However, those methods did not appear to be mathematically correct. Nonetheless, we indicated to Limetree that they could go ahead with the modeling approach they proposed while articulating our concerns that the modeling results might not be accurate. At the time we indicated that Limetree could go forward with the modeling, EPA had already begun discussions with Limetree about conducting ambient monitoring due to the concerns we expressed about the deficiencies in the modeling approach.[8]

**Comment No. 113(b)**

It must be noted that EPA has developed nationwide guidance on these same types of short-term emission rate calculations as part of the 1-hr SO2 NAAQS Attainment Designation process (see in particular Appendix B in the EPA memo "Guidance for 1-Hour SO2 Nonattainment Area SIP Submissions", from Stephen Page to Regional Air Division Directors, April 23, 2014). EPA's guidance includes methods for converting long-term average emission limits to "comparably stringent" short-term emission rates, and these same methods were used by Limetree Bay in the EJ modeling analyses.

This EPA guidance has been utilized in numerous 1-hr SO2 modeling analyses that have formed the basis for designation of nonattainment areas throughout the US, even though there are "uncertainties" in those modeling analyses. In Appendix B of the Page memo, EPA acknowledges some of the emission rate calculation uncertainties and states:

---

[8] The initial discussions about resuming the ambient monitoring networks began in early 2019. On May 7, 2019 Limetree sent a draft ambient monitoring approach to EPA. However, that approach addressed only SO2 in limited locations and circumstances. EPA did not agree with the limited nature of Limetree's ambient monitoring approach and, on July 18, 2019, EPA responded with a draft approach (July 18 draft) that included ambient monitoring requirements at mostly the same 5 original HOVENSA SO2 locations with one station to be relocated to the "peak" area, and for the addition of NO2 and PM2.5 as well. As there was no response to EPA's draft approach from Limetree for weeks, EPA arranged a conference call with Limetree's representatives to discuss the matter on August 20, 2019 during which EPA made clear that EPA was getting very close to issuing a proposed permit decision and, therefore, any response to EPA's approach would have to be provided by Limetree "ASAP." EPA waited one additional month after August 20, 2019 for Limetree to respond to the July 18 draft but did not receive a response. EPA sought to issue a draft permit in a timely manner given that Limetree had made repeated requests of EPA Headquarters offices and the Region to expedite issuance of the draft permit. After two months had passed since Limetree received EPA's approach without providing any response, EPA proceeded to incorporate Region 2's July 18 draft approach into the September 20, 2019 draft permit.

The EPA acknowledges that even with an adjustment to provide this comparable stringency, a source complying with a longer-term average emission limit could possibly have hourly emissions which occasionally exceed the critical emission value (CEV). An hour where emissions are above the critical value does not mean that a NAAQS exceedance is occurring in that hour. Indeed, the guidance states that "if periods of hourly emissions above the CEV are a rare occurrence at a source, these periods would be unlikely to have a significant impact on air quality, insofar as they would be very unlikely to occur repeatedly at the times when the meteorology is conducive for high ambient concentrations of SO2".

**Response 113(b)**

First, the April 23, 2014 document referenced in this comment was "intended to provide guidance and recommendations to state, local and tribal governments for the development of state implementation plans (SIPs) and tribal implementation plans (TIPs) under the 2010 1-hour primary National Ambient Air Quality Standard for Sulfur Dioxide (S02 NAAQS)." The guidance document was intended for developing nonattainment SIPs. The guidance references a method that could be used to establish a permit limit after the SIP modeling is done with the hourly emission rate. It is not a means for developing an hourly emission rate used in modeling, and it was not intended for all pollutants. Further, the guidance states that "[t]his guidance document imposes no binding or enforceable requirements or obligations on any person and is not final agency action."

Nevertheless, the comment incorrectly interprets the method referenced in the guidance. Appendix C of the guidance provides a method where a 1-hour CEV per emission source, analogous to a 1-hour limit that protects the NAAQS and is predetermined through an air quality dispersion modeling analysis, can be converted to a "comparatively stringent" longer term average emission limit. The guidance provides for a longer-term average emission limit of up to 30-days. The method is dependent on the known and established variability of 1-hour emissions by the individual source to develop an adjustment factor, based on the form of the 1-hour SO2 standard and the longer-term averaging period, that is applied to the 1-hour CEV to get a comparably stringent longer-term average emission limit. The method in the guidance is certainly not intended to convert a long-term average to a short-term average, especially not from an annual average to an hourly emission rate. It would be mathematically inaccurate to do so since longer term averages are a function of their short-term variability. Even if a uniform short term emission rate is assumed, it would be an incorrect assumption in this case since the emissions under a PAL are not uniform at all units, and at all times, and an accurate modeled assessment of the NAAQS could not be achieved in this manner.

Regarding the quote in the comment, "if periods of hourly emissions above the CEV are a rare occurrence at a source, these periods would be unlikely to have a significant impact on air quality, insofar as they would be very unlikely to occur repeatedly at the times when the meteorology is conducive for high ambient concentrations of SO2", this too is taken out of context. The sentence relates to the fact that an air quality concentration is not simply a function of emissions alone but also a function of other parameters such as the meteorological conditions when those emissions occur. The sentence also refers to "rare" occasions when a short-term emission rate may exceed its limit as opposed to routine exceedances due to variable emissions. In sum, the guidance cited is not applicable to Limetree's situation.

**Comment No. 113(c)**

All air quality modeling analyses have some degree of uncertainty resulting from calculations and assumptions on the emission rates modeled as well as uncertainties on the representativeness of meteorological and background air quality data. The Limetree Bay EJ modeling analysis used multiple years of site-specific meteorological and site-specific background air quality data, which is undeniably the "best practice" for air modeling. The emissions modeled were based on an analysis of hourly CEMS and heat input data for representative types of emission units and followed the 1-hr SO2 attainment modeling guidance methodologies.

**Response 113(c)**

EPA agrees that there is some inherent uncertainty in all modeling due to the accuracy, precision, and representativeness of the data input into the model. The model itself in this case is fine since it is the EPA preferred refined model, AERMOD. However, the model results, including those derived from an EPA preferred refined model, are only as good as the accuracy, precision and the representativeness of its data inputs. In this case, most of the short-term emission rate data was missing. Large amounts of missing data go beyond accuracy and precision of the data. Limetree had only very limited short-term emission rate data and, as a result, input mostly extrapolated emission rate data into the model. These inputs were inaccurately estimated which go beyond the acceptable level of uncertainty in any modeling analysis. Emission rates were only available for a few turbines, boilers, and heaters. Those emission rates were then extrapolated to the other units assuming the same uniform emissions with no consideration given to the possibilities that those units may increase the short-term peaks allowed under the annual PAL limits. In addition, an annual emission rate was used to approximate a short-term emission rate on the assumption of a linear relationship which is not mathematically accurate and cannot assure compliance with the short-term NAAQS. While the PAL provisions assume some level of uncertainty due to the variety of possible operating configurations and emissions variations across the emission points, the assumptions inherent in Limetree's modeling analysis result in an unacceptable level of uncertainty that has caused EPA to require ambient monitoring in the PAL permit. See also EPA Response to Comment 114(a).

**Comment No. 113(d)**

In summary, the uncertainties in the Limetree Bay air modeling analysis were known going in and are no more or less reliable than any other modeling conducted by EPA for other short-term NAAQS modeling analyses. Region 2 should place more weight on the EJ modeling analysis conclusion that there are no adverse impacts in the area and should not require extensive ambient monitoring under the overly simplistic rationale of addressing model "uncertainties".

**Response 113(d)**

EPA strongly disagrees that the modeling uncertainty is no different than any other modeling results and that the uncertainty in this case was known going in. We were unaware that the emission information was missing. In other modeling results, the short-term mass emission rates for each unit are known quantities and input into the model. The operating configurations of each unit are known quantities and input into the model. Those emission rates and configurations are then incorporated into the permit as enforceable limits. In this case, general assumptions were made such as the extrapolation of a short-term emission rate from the annual average. However, EPA cannot make general assumptions that the health-based NAAQS are protected. Therefore, EPA cannot rely on Limetree's EJ modeling analysis conclusions. The appropriate alternative to

assure compliance with the NAAQS is to require an ambient monitoring network, specific to Limetree's impacts. See also EPA Response to Comments 106, 112 and 113(a)-(c).

**Comment No. 114. The Monitoring Requirements do not properly consider existing monitoring data**

**Comment No. 114(a)**

Limetree Bay analyzed the large amount of available SO2, NO2, and PM2.5 site-specific monitoring data in the area as part of the EJ analysis. Monitoring for SO2 near the refinery has been performed since the 1980s, most recently at five stations located surrounding the Limetree Bay facility. In addition, HOVENSA collected NO2 monitoring data at two of these stations for the period 2006-2008, and the DPNR has been collecting PM2.5 data at a station located downwind from the refinery since at least 2002. This is a very extensive set of monitoring data focused on evaluating impacts from refinery operations that are adequate for performing an EJ analysis.

**Response 114(a)**

The monitors referenced by the commenter were in existence prior to the promulgation of the 2010 NAAQS which is the issue here. EPA notes that it is only requiring that one of the five SO2 monitor locations be moved to the peak location for 1-hour SO2 and adding two NO2 and one PM2.5 monitors in their respective peak locations. The other four SO2 monitors will be located at the previously established existing locations. Some of the data referenced by the commenter measured violations and exceedances of the SO2 NAAQS, in particular, in 2009 and 2010. There currently are no ambient air monitoring data that could be used to compliance with the SO2, NO2, and PM2.5 NAAQS or to address the intent and purpose of 40 CFR § 52.21(aa)(8)(ii)(b) once the refinery reopens. HOVENSA shut down the five SO2 monitors in 2012 with the commitment to restart the monitors if the refinery restarts in the future (see April 26, 2012 letter from HOVENSA and EPA's response in May 30, 2012).

The measured data that existed prior to the shutdown was considered by EPA and Limetree but found to have issues as noted below and was one reason why Limetree's resulting EJ modeling analyses was unreliable. Further, the SO2 ambient monitor measured violations of the 1-hour SO2 NAAQS prior to HOVENSA's shut down. The NO2 monitors were voluntarily installed by HOVENSA without EPA's approval for regulatory use to assess the annual NO2 impacts. The NO2 monitors were not in the area of maximum impacts for the 1-hour NO2 NAAQS. In addition, the NO2 data at Station 5 omitted a significant amount of data from 2007. Therefore, since the 1-hour NO2 NAAQS is based on a 3-year average, there is insufficient data to calculate a design value of the 1-hour NO2 NAAQS. EPA does not have information regarding the quality of the NO2 data measured at these stations or of the 1-hour NO2 NAAQS since the monitors were installed by HOVENSA for the annual average NO2 NAAQS. The Bethlehem Village monitor for PM2.5 is not in a location that would capture Limetree's maximum impacts with respect to the 24-hour PM2.5 standard. See also EPA Response to Comment 114(c).

Lastly, none of the above ambient monitors are sited in the area where in general one could expect the Limetree-specific peak impacts of the 1-hour SO2, 1 hour NO2, or the 24 hour PM2.5 concentrations to occur based on the operating scenario modeled in Limetree's EJ analysis. Therefore, EPA is requiring that one of the monitoring locations be moved to the peak impact areas.

**Comment No. 114(b): SO2 Data Analysis**

More than 30 years of ambient SO2 monitoring data at the various stations is already available in EPA's Air Data database. This includes recent data right up to the refinery ceasing operation in early 2012, and the 1-hr SO2 design concentrations for the period immediately before ceasing (the 3-year period 2009-2011) has been compared to the 1-hr SO2 NAAQS. At station 1, the design concentration was 96% of the NAAQS, and at the other four sites the measured concentrations ranged from 50% down to 13% of the NAAQS. See, SO2 Design Value Analysis 2007-2014, EPA-R02-OAR-2019-0551-0096, page 4 of 8. (Note: this is the design value period used by EPA and DPNR for designating attainment with the 1 hr. SO2 standard. This was for a period when the full refinery was operating, with actual SO2 emissions during 2009-2011 of 2,700 tpy versus the proposed PAL SO2 limit of 1,626 tpy. Considering that the proposed PAL limit is 40% lower than actual emissions during the monitoring data period (future operations under the PAL including lower fuel oil sulfur content limits and the elimination of the incineration of sulfur plant emissions when the tail gas control unit is inoperative), the available monitoring data indicates that future operations under the PAL permit will not pose a threat to the 1-hr SO2 NAAQS. See, SO2 Design Value Analysis 2007-2014, EPA-R02-OAR-2019-0551-0094; 2010 to 2013 SO2 Monitoring Data, EPA-R02-OAR-2019-0551-0096; Environmental Justice Analysis Air Modeling Report, EPA-R02-OAR-2019-0551-0060, Section 7.2. (Note: Monitoring data for each monitor for the years 2010 to 2013 can be found in EPA-R02-OAR-2019-0551-0096. For 2009 data, refer to EPA-R02-OAR-2019-0551-0094, page 4 of 8, third column.)

Region 2's EJ analysis stated that there were measured design value violations of the 1-hour SO2 NAAQS both in 2009 and in 2010 at Station 1, and that there were exceedances of the 1 hour SO2 NAAQS at Station 2 and 3 in 2008, 2009, and 2011. These statements are misleading for several reasons. First, SO2 emissions from Limetree Bay's operations will be 40% lower than HOVENSA's due to the smaller footprint of the project and new applicable requirements that have come into effect since 2008-2011 including NSPS Subpart Ja and lower fuel oil sulfur limits. Second, even with respect to HOVENSA's operations, EPA's statement is misleading because the 1-hr SO2 NAAQS was not even effective until August 2010, and it is not appropriate to compare older, historical monitoring data to a new NAAQS. Third, based on the data presented in the docket, there were no exceedances of the 1-hr SO2 NAAQS at Station 2 and 3 for any year (i.e., the 99th percentile daily 1-hr maximum concentrations at these stations are not above the NAAQS concentration), and the design concentrations never exceeded approximately 60% of the NAAQS. See, SO2 Design Value Analysis 2007-2014, EPA-R02-OAR-2019-0551-0094; 2010 to 2013 SO2 Monitoring Data, EPA-R02-OAR-2019-0551-0096; Environmental Justice Analysis Air Modeling Report, EPA-R02-OAR-2019-0551-0060, Section 7.2.

**Response 114(b)**

In assessing the need for post operational ambient monitoring, EPA reviewed the measured ambient concentration for several years just prior to shutting down the ambient monitors in 2012 (i.e., 2008 to 2011). In each year the design values were different as one would expect. However, in 2009 and 2010 EPA identified two violations of the 1-hour SO2 NAAQS at Station 1. Further, in 2008, 2009, and 2011 there were measured exceedances of the 1-hour SO2 NAAQS at Station 2 and Station 3. This is contained in the docket at EPA-R02-OAR-2019-0551-0094. Commenter has not provided support from the docket or any other source for its claim that there were no exceedances of the 1-hour SO2 NAAQS at Station 2 and 3 for any year. In fact, as noted, EPA

found exceedances or violations of the NAAQS during 4 successive years. Thus, EPA did not restrict the evaluation to a single preceding year that could be an anomaly but looked at a representative set of years since it is understood that each year could be different given different emission scenarios and different meteorology.

We understand that the 1-hour SO2 NAAQS was not in effect prior to August 2010 but the violations measured by the ambient data demonstrates the need to be cautious moving forward especially since the impacts from the refinery operating under the PAL could not be modeled accurately.

Since the commenter referred to the 30-year period, it should be noted that, hypothetically, if the 1 hour SO2 NAAQS had been in effect since 1983, the HOVENSA monitoring data indicate that the measurements (design values) from 1985 through 1988, 1992-1994, and 2000 through 2006 would have been over 75 ppb, the standard for the 1-hour SO2 NAAQS. EPA already demonstrated violations in 2009 and 2010 (in design value years) and used this more recent, representative period to determine that post operational ambient monitoring is warranted in this case. Even the 2011 design value year referenced by the commenter is 72 ppb which is marginally close and does not offer enough assurance that the NAAQS will continue to be met.

Regarding the reference to EPA-R02-OAR-2019-0551-0096, which is an AMP450NC report, the report contains maximum and mean values data from 2010-2013 and is not an SO2 design value report. Page 4 of the document lists SO2 collection methods used in the generation of the AMP450NC and not design value information. EPA-R02-OAR-2019-0551-0094 is a design value report from 2009-2014. EPA-R02-OAR-2019-0551-0094 shows 99th percentile values in excess of 75 ppb for 2008, 2009, and 2011 and design values of greater than 75 ppb for 2009 and 2010.

For designation purposes, USVI was designated " attainment/unclassifiable" since these areas were not required to be characterized under 40 CFR § 51.1203(c) or (d) and the EPA does not have available information including but not limited to appropriate modeling analyses and/or monitoring data that suggests that the areas may (i) not be meeting the NAAQS, or (ii) contribute to ambient air quality in a nearby area that does not meet the NAAQS. EPA did not have the modeling or monitoring, hence the classification. The commenter's note in the parenthetical addressing EPA-R02-OAR-2019-0551-0096 is incorrect as the area is designated as "attainment/unclassifiable."

Regarding the comment that Limetree will be emitting 40% less than HOVENSA (note that Limetree references a 70% reduction elsewhere in their comments), it appears that Limetree is basing this level of reduction on an inappropriate comparison between the potential to emit prior to HOVENSA's shutdown and the PAL level. In fact, Limetree's PAL levels in the permit are based on HOVENSA's actual emissions in 2009 to 2011 plus the significant emission level under 40 CFR § 52.21(b)(23) for each PAL pollutant. The 2009-2011 timeframe is the period when some of the SO2 NAAQS exceedances and violations were measured, so there is significant risk of an exceedance and violation because Limetree's PAL level is similar to the actual emissions when the exceedances and violations took place. Therefore, we do not agree that reductions below HOVENSA's historic allowable emissions has any relevance to the question of whether Limetree's emissions might cause or contribute to a violation of the SO2 NAAQS.

**Comment No. 114(c): PM2.5 Data Analysis**

PM2.5 monitoring is already being performed by DPNR at the Bethlehem Village Housing monitoring station, in a community located in a predominately downwind direction from Limetree Bay. The design concentrations for the recent data period 2015-2017 for the 24-hr and annual averages are approximately 54% and 64% of the 24-hr and annual NAAQS. Limitree Bay also evaluated PM2.5 data for the last 3 years when the HOVENSA refinery was in operation, 2009-2011, and found that the design concentrations were similar between the 2009-2011 and 2015-2017 periods. This data indicates that the PM2.5 monitoring data is consistent over this time period, and that there are no adverse PM2.5 burdens. In addition, PM2.5 emissions will not increase relative to HOVENSA's operations.

**Response 114(c)**

The PM2.5 ambient monitor in Bethlehem Village is expected to continue to operate and will be a good resource for evaluating the NAAQS on St. Croix especially the annual average PM2.5 NAAQS. However, this monitor is not located in Limetree's maximum impact area for the 24-hour PM2.5 NAAQS and, therefore, is not representative of Limetree's maximum 24-hour average impacts. While we do not know the percentage of the 24-hour NAAQS that we would expect at the peak location, we do know that it is likely to be higher than 54% of the 24-hour NAAQS measured at the Bethlehem Village monitoring station. Due to the uncertainty in Limetree's modeling, we do not know what the impacts would be at the peak location. This is why we are requiring an ambient monitor for PM2.5.

**Comment No. 114(d): NO2 Data Analysis**

NO2 monitoring was previously performed by HOVENSA at Stations 2 and 5 for the time period 2006 through 2008 using EPA equivalent monitors and in accordance with the projects Quality Assurance Project Plan (QAPP). EPA Region 2 conducted annual quality assurance audits of these monitors, and the systems passed the audits. This data was used by Region 2 in PSD permits air quality analyses for HOVENSA. Although the data was never required to be loaded and certified into the EPA AQS data base, that does not indicate that the data is inaccurate or questionable. The maximum monitored 1-hr NO2 impact was measured at Station 2 and was 40% of the NAAQS, which is a large compliance margin. And, as reflected in the company's PAL application, NOx emissions from Limetree Bay's operations will be 33% percent lower than the actual emission during 2009-2011 when HOVENSA operated the refinery.

**Response 114(d)**

This data was not relied upon by EPA for any HOVENSA permit since it was not approved for regulatory purposes. While EPA inspectors performed some audits, the monitors were not sited for determining maximum impacts, especially not the 1-hour NO2 impacts since this NAAQS was not yet promulgated. The 40% of the NAAQS reference in the comment is derived by taking one-hour readings from the annual monitor but EPA never evaluated the data for the annual or one-hour standard. The monitors were sited by HOVENSA to determine an annual average background concentration and ambient ratios of NO2/NOx that were needed to calculate the annual average NO2 concentrations. HOVENSA voluntarily installed the monitors since, at the time, EPA only had a single default ambient NO2/NOx ratio of 0.75 in EPA modeling guidelines for determining annual NO2 concentrations, which HOVENSA contend to be too conservative. HOVENSA wanted to demonstrate a better ratio. However, the recalculated ratio was not used for any regulatory purposes by EPA since the siting of the monitors did not undergo proper

regulatory review and EPA could not conclude that the monitor was in the maximum impact location.

**Comment No. 114(e): Summary of Monitoring Data Analysis**

In summary, the ambient monitoring data collected immediately before the refinery ceased operating indicates that there were no NAAQS exceedances[9] or adverse SO2, NO2, and PM2.5 impacts occurring in nearby communities on St. Croix when HOVENSA was operating the refinery. As the draft PAL permit reflects, SO2 and NOx emissions from the refinery under the PAL will be 40% and 33% lower, respectively, than the actual emissions that occurred during 2009-2011. Given these emission reductions under the draft PAL permit (compared to the emissions prior to refinery ceasing operation when the monitoring data was collected), there is no reason to expect that Limetree Bay's operations will approach the prior monitoring levels or cause a NAAQS exceedance. The available data is more than adequate for the EJ analysis, and there is no reasonable technical justification to require additional air monitoring.

In its EJ analysis, Region 2 states that there is "uncertainty" in the background monitored measurements. As an example, Region 2 states that for SO2, "the 10 month comparison of monitored data from April 2012 to February 2013 may not be sufficient to conclude that the monitors measured adequate concentrations to be able to properly characterize the background contributions that require 3 years of data for NAAQS compliance". This statement does not accurately describe the basis of the background SO2 data. Data from Station 5 for the three-year design concentration period from 2010 to 2013 were used as background data, not 10 months of data. EPA states that the NO2 monitored data was not certified by Region 2 or DPNR but does not describe how the monitors passed all Region 2 audits, and operations followed a detailed QAPP. Finally, EPA states that the PM2.5 data had low data capture but does not describe how it was adjusted using standard procedures in 40 CFR § 50 Appendix N to address the low capture rates.

**Response 114(e)**

Each comment in the summary has been responded to above, except for the statement concerning adjustments for low data capture for PM2.5. EPA did not rely on the existing PM2.5 monitor data at the Bethlehem Village monitor because it had low data capture. The EPA does not perform "adjustments" when there is low data capture and, more broadly, EPA does not adjust data that states submit to the Agency. The commenter has not identified any specific language in Appendix N that would provide for adjustments to address low data capture. The comment may be referring to 40 CFR § 50 Appendix N 4.2(c) which provides criteria for when the EPA may consider 24-hour PM2.5 NAAQS design values as valid even though completeness criteria is not met. However, this language in Appendix N 4.2(c) is not applicable in a PM2.5 24-hour NAAQS design value that is equal to or below the level of the NAAQS and can be validated if it passes the maximum quarterly value data substitution test. In order to apply this test, there needs to be at least 50 percent data capture in each quarter that has less than 75 percent data capture. If any quarter has less than 50 percent data capture the data substitution test cannot be used. In 2011 there were 2 quarters with less than 50 percent data capture at the PM2.5 monitor referred to by

---

[9] The refinery cease operating in early 2012, therefore the 1-hr monitoring design concentration period that is most representative of recent refinery operations is 2009-2011. The Station 1 1-hr SO2 design concentration for 2008-2010 was 106% of the 1-hr SO2 NAAQS, however the final design concentration for 2009-2011 that was used for 1-hr SO2 NAAQS attainment designation purposes was 96% of the 1-hr SO2 NAAQS.

the commenter, which prohibits the use of the data substitution test. Note also that EPA did not rely on the 2009-2011 for attainment designations.

**Comment No. 114(f)**

EJ modeling analyses typically do not have the large amount of available site-specific meteorological and ambient air quality monitoring data as in this case. The available monitoring data is adequate and reduces uncertainties in the EJ analysis, and there is no need to collect additional ambient data in order for Region 2 to fulfill obligations under EO 12898.

**Response 114(f)**

EJ modeling is not held to a lower standard than any other modeling used for regulatory purposes. In each of Region 2's Clean Air Act EJ modeling analyses since the 1994 EJ Executive Order was issued, we have applied the same rigor as we have done with the non-EJ modeling analyses. Despite having site-specific meteorological data, the short-term emissions from Limetree and the ambient data that would affect modeled impacts results relevant to the short-term NAAQS are unknown.

**Comment No. 115**

The list of PAL Permit Units in the Appendix to the draft PAL permit must be revised to include TK-7510 as represented in the PAL permit application.

**Response 115**

EPA has revised the Appendix to the PAL Permit to include TK-7510 unit as represented in the PAL permit application.

**Comments from Citizens/Environmental Groups –**
**Air Quality, Ecosystems, Environmental Justice, and Public Health & Safety**

**Comment No. 116**
Permit should be denied due to adverse impacts and likely violation of federal and territorial environmental laws.

**Response 116**
The commenter did not provide specific information about the adverse impacts of concern or the laws that the commenter believes might be violated, so it is not possible to provide a specific response. However, EO 12898, entitled "Federal Actions to Address Environmental Justice in Minority Populations and Low Income Populations" (February 11, 1994), directs federal agencies to make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low income populations in the United States and its territories. EPA Region 2's Interim Environmental Justice Policy directs the Region to apply EO 12898 to "permitting decisions that include new major permits, significant permit modifications, or major permit renewals." EPA Region 2 Interim Environmental Justice Policy at 26 (Dec. 2000). EAB has determined that EO 12898 applies to permits under 40 CFR § 52.21. See EPA Response to Comment 109(b). As discussed in Response to Comment 118, EPA's Environmental Justice analysis could not conclude that the NAAQS are protected, which is why the permit contains conditions for ambient monitoring which will assess whether there are exceedances or violations of the health-based NAAQS, consistent with the PAL regulatory provisions at 52.21(aa)(7)(x) and 40 CFR § 52.21(aa)(8)(ii)(b)(3) and other Clean Air Act Authorities. See detailed explanation in EPA Response to Comment 106 and 108. In addition, the permit has been processed in accordance with the public procedures of 40 CFR § 124 and is consistent with the requirements of the PAL provisions at 40 CFR § 52.21(aa). With respect to territorial environmental laws, DPNR is the permitting authority, not EPA.

**Comment No. 117**
Make all emissions data available to the public online and in written reports in both English and Spanish. All Limetree documents must be translated into Spanish and French Creole to meet accommodations for individuals with Limited English Proficiency. There is no indication that EPA provided materials nor made public meeting accommodations for individuals with Limited English Proficiency (LEP). EPA should extend the public comment period for at least another 45 days in order to allow the USVI's significant LEP population appropriate time to evaluate and comment on the Draft Permit, and provide an additional, multi-lingual public information session within this extended comment period. This is additionally necessary because of new information about continuing impacts of Limetree's polystyrene pollution incident.

**Response 117**
EO 13166, *Improving Access to Services for Persons with Limited English Proficiency*, 65 Fed. Reg. 50,121 (Aug. 16, 2000), directs federal agencies to develop and implement a plan to

provide services to Limited English Proficiency (LEP) individuals and to ensure meaningful access to programs and activities conducted by federal agencies. EPA's LEP Order, *Compliance with Executive Order 13166: Improving Access to Services for Persons with Limited English Proficiency*, issued on July 28, 2011, and updated on Feb. 10, 2017, sets forth the EPA's expectations and requirements to ensure compliance with EO 13166. The LEP Order provides an explanation of how EPA Headquarters and regional program offices can assess the need to provide oral and written services in languages other than English through a balancing of four-factors (1) the number or proportion of LEP individuals in the eligible service population, (2) the frequency with which LEP individuals come in contact with the program, (3) the importance of the service provided by the program, and (4) the resources available to the EPA. EPA must provide meaningful access to any LEP individual; however, the balancing of these factors will assist programs to determine the appropriate means or method by which to achieve that result.

EPA provided a public availability session on November 7, 2019 followed by the public hearing on November 8, 2019 in St. Croix, VI. The public availability session was an informal opportunity open to the public to learn about the draft PAL permit and make more informed official comments during the public comment period and public hearing. The Feb. 10, 2017 EPA LEP Order states that, "at the first point of contact with a LEP individual, EPA staff will make an initial assessment of the need for language assistance services." EPA LEP Order at 7. However, EPA was not made aware before or during either the public availability session or public hearing that there were LEP individuals in need of translation, so the Agency did not have an opportunity to make the assessment with respect to oral translation. No comments either verbally or orally at the hearing or any communication requests were received in any language besides English or from people with LEP. The Feb. 10, 2017 EPA LEP Order further states that with respect to documents intended for public outreach or a broad audience, EPA should translate vital documents only "where a significant percentage of the population…likely to be directly affected" are of limited English proficiency. Id. at 11. According to the 2000 US Census, 0.7% of the USVI population speak English "not at all" and 2.8% of the population speak English "not well." The 2000 Census also reveals that in Southcentral St. Croix, 98.8% of French and French-Creole speakers speak English at least "very well" and 89.5% of the Spanish speakers speak English at least "very well."

Keeping in mind the very low proportion of LEP population in the USVI and other factors listed above, EPA has not translated the written reports and emissions data or extended the public comment period. See also EPA Response to Comment 121, below, regarding extension of the public comment period. The polystyrene incident, referenced in the comment, was raised by commenter in the context of Endangered Species Act (ESA) concerns. As discussed in EPA Response to Comment 123, the nature of the PAL permit is such that the PAL will not increase the likelihood of polystyrene pollution nor does it implicate such pollution in the ESA analysis which is based on potential air emissions impacts on the species. Therefore, polystyrene pollution is not a basis for extending the public comment period.

While it is unclear which specific documents the commenter believes EPA should have translated, EPA notes that, in addition to the EPA LEP Order which does not call for translation in this case, the Region 2 Policy on Translations & Interpretations, Order No. R-1500.1 does not provide for translation of legally binding documents or detailed and lengthy technical documents, such as the draft PAL permit and PAL application, because of the potential for introducing ambiguity or confusion about the intended meaning of the document.

Although EPA has not provided translation given the specific facts of this permit action, some of the data requested by the commenter will be made available online. See EPA Response to Comment 119, below.

**Comment No. 118**
The Environmental Justice analysis is ambiguous and fails to even mention public health impacts. The Draft Permit presents serious Environmental Justice (EJ) issues: the EJ modeling is uncertain, proposes insufficient mitigation measures, and does not mention public health impacts.

**Response 118**
As discussed in detail, below, the EPA-Limetree EJ Analysis, does indeed address public health because it examines the impact of the facility on the National Ambient Air Quality Standards (NAAQS), which are health-based standards. When Congress passed the Clean Air Act in 1970, they required EPA to set the NAAQS at a level that will protect public health with an adequate margin of safety; as such, the NAAQS are health-based air quality standards. This requirement was established with no regard to cost. Therefore, in accordance with the Clean Air Act, EPA developed "criteria" documents that represent a compilation and scientific assessment of all the health and environmental effects information available and further consulted with the Clean Air Scientific Advisory Committee (CASAC) in setting the standards. CASAC is a Congressionally mandated group of independent scientific and technical experts. With CASAC, EPA developed criteria documents for each NAAQS that provide an analysis of sensitive populations such as children, the elderly and asthmatics. The health-based NAAQS, therefore, are not only protective of the general population but consider sensitive populations.

However, we agree that the results of Limetree's June 2019 EJ modeling analysis are uncertain. The EPA-Limetree EJ Analysis outlines the reasons why the modeling results are uncertain. See also EPA Response to Comment 106. This is the reason why we are requiring ambient monitoring in the PAL permit as a strategy under the EJ Executive Order and in accordance with the PAL regulatory provisions and the Clean Air Act.

Limetree modeled one operating scenario. There was enough certainty in this one scenario to approximate the general location of peak impacts since that emission scenario was based on the same operating configuration used during the PAL baseline period. This configuration could serve as an approximation of the location of the impacts including the peak impacts. However, even with the one emissions scenario, the magnitude of the impacts remains uncertain. Further, given that different operating scenarios under different wind conditions lead to different impact locations, a network of ambient monitoring surrounding the vicinity of the facility is the optimum way to assess compliance with the NAAQS. Therefore, as discussed in the EPA-Limetree EJ Analysis, EPA is requiring these ambient monitors to assess compliance with the health-based NAAQS in a community highly impacted by multiple complex environmental burdens and to meet EPA's obligation under EO 12898. Thus, public health is at the core of EPA's reason for requiring an ambient monitoring network for three of the criteria pollutants, SO2, NO2, and PM2.5, so that a comparison to the health-based NAAQS may be made. The PAL conditions do not need to prescribe the specific remedy in the event that an ambient monitor detects a violation of the NAAQS because 40 CFR § 52.21(aa)(8)(ii)(b)(3) provides EPA with authority to "reduce the PAL if [it] determines that a reduction is necessary to avoid causing or contributing to a NAAQS or PSD increment violation." There are other options to address a

NAAQS or increment violation, if one occurs, through the State Implementation Plan (SIP) process. For example, it is possible that a limited number of specific units could cause or contribute to a NAAQS violation, and we could address that violation through the SIP without reducing the PAL. The response to a violation would be tailored to the particular situation. Importantly, the permit conditions do contain robust requirements for ambient monitoring of SO2, NO2 and PM2.5 so that we are alerted to a violation and can respond appropriately.

In addition, as discussed in EPA Response to Comment 120, the PAL permit will limit emissions of Volatile Organic Compounds (VOCs) which include some hazardous air pollutants including ones that may cause cancer. The PAL permit contains record keeping and monitoring requirements for each PAL pollutant to ensure annual emissions stay within the PAL limits.

EPA's EJ analysis forms the basis of measures incorporated into the draft PAL permit to address concerns about the uncertainty of the modeling results. That is, Limetree will be required to conduct ambient monitoring, to upload the ambient measurements onto EPA's Air Quality System (AQS) website, which is available on-line to the public, and to report on a quarterly basis the concentrations that are measured. Furthermore, as the EPA-Limetree EJ Analysis states and the draft permit requires, if an exceedance or violation is measured, Limetree must report this to EPA and DPNR no later than 15 days after detection, as discussed in more detail in EPA Response to Comment 119, below.

**Comment No. 119**
Firstly, the self-reporting mechanism is problematically reminiscent of how, according to Senator Nellie Rivera-O'Reilly, "the U.S. government allowed HOVENSA to 'self-report' its emissions, even though some residents had complained of becoming 'violently ill' from pollution…" Secondly, 15 days just to *report* a violation comprises far too long a time period for this EJ community to live with the health and practical burdens that foreseeably result from breathing unclean air.

**Response 119**
It is important to distinguish between ambient monitoring, which detects pollutant concentrations in ambient air, and unit-specific emissions monitoring which measures the amount of pollution emitted from each of the many units at the facility. The former is used to assess the air quality impacts at Limetree's areas of maximum impact, and the latter measurements are summed to determine whether the PAL emission levels in the permit are violated. We understand the commenters' concern about potential health impacts (discussed, below, in EPA Response to Comment 120) and ensuring the integrity of monitoring and reporting whether it is ambient monitoring or unit-specific emissions monitoring. The reporting requirements in this permit are at least as stringent as those in other Clean Air Act permits. In fact, the monitoring, reporting and record-keeping provisions of a PAL permit are more robust than most PSD permits because the PAL provisions have very specific monitoring, recordkeeping and reporting requirements. See 40 CFR § 52.21(aa)(12)-(14). Limetree is not reporting to itself. Rather, it is reporting to EPA under explicit legally enforceable conditions in the permit and with EPA oversight.

The conditions for unit-specific emissions monitoring were developed based upon widely accepted and rigorous monitoring approaches that are specified in the underlying regulations. The reporting requirements in the permit are federally enforceable. EPA has discretion to take enforcement action against Limetree if there are violations of the monitoring, recordkeeping, and

reporting requirements in the permit. Limetree must provide EPA with semi-annual reports containing unit-specific information and report deviations or exceedances of the PAL emissions limits to EPA within two working days. These reports are public information which are available from EPA through the Freedom of Information Act. More broadly, Limetree must also submit certified compliance reports to DPNR pursuant to Clean Air Act Title V requirements, report deviations to DPNR, and identify corrective actions or preventive measures, within two days; these reports can be obtained from DPNR.

The PAL permit conditions for ambient monitoring require the permittee to develop an ambient air monitoring plan and QAPP which must be approved by EPA, and no data will be accepted by EPA until the approval is issued. The permittee must also follow the Quality Assured/Quality Control procedures specified in 40 CFR § 58. While it is the permittee's responsibility to collect the data, the permittee must upload the data to EPA's on-line Air Quality System website on a regular basis and formally report them to EPA and DPNR on a quarterly and annual basis. The on-line data is available for review not only by EPA and DPNR but by members of the public.

Further, EPA has authority to conduct audits and inspections of the ambient monitors, the measured ambient data, and of the facility, to ensure that Limetree is operating according to their permit conditions and that the ambient measurements meet data quality requirements in EPA regulations including the proper quality assurance, quality controls, and data capture criteria needed for ensuring compliance with the NAAQS. The 15-day notice requirement for exceedances or violations of the NAAQS is to avoid waiting for notification of a potential issue until the time of the quarterly report. Fifteen days is a relatively short amount of time in the context of the statutory and regulatory requirements to address violations of the NAAQS. Violations of the newer more stringent shorter-term NAAQS for NO2, SO2, and PM2.5 addressed in the PAL permit's ambient monitoring conditions, are determined based on 3 years, rather than days, of data. This is why one exceedance of the NAAQS on a particular day does not necessarily mean that there is a violation of the health-based NAAQS. In fact, three years of data are required to make a finding of violation of the NAAQS which puts into perspective the relatively short fifteen-day maximum notice period.

In order to explain why an exceedance of the NAAQS on a particular day does not, by itself, represent a violation of the health-based NAAQS, it is important to provide some background on the "form" of the NAAQS and how it relates to the concentration level. As described in footnote 6 of the EPA's EJ Analysis, the NAAQS for each pollutant may be found on EPA's website at *https://www.epa.gov/criteria-air-pollutants*. Each NAAQS pollutant includes a concentration level and is expressed in a certain form. The concentration level and form are different for each pollutant and averaging time. The concentration level for each pollutant is developed by EPA based on careful evaluation of epidemiological evidence about health impacts from that pollutant taking into account sensitive populations. An exceedance means one occurrence of either a measured or modeled concentration that exceeds the specified concentration level of such standard for the averaging period specified by the standard (40 CFR § 50.1). A violation of the NAAQS occurs when the form of the standard is violated (40 CFR § 51 Appendix W, section 9.2.2, (*i.e.,* when and where the predicted design concentration is greater than the NAAQS)"). A reason for establishing a NAAQS in the respective form is that it eliminates measurements that could be statistical outliers and allows for a determination of a violation to be made on a more robust estimate.

For example, the concentration level of the 1-hour SO2 NAAQS is 75 ppb (or 196 $u$g/m$^3$). The form of the 1-hour SO2 NAAQS is the 3-year average of the 99th percentile of the annual distribution of the daily maximum 1-hour concentrations. An exceedance is a 1-hour concentration that is greater than 75 ppb. A violation of the NAAQS would occur if the 3-year average of the 99th percentile of the annual distribution of the daily maximum 1-hour concentration is greater than 75 ppb. Having the continuous monitor that measures both an exceedance and a violation of a NAAQS will assist EPA and VIDPNR in assessing the status of the air quality in the area and better understand the sources of the elevated concentrations.

**Comment No. 120**

The residents of St Croix will not put the refinery's economic "viability" above their physical health and that of the islands air and water. I do not wish for my health to suffer and do not want the environmental ramifications of allowing more toxic pollutants to be released by the refinery. The air was not as clean, and people got sick that lived close by or lived in the winds where it blew. A local high school is experiencing a strong gas odor. At the time of drafting these comments, students at St. Croix Central High School, located near the Refinery, are missing their second *week* of school due to complaints of a foul smell.

**Response 120**

The community is impacted by a number of environmental burdens, including the history of odors, as discussed in the EPA-Limetree EJ Analysis. The odors, in part, formed the basis of the decision discussed in Region 2's environmental justice analysis, consistent with EO 12898 and the PAL regulatory provisions, to include ambient monitoring conditions in the PAL permit.

EPA received a number of requests for technical assistance from DPNR related to odors on St. Croix over approximately a ten-year period. EPA responded on at least five occasions. The source of the odors varied during our visits and could not always be definitively identified. While regulation of odors is outside the scope of the PAL permit action, we will continue to support DPNR in these efforts. In drafting the PAL permit, EPA did not put economic viability above the health of the people in the community. The PAL permit provisions do not provide for EPA to consider the economic viability of the facility when issuing a PAL permit. Only specific requirements enumerated in the PAL provisions are considered such as emission limitations, monitoring, recordkeeping and reporting requirements, fugitive emissions, and other air pollution emissions-related considerations. And as discussed in EPA Response to Comment 108, EPA can consider other requirements necessary to implement and enforce the PAL, such as those related to avoiding a health-based NAAQS exceedance or violation. In addition, the Executive Order on Environmental Justice and the Clean Air Act directs EPA to consider the health impacts on the community related to ambient air quality. EPA agrees that the health of the residents of St. Croix is important and thus we incorporated ambient monitoring of 3 health-based criteria pollutants into the draft permit so that air quality concentrations may be measured, with required notification to EPA if adverse concentrations are found so that further action can be taken. EPA does not have authority under the PAL permit regulations to impose requirements for specific hazardous air pollutants because the PAL permit program only addresses emissions of pollutants regulated under 40 CFR § 52.21 and precursors to such pollutants, which does not directly include air toxics. However, in response to the community's concern about adverse health impacts due to various air toxic pollutants, EPA notes that air toxics were part of a study conducted in St. Croix in 2011. The study included ambient measurements of the various air toxics. It was found that the concentrations were within benchmark concentrations for health risk

assessments. Because this study was conducted in 2011, it would have included concentrations from the portion of the refinery that will be operating under the PAL permit. To the degree that the air toxics of concern are Volatile Organic Compounds (VOCs), which are precursors to the criteria pollutant ozone, the PAL permit will serve to limit their emissions, including ones that may cause cancer. Otherwise, the air toxics are outside the scope of the PAL permit program. EPA also understands that people reported illnesses and complained of experiencing odors even after HOVENSA shut down. The range of environmental burdens, including odors, experienced by the community is, in part, the basis of our conclusion in the environmental justice analysis that ambient monitoring including site-specific meteorological monitoring should be implemented. The conditions that we included in the PAL ensure that we can take action, as discussed above in EPA Response to Comments 116 and 118, in the event that Limetree's emissions cause exceedances or violations of the health-based NAAQS. We note that one of the ambient monitors will be located near the hospital which will make it possible to measure air quality for the sensitive populations at the hospital. With respect to the commenters' concern about impacts on water, please see EPA Response to Comment 122 which discusses EPA's acid deposition analysis.

**Comment No. 121**

EPA should provide an extension of 60 days for the comment period to allow the community more time to review the thousands of pages of documents. We are asking for more time to review the Limetree Bay Refinery Clean Air Act Plantwide Applicability Limit (PAL) permit application, a highly technical project. The use of a PAL will harm the burdened EJ community of South-Central St. Croix by reducing opportunities for public participation.

**Response 121**

Public participation was a critical factor that weighed into EPA's EJ analysis. The public comment period began on October 9, 2019 and was lengthened from the 30 days as required by regulation, to 47 days.[10] The public notice provided a link to the complete administrative record which was available to the public as of October 9, 2019. Because of EJ concerns, on November 7, 2019, EPA held a public availability session which is not required by regulation. The public availability session included an educational presentation and an informal question and answer session that could assist the public in making informed comments. A public availability session was provided in advance of the public hearing, which was scheduled even before learning whether there was a significant degree of public interest, so that the public could learn more about the draft PAL permit and participate in the permit process. The public was able to submit timely comments until November 25, 2019, which was 18 days after the public availability session. Thus, EPA recognized the importance of public participation opportunities in the permit process, provided more time than required by regulation, and offered opportunities for the public to meaningfully participate in the process and submit comments. Given the ample time provided for commenting on the PAL permit and the accessibility of documents on EPA's website from October 9, 2019 until the close of the public comment period on November 25, 2019, EPA decided not to extend the public comment period as requested in the comment.

If the commenter, in its reference to reduced opportunities for public participation, is also alluding to future additions or emission changes at the facility that are allowed by the PAL, such changes are allowed under the PAL provisions and may or may not require a minor NSR permit

---

[10] Note that while the October 9, 2019 Public Notice announced a 45-day public comment period, EPA added two additional days, for a total of 47 days, because the 45th day fell on a Saturday.

to be issued by the USVI; if a minor NSR permit is required, there would be an associated public comment period. This is a fundamental characteristic of a PAL that was established when EPA wrote its PAL provisions, so EPA Region 2 does not have the discretion to change this in the context of this PAL permit approval. However, the PAL issued in this action requires that emissions stay within the annual emission cap for each pollutant in the PAL permit. Any requested increases or changes greater than the PAL limits would need to undergo another round of permit review in accordance with 40 CFR § 52.21(aa)(11). It is also worth noting that any such increase in the PAL would again be required to meet the public participation requirements in 40 CFR § 124 and would follow environmental justice EO 12898, which also includes a public participation component. Further, 40 CFR § 52.21(aa)(8)(ii)(c) provides that "[e]xcept for the permit reopening in paragraph (aa)(8)(ii)(a)(1) of this section for the correction of typographical/calculation errors that do not increase the PAL level, all other re-openings shall be carried out in accordance with the public participation requirements of paragraph (aa)(5) of this section." Therefore, public participation will be solicited in the future for increases and reopening of the PAL permit, and such participation will be consistent with 40 CFR § 124, the EJ executive order and the PAL provisions.

**Comment No. 122**

EPA must perform a BiOp and consult with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service on all endangered species surrounding the refinery to comply with the Endangered Species Act (ESA). Consultation with National Marine Fisheries Service (NMFS) and the U.S. Fish and Wildlife Service (FWS) is triggered under Section 7 of the ESA by undertaking an agency action such as permitting. The Draft Permit is a federal action that will impact 23 federally-listed threatened and endangered species in the footprint of the Refinery, and accordingly, EPA must consult with the FWS and the NMFS to ensure that the polluting activities contemplated by the Draft Permit will not jeopardize the continued existence of these imperiled species to comply with the ESA. VOCs can impact air-breathing mammals, particularly cetaceans. One study of the chemical composition of Grey Whales' exhales matched a database of VOCs found in humans. The facility will emit significant amounts of greenhouse gases, including carbon dioxide, which is the primary driver of global warming and ocean acidification. Coral species are extremely vulnerable to the impacts of ocean acidification and noncalcareous marine flora and fauna also suffer effects, albeit less obvious effects of ocean acidification, such as neurological changes that alter behavior. NOx contributes to acidification of the ocean Birds are more exposed to PM than humans because they have a higher breathing rate and spend more time in the open air. The Least Tern and Roseate Tern are particularly vulnerable to the impacts of air pollution, particularly from NOx and PM. The primary hypothesis for the effects of soil acidification on terrestrial birds is that acid deposition can reduce the abundance of ground-dwelling invertebrates that some birds require for adequate calcium supply which can adversely affect egg laying, eggshell integrity, and growth of hatchling birds and neonatal mammals.

The Draft Permit contemplates polluting activities with potential to harm to Sandy Point National Wildlife Refuge, a local resource important to St. Croix's tourism economy, which is located about 10 miles west of the Refinery and designated as critical habitat for nesting endangered Leatherback Sea Turtles under the ESA. Sandy Point is also a vital nesting habitat for critically endangered hawksbill sea turtles and threatened green sea turtles.

**Response 122**

Section 7(a)(2) of the ESA requires federal agencies to ensure, in consultation with the FWS and/or NMFS (the Services), that actions they authorize, fund, or carry out are not likely to jeopardize the continued existence of any federally-listed threatened or endangered species or destroy or adversely modify the designated critical habitat of such species. Under applicable implementing regulations promulgated by the Services, consultation is required for actions that "may affect" listed species or designated critical habitat. 50 CFR § 402.14(a). The regulations also provide an optional informal consultation process during which the federal agency may determine, with the written concurrence of the relevant Service(s), that the action is not likely to adversely affect listed species or critical habitat. 50 CFR § 402.13(c). If the agency makes such a determination and the Service(s) concur, the consultation process is terminated, and no further action is necessary. Id.

In connection with the PAL permit, EPA conducted informal consultation with both FWS and NMFS. During the informal consultation process, EPA prepared and provided the Services with an evaluation of potential impacts of the permitting decision on listed species and critical habitat in the action area, responded to inquiries and requests for additional information from the Services, and determined that issuance of the permit would have no likely adverse effects on listed species or designated critical habitat. The Services concurred in writing with EPA's determination. EPA received FWS concurrence on Feb. 28, 2020 and NMFS concurrence on Sept. 4, and 9, 2020. Under 50 CFR § 402.13(c), the consultation process has been properly terminated and EPA has fulfilled its requirements under the ESA. Documentation memorializing EPA's evaluation and determination and the Services' concurrence is included in the record for this permitting action and is incorporated by reference as part of this response.

The Least tern and the Roseate tern, referenced by the commenter as being particularly vulnerable to NOx and PM, are not included on the FWS or NMFS species list for the project and surrounding impact area. FWS has listed the Least tern as endangered for various midwestern and southeastern states in the continental US. Even though this species overwinters in the Caribbean and South America, it is not listed as endangered in the USVI. FWS has listed the Roseate tern as threatened in the USVI but the IPaC tool used for identifying FWS species, does not list this species in the vicinity of the project and impact area.

In addition, the commenter stated that VOCs can impact air-breathing mammals, particularly cetaceans, and mentions the Grey Whale in particular. While the Grey Whale is not one of the listed species in the action area, EPA's ESA analysis did include air-breathing mammals and cetaceans that are listed species, and EPA concluded, with concurrence from the Services, that they are not likely to be adversely affected.

**Comment No. 123**

The polystyrene floats are all over on the south shore beaches, especially Cane Garden Bay Beach. Due to Limetree's contractors and Tropical Storm Karen, on September 24, 2019 polystyrene broke loose from the installation of the Limetree pipeline. As of November 18, 2019, pieces of polystyrene, some as small as bits of rice, were still seen washing up on St. Croix's beaches. This highlights the risk to St. Croix's wildlife, including and especially the 23 ESA-listed species. We are concerned about the potential impacts to wildlife from discharge of other dangerous materials, particularly during inclement weather. Hurricanes have caused oil spills which can be catastrophic for wildlife. The risk of such events is only going to increase with the

reality of a changing climate, dramatically so in the US Virgin Islands. Oil spill response is often extremely ineffective. There will also be increased risk of ship strikes caused by increased vessel traffic that will necessarily accompany the refinery restart. Our corals are already bleached, and our marine life is suffering. There should not be polluting industries near the national parks in the U.S. Virgin Islands.

## Response 123

The PAL permit is neither a construction permit nor an authorization to resume operation at the refinery. Limetree could start operating at any time without the PAL permit and is not required to obtain the permit. Rather, Limetree requested a PAL to create a restriction on its operation so as to afford it operational flexibility without triggering new PSD preconstruction permitting requirements. The annual limits taken by Limetree in the PAL permit are lower than the allowable emissions in the existing PSD permit. Issuance of the PAL permit will not increase, cause, or affect potential issues for wildlife relating to polystyrene accidents, oil spills, or ship strikes or otherwise negatively affect the national parks in the USVI. These issues relate to operations at the facility unrelated to the PAL permit. As noted above, the facility can proceed to operate without any need for the PAL permit. The comment includes a general reference to ESA-listed species. As described in response to Comment 122 above, EPA has complied with applicable ESA requirements by conducting informal consultation with the Services and obtaining their written concurrence on EPA's determination that issuance of the PAL permit will have no likely adverse effects on listed species or designated critical habitat. We also note that Limetree has a Risk Management Plan/Integrated Contingency Plan to address these types of concerns including impacts such as from polystyrene floats that come from Limetree's vessels on the south shorelines of St. Croix including Cane Garden Beach. See EPA Response to Comment 125 below.

The commenter references coral bleaching but does not indicate how the PAL permit would have implications for bleaching-related impacts. Rather, the reference appears to reflect a general concern about the health of the coral species. EPA is fully committed to the protection of coral reefs surrounding St. Croix and established a Caribbean Coral Reef Protection Plan in 2014, updated in December 2019, to address the protection of coral reefs in the Caribbean including the U.S. Virgin Islands. Region 2 developed this Plan to implement "direct" actions to address threats to coral reef ecosystems in the USVI and has taken a strong role in protecting coral reefs through research, grant funding, technical assistance, and program development, implementation and enforcement, and will continue to do so. The main objective of the plan, which recognizes the potential impacts of plastics, addresses threats to the coral reef ecosystem. Furthermore, EPA has focused its efforts both nationally and regionally on addressing the threats to coral reefs from land-based sources of pollution.

## Comment No. 124

Absolutely no Flouride-based fire foam for oil fire extinguishing should ever be used on St. Croix - it is a known carcinogen and akin to PCBs - they must be fluorine free.

## Response 124

Flouride-based compounds such as per- and polyfluoroalkyl substances (PFAS), which include PFOA, PFOS, GenX, and many other chemicals, have been manufactured and used in a variety of industries including fire-fighting foams. Certain PFAS chemicals are no longer manufactured in the United States as a result of phase outs including the PFOA Stewardship Program in which

eight major chemical manufacturers worked with EPA to eliminate the use of PFOA in their products. But products containing these chemicals are still manufactured internationally and possibly in smaller companies in the US. EPA has taken a range of regulatory actions to address PFAS substances in manufacturing and consumer products, but there is no specific action or legal authority under the Clean Air Act's Prevention of Significant Deterioration PAL program whereby EPA can prevent the use of these chemicals for fire foam.

**Comment No. 125**

Commenters are concerned about the inadequacy of comprehensive emergency preparedness plans – especially ones that acknowledge climate change and category 5 hurricanes. Furthermore, sea level rise makes this and all coastal refineries susceptible to flooding, for which this refinery is unprepared to address. The federal government must stop refuting the scientific evidence of climate change and forgetting about environmental protection while trying to protect the profits of polluters. We must transition as fast as possible from fossil fuels if future generations are going to have any chance of a habitable planet. The oil refinery in St. Croix is a threat to the environment and will exacerbate the climate crisis by releasing millions of pounds of carbon dioxide. We must not backslide in efforts to transition to a more just, sustainable, job-producing green economy. We shouldn't be reviving and investing in last century's crude oil refineries and giving big polluters a free pass; we should be dismantling them and shutting down fossil fuel projects. We should be acting as better stewards of the plant and move forward using readily available green, clean technology, such as wind or solar at or around this site on our tourism-based island paradise. Please deny this facility's permit.

**Response 125**

Given the recent history of hurricanes and their devastating impacts on the USVI, we understand the commenter's concern. And we recognize the potential for impacts to the surrounding area that could result in the event of significant damage to the Limetree facility in the event of an accident or as the result of a severe storm. While the PAL provisions at 40 CFR § 52.21(aa) do not include provisions for comprehensive emergency preparedness plans, the facility has a Risk Management Plan (RMP) registered with the Agency, pursuant to the requirements of Section 112(r)(7) of the Clean Air Act and the implementing regulations at 40 CFR § 68. The RMP-covered processes identified in the most recent RMP submission requires compliance with emergency response requirements, acknowledges the vulnerability from hurricanes, and indicates that Limetree maintains a separate hurricane preparedness plan which is reviewed and updated annually prior to the June 1 start of hurricane season. We are not aware of reference to climate change in these documents, but they would address emergencies regardless of the cause. See also EPA Response to Comment 123 with respect to oil spills and the Endangered Species Act. We recognize the commenter's concern about shifting away from fossil fuels and towards a green economy EPA notes that, as discussed in EPA Response to Comment 123, the PAL permit is neither a construction permit nor an authorization to resume operation at the refinery and the PAL provisions of 40 CFR § 52.21 do not contain language related to weighing energy or economic policy in the PAL permit process.

**Comment No. 126**

Children are disproportionately exposed to the emissions and resulting health effects from refineries. Additionally, people of color, including African Americans and Hispanics have a higher cancer risk from toxic air emissions from refineries than the average national population, as do adults living below the poverty level.

**Response 126**

Consistent with President Clinton's April 21, 1997 Executive Order 13045, Protection of Children from Environmental Health Risks and Safety Risks, EPA considers it a "high priority to identify and assess environmental health risks and safety risks that may disproportionately affect children." EPA ensures that human health is protected by reviewing and revising applicable NAAQS, and the Agency has recently adopted stricter NAAQS for several pollutants. As discussed in EPA Response to Comment 118, EPA develops the NAAQS in consultation with the CASAC, that are protective of the sensitive populations, including children. The ambient monitoring provisions in the PAL permit are designed to assess whether the protective health-based NAAQS are being met.

EPA acted consistently with Executive Order 13045 since receiving Limetree's permit application by ensuring that an ambient air quality modeling analysis was performed and by including the ambient monitoring conditions in the PAL permit. Further, as discussed in EPA Response to Comments 116 and 118, EPA invoked its authorities under Sections 114 and 165 of the Clean Air Act and Section 40 CFR § 52.21(aa)(8)(ii)(b)(3) and 40 CFR § 52.21(aa)(7)(x) of the PAL provision, and applied EJ EO 12898 in this case due to the large minority and low income population surrounding this facility. The ambient monitoring requirements are included in the PAL permit to further the protection of this population as well as children and other sensitive groups. See also EPA Responses to Comments 120 and 128 with respect to the concern about toxic air emissions.

**Comment No. 127**

Commenters petitioned the Governor, members of the 29th Legislature, the Delegate to Congress, and the U.S. Department of the Interior where they requested "immediate testing and evaluation of air quality". In addition, the comments petitioned that they would like to have medical treatment and equipment such as gas masks and HAZMET training.

**Response 127**

EPA cannot respond on behalf of the Governor, members of the 29th Legislature, the Delegate to Congress, or the U.S. Department of the Interior. However, with regard to evaluation of air quality, the PAL permit requires ambient air quality monitoring to ensure that EPA and DPNR can take appropriate action if an exceedance or violation is measured. See Responses to Comments 118, 120 and 126; see also EPA Response to Comment 125 on emergency planning.

**Comment No. 128**

The Virgin Islands community and infrastructure cannot survive any major catastrophe or accident and there are no medical facilities presently available to handle emergencies. Need tracking and reporting of incidence and types of cancer on St. Croix. Should know how disease in STT compares with STX.

**Response 128**

The facility will need to comply with the local ordinances regarding infrastructure and emergency plans. The commenter appears to be asking EPA to track the incidence and types of cancer on St. Croix and compare the data with the incidence on St. Thomas. Tracking of cancer in any location falls under different government entities and is not within EPA's authorities under 40 CFR § 52.21. While EPA has not made any comparisons specific to disease, we did compare environment burdens in South St. Croix to other parts of St. Croix and the USVI and

determined that, based on a number of factors discussed in the Sept. 19, 2019 Environmental Justice Analysis, the area near Limetree was disproportionately burdened. In addition, as noted above, air toxics were part of a study conducted in St. Croix in 2011. The study included ambient measurements of the various air toxics. It was found that the concentrations were within benchmark concentrations for health risk assessments. While emergency management is not included in the PAL provisions of 40 CFR § 52.21, we are aware that there is a hospital in St. Croix to the north of the facility although we have not studied its capacity because consideration of emergency facilities is outside the scope of our permit process. See also EPA Response to Comment 125 on emergency planning.

**Comment No. 129**
The baseline emissions calculation is fatally flawed because it is based on unreliable data from an inappropriately high-output time period immediately preceding Hovensa being fined under the CAA.

The Draft Permit's PAL calculations are inappropriately high and could allow for deleterious levels of pollution because the actual emissions (BAE) are extrapolated from extremely limited and extrapolated data, predicated upon a time period of high Refinery output that does not represent the stated plans of Limetree[38], and are taken from the time period immediately preceding Hovensa's due to violations of the CAA.[39] Accordingly, EPA should reject the Draft Permit both for its inappropriate proposition of a PAL and unsuitable calculations pursuant thereto.

The relevant regulations define BAE as "the rate of emissions, in tons per year, of a regulated NSR pollutant" and further defines this as "the average rate, in tons per year, at which the emissions unit actually emitted the pollutant during any consecutive 24- month period selected by the owner or operator within the 10-year period immediately preceding . . . the date a complete permit application is received by the Administrator[.]"[40] The regulations further state that this average rate "shall be adjusted downward to exclude any non-compliant emissions . . . [and] that would have exceeded an emission limitation with which the major stationary source must currently comply."[41] Limetree selected the 24-month baseline period from January 2009 – December 2010 for determining the BAE for each of the proposed PAL pollutants.[42]

These PAL calculations are fundamentally and fatally flawed because they are predicated on BAE data that EPA Region 2 acknowledges is "limited." This seems to be an understatement given the myriad ways in which this data is limited. Specifically, EPA Region 2 states in the EPA-Limetree EJ Analysis: "[Limetree] had limited archived CEM data, from only two out of seven turbines, which measured mass emission levels, and some fuel use data. They also had up to 2 years of hourly heat input rates but only from a few heaters, boilers, and turbines out of approximately 80 such units in the PAL application."[43] The EJ Analysis then continues to note that because the facility has ceased operating for about seven years, this could lead to "differences in emissions and heat input upon startup," and — alarmingly — concedes that "Limetree might very well operate in a different manner than Hovensa . . . [t]herefore, some uncertainty exists in relying on the data."[44] Problematic extrapolation is then noted in the EPA-Limetree EJ Analysis, whereby "since the information was not available for all units, the units that had the available information were assumed to be representative of the other heaters, boilers, and turbines. This assumption leads to additional uncertainty."[45] This uncertainty is problematic in the context of the outsize capacity of Limetree compared to other facilities with PAL permits

and the resultant range of scenarios: "considering the vast number of units at Limetree's refinery and terminal operations compared with other PALs that have been issued, there are many more possible operating scenarios than we have seen in the past[.]"46 This uncertainty is especially problematic given the failure of EPA and Limetree to include the modeling files (with ability to examine and manipulate the data) in the Administrative Record.

In addition to the data being uncertain, the BAE calculation is inappropriate because it sets emissions limits for a project that Limetree claims will be lower-output than Hovensa based on the emissions from an extremely high-output time for Hovensa. As the Permit Application notes, in 2010 (within the BAE time period) Hovensa's processing rate was 525,000 barrels per calendar day.47 In contrast, Limetree represents that it intends to process 200,000 barrels per day.48  We acknowledge that the PAL regime was created to allow facility operators "flexibility . . . to respond rapidly to market changes."49  However, by contemplating more than double the intended output and relying on patently uncertain data therefor, this "baseline" is clearly neither representative of, nor appropriate for, the intended polluting activities. If it is Limetree's intention to ramp up its production to Hovensa-era levels, this must be explicitly disclosed to the community.

Additionally, the BAE calculation is inappropriate because the baseline period, 2009 – 2010 represents the 24-month period prior to Hovensa being fined millions of dollars for Clean Air Act violations.50  The Permit Application states that the BAE calculation is adjusted downward to account for "non-compliant emissions during the baseline period and emissions in excess of newly applicable limits."51  Given the overt unreliability and incompleteness of the calculation data, historic issues with Hovensa's self-reporting of violations (discussed below), and the aforementioned inflated baseline, this adjustment fails to provide adequate assurance that Limetree's activities pursuant to the PAL will not effectuate exceedances of the NAAQS.

Accordingly, for the reasons stated above, we implore EPA to reject this Draft Permit as the BAE, which should properly be set to zero and evaluated by source of pollution, has fundamental and fatal flaws in its calculation. We note that these issues of extrapolation and inflation would be significantly less present if the Refinery were to be properly evaluated as a "new" source for PSD purposes and the emissions limits set by source, rather than by facility. Additionally, we note the failure to include the adjustable modeling files in the Administrative Record and request that EPA Region 2 make these publicly available.

**Response 129**
The commenter correctly states that the relevant regulations define BAE as "the rate of emissions, in tons per year, of a regulated NSR pollutant" and further define this as "the average rate, in tons per year, at which the emissions unit actually emitted the pollutant during any consecutive 24- month period selected by the owner or operator within the 10-year period immediately preceding…the date a complete permit application is received by the Administrator." 40 CFR § 52.21(b)(48)(ii). The regulations further state that this average rate "shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above an emission limitation that was legally enforceable during the consecutive 24-month period [and]…any emissions that would have exceeded an emision limitation with which the major stationary source must currently comply, had such major stationary source been required to comply with such limitations during the consecutive 24-month period." 40 CFR § 52.21(b)(48)(ii)(b)&(c).

In its BAE calculations, the applicant did address past violations and reductions required by the Consent Decree by deducting those emissions or by omitting such emission units from the BAE estimates. Appendix C and Section 4 of the PAL application describe where and how these adjustments were made. EPA subsequently lowered the PALs due to factors including requirements in the Consent Decree to address historic noncompliance and an error in the NOx emission factor for certain emissions units. *Letter from John Filippelli, EPA Region 2, to Darius Sweet and Brian Lever, Limetree, Aug. 14, 2019*. In particular, EPA adjusted the PALs proposed by Limetree to reflect emission reductions from six combustion units that were permanently shut down after the baseline period to meet Consent Decree requirements. EPA also adjusted the baseline for NOx for eleven combustion units, by recalculating with the correct NOx emission factor. Note that in response to a comment from Limetree, received during the public comment period, EPA has raised the PAL level for NOx in the final permit. See EPA Response to Comment 16.

Limetree selected the 24-month baseline period from January 2009 – December 2010 for determining the BAE for each of the proposed PAL pollutants. EPA's understanding is that Limetree chose this 24-month period for its baseline emissions because HOVENSA began shutting down portions of the refinery in 2011 and, as a result, 2009/2010 represents the most recent period of full operation of the facility when it processed, on average, 525,000 barrels per day of crude oil. In subsequent years, especially since 2012, the refinery ceased operations. During the years prior to 2009-2010, HOVENSA processed more than 525,000 barrels per day but Limetree was unable to use those years as the baseline years because they are outside of the 10-year period for selecting the 24-month baseline. Further, future refinery operation at a crude oil processing rate of 200,000 barrels per day is not relevant to the calculation of the BAE or setting the level of PALs in this PAL permit.

The BAE are determined using the best available data and represent annual average emissions. EPA considers BAE estimates based on annual throughput, annual fuel consumption, annual hours of equipment operation, AP-42 emission factors, past stack tests, other direct emissions monitoring data as reflected in the calculations to be reasonable and acceptable. 40 CFR § 52.21(b)(48)(ii)(e) states that "the average rate shall not be based on any consecutive 24-month period for which there is inadequate information for determining *annual* emissions, in tons per year, and for adjusting this amount if required by paragraphs (b)(48)(ii)(*b*) and (*c*) of this section." (emphasis added). While EPA's environmental justice analysis reflects uncertainties with respect to the short-term data necessary to perform an air quality modeling analysis to understand air quality impacts, EPA had adequate information, provided in the administrative record, to establish the BAE using HOVENSA's *annual* emissions estimates during the 2009/2010 baseline period. This information was available in the administrative record for the draft permit. It is important to distinguish between the data required to calculate BAE and the data required for the modeling analysis. It is not unusual to have gaps in unit-specific monitoring data when determining a baseline and, therefore, it is common to use other methods to calculate annual emissions such as emission factors, data from similar units, and the other methods discussed above. However, short-term data were necessary for Limetree's ambient modeling analysis because we were comparing the results of the analysis to the short-term NAAQS for NO2, SO2 and PM2.5. HOVENSA's short-term emission data was limited, and the method used by Limetree to estimate a short-term emission rate contained uncertainties as discussed in EPA Response to Comment 106.

As to the concern regarding baseline emissions and the claim that EPA did not provide "adjustable modeling files" in the administrative record for the public to "examine and manipulate the data," EPA did include a DVD of the AERMOD modeling files in the physical administrative record which could have been run and adjusted by anyone who requested a DVD diskette from EPA or visited the EPA Region 2 New York office. EPA did not include these modeling files on the PAL permit website or the electronic docket. 40 CFR § 124 does not require EPA to post online all documents or data in the record. *See, e.g.*, *In Re: Energy Answers Arecibo, LLC*, 16 E.A.D. 294, 2014 WL 1260977, at \*38 (EAB 2014); *see also In Re: City of Taunton, Department of Public Works*, 17 E.A.D. 105, 2016 WL 3352212, at \*17 n.19 (EAB 2016). EPA notes that modeling files, and the accompanying data set, are extremely large files and therefore we typically do not post these files online, but access to the files, like all supporting documentation that form a basis for the Draft Permit, are available upon request by contacting EPA or by visiting the Region 2 New York office.[11] Indeed, a representative of the commenter visited the New York office during the comment period and was given access to the full administrative record which included the AERMOD DVD that contains the full modeling data and output files. We also note that Limetree's Environmental Justice Modeling Report, which was included in the electronic docket for the draft permit, contains a description of the data used, the model used, assumptions, years of meteorological data, pre-and post- processors, and other modeling details.

Moreover, other than the comment itself, which was received on the last day of the public comment period, EPA does not have any record of communication from any commenter seeking access to the modeling data, nor would EPA have denied any such request if received in time for EPA to make arrangements for viewing the files and data. *See In Re: Energy Answers Arecibo, LLC*, 2014 WL 1260977, at \*38. Finally, even assuming, *arguendo*, EPA should have posted the modeling files to the PAL Permit website or docket during the notice and comment period, EPA did not rely on the modeling data for the baseline emissions calculations because, as noted above, EPA determined the emission rate estimates via the facility's annual emissions. Because EPA did not rely on the modeling files for determining the baseline emissions or PAL levels in the draft permit decision, the commenter is not prejudiced by EPA's failure to post the modeling files on the Draft Permit's public notice website. *See id.* at \*39 (holding that "no harm or prejudice occurred" because, despite some documents not being available online, "the most significant documents forming the basis of the Draft Permit were available online." (citing *In re ConocoPhillips Co.*, 13 E.A.D. 768, 779 n.12 (EAB 2008)).

The commenter raises concern about statements in EPA's EJ Analysis that, after the facility had ceased operating in 2012, the facility's emissions, heat input and operation upon startup could be different than when HOVENSA operated the facility. EPA's statements relate to the modeling analysis rather than the question of the appropriate BAE. In setting the level of the PALs, EPA followed the procedures specified at 40 CFR § 52.21(aa)(6). The PAL provisions are intended to provide flexibility to facilities in their operations as long as they comply with the PAL. Facilities

---

[11] And in response to this comment, Region 2 explored new approaches to making available extremely large files that cannot be posted on our website. We recently learned that the Agency has the ability to upload the modeling files to an FTP site for easier access and included a link to the files in the docket for public review. These modeling files include the AERMOD dispersion modeling files for the Environmental Justice analysis conducted by Limetree, dated June 2019, and the CMAQ photochemical modeling files for the deposition analysis conducted by EPA for the ESA consultation with NMFS, dated August 11, 2020 (the CMAQ files are too large for a DVD diskette). Detailed information to access the modeling files can be found in .pdf format in the final permit's docket.

are not expected or required to operate in the manner in which they operated during the baseline period.

**Comment No. 130**

Limetree must include continuous fenceline monitoring and make all emissions data available to the public online and in written reports in both English and Spanish. The requirement for the use of LIDAR for emissions tracking at the Limetree Bay Refinery.

**Response 130**

Our understanding of the comment is that the commenter would like EPA to require continuous fenceline monitoring and LIDAR requirements for emissions tracking in the PAL permit. The PAL Permit is issued pursuant to 40 CFR § 52.21(aa). There are no requirements in 40 CFR § 52.21(aa) for a source seeking a PAL permit to conduct any fenceline monitoring or any emissions tracking using LIDAR. There are no other EPA regulations that would require a refinery to conduct fenceline monitoring for the criteria pollutants, such as NO2, SO2, CO or Particulate Matter that are the subject of the PAL permit. However, it should be noted that EPA conducted a Risk and Technology review (RTR) of the refinery operations pursuant to Section 112 of the Clean Air Act and finalized its rules in 2015. Among other requirements, the RTR rule established a benzene fenceline monitoring work practice standard with an initial compliance date of Jan. 30, 2018, for existing sources. The fenceline monitoring provisions were incorporated into Title 40 of the Code of Federal Regulations (CFR) § 63, Subpart CC (the Refinery MACT 1 standard) and EPA Reference Methods 325A and 325B. Limetree must comply with these requirements, independent of the PAL permit.

EPA notes that, as discussed in its Response to Comment 106, the facility's existing PSD permit requires Limetree to operate the five ambient monitors (EPA incorporates by reference its previous discussion of ambient monitoring). The ambient monitoring requirement in this PAL permit is based on information that demonstrated reasons for significant concern regarding the new 1-hour SO2 NAAQS. And as also discussed in EPA's Response to Comment 106, EPA agreed to allow the shutdown of the ambient monitors after HOVENSA ceased operation with the understanding that the monitors would be restarted if the facility restarted operations. In addition, Section 165 of the Clean Air Act and Section 40 CFR § 52.21(aa)(8)(ii)(b)(3) and 40 CFR § 52.21(aa)(7)(x) of the PAL provisions provide EPA with specific authority to require ambient monitoring. So, while 40 CFR § 52.21(aa) does not require *fenceline* monitoring, EPA notes that *ambient* monitoring will guard the health of local populations that the commenter seems to be requesting of EPA here.

**Comment No. 131**

While I know Limetree has some equipment and preparedness plans for an oil spill, I am concerned that, much like ship groundings in the USVI, there will be little recourse for damages. Some have suggested a bond or trust fund for clean-up and I believe this should be expected of a facility touted to be so economically viable by so many….What is the emergency protocol for oil spill? It should be offered for public comment.

**Response 131**

The issue of oil spill protocols and damages is beyond the scope of this permit because there are no requirements in 40 CFR § 52.21(aa) for a source seeking a PAL permit to address any issues related to a potential oil spill nor does EPA have authority under the PAL provisions to impose a

bond or trust fund. However, EPA's Oil Spill Program under the Office of Emergency and Remedial Response plays an important role in protecting the environment through prevention of, preparation for, and response to oil spills. The commenter is advised to contact the U.S. Environmental Protection Agency Oil Program Center, 401 M Street, SW Mail Code 5203G, Washington, DC 20460 or *http://www.epa.gov/oilspill*. The commenter may also contact - Region 2 Citizen Hotline/Help Desk at (877) 251-4575 for further information. While unrelated to the PAL permit, we also note the following from the 2/12/19 Biological Opinion for Limetree's Single Point Mooring project, which addressed oil spill response:

*To comply with the USCG Response Plans for Oil Facilities requirements under 33 CFR Part 154, and in accordance with the facility's Integrated Contingency Plan dated July 2017, the Limetree facility has two oil spill response organizations on site. National Response Corporation (NRC) and Marine Spill Response Corporation (MSRC) currently have over 45,000 feet of containment boom available on site, multiple recovery vessels, and two recovery barges.* https://www.eenews.net/assets/2019/10/22/document_pm_03.pdf, at p. 22. See also EPA Response to Comment 125 on emergency planning.

**Comments from Citizens/Environmental Groups –
Reactivation**

**Comment No. 132**

The refinery must be treated as a new source under PSD rules because the refinery owners have not demonstrated a continuous intent to reopen the refinery since it was shut down in 2012. The April 5, 2018 letter from former Assistant Administrator Wehrum to Limetree regarding EPA's reactivation policy does not reflect EPA precedent and we respectfully urge EPA to revoke or, at the very least, disregard this letter. We urge EPA to reject the draft permit which is fundamentally and fatally flawed because it should properly be evaluated as a "new" stationary source under EPA's well-established reactivation policy.  The policy is predicated on the notion that owners and operators of shutdown facilities must continuously demonstrate concrete plans to restart the facility sometime in the reasonably foreseeable future and shutdowns of more than two years are presumed to be permanent and are thus subject to all PSD requirements when reactivated. It is then up to the facility operator to rebut the presumption.  Based on the amount of time that the facility has been shut down, the reason for the shutdown, statements of the owner or operator, the cost and time to reactivate, the status of permits, and the ongoing maintenance and inspections at the facility, the refinery can only reasonably be found to be a new source for purposes of PSD review. Accordingly, the draft permit, which is inappropriately predicated and calculated on a presumption that the refinery is an existing source, must be rejected. In addition, in light of former Assistant Administrator Wehrum's resignation from EPA amid ethics and misconduct investigations by EPA's Inspector General and the Energy and Commerce Committee, and recent reports that Limetree is being considered a "customer" within EPA, we respectfully urge EPA to reject the draft permit due to its improper predication on the April 5, 2018 Wehrum letter.

**Response 132**

This comment does not demonstrate that EPA must deny Limetree Bay's PAL permit application.  The commenters have not supported their arguments with any references to the permitting regulation at 40 C.F.R. 52.21 that govern this PAL permit application.  The regulations do not require that EPA apply the Reactivation Policy in this or any other context under section 52.21 of the regulation, and EPA maintains its earlier view that Limetree Bay has demonstrated under the framework of that policy that the owners of this facility had a continuous intent to restart the refinery operations.

Prior to submitting this PAL permit application, Limetree Bay sought EPA's views on whether resuming certain refinery operations should be treated as constructing a new source under the Reactivation Policy.  EPA responded in April 2018 with the letter from Assistant Administrator Wehrum that is cited and questioned by the commenter (the Limetree Bay Letter).  As described in that letter, EPA had been provided with information that the Agency considered sufficient to show a continuing intent to restart the facility, and the comment has not provided additional information that changes EPA's view on that matter.

Shortly after receiving EPA's response, Limetree Bay submitted an application to the Virgin

Islands Department of Planning and Natural Resources (VIDPNR) for an Authority to Construct (ATC) permit to authorize certain changes to the facility that were necessary to implement what Limetree Bay has called the "MARPOL project," through which the company seeks to produce fuel compliant with the maritime sulfur regulations that took effect in January 2020.  In this April 13, 2018 application, Limetree Bay stated that it "plans to resume operation of certain refinery process units and certain utilities ('MARPOL Project') that are already permitted to operate under Permit No. STX-TV-003-10 and were described in the Title V permit application."  On June 18, 2018, the VIDPNR completed work on this ATC permit application and issued the requested permit.  The VIDPNR did not dispute the company's representations that it was resuming operation of emissions units that were already permitted to operate, and it did not receive any comments from members of the public arguing that the company was building a new major source and should be required to obtain a PSD permit.  The VIDPNR issued the ATC pursuant to its approved minor NSR program, and it could not have done so if it had determined that the source had been permanently shut down and was required to obtain a major source PSD permit to resume operations if applying EPA's Reactivation Policy.  No party filed an appeal or otherwise contested the VIPNR permit decision. EPA also understands that Limetree Bay has been working on the construction authorized under this VIDPNR permit.

Thus, the state of affairs before EPA in this PAL permitting action is that the actions described in Limetree Bay's submissions to EPA and the VIDPNR have thus far been understood to involve resuming operation of an existing major stationary source.  In this context, Limetree Bay has applied to EPA for a permit to establish plantwide applicability limits under section 52.21(aa) of EPA's regulations.  The purpose of this permitting action is to consider Limetree's application to set plantwide applicability limits such that Limetree Bay has flexibility to make certain changes to the facility, within the established limits, without being required to determine whether those changes are subject to PSD.

In evaluating the baseline emission rate for an existing major stationary source to set the plantwide applicability limits, there is no adjustment to the baseline emission rate for permitting actions that should have, but did not, take place. For instance, the baseline emission rate may be adjusted to account for non-compliance emissions during the baseline period. 40 C.F.R. § 52.21(b)(48)(ii)(b). The commenters are not, as part of this comment, arguing that there were non-compliant emissions during the baseline period.  The baseline emission rate may also be adjusted to exclude any emissions "that would have exceeded an emission limitation with which the major stationary source must currently comply." 40 C.F.R. 52.21(b)(48)(ii)(c).  Limetree did not apply for a PSD permit to establish new BACT limits before resuming the operations of the refinery.  The facility applied for a PAL, and EPA is acting on the application before it.  The baseline for the PAL was calculated based on actual emissions in 2009 and 2010 that were allowed under existing PSD permits and other requirements.  The commenters do not point to any other authority within the PAL regulations to adjust the baseline emission rate.

Rather, the commenters argue that EPA should deny the application for the PAL permit and apparently force Limetree Bay to instead submit an application for a PSD permit.  Comment at 3.  But the comments do not demonstrate that EPA is required to apply the Reactivation Policy here or that EPA erred in its 2018 response to Limetree Bay's request under the framework of the policy.  The EPA made clear that its 2018 letter was based on the

information LBT had provided to EPA and that EPA was not providing any final determination on the applicability of the PSD regulations to the projects under consideration. EPA also informed LBT that "[a] final determination on PSD applicability will be made on the basis of the information provided in your application and supporting materials." 2018 Letter at 8. Limetree did not submit an application to EPA related to PSD applicability but did submit an ATC permit application and supporting material to the Virgin Islands, which made a determination regarding that application. At this juncture, the commenters are essentially asserting that both EPA's 2018 letter and this VIDPNRs decision to complete action on the minor NSR permit application were improper. EPA disagrees.

On its face, the Reactivation Policy is just that: a policy. It is not binding, and, if circumstances warrant, it need not be followed. In his 2018 letter to Limetree, Assistant Administrator Wehrum noted that EPA intended to reconsider the Reactivation Policy. Based on EPA's review since that time, the Agency has determined it is not appropriate to continue applying the Reactivation Policy because the policy was not well-grounded in the NSR regulations, and it is not supported by the current NSR regulations. In addition, the Reactivation Policy is difficult to follow and can produce inconsistent results based on subjective judgments about how to weigh the various factors against each other. EPA believes it would be better to apply an approach that is more consistent with the text of the existing regulations, provides more certainty, and is simpler for permitting agencies and permittees to understand and follow, as discussed in more detail below. Since EPA has concluded that the Reactivation Policy is no longer an appropriate policy in the context of the existing NSR regulations, the Agency is not applying it in this permitting action.

As part of the 2018 Limetree Bay Letter, the Assistant Administrator for the Office of Air and Radiation noted that the EPA has previously "not cited any specific regulatory provisions of the NSR program to support its position on source 'reactivation.'" Limetree Bay Letter at 2 n.2. While Regional Offices have continued to apply the Reactivation Policy since the 2002 NSR Reform Rule, the 2018 Limetree Bay Letter is the only guidance or adjudication on this topic that any EPA Headquarters Office has issued since the 1999 order resolving the *Monroe Electric* Title V petition.[12]

Prior to the 2002 NSR Reform Rule, most sources determined their baseline emission rate by averaging the past 24 months, *i.e.* 2 years, of actual emissions. *See* 67 Fed. Reg. 80185, 80188 (Dec. 31, 2002).[13] If a source had not operated in the last 2 years, its baseline emission rate would therefore be zero, like a new source. This comports with the Reactivation Policy's determination that if a source had been shut down for more than two years it should be presumed to be permanently shut down and treated as a new source. The one exception to this previous 24-month baseline emission rate was if a permitting agency agreed to use a period that was "more representative of normal operations." *Id.* The criteria for rebutting the presumption in the Reactivation Policy could then essentially be thought to have provided a guide for permitting agencies to determine whether it would be appropriate to allow a source that hadn't been in operation for the previous two years to use a more representative period to calculate its baseline emission rate. But the Reactivation Policy's focus on the intent of the

---

[12] *In the Matter of Monroe Electric Generating Plant Entergy Louisiana, Inc.*, Petition No. 6-99-2 (June 11, 1999).
[13] In 1992, EPA revised the regulations to adopt a different approach for Electric Utility Steam Generating Units, which could then determine baseline emissions using any two of the past five years. 57 Fed. Reg. 32314 (July 21, 1992).

owner or operator to restart a stationary source was not grounded in the regulations. At best, this provided a sort of equitable framework for the permitting agency to apply under the pre-Reform rules.  In addition, the multiple factors that one may consider within this framework, with no one factor being dispositive, leaves significant room for differences of opinion how to weigh those factors. And some of the factors, such as owner statements and the cause of the shutdown, are highly dependent on the interpretation of the regulator and invite speculation. An owner's statements, for example, may be made for other reasons, such as for the purpose of business negotiations, and the cause of a shutdown may be multifaceted or simply unknowable.

This makes the policy difficult to apply and can lead to inconsistent results, based on subjective judgments of those applying this policy. This should be a disfavored outcome in a regulatory environment where consistency, fairness, and clarity should be the hallmarks of policy.

Furthermore, the regulatory framework in which EPA applied the Reactivation Policy was significantly altered by the 2002 NSR Reform Rule. After the Reform Rule, a source (other than one comprised of  EUSGUs) could select any 24-month period within the last ten years as the period used to establish the source's baseline emission rate. *Id.* at 80195. The EPA specifically rejected the use of a "more representative time period" in lieu of this 24-month period in the past 10 years. *Id.*[14] This rule gave source owners and operators the discretion to select a period other than the prior 24 months to determine the baseline emission rate without having to show that the selected period was representative of normal source operations.  Since making the latter showing under the pre-reform NSR rules was often confusing and involved disputed judgment calls, EPA chose to replace it with a rule that gave source owners and operators discretion to choose any 24-month period within a normal business cycle, which EPA determined to be 10 years for most types of sources based on a study.  67 Fed. Reg. at 80191-92, 199-200; *See also, New York v. EPA*, 443 F.3d 3, 25–26 (D.C. Cir. 2005).  EPA explained that new approach to determining baseline emissions would provide certainty that was lacking under the old one.  67 Fed. Reg. at 80200.

Under this current framework in the NSR regulations, the Reactivation Policy no longer serves the purpose that it did under the pre-Reform NSR regulations, when sources could seek to establish baseline emissions by demonstrating that emissions experienced before the last 24 months were more representative of normal operations. This is illustrated by the circumstances presented here with the Limetree Bay facility.  Limetree Bay applied the current rules and selected a 24-month period within the last 10 years to establish its baseline emissions rate when it applied for and received a minor NSR permit from the Virgin Islands for the MARPOL project. This is also the approach that the EPA has taken in analyzing and issuing this PAL permit. Limetree Bay selected a 24-month period within the last ten years (as of its application for a PAL) and EPA used that period in setting the PAL, with the appropriate adjustments as required by the regulations.  Limetree did not have to show that this 24-month period was representative of its normal operations.   It is thus not consistent with the current approach for determining baseline emissions to then apply the Reactivation Policy to presume that refinery operations have permanently shut down based on some emissions units being idle for the past two years.  Since Limetree Bay has the discretion to

---

[14] The EPA did continue to allow permitting agencies to select a more representative time period for Electric Utility Steam Generating Units (EUSGUs). That is not the situation here as Limetree Bay does not involve any EUSGUs.

establish baseline emissions based on its operations within the last 10 years (which includes a period before these emissions units were idled), it is not necessary to require the company to demonstrate that it did not permanently shut down the facility in this time period to enable it to restart the idled units without obtaining a major NSR permit.[15] Under the rationale for the baseline provisions in the 2002 reform rules, the idling of the refinery portions of the facility may be viewed to have occurred in the normal course of the 10-year business cycle upon which EPA based the baseline provision in the 2002 rule.

The Reactivation Policy is also undermined by other provisions of the NSR regulations. The regulations define a "new emissions unit" as an emissions unit "that is (or will be) *newly constructed* and that has *existed* for less than 2 years . . ." 40 C.F.R. § 52.21(b)(7)(i) (emphasis added). The emission units at Limetree Bay have clearly existed for more than 2 years and are not "newly constructed." Under the plain language of this provision, the emissions units at the Limetree Bay facility are existing emission units. *Id.* § 52.21(b)(7)(ii). It would be an odd result to treat a major stationary source made up entirely of 'existing' emission units as "new" for purposes of determining NSR applicability. The regulatory definition of "construction" also undermines the Reactivation Polity. This definition suggest that the "fabrication" or "erection" of an emission unit is distinct from the "modification" of an emission unit. *Id.* § 52.21(b)(8). The former suggests the new creation of an emission unit while the latter suggests the emission unit is already in existence.

Even if the physical changes necessary to restart an idled emission units are extensive—even perhaps qualifying as reconstruction under the NSPS program, 40 C.F.R. § 60.15—they are not subject to PSD unless they increase emissions, 67 Fed. Reg. at 80194 ("[EPA] decided against applying PSD to 'reconstruction,' *even of entire sources*, on the grounds that, as to existing sources that would not otherwise be subjected to PSD review as a major modification (i.e., such source would not cause a significant net emissions increase), changes that had no emission consequences should not be subject to PSD regardless of their magnitude." (emphasis added)).

While the applicability provisions in 40 C.F.R. § 52.21(a)(2)(i) say that PSD applies to the construction of a "any new major stationary source (as defined in paragraph (b)(1) of this section)," EPA's NSR regulations do not contain a definition of the term "new major stationary source" or otherwise describe what constitutes "new" for this purpose. The EPA believes the best reading of the word "new" in this context is to mean "having recently come into existence." Webster's Dictionary, https://www.merriam-webster.com/dictionary/new. The EPA recognizes that "new" can also mean the "resumption or repetition of a previous act or thing," *id.*, but in context this refers to iterations that are distinct, such as days or editions. It would stretch this concept to suggest a source after a restart is a distinct thing from the source before idling. This would also suggest that when a source restarts after a routine turn-

---

[15] This is not to say that all sources should be allowed to restart and use previous emissions for their baseline if they have been shut down for less than 10 years. For instance, if a source has surrendered its permits, the baseline would have to be adjusted to account for the fact that the source is no longer permitted to emit. *See* 40 C.F.R. 52.21(b)(48)(ii)(*c*). In addition, the PAL provisions require the removal of emissions from permanently shut down emission units from the calculation of the PAL. 40 C.F.R. § 52.21(aa)(6)(i). However, as discussed below both HOVENSA and Limetree Bay have retained their permits for the Refinery, so the first requirement described above is not relevant in this case. In addition, Limetree Bay complied with the second requirement described above by identifying in its PAL permit application several units that it determined were permanently shut down.

around for maintenance and it resumes operation, it is "new" source because it resumes a previous act. The absurdity of this result in the regulatory context is sufficient to refute it. Therefore, the best reading of "new" in the applicability procedures is that the source has recently come into existence.[16]

For the above stated reasons, the EPA no longer believes that the Reactivation Policy is an appropriate policy, and the Agency is not required to apply it to any source, including the Limetree Bay facility.

Nevertheless, even if EPA found cause to continue applying the Reactivation Policy here, the Agency stands by the conclusion reflected in the 2018 letter from Assistant Administrator Wehrum that Limetree Bay and HOVENSA have demonstrated a continuous intent to restart this facility.  As restated in the 2018 Wehrum letter, under EPA's Reactivation Policy, "no single factor is likely to be conclusive in determining intent" and "EPA generally has considered the totality of all such factors and the relevant supporting documentation in evaluating whether there was a continuous intent to restart the facility."  After considering the information provided in this comment, some of which was not provided to EPA in 2018, EPA's view is that the totality of factors and documentation continues to support the conclusion that HOVENSA and Limetree Bay displayed a continuous intent to restart this facility.

An important overall consideration that has informed EPA's evaluation of the totality of the factors bearing on the intent to restart or permanently shut down the facility is that the Limetree Bay facility has never completely shut down.  Since HOVENSA ceased the refinery operations at the complex in the 2011-2012 time period, HOVENSA and Limetree Bay have continuously operated the oil storage and terminal operations, wastewater treatment plant, and power generation equipment at this location.  This situation is thus unique and distinguishable from many of the circumstances cited by the commenter where EPA had expressed the view that a continuous intent to restart was not demonstrated, based in part on the complete cessation of operations at the facility.

The commenter first points to the eight-year time period that parts of the facility have been shut down.  But the comment does not demonstrate why this amount of time precludes HOVENSA and Limetree Bay from showing a continuous intent to restart.  This period of time invokes the presumption that the facility was permanently shut down under the Reactivation Policy, but the policy allows for rebutting that presumption. *See* Policy Determinations Regarding PSD Questions, Region VII, at 2 (Feb. 5, 1981) (finding that a boiler that had been idled for 10 years was not subject to PSD).  The comment does not cite a prior circumstance where EPA or another agency found that the shutdown of this duration precluded a company from rebutting the presumption.  Because the Reactivation Policy calls for looking at the totality of circumstances, it is also important to consider what the facility owners and operators were doing within the period of time that the facility was shut down.  In this case, HOVENSA and Limetree have been continuing to operate portions of the facility, investing in maintenance of the idled portions of the facility, and continuing to hold permits

---

[16] The one exception to this would be a modification to an existing minor source that itself would constitute a major stationary source. 40 C.F.R. § 52.21(b)(1)(i)(c).  But in this context, modified sources are treated like new sources because the Act requires that a major source obtain a PSD permit, not because modified means the same thing as new.

governing the operation of the idled equipment.

Similarly, regarding the second factor cited by the commenter, the comment does not explain how HOVENSA's reasons for shutting down portions of the facility prevent the owners from demonstrating intent to restart the facility. Corporations generally operate to make a profit and return on investment for shareholders, so financial and economic reasons will frequently be part of the motivation for shutting down a portion of a stationary source owned and operated by a corporation. Facility operations inherently ebb and flow for financial and economic reasons. EPA recognized that business flows in cycles when it revised its NSR regulations in 2002 to provide for a 10-year period from which baseline emissions may be drawn. *See New York v. EPA*, 443 F.3d at 25–26. Thus, the motivation for idling part of a facility does not seem particularly informative as to intent to restart in this case. The commenter cites two previous shutdowns that it argues EPA considered to be permanent because they were motivated by financial and economic reasons. But in the *Monroe Electric* Title V order, EPA did not actually determine that the shutdown of that facility was permanent because it had shut down for economic reasons. This order partially granted a petition to object to a title V operating permit based on the view that the facility in question had more clearly engaged in a major modification when it restarted without deciding whether the facility should be considered a new source under the reactivation policy. In the case of *Noranda Lakeshore Mines*, the source was completely shut down for at least 10 years, it had failed to maintain its operating permit, and had been removed from the state's emissions inventory. While EPA noted that the Noranda facility was shutdown "due to market conditions," this fact was not cited by EPA as a reason for its finding that the shutdown was permanent.

On the third factor the commenter addresses ("statements by the owner or operator regarding intent"), the comment does not actually cite a statement "by the owner or operator" that evidences an intent to permanently shut down refinery operations. The comment cites only one statement from the company itself, a 2012 press release from HOVENSA that said "[f]ollowing the shutdown, the complex will operate as an oil storage terminal." This appears to be simply a statement about the facts on the ground after the refinery operations were idled while the other operations were not. This statement does not appear in any way definitive regarding HOVENSA's permanent plans for the facility. The other "statements" referenced in the comment are derived from press reports, and many of those press reports are based on the perceptions of parties other than HOVENSA. The supporting information considered by Assistant Administrator Wehrum in 2018 included company statements, press releases, and various correspondence from 2011 through 2017. The commenter does not address any of this information or provide any reasons for EPA to question the credibility of these statements that are more directly attributable to the owner or operator of the facility. EPA acknowledges that some of the evidence the commenter proffers tends to show that HOVENSA pursued the option of permanently converting the facility to an oil storage and transfer facility. But this does not demonstrate that HOVENSA developed or implemented concrete plans to do so or that it abandoned the option of resuming oil refinery operations at this site. Actions can sometimes speak louder than words, and HOVENSA continued to invest in maintenance of the refinery components of the facility and retained its permits for this portion of the facility.

As to the fourth factor addressed in the comment (cost and time to reactivate), the commenter argues that Assistant Administrator Wehrum analyzed this factor backwards. But Mr.

Wehrum did not characterize the $400 million spent on maintenance as pertaining to this factor.  The 2018 letter does not discuss the total cost and time that Limetree expected to be required to restart the idled portions of the facility.   Rather, the $400 million spent on maintenance by HOVENSA goes to the last factor addressed by the commenter – ongoing maintenance and inspections.  The magnitude of this investment in maintenance of the facility evidences an intent by the owners to restart the facility.  It seems unlikely that a company that intends to permanently abandon or scrap equipment would invest hundreds of millions of dollars in its maintenance.  As discussed in EPA's 2018 letter, Limetree Bay represented that the owners of the facility have maintained critical refinery equipment, such as compressors, pumps, utilities, wastewater treatment units in working order and conducted multiple walkthrough inspections at the plant.  Limetree also provided a list of critical equipment and the timeline of significant maintenance activities performed at the refinery to demonstrate that the maintenance activities were performed.

For the fifth factor addressed in the comment (status of permits), the commenter dismisses the fact the company maintained its environmental permits, claiming that these same permits were also required to operate the portions of the facility that have not been idled.  But the only support provided by the commenter for this conclusory statement is an EPA website compiling information on the facility's emissions and compliance with regulatory requirements.[17]   The second weblink provided by commenter produced an error message.[18]  The comment does not describe the content of any of these permits or show that every one of the facility's permits cover both the refinery operations and those parts of the facility that have continued to operate.   The commenter does not dispute Limetree's representations that HOVENSA and Limetree maintained all environmental permits in active status and submitted timely renewal applications.  Nor does the comment allege that these companies have not complied with the Refinery MACT, NSPS Subpart J, and all of the applicable RCRA regulations while the refinery units were idled.  The first website cited by commenters includes compliance information that might relate to the latter considerations, but the comment does not show how any of this information is relevant to the question of whether Limetree maintained its permits.  Further, the comment does not show how the information on this webpage undermines the EPA's earlier finding that maintaining such permits provides evidence of an intent by these companies to restart the refinery portions of the facility.

In the context of the fourth and sixth factors addressed in the comment, the commenter argues that prior EPA statements that a facility should be treated as permanently shut down if it cannot be restarted quickly and easily (without significant investment of time and capital) suggest the facility should be treated as permanently shut down as well.  EPA acknowledges that Limetree Bay has not been able to restart the refinery operations at this facility as quickly and easily as first projected, as it does appear the company has invested substantial capital and several years of time to get these desired portions of the refinery back on line.  But the focus of the Reactivation Policy has been on determining "if a source is permanently shut down." Wehrum Letter at 2.  While being in a position to restart quickly and easily may be one way to show that a facility has not permanently shut down, this is not the only way.  In a case such as this one where the source never completely shut down and other factors show an intent to restart those portions that were shut down, an owner or operator would not necessarily have to demonstrate that the entire source can be quickly and easily restarted to

---

[17] https://enviro.epa.gov/enviro/multisys2_v2.get_list?facility_uin=110000307864.
[18] https://enviro.epa.gov/enviro/fii_query_dtl.disp_program_facility.

show its intent to restart operations.

Considering the totality of circumstances, were EPA to apply the Reactivation Policy, EPA would continue to find that the presumption of permanent shutdown has been rebutted in this case.  While there are some statements indicating that HOVENSA pursued the option of permanently using the facility for only product storage and transfer, EPA has not received information showing that the company had definite plans to do so or took actions at the facility site to implement such a plan.  The presumption of permanent shutdown would be rebutted in this case by evidence showing that the source continued to operate in part and that the owners invested substantial sums in maintenance of the idled portions of the facility and continued to hold permits governing the operation of the idled equipment.

Regarding the commenters' request that EPA rescind the EPA's April 2018 letter based on government ethics concerns, the commenters point to only generalized allegations concerning potential past ethics violations by the former Assistant Administrator.  The commenters admit they "are not aware of any evidence that the Wehrum Letter was, in itself, a direct result of misconduct." Comment at 8. Thus, these ethical allegations do not justify the withdrawal of the 2018 letter.

The statement the commenter points to regarding Limetree being considered a customer was made by one EPA official and was in reference to the coordination between multiple federal agencies and the Virgin Islands on complex multi-media permitting and approvals. That process was intended to ensure all those participating were up-to-date and informed about where in the process the agencies were, not to impact the substance of the decisions reached. Indeed, this level of coordination between federal agencies and transparency is fully consistent with congressional direction. See 42 U.S.C. 4370m et. seq. (setting out a coordination and transparency program for major federal infrastructure projects).

**Comment No. 133**
Commenters state that the refinery should not be reopened because of HOVENSA's past violations of the Clean Air Act and other environmental laws and that these violations caused HOVENSA to shut down.

**Response 133**
These comments refer to a history of noncompliance at the facility and suggest that the noncompliance led HOVENSA to cease operations. EPA did initiate an enforcement action against HOVENSA for Clean Air Act violations and the action settled in 2011 (a 2020 modification of the settlement, once entered by the U.S. District Court of the Virgin Islands, will transfer the HOVENSA's obligations to Limetree). The consent decree did not require the facility to cease operations. Rather, we understand that economic factors led HOVENSA to cease operations. Regardless of the reason for HOVENSA's decision, the PAL provisions do not provide EPA with authority to deny a PAL permit due to the applicant's history of noncompliance under either the Clean Air Act or other environmental statutes. The PAL provisions do, however, address past violations through adjustments to the baseline and PAL level and EPA has incorporated such adjustments in this permit action. The PAL provisions do, however, address past violations and related Consent Decree requirements through adjustments to the baseline and PAL level, and EPA has incorporated such adjustments in this permit action. See Letter from John Filippelli, Director, Air and Radiation Division, EPA

Region 2, to Darius Sweet, CEO, Limetree Bay Terminals, and Brian K. Lever, President, Limetree Bay Refining (Aug. 14, 2019). See also EPA Response to Comment 16.

# EXHIBIT E

## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>LIMETREE BAY REFINING, LLC )<br>)<br>and )<br>)<br>LIMETREE BAY TERMINALS, LLC )<br>)<br>Defendants. )<br>) | Civ. A. No. 1:21-cv-00264 |

### JOINT STIPULATION

WHEREAS, the United States of America, by the authority of the Attorney General of the United States, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA") filed a civil action against defendants Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC (collectively, "Limetree Bay") under Section 303 of the Clean Air Act ("CAA"), 42 U.S.C. § 7603.

WHEREAS, the complaint seeks injunctive relief under Section 303 of the CAA requiring Limetree Bay to comply with a CAA Emergency Order ("EPA Order," Exhibit 1 hereto) that EPA issued on May 14, 2021, and other relief.

WHEREAS, on June 16, 2021, EPA issued an information request to Limetree Bay under Section 114(a) of the CAA, 42 U.S.C. § 7414(a) ("114 Request," Exhibit 2 hereto) requiring Limetree Bay to install and operate ambient air monitoring equipment for hydrogen sulfide ($H_2S$) and sulfur dioxide ($SO_2$) at nine specified locations.

WHEREAS, Limetree Bay began to idle the Refinery on May 12, 2021, and represents that it does not intend to restart the Refinery or any Refinery Process Unit at the current time, except as necessary to purge hydrocarbons from process units and other equipment as part of the process of bringing the Refinery to a state of indefinite shutdown.

WHEREAS, Limetree Bay continues to operate the Terminal and intends to conduct the activities identified in Paragraph 13.

WHEREFORE, the Parties hereby stipulate and agree as follows:

1.      Limetree Bay certifies that the Refinery[1] has been idled.

2.      Except as provided pursuant to Paragraphs 9, 10 and 13 below, Limetree Bay shall notify the United States and the Court not less than ninety (90) days before restarting the Refinery, or any Refinery Process Unit for any purpose.

3.      The Audit Reports required by Paragraph 115.d of the EPA Order were submitted to EPA by June 25, 2021, in compliance with the deadline set forth in Paragraph 115.d of the EPA Order.

4.      Except as provided pursuant to Paragraphs 9, 10 and 13 below, by no later than ninety (90) days prior to any restart of the Refinery or any refinery Process Unit, Limetree Bay shall submit to EPA the Plan required by Paragraph 115.*l* of the EPA Order (the "303 Order Plan") that addresses all findings, conclusions, and observations set forth in each Audit Report, with a schedule for implementation of all corrective measures.  The 303 Order Plan shall specify which measures must be completed prior to restart of the Refinery or any refinery Process Unit.

---

[1]Terms used in this Stipulation that are defined in the Clean Air Act or in regulations promulgated pursuant to the Act shall have the meanings assigned to them in the Act or such regulations, unless otherwise provided in the Complaint, EPA Order, Consent Decree or First Modification of the Consent Decree.

5.      As part of the 303 Order Plan submitted under Paragraph 4, Limetree Bay shall identify any changed conditions at the Refinery that occurred since May 12, 2021, including but not limited to any corrective measures taken.

6.      Before Limetree Bay restarts the Refinery or any Refinery Process Unit, it shall complete all measures necessary to eliminate any imminent and substantial endangerment to public health or welfare or the environment posed by the Refinery or Refinery Process Unit.

7.      Except as provided pursuant to Paragraphs 9, 10 and 13, no later than ninety (90) days prior to restart of the Refinery or any Refinery Process Unit, Limetree Bay shall submit to EPA an ambient air monitoring plan ("Monitoring Plan") that includes the operation of $H_2S$ and $SO_2$ monitors at the nine (9) monitoring sites specified in Table A of the 114 Request ("Monitoring Sites"), as required by the 114 Request.

8.      Except as provided pursuant to Paragraphs 9, 10 and 13, Limetree Bay shall install and operate the $H_2S$ and $SO_2$ monitors at the Monitoring Sites, as well as a meteorological tower, as required by the 114 Request, no later than thirty (30) days prior to any restart of the Refinery or any refinery Process Unit.

9.      Limetree Bay shall submit to EPA a plan ("Hydrocarbon Purge Plan") for purging hydrocarbons from Refinery Process Units and other equipment at the Refinery as part of the process of bringing the Refinery to a state of indefinite shutdown. The Hydrocarbon Purge Plan shall identify the activity or activities that Limetree Bay intends to undertake under the Hydrocarbon Purge Plan, as well as the measures Limetree Bay has taken or will take prior to restarting, or during the operation of, any Refinery Process Unit covered by the Hydrocarbon Purge Plan, to ensure that the purging process and any associated activities do not present an imminent and substantial endangerment to public health or welfare or the environment, including

3

but not limited to measures in response to recommendations contained in the Audit Reports.  The Hydrocarbon Purge Plan shall include, among other things: the operation of ambient air monitoring during all purging operations and compliance with applicable requirements of 40 C.F.R. Part 60, Subpart Ja and 40 C.F.R. Part 63, Subpart CC.

10.     The purging process and any associated activities shall be conducted in accordance with the EPA-approved Hydrocarbon Purge Plan, subject to any modifications necessary based on monitoring data or other information received by EPA suggesting that operations under the Hydrocarbon Purge Plan may present an imminent and substantial endangerment to public health or welfare, or the environment.  Before EPA makes or requires any modifications to an approved Hydrocarbon Purge Plan, the Parties shall meet and confer.  Any proposed modification by Limetree Bay to the EPA-approved Hydrocarbon Purge Plan shall be subject to Paragraph 12, below.  Limetree Bay shall not begin the purging process or any associated activities without EPA's approval, nor shall Limetree Bay use any Refinery Process Unit other than as specified in the EPA-approved Hydrocarbon Purge Plan.

11.     Limetree Bay may submit and EPA may approve one or more Hydrocarbon Purge Plans subject to Paragraphs 9 and 10.

12.     Any plan required by this stipulation shall be submitted to EPA for its review, comment, and approval or approval with modifications, and shall be sent by email to the EPA and VIDPNR representatives listed in Paragraph 116 of the EPA Order.

13.     For the avoidance of doubt, nothing in the 303 Order or this Stipulation prevents Limetree Bay from operating equipment necessary for Terminal operations, or necessary to generate electricity or provide drinking water or wastewater management for the Facility, the HOVENSA Environmental Response Trust, and for the worker residences dependent on the

4

Facility for such services.

14.     The Parties agree that further proceedings in this case should be stayed for a period of ninety (90) days from the date of filing this Joint Stipulation, and Limetree Bay does not oppose the United States' Unopposed Motion for Stay filed simultaneously with this Stipulation; and the Parties shall submit a joint status report sixty days after the date this Stipulation is filed.

THE UNDERSIGNED PARTY enters into this Stipulation in the matter of United States v. Limetree Bay Refining LLC and Limetree Bay Terminals LLC.

FOR PLAINTIFF THE UNITED STATES OF AMERICA:

JEAN WILLIAMS
Acting Assistant Attorney General
Environment and Natural Resources
Division
United States Department of Justice

Date: July 12, 2021

MYLES E. FLINT, II, Senior Counsel
ERIC D. ALBERT, Senior Attorney
SHEILA McANANEY, Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources
Division
United States Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
(202) 307-1859

6

THE UNDERSIGNED PARTY enters into this Stipulation in the matter of United States v. Limetree Bay Refining LLC and Limetree Bay Terminals LLC.

FOR DEFENDANT LIMETREE BAY
TERMINALS, LLC:

Date: 07/12/2021

MARK CHAVEZ
General Counsel
Limetree Bay Terminals, LLC
One Estate Hope
Christiansted, USVI 00820

7

THE UNDERSIGNED PARTY enters into this Stipulation in the matter of United States v. Limetree Bay Refining LLC and Limetree Bay Terminals LLC.

FOR DEFENDANT LIMETREE BAY REFINING, LLC:

Date:     07/12/2021

MARK DELAQUIL
MATTHEW THURLOW
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue NW
Washington, D.C.  20036
(202) 861-1500

# EXHIBIT F

# DEPARTMENT OF PLANNING AND NATURAL RESOURCES



## AIR POLLUTION CONTROL PROGRAM
## AUTHORITY TO CONSTRUCT AND PERMIT TO OPERATE

For:
**LIMETREE BAY TERMINALS, LLC/**
**LIMETREE BAY REFINING, LLC**

EFFECTIVE DATE: May 08, 2020

PERMIT NUMBER: STX-924-AC-PO-20
(MARPOL Project) Revised

THE PERMITTEE LIMETREE BAY TERMINALS, LLC/LIMETREE BAY REFINING, LLC IS SUBJECT TO ALL TERMS, CONDITIONS, LIMITATIONS, AND STANDARDS CONTAINED HEREIN. THE CONDITIONS IN THIS PERMIT ARE FEDERALLY AND LOCALLY ENFORCEABLE.

_____
Jean-Pierre L. Oriol
Commissioner

08- May- 2020
Date

# FACILITY INFORMATION

PERMITTEE:            Limetree Bay Terminals, LLC/Limetree Bay Refining, LLC
                     #1 Estate Hope
                     Christiansted, VI  00820

SIC CODE:            2911

PERMIT NUMBER:       STX-924-AC-PO-20

FACILITY ADDRESS:    #1 Estate Hope
                     Christiansted, VI  00820

MAILING ADDRESS:     #1 Estate Hope
                     Christiansted, VI  00820

ISLAND:              St. Croix

FACILITY CONTACT:    Catherine Elizee
                     Supervisor, Environmental
                     #1 Estate Hope
                     Christiansted, VI  00820
                     (340) 692-3073
                     email:  CElizee@lbterminals.com

**LIMETREE BAY TERMINALS, LLC** ("LIMETREE BAY TERMINALS") **and LIMETREE BAY REFINING, LLC** ("LIMETREE BAY REFINING") **(collectively, "LIMETREE BAY TERMINALS AND REFINING")** have acquired assets formerly owned by HOVENSA L.L.C., which had idled its refinery process units in 2011 and 2012 but had continued to operate its terminal. Prior to sale of the assets, HOVENSA had entered into a Consent Decree (Case: 1:11-cv-00006) ("Consent Decree") with the Government of the United States Virgin Islands and the United States of America. The Consent Decree is binding on successors and requires that HOVENSA condition any transfer of the refinery upon the execution by the transferee of a modification to the Consent Decree which makes the terms and conditions of the Consent Decree applicable to the transferee.

In 2015, **LIMETREE BAY TERMINALS** entered into an operating agreement with the Government of the United States Virgin Islands. In that 2015 agreement, the facility was contractually obligated to evaluate the potential of resuming operations at the refinery before December 2018.

In 2016, **LIMETREE BAY TERMINALS** entered into the Amended and Restated Asset Purchase Agreement, in which **LIMETREE BAY TERMINALS** agreed, on the terms and subject to the conditions of the APA, to assume all of HOVENSA's Liabilities, other than the Excluded Liabilities, in connection with the purchased assets arising out of or relating to any act, omission, circumstances or other event occurring after the closing.

In 2018, **LIMETREE BAY TERMINALS** entered into the Amended and Restated Terminal Operating Agreement with the Government of the United States Virgin Islands, in which **LIMETREE BAY TERMINALS** agreed, in part, to use commercially reasonable efforts to add itself as a named party defendant to the Consent Decree and to modify the Consent Decree to restart refinery operations.

Also in 2018, **LIMETREE BAY REFINING** entered into the Refinery Operating Agreement with the Government of the United States Virgin Islands, in which **LIMETREE BAY REFINING** agreed, in part, to use commercially reasonable efforts to add itself as a named party defendant to the Consent Decree and to modify the Consent Decree to restart refinery operations.

**LIMETREE BAY TERMINALS** plans to resume operation of some of the refinery's existing process unit and utilities. **LIMETREE BAY TERMINALS** submitted to the U.S. Virgin Islands Department of Planning and Natural Resources ("Department") a revised permit application dated April 24, 2019 (the "Application") proposing to restart refining operations at the St. Croix facility to meet local market demand and produce low sulfur fuels required by EPA regulations and international maritime conventions and standards. As part of this effort, **LIMETREE BAY TERMINALS AND REFINING** is proposing to modify the East Sulfur Recovery Plant, Heaters, #8 Boiler, #9 Boiler, GT No. 7, GT No. 8, and Tanks and to make repairs outlined in Table 1.

Nothing in this permit relieves **LIMETREE BAY TERMINALS AND REFINING** of any obligations to modify the Consent Decree to restart operations, comply with the Consent Decree, or pay penalties for violations of the Consent Decree, as applicable.

**Table 1. MARPOL Project Equipment Description**

| Plant Area | Process Unit | Source ID(s) | Unit Description | Project Description |
|---|---|---|---|---|
| Area I | Penex | Penex | Process Unit | Install reactor (previously located at #2DU) |
| Area I | Penex | H-202 | Hot Oil Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area I | Penex | C-200A | Reciprocating Gas Compressor | Repairs, resume operations |
| Area I | Penex | C-200B | Reciprocating Gas Compressor | Repairs, resume operations |
| Area I | Penex | C-200C | Reciprocating Gas Compressor | Repairs, resume operations |
| Area I | Utility Fractionator | Utility Fractionator. | Process Unit | Repairs, resume operations |
| Area I | Utility Fractionator | H-160 | Charge Heater | Repairs, resume operations |
| Area III | #5 Crude Distillation Unit | #5 CDU | Process Unit | Piping changes repairs, resume operations |
| Area III | #5CDU | H-3101A | Crude Charge Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area III | #5CDU | H-3101B | Crude Charge Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area III | #6 Crude Distillation Unit | #6 CDU | Process Unit | Install tie-ins from #5 CDU to #6 CDU desalter Possible installation of additional gas compressor |
| Area III | #6CDU | H-4101A | Crude Charge Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area III | #6CDU | H-4101B | Crude Charge Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area III | No. 2 Gas Recovery Unit | 2 GRU | Process Unit | Piping changes, repairs, resume operations |
| Area III | Gas Treatment | Unit No. 4800 | Gas Treating | Repairs, resume operations |
| Area III | Gas Treatment | Unit No. 5800 | Gas Treating | Add new flash drum (D-5838) at No. 5 Amine Unit to work in parallel with No. 4 Amine flash drum. Add new rich amine pumps (P5835A/B) and slop oil pump (P-5836), piping changes repairs. resume operation |
| Area IV | #3 Vacuum Unit | #3 VAC | Process Unit | Piping changes repairs resume operations |
| Area IV | #3 VAC | H-4201 | Prestripper Heater | Install ultra-low NOx burners, repairs, resume operations |

| Plant Area | Process Unit | Source ID(s) | Unit Description | Project Description |
|---|---|---|---|---|
| Area IV | #3 VAC | H-4202 | Vacuum Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area IV | #7 Distillate Desulfurizer | #7 DD | Process Unit | Piping changes, install-new pressure swing adsorption system to purify hydrogen, and on-line analyzer, repairs, resume operation |
| Area IV | #7 DD | Heater H-4301A | Reactor Charge Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area IV | #7 DD | Heater H-4301B | Reactor Charge Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area IV | #7 DD | Heater H-4302 | Stripper Reboiler Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area IV | #3 Platformer (Hydrobon) | #3 Plat (Hydrobon) | Process Unit | Repurpose Hydrobon section to light naphtha hydrotreater-resume operation |
| Area IV | #3 Platformer (Hydrobon) | Heater H-4401 | Charge Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area IV | #3 Platformer (Hydrobon) | Heater H-4402 | Fired Reboiler Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area IV | #3 Platformer (Hydrobon) | Heater H-4455 | Fired Reboiler Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area IV | #3 Platformer (Reformer) | #3 Plat (Reformer) | Process Unit | Changes as needed to function as alternative to # 4 Plat Reformer and repairs, resume operations |
| Area IV | #3 Platformer (Reformer) | Heater H-4451 | Charge Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area IV | #3 Platformer (Reformer) | Heater H-4452 | Intermediate Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area IV | #3 Platformer (Reformer) | Heater H-4453 | Intermediate Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area IV | #3 Platformer (Reformer) | Heater H-4454 | Intermediate Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area IV | #6 Distillate Desulfurizer | #6 DD | Process Unit | Install piping and control valves, effluent exchanger, reactor hydrogen quench system, different catalyst in existing reactor piping, repairs, resume operation |
| Area IV | #6 DD | H-4601A | Reactor Charge Heater | Install ultra-low NOx burners, repairs, resume operations |

SAPTXA208

| Plant Area | Process Unit | Source ID(s) | Unit Description | Project Description |
|---|---|---|---|---|
| Area IV | #6 DD | H-4601B | Reactor Charge Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area IV | #6 DD | H-4602 | Stripper Reboiler Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area IV | #6 DD | C-4601A | Reciprocating Gas Compressor | Repairs, resume operations |
| Area IV | #6 DD | C-4601B | Reciprocating Gas Compressor | Repairs, resume operations |
| Area IV | #6 DD | C-4601C | Reciprocating Gas Compressor | Repairs, resume operations |
| Area II | #2 DU | #2 DU | Process Unit | Changes as needed to function as alternate to #6 DD and repairs, resume operations |
| Area II | #2 DU | H-800A | Reactor Charge Heater | Install ultra-low NOx burners, repairs, resume operations as alternate to #6 DD |
| Area II | #2 DU | H-800B | Reactor Charge Heater | Install ultra-low NOx burners, repairs, resume operations as alternate to #6 DD |
| Area II | #2 DU | H-801 | Stripper Heater | Install ultra-low NOx burners, repairs, resume operations as alternate to #6 DD |
| Area IV | #4 Platformer | #4 Platformer | Process Unit | Use Hydrobon section as a naphtha hydrotreater and reformer section as naphtha reformer, install chlorine gas treater and LPG treater, piping, repairs, and resume operations |
| Area IV | #4 Platformer | H-5401 | Charge Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area IV | #4 Platformer | H-5402 | Fired Reboiler Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area IV | #4 Platformer | H-5451 | Charge Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area IV | #4 Platformer | H-5452 | Intermediate Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area IV | #4 Platformer | H-5453 | Intermediate Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area IV | #4 Platformer | H-5454 | Intermediate Heater | Install ultra-low NOx burners, repairs, resume operations |

| Plant Area | Process Unit | Source ID(s) | Unit Description | Project Description |
|---|---|---|---|---|
| Area IV | #4 Platformer | H-5455 | Fired Reboiler Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area IV | #9 Distillate Desulfurizer | #9 DD | Process Unit | Repairs, resume operations |
| Area IV | #9 Distillate Desulfurizer | H-5301A | Reactor Charge Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area IV | #9 Distillate Desulfurizer | H-5301B | Reactor Charge Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area IV | #9 Distillate Desulfurizer | H-5302 | Stripper Reboiler Heater | Install ultra-low NOx burners, repairs, resume operations |
| Area V | #6 Amine | Unit No. 7450 | Process Unit | Install tie-in to East Sulfur Plant TGTU repairs, and resume operations |
| Area V | #7 Amine | Unit No. 7460 | Process Unit | Repairs, resume operations |
| Area VI | East Sulfur Recovery | #3 SRU | Unit No. 4740 | Replace air blowers, primary burner, intra-stage reheaters, reload catalyst, piping, repairs, and resume operations |
| Area VI | East Sulfur Recovery | #4 SRU | Unit No. 4750 | Replace air blowers, primary burner, reload catalyst, piping, repairs, and resume operations |
| Area VI | East Sulfur Recovery | #2 Beavon | H-4761 (T-4761) | Replace #2 Beavon to a Shell Claus Offgas Treater ("SCOT") type TGTU (change hydrogenation reactor catalyst, replace fired reheater with steam reheater, install quench column, absorber, pumps, and quench water cooler, and filter system), piping, repairs, and resume operations |
| Area VI | East Sulfur Recovery | H-4745 | East Incinerator | Repairs resume operations |
| Area VI | East Sulfur Recovery | #3 and #4 SRU | East Sulfur Pits | Install sulfur pit eductor system, install replacement of existing priller/pelletizer, install new drain hubs, piping, repairs, and resume operations |
| Area VI | East Sulfur Storage Area | Materials Handling | Materials Handling | Repairs resume operations |
| Area VI | Advanced Wastewater Treatment System | #2 API (Unit No.1660) | Oil/Water Separator | Repairs, resume operations |
| Area VI | Advanced Wastewater Treatment System | #2 WEMCO | Induced Air Floatation | Repairs, resume operations |
| Area VI | Advanced Wastewater Treatment System | West Benzene Stripper (STK-3510) | Air Stripper | Repairs, resume operations |
| Area VI | Advanced Wastewater Treatment System | East Benzene Stripper (STK-3530) | Air Stripper | Repairs, resume operations |

SRPTXXA210

| Plant Area | Process Unit | Source ID(s) | Unit Description | Project Description |
|---|---|---|---|---|
| Area VI | Advanced Wastewater Treatment System | #3 WEMCO | Induced Air Floatation | Repairs, resume/continue operations |
| Area VI | Advanced Wastewater Treatment System | Miscellaneous Equipment | Process Unit | Piping changes, repairs, resume/continue operations |
| Area VI | Advanced Wastewater Treatment System | #3 & #4 Sour Water Strippers (Unit No. 4720/30) | Steam Stripper | Add new drum, repairs, resume operations |
| Area VI | Advanced Wastewater Treatment System | #5 Sour Water Strippers (Unit No. 7400) | Steam Stripper | Install new drain hubs, repairs, resume operations |
| Area VI | Advanced Wastewater Treatment System | CPS Oil/Water Separator | Oil/Water Separator | Repairs, resume operations |
| Area VI | Refinery Flare System | #3 Flare (H-1104) | Gas Burner | Additional piping connected to header, install connections for future possible project, and repairs, resume operations |
| Area VI | Refinery Flare System | FCC Flare (L.P. Flare - STK 7941) | Gas Burner, steam assist | Additional piping connected to header, install connections for future possible project, and repairs, resume operations |
| Area VII | Delayed Coker Unit | DCU | Process Unit | Install blowdown eductor system, automatic unheading valves on the bottom of each coke drum, and additional instrumentation, piping, repairs, resume operations |
| Area VII | Delayed Coker Unit | H-8501A | Coker Process Heater 1 | Revise permit conditions. Repairs, resume operations |
| Area VII | Delayed Coker Unit | H-8501B | Coker Process Heater 2 | Revise permit conditions. Repairs, resume operations |
| Area VII | Delayed Coker Unit | TK-8501 (Hot pitch tank) | Fixed roof storage tank | Revise permit conditions. Repairs, resume operations |
| Area VII | Delayed Coker Unit | TK-8502 (Quench water tank) | Open roof tank | Repairs, resume operations |
| Area VII | Delayed Coker Unit | TK-8503 | Fixed roof | Repairs, resume operations |
| Area VII | Coker Complex | Coke handling, storage, & loading system | Transportation & breaking of solid coke between drums & dock | Revise permit conditions. Repairs, resume operations |
| Area VII | Coker Complex | Tank TK-8511 & Residuals Recycling System | Tank TK-8511 & recycling system | Repairs, resume operations |
| Area VIII | Utility III | #8 Boiler (B-3303) | Boiler; Produces Steam | Install NOx Control, repairs, resume operations |
| Area VIII | Utility III | #9 Boiler (B-3304) | Boiler; Produces Steam | Install NOx Control, repairs, resume operations |

Limetree Bay Terminals, LLC/
Limetree Bay Refining, LLC

Authority to Construct and Permit to Operate
APPX A213-19

| Plant Area | Process Unit | Source ID(s) | Unit Description | Project Description |
|---|---|---|---|---|
| Area VIII | Utility III | #10 Boiler<B-3701) | Boiler: Produces Steam | Repairs, resume operations |
| Area VIII | Powerhouse 2 | GT No. 7 (G-3407) | Turbine; Produces Electricity | Install SCR or steam injection, repairs, continue/resume operations |
| Area VIII | Powerhouse 2 | GT No. 8 (G-3408) | Turbine; Produces Electricity | Install SCR or steam injection, repairs, continue/resume operations |
| Area VIII | Powerhouse 2 | GT No. 9 (G-3409) | Turbine; Produces Electricity | Repairs, resume operations |
| Area VIII | Powerhouse 2 | GT No. 10 (G-3410) | Turbine; Produces Electricity | Repairs, resume operations |
| Area VIII | GT No. 13 and Duct Burner | GT No. 13 (G-3413) | Turbine; Produces Electricity | Repairs, resume operations |
| Area VIII | GT No. 13 and Duct Burner | H-3413 | Duct Burner | Repairs, resume operations |
| Area IX | Tank | TK-1071 | External Floating Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-1663 | External Floating Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-6814 | External Floating Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-6815 | External Floating Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-6816 | External Floating Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-6825 | Fixed Roof | Convert from fixed roof to internal floating roof, Repairs, continue/resume operations |
| Area IX | Tank | TK-6836 | External Floating Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-6838 | External Floating Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-6839 | External Floating Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-6840 | External Floating Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-6841 | Internal Floating Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-7405 | Fixed Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-7406 | Fixed Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-7411 | Fixed Roof | Convert from fixed roof to internal floating roof, Repairs, continue /resume operations |
| Area IX | Tank | TK-7412 | Fixed Roof | Convert from fixed roof to internal floating roof, Repairs, continue/resume operations |
| Area IX | Tank | TK-7413 | Fixed Roof | Repairs, continue /resume operations |

| Plant Area | Process Unit | Source ID(s) | Unit Description | Project Description |
|---|---|---|---|---|
| Area IX | Tank | TK-7414 | Fixed Roof | Repairs, continue /resume operations |
| Area IX | Tank | TK-7425 | Internal Floating Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-7426 | Internal Floating Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-7427 | Fixed Roof | Repairs, continue /resume operations |
| Area IX | Tank | TK-7443 | External Floating | Repairs, continue/resume operations |
| Area IX | Tank | TK-7444 | External Floating | Repairs, continue/resume operations |
| Area IX | Tank | TK-7445 | External Floating | Repairs, continue/resume operations |
| Area IX | Tank | TK-7446 | Fixed Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-7447 | External Floating Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-7448 | Internal Floating Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-7501 | Fixed Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-7502 | External Floating Roof | Repairs, continue /resume operations |
| Area IX | Tank | TK-7510 | External Floating Roof | Repairs, continue /resume operations |
| Area IX | Tank | TK-7511 | External Floating Roof | Repairs, continue /resume operations |
| Area IX | Tank | TK-7512 | External Floating Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-7514 | External Floating Roof | Repairs, continue /resume operations |
| Area IX | Tank | TK-7515 | External Floating Roof | Repairs, continue /resume operations |
| Area IX | Tank | TK-7516 | External Floating Roof | Repairs, continue /resume operations |
| Area IX | Tank | TK-7541 | Fixed Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-7542 | Fixed Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-7601 | Internal Floating Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-7604 | Internal Floating Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-7605 | External Floating Roof | Repairs, continue/resume operations |
| Area IX | Tank | TK-7932 | Open roof tank | Repairs, continue /resume operations |
| Area IX | Tank | TK-7933 | Fixed Roof | Repairs, continue/resume operations |
| Area X | Piping | Unit No. 1902 | East/West fuel gas system | Repairs, continue/resume operations |
| Area X | Piping | Unit No. 3303 | East/West fuel gas system | Repairs, continue/resume operations |

Authority to Construct and Permit to Operate

10

| Plant Area | Process Unit | Source ID(s) | Unit Description | Project Description |
|---|---|---|---|---|
| Area X | Storage Pile and Conveyor | N/A | Sulfur Storage and Ship Loading | Repairs, resume operations |

\* Per Title V Permit No. STX-TV-003-10

Limetree Bay Terminals, LLC/
Limetree Bay Refining, LLC

Authority to Construct and Permit to Operate
STX-PSD-914-19

This Authority to Construct and Permit to Operate (herein "the Permit", "this Permit", or "MARPOL Project Permit") is issued under the authority of the Virgin Islands Air Pollution Control Act and Virgin Islands Rules and Regulations Title 12, Chapter 9, §206-26, §206-27 and §206-31 and permits the construction and operation of units identified in Section I and the Application, under the cited rules.

## SECTION I: REGULATORY REQUIREMENTS

**LIMETREE BAY TERMINALS AND REFINING,** shall continue to comply with applicable regulatory requirements as defined in the St. Croix facility Title V Permit No. STX-TV-003-10, for all emission units affected but not modified by the MARPOL Project. For the affected facilities and sources that are modified by the MARPOL Project, existing requirements and changes from the requirements in the Title V permit are summarized in Table 2. Where a term or condition of this Permit differs from, modifies or changes a provision of Title V Permit No. STX-TV-003-10, **LIMETREE BAY TERMINALS AND REFINING** agrees to comply with the terms and conditions of this Permit in lieu of those in the Title V Permit until such permit is amended to reflect the terms and conditions of this Permit.

1. Based on the information submitted in the Application and supporting documents, **LIMETREE BAY TERMINALS AND REFINING's** MARPOL Project is subject to the regulations outlined in Table 2.

**Table 2.  Applicable Regulations**

Provisions marked with an * are existing requirements in the Title V permit that will not change as a result of the MARPOL

| Regulation | Affected Source and Section |
|---|---|
| *40 CFR Part 60, Subpart A: General Provisions | Area wide requirement |
| 40 CFR Part 60, Subpart Ja: Petroleum Refineries | East Sulfur Recovery Plant conversion to a reduction control system followed by an incinerator |
| 40 CFR Part 60, Subpart GGGa: Equipment Leaks of VOC in Petroleum Refineries which construction, reconstruction or modification commenced after November 7, 2006 | As applicable, equipment in VOC service |
| *40 CFR Part 60, Subpart QQQ: Petroleum Refinery Wastewater System | As applicable, individual drain system |
| *40 CFR Part 60, Subpart GG: Standards of Performance for Stationary Gas Turbines | GT-7 and GT-8 |

| Regulation | Affected Source and Section |
|---|---|
| *40 CFR Part 60, Subpart KKKK: Stationary Gas Turbines | GT-13 and duct burner |
| *40 CFR Part 60, Subpart D: Fossil-Fuel-Fired Steam Generators | Boilers #8 and #9 |
| *40 CFR Part 61, Subpart A: General Provisions | Area wide requirement |
| *40 CFR Part 61, Subpart M: Asbestos | Asbestos containing material included in MARPOL project |
| *40 CFR Part 61, Subpart FF: Benzene Waste Operations | Facilities used for the storage and treatment of benzene containing waste |
| 40 CFR Part 63, Subpart A: General Provisions | Area wide requirement. |
| *40 CFR Part 63, Subpart CC: Petroleum Refineries | Petroleum refinery process units and associated emission points |
| *40 CFR Part 63, Subpart WW: NESHAP for storage vessels | Storage vessels as applicable under Subpart CC |
| *40 CFR Part 63, Subpart UUU: NESHAP for Catalytic Cracking Units, Catalytic Reforming Units, and Sulfur Recovery Units | #3 Plat, #4 Plat, and East Sulfur Recovery Plant |
| *40 CFR Part 63, Subpart YYYY: NESHAP for Stationary Combustion Turbines | GT-13 |
| *40 CFR Part 63, Subpart DDDDD: NESHAP for Major Sources: Industrial, Commercial, and Institutional Boilers and Process Heaters | All existing boilers and process heaters at Limetree Bay |
| *40 CFR Part 63, Subpart ZZZZ: NESHAP for Stationary Reciprocating Internal Combustion Engines | Penex Reciprocating Gas Compressors |
| *Virgin Islands Air Pollution Control Act Rules and Regulations, Title 12, Chapter 9, Sections 204 - 206 | Facility-wide as applicable |

2. In addition to the regulatory requirements summarized in Table 2 above, **LIMETREE BAY TERMINALS AND REFINING** shall comply with the applicable provisions of 40 CFR §52.21(r)(6).

3. The MARPOL Project is a minor modification which shall not result in a significant increase of any regulated New Source Review (NSR) pollutant.

4. **LIMETREE BAY TERMINALS AND REFINING** shall comply with 40 CFR 68 when applicable.

5. For the purposes of Section II.2, referenced above, the following provisions shall apply:

   (a) Annual emissions shall be based on:

      i. Department of U.S. Environmental Protection Agency (USEPA) policies in effect, AP-42, or engineering estimates;

      ii. Actual data to determine the activity rate; and

      iii. Account for the control equipment.

   Department and USEPA regulations and policies have established a hierarchy of emissions rate information to be used in calculation of emissions. Annual emissions shall be calculated using the most reliable emissions rates available.

   (b) Permit STX-924-AC-PO-19 (MARPOL Project) contains provisions relevant to the calculation of emissions rates, such as stack testing or monitoring and recording of process parameters. **LIMETREE BAY TERMINALS AND REFINING** is authorized to use this information to comply with Section II.2 in the calculation of annual emissions.

   (c) Nothing in the MARPOL Project Permit shall require **LIMETREE BAY TERMINALS AND REFINING,** during the construction phase, to monitor or record information relating to annual emissions in addition to the information required by the MARPOL Project Permit.

## SECTION II: SPECIFIC CONDITIONS
## FOR THE MARPOL PROJECT

**LIMETREE BAY TERMINALS AND REFINING** is proposing to resume operations of some of the St. Croix facility refining process units (the "MARPOL Project"). The MARPOL Project will be comprised of a modification of the East Sulfur Recovery Plant to increase its capacity and convert the #2 Beavon tail gas treatment unit to a reduction control system (Scot Unit) followed by an incinerator (East Incinerator) and various equipment changes listed in Table 1 including the #5 CDU, #6 CDU, #3 VAC, #7 DD, #3 Plat, #6 DD, #2 DU, #4 Plat, Penex, Utility Frac., Coker, #9 DD, #2 GRU, Gas Treatment (Unit No. 4800), Gas Treatment (Unit No. 5800), and various other units to support resumption of refining operations at the St. Croix facility to meet local market

demand and produce low sulfur fuels required by EPA regulations and international specifications and treaties. **LIMETREE BAY TERMINALS AND REFINING** is proposing to install steam injection or selective catalytic reduction (SCR) systems on GT-7 and GT-8 and installation of NOx controls on Boilers #8 and #9 to meet the NSPS subpart D standards. Additionally, **LIMETREE BAY TERMINALS AND REFINING** has requested revisions to conditions in the Title V operating permit (STX-TV-003-10) which have as their basis conditions in permits that were issued in support of the Coker Project and the incorporation of additional requirements and standards for emissions units that were physically modified as part of the Coker Project. **LIMETREE BAY TERMINALS AND REFINING** shall construct, modify, test and operate in accordance with all the conditions of this permit. [12 V.I.R&R 09.206-26(d)(2)] **LIMETREE BAY TERMINALS AND REFINING** shall comply with the MARPOL Project Scope (See Attachment 1 of this permit). [12 V.I.R&R 09.206-26(d)(2)] Changes in the Project Scope shall be approved by DPNR in accordance with 12 V.I.R&R 09.206-26(e)(l).

A.    OPERATIONAL REQUIREMENTS

1.  **LIMETREE BAY TERMINALS AND REFINING** shall comply with standards outlined in § 60.592a, of 40 CFR Part 60, Subpart GGGa as applicable.

2.  **LIMETREE BAY TERMINALS AND REFINING** is subject to and will comply with 40 CFR Part 63, Subpart CC as applicable, as amended [80 FR 75253, Dec. 1, 2015]: National Emission Standards for Hazardous Air Pollutants from Petroleum Refineries ("NESHAP").

3.  **LIMETREE BAY TERMINALS AND REFINING** is subject to and will comply with 40 CFR Part 63, Subpart UUU as amended [80 FR 75273, Dec. 1, 2015]: NESHAP for Catalytic Cracking Units, Catalytic Reforming Units, and Sulfur Recovery Units.

4.  **LIMETREE BAY TERMINALS AND REFINING** is subject to and will comply with 40 CFR Part 63, Subpart ZZZZ as amended [79 FR 11290, Feb 27, 2014]: NESHAP for Stationary Reciprocating Internal Combustion Engines.

5.  **LIMETREE BAY TERMINALS AND REFINING** is subject to and will comply with 40 CFR Part 63, Subpart DDDDD: NESHAP for Major Sources: Industrial, Commercial, and Institutional Boilers and Process Heaters.

6.  Prior to building, erecting, altering or replacing any article, machine, equipment or other contrivance other than those subject to this Permit, the use of which may cause the issuance of air contaminants or may eliminate or reduce or control the issuance of air contaminants, **LIMETREE BAY TERMINALS AND REFINING** shall first obtain a written Authority to Construct from the Commissioner or his designated representative. [12 V.I. R&R § 206- 20(a)(l995)].

7.  Prior to operation at any other location, **LIMETREE BAY TERMINALS AND REFINING** must submit a separate application for an Authority to Construct the equipment(s) at each new location or construction project that will be conducted on noncontiguous property. [12 V.I. R&R § 206-21(a)(1995)].

8. Construction and operation of the sources authorized by this Permit will not prevent the attainment or maintenance of any ambient air quality standard and will not result in a violation of any provision of this chapter or the Virgin Islands State Implementation Plan [12 V.I. R&R, Ch. 9 § 206-26(a)(2)(1995) and 12 V.I.R&R, Ch. 9 § 206-27(a)(l)(B) (1995)].

9. **LIMETREE BAY TERMINALS AND REFINING** shall not cause or permit the discharge from any source whatsoever such quantities of air contaminants or other material which cause injury, detriment, nuisance, annoyance to persons or to the public or which endanger the comfort, repose, health, or safety of any such persons or the public or which cause or have tendency to cause injury or damage to business or property. [12 V.I.R&R, Ch. 9 § 204-27(a)].

10. Nothing in any other regulation concerning emission of air contaminants, or any other regulations relating to air pollution, shall in any manner be construed as authorizing or legalizing the creation or maintenance of a nuisance described in the above-mentioned condition. [12 V.I. R&R, Ch. 9 §204-27(b)].

11. **LIMETREE BAY TERMINALS AND REFINING** shall comply with sulfur compound emission controls outlined in 12 V.I.R&R § 204-26(a)(1) and (b) for the emissions sources.

12. **LIMETREE BAY TERMINALS AND REFINING** shall not build, erect, install or use any article, machine, equipment or other contrivance, the sole purpose of which is to dilute or conceal an emission without resulting in a reduction in the total release of air contaminants to the atmosphere. [12 V.I.R& R, Ch. 9 § 204-30]

13. It shall be the duty **of LIMETREE BAY TERMINALS AND REFINING** to report any discontinued or dismantled fuel burning, combustion or process equipment or device coming under the jurisdiction of the permit provision of this chapter within thirty (30) days of permanent discontinuance or dismantlement of such equipment or device. [12 V.I.R&R, Ch. 9 § 204-31].

14. **LIMETREE BAY TERMINALS AND REFINING** shall report to the Department any physical change or changes in construction and operation which increase the amount of air pollutants or process production. [12 V.1.R&R 09-204-20(ff)(l995)]

15. During construction and operation, any source subject to this Permit, which is responsible for contravening ambient air quality standards, will be required to be modified to bring operation into compliance. [12 V.I.R&R 09-206-26(a)(2)(1995)]

B.    SPECIFIC EQUIPMENT CONDITIONS

1.  East Sulfur Recovery Plant

(a) **LIMETREE BAY TERMINALS AND REFINING** shall use the SCOT type TGTU to control tailgas from the Nos. 3 and 4 Sulfur Recovery Units.[1]

(b) Exhaust from the SCOT type TGTU shall be routed to the East Incinerator (H-4745).

(c) During periods of sulfur recovery plant (*i.e.,* SRUs and TGTU) startup, shutdown, or malfunction, the tailgas shall be routed directly to the East Incinerator (H-4745).

2.  Gas Turbine Steam Generators GT-7 and GT-8

(d) **LIMETREE BAY TERMINALS AND REFINING** shall combust only gaseous fuel or No. 2 oil with a maximum sulfur content of 0.1% weight.

(e) **LIMETREE BAY TERMINALS AND REFINING** shall install and operate the steam injection or selective catalytic reduction ("SCR") in GT-7 and GT-8, as applicable, for the purpose of NOx control, at all times except during periods of startup, shutdown or maintenance of the gas turbines.

(f) **LIMETREE BAY TERMINALS AND REFINING** shall install, operate and maintain the steam injection or SCRs, as necessary, in accordance with the manufacturer's specifications.

3.  Boilers #8 and #9

(g) LIMETREE BAY TERMINALS AND REFINING shall combust gaseous fuel.

(h) **LIMETREE BAY TERMINALS AND REFINING** shall install and operate the NOx controls in Boilers #8 and #9 at all times except during periods of startup, shutdown, or maintenance of the boilers.

C.    EMISSIONS LIMITS AND WORK PRACTICES

1.  East Sulfur Recovery Plant

a.  East Sulfur Recovery Plant is subject to NSPS subpart Ja: Standards of Performance for Petroleum Refineries

b.  **LIMETREE BAY TERMINALS AND REFINING** shall comply with standards outlined in § 60.102a(f)(1)(i) as applicable to an oxidation control system or a

---

[1] The Department is revising 12 V.1.R& R, Ch. 9 § 204-45 to remove the requirement for a Beavon unit, and to allow for use of a SCOT unit. Pending finalization of such regulatory revision, Limetree Bay Terminals and Refining may use a SCOT unit in lieu of a Beavon Unit to control tailgas from the Nos. 3 and 4 Sulfur Recovery Units.

reduction control system followed by incineration.

c.   The emissions from the East Incinerator shall not exceed the limitations in Table 3.

**Table 3. MARPOL Project Modified Unit Emission Limits**

| Air  Pollutant | Annual Emissions(tpy)[1] |
|---|---|
| NOx | 24 |
| CO | 20 |
| VOC | 1.3 |
| SO$_2$ | 282 |
| PM | 4.2 |

(1) Emissions corresponding to East Incinerator H-4745.

D.   REQUESTED REVISIONS TO TITLE V CONDITIONS, WHICH ARE BASED ON
     THE COKER PROJECT PERMIT AND ADDITIONAL REQUESTED CONDITIONS

**LIMETREE BAY TERMINALS AND REFINING** shall comply with the additional requirements and standards in Table 4.

**Table 4.  Title V Permit Revisions and Additional Conditions**

| Unit | Pollutant | Title V STX-TV-003-10 | Title V Permit Language Changes (Requested Revisions and Additions) |
|---|---|---|---|
| Coker Heaters (H-8501A/B) | SO$_2$ | 3.1.2.7.2 | The process heaters shall be limited to burning refinery gas or propane with an H$_2$S content less than 75 parts per million by volume (ppmv) averaged over a 3-hour rolling period. [STX-924-AC-PO-19] |
| Coker Heaters (H-8501A/B) | NOx | 3.1.2.7.3 | Each heater shall be equipped with ultra-low NOx burners. The emission rate of NOx from each heater shall not exceed 0.07 lb/mmBtu. [STX-924-AC-PO-19] |
| Coker Heaters (H-8501A/B) | CO | 3.1.2.7.4 | The emission rate of CO from each heater shall not exceed 0.030 lb/mmBTU. [STX-924-AC-PO-19] |
| Coker Heaters (H-8501A/B) | VOC | 3. 1.2.7.5 | The emission rate of VOC from each heater shall not exceed 0.0050 lb/mmBTU [STX-924-AC-PO-19] |
| Coker Heaters (H-8501A/B) | PM/ PM1O | 3.1.2.7.6 | The allowable particulate emission rate for these heaters are as follows, where $E = l/ P^{0.22}$ and P = heat input in mmBtu/hr: H-8501A: E = 0.29 lb/mmBtu H-85018:  E = 0.29 lb/mmBtu [VIRR-l 2-09-204-23(b)] |

Limetree Bay Terminals, LLC/          Authority to Construct and Permit to Operate          18
Limetree Bay Refining, LLC                              STX-924-AC-PO-19

APPX 221

| Unit | Pollutant | Title V STX-TV-003-10 | Title V Permit Language Changes (Requested Revisions and Additions) |
|------|-----------|----------------------|--------------------------------------------------------------------|
| TK-8501 | VOC | 3.1.10.1.1 | [RESERVED]* |
| TK-8501 | VOC | 3.1.10.1.2 | Tank TK-8501 shall be subject to NSPS Subpart Kb monitoring requirements (40 CFR 60, Subpart Kb, 60.110b-117b). However, TK-8501 shall be exempt from the control requirements under Subpart Kb because it is restricted from storing material with a true vapor pressure greater than 0.5 psia. Record and maintain records as set forth in condition 5.3.10.1.5. [NSPS Subpart Kb and STX-924-AC-P0-19] |
| Refinery | All | 3.1.17.6 | [RESERVED] |
| Coker | All | 3.1.17.7 | [RESERVED] |
| Coke Handling, Storage and Loading Facility | PM (all species) | 3.1.17.10 | The Permittee shall use the following design/work practice controls for the Coke Cutting/Coke Pit: high pressure water cutting of coke & enclosed drop zones/coke pit (No roof). The Permittee shall maintain records documenting the design.  [STX-924-AC-PO-19] |
| Coke Handling, Storage and Loading Facility | PM (all species) | 3.1.17.11 | The Permittee shall use the following design/work practice controls for the Coke Crusher: enclosed crusher structure (enclosed structures can have ventilation vents or access ways). Moisture content control from initial cutting. The Permittee shall maintain records documenting the design. [STX-924-AC-PO-10] |
| Coke Handling, Storage and Loading Facility | PM (all species) | 3.1.17.12 | The Permittee shall use the following design/work practice controls for the Coke Transfer to Storage: enclosed (enclosed structures can have ventilation vents or access ways) conveyor to storage. The Permittee shall maintain records documenting the design.  [STX-924-AC-PO-19] |
| Coke Handling, Storage and Loading Facility | PM (all species) | 3.1.17.13 | The Permittee shall use the following design/work practice controls for the Coke Storage: enclosed (enclosed structures can have ventilation vents or access ways) storage buildings, baghouse for vent control, and moisture content control from initial cutting. The Permittee shall maintain records documenting the design.  [STX-924-AC-PO-l9] |
| Coke Handling, Storage and Loading Facility | PM (all species) | 3.1.17.14 | The Permittee shall use the following design/work practice controls for the Coke Loading: enclosed (enclosed structures can have ventilation vents or access ways) conveyor to loading dock.  "Spout" containment loading to minimize drop emissions when loading ship. The Permittee shall maintain records documenting the design. [STX-924-AC-PO-19] |

| Unit | Pollutant | Title V STX-TV-003-10 | Title V Permit Language Changes (Requested Revisions and Additions) |
|---|---|---|---|
| Coke Handling, Storage and Loading Facility | PM (all species) | 3.1.17.17.1 | [RESERVED] |
| Coker Steam Vents | All | 3.2.17.1 (new) | The Permittee shall comply with a depressurization level of 2 psig for the Coker Steam Vents. [STX-924-AC-PO-19] |
| Coker Steam Vents | All | 5.2. 17.4 (new) | In accordance with the Coke Steam Vent requirement of 3.2.17.1, the Permittee shall demonstrate compliance using the methods at 40 CFR 63.657(b). [STX-924-AC-PO-19] |
| Coker Heaters (H-8501A/B) | CO | 4.2.2.5.1 | For NOx and CO, the Permittee shall perform a stack test annually. The tests shall use EPA Reference Method 7E for NOx and EPA Reference Method 10 for CO and use an average of three (3) 1-hr samples. STX-924-AC-PO-19] |
| Coker Heaters (H-8501A/B) | CO, VOC | 4.2.2.5.2 | For-PM/PM10, the Permittee shall perform a stack test during the initial term of the Permittee's Title V operating permit. This requirement shall not apply if a stack test using EPA or VIDPNR approved reference methods has been performed within 2 years of the issuance date of this Title V permit. The Permittee shall retest after the initial term of the Permittee's Title V operating permit to the extent required by (i) the provisions of the applicable local or federal preconstruction permit, or (ii) VIRR Title 12, Chapter 9. In lieu of the testing requirement, the Permittee may use alternative compliance monitoring methods approved by VIDPNR or required by current or future applicable requirements. [VIRR 12-206-71(a)(3)(b) and STX-924-AC-PO-19] |

| Unit | Pollutant | Title V STX-TV-003-10 | Title V Permit Language Changes (Requested Revisions and Additions) |
|---|---|---|---|
| Coker Heaters (H-8501A/B) | CO, VOC | 4.2.2.5.3 (new) | For VOC, the Permittee shall perform a stack test only in the event that the required annual CO test in Section 4.2.2.5.1 shows an exceedance of the CO limit. The test shall use EPA Reference Method 25 and use an average of three (3) 1-hr samples. [STX-924-AC-P0-19] |
| West SRU | H$_2$S, TRS | 5.2.7.8 (new) | For T-1061, the Permittee shall use a CEM to comply with the limits in 3.2.7.5 in accordance with 40 CFR 60 Appendices A, B, & F, as applicable. [STX-924-AC-P0-19] |
| Coke Handling, Storage and Loading Facility | PM (all species) | 5.2.17.1 | [RESERVED] |
| Coker Heaters (H-8501A/B) | CO, VOC | 5.3.2.7.6 | The Permittee shall submit to the VIDPNR the results of the NOx emission rate test runs, the CO emission rate test runs, and VOC (if applicable) on H-8501A and H-85018 within 60 days of the test. [STX-557A-E-02(X)(F) and (G), June 4, 2002] and [STX-924-AC-PO-19] |
| TK-8501 | VOC | 5.3.10.1.5 | The Permittee shall record and maintain records documenting the material stored in the storage tank (TK-8501) showing that the tank remains exempt from control requirements in accordance with NSPS Subpart Kb, 40 60.110b(b). The Permittee shall comply with the reporting requirements of NSPS Kb, as applicable. [STX-924-AC-PO-19] |
| Compressor Engines at #SOD | NOx | 3.1.3.3 | [RESERVED] |
| Compressor Engines at #SOD | CO | 3.1.3.4 | [RESERVED] |
| Compressor Engines at Penex | NOx | 3.1.3.5 | [RESERVED] |
| Compressor Engines at Penex | CO | 3.1.3.6 | [RESERVED] |

| Unit | Pollutant | Title V STX-TV-003-10 | Title V Permit Language Changes (Requested Revisions and Additions) |
|------|-----------|----------------------|---------------------------------------------------------------------|
| Compressors at Penex and 5DD | NOx CO | 4.2.3.2 | [RESERVED] |
| Compressors at Penex and 5DD | NOx CO | 5.3.3.6 | [RESERVED] |
| TK-6815 & TK-6839 | VOC | 3.1.9.1 | Prior to startup of the coker, Tanks TK-6815 and TK-6839 shall be equipped with sleeves on the slotted guide poles. [STX-557A-E-02(VIII)(A), June 4, 2002 and STX-924-AC-PO-19] |
| TK-6815 & TK-6839 | VOC | 5.3.9.7 | [RESERVED] |
| No. 6 Sour Water Stripper Sour Water Tank (TK-1071), Desalter Effluent Water (DEW)Tank <TK-1663) | VOC | 3.1.9.3 (new) | Tanks TK-1071 and TK-1663 are required to be equipped with external floating roofs and are subject to NSPS Subpart Kb monitoring (40 CFR 60.113b(b)) for external floating roof tanks. Seal gap measurements shall be performed (secondary once/yr, primary once/5 yrs). The Permittee shall inspect seals and fittings each time the storage tank is emptied and degassed. [40 CFR 60.113b(b) and STX-924-AC-PO-19] |
| No. 6 Sour Water Stripper Sour Water Tank (TK-1071), Desalter Effluent Water (DEW) Tank <TK-1663) | VOC | 5.3.9.8 (new) | For TK-1071 and TK-1663, the Permittee shall comply with the reporting requirements of NSPS Subpart Kb, as applicable. [40 CFR 60.115b and STX-924-AC-PO-19] |

| Unit | Pollutant | Title V STX-TV-003-10 | Title V Permit Language Changes (Requested Revisions and Additions) |
|---|---|---|---|
| Process equipment | VOC | 2.2.7.5 (new) | The Permittee shall comply with 40 CFR 60, Subpart GGGa. [STX-924-AC-PO-19] |
| West SRU | H$_2$S, TRS | 3.2.7.3 | For T-1061, the Permittee shall not discharge or cause the discharge of any gases into the atmosphere from any Claus sulfur recovery plant containing in excess of 162 ppm by volume of reduced sulfur compounds based on an hourly rolling 12-hour average and 66 ppm by volume of reduced sulfur compounds based on daily rolling 30-day average and IO ppm by volume of H2S based on hourly rolling 12-hour average, each calculated as ppm S02 by volume (dry basis) at zero percent excess air. [40 CFR 60.l02a(f)(1)(iii); 40 CFR 63, Subpart UUU and STX-924-AC-PO-19] |
| Boiler 10 (B-3701) | CO | 3.1.1.5.3 | The emission rate of CO from Boiler B-3701 shall not exceed 0.070 lb/mmBTU. [STX-924-AC-PO-19] |
| Boiler 10 (B-3701) | VOC | 3.1.1.5.4 | The emission rate of VOC from Boiler B-3701 shall not exceed 0.0050 lbs/mmBTU [STX-924-AC-PO-19] |
| Boiler 10 (B-3701) | CO | 4.2.1.3.4 | The emission rate of CO from Boiler B-3701 shall be based on the average value of three (3) 1-hour successive test runs conducted annually using EPA Reference Method 10. [STX-924-AC-PO-19] |

| Unit | Pollutant | Title V STX-TV-003-10 | Title V Permit Language Changes (Requested Revisions and Additions) |
|------|-----------|----------------------|---------------------------------------------------------------------|
| Boiler 10 (B-3701) | VOC | 4.2.1.3.6 | The Permittee shall conduct a stack test for VOC only in the event that the required annual CO test in 4.2.1.3.4 shows an exceedance of the CO limit. The emission rate of VOC from Boiler B-3701 shall be based on the average value of three (3) I-hour successive test runs conducted annually using EPA Reference Method 25. [STX-924-AC-PO-l9] |
| Boiler 10 (B-3701) | CO VOC | 5.3.1.3.5 | The Permittee shall submit the results of the NOx, CO, and VOC (if applicable) emission rate test runs on the boiler to the VIDPNR within 60 days of test completion. f ST X-924-AC-PO- 1 9] |

*"RESERVED" used to avoid disrupting the sequencing in Title V Permit STX-TV-0003-10.

E.     TESTING REQUIREMENTS

1.  At least 30 days prior to the actual stack testing, where required by this Permit, **LIMETREE BAY TERMINALS AND REFINING** shall submit to the Department a written protocol detailing the methods and procedures to be used during the performance testing as applicable. [12 V.I.R&R 09.206-25(b)(1995)]

2.  **LIMETREE BAY TERMINALS AND REFINING** shall notify the Department at least 30 days prior to conducting a performance test, where required by this Permit. [V.I.R.&R. Ch.9 §206-25(b)(l995)]

3.  **LIMETREE BAY TERMINALS AND REFINING** shall provide permanent or other sampling and testing facilities as may be required by the Department to determine the nature and quantity of emissions for each unit. Such facilities shall conform to all applicable laws and regulations concerning safe construction and practice. [V.1.R.&R. Ch.9 § 206-25(d)(2)]

4.  **LIMETREE BAY TERMINALS AND REFINING** shall conduct performance tests required in 40 CFR §60.8 and shall use as reference methods and procedures the test methods in appendix A to 40 CFR Part 60 or other methods and procedures as specified in 40 CFR Part 60, except as provided in 40 CFR §60.8(b).

5.  **LIMETREE BAY TERMINALS AND REFINING** shall determine compliance with the S02 standard at 40 CFR § 60.104(a)(2) in accordance with the test method and procedures at 40 CFR § 60.106(±).

6.  **LIMETREE BAY TERMINALS AND REFINING** shall determine compliance with the NOx standard at 40 CFR § 60.332(a)(2) in accordance with the procedures at 40 CFR §60.335.

7. For units that were required to test annually or more, under Title V permit STX-TV-003-10, and did not test because the units were idled , testing shall be conducted no later than 180 calendar days after resuming Regular Operation unless otherwise specified in the Consent Decree or Consent Decree Modification. Regular Operations shall mean that the idled unit has reached sustained operations and is now operating as intended in support of the Permittee's output of product(s) or services after having been idled.

8. For units that were required to test every five years, under Title V permit STX-TV-003-10, and did not test because the units were idled, testing shall be conducted once every 5 year after the unit resumes Regular Operation unless otherwise specified in the Consent Decree or Consent Decree Modification. Regular Operations shall mean that the idled unit has reached sustained operations and is now operating as intended in support of the Permittee's output of product(s) or services after having been idled.

## F.   MONITORING REQUIREMENTS

1. All monitors, recorders and meter devices, if required by this Permit, shall be installed prior to operation of the equipment, unless otherwise stated. LIMETREE BAY TERMINALS AND REFINING shall maintain and calibrate, in a manner consistent with the manufacturer's specifications, all monitors, meters, hydrocarbon analyzers, and recorders as required above. All specifications shall be made available to representatives of the Department upon request.

2. All monitors, recorders and meters required in this Permit shall be located in a manner which allows easy access and visibility. The Department may require relocation of the monitor or remote readout equipment.

## G.   RECORDKEEPING AND REPORTING

1. **LIMETREE BAY TERMINALS AND REFINING** shall comply with the reporting and recordkeeping requirements as applicable, to affected facilities authorized by this Permit, as outlined in 40 CFR Part 60, Subpart A.

2. **LIMETREE BAY TERMINALS AND REFINING** shall comply with the notification, reporting and recordkeeping requirements as applicable, as outlined in Section 60.7 in 40 CFR Part 60, Subpart A.

3. **LIMETREE BAY TERMINALS AND REFINING** shall comply with the reporting and recordkeeping requirements as applicable, as outlined in Section 60.592a in 40 CFR Part 60, Subpart GGGa.

4. **LIMETREE BAY TERMINALS AND REFINING** shall comply with the notification, reporting and recordkeeping requirements as applicable, as outlined in Section 63.10 in 40 CFR Part 63, Subpart A.

5. **LIMETREE BAY TERMINALS AND REFINING** shall comply with the reporting

and recordkeeping requirements as applicable, as outlined in Section 63.655 in 40 CFR Part 63, Subpart CC.

6. **LIMETREE BAY TERMINALS AND REFINING** shall comply with the reporting and recordkeeping requirements as applicable, as outlined in Section 63.1575 and 1576 in 40 CFR Part 63, Subpart UUU.

7. **LIMETREE BAY TERMINALS AND REFINING** shall comply with the reporting and recordkeeping requirements as applicable, as outlined in Section 63.6650 and 63.6655 in 40 CFR Part 63, Subpart ZZZZ.

8. **LIMETREE BAY TERMINALS AND REFINING** shall comply with the reporting and recordkeeping requirements as applicable, as outlined in Section 63.7550 and 7555 in 40 CFR Part 63, Subpart DDDDD.

9. **LIMETREE BAY TERMINALS AND REFINING** shall submit a written notification to the Department thirty (30) days prior to commencement of construction as authorized in this Permit.

10. **LIMETREE BAY TERMINALS AND REFINING** shall submit a written notification to the Department of the date of commencement of operation of the process units authorized in this Permit, and to be postmarked no later than 15 days after such time.

11. **LIMETREE BAY TERMINALS AND REFINING** shall submit a written report of the results of each performance test, if required by this Permit, before the close of business on the 60th day following completion of the performance test. [12 V.I.R&R 09.206- 25(c)(1995)]

12. **LIMETREE BAY TERMINALS AND REFINING** shall maintain records of the occurrence and duration of startup, shutdown, or malfunction in the operation of the emissions units authorized by this Permit. In addition, the type of malfunction, date of malfunction, parts replaced, the service performed, and downtime shall be recorded.

13. Manufacturer's specifications and operating procedures shall be kept on site and readily available to USEPA and Department representatives.  [12 V.I.R&R 09.206-91(b)]

## SECTION III: FACILITY WIDE REQUIREMENTS

1. **LIMETREE BAY TERMINALS AND REFINING** shall also comply with any other emission limits, testing, monitoring, recordkeeping and reporting required pursuant to the Virgin Islands rules and regulations.

2. Where an applicable requirement of the Clean Air Act, as amended 42 U.S.C. §7401 (Act) is more stringent than an applicable requirement of regulations promulgated under Title IV of the Act, the permit incorporates both provisions into the permit and the Commissioner or the Administrator can enforce both provisions.

3. Compliance with any annual limitations of this Permit shall be determined from a running

total of 12 months of data unless otherwise specified in a particular condition.

4. All records and data required to demonstrate compliance in this Permit shall be submitted to the Department upon request.

5. **LIMETREE BAY TERMINALS AND REFINING** shall operate and maintain all operating equipment, air pollution control equipment, and monitoring equipment in a manner consistent with good air pollution control practices for minimizing emissions at all times including during startup, shutdown, and malfunction.

6. **LIMETREE BAY TERMINALS AND REFINING** shall ensure that any fugitive dust associated with the construction or installation of the equipment covered by this Permit is minimized and controlled. [12 V.I.R.&R., Ch. 9, 206-26(d)(l)]

7. **LIMETREE BAY TERMINALS AND REFINING** shall construct and/or install the equipment, control apparatus and emission monitoring equipment within the design limitations.

8. **LIMETREE BAY TERMINALS AND REFINING** shall report any exceedance of this Permit in the Title V semi-annual report. If there is no exceedance, a statement as such will be included in the Title V semi-annual report.

9. **LIMETREE BAY TERMINALS AND REFINING** shall not discharge into the atmosphere, any air contaminant(s) with opacity greater than or equal to twenty percent (20%) for any time period, except for a period or periods aggregating not more than 3 minutes in any 30-minute period when opacity shall be less than or equal to 40%. [12 V.I. R&R, Ch. 9 §204-22(a) and (b)].

10. For the purpose of ascertaining compliance or non-compliance with any air pollution control rule or regulation, the Commissioner may require **LIMETREE BAY TERMINALS AND REFINING**, which owns such air contamination source, to conduct acceptable tests to measure emissions.

11. **LIMETREE BAY TERMINALS AND REFINING** shall not cause or permit any materials to be handled, transported, or stored in a building, its appurtenances, or cause a road to be used, constructed, altered, repaired or demolished without taking the necessary precautions to prevent particulate matter from becoming airborne. [12 V.I.R&R, Ch. 9 §204-25(a)(l) through (9)].

12. The Commissioner may require other reasonable measures as may be necessary to prevent particulate matter from becoming airborne. [12 V.I.R&R, Ch.9 §204-25(b)]

13. **LIMETREE BAY TERMINALS AND REFINING** shall not cause or permit the discharge of visible emissions of fugitive dust beyond the boundary line of the property on which their emissions originate. [12 V.I.R&R, Ch. 9 §204-25(c)]

14. **LIMETREE BAY TERMINALS AND REFINING** shall notify the Commissioner in writing not less than thirty (30) days prior to any proposed stack test of the emissions units' subject to this Permit, of the time and date of the proposed stack test as applicable.

Such notification shall also include the acceptable procedures to be used to conduct said stack test including sampling and analytical procedures.

15. **LIMETREE BAY TERMINALS AND REFINING** shall allow the Commissioner, or his representatives, free access to observe stack testing.

16. **LIMETREE BAY TERMINALS AND REFINING** must provide the following as applicable:

   (a)  Sampling ports adequate for applicable test methods;

   (b)  Safe access to sampling ports; and

   (c)  Utilities for sampling and testing equipment.


17. **LIMETREE BAY TERMINALS AND REFINING** shall not cause or permit any materials to be handled, transported, or stored in a building, its appurtenances, or cause a road to be used, constructed, altered, repaired or demolished without taking the necessary precautions to prevent particulate matter from becoming airborne. [V. I. R&R 204-25(a)(1) through (9)].

18. The Commissioner may require other reasonable measures as may be necessary to prevent particulate matter from becoming airborne.

19. **LIMETREE BAY TERMINALS AND REFINING** shall not cause or permit the discharge of visible emissions of fugitive dust beyond the boundary line of the property on which their emissions originate.

20. **LIMETREE BAY TERMINALS AND REFINING** shall maintain the following records of monitoring information if monitoring is required by this Permit.

   (a)  The date, location and time of sampling or measurements

   (b)  The date(s) analyses performed

   (c)  The company or entity performing the analyses

   (d)  The analytical techniques or methods used

   (e)  The result of such analyses

   (f)  The facility's status at the time of sampling or measurements.

## SECTION IV: GENERAL REQUIREMENTS

1. This Authority to Construct shall automatically become invalid one (1) year after the date of its issuance, unless the construction or modification has commenced or an application for extension, in the form of a letter to the Commissioner, is made thirty (30) days prior to the expiration date of the Permit. [12 V.I.R&R, Ch. 9, 206-26(f)(l)]

2. The Permit to Operate shall be valid for a period of three (3) years after the date of its issuance, unless a timely application for renewal has been made or the Authority to Construct and Permit to Operate has been incorporated into the Title V Permit in accordance with 12 V.I. R&R §206-21(b). In accordance with V.I. R&R § 206-20(c) and 206-27(c)(1), the Permit to Operate is granted and the article, machine, equipment, or contrivance may be operated once the article, machine, equipment or contrivance is made to conform to the standards in the MARPOL ATC and elsewhere in Title 12, Chapter 9.

3. Any revisions to activities described in the permit application and authorized in this Permit shall be approved by the Commissioner prior to commencement of operations. [12 V.I.R&R, Ch. 9, §206-26(e)(1)]

4. In the case that this Permit is subject to any challenge by third parties, the effectiveness of the Permit stands until any judicial court decides the contrary.

5. **LIMETREE BAY TERMINALS AND REFINING** shall comply with all conditions of this Permit. Any permit noncompliance constitutes a violation and is grounds for enforcement action; for permit termination, revocation and reissuance, or modification; or for denial of a permit renewal application.

6. All terms and conditions contained herein shall be enforceable by the USEPA and citizens of the United States under the Clean Air Act, as amended, 42 U.S.C. § 7401, et seq.

7. Nothing in this Permit shall alter or affect the authority of the USEPA to obtain information pursuant to 42 U.S.C. § 7414, "Inspections, Monitoring, and Entry".

8. **LIMETREE BAY TERMINALS AND REFINING** shall not claim as a defense in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this Permit.

9. The Department may modify, revoke, reopen and reissue the Permit or terminate the Permit for cause [12 V.I.R&R § 206-28]. The filing of a request by the source for a permit modification, revocation and reissuance, or termination or the filing of a notification of planned changes or anticipated noncompliance does not stay any permit condition.

10. This Permit does not convey any property rights of any sort, or any exclusive privilege.

11. Issuance of this Permit does not relieve the **LIMETREE BAY TERMINALS AND REFINING** from the responsibility of obtaining and complying with any other permits, licenses, or approvals required by the Department or any other federal, territorial, or local agency.

12. Nothing in this Permit shall alter or affect the liability of **LIMETREE BAY TERMINALS AND REFINING** for any violation of applicable requirements prior to or at the time of Permit issuance.

13. Any condition or portion of this Permit, which is challenged, becomes suspended or is ruled invalid as a result of any legal or other action shall not invalidate any other portion or condition of this Permit.

14. Compliance with the terms of this Permit shall be deemed compliance with all applicable requirements as of the date of Permit issuance, provided that all applicable requirements are included and specifically identified in the Permit or permit application.

15. In accordance with 12 V.I.R.&R. §206-65, the Department shall allow certain defined changes at permitted facilities that contravene permit terms or conditions or make them inapplicable without requiring a permit revision. Such changes may not include changes that violate applicable requirements or contravene permit terms and conditions that are monitoring (including test methods), recordkeeping, reporting, or compliance certification requirements.

16. If after notification as described in Condition 15 above, the Department deems that the change implemented by the source does not qualify under § 206-65(b), the original terms of the permit remain fully enforceable.

17. Provisions for operational flexibility do not preclude a source's obligation to comply with all applicable requirements.  [12 V.I.R&R 09-206-65(a)(3)(1995)]

18. Any application forms, all reports, or compliance certifications submitted pursuant to this Permit shall contain a certification of truth, accuracy and completeness signed by a responsible official of the facility. Any certification submitted by the facility shall state that, based on information and belief formed after reasonable inquiry, the statements and information in the document are true, accurate and complete. [12 V.I.R&R 09-206-64(1995]

19. Information contained in permit applications shall be public, except that which is claimed confidential in accordance with the Virgin Islands Air Pollution Control Act. The contents of the permit itself are not entitled to confidentiality. [12 V.I.R&R, Ch. 9 §206-62(d)]

20. Upon request, **LIMETREE BAY TERMINALS AND REFINING** shall furnish to the Department copies of records that this facility is required to keep by this Permit, which information may be claimed to be confidential in accordance with the Virgin Islands Air Pollution Control Act. **LIMETREE BAY TERMINALS AND REFINING** may furnish such records directly to the Department, if necessary, along with a claim of confidentiality. [12 V.I.R&R 09-206-62((d)(1995]

21. A copy of this Permit shall be kept on-site at **LIMETREE BAY TERMINALS AND REFINING**.  [12 V.I.R&R 09-206-20(d)(1995)]

22. LIMETREE BAY TERMINALS shall assume HOVENSA's Liabilities under the

Consent Decree (Case No. 1:11-cv-00006) in connection with the assets purchased pursuant to the Amended and Restated Asset Purchase Agreement arising out of or relating to any act, omission, circumstances or other event occurring after the closing of such purchase, and shall use commercially reasonable efforts to add itself as a named party defendant to the Consent Decree and execute a modification to the Consent Decree by August 31, 2020 to restart refinery operations. [12 V.I.R&R 09.206.26(d)](1995)] [V.I.R&R 09.206.27(c)(1995)] [Amended and Restated Asset Purchase Agreement] [Amended and Restated Terminal Operating Agreement with the Government of the United States Virgin Islands]

23. LIMETREE BAY REFINING shall use commercially reasonable efforts to add itself as a named party defendant to the Consent Decree (Case No. 1:11-cv-00006) and execute a modification to the Consent Decree by August 31, 2020 to restart refinery operations. [Refinery Operating Agreement with the Government of the United States Virgin Islands]

24. This permit shall not release LIMETREE BAY TERMINALS AND REFINING from violations that occur post-restart or prior to any modification of the Consent Decree (Case: 1:11-cv-00006) as entered by the court. [12 V.I.R&R 09.206.26(d) (1995) [V.I.R&R 09.206.27(c)(l995)]

25. The Commissioner may cancel an approval if the construction is not begun within two (2) years from the date of issuance, or if during the construction, work is suspended for one (1) year (365 days consecutive) [12 V.I.R&R 09.206.31(e)(1995)]

26. The Commissioner shall modify or revoke an Authority to Construct or permit to Operate for the reasons and manner outlined in 12 V.1.R&R 09.206-28(1995).

# EXHIBIT G

### HOVENSA/LBT TIMELINE DEMONSTRATING INTENT TO RESTART

- **January 26, 2011**: HOVENSA announces plans to idle the refinery units on the west side of the facility to improve refinery economics. No statements were made indicating that the shutdown of the refinery units on the west side was intended to be permanent. *See* Tab A to January 3, 2018 submission.

- **July 26, 2011**: HOVENSA adopts Anti-Cannibalization of Process Equipment Procedure to preserve idled equipment for restart. *See* Tab 2 to January 26, 2018 submission.

- **January 18, 2012**: HOVENSA announces plans to idle the refinery units on the east side of the facility and continue terminal operations. No statements were made that the shutdown of the east side refinery units was intended to be permanent. *See* Tab B to January 3, 2018 submission.

- **January 20, 2012**: GVI sends letter to HOVENSA requesting information about the shutdown of refining operations. *See* Tab C to January 3, 2018 submission. HOVENSA responds on February 7, 2012 as noted below.

- **February 2, 2012**: HOVENSA meeting with GVI; GVI rejects HOVENSA's proposed amendments to the Concession Agreement to facilitate operations as a terminal and insists that HOVENSA "either restart and operate the refinery or conduct a sale process to sell the business to a purchaser that would engage in refinery operations." *See* September 15, 2015 Hill Certification (Paragraphs 55 and 57, pages 25 and 26), Tab D to January 3, 2018 submission.

- **February 6, 2012**: Environmental and management teams meet with EPA Region 2 regarding idling of refinery operations. HOVENSA explains plans to retain permits for refinery restart and revision of permits for terminal operations.

- **February 7, 2012**: HOVENSA responds to January 20, 2012 GVI letter indicating that HOVENSA plans to keep permits to facilitate refinery restart, is reviewing Consent Decree ("CD") for modifications that would allow a resumption of refinery operations, and is developing maintenance procedures. *See* Tab E to January 3, 2018 submission.

- **February 21, 2012**: HOVENSA announces that the shutdown of the remaining refinery units is complete. No statements are made indicating that the shutdown is intended to be permanent. *See* Tab F to January 3, 2018 submission.

- **February 22, 2012**: HOVENSA releases a chemical cleaning schedule for East Side Units and certain West Side Units that had not yet been steam cleaned, as well as a list of equipment chemically cleaned between February and April 2012. *See* Tab 3 to January 26, 2018 submission.

- **March 6, 2012**: Meeting among EPA, USDOJ, USVI Department of Planning and Natural Resources ("DPNR"), and GVI. HOVENSA indicates that it wants to retain

flexibility to restart the idled refinery units because the economic circumstances could change in 2-3 years.

- **March 23, 2012**: USDOJ sends letter to HOVENSA with follow-up questions from March 6, 2012 meeting, asking for more information about the process for idling existing units. *See* Tab G to January 3, 2018 submission. HOVENSA responds on April 19, 2012, as noted below.

- **April 19, 2012**: HOVENSA responds to USDOJ inquiry detailing its procedures for "idling a process unit" and explaining the steps taken to preserve the condition of the refinery units during shutdown with an eye towards a possible return to service. *See* Tab H to January 3, 2018 submission.

- **August 24, 2012**: HOVENSA submits comments on the proposed rule entitled "Approval and Promulgation of Air Quality Implementation Plans; United States Virgin Islands; Regional Haze Federal Implementation Plan," regarding conditions that would apply to refinery restart, reflecting its continued interest in restart. *See* Tab I to January 3, 2018 submission.

- **August 31, 2012:** HOVENSA submits permit renewal application for TPDES permit, which includes three operating scenarios, including the scenario of operating the refinery. *See* Tab W to January 3, 2018 submission.

- **October 5, 2012**: EPA sends letter to HOVENSA indicating that the "idled" state of the refinery is not in compliance with the CD; it must permanently shut down the refining operations and surrender permits or comply with testing and other requirements of the CD. EPA offers option to negotiate a change to the CD to address the "idled" state of the refinery. *See* Tab J to January 3, 2018 submission.

- **December 3, 2012**: HOVENSA responds to EPA letter seeking a standstill of the CD requirements to avoid loss of permits that would inhibit the sale of the refinery for restart. *See* Tab K to January 3, 2018 submission.

- **January 10, 2013**: Walkthrough of Area 9 (specifically, Tank #7407) completed. *See* Tab 4 to January 26, 2018 submission.

- **January 16, 2013**: Refinery Rounds of #1 Power House and Util 2, as well as #4 Platformer completed. *See* Tabs 5 & 6 to January 26, 2018 submission. Equipment Preservation Checklist for West Refinery Areas 2 & 4, Coker, and Area 8 completed. *See* Tab 7 to January 26, 2018 submission.

- **January 24, 2013**: Refinery Rounds of East SRU Complex (3&4 SRU, 2 Beavon, 3, 4, & 5 SWS), as well as West SRU Complex (1&2 SRU, 1 Beavon, 6 SWS, 2&3 Flares, West Benzene Stripper) completed. *See* Tabs 8 & 9 to January 26, 2018 submission. Walkthrough of Area 9 (specifically, the Dry Cargo Dock, RO/RO, & Sea Water Intake) completed. *See* Tab 4 to January 26, 2018 submission.

- 2 -

- **January 28, 2013**: Refinery Rounds of Area 2 completed. *See* Tab 10 to January 26, 2018 submission. Equipment Preservation Checklist for West Refinery Areas 2 & 4, Coker, and Area 8 completed. *See* Tab 11 to January 26, 2018 submission.

- **January 30, 2013**: Meeting with EPA on standstill proposal in response to EPA's October 5, 2012 letter; HOVENSA indicates that standstill and retaining permits are imperative to sale and restart of refinery.

- **January 31, 2013**: Walkthrough of Area 9 (specifically, Dock # 9) completed. *See* Tab 4 to January 26, 2018 submission.

- **February 7, 2013**: Refinery Rounds of Area 1 completed. *See* Tabs 4 & 12 to January 26, 2018 submission.

- **February 14, 2013**: Walkthrough of Area 6 (specifically, API and Bundle Wash) completed. *See* Tab 4 to January 26, 2018 submission.

- **February 21, 2013**: Walkthrough of Area 9 (specifically, Tank # 6813) completed. *See* Tab 4 to January 26, 2018 submission.

- **February 28, 2013**: Terminal Action Log for Coker Dome completed. *See* Tabs 4 & 13 to January 26, 2018 submission.

- **March 7, 2013**: Walkthrough of Christiansted Equipment completed. *See* Tab 4 to January 26, 2018 submission.

- **March 9, 2013**: Walkthrough of Area 9 (specifically, Tank #7417) completed. *See* Tab 4 to January 26, 2018 submission.

- **March 15, 2013**: HOVENSA responds to EPA's January 15, 2013 letter and states that the idling process and procedures used for potential restart met industry-wide major turnaround standards. *See* Tab L to January 3, 2018 submission.

- **March 21, 2013**: Walkthrough of Area 9 (specifically, RO/RD Dock) completed. *See* Tab 4 to January 26, 2018 submission.

- **March 28, 2013**: Walkthrough of Central Maintenance completed. *See* Tab 4 to January 26, 2018 submission.

- **April 3, 2013**: Fourth Amendment to the Concession Agreement is signed, providing for a bona fide process to facilitate a sale of the refinery to facilitate restart.

- **April 4, 2013**: Walkthrough of Area 9 (specifically, Tank #7401) completed. *See* Tab 4 to January 26, 2018 submission.

- **April 11, 2013**: Walkthrough of Area 9 (specifically, the Terminal Building) completed. *See* Tab 4 to January 26, 2018 submission.

- **April 18, 2013**: Walkthrough of the Fire Station and Auto Garage completed. *See* Tab 4 to January 26, 2018 submission.

- **April 25, 2013**: Walkthrough of the HOVENSA Beach for Earth Day completed. *See* Tab 4 to January 26, 2018 submission.

- **May 2, 2013**: Walkthrough of Area 9 (specifically, the Dry Cargo Dock) completed. *See* Tab 4 to January 26, 2018 submission.

- **May 9, 2013**: Walkthrough of the SCPC completed. *See* Tab 4 to January 26, 2018 submission.

- **May 16, 2013**: Walkthrough of Area 6 (specifically, the Reverse Osmosis Units and Spheres) completed. *See* Tab 4 to January 26, 2018 submission.

- **May 23, 2013**: Walkthrough of Area 6 (specifically, the TDU) completed. *See* Tab 4 to January 26, 2018 submission.

- **May 30, 2013**: Walkthrough of Area 6 (specifically, the AWWT) completed. *See* Tab 4 to January 26, 2018 submission.

- **June 6, 2013**: Walkthrough of Area 9 (specifically, Dock #3) completed. *See* Tab 4 to January 26, 2018 submission.

- **June 13, 2013**: Walkthrough of Area 9 (specifically, Tank #7403) completed. *See* Tab 4 to January 26, 2018 submission.

- **June 20, 2013**: Walkthrough of Area 9 (specifically, the NRC and MSRC Buildings) completed. *See* Tab 4 to January 26, 2018 submission.

- **June 27, 2013**: Walkthrough of the Quality Control Lab completed. *See* Tab 4 to January 26, 2018 submission.

- **July 11, 2013**: Walkthrough of Area 7 (specifically, the East Power Utilities #2) completed. *See* Tab 4 to January 26, 2018 submission.

- **July 15, 2013**: Pressure Vessel External Inspection Checklist completed for the 7000-FCC Unit. *See* Tab 14 to January 26, 2018 submission.

- **July 18, 2013**: Walkthrough of Area 3 (specifically, Crude #5) completed. *See* Tab 4 to January 26, 2018 submission.

APPX-240

- **July 25, 2013**: Walkthrough of Area 1 completed. *See* Tab 4 to January 26, 2018 submission.

- **July 26, 2013**: Exception to the Anti-Cannibalization of Process Procedure granted for GT-4 and GT-5. *See* Tab 15 to January 26, 2018 submission.

- **July 29, 2013**: Centrifugal Compressor Rotor Rotation/Gearbox Inspection Checklist completed for the C7101A Wet Gas Compressor. *See* Tab 16 to January 26, 2018 submission.

- **July 31, 2013**: HOVENSA submits CD Semiannual Progress Report for period from January 1, 2013 through June 30, 2013. The report notes that the process units are "being maintained in an idled state in a manner that preserves its existing condition" in the event that the units are restarted. *See* Report at p. 12, Tab M to January 3, 2018 submission.

- **August 8, 2013**: Walkthrough of HOVENSA Warehouse completed. *See* Tab 4 to January 26, 2018 submission.

- **August 15, 2013**: Walkthrough of Area 9 (specifically, Tank #6833) completed. *See* Tab 4 to January 26, 2018 submission.

- **August 16, 2013**: Centrifugal Compressor Rotor Rotation/Gearbox Inspection Checklist completed for the C4451A unit. *See* Tab 17 to January 26, 2018 submission.

- **August 22, 2013**: Walkthrough of Scaffold Lay-down Yard completed. *See* Tab 4 to January 26, 2018 submission.

- **August 29, 2013**: Walkthrough of Area 9 (specifically, Tank #6833) completed. *See* Tab 4 to January 26, 2018 submission.

- **September 5, 2013**: Walkthrough of Area 5 (specifically, the Acid Plant) completed. *See* Tab 4 to January 26, 2018 submission.

- **September 12, 2013**: Walkthrough of Area 9 (specifically, Tank Field #60) completed. *See* Tab 4 to January 26, 2018 submission.

- **October 2013**: Presentation to HOVENSA executive committee describes $400 million in costs incurred to idle and preserve refinery units for restart. *See* Attachment A.

- **October 1, 2013**: Centrifugal Compressor Rotor Rotation/Gearbox Inspection Checklist completed for the C8501 Wet Gas Compressor (second cycle). *See* Tab 18 to January 26, 2018 submission.

- **November 4, 2013**: Fourth Amendment to the Concession Agreement is ratified and HOVENSA is permitted to operate the terminal while it "undertake[s] a process to locate a buyer that would operate the refinery." *See* Fourth Amendment to the Concession

Agreement, Tab N to January 3, 2018 submission, and September 15, 2015 Hill Certification at paragraph 56-57, page 25-26, Tab D to January 3, 2018 submission.

- **December 6, 2013**: Marine/Terminal Safety Leadership Walkthrough of Dock #7. *See* Tab 4 to January 26, 2018 submission.

- **December 30, 2013**: 2013 Maintenance Activity Report released. *See* Tab 20 to January 26, 2018 submission.

- **December 31, 2013**: Centrifugal Compressor Rotor Rotation/Gearbox Inspection Checklist completed for the C2301A unit. *See* Tab 21 to January 26, 2018 submission.

- **January 9, 2014**: Centrifugal Compressor Rotor Rotation/Gearbox Inspection Checklist completed for the C4901A LSG Recycle Compressor (fifth cycle). *See* Tab 22 to January 26, 2018 submission. Walkthrough of Area 9 (specifically, Tank #7418) completed. *See* Tab 23 to January 26, 2018 submission.

- **January 16, 2014**: Walkthrough of Area 9 (specifically, the Loading Rack) completed. *See* Tab 23 to January 26, 2018 submission.

- **January 23, 2014**: Walkthrough of Area 4 (specifically, the LSG Unit) completed. *See* Tab 23 to January 26, 2018 submission.

- **January 30, 2014**: Walkthrough of Area 4 (specifically, the 3 and 4 Plat formers) completed. *See* Tab 23 to January 26, 2018 submission.

- **February 6, 2014**: Walkthrough of Area 9 (specifically, Dock #9) completed. *See* Tab 23 to January 26, 2018 submission.

- **February 13, 2014**: Walkthrough of Area 9 (specifically, the Gasoline Blending Unit) completed. *See* Tab 23 to January 26, 2018 submission.

- **February 20, 2014**: Walkthrough of Area 7 (specifically, the Coker Unit) completed. *See* Tab 23 to January 26, 2018 submission.

- **February 27, 2014**: Walkthrough of Area 9 (specifically, Tank #7510) completed. *See* Tab 23 to January 26, 2018 submission.

- **March 6, 2014**: Terminal Action Log for Power and Utilities (Powerhouse 1) completed. *See* Tabs 23 & 24 to January 26, 2018 submission.

- **March 13, 2014**: Walkthrough of Area 9 (specifically, Tank Field #3 and Tanks #6812, 6813, & 6814) completed. *See* Tab 23 to January 26, 2018 submission.

- **March 20, 2014**: Terminal Action Log for the 1 & 2 SRU completed. *See* Tabs 23 & 25 to January 26, 2018 submission.

- **March 27, 2014**: Walkthrough of Area 9 (specifically, Dock #3) completed. *See* Tab 23 to January 26, 2018 submission.

- **April 3, 2014**: Walkthrough of Area 2 completed. *See* Tab 23 to January 26, 2018 submission.

- **April 10, 2014**: Walkthrough of Area 6 (specifically, AWWT and Tetra) completed. *See* Tab 23 to January 26, 2018 submission.

- **April 17, 2014**: Walkthrough of the Fire Station, Primailsa, and Total Safety completed. *See* Tab 23 to January 26, 2018 submission.

- **April 24, 2014**: Earth Day cleanup event of HOVENSA's beach. *See* Tab 23 to January 26, 2018 submission.

- **May 1, 2014**: Equipment Preservation Checklist for West Refinery Areas 2 & 4, Coker, and Area 8 completed. *See* Tab 26 to January 26, 2018 submission. Walkthrough of Area 6 (specifically, the FCC, Acid Plant, MTBE) completed. *See* Tab 23 to January 26, 2018 submission.

- **May 6, 2014**: Critical Compressor Preservation Logs completed for Reciprocating and Centrifugal Compressors. *See* Tabs 27 & 28 to January 26, 2018 submission.

- **May 8, 2014**: Walkthrough of Area 9 (specifically, the Dry Cargo Dock) completed. *See* Tab 23 to January 26, 2018 submission.

- **May 15, 2014**: Walkthrough of the NRC Compound completed. *See* Tab 23 to January 26, 2018 submission.

- **May 19, 2014**: Exception to the Anti-Cannibalization of Process Procedure granted for GT-4 and GT-5. *See* Tab 29 to January 26, 2018 submission.

- **May 22, 2014**: Terminal Action Log completed for the 3 & 4 SRU. *See* Tabs 23 & 30 to January 26, 2018 submission.

- **May 29, 2014**: Walkthrough of Area 9 (specifically, the #1 Manifold, Seven Seas, and Spheres) completed. *See* Tab 23 to January 26, 2018 submission.

- **June 5, 2014**: Walkthrough of the Old CE Warehouse/West Fab Shop. *See* Tab 23 to January 26, 2018 submission.

- **June 12, 2014**: Centrifugal Compressor Rotor Rotation/Gearbox Inspection Checklist completed for the C2301-C unit (10th cycle). *See* Tab 31 to January 26, 2018 submission. Walkthrough of the North HOVENSA Warehouse completed. *See* Tab 23 to January 26, 2018 submission.

APPX-243

- **June 19, 2014**: Walkthrough of Area 9 (specifically, Dock #2 Teague Bay) completed. *See* Tab 23 to January 26, 2018 submission.

- **June 26, 2014**: Walkthrough of multiple areas completed, including Tanks #6802, 6814, 7404, 7602, Tank Field #22, DK#3, TDU, Quality Control Laboratory, and Truck Rack. *See* Tab 23 to January 26, 2018 submission.

- **July 3, 2014**: Walkthrough of multiple areas completed, including Tanks #7510, 6812, 7424, 7425, and DK#5. *See* Tab 23 to January 26, 2018 submission.

- **July 10, 2014**: Walkthrough of multiple areas completed, including Tanks #6808 and 6814, and 3 Crude. *See* Tab 23 to January 26, 2018 submission.

- **July 11, 2014**: Terminal Action Log completed for 3CDU / 1 Vac. *See* Tab 32 to January 26, 2018 submission.

- **July 22, 2014**: HOVENSA submits comments on Virgin Islands Water Quality Rules revisions, stating that the rules could "imperil any industrial use of the HOVENSA site and will likely adversely affect the sales process and any potential restart of the refinery." *See* Tab O to January 3, 2018 submission.

- **July 24, 2014**: Walkthrough of multiple areas completed, including Tanks #6808, 7605, AWWT, Truck Rack, and East Utilities. *See* Tab 23 to January 26, 2018 submission.

- **July 25, 2014**: Inspections of the OSBL Control Room completed. *See* Tab 33 to January 26, 2018 submission.

- **July 28, 2014**: Inspections of the OSBL Control Room completed. *See* Tab 34 to January 26, 2018 submission.

- **July 29, 2014**: HOVENSA submits CD Semiannual Progress Report for period from January 1, 2014 through June 30, 2014. The report notes, "HOVENSA implemented its procedures for idling all units in a safe and secure fashion," and has been "engaged in a bona fide sales process to identify a purchaser to restart the refinery." *See* Report at p. 5, Tab P to January 3, 2018 submission.

- **July 31, 2014**: Hurricane preparedness checklists completed. *See* Tab 23 to January 26, 2018 submission.

- **August 4, 2014**: Inspections of the OSBL Control Room and Idled Buildings completed. *See* Tab 35 to January 26, 2018 submission.

- **August 7, 2014**: Walkthrough of multiple areas completed, including Tanks # 6808 and 7404, and the Bundle Wash. *See* Tab 23 to January 26, 2018 submission.

- **August 14, 2014**: Walkthrough of multiple areas completed, including DK#8, LPS Storage area north of the Dry Cargo Dock, and the Coker Unit. *See* Tab 23 to January 26, 2018 submission.

- **August 21, 2014**: Walkthrough of multiple areas completed, including the VI Recycle Area and TDU. *See* Tab 23 to January 26, 2018 submission.

- **August 28, 2014**: Walkthrough of multiple areas completed, including Tank # 7404 and Area 1. *See* Tab 23 to January 26, 2018 submission.

- **September 4, 2014**: Walkthrough of multiple areas completed, including the Fire Station, Valve Shop, Primaisla, Central Maintenance, and Autoclave. *See* Tab 23 to January 26, 2018 submission.

- **September 11, 2014**: Walkthrough of multiple areas completed, including the #3 API & Lagoon, #7 Flare, and East NESHAPS. *See* Tab 23 to January 26, 2018 submission.

- **September 25, 2014**: Walkthrough of multiple areas completed, including the CE, Terminal Warehouse, and Pinnacle Shop. *See* Tab 23 to January 26, 2018 submission.

- **October 2, 2014**: Walkthrough of multiple areas completed, including the Gasoline Blending Unit and Tank Fields #6 and #7. *See* Tab 23 to January 26, 2018 submission.

- **October 9, 2014**: Walkthrough of multiple areas completed, including the Old CE, West Fab Shop, SS#32 and Water Tanks, and Training School. *See* Tab 23 to January 26, 2018 submission.

- **October 13, 2014**: Centrifugal Compressor Rotor Rotation/Gearbox Inspection Checklist completed for the C2301-C unit (14th cycle). *See* Tab 36 to January 26, 2018 submission.

- **October 16, 2014**: Walkthrough of multiple areas completed, including the Dry Cargo Dock, Tug Dock, and Sea Water Intake. *See* Tab 23 to January 26, 2018 submission.

- **October 23, 2014**: Walkthrough of multiple areas completed, including the Rec. Hall, Tank Field #56, and #3 Manifold. *See* Tab 23 to January 26, 2018 submission.

- **October 27, 2014**: HOVENSA submits public comments on the Petroleum Refinery Sector Risk and Technology Review and New Source Performance Standards ("RSR") proposed rule. The RSR amendments to MACT CC and MACT UUU apply only to petroleum refineries.

- **October 30, 2014**: Walkthrough of multiple areas completed, including the Batch Plant, Marine Compound, and North Coke Dome. *See* Tab 23 to January 26, 2018 submission.

- **November 6, 2014**: Walkthrough of multiple areas completed, including the East Maintenance Building, Ice Plant, and Insulation Building. *See* Tab 23 to January 26, 2018 submission.

- **November 13, 2014**: Walkthrough of the East Power Utilities. *See* Tab 23 to January 26, 2018 submission.

- **November 20, 2014**: Walkthrough of the TDU. *See* Tab 23 to January 26, 2018 submission.

- **December 2014**: HOVENSA declares bankruptcy; scales back maintenance activities due to cash flow constraints, but continues inspection program and addresses safety concerns.

- **December 4, 2014**: Walkthrough of multiple areas completed, including the Maintenance Building, Valve Shop, and EMP Building. *See* Tab 23 to January 26, 2018 submission.

- **December 5, 2014**: Critical Compressor Preservation Log completed for Reciprocating Compressors. *See* Tab 37 to January 26, 2018 submission.

- **December 11, 2014**: Critical Compressor Preservation Log completed for Centrifugal Compressors. *See* Tab 38 to January 26, 2018 submission.

- **December 18, 2014**: Walkthrough of the Terminal Main Jetty completed. *See* Tab 23 to January 26, 2018 submission.

- **December 19, 2014**: HOVENSA submits permit renewal application for the Title V operating permit. The Title V operating permit renewal application retains all idled units. *See* Tab X to January 3, 2018 submission.

- **January 8, 2015**: Centrifugal Compressor Rotor Rotation/Gearbox Inspection Checklist completed for the C4850-C unit. *See* Tab 39 to January 26, 2018 submission; Walkthrough of HOVENSA Administrative Building completed. *See* Tab 40 to January 26, 2018 submission.

- **January 15, 2015**: Walkthrough of the Old and New Bundle Wash Areas completed. *See* Tab 40 to January 26, 2018 submission.

- **January 22, 2015**: HOVENSA files its answer to EPA complaint regarding alleged Risk Management Program ("RMP") violations in 2010/11. Answer includes clear statement that "the shutdown was an idling of existing covered processes, not the permanent discontinuance of refining operations." *See* Tab Q to January 3, 2018 submission. Terminal Action Log for Tank 6851, the Penex Unit, and the #1 Powerhouse completed. *See* Tabs 40 & 41 to January 26, 2018 submission.

- **January 29, 2015**: Walkthrough of the Old Warehouse and Compound Area completed. *See* Tab 40 to January 26, 2018 submission.

- **February 5, 2015**: Walkthrough of the AWWT completed. *See* Tab 40 to January 26, 2018 submission.

- **February 12, 2015**: Terminal Action Log completed for Areas 3 and 4. *See* Tabs 40 & 42 to January 26, 2018 submission.

- **February 19, 2015**: Walkthrough of the CE, Pinnacle Shop, and Terminal Warehouse completed. *See* Tab 40 to January 26, 2018 submission.

- **February 26, 2015**: Walkthrough of DK #1 Tug Boat Tour completed. *See* Tab 40 to January 26, 2018 submission.

- **March 5, 2015**: Walkthrough of the Gasoline Blender (GBU) completed. *See* Tab 40 to January 26, 2018 submission. Equipment Preservation Checklist completed for West Refinery Areas 2 and 4, Coker, and Area 8. *See* Tab 43 to January 26, 2018 submission.

- **March 6, 2015**: Walkthrough of the New Quality Control Laboratory completed. *See* Tab 40 to January 26, 2018 submission.

- **March 20, 2015**: Walkthrough of the Dry Cargo Dock completed. *See* Tab 40 to January 26, 2018 submission.

- **March 27, 2015**: Walkthrough of the Container Storage Area completed. *See* Tab 40 to January 26, 2018 submission.

- **April 3, 2015**: Walkthrough of the NRC Compound completed. *See* Tab 40 to January 26, 2018 submission.

- **April 10, 2015**: Walkthrough of the DCS, Safety/Environmental/Auto Garage/Total Safety completed. *See* Tab 40 to January 26, 2018 submission.

- **April 16, 2015**: Walkthrough of the VI Recycle Compound completed. *See* Tab 40 to January 26, 2018 submission.

- **April 22, 2015**: Earth Day cleanup event of HOVENSA's beach. *See* Tab 40 to January 26, 2018 submission.

- **May 7, 2015**: Walkthrough of the Coker completed. *See* Tab 40 to January 26, 2018 submission.

- **May 14, 2015**: Walkthrough of the Marine Compound and Tug Dock completed. *See* Tab 40 to January 26, 2018 submission.

APPX-247

- **May 28, 2015**: Walkthrough of the 6 Sour Water Stripper completed. *See* Tab 40 to January 26, 2018 submission.

- **June 4, 2015**: Walkthrough of the Power Utilities completed. *See* Tab 40 to January 26, 2018 submission.

- **June 11, 2015**: Walkthrough of the Refrigerated LPG Storage Unit completed. *See* Tab 40 to January 26, 2018 submission.

- **June 18, 2015**: Walkthrough of the Main Jetty completed. *See* Tab 40 to January 26, 2018 submission.

- **July 2, 2015**: Walkthrough of the Spheres Tank Field and Seven Seas Unit completed. *See* Tab 40 to January 26, 2018 submission.

- **July 9, 2015**: Walkthrough of the #3 API, Benzene Stripper, and Old Vac Truck Compound completed. *See* Tab 40 to January 26, 2018 submission.

- **July 16, 2015**: Walkthrough of the Loading Rack completed. *See* Tab 40 to January 26, 2018 submission.

- **July 21, 2015**: HOVENSA submits CD Semiannual Progress Report for period from January 1, 2015 through June 30, 2015. The report identifies idled refinery units as existing units and expressly contemplates the possibility of a restart once a sale of the refinery assets is complete. *See* Report at p. 5, Tab R to January 3, 2018 submission.

- **July 25, 2015**: Walkthrough of the Central Maintenance Building completed. *See* Tab 40 to January 26, 2018 submission.

- **July 30, 2015**: Walkthrough of the Dry Cargo Dock and RO/RO completed. *See* Tab 40 to January 26, 2018 submission.

- **August 6, 2015**: Walkthrough of the CE and Pinnacle Shop completed. *See* Tab 40 to January 26, 2018 submission.

- **August 15, 2015**: Walkthrough of the BTX Cargo Manifold and Tank Fields #20 and 20A completed. *See* Tab 40 to January 26, 2018 submission.

- **September 3, 2015**: Walkthrough of the T/A Building, Car Wash, Fuel Pump Station, and Auto Garage completed. *See* Tab 40 to January 26, 2018 submission.

- **September 10, 2015**: Walkthrough of the SCPC Office Building near the west fence line completed. *See* Tab 40 to January 26, 2018 submission.

- **September 15, 2015**: HOVENSA files for bankruptcy. Certification by Tom Hill, HOVENSA Restructuring Officer, is filed with the bankruptcy court. States that some of

- 12 -

the refinery operations were idled in 2011 and remaining operations in February 2012; but that in order to facilitate the sale of the refinery, "HOVENSA continues to maintain the refinery facility in an 'idled' state, incurring significant inspection, maintenance, and oversight expenses in order to comply with various environmental, operations, and safety regulation and related requirements" (paragraph 16, page 8). "The idling of the refinery was an extensive – and expensive – process. In undertaking this process, HOVENSA took measures to maintain the necessary permits and licenses so that the oil refinery operation could be restarted in the future." *See* Certification of Thomas E. Hill in Support of Chapter 11 Petition and First Day Motions ("Hill Certification"), (Paragraph 52, page 23), Tab D to January 3, 2018 submission.

- **September 24, 2015**: Walkthrough of the Dock Road completed. *See* Tab 40 to January 26, 2018 submission.

- **October 1, 2015**: Walkthrough of the East and West Tank Field #59 completed. *See* Tab 40 to January 26, 2018 submission.

- **October 22, 2015**: Walkthrough of Tank Field #60 completed. *See* Tab 40 to January 26, 2018 submission.

- **November 5, 2015**: Walkthrough of the HOVENSA Warehouse, Fire Station, Drum Compound, and Total Safety completed. *See* Tab 40 to January 26, 2018 submission.

- **November 12, 2015**: Walkthrough of the HOVENSA Administrative Building completed. *See* Tab 40 to January 26, 2018 submission.

- **November 19, 2015**: Walkthrough of the East Power Utilities completed. *See* Tab 40 to January 26, 2018 submission.

- **December 1, 2015**: Bankruptcy Court approves sale to LBT. Operating Agreement is signed by GVI and LBT, committing LBT to evaluate restarting the refinery and preventing LBT from taking actions that would inhibit restart. *See* Operating Agreement, pages 31-32, Tab S to January 3, 2018 submission.

- **December 3, 2015**: Walkthrough of the Advanced Wastewater Treatment facility completed. *See* Tab 40 to January 26, 2018 submission.

- **December 10, 2015**: Walkthrough of the Quality Control Laboratory completed. *See* Tab 40 to January 26, 2018 submission.

- **December 17, 2015**: Walkthrough of the East and West Tank Field #56 completed. *See* Tab 40 to January 26, 2018 submission.

- **December 24, 2015**: Walkthrough of the Marine/Terminal Building completed. *See* Tab 40 to January 26, 2018 submission.

- **December 29, 2015**: Legislature of the Virgin Islands approves Operating Agreement with LBT.

- **January 4, 2016**: HOVENSA and LBT execute Asset Purchase Agreement and LBT shifts focus from maintaining the status quo of the equipment to resuming operations of the refinery by retaining experts and engineers to assess the status of the equipment and develop plans for restart, including repairs, revamps, reconfigurations, and operations.

- **Beginning January 2016:** LBT continues HOVENSA's inspection program.

- **January 7, 2016**: Walkthrough of the Dry Cargo Dock and Coker Dome #1 completed. *See* Tab 44 to January 26, 2018 submission.

- **January 14, 2016**: Walkthrough of the Truck Loading Rack completed. *See* Tab 44 to January 26, 2018 submission.

- **January 21, 2016**: Walkthrough of Area 3 completed. *See* Tab 44 to January 26, 2018 submission.

- **January 28, 2016**: Walkthrough of Area 5 (specifically, the FCC) completed. *See* Tabs 44 & 65 to January 26, 2018 submission.

- **February 4, 2016**: Walkthrough of Area 6 (specifically, API #1) completed. *See* Tab 44 to January 26, 2018 submission.

- **February 11, 2016**: Walkthrough of the East Refinery Maintenance Building and other buildings. *See* Tab 44 to January 26, 2018 submission.

- **February 18, 2016**: Walkthrough of Area 9 (specifically, the Spheres Tank Field) completed. *See* Tab 44 to January 26, 2018 submission.

- **February 24, 2016**: LBT retains contractor to "assess potential for restreaming all or portions of recently purchased St. Croix Refinery . . . ."

- **February 25, 2016**: Walkthrough of Area 9 (specifically, Tank 7401) completed. *See* Tab 44 to January 26, 2018 submission.

- **March 3, 2016**: Walkthrough of Area 9 (specifically, the Tank Field between Tanks 7421 and 7439) completed. *See* Tab 44 to January 26, 2018 submission.

- **March 10, 2016**: Walkthrough of the East Fab Shop and Ice Plant completed. *See* Tab 44 to January 26, 2018 submission.

- **March 17, 2016**: Walkthrough of Area 9 (specifically, the pipeline east of the Terminal Building) completed. *See* Tab 44 to January 26, 2018 submission.

- **March 22, 2016**: LBT sends letter to DOJ/ EPA asking for modifications to the CD discussing the need to avoid surrender of permits to allow LBT time to study restart options. *See* Tab T to January 3, 2018 submission.

- **March 24, 2016**: Walkthrough of Area 9 (specifically, Tank Field #8, Tanks 6804 and 6806) completed. *See* Tab 44 to January 26, 2018 submission.

- **March 31, 2016**: Walkthrough of Area 9 (specifically, Tank Field #59, Tank 7510) completed. *See* Tab 44 to January 26, 2018 submission.

- **April 7, 2016**: Walkthrough of Area 9 (specifically, the Truck Rack/Loading Rack) completed. *See* Tab 44 to January 26, 2018 submission.

- **April 14, 2016**: Walkthrough of the Terminal - Dock 3 completed. *See* Tab 44 to January 26, 2018 submission.

- **April 21, 2016**: Walkthrough of the Terminal - East Jetty completed. *See* Tab 44 to January 26, 2018 submission.

- **April 27, 2016**: LBT enters Memorandum of Understanding with consultant to conduct study of refinery restart. Consultant performs preliminary evaluation of 20 refinery units, equipment, lines, instrumentation, and electrical systems, and develops scope of work for mechanical integrity inspections, unit walk-throughs, and additional units to be evaluated.

- **April 28, 2016**: Walkthrough of the Marine Compound completed. *See* Tab 44 to January 26, 2018 submission.

- **May 5, 2016**: Walkthrough of the Terminal - Dock 8 completed. *See* Tab 44 to January 26, 2018 submission.

- **May 12, 2016**: Walkthrough of Area 8 (specifically, the East Power Utilities) completed. *See* Tab 44 to January 26, 2018 submission.

- **May 19, 2016**: Walkthrough of Area 9 (specifically, Tank 7404) completed. *See* Tab 44 to January 26, 2018 submission.

- **May 26, 2016**: Walkthrough of the Valve Shop and Autoclave completed. *See* Tab 44 to January 26, 2018 submission.

- **June 9, 2016**: Walkthrough of the HOVENSA Warehouse and Drum Compound completed. *See* Tab 44 to January 26, 2018 submission.

- **June 16, 2016**: Walkthrough of the Gasoline Blending Unit completed. *See* Tab 44 to January 26, 2018 submission.

- **June 23, 2016**: Annual drill exercise completed, including activation of response teams. *See* Tab 44 to January 26, 2018 submission.

- **June 30, 2016**: Walkthrough of Area 6 (specifically, the AWWT) completed. *See* Tab 44 to January 26, 2018 submission.

- **July 7, 2016**: Walkthrough of Area 6 (specifically, the Bundle Wash and ORS) completed. *See* Tab 44 to January 26, 2018 submission.

- **July 14, 2016**: Walkthrough of Area 9 (specifically, Tank Field #56) completed. *See* Tab 44 to January 26, 2018 submission.

- **July 22, 2016**: HOVENSA submits CD Semiannual Progress Report for the period from January 1, 2016 through June 30, 2016. The report notes that "[a]s part of its operating agreement with the Virgin Islands, LBT is required to evaluate the prospects of a refinery restart and take all commercially reasonable measures to facilitate such refinery restart over an 18 to 36 month period." *See* Report at pp. 7-8, Tab U to January 3, 2018 submission.

- **July 28, 2016**: Walkthrough of the CE, Pinnacle Shop, and Terminal Warehouse completed. *See* Tab 44 to January 26, 2018 submission.

- **August 4, 2016**: Walkthrough of the Terminal - Docks 3 and 4 completed. *See* Tab 44 to January 26, 2018 submission.

- **August 11, 2016**: Walkthrough of Area 4 (specifically, 4 Plat and 7 DD) completed. *See* Tab 44 to January 26, 2018 submission.

- **August 18, 2016**: Walkthrough of the Terminal - Dock 9 completed. *See* Tab 44 to January 26, 2018 submission.

- **August 23, 2016**: East Refinery Selected Units Restart Phase I Report completed.

- **August 25, 2016**: Walkthrough of the former HOVENSA Administrative Building completed. *See* Tab 44 to January 26, 2018 submission.

- **September 8, 2016**: Walkthrough of the Terminal - Main Jetty completed. *See* Tab 44 to January 26, 2018 submission.

- **September 15, 2016**: Walkthrough of the East Spheres and West of AWWT completed. *See* Tab 44 to January 26, 2018 submission.

- **September 22, 2016**: Walkthrough of the Terminal - Loading Rack completed. *See* Tab 44 to January 26, 2018 submission.

- **September 29, 2016**: Walkthrough of Area 9 (specifically, Tank Field 59, Tanks 7510 and 7513) completed. *See* Tab 44 to January 26, 2018 submission.

- **October 6, 2016**: Walkthrough of the Quality Control Laboratory completed. *See* Tab 44 to January 26, 2018 submission.

- **October 13, 2016**: Walkthrough of Area 6 (specifically, the #7 Flare and the Sour Water Stripper Limits) completed. *See* Tab 44 to January 26, 2018 submission.

- **October 20, 2016**: Walkthrough of Area 9 (specifically, the Gasoline Blending Unit) completed. *See* Tab 44 to January 26, 2018 submission.

- **October 24, 2016**: Walkthrough of Area 6 (specifically, the #1 API and Container Storage Area) completed. *See* Tab 44 to January 26, 2018 submission.

- **November 8, 2016**: Status update on study of equipment for refinery restart including #4 platformer/hydrobon, #7 distillate hydrotreater, and auxiliary units.

- **November 10, 2016**: Walkthrough of Terminal Docks 3 and 4 completed. *See* Tab 44 to January 26, 2018 submission.

- **November 17, 2016**: Walkthrough of the HOVENSA Warehouse and Drum Compound completed. *See* Tab 44 to January 26, 2018 submission.

- **December 1, 2016**: Engineering study of restart of the #4 platformer/hydrobon and #7 distillate hydrotreater completed.

- **December 8, 2016**: Walkthrough of the Terminal Dry Cargo Dock, RO/RO, and Sea Water Intake completed. *See* Tab 44 to January 26, 2018 submission.

- **February 28, 2017**: LBT submits an application for a minor modification of the Title V operating permit, proposing to relinquish the authority to operate twelve process heaters, three boilers, and four gas turbines for purposes of achieving $NO_X$ reductions required by the CD. No other emissions units associated with the refining operations are identified as having been permanently shut down.

- **March 16, 2017**: Leadership Walkthrough Action Log completed for Area 9 (specifically, Tank 6813). *See* Tab 46 to January 26, 2018 submission.

- **March 20, 2017**: Engineering study of Coker Unit restart evaluation completed identifying next steps for process design and permitting for Coker Unit and related coke handling facilities.

- **July 25, 2017**: LBT submits CD semiannual progress report for period from January 1, 2017 through June 30, 2017. The report refers to a possible restart, noting that "Limetree Bay Terminals has proposed to review the corrective actions [for Hydrocarbon Flaring

Incidents] that have been proposed and provide an implementation plan, if the refinery is restarted." *See* Report at p. 10, Tab V to January 3, 2018 submission.

- **August 2017**:  Several engineering firms perform unit inspections, walk-throughs, mechanical integrity inspections, and visual inspections of equipment to develop concrete plans for restart.

- **August 30, 2017**:  LBT retains RTP to develop air-permitting strategy for refinery restart.

- **September 2017 – present**:  LBT cleans hurricane debris from refining process units and areas, starting with asbestos removal and removing hazards for personnel.

- **October 18, 2017**: Hot Work Permit: Surveys, Scans, and visual inspections of piping and rotating equipment - Work Permits and related entry logs and job safety analysis for Lt. Ends Treating and 5 & 6 CDU. *See* Tab 47 to January 26, 2018 submission.

- **October 19, 2017**: Hot Work Permit: Surveys, Scans, and visual inspections of piping and rotating equipment - Work Permits and related entry logs and job safety analysis for 5CDU, 3Vac, East Units, Coker and #2API. *See* Tab 48 to January 26, 2018 submission.

- **October 20, 2017**: Hot Work Permit: Surveys, Scans, and visual inspections of piping and rotating equipment - Work Permits and related entry logs and job safety analysis for 5 & 6CDU, LPG Frac. and establish survey control lines for East Side of Refinery. *See* Tab 49 to January 26, 2018 submission.

- **November 3, 2017**: Hot Work Permit: Removal of insulation, Surveys, Scans, and visual inspections of piping and rotating equipment - Work Permits and related entry logs and job safety analysis for 4DD, 2Vac, 2Vis, Naphtha Frac. 2Plat, 5DD, 1GRU, Deiso., 2DU Frac., Penex, 3CDU/1Vac, 3Vac, East LPG Treaters; #6, 7, 9 DD, 3 & 4 Plat, 2 GRU, 5CDU. *See* Tab 50 to January 26, 2018 submission.

- **November 4, 2017**: Hot Work Permit: Removal of insulation, Surveys, Scans, and visual inspections of piping and rotating equipment - Work Permits and related entry logs and job safety analysis for 5CDU, Coker, 3Vac, #3, 4, 5 SWS, 3 & 4 SRUs, #6 & 7 Amine units, 3 API, East NESHAPS, 4DD, Naphtha Frac., 2Vac, 2Vis, 2Plat, 5DD, 1GRU, Deiso. *See* Tab 51 to January 26, 2018 submission.

- **November 12, 2017**: Hot Work Permit: Internal compressor inspections and Removal of insulation and debris - Work Permits and related entry logs and job safety analysis for Coker Compressor, 3DD, Penex, 4DD, 2Vac, 2Vis. *See* Tab 52 to January 26, 2018 submission.

- **December 5, 2017**: Hot Work Permit: Removal of insulation and debris, Surveys, Scans, and visual inspections of piping and rotating equipment - Work Permits and related entry logs and job safety analysis for 3 & 4 SRUs, FCC, Tk 4726, 2 & 4 DD, Coker, #6, 7,

- 18 -

9DD, 3 & 4 Plat, 5 & 6 CDU, HP Treater and 2GRU.  *See* Tab 53 to January 26, 2018 submission.

- **December 15, 2017**: Hot Work Permit: Removal of insulation and debris, Surveys, Scans, and visual inspections of piping and rotating equipment - Work Permits and related entry logs and job safety analysis for FCC, Coker, pipe rack from FCC Merox to East flares, 4Plat.  *See* Tab 54 to January 26, 2018 submission.

- **January 18, 2018**: Interoffice Correspondence re #5 Crude Unit T-3101 Thickness Readings.  *See* Tab 55 to January 26, 2018 submission.

# EXHIBIT H

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

July 9, 1982

MEMORANDUM

SUBJECT:    Reactivation of Amerada Hess Corporation's Port Reading Facility
and PSD Review

FROM:    Director
Division of Stationary Source Enforcement

TO:    Conrad Simon, Director
Air and Waste Management Division, Region II

This is in response to Michael Bonchonsky's memo of May 25, 1992, concerning the applicability of PSD review to the reactivation and modification of the Port Reading Refinery, which is owned by the Amerada Hess Corporation.

Your memorandum basically outlines two issues, 1) Is the reactivation of existing facilities at Port Reading subject to PSD review and 2) Upon reactivation, what emissions may Amerada Hess use as creditable emission decreases.

On the issue of reactivation, the Agency has maintained the policy that if a source can demonstrate, to the satisfaction of the Administrator, that its shutdown was not intended to be of a permanent nature, PSD review does not apply to its reactivation. Although the facility in question has been inactive since 1974, Amerada Hess has submitted adequate evidence to demonstrate that its shutdown was not intended to be permanent. The reactivation of boilers 1 and 2 and the FCC Unit would not trigger PSD review. PSD review may be applicable only if new facilities or modifications cause a significant net emissions increase.

Regarding creditable emissions, Amerada Hess would like to take credit for the difference in emissions between operation prior to shutdown in 1974 and operation after the reactivation of the facility. During the shutdown of the plant (1978) the baseline for the area in which the source is located was triggered. Your memo contains the correct analysis of baseline emissions and creditable emission reductions: The baseline concentration includes the actual emissions of a source in existence on the baseline date. Upon reactivation of its facility, Amerada Hess may only credit a decrease in emissions from the actual emissions occurring on the baseline date.

According to the information in your memo, Amerada Hess will only have creditable decreases in emissions at boilers 1 and 2 of 18 TPY of NOx, 32 TPY of SO2 and 2 TPY of CO. Amerada Hess may not take any credit for emission changes occurring at the FCC Unit, since emissions at this unit were zero on the baseline date.

The proposed modifications and the additional new facilities to the refinery will be subject to PSD review for CO. Amerada Hess is not required to perform an increment and/or NAAQS analysis of the SO2 and NOx emissions are not subject to PSD review. Nevertheless, the SO2 emissions still consume increment and must be addressed by the next major modification or major source of SO2 to locate in the area.

In closing, I would like to emphasize that, at this time, this determination (or any other PSD determination) is in no way affected by the CMA settlement agreement. The PSD regulations, as amended on August 7, 1980, remain in effect and binding until amended through formal rulemaking procedures.

This response has been reviewed and received concurrence from the Office of General Counsel and the Office of Air Quality Planning and Standards.

If you have any questions regarding this determination, please contact Janet Farella of my staff at 382-2877.


Edward E. Reich


cc:    Ken Eng, Region II
       Mike Trutna, OAPQS
       Peter Wyckoff, OGC


PREPARED BY:JFARELLA:rbr:22877:7/1/82:DISK JANET #2:AMERADA/HESS

# EXHIBIT I

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D.C. 20460

OFFICE OF
AIR AND RADIATION

NOV 19, 1991

MEMORANDUM

SUBJECT:   Applicability of PSD to Watertown Power Plant, South Dakota;
           Shutdown for 9 years.

FROM:      John B. Rasnic, Director
           Stationary Source Compliance Division
           Office of Air Quality Planning and Standards

TO:        Douglas M. Skie, Chief
           Air Programs Branch (8AT-AP)

This is in response to your memorandum dated September 26, 1991, regarding the applicability of PSD to a shutdown power plant upon reactivation. My staff has reviewed the materials provided and we believe that the position Region VIII has taken thus far is consistent with the EPA national policy.

The general policy on whether a shutdown plant if reopened would be subject to PSD as a new source is set forth in a series of memoranda from the Stationary Source Compliance Division (SSCD) starting with a September 6, 1978 memorandum from Edward E. Reich to Stephen A. Dvorkin. According to SSCD guidance, whether a source which has been shut down is subject to PSD review upon reactivation depends on whether the shutdown is considered permanent. EPA evaluates permanence of shutdowns based upon the intent of the owner or operator. The facts and circumstances of the particular case, including duration of the shutdown and the handling of the shutdown by the State, are considered evidence of intent of the owner or operator. A shutdown lasting for two years or more, or resulting in removal of the source from the emissions inventory of the State, should be presumed permanent. The owner or operator proposing to reopen the source would have the burden of showing that the shutdown was not permanent, and of overcoming any presumption that it was. Also see the attached May 27, 1987 memorandum from John S. Seitz to David P. Howekamp regarding Reactivation of Noranda Lakeshore Mines' RLA Plant and PSD review.

In the case of the Watertown Power Plant (WPP), your staff has provided the following information. The plant consists solely of a single unit, simple cycle, oil fired combustion turbine. The WPP operated from 1979 until 1981 when the turbine failed. Extensive and costly repairs were made and completed in 1982.

2

Of the $1.5 million spent on repairing the turbine, $1.2 million was covered by insurance, and more of the cost was recovered by litigation against the manufacturer. The net cost to restore the turbine at WPP was $237,953.

Due to operating costs and diminished load growth, however, the Board of Directors decided to place the plant on deactivated status until 1984 and decided again in 1984 and then in 1989 to continue the deactivated status. The SIP operating permit was allowed to expire.

Since 1982, the unit has been treated as being in cold standby, requiring 6-8 weeks to reactivate. Information submitted to EPA thus far indicates that the plant has been maintained to ensure its readiness. The September 13, 1991 letter to Mr. John Dale of your staff from the Missouri Basin Municipal Power Agency (MBMPA) details what has been done during the entire standby period to ensure readiness; thereby, validating the intent to reactivate. These actions include maintaining two full time employees on site, and periodic testing and maintenance of the system to ensure quick reactivation. It appears that reactivation of the plant would not require more than a limited amount of time and capital. Further, the MBMPA has stated in a variety of reports, starting from the early 1980s, their intent to reactivate the plant.

With the facts presented, which include an intent to maintain the turbine, WPP has overcome the presumption that the shutdown was permanent. Therefore, although this plant has been shut down for a period of time long enough to be considered permanently shut down, and has relinquished its operating permits, the source has demonstrated their intent to treat the shutdown as temporary. This is a unique situation given the very long period of the shutdown. However, the continued maintenance of the facility throughout the years, the resulting ability to bring the plant back on line with only a few weeks of work, and the statements of intent of the owners at the time of shutdown and in subsequent years to reactivate the facility, all compel us to concur with your determination that Missouri Basin has demonstrated that the shutdown was never intended to be permanent. Therefore, given the evidence presented, reactivation of this combustion turbine would not be subject to PSD requirements.

If you have any questions concerning our response, please contact Clara Poffenberger at FTS 398-8709.

Attachments

cc:    John Dale, Region VIII
       Gary McCutchen, NSR Section, AQMD (MD-15)

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D.C. 20460
SEP 6 1978

OFFICE OF ENFORCEMENT

MEMORANDUM

SUBJECT:    PSD Requirements

FROM:    Director
Division of Stationary Source Enforcement

TO:    Stephen A. Dvorkin, Chief
General Enforcement Branch
Region II

In response to your memo dated June 29, 1978, we have consulted with the Offices of General Counsel and Air Quality Planning and Standards and provide the following responses to your questions regarding the applicability of several PSD requirements.

Q - 1(a). Is a source which shut down approximately four years ago because of an industrial accident, and which was not and is not required to obtain a permit under a SIP, subject to the requirements of PSD? This source was not subject to PSD requirements prior to March 1, 1978.

A - This is a question which we have not previously addressed, but we believe that EPA policy should be as follows. A source which had been shut down would be a new source for PSD purposes upon reopening if the shutdown was permanent. Conversely, it would not be a new source if the shutdown was not permanent. Whether a shutdown was permanent depends upon the intention of the owner or operator at the time of the shutdown as determined from all the facts and circumstances, including the cause of the shutdown and the handling of the shutdown by the State. A shutdown lasting for two years or more, or resulting in removal of the source from the emissions inventory of the State, should be presumed permanent. The owner or operator proposing to reopen the source would have the burden of showing that the shutdown was not

2

permanent, and of overcoming any presumption that it was. Under the facts you have given us, we would presume that the shutdown was permanent, since it has already lasted about four years. Consequently, unless the owner or operator of the source were to rebut that presumption, we would treat the source as a new source for PSD purposes.

We assume that your statement that the source was not subject to the PSD regulations in effect before March 1, 1978, means that it was not in one of the nineteen source categories listed in Section 52.21(d) (1) of those regulations. A proposed new source which was not in one of those categories would be subject to the PSD regulations promulgated on June 19, 1978, unless (1) all required SIP permits had been obtained by March 1, 1978, and (2) construction commences before March 19, 1979, is not discontinued for 18 months or more and is completed within a reasonable time. See Section 52.21(i) (3), 43 FR 26406. Here, all required SIP permits were obtained by March 1, since none was required. Consequently, the source would not be subject to the new regulations, assuming that the reopening is commenced before March 19, 1979, is not discontinued for more than 18 months and is completed within a reasonable time.

If we were to treat the source as an existing source for PSD purposes, we would also conclude that it is not subject to the new regulations.[SEE FOOTNOTE 1] No source on which construction commenced before June 1, 1975, would be subject to those regulations. [SEE FOOTNOTE 1] See Clean Air Act Sections 168(b), 169(4); 40 CFR 52.21(d) (1) (1977). Here, since the source was in operation about 4 years ago, construction on it presumably commenced before then, well before June 1, 1975. Hence, it would (presumably) not be subject to the new regulations.

Q - 1(b). Would your answer to 1.a., above, change if the source is or was required to obtain a SIP permit?

A - If the source shut down temporarily, it would not be required to obtain a PSD permit in order to start up.

_____

[FOOTNOTE 1] Application of this rule requires special guidance for multifacility sources which construct in phases. Generally, if one phase of a multifacility source commenced construction by June 1, 1975, all other mutually dependent phases specifically approved for construction at the same time will also be "grandfathered". On the other hand, each independent facility must have commenced construction individually by June 1, 1975, to have achieved grandfather status. See 43 FR 26396, 19 June 1978.

3

On the other hand, if the source shut down permanently, it would, upon reopening, be required to obtain a PSD permit unless the following two conditions were met: 1) the SIP permit was obtained prior to 3/1/78 and 2) any construction necessary for reopening is commenced prior to 3/19/79, is not discontinued for 18 months or more and is completed within a reasonable time.

Q - 2. Is the EPA required in all cases to forebear from issuing a PSD permit until a SIP permit has been issued or is such forbearance required only when the source is subject to the "Interpretative Ruling" (41 FR 55524, December 21, 1976)?

A - EPA should refrain from issuing a PSD permit prior to issuance of a SIP permit only in cases where the source is also subject to the Interpretative Ruling. (See 43 FR 26402, column 3.)

Q - 3. In the evaluation of BACT, does equipment reliability play a part, i.e., should a unit capable of 80% control with a 20% downtime, be preferred to a unit capable of 90% control with a 35% downtime? Can backup equipment be required for BACT purposes?

A - Questions concerning BACT should be addressed to the Control Programs Development Division in Durham, N.C.

Q - 4. For the purpose of determining what constitutes "air pollution control equipment," what is meant by the phrase ". . . normal product of the source or its normal operation"? (43 FR 26392, mid. col., June 19, 1978). Does that refer to the quantity or quality of the product or both, i.e., if a baghouse collects 100% of the product, a settling chamber collects 20%, and without some device no product is collected, what is deemed to be "air pollution control equipment"?

A - If a source (such as one which produces zinc-oxide) cannot capture any of its product without the use of some type of control device, the least efficient control device used in the industry will be considered vital to the process. For example, if sources in such an industry typically employ either settling chambers or baghouses, potential emissions will be calculated as the emissions from such a source with a settling chamber installed.

Q - 5. Do the provisions of Section 167 of the Clean Air Act, which refer to issuance of an Order and seeking injunctive relief for PSD violations, create enforcement authorities independent of those created in Section 113 for SIP violations, or do they simply incorporate Section 113 by reference?

A - We believe that Section 167 provides the Agency with enforcement authority which

4

is not necessarily otherwise provided by Section 113. The Office of Enforcement is drafting

guidance on implementation of Section 167. This guidance should be completed shortly. In the interim, the Agency should enforce against violations of the PSD requirements under the mechanisms established by Section 113, generally. There is one important situation, however, in which resort to Section 167 may be necessary. This would occur when a state had issued a permit that EPA considered to be invalid. In this situation, we believe that Section 167 provides the Agency with the authority to halt the construction of the source directly, without first having to resort to the cumbersome process of seeking a judicial declaration that the state permit is invalid. (See 42 FR 57473 (1977)). In this respect, Section 167 provides the agency with authority similar to that provided by section 113(a) (5) and (b)(5) to prevent sources with invalid permits from constructing in nonattainment areas. Please note, however, that no delegations for enforcement of the PSD requirements have been signed yet, and so any action under Section 167 would have to be taken in close coordination with DSSE, and any Section 167 orders would have to be signed by the Administrator.

If you have any further questions on these issues, please contact Libby Scopino at FTS 755-2564.

Edward E. Reich

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D.C. 20460

OFFICE OF
AIR AND RADIATION

MAY 27 1987

<u>MEMORANDUM</u>

SUBJECT:     Reactivation of Noranda Lakeshore Mines, RLA Plant and PSD Review

FROM:        John S. Seitz, Director
             Stationary Source Compliance Division
             Office of Air Quality Planning and Standards

TO:          David P. Howekamp, Director
             Air Management Division, Region IX

Pursuant to your recent request, this memorandum addresses the status of Noranda Lakeshore Mines' roaster leach acid (RLA) plant in Arizona. Noranda is contemplating startup of the RLA plant which has been shut down since 1977. The company contends that the shutdown was not intended to be permanent, and therefore believes that the plant should not be subject to PSD review.

Whether or not a source which has been shut down is subject to PSD review upon reactivation depends on whether the shutdown is considered permanent. EPA evaluates permanence of shutdowns based on the intent of the owner or operator. The facts and circumstances of the particular case, including the duration of the shutdown and the handling of the shutdown by the State, are considered as evidence of the owner or operator's intent. This decision making framework follows the policy on plant reactivation which EPA set forth in 1978. The September 6, 1978 memorandum which initiated this policy states: "A shutdown lasting for two years or more, or resulting in removal of the source from the emissions inventory of the State, should be presumed permanent. The owner or operator proposing to reopen the source would have the burden of showing that the shutdown was not permanent,

2

and of overcoming any presumption that it was." Several memoranda later issued by SSCD (August 8, 1980; October 3, 1980; July 9, 1982) applied this shutdown/reactivation policy.

In the case of Noranda's RLA plant, your staff has provided the following information. The RLA plant, previously owned by Hecla Mining Company, was shut down by Hecla in 1977 due to market conditions. Reports issued by Hecla at the end of 1977 stated that the ALA facility could be operational within one week. However, due to poor economic conditions Hecla decided to terminate their lease for the ALA plant. In 1979 Noranda purchased the facility, but never operated the ALA plant due to similar economic problems; the ALA plant itself has not operated since 1977. The ALA plant was deleted from Noranda's operating permits in 1980, and Noranda' remaining operating permits were surrendered in 1984. In 1986, the ALA plant was removed from the State's emission inventory. Your staff has also indicated that the roaster may need at least several hundred thousand dollars worth of work before being operable, and could not come on line for approximately four months.

Since the ALA plant has been shut down for well over 2 years and has been removed from the State's emission inventory, EPA presumes that the shutdownwas permanent. However, Noranda has submitted documentation to Region 9 seeking to demonstrate that the shutdown was not intended to be permanent. Included is a 1980 statement of intent for long term operation of the facility, evidence of some search for toll concentrates of sufficient quality to allow operation, and evidence of some level of custodial maintenance. The question which now arises is whether the information submitted is sufficient to rebut the presumption of a permanent shutdown.

EPA evaluates the permanence of the shutdown based on the demonstrated intent of the owner or operator to reopen the source. Facts and circumstances surrounding the shutdown, including duration of the shutdown and the handling of the shutdown by the source and State, are evidence of the owner's intent. In Noranda's case, the significant amount of time that has elapsed, as well as Noranda's failure to maintain the operating permit, removal of the ALA plant from the emissions inventory, and the time and capital that must be invested in the rehabilitation of the plant in order to make it operable, are evidence that the shutdown was intended to be permanent.

3

There is not sufficient evidence of intent to reopen the source to regard this as a

temporary shutdown. Therefore, SSCD concurs with Region 9's determination that the source, for PSD purposes, is permanently shut down, and must meet Federal PSD requirements for construction and operation.

If You have any questions, please contact Sally M. Farrell at FTS 382- 2875.

cc:    Wayne Blackard, Region IX
       Nancy Harney, Region IX
       Bruce Armstrong, OPAR
       NSR Contacts

# EXHIBIT J

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D.C. 20460

MAY 27 1987

<u>MEMORANDUM</u>

SUBJECT:     Reactivation of Noranda Lakeshore Mines' RLA Plant and PSD Review

FROM:        John S. Seitz, Director Stationary Source Compliance Division
             Office of Air Quality Planning and Standards

TO:          David P. Howekamp, Director Air Management Division, Region IX

Pursuant to your recent request, this memorandum addresses the status of Noranda Lakeshore Mines' roaster leach acid (RLA) plant in Arizona. Noranda is contemplating startup of the RLA plant which has been shut down since 1977. The company contends that the shutdown was not intended to be permanent, and therefore believes that the plant should not be subject to PSD review.

Whether or not a source which has been shut down is subject to PSD review upon reactivation depends on whether the shutdown is considered permanent. EPA evaluates permanence of shutdowns based on the intent of the owner or operator. The facts and circumstances of the particular case, including the duration of the shutdown and the handling of the shutdown by the State, are considered as evidence of the owner or operator's intent. This decision making framework follows the policy on plant reactivation which EPA set forth in 1978. The September 6, 1978 memorandum which initiated this policy states:"A shutdown lasting for two years or more, or resulting in removal of the source from the emissions inventory of the State, should be presumed permanent. The owner or operator proposing to reopen the source would have

2

the burden of showing that the shutdown was not permanent, and of overcoming any presumption that it was." Several memoranda later issued by SSCD (August 8, 1980; October 3, 1980; July 9, 1982) applied this shutdown/reactivation policy.

In the case of Noranda's RLA plant, your staff has provided the following information. The RLA plant, previously owned by Hecla Mining Company, was shut down by Hecla in 1977 due to market conditions. Reports issued by Hecla at the end of 1977 stated that the ALA facility could be operational within one week. However, due to poor economic conditions Hecla decided to terminate their lease for the ALA plant. In 1979 Noranda purchased the facility, but never operated the ALA plant due to similar economic problems; the ALA plant itself has not operated since 1977. The ALA plant was deleted from Noranda's operating permits in 1980, and Noranda' remaining operating permits were surrendered in 1984. In 1986, the ALA plant was removed from the State's emission inventory. Your staff has also indicated that the roaster may need at least several hundred thousand dollars worth of work before being operable, and could not come on line for approximately four months.

Since the ALA plant has been shut down for well over 2 years and has been removed from the State's emission inventory, EPA presumes that the shutdown was permanent. However, Noranda has submitted documentation to Region 9 seeking to demonstrate that the shutdown was not intended to be permanent. Included is a 1980 statement of intent for long term operation of the facility, evidence of some search for toll concentrates of sufficient quality to allow operation, and evidence of some level of custodial maintenance. The question which now arises is whether the information submitted is sufficient to rebut the presumption of a permanent shutdown.

EPA evaluates the permanence of the shutdown based on the demonstrated intent of the owner or operator to reopen the source. Facts and circumstances surrounding the shutdown, including duration of the shutdown and the handling of the shutdown by the source and State, are evidence of the owner's intent. In Noranda's case, the significant amount of time that has elapsed, as well as Noranda's failure to maintain the operating permit, removal of the ALA plant from the emissions inventory, and the time and capital that must be invested in the rehabilitation of the plant in order to make it operable, are evidence that the shutdown was intended to be permanent.

3

There is not sufficient evidence of intent to reopen the source to regard this as a temporary shutdown. Therefore, SSCD concurs with Region 9's determination that the source, for PSD purposes, is permanently shut down, and must meet Federal PSD requirements for construction and operation.

If You have any questions, please contact Sally M. Farrell at FTS 382- 2875.

cc:    Wayne Blackard, Region IX
       Nancy Harney, Region IX
       Bruce Armstrong, OPAR
       NSR Contacts

# EXHIBIT K

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET
ATLANTA, GEORGIA 30303-8960

December 13, 2000

4APT-ARB

Mr. Ronald Methier, Chief
Air Protection Branch
Georgia Environmental Protection Division
4244 International Parkway, Suite 120
Atlanta, Georgia 30354

SUBJ:  Southern LNG, Inc., Elba Island Terminal, Savannah Georgia
        Draft Air Quality Permit and PSD Preliminary Determination

Dear Mr. Methier:

        We are in receipt of the letter from the Georgia Environmental Protection Division
(GAEPD) dated November 6, 2000, transmitting a draft air quality permit and prevention of
significant deterioration (PSD) preliminary determination for the above facility.  This project
consists of reactivating the Southern LNG Elba Island liquified natural gas (LNG) terminal.  The
terminal has not been in commercial operation since 1982.  As part of the project, Southern LNG
proposes to replace five existing natural gas-fired LNG vaporizers with five larger capacity LNG
vaporizers.  We have discussed the project with representatives from GAEPD and Southern LNG.

        Our comments on the preliminary determination, draft permit, and permit application are
as follows:

1.      Southern LNG has taken the position that, except for the new vaporizers, all other
        emissions units at the facility should be collectively considered an existing source and not
        a new source for PSD applicability purposes.  Support for this position has been supplied
        in terms of EPA's Reactivation Policy.  In brief, the Reactivation Policy provides that a
        reactivated facility can be considered an existing source if the facility owner can rebut the
        presumption that the deactivation of the facility was intended to be a permanent shutdown.
        GAEPD apparently agrees with the applicant's position and has not required PSD review
        for emissions units other than the new vaporizers.  At this time we are not taking
        exception with conclusions regarding the Reactivation Policy, although concluding that a
        facility commercially inactive for 18 years is not a new source definitely extends the
        Reactivation Policy presumptive rebuttal provision to its limits.

2

What the permit application and the preliminary determination did not address, however, is whether the planned reactivation constitutes a modification under PSD rules. In two recent actions, EPA concluded that reactivation of a long dormant facility constituted a change in the method of operation and was therefore a modification. The more definitive of these two actions was a June 1999 Order issued by the EPA Administrator in relation to Entergy Louisiana's Monroe Electric Generating Plant (Entergy). In the Entergy case, the Administrator determined that the PSD exemption excluding an increase in hours of operation from consideration as a modification was not applicable. The Administrator reasoned that the intent of this exemption was to allow operating facilities to respond to changes in market conditions, and not to accommodate startup of facilities that had long been dormant. The second action was an August 2000 opinion from EPA Region 1 citing the Entergy Order in concurring with a state permitting agency that the reactivation of a power generating facility should be considered a modification.

In response to our concern (stemming from the Entergy Order) about whether reactivation constitutes a modification under PSD rules, Southern LNG recently provided an assessment to demonstrate that the circumstances in the Entergy case and in the Region 1 case differ from those in the Elba Island terminal case. Although we appreciate Southern LNG's timely comments, we do not believe these comments distinguish the LNG terminal from the Entergy facility. Southern LNG comments that the Elba Island terminal was never in a "shutdown" mode as was the Entergy facility. In fact, EPA did not rule on whether the Entergy facility was ever permanently shut down. Rather, EPA's position in the Entergy case was that the Entergy facility had long been dormant and that the increase in hours of operation resulting from reactivation should be considered a change in the method of operation because reactivation of a long-dormant facility did not meet the intent of the increase-in-hours-of-operation exemption. Similarly, we are not necessarily contending that the Elba Island terminal was permanently shut down. Our view instead is that, by any objective standard, the emissions units at the terminal have long been dormant just as in the Entergy case.

In summary, we request that GAEPD reconsider whether reactivation of the Southern LNG Elba Island terminal constitutes a major modification under PSD rules. This reconsideration should take into account the findings in the Entergy Order issued June 11, 1999.

2.    The existing permit for the Southern LNG terminal is dated March 1979 and does not refer to any emissions units other than the existing vaporizers. We understand from GAEPD that the internal combustion reciprocating engine generators and combustion turbine generators were not listed in the permit because Georgia rules at the time did not cover such emissions units. If the draft construction permit for the reactivation project remains unchanged, the generators (with a total potential regulated pollutant emission rate of more than 1,000 tons per year) will continue without enforceable permit restrictions. Unless the generators are addressed in the construction permit for the reactivation, we

3

anticipate that the generic applicable requirements for these units in the title V operating permit eventually issued for the Elba Island terminal will allow emissions far in excess of those considered in the modeling evaluation for the reactivation.

3.    We have the following comments on the vaporizer best available control technology (BACT) section of the September 2000 revised permit application:

a.    On page 6-1, the applicant states that the volatile organic compounds (VOC) emissions increase exceeds the PSD significant emissions increase level of 40 tons per year (TPY) and refers to Table 6-1 as consistent with this statement.  Table 6-1 shows a VOC emissions increase of 19.3 tpy which is less than the significant increase level.  (Section 6.4.3 of the BACT evaluation contains a review for VOC emissions but refers to this as a "voluntary" review for information purposes only.)  The draft permit includes emission limits for nitrogen oxides ($NO_x$) and carbon monoxide (CO) but not for VOC.  We recommend that GAEPD consider including a VOC emission limit to insure that PSD avoidance for VOC is enforceable.

b.    Within the $NO_x$ BACT evaluation section of the permit application, the applicant discusses good combustion control practices (page 6-9).  The first paragraph of this discussion refers repeatedly to gas turbines and not to vaporizers.  GAEPD should confirm that the good combustion control practice assessment is appropriate for vaporizers.

c.    On page 6-11 of the permit application, the applicant makes the following statement:  "T-Thermal plans to institute future modifications to the combustion air staging design to further reduce $NO_x$ production in this burner, but a commercial prototype is not currently available."  We recommend that GAEPD ask Southern LNG to provide periodic reports on progress in T-Thermal burner improvements and to assess the feasibility of burner retrofit when improvements are commercially available.

4.    In terms of the air quality impact assessment, our review comments on this PSD application have been discussed with GAEPD.  The additional information through these discussions resolved some of our comments and questions.  The following are our remaining  comments:

a.    Impact Area Visibility Analysis - The Additional Impact Analysis of the permit application (Section 7.0) addressed visibility in the "near field region" (i.e., the area within 50 km of the Elba Island terminal).  Of concern in this analysis are visibility sensitive receptors within the impact area (e.g., airports, state parks, etc.).  The provided analysis appears to have been performed only at a distance of 50 km from the Elba Island terminal.  Confirmation is needed that no visibility sensitive receptors exist closer than 50 km from the terminal.

4

b.    Growth, Soils, and Vegetation Analysis - The Additional Impact Analysis of the permit application (Section 7.0) provided no assessment of growth, soils, and vegetation impacts. This section only refers to a Federal Energy Regulatory Commission (FERC) favorable environmental assessment (EA) published in January 2000. Because no specific analysis is provided in the application, it is unknown whether: 1) the EA is appropriate to the current facility configuration, and 2) the EA analysis is appropriate and sufficient to satisfy PSD requirements. Not providing this information in the application means it may not have been available for public review of the draft PSD permit.

c.    ISCPRIME - The separately provided project specific justification for the use of the non-regulatory model ISCPRIME in this application has been reviewed and found appropriate and sufficient. ISCPRIME is an acceptable air quality model to estimate Southern LNG's impacts.

d.    Southern LNG PSD Sources - The Elba Island terminal has not operated since 1982. The PSD major source $NO_2$ baseline date is February 8, 1988. The PSD minor source $NO_2$ baseline date for the impact area is April 12, 1991. The baseline concentration, the reference point for air quality deterioration under the PSD program, is defined as the air quality at the time the first complete PSD application is received for an area. For major sources, all actual emissions associated with construction (i.e., physical changes or changes in the method of operation) after the major source baseline date affect increment. Because Southern LNG has not operated since 1982, emissions associated with the total facility operation appear to consume PSD increment and should be included in future PSD impact modeling in the area.

e.    Impact Modeling Site Boundary - Figures D-3 through D-5 and the plot plan provided in the application show a fenced area about the facility that does not include the total island. As the application acknowledges, the public can access Elba Island via the Savannah River or South Channel. Evaluations of site boundaries for other facilities have determined that a shoreline by itself is not a sufficient barrier to public access to qualify the land area as non-ambient air for impact modeling. Therefore, to consider the total island as non-ambient air, additional "barrier(s)" to the public are needed along the shorelines.

f.    Load Modeling - The application states, without supporting information, that modeling analysis to determine worst impact under various loads was determined to be unnecessary. Although the modeling protocol indicates only the generators will operate at reduced loads, no other reason is given to justify not considering load in determining the worst case impact.

5

g.    Emission Inventories - The selected other emission sources used in the national ambient air quality standards and PSD increment compliance modeling are

provided in Table D-1 of the permit application.  The following are comments/questions concerning the inventories:

- All emission units from each source were combined into one representative emission point independent of the source's location.  This technique is appropriate for sources with only one set of available coordinates or sources located a considerable distance from the significant impact area. The relative location of emission points becomes important the closer the source is to the Elba Island terminal.  To determine the importance of this issue in the provided impact analysis, the location of each emission unit within the significant impact area should be provided for each emission source.

- Table D-1 of the permit application does not distinguish PSD emission sources.  The PSD sources should be identified.

- Tanker unloading will occur approximately once per week.  Unloading pumps will be maintained and powered by the tanker's power source.  This secondary emission source was not included in the ambient air quality impact assessment.  Because of the frequency and stationary nature of the tanker while unloading, tanker emissions during unloading should be considered for inclusion in all impact assessments.

h.    Ozone Ambient Conditions - Total VOC emissions from the Elba Island terminal are greater than the PSD significant emission rate.  Although ozone impact modeling is not normally required for single sources, information on the current ozone levels in the area should be cited to provide qualitative assurance that the increased VOC emissions from facility operation will not cause or contribute to violations of the ozone national ambient air quality standards.

6

If you have any questions concerning comments not related to the air impact assessment, please contact Darren Palmer at (404) 562-9052 or Jim Little at (404) 562-9118.  Questions concerning our comments on the air impact assessment should be directed to Stan Krivo at (404) 562-9123.

Sincerely,


R. Douglas Neeley
Chief
Air and Radiation Technology Branch
Air, Pesticides and Toxics
  Management Division

# EXHIBIT L

THE TEXT YOU ARE VIEWING IS A COMPUTER-GENERATED OR RETYPED VERSION OF A
PAPER PHOTOCOPY OF THE ORIGINAL.  ALTHOUGH CONSIDERABLE EFFORT HAS BEEN
EXPENDED TO QUALITY ASSURE THE CONVERSION, IT MAY CONTAIN TYPOGRAPHICAL
ERRORS.  TO OBTAIN A LEGAL COPY OF THE ORIGINAL DOCUMENT, AS IT
CURRENTLY EXISTS, THE READER SHOULD CONTACT THE OFFICE THAT ORIGINATED
THE CORRESPONDENCE OR PROVIDED THE RESPONSE.

July 31, 1981

REF: 4AH-AF

Dear State/Local Director:

On March 11, 1981, I sent you a summary of PSD policy determinations made by
Region IV.  Enclosed is an update which should be added to the first
summary.  Any questions concerning these determinations should be sent to
Roger Pfaff (404/381-9236).

Thomas W. Devine
Director
Air & Hazardous Materials Division

Enclosure

4AH-AF:PFAFF:je:7/28/81(5118)

4AH-AF          4AH-AF          4AH
PFAFF           GIBBS           DEVINE

EPA Region IV

Policy Determinations Regarding PSD Questions

1.  2/5/81

    Question:    A boiler at a major stationary source has been shut down for 11 years.  At the time of the shutdown extensive efforts were made to keep the boiler from deteriorating.  During the shutdown period this maintenance has continued.  A recent inspection by the manufacturer shows that very little effort would be required to return the boiler to service.  The operating permit has been allowed to expire.  The owner maintains that the boiler was always intended to be used at some time in the future.  Is the returning to service of the boiler subject to PSD?

    Answer:    No.  Normally, a shutdown of greater than 2 years is considered permanent.  If however, the owner demonstrates that the shutdown was not intended to be permanent, the shutdown may be considered temporary.  If the shutdown is considered temporary, a startup would not be subject to PSD.  The "acid test" is whether the shutdown is permanent.  In any case, the increase would be considered an increase in actual emissions for any future net increase calculation and for increment consumption purposes.

    Reference:    Memo from Edward Reich, "Summary of PSD Determinations," PSD 117.

2.  2/6/81

    Question:    In the July 22, 1980 Federal Register, EPA declared 7 additional compounds (in addition to methyl chloroform and methylene chloride) to be of negligible photochemical reactivity.  Does this expand the list of compounds which are not considered VOC's for purposes of PSD?

    Answer:    Yes.  The complete list of organic compounds not considered photochemically reactive for purposes of PSD is now:

        1.  1,1,1 - trichloroethane
        2.  methylene chloride
        3.  methane
        4.  ethane
        5.  trichlorofluoromethane
        6.  dichlorodifluoromethane

-2-

    7. chlorodifluoromethane
    8. trifluoromethane
    9. trichlorotrifluoroethane
   10. dichlorotetrafluoroethane
   11. chloropentafluoroethane

Some of these compounds are proposed for regulation under NSPS. When the NSPS is promulgated, each of these compounds will be considered a separate pollutant for PSD purposes, but will still not be considered a VOC.

Reference:    45 FR 48541

3.  2/10/81

Question:    A major source proposes to build in a nonattainment area, but the area is projected to be attainment (based on the approved Part D SIP) before startup of the source. Is the source subject to PSD?

Answer:    No. It is not subject to PSD, and the state is not required to subject it to Part D requirements. This is a loophole in the regulations. EPA has proposed a revision to eliminate the loophole.

Reference:    45 FR 9124, January 28, 1981

4.  2/18/81

Question:    The PSD baseline air quality is based on actual emissions from existing sources. Actual emissions are defined as the average emissions rate in tons per year. How does Region IV interpret this in establishing short-term (24-hour, 3-hour) baseline air quality levels when air quality modelling is used?

Answer:    Baselines for 3-hour and 24-hour averages should be set using the maximum 3-hour average or 24-hour average emission rate of the existing source, respectively, which occurred during the period over which the annual emission rate was determined. For example, if a source's annual emission rate is determined to be 430 per year by averaging 400 tons per year in 1978 and 460 tons per year in 1979, the 3-hour baseline emission rate would be the maximum 3-hour average emission rate which occurred during the period of 1978 and 1979.

-3-

5.    3/20/81

    Question:    An ambient monitor was operated for 1 year (or shorter time, if representative of highest values) and then shut down.  A proposed source wishes to use the data for its PSD application.  Except for the time lapse, the data is representative of current air quality at the proposed site, is of good quality, and was gathered entirely in a time period less than 3 years before the source submits its application.  Can the data be used, even though the monitor has been shut down?

    Answer:    As long as all the data needed in application are collected sequentially, and all the data are collected some time in the previous three years, the timing requirement is satisfied.  For example, suppose a state agency operated an ozone monitor throughout a particular ozone season, which the agency determines to be April through September of 1978.  The monitor is then shut down.  This data could be used in a PSD application submitted any time before April 1, 1981, provided the data are still representative of current conditions, and all other requirements are met, such as quality assurance and monitor location.

    Reference:    40 CFR 52.21 (m), 45 FR 52724

6.    5/5/81

    Question:    A minor source locates in a PSD area where the baseline has been triggered.  In another nearby PSD area, the baseline is still untriggered after the minor source begins operation.  The source's emissions impact this neighboring area.  Do these emissions consume increment?

    Answer:    No.  The baseline air quality is that which actually exists in the baseline area on the baseline date, minus contributions from new major sources.  Therefore, at some future baseline date for the neighboring area, the baseline air quality must include the actual contribution from the minor source.  Since the emissions are in the baseline for the area, they do not consume increment.  If the situation is reversed (minor source locates in untriggered area, impacts triggered area), emissions would consume increment in the neighboring area, but not in the area where the source locates.

    Reference:    40 CFR 52.21 (b) (13)

-4-

7.  5/6/81

Question:    A minor source which adds emissions of a pollutant in a major amount is subject to PSD as a new major source, rather than as a modification. The netting concept is used only in the definition of major modification, and not in the definition of major stationary source. This seems to indicate that a minor source adding a major emission point could not escape PSD by considering previous decreases which cause the net increase to be less than the major source threshold. Is this the case?

Answer:    Yes. For example, suppose a minor source emitting 200 tpy had a decrease in actual emissions in 1978 of 50 tpy, leaving 150 tpy. In 1981, 260 tpy is proposed to be added. If the 50 tpy reduction could be used to offset the 260 tpy increase, the increase would be only 210 tpy and the source would escape review. The 50 tpy decrease cannot be used, however, so the 260 tpy increase is subject to review as a new major stationary source.

References:    40 CFR 52.21 (b) (1)

8.  6/5/81

Question:    An existing source is major only because its SO2 emissions are 120 tons per year. The source proposes to add 60 tons per year of particulate emissions. At the same time, the source is willing to accept a new, federally enforceable limitation which lowers its SO2 emissions to 90 tons per year. Is the proposed addition of 60 tons per year of particulate subject to PSD?

Answer:    No. Since the source will not be major after the change, the action is not subject to PSD.

Reference:    40 CFR 52.21 (b) (2) (i)

9.  6/15/81

Question:    An existing major source proposes to increase emissions by 45 tons per year of SO2 and 55 tons per year of NOx. Can the 50 ton exemption under 40 CPR 52.21 (i) (7) be used to exempt SO2 from ambient analysis, even though the

-5-

NOx increase is greater than 50 tons per year?  In other words, must each pollutant increase be less than 50 tons per year for any pollutant to qualify?

Answer:      The exemption would not apply.  Each pollutant increase must be less than 50 tons per year before the exemption applies for any pollutant.

Reference:   40 CFR 52.21 (i) (7)

10. 7/15/81

Question:    The PSD preamble gives the air quality de minimis level for NO2 as 14 ug/m3 24-hour average.  The regulations give it as 14 ug/m3 annual average.  Which is correct?

Answer:      When the regulation was published, it was meant to say 24-hour average.  Headquarters has recently decided to change it to an annual average, along with some other changes to the table.  Since the published version of the regulation already says annual, and since the value is now intended to be annual, Region IV will now allow the annual number to be used.  The other changes to the table will not be official until published.

Reference:   40 CFR 52.21 (i) (8) (i); 45 FR 52709

5118

# EXHIBIT M

# THE VIRGIN ISLANDS OF THE UNITED STATES

OFFICE OF THE GOVERNOR

GOVERNMENT HOUSE

Tel: (340) 773-1404
Fax: (340) 713-9806

1105 King Street
Christiansted, St. Croix, U.S.V.I. 00820

Tel: (340) 772-1000
Fax: (340) 772-0333

July 12, 2013

**VIA HAND DELIVERY**

Honorable Shawn-Michael Malone
President
30th Legislature
Capitol Building
St. Thomas, Virgin Islands  00802

**Re:     Transmittal of Legislation Ratifying the Fourth Amendment to the HOVENSA Concession Agreement**

Dear Mr. President:

Enclosed for consideration by the 30th Legislature is a bill ratifying the Fourth Amendment to the HOVENSA Concession Agreement (the "Fourth Amendment" or "Amendment"), which requires the owners of HOVENSA to initiate a bona fide process to sell the HOVENSA oil refinery—a process that I believe offers the best chance of identifying a new owner who will restart the refinery, and with it, the engines of job creation on St. Croix and economic growth in the Territory as a whole.  The Amendment sets forth the terms and conditions under which HOVENSA's owners must undertake a defined and arms-length process to sell the refinery and its related facilities to a willing operator.  I believe the Amendment provides a major opportunity for the Territory to heal its economic wounds and allow our people to move forward to a brighter future.  Upon full consideration by the Legislature, I strongly urge you and your distinguished colleagues to approve the bill and pass it into law.

The Fourth Amendment, which has been executed among the Government, HOVENSA, HOVIC and PDVSA VI, is the most recent proposed modification to the Concession Agreement originally ratified by this body on September 1, 1965, which authorized the construction of the refinery, and which (as amended from time to time) has governed the Territory's relationship with HOVENSA, its owners, and their predecessors for nearly 50 years.  That 1965 agreement, and the world-class refinery it brought to St. Croix, has produced economic benefits for the

Honorable Shawn-Michael Malone
Transmittal of Legislation Ratifying the Fourth Amendment to the
HOVENSA Concession Agreement
July 12, 2013
Page 2

Territory worth billions of dollars — in the form of well-paid, professional jobs and the substantial economic activity and tax revenue generated thereby.

In the past, the Government and the refinery's owners have come together to modify their agreement when economic circumstances required it, for the mutual benefit of all involved. This time, HOVENSA initially spurned that well-established, mutual process and sought to impose new terms on the Government unilaterally; but through patience and an unbending insistence on the Government's contractual rights and economic interests, we have brought HOVENSA back to the negotiating table and reached an agreement.

The driving purpose of the Fourth Amendment is to achieve the economic benefits of an operating refinery with a new owner and thereby renew the economic health of St. Croix and the rest of the Virgin Islands.

### BACKGROUND—ORIGINS OF THE FOURTH AMENDMENT AGREEMENT

As you and your colleagues know, the precipitating event for the proposed Amendment was the abrupt announcement on January 18, 2012, by HOVENSA and its owners, of the imminent termination of refining operations on St. Croix and the planned conversion of the facility into an oil storage terminal. That announcement was followed by the actual shutdown of the facility just three weeks later. The sudden loss of the Territory's largest employer, the bulk of its industrial sector, and thousands of jobs threw the Territory into crisis.

Navigating and emerging from that crisis has been my highest priority for the past 18 months. Almost immediately after announcing the refinery closure, HOVENSA unilaterally proposed a series of drastic modifications to the Concession Agreement—one-sided modifications designed to permit them to essentially mothball the refinery while allowing the company to operate an oil terminal business on just a portion of its facilities. HOVENSA's proposal to use the facility as a storage terminal would likely require fewer than 100 employees, whereas an operating refinery—even one of reduced scale and scope utilizing only the most efficient portions of the existing facility—would require far closer to 1,000 employees. Moreover, HOVENSA's proposal would also have relieved the company of many of its obligations under the Concession Agreement, while leaving the Government with no guarantee or expectation that the refinery would ever be restarted or put up for sale. In addition, HOVENSA demanded agreement to its terms and ratification by this body no later than April 30, 2012 — far too short a time for us to thoroughly assess the situation and make informed decisions about the best course of action for the Territory. In the fearful and uncertain atmosphere of those days, I faced enormous pressure to agree to HOVENSA's proposed terms, while our community remained troubled and concerned about its future.

To obtain the time necessary to safeguard the Territory's interests, I negotiated an interim agreement permitting HOVENSA to operate an oil storage terminal business on a temporary basis, in exchange for nine additional months of discounted fuel for the Virgin Islands Water and Power Authority ("WAPA") and an additional three months to consider and respond to

HOVENSA's proposed modifications to the Concession Agreement. By securing WAPA's fuel-oil supply for the remainder of 2012, we gave WAPA time to identify, negotiate and execute an agreement with a new supplier and solidify its path for a long-term solution to our energy costs. At the same time, the Government had given additional time to analyze our claims and assess our legal options. During this time, we retained experienced industry consultants at Duff & Phelps to assist in our analysis and to identify the "highest and best use" for the refinery site.

The Government used the additional time to its advantage. By August 2012, WAPA had identified and was negotiating a supply contract with a new fuel supplier, Trafigura, and had begun exploring a conversion to less-expensive liquefied propane gas ("LPG") or liquefied natural gas ("LNG") fuel that would greatly reduce the Territory's energy costs by the last quarter of 2014. The Attorney General, working with outside counsel, had thoroughly analyzed the Government's legal options. Most important, Duff & Phelps had completed its analysis and produced an exhaustive, detailed report concluding that only one activity at the HOVENSA site could create the level of economic activity and employment approaching that previously associated with the refinery: restarting and resuming refining operations.

If there is skepticism on this point, let me assure you: a reopened refinery is an attainable goal. It is true that HOVENSA has been losing money on its refining operations for several years. But as recently as 2008 it was extremely profitable. Duff & Phelps' analysis concluded that the refinery's current problems—most notably, its high energy costs—can be remedied, and that it can be profitable again in the hands of an owner committed to the refining business and willing to make reasonable capital investments consistent with that commitment.

HOVENSA is not such an owner. Not only did it shutter the St. Croix refinery last year, but one of its parent companies, Hess Corporation, has publicly announced its intention to exit the refinery business altogether, and the other, Venezuela's national oil company has indicated no interest in making new investments in the refinery. Although HOVENSA has not publicly admitted it, it seems all but certain that, under its current ownership, the St. Croix refinery will never reopen.

In short, during the window created by the interim agreement executed in the spring of 2012, the Government determined that the highest and best use of the refinery site is refining operations; that with some modifications and investments, the refinery can be restarted and returned to profitability; and that there is likely a viable market for the refinery. Accordingly, on August 6, 2012, I informed HOVENSA and the public of the Government's position: The company must either restart the refinery or sell it to someone who will. Implicit in that statement was another message: if HOVENSA did not take either of those actions, the Government would vigorously pursue all of its remedies under the law.

When HOVENSA responded, it made a substantial concession: it would agree to put the refinery up for sale, on the condition that the Government first enter into an amended concession agreement that — if the refinery did not sell — would permit HOVENSA to shed most of its obligations under the existing Concession Agreement and still operate its oil storage terminal

business on highly favorable terms. I refused: Any permanent modification of the Concession Agreement would reduce HOVENSA's incentives to sell the refinery and would simply transfer value from the Government to HOVENSA, which, if the refinery were ever sold, would use the more favorable terms to extract a higher price for the refinery. Accordingly, I continued to insist that any amendment to the Concession Agreement during the sales process be temporary.

The parties remained at impasse from mid-December 2012 to late January 2013. In my State of the Territory address, I reiterated that the Government would accept no long-term use for the HOVENSA facility other than oil refining, and that if HOVENSA were unable or unwilling to restart operations or sell the facility to a willing operator, the Government would require HOVENSA to take down the refinery and remediate the site. Shortly thereafter, with the end of the parties' interim agreement approaching at the end of February, HOVENSA reached out with a new offer that accepted the Government's last major condition — HOVENSA would agree to sell the refinery and would accept a temporary modification of the Concession Agreement to facilitate the sale.

The parties moved to detailed negotiations to flesh out the agreement. By late March 2013, those negotiations resulted in the Fourth Amendment Agreement now before you for consideration. Although unexpected events in Venezuela caused final execution of the Amendment by PDVSA to be delayed, all parties have now signed the agreement. The final step before HOVENSA can begin its sales process and move St. Croix toward a better, more prosperous future, is ratification by this Legislature.

### THE FOURTH AMENDMENT AGREEMENT—STRUCTURE

The basic structure of the Fourth Amendment is as follows: HOVENSA will undertake a bona fide sales process administered by a reputable and experienced investment banking firm. In exchange, the Government will *temporarily* permit HOVENSA to operate the refinery site as an oil storage terminal, on terms consistent with the smaller economic output of such an operation — including temporarily reduced payments in lieu of property tax ("PILOT"). If the refinery is sold to an acceptable buyer, who will want to negotiate a new agreement with the Government and which this body must also ratify, HOVENSA may be released from its obligations under the Concession Agreement, and HOVENSA will pay the Government a portion of the sales proceeds. If the refinery does not sell, HOVENSA will resume its obligations under the Concession Agreement and repay to the Government all deferred payments in lieu of property tax.

The agreement is structured to give HOVENSA powerful incentives to sell. The sales process will commence upon ratification of the Fourth Amendment Agreement and terminate no later than August 15, 2014 — ample time, according to our industry experts, for a thorough process, but not enough to give HOVENSA any time, or incentive, to delay. And at the end of the sales process period, if the refinery is not sold, HOVENSA will face four unpalatable consequences. First, most of its obligations under the Concession Agreement will resume— including the obligation to bid to supply WAPA with heavily discounted fuel oil. Second, it will

be forced to repay any PILOT payments deferred during the agreement.  Third, although HOVENSA will be permitted to continue storing oil pursuant to contracts entered into during the sales process, it will no longer be permitted to enter into new storage contracts, meaning that it can no longer contract with new customers or expand its terminal business.  And fourth, the Government will retain all of its legal rights under the existing Concession Agreement, including the right to assert breach-of-contract claims for the periods before and after the end of the sales process.

In short, if HOVENSA fails to sell the refinery, it faces the prospect of resumed Concession Agreement obligations, a substantial repayment of deferred taxes, a limited revenue-producing oil terminal, and a lawsuit.  These facts strongly suggest that HOVENSA will make every conceivable effort to finalize a sale within the allotted time.  That — in addition to information the Government has received from its consultants, from third parties, and from HOVENSA itself suggesting that there will be an active market for the refinery — creates a high likelihood that by the fall of 2014, the refinery will be in the hands of a new operator, and the Territorial economy will have begun its recovery.  That has been my goal from the beginning of the HOVENSA crisis, and I believe the attached Amendment offers the best opportunity to reach that goal, for the benefit of the entire Territory and our people.

## THE FOURTH AMENDMENT AGREEMENT — SPECIFIC CONCERNS

I would also take this opportunity to address some concerns about particular aspects of the Fourth Amendment Agreement.

### Deferred property-tax payments will be minimal, and will likely be recouped.

Several Senators have expressed concerns with the Amendment's partial deferral of HOVENSA's payments in lieu of property tax.  Under the Concession Agreement, current PILOT payments are set at $14 million per year.  Under the Fourth Amendment, they will be temporarily reduced to $7 million per year beginning on October 1, 2013 and extending through 2019, or for so long as HOVENSA operates an oil storage terminal.  The deferred amount may be as little as $7 million (if the refinery is sold as planned in 2014) but no more than $42 million (if the refinery is not sold and HOVENSA continues to operate its storage terminal for the full period allowed by the Agreement).

But the Amendment is structured so the Government is almost certain to be made whole for all of those amounts.

- If the refinery is not sold, the Government will recoup *every dollar* of foregone revenue, plus interest.

- If the refinery is sold during the sales process period, the foregone revenue cannot exceed $7 million—a very small price to pay for a restarted refinery, which will contribute hundreds of millions of dollars to the Territorial economy.

And in any event, even that $7 million will almost certainly be recouped from the Government's share of the sales proceeds, as explained below.

### The Government's share of the refinery sales proceeds should greatly exceed any foregone tax revenue.

Upon sale of the refinery, the Government will receive 20% of the sales proceeds, capped at $50 million. This means that even if the refinery's sales price is just $35 million (at the very low end of its estimated value), the Government's share will fully offset the $7 million in foregone PILOT.

By contrast, if the refinery sells for the mid-range estimate of its value—$250 million—the Government would not only recoup the $7 million in foregone PILOT, but would receive an additional $43 million. That $43 million would be *in addition to* the economic benefits that would flow from a restarted refinery.

### Forbearance from collecting import/export duties on stored fuels will result in no loss of revenue.

The Government's other obligation under the Amendment is its promise to forbear from collecting import duties on petroleum shipments to and from HOVENSA's (temporary) oil storage terminal. The Government has been advised by its industry consultants that its forbearance on import duties is necessary for any import/export activity to occur at all especially given the number of more established participants in this niche within the Caribbean region. If the Government charged the 6% duty on shipments to and from HOVENSA's storage terminal, the additional cost would make the terminal non-competitive with Gulf Coast and other Caribbean terminal operators. For that reason, the Government's forbearance will not result in any lost revenues: to the contrary, by permitting the terminal to operate on competitive terms, the Government's forbearance ensures that the terminal will continue to operate at some commercial level, ensuring a level of employment through this transition period to a more permanent economic activity, as well as allowing the company to continue to provide needed storage to supply the community's fuel needs.

### The Fourth Amendment does not alter HOVENSA's environmental obligations.

Nothing in the Amendment alters HOVENSA's obligations under the Clean Air Consent Decree and federal and Territorial environmental laws and regulations. In fact, the Amendment specifically requires that HOVENSA comply with all applicable environmental laws and regulations, consent decrees, and orders.

**Honorable Shawn-Michael Malone**
**Transmittal of Legislation Ratifying the Fourth Amendment to the**
**HOVENSA Concession Agreement**
**July 12, 2013**
**Page 7**

**The Fourth Amendment does not prevent the Government from bringing its breach-of-contract claims in the event the refinery does not sell.**

Finally, it is important to emphasize that absolutely nothing in the Amendment absolves HOVENSA for any breaches of the Concession Agreement that occurred prior to the execution of the Amendment or after the sales process period ends. To the extent HOVENSA has breached its obligation to (for example) bid to supply fuel to WAPA at discounted prices through 2022, nothing in the Amendment affects the Government's right to seek damages for that breach (and all other breaches) for all contract years following the end of the sales process. If the refinery does not sell, all of the Government's legal options remain on the table.

<p align="center">*    *    *</p>

In short, it is my view that ratification of the Fourth Amendment Agreement is critical to the economic well-being of the Territory and strongly in the public interest. We cannot afford to have 2,000 acres of a rusting metal façade sitting idle in the middle of St Croix providing neither jobs nor economic activity necessary for our well-being. This is not the original course that HOVENSA and its owners wanted, but it is the best course for the long term interest of our community: we allow a company to exit that no longer wants to be here, we explore the preferred alternatives, and then we negotiate a new agreement with new terms and conditions that are best for our Territory.

I hope that you will join me in ushering a new era of industry, employment, and economic success on the south shore of St. Croix that will be beneficial to the entire Virgin Islands. I look forward to working with you to make that happen.

Sincerely,

John P. de Jongh, Jr.
Governor

Enclosures

pc:    Hon. Vincent F. Frazer, Esq., Attorney General, Department of Justice

**BILL NO. 30-** _____

## THIRTIETH LEGISLATURE OF THE UNITED STATES VIRGIN ISLANDS

### REGULAR SESSION

### 2013

To ratify the "Fourth Amendment Agreement" between the Government of the Virgin Islands, HOVENSA, LLC, Hess Oil Virgin Islands Corporation and PDVSA, V.I., Inc. and for other related purposes.

## PROPOSED BY THE GOVERNOR

WHEREAS, the Government of the Virgin Islands ("Government"), HOVENSA, LLC, ("HOVENSA"), Hess Oil Virgin Islands Corporation ("HOVIC") and PDVSA, V.I., Inc. ("PDVSA VI") are parties to a Concession Agreement relating to the construction and operation of the Oil Refinery and Related Facilities in St. Croix, U.S. Virgin Islands, approved by the Legislature of the U.S. Virgin Islands (the "Legislature") on September 1, 1965 and subsequently amended, supplemented and clarified at various times, most recently on April 15, 1998, by mutual agreement of the parties (the "Concession Agreement"); and

WHEREAS, pursuant to the Third Amendment and Extension Agreement dated April 15, 1998 (the "Third Extension Agreement"), the Concession Agreement's effective period currently runs through the year 2022; and

WHEREAS, on January 18, 2012, HOVENSA announced its intention to cease refining operations at the Oil Refinery and Related Facilities, and ceased such operations on or about February 16, 2012; and

WHEREAS, HOVENSA desires to convert the Oil Refinery and Related Facilities to an oil storage terminal operation; and

WHEREAS, the Concession Agreement obligates HOVENSA to continue refinery operations at the Oil Refinery and Related Facilities through the end of the effective period, and does not permit HOVENSA to operate a stand-alone oil storage terminal business; and

WHEREAS, while the Government acknowledges that HOVENSA has reported significant operating losses in recent years, the Government strongly believes that the economic well-being of the United States Virgin Islands depends upon the operation of an oil refinery at the Oil Refinery and Related Facilities; and

[1]

APPX-296

WHEREAS, the Government, in consultation with industry experts, has determined that refining operations remain the highest and best use of the refinery site, and that no other commercial activity could generate economic benefits comparable to those generated by an operating refinery; and

WHEREAS, the Government believes that the economic well-being of the U.S. Virgin Islands depends on the resumption of refining operations at the Oil Refinery and Related Facilities, and

WHEREAS, the  Government prefers that the Oil Refinery and Related Facilities be sold to a new owner who will resume refining operations; and

WHEREAS, in the interest of reaching a mutually acceptable resolution, the parties entered into an interim agreement on or around April 3, 2013 (the "Interim Agreement") providing that in exchange for the agreement by HOVENSA's owners to undertake a bona fide sales process (the "Sales Process") to sell the Oil Refinery and Related Facilities to a third party buyer on an arm's length basis and for other consideration given, the Government would, among other consideration, forbear for a limited period of time from collecting certain import duties and other taxes on shipments of petroleum products into the Oil Refinery and Related Facilities; and

WHEREAS, it is the Government's position that the Interim Agreement offers the best opportunity to achieve a sale of, and the re-start of refining operations at, the Oil Refinery and Related Facilities, and thus is in the public interest.

NOW, THEREFORE, *Be it enacted by the Legislature of the Virgin Islands:*

**SECTION 1.** The Interim Agreement, dated April 3, 2013, entitled "The Fourth Amendment Agreement" between the Government of the Virgin Islands (the "Government"), HOVENSA, LLC ("HOVENSA"), Hess Oil Virgin Islands Corporation ("HOVIC") and PDVSA, V.I., Inc. ("PDVSA VI"), having been executed by the Governor of the United States Virgin Islands, the General Manager for HOVENSA, the Vice President of HOVIC, and the President of PDVSA VI, respectively, is hereby ratified, and a copy thereof is appended hereto as Appendix I and made a part hereof.

FOURTH AMENDMENT AGREEMENT

April 3, 2013

AGREEMENT

THIS FOURTH AMENDMENT AGREEMENT, herein called the "Fourth Amendment Agreement", is hereby entered between the GOVERNMENT OF THE VIRGIN ISLANDS (the "Government"), HOVENSA, LLC ("HOVENSA"), a limited liability company existing under the laws of the U.S. Virgin Islands, HESS OIL VIRGIN ISLANDS CORP. ("HOVIC"), and PDVSA V.I., INC ("PDVSA VI"), corporations existing under the laws of the U.S. Virgin Islands and the sole members of HOVENSA

**WITNESSETH:**

WHEREAS, the Government, HOVENSA, HOVIC, and PDVSA VI are parties to a Concession Agreement relating to the construction and operation of the Oil Refinery and Related Facilities in St. Croix, U.S. Virgin Islands, approved by the Legislature of the U.S. Virgin Islands (the "Legislature") on September 1, 1965 and subsequently amended, supplemented and clarified at various times, most recently on April 15, 1998, by mutual agreement of the parties (the "Concession Agreement"); and

WHEREAS, pursuant to the Third Amendment and Extension Agreement dated April 15, 1998 (the "Third Extension Agreement"), the Concession Agreement's effective period currently runs through the year 2022; and

WHEREAS, on January 18, 2012, HOVENSA announced its intention to cease refining operations at the Oil Refinery and Related Facilities, and ceased such operations on or about February 16, 2012; and

WHEREAS, HOVENSA desires to convert the Oil Refinery and Related Facilities to an oil storage terminal operation; and

WHEREAS, the Government believes that the economic well-being of the U.S. Virgin Islands depends on continued refining operations at the Oil Refinery and Related Facilities and prefers that said facilities be sold to a new owner who will resume refining operations; and

WHEREAS, in the interest of reaching a mutually acceptable resolution of the situation, the parties entered into an interim agreement (the "Interim Agreement") providing that in exchange for consideration given, the Government would, among other consideration, forbear from collecting certain import duties and other taxes on shipments of petroleum products into the Oil Refinery and Related Facilities.

NOW, THEREFORE, the Government, HOVENSA, HOVIC and PDVSA VI hereby agree to enter into this Fourth Amendment Agreement, which temporarily suspends certain of the parties' contractual obligations under the Concession Agreement to facilitate a sale of the Oil Refinery and Related Facilities, on the following terms.

1



1.     **Effective Date; Effect on Existing Obligations**

a.     This Fourth Amendment Agreement shall take effect upon execution by all parties hereto and ratification by the Legislature (the "Effective Date"), and shall expire, except as provided herein, on August 15, 2014. The period between the Effective Date and the August 15, 2014 expiration date, which period may be extended by agreement of the parties in writing, is hereinafter referred to as the "Sales Process Period."

b.     The Governor shall use his best efforts to secure ratification by the Legislature. If this Fourth Amendment Agreement is not ratified by the Legislature by August 15, 2013, the Interim Agreement shall expire and the Concession Agreement shall remain in full force and effect.

c.     Prior to, during, and following the Sales Process Period, all the parties' existing rights, exemptions and obligations under the Concession Agreement shall remain in full force and effect, except as otherwise provided herein.

2.     **Sales Process**

During the Sales Process Period, HOVIC and PDVSA VI shall undertake a *bona fide* process to facilitate a sale, directly or indirectly, of the Refinery and Related Facilities on an arm's-length basis (the "Sales Process"). The Sales Process shall proceed on the following terms.

a.     Not later than 10 days following the Effective Date, HOVENSA shall retain a reputable investment bank experienced in the sale of oil and gas assets to conduct a *bona fide* Sales Process.

b.     Prior to commencement of the Sales Process, HOVENSA shall arrange for the retained investment bank to brief the Governor of the U.S. Virgin Islands and his advisers, Duff & Phelps LLC ("D&P"), and explain the strategy and mechanics of the Sales Process and respond to questions posed by the Governor and D&P. Thereafter, the retained investment bank shall provide status briefings to D&P on a monthly basis, and on the occurrence of any event material (in the reasonable judgment of the retained investment bank) to the Sales Process.

c.     Prior to issuance, all offering memoranda and/or teasers prepared by the investment bank or HOVENSA shall be provided to the Governor and D&P for review and comment, which comments shall be provided within three (3) business days of receipt of the memoranda and/or teasers.

d.     Within fifteen (15) days following the initial briefing described in subsection 2(b) above, the Government shall provide guidance in writing to the investment bank regarding possible modifications of, or alternative approaches to, the existing Concession Agreement or replacement concession agreement that may be available to a purchaser of the Oil Refinery and Related Facilities. It is understood that any modification of, or alternative approach to, the existing Concession Agreement for the benefit of a purchaser would be subject to approval by the Legislature.

2



3.    **Government Obligations**

The Government's rights and obligations under this Fourth Amendment Agreement shall be the same as *its rights and obligations under the Concession Agreement*, except that:

a.    During the Sales Process Period, the Government will suspend HOVENSA's obligation under Section 3 of the Third Extension Agreement to bid annually to supply the fuel needs of the Virgin Islands Water and Power Authority ("VIWAPA");

b.    The Government shall reduce HOVENSA's obligation under Section 7 of the Third Extension Agreement to make payments in lieu of property taxes, as follows:

(i)    HOVENSA shall pay $7 million annually for the fiscal year beginning October 1, 2013, and thereafter through the fiscal year ending September 30, 2019, for so long as HOVENSA is operating an oil storage terminal at the Oil Refinery and Related Facilities or until the Oil Refinery and Related Facilities are sold.

(ii)    If the Refinery and Related Facilities are not sold during the Sales Process Period, at such time as HOVENSA ceases to operate an oil storage terminal at the Oil Refinery and Related Facilities or on August 15, 2019, whichever is earlier, HOVENSA shall make a lump sum payment to the Government of such amount as is necessary for the Government to recoup the value of all payments foregone under Section 3(b)(i).

c.    The Government shall forbear from the collection of import duties and other taxes on all oil storage contracts that (1) are entered into prior to or during the Sales Process Period, and (2) expire not later than the earlier of (i) five years following the effective date of such contracts, or (ii) August 15, 2019.

4.    **HOVENSA Obligations**

a.    **Continuing and Modified Obligations.**  HOVENSA's rights and obligations under this Fourth Amendment Agreement shall be the same as *its rights and obligations under the Concession Agreement*, except as provided herein.  Those obligations include (but are not limited to):

(i)    Making available storage for sufficient fuels to meet the local needs of St. Croix through August 15, 2019, so long as HOVENSA is operating an oil storage terminal on St. Croix;

(ii)    Making fuels available to the Government and the public at the HOVENSA loading rack through March 31, 2014, after which date HOVENSA will assist the Government in securing responsible third-party suppliers and operators;

(iii)    Making annual payments in lieu of property taxes in the amounts set forth above;

3



    (iv)    Paying all other applicable taxes, fees, and lease payments (including but not limited to the submerged lands lease and permits and Coastal Zone Management permits) at existing rates through August 15, 2019; and

    (v)    Complying with all applicable environmental laws, regulations, consent decrees (except to the extent hereafter amended), and orders.

b.    **New Obligations.**

    (i)    Upon consummation of a sale of the Oil Refinery and Related Facilities, HOVENSA shall make a lump sum payment to the Government equal to the lesser of (1) 20% of the gross sale proceeds and (2) $50 million.

    (ii)    During the Sales Process Period, and for any period during which HOVENSA operates an oil storage terminal at the Oil Refinery and Related Facilities, HOVENSA shall:

        (A)    On an annual basis, and subject to the execution of an appropriate non-disclosure agreement, submit to the Office of the Governor a list of client names, contract end dates, and types of petroleum products stored for all contracts longer than two years in duration for storage at the Oil Refinery and Related Facilities;

        (B)    Invest a minimum of $500,000 annually in scholarships and/or career and technical education programs for United States Virgin Islands residents, and

Provide, on an as-is basis, the University of the Virgin Islands ("UVI") with access to the specialized classrooms, laboratories, and equipment at the HOVENSA Training School for use in UVI training programs. UVI will indemnify HOVENSA for any liabilities incurred because of its use of these facilities, and will reimburse HOVENSA for direct costs associated with UVI's use of those facilities.

5.    **Termination and Discharge Upon Sale**

Upon completion of any arm's-length sale of the Oil Refinery and Related Facilities the rights and obligations of HOVENSA, HOVIC and PDVSA VI under the Concession Agreement shall be terminated and each of said parties released and discharged of such rights and obligations thereunder except as otherwise required by law.



AGREED on as of the Third Day of April, 2013.

GOVERNMENT OF THE U.S. VIRGIN ISLANDS

By:_____

John P. de Jongh, Jr.
Governor

APPROVED FOR LEGAL SUFFICIENCY:

By:_____

Vincent F. Frazer
Attorney General

5

AGREED on as of the Third Day of April, 2013.

HESS OIL VIRGIN ISLANDS CORP.

By:_____

Larry Ornstein
Vice President

PDVSA, VI, Inc.

By:_____

Jesus E. Luongo
President

HOVENSA, LLC

By:_____

Sloan Schoyer
General Manager

6



AGREED on as of the Third Day of April, 2013.

HESS OIL VIRGIN ISLANDS CORP.

By:_____
    Larry Ornstein
    Vice President

PDVSA, VI. Inc.

By:_____ 
    Jesus E. Luongo
    President

HOVENSA, LLC

By:_____
    Sloan Schoyer
    General Manager

6



AGREED on as of the Third Day of April, 2013.

HESS OIL VIRGIN ISLANDS CORP.

By: _____

    Larry Ornstein
    Vice President

PDVSA, VI, Inc.

By: _____

    Jesus E. Luongo
    President

HOVENSA, LLC

By: _____ 

    Sloan Schoyer
    General Manager

6

DC 22n683 13

# HOVENSA
## Fourth Amendment Agreement—Annotated
### Dated: April 3, 2013

| Provision | Text | Explanation |
|---|---|---|
| Section 1: Effective Date; Effect on Existing Obligations | | |
| 1.a | This Fourth Amendment Agreement shall take effect upon execution by all parties hereto and ratification by the Legislature (the "Effective Date"), and shall expire, except as provided herein, on August 15, 2014. The period between the Effective Date and the August 15, 2014 expiration date, which period may be extended by agreement of the parties in writing, is hereinafter known as the "Sales Process Period". | Limiting the sales process to approximately one year should be sufficient to substantially complete a thorough sales process. HOVENSA wanted a longer period, which would have reduced their incentive to move quickly to find a buyer. The end of the Sales Process Period also marks the end of the period during which important HOVENSA obligations (especially the WAPA subsidy) are deferred. |
| 1.b | The Governor shall use his best efforts to secure ratification by the Legislature. If this Fourth Amendment Agreement is not ratified by the Legislature by August 15, 2013, the Interim Agreement shall expire and the Concession Agreement shall remain in full force and effect. | The August 15 date is designed to ensure both that the Legislature has sufficient time to consider and debate the new Agreement, and that the sales process will be launched as soon as possible, thus formally triggering the Sales Process Period and HOVENSA's obligations thereunder. |
| 1.c | Prior to, during, and following the Sales Process Period, all the parties' existing rights, exemptions and obligations under the Concession Agreement shall remain in full force and effect, except as otherwise provided herein. | This is an extremely important provision, making clear that this Agreement does not relieve HOVENSA of any obligations except those specifically described in the Agreement. |

APPX-306

| Provision | Text | Explanation |
|---|---|---|
| Section 2: Sales Process | | |
| 2 (preamble) | During the Sales Process Period, HOVIC and PDVSA VI shall undertake a *bona fide* process to facilitate a sale, directly or indirectly, of the Refinery and Related Facilities on an arm's-length basis (the "Sales Process"). The Sales Process shall proceed on the following terms: | The sales process is the Government's best chance to keep an operating and profitable refinery on St. Croix, with the enormous financial benefits it brings — a new corporate entity, large-scale employment, and tax revenues. The Government's insistence that the sale be both "bona fide" and "arm's length" protects the Government from any kind of self-dealing by HOVENSA and its owners. The Sales Process will be administered by a reputable investment bank, not by HOVENSA or its owners themselves. The investment bank will be incentivized to perform a robust process to contact all potential buyers in order to achieve a successful sale. *See* Section 2.a. Additionally, periodic reports will be provided to the Governor and to the Government's industry experts. |
| 2.a | Not later than 10 days following the Effective Date, HOVENSA shall retain a reputable investment bank experienced in the sale of oil and gas assets to conduct a *bona fide* Sales Process. | The 10-day time limit ensures that the Sales Process will begin quickly following ratification, because once the investment bank is engaged, HOVENSA and its owners will be paying for its services. |
| 2.b | Prior to commencement of the Sales Process, HOVENSA shall arrange for the retained investment bank to brief the Governor of the U.S. Virgin Islands and his advisers, Duff & Phelps LLC ("D&P"), and explain the strategy and mechanics of the Sales Process and respond to questions posed by the Governor and D&P. Thereafter, the retained investment bank shall provide status briefings to D&P on a monthly basis, and on the occurrence of any event material (in the reasonable judgment of | This information-sharing provision ensures that the Government is fully engaged in the Sales Process, significant bids, and any other events that are material to the sale of the Refinery, particularly because renegotiation of the Concession Agreement may be an integral part of the sales process. |

APPX-307

| Provision | Text | Explanation |
|---|---|---|
| | the retained investment bank) to the Sales Process. | |
| 2.c | Prior to issuance, all offering memoranda and/or teasers prepared by the investment bank or HOVENSA shall be provided to the Governor and D&P for review and comment, which comments shall be provided within three (3) business days of receipt of the memoranda and/or teasers. | This information-sharing provision ensures that the sales materials used by HOVENSA and its bankers provide an accurate portrayal of the Refinery and Related Facilities, the terms of the existing Concession Agreement, and the benefits of doing business in the U.S. Virgin Islands. |
| 2.d | Within fifteen (15) days following the initial briefing described in subsection 2.b above, the Government shall provide guidance in writing to the investment bank regarding possible modifications of, or alternative approaches to, the existing Concession Agreement or replacement concession agreement that may be available to a purchaser of the Oil Refinery and Related Facilities. It is understood that any modification of, or alternative approach to, the existing Concession Agreement for the benefit of a purchaser would be subject to approval by the Legislature. | The Government will provide guidance to prospective buyers about how a new Concession Agreement might work, so that buyers can prepare bids that realistically account for the terms on which the refinery will ultimately operate. The Government successfully resisted HOVENSA's strenuous effort to get the Government to agree to specific terms of an actual new Concession Agreement in advance — an event that would have effectively transferred value from the Government to the owners of HOVENSA in the form of higher bids. In its current form, this provision commits the Government to nothing, permitting it to negotiate with a purchaser on a clean slate. The provision also emphasizes the importance, and necessity, of the Legislature's approval of any agreement(s) ultimately negotiated with such a purchaser. |

APPX-308

| Provision | Text | Explanation |
|---|---|---|
| Section 3: | Government Obligations | |
| 3 (preamble) | The Government's rights and obligations under this Fourth Amendment Agreement shall be the same as its rights and obligations under the Concession Agreement, except that: | This preamble reiterates what § 1(c) already makes clear: that HOVENSA will be held to all its existing obligations unless those obligations are specifically deferred or relieved in this Agreement. |
| 3.a | During the Sales Process Period, the Government will suspend HOVENSA's obligation to bid under Section 3 of the Third Extension Agreement to bid annually to supply the fuel needs of the Virgin Islands Water and Power Authority ("VIWAPA"); | HOVENSA originally demanded a complete release from any obligation to bid on WAPA's fuel oil needs, arguing that the revenues from its planned terminal operation would never be sufficient to support such a subsidy. This compromise limits the suspension of the obligation to just the Sales Process Period. The Government views this as acceptable, in light of the fact that (1) WAPA now has an arrangement in place that ensures continuing access to a fuel supply: (2) the supply contract for 2013 has already been awarded to another provider; (3) WAPA is moving quickly toward conversion to much less expensive LPG fuel, which WAPA maintains will substantially lower utility prices in the Territory. Moreover, the value generated by an operating refinery will vastly exceed any value foregone by suspending this obligation during the Sales Process Period. The value deferred should also be recouped in the event of a successful sale. *See* Section 4.b.(i). |

APPX-309

| Provision | Text | Explanation |
|---|---|---|
| 3.b (preamble) | The Government shall reduce HOVENSA's obligation under Section 7 of the Third Extension Agreement to make payments in lieu of property taxes, as follows: | Deferral of HOVENSA's payments in lieu of property tax ("PILOT") is a major part of the business deal reflected in the Agreement and was critical to getting HOVENSA's owners to agree to the sales process. The most important part of this provision is HOVENSA's obligation to *pay back* all of the deferred amounts if the refinery does not sell, and to pay the Government up to $50 million out of gross proceeds if it does sell. *See* Sections 3.b.(ii) and 4.b.(i). |
| 3.b.(i) | HOVENSA shall pay $7 million annually for the fiscal year beginning October 1, 2013, and thereafter through the fiscal year ending September 30, 2019, for so long as HOVENSA is operating an oil storage terminal at the Oil Refinery and Related Facilities or until the Oil Refinery and Related Facilities are sold. | HOVENSA will continue to pay $14 million in annual PILOT payments through the end of FY 2013. Thereafter, the annual PILOT payment is reduced to $7 million (1) until the Refinery is sold, at which time a new concession agreement will likely be negotiated with the purchaser, or (2) until the Refinery ceases to operate as an oil terminal. This deferral of PILOT payments permits HOVENSA to reduce its losses during the period in which it operates a terminal. As explained below, if the Refinery does not sell, HOVENSA is obligated to pay the Government 100% of the deferred amounts. |

APPX-310

| Provision | Text | Explanation |
|---|---|---|
| 3.b.(ii) | If the Refinery and Related Facilities are not sold during the Sales Process Period, at such time as HOVENSA ceases to operate an oil storage terminal at the Oil Refinery and Related Facilities or on August 15, 2019, whichever is earlier, HOVENSA shall make a lump sum payment to the Government of such amount as is necessary for the Government to recoup the value of all payments foregone under Section 3.b.(i). | This provision ensures that if the Refinery does not sell, the Government will get back 100% of the amounts deferred, and that the deferral does not reduce the magnitude of the Government's claims against HOVENSA. Note that because the provision guarantees recoupment of "the value of all payments foregone," it should be interpreted to require HOVENSA to pay interest on the deferred amounts. |
| 3.c | The Government shall forbear from the collection of import duties and other taxes on all oil storage contracts that (1) are entered into prior to or during the Sales Process Period, and (2) expire not later than the earlier of (i) five years following the effective date of such contracts, or (ii) August 15, 2019. | This provision permits HOVENSA to operate an oil storage terminal business during the Sales Process Period, and, for contracts entered into during the Sales Process Period, for up to 5 years thereafter. Without this forbearance, it would not be possible to operate the terminal as customers would elect to operate the terminal as customers would elect storage at one of the other Caribbean storage options where such forbearance is standard. This provision is in the Government's interest for several reasons: (1) without it, there would likely be no economic activity or employment at the HOVENSA site; (2) no storage of fuel for local use would be available from the site; and (3) the economic value of HOVENSA to potential buyers would be less (resulting in lower sales proceeds shared by the Government and increasing the risk of an unsuccessful sales process). |

APPX-311

| Provision | Text | Explanation |
|---|---|---|
| Section 4: HOVENSA Obligations | | |
| 4.a | **Continuing and Modified Obligations.** HOVENSA's rights and obligations under this Fourth Amendment Agreement shall be the same as its rights and obligations under the Concession Agreement, except as provided herein. Those obligations include (but are not limited to): | This provision again confirms that HOVENSA's obligations under the Concession Agreement remain in effect, except as specifically provided in the Agreement. |
| 4.a.(i) | Making available storage for sufficient fuels to meet the local needs of St. Croix through August 15, 2019, so long as HOVENSA is operating an oil storage terminal on St. Croix; | This simply reiterates an obligation that already exists, and that HOVENSA has every reason to comply with anyway: "making available storage" is precisely what its oil storage terminal does. |
| 4.a.(ii) | Making fuels available to the Government and the public at the HOVENSA loading rack through March 31, 2014, after which date HOVENSA will assist the Government in securing responsible third-party suppliers and operators; | This, again, reiterates an existing obligation, modifying it slightly to permit HOVENSA to contract out the operation of the rack. |
| 4.a.(iii) | Making annual payments in lieu of property taxes in the amounts set forth above; | This merely cross-references Section 3(b). |
| 4.a.(iv) | Paying all other applicable taxes, fees, and lease payments (including but not limited to the submerged lands lease and permits and Coastal Zone Management permits) at existing rates through August 15, 2019; and | This reiterates existing obligations. |
| 4.a.(v) | Complying with all applicable environmental laws, regulations, consent decrees (except to the extent hereafter amended), and orders. | This reiterates existing obligations. |
| 4.b.(i) | **New Obligations.** Upon consummation of a sale of the Oil Refinery and Related Facilities, HOVENSA shall make a lump sum payment to the Government equal to the lesser of (1) 20% | This provision gives the Government "upside" from the sale of the Refinery, and recoups some or all of deferred payments in lieu of property tax and |

| Provision | Text | Explanation |
|---|---|---|
| | of the gross sale proceeds and (2) $50 million; | WAPA subsidies, up to $50 million. |
| | | Although it is possible that the Government's share of the sale price will be less than $50 million, a successful sale will bring economic benefits to the Territory vastly in excess of that amount. |
| 4.b.(ii) | During the Sales Process Period, and for any period during which HOVENSA operates an oil storage terminal at the Oil Refinery and Related Facilities, HOVENSA shall: | |
| | (A) On an annual basis, and subject to the execution of an appropriate non-disclosure agreement, submit to the Office of the Governor a list of client names, contract end dates, and types of petroleum products stored for all contracts longer than two years in duration for storage at the Oil Refinery and Related Facilities; | Subpart (A) ensures that the Government will have sufficient information (in addition to that which is already available from the Customs Service) to monitor HOVENSA's compliance with the terms of the agreement. |
| | (B) Invest a minimum of $500,000 annually in scholarships and/or career and technical education programs. for United States Virgin Islands residents; and | Subpart (B) continues HOVENSA's longstanding commitment to providing scholarships for USVI residents, and modifies it to include career and technical education programs. |
| | [(C)][1] Provide, on an as-is basis, the University of the Virgin Islands ("UVI") with access to the specialized classrooms, laboratories, and equipment at the HOVENSA Training School for | The final subpart (which should be designated subpart (C)) satisfies the UVI's request that it be given access to HOVENSA's training facilities. The indemnity and costs provisions were necessary to allay HOVENSA's concerns over potential liability for accidents or other injuries that might occur during UVI's use. |

[1] This provision is supposed to be subsection (C); a formatting error led to its inclusion as it appears here.

APPX-313

| Provision | Text | Explanation |
|---|---|---|
| | use in UVI training programs. UVI will indemnify HOVENSA for any liabilities incurred because of its use of these facilities, and will reimburse HOVENSA for direct costs associated with UVI's use of those facilities. | |
| Section 5: Termination and Discharge Upon Sale | | |
| | Upon completion of any arm's-length sale of the Oil Refinery and Related Facilities the rights and obligations of HOVENSA, HOVIC and PDVSA VI under the Concession Agreement shall be terminated and each of said parties released and discharged of such rights and obligations thereunder except as otherwise required by law. | This simply confirms that a sale of the Refinery terminates the Concession Agreement and both parties' obligations under it. The Government will negotiate a new concession agreement with the new owner, in which it may ask for concessions and benefits of similar or greater value to those provided under the old agreement. |

APPX-314

# UNITED STATES COURT OF APPEALS

## FOR THE THIRD CIRCUIT

| | |
|---|---|
| PORT HAMILTON REFINING AND TRANSPORTATION, LLLP<br><br>    Petitioner<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY<br><br>    Respondent | Case No.: 23-1094 |

## DECLARATION OF EDUARDO G. DEL VALLE

I, Eduardo G. Del Valle, hereby declare as follows:

1.     I am over 18 years of age, of sound mind, and competent to make this Declaration. I have personal knowledge of the facts set forth in this declaration. I am making this Declaration in Miami, Florida and affirm, subject to the penalties of perjury, that the statements in this Declaration are true and correct.

2.     I am a chemical engineer by training with an expertise in refining processes. For many years I served as the head of refining economics in Aruba where I analyzed the economics for the Aruban and Venezuelan refineries.

3.     I am intimately familiar with the refinery on St. Croix and after Limetree Bay Refining, LLC declared bankruptcy in 2021, I performed much of the due diligence relating to the ability of the refinery to be restarted and recognized that the refinery could be restarted in a

"topping mode" that would allow it to operate profitably without requiring any new permits from the U.S. Environmental Protection Agency ("EPA").

4.    I am an investor in Port Hamilton Refining and Transportation, LLLP's ("Port Hamilton") and serve as a consultant to Port Hamilton on refinery operations and economics. Prior to Port Hamilton being formed, I advised its principals about the St. Croix refinery and the economic and operational conditions that made the purchase of the refinery a good investment opportunity.

5.    I specifically advised the principals of what became Port Hamilton Refining and Transportation, LLLP that the refinery could recommence operations in topping mode and that it would not require new permits from EPA.

6.    I based my conclusions that the refinery could recommence operations in topping mode on the due diligence I performed and my extensive knowledge of refinery operations. My due diligence included reviewing, and relying upon, the following:

    a.    On April 5, 2018, the U.S. Environmental Protection Agency ("EPA") issued a determination to Limetree Bay Terminals ("Previous Owner") (Record, B-02) stating that the St. Croix refinery could be restarted without obtaining a preconstruction permit under the Prevention of Significant Deterioration ("PSD") program under the Clean Air Act (the "2018 Determination").

    b.    The First Modification to a consent decree (Record, I-14) between Limetree Bay Refining, LLC and EPA (and others) that was agreed to in August 2020. The First Modification to the consent decree stated in the third whereas clause that Hovensa, LLC had idled the refinery in 2012. The seventeenth whereas clause confirmed that neither Hovensa nor Limetree Bay Refining had shut down the refinery.

2

APPX-316

c. EPA issued Emergency Order CAA-02-2021-1003a (known as a "303 Order") issued by EPA on May 14, 2021. This order required the refinery to temporarily shut down. That order specifically acknowledged that the refinery had announced on February 21, 2021 that it had "successfully resumed operations and begun production and commercial sales of refined products." Despite knowing that the refinery had resumed operations, the EPA did not take issue with the fact that it had done so without first obtaining a PSD permit. Further, the 303 Order specifically anticipated the possibility that the refinery would recommence operations before the order expired, if "based on the auditor reports and Respondents' implementation plan, EPA determines, in consultation with VIDPNR, that operations can resume before the expiration of the Order."

d. The July 12, 2021 joint stipulation between Previous Owner and EPA. The joint stipulation set forth specific requirements that the Previous Owner had to meet in order to recommence refining operations. The joint stipulation did *not* require LBR to obtain a PSD permit to recommence operations. Moreover, the Joint Stipulation specifically included LBR's representation that the refinery had been idled. The 2021 joint stipulation and EPA's decision for the refinery to not obtain a PSD permit supported Port Hamilton's decision to purchase the refinery and was relied upon by Port Hamilton in making that decision.

e. The September 24, 2021 notice to potential bidders in which EPA advised of various environmental issues relating to the refinery and indicating the refinery *may* require a new PSD permit depending on the configuration. This document did *not* include any statement that a new PSD permit would definitely be required. Nor did

3

4855-1326-5490.v2

it indicate that EPA was considering rescinding its finding that the refinery had been in idled status since 2012. Although the notice did state that EPA has required PSD permits for restarting long-dormant facilities, Port Hamilton was aware that the refinery had recommenced operations from September 2020 until May 2021 and thus was not "long-dormant."

7.    When the Previous Owner conveyed the St. Croix refinery to Port Hamilton in January 2022, Port Hamilton relied upon EPA's 2018 Determination. Port Hamilton believed that that document, combined with all of the above described documents clearly demonstrated that the St. Croix refinery possessed operational permits and that there was no requirement for the refinery to go through the PSD permitting process.

8.    Since Port Hamilton purchased the refinery, it was maintained in a hot idle mode with the intention for the facility to resume its operations. It was anticipated that the refinery would resume operations by late-2023.

9.    As contemporaneous evidence of Port Hamilton's understanding of, and reliance upon, EPA's numerous statements that supported the recommencement of refining operations without needing a new PSD permit, I am attaching a copy of portions of a July 2022 investor package prepared by Port Hamilton's investment banker for potential investors. In that package, Port Hamilton repeatedly described its ability to recommence refining operations quickly because it did not require new permits from EPA.

10.    If St. Croix goes through PSD permitting, it will not be able to resume operations until 2026, based on the standard timeline for such permitting.

11.    The length of the delay and the uncertainty inherent in the outcome of any PSD permitting process jeopardizes Port Hamilton's plans to resume operations and threatens its very

4855-1326-5490.v2

existence. Without what Port Hamilton believed to be definitive decisions concerning the St. Croix refinery's PSD permitting, it would have not purchased the refinery.

Date: February 24, 2023

Signature: *Eduardo G. del Valle*

Eduardo G. Del Valle

4855-1326-5490.v2








# Port Hamilton Refining & Transportation

Confidential Information Memorandum

July 2022

Jefferies

APPX.320

## Opportunity Overview

**Port Hamilton is seeking a Confidential to fund the operational restart of the Refinery in a "topping mode" configuration**

### Company and Refinery Background

- Port Hamilton Refining and Transportation LLP ("Port Hamilton," or "PHRT" or the "Company") was formed in connection with the acquisition of the Limetree Bay Refinery out of bankruptcy

  - Refinery was purchased through a 363 asset sale for ~$62 million, free and clear of all liens and encumbrances, and the sale closed January 2022 (transaction was funded with 100% equity)[1]

- The Port Hamilton Refinery, which was formerly Limetree Bay Refinery (the "St. Croix Refinery" or the "Refinery"), is a ~180 mbpd refinery[2] strategically located in the Caribbean on St. Croix, U.S. Virgin Islands ("USVI")

  - Located on ~500 acres and adjacent to Limetree Bay Terminals ("LBT" or the "Terminal"), which is the largest terminal (>30 mmbbl) in the Caribbean

- The Refinery and Terminal were recently refurbished and restarted by its former owner, who purchased the facility in 2016

  - Refinery and Terminal were originally developed and operated by Hess and subsequently HOVENSA until it was idled in 2012

  - Prior to being oiled, the Refinery was one of the largest in the world (~650 mbpd throughput)

  - After its acquisition in 2016, the former owner invested ~$4.1 billion into the Refinery and Terminal to refurbish and upgrade the facilities (~$3 billion of which invested into Refinery)

  - Refinery restarted operations in September 2020

- The Refinery was fully operational prior to a voluntary shutdown in May 2021 after a series of environmental incidents

  - Environmental incident that caused the shutdown involved the coker unit; among others; there are no current plans to restart the coker in the immediate future

  - The EPA issued a temporary shutdown order and subsequently reached agreement on stipulation which clearly outlined corrective measures necessary to resume operations

- Despite clear remedial action to be undertaken to resume operations, the Refinery filed for bankruptcy in July 2021

  - The project was plagued by cost overruns, construction timing delays, and operational challenges leading to stakeholders who were unwilling to continue funding the project

  - In addition, refinery margins, particularly coking and hydroskimming, had not fully recovered from COVID-related demand destruction

(1) Port Hamilton only acquired the Refinery. The Limetree Bay Terminals remain under separate ownership.
(2) Reflects throughput under contemplated restart configuration.

### Transaction Overview

- Port Hamilton intends to restart the refinery in a "topping" configuration

  - Only the crude unit, straight run fractionators and associated treating (caustic, merox) units will restart

  - Provides for the quickest possible restart and much clearer EPA path with a reasonable additional investment required

  - Ability to restart under existing EPA permits

  - Simple and safe operations with limited tankage requirements

- Financing will be utilized to fund the required capital and personnel investments to achieve a restart

  - Primarily involves capital investments relating to the hiring and training of operational personnel and preparing the refinery for restart, including modifications to address EPA requirements

  - Refinery can be restarted in 9-12 months after capital is raised



**Proximity of Port Hamilton to Key Markets**

New York 1,500 Miles
Jacksonville 1,200 Miles
Houston 1,900 Miles
Los Angeles 3,900 Miles
Europe 4,500 Miles
Port Hamilton
West Africa 4,500 Miles
San Luis, Brazil 1,700 Miles
Santos, Brazil 3,700 Miles
Caracas, Venezuela 500 Miles
China 14,000 Miles

**Jefferies**

APPX-321

2

# Key Investment Considerations

**Transaction and market dynamics created a highly compelling acquisition opportunity for Port Hamilton to acquire and restart the Refinery, leveraging the $3 Bn put into the facility and learnings from prior ownership**

**Why did Port Hamilton want to own the Refinery?**

- Large-scale, high complexity refinery benefiting from over $3 billion in capex over past 2 years
- Opportunity to quickly resume safe, reliable topping operation with minimum additional capex to generate cash flow
- Large array of downstream conversion units provide significant upside/optionality to respond to varying market environments
- Ability to efficiently repurpose some of the existing equipment to support renewable distillates operation and capture regulatory market incentives
- Advantaged marine and terminal logistics versus U.S. mainland refineries – VLCC accessible and Jones Act Exempt

**Why were the transaction dynamics so favorable?**

**Why was former ownership unsuccessful in restarting the refinery?**

**Why will Port Hamilton succeed?**

- Company will operate the Refinery as a topping plant which involves minimal operational, regulatory, and capital risk
- Clear path to operate consistent with EPA requirements
- Very strong market fundamentals support highly profitable refinery operations
- Best in class management, advisory, and regulatory teams are being put in place with significant refining operating experience

Confidential

APPX-322

Jefferies

# Summary of Key Restart Workstreams and Requirements

*Port Hamilton has clear, executable path to a restart of the Refinery in 9-12 months after capital is secured within existing EPA permits[1]*

**Key Restart Workstreams**

**Once Port Hamilton secures capital, the Company will further advance the below in order to achieve an operational restart:**

- Complete and satisfy EPA requirements: Currently in process (further detail below)
- Recruit and train personnel: Have already identified key managers
- Secure key commercial agreements: In advanced discussions with marketers to secure supply/offtake and inventory intermediation as well as Limetree Bay Terminals to secure storage
- Prepare the refinery for restart:
  - Modifications to meet EPA and VIDPNR requirements
  - New VIDPNR permits will be required to operate facility in topping configuration
  - Unit cleaning and start-up related maintenance
  - Projects required to prepare refinery for operating in topping mode (caustic scrubber, repurpose merox, Distributed Control System changes)
  - Once funding is secured, it will take Port Hamilton 9-12 months to restart operations

**Summary of EPA Requirements for a Restart**

**EPA Requirements for a Restart:**

- Port Hamilton has clear, well-defined requirements from the EPA that it must satisfy in order to restart operations
- Primary requirements include addressing facility-wide corrective actions pertaining to staffing and training identified in audit reports arising out of the May 2021 incident
- Reviewing and completing the Refinery risk management plan
- Installation of four new air monitoring systems as well as the upgrade of five existing air monitoring systems
- Finalize hydrocarbon purge plan that was submitted to EPA by the prior owners
- There is no regulatory impediment on Port Hamilton restarting operations
  - Ability to restart once defined EPA requirements are satisfied
- No additional permits or approvals are required by the EPA to restart operations in topping mode configuration

[1] Note: Additional U.S. Virgin Island Department of Planning and Natural Resources ("VIDPNR") permits will be required to operate the facility in a "topping" configuration. However, no additional EPA permits or approvals are required.

Jefferies

APPX 323

# CERTIFICATE OF SERVICE

On February 24, 2023, I served the Appendix by using the Court's electronic filing system, which will deliver a Notice of Filing to:

HEATHER E. GANGE
U.S. Department of Justice
Environment and Natural
Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Telephone No: (202) 514-4206
Heather.Gange@usdoj.gov

Corinne Snow
VINSON & ELKINS LLP
1114 Avenue of the Americas
32nd Floor
New York, NY 10036
Phone: (212) 237-0157
Email: csnow@velaw.com

*Counsel for Respondent*

*Counsel for proposed intervener*
*Limetree Bay Terminals, LLC*

Michael Ray Harris
Associate Professor of Law
Environmental Justice Clinic
Vermont Law & Graduate School
PO Box 96, 164 Chelsea Street
South Royalton, VT 05068
(802) 831-1364
mrharris@vermontlaw.edu

*Counsel for proposed intervenors*
*St. Croix Environmental Association,*
*Sierra Club, and Center for Biological Diversity*

/s/ Andrew C. Simpson