ORAL ARGUMENT SCHEDULED FOR MAY 23, 2023

No. 23-1094

_____

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

PORT HAMILTON REFINING AND TRANSPORTATION, LLLP,
*Petitioner*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Respondent*.

_____

Petition for Review of Action of the U.S. Environmental Protection Agency

_____

**Respondent U.S. Environmental Protection Agency's**

**Appendix Volume II  (pp. EPA-108–EPA-819)**

_____


Of Counsel:

JOSEPH SIEGEL                              TODD KIM
*Attorney*                                 *Assistant Attorney General*
U.S. Environmental Protection Agency       HEATHER E. GANGE
Region 2                                   *Senior Attorney*
290 Broadway                               Environment and Natural Resources Division
New York, NY 10007                         U.S. Department of Justice
                                           Post Office Box 7411
                                           Washington, D.C. 20044
                                           (202) 514-4206
                                           Heather.Gange@usdoj.gov

PORT HAMILTON REFINING AND TRANSPORTATION, LLLP V. EPA
No. 23-1094

TABLE OF CONTENTS – VOLUME II

EPA Response

B-02 - EPA letter from William Wehrum to LeAnn Johnson Koch
"Re: Limetree Bay Terminals, St. Croix, U.S. Virgin Islands –
Permitting Questions" (Apr. 5, 2018). ...............................................................EPA-108

D-01 - In re: Limetree bay Services, LLC, et al., No 21-32351, EFC No. 977,
Order (I) Authorizing the Sale of All or Substantially All of the Debtors'
Assets Free and Clear of Liens, Claims, Encumbrances, and Interests,
(II) Authorizing the Debtors to Perform Under the Asset Purchase Agreement,
(III) Approving Procedures for the Assumption and Assignment of Executory
Contracts and Unexpired Leases, and (IV) Granting Related Relief
(Bankr. S.D. Tex. Dec. 21, 2021). ....................................................................EPA-116

D-02 - In re: Limetree Bay Services, LLC, et al., Case No. 21-32351,
Joint Stipulation between the United States and Limetree Allowing Occupational
Health and Safety Administration to issue a Citation and Notification
of Penalty pursuant to Inspection 1521774 (Bankr. S.D. Tex. Nov. 8, 2021). ...................EPA-154

D-03 - Letter from Dore La Posta, EPA Region 2, to All Potential
Buyers of Limetree Bay Refinery (Sept. 24, 2021). ..........................................EPA-196

E-01 - Administrator Michael S. Regan, Withdrawal of Plantwide
Applicability Limit, Permit No. EPA-PAL-VI001/2019 (Mar. 25, 2021)..........................EPA-202

E-03 - Response to Comments on the Draft PAL Permit issued by EPA
on September 30, 2019 to Limetree Bay Terminal and Limetree Bay
Refining, EPA-PAL-VI001/2019 (Dec. 2, 2020). ............................................EPA-205

I-02 - Inspection Report Re: PHRT, EPA Region 2, Clean Air Act
Section 112(r) General Duty Clause Inspection (Sept. 20-26, 2022). ................EPA-217

        NOTE: Photographs contained in Inspection Report I-02 are Record Item J-03 in
        Appendix Volume 3, filed under seal.

I-03 - Response Letter from Thomas V. Eagan, Counsel to PHRT, to
Dwayne Harrington, US EPA, "Re: Request for Information Pursuant
to Section 104(e) of the Comprehensive Environmental Response, Compensation
and Liability Act received on August 18, 2022" (Sept. 1, 2022). ....................EPA-224

I-05 - Letter from Joseph Siegel, Attorney, EPA Region 2, to Julie R. Domike
and Thomas V. Eagan, Counsel to PHRT (Aug. 23, 2022). ...............................EPA-233

I-06 - Letter from Virginia Wong, EPA Region 2, to Thomas V. Eagan,
Counsel to PHRT (Aug. 22, 2022)......................................................................EPA-235

I-07 - Letter from Julie R. Domike and Thomas Eagan, Counsel to PHRT,
to Suilin Chan and Joseph Siegel, EPA Region 2 (Jul. 27, 2022). .....................EPA-237

I-08 - Statement from Charles Chambers, Representative of Port Hamilton
Refining and Transportation, Before the 34th Legislature of the U.S. Virgin Islands,
Committee on Economic Development and Agriculture (Jul. 14, 2022). ...........EPA-241

I-10 - Letter from Virginia Wong, EPA Region 2, to Mark Chavez, Limetree
Bay Terminals, LLC, and Julie R. Domike and Tom V. Eagan, Counsel to
PHRT, "Re: Territorial Pollutant Discharge Elimination System
(TPDES) permits" (May 25, 2022).....................................................................EPA-244

I-11 - Letter from Liliana Villatora, EPA Region 2, to Julie R. Domike
and Thomas Eagan, Counsel to PHRT, "Re: the refinery's air permitting
requirements" (Mar. 22, 2022)............................................................................EPA-248

I-12 - Letter from Myles E. Flint, II, U.S. Department of Justice, to Julie
R. Domike and Thomas Eagan, Counsel to PHRT, "Re: Questions Regarding
Refinery Restart" (Mar. 2, 2022). .......................................................................EPA-252

I-13 - Letter from Paul Simon, EPA Region 2, to Julie R. Domike and
Tom V. Eagan, Counsel to PHRT, "Re: Questions Regarding Refinery
Restart" (Mar. 2, 2022). ......................................................................................EPA-256

I-14 - First Modification to the Consent Decree, *United States & U.S.
Virgin Islands v. HOVENSA L.L.C.*, No 1:11-cv-00006, ECF No. 42
(Entered, D.V.I. Dec. 30, 2021)...........................................................................EPA-259

I-15 - Complaint, U.S. v. Limetree Bay Refining, LLC and Limetree Bay
Terminals, LLC, Civ. A. No. 1:21-cv-264 (D.Ct. USVI Jul. 12, 2021). .............EPA-417

I-16 - Join Stipulation, U.S. v. Limetree Bay Refining, LLC and Limetree
Bay Terminals, LLC, Civ. A. No. 1:21-cv-264 (D.Ct., USVI Jul. 12, 2021)......EPA-438

I-17 - In the Matter of Limetree Bay Terminals, LLC and Limetree Bay Refining,
LLC, Clean Air Act Emergency Order, CAA-02-2021-1003, issued by EPA
Region 2 (May 14, 2021). ....................................................................................EPA-447

I-18 - Second Modification to the Consent Decree, *United States &
U.S. Virgin Islands v. HOVENSA L.L.C.*, No 1:11-cv-00006, ECF No. 22-3
(Filed, D.V.I. Apr. 26, 2021). ..............................................................................EPA-491

I-28 - Operating Agreement By and Among The Government of the U.S.
Virgin Islands and Limetree Bay Terminals, LLC (Dec. 1, 2015). ....................EPA-705



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

April 5, 2018

OFFICE OF
AIR AND RADIATION

Ms. LeAnn Johnson Koch
Perkins Coie
700 13th Street, NW
Suite 600
Washington, D.C. 20005-3960

Re: Limetree Bay Terminals, St. Croix, U.S. Virgin Islands – Permitting Questions

Dear Ms. Johnson Koch:

This is in response to your February 1, 2018, letter to the U.S. Environmental Protection Agency's (EPA) Region 2 Office, in which you sought EPA's concurrence on three New Source Review (NSR) permitting questions pertaining to the Limetree Bay Terminals (LBT) facility in St. Croix, U.S. Virgin Islands (USVI). In your letter, you specifically asked whether EPA concurs with LBT that:

> (1) restarting some of the idled refinery units as part of the "MARPOL Project"[1] (to produce fuel compliant with the maritime sulfur regulations taking effect January 2020) will not result in the facility being viewed as a new stationary source under EPA's current so-called Reactivation Policy;

> (2) the MARPOL Project and another LBT project to produce Renewable Diesel Fuel are independent and should not be considered a single project for purposes of applicability under the Prevention of Significant Deterioration (PSD) regulations; and

> (3) the addition of a deeper water loading configuration (Single Point Mooring or SPM) should be considered a modification to an existing emissions unit (i.e., the dock system and associated loading terminal) and not a new emissions unit for the PSD applicability analysis.

In addition to the foregoing inquiries, you previously sought EPA guidance regarding when emission decreases from a project can be considered within the NSR applicability analysis.

---

[1] MARPOL is the International Convention for the Prevention of Pollution from Ships.

Based on EPA's review of your submitted analyses and supporting documents, we concur that: (1) restarting of the refinery's idled units for the MARPOL Project should not be treated as a new stationary source under the current Reactivation Policy; (2) the MARPOL Project and the Renewable Diesel Fuel Project are independent of each other and therefore separate projects for PSD applicability; and (3) constructing the SPM would be considered a modification to an existing emissions unit rather than a new emissions unit. Discussion on each of these issues is provided below, along with information to address your previous question regarding accounting of emission decreases within the NSR applicability analysis.

<u>Restarting Refinery Units and the Current Reactivation Policy</u>

The current policy on the reactivation of sources provides that a major stationary source that has been idled for 2 or more years is presumed to be permanently shut down. *See In the Matter of Monroe Electric Generating Plant Entergy Louisiana, Inc.*, Proposed Operating Permit, Petition No. 6-99-2 (June 11, 1999). That policy states that if a source is permanently shut down, upon reactivation it is considered a "new" stationary source for purposes of PSD review. Accordingly, PSD applicability would be based on the reactivated source's potential to emit.

Importantly, however, this 2-year presumption is rebuttable. EPA will not consider the shutdown to have been permanent upon the owner or operator of the source making a demonstration that, at the time of the shutdown, and continuously throughout the shutdown period, they intended to restart the facility. Among the factors that EPA in the past has considered in evaluating the owner or operator's intent are:

- Length of time the facility has been shut down and concrete plans for restart;
- Statements by the owner or operator of intent;
- The cause of the shutdown;
- Status of permits, including but not limited to Clean Air Act operating permits, acid rain permits and other required permits, and emission inventory;
- Maintenance and inspections during shutdown; and
- Time and capital needed to restart.

In evaluating these factors, no single factor is likely to be conclusive in determining intent. Instead, EPA generally has considered the totality of all such factors and the relevant supporting documentation in evaluating whether there was a continuous intent to restart the facility.[2]

In the case of LBT's facility in St. Croix, our review of the information you have submitted leads us to conclude that both LBT and HOVENSA displayed a continuous intent to restart the refinery operations. Therefore, applying the criteria of the current Reactivation Policy, we have determined that LBT's St. Croix facility was not permanently shut down and should not be considered a "new source" for purposes of PSD applicability.

---

[2] As this description indicates, the current Reactivation Policy has been derived from a series of EPA site-specific determinations and guidance issued over the course of many years. Further, EPA has not cited any specific regulatory provisions of the NSR program to support its position on source "reactivation." We are applying the current Reactivation Policy to resolve the LBT issue, but we intend to reconsider the policy in the near future.

2

LBT's facility in St. Croix was previously owned by HOVENSA until 2016, at which time LBT purchased the refinery and terminal operations. As LBT explains, an economic downturn caused HOVENSA to idle the refinery operations in 2012. Nevertheless, since that time, the terminal operations, wastewater treatment plant, and power generation have continued to operate at this location. Even before HOVENSA announced, on February 21, 2012, that it had completed the final idling of all refinery units, HOVENSA had informed the USVI government of its plans to retain its permits and implement maintenance procedures on their equipment so that it could restart the refinery. LBT represents that over the next several years, HOVENSA spent over $400 million to maintain the restart capability of the refinery operations, which included removing residual material from equipment, retaining control room operability, and conducting other process equipment mothballing activities.

LBT provided EPA with a timeline and supporting information that included evidence of this continuous intent by HOVENSA and LBT to restart the facility. The supporting information included company statements, press releases, and various correspondence from 2011 through 2017. LBT also confirmed that HOVENSA and LBT maintained all environmental permits in active status and submitted timely renewal applications. Further, LBT stated that these companies continued to comply with the Refinery MACT, NSPS Subpart J, and all of the applicable RCRA regulations while the refinery units were idled. LBT represents that the companies maintained critical refinery equipment, such as compressors, pumps, utilities, wastewater treatment units in working order and conducted multiple walkthrough inspections at the plant, activities that are necessary for a restart. In order to demonstrate that the maintenance activities were performed, LBT provided a list of critical equipment and the timeline of significant maintenance activities performed at the refinery. LBT also represents that neither it nor HOVENSA made any statements to any party or issued any press release indicating any intent *not* to restart the plant in the future.

## Project Aggregation – Renewable Diesel Project and Refinery Restart (MARPOL Project)

The term "project aggregation" describes the process of grouping "nominally separate changes that are sufficiently related based on established criteria … into a single common project for the purpose of determining PSD applicability."[3] More specifically, the emissions of the nominally separate changes are combined for the purposes of determining whether a "significant emissions increase" – referred to as "Step 1" of the NSR applicability test – will occur from the project. EPA's project aggregation policy aims to ensure the proper permitting of modifications that involve multiple physical and/or operational changes. Where the projects at issue are more reasonably deemed to constitute a single project for purposes of NSR, a source will not be allowed to circumvent major NSR by seeking to permit the individual activities separately under minor source NSR.

---

[3] Letter from Stephen Page, Director, Office of Air Quality Planning and Standards, to David Isaacs, Vice President, Government Policy, Semiconductor Industry Association (August 26, 2011). (SIA Letter)

LBT plans to construct the Renewable Diesel Project and the MARPOL Project at the current plant site in late 2018. Given that these projects will begin close in time to one another, LBT has sought EPA's concurrence that these projects should not be aggregated (i.e., considered to be a single project) for the purposes of the PSD applicability analyses. LBT representatives have been clear in statements to EPA that, while they are pursuing the Renewable Diesel Project and the MARPOL projects concurrently, they are separate and distinct projects. Based upon EPA's review of all the information LBT provided, we concur that the two projects are independent of each other and, therefore, should not be aggregated for purposes of PSD applicability.

In analyzing whether the two LBT projects at issue here should be aggregated, we have followed our current policy on project aggregation, which takes into account indicia of relatedness among the individual actions at a source in order to determine whether the activities, in the aggregate, are one physical or operational change as those terms are used in the statute and regulations.[4] Our policy on aggregation outlines an approach relying upon case-specific factors (*e.g.*, timing, funding, and the company's own records) and the relationship between nominally separate changes.

As explained in your letter, the MARPOL Project involves restarting certain existing refinery units to process crude oil, heavy fuel oil, and petroleum intermediates into refined petroleum products. This project will involve restarting a crude unit, a reformer, two naphtha hydrotreating units, a coker unit, two distillate hydrotreating units, an isomerization unit, and two sulfur recovery plants. These units will be configured to produce low-sulfur fuels (i.e., gasoline, diesel, and fuel oil) and are scheduled to begin operation just before January 2020, when the relevant MARPOL amendments and EPA implementing regulations take effect. LBT represents that the economic viability of the MARPOL Project depends on the value generated from converting petroleum crude into refined petroleum products and market advantages that may exist due to an anticipated market shortfall of MARPOL-compliant marine fuel in 2020.

Your letter explains that the proposed Renewable Diesel project will convert vegetable, animal, and recycled cooking oils into renewable diesel fuel. This project involves building a feedstock pretreatment train and a new hydrogen unit to convert the oils into diesel compounds, and repurposing an existing hydrotreating unit (previously used for the hydrotreating of petroleum liquids) as the reactor for the conversion. LBT represents that the Renewable Diesel Project will produce fuel meeting the requirements of the Renewable Fuel Standard (RFS) and California's Low Carbon Fuel Standard (LCFS) programs, and that the fuel could be blended with transportation fuel sold in the United States to generate Renewable Identification Numbers (RINs) under the RFS as well as LCFS credits. Further, LBT suggests that the renewable diesel fuel may be eligible for a federal blender's tax credit. According to LBT, the economic viability of the Renewable Diesel Project depends heavily on the future value of converting vegetable, animal, and recycled cooking oils into renewable fuel, as well as the value of RINs, LCFS, and other tax credits. Significantly, none of these factors relate to the MARPOL project.

---

[4] While EPA issued a revised policy on project aggregation in 2009, the policy has been stayed and is currently under reconsideration by the Agency. *See* 74 FR 2376 (January 15, 2009), 74 FR 7193 (Feb. 13, 2009), 75 FR 27643 (May 18, 2010). *See* 75 FR 19570-71 (April 15, 2010) for a collection of memoranda that provide examples of EPA's current approach to project aggregation.

4

LBT has shown that each of these two projects is technically distinct and does not depend on the other in terms of decision-making and timing, interaction between units, the process technologies used, feedstocks involved, or products produced. LBT stated that the MARPOL Project will be fully self-contained as the selected units are inspected, reconditioned as needed, and restarted. More specifically, LBT maintains that the raw materials, piping, process equipment, and material transfer systems for each project will be completely unshared and independent of the other project. LBT represents that the construction of one project does not necessitate or otherwise influence the construction of the other project.

LBT has demonstrated to our satisfaction that the economic viability of each project stands on its own, such that the Renewable Diesel Project could proceed on its own financial merits, regardless of the future of the MARPOL Project, and vice versa. In particular, LBT noted the unique opportunity presented to timely and economically reconfigure the idled hydrotreating equipment and the current availability of renewable fuel and tax credits as proof of lack of economic dependency between the Renewable Diesel and MARPOL Projects. Each project's feasibility is based on its own set of incentives and market realities and does not depend on the other project going forward.

We note that the one thing that may be considered to be common to both projects is the potential for shared utilities. However, sharing utilities does not in and of itself mean that activities at a source are functionally or economically dependent on one another. Since both projects will produce fuel gas, the power and steam required to operate each project can be generated from fuel gas produced by either the renewable diesel unit or the MARPOL refining unit, and in some cases the projects may combust fuel oil, so neither project is dependent on the other project for steam or power generation. In addition, LBT stated that each project will rely on the existing wastewater treatment and water production facilities at the terminal. LBT maintains there is no appreciable cost benefit that the Renewable Diesel Project will receive by virtue of the MARPOL Project because the utilities are already in operation as part of the ongoing terminal operations.

<u>Single Point Mooring – Modification to an Existing Emission Unit</u>

LBT also seeks a determination that the addition of a single point mooring (SPM) project to its existing marine loading/unloading system should be considered a modification to an existing unit at the facility rather than a new unit pursuant to the PSD regulations. In your letter, you explain that the existing marine loading/unloading system consists of ten marine docks, each of which can load and unload multiple petroleum products. According to LBT, the proposed SPM addition would "extend from the jetty on the seabed for approximately 5,800 feet to a Pipeline End Manifold" that would be connected to a buoy via a flexible hose, and the buoy would load/unload crude oil onto ships via two floating hoses.

Based on the information provided by LBT, EPA believes that the addition of the SPM is reasonably considered to be an extension of the existing marine loading terminal. Therefore, EPA concludes that the SPM should be treated as a modification of the existing marine terminal emissions unit.

5

The definition of "emissions unit" in the PSD regulations does not speak to how broadly or narrowly to consider the scope of an emissions unit at a stationary source, nor does it address how to treat a new emissions point, such as the SPM, that is added to an existing stationary source with existing emission units. The definition at 40 CFR §52.21 (b)(7) states:

> *Emissions unit* means any part of a stationary source that emits or would have the potential to emit any regulated NSR pollutant and includes an electric utility steam generating unit as defined in paragraph (b)(31) of this section. For purposes of this section, there are two types of emissions units as described in paragraphs (b)(7)(i) and (ii) of this section:
>
> > (i) A new emissions unit is any emissions unit that is (or will be) newly constructed and that has existed for less than 2 years from the date such emissions unit first operated.
> >
> > (ii) An existing emissions unit is any emissions unit that does not meet the requirements in paragraph (b)(7)(i) of this section. A replacement unit, as defined in paragraph (b)(33) of this section, is an existing emissions unit.

This regulatory language can be reasonably interpreted to provide that multiple pieces of related process equipment (or emission points) comprise a single emissions unit.

Prior EPA determinations interpreting the PSD regulations provide specific guidance on this question. Those determinations illustrate that ascertaining the proper scope of an "emissions unit" often requires very case- and fact-intensive analyses. For instance, in a letter to the Semiconductor Industry Association, EPA confirmed that it was appropriate to treat an entire semiconductor fabrication building, or "fab," as one emissions unit.[5] EPA based this decision on the "interconnected nature of the 'tools' in the fab" and the systems that deliver materials and manage discharges. The letter also pointed out that fab units could be located in adjoining buildings if they are "physically connected, integrated, and operated" in a continuous and consolidated manner, and that it may be more appropriate to treat physically separated operations as a separate emissions unit. In that letter, EPA also referenced other determinations by EPA Regions, in which the Regional office provided rationale for why grouping related processes and equipment into a single emissions unit made sense given the circumstances.[6]

In analyzing the SPM project, we note that the existing marine terminal currently loads and unloads crude oil in addition to other petroleum products. Based on the information provided in LBT's recent permit application to the Virgin Islands Department of Planning and Natural Resources, the SPM will load and unload only crude oil. Since LBT is currently loading and

---

[5] SIA Letter.

[6] Letter from Judith M. Katz, Region III, U.S. EPA, to John M. Daniel, Director, Air Program Coordination, Commonwealth of Virginia, Department of Environmental Quality, (November 30, 2000); Letter from Douglas M Skie, Region VIII, U.S. EPA, to Brad Beckham, Director, Air Pollution Control Division, Colorado Department of Health (February 6, 1990).

unloading crude oil at the existing marine terminal, the proposed SPM would not change the nature of the pollutant-emitting activity occurring at the terminal. Furthermore, the SPM will be physically connected to the existing marine loading terminal by way of an underwater piping system and will be completely integrated with the loading and storage operations at the existing terminal. Consequently, the SPM and current marine terminal appear to share the same interconnectedness that EPA previously found persuasive in its analysis of semiconductor fabs, which supports treating LBT's proposed SPM and the existing terminal as a single emissions unit.

We also note that state agency permit actions have also reflected the flexibility within the definition of emissions unit. There are several examples of state permitting agencies treating multiple marine loading berths/docks as a single emissions unit in the context of Title V permits.[7] Thus, the treatment of multiple loading docks or berths as a single emissions unit is not unusual.

Finally, in other correspondence LBT has informed EPA that it will be installing a vapor capture and collection system at the existing marine terminal, although LBT has indicated the system will not be used to reduce emissions that occur while loading ships at the SPM. Instead, LBT has indicated it intends to comply with the submerged loading requirements[8] when the ships are loaded at the SPM, and that the control of emissions from the existing docks will help offset the emission increases from the operation of the SPM. We note that, in the context of the PSD program, a BACT determination for a major modification is focused on each emissions unit. However, this approach does not foreclose a determination that different emission points within an emissions unit can have distinct BACT requirements due to technical or economic feasibility or other factors considered under a BACT review. Consequently, for LBT to install a vapor recovery system at the existing loading berths and apply a different control strategy for the SPM emission point does not necessitate that the SPM be treated as a separate emissions unit under the PSD program. EPA views the proposed SPM and the new vapor control system as being part of the overall integrated loading/unloading operation at the terminal, and views this operation as an integrated emissions unit for PSD purposes.

Consideration of Emission Decreases from the Project

While not specifically raised in your February 1, 2018 letter, LBT previously asked EPA whether, under the NSR applicability procedures (e.g., 40 CFR §52.21(a)(2)), emission decreases may be taken into account when a "significant emissions increase" calculation of projects which involve only existing units is undertaken at Step 1 of the NSR applicability analysis. As you should be aware, EPA has recently clarified that emission decreases from a project are to be considered at Step 1. This applies not only to existing emission units for but all categories of projects. *See* Project Emissions Accounting Under the New Source Review Preconstruction Permitting Program (March 13, 2018).

---

[7] *See, e.g.*, Indiana Department of Environmental Management, Part 70 Operating Permit, BP Products North America, Inc. – Whiting Business Unit (December 14, 2006); Commonwealth of Virginia, Department of Environmental Quality, Federal Operating Permit, TransMontaigne Operating Company, L.P. – Norfolk Terminal (April 7, 2014). EPA is also aware of analogous non-marine loading activities, such as truck loading racks, being treated as a single emissions unit.

[8] 46 CFR 153.282.

7

Conclusion

EPA's responses contained within this letter are based on the information LBT has provided EPA through letters and emails pertaining to your permitting questions. Since EPA does not have emissions information and other specifics regarding your planned projects, EPA is not providing any final determination on the applicability of the PSD regulations to your projects. A final determination on PSD applicability will be made on the basis of the information provided in your application and supporting materials. Finally, nothing in this letter's discussion of PSD policies should be interpreted to reflect EPA's views on the applicability or requirements of any other programs, including the New Source Performance Standards and the National Emissions Standards for Hazardous Air Pollutants.

If you have any questions about this letter, please contact Anna Marie Wood in the Office of Air Quality Planning and Standards at (919) 541-3604 or wood.anna@epa.gov.

Sincerely,

William L. Wehrum
Assistant Administrator

cc: Alexander Dominguez
    David Harlow
    John Filippelli
    Bill Harnett
    Peter D. Lopez
    Peter Tsirigotis
    Anna Marie Wood

8

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

December 21, 2021
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE: | Chapter 11 |
| **LIMETREE BAY SERVICES, LLC, *et al.*,**[1] | **Case No.: 21-32351 (DRJ)** |
| Debtors. | **(Jointly Administered)** |

**ORDER (I) AUTHORIZING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES,
AND INTERESTS, (II) AUTHORIZING THE DEBTORS TO PERFORM UNDER THE
ASSET PURCHASE AGREEMENT, (III) APPROVING PROCEDURES FOR THE
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

**[Re:  Docket No. 191]**

Upon the motion, dated July 26, 2021 [Docket No. 191] (the "Motion"),[2] of the above-

captioned debtors and debtors in possession (collectively, the "Debtors"), pursuant to sections

105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the

"Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Section K of the Procedures for Complex Cases in the

Southern District of Texas (the "Complex Rules"), for entry of (a) an order (i) approving

procedures (as amended, the "Bidding Procedures") for the solicitation of bids for the acquisition

of substantially all assets of the Debtors (the "Sale"), (ii) scheduling an auction and final hearing

for approval of the Sale, (iii) establishing procedures for the assumption and assignment of

executory contracts and unexpired leases of the Debtors (collectively, the "Executory

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Limetree Bay Services, LLC (1866); Limetree Bay Refining Holdings, LLC (1776); Limetree Bay Refining Holdings II, LLC (1815); Limetree Bay Refining, LLC (8671); Limetree Bay Refining Operating, LLC (9067); Limetree Bay Refining Marketing, LLC (9222).  The Debtors' mailing address is Limetree Bay Services, LLC, 11100 Brittmoore Park Drive, Houston, TX 77041.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the APA (as defined herein), as applicable.

Contracts"), and (iv) granting further relief, and (b) an order (i) authorizing the Sale to the Winning Bidder, free and clear of any and all Interests (as defined in the Motion), except for any assumed liabilities, (ii) authorizing the assumption and assignment of Executory Contracts, if any, designated for assignment to the purchaser in connection with the Sale, and (iii) granting further and additional relief as described in the Motion, the Designation of Winning Bid (as defined in the Motion), or the Sale Order; and this Court having approved the Bidding Procedures pursuant to the *Order Granting Debtors' Emergency Motion for Entry of Order: (I) Establishing Bidding and Sale Procedures; (II) Approving the Sale of Assets; and (III) Granting Related Relief* [Docket No. 392] (as amended, the "Bidding Procedures Order"); and this Court having entered the *Order Granting Debtors' Emergency Motion to (I) Reopen Auction Pursuant to Bidding Procedures, (II) Approve Schedule and Procedures for Continued Auction, and (III) Grant Related Relief* [Docket No. 913] (the "Auction Reopening Order"); and upon the designation of West Indies Petroleum Limited and Port Hamilton Refining and Transportation, LLLP (together, the "Purchaser") as Winning Bidder pursuant to that certain Asset Purchase Agreement dated as of December [__], 2021 (the "APA") by and among Limetree Bay Services, LLC, Limetree Bay Refining Holdings, LLC, Limetree Bay Refining Holdings II, LLC, Limetree Bay Refining, LLC, Limetree Bay Refining Operating, LLC, and Limetree Bay Refining Marketing, LLC (the "Sellers"), on the one hand, and Purchaser, on the other hand, a copy of which is attached hereto as **Exhibit 1**; and the Court having reviewed and considered the Motion, the Designation of Winning Bid, and the APA, and all associated documents and filings, and any objections thereto; and upon the full record in support of the final approval of the Sale pursuant to the APA, including the statements made and evidence presented during the hearing on December 21, 2021 (the "Sale Hearing"); and this Court having found that the approval of the

Sale pursuant to the APA and other relief granted herein serves the best interests of the Debtors' estates, their creditors, and all other parties in interest; and this Court finding just cause for approving the Sale pursuant to the APA and granting the relief provided herein; and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AS FOLLOWS**:[3]

A.    <u>Jurisdiction and Venue</u>.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

B.    <u>Bases for Relief</u>.  The statutory and other legal bases for the relief provided herein are sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014, Bankruptcy Local Rules 2002-1 and 4002-1, and Section K of the Complex Rules.  The consummation of the Sale contemplated by the APA and this Sale Order is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Complex Rules, and the Debtors and the Purchaser have complied with all of the applicable requirements of such sections and rules in respect of the Sale.

C.    <u>Final Order</u>.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, waives any stay, and expressly directs entry of judgment as set forth herein.

---

[3] The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052 made applicable pursuant to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law, they are adopted as such. To the extent any conclusions of law are findings of fact, they are adopted as such.

D.      Notice of the Motion.  As evidenced by the affidavits and/or certificates of service filed with the Court, proper, timely, adequate, and sufficient notice of the Bidding Procedures, the Auction, the Sale, the Sale Hearing, and all deadlines related thereto, has been provided, as relevant, in accordance with sections 102(1) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9007, and 9014, Bankruptcy Local Rules 2002-1 and 4002-1, and in compliance with the Bidding Procedures Order, to all interested persons and entities, including, without limitation, the Notice Parties.

E.      The Debtors filed the *Notice of Extension of Milestones and Bid Procedures Deadlines* [Docket No. 696], *Second Notice of Extension of Milestones and Bid Procedures Deadlines* [Docket No. 749], *Third Notice of Extension of Milestones and Bid Procedures Deadlines* [Docket No. 761], *Fourth Notice of Extension of Milestones and Bid Procedures Deadlines* [Docket No. 799], *Fifth Notice of Extension of Milestones and Bid Procedures Deadlines* [Docket No. 819], *Notice of (I) Designation of Winning Bid and Back-up Bids and (II) Sixth Notice of Extension of Milestones and Bid Procedures Deadlines* [Docket No. 829], and *Seventh Notice of Extension of Milestones and Bid Procedures Deadlines* [Docket No. 935], which provided details of the Bidding Procedures deadlines, including the Auction date and related deadlines.  Further, such notices were served on all parties required to receive such notice under the Bidding Procedures Order and applicable rules and were sufficient and proper notice to any other interested parties.

F.      The Debtors filed the *Notice of Designation of Winning Bid and Back-up Bid* [Docket No. 948] (the "Designation of Winning Bid") in accordance with the Bidding Procedures Order and such notice was appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the conclusion of the Auction, the identities of

the Winning Bidder and the Back-up Bidders, and the terms of the Winning Bid and the Back-up

Bid.

G.      The Debtors filed the *Notice of Emergency Sale Hearing on December 21, 2021
at 10:00 a.m. Central Time* [Docket No. 914] in accordance with the Bidding Procedures Order

and such notice was appropriate and reasonably calculated to provide all interested parties with

timely and proper notice of the Sale Hearing.

H.      The notice described in the foregoing Paragraphs is good, sufficient, and

appropriate under the circumstances, and no other or further notice of the Bidding Procedures,

the Auction, the Sale, the Sale Hearing, and all deadlines related thereto shall be required.

I.      Marketing and Sale Process. The Sale of the Purchased Assets to the Purchaser

pursuant to the Bidding Procedures is duly authorized under sections 363(b)(1) and 363(f) of the

Bankruptcy Code, Bankruptcy Rule 6004(f), and Bankruptcy Local Rules 2002-1 and 4002-1.

As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale

Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the

Debtors and their professionals, agents, and other representatives engaged in a robust and

extensive marketing and sale process and have marketed the Purchased Assets and conducted all

aspects of the sale process in good faith and in compliance with the Bidding Procedures and the

Bidding Procedures Order.  The marketing process undertaken by the Debtors and their

professionals, agents, and other representatives with respect to the Purchased Assets has been

adequate and appropriate and reasonably calculated to maximize value for the benefit of all

stakeholders.  The Bidding Procedures and the Auction were duly noticed, were substantively

and procedurally fair to all parties, and were conducted in a diligent, non-collusive, fair, and

good-faith manner.  The Prepetition Secured Parties have acted in good faith in all aspects of the

sale process, including, without limitation, the Auction, and in compliance with the Bidding Procedures and the Bidding Procedures Order.

J.        Pursuant to the terms of the Bidding Procedures, the Debtors conducted an Auction which commenced on December 17, 2021 in accordance with the Bidding Procedures and Bidding Procedures Order.  The transaction contemplated by the APA was the highest and best bid for the Purchased Assets received by the Debtors and, therefore, the Purchaser was designated as the Winning Bidder and the transaction contemplated by the APA was designated as the Winning Bid.  As established by the record of the Sale Hearing, the bidding and related procedures established by the Bidding Procedures Order have been complied with in all material respects by the Debtors and the Purchaser.  The Bidding Procedures afforded a full, fair and reasonable opportunity for any entity or person to make a higher or otherwise better offer to purchase the Purchased Assets, and the APA constitutes the best and highest offer for the Purchased Assets following conclusion of the Auction.

K.        <u>Corporate Authority</u>.  The Purchased Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541 of the Bankruptcy Code.  The Debtors (i) have full corporate power and authority to execute the APA, and the Sale to the Purchaser has been duly and validly authorized by all necessary corporate action, (ii) have all of the corporate power and authority necessary to consummate the Sale contemplated by the APA, (iii) have taken all corporate action necessary to authorize and approve the APA and the consummation by the Debtors of the Sale contemplated thereby, and (iv) require no consents or approvals, other than those expressly provided for in the APA, to consummate the Sale.

L.      Highest and Best Offer; Business Judgment.   The Debtors have demonstrated sufficient basis to enter into the APA and sell the Purchased Assets on the terms outlined therein and assume and assign the Business Contracts (the "Designated Contracts") to the Purchaser in accordance with the terms of the APA, and this Sale Order under sections 363 and 365 of the Bankruptcy Code.  Such actions are appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors, their creditors, their estates, and other parties in interest. Approval of the Sale pursuant to the APA at this time is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.

M.      The offer of the Purchaser, upon the terms and conditions set forth in the APA, including the total consideration to be realized by the Debtors thereunder, (i) is the highest and best offer received by the Debtors after extensive marketing, including through the Bidding Procedures, (ii) is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest and (iii) constitutes full and adequate consideration, is fair and reasonable and constitutes reasonably equivalent value, fair consideration, and fair value for the Purchased Assets under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, and under the laws of the United States, any state, territory, possession, or the District of Columbia.  Taking into consideration all relevant factors and circumstances, no other entity has offered to purchase the Purchased Assets for greater economic value to the Debtors or their estates or on terms more beneficial to the Debtors and their respective estates.

N.      Neither the Debtors nor the Purchaser (i) has entered into the APA or proposes to consummate the Sale for the purposes of hindering, delaying, or defrauding the Debtors' present or future creditors or (ii) is entering into the APA or proposing to consummate the Sale fraudulently, for the purpose of statutory or common law fraudulent conveyance and fraudulent

transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

O.      Good and sufficient reasons for approval of the APA have been articulated by the Debtors.  The Debtors have demonstrated compelling circumstances for the Sale outside (i) the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code and (ii) a plan of reorganization or liquidation (as the case may be), in that, among other things, the consummation of the Sale to the Purchaser is necessary and appropriate to preserve and to maximize the value of the Debtors' estates.  To maximize the value of the Purchased Assets, it is essential that the consummation of the Sale occur promptly.

P.      The sale of the Purchased Assets outside of a chapter 11 plan pursuant to the APA neither impermissibly restructures the rights of the Debtors' creditors or equity interest holders nor impermissibly dictates the terms of a chapter 11 plan of the Debtors.  The APA and the Sale do not constitute a *sub rosa* chapter 11 plan.

Q.      Back-up Bidder.  The Debtors have also demonstrated sufficient basis to select and designate the bid of St. Croix Energy, LLLP ("SCE") as the next highest and otherwise best bid for all or substantially all assets of the Debtors pursuant to the terms of that certain the Asset Purchase Agreement dated as of December 16, 2021 by and between the Debtors and St. Croix Energy, LLLP (as amended and modified on the record during the Auction, the "SCE APA" or "Designated Back-up Bid").  Such actions are appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors, their creditors, their estates, and other parties in interest.  Approval of SCE as the Back-up Bidder (as defined in the Bidding Procedures Order) and SCE APA as the Back-up Bid (as defined in the Bidding Procedures Order) at this time is in

the best interests of the Debtors, their creditors, their estates, and all other parties in interest.

R.    <u>Opportunity to Object</u>.  A reasonable opportunity to object or be heard with respect to the Bidding Procedures, the Auction, the Sale (and all transactions contemplated in connection therewith), the procedures for assumption and assignment of the Designated Contracts to the Purchaser pursuant to the APA, the Sale Hearing, and all deadlines related thereto has been afforded to all parties in interest required to receive notice pursuant to the Bidding Procedures Order, including, but not limited to, the Notice Parties and any party that has requested notice pursuant to Bankruptcy Rule  2002.

S.    <u>Good Faith Purchaser; Arm's Length Sale</u>.  The APA was negotiated, proposed, and entered into by the Debtors and the Purchaser without collusion, in good faith, and from arm's length bargaining positions.  Neither the Debtors, nor the Purchaser, nor any affiliate of the Purchaser has engaged in any conduct that would cause or permit the APA or the Sale to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

T.    The Purchaser is a good-faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.  In particular, (i) the Purchaser recognized that the Debtors were free to deal with any other party interested in purchasing the Purchased Assets; (ii) the Purchaser in no way induced or caused the chapter 11 filing by the Debtors; (iii) the Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (iv) no common identity of directors, officers, or controlling stakeholders exists between the Purchaser and any of the Debtors; (v) the Purchaser agreed to subject their bid to the competitive bid procedures set forth in the Bidding Procedures Order; (vi) all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Sale have been disclosed; and (vii) the Purchaser has not

acted in a collusive manner with any person.

U.     Neither the Purchaser nor any of their affiliates, members, officers, directors, shareholders, or any of its or their respective successors or assigns is an "insider" or "affiliate" of any of the Debtors, as those terms are defined in sections 101(31) and 101(2) of the Bankruptcy Code, and the Purchaser's professionals, agents, and other representatives have complied in all respects with the Bidding Procedures Order and all other applicable orders of this Court in negotiating and entering into the APA.  The APA complies with the Bidding Procedures Order and all other applicable orders of this Court.

V.     <u>Free and Clear Transfer Required by Purchaser</u>.  The Purchaser would not have entered into the APA and would not have consummated the Sale, thus adversely affecting the Debtors, their estates, and their creditors, if the Sale was not free and clear of all Liens, Claims, and Interests (each as defined herein) of any kind or nature whatsoever (excluding the assumed liabilities under the Refinery Operating Agreement, dated as of July 2, 2018, by and between Limetree Bay Refining, LLC (as Refinery Operator) and Government of U.S. Virgin Islands (the "**Operating Agreement Assumed Liabilities**")) as more fully set forth in Paragraph 9 of this Sale Order, or if the Purchaser would, or in the future could, be liable for any Excluded Liabilities.  For the avoidance of doubt, the Purchaser shall have no responsibility whatsoever with respect to the Excluded Liabilities, which shall remain the responsibility of the Debtors before, on, and after the Closing of the Sale.

W.     As of the Closing, and pursuant and subject to the terms of the APA and Transaction Documents, the transfer of the Purchased Assets and the Sale will effect a legal, valid, enforceable, and effective transfer of the Purchased Assets and will vest the Purchaser – with Purchaser taking title in PHRT – with all of the Debtors' rights, title, and interests in the

Purchased Assets free and clear of all Liens, Claims, and Interests (each as defined herein) of any kind or nature whatsoever (excluding the Operating Agreement Assumed Liabilities), including, but not limited to, (i) liens, mortgages, deeds of trust, pledges, charges, security interests, rights of first refusal, hypothecations, encumbrances, easements, servitudes, leases or subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of offset or recoupment, right of use or possession, subleases, leases, conditional sale arrangements, or other title retention arrangements, other liens (including mechanic's, materialman's, possessory and other consensual and non-consensual liens and statutory liens), judgments, charges of any kind or nature, if any, including any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, any dedication under any gathering, transportation, treating, purchasing or similar agreement that is not assumed by or assigned to the Purchaser, or any rights that purport to give any party a right of first refusal or consent with respect to the Debtors' interest in the Purchased Assets or any similar rights; (ii) all claims as defined in section 101(5) of the Bankruptcy Code, including all rights or causes of action (whether in law or in equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other person, consent rights, options, contract rights, covenants, claims for reimbursement, exoneration, products liability, alter-ego, environmental, or tax, decrees of any court or foreign or domestic governmental entity, indentures, loan agreements, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement,

understanding, law, equity or otherwise; (iii) all debts, liabilities, obligations, contractual rights and claims, labor, employment and pension claims, and debts arising in any way in connection with any agreements, acts, or failures to act, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise; (iv) any rights based on any successor or transferee liability; (v) any rights that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of the Debtors' or the Purchaser's interest in the Purchased Assets, or any similar rights; (vi) any rights under labor or employment agreements; (vii) any rights under mortgages, deeds of trust, and security interests; (viii) any rights related to intercompany loans and receivables between the Debtors and any non-Debtor subsidiary or affiliate; (ix) any rights under pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of the Employee Retirement Income Security Act of 1974 (as amended, "ERISA")), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (x) any other employee claims related to worker's compensation, occupational disease, or unemployment or temporary disability, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor

Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue Code and of any similar state law (collectively, "COBRA"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (l) the WARN Act (29 U.S.C. §§ 2101 *et seq.*) (the "WARN Act"); (xi) any bulk sales or similar law, including any applicable bulk sale, bulk transfer, successor liability, or similar Laws, or any Laws triggered by a bulk sale or transfer of property; (xii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing, including, without limitation, any *ad valorem* taxes assessed by any applicable taxing authority; (xiii) any executory contract or unexpired lease to which a Debtor is a party that will not be assumed and assigned to the Purchaser pursuant to this Sale Order and the APA, subject to the obligations of the Purchaser under any Transaction Documents; and (xiv) any other Excluded Liabilities as provided in the APA.

X.    Satisfaction of Section 363(f).   The Debtors may sell the Purchased Assets free and clear of any and all Liens, Claims, and Interests (each as defined herein) of any kind or nature whatsoever, including any rights or claims based on any putative successor or transferee liability, as set forth herein, because, in each case, one or more of the standards set forth in sections 363(f)(1)–(5) of the Bankruptcy Code has been satisfied. All parties in interest,

including, without limitation, any holders of Liens, Claims, or Interests, who did not object, or who withdrew their objection, to the Sale, are adequately protected by having their Liens, Claims, or Interests, if any, attach to the portion of the purchase price ultimately attributable to the Purchased Assets against or in which they claim an interest, in the order of their priority, with the same validity, force and effect, if any, which they now have against such Purchased Assets, subject to any claims and defenses the Debtors or their estates may possess with respect thereto.

Y.      No Successorship.  Neither the Purchaser nor any of its affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and neither the Purchaser nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates, except as otherwise expressly provided in the APA.

Z.      The Designated Contracts.  The Debtors have demonstrated (i) that it is an exercise of their sound business judgment to assume and assign any Designated Contracts to the Purchaser in connection with the consummation of the Sale and (ii) that the assumption and assignment of the Designated Contracts to the Buyers is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.  The Designated Contracts to be assigned to the Purchaser are an integral part of the Purchased Assets being purchased by the Purchaser and, accordingly, such assumption, assignment and cure of any defaults under the Designated Contracts in accordance with the procedures set forth in this Sale Order and the APA are reasonable and enhance the value of the Debtors' estates.  Any counterparty to a Designated Contract that does not actually file with the Court an objection to such assumption and assignment in accordance with the terms of this Sale Order or the APA will be deemed to have consented to such assumption and assignment.

AA.     <u>Cure Amounts and Adequate Assurance</u>.  The Debtors and the Purchaser, as applicable, have, including by way of entering into the APA and Transaction Documents, and agreeing to the provisions relating to any Designated Contracts, (i) provided adequate assurance of cure of any default existing prior to the date hereof under any of the Designated Contracts within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) provided adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Designated Contracts within the meaning of section 365(b)(1)(B) of the Bankruptcy Code and the Purchaser has, based upon the record of these proceedings, including the evidence proffered by the Debtors at the Sale Hearing, provided adequate assurance of their future performance of and under the Designated Contracts pursuant to sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.  The Purchaser's promise under the APA and Transaction Documents to perform the obligations under any Designated Contracts, shall constitute adequate assurance of future performance under the Designated Contracts being assigned to the Purchaser within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  Subject to the procedures for the assumption and assignment of Executory Contracts set forth in this Sale Order or the APA, the Cure Amounts are hereby deemed to be the sole amounts necessary to cure any and all defaults under the Designated Contracts under section 365(b) of the Bankruptcy Code.

BB.     <u>Time Is of the Essence; Waiver of Stay</u>.  Time is of the essence in consummating the Sale.  In order to maximize the value of the Purchased Assets, it is essential that the sale and assignment of the Purchased Assets occur within the time constraints set forth in the APA. Accordingly, there is cause to waive the stays contemplated by Bankruptcy Rules 6004 and 6006.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

### I.      The Sale Is Approved.

1.      The Sale of the Purchased Assets pursuant to and in accordance with the terms of the APA and associated Transaction Documents is hereby approved.

### II.     Objections Overruled.

2.      All objections to the entry of this Sale Order or to the relief granted herein, whether filed, stated on the record before this Court or otherwise, which have not been withdrawn, waived, or settled, and all reservations of rights included therein, are denied and overruled on the merits.  All objections to the entry of this Sale Order or to the relief granted herein that were not timely filed are hereby forever barred.

3.      Notice of the Bidding Procedures, the Auction, the Sale (and all transactions contemplated in connection therewith), the Sale Hearing, and all deadlines related thereto was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

### III.    Approval of the APA.

4.      The APA, including all of the terms and conditions thereof and appendices and exhibit thereto, and Transaction Documents, to the extent necessary, are hereby approved. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors are authorized and directed to take any and all actions necessary to fulfill their obligations under, and comply with the terms of, the APA and Transaction Documents and to consummate the Sale pursuant to and in accordance with the terms and conditions of the APA and this Sale Order, without further leave of the Court.  The Debtors are further authorized to pay, without further order of this Court, whether before, at, or after the Closing, any expenses or costs that are required to be paid in

order to consummate the transactions contemplated by the APA or Transaction Documents or perform their obligations under the APA and Transaction Documents, including, without limitation, the payment of $1,000,000 in approved Bid Protection (as defined in the *Order Granting Debtors' Emergency Motion to Amend Bid Procedures Order and Other Related Relief* [Docket No. 831]).

5.      The Debtors are authorized, in accordance with the APA, to execute and deliver, and empowered to perform under, consummate, and implement, the APA, together with all additional instruments, documents, and other agreements that may be reasonably necessary or desirable to implement the APA, including, without limitation, the Transaction Documents, and to take all further actions as may be reasonably requested by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser or reducing to possession, the Purchased Assets, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the APA.  No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the transaction(s) which are the subject of the APA and approved by and through this Order.

**IV.     Approval of Back-up Bid.**

6.      SCE is hereby approved as the Back-up Bidder (as defined in the Bid Procedures Order), and the SCE APA is hereby approved and authorized as the Back-up Bid (as defined in the Bid Procedures Order).  The Designated Back-up Bid shall remain open in accordance with the terms of the SCE APA through and including January 26, 2022.  In the event the APA is terminated or the sale of the Purchased Assets to Purchaser is not consummated on or before January 21, 2022, then SCE shall be deemed the Winning Bidder (as defined in the Bid Procedures Order) in accordance with the Bid Procedures Order and all references herein to the Purchaser and the APA instead shall be deemed to refer to SCE and the Designated Back-up Bid,

respectively, without further order of this Court.  In such case, (i) the findings and other provisions of this Sale Order shall apply to SCE and the Designated Back-up Bid to the same extent as they apply to the Purchaser and APA, and (ii) the Debtors shall, within one (1) day of the selection of SCE as the Winning Bidder, file a notice with the Court advising (x) that the APA with Purchaser was not consummated on or before January 21, 2022, (y) that SCE and the Designated Back-up Bid have become the Winning Bidder and Winning Bid, respectively, pursuant to this Sale Order, and (z) that SCE shall have until January 26, 2022 to consummate the transaction under the Designated Back-up Bid.  In the event the Debtors consummate the transaction under the Designated Back-up Bid, the budgetary line item for professional fees under the Transition Services Agreement by and between the Debtors and SCE shall be allocated as follows: (a) counsel for the Debtors shall be entitled to $100,000 for costs associated with chapter 11 plan solicitation; and (b) the remaining funds shall be allocated between the Debtors and the Committee, with two-thirds (2/3) of such funds being allocated to the Debtors and one-third (1/3) of such funds being allocated to the Committee.

**V.    Binding Effect of Order.**

7.    This Sale Order and the APA shall be binding upon all creditors of, and equity holders in, the Debtors and any and all other parties in interest, including, without limitation, any and all holders of Liens, Claims, or Interests (including holders of any rights or claims based on any putative successor or transferee liability) of any kind or nature whatsoever, all counterparties to the Executory Contracts, the Purchaser, all successors and assigns of the Purchaser, the Debtors and their affiliates and subsidiaries, and any trustee or successor trustee appointed in the Debtors' Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code. Nothing contained in this Sale Order shall conflict with or derogate from the provisions of the APA.  In the event of a direct conflict between the express terms of the Sale Order and a

provision of the APA, the terms of this Sale Order shall govern solely and exclusively to the extent of the direct conflict and all other provisions of the APA shall be unaffected by the subject conflict; *provide*, *however*, that it is the intention of this Court to approve the APA and Transaction Documents in their entirety and without material alteration and, thus, this Sale Order should be interpreted, to the extent possible, not to conflict with the terms of the APA and Transaction Documents.

## VI.    **Amendments to the APA.**

8.    The APA and any related agreements, documents, or other instruments may be modified, amended, supplemented, or restated by the parties thereto, in a writing signed by both parties and in accordance with the terms thereof, without further order of this Court, *provided* that any such modification, amendment, supplement, or restatement does not (i) reduce the purchase price under the APA or (ii) otherwise have a material adverse effect on the Debtors' estates.    The parties shall give notice of any proposed modifications, amendments or supplements, along with a copy of the proposed modifications, amendments or supplements, to counsel for (a) the Committee, (b) the DIP Agent, (c) the Prepetition Secured Parties (excluding J. Aron), and (d) the LBT Entities[4] at least three (3) business days prior to the effective date of such modification, amendment or supplement.    The Committee, the DIP Agent, the Prepetition Secured Parties (excluding J. Aron), and LBT Entities shall have two (2) business days from the date of the notice to object to any such modification, amendment or supplement.    If an objection is timely made, the subject modification, amendment or supplement, solely to the extent objectionable, shall not take effect until such objection is resolved amicably or by order of the Court.    The APA shall not be altered, amended, rejected, discharged, or otherwise affected

---

[4] The term "LBT Entities" as used herein shall mean, collectively or individually, (i) Limetree Bay Terminals Holdings, LLC (ii) Limetree Bay Terminals Holdings II, LLC; (iii) Limetree Bay Cayman, Ltd.; (iv) Limetree Bay Terminals, LLC; and (v) Limetree Bay Financing, LLC.

without the prior written consent of the Purchaser.

**VII.    <u>Transfer of the Purchased Assets Free and Clear.</u>**

9.    Except as expressly permitted or otherwise specifically provided for in the APA or this Sale Order, pursuant to sections 105(a), 363(b), 363(f), and 365(b) of the Bankruptcy Code, upon the Closing, the Purchased Assets shall be transferred to the Purchaser free and clear of any and all Liens, Claims, and Interests of any kind or nature whatsoever, excluding the Operating Agreement Assumed Liabilities.  For purposes of this Sale Order, "Liens," "Claims," and "Interests" shall mean:

a.    any and all charges, liens (statutory or otherwise), claims, mortgages, leases, subleases, hypothecations, deeds of trust, pledge, security interests, options, rights of use or possession, rights of first offer or first refusal (or any other type of preferential arrangement), rights of consent, rights of setoff, successor liability, easements, servitudes, restrictive covenants, interests or rights under any operating agreement, encroachments,  encumbrances, third-party interests, or any other restrictions or limitations of any kind with respect to the Purchased Assets including all the restrictions  or limitations set forth in Paragraph W above (collectively, "<u>Liens</u>");

b.    any and all claims as defined in section 101(5) of the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code, including, without limitation, (i) any and all claims or causes of action based on or arising under any labor, employment, or pension laws, (ii) any and all claims or causes of action based upon or relating to any putative successor or transferee liability, and (iii) any and all other claims, causes of action, rights, remedies, obligations, liabilities, counterclaims, cross-claims, third-party claims, demands, restrictions, responsibilities,  or contribution, reimbursement, subrogation, or indemnification claims or liabilities based on or relating to any act or omission of any kind or nature whatsoever asserted against any of the Debtors or any of their respective affiliates, subsidiaries, directors, officers, agents, successors or assigns in connection with or relating to the Debtors, their operations, their business, their liabilities, the Debtors' marketing and  bidding process with respect to the Purchased Assets, or the Sale contemplated by the APA including all the claims set forth in Paragraph W above (collectively, "<u>Claims</u>"); and

c.    any and all equity or other interests of any kind or nature whatsoever in or with respect to (x) any of the Debtors or their respective

affiliates, subsidiaries, successors, or assigns or (y) the Purchased Assets, including all the interests set forth in Paragraph W above (collectively, "Interests");

whether in law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the Petition Date, or occurring or arising prior to the Closing.  Any and all such Liens, Claims, and Interests shall attach to the portion of the purchase price ultimately attributable to the Purchased Assets against or in which they claim an interest, in the order of their priority, with the same validity, force, and effect, if any, which they now have against such Purchased Assets, subject to any claims, defenses, and objections, if any, that the Debtors or their estates may possess with respect thereto.  On the Closing, the Purchaser shall take title to and possession of the Purchased Assets in PHRT, subject only to the obligations under the APA and Transaction Documents, including Operating Agreement Assumed Liabilities.

10.    Nothing in this Order or the APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order. Nothing in this Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.  Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any

defense asserted under this Order.

11.    Furthermore, notwithstanding anything in this Order or in the APA to the contrary, the Purchaser must become party to (i) the Consent Decree as modified by the First Modification and Second Modification in United States and the *United States Virgin Islands v. HOVENSA L.L.C.*, Civ. No. 1:11-cv-00006, in the United States District Court of the Virgin Islands, St. Croix Division (the "Consent Decree"), and (b) the Joint Stipulation in *United States v. Limetree Bay Refining, LLC, and Limetree Bay Terminals, LLC*, Civ. No. 1:21-cv-00264 (as each may be amended with the mutual consent of the parties); *provided*, that Purchaser shall not become liable for any obligations, other than air monitoring obligations, under such Consent Decree or Joint Stipulation that do not relate to property or units purchased or to be operated by Purchaser pursuant to this Sale Order by reason of so becoming a party to such Consent Decree or Joint Stipulation.    Nothing in this Order or the Sale Agreement (a) prevents the U.S. Environmental Protection Agency or other agency from issuing any order or taking other action under applicable nonbankruptcy law, or (b) modifies the Consent Decree, the Joint Stipulation, or any other applicable environmental, health and safety, or police and regulatory law.

**VIII.    Vesting of Assets in the Purchaser.**

12.    The transfer of the Purchased Assets to the Purchaser with Purchaser taking title in PHRT pursuant to the APA shall constitute a legal, valid, and effective transfer of the Purchased Assets on the Closing, and shall vest the Purchaser with all of the Debtors' rights, title, and interests in the Purchased Assets free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever (with the exception of the Operating Agreement Assumed Liabilities).

**IX.    Release of Liens.**

13.    If any person or entity that has filed any financing statements, mortgages, mechanic's liens, *lis pendens*, or any other documents or agreements evidencing a Lien on the

Debtors or any of the Purchased Assets conveyed pursuant to the APA and this Sale Order shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all Liens  which the person or entity has with respect to the Debtors or the Purchased Assets or otherwise, then (a) the Debtors are hereby authorized to execute and file such statements, instruments, releases,  and other documents on behalf of the person or entity with respect to the Purchased Assets, and (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens in the Purchased Assets of any kind or nature whatsoever.  Upon releasing of any Liens, the Liens will attach to the proceeds of the Sale attributable to the subject assets in the order and priority that existed prior to such releases.

**X.**    **Assumption and Assignment of Designated Contracts.**

14.    Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing, the following procedures (the "Assumption and Assignment Procedures") for the Debtors' assumption and assignment to the Purchaser of the Designated Contracts is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto shall be deemed satisfied upon compliance with the Assumption and Assignment Procedures.

a.   Within three (3) business days of the entry of this Order, the Debtors shall file with the Court and serve the same on all known counterparties to the Designated Contracts a notice (a "Designated Contract Notice") containing the following: (i) the executory contracts and unexpired leases that will be Designated Contracts under the APA that will be assumed and assigned to Purchaser; (ii) the name and address of the known contract counterparties thereto; (iii) the amount, if any, determined by the Debtors to be necessary to be paid to cure any existing default in accordance with Section 365(b) and 365(f)(2) of the Bankruptcy Code (the "Cure Amount"); (iv) the date upon which the assumption and assignment of the Designated Contract to the Purchaser shall be effective (the "Contract

Assignment Date"); and (v) the deadline by which any counterparties must file an objection to the proposed assumption and assignment of such Designated Contract, which deadline shall be fourteen (14) days from the filing of the Designated Contract Notice (the "<u>Designated Contract Objection Deadline</u>").

b. All objections to the proposed assumption and assignment of any Designated Contracts must: (i) be filed with the Court on or before the Designated Contract Objection Deadline and served on the Debtors, the U.S. Trustee and Notice Parties; (ii) identify the Designated Contract(s) to which the objector is party; (iii) describe with particularity any cure the objector contends is required under Section 365 of the Bankruptcy Code (the "<u>Cure Claim</u>"); (iv) identify the bases of the alleged Cure Claim under the proposed Designated Contract; and (v) attach all documents supporting or evidencing the Cure Claim.

c. If no objection is filed by the Designated Contract Objection Deadline, the Cure Amount set forth in the Designated Contract Notice, or any amended version thereof, as applicable, shall control and any counterparties to the subject Designated Contract(s) shall be deemed to waive and shall be forever barred from asserting in any other claim or objection under Section 365 of the Bankruptcy Code, or otherwise, including, without limitation, any objection to the assignability of any of the Designated Contracts.

d. Any Cure Claim not resolved through an agreement of the Debtors, Purchaser, and the objecting party within fourteen (14) days after the Designated Contract Objection Deadline shall be presented to the Court at a hearing to be scheduled as soon as practicable with the Court's availability, or such later date and time as the Debtors, the Purchaser, and the objecting party may agree or the Court may order.

15.    The Debtors are hereby authorized, in accordance with the APA, and in accordance with sections 105(a) and 365 of the Bankruptcy Code, to (i) assume and assign to the Purchaser the Refinery Operating Agreement, dated as of July 2, 2018, by and between Limetree Bay Refining, LLC (as Refinery Operator) and Government of U.S. Virgin Islands, effective upon the Contract Assignment Date and subject to the Debtors' compliance with the Assumption and Assignment Procedures, free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever (with the exception of the Operating Agreement Assumed Liabilities and, if any, obligations with respect to Cure Amount and Cure Claims as to any Designated Contracts),

which Designated Contracts, by operation of this Sale Order, shall be deemed assumed and assigned to the Purchaser effective as of the date set forth in the notice filed in connection therewith, and (ii) execute and deliver to the Purchaser such documents or other instruments as the Purchaser may deem reasonably necessary to assign and transfer the Designated Contracts to Purchaser with PHRT becoming the party to such Designated Contracts.

16.     Subject to paragraph 14 hereof, compliance with the APA and the Assumption and Assignment Procedures set forth herein, and Purchaser's payment of allowed Cure Amounts/Cure Claims, if any, with respect to the subject Executory Contract:

a.  The Debtors are authorized to and may assume all of the Designated Contracts in accordance with section 365 of the Bankruptcy Code.

b.  The Debtors are authorized to and may assign each Designated Contract to the Purchaser with PHRT becoming the party to such Designated Contracts in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Designated Contract that prohibit or condition the assignment of such Designated Contract on the consent of the counterparty thereto or allow the non-Debtor party to such Designated Contract to terminate, recapture, impose any penalty, condition, renewal or extension, or modify any term or condition upon the assignment of such Designated Contract shall constitute unenforceable anti-assignment provisions which are expressly preempted under section 365 of the Bankruptcy Code and void and of no force and effect.

c.  All requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption and assignment of the Designated Contracts by the Debtors to the Purchaser have been satisfied.

d.  Upon the Contract Assignment Date, the Designated Contracts shall be transferred and assigned to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Designated Contract (including those of the type described in sections 365(b)(2), 365(e)(1) and 365(f) of the Bankruptcy Code) that prohibits, restricts, limits, or conditions such assignment or transfer.

e.  After the Debtors' transfer and assignment of the Designated Contracts to the Purchaser, in accordance with sections 363 and 365 of the Bankruptcy

Code, the Purchaser shall be fully and irrevocably vested in all right, title, and interest of each Designated Contract.

     f.   Any portion of any Designated Contract which purports to permit a landlord thereunder to cancel the remaining term of such Designated Contact if the Debtors discontinue their use or operation of the leased premises is void and of no force and effect, and shall not be enforceable against the Purchaser, or their assignees and sublessees; and the landlords under any such Designated Contract shall not have the right to cancel or otherwise modify the Designated Contract or increase the rent, assert any claim or impose any penalty by reason of such discontinuation, the Debtors' cessation of operations, the assignment of such Designated Contract to the Purchaser, or the interruption of business activities at any of the leased premises.

    17.   All defaults and all other obligations of the Debtors under the Designated Contracts occurring, arising or accruing prior to the assignment thereof to the Purchaser upon the Contract Assignment Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) are deemed to have been cured or satisfied by the Purchaser's payment of the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Designated Contract in the applicable Cure Amounts set forth on the Designated Contract Notice or any supplement thereto (or any other Cure Amount reached by agreement after an objection to the proposed Cure Amount by a counterparty to a Designated Contract), which was served in compliance with this Sale Order, and which Cure Amounts shall be satisfied on the Contract Assignment Date and in accordance with the APA.

    18.   Pursuant to section 365(k) of the Bankruptcy Code, the Debtors and their estates shall be relieved from any liability for any breach of any Designated Contract following the effective date of such assumption and assignment to Purchaser.

**XI.**    **Disposition of Sale Proceeds**

    19.   Upon receipt of the Purchase Price, (a) pursuant to paragraph 25 of the Court's

*Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Superpriority Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 495] (the "<u>DIP Order</u>") and section 2.04(b) of the DIP Credit Agreement (as defined in the DIP Order), the Debtors shall immediately transfer to 405 Sentinel LLC, the Debtors' DIP lender, that portion of the Purchase Price as is required to indefeasibly pay the DIP Obligations (as defined in the DIP Order) in full and (b) the Debtors shall immediately transfer into a segregated debtor in possession account a portion of the Purchase Price equal to the sum of (i) the Carve Out (as defined in the DIP Order) provided in the DIP Order and (ii) professional fees payable under the Approved Budgets (as defined in the DIP Order); provided, however, that as soon as reasonably practicable, the Debtors shall use such funds to pay professional fees as permitted under the Approved Budgets, subject to the interim compensation procedures order, if applicable.  All parties reserve their respective rights with respect to any proposed Budgets (as defined in the DIP Order) that, as of the date hereof, have not been approved in accordance with the DIP Order.

**XII.    <u>Modification of the Automatic Stay.</u>**

20.    The automatic stay provisions of section 362 of the Bankruptcy Code are lifted and modified to the extent necessary to implement the terms and conditions of the APA and the provisions of this Sale Order.

**XIII.    <u>Release of Liens by Creditors; Collection of Purchased Assets.</u>**

21.    Except as expressly provided to the contrary in this Sale Order or in the APA, the holder of any valid Lien, Claim, or Interest in the Debtors or the Purchased Assets shall, as of the Closing, be deemed to have waived and released such Lien, Claim, or Interest, without regard to whether such holder has executed or filed any applicable release, and such Lien, Claim, or,

Interest shall automatically, and with no further action by any party, attach to the portion of the purchase price ultimately attributable to the Purchased Assets against or in which they claim an interest, in the order of their priority, with the same validity, force, and effect, if any, which they now have against such Purchased Assets, subject to any claims, defenses, and objections, if any, that the Debtors or their estates may possess with respect thereto.  Notwithstanding the foregoing, any such holder of such a Lien, Claim, or Interest is authorized to execute and deliver any waivers, releases, or other related documentation, as reasonably requested by the Debtors.

22.    As of the Closing, the Purchaser and its successors and assigns shall be designated and appointed as the Debtors' true and lawful attorney with full power of substitution in the Debtors' name and stead on behalf of and for the benefit of the Purchaser, and its successors and assigns, for the sole and limited purposes of demanding and receiving any and all of the Purchased Assets and giving receipts and releases for and in respect of the Purchased Assets, or any part thereof, and from time to time, instituting and prosecuting against third parties for the benefit of the Purchaser, their successors and assigns, proceedings at law, in equity or otherwise, which the Purchaser, and their successors and assigns, may deem proper for the collection or reduction to possession of any of the Purchased Assets; *provided*, that such rights shall be subject to the terms and conditions of the APA and Transaction Documents, to the extent applicable, and, under no circumstances, shall Purchaser have the right to take any action on behalf of the Debtors with respect to the Excluded Assets or the Chapter 11 Cases or any related proceeding. This Court shall retain jurisdiction to determine whether any actions taken by Purchaser exceeds the authority conferred by this paragraph and, if such action is determined to be in violation of this provision, order any appropriate relief.

## XIV.  **Effect of Recordation of Order.**

23.    This Sale Order, once filed, registered, or otherwise recorded, (a) shall be

effective as a conclusive determination that, upon the Closing, all Liens, Claims, and Interests of any kind or nature whatsoever (except for the Operating Agreement Assumed Liabilities) existing as to the Purchased Assets prior to the Closing have been unconditionally released, discharged, and terminated and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, local officials, notaries, protonotaries, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to, the Purchased Assets.  Each and every federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the Sale contemplated by the APA, including, without limitation, recordation of this Sale Order.

**XV.** **Administrative Priority Status.**

24.     Purchaser reserves the right to seek allowance of an administrative expenses claim under sections 503(b) and 507(a)(2) of the Bankruptcy Code on account of any amounts that become payable by the Debtors to the Purchaser pursuant to or in connection with the APA or the Transaction Documents; *provided, however*, that the Debtor, UCC, and, to the extent any amounts remain owing under the DIP Credit Agreement, the DIP Lender expressly reserve and retain any and all rights, claims, defenses and other objections or oppositions to the allowance of any such claim(s).

**XVI.**  **Prohibition of Actions Against the Purchaser.**

25.     Except as expressly permitted or otherwise specifically provided for in the APA, Transaction Documents, or this Sale Order, including, without limitation, as to any Cure Amounts or Cure Claims, the Purchaser and its affiliates shall have no liability or responsibility to any non-Debtor entity[5] for any liability or other obligation of the Debtors' arising under or related to the Purchased Assets or otherwise, and upon Closing, all entities or persons are permanently and forever prohibited, barred, estopped, and enjoined from asserting against the Purchaser and its permitted successors, designees, and assigns, or property, or the Purchased Assets conveyed in accordance with the APA, any Lien, Claim, or Interest of any kind whatsoever arising prior to Closing, including, without limitation, under any theory of successor or transferee liability, *de facto* merger or continuity liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.

**XVII.**  **No Interference.**

26.     Following the Closing, no holder of a Lien, Claim, or Interest in or against the Debtors or the Purchased Assets shall interfere with the Purchaser's title to or use and enjoyment of the Purchased Assets based on or related to such Lien, Claim, and/or Interest or any actions that the Debtors may take in the Chapter 11 Cases or any successor cases.

**XVIII.** **Retention of Jurisdiction.**

27.     This Court retains jurisdiction to, among other things, interpret, enforce, and implement the terms and provisions of this Sale Order and the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in

---

[5] For purposes of this provision, a Debtor entity includes any person or entity asserting a right of the Debtors or their respective bankruptcy estate, including, without limitation, the official committee of unsecured creditors, and any trustee appointed in the Chapter 11 Cases, whether under chapter 7 of the Bankruptcy Code or pursuant to a confirm chapter 11 plan.

all respects, including, but not limited to, retaining jurisdiction to:  (a) compel delivery of the Purchased Assets or performance of other obligations owed to the Purchaser; (b) compel delivery of the purchase price or performance of other obligations owed to the Debtors; (c) resolve any disputes arising under or related to the APA, except as otherwise provided therein; (d) interpret, implement, and enforce the provisions of this Sale Order; and (e) protect the Purchaser and its affiliates against (i) any Liens, Claims, and Interests in or against the Debtors or the Purchased Assets of any kind or nature whatsoever and (ii) any creditors or other parties in interest regarding the turnover of the Purchased Assets that may be in their possession.

## XIX.    <u>Good Faith Purchaser.</u>

28.    The Sale contemplated by the APA are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to the Purchaser (including the assumption and assignment by the Debtors of any Designated Contract), unless such authorization is duly stayed pending such appeal.  The Purchaser is a purchaser in good faith of the Purchased Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

## XX.    <u>Inconsistencies with Prior Orders, Pleadings or Agreements.</u>

29.    To the extent this Sale Order is inconsistent or conflicts with any prior order (other than the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Superpriority Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 495]) or pleading in these Chapter 11 Cases, the terms of this Sale Order shall govern and any prior orders shall be deemed amended or otherwise modified solely to the extent required to permit consummation of the Sale pursuant to this Sale Order, the APA,

and Transaction Document.

## XXI.  **Failure to Specify Provisions.**

30.     The failure to specifically reference any particular provisions of the APA or other related documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA and other related documents be authorized and approved in their entirety and without alteration.

## XXII. **Provisions Regarding LBT Entities.**

31.     Sale of Debtors' Interest in Assets Only.  This Order authorizes, permits, and shall be deemed to authorize and permit the Debtors to sell to the Purchaser any undivided interest of shared services systems owned by the Debtors.  Notwithstanding anything to the contrary in this Order or the APA, nothing in this Order authorizes, permits or shall be deemed to authorize or permit, the Debtors to sell, transfer or assign to the Purchaser or any other party any Non-Debtor Asset (as defined in the Bidding Procedures) including, for the avoidance of doubt, the LBT Entities' undivided interest of shared services systems, any real property owned by the LBT Entities, or the rights of the LBT Entities under any Permits.

32.     LBT Entities Not Affiliates of the Debtors.  Notwithstanding anything to the contrary in this Order, the APA, or any applicable transition services agreement, the LBT Entities are not, and shall not be considered, affiliates of the Debtors for purposes of this Order, the APA, or any applicable transition services agreement, including, without limitation, with respect to any obligations, rights, representations, warranties, covenants, indemnification, or releases set forth in this Order or the APA, and no such obligations, rights, representations, warranties, covenants, indemnification, or releases shall be deemed to bind, extend to, or be

enforceable against any of the LBT Entities in their capacity as affiliates of the Debtors; *provided*, *that*, for the avoidance of doubt, any provisions of this Order that apply to the LBT Entities in any capacity other than as affiliates of the Debtor shall not be modified in any way by the terms of this paragraph 33.

33.    <u>No Assumption or Assumption and Assignment.</u>  Notwithstanding anything to the contrary in this Order or the APA, (i) no agreements between the Debtors and the LBT Entities, including that certain Shared Services Systems Agreement dated as of November 30, 2018 by and among Limetree Bay Terminals, LLC, Limetree Bay Refining, LLC, and Limetree Bay Refining Marketing, LLC (the "**SSSA**"), are being assumed or assumed and assigned; (ii) nothing contained in this Order or the APA authorizes the Debtors to transfer any rights under the SSSA to the Purchaser or any other party; *provided*, *that*, the Debtors may transfer to Purchaser the assignment of ingress and egress easement as well as any other access easements on the subject refinery/terminal property held by Limetree Bay Refining, LLC, if any; (iii) nothing contained in this Order, the APA, or any applicable transition services agreement, obligates or requires, or shall be deemed to obligate or require, the LBT Entities, the Debtors, or the Purchaser to provide any services, or goods including, without limitation, employees, fuel, or power to the LBT Entities, the Debtors, or the Purchaser, including pursuant to the SSSA; and (iv) nothing contained in this Order, the APA, or any applicable transition services agreement, waives or shall be deemed to waive any rights of the LBT Entities or the Debtors under or with respect to the SSSA or the rights of the Debtors, the LBT Entities, or the Purchaser with respect to potential assumption or assumption and assignment of the SSSA pursuant to section 365 of the Bankruptcy Code.

34.     Rights of Access Are Preserved.  Notwithstanding anything to the contrary in this Order, the APA or any applicable transition services agreement, all rights, claims, and defenses of the LBT Entities, the Debtors, and the Purchaser (if any) under or with respect to any agreements benefitting or in favor of the LBT Entities, the Debtors, or the Purchaser (if any), respectively are expressly and fully reserved and preserved, including, without limitation, all easements and rights of use or access to the Debtors' property and property jointly owned by the Debtors and the LBT Entities' property, including as set forth in the SSSA, and, for the avoidance of doubt, the LBT Entities and Purchaser may continue to use and benefit from all such easements and rights of use or access after Closing in accordance with the SSSA or any other agreements between the Debtors and the LBT Entities.

35.     Shared Authorization.  Notwithstanding anything to the contrary in this Order or the APA, (i) Purchaser and the LBT Entities shall work in good faith with one another and use commercially reasonable efforts to take any actions necessary to maintain any licenses, certificates, permits, orders, approvals, consents, determinations, variances, franchises, entitlements, approvals or other authorizations from any governmental authority that are shared by and between the LBT Entities and the Debtors and that are acquired or used by Purchaser as a result of the Sale; and (ii) nothing in this Order or the APA imposes any obligation of the Purchaser or the Debtors to comply with applicable regulatory or governmental laws or authorities on the LBT Entities.

36.     Payment of Budgeted Amounts under Transition Services Agreement (If SCE Becomes the Winning Bidder).  In the event that SCE and the Designated Back-up Bid become the Winning Bidder and Winning Bid, respectively, notwithstanding anything in this Order or any previous order of the Court, the Debtors are authorized, directed to, and shall use any

payments or proceeds received from the Purchaser under any transition services agreement to first pay the amounts set forth in the budget attached to such transition services agreement before such payments or proceeds are used for any other purpose by the Debtors.

**XXIII. <u>Additional Provisions</u>**

37.    <u>Galena Park Independent School District, et al. [Docket No. 838]</u>.  To the extent the Debtors have any assets within the boundaries of the Certain Texas Taxing Entities (as that term is defined in the *Limited Objection and Reservation of Rights of Certain Texas Taxing Entities to the Debtors' Emergency Motion to (I) Establishing Bidding and Sale Procedures; (II) Approving the Sale of Assets; and (III) Granting Related Relief, Motion for Sale of All or Substantially All Assets Free and Clear of Liens as Described in Section 363(f)* [Docket No. 838]) that constitute Purchased Assets under the APA (the "<u>Texas Taxing Entities' Assets</u>"), the Certain Texas Taxing Entities' tax liens shall attach to the portion of the Purchase Price ultimately attributable to the Texas Taxing Entities' Assets in the order of their priority, with the same validity, force, and effect, if any, which such tax liens now have against the Texas Taxing Entities Assets, subject to any claims, defenses, and objections, if any, that the Debtors or their estates may possess with respect thereto.

38.    <u>HKA Enterprises, LLC [Docket No. 851]</u>.  For the avoidance of doubt, the construction lien recorded by HKA Enterprises, LLC ("<u>HKA</u>") as document #2021002480, Book 1622 Page 324 with the Recorder of Deeds located in the Virgin Islands, St. Croix (the "<u>Construction Lien</u>"), shall attach to that portion of the Purchase Price ultimately attributable to the sale of the purported collateral for the Construction Lien (the "<u>HKA Collateral</u>") in the order of priority and with the same validity, force, and effect, if any, which it may now have against the HKA Collateral, subject to any claims, defenses, and objections, if any, that the Debtors or their estates may possess with respect thereto, as provided in paragraphs 9 and 21 of this Order.

39.    Axens North America [Docket Nos. 854 and 874].  Notwithstanding anything to the contrary herein, all reservation of rights set forth in the Limited Objection filed by Axens North America Inc. ("Axens") [Docket No. 874] are hereby reserved.  Nothing contained herein shall constitute a waiver of Axens' right to assert claims for infringement of its intellectual property, unfair competition and/or any other claims for unlawful use of any unit previously owned by the Debtors, which are the subject of that certain License Agreement, dated November 21, 2018 between the debtor, Limetree Bay Refining LLC, and Axens (the "License"), in the event the Debtors do not assume and assign the License to Purchaser.

40.    SAP America, Inc. [Docket Nos. 863 and 951].  Absent compliance with Section 365 of the Bankruptcy Code and the Assumption and Assignment Procedures, or written agreement of the Debtors and SAP America, Inc. ("SAP"), (a) the Debtors shall not (i) assume, assume and assign, or otherwise transfer any executory contract between any Debtor and SAP or (ii) provide transition services utilizing or allow the shared use of the software, proprietary information, or cloud services owned, licensed, or provided by SAP (the "SAP Software") or any SAP Software-related services licensed or provided by SAP to either the Purchaser, SCE, or any third party to the extent prohibited under the applicable agreement(s) between the Debtors and SAP, and (b) neither the Purchaser nor SCE shall acquire any license or other rights under any executory contract between any Debtor and SAP notwithstanding the transfer of any Business IT Assets pursuant to the Sale.

41.    Intertek USA Inc. [Docket No. 867].  Nothing in this Sale Order shall be construed as a determination of, and Intertek USA Inc. and the Debtors expressly reserve all rights, claims, and defenses with respect to, the respective rights and interests of Intertek USA Inc. and the Debtors to the Intertek Equipment (as defined in Intertek's *Motion for Relief from*

*Automatic Stay Pursuant to 11 U.S.C. § 362(d) and for Waiver of the 14- Day Stay Pursuant to Fed. R. Bankr. P. 4001(a)(3)* [Docket No. 868]).

    42.    <u>Harris County, Texas [Docket No. 869]</u>.  The Debtors agree that, to the extent the Debtors have any personal assets located in Harris County, Texas that constitute Purchased Assets under the APA (the "<u>Harris County Assets</u>"), the Harris County tax lien shall attach to the portion of the purchase price ultimately attributable to the Harris County Assets in the order of its priority, with the same validity, force, and effect, if any, which it now has against such Purchased Assets, subject to any claims, defenses, and objections, if any, that the Debtors or their estates may possess with respect thereto.

    **Signed:  December 21, 2021.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

**<u>Exhibit 1</u>**

**Asset Purchase Agreement**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 21-32351** |
| **Limetree Bay Services, LLC, *et al.*,** | § | |
| | § | **Chapter 11** |
| **Debtors.** | § | |

<u>**Stipulation and Agreed Order**</u>

Limetree Bay Services, LLC, Limetree Bay Refining Holdings, LLC, Limetree Bay Refining Holdings II, LLC, Limetree Bay Refining, LLC, Limetree Bay Refining Operating, LLC, Limetree Bay Refining Marketing, LLC (collectively ("Limetree"), debtors in the above-captioned bankruptcy case, and the United States stipulate and agree that:

1.  The Occupational Safety and Health Administration ("OSHA") conducted an inspection of Limetree (Inspection 1521774);

2.  As a result of that inspection, OSHA believes that Limetree committed violations of the Occupational Safety and Health Act (the "OSH Act") on May 12, 2021;

3.  Limetree filed a petition for relief on July 21, 2021;

4.  Pursuant to the police or regulatory exception to the automatic stay, OSHA may issue a Citation and Notification of Penalty pursuant to Inspection 1521774 as the first step in seeking a final order for abatement of the alleged violations and assessment of the proposed penalties;

5.  Limetree reserves all rights to contest the alleged violations and penalties;

6.  OSHA and Limetree wish to resolve any issues as to the applicability of the police or regulatory exception to the automatic stay to the issuance of the attached Citation and Notification of Penalty as provided herein,

Based on the agreement of the parties, it is hereby **ORDERED THAT:**

1.  OSHA may issue the attached Citation and Notification of Penalty subject to the limitations provided in this Stipulation.

2.  Issuance of this Citation is not a demand for payment and payment of any penalty is subject to any claim process under the Bankruptcy Code.  Failure to timely contest the citation and proposed penalty amount will result in an administrative final order affirming the citation and proposed penalty by operation of law under the OSH Act, but enforcement or collection of the penalty pursuant to such an order is stayed by the automatic stay.  Entry or accrual of a final order will not

establish its priority for payment under the Bankruptcy Code which will be determined by the Bankruptcy Court.  Limetree and the United States recognize and acknowledge that the claim, if allowed, is unsecured.  No payment of a penalty is required prior to allowance of a claim by the Bankruptcy Court, determination of the amount to be paid to allowed claims under the bankruptcy process, and the time for payment of claims of creditors.

3.      Failure to timely contest the Citation and Notification of Penalty will result in a final order by operation of law under the OSH Act that will not be subject to any right of appeal, but will not require any payment outside of the claim process under the Bankruptcy Code.

4.      Payment of any penalty or additional amounts is subject to any claim process under the Bankruptcy Code.


**BAKER & HOSTETLER LLP**


/s/ Joseph M. Esmont w/ permission by Richard A. Kincheloe
**Elizabeth A. Green, Esq.**
Fed ID No.: 903144
**Jimmy D. Parrish, Esq.**
Fed. ID No. 2687598
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL  32801-3432
Telephone:  407.649.4000
Facsimile:  407.841.0168
Email:  egreen@bakerlaw.com
          jparrish@bakerlaw.com

**BAKER & HOSTETLER LLP**
**Jorian L. Rose, Esq.**
N.Y. Reg. No. 2901783
45 Rockefeller Plaza
New York, New York
Telephone:  212.589.4200
Facsimile:  212.589.4201
Email: jrose@bakerlaw.com
*Admitted Pro Hac Vice 07/13/2021*

**BAKER & HOSTETLER LLP**
**Joseph M. Esmont, Esq.**
Ohio Reg. No. 84322
127 Public Sq. Ste. 2000
Cleveland, OH 44114-1214
Telephone:  216.621.0200
Facsimile:  216.696.0740
Email: jesmont@bakerlaw.com
*Admitted Pro Hac Vice 08/04/2021*

*Counsel for the Debtors and Debtors in Possession*


JENNIFER B. LOWERY,
Acting United States Attorney

*s/ Richard A. Kincheloe*
Richard A. Kincheloe
Assistant United States Attorney
Attorney-in-Charge
United States Attorney's Office
Southern District of Texas
Texas Bar No. 24068107
S.D. Tex. ID No. 1132346
1000 Louisiana St., Suite 2300
Houston, Texas 77002
Telephone: (713) 567-9422
Facsimile: (713) 718-3033
Email:  Richard.Kincheloe@usdoj.gov
**Attorney for the United States of America**

**U.S. Department of Labor**    Occupational Safety and Health Administration
B7 Calle Tabonuco, Suite 1105
Guaynabo, PR 00968



Limetree Bay Refining, LLC.
and its successors
1 Estate Hope
Christiansted, VI 00820

Dear Employer:

Enclosed you will find citations for violations of the Occupational Safety and Health Act of 1970 (the Act) which may have accompanying proposed penalties. Also enclosed is a booklet entitled, "Employer Rights and Responsibilities Following an OSHA Inspection", (OSHA 3000-04R) revised 2018, which explains your rights and responsibilities under the Act. If you have any questions about the enclosed citations and penalties, I would welcome further discussions in person or by telephone. Please contact me at (787) 277-1560.

You will note on page 6 of the booklet that, for violations which you do not contest, you must (1) notify this office promptly by letter that you have taken appropriate corrective action within the time set forth on the citation; and (2) pay any penalties assessed. Please inform me of the abatement steps you have taken and of their dates together with adequate supporting documentation; e.g., drawings or photographs of corrected conditions, purchase/work orders related to abatement actions, air sampling results. This information will allow us to close the case.

As indicated on page 3 of the booklet, you may request an informal conference with me during the 15-working-day notice of contest period. During such an informal conference you may present any evidence or views which you believe would support an adjustment to the citation or the penalty.

If you are considering a request for an informal conference to discuss any issues related to this Citation and Notification of Penalty, you must take care to schedule it early enough to allow time to contest after the informal conference, should you decide to do so. Please keep in mind that a written letter of intent to contest must be submitted to the Area Director within 15 working days of your receipt of the citation. The running of this contest period is not interrupted by an informal conference.

If you decide to request an informal conference, please complete the attached notice at the bottom of this letter and post it next to the Citations as soon as the time, date and the place of the informal conference have been determined. Be sure to bring to the conference with you any and all supporting documentation of existing conditions as well as of any abatement steps taken thus far. If conditions warrant, we can enter into an informal settlement agreement which amicably resolves this matter without litigation or contest.

You should be aware that OSHA publishes information on its inspection and citation activity on the Internet under the provisions of Electronic Freedom of Information Act. The information related to these alleged violations will be posted when our system indicates that you have received this citation. You are encouraged to review the information concerning your establishment at www.osha.gov. If you have any dispute with the accuracy of the information displayed, please contact this office.

Sincerely,

**Alfredo Nogueras, CSP**
Area Director

Enclosures

**U.S. Department of Labor**
Occupational Safety and Health Administration
B7 Calle Tabonuco, Suite 1105
Guaynabo, PR 00968



---

## Citation and Notification of Penalty

---

**To**:
Limetree Bay Refining, LLC.
and its successors
1 Estate Hope
Christiansted, VI 00820

**Inspection Site:**
1 Estate Hope
Christiansted, VI 00820

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:

*The violation(s) described in this Citation and Notification of Penalty is (are) alleged to have occurred on or about the day(s) the inspection was made unless otherwise indicated within the description given below.*

---

This Citation and Notification of Penalty (this Citation) describes violations of the Occupational Safety and Health Act of 1970. The penalty(ies) listed herein is (are) based on these violations. You must abate the violations referred to in this Citation by the dates listed and pay the penalties proposed, unless within 15 working days (excluding weekends and Federal holidays) from your receipt of this Citation and Notification of Penalty **you either call to schedule an informal conference (see paragraph below) or** you mail a notice of contest to the U.S. Department of Labor Area Office at the address shown above. Please refer to the enclosed booklet (OSHA 3000) which outlines your rights and responsibilities and which should be read in conjunction with this form. Issuance of this Citation does not constitute a finding that a violation of the Act has occurred unless there is a failure to contest as provided for in the Act or, if contested, unless this Citation is affirmed by the Review Commission or a court.

**Posting -** The law requires that a copy of this Citation and Notification of Penalty be posted immediately in a prominent place at or near the location of the violation(s) cited herein, or, if it is not practicable because of the nature of the employer's operations, where it will be readily observable by all affected employees. This Citation must remain posted until the violation(s) cited herein has (have) been abated, or for 3 working days (excluding weekends and Federal holidays), whichever is longer.

**Informal Conference -** An informal conference is not required. However, if you wish to have such a conference you may request one with the Area Director during the 15 working day contest period by calling (787) 277-1560. During such an informal conference, you may present any evidence or views which you believe would support an adjustment to the citation(s) and/or penalty(ies).

If you are considering a request for an informal conference to discuss any issues related to this Citation and Notification of Penalty, you must take care to schedule it early enough to allow time to contest after the informal conference, should you decide to do so. Please keep in mind that a written letter of intent to contest must be submitted to the Area Director within 15 working days of your receipt of this Citation. The running of this contest period is not interrupted by an informal conference.

If you decide to request an informal conference, please complete, remove and post the Notice to Employees next to this Citation and Notification of Penalty as soon as the time, date, and place of the informal conference have been determined. Be sure to bring to the conference any and all supporting documentation of existing conditions as well as any abatement steps taken thus far. If conditions warrant, we can enter into an informal settlement agreement which amicably resolves this matter without litigation or contest.

**Right to Contest –** You have the right to contest this Citation and Notification of Penalty. You may contest all citation items or only individual items. You may also contest proposed penalties and/or abatement dates without contesting the underlying violations. **Unless you inform the Area Director in writing that you intend to contest the citation(s) and/or proposed penalty(ies) within 15 working days after receipt, the citation(s) and the proposed penalty(ies) will become a final order of the Occupational Safety and Health Review Commission and may not be reviewed by any court or agency.**

**Penalty Payment –** Penalties are due within 15 working days of receipt of this notification unless contested. (See the enclosed booklet and the additional information provided related to the Debt Collection Act of 1982.) Make your check or money order payable to "DOL-OSHA". Please indicate the Inspection Number on the remittance. You can also make your payment electronically at www.pay.gov. At the top of the pay.gov homepage, type **"OSHA"** in the Search field and select Search. From **OSHA Penalty Payment Form** search result, select Continue. The direct link is:

<u>https://www.pay.gov/paygov/forms/formInstance.html?agencyFormId=53090334</u>

You will be required to enter your inspection number when making the payment. Payments can be made by credit card or Automated Clearing House (ACH) using your banking information. Payments of $25,000 or more require a Transaction ID, and also must be paid using ACH. If you require a Transaction ID, please contact the OSHA Debt Collection Team at (202) 693-2170.

OSHA does not agree to any restrictions or conditions or endorsements put on any check, money order, or electronic payment for less than the full amount due, and will process the payments as if these restrictions or conditions do not exist.

**Notification of Corrective Action –** For each violation which you do not contest, you must provide *abatement certification* to the Area Director of the OSHA office issuing the citation and identified above. This abatement certification is to be provided by letter within 10 calendar days after each abatement date. Abatement certification includes the date and method of abatement. If the citation indicates that the violation was corrected during the inspection, no abatement certification is required for that item. The abatement certification letter must be posted at the location where the violation appeared and the corrective action took place or employees must otherwise be effectively informed about abatement activities. A sample abatement certification letter is enclosed with this Citation. In addition, where the citation indicates that *abatement documentation* is necessary, evidence of the purchase or repair of equipment, photographs or video, receipts, training records, etc., verifying that abatement has occurred is required to be provided to the Area Director.

**Employer Discrimination Unlawful –** The law prohibits discrimination by an employer against an employee for filing a complaint or for exercising any rights under this Act. An employee who believes that

he/she has been discriminated against may file a complaint no later than 30 days after the discrimination occurred with the U.S. Department of Labor Area Office at the address shown above.

**Employer Rights and Responsibilities** – The enclosed booklet (OSHA 3000) outlines additional employer rights and responsibilities and should be read in conjunction with this notification.

**Notice to Employees** – The law gives an employee or his/her representative the opportunity to object to any abatement date set for a violation if he/she believes the date to be unreasonable. The contest must be mailed to the U.S. Department of Labor Area Office at the address shown above and postmarked within 15 working days (excluding weekends and Federal holidays) of the receipt by the employer of this Citation and Notification of Penalty.

**Inspection Activity Data –** You should be aware that OSHA publishes information on its inspection and citation activity on the Internet under the provisions of the Electronic Freedom of Information Act. The information related to these alleged violations will be posted when our system indicates that you have received this citation. You are encouraged to review the information concerning your establishment at www.osha.gov. If you have any dispute with the accuracy of the information displayed, please contact this office.

EPA-161

**U.S. Department of Labor**
Occupational Safety and Health Administration



# NOTICE TO EMPLOYEES OF INFORMAL CONFERENCE

An informal conference has been scheduled with OSHA to discuss the citation(s) issued on .

The conference will be held by telephone or at the OSHA office located at B7 Calle Tabonuco,

Suite 1105, Guaynabo, PR 00968 on _____ at _____. Employees

and/or representatives of employees have a right to attend an informal conference.

**CERTIFICATION OF CORRECTIVE ACTION WORKSHEET**

**Inspection Number: 1521774**

Company Name: Limetree Bay Refining, LLC.
Inspection Site: 1 Estate Hope, Christiansted, VI 00820
Issuance Date:

List the specific method of correction for each item on this citation in this package that does not read "Corrected During Inspection" and return to: **U.S. Department of Labor – Occupational Safety and Health Administration, B7 Calle Tabonuco, Suite 1105, Guaynabo, PR 00968.**

Citation Number _____ and Item Number _____ was corrected on _____
By (Method of Abatement): _____
_____

Citation Number _____ and Item Number _____ was corrected on _____
By (Method of Abatement): _____
_____

Citation Number _____ and Item Number _____ was corrected on _____
By (Method of Abatement): _____
_____

Citation Number _____ and Item Number _____ was corrected on _____
By (Method of Abatement): _____
_____

Citation Number _____ and Item Number _____ was corrected on _____
By (Method of Abatement): _____
_____

Citation Number _____ and Item Number _____ was corrected on _____
By (Method of Abatement): _____
_____

I certify that the information contained in this document is accurate and that the affected employees and their representatives have been informed of the abatement.

_____         _____
Signature                                Date
_____         _____
Typed or Printed Name                    Title

**NOTE: 29 USC 666(g)** whoever knowingly makes any false statements, representation or certification in any application, record, plan or other documents filed or required to be maintained pursuant to the Act shall, upon conviction, be punished by a fine of not more than $10,000 or by imprisonment of not more than 6 months or both.

**POSTING:** A copy of completed Corrective Action Worksheet should be posted for employee review

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



<u>**Citation and Notification of Penalty**</u>

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

<u>Citation 1 Item 1</u>     Type of Violation:  **Serious**

29 CFR 1910.119(d)(2)(i)(D): Safe upper and lower limits for such items as temperature, pressures, flows, or compositions pertaining to the technology of the process were not compiled before conducting any process hazard analysis required by this standard:

(a) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer failed to compile complete and accurate safe upper and lower limits for such items as temperatures, pressures, flows, or compositions for the DCU. The employer did not compile complete information on low and high pilot gas pressure for the Coker Feed Furnace (H-8501B). Failure to establish accurate safe operating limits for H-8501 pilot gas system to ensure it alarms and trips at the correct pressure can lead to process upsets, and expose employees to fire, explosion and toxic hazards.

(b) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer failed to compile complete and accurate safe upper and lower limits for such items as temperatures, pressures, flows, or compositions for the DCU. The employer did not compile complete accurate information on the process's technology, including upper and lower limits for injecting antifoam into Coke drum during Coke fill to prevent foam over. Failure to establish accurate safe operating limits for antifoam could result in overfill of Coke Drums and expose employees to fire, explosion, and toxic hazards.

(c) On or about May 12, 2021, at Limetree Bay Refining, LLC., Flare No. 8 Complex - the employer failed to compile complete and accurate safe upper and lower limits for such items as temperatures, pressures, flows, or compositions for the Flare No.8. The employer did not compile accurate information on the process's technology, including upper and lower limits for level in Coker Flare Knockout Drum (D-8702) and FCC Flare Knockout Drum (D-7941). Failure to establish accurate safe operating limits for flare knockout drum level could overfill drums, cause liquid carryover to flare, flaming rain and expose employees to fire, explosion, toxic and respiratory hazards.

**ABATEMENT DOCUMENTATION REQUIRED FOR THIS ITEM**

Date By Which Violation Must be Abated:
Proposed Penalty:

$13,653.00

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                Page 6                OSHA-2

EPA-164

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



<u>**Citation and Notification of Penalty**</u>

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

<u>Citation 1 Item 2</u>    Type of Violation: **Serious**

29 CFR 1910.119(d)(2)(i)(E): The employer failed to perform an evaluation of the consequences of deviations, including those affecting the safety and health of employees:

(a) On or about May 12, 2021 at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer failed to compile complete and accurate information concerning the technology of the DCU to include an evaluation of the consequences of deviations, including those affecting the safety and health of employees. The employer did not include an evaluation of the consequences of exceeding the quench water flowrate during an abnormal, or "tarry drum," quenching scenario. Failure to evaluate consequences of exceeding safe operating limits for quench water flowrate can cause an overfill/overpressure scenario, and expose employees to fire, explosion, and toxic hazards.

(b) On or about May 12, 2021 at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer failed to compile complete and accurate information concerning the technology of the DCU to include an evaluation of the consequences of deviations, including those affecting the safety and health of employees. The employer did not include an evaluation of the consequences of exceeding the design metal temperature of the Coker Feed Furnace (H-8501B) tube and swing elbow. Failure to accurately establish safe operating limits for heater tubes/elbows and evaluate consequences of exceeding limits can cause catastrophic tube rupture, and expose employees to fire, explosion, and toxic hazards.

(c) On or about May 12, 2021 at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer failed to compile complete and accurate information concerning the technology of the DCU to include an evaluation of the consequences of deviations, including those affecting the safety and health of employees. The employer did not include an evaluation of the consequences of low pilot fuel gas to Coker Feed Furnace (H-8501B) during coke drum filling. Failure to accurately establish safe operating limits for H-8501B's pilot fuel gas and evaluate consequences pilot gas can expose employees to fire, explosion, and toxic hazards.

(d) On or about May 12, 2021 at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer failed to compile complete and accurate information concerning the technology of the DCU to include an evaluation of the consequences of deviations, including those affecting the safety and health of employees. The employer did not include an evaluation of the consequences of low Coker Feed Furnace (H-8501B) process outlet temperature (also known as coil outlet temperature). Failure to accurately establish safe operating limits for H-8501B's COT and evaluate consequences of low drum inlet temperature can lead to abnormal coke drum scenario, and expose employees to fire, explosion, and toxic hazards.

(e) On or about May 12, 2021 at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer failed to

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                    Page 7                    OSHA-2

EPA-165

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



**Citation and Notification of Penalty**

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

compile complete and accurate information concerning the technology of the DCU to include an evaluation of the consequences of deviations, including those affecting the safety and health of employees. The employer did not include an evaluation of the consequences of high temperature and high pressure for Coke Drum overhead vapor line to Blowdown Tower (T-8512) during an abnormal, or "tarry drum," quenching scenario. Failure to establish accurate safe operating limits and evaluate consequences of high temperature and high pressure can exceed design temperature and pressure of process equipment resulting in loss of containment, and expose employees to fire, explosion, and toxic hazards.

(f) On or about May 12, 2021 at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer failed to compile complete and accurate information concerning the technology of the DCU to include an evaluation of the consequences of deviations, including those affecting the safety and health of employees. The employer did not include an evaluation of the consequences of exceeding the process temperature of the overhead vapor line to the Coker Fractionation Tower (T-8501). Failure to establish accurate safe operating limits and evaluate consequences of high temperature can exceed design temperature of piping resulting in loss of containment, and expose employees to fire, explosion, and toxic hazards.

(g) On or about May 12, 2021 at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer failed to compile complete and accurate information concerning the technology of the DCU to include an evaluation of the consequences of deviations, including those affecting the safety and health of employees. The employer did not include an evaluation of the consequences of high pressure in Coke Drum (D-8504) overhead vapor line (PI-4010) during an abnormal, or "tarry drum" quenching scenario. Failure to establish accurate safe operating limits and evaluate consequences of high pressure can exceed design pressure of piping resulting in loss of containment, and expose employees to fire, explosion, and toxic hazards.

(h) On or about May 12, 2021 at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer failed to compile complete and accurate information concerning the technology of the DCU to include an evaluation of the consequences of deviations, including those affecting the safety and health of employees. The employer did not include an evaluation of the consequences of high pressure in Blowdown Drum Overhead Separator (D-8513) overhead line (PC-4653) and flare line (PC-4693) during an abnormal, or "tarry drum," quenching scenario. Failure to establish accurate safe operating limits and evaluate consequences of high pressure can exceed design pressure of piping resulting in loss of containment, and expose employees to fire, explosion, and toxic hazards.

(i) On or about May 12, 2021 at Limetree Bay Refining, LLC., Flare No. 8 Complex - the employer failed to compile complete and accurate information concerning the technology of the Flare No. 8 to include an evaluation of the consequences of deviations, including those affecting the safety and health of employees. The employer did not include an evaluation of the consequences of high level in Coker Flare Knockout Drum (D-8702) and FCC Flare Knockout Drum (D-7941). Failure to establish accurate safe operating limits and evaluate consequences of exceeding limits for flare knockout drum level causes liquid carryover to flare header, flaming rain and expose employees to fire, explosion, toxic and respiratory hazards.

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                Page 8                OSHA-2

EPA-166

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



<u>**Citation and Notification of Penalty**</u>

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

### ABATEMENT DOCUMENTATION REQUIRED FOR THIS ITEM

Date By Which Violation Must be Abated:
Proposed Penalty:                                                                       $13,653.00

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                    Page 9                                    OSHA-2

EPA-167

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



<u>**Citation and Notification of Penalty**</u>

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

<u>Citation 1 Item 3</u>    Type of Violation: **Serious**

29 CFR 1910.119(d)(3)(i)(D): Relief system design and design basis pertaining to the equipment in the process were not compiled before conducting any process safety analysis required by this standard.

(a) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer's relief system design basis and calculations did not include complete and accurate information such as all applicable overpressure scenarios and relief load calculations, Pressure Relief Device (PRD) documentation (PRD make/model, and materials of construction), and installation documentation (Relief piping isometrics), inlet and outlet pressure drop calculations including PRV stability (engineering analysis), and piping stress and reaction force analysis.

(b) On or about May 12, 2021 at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer failed to update relief system design basis and calculations after the crude composition changed.

(c) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer's relief system design basis and calculations did not include relief system design basis for the Blowdown Tower (T-8512).

(d) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer's relief system design basis failed to reevaluate overpressure scenario and sizing calculations for the Blowdown Tower (T-8512), Blowdown Drum Overhead Accumulator (D-8513) and Coke Fractionation Tower (T-8501), when the capacity of Coke Drum relief devices was increased.

(e) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer's relief system design basis and calculations did not include an evaluation of overpressure scenarios involving automatic control valve failure. In particular, the Coke Drum D-8504's relief system design basis shows that the vapor blocked outlet is the controlling scenario but the scenario analyses stated that there is "no relief" due to automatic control valve failure.

(f) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer's relief system design basis and calculations failed to include an evaluation of overpressure scenarios associated with water entering hot oil inside Coke Drum during quenching operation.

(g) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer's relief system design basis and calculations did not include or evaluate two phase flow as a Coke Drum relieving scenario during abnormal quenching.

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



<u>**Citation and Notification of Penalty**</u>

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

(h) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer's relief system design basis and calculations did not take into account viscosity of process streams in Coker Unit relief system design basis.

(i) On or about May 12, 2021, at Limetree Bay Refining, LLC., Flare No. 8 Complex - the employer's relief system design basis and calculations failed to evaluate all applicable overpressure scenarios when sizing Flare No. 8 header and the associated Flare knockout drums (D-7941 and D-8702).

(j) On or about May 12, 2021, at Limetree Bay Refining, LLC., Flare No. 8 Complex - the employer's relief system design basis failed to compile complete accurate information for the East Flare header.

(k) On or about May 12, 2021, at Limetree Bay Refining, LLC., Flare No. 8 Complex - the employer's relief system design basis and calculations did not include sizing calculations for the FCC Flare Knockout Drum (D-7941) and Coker Flare Knockout Drum (D-8702).

**ABATEMENT DOCUMENTATION REQUIRED FOR THIS ITEM**

Date By Which Violation Must be Abated:
Proposed Penalty:                                                                                  $13,653.00

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                    Page 11                    OSHA-2

EPA-169

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



<u>**Citation and Notification of Penalty**</u>

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

<u>Citation 1 Item 4</u>   Type of Violation: **Serious**

29 CFR 1910.119(d)(3)(i)(G): The employer's material and energy balances (M&EB) were not accurate and did not reflect the current crude composition and operating conditions:

(a) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer failed to update their material and energy balances (M&EB) for the DCU and Flare No.8 after the crude composition changed. Failure to compile complete accurate M&EB results in incorrect process conditions being used for process hazard analyses (PHAs), relief system design basis and calculations, and safe operating limits for equipment, exposing employees to the hazard of explosions, fires from LPG, naphtha, gas oils, coke and toxic gases (H2S, benzene, and carbon monoxide) while working in the DCU.

(b) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer failed to compile complete M&EB information that included normal operating pressure, viscosity of stream, specific heat ratio Cp/Cv, and compressibility factor for the gaseous phase process streams in the DCU. Failure to compile complete accurate M&EB results in using incorrect process conditions in the PHAs, relief system design basis and calculations, and safe operating limits for equipment in operating procedures, exposed employees to the hazard of explosions, fires from LPG, naphtha, gas oils, coke and toxic gases (H2S, benzene and carbon monoxide) while working in the DCU.

**ABATEMENT DOCUMENTATION REQUIRED FOR THIS ITEM**

Date By Which Violation Must be Abated:
Proposed Penalty:                                                                                    $13,653.00

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                    Page 12                    OSHA-2

EPA-170

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



<u>**Citation and Notification of Penalty**</u>

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

<u>Citation 1 Item 5</u>    Type of Violation: **Serious**

29 CFR 1910.119(d)(3)(ii): The employer did not document that equipment complies with recognized and generally accepted good engineering practices.

(a) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer failed to document that equipment complies with recognized and generally accepted good engineering practices such as but not limited to ASME BPVC Section VIII Division 1 (2013) OVERPRESSURE PROTECTION UG 125 (c)(1) when the accumulated pressure for Coke Drum (D-8504) exceeded the Maximum Allowable Working Pressure (MAWP) of 16% for a multiple relief non-fire scenario. This hazardous situation could result in vessel failure and expose employees to vessel rupture, flammable, toxic and respiratory hazards.

(b) On or about May 12, 2021, at Limetree Bay Refining, LLC., Flare No. 8 Complex - The employer failed to document that equipment complies with recognized and generally accepted good engineering practices such as, but not limited to, API 521 Pressure-relieving and Depressuring Systems (2014), Section 5.7.9.5 when the FCC Complex Flare Knockout Drum (D-7941) and Coker Flare Knockout Drum (D-8702) did not have sufficient capacity to handle liquids during an emergency release from the Coker Unit. Failure to provide sufficient capacity for knockout drum caused drums to overflow with an oily mist, resulting in liquid carryover to flare, flare rainout, fire, and employee exposure and surrounding community to flammable, toxic and respiratory hazards.

(c) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer failed to document that equipment complies with the employer's chosen recognized and generally accepted good engineering practices Hovensa Engineering Standard 1310.1 Fireproofing - General Requirement, Section 3.19, and API 2218, Fireproofing Practices in Petroleum and Petrochemical Processing Plants (1st edition, 1998) Sections 3.1.8 and 3.1.9, when the emergency isolation valves (MOV-4513) used to isolate Coke Blowdown Tower (T-8512) was not equipped with fireproofing (i.e. insulation on tubing and conduit) to withstand fire. This hazardous situation could result in failure of emergency isolation valve and expose employees to fire and toxic hazards during emergency.

(d) On or about May 12, 2021, at Limetree Bay Refining, LLC., Flare No. 8 Complex - the employer failed to document that equipment complies with recognized and generally accepted good engineering practices such as but not limited to API 521 (2014) Sections 5.7.2.3.1 and 5.8.4.4, Table 12-Recommended Design Thermal Radiation for Personnel Permissible Design Level K kW/m2 (Btu/h·ft2) Conditions when the radiation levels exceeded the maximum radiation rate of 1,500 Btu/ ft2*hr at the Flare Knockout Drums - FCC Flare KO Drum (D-7941) and Coker Flare Knockout Drum (D-8702). Failure to protect employees and equipment from thermal radiation levels during flaring event can result in severe burn injuries, exposure to toxic and respiratory hazards, and cause

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



## Citation and Notification of Penalty

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

equipment to catastrophically fail.

(e) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer failed to document that equipment complies with recognized and generally accepted good engineering practices such as but not limited to API 521 (2014) Sections 4.4.7 and 5.5.11 when the employer's relief system did not consider two-phase overpressure scenarios creating unbalanced forces on relief system piping and supports. Failure to design relief system piping and associated supports for two phase flow can result in failure of piping, pipe supports, and employee exposure to flammable, toxic and respiratory hazards.

**ABATEMENT DOCUMENTATION REQUIRED FOR THIS ITEM**

Date By Which Violation Must be Abated:
Proposed Penalty:                                                                $13,653.00

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                    Page 14                                        OSHA-2

EPA-172

**U.S. Department of Labor**
Occupational Safety and Health Administration

Inspection Number: 1521774
Inspection Date(s): 03/26/2021 - 06/11/2021
Issuance Date:



<u>**Citation and Notification of Penalty**</u>

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

<u>Citation 1 Item 6</u>    Type of Violation: **Serious**

29 CFR 1910.119(e)(1): The process hazard analysis did not identify the hazards involved in the process:

(a) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer's 2020 UNIT 8500 Coker Unit Re-do Process Hazard Analysis Final Report failed to identify, evaluate, and control the hazards of quenching coke drums. The PHA did not identify, evaluate and control the hazard of high levels in Coke Drums (D-8501/2/3/4) during quenching. Failure to control hazards of excessive quench water resulted in overfill/overpressure of Coker Unit equipment, and liquid carryover to flare, exposing employees to fire, explosion, and toxic release hazards.

(b) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer's 2020 UNIT 8500 Coker Unit Re-do Process Hazard Analysis Final Report failed to evaluate and control the hazards of quenching coke drums. The PHA identified the hazard of adding too much quench water to the Coke Drums but did not evaluate and specify controls for the hazards of leaving the 3-inch bypass valve around the quench water valve (FV-4067) open. Failure to control hazards of excessive quench water resulted in overfill/overpressure of Coker Unit and liquid carryover to flare, exposing employees to fire, explosion, and toxic release hazards.

(c) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer's 2020 UNIT 8500 Coker Unit Re-do Process Hazard Analysis Final Report failed to evaluate and control the hazards of the DCU process. The PHA identifies low temperature and loss of feed to Coke Drums (D-8501A/B/C/D) upon Coker Feed Furnace (H-8501A/B) trip but did not evaluate and specify controls for the hazards of an abnormal Coke Drum. Failure to evaluate and control hazards of abnormal coke drum caused overfill/overpressure of Coker Drum, liquid carryover to flare, and exposed employees, contractors, and off-site communities to fire explosion, and toxic release hazards.

(d) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer's 2020 UNIT 8500 Coker Unit Re-do Process Hazard Analysis Final Report failed to identify, evaluate, and control the hazards of processing lighter crude. Failure to evaluate changes to crude on DCU unit affected safe operation of the unit, and exposed employees and contractors to fire explosion, and toxic release hazards.

(e) On or about May 12, 2021, at Limetree Bay Refining, LLC., Flare No. 8 - the employer's 2020 UNIT 7940 - No. 8 Flare FINAL Re-do Process Hazard Analysis Report failed to evaluate and control the hazards involved in the Flare No. 8 process. The PHA failed to evaluate high flow overpressure scenarios from the upstream Coker Unit, and specify controls for hazards of overfilling of FCC LP Flare Knockout Drum (D-7941), and Coker Flare Knockout Drum (D-8702). Failure to control hazards of liquid carryover to flare during abnormal coke operations

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty          Page 15          OSHA-2

EPA-173

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



**Citation and Notification of Penalty**

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

exposed employees to flare rainout, fire, and toxic release hazards.

### ABATEMENT DOCUMENTATION REQUIRED FOR THIS ITEM

Date By Which Violation Must be Abated:
Proposed Penalty:                                                                 $13,653.00

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                    Page 16                    OSHA-2

EPA-174

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



<u>**Citation and Notification of Penalty**</u>

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

<u>Citation 1 Item 7</u>    Type of Violation: **Serious**

29 CFR 1910.119(e)(3)(iii): The process hazard analysis did not address engineering and administrative controls applicable to the hazards and their interrelationships such as appropriate application of detection methodologies to provide early warning of releases.

(a) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer's PHA failed to evaluate the absence of administrative controls applicable to the hazards of the Coker Unit quenching process when too much quench water entered the Coke Drum (D-8504) due to a bypass valve and blind being inadvertently left open. PHA did not address the bypass valve or blind at all. The valve was not on the car seal list, the blind was not on blind list survey and instructions were not included in the operating procedure to verify that valve and blind were closed.

(b) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer's PHA failed to evaluate the absence of administrative controls applicable to the hazards of insufficient Coke Drum temperature leading to a tarry drum. In particular, the employer did not have procedures for handling and responding to tarry drums or high level in Coke Drum.

(c) On or about May 12, 2021, at Limetree Bay Refining, LLC., Flare No. 8 Complex - The employer's PHA failed to evaluate the absence of engineering and administrative controls applicable to the hazards of thermal radiation flux levels from flaring exposing personnel to burn and toxic vapors. In particular, the employer did not provide protection measures such as shielding or installing a boundary/barricade to restrict personnel and signage warning of the potential of thermal radiation exposure for areas near Flare No. 8.

(d) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer's PHA failed to evaluate the absence of engineering and administrative applicable to the hazard of toxic gases (H2S and benzene) entering the Coker Unit Operator Shelter (Building # 8503) during an emergency release from process equipment in the Coker Unit. In particular, the employer failed to ensure that Building #8503 had sufficient mitigation systems for a shelter in place location in the event of a toxic release - it was not equipped with appropriate engineering controls to detect, mitigate and reduce hazards to workers in the event of a toxic release.

**ABATEMENT DOCUMENTATION REQUIRED FOR THIS ITEM**

Date By Which Violation Must be Abated:
Proposed Penalty:                                                                                    $13,653.00

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



## Citation and Notification of Penalty

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

Citation 1 Item 8    Type of Violation: **Serious**

29 CFR 1910.119(e)(3)(v): The PHA did not address facility siting :

(a) On or about May 12, 2021 at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer failed to evaluate and control facility siting hazards in the 2020 Coker Unit Initial PHA when it did not evaluate and control the hazards of toxic gases (H2S and benzene) entering the Coker Control Building # 8503 (i.e. currently the Coker Unit Operator Shelter) during an emergency release from process equipment in the Coker Unit. Failure to control ingress of toxic vapors can expose workers to toxic, flammable and respiratory hazards during an emergency release and prevent timely evacuation.

(b) On or about May 12, 2021 at Limetree Bay Refining, LLC., Flare No. 8 Complex - The employer failed to evaluate and control facility siting hazards in the 2021 Flare Initial PHA when it did not evaluate and control the hazards to personnel, occupied buildings and process equipment exposed to thermal radiation flux levels greater than 2,000 BTU/ft2*hr from Flare No. 8. Failure to evaluate effects of thermal radiation on occupied buildings and process equipment can expose process equipment and employees to high thermal radiation levels resulting in loss of containment and burn injuries.

(c) On or about May 12, 2021 at Limetree Bay Refining, LLC., Flare No. 8 Complex - The employer failed to identify, evaluate and control facility siting hazards in the 2021 Flare Initial PHA, when it did not evaluate and control the hazard of toxic vapor dispersion during flaring of Flare No. 8. Failure to control toxic vapor from worst case atmospheric flaring scenario can expose employees to toxic, respiratory hazards when responding to emergencies.

**ABATEMENT DOCUMENTATION REQUIRED FOR THIS ITEM**

Date By Which Violation Must be Abated:
Proposed Penalty:                                                              $13,653.00

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                    Page 18                                    OSHA-2

EPA-176

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



<u>**Citation and Notification of Penalty**</u>

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

<u>Citation 1 Item 9</u>     Type of Violation: **Serious**

29 CFR 1910.119(e)(3)(vi):The process hazard analysis did not address human factors.

a) On or about May 12, 2021 at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer's 2020 UNIT 8500 Coker Unit Re-do Process Hazard Analysis Final Report failed to evaluate human factors when the human-machine interface (HMI) part of the distributed control system (DCS) was inadequately designed such that safety-critical alarms were indistinguishable and not prioritized. Failure to evaluate human factors in the design of the HMI DCS system can confuse operators during an emergency event when several thousand alarms may be reported at the console simultaneously without any prioritization scheme, delaying operator intervention/prompt action to an emergency, exposing employees to fire and toxic exposure hazards.

b) On or about May 12, 2021 at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer's 2020 UNIT 8500 Coker Unit Re-do Process Hazard Analysis Final Report failed to evaluate human factors when process equipment - pressure vessels, pipes, valves, instruments, and controls were not labeled. During the P&ID walk down of the Coker Unit, OSHA observed pressure vessels (Coker Drums, Blowdown Tower, Fractionation Tower, etc.), piping, pumps, control valves (MOV), emergency isolation valves, manual valves including car seal/locked open valves, and instruments were not labeled. Failure to properly label process equipment can lead to inadvertent operation of equipment such as opening the incorrect valve or errors with Coke Drum switching, exposing employees to fire, explosion, and toxic release hazards.

c) On or about May 12, 2021 at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer's 2020 UNIT 8500 Coker Unit Re-do Process Hazard Analysis Final Report did evaluate human factors in the initial Coker PHA related to hiring and retaining experienced personnel due to the remote location of the facility. Failure to have appropriate staffing and experienced operators can create worker fatigue and unsafe operations, exposing employees to fire, explosion, and toxic release hazards.

d) On or about May 12, 2021 at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer's 2020 UNIT 8500 Coker Unit Re-do Process Hazard Analysis Final Report did not evaluate human factors when the operating procedures, Coke Drum Preparation, Switching, Drum Quenching, Drum Draining, and Drum Unheading (DCU-OP-401) were too long, unclear, not concise, and inaccurate. Failure to develop clearly written operating procedures can increase the likelihood of an error when using the procedure, exposing operators to fire and toxic hazards.

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                Page 19                OSHA-2

EPA-177

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



**Citation and Notification of Penalty**

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

**ABATEMENT DOCUMENTATION REQUIRED FOR THIS ITEM**

Date By Which Violation Must be Abated:
Proposed Penalty:                                                           $13,653.00

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                    Page 20                    OSHA-2

EPA-178

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



## Citation and Notification of Penalty

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

Citation 1 Item 10   Type of Violation: **Serious**

29 CFR 1910.119(f)(1): The employer did not develop and implement written operating procedures that provide clear instructions for safely conducting activities involved in each covered process consistent with the process safety information:

Instance a) On or about May 12, 2021 at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer failed to develop and implement written operating procedures to manage and address abnormal coke drum conditions including, but not limited to, low-temperature drums with incompletely coked contents, i.e. "Tarry Drum," a short run coke drum, and/or a partial or fully unquenched coke drum.

Instance b) On or about May 12, 2021 at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer failed to implement the written operating procedure DCU OP-401 "Delayed Coker Unit - Coke Drum Preparation, Switching, Drum Quenching, Drum Draining, and Drum Unheading" when the requirement for the Structure and Console Operators to sign-off each step of the in-hand procedure as it was performed was not practiced or enforced.

Instance c) On or about May 12, 2021 at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer failed to implement the written operating procedure GENERIC OPERATING PROCEDURE 0000-588 "Shift Handover" when supervisory staff were not available to conduct shift handover discussions and did not ensure that Operators completed the shift log.

### ABATEMENT DOCUMENTATION REQUIRED FOR THIS ITEM

Date By Which Violation Must be Abated:
Proposed Penalty:                                                    $13,653.00

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                Page 21                                OSHA-2

EPA-179

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



**Citation and Notification of Penalty**

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

<u>Citation 1 Item 11</u>    Type of Violation: **Serious**

29 CFR 1910.119(f)(1)(ii): The employer's written operating procedures did not address the requirements for the operating limits:

(a) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer failed to address operating limits in the written operating procedure DCU OP-401 "Delayed Coker Unit - Coke Drum Preparation, Switching, Drum Quenching, Drum Draining, and Drum Unheading" when the safe upper and lower temperature limits for the Coker Feed Furnace (H-8501A/B) Process Outlet temperatures (Coil Outlet Temperature or COT) were not identified.

(b) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer failed to address operating limits in the written operating procedure DCU OP-401 "Delayed Coker Unit - Coke Drum Preparation, Switching, Drum Quenching, Drum Draining, and Drum Unheading" when the safe upper temperature limits for the Coker Feed Furnace (H-8501A/B) tube skin temperature indicators were not identified.


**ABATEMENT DOCUMENTATION REQUIRED FOR THIS ITEM**

Date By Which Violation Must be Abated:
Proposed Penalty:                                                                      $13,653.00

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                Page 22                OSHA-2

EPA-180

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



**Citation and Notification of Penalty**

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

<u>Citation 1 Item 12</u>   Type of Violation: **Serious**

29 CFR 1910.119(f)(4): The employer did not develop and implement safe work practices to provide for the control of hazards during operations such as lockout/tagout; confined space entry; opening process equipment or piping:

a) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer failed to implement the safe work practice 35-0044 "Walk the Line (WTL) Guidance" to isolate and return equipment to service when Operations along with designated personnel (Maintenance, Engineering, SME, etc.) did not walk down the Coke Drum quench water system following a piping repair where the quench water 3" bypass valve was opened to drain the water lines. On May 12, 2021, an excessive amount of quench water, due to unsecured and open quench water 3" bypass valve and spectacle blind, entered Coke Drum D-8504, resulting in an overpressure event, release to flare, and a fire at the flare stack.

b) On or about May 12, 2021 at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer failed to develop and implement safe work practices to ensure the position of car seals was verified to prevent inadvertent valve opening or closure (i.e. deviating from normal operating conditions). Car seal inspections were not performed when equipment was returned to service following maintenance activities where a car sealed valve's normal state/condition was changed.

**ABATEMENT DOCUMENTATION REQUIRED FOR THIS ITEM**

Date By Which Violation Must be Abated:
Proposed Penalty:                                                                                    $13,653.00

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                    Page 23                    OSHA-2

EPA-181

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



**Citation and Notification of Penalty**

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

Citation 1 Item 13   Type of Violation: **Serious**

29 CFR 1910.119(i)(2)(i): The pre-startup safety review did not confirm that construction and equipment is in accordance with design specifications prior to the introduction of highly hazardous chemicals to a process:

a) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer's pre-startup safety review (PSSR) failed to confirm that prior to the introduction of highly hazardous chemicals (HHC) into the DCU process that the construction and equipment is in accordance with design specifications when field verification, inspection, and testing was not conducted and documented in Limetree's Vessels and Exchangers Checklist. In particular, the employer failed to complete the following items prior to startup: restore missing cladding on internal surfaces of Coke drums, correct corrosion under insulation (CUI) on Coke drums, correcting pitting on Blowdown Drum Overhead Separator (D-8513), and Flare Knockout Drum (D-7941), and restore pressure vessel fireproofing. Failure to confirm pressure vessels meet design specifications and inadequate inspection and testing can result in loss of containment and expose employees to fire, toxic, and explosion hazards.

b) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer's PSSR failed to confirm that prior to the introduction of HHC into the DCU process that the construction and equipment is in accordance with design specifications when field verification, inspection, and testing was not conducted and documented in Limetree's Piping and Pipe Support Checklist. In particular, the employer failed to complete the following items prior to startup: correct corrosion on flanges and bolts, inspect insulated piping for CUI, label all process piping, restore fireproofing on pipe supports, and verify all piping is adequately supported. Failure to confirm piping and pipe supports meet design specifications and inadequate inspection, and testing can result in loss of containment from piping and expose employees to fire, toxic, and explosion hazards.

c) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU), the employer's PSSR failed to confirm that prior to the introduction of HHC into the DCU process that the construction and equipment is in accordance with design specifications when the following items in Limetree's Safety Valves Checklist were not completed and documented. In particular, the employer failed to complete the following items prior to startup: verify inlet outlet of pressure relief devices/vacuum relief devices are inspected for fouling in plugging, evaluate the potential for external pressure (vacuum) during pump-out from TK-8501, verify relief device sizing calculations are adequate, and verify isolation valves that may inhibit operation of relief valves are controlled in accordance with car seal program and included on a list. Failure to confirm safety valves meet design specifications and inadequate inspection, and testing can result in loss of containment and expose employees to fire, toxic, and explosion hazards.

d) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer's PSSR failed to confirm that prior to the introduction of HHC into the DCU process that the construction and equipment is

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                    Page 24                    OSHA-2

EPA-182

**U.S. Department of Labor**
Occupational Safety and Health Administration

Inspection Number: 1521774
Inspection Date(s): 03/26/2021 - 06/11/2021
Issuance Date:



## Citation and Notification of Penalty

**Company Name: Limitree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

in accordance with design specifications when field verification, inspection, and testing was not conducted and documented in Limitree's Heaters Checklist. In particular, the employer failed to complete the following items prior to startup: verify heater tubes were adequately inspected including taking wall thickness measurements of tubes in convection section, establish criteria for heater inspections including locating condition monitoring locations for heater tubes, bends and fittings, and restoring fireproofing as required. Failure to confirm heaters meet design specifications and inadequate inspection, and testing can result in loss of containment and expose employees to fire, toxic, and explosion hazards.

e) On or about May 12, 2021, at Limitree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer's PSSR failed to confirm that prior to the introduction of HHC into the DCU process that the construction and equipment is in accordance with design specifications when Limitree's Instrumentation Checklist failed to complete the following prior to startup. In particular, the employer failed to complete the following items prior to startup: verify instruments were inspected and tested and results documented, verify instrument air lines and process tubing are cleaned and flushed, verify that all safety systems (i.e. emergency shutdown, interlocks, fire, flammable and toxic gas detectors are tested and documented, and verify distributed control system (DCS) alarms are appropriate (i.e. no redundant alarms, nuisance or confusing alarms are present. Failure to confirm instrumentation meets design specifications and inadequate inspection, and testing can result in upset process conditions and loss of containment, exposing employees to fire, toxic, and explosion hazards.

f) On or about May 12, 2021, at Limitree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer's PSSR failed to confirm that prior to the introduction of HHC into the DCU process that the construction and equipment are in accordance with design specifications when field verification, and inspection, was not conducted and documented for occupied buildings. In particular, the PSSR did not include any requirements for buildings. In particular, the Coker Unit Operator Shelter Building (#8503) was not adequately designed as a shelter in place to protect occupants in the event of a fire, explosion or toxic release in accordance with API 752 - Management of Hazards Associated with Location of Process Plant Permanent Buildings and LIMITREE BAY TERMINALS L.L.C. LIMITREE BAY REFINING L.L.C. Integrated Contingency Plan St. Croix, United States Virgin Islands September 2020. Failure to confirm buildings meet design specifications and not equipping occupied buildings with the means to detect, alarm, and control toxic vapor ingress during an emergency can expose employees to fire, toxic, and explosion hazards.

g) On or about May 12, 2021, at Limitree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer's PSSR failed to confirm that prior to the introduction of HHC into the DCU process that the construction and equipment is in accordance with design specifications when field verification, inspection, and testing was not conducted and documented in Limitree's. In particular, the PSSR did not include any requirements for storage tanks in the Coker Unit, including the Vacuum Residuum Tank (TK-8501). Failure to confirm storage tanks meet design specifications and inadequate inspection and testing resulted in the vacuum collapse of the tank and exposed employees to fire, toxic, and explosion hazards.

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



**Citation and Notification of Penalty**

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

**ABATEMENT DOCUMENTATION REQUIRED FOR THIS ITEM**

Date By Which Violation Must be Abated:
Proposed Penalty:                                                                      $13,653.00

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                    Page 26                    OSHA-2

EPA-184

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



**Citation and Notification of Penalty**

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

<u>Citation 1 Item 14</u>    Type of Violation: **Serious**

29 CFR 1910.119(i)(2)(ii): The pre-startup safety review did not confirm that prior to the introduction of highly hazardous chemicals to a process the safety, operating, maintenance, and emergency procedures were in place and were adequate:

a) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer's pre-startup safety review failed to confirm that prior to the introduction of highly hazardous chemicals to a process that the operating procedures for the Coker Unit, DCU OP-401 "Delayed Coker Unit - Coke Drum Preparation, Switching, Drum Quenching, Drum Draining, and Drum Unheading were in place and adequate prior to startup. In particular, the employer failed to develop and implement written operating procedures to manage and address abnormal coke drum conditions including, but not limited to, low temperature drums with incompletely coked contents, i.e. "Tarry Drum," a short run coke drum, and/or a partial or fully unquenched coke drum. Failure to implement adequate operating procedures before startup can result in operator errors, catastrophic incidents and expose employees to fire, toxic and explosion hazards.

**ABATEMENT DOCUMENTATION REQUIRED FOR THIS ITEM**

Date By Which Violation Must be Abated:
Proposed Penalty:                                                    $13,653.00

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                Page 27                                OSHA-2

EPA-185

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



**Citation and Notification of Penalty**

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

<u>Citation 1 Item 15</u>   Type of Violation: **Serious**

29 CFR 1910.119(j)(2): The employer did not establish and implement written procedures to maintain the on-going integrity of process equipment:

a) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer failed to establish and implement written procedures to maintain the on-going integrity of process equipment. Specifically, the employer's written procedures for the inspection of pressure vessels, 69-60100 "PRESSURE VESSEL INSPECTION" did not include written procedures for inspecting insulated pressure vessels for Corrosion Under Insulation (CUI). Failure to address CUI on insulated equipment could result in unidentified, unmitigated corrosion leading to vessel failure and loss of containment, exposing employees to fire, toxic, and explosion hazards.

**ABATEMENT DOCUMENTATION REQUIRED FOR THIS ITEM**

Date By Which Violation Must be Abated:
Proposed Penalty:                                                                                    $13,653.00

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                    Page 28                    OSHA-2

EPA-186

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



<u>**Citation and Notification of Penalty**</u>

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

<u>Citation 1 Item 16</u>   Type of Violation: **Serious**

29 CFR 1910.119(j)(4)(i): Inspections and tests shall be performed on process equipment.

(a) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer failed to perform detailed internal inspection and testing on all heater piping such as but not limited to tubing, 180 degree bends/elbows, and fittings located in the convection section of the Coker Feed Furnace (H-8501A/B) prior to startup. Failure to inspect and test heater piping resulted in a catastrophic tube and elbow rupture and employee exposure to fire, toxic and explosion hazards.

**ABATEMENT DOCUMENTATION REQUIRED FOR THIS ITEM**

Date By Which Violation Must be Abated:
Proposed Penalty:                                                           $13,653.00

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                    Page 29                    OSHA-2

EPA-187

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



<u>**Citation and Notification of Penalty**</u>

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

<u>Citation 1 Item 17</u>   Type of Violation: **Serious**

29 CFR 1910.119(j)(5): 1910.119(j)(5) the employer shall correct deficiencies in equipment that are outside acceptable limits before further use or in a safe and timely manner when necessary means are taken to assure safe operation.

a) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer failed to correct deficiencies in Coke Drums (D-8501/2/3/4) that are outside acceptable limits (defined by the process safety information in paragraph (d) of this section) by not replacing the 410 stainless steel clad liner per original Coke drum design drawing before further use or in a safe and timely manner when necessary means were not taken to assure safe operation. The employer failed to restore stainless steel clad liner on the internal surfaces of Coke drums without corrosion protection which could have resulted in catastrophic failure of drums and exposure to fire, toxic and hazards.

b) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer failed to correct deficiencies in Coke Drums (D-8501/2/3/4) that are outside acceptable limits (defined by the process safety information in paragraph (d) of this section) by not correcting the bulging of the Coke drums found during laser scanning of drums before further use or in a safe and timely manner when necessary means were not taken to assure safe operation. The employer did not correct bulging on Coke drums; failure to do so can result in catastrophic failure of drums and exposure to fire, toxic and hazards.

c) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer failed to correct deficiencies in Blowdown Overhead Separator (D-8513) that are outside acceptable limits (defined by the process safety information in paragraph (d) of this section) by not correcting significant pitting found on bottom of the vessel before further use or in a safe and timely manner when necessary means were not taken to assure safe operation. The employer did not perform weld buildup of D-8513; failure to do so can result in catastrophic failure of vessel and exposure to fire, toxic and hazards.

d) On or about May 12, 2021, at Limetree Bay Refining, LLC. Flare No. 8 Complex - The employer failed to correct deficiencies in process equipment that are outside acceptable limits (defined by the process safety information in paragraph (d) of this section) by not repairing the significant pitting on Flare Knockout Drum (D-7941) before further use or in a safe and timely manner when necessary means were not taken to assure safe operation. The employer failed to repair significant pitting on D-7941 which can result in catastrophic failure of vessel and exposure to fire, toxic and hazards.

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                    Page 30                    OSHA-2

EPA-188

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



**Citation and Notification of Penalty**

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

**ABATEMENT DOCUMENTATION REQUIRED FOR THIS ITEM**

Date By Which Violation Must be Abated:
Proposed Penalty:                                                          $13,653.00

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                    Page 31                                OSHA-2

EPA-189

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



## Citation and Notification of Penalty

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

Citation 1 Item 18   Type of Violation: **Serious**

29 CFR 1910.119(l)(1):The employer did not establish and implement written procedures to manage changes to process chemicals, technology, equipment, and procedures; and, changes to facilities that affect a covered process:

(a) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit - The employer failed to implement their management of change procedure 35-0002 "Management of Change (MOC) Evaluation Process" when a crawler crane was used to transfer dried petroleum coke in the Coke Pit as a replacement for a fixed overhead gantry crane that was out of service. No permanent or temporary MOC was conducted to manage this facility change requiring personnel to enter the coke pit when using the crawler crane, exposing employees to toxic, respiratory, and thermal contact hazards. This facility change also resulted in operational delays leading to process upsets that caused a loss of containment.

**ABATEMENT DOCUMENTATION REQUIRED FOR THIS ITEM**

Date By Which Violation Must be Abated:
Proposed Penalty:                                                                 $13,653.00

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                    Page 32                                    OSHA-2

EPA-190

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



<u>**Citation and Notification of Penalty**</u>

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

<u>Citation 1 Item 19</u>   Type of Violation: **Serious**

29 CFR 1910.119(l)(3): Employees involved in operating a process and maintenance and contract employees whose job tasks would be affected by a change in the process were not informed of and trained in the change prior to start-up of the process or affected part of the process.

a) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - The employer failed to update and train employees on changes made to SOP OP-401 DCU - Coke Drum Preparation, Switching, Drum Quenching, Drum Draining and Drum Unheading, Revision #4.

Date By Which Violation Must be Abated:
Proposed Penalty:                                                        $13,653.00

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                Page 33                OSHA-2

EPA-191

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Inspection Number**: 1521774
**Inspection Date(s)**: 03/26/2021 - 06/11/2021
**Issuance Date**:



**Citation and Notification of Penalty**

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site:** 1 Estate Hope, Christiansted, VI 00820

---

<u>Citation 2 Item 1</u>    Type of Violation: **Other-than-Serious**

29 CFR 1910.119(m)(4)(ii): A report prepared at the conclusion of an incident investigation did not include the date the investigation began:

a) On or about May 12, 2021, at Limetree Bay Refining, LLC., Delayed Coker Unit (DCU) - the employer's incident investigation report, Coke Drum 4 Depressure to Flare, Limetree Bay Refining, St. Croix, USVI - Incident Report LBR1521774-4.5 (Final Rev 6/11/2021) failed to indicate the date the investigation was initiated.

**ABATEMENT DOCUMENTATION REQUIRED FOR THIS ITEM**

Date By Which Violation Must be Abated:
Proposed Penalty:                                                                                        $0.00

_____
**Alfredo Nogueras, CSP**
Area Director

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                    Page 34                    OSHA-2

EPA-192

---

**U.S. Department of Labor**
Occupational Safety and Health Administration
B7 Calle Tabonuco, Suite 1105Guaynabo, PR 00968



---

## INVOICE /
## DEBT COLLECTION NOTICE

---

**Company Name: Limetree Bay Refining, LLC.**
**Inspection Site: 1 Estate Hope, Christiansted, VI 00820**
**Issuance Date:**

Summary of Penalties for Inspection Number:          1521774

| | |
|---|---|
| Citation 1 Item 1, Serious | $13,653.00 |
| Citation 1 Item 2, Serious | $13,653.00 |
| Citation 1 Item 3, Serious | $13,653.00 |
| Citation 1 Item 4, Serious | $13,653.00 |
| Citation 1 Item 5, Serious | $13,653.00 |
| Citation 1 Item 6, Serious | $13,653.00 |
| Citation 1 Item 7, Serious | $13,653.00 |
| Citation 1 Item 8, Serious | $13,653.00 |
| Citation 1 Item 9, Serious | $13,653.00 |
| Citation 1 Item 10, Serious | $13,653.00 |
| Citation 1 Item 11, Serious | $13,653.00 |
| Citation 1 Item 12, Serious | $13,653.00 |
| Citation 1 Item 13, Serious | $13,653.00 |
| Citation 1 Item 14, Serious | $13,653.00 |
| Citation 1 Item 15, Serious | $13,653.00 |
| Citation 1 Item 16, Serious | $13,653.00 |
| Citation 1 Item 17, Serious | $13,653.00 |
| Citation 1 Item 18, Serious | $13,653.00 |
| Citation 1 Item 19, Serious | $13,653.00 |
| Citation 2 Item 1, Other-than-Serious | $0.00 |

**TOTAL PROPOSED PENALTIES:**                                              **$259,407.00**

To avoid additional charges, please remit payment promptly to this Area Office for the total amount of the uncontested penalties summarized above. Make your check or money order payable to: "DOL-OSHA". Please

indicate OSHA's Inspection Number (indicated above) on the remittance. You can also make your payment electronically at www.pay.gov. At the top of the pay.gov homepage, type "**OSHA**" in the Search field and select Search. From the **OSHA Penalty Payment Form** search result, select Continue. The direct link is: https://www.pay.gov/paygov/forms/formInstance.html?agencyFormId=53090334. You will be required to enter your inspection number when making the payment. Payments can be made by credit card or Automated Clearing House (ACH) using your banking information. Payments of $25,000 or more require a Transaction ID, and also must be paid using ACH. If you require a Transaction ID, please contact the OSHA Debt Collection Team at (202) 693-2170.

OSHA does not agree to any restrictions or conditions or endorsements put on any check, money order, or electronic payment for less than the full amount due, and will cash the check or money order as if these restrictions or conditions do not exist.

If a personal check is issued, it will be converted into an electronic fund transfer (EFT). This means that our bank will copy your check and use the account information on it to electronically debit your account for the amount of the check. The debit from your account will then usually occur within 24 hours and will be shown on your regular account statement. You will not receive your original check back. The bank will destroy your original check, but will keep a copy of it. If the EFT cannot be completed because of insufficient funds or closed account, the bank will attempt to make the transfer up to two times.

Pursuant to the Debt Collection Act of 1982 (Public Law 97-365) and regulations of the U.S. Department of Labor (29 CFR Part 20), the Occupational Safety and Health Administration is required to assess interest, delinquent charges, and administrative costs for the collection of delinquent penalty debts for violations of the Occupational Safety and Health Act.

**Interest**: Interest charges will be assessed at an annual rate determined by the Secretary of the Treasury on all penalty debt amounts not paid within one month (30 calendar days) of the date on which the debt amount becomes due and payable (penalty due date). The current interest rate is one percent (1%). Interest will accrue from the date on which the penalty amounts (as proposed or adjusted) become a final order of the Occupational Safety and Health Review Commission (that is, 15 working days from your receipt of the Citation and Notification of Penalty), unless you file a notice of contest. Interest charges will be waived if the full amount owed is paid within 30 calendar days of the final order.

**Delinquent Charges**: A debt is considered delinquent if it has not been paid within one month (30 calendar days) of the penalty due date or if a satisfactory payment arrangement has not been made. If the debt remains delinquent for more than 90 calendar days, a delinquent charge of six percent (6%) per annum will be assessed accruing from the date that the debt became delinquent.

**Administrative Costs**: Agencies of the Department of Labor are required to assess additional charges for the recovery of delinquent debts. These additional charges are administrative costs incurred by the Agency in its attempt to collect an unpaid debt. Administrative costs will be assessed for demand letters sent in an attempt to collect the unpaid debt.

_____          _____

**Alfredo Nogueras, CSP**                                                      Date

Area Director



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 2
290 BROADWAY
NEW YORK, NY 10007-1866

September 24, 2021

***Via* Electronic Mail**
All Potential Buyers of Limetree Bay Refinery
c/o Elizabeth A. Green
egreen@bakerlaw.com

> Re:    Environmental information about the Limetree Bay Refinery; *In re Limetree Bay Services, LLC, et al.*, Case No. 21-32351, pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

The United States Environmental Protection Agency ("EPA") provides this letter to potential buyers of the Limetree Bay Refinery in an attempt to provide a common base of information for all potential bidders and minimize the risk of misunderstanding or surprise. This letter is merely informational, and buyers should not interpret it as designed to either encourage or discourage a sale or any particular use of the facility. This letter is not intended to be nor should be read as an exhaustive list of environmental compliance, permitting, or liability issues related to the debtors or the refinery.

Limetree Bay Terminals, LLC, and Limetree Bay Refining, LLC (jointly, "Limetree Bay") are also subject to requirements contained in environmental permits issued by EPA and the Virgin Islands Department of Planning and Natural Resources ("VIDPNR"), including Prevention of Significant Deterioration permits issued by the EPA and a Clean Air Act Title V operating permit issued by VIDPNR. Any potential purchaser of the facility will have to perform its own environmental due diligence, and any entity that becomes an owner/operator of the refinery will have to employ environmental compliance staff who maintain familiarity with all applicable environmental requirements and ensure that the refinery is operated in compliance with applicable law.

I.    **Audit Reports**

The EPA issued an emergency order on May 14, 2021, requiring the refinery to cease operations for sixty days. This order also required the debtors to retain independent third-party auditors to conduct an environmental compliance audit and process area audits.

The debtors have obtained (a) an environmental compliance audit report, and (b) process area audits of (1) the flare system, (2) the amine unit and sulfur recovery unit system, and (3) the delayed coker system. The EPA sent a letter to the debtors on July 28, 2021, concerning the environmental compliance audit report, and therein referenced a letter the EPA had sent to the debtors on June 9, 2021.

These audits and letters detail compliance issues under environmental law of which potential buyers should be aware. The EPA recommends that any buyer review these documents.

II.     **2021 Complaint and Joint Stipulation**

On July 12, 2021, the United States filed suit against Limetree Bay in the United States District Court for the Virgin Islands, for injunctive relief for compliance with environmental law.  Case No. 1:21-cv-264.  On the same day, the United States filed with the court a joint stipulation with Limetree Bay.

The joint stipulation requires Limetree Bay, among other things, to:

(a)     Submit a plan for purging hydrocarbons from the refinery to bring the refinery to an indefinite state of shutdown, including operation of ambient air monitors during the purging process;[1]

(b)     Conduct the purging process in accordance with the EPA-approved Hydrocarbon Purge Plan, subject to any modification necessary, and not begin purging without the EPA's approval;

(c)     Except as otherwise provided in the stipulation, at least ninety days before restarting the refinery or any refinery process unit:

    (1)     Notify both the presiding court and the United States,
    (2)     Submit the Corrective Action Plan required by the May 14 order to the EPA.  The plan must specify which measures must be completed before restarting the refinery or a refinery process unit, and
    (3)     Submit an ambient air monitoring plan to the EPA that includes operation of hydrogen sulfide ($H_2S$) and sulfur dioxide ($SO_2$) monitors at nine EPA-identified monitoring sites;

(d)     Except as otherwise provided in the stipulation, at least thirty days before restarting the refinery or any refinery process unit, install and operate the nine ambient air monitoring sites plus a meteorological tower; and

(e)     Before restarting the refinery or any refinery process unit, complete all measures necessary to eliminate any imminent and substantial endangerment to public health or welfare or the environment.

III.    **2011 Consent Decree**

On January 26, 2011, the United States and the United States Virgin Islands filed suit against HOVENSA in the United States District Court for the Virgin Islands seeking injunctive relief and civil penalties for alleged violations of the Clean Air Act, 42 U.S.C. §§ 7401-7671, and the Virgin Islands Air Pollution Control Act.  In conjunction with the filing of the complaint, the United States lodged a consent decree resolving the claims alleged in the complaint.  The court entered the consent decree on June 7, 2011.  The claims addressed in the 2011 consent decree included alleged violations of the Clean Air Act and its

---

[1] Limetree has submitted to EPA, and EPA has approved, Phases 1 and 2 of the Hydrocarbon Purge Plan. Information about Phases 1 and 2 can be found on the EPA website at https://www.epa.gov/vi/limetree-bay-terminals-and-limetree-bay-refining-llc.  Limetree has indicated that it expects to provide at least one additional plan (Phase 3) to EPA for hydrocarbon purging, and that additional phases after Phase 3 may be necessary to fully complete the purging process.

implementing regulations, including prevention of significant deterioration provisions, the New Source Performance Standards ("NSPS"), leak detection and repair ("LDAR") provisions for equipment leaks, and National Emission Standards for Hazardous Air Pollutants for benzene waste operations provisions. The 2011 consent decree required HOVENSA to: reduce nitrogen oxide ("NO$_x$") emissions and control SO$_2$, particulate matter ("PM"), and carbon monoxide ("CO") emissions from the refinery's fluid catalytic cracking unit; significantly reduce NO$_x$ emissions from the refinery's heaters, boilers, generating turbines, and compressor engines through the installation of pollution control equipment; reduce SO$_2$ emissions by burning lower sulfur fuel oil and complying with H$_2$S limits for fuel gas combustion requirements for heaters, boilers, flares, and sulfur recovery plants; comply with regulatory requirements for acid gas and hydrocarbon flaring, and implement a program to investigate and correct the causes of flaring incidents and take preventive action; create a preventive maintenance and operation plan for minimizing SO$_2$ emissions from the sulfur recovery plant; reduce emissions of volatile organic compounds ("VOCs") through stricter LDAR requirements for equipment leaks and by replacing valves that are leaking above a specified level with low emissions valves or low emissions valve packing; and reduce emissions of benzene by improving management of benzene waste streams. The 2011 consent decree also required HOVENSA to pay $5,375,000 in civil penalties and deposit $4,875,000 into an escrow account to be used to implement Territorial Supplemental Environmental Projects.

## IV.    Modification of 2011 Consent Decree

On August 25, 2020, the United States lodged the proposed First Modification of the Consent Decree with the court. The first modification was subject to a thirty day public comment period. After reviewing and responding to public comments, the United States filed a motion to enter the First Modification of the Consent Decree on April 26, 2021. The motion to enter is still pending before the court. A second, non-material modification of the consent decree that does not require court approval was also submitted to the court on April 26, 2021.

The First Modification adds Limetree Bay and the Environmental Response Trust ("ERT") as parties to the consent decree and transfers uncompleted or ongoing decree responsibilities to Limetree Bay and the ERT, such that Limetree Bay and the ERT effectively step into the shoes of HOVENSA, and HOVENSA is released from its decree obligations and liabilities as of the date of entry of the First Modification. The First Modification also modifies the following deadlines and injunctive relief obligations to reflect the changed operational realities of the refinery: (1) briefly extends the deadline for Limetree Bay to install Qualifying Controls and apply for emission limits from the appropriate permitting authority sufficient to achieve 3,663 tons per year of NO$_x$ emission reductions; (2) modifies the language to reflect the current configuration of the East Side sulfur recovery plant ("SRP") and extends the deadline for installing control technology to control the sulfur emissions from the East Side SRP and comply with NSPS Subparts A and Ja; (3) modifies the requirement to install and operate flare gas recovery systems ("FGRS") on certain flares in order to comply with NSPS Subpart Ja and potentially requires Limetree Bay to perform mitigation projects if emissions exceed a specified level. Specifically, because the operational profile of the refinery is now significantly different as compared to when the consent decree was entered into in 2011, the First Modification conditions the installation of FGRS on the refinery's flaring emission levels after restart (as defined in the First Modification); providing that FGRS is not required if flaring emissions remain below specified gas flow rates, but requiring Limetree Bay to install and operate FGRS if the specified gas flow rates are exceeded[2], thereby ensuring the expected emission

---

[2] On April 13, 2021, Limetree Bay submitted a letter to EPA acknowledging that it had exceeded the specified gas flow rates, requiring Limetree Bay to install and operate FGRS on the FCCU Low Pressure Flare (Flare 8) by March 14, 2023.

reduction benefits that were required by the 2011 consent decree are obtained while taking into account the modified operating profile of the refinery; (4) modifies Section V.P (Benzene Waste NESHAP Program) to reflect that HOVENSA selected the 6 BQ compliance option set forth in 40 C.F.R. § 61.342(e), and that Limetree Bay has agreed to redo the one-time review and verification of the refinery's total annual benzene ("TAB") report following restart; (5) modifies Section V.R (LDAR Program) to make the terms consistent with the more recent LDAR regulations, including lower leak definitions, to ensure that a minimum of three audits will be conducted before the decree is terminated, and to update the Valve Preventative Leak Maintenance Program; (6) modifies Section VIII.B (NSPS Applicability: Boilers and Generating Turbines) to extend the deadline for demonstrating compliance with NSPS Subparts A and GG at GT-4, GT-7, and GT-8, and to reflect that Limetree Bay has installed combustion liner systems on GT-7 and GT-8 to reduce $NO_x$ emissions, and to operate at lower maximum load limits on GT-4, GT-7, and GT-8 until Limetree Bay demonstrates compliance with NSPS Subparts A and GG; (7) modifies Section IX.A (Territorial Supplemental Environmental Project) to reflect the transfer of HOVENSA's obligation to disburse monies for the Territorial Supplemental Environmental Project to the ERT; and (8) modifies Section IX.B (Additional Work) to reflect that HOVENSA's remaining obligations for the VIWAPA Emissions Monitoring Assistance Program were transferred to the ERT [First Modification ¶ 140A].

The consent decree conditions any transfer on the transferee executing a modification of the consent decree which makes the terms and conditions applicable to the transferee.

## V.    Prevention of Significant Deterioration Permit

A prospective purchaser may also be required to obtain a Prevention of Significant Deterioration ("PSD") permit under the Clean Air Act to restart the refinery.  42 U.S.C. § 7475; 40 C.F.R. § 52.21.

A PSD permit is required to construct any new "major stationary source" of air pollutants, as defined by 40 C.F.R. § 52.21(b)(1), or to make a "major modification" to any existing major stationary source, as defined by 40 C.F.R. § 52.21(b)(2).  *See* 40 C.F.R. § 52.21(a)(2)(iii).  EPA has required PSD permits for restarting long-dormant facilities that qualify as major stationary sources because this action can qualify as either the construction of a new source or a major modification of an existing one.  PSD permits must include emission limits that constitute the Best Available Control Technology ("BACT") to minimize the emission of regulated pollutants.  42 U.S.C. §§ 7475(a)(4) and 7479(3); 40 C.F.R. § 52.21(b)(12), (j)(2)-(3).

PSD permitting is factually-driven.  If the refinery is required to obtain a PSD permit, the permit will require BACT to be installed and operational prior to restart of the refinery.

## VI.    Additional Clean Air Act Requirements

As described in its complaint referenced in Section II, above, EPA has concerns about incidents of excess release of $H_2S$ and $SO_2$. The refinery must adhere to the $H_2S$ input gas concentration limit specified in 40 C.F.R. § 60.103a(h) and the refinery's Title V operating permit of (a) 162 parts per million volume, determined hourly on a 3-hour rolling average basis, for Flare #8 and the East Mix Drum Fuel Gas System, and (b) 75 parts per million volume at the Coker Mix Drum Fuel Gas System.  During incidents where emissions exceed the 500-lb. $SO_2$ threshold in a twenty-four hour period, the refinery is also subject to requirements in 40 C.F.R. Part 60, Subpart Ja.  Subpart Ja requires a regulated entity to conduct a root cause and corrective action analysis whenever $SO_2$ emissions from a flare exceed the 500-lb/day threshold.

The Environmental Compliance Audit Report and the Flare Systems Audit Report also identified a number of compliance issues related to Clean Air Act Risk Management Program (RMP) requirements, such as requirements relating to Process Safety Information, Process Hazard Analysis, Operating Procedures, and Training. Potential issues in these RMP elements are intended to be captured during Prestartup Review, prior to introducing a regulated RMP substance to a process. The recent release events at the refinery indicate potential failure of one or more RMP elements. A new owner or operator would be responsible for ensuring that all RMP requirements are implemented and that the interconnections between the program elements have been characterized to ensure compliance. Attention to Process Safety Information and Mechanical Integrity program elements, especially as they pertain to the safe design and maintenance of process areas in accordance with recognized and generally accepted good engineering practices, will be important for any future owner/operator of the refinery as they evaluate conformance with Prestartup Review and other program elements.

Prospective purchasers should evaluate the need for modifications to the facility's Title V operating permit under the Clean Air Act.

Finally, the EPA's Petroleum Refinery Sector Rule, NESHAP Subpart CC, requires, among other things, that oil refineries conduct fence line monitoring for benzene and that the annual average benzene emissions stay below 9 $\mu g/m^3$. Any purchaser will need to ensure compliance with this requirement.

## VII.    Resource Conservation and Recovery Act

The Environmental Response Trust is addressing legacy contamination at the facility, in part with funding from Limetree Bay Terminals. The trust is remediating contamination from HOVENSA's operations pursuant to a federal permit issued by EPA under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901, *et seq.*, under the oversight of EPA. While the legacy contamination includes impacted groundwater subject to remediation under the permit, new contamination tied to refinery and/or terminal operations is not covered by the RCRA permit. According to the ERT, new (non-legacy) contamination has been detected in the groundwater. The ERT and Limetree Bay are working to gather and analyze data to determine whether the refinery, terminal, or both caused the release(s) resulting in the new contamination. Any future refinery owner will be obligated under RCRA to remediate contamination on or migrating from the property it acquires. A future owner subject to such obligations may seek contribution and/or cost recovery from any liable third party to the extent allowed by law, and may propose to reach an understanding, or enter into an agreement, with the federal and/or local government concerning such obligations.

## VIII.    Clean Water Act

On August 13, 2021, the EPA sent a letter to Limetree Bay notifying them of potential violations of Sections 301(a), 308, and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1318(a) and 1342, and providing them with a copy of EPA's inspection report. A purchaser of the refinery will need to comply with the Clean Water Act, including by correcting any violations that are ongoing at the time of the transfer.

**IX.     Additional Matters**

As previously stated, any prospective purchaser should carry out its own due diligence concerning potential environmental liabilities and obligations.  EPA has not performed a comprehensive environmental compliance review of the refinery facility, and EPA does not represent that the information contained in this letter identifies all environmental violations that a new owner would have to address, nor all environmental obligations for which a new owner would be responsible.

Sincerely,

DORE LAPOSTA

Digitally signed by DORE LAPOSTA
Date: 2021.09.24 17:02:31 -04'00'

Dore LaPosta, Director
Enforcement and Compliance Assurance Division

**BEFORE THE ENVIRONMENTAL APPEALS BOARD**
**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**WASHINGTON, D.C.**


| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| LIMETREE BAY TERMINALS, LLC | ) | |
| LIMETREE BAY REFINING, LLC | ) | |
| | ) | CAA Appeal Nos. 20-02 and 20-03 |
| Permittee | ) | |
| | ) | |
| Plantwide Applicability Limit | ) | |
| Permit No. EPA-PAL-VI001/2019 | ) | |
| Docket No. EPA-R02-OAR-2019-0551 | ) | |

## <u>NOTICE OF WITHDRAWAL</u>

The EPA offices responsible for issuance of the permit at issue in this matter respectfully

submit notification of the attached permit withdrawal, under 40 C.F.R. Section 124.19(j), of

Plantwide Applicability Limit Permit No. EPA-PAL-VI001/2019. Region 2 is distributing the

permit withdrawal to all interested parties.

Respectfully Submitted,

/ s/_____
Robert DeLay
Office of Regional Counsel
EPA Region 2 (16W-011)
290 Broadway
New York, New York 10007-1866
212-637-3214
Delay.Robert@epa.gov

/ s/_____
John T. Krallman
Brian Doster
Air and Radiation Law Office
EPA Office of General Counsel (MC 2344A)
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460
202-564-7606
Krallman.John@epa.gov
Doster. Brian@epa.gov

*Attorneys for EPA Offices*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 25, 2021, the foregoing was filed electronically with the Clerk of the Environmental Appeals Board using the EAB eFiling System, and was served on the following by electronic mail:

Elizabeth Leigh Neville, Esq.
The Neville Law Firm, L.L.C.
127 West Fairbanks Avenue, #262
Winter Park, Florida 32789
elizabeth@neville.com

*Attorney for Petitioners*

LeAnn M. Johnson Koch
Jena A. MacLean
Odin A. Smith
Perkins Coie LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
LeAnnJohnson@perkinscoie.com
JMacLean@perkinscoie.com
OSmith@perkinscoie.com

*Attorneys for Limetree*

/ s/ _____
                    Robert DeLay



# U. S. Environmental Protection Agency
# Region 2 Office

# Response to Comments

# On the Clean Air Act
# Plantwide Applicability Limit Permit
# for the

# Limetree Bay Terminal and Limetree Bay Refining
# St. Croix, U.S. Virgin Islands

# November 2020

**ENCLOSURE II**

**Limetree Bay Refining and Limetree Bay Terminals, St. Croix, U.S. Virgin Islands
Plantwide Applicability Limits (PAL) Permit – November 2020**

**Response to Comments**

**Table of Contents**

**Comments from Limetree Bay Refining and Limetree Bay Terminals**                    **Page**

General Comments ……………………………………………………………………   3 - 11

Section I Plantwide Applicability Limits …………………………………………... 12 - 14

Section II General Permit Conditions …………………………………………… 15 - 23

Section III Monitoring Methods ………………………………………………… 24 - 27

Section IV Specific Monitoring Requirements ………………………………… 28 - 50

Section V Testing ………………………………………………………………... 51 - 54

Section VII Reporting and Notifications ………………………………………... 55 - 56

Section VIII Ambient Monitoring ……………………………………………… 57 - 87

**Comments from Citizens/Environmental Groups**

Air Quality, Ecosystems, Environmental Justice, and Public Health & Safety……… 88 - 105

Reactivation ………………………………………………………………………… 106 - 114

2

**Comments from Citizens/Environmental Groups –
Reactivation**

**Comment No. 132**

The refinery must be treated as a new source under PSD rules because the refinery owners have not demonstrated a continuous intent to reopen the refinery since it was shut down in 2012. The April 5, 2018 letter from former Assistant Administrator Wehrum to Limetree regarding EPA's reactivation policy does not reflect EPA precedent and we respectfully urge EPA to revoke or, at the very least, disregard this letter. We urge EPA to reject the draft permit which is fundamentally and fatally flawed because it should properly be evaluated as a "new" stationary source under EPA's well-established reactivation policy. The policy is predicated on the notion that owners and operators of shutdown facilities must continuously demonstrate concrete plans to restart the facility sometime in the reasonably foreseeable future and shutdowns of more than two years are presumed to be permanent and are thus subject to all PSD requirements when reactivated. It is then up to the facility operator to rebut the presumption. Based on the amount of time that the facility has been shut down, the reason for the shutdown, statements of the owner or operator, the cost and time to reactivate, the status of permits, and the ongoing maintenance and inspections at the facility, the refinery can only reasonably be found to be a new source for purposes of PSD review. Accordingly, the draft permit, which is inappropriately predicated and calculated on a presumption that the refinery is an existing source, must be rejected. In addition, in light of former Assistant Administrator Wehrum's resignation from EPA amid ethics and misconduct investigations by EPA's Inspector General and the Energy and Commerce Committee, and recent reports that Limetree is being considered a "customer" within EPA, we respectfully urge EPA to reject the draft permit due to its improper predication on the April 5, 2018 Wehrum letter.

**Response 132**

This comment does not demonstrate that EPA must deny Limetree Bay's PAL permit application. The commenters have not supported their arguments with any references to the permitting regulation at 40 C.F.R. 52.21 that govern this PAL permit application. The regulations do not require that EPA apply the Reactivation Policy in this or any other context under section 52.21 of the regulation, and EPA maintains its earlier view that Limetree Bay has demonstrated under the framework of that policy that the owners of this facility had a continuous intent to restart the refinery operations.

Prior to submitting this PAL permit application, Limetree Bay sought EPA's views on whether resuming certain refinery operations should be treated as constructing a new source under the Reactivation Policy. EPA responded in April 2018 with the letter from Assistant Administrator Wehrum that is cited and questioned by the commenter (the Limetree Bay Letter). As described in that letter, EPA had been provided with information that the Agency considered sufficient to show a continuing intent to restart the facility, and the comment has not provided additional information that changes EPA's view on that matter.

Shortly after receiving EPA's response, Limetree Bay submitted an application to the Virgin

Islands Department of Planning and Natural Resources (VIDPNR) for an Authority to Construct (ATC) permit to authorize certain changes to the facility that were necessary to implement what Limetree Bay has called the "MARPOL project," through which the company seeks to produce fuel compliant with the maritime sulfur regulations that took effect in January 2020.   In this April 13, 2018 application, Limetree Bay stated that it "plans to resume operation of certain refinery process units and certain utilities ('MARPOL Project') that are already permitted to operate under Permit No. STX-TV-003-10 and were described in the Title V permit application."  On June 18, 2018, the VIDPNR completed work on this ATC permit application and issued the requested permit.  The VIDPNR did not dispute the company's representations that it was resuming operation of emissions units that were already permitted to operate, and it did not receive any comments from members of the public arguing that the company was building a new major source and should be required to obtain a PSD permit.  The VIDPNR issued the ATC pursuant to its approved minor NSR program, and it could not have done so if it had determined that the source had been permanently shut down and was required to obtain a major source PSD permit to resume operations if applying EPA's Reactivation Policy.  No party filed an appeal or otherwise contested the VIPNR permit decision. EPA also understands that Limetree Bay has been working on the construction authorized under this VIDPNR permit.

Thus, the state of affairs before EPA in this PAL permitting action is that the actions described in Limetree Bay's submissions to EPA and the VIDPNR have thus far been understood to involve resuming operation of an existing major stationary source.  In this context, Limetree Bay has applied to EPA for a permit to establish plantwide applicability limits under section 52.21(aa) of EPA's regulations.  The purpose of this permitting action is to consider Limetree's application to set plantwide applicability limits such that Limetree Bay has flexibility to make certain changes to the facility, within the established limits, without being required to determine whether those changes are subject to PSD.

In evaluating the baseline emission rate for an existing major stationary source to set the plantwide applicability limits, there is no adjustment to the baseline emission rate for permitting actions that should have, but did not, take place. For instance, the baseline emission rate may be adjusted to account for non-compliance emissions during the baseline period. 40 C.F.R. § 52.21(b)(48)(ii)(b). The commenters are not, as part of this comment, arguing that there were non-compliant emissions during the baseline period.  The baseline emission rate may also be adjusted to exclude any emissions "that would have exceeded an emission limitation with which the major stationary source must currently comply." 40 C.F.R. 52.21(b)(48)(ii)(c).  Limetree did not apply for a PSD permit to establish new BACT limits before resuming the operations of the refinery.  The facility applied for a PAL, and EPA is acting on the application before it.  The baseline for the PAL was calculated based on actual emissions in 2009 and 2010 that were allowed under existing PSD permits and other requirements.  The commenters do not point to any other authority within the PAL regulations to adjust the baseline emission rate.

Rather, the commenters argue that EPA should deny the application for the PAL permit and apparently force Limetree Bay to instead submit an application for a PSD permit.  Comment at 3.  But the comments do not demonstrate that EPA is required to apply the Reactivation Policy here or that EPA erred in its 2018 response to Limetree Bay's request under the framework of the policy.  The EPA made clear that its 2018 letter was based on the

information LBT had provided to EPA and that EPA was not providing any final determination on the applicability of the PSD regulations to the projects under consideration. EPA also informed LBT that "[a] final determination on PSD applicability will be made on the basis of the information provided in your application and supporting materials." 2018 Letter at 8. Limetree did not submit an application to EPA related to PSD applicability but did submit an ATC permit application and supporting material to the Virgin Islands, which made a determination regarding that application. At this juncture, the commenters are essentially asserting that both EPA's 2018 letter and this VIDPNRs decision to complete action on the minor NSR permit application were improper. EPA disagrees.

On its face, the Reactivation Policy is just that: a policy. It is not binding, and, if circumstances warrant, it need not be followed. In his 2018 letter to Limetree, Assistant Administrator Wehrum noted that EPA intended to reconsider the Reactivation Policy. Based on EPA's review since that time, the Agency has determined it is not appropriate to continue applying the Reactivation Policy because the policy was not well-grounded in the NSR regulations, and it is not supported by the current NSR regulations. In addition, the Reactivation Policy is difficult to follow and can produce inconsistent results based on subjective judgments about how to weigh the various factors against each other. EPA believes it would be better to apply an approach that is more consistent with the text of the existing regulations, provides more certainty, and is simpler for permitting agencies and permittees to understand and follow, as discussed in more detail below. Since EPA has concluded that the Reactivation Policy is no longer an appropriate policy in the context of the existing NSR regulations, the Agency is not applying it in this permitting action.

As part of the 2018 Limetree Bay Letter, the Assistant Administrator for the Office of Air and Radiation noted that the EPA has previously "not cited any specific regulatory provisions of the NSR program to support its position on source 'reactivation.'" Limetree Bay Letter at 2 n.2. While Regional Offices have continued to apply the Reactivation Policy since the 2002 NSR Reform Rule, the 2018 Limetree Bay Letter is the only guidance or adjudication on this topic that any EPA Headquarters Office has issued since the 1999 order resolving the *Monroe Electric* Title V petition.[12]

Prior to the 2002 NSR Reform Rule, most sources determined their baseline emission rate by averaging the past 24 months, *i.e.* 2 years, of actual emissions. *See* 67 Fed. Reg. 80185, 80188 (Dec. 31, 2002).[13] If a source had not operated in the last 2 years, its baseline emission rate would therefore be zero, like a new source. This comports with the Reactivation Policy's determination that if a source had been shut down for more than two years it should be presumed to be permanently shut down and treated as a new source. The one exception to this previous 24-month baseline emission rate was if a permitting agency agreed to use a period that was "more representative of normal operations." *Id.* The criteria for rebutting the presumption in the Reactivation Policy could then essentially be thought to have provided a guide for permitting agencies to determine whether it would be appropriate to allow a source that hadn't been in operation for the previous two years to use a more representative period to calculate its baseline emission rate. But the Reactivation Policy's focus on the intent of the

---

[12] *In the Matter of Monroe Electric Generating Plant Entergy Louisiana, Inc.*, Petition No. 6-99-2 (June 11, 1999).
[13] In 1992, EPA revised the regulations to adopt a different approach for Electric Utility Steam Generating Units, which could then determine baseline emissions using any two of the past five years. 57 Fed. Reg. 32314 (July 21, 1992).

owner or operator to restart a stationary source was not grounded in the regulations. At best, this provided a sort of equitable framework for the permitting agency to apply under the pre-Reform rules. In addition, the multiple factors that one may consider within this framework, with no one factor being dispositive, leaves significant room for differences of opinion how to weigh those factors. And some of the factors, such as owner statements and the cause of the shutdown, are highly dependent on the interpretation of the regulator and invite speculation. An owner's statements, for example, may be made for other reasons, such as for the purpose of business negotiations, and the cause of a shutdown may be multifaceted or simply unknowable.

This makes the policy difficult to apply and can lead to inconsistent results, based on subjective judgments of those applying this policy. This should be a disfavored outcome in a regulatory environment where consistency, fairness, and clarity should be the hallmarks of policy.

Furthermore, the regulatory framework in which EPA applied the Reactivation Policy was significantly altered by the 2002 NSR Reform Rule. After the Reform Rule, a source (other than one comprised of EUSGUs) could select any 24-month period within the last ten years as the period used to establish the source's baseline emission rate. *Id.* at 80195. The EPA specifically rejected the use of a "more representative time period" in lieu of this 24-month period in the past 10 years. *Id.*[14] This rule gave source owners and operators the discretion to select a period other than the prior 24 months to determine the baseline emission rate without having to show that the selected period was representative of normal source operations. Since making the latter showing under the pre-reform NSR rules was often confusing and involved disputed judgment calls, EPA chose to replace it with a rule that gave source owners and operators discretion to choose any 24-month period within a normal business cycle, which EPA determined to be 10 years for most types of sources based on a study. 67 Fed. Reg. at 80191-92, 199-200; *See also, New York v. EPA*, 443 F.3d 3, 25–26 (D.C. Cir. 2005). EPA explained that new approach to determining baseline emissions would provide certainty that was lacking under the old one. 67 Fed. Reg. at 80200.

Under this current framework in the NSR regulations, the Reactivation Policy no longer serves the purpose that it did under the pre-Reform NSR regulations, when sources could seek to establish baseline emissions by demonstrating that emissions experienced before the last 24 months were more representative of normal operations. This is illustrated by the circumstances presented here with the Limetree Bay facility. Limetree Bay applied the current rules and selected a 24-month period within the last 10 years to establish its baseline emissions rate when it applied for and received a minor NSR permit from the Virgin Islands for the MARPOL project. This is also the approach that the EPA has taken in analyzing and issuing this PAL permit. Limetree Bay selected a 24-month period within the last ten years (as of its application for a PAL) and EPA used that period in setting the PAL, with the appropriate adjustments as required by the regulations. Limetree did not have to show that this 24-month period was representative of its normal operations. It is thus not consistent with the current approach for determining baseline emissions to then apply the Reactivation Policy to presume that refinery operations have permanently shut down based on some emissions units being idle for the past two years. Since Limetree Bay has the discretion to

---

[14] The EPA did continue to allow permitting agencies to select a more representative time period for Electric Utility Steam Generating Units (EUSGUs). That is not the situation here as Limetree Bay does not involve any EUSGUs.

establish baseline emissions based on its operations within the last 10 years (which includes a period before these emissions units were idled), it is not necessary to require the company to demonstrate that it did not permanently shut down the facility in this time period to enable it to restart the idled units without obtaining a major NSR permit.[15]  Under the rationale for the baseline provisions in the 2002 reform rules, the idling of the refinery portions of the facility may be viewed to have occurred in the normal course of the 10-year business cycle upon which EPA based the baseline provision in the 2002 rule.

The Reactivation Policy is also undermined by other provisions of the NSR regulations. The regulations define a "new emissions unit" as an emissions unit "that is (or will be) *newly constructed* and that has *existed* for less than 2 years . . ." 40 C.F.R. § 52.21(b)(7)(i) (emphasis added). The emission units at Limetree Bay have clearly existed for more than 2 years and are not "newly constructed."  Under the plain language of this provision, the emissions units at the Limetree Bay facility are existing emission units. *Id.* § 52.21(b)(7)(ii). It would be an odd result to treat a major stationary source made up entirely of 'existing' emission units as "new" for purposes of determining NSR applicability. The regulatory definition of "construction" also undermines the Reactivation Polity. This definition suggest that the "fabrication" or "erection" of an emission unit is distinct from the "modification" of an emission unit. *Id.* § 52.21(b)(8). The former suggests the new creation of an emission unit while the latter suggests the emission unit is already in existence.

Even if the physical changes necessary to restart an idled emission units are extensive—even perhaps qualifying as reconstruction under the NSPS program, 40 C.F.R. § 60.15—they are not subject to PSD unless they increase emissions, 67 Fed. Reg. at 80194 ("[EPA] decided against applying PSD to 'reconstruction,' *even of entire sources*, on the grounds that, as to existing sources that would not otherwise be subjected to PSD review as a major modification (i.e., such source would not cause a significant net emissions increase), changes that had no emission consequences should not be subject to PSD regardless of their magnitude." (emphasis added)).

While the applicability provisions in 40 C.F.R. § 52.21(a)(2)(i) say that PSD applies to the construction of a "any new major stationary source (as defined in paragraph (b)(1) of this section)," EPA's NSR regulations do not contain a definition of the term "new major stationary source" or otherwise describe what constitutes "new" for this purpose.  The EPA believes the best reading of the word "new" in this context is to mean "having recently come into existence." Webster's Dictionary, https://www.merriam-webster.com/dictionary/new. The EPA recognizes that "new" can also mean the "resumption or repetition of a previous act or thing," *id.*, but in context this refers to iterations that are distinct, such as days or editions. It would stretch this concept to suggest a source after a restart is a distinct thing from the source before idling. This would also suggest that when a source restarts after a routine turn-

---

[15] This is not to say that all sources should be allowed to restart and use previous emissions for their baseline if they have been shut down for less than 10 years. For instance, if a source has surrendered its permits, the baseline would have to be adjusted to account for the fact that the source is no longer permitted to emit. *See* 40 C.F.R. § 52.21(b)(48)(ii)(*c*). In addition, the PAL provisions require the removal of emissions from permanently shut down emission units from the calculation of the PAL. 40 C.F.R. § 52.21(aa)(6)(i).  However, as discussed below both HOVENSA and Limetree Bay have retained their permits for the Refinery, so the first requirement described above is not relevant in this case.  In addition, Limetree Bay complied with the second requirement described above by identifying in its PAL permit application several units that it determined were permanently shut down.

around for maintenance and it resumes operation, it is "new" source because it resumes a previous act. The absurdity of this result in the regulatory context is sufficient to refute it. Therefore, the best reading of "new" in the applicability procedures is that the source has recently come into existence.[16]

For the above stated reasons, the EPA no longer believes that the Reactivation Policy is an appropriate policy, and the Agency is not required to apply it to any source, including the Limetree Bay facility.

Nevertheless, even if EPA found cause to continue applying the Reactivation Policy here, the Agency stands by the conclusion reflected in the 2018 letter from Assistant Administrator Wehrum that Limetree Bay and HOVENSA have demonstrated a continuous intent to restart this facility.   As restated in the 2018 Wehrum letter, under EPA's Reactivation Policy, "no single factor is likely to be conclusive in determining intent" and "EPA generally has considered the totality of all such factors and the relevant supporting documentation in evaluating whether there was a continuous intent to restart the facility."  After considering the information provided in this comment, some of which was not provided to EPA in 2018, EPA's view is that the totality of factors and documentation continues to support the conclusion that HOVENSA and Limetree Bay displayed a continuous intent to restart this facility.

An important overall consideration that has informed EPA's evaluation of the totality of the factors bearing on the intent to restart or permanently shut down the facility is that the Limetree Bay facility has never completely shut down.  Since HOVENSA ceased the refinery operations at the complex in the 2011-2012 time period, HOVENSA and Limetree Bay have continuously operated the oil storage and terminal operations, wastewater treatment plant, and power generation equipment at this location.  This situation is thus unique and distinguishable from many of the circumstances cited by the commenter where EPA had expressed the view that a continuous intent to restart was not demonstrated, based in part on the complete cessation of operations at the facility.

The commenter first points to the eight-year time period that parts of the facility have been shut down.  But the comment does not demonstrate why this amount of time precludes HOVENSA and Limetree Bay from showing a continuous intent to restart.  This period of time invokes the presumption that the facility was permanently shut down under the Reactivation Policy, but the policy allows for rebutting that presumption. *See* Policy Determinations Regarding PSD Questions, Region VII, at 2 (Feb. 5, 1981) (finding that a boiler that had been idled for 10 years was not subject to PSD). The comment does not cite a prior circumstance where EPA or another agency found that the shutdown of this duration precluded a company from rebutting the presumption.  Because the Reactivation Policy calls for looking at the totality of circumstances, it is also important to consider what the facility owners and operators were doing within the period of time that the facility was shut down.  In this case, HOVENSA and Limetree have been continuing to operate portions of the facility, investing in maintenance of the idled portions of the facility, and continuing to hold permits

---

[16] The one exception to this would be a modification to an existing minor source that itself would constitute a major stationary source. 40 C.F.R. § 52.21(b)(1)(i)(*c*).  But in this context, modified sources are treated like new sources because the Act requires that a major source obtain a PSD permit, not because modified means the same thing as new.

governing the operation of the idled equipment.

Similarly, regarding the second factor cited by the commenter, the comment does not explain how HOVENSA's reasons for shutting down portions of the facility prevent the owners from demonstrating intent to restart the facility. Corporations generally operate to make a profit and return on investment for shareholders, so financial and economic reasons will frequently be part of the motivation for shutting down a portion of a stationary source owned and operated by a corporation. Facility operations inherently ebb and flow for financial and economic reasons. EPA recognized that business flows in cycles when it revised its NSR regulations in 2002 to provide for a 10-year period from which baseline emissions may be drawn. *See New York v. EPA*, 443 F.3d at 25–26. Thus, the motivation for idling part of a facility does not seem particularly informative as to intent to restart in this case. The commenter cites two previous shutdowns that it argues EPA considered to be permanent because they were motivated by financial and economic reasons. But in the *Monroe Electric* Title V order, EPA did not actually determine that the shutdown of that facility was permanent because it had shut down for economic reasons. This order partially granted a petition to object to a title V operating permit based on the view that the facility in question had more clearly engaged in a major modification when it restarted without deciding whether the facility should be considered a new source under the reactivation policy. In the case of *Noranda Lakeshore Mines*, the source was completely shut down for at least 10 years, it had failed to maintain its operating permit, and had been removed from the state's emissions inventory. While EPA noted that the Noranda facility was shutdown "due to market conditions," this fact was not cited by EPA as a reason for its finding that the shutdown was permanent.

On the third factor the commenter addresses ("statements by the owner or operator regarding intent"), the comment does not actually cite a statement "by the owner or operator" that evidences an intent to permanently shut down refinery operations. The comment cites only one statement from the company itself, a 2012 press release from HOVENSA that said "[f]ollowing the shutdown, the complex will operate as an oil storage terminal." This appears to be simply a statement about the facts on the ground after the refinery operations were idled while the other operations were not. This statement does not appear in any way definitive regarding HOVENSA's permanent plans for the facility. The other "statements" referenced in the comment are derived from press reports, and many of those press reports are based on the perceptions of parties other than HOVENSA. The supporting information considered by Assistant Administrator Wehrum in 2018 included company statements, press releases, and various correspondence from 2011 through 2017. The commenter does not address any of this information or provide any reasons for EPA to question the credibility of these statements that are more directly attributable to the owner or operator of the facility. EPA acknowledges that some of the evidence the commenter proffers tends to show that HOVENSA pursued the option of permanently converting the facility to an oil storage and transfer facility. But this does not demonstrate that HOVENSA developed or implemented concrete plans to do so or that it abandoned the option of resuming oil refinery operations at this site. Actions can sometimes speak louder than words, and HOVENSA continued to invest in maintenance of the refinery components of the facility and retained its permits for this portion of the facility.

As to the fourth factor addressed in the comment (cost and time to reactivate), the commenter argues that Assistant Administrator Wehrum analyzed this factor backwards. But Mr.

- 112

Wehrum did not characterize the $400 million spent on maintenance as pertaining to this factor.  The 2018 letter does not discuss the total cost and time that Limetree expected to be required to restart the idled portions of the facility.  Rather, the $400 million spent on maintenance by HOVENSA goes to the last factor addressed by the commenter – ongoing maintenance and inspections.  The magnitude of this investment in maintenance of the facility evidences an intent by the owners to restart the facility.  It seems unlikely that a company that intends to permanently abandon or scrap equipment would invest hundreds of millions of dollars in its maintenance.  As discussed in EPA's 2018 letter, Limetree Bay represented that the owners of the facility have maintained critical refinery equipment, such as compressors, pumps, utilities, wastewater treatment units in working order and conducted multiple walkthrough inspections at the plant.  Limetree also provided a list of critical equipment and the timeline of significant maintenance activities performed at the refinery to demonstrate that the maintenance activities were performed.

For the fifth factor addressed in the comment (status of permits), the commenter dismisses the fact the company maintained its environmental permits, claiming that these same permits were also required to operate the portions of the facility that have not been idled.  But the only support provided by the commenter for this conclusory statement is an EPA website compiling information on the facility's emissions and compliance with regulatory requirements.[17]  The second weblink provided by commenter produced an error message.[18]  The comment does not describe the content of any of these permits or show that every one of the facility's permits cover both the refinery operations and those parts of the facility that have continued to operate.   The commenter does not dispute Limetree's representations that HOVENSA and Limetree maintained all environmental permits in active status and submitted timely renewal applications.  Nor does the comment allege that these companies have not complied with the Refinery MACT, NSPS Subpart J, and all of the applicable RCRA regulations while the refinery units were idled.  The first website cited by commenters includes compliance information that might relate to the latter considerations, but the comment does not show how any of this information is relevant to the question of whether Limetree maintained its permits.  Further, the comment does not show how the information on this webpage undermines the EPA's earlier finding that maintaining such permits provides evidence of an intent by these companies to restart the refinery portions of the facility.

In the context of the fourth and sixth factors addressed in the comment, the commenter argues that prior EPA statements that a facility should be treated as permanently shut down if it cannot be restarted quickly and easily (without significant investment of time and capital) suggest the facility should be treated as permanently shut down as well.  EPA acknowledges that Limetree Bay has not been able to restart the refinery operations at this facility as quickly and easily as first projected, as it does appear the company has invested substantial capital and several years of time to get these desired portions of the refinery back on line.  But the focus of the Reactivation Policy has been on determining "if a source is permanently shut down." Wehrum Letter at 2.  While being in a position to restart quickly and easily may be one way to show that a facility has not permanently shut down, this is not the only way.  In a case such as this one where the source never completely shut down and other factors show an intent to restart those portions that were shut down, an owner or operator would not necessarily have to demonstrate that the entire source can be quickly and easily restarted to

---

[17] https://enviro.epa.gov/enviro/multisys2_v2.get_list?facility_uin=110000307864.
[18] https://enviro.epa.gov/enviro/fii_query_dtl.disp_program_facility.

show its intent to restart operations.

Considering the totality of circumstances, were EPA to apply the Reactivation Policy, EPA would continue to find that the presumption of permanent shutdown has been rebutted in this case. While there are some statements indicating that HOVENSA pursued the option of permanently using the facility for only product storage and transfer, EPA has not received information showing that the company had definite plans to do so or took actions at the facility site to implement such a plan. The presumption of permanent shutdown would be rebutted in this case by evidence showing that the source continued to operate in part and that the owners invested substantial sums in maintenance of the idled portions of the facility and continued to hold permits governing the operation of the idled equipment.

Regarding the commenters' request that EPA rescind the EPA's April 2018 letter based on government ethics concerns, the commenters point to only generalized allegations concerning potential past ethics violations by the former Assistant Administrator. The commenters admit they "are not aware of any evidence that the Wehrum Letter was, in itself, a direct result of misconduct." Comment at 8. Thus, these ethical allegations do not justify the withdrawal of the 2018 letter.

The statement the commenter points to regarding Limetree being considered a customer was made by one EPA official and was in reference to the coordination between multiple federal agencies and the Virgin Islands on complex multi-media permitting and approvals. That process was intended to ensure all those participating were up-to-date and informed about where in the process the agencies were, not to impact the substance of the decisions reached. Indeed, this level of coordination between federal agencies and transparency is fully consistent with congressional direction. See 42 U.S.C. 4370m et. seq. (setting out a coordination and transparency program for major federal infrastructure projects).

**Comment No. 133**
Commenters state that the refinery should not be reopened because of HOVENSA's past violations of the Clean Air Act and other environmental laws and that these violations caused HOVENSA to shut down.

**Response 133**
These comments refer to a history of noncompliance at the facility and suggest that the noncompliance led HOVENSA to cease operations. EPA did initiate an enforcement action against HOVENSA for Clean Air Act violations and the action settled in 2011 (a 2020 modification of the settlement, once entered by the U.S. District Court of the Virgin Islands, will transfer the HOVENSA's obligations to Limetree). The consent decree did not require the facility to cease operations. Rather, we understand that economic factors led HOVENSA to cease operations. Regardless of the reason for HOVENSA's decision, the PAL provisions do not provide EPA with authority to deny a PAL permit due to the applicant's history of noncompliance under either the Clean Air Act or other environmental statutes. The PAL provisions do, however, address past violations through adjustments to the baseline and PAL level and EPA has incorporated such adjustments in this permit action. The PAL provisions do, however, address past violations and related Consent Decree requirements through adjustments to the baseline and PAL level, and EPA has incorporated such adjustments in this permit action. See Letter from John Filippelli, Director, Air and Radiation Division, EPA

Region 2, to Darius Sweet, CEO, Limetree Bay Terminals, and Brian K. Lever, President, Limetree Bay Refining (Aug. 14, 2019). See also EPA Response to Comment 16.

## Port Hamilton Refining and Transportation LLLP
## 112(r) CAA General Duty Clause Inspection

| | |
|---|---|
| **Stationary Source** | Port Hamilton Refinery and Transportation LLLP |
| **Date of Inspection** | September 20 – 26, 2022 |
| **USEPA Inspectors** | Dwayne Harrington and Karl Lindberg, EPA Region 2 |
| **Description of Activities** | • Opening meeting with facility representatives<br>• File review<br>• Facility Tour<br>• Closing meeting with facility representatives |

## STATIONARY SOURCE INFORMATION

| | |
|---|---|
| **Facility Location** | 1 Estate Hope, St. Croix, USVI 00820 |
| **Number of Employees** | 42; primarily contractors (Pinnacle Services) |
| **Description of Surrounding Area** | Residential/Industrial |
| **PHRT Facility Representatives** | Fermin Rodriguez, VP and Refinery Manager<br>Catherine Elizee, Environmental Manager<br>Sloan Schoyer, Consultant (Pinnacle Services) |

### General Information

Port Hamilton Refining and Transportation, LLLP (PHRT) owns and operates the eastern portion of the approximately 1,500-acre former HOVENSA oil terminal/refinery located in St. Croix (the eastern portion is referred to herein as the Refinery). The Refinery is currently idle and was most recently formerly owned and operated by Limetree Bay Refining, LLC (LTBR). West Indies Petroleum Limited and PHRT (jointly, PHRT) were the winning bidder for the Refinery at an auction held in bankruptcy court in December 2021. PHRT currently plans to restart and operate the Refinery. The adjacent, remaining portion of the petroleum terminal is currently operated by Ocean Port Terminals (OPT). PHRT and OPT share a power distribution system, fire water system, oily water/wastewater treatment system, instrument air system, and nitrogen system.

There are currently forty-two employees on site under contract with PHRT (associated with the contractor Pinnacle Services). Pinnacle Services employees are primarily former HOVENSA and/or LTBR refinery operators and unit supervisors. During the daytime shift, there are three area Lead Shift Supervisors and six operators on site, and during the night shift there are two operators. The PHRT Maintenance Department consists of approximately twenty people.

Four environmental contractors assist PHRT in implementing its air, water, and waste management compliance programs.

1

**PHRT Process Unit Status and Inventories**

| Unit | Operational status | Chemical contents and estimated volumes |
|---|---|---|
| **#5 Crude Unit** | Not operating since May 2021 | See Appendix B |
| **#6 Crude Unit** | 1 Desalter and 2 vessels not-operating since May 2021, rest of unit idle since 2012 | See Appendix B |
| **#3 Vacuum Unit** | Not operating since May 2021 | See Appendix B |
| **#2 Distillate Desulfurizer** | Idle since 2012 | Empty |
| **#6 Distillate Desulfurizer** | Not operating since May 2021 | See Appendix B |
| **#7 Distillate Desulfurizer** | Not operating since May 2021 | See Appendix B |
| **#9 Distillate Desulfurizer** | Not operating since May 2021 | See Appendix B |
| **#3 Platformer** | Idle since 2012 | Empty |
| **#4 Platformer** | Not operating since May 2021 | See Appendix B |
| **#3 Hydrobon (Hydrogen Unit)** | Not operating since May 2021 | Empty |
| **Delayed Coker Unit** | Not operating since May 2021 | See Appendix B |
| **Coke handling and storage** | Not operating since May 2021 | See Appendix B |
| **Penex Isomerization Unit** | Idle since 2012 | Empty |
| **Boilers** | Boilers 8,9&10 not operating since May 2021. Rest of boilers idle since 2012 or prior. | Empty |
| **Utility Fractionator Distillation Tower** | Idle since 2012 | Empty |
| **Powerhouse Steam and Turbine Generators** | GTs 7 & 8 on standby, GTs 9, 10&13 not operating since May 2021, rest idle since 2012. | See Appendix B |
| **Flares** | Flare 8 not operating since May 2021, Flare 7 idle since August 2020, rest of flares idle since 2012 | Empty |
| **East Fuel Gas System** | Not operating since May 2021 | See Appendix B |
| **West Fuel Gas System** | Idle since 2012 | Empty |
| **Flare System** | Flare 8 not operating since May 2021, Flare 7 idle since August 2020, rest of flares idle since 2012 | Empty |
| **#2 Gas Recovery Unit** | Not operating since May 2021 | See Appendix B |
| **Amine Units (Total)** | Not operating since May 2021 | See Appendix B |
| **#4 Amine Unit** | Not operating since May 2021 | See Appendix B |
| **#5 Amine Unit** | Not operating since May 2021 | See Appendix B |
| **#6 Amine Unit** | Not operating since May 2021 | See Appendix B |

| | | |
|---|---|---|
| **#7 Amine Unit** | Not operating since May 2021 | See Appendix B |
| **Amine piping and Contactors** | Not operating since May 2021 | See Appendix B |
| **East Sulfur Recover Plant** | Not operating since May 2021 | Empty |
| **East Sulfur Pit** | Not operating since May 2021 | See Appendix B |
| **East Sulfur Storage** | In service | See Appendix B |
| **Tank 7443** | In service | See Appendix B |
| **Tank 8501** | In service | See Appendix B |
| **Tank 8502** | In service | See Appendix B |
| **#3 LPG Fractionation Unit** | Not operating since May 2021 | See Appendix B |
| **Alkylation Unit** | Idle since 2012 | Empty |
| **Fluid Catalytic Cracking Unit** | Idle since 2012 | Empty |
| **#2 Visbreaker** | Idle since 2012 | Empty |
| **#3 Sour Water Stripper** | Idle since 2012 | Empty |
| **#4 Sour Water Stripper** | Idle since 2012 | Empty |
| **#5 Sour Water Stripper** | Not operating since May 2021 | Empty |
| **West Side Refinery** (other than #2DD, #2 Vis, Penex, Util. Frac. and Flare 3) | Idle since between 2010 and 2012 | Empty |
| **Haz Waste Storage** | | No hazardous waste has been generated from PHRT |

Delayed Coker Unit and Coke Domes:

There are two concrete domes (North and South) for storage of petroleum coke produced by the Delayed Coker Unit and fed by a conveyor system.

In August 2022, a fire occurred in a coke pile in the North Coke Dome. The fire smoldered for approximately two weeks until it was extinguished as a result of the efforts of eleven mainland U.S. and forty-three local contractors. The coke piles in the North and South Domes are currently turned over once a week and water sprayed one time per week, and temperature in the coke dome piles is monitored once a day.

**Facility Inspection:**

Pursuant to Section 112(r)(1) of the Clean Air Act (CAA), 42 U.S.C. § 7412(r)(1), the owners and operators of stationary sources producing, processing, handling, or storing substances listed pursuant to Section 112(r)(3) of the CAA, 42 U.S.C. § 7412(r)(3), or any other extremely hazardous substance have a general duty, in the same manner and to the same extent as under 29 U.S.C. § 654, to identify hazards that may result from accidental releases of such substances using appropriate hazard assessment techniques, to design and maintain a safe facility taking such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases that do occur.

The following facility process elements were reviewed during EPA's General Duty Clause inspection, as per EPA's General Duty Clause Guidance, for the current (idled) conditions at the facility:

3

## Chemical and Process Hazard Identification

Facility representatives provided the EPA Inspectors with Safety Data Sheets for certain on-site hazardous materials, which are also available online.

The most recent Process Hazard Analysis for the Refinery was performed in 2019-2020 by an outside consultant (Primatech) for LTBR, the prior owner. PHRT could not provide a copy of this analysis.

PHRT could not provide a current hazard assessment for the processes that presently contain extremely hazardous substances at the Facility. A hazard identification and review, including process configuration, maintenance, hazard recognition, and the effectiveness of emergency shutdown and response procedures, has not been performed by PHRT.

## Design a Safe Facility

PHRT could not provide documentation that its process design complies with recognized and generally accepted industry practices.

PHRT provided examples of piping and instrumentation diagrams (P&IDs) that had been updated by LTBR from earlier P&IDs that had been prepared by its predecessor operator, HOVENSA. The P&IDs for the following units were provided for review (including the date of the P&ID):

- #5 Crude Unit; 2021
- #3 LPG Fractionation Unit; 2020
- #4 Amine Unit; 2021
- #5 Amine Unit; 2020
- #3 Vacuum Unit; 2021

PHRT provided a process block flow diagram of the Refinery that had been prepared by LTBR dated 9/22/2020.

PHRT presented electrical classification area schematics that had been prepared by HOVENSA (a former owner/operator).

PHRT could not provide pressure relief design and inspection records.

## Maintain a Safe Facility

Operating Procedures and Operator Training

Current PHRT operating procedures and operator training records could not be provided. PHRT stated it relies on Lead Shift Supervisors and operator professional experience for its current operating procedures.

According to PHRT, all process control units can be controlled from the main control room, including unit shutdowns.

PHRT has Lockout/Tagout, Hot Work, and High Energy Isolation System programs, and it presented recent documents regarding these programs for review.

PHRT presented Pre-Startup Safety Review (PSSR) procedures and examples of PSSRs from LTBR's Crude Unit 2020 startups. PHRT presented a statement that PHRT will adopt the LTBR/OPT health and safety policies and procedures, including PSSR.

4

Maintenance

The facility does not have a preventative maintenance program, and facility personnel stated that there are currently no formal process unit inspections. A preventative maintenance program should include the following: schedules for inspections of equipment; records of when inspections and tests were last conducted; records of any repairs that have been made; the schedule for future inspections, tests, and/or replacement of equipment, as well as documentation demonstrating that inspections comply with applicable industry codes and standards. PHRT representatives stated the following: that unit operators perform daily walkthroughs for each unit to record gauges and unit conditions, etc.; that operators normally address routine issues; and that area supervisors are notified of issues that require further attention from the maintenance department. However, as discussed below, during the Facility tour, the EPA Inspectors observed conditions demonstrating a systemic lack of maintenance.

Self Audit

PHRT did not have access to the previous operator's most recent three-year Process Safety Management/Risk Management Plan audit for the facility, and PHRT has not performed a process safety audit. Facility representatives stated that safety walk-throughs are performed daily by refinery operators and Lead Area Supervisors, but documentation was not provided.

Incident Investigation

PHRT representatives stated that they have an incident investigation procedure, and that other than the North Coke Dome fire in August 2022, there have been no recent incidents requiring an investigation.

Managing Changes

PHRT presented a 2019 LTBR Management of Change procedure. There have been no recent changes at the facility requiring a Management of Change procedure.

**Minimizing the Effects of Releases**

Emergency Response:

The OPT Fire Brigade and Hazardous Materials Unit support PHRT in the event of an incident, with support as necessary from local emergency fire services and Virgin Islands Territorial Emergency Management Agency.

PHRT has a vacuum truck on site and relies on a contractor (NRC) for primary oil spill response and cleanup.

PHRT presented documents and schematics for the East Refinery fire water system and its fixed fire water delivery systems throughout the facility.

PHRT demonstrated for the EPA Inspectors (9/23/22) its anhydrous ammonia deluge system that is designed to reduce ammonia vapors in the event of a release.

There are chemical monitors for $H_2S$, $SO_2$, CO, and hydrocarbons (LEL) throughout the PHRT and OPT facilities. Under an agreement with EPA, PHRT is currently maintaining five off site monitoring stations for $H_2S$ and $SO_2$, with the installation of an additional four locations planned.

5

**Facility Tour**

The following process units were toured:

- # 5 Crude Unit
- # 6 Crude Unit
- # 3 Vacuum Unit
- Anhydrous Ammonia Drum
- Amine Units
- LPG Unit #3
- Delayed Coker Unit
- Coker Supply Tank 8501

All photos taken during the Facility Inspection were taken, labeled, and provided to EPA by PHRT.

Numerous examples of corrosion, including extreme corrosion and in many cases to a degree resulting in extreme deterioration (exfoliation), were observed on process valves, flanges, pipes, nuts/bolts, and pressure relief devices in all unit processes. Many process components appear not have been adequately inspected or maintained for significant periods and may not be operable or at least fully operable for routine service or in an emergency (as documented in Inspection Photos). Gaskets were also observed in poor condition, and many exhibited severe corrosion. Corrosion on these process components to such a visible degree demonstrates severely compromised integrity and operability. These conditions demonstrate a risk of imminent release of extremely hazardous substances. Because of this degree of corrosion, the vessels, piping, and/or valves may fail, resulting in a catastrophic release.

Many valves and piping on the liquified petroleum gas (LPG) process are in an advanced state of corrosion and disrepair (as documented in Inspection Photos). These conditions demonstrate a risk of fire and/or explosion.

Many valves and piping on the Anhydrous Ammonia Drum are in an advanced state of corrosion and disrepair (as documented in Inspection Photos). These conditions demonstrate a risk of catastrophic release of anhydrous ammonia and off-facility impact.

Inspectors observed exposed wires in Class I Division I electrical system areas (areas where flammable substances are located). Such exposed wires could be potential ignition sources. PHRT representatives could not confirm if the wires were live or disconnected from the electrical system.

Severe corrosion was observed in many components of the Amine Reduction Unit (see inspection photos). Gaseous hydrogen sulfide potentially entrained in the Unit may present an extreme health hazard in the event of an accidental release.

Liquid was observed leaking from failed pipe-tank welds on all of the drain lines of the #6 Crude Desalter Unit (as documented in Inspection Photos), which is indicative of the process not having been adequately inspected or maintained for a significant period and a systemic lack of facility process preventative maintenance.

Coker Supply Tank 8501 partially imploded in 2020 when the facility was operated by LTBR (as documented in Inspection Photos). According to PHRT, the tank implosion apparently was the result of a failed relief vent during routine offloading of the tank, along with the concomitant failure of other, redundant pressure relief devices on the tank, apparently through lack of routine preventative

6

maintenance. The Coker Supply Tank was subsequently inspected by an API-certified inspector who determined it to be fit for limited service if its contents remained below an established fill volume. The tank is still in service and contains 12,000 barrels of heavy oil.

**INSPECTOR SIGNATURE:** DWAYNE HARRINGTON

Digitally signed by DWAYNE HARRINGTON
Date: 2022.10.21 12:23:34 -04'00'

Dwayne Harrington, Inspector          Date

**INSPECTOR SIGNATURE:** KARL LINDBERG

Digitally signed by KARL LINDBERG
Date: 2022.10.21 12:34:01 -04'00'

Karl Lindberg, Inspector          Date

**APPROVER SIGNATURE:** ELLEN BANNER

Digitally signed by ELLEN BANNER
Date: 2022.10.21 12:36:34 -04'00'

Ellen Banner, Section Chief          Date

Appendix A - Inspection Photos

Appendix B - PHRT Complete Process Unit Status and Inventories

7

# PORT HAMILTON REFINING AND TRANSPORTATION, LLLP

September 1, 2022

Dwayne Harrington
Response and Prevention Branch
U.S. Environmental Protection Agency
2890 Woodbridge Avenue
Bldg. 205B (MS-211)
Edison, NJ 08837-3679
Via email: Harrington.dwayne@epa.gov
And
Via email: regna.jean@epa.gov

RE:    **Request for Information Pursuant to Section 104(e) of the Comprehensive
         Environmental Response, Compensation, and Liability Act (CERCLA) received on
         August 18, 2022.**

Dear Sir/Madam,

Port Hamilton Refining and Transportation, LLLP, ("PHRT") is responding to the Agency's request for information under Section 104(e) of CERCLA, (the Request), received via electronic mail on August 18, 2022. The Region requested this response within fourteen days of receipt of the Request.

**Specific Listed Requests**

1.

a. State the correct legal name and mailing address of your Company. If the legal name of your Company at the time of the Release at or from the Facility was different, provide that name also.
   ***Port Hamilton Refining and Transportation, LLLP, a Virgin Islands limited liability limited partnership***
   ***1 Estate Hope***
   ***Christiansted, USVI 00820***

b. State the name(s) and address(es) of the President, the Chairman of the Board, and the Chief Executive Officer of your Company.
   ***Co-Chief Executive Officers are David Roberts and Charles Chambers***
   ***1 Estate Hope, Christiansted, USVI  00820***

c. If your Company is a subsidiary or affiliate of another corporation, or has subsidiaries, identify each such entity and its relationship to the Company, and state the name(s) and address(es) of each such entity's President, Chairman of the Board, and Chief Executive Officer.
   ***None***

**1 ESTATE HOPE ▪ CHRISTIANSTED, VI 00820 ▪ TEL: 340-692-3000**

      d.  Identify the state and date of incorporation and the agent for service of process for your Company and each entity identified in your response to question 1.c. above.
***Port Hamilton Refining and Transportation, LLLP incorporated in the Virgin Islands; incorporation date December 7, 2021, amended February 24, 2022.***
***Agent for Service of process: Marjorie Rawls Roberts, Esq. Telephone 340-776-7235; jorie@mrrv.law.com***

2.  Please provide the following information for the Facility:

      a.  the name and address of the Facility;
***Same as 1.a.***

      b.  the owner and operator of the Facility
***Same as 1.a.***

      c.  the name, address, and phone number of the Facility's supervisor, manager, or equivalent;
***Fermin Rodriguez, V.P. and Refinery Manager***
***1 Estate Hope***
***Christiansted, USVI 00820***
***340-643-2265***

      d.  the nature of the operations at the Facility;
***Idled Petroleum Refinery***

      e.  the primary North American Industry Classification System Code for the Facility;
***32411***

      f.  how many employees were employed at the Facility as of the time of the Release.
***42***

      g.  the date your Company commenced operations at the Facility;
***Port Hamilton assumed ownership on January 24, 2022; refining operations have not yet been re-commenced.***

      h.  the date your Company ceased operations at the Facility, if applicable;
***Not Applicable***

      i.  how much land the Facility occupies; and
***500 acres***

      j.  the distance from the Facility to the nearest neighboring town.
***4 miles***

3.  Please provide the following information about the Release:

      a.  the date (month/day/year) and time (using a 24-hour clock) that the Release began; and
***The automatic alarm was activated on 08/04/2022 at approximately 04:20hrs***

Section 104(e) CERCLA Request
September 1, 2022

      b.  if the Release has ended, the date (month/day/year) and time (using a 24-hour clock) that the Release ended, and if the Release has not ended, please so state.
***8/26/22 at 07:30hrs***

4.  Please provide a detailed description of the Release. Provide all information available to you concerning the primary cause and any ancillary causes of the subject Release, including a detailed description of all processes involved.
      a.  Describe the source of the Release. Your description should identify the materials involved in the incident and/or fire, the approximate quantity of such materials, how the materials are/were stored (including whether covered or contained in a structure or enclosure), how long the materials have been stored at the location, and any steps taken to ensure that release and/or fire would not occur.
***Petroleum Coke produced at the Coker Unit in 2021, between January and May on 2021, under Limetree Bay Refining, LLC ownership was stored in two concrete domes. Each dome has a diameter of approximately 250ft. The North Dome contained a total of approximately 6,000tons of petroleum coke in piles. Not all of the material was involved in the release (not all was smoldering). All material was contained in the coke dome and had been stored at this location for at least 14 months (last deposit of the material in the coke dome occurred in 2nd quarter 2021). The contractor, Savage (under Limetree Bay Refining contract), was responsible for the handling and storage of the material; Savage left the site abruptly after the prior owner declared bankruptcy. PHRT took ownership of the refinery (including the coke domes) in January of 2022.***

    If the storage of these materials is covered by a permit, please identify such permit.
***Title V Permit STX-TV-003-10***

      b.  Provide a detailed description of how the material is loaded and unloaded from the storage domes at the Facility, what air emissions controls are in place, and how the emission control devices are monitored.
***During normal operation at the Coker Unit, the Coke was moved from the Coke Pit at the Coker unit by an overhead crane into the Crusher and from there, went on a totally enclosed conveyor system that moved the coke to the top of either the North or South dome. From the top of the dome, the coke moved down through the Stacker structure and onto the Stacker arm that dropped the coke into piles. The Stacker arm can move around to deposit the coke throughout the dome. When the conveyor system is operating, fans at the dome circulate air through a baghouse located between the domes. Water sprays at transfer points throughout the conveyor system kept dust from being created at drop points during coke transfer operations.***

5.  Provide a detailed description of how the Release was first discovered, including the exact date and time that the Release was discovered, and describe any alarm system(s) that was/were triggered. (Discovery includes, but is not limited to, process control device indication, chemical specific alarm, observation by an employee). Please provide all available documents, descriptions and data to support your answer, including names and phone numbers of all persons who first discovered the Release.
***An automatic Carbon Monoxide (CO) alarm was activated. The PHRT night Shift Supervisor, Christopher Thomas (340-692-3000), was notified by the Terminal Shift***

EPA-226

Section 104(e) CERCLA Request
September 1, 2022

*Superintendent (TSS), a Limetree Bay Terminals (now doing business as Ocean Point Terminals) employee, on 08/04/2022 at approximately 04:20 hrs that the alarm was going off.*

6. Describe the immediate response activities taken to mitigate the incident. In addition, describe all further response actions taken to date to address the incident.
*The immediate response to the alarm was to do a visual inspection of the dome. The night Shift Supervisor inspected the dome around 05:00 hrs, and did not smell any smoke or see any glow or fire, or anything unusual; he attempted to stop the alarm but could not do so. Approximately one hour later, a second inspection was made by the Refinery Shift Supervisor. He noticed some smoke inside the dome at the highest point of the ceiling. He notified the Plant Manager who activated Incident Command at 08:00hrs and additional plans were set in motion to begin applying water to the piles inside the North dome. Firefighting equipment was used to apply water, starting with 1.5 and 3 inch hoses using service water. A pumper truck was then brought to the site to pump additional firewater via specialized remote nozzles that could be left inside the dome without manual intervention to continuously spray water on the coke. Water was continuously sprayed until the necessary heavy equipment (with an operator) became available (excavator and front end loader) to move the coke piles. Experts in coke handling and firefighting were flown in from the mainland to provide expertise and additional labor. A total of 11 contractors were flown in from the Mainland (2 from Savage for the first 3 days, then 9 from Williams Fire and Hazard Control for the remaining of the event) and 43 local contractors were hired to supplement the PHRT labor force to respond to the incident. In order to make room to allow the excavator to expose the core inside the northwest pile where the smoldering was located, a total of approximately 3,615 tons of coke were removed from the North dome via trucks to the Coke Pit at the Coker unit. The source of the smoldering was exposed by the excavator; water was applied to cool down the pile and extinguish all smoldering until the coke was at ambient temperature.*

7. Using your best professional judgment, provide estimates for each hazardous substance or extremely hazardous substance released (in pounds) to each media during the Release. If multiple substances were released, supply the following information for each. Quantities released to each media should add up to the total quantity released.
Name: *Sulfur Dioxide*
CAS Number: *7446-09-5*
Concentration (wt%): *Unknown*
Physical state at time of release: *Gaseous*
Released to: *Air*          Quantity (lbs.) *9,129 lbs or 406 lb/day*

Name: *Nitrogen Dioxide*
CAS Number: *10102-44-0*
Concentration (wt%): *Unknown*
Physical state at time of release: *Gaseous*
Released to: *Air*          Quantity (lbs.) *607.5 lbs or 25 lb/day*

Name: *Nitrogen Oxide*
CAS Number: *10102-43-9*
Concentration (wt%): *Unknown*

4

Physical state at time of release: ***Gaseous***
Released to: ***Air***        Quantity (lbs.) ***607.5 lbs or 25 lb/day***

Name: ***Biphenyl***
CAS Number: ***92-52-4***
Concentration (wt%): ***Unknown***
Physical state at time of release: ***Gaseous***
Released to: ***Air***        Quantity (lbs.) ***2 lbs or 0.1 lb/day***

Name: ***Naphthalene***
CAS Number: ***91-20-3***
Concentration (wt%): ***Unknown***
Physical state at time of release: ***Gaseous***
Released to: ***Air***        Quantity (lbs.) ***11.7 lbs or 0.5 lb/day***

Name: ***Phenanthrene***
CAS Number: ***85-01-8***
Concentration (wt%): ***Unknown***
Physical state at time of release: ***Gaseous***
Released to: ***Air***        Quantity (lbs.) ***0.6 lbs or 0.03 lb/day***

8.  In determining the extent of the Release, identify and describe whatever techniques were employed to quantify the Release. Describe any air monitoring or other methods that were used to measure and assess materials and quantities released. Please provide your estimate of the quantity of the release for each day the release continued.

    Please provide copies of the calculations performed, identify those amounts which were estimated, and discuss the reliability of such estimates.

    ***See included Excel Spreadsheet with calculations. Calculations were based on an estimate of the amount of coke that was involved in the smoldering event. This number was estimated by the personnel who was inside the dome moving the coke and applying the water to cool it down. Operations personnel described the coke being moved as still being intact after being cooled down, nothing was observed as being completely consumed. From that, an estimate of 10% of the volume involved was estimated to have been completely consumed to account for some consumption for the total volume. The sulfur content was taken from a lab analysis when the Coker unit was operating. Most of the sulfur was assumed to have oxidized to SO2, counting for a small amount remaining in the ash (less than 0.5%). NOx (NO and NO2) were derived using AP-42 factors for uncontrolled anthracite coal combustors. No factors were found for petroleum coal. Anthracite is believed to be closer in composition than other types of coal. These factors should be very conservative, taking into consideration a smoldering pile of coke inside a dome should be a low oxygen environment and not an open flame, which encourages NOx formation. In order to try to account for a low oxygen environment, it was assumed 50% of NOx formation was NO. This number is not based on any published factors. The speciated organics were estimated using AP-42 factors for anthracite coal combustors. The highest values between the stoker-fired boiler and residential space heaters was used. So far, PHRT has not found any published factors for smoldering piles of coke. We suspect the factors used in this***

*estimate are grossly over estimating the amounts released because the environment is very different than a boiler and the pile was doused with water from the beginning of the event, constantly lowering the temperature. If PHRT finds emission factors that seem to be more representative, we will update our calculations.*

9.  Provide a complete description of where any of the substances identified in your response to Question 7 migrated to, including any nearby localities. Include in your answer whether any of the substances identified in your response to Question 7 migrated:
    a.  beyond the confines of an enclosed structure; and
    *When water was applied to the smoldering coke, steam was generated and could be seen coming out of the top of the dome door and openings in the top conveyor system. There was a slight smell of burning coke around the dome area, approximately 200ft downwind.*
    b.  beyond the property boundaries of your Facility (for example, a vapor release was carried by prevailing wind beyond the fenceline of your Facility).
    *No odors were detected at the fenceline of the property or beyond, downwind of the domes. Fenceline monitoring for CO, VOCs, $SO_2$ and $O_2$ showed no elevated concentrations that could be attributed to the event.*

10. Indicate the distance between the point of the release and the nearest Facility boundary. Provide site map or drawing if available.
    *1,600 ft to the East fenceline*

11. Describe the basis for your answers to Questions 9 a. - b., and the methodologies which were used to determine the answers to Questions 9 a. - b. (for example, by observation and/or use of monitoring equipment).
    *See 9a. and 9b.*

12. Identify the person who was responsible for the investigation of the Release for your Company. Please provide a copy of any investigation report(s).  *Gerald McBean. Report is still in progress.*

13. Were federal authorities notified of the Release?
    *No*

    If so, please provide the following information:
    a.  the name, address and telephone number of the federal authorities that were notified;
    b.  the date and time (using a 24-hour clock) that the federal authorities were notified; and
    c.  the name and title of the person who made this notification.

14. Were all appropriate State Emergency Response Commissions ("SERCs") notified of the Release? If so, please provide the following information:
    a.  the name, address and telephone number of the SERCs that were notified;
    *Austin Callwood, VIDPNR, 45 Mars Hill, Frederiksted, 340-773-1082*

    b.  the date and time (using a 24-hour clock) that the SERCs were notified; and
    *Morning of August 6, 2022*

    c.  the name and title of the person who made this notification.

*Fermin Rodriguez, VP and Refinery Manager*

15. Were all appropriate Local Emergency Planning Committees ("LEPCs") notified of the Release?
    ***No***
    If so, please provide the following information:
    a.  the name, address and telephone number of the LEPCs that were notified;
    b.  the date and time (using a 24-hour clock) that the LEPCs were notified; and
    c.  the name and title of the person who made this notification.
    d.

16. If applicable, was an update to the immediate notification provided to the NRC, SERC and/or LEPC(s)? ***PHRT continually updated VIDPNR regarding the status of the smoldering coke pile; we also updated EPA regarding same.*** Please discuss the circumstance(s) that warranted each update to the immediate notification.

***17.*** Was a written follow-up emergency notice provided to the SERC and the LEPC(s) pursuant to Section 304(c) of the Emergency Planning and Community Right to Know Act ("EPCRA"), 42 U.S.C. § 11004(c)?
    ***No***
    If so, identify to whom the follow-up notices were sent and provide copies of such notices and proof of mailing. If multiple follow-up notices were provided to the SERC and LEPC, please provide copies of such notices and proof of mailing.

18. Was the general public notified of the Release? If so, describe how and when the notification was made.
    ***A press release was issued on August 7, 2022.***

19. Was there an evacuation in response to the Release? If so, describe how the evacuation was accomplished and how many people were evacuated.
    ***There was no evacuation***

20. Were any persons injured or hospitalized as a result of the Release? If so, please provide the following information:
    a.  the number of people who were injured or hospitalized as a result of the Release and their identities, if known;
        ***No people were injured or hospitalized***
    b.  the extent of the injuries suffered by the people identified in your response to Question 20(a). ***NA***
    c.  the role(s), if any, at the scene of the Release of the people identified in your response to Question 20(a); and
    d.  identify the hospital(s) where people who were injured as a result of the Release were sent. ***NA***

21. Were written operating procedures available to Facility personnel at the time of the Release which detail the actions to be taken in case of a release or malfunction? If so, please provide copies of the appropriate operating procedures.
    ***The facility Integrated Contingency Plan (ICP) contains emergency response actions. Please see attached excerpt.***

22. Were the actions outlined in the Facility operating procedures followed at the time of the Release? ***Yes***

23. Describe any actions taken since the Release to prevent such a release from occurring in the future. ***The coke piles in the North and South domes are inspected during each shift, using an infrared camera to detect any increase in temperature. We continue to spray water over the coke piles in both domes and at the coke pit every 4 hours for one hour.***

24. If information regarding the quantity of the Release provided in your response to this request for information, or information previously submitted to EPA regarding the quantity of the Release, differs from your report to the NRC, SERC, or the LEPC(s), explain the differences and the bases for the differences. ***NA***

25. Please provide a chemical inventory for the chemicals stored on site at the time of the Release and the maximum and average inventories for the chemicals which have been stored on site for each of the past three years. If applicable, please include materials which were owned by a partner or another company and were stored on site at the time of the Release and for each of the past three years.
***Please see attached Tier II reports submitted by Limetree Bay Terminals and Limetree Bay Refining.***

26. For each question contained herein, if information or documents responsive to this Information Request are not in your possession, custody, or control, identify the persons from whom such information or documents can be obtained.

Please contact Catherine Elizee (Catherine.elizee@phrt.com) or Julie Domike (jdomike@babstcalland.com) if you have any questions regarding this submittal.

Sincerely yours,

Thomas V. Eagan, Esq.
Counsel to Port Hamilton Refining and Transportation, LLLP

Enclosures

cc:    J.P. Oriol, Commissioner (DPNR)
       Austin Callwood, Director (DPNR)
       Julie Domike, Esq
       Fermin Rodriguez, VP and Refinery Manager

# PORT HAMILTON REFINING AND TRANSPORTATION, LLLP

**<u>CERTIFICATION OF RESPONSE</u>**

State of Florida

County of Miami/Dade

      I certify, under penalty of law, that I have personally examined and am familiar with the information submitted in response to the Information Request and all documents submitted with this response, and that based on my inquiry of those individuals immediately responsible for obtaining the information, I believe that the submitted information is true, accurate, and complete, and that all documents submitted with this response are complete and authentic unless otherwise indicated.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment. I am also aware that for one year from the date of the Information Request, I am under an obligation to supplement my response to the Information Request if any additional information relevant to the matters should become known or available to me.

                                      Thomas V. Eagan, Esquire
                                      Counsel to Port Hamilton Refining and
                                        Transportation, LLLP

                         _____
                                 Signature

Sworn to before me this 1st day of September, 2022

_____
Notary Public

CAA-02-2022-1463



**United States Environmental Protection Agency
Region 2
290 Broadway
New York, New York 10007**

*May Contain Information Claimed as Confidential Business Information*

August 23, 2022

<u>*VIA ELECTRONIC MAIL*</u>

Julie R. Domike, Esq.
Babst Calland, Attorneys at Law
505 9th Street NW, Suite 700
Washington, DC 20004

Thomas V. Eagan, Esq.
Rasco Klock Perez & Nieto
2555 Ponce de Leon Blvd, Suite 600
Coral Gables, Florida 33134

Dear Ms. Domike and Mr. Eagan:

Thank you for sending the U.S. Environmental Protection Agency Region 2 (EPA) the July 27, 2022 corrected version of your July 15, 2022 letter on behalf of Port Hamilton Transportation and Refining, LLLP (Port Hamilton), in response to EPA's March 22, 2022 letter regarding St. Croix Refinery Permitting Requirements.  EPA is reviewing your responses to the questions in our March 22 letter and will provide a response after we complete our review.  In the interim, we wish to address a few statements in your letter regarding potential activities that Port Hamilton appears to be considering while EPA is conducting its applicability review under the Clean Air Act's Prevention of Significant Deterioration (PSD) permit program. This interim response is in addition to the points made in the August 23, 2022 letter to you from Myles Flint of the Department of Justice.

Your July 27, 2022 letter asserts that actions under EPA's May 14, 2021 Section 303 Order, the December 30, 2021 First Modification of the Consent Decree, and the July 12, 2021 Joint Stipulation "are the only actions necessary prior to restart."  Your letter further states that Port Hamilton is targeting the second quarter of calendar year 2023 for restarting petroleum refining operations, and that "PHRT is under no obligation under the Joint Stipulation, Consent Decree, or applicable regulations to delay such resumption pending EPA's evaluation of PSD permitting applicability."

In response, we reiterate that, as stated in our March 22 letter, "[B]ecause a PSD permit may be required prior to startup of the refinery operations or of any refinery unit(s), EPA strongly

recommends that you not proceed with any such actions while EPA continues to evaluate PSD applicability."

Please let me know if you have any questions.

Sincerely,

*Joseph Siegel*

Joseph A. Siegel, Attorney
Air Branch, Office of Regional Counsel
EPA Region 2
Siegel.joseph@epa.gov
212-637-3208



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 2
290 BROADWAY
NEW YORK, NY 10007-1866

August 22, 2022

ELECTRONIC MAIL: teagan@rascoklock.com

Thomas V. Eagan, Partner
Virgin Islands Refining Co., LLC
General Partner in Port Hamilton Refining and Transportation, LLLP
1 Estate Hope
Christiansted, Virgin Islands   00820

Re:    Refinery Amine Units Chemical Cleaning Project

Dear Mr. Eagan:

This letter responds to Port Hamilton Refining and Transportation, LLLP (PHRT)'s letter dated August 2, 2022, and the information submitted on August 5, 2022, informing the Virgin Islands Department of Planning and Natural Resources (DPNR) and the U. S. Environmental Protection Agency (EPA) of PHRT's intent to commence purging the amine units and dispose of the waste through the facility's wastewater treatment plant. In the letter, PHRT seeks agreement from DPNR and EPA that the amine neutralization project proposed in the August 2nd letter is permitted by Territorial Discharge Elimination System (TPDES) permit (VI0000019) originally issued to HOVENSA, LLC on February 22, 2008 (hereinafter "the 2008 Permit"). The EPA does not concur with your regulatory applicability analysis and determination.

As stated in EPA's letter dated May 25, 2022, the 2008 Permit may not be transferred to PHRT. That letter also reminded both Limetree Bay Terminals, LLC and PHRT of their affirmative obligation to apply for TPDES permits for all pollutants discharged from the refinery and terminal operations into receiving waters. To have TPDES permit coverage, PHRT must apply for its own TPDES permit from DPNR. To date, the DPNR has not received a TPDES application from PHRT, and has not issued a TPDES permit to PHRT. As a result, PHRT does not have coverage under any TPDES permit for either the process wastewater treatment plant, or for any regulated storm water outfalls associated with its industrial activities, as required by 40 CFR 122.26(b).

Moreover, even if the 2008 Permit were effective, it does not authorize the discharge of amine waste through the wastewater treatment plant. The 2008 Permit effluent limits and special conditions were written to satisfy the regulatory requirements and water quality standards in place at the time of issuance, based on the activity and effluent characteristics included in the January 30, 2007, TPDES permit application submitted by HOVENSA ("the 2007 Application"). The 2007 Application did not include any description of amine purging waste, nor does it include the full suite of analytical testing results required to characterize the proposed discharge of amine unit cleaning waste.

Permitting authorities rely upon analytical test results to determine whether the proposed discharge would cause or contribute, or have the reasonable potential to cause or contribute, to an exceedance of the applicable water quality standards. These results, along with detailed descriptions of proposed wastestreams and activities at a facility, are also used to determine the applicable technology-based

effluent limitation guidelines. Neither analysis has been performed for the amine purge waste, as this waste stream was not included in the 2007 Application.

Furthermore, the cleaning of the amine units cannot be included in the definition of "maintenance wastewaters," as stated in your letter. Chemical additives described by the 2008 permit are used for cleaning the boiler units to remove scale and corrosion that would interfere with heat transfer. The 2008 Permit quoted in the August 2nd letter refers to specific chemical additives identified by HOVENSA in its 2007 Application, which do not include amines.

Additionally, on page 6 of your letter, you refer to the April 1974 EPA *Development Document for Effluent Limitation Guidelines and New Source Performance Standards for the Petroleum Refining Point Source Category*. The statement referenced does not authorize the discharge of amine. Rather, it explains that maintenance wastes must either be slowly bled into the system if appropriate, such that they may be diluted by other, less hazardous, wastestreams, or be disposed through the use of contract carriers. Nothing in that document authorizes the discharge of amine waste through the wastewater treatment plant in the method PHRT proposes, nor does it define the purging of amine units as maintenance cleaning wastes.

In meetings on this topic, EPA has repeatedly informed PHRT that disposing of this waste through the wastewater treatment plant is not authorized by the 2008 Permit. EPA has also stated that it is unlikely to be approved, given the need to ensure that this discharge would not cause or contribute to an exceedance of all current water quality standards, including whole effluent toxicity.

Section 301 of the Clean Water Act ("CWA"), 33 U.S.C. § 1311, prohibits the discharge of any pollutant from a point source to a water of the United States except, among other things, in compliance with a permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342. With this letter, the EPA hereby informs PHRT that the disposal of the amine purge waste, as described in your letter of August 2, 2022, is not authorized by any applicable TPDES permit, and therefore, if it were to occur, would be a violation of Section 301 of the CWA. Under the CWA, the United States can unilaterally seek compliance and penalties to address violations through a civil action in federal district court, or through administrative actions that include penalty complaints and orders for compliance.

Should you have any questions, please contact me at wong.virginia@epa.gov or 212-637-4241; or Karen O'Brien, P.E. of the NPDES Section, at obrien.karen@epa.gov or 212-637-3717.

Sincerely,

VIRGINIA WONG
Digitally signed by VIRGINIA WONG
Date: 2022.08.22 11:31:59 -04'00'

Virginia Wong, Chief
Clean Water Regulatory Branch
Water Division

cc:    Mr. Austin F. Callwood, DPNR/DEP, Director
       Ms. Mary Stiehler, DPNR/DEP, Environmental Program Manager
       Ms. Catherine Elizee, PHRT
       Mr. Fermin Rodriguez, PHRT

# PORT HAMILTON REFINING AND TRANSPORTATION, LLLC

**Statement from Charles Chambers**

**Representative of Port Hamilton Refining and Transportation**

**Before the**

**34th Legislature of the U.S. Virgin Islands**
**Committee on Economic Development and Agriculture**

Chairman Kenneth Gittens, Vice Chair Milton Potter, and Members of the Committee on Economic Development and Agriculture - Good Morning.

On behalf of Port Hamilton Refining and Transportation (PHRT), I wish to thank you for the opportunity to appear today before the Legislature of the U.S. Virgin Islands to discuss our ownership of the refinery on St. Croix and give an update on our exciting plans for the facility.

We are grateful to the Committee and to your colleagues in the 34th Legislature for your interest in this matter and your support in our efforts to enhance economic development for the people of the United States Virgin Islands.

For your information members, Port Hamilton Refining and Transportation is a consortium of United States and Caribbean investors who came together to purchase the refinery on St. Croix. I am the largest shareholder of Port Hamilton Refining and Transportation. For clarity and full disclosure Mr. Chairman, I am also one of the owners and the Chief Executive Officer of West Indies Petroleum Limited (WIPL) which is a company that is based in Jamaica. However, I appear before you today primarily in my capacity as lead principal of Port Hamilton Refining and Transportation which is a totally separate legal entity from WIPL.

1

# PORT HAMILTON REFINING AND TRANSPORTATION, LLLC

Chairman and members, the facts surrounding the purchase of the refinery on St. Croix are as follows:

Port Hamilton Refining and Transportation and WIPL were designated as the winning bidders under the order and are parties to the Asset Purchase Agreement as purchaser on December 21, 2021. Title for the refinery was transferred to Port Hamilton in January 2022 at the time of closing, per the bill of sale attached to the Asset Purchase Agreement.

So, while both WIPL and Port Hamilton were Purchasers under the Agreement, the court filings specify that title to the assets and contracts is in Port Hamilton Refining and Transportation's name. In January 2022, Port Hamilton successfully closed the sale and thereby completed the acquisition of the refinery on the south shore of St. Croix.

Danville Walker, Senior Vice President of WIPL is here today and will provide a statement on behalf of WIPL, while I will focus on PHRT and our intentions for the refinery on St. Croix.

Chairman, Port Hamilton Refining and Transportation appears before you today at a time when there is much conversation across the region about record high gas prices and accompanying concerns regarding inflation. We are sensitive to the fact that our proprietorship of the refinery on St. Croix places us in a unique position to assist with addressing these issues - both within the USVI and across the Caribbean region, including the United States.

The reality is that the demand for refined petroleum products such as gasoline and diesel is exceeding the industry's current capability to supply this demand. This shortness of supply in the market has contributed to price increases that are straining the finances of many hard-working people. Our objective is to restart the refinery on St. Croix in a safe and environmentally sound manner which we hope will help to alleviate this tight supply situation.

2

# PORT HAMILTON REFINING AND TRANSPORTATION, LLLC

For emphasis Chairman and members, we reiterate our commitment to the safe and environmentally sound restarting of the refinery at 180-thousand barrels per day of production amidst the current tight supply environment, particularly in the United States and the Caribbean.

Port Hamilton Refining and Transportation has a good opportunity to quickly bring new supply to the market with refinery production that is both inside the United States and the Caribbean.  We are continuously pushing within the international investment community towards ensuring that the PHRT Refinery is restarted in the shortest possible time, by the second quarter of next year once financing is secured.

Port Hamilton Refining and Transportation takes very seriously our role and opportunity to be partners with the St. Croix community. Port Hamilton Refining and Transportation will strengthen the economy through the well-paying jobs we create, and through workforce training and development. We hope that in September 2022 we will be able to commence phase one hiring as we push towards the restarting of operations of the refinery on St. Croix which we expect will create a number of jobs for the people of St. Croix.

By way of update Chairman, conversations are underway with local and federal regulators and a host of other critical constituents in order to ensure the safe, environmentally friendly and quick restart of the refinery.  For nearly 50 years the refinery produced 650,000 barrels per day and was a critical asset in the US and Caribbean fuel supply chain. Those years were a boon for the economy of the U.S. Virgin Islands which can be realized in the future with a restart of the refinery

St. Croix's strategic location and the Port Hamilton Refining and Transportation restart could significantly aid in economic sustainability for the U.S. Virgin Islands, and aid in Energy Policy and National Security Policy for the United States. In addition to supply to the Caribbean, the refinery could supply the East and Gulf Coasts of the United States, service delivery fast, and be an integral part of increasing the supply of fuel / energy products.

3

# PORT HAMILTON REFINING AND TRANSPORTATION, LLLC

We are aware and sensitive to the fact Mr. Chairman and members, that over the last ten (10) years, the people of the U.S. Virgin Islands have endured multiple hardships that have negatively impacted the economy, from the refinery shutdown in 2012, Irma and Maria, the back-to-back hurricanes in 2017, and two years of COVID-19. Through it all, U.S. Virgin Islanders have been hardworking and resilient. It is with this resilience, that we will recover and play our part in helping to transform the territory together.

We are happy to have been given the opportunity to provide an update in this august forum concerning Port Hamilton Refining and Transportation's ownership and plans for St. Croix in the United States Virgin Islands.

Chairman and your members, do accept the assurance of our highest consideration.

4



# Legislature of the Virgin Islands

·

## Office of Senator Kenneth L. Gittens

Capitol Building, Charlotte Amalie, VI 00804 • 3022 Golden Rock, Christiansted, VI 00820

**Kenneth L. Gittens**
**Senator**

**COMMITTEES**
Economic
Development &
Agriculture
*Chairperson*

Rules & Judiciary
*Vice-Chair*

Health, Hospital &
Human Services
*Member*

Education &
Workforce
Development
*Member*

Homeland
Security, Justice,
Public Safety &
Veterans Affair
*Member*

Committee of the
Whole
*Member*

To:     Kurell Sheridan
        Executive Director
        34th Legislature of the Virgin Islands

        Senator Donna Frett-Gregory
        President 34th Legislature of the Virgin Islands From

From:   Senator Kenneth L. Gittens, Chair
        Committee on Economic Development & Agriculture

Date:   August 1, 2022

Subject: Committee Report for Thursday, July 14, 2022, Hearing

Pursuant to the Rules of the 34th Legislature of the Virgin Islands, enclosed is the
report for the Committee on Economic Development & Agriculture hearing held
in the Frits E. Lawaetz Legislative Chambers on St. Croix.

## Staff Present

**Clerk**
Myrna Pickard

**Public Affairs & Media**
Eustace Brown
Alvin Burke
Alwyn Baptiste
Bernard Matthew, Sr.
Melissa Gustave

**Sergeant-at-Arms**
Sherleen Francis

The Committee on Economic Development and Agriculture met on Thursday, July 14, 2022, at the Frits E. Lawaetz Conference Room on St. Croix to receive testimony on the overall status of the Limetree Bay Refinery, its recent sale, and other activities taking place at and around the refinery site. The committee also received testimony on the Agricultural Plan, developed by the University of the Virgin Islands as per Act 8404.

**Hearing Start Time   10:21 a.m.**
**Hearing End Time      5:40 p.m.**

**Committee Members Present Included:**
Vice-Chairman Senator Milton E. Potter
Senator Dwayne M. DeGraff
Senator Novelle E. Francis, Jr.
Senator Donna A. Frett-Gregory
Senator Alma Francis Heyliger
Senator Javan E. James, Sr.

**Non-Committee Members Present included:**
Senator Kurt A. Vialet
Senator Janelle Sarauw
Senator Franklin Johnson
Senator Genevieve Whitaker
Senator Samuel Carrion

There were six (6) testifiers presenting to the committee in block one. Testifiers appeared in person. Topics discussed were the who are primary owners of Port Hamilton Refining and its relationship to West Indies Petroleum, who is responsible for owed payments to the Government of the Virgin Islands, plans for the refinery unused equipment and its overall value of assets, and employment opportunities.

| Testifiers: | Title: | Department/Agency: |
| --- | --- | --- |
| Danville Walker | Chairman | West Indies Petroleum |
| Charles Chambers | Chief Executive. Officer | Port Hamilton Refining |
| Fermin Rodriguez | Vice President | Port Hamilton Refining |
| Hon. Richard E. Evangelista | Commissioner | DLCA |
| Nathan Simmonds | Director | Public Finance Authority |
| Kye Walker | Attorney | Public Finance Authority |

Senators were given eight (8) minutes for their first round of questioning that was followed by a five (5) minute round of questioning. They exhausted all questions and proceeded to a recess called by the chair before Block II.

**The second block began at 3:15 p.m. and included discussion on the Agricultural Plan –** Act 8404 developed by the University f the Virgin Islands. Information regarding moving the plan forward through legislative action and other alternatives.

| Testifiers: | Title: | Department/Agency: |
|---|---|---|
| Dr. David Hall | President | University of the Virgin Islands |
| Dale Browne | Owner | Sejah Farm of the Virgin Islands |
| Sommer Sibilly Brown | Owner | V.I. Good Food Co-Op |
| Luca Gasperi | Owner | Art Farm LLC |
| Nate Olive | Owner | Ridge to Reef |

Dr. David Hall appeared virtually using the TEAMS Online Platform. He reviewed the plan and explained the challenges facing the farmers in the territory. Farmers who also attended the hearing expressed their concerns with the lack of attention given to them and are all in full support of the Agricultural plan. Commissioner Positive T.A. Nelson was invited and asked to submit a testimony regarding the plan, however the commissioner did not attend nor did the committee receive a testimony. The Department of Agriculture is essential to the discussion and possible solutions in moving the plan forward.

Senators were given a five (5) minute round of questioning, followed up by a three (3) minute round of questioning.

During the hearing, several requests for additional information were made through the chair. They are as follows:

**Through the Chair Requests:**

1. Senator Alma Francis Heyliger requested a list of vacancies for the 170 positions available in September 2022, the salary ranges and a list of WIPL and PHRT shareholders.
2. Senator Kurt A. Vialet requested detail of the three (3) phases and a list of WIPL and PHRT shareholders.
3. Senator Novelle E. Francis, Jr. requested a list of WIPL and PHRT shareholders.
4. Senator Franklin Johnson requested copies submitted to/from EPA from PHRT and a list of the nine (9) locations of monitoring equipment.
5. Senator Samuel Carrion requested a list of resident agents, directors, principal officers and shareholders from PHRT.

Chairman Gittens thanked the testifiers and his colleagues for their contributions to the hearing and adjourned the hearing at 5:40 p.m.

Case: 23-1094    Document: 46-1    Page: 139    Date Filed: 04/13/2023



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

REGION 2
290 BROADWAY

NEW YORK, NY 10007-1866

May 25, 2022

***Via Electronic Mail***

Mark Chavez
Limetree Bay Terminals, LLC
1 Estate Hope
Christiansted, St. Croix, Virgin Islands 00820

Julie R. Domike, Esq.
Babst Calland, Attorneys at Law
505 9th Street NW, Suite 700
Washington, DC 20004

Tom V. Eagan, Esq.
Rasco Klock Perez & Nieto
2555 Ponce de Leon Blvd, Suite 600
Coral Gables, Florida 33134

Dear Mr. Chavez, Ms. Domike and Mr. Eagan:

This letter concerns the U.S. Environmental Protection Agency Region 2's (EPA) review of a letter dated April 14, 2022, from Vinson & Elkins, on behalf of Limetree Bay Terminals, LLC (Limetree Bay Terminals), which was addressed to Rasco Klock Perez & Nieto, and that copied our office (the April 14, 2022 letter). The April 14, 2022 letter addressed the suspension of services to the refinery now owned by Port Hamilton Refining and Transportation LLLP (PHRT) and West Indies Petroleum Limited's (WIPL). This letter serves as a reminder to both Limetree Bay Terminals and PHRT/WIPL of their affirmative obligation to apply for Territorial Pollutant Discharge Elimination System (TPDES) permits for all pollutants discharged by the refinery and oil terminal (together, the Facility). We are also writing under separate cover to the Virgin Islands Department of Planning and Natural Resources (VI DPNR) to reiterate its role and responsibilities for issuance of TPDES permits for the Facility. A copy of EPA's letter to DPNR is attached for your reference.

Below is a description of the EPA's understanding of TPDES permit coverage applicable to the Facility:

- The VI DPNR issued a final TPDES permit to the HOVENSA LLC on February 22, 2008 (the 2008 Permit).
- The 2008 Permit expired on February 28, 2013.

- HOVENSA submitted a timely and complete renewal application on August 31, 2012. The expired 2008 Permit was administratively extended as a result of the timely and complete renewal application.

- In response to a February 2, 2016 request and transfer of ownership documentation between HOVENSA and Limetree Bay Terminals, in a letter dated June 2, 2016, the VI DPNR transferred all TPDES permit responsibilities, coverage, and liability from HOVENSA to Limetree Bay Terminals, effective as of April 1, 2016 (the June 2, 2016 letter).

- Expired permits may not be modified, as this would circumvent the requirement that the fixed term not exceed five years for NPDES permits established by the Clean Water Act (CWA) Section 402(b)(1)(B)).[1] As a result, the administratively extended 2008 Permit is the only permit still in effect.  Since it is administratively extended, it remains as it was in 2008, in the name of HOVENSA, but it is the responsibility of Limetree Bay Terminals.

- In the June 2, 2016 letter, the VI DPNR requested a full application from Limetree Bay Terminals for a new TPDES permit for the Facility.

- A TPDES permit application was submitted on June 11, 2019, by Limetree Bay Refining, on behalf of both Limetree Bay Refining and Limetree Bay Terminals (the 2019 Application). The 2019 Application includes a statement that Limetree Bay Refining elected by letter dated May 29, 2019, to be added as co-permittee to the 2008 Permit. The 2019 Application was signed by the President of Limetree Bay Refining.

---

[1] Provided that the permittee submitted an application at least 180 days before the expiration date of their existing permit, pursuant to 40 C.F.R. § 122.21, the terms of the existing, expired permit for the facility are understood to be administratively extended. It is EPA's position that a permit-issuing authority (EPA or the state) should not modify the conditions of expired permits that have been administratively extended in accordance with 40 C.F.R. § 122.6 but should rather include any new permit terms in new, reissued permits. Under the Clean Water Act, NPDES permits have "a fixed term not exceeding five years." CWA § 402(b)(1)(B). 40 C.F.R. § 122.46(b) provides that "[e]xcept as provided in [40 C.F.R.] 122.6, the term of a permit shall not be extended through modification beyond the maximum duration specified in this section." Under 40 C.F.R § 122.6, the conditions of an expired EPA-issued permit remain "fully effective and enforceable" until the effective date of a new permit provided that the permittee has submitted a timely and complete application for a new permit, and the EPA "through no fault of the permittee" does not issue a new permit prior to the expiration date of the prior permit. Under 40 C.F.R. § 122.6(d), states that are authorized to administer the NPDES program may also administratively extend expired permits "if State law allows." Administrative extension of an expired permit is simply intended to allow the expired permit to remain enforceable while the permit issuing authority is reviewing a timely and complete application for permit reissuance. See 40 C.F.R. § 122.6(a) and (b). Allowing modifications of an expired/extended permit would circumvent the 5-year permit limit by allowing piecemeal modifications of expired permits, in place of permit reissuance.

EPA has made clear that expired/extended NPDES permits may not be modified. For example, in EPA's Federal Register notice for the 1984 amendment to the NPDES permit regulations, the agency stated that "permits which have 'expired' cannot be modified. While expired permits may be continued in effect beyond the permit terms under the Administrative Procedure Act and 40 C.F.R. § 122.6 [C.F.R. § 122.5], these permits may only be changed by reissuance." 40 Fed. Reg. 27998 (Sept. 26, 1984).

- The 2019 Application included staged plans for start-up of the refining operations. Although it did include effluent characteristics data, that data is not representative of the effluent during refining operations as required to process the 2019 Application.

The EPA is concerned that the 2008 Permit and 2019 Application on file do not represent the current ownership and activities at the Facility, and that neither Limetree Bay Terminals nor PHRT/WIPL has appropriate TPDES permit coverage for discharges from their respective industrial activities. Discharge of pollutants that are not authorized pursuant to a National Pollutant Discharge Elimination System permit is a violation of the Section 301 of the CWA (33 U.S.C.A. § 1251 et seq).

The April 14, 2022 letter states:

> On a go forward basis, given Limetree Terminals and the Refinery are now separately owned and operated, each business should have its own permits required for their respective operations.[4]
>
>> [4] There may be limited exceptions for certain facilities that are jointly owned and required for the operation of both facilities, like the wastewater treatment facility, which we are willing to discuss with PHRT and the relevant regulatory authorities.

The EPA agrees that each entity must seek their own permit coverage, in particular for the numerous storm water outfalls throughout the Facility. The wastewater treatment facility primarily treats process wastewater from the refining operation, as well as other wastestreams that come from both the refining and terminal operations. EPA agrees that the two entities will need to come to an agreement about the operation and permit coverage for the wastewater treatment plant and discharge. NPDES regulations at 40 C.F.R. §122.1 suggest that where there is combined ownership, the operator should apply for permit coverage.

That same regulation also requires a full and complete application that represents the current and anticipated discharges and activities at that facility.  Failure to provide the VI DPNR, the permitting authority, with the information necessary to support the permit issuance process could result in a determination that the applications on file from HOVENSA, Limetree Bay Terminals and Limetree Bay Refining are incomplete. Such a determination may jeopardize the administrative extension of the 2008 Permit.

Should you have any questions, please contact me at wong.virginia@epa.gov, or 212-637-4241; or Karen O'Brien of the NPDES Section at obrien.karen@epa.gov, or (212) 637-3717.

Sincerely,

VIRGINIA WONG   Digitally signed by VIRGINIA WONG
Date: 2022.05.25 18:58:20 -04'00'

Virginia Wong, Chief
Clean Water Regulatory Branch
Water Division

cc:     Ms. Mary Stiehler, DPNR/DEP, Environmental Program Manager
        Mr. Austin F. Callwood, DPNR/DEP, Director



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 2
290 BROADWAY
NEW YORK, NY 10007-1866

March 22, 2022

*Via Electronic Mail – JDomike@babstcalland.com; TEagan@rascoklock.com*

Julie R. Domike, Esq.
Babst Calland, Attorneys at Law
505 9th Street NW, Suite 700
Washington, DC 20004
JDomike@babstcalland.com

Thomas V. Eagan, Esq.
Rasco Klock Perez & Nieto
2555 Ponce de Leon Blvd, Suite 600
Coral Gables, Florida 33134
Teagan@rascoklock.com

**Re: St. Croix Refinery Permitting Requirements**

Dear Ms. Domike and Mr. Eagan:

The United States Environmental Protection Agency (EPA) is aware that West Indies Petroleum Limited (WIPL) and Port Hamilton Refining and Transportation LLLP (PHRT) purchased the refinery[1] located at 1 Estate Hope, Christiansted, U.S. Virgin Islands that was previously owned by Limetree Bay Refining, LLC (LBR) (the Refinery). WIPL and PHRT have been in communication with EPA regarding efforts to resume operation of the Refinery, and EPA and the U.S. Department of Justice have written to you on February 4, 2022 and March 2, 2022 regarding many of the requirements that EPA expects the Refinery to meet before it can resume operations. As noted in EPA's March 2, 2022 correspondence to you, this letter addresses the topic of permitting requirements applicable to the Refinery under the Clean Air Act Prevention of Significant Deterioration (PSD) program.

EPA is committed to ensuring that operation of the Refinery complies with the law and does not pose public health or environmental threats to the St. Croix community. While EPA does not yet have all the details related to the Refinery's prior operations and future plans, based on the information currently available to EPA there are strong indicators to suggest that the Refinery must obtain a PSD permit prior to startup of Refinery operations. EPA seeks additional information from WIPL and PHRT regarding past and future changes to process and emission units at the Refinery to enable the Agency to evaluate this issue further before making a final determination as to PSD applicability.

---

[1] WIPL and PHRT purchased the units associated with the refining operations, while Limetree Bay Terminals, LLC (LBT) still owns and operates the storage tank units and terminals that are co-located with the refining operations.

EPA's PSD regulations provide that "no new major stationary source or major modification . . . shall begin actual construction" without a PSD permit. 40 CFR § 52.21(a)(2)(iii). The PSD regulations "apply to the construction of any new major stationary source or major modification of any existing major stationary source." 40 CFR § 52.21(a)(2)(ii). A major modification is defined as "any physical change in or change in the method of operation of a major stationary source that would result in: a significant emissions increase . . . of a regulated NSR pollutant . . . and a significant net emissions increase of that pollutant from the major stationary source." 40 CFR § 52.21(b)(2)(i).

To determine whether the Refinery needs to obtain a PSD permit, EPA requests that you provide responses to the following questions; EPA may request responses to additional questions and/or request additional documentation as it evaluates your responses:

1) Which process units and emissions units at the Refinery did LBR and/or LBT (hereinafter collectively referred to as "Limetree") physically change, beginning in 2018? For each unit, describe details of the changes, including what the change was, why it was made, whether equipment was modified or replaced, the potential to emit for the changed equipment, and the cost of the work.
2) For each unit physically changed at the Refinery by Limetree, what was the actual throughput/operating rate achieved during each month the unit operated between October 2020 and May 2021?
3) What was the average utilization rate of the Refinery in bbl/month during the period of operation by Limetree in 2021?
4) Which process units and emissions units do you plan to operate without making further changes prior to operation? Indicate when you plan to begin operating each such unit.
5) Which process units and emissions units do you plan to operate after making changes to those units?
   a) For each unit, describe the specific changes and the reasons for the changes.
   b) For each unit that had previously undergone physical changes by Limetree, indicate if, and in what manner, your changes relate to the changes made by Limetree.
   c) For each unit, what is your timeline for making the change(s) and beginning operation?
   d) Indicate the expected capacity and potential to emit at each unit for each PSD pollutant.
6) What products do you plan to produce in the next five years, when do you plan to begin producing each product, and in what quantities do you plan to produce them?
7) For each product listed in your response to question 6, identify the process units and emissions units that will be used to produce the product.
8) Provide a detailed timeline for your plans for the startup of the Refinery, expanding upon your January 20, 2022 "Proposal to the USEPA and USDOJ for the Restart of Limetree Bay Refinery Operations." If you plan to start up the Refinery in phases, please provide a detailed timeline for, and a list of actions in, each phase.
9) How did changes made by Limetree affect the emissions profile at the Refinery? How will changes you intend to make affect the emissions profile at the Refinery?

Please provide, as soon as possible, your responses to these inquiries, along with your PSD

applicability analysis for the proposed changes to, and startup of, the Refinery, and all information relevant to, and in support of, your analysis. Upon receipt of this information, EPA will continue its review.

This information should be sent electronically to:

> Suilin Chan
> Chief, Permitting Section
> Air Programs Branch
> Air and Radiation Division
> U.S. Environmental Protection Agency, Region 2
> 290 Broadway
> New York, NY 10007
> chan.suilin@epa.gov
>
> and
>
> Joseph Siegel
> Air Branch
> Office of Regional Counsel
> U.S. Environmental Protection Agency, Region 2
> 290 Broadway
> New York, NY 10007
> siegel.joseph@epa.gov

You may choose to assert a business confidentiality claim covering all or part of the information submitted. For EPA to consider a claim of business confidentiality for one or more of the documents submitted by you, a cover sheet, stamped or typed legend, or other suitable form of notice must be placed on or enclosed with the document, with language such as "trade secret," "proprietary," or "company confidential." Portions of non-confidential documents for which you seek confidential treatment should be clearly identified and may be submitted separately to facilitate identification and handling by EPA. For each confidentiality claim, the date or occurrence of any event after which the information can be released should be indicated, if applicable. If no confidentiality claim accompanies the information received by EPA, it may be made available to the public without further notice to you. EPA will disclose information covered by a confidentiality claim only to the extent allowed by, and in accordance with, the procedures set forth in EPA's public information regulations, 40 CFR § 2.201, *et seq.*

The strong indicators that suggest the Refinery must obtain a PSD permit prior to startup of Refinery operations include the following information. The Refinery was shut down by HOVENSA in February 2012. Information currently available to EPA indicates that HOVENSA's initial intention was to convert the facility[2] to an oil storage terminal. According to a July 12, 2013 letter from Governor John P. de Jongh, Jr. to the USVI legislature, at the urging of the Governor, HOVENSA instead sought to find a buyer. It took nearly four years after the

---

[2] The "facility" references both the Refinery and LBT.

shutdown, and a bankruptcy proceeding, before HOVENSA did so. LBT then purchased the facility with the option to rehabilitate and start up the Refinery, and thereafter transferred most of the Refinery's assets to LBR. After about three years of evaluation and planning, and about three years of intensive physical rehabilitation of the Refinery, and spending approximately $4.1 billion[3] using over 4,000 workers,[4] Limetree was unable to start up the Refinery in compliance with CAA requirements, as several unsuccessful startup attempts by Limetree resulted in significant violations of Limetree's Title V permit and NSPS Subpart Ja requirements. In addition, following Limetree's startup attempts, EPA determined that the Refinery presented an imminent and substantial endangerment to public health or welfare or the environment on St. Croix, necessitating EPA's issuance of a CAA Section 303 Order on May 14, 2021. Subsequently, on July 12, 2021, the Department of Justice filed a complaint in federal court under Section 303 of the Clean Air Act. In the interim, LBR announced in June 2021 that it would not restart. The Refinery then ended up in a second bankruptcy proceeding. It is now an additional nine months since LBR's June 2021 announcement that it would not restart. Given this history, to protect the health of the residents of St. Croix who have experienced manifold health and environmental impacts over decades, including those from the Refinery, it is important to ensure that further operation of the Refinery is conducted in compliance with all applicable CAA requirements, including the PSD permitting requirements.

Because a PSD permit may be required prior to startup of the Refinery operations or of any Refinery unit(s), EPA strongly recommends that you not proceed with any such actions while EPA continues to evaluate PSD applicability. In addition, as EPA has made clear, it is very important to avoid any recurrence of the incidents that took place at the Refinery in the first half of 2021. EPA thus wants to work with you to ensure that the Refinery is operated safely and properly under EPA regulations and protects both the health of the local community and the environment.

If you have any questions about this letter, please contact Joseph Siegel of the EPA Region 2 Office of Regional Counsel at 212-637-3208 or siegel.joseph@epa.gov.

Sincerely,

Villatora,
Liliana

Digitally signed by
Villatora, Liliana
Date: 2022.03.22
07:55:52 -04'00'

Liliana Villatora
Chief, Air Branch, Office of Regional Counsel
EPA Region 2

cc:    Hon. Jean-Pierre Oriol, Commissioner, VIDPNR

---

[3] *In re: Limetree Services, LLC*, Case No. 21-32351, U.S. Bankruptcy Court, Southern District of Texas, Declaration of Mark Shapiro, Senior Managing Director for GlassRatner Advisory & Capital Group LLC, Chief Restructuring Officer for Limetree (July 13, 2021).

[4] Statement of Bob Weldzius, Senior Vice President of refining at Limetree Refinery, EPA Public Hearing Transcript, Plantwide Applicability Limit Public Hearing, Nov. 8, 2019.



**U.S. Department of Justice**

Environment and Natural Resources Division

90-5-2-1-08229/3

*Environmental Enforcement Section*                                                        *Telephone (202) 307-1859*
*P.O. Box 7611*                                                                                              *Facsimile (202) 616-2427*
*Washington, DC 20044*

March 2, 2022

*VIA ELECTRONIC MAIL*

Julie R. Domike, Esq.
Babst Calland, Attorneys at Law
505 9th Street NW, Suite 700
Washington, DC 20004

Thomas V. Eagan, Esq.
Rasco Klock Perez & Nieto
2555 Ponce de Leon Blvd, Suite 600
Coral Gables, Florida 33134

**Re: Questions Regarding Refinery Restart**

Dear Julie and Tom:

In late December 2021, West Indies Petroleum Limited ("WIPL") and Port Hamilton Refining and Transportation LLLP ("PHRT") submitted questions to the U.S. Department of Justice ("DOJ") regarding the refinery ("Refinery") located at 1 Estate Hope, Christiansted, U.S. Virgin Islands ("Facility"). WIPL and PHRT have since purchased the Refinery from Limetree Bay Refining, LLC ("LBR"). DOJ and the U.S. Environmental Protection Agency ("EPA"), Region 2, have reviewed those questions and endeavor to answer them below and in the attached letter from EPA. This letter focuses on issues relating to the *United States and the United States Virgin Islands v. HOVENSA L.L.C.*, Civ. No. 1:11-cv-00006 (D.V.I.) ("HOVENSA") and the *United States v. Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC*, 1:21-cv-000264-WAL-GWC (D.V.I.) ("CAA 303 Action") actions. The attached letter from EPA focuses on permitting and other regulatory matters.

The answers here and in the attached are not intended to be nor should be read as an exhaustive list of the environmental obligations that WIPL and PHRT will need to meet as an owner and operator of the Refinery. As additional information is received from WIPL and PHRT, the United States may conclude that other actions, not listed below, are necessary. In the meantime, WIPL and PHRT should continue to consult with their legal and technical experts in

environmental regulations and permitting. [1] Please also see the September 24, 2021 letter from EPA to potential purchasers of the Refinery. WIPL and PHRT should also engage with the Virgin Islands Department of Planning and Natural Resources ("VIDPNR"), which, although not the permitting authority for CAA prevention of significant deterioration ("PSD") permits, is the permitting authority for other facility CAA permits, including Title V permits and Virgin Islands permits to construct and operate, as well as for Clean Water Act ("CWA") Territorial Pollutant Discharge Elimination System ("TPDES") permits.

We also note that the United States has not yet received any information about what the business relationship between WIPL, PHRT and Limetree Bay Terminals, LLC ("LBT") will be. We have received only the limited information contained in WIPL and PHRT's January 20, 2022 proposal for the restart of the Refinery ("Restart Proposal") and your February 23, 2022 letter (which we are in the process of reviewing) about how WIPL and PHRT plan to operate the Refinery. Some of the answers provided below and in the attached are subject to change as the United States continues to review information and learns more.

**Question 1:** *Can West Indies Petroleum use Limetree's existing permits to restart the refinery? If not, what does West Indies Petroleum need to do in order to restart the refinery?*

**Answer:** With regard to certain CAA matters, as well as CWA permitting issues, please see the attached letter from EPA. There are a number of other actions WIPL and PHRT need to take prior to startup of the Refinery. These include the actions set forth below.

- Consistent with Paragraph 11 of the December 21, 2021 Sale Order, WIPL and PHRT need to become parties to the HOVENSA Consent Decree and the Joint Stipulation in the CAA 303 Action.
- WIPL and PHRT, together with LBT and LBR, need to reach agreement with the United States on a new consent decree to resolve the CAA 303 Action. (The Joint Stipulation was not a final resolution of the case.)
- Submit the notification, the "303 Order Plan" and the "Monitoring Plan" required by Paragraphs 2, 4, 5 and 7, respectively, of the Joint Stipulation,[2] and complete all measures necessary to eliminate any imminent and substantial endangerment to public health or welfare or the environment posed by the Refinery or a Refinery process unit (Joint Stipulation at ¶6). Please see Paragraph 115.*l.* of EPA's May 14, 2021 administrative order under Section 303 of the CAA ("303 Order") for the required elements of the 303 Order Plan.
- No later than thirty days prior to any restart of the Refinery or a Refinery process unit, WIPL and PHRT need to install and operate the hydrogen sulfide ("$H_2S$") and designated Federal Reference or Equivalent Method sulfur dioxide ("$SO_2$") monitors at the nine monitoring sites, as well as a meteorological tower, as required by EPA's June

---

[1] Given that the U.S. Department of Labor's Occupational Safety and Health Administration cited Limetree Bay for violations, WIPL and PHRT may wish to engage with OSHA as well. However, WIPL and PHRT should understand that this letter is not sent on behalf of OSHA as the undersigned does not represent OSHA.

[2] As indicated in Paragraph 12 of the Joint Stipulation, the plans required by the Stipulation shall be submitted to EPA for its review, comment, and approval (or approval with modifications).

16, 2021 information request to LBT and LBR under Section 114(a) of the CAA (Joint Stipulation at ¶8).[3]

WIPL and PHRT must also review and address deficiencies in the environmental compliance audit conducted under the 303 Order issued to LBR and LBT (collectively "Limetree"). EPA notified Limetree of these deficiencies in a letter dated July 28, 2021 (attached). WIPL and PHRT must address these audit deficiencies, and any additional corrective actions must be completed to ensure WIPL's and PHRT's restart of the Refinery will not endanger public health or welfare or the environment.

As indicated in EPA's September 24, 2021 letter to potential purchasers (at footnote 2 and accompanying text), Limetree triggered the obligation, under the First Modification to the Consent Decree, to install and operate a flare gas recovery system ("FGRS") on the FCCU Low Pressure Flare (a.k.a. Flare #8). The absence of an FGRS at the Refinery was one of the causes for the excess emissions of $H_2S$ and $SO_2$ from the Refinery during the first half of 2021.

We understand from PHRT's February 21, 2022 progress report and your February 23, 2022 letter that the company has engaged Becht Engineering to develop the process engineering design for the FGRS. Because appropriate sizing of an FGRS is crucial in order for the system to ensure compliance with 40 C.F.R. Part 60, Subpart Ja, at Flare #8, the United States requests that before the process design specifications are developed, PHRT and WIPL engage with DOJ and EPA on how the companies and Becht Engineering will determine an appropriate size for the FGRS, and discuss their conclusions as to the size.

**Question 2:** *Limetree told West Indies that EPA was not letting them purge the refinery. What does West Indies Petroleum need to do in order to be allowed to purge the refinery?*

**Answer:** While the United States does not fully understand the question, we offer the following information: Pursuant to the Joint Stipulation, Limetree was required to submit a hydrocarbon purge plan for EPA approval. EPA approved Phase 1 of Limetree's hydrocarbon purge plan on July 29, 2021, which allowed Limetree to test Flare #8 on July 31, 2021. EPA approved Phase 2 of Limetree's hydrocarbon purge plan on August 26, 2021, which included using Flare #8 to purge certain portions of the Refinery. While Limetree initiated work under the Phase 2 purge plan, it did not complete it, due to financial constraints. Additionally, while Limetree indicated that it would submit additional phases of the hydrocarbon purge plan, covering other portions of the Refinery, such as the amine unit, sulfur recovery unit, or the "outside the battery limit" portions of the Refinery, those phases were never submitted.

The United States informed Limetree that in addition to complying with the approved purge plan, Limetree may only purge the Refinery in compliance with CAA regulatory requirements at all times, including but not limited to compliance at Flare #8 with: 1) the 162 parts per million volume (ppmv) $H_2S$ concentration limit for flares, determined hourly on a 3-hour rolling average basis, as per 40 C.F.R. Part 60, Subpart Ja, and 2) the requirements in 40 C.F.R. Part 63, Subpart CC for flares, which require that the pilot light be lit when regulated material is sent to Flare #8 and that the continuous emission monitoring system be operating.

---

[3] With respect to Paragraphs 9-11 of the Joint Stipulation, which deal with purging hydrocarbons from the refinery, see the below response to WIPL/PHRT's final question.

Compliance with the Subparts Ja and CC requirements may necessitate the use of supplemental propane in order to meet the net heating value necessary to ensure efficient combustion of regulated gases at Flare #8.

We appreciate that WIPL and PHRT have begun discussions with DOJ and EPA about the companies' plans to operate the Refinery. We hope that the answers provided above and in the attached letter from EPA will be useful to WIPL and PHRT, and we look forward to continued open communication between the parties.

If you have any questions about this letter, please contact me.

Very truly yours,

MYLES FLINT
Digitally signed by MYLES FLINT
Date: 2022.03.02 17:11:12 -05'00'

Myles E. Flint, II

Attachments

cc:
Liliana Villatora
Sara Froikin
Jennifer Pierce
Providence Spina
Kathryn Caballero
John Fehrenbach
Stephanie Sebor
Pamela Tepper
Jean-Pierre Oriol



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 2
290 BROADWAY
NEW YORK, NY 10007-1866

March 2, 2022

*Via Electronic Mail – JDomike@babstcalland.com; TEagan@rascoklock.com*

Julie R. Domike, Esq.
Babst Calland, Attorneys at Law
505 9th Street NW, Suite 700
Washington, DC 20004

Tom V. Eagan, Esq.
Rasco Klock Perez & Nieto
2555 Ponce de Leon Blvd, Suite 600
Coral Gables, Florida 33134

Re: Questions Regarding Refinery Restart

Dear Ms. Domike and Mr. Eagan:

In this letter, EPA provides information in response to a question West Indies Petroleum Limited ("WIPL") and Port Hamilton Refining and Transportation LLLP ("PHRT") posed to the U.S. Department of Justice ("DOJ") in late December 2021 regarding permitting and other requirements that need to be met before the restart of the refinery ("Refinery") located at 1 Estate Hope, Christiansted, U.S. Virgin Islands ("Facility"). This letter should be read in tandem with the accompanying letter from DOJ. The information provided below and in the accompanying letter are not intended to be nor should be read as an exhaustive list of the environmental obligations that WIPL and PHRT will need to meet as an owner and operator of the Refinery.

<u>Clean Air Act ("CAA")</u>

EPA issued Prevention of Significant Deterioration ("PSD") permits to HOVENSA L.L.C. ("HOVENSA"), a prior owner of the Facility, on August 15, 2007, May 9, 2011, and August 17, 2011. On October 3, 2018, Limetree Bay Terminals, LLC ("LBT") submitted a request to EPA for the transfer of these PSD permits from HOVENSA after LBT's 2016 purchase of the Facility. On November 5, 2018, EPA transferred these permits to LBT. EPA expects to send you a separate letter shortly regarding additional PSD permitting issues.

On March 15, 2016, the Virgin Islands Department of Planning and Natural Resources ("VIDPNR") approved HOVENSA's request for an administrative permit amendment to its CAA Title V permit, which sought to replace HOVENSA with LBT as the permittee. In 2019, LBT and Limetree Bay Refining, LLC ("LBR") submitted a Title V permit application which sought to add LBR to the Facility's permit; that application is still pending with VIDPNR.

It is very important to avoid any repeat of the incidents that occurred at the Refinery in the first half of 2021, involving emissions of hydrogen sulfide (H₂S), sulfur dioxide (SO₂), uncombusted hydrocarbons, and/or flare rainout from the Refinery. Among other things, the Refinery must comply with the H₂S gas concentration limits specified in 40 C.F.R. § 60.103a(h) and the Refinery's Title V operating permit of: (a) 162 parts per million volume (ppmv), determined hourly on a 3-hour rolling average basis, for Flare #8 and the East Mix Drum Fuel Gas System, and (b) 75 ppmv at the coker process heaters. During incidents where emissions exceed the 500-lb. SO₂ threshold in a twenty-four hour period, the Refinery is also subject to requirements in 40 C.F.R. Part 60, Subpart Ja.  Subpart Ja requires a regulated entity to conduct a root cause and corrective action analysis whenever SO₂ emissions from a flare exceed the 500-lb/day threshold. The Refinery must also comply with the requirements of 40 C.F.R. Part 63, Subpart CC, such as the requirement that the pilot light at Flare #8 be lit and meeting 270 BTU/scf in the combustion zone of the flare when regulated material is sent to Flare #8 and that the required continuous emission monitoring system ("CEMS") be operating.

In addition, Subpart CC requires that the Refinery conduct benzene fenceline monitoring and, if that monitoring shows annual exceedances above the specified action level, conduct a root cause analysis ("RCA") to determine the causes and undertake appropriate corrective action. EPA believes that Limetree's RCA was inadequate and needs to be reevaluated to identify the root causes of the action level exceedance and the corrective actions needed to avoid future benzene fenceline exceedances. *See* email from EPA to Limetree on January 20, 2022, attached.

For any processes at the Refinery that are subject to the risk management requirements of Section 112(r)(7) of the CAA and the implementing regulations at 40 C.F.R. Part 68 (the Chemical Accident Prevention Provisions), pursuant to 40 C.F.R. § 68.10(a)(3), compliance with the applicable requirements of 40 C.F.R. Part 68 is required no later than the date on which a regulated substance is first present above a threshold quantity in a process. The definition of process is very broad, as set forth in 40 C.F.R. § 68.3, and includes "any activity involving a regulated substance including any use, storage, manufacturing, handling, or on-site movement of such substances, or combination of these activities." The list of the regulated substances and threshold quantities are set forth at 40 C.F.R. § 68.130. The general requirements, set forth in 40 C.F.R § 68.12, include submitting a Risk Management Plan to the Agency reflecting all regulated processes. Prior operations at the Refinery included a number of processes that were subject to program level 3 requirements, which are detailed at 40 C.F.R. § 68.12(d).

WIPL and PHRT must also comply with the Federal Implementation Plan for Regional Haze for the United States Virgin Islands, codified at 40 C.F.R. § 52.2781(d), including requirements at §52.2781(d)(4) that the source notify EPA 60 days in advance of startup and resumption of operation of refinery process units and provide required information. The companies need to comply with the ongoing obligations of CAA §§ 169A and 169B and 40 C.F.R. § 51.308.

Clean Water Act ("CWA")

The CWA's National Pollutant Discharge Elimination System ("NPDES") permitting authority has been delegated by EPA to VIDPNR, which administers the program as the Territorial Pollutant Discharge Elimination System ("TPDES") permit program. There is currently one TPDES permit for the oil

terminal and Refinery, which was originally issued by VIDPNR to HOVENSA on February 22, 2008.[1] The permit authorized discharges into waters of the Virgin Islands from certain waste streams that were identified in HOVENSA's permit application, from both the terminal and the Refinery, including storm water runoff, non-process wastewater, ballast water, and process wastewater. By letter dated June 2, 2016, VIDPNR provided notice to HOVENSA and LBT that the permit was automatically transferred to LBT on April 1, 2016, to reflect the transfer of ownership. The permit has been administratively extended and remains in full force and effect, but only as it relates to LBT. The permit cannot be transferred to WIPL and PHRT pursuant to 40 C.F.R. Part 122, Subpart D. Rather, WIPL and PHRT must timely submit TPDES permit applications and secure TPDES permit(s) prior to starting up Refinery operations.

The only permit application option currently is the submittal to VIDPNR of NPDES individual permit applications (Form 1, Form 2C and Form 2F) for all proposed waste streams to be discharged through Internal Outfall 401 (effluent from Industrial Wastewater Treatment Plant), Outfall 001 (effluent from IWWTP and stormwater runoff), and all other stormwater outfalls associated with industrial activity.[2,3]

If you have any questions about the CAA issues in this letter, please reach out to Liliana Villatora at 212-637-3218 or at villatora.liliana@epa.gov, Sara Froikin at 212-637-3263 or at froikin.sara@epa.gov, or Jennifer Pierce at 212-637-3228 or at pierce.jennifer@epa.gov. If you have any questions about the CWA issues in this letter, please reach out to Phyllis Feinmark at 212-637-3232 or at feinmark.phyllis@epa.gov or Lauren Fischer at 212-637-3231 or at fischer.lauren@epa.gov.

Sincerely,

Simon, Paul
Digitally signed by Simon, Paul
Date: 2022.03.02 13:18:54 -05'00'

Paul Simon
Acting Regional Counsel
U.S. EPA, Region 2

Attachment

Cc: Commissioner Jean-Pierre Oriol
    John Fehrenbach, Esq.
    Stephane Sebor, Esq.

---

[1] The Permit effective date is March 1, 2008 and the expiration date is February 28, 2013.

[2] Coverage for all regulated stormwater discharges associated with industrial activity (except for Outfall 001) under the 2017 Virgin Islands TPDES Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activities ("MSGP") is no longer available because the MSGP expired on February 28, 2022. EPA has issued guidance to VIDPNR on an option for a path forward until the MSGP is re-issued.

[3] DPNR uses EPA permit applications. The applications are available at https://www.epa.gov/npdes/npdes-applications-and-forms-epa-applications.

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA, and | ) |
| UNITED STATES VIRGIN ISLANDS | ) |
| | ) |
| Plaintiffs, | ) Civ. No. 1:11-cv-00006 |
| v. | ) |
| | ) |
| HOVENSA L.L.C. | ) |
| | ) |
| Defendant. | ) |
| | ) |

## **FIRST MODIFICATION OF THE CONSENT DECREE**

WHEREAS, the United States of America ("United States"), the United States Virgin Islands ("Virgin Islands"), and HOVENSA L.L.C. ("HOVENSA") are parties to a Consent Decree entered by this Court on June 7, 2011 in the above-captioned matter (Civ. No. 1:11-cv-00006, Doc. 6).

WHEREAS, the United States, the Virgin Islands, HOVENSA, Limetree Bay Terminals, LLC, Limetree Bay Refining, LLC, and the Environmental Response Trust ("ERT") are parties to this first modification of the Consent Decree ("First Modification").

WHEREAS, HOVENSA idled the refinery and terminal operations in 2012 and 2015, respectively, and filed for bankruptcy on September 15, 2015 in the United States District Court for the District of the Virgin Islands, Bankruptcy Division (the "Bankruptcy Court").

WHEREAS, on December 1, 2015, the Bankruptcy Court entered an Order (Case No. 1:15-bk-10003-MFW, Doc. 394) approving the sale of certain refining and terminal assets owned by HOVENSA to Limetree Bay Terminals, LLC pursuant to the terms of the Amended and Restated Asset Purchase Agreement in the form appearing as Doc. 528-1 in Case No. 1:15-bk-10003-MFW ("Final APA").

WHEREAS, on January 4, 2016, the sale of certain refining and terminal assets to Limetree Bay Terminals, LLC closed.

WHEREAS, HOVENSA represented in the Final APA that it was in material compliance with the Consent Decree.

WHEREAS, pursuant to the Final APA, Limetree Bay Terminals, LLC, in part, agreed to "promptly … use commercially reasonable efforts…, in cooperation with the applicable Governmental Entities, to ... make the terms, conditions, obligations and liabilities of the Consent Decree applicable to the Purchased Assets, including [Limetree Bay Terminals, LLC] and [HOVENSA] executing a modification to the Consent Decree pursuant to which [Limetree Bay Terminals, LLC] shall assume the terms, conditions, obligations and liabilities of [HOVENSA] as they relate to the Purchased Assets under the Consent Decree and [HOVENSA] shall be released from such terms, conditions, obligations and liabilities (the "Limited Consent Decree Modification") …."

WHEREAS, pursuant to the Final APA, "[i]f, despite [Limetree Bay Terminals, LLC's] and [HOVENSA's] respective efforts, the applicable Governmental Entities do not agree to the Limited Consent Decree Modification, regardless of whether such failure to agree occurs before or after the Closing, [Limetree Bay Terminals, LLC] and [HOVENSA] promptly thereafter shall … cooperate and take, or cause to be taken, all steps required under the Consent Decree to make the terms, conditions, obligations and liabilities of the Consent Decree applicable to [Limetree Bay Terminals, LLC], including (A) [Limetree Bay Terminals, LLC] and [HOVENSA] executing a modification to the Consent Decree pursuant to which [Limetree Bay Terminals, LLC] shall assume the terms, conditions, obligations and liabilities of [HOVENSA] under the Consent Decree and [HOVENSA] shall be released from such terms, conditions, obligations and

liabilities (the "Consent Decree Modification") …."

WHEREAS, the applicable Governmental Entities, HOVENSA and Limetree Bay Terminals, LLC did not agree to a Limited Consent Decree Modification.

WHEREAS, "on the terms and subject to the conditions of" the Final APA, Limetree Bay Terminals, LLC agreed to assume all of HOVENSA's Liabilities, other than the Excluded Liabilities, "under the Consent Decree in connection with the Purchased Assets arising out of or relating to any act, omission, circumstances or other Event occurring after the Closing" (as each term is defined in the Final APA).

WHEREAS, Limetree Bay Terminals, LLC's agreement to enter into a Consent Decree Modification does not alter the rights and obligations of the parties to the Final APA.

WHEREAS, Paragraph 7 of the Consent Decree required HOVENSA to condition any transfer, in whole or in part, of the ownership or operation of the Refinery "upon the execution by the transferee of a modification to this Consent Decree, which makes the terms and conditions of this Consent Decree applicable to the transferee."

WHEREAS, pursuant to the Plan of Liquidation and the ERT Agreement, the ERT assumed HOVENSA's Consent Decree obligations under and relating to Section IX.A (Territorial Supplemental Environmental Project ("TSEP(s)")) and Section IX.B. (VIWAPA Emissions Monitoring Assistance).

WHEREAS, on February 17, 2016, groundwater and other remediation systems, including the Vapor Enhanced Recovery Units 1 and 2 ("VER-1" and "VER-2"), were transferred from HOVENSA to the ERT in accordance with the Plan of Liquidation.

WHEREAS, on October 11, 2012, HOVENSA submitted a Notice of Dismantlement of VER-1 in compliance with Section 204-31 of the Rules and Regulations of the Virgin Islands Air

Pollution Control Act and section 2.4.7.1 of HOVENSA's Title V Permit.

WHEREAS, Limetree Bay submitted to the Virgin Islands Department of Planning and Natural Resources ("VIDPNR") and/or EPA, by letters dated February 28, 2017, June 9, 2017, and May 30, 2019, requests to modify its Title V and non-title V permits to reflect the permanent Shutdown of certain combustion devices to satisfy the requirements of Section V.F of the Consent Decree to reduce NOx emissions by 4,744 tons per year.

WHEREAS, except to the extent set forth in the preceding WHEREAS clause, neither HOVENSA nor Limetree Bay has permanently Shutdown and surrendered permits for the Refinery or portions of the Refinery to satisfy the requirements of the Consent Decree in the manner provided in Paragraph 229 (Effect of Shutdown) of the Consent Decree.

WHEREAS, on or before April 24, 2018, Limetree Bay notified the Virgin Islands of the intent to restart Refinery Operations at the Refinery.

WHEREAS, on April 24, 2018, an affiliate of Limetree Bay Terminals, LLC formed a new limited liability company under the laws of the Virgin Islands, Limetree Bay Refining, LLC.

WHEREAS, in July 2018, Limetree Bay Terminals, LLC entered into the Amended and Restated Terminal Operating Agreement with the Virgin Islands, in which Limetree Bay Terminals, LLC, in part, agreed to "use commercially reasonable efforts to … add [itself] as a named party defendant to the … Consent Decree and modify the … Consent Decree to restart Refinery Operations." (Amended and Restated Terminal Operating Agreement by and Among the Government of the Virgin Islands and Limetree Bay Terminals, LLC, Section 4.1(B)).

WHEREAS, also in July 2018, Limetree Bay Refining, LLC entered into the Refinery Operating Agreement with the Virgin Islands, in which Limetree Bay Refining, LLC, in part, agreed to "use commercially reasonable efforts to … add [itself] as a named party defendant to

EPA-262

the … Consent Decree and modify the … Consent Decree to restart Refinery Operations."
(Refinery Operating Agreement by and Among the Government of the Virgin Islands and
Limetree Bay Refining, LLC, Section 4.1(B)).

WHEREAS, on May 28, 2020, HOVENSA certified to the United States and the Virgin
Islands that it had taken the actions described in Appendix Q ("HOVENSA Certification") in
completion and satisfaction of the Consent Decree requirements identified therein as of June 30,
2019.

WHEREAS, due to the bankruptcy, the Parties desire to capture the certification of
HOVENSA as to the Consent Decree obligations completed by HOVENSA for purposes of
satisfying the requirement to certify completion for purposes of termination in accordance with
Paragraphs 231 and 232 of the Consent Decree and to identify the Consent Decree obligations
that have not yet been completed.

WHEREAS, on November 30, 2018, Limetree Bay Terminals, LLC, executed a Bill of
Sale transferring in whole or in part certain Refinery assets that are subject to the requirements of
the Consent Decree to Limetree Bay Refining, LLC.

WHEREAS, the United States, the Virgin Islands, HOVENSA, Limetree Bay Terminals,
LLC, Limetree Bay Refining, LLC, and the ERT have reached an agreement on the First
Modification as set forth herein, and, pursuant to Paragraphs 7 and 228 (Modification) of the
Consent Decree, seek to modify the Consent Decree in accordance herewith.

WHEREAS, the United States, the Virgin Islands, HOVENSA, Limetree Bay Terminals,
LLC, Limetree Bay Refining, LLC, the ERT, and this Court, by entering the First Modification,
find that the First Modification has been negotiated in good faith and at arm's length; that the
First Modification is fair, reasonable, and in the public interest.

5

WHEREAS, the United States, the Virgin Islands, HOVENSA, Limetree Bay Terminals, LLC, Limetree Bay Refining, LLC, and the ERT agree and acknowledge that final approval by the United States and entry of the First Modification is subject to the procedures set forth in 28 C.F.R. § 50.7, which provides for notice of the First Modification in the Federal Register, an opportunity for public comment, and the right of the United States to withdraw or withhold consent if the comments disclose facts or considerations that indicate that the First Modification is inappropriate, improper or inadequate.

NOW THEREFORE, upon the consent and agreement of the United States, the Virgin Islands, HOVENSA, Limetree Bay Terminals, LLC, Limetree Bay Refining, LLC, and the ERT, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

1.      The terms and conditions of the Consent Decree are applicable to Limetree Bay Terminals, LLC, Limetree Bay Refining, LLC, and their respective successors or assigns, except as otherwise specifically set forth herein.

2.      The terms and conditions of the Consent Decree that apply to VER-1 and VER-2, and any obligations in Parts X (Reporting and Recordkeeping), and XIX (Termination) that relate to VER-1 and VER-2, are applicable to the ERT. All requirements of this Consent Decree that apply to VER-1 are satisfied pursuant to Paragraph 229.

3.      As of the Date of Entry of the First Modification, the obligations under and relating to Section IX.A and B of the Consent Decree, including the obligation to disburse funds from the TSEP Escrow Account for any TSEP approved by VIDPNR, to disburse funds earmarked for the VIWAPA Emissions Monitoring Assistance Program, and any obligations in Part X (Reporting and Recordkeeping) that relate to the TSEP Escrow Account or to the

VIWAPA Emissions Monitoring Assistance Program are transferred to the ERT as specified in the First Modification.

    **4.**      Limetree Bay Terminals, LLC, Limetree Bay Refining, LLC, and the ERT shall be added as Parties to the Consent Decree.

    **5.**      In accordance with Paragraphs 1-4 of the First Modification, effective upon the Date of Entry of the First Modification:

        a.      Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC shall be substituted for HOVENSA as the Defendant, for all provisions of the Consent Decree, including all rights, liabilities and obligations of HOVENSA, except as set forth in this First Modification.

        b.      The ERT shall be substituted for HOVENSA as the Defendant only to the extent any obligation set forth in the Consent Decree relates to either VER-1 or VER-2 or Part IX (Territorial Supplemental Environmental Project).

    **6.**      Limetree Bay shall retain any and all records that it received from HOVENSA related to the implementation of the requirements of the Consent Decree for the periods specified in the relevant Paragraphs of the Consent Decree along with all records required to be maintained by Limetree Bay pursuant to the First Modification. Limetree Bay is not liable for penalties for HOVENSA's failure to keep records required under the Consent Decree but will use commercially reasonable efforts to create a compliant version upon request by the United States or the Virgin Islands.

    **7.**      Limetree Bay shall not be required to make any submittal or report or take any action required by the Consent Decree if a prior submittal, report, or action by HOVENSA fully satisfied that same requirement of the Consent Decree.

**8.** As of the Date of Entry of the First Modification, HOVENSA shall be released from the obligations and liabilities under the Consent Decree.

**9.** Nothing in the First Modification shall affect any obligations that the parties to the First Modification may have to one another under any agreement or court order including, without limitation, the Order Granting Final Approval of Disclosure Statement and Confirming Chapter 11 Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code (In re HOVENSA L.L.C., Chapter 11 Case No. 1:15-bk-10003-MFW, Doc. No. 572) (the "Confirmation Order"), except as provided under the Consent Decree. Nothing in the First Modification shall affect any of the settlement, release, or injunction provisions set forth in the Plan of Liquidation or the Confirmation Order, except as provided under the Consent Decree. Nothing in the First Modification shall affect any rights obligations, or liabilities that the parties to the Final APA have to one another under the Final APA.

**10.** Except as specifically provided in the First Modification, the definitions in the Consent Decree shall continue to apply.

**11.    Replace the following definitions in Paragraph 10:**

E. "Acid Gas Flaring Device" or "AG Flaring Device" shall mean any device that is used for the purpose of combusting Acid Gas and/or Sour Water Stripper Gas, except facilities in which gases are combusted to produce sulfur or sulfuric acid. The AG Flaring Devices are identified in Appendix D ("List of Flaring Devices Subject to NSPS Subpart Ja"). To the extent that, during the duration of the Consent Decree, the Refinery utilizes AG Flaring Devices other than those specified in Appendix D for the purpose of combusting Acid Gas and/or Sour Water Stripper Gas, those AG Flaring Devices shall be covered under this Consent Decree.

AA.    "HOVENSA" shall mean HOVENSA L.L.C.

CC.    "Hydrocarbon Flaring Device" or "HC Flaring Device" shall mean a flare used to safely control (through combustion) any excess volume of a refinery-generated gas other than Acid Gas and/or Sour Water Stripper Gas and/or Tail Gas. The HC Flaring Devices are identified in Appendix D ("List of Flaring Devices Subject to NSPS Subpart Ja"). To the extent that, during the duration of the Consent Decree, the Refinery utilizes HC Flaring Devices other than those specified in Appendix D for the purposes of combusting any excess volume of a refinery-generated gas other than Acid Gas and/or Sour Water Stripper Gas and/or Tail Gas, those HC Flaring Devices shall be covered under this Consent Decree.

MM.    "Parties" shall mean, as of the Date of the Entry of the First Modification, the United States, the Virgin Islands, Limetree Bay Terminals, LLC, Limetree Bay Refining, LLC, and the Environmental Response Trust.

NN.    "Refinery" shall mean the petroleum refining and terminal facilities in St. Croix, Virgin Islands. As of the Date of Lodging and the Date of Entry, both the petroleum refining and terminal facilities, the boundaries of which are shown in Appendix I ("Map of HOVENSA, L.L.C."), were owned and operated by HOVENSA L.L.C. As of the Date of Lodging of the First Modification, the petroleum refining facility is owned and operated by Limetree Bay Refining, LLC, the terminal facility is owned and operated by Limetree Bay Terminals, LLC, and the boundaries of each as of the Date of Lodging of the First Modification are shown in Appendix R ("Map of Refinery").

**12.    Add the following definitions to Paragraph 10 of the Consent Decree:**

CCC.    "BWON Equipment" shall mean equipment used in handling, storage, treatment, or disposal of "non-aqueous and aqueous benzene waste streams" regulated under 40 C.F.R. Part

61, Subpart FF, except that the term shall also include "affected facilities" under NSPS Subpart QQQ.

DDD.  "BWON and LDAR Equipment" shall mean LDAR Equipment and BWON Equipment.

EEE.  "Covered Equipment" shall include all pumps and valves, excluding pressure relief valves, in light liquid or gas/vapor service in all process units that are subject to the equipment leak provisions of 40 C.F.R. Part 60, Subparts VVa and GGGa.

FFF.  "Date of Entry of the First Modification of the Consent Decree" and "Date of Entry of the First Modification" shall mean the date on which the First Modification of the Consent Decree is approved and signed by a District Court Judge for the District of the Virgin Islands and entered in the Court docket by the Clerk of the United States District Court for the District of the Virgin Islands.

GGG.  "Date of Lodging of the First Modification of the Consent Decree" and "Date of Lodging of the First Modification" shall mean the date on which the First Modification of the Consent Decree is lodged with the United States District Court for the District of the Virgin Islands.

HHH.  "Environmental Response Trust" or "ERT" shall mean the ERT established pursuant to the Plan of Liquidation and the ERT Agreement, which satisfied the conditions set forth in Article XI of the Plan of Liquidation and which designated Project Navigator, Ltd. as Environmental Response Trustee. On December 20, 2019, the Bankruptcy Court appointed PathForward Consulting Inc., as a successor Environmental Response Trustee. The effective date of the ERT was February 17, 2016, as provided in Case No. 1:15-10003, Doc. 625.

III.    "ERT Agreement" shall mean Doc. 626-1 in Case No. 1:15-10003-MFW, United States District Court for the District of the Virgin Islands, Bankruptcy Division – St. Croix, Virgin Islands.

JJJ.    "First Modification of the Consent Decree" and "First Modification" shall mean this modification of the Consent Decree, including any and all appendices attached to the First Modification.

KKK.    "Idled Unit" shall mean (1) an emissions unit to which a requirement of the Consent Decree applies (including, but not limited to, the FCCU, Coker, Flaring Devices, heaters, boilers, Generating Turbines, and Compressor Engines) for which no part was operated between June 1, 2012 and at least June 1, 2019, and that is listed in Appendix K ("List of Idled Units") hereto, and (2) Flare 7, from the time that Flare 7 is isolated and Shutdown under Paragraph 50E. An Idled Unit does not include BWON and LDAR Equipment.

LLL.    "In Regulated Service" shall mean: (1) BWON Equipment with benzene-containing wastes regulated under 40 C.F.R. Part 61 Subpart FF or (2) LDAR Equipment in "light liquid" and/or "gas/vapor service" as those terms are used in Section V.R of the Consent Decree.

MMM. "In Service Unit" shall mean an emission unit to which a requirement of the Consent Decree applies that is not an Idled Unit. In Service Unit does not include BWON and LDAR Equipment.

NNN.    "LDAR Equipment" shall mean each valve, pump, pressure relief device, sampling connection system, open-ended valve or line, and flange or other connector In Regulated Service and, for purposes of recordkeeping and reporting requirements only, compressors shall be considered LDAR Equipment, as defined in 40 C.F.R. § 60.591.

OOO. "LHE Combustion Liner System" shall mean a Lean Head End Combustion Liner system as generally described in publication GER-4211, *Gas Turbine Emissions and Control*, which were installed by Limetree Bay on GTs 7 and 8.

PPP. "Limetree Bay" shall mean Limetree Bay Terminals, LLC, Limetree Bay Refining, LLC, and their respective successors and assigns.

QQQ. "Pilot Gas" shall mean the minimum amount of gas necessary to maintain the presence of a flame for ignition of vent gases.

RRR. "Plan of Liquidation" shall mean the Debtor's Second Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code, Order of the United States District Court for the District of the Virgin Islands, Bankruptcy Division – St. Croix, Virgin Islands (Case No. 1:15-10003-MFW, Doc. 572-1).

SSS. "Purge Gas" shall mean the gas introduced between a Flaring Device header's water seal and the flare tip to prevent oxygen infiltration (backflow) into the flare tip. For a Flaring Device with no water seal, the function of Purge Gas is performed by Sweep Gas, and therefore, by definition, such a Flaring Device has no Purge Gas.

TTT. "Refinery Operations" shall mean the processing of crude oil and other feedstock into refined petroleum products and the commercialization thereof.

UUU. "Restart" shall mean: (1) the change in status of BWON or LDAR Equipment from not In Regulated Service to In Regulated Service; and (2) the resumption of operation of an Idled Unit. For a fuel gas combustion device or flare, resumption of operation means combusting Fuel Gas. For an FCCU, resumption of operations means receiving feed in the unit. For an SRP, resumption of operations means introducing acid gas to the unit. For a Coker and the Coke Handling Storage and Loading Facility, resumption of operation means receiving

feed to the coker drum. For a sulfur pit, resumption of operation means when sulfur is drained to a sulfur pit.

VVV. "TSEP" shall mean the Territorial Supplemental Environmental Project(s) developed by the VIDPNR pursuant to Section IX.A of the Consent Decree.

WWW. "TSEP Escrow Account" shall mean the escrow account in which HOVENSA deposited $4.875 million in accordance with Section IX.A of the Consent Decree and to which the ERT assumed HOVENSA's rights and obligations pursuant to the Plan of Liquidation and the ERT Agreement.

**13.     Replace Paragraph 27 with the following new Paragraph 27:**

27.     By six (6) years and one month from Date of Entry, Limetree Bay shall install sufficient Qualifying Controls and have applied for emission limits from the appropriate permitting authority to achieve 3,663 tpy $NO_x$ emission reductions as determined by the summation in Paragraph 24. By six (6) years and three (3) months from Date of Entry, Limetree Bay shall provide EPA with a report showing how it satisfied the requirement of this Paragraph and Paragraph 23.

**14.     Add the following new Paragraph 28A to Part V.F:**

28A.     Limetree Bay represents that it (or HOVENSA) has installed sufficient qualifying controls to achieve the aggregate NOx emissions reductions of 4,744 tpy required by Paragraphs 26, 27, and 28, by permanent Shutdown and relinquishment of permits for the heaters, boilers, generating turbines and compressor engines identified in Appendix N ("Emissions Units Permanently Shutdown as of June 1, 2019"). Limetree Bay will submit the report required by Paragraph 28, certified in accordance with Paragraph 231. Provided the report submitted under Paragraph 28 demonstrates that the 4,744 tpy of NOx reductions have been achieved, Limetree

Bay is deemed to have satisfied the requirements of Section V.F and the requirements of

Paragraphs 230 and 231 related to Termination,  subject to EPA's review under Paragraphs 232

and 233.

**15.     Replace Paragraph 36 with following new Paragraph  36:**

36.     For each fuel gas combustion  device that became an affected facility under NSPS

Subpart Ja pursuant to the Consent Decree, entry of the First Modification  shall satisfy the notice

requirements of 40 C.F.R. § 60.7(a) and compliance  with the relevant monitoring  requirements

of the Consent Decree shall satisfy the notification  of initial  performance test requirement of 40

C.F.R. § 60.8(a).

**16.     Add the following sentence to Subparagraph 41.a:** As of the Date of Entry of the First

Modification,  the East Side SRP consists of two Claus Trains, #3 SRU, #4 SRU, and a tail gas

treatment unit followed  by incineration.

**17.     Replace Paragraphs 45 and 46 with the following new Paragraphs  45 and 46:**

45.     <u>Compliance  with NSPS Emissions  Limits  at the East Side SRP</u>. By no later than

the date of Restart of the East Side SRP, Limetree Bay shall install,  at the East Side SRP, control

equipment  necessary to control the emissions  of sulfur compounds  from the East Side SRP to

comply  with NSPS Subparts A and Ja.  Notwithstanding  any provision of Limetree Bay's Title  V

permit (STX-TV-003-10)  or any successor operating  permit, Limetree Bay shall not vent tail gas

from the East Side SRP to an incinerator, unless such venting complies  with NSPS Subparts A

and Ja.

46.     [Reserved]

**18.     Replace Paragraph 47 with the following new Paragraph 47:**

47.     For the East Side SRP, which became an affected facility under NSPS Subpart Ja

pursuant to Section V.I, entry of the First Modification shall satisfy the notice requirements of 40 C.F.R. § 60.7(a), and compliance with the relevant monitoring requirements of this Consent Decree shall satisfy the notification of initial performance test requirement of 40 C.F.R. § 60.8(a).

**19.    Replace Paragraph 49 with the following new Paragraph 49:**

49.    All Flaring Devices listed in Appendix D ("List of Flaring Devices Subject to NSPS Subpart Ja") are affected facilities, as that term is used in 40 C.F.R. Part 60, Subpart Ja, and by the dates listed in Appendix D, shall comply with the requirements of NSPS Subparts A and Ja.

**20.    Replace Paragraph 50 with the following new Paragraphs 50A through 50F:**

50A.    <u>Mitigation of Flaring Emissions</u>.  Limetree Bay shall monitor and quantify all flaring emissions from the FCCU Low Pressure Flare and Flare 3 for the one-year period beginning on the date of Restart of the flare, using the following equation:

$$Mitigation\ Amount = \sum_{i=1}^{n}\left[\left(C_{H_2S_i} - 162\ ppm\ H_2S\right) \times F_i \times \frac{1\ scf\ SO_2}{1\ scf\ H_2S} \times \frac{lb-moles\ SO_2}{385.3\ scf\ SO_2} \times \frac{64\ lbs\ SO_2}{lb-mole\ SO_2} \times \frac{1\ ton\ SO_2}{2000\ lbs\ SO_2}\right]$$

Where:

$Mitigation\ Amount$ = tons of $SO_2$ emissions that result from combustion of gas in a particular flare with an $H_2S$ concentration above the 162 ppm standard and which could have been captured by a reasonably sized FGRS

$n$ = each hour that is part of a three-hour rolling average in the first 365 Days after Restart of the flare where the $H_2S$ concentration in the gas flared at the particular flare exceeds the 162 ppm standard

$C_{H_2S_i}$ = the hourly average concentration of $H_2S$ for hour $i$ in the gas flared at the particular flare as measured by the $H_2S$ CEMS

$F_i$ = hourly average flow in scfh for hour $i$ of all gas to the particular flare as measured by the flare flow meter but excluding Pilot Gas and excluding any flow above 2 times Baseload Average Flow

*Baseload Average Flow* = 90th percentile of hourly average flow in the first 365 Days after Restart of the flare of all gas to the particular flare as measured by the flare flow meter.

Limetree Bay shall mitigate the Mitigation Amount using the formula above and implementing one or more mitigation projects as specified in this Paragraph.

      a.    <u>Mitigation Emissions Less Than 10 Tons</u>. No mitigation is required if the Mitigation Amount is less than 10 tons.

      b.    <u>Mitigation Emissions Above 10 Tons</u>. If the Mitigation Amount is above 10 tons, Limetree Bay will mitigate emissions above 10 tons by implementing one or more of the mitigation projects in Appendix P ("Flaring Mitigation Projects") in accordance with the requirements therein.

    50B.    <u>Installation of Flare Gas Recovery Systems</u>. For the FCCU Low Pressure Flare and Flare 3, Limetree Bay shall design, install, operate and maintain flare gas recovery system(s) to control all continuous and intermittent, routinely-generated refinery fuel gases (not including Purge Gas, or Pilot Gas or molecular seal gases necessary to ensure safe operation of the flares) that are combusted in the flare(s), if the quantity of gases sent to the flares exceeds the amounts specified, or if there is noncompliance with the NSPS Subpart Ja emission standard, as specified in this Paragraph.

      a.    <u>First Year of Operation:  Gas Quantity</u>. The requirements of this Subparagraph 50B.a apply only during the one-year period beginning on the date of Restart of the flare.

      i.    <u>FCCU Low Pressure Flare</u>. If, during the first or second six-month successive non-overlapping block period during the first year after Restart of the FCCU Low Pressure Flare, greater than an average of 1,500,000 standard cubic feet per day (scfd) combined flow of all gases, other than hydrogen from initial

reformer restart, is sent to the FCCU Low Pressure Flare (and any flare interconnected with the FCCU Low Pressure Flare), as measured by the flare flow meter, then by not later than two years from the end of the six-month period in which the gas quantity is exceeded and the report is due under Paragraph 50C.b, Limetree Bay shall install and operate a flare gas recovery system for the FCCU Low Pressure Flare.

        ii.    <u>Flare 3</u>.  If, during the first or second six-month successive non-overlapping block periods during the first year after Restart of Flare 3, greater than an average of 750,000 scfd combined flow of all gases is sent to the Flare 3, as measured by the flare flow meter, then by not later than two years from the end of the six-month block period in which the gas quantity is exceeded and the report is due under Subparagraph 50C.b, Limetree Bay shall install and operate a flare gas recovery system for Flare 3.

    b.    <u>After First Year of Operations:  Gas Quantity</u>.  The requirements of this Subparagraph 50B.b apply beginning with the first full Calendar Quarter after the one-year period in Subparagraph 50B.a.  The first full Calendar Quarter will include all days after the first year after Restart of the flare until the end of the first full Calendar Quarter.

        i.    <u>FCCU Low Pressure Flare</u>.  If, during any two successive Calendar Quarters either (a) during the second year after Restart of the FCCU Low Pressure Flare, greater than an average of 750,000 scfd combined flow of all gases, other than hydrogen from initial reformer restart, or (b) after the second year after Restart of the FCCU Low Pressure Flare, greater than an average of 500,000 scfd combined flow of all gases, other than hydrogen from initial reformer restart, is

17

sent to the FCCU Low Pressure Flare (including any flare interconnected with the FCCU Low Pressure Flare), as measured by the flare flow meter, then by not later than two years from the end of the second Calendar Quarter in which the gas quantity is exceeded and the report required under Subparagraph 50C.c is due, Limetree Bay shall install and operate a flare gas recovery system for the FCCU Low Pressure Flare.

ii.    Flare 3.  If, during any two successive Calendar Quarters after the first year after Restart of Flare 3, greater than an average of 250,000 scfd combined flow of all gases is sent to Flare 3, as measured by the flare flow meter, then by not later than two years from the end of the second Calendar Quarter in which the gas quantity is exceeded and the report required under Subparagraph 50C.c is due, Limetree Bay shall install and operate a flare gas recovery system(s) for Flare 3.

iii.    Within the first six months of Restart of either Flare 3 or the FCCU Low Pressure Flare, whichever is earlier, Limetree may increase the average gas quantity for Flare 3 specified in Subparagraph 50B.b.ii from 250,000 scfd to 300,000 scfd combined flow of all gases.  If Limetree exercises this option, then the average gas quantity for FCCU Low Pressure Flare specified in Subparagraph 50B.b.i shall be reduced from 750,000 scfd to 700,000 scfd during the second year of Restart of the FCCU Low Pressure Flare, and from 500,000 scfd to 450,000 scfd combined flow of all gases after the second year after Restart of the FCCU Low Pressure Flare.  Within 30 Days of exercising this option, Limetree shall notify EPA and the VIDPNR, including the date on which Limetree

exercised this option, as provided in Paragraph 225 (Notice), and shall certify the notification as required by Paragraph 144.

    iv.    <u>Adjustment to Gas Quantity Based on Changes in Refining Operating Rate</u>. The gas quantities specified in this Subparagraph 50B.b apply where the refinery's charge rate to the atmospheric crude unit(s) ("operating rate") is not more than 180,000 barrels (bbls) per day in a Calendar Quarter. If the average actual refinery operating rate is greater than 180,000 bbls per day in a Calendar Quarter, then the following gas quantities apply in lieu of the gas quantities in 50B.b.(i). and (ii).:

    (1)    <u>FCCU Low Pressure Flare</u>: (A) During the second year after Restart of the FCCU Low Pressure Flare: (750,000 scfd (or 700,000 scfd if applicable pursuant to Subparagraph 50B.b.iii)/180,000 bbls) multiplied by the actual refinery operating rate per Calendar Quarter, measured as an average combined flow of all gases, other than hudrogen from initial reformer restart, to the FCCU Low Pressure Flare in scfd in any Calendar Quarter, as measured by the flare flow meter. (B) After the second year after Restart of the FCCU Low Pressure Flare: (500,000 scfd (or 450,000 scfd if applicable pursuant to Subparagraph 50B.b.iii)/180,000 bbls) multiplied by the actual refinery operating rate per Calendar Quarter, measured as an average combined flow of all gases, other than hydrogen from initial reformer restart, to the FCCU Low Pressure Flare in scfd in any Calendar Quarter, as measured by the flare flow meter.

(2)    Flare 3: Greater than (250,000 scfd (or 300,000 scfd if applicable pursuant to Subparagraph 50B.b.iii)/180,000 bbls) multiplied by the actual refinery operating rate, measured as an average combined flow of all gases to Flare 3 in scfd in any Calendar Quarter, as measured by the flare flow meter.

c.    After First Year of Operations: Noncompliance.  If, during any two successive Calendar Quarters there is noncompliance with the NSPS Subpart Ja $H_2S$ concentration standard in 40 C.F.R. § 60.103a(h) for greater than 5% of either flare's operating time, and greater than 10 tons of excess $SO_2$ emissions from the same flare, then by not later than 18 months from the end of the two Calendar Quarters in which both the noncompliance rate and excess $SO_2$ emissions are exceeded and the report required under Subparagraph 50C.c is due, Limetree Bay shall install and operate a flare gas recovery system(s) for the relevant flare.

50C.    Monitoring and Reporting.  For purposes of the requirements of Paragraphs 50A and 50B, the monitoring and reporting requirements of this Paragraph applies.

a.    Monitoring.  For the FCCU Low Pressure Flare and Flare 3, upon Restart of the flare, Limetree Bay shall comply with the hydrogen sulfide monitoring, sulfur monitoring and flow monitoring requirements of 40 C.F.R. § 60.107a(a)(2), (e) and (f) respectively.  Prior to a Restart of a flare, an instrument for continuously monitoring and recording the $H_2S$ concentration by volume (dry basis) shall be installed, operated, calibrated and maintained pursuant to 40 C.F.R. § 60.107a(a)(2), notwithstanding any exceptions or alternate methods allowed in NSPS Subpart Ja.

i.    Data from the $H_2S$ CMS generated prior to the demonstration of compliance (see Appendix L ("Exceptions For Compliance on Restart")) shall be

included for purposes of calculating Mitigation Amount during the first year of a

flare's operation pursuant to Paragraph 50A, regardless of whether the flare's $H_2S$

CMS fails its Cylinder Gas Audit ("CGA") or RATA.

      ii.     In the event that the $H_2S$ CMS fails its CGA or RATA, then the

measured values of the emissions from the flare emitted prior to the

demonstration of compliance will be adjusted based on the level of inaccuracy, as

demonstrated by the CGA or RATA, or the CGA or RATA and other credible

evidence.

      iii.    The quantity of hydrogen from initial reformer restart combusted

in the FCCU Low Pressure Flare shall be measured by a flow meter.

    b.    <u>Recordkeeping and Reporting for First Year of Operations</u>. Within thirty

(30) days of the end of each of the six-month block periods during the first year after Restart of

the flare, Limetree Bay shall submit a report containing the following information for each flare:

      i.     The quantity of all gases in scfd sent to each flare for the period

covering the six-month block period preceding the date of the report, on both a

cumulative and per-day basis;

      ii.     The quantity of hydrogen from initial reformer restart combusted

in the FCCU Low Pressure Flare on both a cumulative and per-day basis;

      iii.    In the second six-month block period report, the quantity of

Mitigation Amount for the period covering the two six-month block periods

preceding the date of the report, provided both on a cumulative and per-day basis;

and

        iv.      Notification of whether the total gas quantity specified in Subparagraph 50B.a.i or a.ii has been exceeded.

Limetree Bay shall report this data to EPA and the VIDPNR as provided in Paragraph 225 (Notice), and shall certify the report as required by Paragraph 144.

        c.      <u>Reporting After First Year of Operations</u>.  If the requirement to install flare gas recovery is triggered, as described in Subparagraphs 50B.b.i, 50B.b.ii, or 50B.c, then Limetree Bay shall notify EPA within thirty (30) days and provide the information in Subparagraphs (i)-(v) below.  If the requirement for flare gas recovery is not triggered, then the information in Subparagraphs (i)-(v) below, for each Calendar Quarter, shall be included in the semi-annual progress reports required under Paragraph 143 beginning with the next semi-annual progress report following the first full Calendar Quarter after the first year of operations:

        i.      The quantity of all gases combusted in each flare in scfd, as measured by the flare flow meter, for the period covering the Calendar Quarter preceding the date of the report, on both a cumulative and per-day basis;

        ii.      The quantity of hydrogen from initial reformer restart combusted in the FCCU Low Pressure Flare;

        iii.      Any adjustments to the specified gas quantity pursuant to Subparagraph 50B.b.iii, including the adjusted gas quantity, operating rate, and the change in operating rate;

        iv.      The total period of noncompliance with the NSPS Subpart Ja concentration standard, expressed as a percentage of operating time and excess $SO_2$ emissions expressed as tons during the Calendar Quarter; and

> v.      Notification of whether the total gas quantity specified in
> Subparagraph 50B.b.i or b.ii has been exceeded, and/or whether the total period of
> noncompliance with the NSPS Subpart Ja $H_2S$ concentration standard and excess
> $SO_2$ emissions, specified in Subparagraph 50B.c has been exceeded.

Limetree Bay shall report this data to EPA and the VIDPNR as provided in Paragraph 225
(Notice), and shall certify the report as required by Paragraph 144.

50D.    <u>Hydrogen Sulfide Monitoring</u>.   To evaluate the potential transport of $H_2S$ to the
refinery's wastewater treatment system from the use of $H_2S$ scavengers in the flare gas
system(s), by no later than 90 Days after Limetree Bay begins using $H_2S$ scavenger in its flare
gas system(s), Limetree Bay shall monitor $H_2S$ emissions from the wastewater treatment system,
as follows:

a.      Limetree Bay shall install three temporary $H_2S$ monitors at fixed locations
around the dissolved air flotation (DAF) unit and the API separator on the East Side, and one
temporary $H_2S$ monitor at a fixed location near the API separator on the West Side (if Sulfix is
used on Flare 3), as specified in Appendix S ("Map of $H_2S$ Monitoring Locations"), to
continuously monitor $H_2S$ emissions from the DAF and API separators.

b.      If Limetree Bay stores slop oil in fixed roof tanks, Limetree Bay shall
install a temporary $H_2S$ monitor at a fixed location near such tank.

c.      Limetree Bay shall use temporary $H_2S$ monitors that are designed to meet
the following criteria:

i.      Utilizes an electrochemical sensor;

ii.      A response time of 15 seconds or less;

iii.      A lower detection limit (sensitivity) of at least 0.5 ppm;

iv.    A resolution of 0.1 ppm and an accuracy of ± 5% over its calibrated range of at least 0-100 ppm;

v.    An accuracy of ± 0.05 ppm at 1 ppm (± 5%);

vi.    A built-in datalogging function for data collection and analysis; and

vii.    A low temperature drift (less than 0.1 ppm for the zero reading) and high selectivity for $H_2S$ in the presence of interfering gases (such as sulfur dioxide, nitrogen dioxide, and hydrocarbons).

d.    <u>Duration</u>.    The temporary $H_2S$ monitors shall be operated for a period of not less than two years.

i.    If $H_2S$ is detected at levels exceeding the OSHA permissible exposure limit of 10 ppm (15 mg/m³) at any monitoring location over an 8-hour time weighted average (see 29 C.F.R. § 1910.1000(d)) equal to or more than 5% of the time during any rolling 30-day period, then Limetree Bay shall submit a plan to EPA for approval to address the cause of any $H_2S$ emissions attributable to the use of $H_2S$ scavengers and to install permanent $H_2S$ monitors meeting the criteria specified in Subparagraph 50D.c. If the cause is not attributable to the use of $H_2S$ scavengers, the report shall explain the basis for Limetree Bay's determination.  If EPA disagrees with Limetree Bay's determination, the disagreement is subject to dispute resolution in accordance with Part XVI (Retention of Jurisdiction/Dispute Resolution).

ii.    If $H_2S$ is detected at levels above 10 ppm for less than 5% of the time during all rolling 30-day periods at the end of the two years, Limetree Bay is

Case: 1:11-cv-00006-WAL-GWC   Document #: 221   Filed: 06/29/20   Page 25 of 159

not required to install permanent monitors, and may discontinue use of the temporary monitors.

50E.    <u>Idling of Flare 7</u>.  Limetree Bay may, for a period not to exceed 72 hours, and prior to the restart of any petroleum refining process unit, temporarily interconnect and jointly operate the FCCU Low Pressure Flare and Flare 7, until Flare 7 can be safely isolated and Shutdown at which time Flare 7 will be an Idled Unit. The temporary interconnection of Flare 7 with the FCCU Low Pressure flare will not be considered an interconnection for purposes of Subparagraphs 50B.a.i and 50B.b.i.

50F.    <u>Root Cause, Corrective Action and Reporting for Flaring Incidents Post Installation of Flare Gas Recovery</u>.  Following the installation of a flare gas recovery system on a flare pursuant to Paragraph 50B, Acid Gas, Tail Gas and Hydrocarbon Flaring Incidents occurring while the flare gas recovery system is in operation will be investigated and reported in accordance with NSPS Subpart Ja, 40 C.F.R. § 60.103a(c)(1)-(c)(3) in lieu of the investigation and reporting requirements in Paragraphs 60, 61, 70 and 71. Copies of NSPS Subpart Ja root cause and corrective action reporting will be included in the semi-annual CD reports required under Paragraph 71 and Part X (Reporting and Recordkeeping). The stipulated penalty provisions for Flaring Incidents will continue to apply until termination.

50G.    If no Acid Gas, Tail Gas or Hydrocarbon Flaring Incidents occur at the Refinery for any consecutive 24 calendar month period, then any Acid Gas, Tail Gas and Hydrocarbon Flaring Incidents occurring thereafter shall be investigated and reported in accordance with NSPS Subpart Ja, 40 C.F.R. § 60.103a(c)(1)-(c)(3) in lieu of the investigation and reporting requirements in Paragraphs 60, 61, 70 and 71. The stipulated penalty provisions for Flaring Incidents will continue to apply until termination.

EPA-283

**21.    Replace Paragraph 51 with the following new Paragraph 51:**

[Reserved]

**22.    Modify the applicable regulatory provisions in Subparagraphs 54.a and 54.b:**

References in Subparagraph 54.a and Subparagraph 54.b to 40 C.F.R. § 60.102a(g)(1)

relate to fuel gas combustion devices only and shall be changed to 40 C.F.R. § 60.103a(h)

relating to flares.

**23.    Replace Paragraph 55 with the following new Paragraph 55:**

55.    For each Flaring Device which became an affected facility under NSPS Subpart

Ja pursuant to this Consent Decree, entry of the First Modification shall satisfy the notice

requirements of 40 C.F.R. § 60.7(a), and compliance with the relevant monitoring requirements

of this Consent Decree shall satisfy the notification of initial performance test requirement of 40

C.F.R. § 60.8(a).

**24.    Replace Subparagraph 70.a with the following new Subparagraph 70.a:**

a.    <u>Investigation, Reporting, Corrective Action, and Stipulated Penalties</u>. For

Tail Gas Incidents, Limetree Bay shall follow the same investigative, reporting, corrective

action, and assessment of stipulated penalty procedures as those set forth in Paragraphs 60

through 68 for Acid Gas Flaring Incidents. Those procedures shall be applied to TGU

shutdowns, bypasses of a TGU, or other events which result in a Tail Gas Incident, including

scheduled and unscheduled Shutdowns of a Claus Sulfur Recovery Plant.

**25.    Modify Subparagraph 70.b.ii to include a missing formula unit:**

$0.169 \times 10^{-6} = [\text{lb mole of } SO_2 / 379\text{-scf of } SO_2] [64 \text{ lbs } SO_2 / \text{lb mole } SO_2][1 \times 10^{-6}]$

**26.    Insert the new Paragraphs 71A and 72A as follows:**

71A.  The requirements of Section V.K shall not apply to Limetree Bay with respect to Acid Gas Flaring Incidents and Tail Gas Incidents that occurred prior to January 4, 2016.

72A.  The requirements of Section V.L shall not apply to Limetree Bay with respect to Hydrocarbon Flaring Incidents that occurred prior to January 4, 2016.

**27.    Replace Section V.P, Benzene Waste NESHAP Program, with the following new Section V.P, Benzene Waste NESHAP Program.**

**P.    Benzene Waste NESHAP Program.**

77.  <u>Current Subpart FF Status</u>.  Limetree Bay shall continue to comply with the compliance option set forth in 40 C.F.R. § 61.342(e) (hereinafter referred to as the "6 BQ Compliance Option"), for which, in accordance with the Consent Decree, notice was provided on September 14, 2012.

78.  [Reserved]

79.  <u>One-Time Review and Verification of the Refinery's TAB and Compliance with the Benzene Waste NESHAP.</u>

a.    <u>Phase One of the Review and Verification Process</u>.  By March 30, 2021, Limetree Bay shall complete a review and verification of the Refinery TAB and its compliance with the Benzene Waste NESHAP (Phase One Review and Verification).  Limetree Bay's review and verification process shall include, but not be limited to:

i.    An identification of each waste stream that is required to be included in the Refinery's TAB where these waste streams meet the definition of a waste under 40 C.F.R. § 61.341 (e.g., slop oil, tank water draws, spent caustic, spent caustic hydrocarbon layer, desalter rag layer dumps, desalter vessel process sampling points, other sample wastes, maintenance wastes, and turnaround

wastes);

    ii.        A review and identification of the calculations and/or measurements used to determine the flows of each waste stream for the purpose of ensuring the accuracy of the annual waste quantity for each waste stream;

    iii.       An identification of the benzene concentration in each waste stream, including sampling for benzene concentration at no less than 10 waste streams consistent with the requirements of 40 C.F.R. § 61.355(c)(1) and (3); provided, however, that previous analytical data or documented knowledge of waste streams may be used, 40 C.F.R. § 61.355(c)(2), for streams not sampled; and

    iv.       An identification of any existing noncompliance with the requirements of Subpart FF.

By no later than sixty (60) Days following the completion of Phase One Review and Verification, Limetree Bay shall submit a Benzene Waste NESHAP Compliance Review and Verification report ("BWON Compliance Review and Verification Report") that sets forth and certifies the results of the Phase One Review and Verification, including but not limited to the items identified in Subparagraphs (i) through (iv) of this Paragraph.

    b.       <u>Phase Two of the Review and Verification Process.</u> Based on EPA's review of the BWON Compliance Review and Verification Report(s), EPA may select up to 20 additional waste streams at the Refinery for sampling for benzene concentration. Limetree Bay shall conduct the required sampling under representative conditions and submit the results to EPA within sixty (60) Days of receipt of EPA's request. Limetree Bay shall use the results of this additional sampling to recalculate the TAB and the uncontrolled benzene quantity and to

amend the BWON Compliance Review and Verification Report, as needed. To the extent that

EPA requires Limetree Bay to re-sample any waste stream sampled by Limetree Bay on or after

June 10, 2019, Limetree Bay may average the results of such sampling events. Limetree Bay

shall submit an amended BWON Compliance Review and Verification Report within ninety (90)

Days following the date of the submittal of the required Phase Two sampling report, if Phase

Two sampling is required by EPA.

80.    Implementation of Actions Necessary to Correct Non-Compliance or to Come
Into Compliance.

a.    [Reserved]

b.    Submittal of Compliance Plan. If the results of the BWON Compliance

Review and Verification Report identify any compliance issues, Limetree Bay shall submit to

EPA and the VIDPNR by no later than 180 Days after completion of the BWON Compliance

Review and Verification Report, a plan that identifies with specificity a schedule that Limetree

Bay will implement to ensure that the Refinery complies with the 6 BQ Compliance Option, as

soon as practicable.

c.    Review and Approval of Plans Submitted Pursuant to Subparagraph 80.b.

Any plan submitted pursuant to Subparagraph 80.b, shall be subject to approval, disapproval or

modification by EPA. Within sixty (60) Days after receiving any notification of disapproval or

request for modification from EPA, Limetree Bay shall submit to EPA and the VIDPNR a

revised plan that responds to all identified deficiencies. Upon receipt of approval or approval

with conditions, or if no approval, disapproval, or approval with conditions is provided by EPA,

Limetree Bay shall implement the plan according to the schedule provided in the plan. Disputes

arising under this Subparagraph shall be resolved in accordance with the dispute resolution provisions of Part XVI (Retention of Jurisdiction/Dispute Resolution).

     d.    <u>Certification of Compliance with the 6 Mg Compliance Option</u>. By no later than thirty (30) Days after completion of the implementation of all actions, if any, required pursuant to Subparagraphs 80.b or 80.c to come into compliance with the 6 BQ Compliance Option, Limetree Bay shall submit a report to EPA and the VIDPNR certifying that the Refinery complies with the Benzene Waste NESHAP.

     81.    <u>Carbon Canisters and Individual Drain System Vents</u>. Limetree Bay shall continue to operate the three-tier system for control of vents associated with the Subpart FF wastewater collection system. Vent controls are identified as either Type I (a single flow indicator "breather valve"), Type II ("breather valve" connected to a single carbon canister), or Type III (dual carbon canisters). All closed vent piping associated with these vent control systems will be monitored in accordance with the provisions associated with 40 C.F.R. § 61.349. Limetree Bay shall comply with the following:

     a.    All Type I vents with flow indicators (40 C.F.R. § 61.346(b)) shall be visually inspected for flow on a daily schedule. Flow shall be indicated if the flow indicator on the breather valve has lifted. Any "breather valve" determined to relieve six or more times in any consecutive two-month period will be converted to a Type II control system. Installation of the carbon canister required by conversion to the Type II control shall be completed within two weeks. Daily visual inspection of the Type I control system will continue until conversion to a Type II control is completed.

     b.    All Type II vent control systems ("breather valve" connected to a single carbon canister) shall be visually inspected on a daily schedule.

      i.      If the "breather valve" is determined not to have relieved, no additional monitoring is required.  Secondly, if the "breather valve" is visually inspected and determined to have relieved, then the discharge opening of the carbon canister will be immediately monitored for benzene.  If the benzene concentration of carbon canister discharge is determined to be less than 5 ppm, no additional actions are required.  If the benzene concentration of the carbon canister discharge is determined to be equal to or greater than 5 ppm, the carbon canister will be replaced by the end of the next Day.

      ii.      For any Type II vent control system, if carbon canister replacement is required two or more times in any four consecutive week period the control system will be converted to a Type III system.  Installation of the dual carbon canister system required by conversion to the Type III control shall be completed within two weeks.  Daily inspection and monitoring (if required) of the Type II control system will continue until conversion to a Type III control is completed.

c.      All Type III vent control systems will be operated in the manner described in Subparagraphs c.i through c.vii.

      i.      Except as expressly permitted under Subparagraph c.v, Limetree Bay shall not use single carbon canisters for any new process units or installations that require controls pursuant to the Benzene Waste NESHAP.

      ii.      For dual carbon canister systems, "breakthrough" between the primary and secondary canister is defined as any reading equal to or greater than 5 ppm benzene.

      iii.      Limetree Bay shall monitor for breakthrough between the primary

31

and secondary carbon canisters in accordance with the frequency specified in 40
C.F.R. § 61.354(d), or monthly, whichever is more frequent. This requirement
shall commence within seven (7) Days after installation of a new, dual carbon
canister system.

      iv.    Limetree Bay shall replace the original primary carbon canisters
immediately when breakthrough is detected between the primary and secondary
canister. The original secondary carbon canister will become the new primary
carbon canister and a fresh carbon canister will become the secondary canister, or
both canisters may be replaced. For purposes of this Subparagraph,
"immediately" shall mean by the end of the next calendar Day.

      v.    Temporary Applications.  Limetree Bay may utilize properly sized
single canisters for short-term operations such as with temporary storage tanks or
as temporary control devices. For canisters operated as part of a single canister
system, breakthrough is defined for purposes of this Consent Decree as any
reading of benzene above 5 ppm. Limetree Bay shall monitor for breakthrough
from single carbon canisters each calendar day. Limetree Bay shall replace the
single carbon canister with a fresh carbon canister, discontinue flow, or route the
stream to an alternate, appropriate device immediately when breakthrough is
detected. For this Subparagraph, "immediately" shall mean by the end of the next
Day. If Limetree Bay discontinues flow to the single carbon canister or routes the
stream to an alternate, appropriate control device, such canister must be replaced
before it is returned to service.

      vi.    Limetree Bay shall maintain a readily available supply of fresh

EPA-290

carbon canisters at all times or otherwise ensure that such canisters are readily available to implement the requirements of this Paragraph.

       vii.     Limetree Bay shall maintain records associated with the requirements of this Paragraph in accordance with or as under 40 C.F.R. § 61.356(j)(10), including the monitoring readings observed and the constituents being monitored.

82.    <u>Laboratory Audits</u>.  All laboratories that perform analyses of Limetree Bay's Benzene Waste NESHAP samples shall be audited to ensure that proper analytical and quality assurance/quality control procedures are followed for such samples.  For purposes of this Paragraph, audits can include audits conducted by parties other than Limetree Bay.

       a.     Prior to conducting its Phase One Review and Verification process set forth in Subparagraph 79.a, audits shall be completed of all laboratories used to perform analyses of Benzene Waste NESHAP samples to ensure that proper analytical and quality assurance/quality control procedures are followed.  In addition, an audit shall be conducted of any laboratory used for analyses of benzene samples prior to such use.

       b.     Subsequent laboratory audits shall be conducted for each laboratory continuing to perform analyses of Limetree Bay's Benzene Waste NESHAP samples, such that each laboratory is audited every two (2) years for the life of the Consent Decree.

83.    <u>Annual Program</u>.  After the Date of Lodging of the First Modification, Limetree Bay shall continue to use the facility's written management of change procedures to review process information and construction projects, to ensure that all new benzene waste streams are included in Limetree Bay's waste stream inventory.

84.     Training.   Limetree Bay shall implement the following training program at the Refinery:

a.      By June 1, 2020 and thereafter within ninety (90) Days from the installation of any new type of benzene control equipment, Limetree Bay shall update the facility's standard operating procedures ("SOPs") for all control equipment used to comply with the Benzene Waste NESHAP.

b.      By June 1, 2020, Limetree Bay shall update the facility's BWON training program pursuant to the criteria in Appendix E ("Limetree Bay's LDAR and BWON Training Program Summary") and submit the updated training program to EPA.

c.      Limetree Bay shall continue to provide an annual (i.e., once each calendar year) training program for employees (which shall include contract employees for purposes of this Paragraph) asked to draw benzene waste samples as specified in 40 C.F.R. § 61.355.  Such employees shall be trained prior to collecting samples and receive training annually.

d.      Limetree Bay shall continue to perform "refresher" training every three (3) years on the procedures in Subparagraph 84.a for all employees assigned to operate control equipment.

85.     Waste/Slop/Off-Spec Oil Management.

a.      Control Status of and Plan to Quantify Uncontrolled Waste/Slop/Off-Spec Oil Streams.  By June 1, 2020, Limetree Bay shall submit to EPA and the VIDPNR any revisions to the facility's "Waste/Slop/Off-Spec Oil Management Plan," submitted by HOVENSA in June 2012 for quantifying waste/slop/off-spec oil movements for all benzene waste streams which are not controlled at the Refinery, along with schematics that: (i) depict the waste management units (including sewers) that handle, store, and transfer waste/slop/off-spec oil streams; (ii) identify the

control status of each waste management unit; and (iii) show how such oil is transferred.
Representatives from Limetree Bay and EPA thereafter may confer about the appropriate
characterization of the waste/slop/off-spec oil streams as benzene waste streams and the
necessary controls, if any, for the waste management units handling such oil streams for
purposes of the Refinery's TAB calculation and/or compliance with the 6 BQ Compliance
Option. If requested by EPA, Limetree Bay shall promptly submit revised schematics that reflect
the Parties' agreements regarding the characterization of these oil streams and the appropriate
control standards. Limetree Bay shall use these plans and schematics in preparing the end-of-
line sampling plans required under Paragraph 87.

        b.     <u>Aqueous Benzene Waste Streams.</u> For purposes of calculating the TAB
pursuant to the requirements of 40 C.F.R. § 61.342(a), Limetree Bay shall include all
waste/slop/off-spec oil streams that become "aqueous" until such streams are recycled to a
process or put into a process feed tank (unless the tank is used primarily for the storage of
wastes). Appropriate adjustments shall be made to such calculations to avoid the double
counting of benzene. For purposes of complying with the 6 BQ Compliance Option, all waste
management units handling aqueous benzene waste streams shall either meet the applicable
control standards of Subpart FF or shall have their uncontrolled benzene quantity count towards
the applicable 6 Mg limit.

        86.    <u>Benzene Waste Operations Sampling Plans: General.</u> By June 1, 2020, Limetree
Bay shall update the Benzene Waste Operations Sampling Plan that HOVENSA submitted in
June 2012, designed to describe the sampling of benzene waste streams that Limetree Bay will
utilize to estimate quarterly and annual uncontrolled benzene quantities under the 6 BQ

Compliance Option.  Limetree Bay shall continue to comply with the June 2012 Benzene Waste Operations Sampling Plan until the updated plan is submitted.

87.    Benzene Waste Operations Sampling Plans:  Content Requirements.  The sampling plan shall include, but need not be limited to:

a.    Annual sampling of all uncontrolled waste streams that count toward the 6 Mg/yr calculation and contain greater than 0.05 Mg/yr of benzene at the point of generation.

b.    [Reserved]

c.    The proposed End-of-Line (EOL) sampling locations and methods for flow calculations to be used in calculating projected quarterly and annual uncontrolled benzene quantity calculations under the terms of Paragraph 90.  Based on the current configuration of the Refinery's wastewater system, overflows from API separators 1, 2, and 3 are the only "routine" wastewater benzene streams not controlled in accordance with Subpart FF.  Therefore, sampling of the three API overflow streams will constitute the individual EOL locations.

88.    Benzene Waste Operations Sampling Plans:  Timing for Implementation.  Limetree Bay will implement the updated plan unless and until (a) EPA disapproves the plan, or (b) Limetree Bay modifies the plan under Paragraph 89.

89.    Benzene Waste Operations Sampling Plans:  Modifications.

a.    Changes in Processes, Operations, or Other Factors.  If changes in processes, operations, or other factors lead Limetree Bay to conclude that the sampling plan may no longer provide an accurate basis for estimating the Refinery's quarterly or annual uncontrolled benzene quantity under Paragraph 90, then by no later than ninety (90) Days after Limetree Bay determines that the plan no longer provides an accurate measure, Limetree Bay will submit to EPA and the VIDPNR a revised plan for EPA approval.  In the first full Calendar Quarter after

submitting the revised plan, Limetree Bay will implement the revised plan. Limetree Bay will continue to implement the revised plan unless and until EPA disapproves the revised plan.

b.    Requests for Modifications to the Sampling Frequency. After two (2) years of implementing a sampling plan, Limetree Bay may submit a request to EPA for approval, with a copy to the VIDPNR, to reduce the facility's sampling frequency. Limetree Bay may implement the modified sampling frequency 90 days after submission unless EPA disapproves the modification.

90.    Quarterly and Annual Estimations of Uncontrolled Benzene Quantities. At the end of each Calendar Quarter and based on sampling results and approved flow calculations, Limetree Bay will calculate a quarterly and projected annual uncontrolled benzene quantity.

91.    In making the calculations required by Paragraph 90, Limetree Bay will use the average of the samples collected at each sampling location in accordance with the Benzene Waste Operations Sampling Plan. If these calculations do not identify any potential violations of the benzene waste operations NESHAP, Limetree Bay will submit these calculations in the reports due under this Section V.P.

92.    Corrective Measures: Basis. If the quarterly uncontrolled benzene calculations, required pursuant to Paragraph 90, exceeds 1.5Mg and/or the estimated annual uncontrolled benzene quantities equal or exceed 6 Mg for the then current compliance year, then by no later than sixty (60) Days after the end of the Calendar Quarter, Limetree Bay will submit a compliance assurance plan to EPA for approval, with a copy to the VIDPNR. In that compliance assurance plan, Limetree Bay will identify the quantity and cause(s) of the potentially-elevated benzene quantities, all corrective actions that Limetree Bay has taken or plans to take to ensure that the cause(s) will not recur, and either the schedule of actions that Limetree Bay will take to

ensure that the Refinery complies with the Benzene Waste Operations NESHAP for the calendar compliance year or an explanation that Limetree Bay will be able to meet the annual limit without taking corrective action. Limetree Bay will implement the plan unless and until EPA disapproves, in which case Limetree Bay shall address EPA's comments.

93.    <u>Miscellaneous Measures</u>.

a.    As of the Date of Lodging, Limetree Bay shall:

i.    Conduct monthly visual inspections of and, if appropriate, refill all water traps used to comply with Subpart FF within the Refinery's individual drain systems;

ii.    Ensure that all segregated stormwater drains are marked at the drain (color coding may be used);

iii.    Conduct monitoring of existing API Separators 1, 2, and 3 or any new Subpart FF-regulated oil/water separators as outlined below:

(1)    Conduct semi-annual seal gap measurements on all secondary seals on all floating roof portions in accordance with 40 C.F.R. § 60.693-2.

(2)    The fixed roof portions of all Subpart FF regulated oil/water separators shall be monitored on a quarterly basis if Method 21 monitoring conducted pursuant 40 C.F.R. § 61.355(h) determine a leak rate of greater than one (1) percent. Monitoring of the fixed roof portion of all Subpart FF required oil/water separators will be conducted annually if Method 21 monitoring conducted pursuant to 40 C.F.R. § 61.355(h) determine a leak rate of one (1) percent or less.

      (3)     A current listing, as of Date of Lodging, of all Method 21 monitoring locations for API Separators 1, 2, and 3 is attached in Appendix F ("Method 21 Monitoring Locations for API Separators 1, 2, and 3"). When modifications to the API separators occur, Limetree Bay shall update and maintain a current listing of all monitoring locations for API Separators l, 2, and 3.

94.    <u>Record Keeping and Reporting Requirements for this Section V.P Outside of the Reports Required under 40 C.F.R. § 61.357 or under the Progress Report Procedures of Part X (Reporting and Recordkeeping)</u>. At the times specified in the applicable provisions of this Section V.P, Limetree Bay will submit, as and to the extent required, the following reports to EPA and the VIDPNR:

a.    BWON Compliance Review and Verification Report (Subparagraph 79.a), as amended, if necessary (Subparagraph 79.b);

b.    Compliance assurance plan, if necessary (Paragraph 92);

c.    Compliance certification, if necessary (Subparagraph 80.d);

d.    Schematics of waste/slop/off-spec oil movements (Subparagraph 85.a), as revised, if necessary; and

e.    Sampling Plans (Paragraph 86), and revised Sampling Plans, if necessary (Subparagraph 89.a).

**28.    Paragraph 99 is revised by changing June 30, 2011 to December 31, 2012.**

**29.    Replace Section V.R, Leak Detection and Repair ("LDAR") Program with the following new Section V.R, LDAR Program.**

**R.    <u>Leak Detection and Repair ("LDAR") Program</u>.**

100.    <u>Introduction</u>.  In order to minimize or eliminate fugitive emissions of volatile

organic compounds ("VOCs"), benzene, volatile hazardous air pollutants ("VHAPs"), and

organic hazardous air pollutants ("HAPs") from equipment in light liquid and/or in gas/vapor

service, Limetree Bay shall comply with the leak detection and repair ("LDAR") requirements of

this Section V.R. The terms "in light liquid service" and "in gas/vapor service" shall have the

definitions set forth in the applicable provisions of 40 C.F.R. Part 60, Subpart VVa and GGGa.

101.    No later than the Date of Lodging of the First Modification, the group of all

equipment within each process unit (as "equipment" and "process unit" are defined by 40 C.F.R.

§ 60.591a) and each compressor shall become affected facilities under 40 C.F.R. Part 60, Subpart

GGGa, and shall become subject to and comply with the requirements of 40 C.F.R. Part 60,

Subpart GGGa, and the requirements of this Section V.R.

102.    <u>Duration</u>.  The requirements of this Section V.R shall remain in effect through

May 1, 2025, or termination of the Consent Decree, whichever is later.

103.    <u>Written Refinery-Wide LDAR Program</u>.  No later than three (3) months after the

Date of Entry of the First Modification, Limetree Bay shall update and thereafter maintain its

written refinery-wide program for compliance with applicable LDAR Regulations and the LDAR

requirements of this Consent Decree, which shall include:

a.    Procedures to identify all equipment in light liquid and/or in gas/vapor

service that is subject to the LDAR Regulations and has the potential to leak VOCs, HAPs,

VHAPs, and benzene within process units;

b.    Procedures for identifying leaking equipment within process units;

c.    Procedures for repairing and keeping track of leaking equipment; and

EPA-298

      d.      Procedures for identifying and including in the LDAR program new equipment.

Limetree Bay shall submit to EPA a copy of the written refinery-wide LDAR program updated pursuant to this Paragraph in the next semi-annual report following the development of the program, and review annually and update as needed.

      104.    [Reserved]

      105.    <u>Training</u>. Limetree Bay shall implement the following training programs at the Refinery:

      a.      Within six (6) months from the Date of Entry of the First Modification, update the LDAR training program pursuant to the criteria in Appendix E ("Limetree Bay's LDAR and BWON Training Program Summary") and submit it to EPA;

      b.      From and after the Date of Entry of the First Modification, Limetree Bay shall continue to provide LDAR training to existing personnel assigned to LDAR responsibilities (including but not limited to monitoring, recordkeeping, reporting, or data management). For newly hired personnel with LDAR program responsibilities, provide LDAR training prior to the personnel beginning work. All employees assigned to LDAR responsibilities shall receive training annually.

      c.      For other Refinery operations and maintenance personnel whose duties include limited LDAR responsibilities, continue to provide training developed pursuant to the criteria in Appendix E ("Limetree Bay's LDAR and BWON Training Program Summary") that includes instruction on those aspects of LDAR relevant to the person's duties. This training shall be provided every three (3) years until termination of this Consent Decree. For newly hired

operations and maintenance personnel, such training shall be provided within six (6) months of
hiring; and

       d.     If contractors are used to fulfill the requirements of this Section V.R,
Limetree Bay shall require that such contractors be trained as required by this Paragraph, and
Limetree Bay shall maintain records of such training.

   106.   <u>LDAR Audits</u>. Limetree Bay shall continue to implement the refinery-wide
audits set forth in this Paragraph, to ensure the Refinery's compliance with all applicable LDAR
Regulations and the LDAR requirements of this Consent Decree. The LDAR audits shall
include but shall not be limited to, comparative monitoring, records review to ensure monitoring
and repairs were completed in the required periods, field reviews to ensure all regulated
equipment is included in the LDAR program, a review to ensure records and reports have been
maintained and submitted as required, and observation of the LDAR technicians' calibration and
monitoring techniques. During the LDAR audits, leak rates shall be calculated for each process
unit where comparative monitoring was performed.

       a.    <u>Initial Compliance Audit</u>. By not later than 270 Days after the Date of
Lodging of the First Modification, Limetree Bay shall complete a refinery-wide third-party audit
of its compliance with the LDAR Regulations and the requirements of applicable Sections of the
Consent Decree, which includes, at a minimum, each of the audit requirements set forth in this
Paragraph other than comparative monitoring. For purposes of this requirement, "third party"
may include a qualified contractor, consultant, industry group, or trade association. Within thirty
(30) Days of receipt of the completed audit, Limetree Bay shall submit its Initial Compliance
Audit Report to EPA and the VIDPNR that sets forth any areas of non-compliance identified as a
result of its audit and includes a proposed compliance schedule for correcting the non-

compliance.  If the proposed compliance schedule extends greater than sixty (60) Days beyond
the audit completion date, Limetree Bay must seek approval of the compliance schedule from
EPA.  Limetree Bay shall implement the compliance schedule as proposed until the schedule is
approved or disapproved by EPA.  Upon receipt of any disapproval from EPA, Limetree Bay
shall correct the non-compliance pursuant to the schedule that EPA proposed, or, if EPA did not
so specify, as expeditiously as practicable.  Within one (1) year of Date of Entry of the First
Modification, Limetree Bay shall certify to EPA that the Refinery:

      i.      Is in compliance;

      ii.      Has completed related corrective action and/or is on a compliance
schedule (if necessary); and

      iii.      Shall specifically certify that all existing equipment has been
identified and included in the facility LDAR program, to the extent required by
applicable regulations and the Consent Decree, as of the date such certification is
made.

      b.      <u>Subsequent Audits</u>.  Limetree Bay shall conduct an audit of its LDAR
program compliance with applicable LDAR Regulations and the requirements under this Section
V.R, at least once every two (2) years after the initial compliance audit required by Subparagraph
106.a, in the same Calendar Quarter.  Limetree Bay shall retain a contractor with expertise in the
LDAR Program's requirements and familiarity with Certified Low-Leaking Valve and/or
Certified Low-Leaking Valve Packing Technology to perform the first subsequent audit ("Third-
Party LDAR Audit").  Thereafter, Limetree Bay shall alternate performance of the audit between
Limetree Bay personnel familiar with the LDAR Program's requirements or contractors with

expertise in the LDAR Program's requirements ("Internal Audit") and a Third-Party LDAR Audit.

107.    <u>Implementation of Actions Necessary to Correct Non-Compliance</u>.  If the results of any of the audits conducted pursuant to this Section V.R identify any area(s) of non-compliance, Limetree Bay shall implement, as soon as practicable, all appropriate steps necessary to correct the area(s) of non-compliance and to prevent a recurrence of the cause of the non-compliance, to the extent practicable.  For purposes of this Paragraph, if a ratio of the process-unit valve leak percentage established through a comparative monitoring audit conducted pursuant to Paragraph 106, and the average valve leak percentage reported for the process unit for the last four (4) monitoring periods preceding the audit, is equal to or greater than 3.0, and provided the auditor identified at least three (3) leaking valves in the process unit, it shall be deemed an area of non-compliance and cause for corrective action.  If the calculated ratio yields an infinite result, Limetree Bay shall assume one (1) leaking valve was found in the process unit through its routine monitoring during the four (4) monitoring periods.  In the Semi-Annual LDAR Report submitted pursuant to the provisions of Paragraph 123 covering the period when an audit was conducted, Limetree Bay shall submit the results of the audit, and shall certify to EPA that the audit has been completed and that the Refinery is in compliance or on a compliance schedule.

108.    <u>Retention of Audit Reports</u>.  Until termination of the Consent Decree, Limetree Bay shall retain the audit reports generated pursuant to this Section V.R and shall maintain a written record of the corrective actions taken in response to any deficiencies identified in any audits.

109.    <u>Leak Definition for Valves and Pumps</u>.  Limetree Bay shall utilize the leak definitions for valves as defined at 40 C.F.R. § 60.482-7a(b) and pumps in light liquid and/or gas/vapor service as defined at 40.C.F.R. § 60.482-2a(b)(1)(ii), unless a lower leak definition is established under applicable permit(s) or other applicable LDAR Regulations from the Date of Lodging of the First Modification.

110.    [Reserved]

111.    [Reserved]

112.    <u>Limetree Bay Valve Preventative Leak Maintenance Program.</u>  Within thirty (30) Days after the Date of Lodging of the First Modification, Limetree Bay shall implement the Valve Preventative Leak Maintenance Program (the "Valve Preventative Leak Maintenance Program" or "the program") set forth in this Paragraph 112 to replace and/or improve the emissions performance of valves subject to this Section V.R ("Covered Equipment Valve").

a.    <u>Definitions</u>.  The following definitions apply to this Paragraph 112:

i.    "Extension," for the purposes of Subparagraph 112.a.iii(1)(B) and 112.a.iii(2)(B) shall mean that: (i) the tested and untested valves were produced by the same manufacturer to the same or essentially equivalent quality requirements; (ii) the characteristics of the valve that affect sealing performance (e.g., type of valve, stem motion, tolerances, surface finishes, loading arrangement, and stem and body seal material, design, and construction) are the same or essentially equivalent as between the tested valve and the untested valve; and (iii) the temperature and pressure ratings of the tested valve are at least as high as the temperature and pressure ratings of the untested valve.

ii.    "Low Emissions Packing" or "Low-E Packing" shall mean either (1) or (2) as follows:

(1)    A valve packing product, independent of any specific valve, for which the manufacturer has issued a written warranty that the packing will not emit fugitives at greater than 100 ppm, and that, if it does so emit at any time in the first five years, the manufacturer will replace the product; provided however, that no packing product shall qualify as "Low-E" by reason of written warranty unless the packing first was tested by the manufacturer or a qualified testing firm pursuant to generally accepted good engineering practices for testing fugitive emissions and the results of the testing reasonably support the warranty; or

(2)    A valve packing product, independent of any specific valve, that has been tested by the manufacturer or a qualified testing firm pursuant to generally accepted good engineering practices for testing fugitive emissions, and that, during the test, at no time leaked at greater than 500 ppm, and on average, leaked at less than 100 ppm.

iii.    "Low Emissions Valve" or "Low E Valve" shall mean either (1) or (2) as follows:

(1)    A valve (including its specific packing assembly) for which the manufacturer has issued a written warranty that it will not emit fugitives at greater than 100 ppm, and that, if it does so emit at any time in the first five years, the manufacturer will replace the valve; provided

46

EPA-304

however, that no valve shall qualify as "Low E" by reason of written warranty unless the valve (including its specific packing assembly) either:

> (A)    first was tested by the manufacturer or a qualified testing firm pursuant to generally accepted good engineering practices for testing fugitive emissions and the results of the testing reasonably support the warranty; or

> (B)    is an Extension of another valve that qualified as "Low E" under Subparagraph 112.a.iii.

(2)    A valve (including its specific packing assembly) that:

> (A)    Has been tested by the manufacturer or a qualified testing firm pursuant to generally accepted good engineering practices for testing fugitive emissions and that, during the test, at no time leaked at greater than 500 ppm, and on average, leaked at less than 100 ppm; or

> (B)    Is an Extension of another valve that qualified as "Low E" under Subparagraph 112.a.iii.

iv.    "Maintenance Shutdown" shall mean a Shutdown of a process unit that lasts longer than thirty (30) Days.

b.    <u>Procedures Required to be Implemented</u>.    Under the Valve Preventative Leak Maintenance Program, Limetree Bay shall implement the following procedures:

i.    By no later than thirty (30) Days after the Date of Lodging of the First Modification, Limetree Bay shall implement modified purchasing procedures that evaluate the availability of valves and/or valve packing that meet

47

the requirements for a Low-E Valve or Low-E Packing at the time that the valves and/or valve packing is acquired.

      ii.      Except as provided in Subparagraph 112.c, by no later than thirty (30) Days after the Date of Lodging of the First Modification, Limetree Bay shall install valve packing material that meets the requirements for Low-E Packing whenever repacking any Covered Equipment Valve.

      iii.      Except as provided in Subparagraph 112.c, by no later than ninety (90) Days after the Date of Lodging of the First Modification, Limetree Bay shall ensure that each new valve that would qualify as a Covered Equipment Valve that it installs is a Low-E Valve or is fitted with Low-E Packing. Newly installed sampling and instrumentation valves in service on piping with a diameter of 5/8 inches or less are not required to be Low-E Valves or be fitted with Low-E Packing.

      iv.      <u>Replacement and Repacking of Leaker Valves</u>. Except as provided in Subparagraph 112.c, by not later than five months after Restart, for each Covered Equipment Valve for which the highest emission level that is recorded during monitoring in compliance with Method 21 is at or above 2000 ppm during any two monitoring events (excluding repair verification monitoring) in any 60-month period following the Date of Lodging of the First Modification, Limetree Bay shall replace or repack such valve with a Low-E Valve or with Low-E Packing. If a valve is repacked or replaced according to this Subparagraph, there shall be a period of 15 days after it is repacked or replaced, where this Subparagraph 112.b.iv shall not apply, to allow for adjustment of the valve. The

timing of replacement or repacking under this Subparagraph 112.b.iv shall be in accordance with Subparagraph 112.d.

c.　　Unavailability of a Low-E Valve or Low-E Packing

　　　i.　　Commercial Unavailability.　Limetree Bay shall not be required to utilize a Low-E Valve or Low-E Packing to replace or repack a valve if a Low-E Valve or Low-E Packing is commercially unavailable in accordance with the provisions in Appendix M ("Process and Factors For 'Commercial Unavailability' of Low-E Valve or Packing").　Prior to claiming this commercial unavailability exemption, Limetree Bay must contact a reasonable number of vendors of valves and obtain a written representation or equivalent documentation from each vendor that the particular valve that Limetree Bay needs is commercially unavailable either as a Low-E Valve or with Low-E Packing.　In the semi-annual report required under Part X (Reporting and Recordkeeping), Limetree Bay shall:　(i) identify each valve for which it could not comply with the requirement to replace or repack the valve with a Low-E Valve or Low-E Packing; (ii) identify the vendors it contacted to determine the unavailability of such a Low-E Valve or Low-E Packing; and (iii) include the written representations or documentation that Limetree Bay secured from each vendor regarding the unavailability.

　　　ii.　　Ongoing Assessment of Availability.　Limetree Bay may use a prior determination of Commercial Unavailability of a valve or valve packing pursuant to this Paragraph and Appendix M for a subsequent Commercial Unavailability claim for the same valve or valve packing (or valve or valve packing in the same or similar service), provided that the previous determination was completed

within the preceding 12-month period. After one year, Limetree Bay must conduct a new assessment of the availability of a valve or valve packing meeting Low-E Valve or Low-E Packing requirements.

d.      <u>Timing of Valve Replacement/Improvement</u>

      i.      <u>If Replacing or Repacking Does Not Require a Process Unit Shutdown</u>. If replacing or repacking does not require a process unit Shutdown, Limetree Bay shall replace or repack such valve by no later than thirty (30) Days after the monitoring event that triggers the replacing or repacking requirement, unless Limetree Bay complies with the following:

      (1)      Prior to the deadline, Limetree Bay must take all actions necessary to obtain the required valve or valve packing, including all necessary associated materials, as expeditiously as practical, and retain documentation of the actions taken and the date of each such action.

      (2)      If, despite Limetree Bay's efforts to comply with Subparagraph 112.d.i(1) the required valve or valve packing, including all necessary associated materials, is not available in time to complete the installation within thirty (30) Days, Limetree Bay must take all reasonable actions to minimize emissions from the valve pending completion of the required replacing or repacking. Examples include:

      (A)      Repair;

      (B)      More frequent monitoring, with additional repairs as needed; or

(C)     Where practical, interim replacing or repacking of a

valve with a valve that is not a Low-E Valve or with packing that

is not Low-E Packing; and

(3)     Limetree Bay must promptly perform the required

replacing or repacking after Limetree Bay's receipt of the valve or valve

packing, including all necessary associated materials.

ii.     <u>If Replacing or Repacking Requires a Process Unit Shutdown</u>.  If

replacing or repacking requires a process unit Shutdown, Limetree Bay shall

replace or repack such valve during the first Maintenance Shutdown that follows

the monitoring event that triggers the requirement to replace or repack the valve,

unless Limetree Bay documents that insufficient time existed between the

monitoring event and that Maintenance Shutdown to enable Limetree Bay to

purchase and install the required valve or valve packing technology.  In that case,

Limetree Bay shall undertake the replacing or repacking at the next Maintenance

Shutdown that occurs after Limetree Bay's receipt of the valve or valve packing,

including all necessary associated materials.

e.     <u>Records of Low-E Valves and Low-E Packing</u>.  Prior to purchasing any

Low-E Valves or Low-E Packing, Limetree Bay shall secure, from each manufacturer,

documentation that demonstrates that the proposed valve or packing technology meets the

definition of "Low-E Valve" and/or "Low-E Packing."  Limetree Bay shall retain that

documentation for five (5) years and make it available upon request.

f.     <u>Valve Replacement/Improvement Report</u>.  In each semi-annual report due

under Part X (Reporting and Recordkeeping), Limetree Bay shall include a separate section in

51

the report that: (i) describes the actions it took to comply with this Paragraph 112, including identifying each valve that was replaced or upgraded; and (ii) identifies the schedule for any future valve replacements or upgrades required as part of Subparagraph 112.d.

113.    LDAR Monitoring Frequency.  By no later than the Date of Entry of the First Modification, for all Covered Equipment, except as provided in 40 C.F.R. § 60.482-1a(c)-(f), Limetree Bay shall comply with the monitoring frequency for valves as required by 40 C.F.R. § 60.482-7a, 40 C.F.R. § 60.482-10a, and 40 C.F.R. § 60.483-2a and for pumps as required by 40 C.F.R. § 60.482-2a.

114.    Electronic Storage of LDAR Data.  On and after the Date of Lodging of the First Modification, Limetree Bay shall record all LDAR monitoring and repair data in an electronic database.

115.    Electronic Monitoring and Reporting of LDAR Data.  On and after the Date of Lodging of the First Modification, Limetree Bay shall use dataloggers and/or electronic data collection devices during LDAR monitoring.  Limetree Bay or contractor(s) retained by Limetree Bay shall use their best efforts to transfer each monitoring reading to the database within five (5) Days of collecting the reading.  For all monitoring events in which an electronic data collection device is used, the collected monitoring data shall include a time and date stamp, screening value, operator identification, and instrument identification.  Limetree Bay may use paper logs where necessary or more feasible (e.g., small rounds, remonitoring, or when dataloggers are not available or broken), and shall record the identification of the technician undertaking the monitoring, the date, time, screening value, and the identification of the monitoring equipment. Limetree Bay shall transfer any manually recorded monitoring data to the electronic database within seven (7) Days of monitoring.

EPA-310

116.   <u>QA/QC of LDAR Data.</u>  By no later than ninety (90) Days after the Date of Lodging of the First Modification, Limetree Bay shall develop and implement a procedure to ensure a quality assurance/quality control ("QA/QC") review of all data generated by each LDAR monitoring technician.  This QA/QC procedure shall require:

    a.   Monitoring technician(s) to review and certify the accuracy of the monitoring data they collected each week; and

    b.   Non-monitoring personnel to review monitoring data quarterly, including but not limited to, number of components monitored per technician, time between monitoring events, and abnormal data patterns.

117.   <u>LDAR Personnel.</u>  By no later than the Date of Lodging of the First Modification, Limetree Bay shall maintain the facility's existing program which holds Limetree Bay LDAR personnel accountable for LDAR performance.  Limetree Bay shall maintain a position with responsibility for LDAR management and with the authority to implement improvements.

118.   <u>Adding / Removing Valves and Pumps.</u>  On and after the Date of Lodging of the First Modification, Limetree Bay shall continue to implement its tracking program for maintenance records (e.g., a Management of Change program) to ensure that valves and pumps subject to the LDAR Regulations and this Consent Decree, which are installed and placed into VOC service, are integrated into the LDAR program.

119.   <u>Calibration.</u>  Limetree Bay shall conduct all calibrations of LDAR monitoring equipment using methane as the calibration gas, in accordance with 40 C.F.R. Part 60, EPA Reference Test Method 21.

120.    <u>Calibration Drift Assessment.</u> Within six calendar months of the Date of Lodging of the First Modification, Limetree Bay shall conduct calibration drift assessments of LDAR monitoring equipment pursuant to 40 C.F.R. § 60.485a(b)(2).

121.    <u>Extended Maintenance and Delay of Repair.</u> Beginning no later than one (1) year from Date of Lodging of the First Modification, Limetree Bay shall eliminate normal use of delay of repair exemptions for equipment in VOC service (as defined in 40 C.F.R. § 60.481a) under applicable regulations and the Consent Decree, and shall perform monitoring and maintenance as follows: perform monitoring and "drill and tap" repairs according to Subparagraphs 121.a and b, and perform extended maintenance to attempt to stop the leak source as outlined under Subparagraph 121.c. If Limetree Bay, after having implemented one or more of the extended maintenance leak repair techniques identified in Subparagraph 121.c, cannot repair the leak, Limetree Bay may delay repair of the leak until the next process unit Shutdown. Extended maintenance shall not be required where any of the following is the case: (i) for the period beginning no later than one (1) year from the Date of Lodging of the First Modification through five (5) years of the Date of Entry of the First Modification, the number of valves on the delay of repair list does not exceed 0.1 percent refinery-wide upon determination of delay of repair; and for the period beginning no later than five (5) years of the Date of Entry of the First Modification, the number of valves on the delay of repair list does not exceed 0.05 percent refinery-wide upon determination of delay of repair; or (ii) the feasible extended maintenance techniques listed in Subparagraph 121.c would result in a Shutdown of a process unit or create an unsafe operating condition. Limetree Bay shall report the circumstances (why it was required, what was actually performed, whether it was successful) of all leaks attempted to be repaired under Subparagraph 121.c in semi-annual reports required under Paragraph 71.

a.    For all equipment:

i.    Require sign-off by the plant manager, a corporate official responsible for environmental management and compliance, a corporate official responsible for plant engineering, an operations manager, an area superintendent, or an area manager or designee by the 15th day after identification of the leak that the equipment cannot be removed from VOC service and is technically infeasible to repair without implementation of extended maintenance as set forth in Subparagraph 121.c; and

ii.    Monitor monthly equipment on the "delay of repair" list which remains in VOC service.

b.    For valves:  For valves, other than control valves and pressure relief valves, require use of "drill and tap" or similarly effective repairs, unless the valve can be repaired by other means or Limetree Bay can demonstrate that there is a safety, mechanical, or adverse environmental concern posed by attempting to repair the leak in this manner.  Limetree Bay shall perform multiple "drill and tap" attempts (or similarly effective repairs) within fifteen (15) Days of identification of the leak, if necessary, to repair the valve.

c.    If the repair methods undertaken pursuant to Subparagraph 121.b have not stopped the source of the leak, Limetree Bay shall, within sixty (60) Days of identifying the leak, perform at least one extended maintenance attempt to stop the leak source, including building an enclosure for the equipment which meets 'no detectable emissions' standards under NSPS Subpart VV, line-stopping (i.e., inserting a plugging device inside the line so the contents can temporarily be held back while maintenance is performed on-line), hot-tapping (i.e., connecting a new piping service to an existing line with no interruption of flow), or pipe-freezing (i.e., holding

back system pressure in a section of piping using freeze chambers which are installed over a short section of piping and injected with liquid nitrogen or $CO_2$). Limetree Bay shall report the circumstances (why it was required, what was actually performed, was it successful) of all leaks attempted to be repaired or exempt from repair under this Subparagraph in semi-annual reports required under Part X (Reporting and Recordkeeping). If Limetree Bay applies a different extended repair technique than those listed in this Subparagraph, Limetree Bay shall report such technique under Paragraph 123 and explain how it is similarly effective at stopping the leak, and shall specifically explain why this technique could not be applied within fifteen (15) Days of identification of the leak.

122.    <u>Recordkeeping Requirements for this Section V.R</u>. For at least two (2) years after termination of this Consent Decree, Limetree Bay shall retain records to demonstrate its compliance with the requirements of this Section V.R.

123.    As part of the reports required under 40 C.F.R. §§ 60.487a and 63.655 (Semi-Annual LDAR Report), Limetree Bay shall include the following information, at the following times:

a.    The next Semi-Annual LDAR Report after the applicable compliance date for each requirement shall include notification of the following:

i.    Implementation of the "Valve Preventative Leak Maintenance Program" of Paragraph 112;

ii.    Implementation of QA/QC procedures for review of data generated by LDAR technicians as required by Paragraph 116;

    iii.   Development of a tracking program for new valves and pumps added during maintenance and construction (Management of Change Program) as required by Paragraph 118;

    iv.   Implementation of the calibration and calibration drift assessment procedures of Paragraphs 119 and 120;

    v.   Implementation of the "delay of repair" procedures of Paragraph 121;

    vi.   Utilization of electronic data collection devices during LDAR monitoring, pursuant to the requirements of Paragraph 115;

    vii.   [Reserved]; and

    viii.   Implementation of the monitoring requirements of Paragraph 113.

 b.  Until termination of this Section V.R, each Semi-Annual LDAR Report that Limetree Bay submits shall include:

    i.   An identification of each audit, if any, that was conducted pursuant to the requirements of Paragraph 106 in the previous semi-annual period. For each audit identified, the report shall include an identification of the auditors, a summary of the audit results, and a summary of the actions that Limetree Bay took or intends to take to correct all deficiencies identified in the audits.

    ii.   Training. Information identifying the measures taken to comply with the provisions of Paragraph 105;

    iii.   [Reserved]; and

    iv.   Monitoring. The following information on LDAR monitoring:

EPA-315

(1)    A list of the process units monitored during the reporting period;

(2)    The number of valves and pumps present in each monitored process unit;

(3)    The number of valves and pumps monitored in each process unit and if less than the number in (2), include an explanation as to why;

(4)    The number of valves and pumps found leaking in each process unit during the period, and the valve leak percentage for each process unit;

(5)    The number of "difficult to monitor" pieces of equipment monitored;

(6)    The projected month of the next monitoring event for that unit;

(7)    A list of all equipment currently on the "delay of repair" list, the date each component was placed on the list, the date each such component was determined to be leaking above applicable leak definitions, the circumstances of any extended maintenance repairs under Subparagraph 121.c, the associated monitoring results for each piece of equipment, and whether such activities were completed in a timely manner;

(8)    [Reserved];

(9)    The number of valves not repacked or replaced and recorded as required under Paragraph 112;

(10)    The number of valves which were newly installed without appropriate packing or valve technology, as required under Paragraph 112; and

(11)    The number of missed or untimely repairs under Paragraph 111.

**30.    Replace Part VI, Permitting with the following new Part VI, Permitting.**

124.    <u>Obtaining Permit Limits for Consent Decree Emission Limits That Are Effective On or Before the Date of Entry of the First Modification</u>.  Except as set forth below, by no later than 180 Days after the Date of Entry of the First Modification, Limetree Bay shall submit applications, amendments and/or supplements to the relevant permitting authority to incorporate the surviving Consent Decree obligations identified in Appendix O ("Requirements That Shall Survive Termination of the Consent Decree") that are effective on or before the Date of Entry of the First Modification into federally enforceable minor or major new source review permits or other permits (other than Title V permits) or provisions (e.g., SIP) that are federally enforceable. Upon issuance of such permits or in conjunction with such permitting, Limetree Bay shall file all applications necessary to incorporate the requirements of those permits into the Title V permit for the Refinery.

125.    <u>Obtaining Permit Limits For Consent Decree Emission Limits That Become Effective After Date of Entry of the First Modification</u>.  Except as set forth below, as soon as practicable, but in no event later than 180 Days after the effective date or establishment of any surviving Consent Decree obligations identified in Appendix O, other than those effective on or

EPA-317

before the Date of Entry of the First Modification, Limetree Bay shall submit applications,

amendments and/or supplements to the relevant permitting authority to incorporate those

emission limits and standards into federally enforceable minor or major new source review

permits, or other permits (other than Title V permits) or provisions (e.g., SIP) that are federally

enforceable. Upon issuance of such permit or in conjunction with such permitting, Limetree Bay

shall file all applications necessary to incorporate the requirements of those permits into the

Title V permit for the Refinery.

126.    Mechanism for Title V Incorporation.    The Parties agree that the incorporation of

any surviving Consent Decree obligations into the Title V permit for the Refinery as required by

Paragraphs 124 and 125 shall be in accordance with the applicable territorial Title V rules.

127.    Construction Permits.    Limetree Bay agrees to obtain all required, federally

enforceable permits for the construction of the pollution control technology and/or the

installation of equipment necessary to implement the requirements of the Consent Decree.

127A.    Obligations That Shall Survive Consent Decree Termination.    The requirements

imposed by the provisions identified in Appendix O shall survive termination of the Consent

Decree under Part XIX (Termination).

a.    Emission Limits and Standards. The requirements identified in Appendix

O shall constitute emission limits and standards that shall survive termination of the Consent

Decree by virtue of being incorporated into non-Title V federally enforceable minor or major

permits or being required under a federally enforceable rule as required by Paragraphs 124 and

125.

b.    Optional Review of Draft Permit Application for Consistency with

Consent Decree.

i.    By not later than 180 days prior to the date for submission of any permit application(s) to incorporate surviving emission limits and standards identified in this Paragraph 127A and Appendix O into federally-enforceable minor or major new source review permits or other permits (and, upon issuance of such permits or in conjunction with such permitting, into Title V permits) Limetree Bay may, following the procedures in Paragraph 225 (Notices), submit for EPA and VIDPNR review and comment a draft of the permit application(s) containing the terms, conditions and other provisions to incorporate such surviving obligations.  EPA's review and comment is intended to assist efforts to submit permit application(s) to the relevant permitting entity that fully incorporate such surviving obligations;  EPA does not warrant or guarantee by its review and comment on a *draft* permit application that Limetree Bay has met or will thereafter meet the requirement of Paragraph 234.e to show that, at the time of Termination of this Consent Decree, the *final* permit(s) once issued by the relevant permitting entity accurately and fully incorporate the surviving Consent Decree obligations.   In addition,  such review by EPA is not pre-decisional or binding upon the relevant permitting entity, which may at its discretion require additional and/or more stringent terms and conditions than those required under this Consent Decree.

ii.    If Limetree Bay elects to submit a draft permit application(s) for optional review under this Subparagraph, Limetree Bay shall have 30 days from the date of receipt of EPA's comments in which to submit its permit application(s) to the relevant permitting entity(s), notwithstanding the deadline for

submission of permit applications under Paragraph 124 or Paragraph 125, as applicable. The Parties may agree to a longer time period for submission of the permit application(s) to the relevant permitting entity(s) if needed to address questions or issues concerning EPA's review.

**31.    Replace Subparagraph 130.b with the following new Subparagraph 130.b:**

b.    CD Emissions Reductions may be used only at the Refinery.

**32.    Add the following new Paragraph 135A:**

135A. For Boilers 5, 8, and 9, which became subject to NSPS Subpart D pursuant to Paragraph 135, entry of the First Modification of the Consent Decree shall satisfy the notice requirements of 40 C.F.R. § 60.7(a).

**33.    Replace Paragraph 136 with the following new Paragraph 136:**

136.    <u>NSPS Subparts A and GG</u>.

a.    <u>Power Line-Up</u>. Limetree Bay submitted its "power line-up" to the United States and the Virgin Islands on December 31, 2018. The power line-up identified Generating Turbines that Limetree Bay plans to operate when Idled Units at the Refinery resume operation and the normal operating range at which they are expected to operate. By December 31, 2019, Limetree Bay shall re-submit its power line-up to the United States and the Virgin Islands if there are any changes from the December 31, 2018 submission.

b.    <u>Applicability and Compliance with NSPS Subparts A and GG</u>: Generating Turbines 4, 7, 8, and 9 are "affected facilities" as that term is defined in 40 C.F.R. Part 60, Subparts A and GG.

      i.     <u>Generating Turbine 9</u>. Generating Turbine 9 shall continue to comply with the requirements of NSPS Subparts A and GG. Paragraph 229A and Appendix L shall apply to Generating Turbine 9.

      ii.     <u>Generating Turbines 4, 7, and 8</u>

(1) From the Date of Lodging of the First Modification until Limetree Bay demonstrates compliance with NSPS Subparts A and GG in accordance with Subparagraph 136.b.ii(2), Generating Turbines 4, 7, and 8 shall comply with the requirements of NSPS Subparts A and GG, except that in lieu of complying with the NSPS Subpart GG numerical standard for $NO_x$, the Generating Turbines shall comply with the applicable Maximum Load Limits set forth in Subparagraph 136.d.ii.

(2) By no later than December 31, 2020, Generating Turbines 4, 7, and 8 shall demonstrate compliance with all requirements of NSPS Subparts A and GG. Compliance with the applicable NSPS Subpart GG numerical standard for $NO_x$, shall be demonstrated (a) by CEMS or a stack test performed using the test methods specified in 40 C.F.R. § 60.335 and § 60.8, and at four different load points, including one load point within 5 percent at 90-to-100 percent of the manufacturer's design capacity, or at the highest achievable load point if Limetree Bay can demonstrate that a load point within 5 percent at 90-to-100 percent of design

capacity cannot be physically achieved in practice, or (b) by an alternate test method specifically approved by EPA in writing.

c.      Custom Sulfur Monitoring Plan:

    i.   Pursuant to 40 C.F.R. § 60.334(i)(3), Limetree Bay submitted a custom sulfur monitoring schedule to EPA on August 31, 2017 for propane and distillate. The custom sulfur monitoring schedule may be revised in accordance with 40 C.F.R. § 60.334(i)(3). Limetree Bay shall comply with any proposed custom sulfur monitoring schedule as submitted unless EPA disapproves. If EPA disapproves of a custom schedule, then within thirty (30) Days of Limetree Bay's receipt of disapproval, Limetree Bay will submit to EPA a revised custom schedule that provides for compliance with the applicable monitoring requirements, which may include additional or different monitoring. Limetree Bay shall comply with the revised custom schedule as submitted unless EPA disapproves.

d.      Maximum Load Limits for Generating Turbines 4, 7, and 8 until Subparagraph 136.b.ii(2) compliance demonstration:

    i.   Interim Controls

Limetree Bay has installed LHE Combustion Liner Systems on GTs 7 and 8, which will not be removed any earlier than the date Limetree Bay installs and operates alternative $NO_x$ controls, or is replaced at or before end of life. Limetree Bay shall demonstrate compliance with the NSPS, Subparts A and GG numerical standard for $NO_x$, as required in Subparagraph 136.b.ii.(2), within sixty Days after it begins operations with alternative $NO_x$ controls.

EPA-322

ii.    <u>Applicability of Maximum Load Limits</u>

From the Date of Lodging of the First Modification until Limetree Bay demonstrates full compliance with NSPS Subparts A and GG, as required in Subparagraph 136.b.ii.(2), Generating Turbines 4, 7, and 8 shall comply with the applicable Maximum Load Limits as set forth in Subparagraphs 136.d.iii through 136.d.iv.

iii.    <u>Maximum Load Limits</u>.  From the Date of Lodging of the First Modification until a subsequent Maximum Load Limit is established in accordance with Subparagraph 136.d.iv, the following fuel and load limits are the applicable Maximum Load Limits for Generating Turbines 4, 7, and 8:

| Turbine | Fuel | Maximum Load (1-hour block average) |
|---------|------|-------------------------------------|
| GT-4 | Propane Gas | 6.67 MW |
| | Fuel Oil | 6.49 MW |
| | Fuel Gas | 6.49 MW |
| GT-7 | Propane Gas | 14.53 MW |
| | Fuel Oil | 12.97 MW |
| | Fuel Gas | 12.97 MW |
| GT-8 | Propane Gas | 12.14 MW |
| | Fuel Oil | 11.09 MW |
| | Fuel Gas | 11.09 MW |

iv.    <u>Subsequent Maximum Load Limits.</u>

(1)    Limetree Bay may establish subsequent Maximum Load Limits for Generating Turbine 4, 7, or 8 or combust other fuels, provided it establishes those limits by conducting testing, in accordance with

Subparagraph 136.d.iv(2) – (5) below. Such testing may be conducted

prior to and/or after the Date of Lodging of the First Modification.

(2)      Limetree Bay shall use the test methods specified in 40

C.F.R. § 60.335 and § 60.8 to measure $NO_x$ emissions from the

Generating Turbine to establish subsequent Maximum Load Limits,

except that for the purpose of conducting the stack test required by this

Subparagraph 136.d.iv(2), Limetree Bay shall not be required to test at 90-

to-100 percent of design capacity, as one of its four load points.

(3)      Limetree Bay shall provide notice to EPA and the VIDPNR

no later than thirty (30) Days prior to any stack test of Generating

Turbines 4, 7, and 8 conducted to establish subsequent Maximum Load

Limits.

(4)      No later than thirty (30) Days after conducting tests to

establish subsequent Maximum Load Limits, Limetree Bay shall provide

the results of such testing to EPA and the VIDPNR.

(5)      From the Day that Limetree Bay satisfactorily completes a

test conducted pursuant to this Subparagraph 136.d.iv, the applicable

Maximum Load Limit shall be the maximum MW load, measured in a

single run, on a 1-hour block average, at which the stack test results

demonstrate that a specific fuel will result in emissions that will not

exceed the NSPS Subparts GG $NO_x$ numerical standard in 40 C.F.R. §

60.332(a)(2), and Limetree Bay shall operate at or below this subsequent

Maximum Load Limit.

66

     e.    <u>Recordkeeping</u>.  From the Date of Lodging of the First Modification until compliance is demonstrated in accordance with Subparagraph 136.b.ii(2),  Limetree Bay shall maintain a record of the operating MW load, measured on a 1-hour block average, for Generating Turbines 4, 7, and 8.  Limetree Bay shall make these records available to EPA and the VIDPNR upon request.

     f.    <u>Notice</u>.  If Generating Turbines 4, 7, or 8 exceed the applicable Maximum Load Limit set forth in Subparagraph 136.d.iii or established in accordance with Subparagraph 136.d.iv,  Limetree Bay shall within seven (7) Days of the exceedance provide notice to the EPA and the VIDPNR.

     g.    <u>Stipulated Penalties</u>.

     i.    Generating Turbines 4, 7, and 8 – Failure to Comply with Maximum Load Limit.  Limetree Bay shall be subject to a stipulated penalty of $250 for every hour that Limetree Bay operates Generating Turbine 4, 7, or 8 at a MW load more than ten (10) percent higher than the applicable Maximum Load Limit set forth in Subparagraph 136.d.iii or established in accordance with Subparagraph 136.d.iv,  except that stipulated penalties for exceedances of a Maximum Load Limit do not apply during a performance test for which Limetree Bay provided notice to EPA pursuant to Subparagraph 136.d.iv(3).

     ii.    Generating Turbines 4, 7, 8, and 9 – Failure to Comply with NSPS Subpart GG by Compliance Date.  Limetree Bay shall be subject to the following stipulated penalties for failure to comply with NSPS Subpart GG following the compliance dates set forth in Paragraphs 136.b.i and b.ii(2):

| Period of Non-Compliance | Penalty Per Day Per Turbine |
|---|---|
| 1st Day through 30th Day after deadline | $200 |
| 31st through 60th Day after deadline | $500 |
| Beyond 60th Day after deadline | $1,000 |

**34.    Add the following new Paragraph 136A:**

136A.  For Generating Turbines 4, 7 and 8, which became subject to NSPS Subpart GG pursuant to Paragraph 136, entry of the First Modification of the Consent Decree and compliance with the relevant monitoring and compliance demonstration requirements of this Consent Decree shall satisfy the notice requirements of 40 C.F.R. § 60.7(a) and the initial performance test requirement of 40 C.F.R. § 60.8(a).

**35.    Replace Section IX.A with the following new Section IX.A:**

IX.A. Territorial Supplemental Environmental Project

137.    Virgin Islands Territorial SEP

a.    The VIDPNR shall develop and ensure implementation of Territorial Supplemental Environmental Projects ("TSEP") designed to benefit the people of the Virgin Islands.  These projects shall be consistent with environmental, public health, pollution prevention or reduction, or other benefits and objectives of the environmental protection laws of the United States and the Virgin Islands.  Among the potential projects, the VIDPNR is developing TSEPs for the establishment of a cancer registry and the establishment of a pediatric environmental specialty health unit.

b.    Within thirty (30) Days of a written request by the VIDPNR to the ERT for funding, the ERT shall provide for the disbursal of such funds from the TSEP Escrow Account, as directed by the VIDPNR, for the purpose of implementing the identified TSEP.

c.    All funds disbursed pursuant to this Paragraph shall be paid directly by the ERT to the TSEP provider(s) identified by the VIDPNR.

EPA-326

d.    In annual reports, due the thirty-first Day of January, the ERT shall identify the amount remaining in the TSEP Escrow Account at the end of the reporting period, and the amount disbursed and to whom it was disbursed during the reporting period.

e.    At the time the Court orders this Consent Decree to be terminated, the ERT shall disburse any remaining monies in the TSEP Escrow Account to the VIDPNR for development and implementation of projects that are consistent with the TSEP criteria set forth in this Paragraph.

138.    [Reserved]

139.    [Reserved]

140.    [Reserved]

**36.    Replace Section IX.B with the following new Section IX.B:**

**B.    <u>Additional Work</u>**

140A.    <u>VIWAPA Emissions Monitoring Assistance Subsequent to the First Modification</u>

a.    Prior to the disbursal of funds to VIWAPA, the ERT shall submit to EPA for EPA's review: (i) its contractor's detailed description of the assistance provided, including expenditures, certified as accurate by a responsible VIWAPA company official; and (ii) its contractor's statement indicating what monies expended by VIWAPA are consistent with the Consent Decree and the approved SOW.

b.    Within thirty (30) Days of receipt by the ERT of the statement by its contractor referenced in Subparagraph a. above, the ERT shall reimburse VIWAPA from funds earmarked for the VIWAPA Emissions Monitoring Assistance Program in accordance with the statement.

c.    The ERT shall not itself perform, participate (physically or otherwise) in

performing, or assume responsibility for, any work, tasks, or functions that relate to the VIWAPA Assistance Program or that VIWAPA is legally obligated to perform or performs in the ordinary course of its business.

**37. Replace Section IX.C with the following new Section IX.C:**

**C.**    <u>**Public Statements**</u>

     141.    [Reserved]

**38. Add the following sentence to Paragraph 142:**

For BWON and LDAR Equipment, Limetree Bay shall maintain: (1) a database that identifies BWON or LDAR Equipment that is not In Regulated Service and BWON or LDAR Equipment that is In Regulated Service; (2) a database of any change in status of BWON or LDAR Equipment and the date of such change; and (3) records documenting information reported pursuant to Subparagraphs 143.a.v(3) through 143.a.v(4).

**39. Replace Subparagraphs a.iv and a.v of Paragraph 143 with the following new Subparagraphs a.iv and a.v:**

         iv.    A summary of Limetree Bay's compliance with Paragraph 136, including a description of any exceedances of any Maximum Load Limit set forth in Subparagraph 136.d.iii or as the result of any test conducted pursuant to Subparagraph 136.d.iv(2).

         v.    Any such additional matters relevant to the obligations of this Consent Decree, including, but not limited to, the following:

             (1)    A list of In Service Units, Idled Units, and any change(s) in the status of In Service Units or Idled Units from the prior semi-annual reporting period;

(2)      Identification of any Idled Unit that is operated for any
period prior to Restart, along with the hours, duration, and purpose of such
operation, except that this requirement shall not apply to units after they
have been Restarted;

(3)      A list by area or process unit of BWON and LDAR
Equipment that is currently In Regulated Service; and

(4)      A list by area or process unit identifying any changes in
status of Equipment In Regulated Service from the prior semi-annual
reporting period.

**40.    Replace Subparagraph 143.b.iii with the following new Subparagraph 143.b.iii:**

143.b.iii.      $SO_2$ emissions in tons per year for each SRP and $SO_2$ and Reduced Sulfur
Compounds (RSC) emissions in tons per year for each SRP using a Beavon unit as a control
device.

**41.    Replace Paragraph 162 with the following new Paragraph 162:**

162.    For failure to comply with applicable NSPS Subparts A and Ja requirements, at
the flares listed on Appendix D ("List of Flaring Devices Subject to NSPS Subpart Ja") after the
deadlines for compliance in Paragraphs 49, per Flaring Device:

| Period of Non-Compliance | Penalty per Day |
|---|---|
| 1st through 30th Day after deadline | $500 |
| 31st through 60th Day after deadline | $1,500 |
| Beyond 60th Day after deadline | $2,000 |

**42.    Insert new Paragraphs 162A, 162B and 162C:**

162A.  For failure to install flare gas recovery system(s), if required by Subparagraphs
50B.a, 50B.b, or 50B.c:

| Period of Non-compliance | Penalty per Day |
|---|---|
| 1st through 30th day after deadline | $1,200 |
| 31st through 60th day after deadline | $2,500 |
| Beyond 60th day after deadline | $5,000, or an amount equal to 1.2 times the economic benefit of non-compliance, whichever is greater |

162B.  For failure to monitor emissions or flow rate as required by Paragraphs 50A, 50C.a, and 50D, and for failure to maintain records and reports as required by Subparagraphs 50C.b and 50C.c:

| Period of Non-compliance | Penalty per Day |
|---|---|
| 1st through 30th day after deadline | $500 |
| 31st through 60th day after deadline | $1000 |
| Beyond 60th day after deadline | $2,500, or an amount equal to 1.2 times the economic benefit of non-compliance, whichever is greater |

162C.  For failure to mitigate emissions, if required by Paragraph 50A and Appendix P ("Flaring Mitigation Projects"):

| Period of Non-compliance | Penalty per Day |
|---|---|
| 1st through 30th day after deadline | $1000 |
| 31st through 60th day after deadline | $2500 |
| Beyond 60th day after deadline | $5,000, or an amount equal to 1.2 times the economic benefit of non-compliance, whichever is greater |

**43.    In Paragraph 163, change the Subpart NSPS references "NSPS Subparts J/Ja" to "NSPS Subpart Ja".**

**44.    Replace Subparagraph 165.e with the following new Subparagraph 165.e:**

e.    Failure to implement the requirements of Paragraph 112 (Valve Preventive

Maintenance Program):

>        i.        For failure to install a Low-E Valve or a valve fitted with Low-E
> Packing when required to do so pursuant to Subparagraph 112.b.ii or 112.b.iii:
> $300 per valve.

>        ii.        For failure to install a Low-E Valve or a valve fitted with Low-E
> Packing when required to do so pursuant to Subparagraph 112.b.iv: $10,000 per
> valve.

>        iii.        For each failure to record information as required pursuant to
> Subparagraphs 112.c, 112.e, and 112.f: $100 per valve.

**45.    Replace Paragraph 167 with the following new Paragraph 167:**

167.    [Reserved]

**46.    Add the following new Paragraph 178A to Part XII (Stipulated Penalties):**

178A.  Limetree Bay shall not be liable for any stipulated penalties for non-compliance
with Consent Decree requirements where:

>        a.        the non-compliance began and ended on or prior to January 4, 2016, or

>        b.        the non-compliance began prior to January 4, 2016 and continued on or
after January 4, 2016 for a failure by HOVENSA to timely and fully comply with a submission,
notice, recordkeeping, or reporting requirement under the Consent Decree, or

>        c.        the non-compliance began prior to the Date of Lodging of the First
Modification and the Consent Decree requirement was changed, deleted, replaced, or the
deadline extended by the First Modification and Limetree Bay complies with the changed,
deleted, replaced, or extended requirement or deadline.  Limetree Bay will be liable for
stipulated penalties, if it fails to comply with the changed, replaced, or extended Consent Decree

EPA-331

requirement or deadline.

Except as set forth in Subparagraph 178A.b or 178A.c, where non-compliance occurred and/or continued on/or after January 4, 2016, regardless of when the non-compliance began, Limetree Bay shall be responsible for stipulated penalties for such continuing non-compliance but only for the time period on/or after January 4, 2016.

47.    **Replace Part XVII with the following new Part XVII:**

## XVII.  EFFECT OF SETTLEMENT

199.    Definitions.  For purposes of this Part XVII (Effect of Settlement), the following definitions apply:

a.    "Applicable NSR/PSD Requirements" shall mean:

i.    PSD requirements at Part C of Subchapter I of the Act, 42 U.S.C. § 7475, and the regulations promulgated thereunder at 40 C.F.R. §§ 52.21 and 51.166; and the portions of the applicable SIP and related rules adopted as required by 40 C.F.R. §§ 51.165 and 51.166;

ii.    Any Title V regulations that implement, adopt, or incorporate the specific regulatory requirements identified above; any applicable federally-enforceable territorial regulations that implement, adopt, or incorporate the specific federal regulatory requirements identified above; any Title V permit provisions that implement, adopt, or incorporate the specific regulatory requirements identified above; and

iii.    Any applicable territorial laws or regulations that implement, adopt, or incorporate the specific federal regulatory requirements identified above

regardless of whether such laws or regulations have been formally approved by EPA as part of the applicable State Implementation Plan.

b.      "Applicable NSPS Subparts A and J Requirements" shall mean the standards, monitoring, testing, reporting, and recordkeeping requirements found at 40 C.F.R. §§ 60.100 through 60.109 (Subpart J) relating to a particular pollutant and a particular affected facility, and the corollary general requirements found at 40 C.F.R. §§ 60.1 through 60.19 (Subpart A) that are applicable to any affected facility covered by Subpart J. This term shall also include the requirements of 12 VIRR Section 204-45, "Standards of Performance for Sulfur Recovery Units at Petroleum Refineries."

c.      "Applicable NSPS Subparts A and Ja Requirements" shall mean the standards, monitoring, testing, reporting, and recordkeeping requirements found at 40 C.F.R. § 60.100a through 60.109a (Subpart Ja) relating to a particular pollutant and a particular affected facility, and the corollary general requirements found at 40 C.F.R. §§ 60.1 through 60.19 (Subpart A) that are applicable to any affected facility covered by Subpart Ja.

d.      "Applicable NSPS Subparts A and D Requirements" shall mean the standards, monitoring, testing, reporting, and recordkeeping requirements found at 40 C.F.R. §§ 60.40 through 60.46 (Subpart D) relating to a particular pollutant and a particular affected facility, and the corollary general requirements found at 40 C.F.R. §§ 60.1 through 60.19 (Subpart A) that are applicable to any affected facility covered by Subpart D.

e.      "Applicable NSPS Subparts A and GG Requirements" shall mean the standards, monitoring, testing, reporting, and recordkeeping requirements found at 40 C.F.R. §§ 60.330 through 60.335 (Subpart GG) relating to a particular pollutant and a particular affected

facility, and the corollary general requirements found at 40 C.F.R. §§ 60.1 through 60.19 (Subpart A) that are applicable to any affected facility covered by Subpart GG.

f.      "Applicable NSPS Subparts A and QQQ Requirements" shall mean the standards, monitoring, testing, reporting, and recordkeeping requirements found at 40 C.F.R. §§ 60.690 through 60.699 (Subpart QQQ) relating to a particular pollutant and a particular affected facility, and the corollary general requirements found at 40 C.F.R. §§ 60.1 through 60.19 (Subpart A) that are applicable to any affected facility covered by Subpart QQQ.

g.      "Benzene Waste NESHAP Requirements" shall mean the requirements imposed by the National Emission Standard for Benzene Waste Operations, 40 C.F.R. Part 61, Subpart FF, and any applicable territorial regulations that implement, adopt or incorporate the Benzene Waste NESHAP.

h.      "Delayed Coker Unit Project" or "Coker Project" shall mean the equipment that was newly constructed or modified between August 19, 1999 and May 8, 2002 as follows: Coker Unit process equipment and associated gas plant, process heaters, H-8501 and H-8502, Boiler No. 10, No. 7 Amine, No. 6 Sour Water Stripper, sour water tank, pitch storage tank, desalter effluent water tank, coke cutting water tank, coke pit, Nos. 1 and 2 Sulfur Recovery Plants and associated No. 1 Beavon, the process equipment located in the No. 5 Crude, No. 3 Vacuum, No. 3 Crude, No. 1 Vacuum, No. 1 Visbreaker, and Numbers. 2, 4, 6, and 7 Distillate Desulfurizing Units, and outside battery limit modifications to the terminal, tank farm and blending equipment.

i.      "Limetree Bay" shall include Limetree Bay Terminals, LLC, Limetree Bay Refining, LLC, and except with respect to Paragraph 206, HOVENSA.

j.      "LDAR Requirements" shall mean the requirements relating to equipment

in light liquid service and gas/vapor service set forth at 40 C.F.R. Part 60, Subparts, VV, VVa, GGG and GGGa; 40 C.F.R. Part 61, Subparts J and V; and 40 C.F.R. Part 63, Subparts F, H, and CC; and any applicable territorial regulations or State Implementation Plan requirements that implement, adopt or incorporate those federal regulations or set similar standards.

k.     "Post-Lodging Compliance Dates" shall mean any dates in this Part XVII (Effect of Settlement) after the Date of Lodging. Post-Lodging Compliance Dates include dates certain (e.g., "December 31, 2019"), dates after Lodging represented in terms of "months after Lodging" (e.g., "12 months after the Date of Lodging" or "12 months after Date of Lodging of the First Modification"), and dates after the Date of Lodging represented by actions taken (e.g., "comply with"). The Post-Lodging Compliance Dates represent the dates by which work is required to be completed or an emission limit is required to be met under the applicable provisions of the Consent Decree.

200.     Liability Resolution Regarding the Applicable NSR/PSD Requirements. With respect to emissions of the following pollutants from the following units, entry of the Consent Decree resolves all civil liability of Limetree Bay to the United States and the Virgin Islands: (1) for violations of the Applicable NSR/PSD Requirements resulting from the construction or modification of the following units that occurred prior to the Date of Lodging, and that commenced and ceased prior to the Date of Lodging; and (2) for any violations of the Applicable NSR/PSD Requirements resulting from pre-Date of Lodging construction or modification of the following units, that commenced prior to the Date of Lodging and continued up to the following dates:

| Unit | Pollutant | Date |
|------|-----------|------|
| FCCU | NO$_x$ | Date of Entry of the Consent Decree |

|                          | SO$_2$ | Date of Entry of the Consent Decree |
|                          | PM     | Date of Entry of the Consent Decree |
| Heaters, boilers, Generating Turbines, and Compressor Engines | NO$_x$ | December 31, 2019 |
|                          | SO$_2$ | Date of Entry of the Consent Decree |
| Coker Project            | H$_2$S | December 31, 2012 |

The limits for VOC, CO, H$_2$S, NO$_x$, SO$_2$, PM, PM-10, and PM$_{2.5}$ contained in VIDPNR Permit STX-557A-E-02 for the Coker Project were intended to limit the emissions of these pollutants for purposes of avoiding permitting pursuant to 40 C.F.R. § 52.21. Section VIII.A establishes injunctive relief to resolve EPA's September 18, 2007 NOV, CAA-02-2007-1313, issued to HOVENSA. Limetree Bay may seek relaxation of the emissions limits in Permit STX-557A-E 02 and STX-557-I-00 pertaining to VOC, CO, H$_2$S, NO$_X$, SO$_2$, PM-10, PM, and PM$_{2.5}$, or Reduced Sulfur Compounds upon compliance with the interim limit for the Coker Steam Vents as specified in Subparagraph 132.a and with the interim limit for Beavon Unit #1 as specified in Appendix H ("Additional Coker Project Injunctive Relief"), and all other injunctive relief specified in Appendix H. Such relaxations will not be deemed to constitute a major modification to the Refinery within the meaning of 40 C.F.R. § 52.21(r)(4) and the requirements of Subparagraphs (j) through (s) of 40 C.F.R. § 52.21 shall not apply by virtue of such relaxations.

201.    Conditional Resolution of Liability for CO Emissions Under the Applicable NSR/PSD Requirements. With respect to emissions of CO from the FCCU, if and when Limetree Bay accepts an emissions limit pursuant to Paragraph 19 of the Consent Decree and demonstrates compliance using CEMS at the FCCU, then any civil liability of Limetree Bay to

the United States and the Virgin Islands shall be resolved for violations of the Applicable NSR/PSD Requirements relating to CO emissions at the FCCU resulting from pre-Date of Lodging construction or modification of the FCCU that either ceased prior to the Date of Lodging or continued up to the date on which Limetree Bay demonstrates compliance with such CO emissions limit.

202.    <u>Reservation of Rights Regarding Applicable NSR/PSD Requirements: Release for Violations Continuing After the Date of Lodging Can Be Rendered Void</u>. Notwithstanding the resolution of liability in Paragraphs 200 and 201, the releases of liability by the United States and the Virgin Islands to Limetree Bay for violations of the Applicable NSR/PSD Requirements during the period between the Date of Lodging and the Post- Lodging Compliance Dates shall be rendered void if Limetree Bay materially fails to comply with the corresponding obligations and requirements of Part V (Affirmative Relief/Environmental Projects), Sections V.A through V.E (relating to the FCCU), Sections V.F through V.H (relating to heaters, boilers, Generating Turbines and Compressor Engines), and Part VIII (Additional Injunctive Relief); provided, however, that the releases in Paragraphs 200 and 201 shall not be rendered void if Limetree Bay remedies such material failure and pays any stipulated penalties due as a result of such material failure.

203.    <u>Exclusions from Release Coverage Regarding Applicable NSR/PSD Requirements in the Consent Decree: Construction and/or Modification Not Covered</u>. Notwithstanding the resolution of liability in Paragraphs 200 and 201, nothing in the Consent Decree precludes the United States or the Virgin Islands from seeking injunctive relief, penalties, or other appropriate relief from Limetree Bay for violations by Limetree Bay of the Applicable NSR/PSD Requirements resulting from: (i) construction or modification that commenced prior

to the Date of Lodging, if the resulting violations relate to pollutants or units not covered by the Consent Decree; or (ii) any construction or modification that commences after the Date of Lodging.

204.  <u>Evaluation of Applicable NSR/PSD Requirements.</u>  Increases in emissions from units covered by the Consent Decree, where the increases result from construction or modification of any units within the Refinery, after January 4, 2016, are beyond the scope of the release in Paragraphs 200 and 201, and Limetree Bay is not relieved from any obligation to evaluate any such increases in accordance with the Applicable NSR/PSD Requirements.

205.  <u>Resolution of Liability Regarding Applicable NSPS Requirements</u>.  With respect to emissions of the following pollutants from the following units, entry of the Consent Decree resolves all civil liability of Limetree Bay to the United States and the Virgin Islands for violations of the applicable NSPS Subparts, referenced in Paragraph 199.b through f, listed below from the date that the claims of the United States and the Virgin Islands accrued up to the specified Post-Lodging Compliance Date:

| Unit | Applicable NSPS Subpart | Pollutant | Date |
|---|---|---|---|
| FCCU | A and J | $SO_2$, CO, and PM | Date of Lodging of the Consent Decree |
|  |  | PM (opacity monitoring requirements) | Date of AMP approval receipt (see Paragraph 22) |
| FCCU Turboexpander Vents | A and J | $SO_2$, CO, PM (opacity) | Date of Lodging of the Consent Decree |
| All fuel gas combustion devices listed in Appendix C ("NSPS Subpart J or Ja Compliance Schedule for Listed Fuel Gas Combustion Devices (Other than Flaring Devices)") | A, J, and Ja, as applicable | $SO_2$ | Dates listed in Appendix C ("NSPS Subpart J or Ja Compliance Schedule for Listed Fuel Gas Combustion Devices (Other than Flaring Devices)") |
| Flaring Devices | A, J, and Ja | $SO_2$ | Dates listed in Appendix D ("List of Flaring Devices Subject to NSPS Subpart Ja") |
| East Side SRP | A, J and Ja | $SO_2$ and TRS | April 1, 2015 |
| West Side SRP | A, J and Ja | $SO_2$ and TRS | December 31, 2011 |
| Generating Turbines 1-3 and 6 | A and GG | $NO_x$ and $SO_2$ | Five (5) years from Date of Entry of the Consent Decree |
| Generating Turbines 4, 7 and 8 | A and GG | $NO_x$ and $SO_2$ | December 31, 2020 |
| Generating Turbine 5 and 9 | A and GG | $NO_x$ and $SO_2$ | Date of Lodging of the First Modification |
| Boilers 5, 8, and 9 | A and D | $NO_x$, $SO_2$, and PM | July 31, 2012 (or 12/31/2015 for Boiler 5 if replaced) |
| The FCCU and Coker Drain Systems | A and QQQ | VOC | December 31, 2012 |

206.    <u>Reservation of Rights Regarding Applicable NSPS Requirements:  Release for Violations Continuing After the Date of Lodging Can Be Rendered Void</u>.  Notwithstanding the resolution of liability in Paragraph 205, the releases of liability by the United States and the Virgin Islands to Limetree Bay for violations of the applicable NSPS Subparts listed in Paragraph 205 shall be rendered void if Limetree Bay fails to comply with the obligations and requirements of Parts V (Affirmative Relief/Environmental Projects), VI (Permitting) and VIII (Additional Injunctive Relief) (relating to NSPS requirements); provided, however, that the releases in Paragraph 205 shall not be rendered void if Limetree Bay remedies such failure and pays any stipulated penalties due as a result of such failure.

207.    <u>Resolution of Liability for Coker Project</u>. Entry of the Consent Decree resolves all civil and administrative liability, commencing with the beginning of construction of the Coker Project through completion of the injunctive relief required pursuant to Paragraphs 132 through 134, of Limetree Bay to the United States and Virgin Islands for the following:

a.    EPA's November 22, 2006 NOV, CAA-02-2007-1303, issued to HOVENSA for alleged violations arising under HOVENSA's Coker Operating Permit STX-557A-E-02, and HOVENSA's written notification dated January 9, 2008, to the Virgin Islands of calculated exceedances on January 2, 2008, of Coker Process Heater (H-8501B) of PM and VOC limits in the Coker Operating Permit;

b.    The findings of violation in Paragraphs 49 through 55 of EPA's September 18, 2007 NOV, CAA-02-2007-1313, issued to HOVENSA, and any other violations of the permitting regulations cited in Paragraphs 49 through 55 of the NOV with respect to the Coker Project; and

c.    EPA's March 20, 2007 Compliance Order, CAA-02-2007-1004, as

amended on April 5, 2007 by Compliance Order, CAA-02-2007-1004a, arising from HOVENSA's alleged failure to provide complete responses to EPA's December 21, 2006 Information Request Letter, issued pursuant to § 114 of the Clean Air Act.

208.    <u>Resolution of Liability Regarding Benzene Waste NESHAP Requirements</u>. Entry of the First Modification of the Consent Decree resolves all civil liability of Limetree Bay to the United States and the Virgin Islands for violations of the statutory and regulatory requirements set forth below in Subparagraphs a - c that (i) commenced and ceased prior to the Date of Entry of the First Modification, and/or (ii) commenced prior to the Date of Entry of the First Modification and continued past the Date of Entry of the First Modification (including violations discovered after the Date of Entry of the First Modification for BWON Equipment returned to In Regulated Service on or after the Date of Entry of the First Modification), provided that the events giving rise to such violations are identified by Limetree Bay in its BWON Compliance Review and Verification Report submitted pursuant to Paragraph 79 and corrected by Limetree Bay as required under Paragraph 80.

a.    <u>Benzene Waste NESHAP</u>. The National Emission Standard for Benzene Waste Operations, 40 C.F.R. Part 61, Subpart FF, promulgated pursuant to Section 112(e) of the Act, 42 U.S.C. § 7412(e), including any federal regulation that adopts or incorporates the requirements of Subpart FF by express reference, but only to the extent of such adoption or incorporation;

b.    Any applicable, federally-enforceable permits or territorial regulations that implement, adopt, or incorporate the specific federal regulatory requirements identified in Subparagraph a.

c.    Any applicable territorial regulations enforceable by the Virgin Islands

that implement, adopt, or incorporate the specific federal regulatory requirements identified in Subparagraph a.

209.    <u>Resolution of Liability Regarding LDAR Requirements</u>.  Entry of the First Modification of the Consent Decree resolves all civil liability of Limetree Bay to the United States and the Virgin Islands for violations of the statutory and regulatory requirements set forth below in Subparagraphs a - c that (i) commenced and ceased prior to the Date of Entry of the First Modification, and/or (ii) commenced prior to the Date of Entry of the First Modification and continued past the Date of Entry of the First Modification (including violations discovered after the Date of Entry of the First Modification for LDAR Equipment returned to In Regulated Service on or after the Date of Entry of the First Modification), provided that the events giving rise to such violations are identified by Limetree Bay in its Initial Compliance Audit Report submitted pursuant to Subparagraph 106.a and corrected by Limetree Bay as required under Paragraph 107:

a.    <u>LDAR Requirements</u>.  For all equipment in light liquid and gas and/or vapor service, the LDAR requirements promulgated by EPA pursuant to Sections 111 and 112 of the Clean Air Act and codified at 40 C.F.R. Part 60, Subparts VV, VVa, GGG and GGGa, 40 C.F.R. Part 61, Subparts J and V, and 40 C.F.R. Part 63, Subparts F, H, and CC;

b.    Any applicable, federally-enforceable permits or territorial regulations that implement, adopt, or incorporate the specific regulatory requirements identified in Subparagraph a; and

c.    Any applicable territorial regulations or permits enforceable by the Virgin Islands that implement, adopt, or incorporate the specific regulatory requirements identified in Subparagraph a.

210.    Reservation of Rights Regarding Benzene NESHAP and LDAR Requirements.
Notwithstanding the resolution of liability in Paragraphs 208 and 209, nothing in the Consent
Decree precludes the United States and/or the Virgin Islands from seeking from Limetree Bay
injunctive and/or other equitable relief or civil penalties for violations by Limetree Bay of
Benzene Waste NESHAP and/or LDAR requirements that (i) commenced and ceased prior to the
Date of Entry of the First Modification, and/or (ii) commenced prior to the Date of Entry of the
First Modification and continued after the Date of Entry of the First Modification (including
violations discovered after the Date of Entry of the First Modification for BWON and LDAR
Equipment returned to In Regulated Service on or after the Date of Entry of the First
Modification) if Limetree Bay fails to identify and address such violations as required by
Paragraphs 79, 80, 106.a, and 107.

211.    Audit Policy.  Nothing in the Consent Decree is intended to limit or disqualify
Limetree Bay, on the grounds that information was not discovered and supplied voluntarily, from
seeking to apply EPA's Audit Policy to any violations or noncompliance that Limetree Bay
discovers during the course of any investigation, audit, or enhanced monitoring that Limetree
Bay is required to undertake pursuant to the Consent Decree.

212.    Claim/Issue Preclusion.  In any subsequent administrative or judicial proceeding
initiated by the United States or the Virgin Islands for injunctive relief, penalties, or other
appropriate relief relating to Limetree Bay violations of the PSD/NSR, NSPS, Benzene Waste
NESHAP, and/or LDAR requirements not identified in this Part XVII (Effect of Settlement):

a.    Limetree Bay shall not assert, and may not maintain, in any subsequent
administrative, civil, or criminal action commenced by the United States or the Virgin Islands
any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue

preclusion, or claim-splitting.  Nor may Limetree Bay assert or maintain any other defenses based upon any contention that the claims raised by the United States or the Virgin Islands in the subsequent proceeding should have been brought in the instant case.  Nothing in the preceding sentences is intended to affect the ability of Limetree Bay to assert that the claims are deemed resolved by virtue of this Part XVII (Effect of Settlement).

        b.      Except as set forth in Subparagraph a, the United States and the Virgin Islands may not assert or maintain that the Consent Decree constitutes a waiver or determination of, or otherwise obviates, any claim or defense whatsoever, or that the Consent Decree constitutes acceptance by Limetree Bay of any interpretation or guidance issued by EPA related to the matters addressed in the Consent Decree.

     213.   <u>Imminent and Substantial Endangerment</u>.  Nothing in the Consent Decree shall be construed to limit the authority of the United States and the Virgin Islands to undertake any action against any person, including Limetree Bay, to abate or correct conditions which may present an imminent and substantial endangerment to the public health, welfare, or the environment.

     213A. The resolution of liability in Paragraphs 200, 201, 205, 207, 208, and 209 of the Consent Decree shall not be rendered void by the inability of an Idled Unit or BWON and LDAR Equipment not In Regulated Service to demonstrate compliance with an applicable Consent Decree requirement during the time that the Idled Unit was not operating or the BWON and LDAR Equipment was not In Regulated Service, until the unit or equipment demonstrates compliance as required by Paragraph 229A.b.  In accordance with Paragraph 229A, Idled Units and BWON and LDAR Equipment not In Regulated Service that comply with Subparagraph 229A.b, shall be considered in compliance with the Consent Decree for purposes of Section V.M

(Stipulated Penalties Under This Section) and Part XII (Stipulated Penalties).

**48.    Replace Paragraph 221 with the following new Paragraph 221.**

221.    Post-Lodging, Pre-Entry Obligations.  Obligations of Limetree Bay under this Consent Decree to perform duties after the Date of Lodging of the First Modification but prior to the Date of Entry of the First Modification shall be legally enforceable only on or after the Date of Entry of the First Modification.  Liability for stipulated penalties, if applicable, shall accrue for violations of such obligations, and the United States or the Virgin Islands may demand payment as provided in the Decree, provided that stipulated penalties accruing between the Date of Lodging of the First Modification and the Date of Entry of the First Modification may not be collected unless and until the First Modification of the Consent Decree is entered by the Court.

**49.    Replace Paragraph 225 with the following new Paragraph 225:**

225.    Notice.  Unless otherwise provided herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

As to the United States, by email:

> Eescdcopy.enrd@usdoj.gov
> Re: DJ# 90-5-2-1-08229/1

As to the United States, by mail:

> EES Case Management Unit
> Environment and Natural Resources Division
> U.S. Department of Justice
> P.O. Box 7611
> Washington, DC 20044-7611
> DJ# 90-5-2-1-08229/1

As to EPA Headquarters, by mail:

> Director
> Air Enforcement Division

Office of Civil Enforcement (2242A)
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, DC 20044

Director
Air Enforcement Division
Office of Civil Enforcement
c/o Matrix New World Engineering, Inc.
26 Columbia Turnpike, Suite 200
Florham Park, NJ 07932-2213


And an electronic copy, in .pdf format, to:

foley.patrick@epa.gov

As to EPA Region 2, by mail:

Director
Enforcement and Compliance Assurance Division
U.S. EPA Region 2
290 Broadway, 21st Floor
New York, NY 10007-1866

United States Environmental Protection Agency
Region 2
Office of Regional Counsel
290 Broadway
New York, NY 10007

Director, Caribbean Environmental Protection Division
U.S. EPA Region 2
City View Plaza II, Suite 7000
#48 Rd. 165 km 1.2
Guaynabo, PR 00968-8069

And an electronic copy, in .pdf format, to:

patel.harish@epa.gov

At its option, in lieu of submitting hardcopies to EPA Headquarters and EPA Region 2 by mail, Limetree Bay may submit electronically, in .pdf format, all notifications, submissions, or

communications that are required by this Consent Decree to:

> jmack@matrixneworld.com
> foley.patrick@epa.gov
> patel.harish@epa.gov

<u>As to the United States Virgin Islands and VIDPNR, by mail and hand-delivery:</u>

> Director, Division of Environmental Protection
> Virgin Islands Department of Planning and Natural Resources
> 45 Estate Mars Hill
> Frederiksted, St. Croix, U.S. Virgin Islands 00840-4474

And an electronic copy, in .pdf format, to:

> jp.oriol@dpnr.vi.gov

<u>As to Limetree Bay</u>:

> Limetree Bay Terminals, LLC
> General Counsel
> One Estate Hope
> Christiansted, USVI 00820
> dmolloy@lbenergy.com

> Limetree Bay Refining, LLC
> General Counsel
> One Estate Hope
> Christiansted, USVI 00820
> dmolloy@lbenergy.com

And electronic copy, in .pdf format, to:

> celizee@lbenergy.com
> rbiggs@lbenergy.com
> leannjohnson@perkinscoie.com

As to the ERT:

> Roberto Puga
> PathForward Consulting Inc.
> 32915 Danaoak
> Dana Point, CA 92629
> rpuga@pathforwardconsult.com

Mary Koks
Munsch Hardt Kopf & Harr P.C.
700 Milam Street
Suite 2700
Houston, TX 77002-2806

      a.      Unless otherwise provided herein, notifications, submissions or communications between the Parties shall be deemed submitted on the date they are postmarked and sent by U.S. Mail or overnight mail, postage prepaid, or the date of electronic submissions, as applicable.  Notices under Part XV (Force Majeure) and Part XVI (Retention of Jurisdiction/Dispute Resolution) shall be sent by overnight mail or by certified or registered mail, return receipt requested.

      b.      Notifications to or communications mailed to Limetree shall be deemed to be received on the earlier of (i) actual receipt by Limetree or (ii) receipt of an electronic version sent to the addressees set forth in this Paragraph.

      c.      If the date for submission of a report, study, notification, or other communication falls on a Saturday, Sunday, or federal or territorial holiday, the report, study, notification, or other communication will be deemed timely if it is submitted the next Working Day.

**50.    Add the following sentence to Paragraph 229.**

As of the Date of Entry of the First Modification, the emissions units listed in Appendix N have been permanently Shutdown.

**51.    Add the following new Paragraph 229A "Effect of Idling" to Part XVIII (General Provisions):**

      229A.  Effect of Idling

a.    <u>Stipulated Penalties for Idled Units and BWON and LDAR Equipment Not in Regulated Service.</u>

  i. Idled Units and BWON and LDAR Equipment not In Regulated Service that comply with Subparagraph 229A.b, shall be considered in compliance with the Consent Decree for purposes of Section V.M (Stipulated Penalties Under This Section) and Part XII (Stipulated Penalties).

  ii. Limetree Bay shall not be required to report, pursuant to the Consent Decree, non-compliance with the Consent Decree requirements applicable to an Idled Unit or BWON and LDAR Equipment not In Regulated Service prior to the Restart of the Idled Unit or BWON and LDAR Equipment.

b.    <u>Restart of Idled Units, and BWON and LDAR Equipment not In Regulated Service.</u>

  i. Idled Units and BWON and LDAR Equipment not In Regulated Service shall comply with the applicable Consent Decree requirements upon Restart of an Idled Unit or after BWON and LDAR equipment is placed back In Regulated Service, unless an exception applies as provided in Subparagraph 229A.b.ii.

  ii. <u>Appendix L Restart Compliance Exceptions.</u>

  (1) Idled Units and BWON and LDAR Equipment not In Regulated Service that are subject to an exception in Appendix L ("Exceptions for Compliance on Restart") and that comply with applicable Appendix L requirements shall be considered in compliance with the corresponding Consent Decree requirements for purposes of Section V.M

(Stipulated Penalties for Acid Gas Flaring) and Part XII (Stipulated

Penalties).

(2)     If Limetree Bay fails to meet an interim FCCU emission

limit established in Appendix L, Limetree Bay shall be subject to the

stipulated penalties under Paragraph 151.

(3)     For Idled Units and BWON and LDAR Equipment not In

Regulated Service that are subject to an Appendix L exception for Consent

Decree stack testing, performance testing, or monitoring requirements,

Limetree Bay shall be subject to stipulated penalties for violating the

corresponding applicable Consent Decree requirement from the Day after

the applicable Appendix L deadline.

iii.     If an Idled Unit is required by the Consent Decree to comply with

a 365-Day rolling average, 7-Day rolling average or other emission rate based on

an average of emissions for more than one Operating Day or hour in an Operating

Day, compliance with the emissions limit shall be determined by using emissions

data from Operating Days after Restart.

**52.     Replace Subparagraph 234.e with the following new Subparagraph 234.e:**

e.     Application for and receipt of permits incorporating the emission limits

and standards in Appendix O; and

**53.     Add the following new Paragraph 234A to Part XIX (Termination):**

234A.  Exceptions to Conditions Precedent to Termination:

The conditions precedent to termination in Subparagraphs 234.b and f, to comply with all

provisions contained in the Consent Decree, and operate for at least one (1) year in compliance

with the emission limits established in the Consent Decree, shall not apply to a unit that is an Idled Unit and has not yet demonstrated compliance with specifically identified Consent Decree requirements applicable to the unit in Part V (Affirmative Relief / Environmental Projects) because, except for Flare 7, the unit has not operated since June 1, 2012, or for Flare 7, the unit has not operated after it was isolated and Shutdown as provided in Paragraph 50E.

At such time as Limetree Bay believes it has satisfied the requirements to move for termination under Paragraph 234, Limetree Bay may satisfy the requirements of Subparagraphs 234.b and f by certifying that: (a) the unit is an Idled Unit, (b) for units other than Flare 7, that there have been no emissions from the Idled Unit since June 1, 2012, or for Flare 7, there have been no emissions from Flare 7 after it was isolated and Shutdown as provided in Paragraph 50E, and (c) that all surviving emission limits and standards applicable to the Idled Unit are incorporated into permits as required by Paragraphs 124 - 126 and Appendix O. Neither the United States nor the Virgin Islands shall object to Limetree Bay's certification on the grounds that Limetree Bay failed to complete Consent Decree requirements applicable to an Idled Unit if Limetree Bay was not able to do so because, for units other than Flare 7, the unit has not operated since June 1, 2012, or for Flare 7, the unit has not operated after it was isolated and Shutdown as provided in Paragraph 50E.

**54.    Replace Paragraph 235 with the following New Paragraph 235:**

235.    <u>Termination: Procedure</u>. At such time as Limetree Bay believes that it has satisfied the requirements for termination set forth in Paragraph 234, Limetree Bay will certify such compliance and completion to the United States and the Virgin Islands in accordance with the certification language of Paragraph 231. Unless either the United States or the Virgin Islands objects in writing with specific reasons within 120 days of receipt of Limetree Bay's certification

under this Paragraph, the Court may upon motion by Limetree Bay order that this Consent Decree be terminated. At the time the Court orders the Consent Decree to be terminated, any remaining monies in the TSEP Escrow Account shall be disbursed to the VIDPNR in accordance with Subparagraph 137.e. If either the United States or the Virgin Islands objects to the certification submitted by Limetree Bay, then the matter will be submitted to the Court for resolution under Part XVI (Retention of Jurisdiction/Dispute Resolution). In such case, Limetree Bay will bear the burden of proving that this Consent Decree should be terminated.

HOVENSA's certification of completion in Appendix Q may be used by Limetree Bay to satisfy the requirements for certification in Paragraphs 230 and 231, subject to Paragraphs 232 (EPA review) and 233 (stipulated penalties), for purposes of satisfying the requirements for termination of the Consent Decree.

**55.    Replace the following appendices with the following new appendices, which are attached:**

Appendix C    NSPS Subparts J or Ja Compliance Schedule for Listed Fuel Gas Combustion Devices (Other than Flaring Devices)

Appendix D    List of Flaring Devices Subject to NSPS Subpart Ja

Appendix E    Limetree Bay's LDAR and BWON Training Program Summary

Appendix F    Method 21 Monitoring Locations for API Separators 1, 2, and 3

Appendix G    [Reserved]

Appendix H    Additional Coker Project Injunctive Relief

**56.    Add the following new appendices, which are attached:**

Appendix J    In Service Units and the BWON and LDAR Equipment In Regulated Service

Appendix K    List of Idled Units

Appendix L    Exceptions for Compliance on Restart

Appendix M    Process and Factors for "Commercial Unavailability" of Low-E Valve or Packing

Appendix N    Emissions Units Permanently Shutdown as of June 1, 2019

Appendix O    Requirements That Shall Survive Termination of the Consent Decree

Appendix P    Flaring Mitigation Projects

Appendix Q    HOVENSA Certification

Appendix R    Map of Refinery

Appendix S    Map of $H_2S$ Monitoring Locations

**57.**    The Table of Appendices will be revised consistent with Paragraphs 55 and 56 of the First Modification.

**58.**    Except as specifically provided in the First Modification, all other terms and conditions of the Consent Decree remain unchanged and in full effect.

**59.**    No party to the First Modification (the United States, the Virgin Islands, HOVENSA, Limetree Bay, and the ERT) will oppose entry of the First Modification by this Court or challenge any provision of the First Modification unless the United States has notified each of those parties, in writing, that the United States no longer supports entry of the First Modification.

SO ORDERED, THIS _____ DAY OF _____, 2020.

12/30/21

VIRGIN ISLANDS DISTRICT JUDGE

THE UNDERSIGNED PARTY enters into the First Modification of the Consent Decree

in the matter of United States, et al. v. HOVENSA L.L.C.

FOR PLAINTIFF THE UNITED STATES
OF AMERICA:

JEFFREY BOSSERT CLARK
Assistant Attorney General
Environment and Natural Resources
Division
United States Department of Justice

Date: 8/21/2020

MYLES E. FLINT, II
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources
Division
United States Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
(202) 307-1859

GRETCHEN C.F. SHAPPERT
United States Attorney
District of the Virgin Islands
Federal Building and U.S. Courthouse
5500 Veterans Drive, Room 260
St. Thomas, USVI 00802

96

THE UNDERSIGNED PARTY enters into the First Modification of the Consent Decree in the matter of United States, et al. v. HOVENSA L.L.C.

FOR THE UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY:

Date: 7/27/20

SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency

ROSEMARIE A. KELLEY
Director
Office of Civile Enforcement
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency

EVAN BELSER
Acting Director
Air Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency

97

THE UNDERSIGNED PARTY enters into the First Modification of the Consent Decree

in the matter of United States, et al. v. HOVENSA L.L.C.

FOR PLAINTIFF THE UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY
REGION 2:

**ERIC SCHAAF** Digitally signed by ERIC SCHAAF
Date: 2020.07.15 17:31:49 -04'00'

Date: _____

ERIC SCHAAF
Regional Counsel
United States Environmental Protection
Agency
Region 2
290 Broadway
New York, NY 10007-1866

OF COUNSEL:

FLAIRE MILLS
Associate Regional Counsel
United States Environmental Protection Agency
Region 2
290 Broadway
New York, NY 10007-1866

98

THE UNDERSIGNED PARTY enters into the First Modification of the Consent Decree

in the matter of United States, et al v. HOVENSA L.L.C.

FOR PLAINTIFF THE UNITED STATES
VIRGIN ISLANDS:

Date: July 21, 2020

PAMELA R. TEPPER
Solicitor General
U.S. Virgin Islands Department of Justice
34-38 Kronprindsens Gade
GERS Complex, 2nd Floor
St. Thomas, VI 00802

JEAN-PIERRE L. ORIOL
Commissioner
Government of the United States Virgin
Islands
Department of Planning & Natural
Resources
45 Estate Mars Hill
Frederiksted, VI 00840

99

Case: 1:11-cv-00006-WAL-GWC     Document #: 221     Filed: 06/29/20     Page: 100 of 158

THE UNDERSIGNED PARTY enters into the First Modification of the Consent Decree

in the matter of United States, et al v. HOVENSA L.L.C.


FOR DEFENDANT HOVENSA L.L.C.:

Date: ___7/13/2020___

MATTHEW R. KAHN
c/o Alvarez & Marsal North America, LLC
Attn: Tom Hill
540 W. Madison St, 18th Floor
Chicago, IL 60661

THE UNDERSIGNED PARTY enters into the First Modification of the Consent Decree

in the matter of United States, et al v. HOVENSA L.L.C.

FOR LIMETREE BAY TERMINALS,
LLC:

Date: _6/18/20_____

BRIAN K. LEVER
President and Chief Executive Officer
Limetree Bay Terminals, LLC
One Estate Hope
Christiansted, USVI 00820

THE UNDERSIGNED PARTY enters into the First Modification of the Consent Decree

in the matter of United States, et al v. HOVENSA L.L.C.

FOR LIMETREE BAY REFINING, LLC:

Date: _6/18/20_____

BRIAN K. LEVER
President
Limetree Bay Refining, LLC
One Estate Hope
Christiansted, USVI 00820

102

THE UNDERSIGNED PARTY enters into the First Modification of the Consent Decree

in the matter of United States, et al v. HOVENSA L.L.C.

FOR THE ENVIRONMENTAL
RESPONSE TRUST:

Date: 7/9/20

ROBERTO PUGA,
Agent for PathForward Consulting Inc. not in
its individual capacity, but solely as the
Trustee of the Hovensa Environmental
Response Trust
One World Trade Center, 8th Floor
Long Beach, CA 90831

103

**APPENDIX C**
**NSPS SUBPARTS J OR JA COMPLIANCE SCHEDULE FOR LISTED FUEL GAS**
**COMBUSTION DEVICES (OTHER THAN FLARING DEVICES)**

| FUEL GAS COMBUSTION DEVICES FOR WHICH COMPLIANCE RESPONSIBILITY IS ASSIGNED TO THE ERT | | |
|---|---|---|
| Unit | | Date of Compliance With Subpart J Fuel Gas Limit |
| VER-1* | VER-1 | Date of Lodging |
| VER-2* | VER-2 | Date of Lodging |
| * Compliance based upon AMP submittal for EPA approval | | |

| FUEL GAS COMBUSTION DEVICES FOR WHICH COMPLIANCE RESPONSIBILITY IS ASSIGNED TO LIMETREE BAY | | |
|---|---|---|
| Unit | | Date of Compliance With Subpart J Fuel Gas Limit |
| 2 Vis. | H-2185 | Date of Lodging |
| Coker | H-8501A | Date of Lodging |
| Coker | H-8501B | Date of Lodging |
| LSG Heater | H-4901 | Date of Lodging |
| Sulf Acid* | STK-7801 | Date of Lodging |
| GT-13 / HRSG | G-3413 / H-3413 | Date of Lodging |

C-1

| FUEL GAS COMBUSTION DEVICES FOR WHICH COMPLIANCE RESPONSIBILITY IS ASSIGNED TO LIMETREE BAY | | |
|---|---|---|
| Unit | | Date of Compliance With Subpart Ja Fuel Gas Limit |
| 1 Vis. | H-101 | 12/31/2015 |
| 1 Vis. | H-104 | 12/31/2015 |
| Utl. Fract. | H-160 | 12/31/2015 |
| Penex | H-200 | 12/31/2015 |
| Penex | H-201 | 12/31/2015 |
| Penex | H-202 | 12/31/2015 |
| Penex | C-200A | 12/31/2015 |
| Penex | C-200B | 12/31/2015 |
| Penex | C-200C | 12/31/2015 |
| 2 CDU | H-401A | 12/31/2015 |
| 2 CDU | H-401B | 12/31/2015 |
| 2 CDU | H-401C | 12/31/2015 |
| 2 Plat. | H-600 | 12/31/2015 |
| 2 Plat. | H-601 | 12/31/2015 |
| 2 Plat. | H-602 | 12/31/2015 |
| 2 Plat. | H-603 | 12/31/2015 |
| 2 Plat. | H-604 | 12/31/2015 |
| 2 Plat. | H-605 | 12/31/2015 |
| 2 Plat. | H-606 | 12/31/2015 |
| 2 DD | H-800A | 12/31/2015 |
| 2 DD | H-800B | 12/31/2015 |
| 2 DD | H-801 | 12/31/2015 |
| 3 CDU | H-1401A | 12/31/2015 |
| 1 Vac. | H-1401B | 12/31/2015 |
| 3 DD | H-1500 | 12/31/2015 |
| 3 DD | H-1501 | 12/31/2015 |
| 3 DD | C-1500A | 12/31/2015 |
| 3 DD | C-1500B | 12/31/2015 |
| 3 DD | C-1500C | 12/31/2015 |
| 2 Vac. | H-2101 | 12/31/2015 |
| 2 Vac. | H-2102 | 12/31/2015 |
| 4 DD | H-2201A | 12/31/2015 |
| 4 DD | H-2201B | 12/31/2015 |
| 4 DD | H-2202 | 12/31/2015 |

C-2

| FUEL GAS COMBUSTION DEVICES FOR WHICH COMPLIANCE RESPONSIBILITY IS ASSIGNED TO LIMETREE BAY | | |
|---|---|---|
| Unit | | Date of Compliance With Subpart Ja Fuel Gas Limit |
| 5 DD | H-2400 | 12/31/2015 |
| 5 DD | H-2401 | 12/31/2015 |
| 5 DD | C-2400A | 12/31/2015 |
| 5 DD | C-2400B | 12/31/2015 |
| Naph Frac | H-2501 | 12/31/2015 |
| 1 SRU | H-1032 | 12/31/2015 |
| 2 SRU | H-1042 | 12/31/2015 |
| 1 Beavon | H-1061 | 12/31/2015 |
| #1 F. Boiler | B-1151 | 12/31/2015 |
| #3 F. Boiler | B-1153 | 12/31/2015 |
| #4 F. Boiler | B-1154 | 12/31/2015 |
| #5 F. Boiler | B-1155 | 12/31/2015 |
| GT-1* | G-1101E | 12/31/2015 |
| GT-2* | G-1101F | 12/31/2015 |
| GT-3* | G-1101G | 12/31/2015 |

C-3

| FUEL GAS COMBUSTION DEVICES FOR WHICH COMPLIANCE RESPONSIBILITY IS ASSIGNED TO LIMETREE BAY | | |
|---|---|---|
| Unit | | Date of Compliance With Subpart J Fuel Gas Limit |
| 5 CDU | H-3101A | 12/31/15 |
| 5 CDU | H-3101B | 12/31/15 |
| 6 CDU | H-4101A | 12/31/15 |
| 6 CDU | H-4101B | 12/31/15 |
| 3 Vac. | H-4201 | 12/31/15 |
| 3 Vac. | H-4202 | 12/31/15 |
| 7 DD | H-4301A | 12/31/15 |
| 7 DD | H-4301B | 12/31/15 |
| 7 DD | H-4302 | 12/31/15 |
| 3 Plat. | H-4401 | 12/31/15 |
| 3 Plat. | H-4402 | 12/31/15 |
| 3 Plat. | H-4451 | 12/31/15 |
| 3 Plat. | H-4452 | 12/31/15 |
| 3 Plat. | H-4453 | 12/31/15 |
| 3 Plat. | H-4454 | 12/31/15 |
| 3 Plat. | H-4455 | 12/31/15 |
| 2 Sulf. | H-4502 | 12/31/15 |
| 2 Sulf. | H-4503 | 12/31/15 |
| 2 Sulf. | H-4504 | 12/31/15 |
| 2 Sulf. | H-4505 | 12/31/15 |
| 6 DD | H-4601A | 12/31/15 |
| 6 DD | H-4601B | 12/31/15 |
| 6 DD | H-4602 | 12/31/15 |
| 6 DD | C-4601A | 12/31/15 |
| 6 DD | C-4601B | 12/31/15 |
| 6 DD | C-4601C | 12/31/15 |
| 9 DD | H-5301A | 12/31/15 |
| 9 DD | H-5301B | 12/31/15 |
| 9 DD | H-5302 | 12/31/15 |
| 4 Plat. | H-5401 | 12/31/15 |
| 4 Plat. | H-5402 | 12/31/15 |
| 4 Plat. | H-5451 | 12/31/15 |
| 4 Plat. | H-5452 | 12/31/15 |
| 4 Plat. | H-5453 | 12/31/15 |

C-4

| FUEL GAS COMBUSTION DEVICES FOR WHICH COMPLIANCE RESPONSIBILITY IS ASSIGNED TO LIMETREE BAY | | |
|---|---|---|
| Unit | | Date of Compliance With Subpart J Fuel Gas Limit |
| 4 Plat. | H-5454 | 12/31/15 |
| 4 Plat. | H-5455 | 12/31/15 |
| 3 & 4 SRU | H-4745 | 12/31/15 |
| 2 Beavon | H-4761 | 12/31/15 |
| #6 F. Boiler | B-3301 | 12/31/15 |
| #7 F. Boiler | B-3302 | 12/31/15 |
| #8 F. Boiler | B-3303 | 12/31/15 |
| #9 F. Boiler | B-3304 | 12/31/15 |
| #10 F. Boiler | B-3701 | 12/31/15 |
| GT-4 | G-3404 | 12/31/15 |
| GT-5 | G-3405 | 12/31/15 |
| GT-6 | G-3406 | 12/31/15 |
| GT-7 | G-3407 | 12/31/15 |
| GT-8* | G-3408 | 12/31/15 |
| GT-9* | G-3409 | 12/31/15 |
| GT-10* | G-3410 | 12/31/15 |
| * Compliance based upon AMP submittal for EPA approval | | |

C-5

**APPENDIX D**
**LIST OF FLARING DEVICES SUBJECT TO NSPS SUBPART Ja**

| Flaring Device | Date |
|---|---|
| FCCU Low Pressure Flare and Flare 3 | Restart |
| FCCU High Pressure Flare | Five (5) years from Date of Entry of the Consent Decree (June 7, 2016) |
| LPG Flare | Five (5) years from Date of Entry of the Consent Decree (June 7, 2016) |
| Flares 2 | Seven (7) years from Date of Entry of the Consent Decree (June 7, 2018) |
| Flares 5, 6 and 7 | Ten (10) years from Date of Entry of the Consent Decree (June 7, 2021) |

Flares 1 and 4 are no longer in service and are not subject to this Consent Decree.

**APPENDIX E**
**Limetree Bay's LDAR and BWON Training Program Summary**

The Limetree Bay training program will utilize a combination of training methods to educate refinery personnel on their roles and responsibilities within the LDAR and BWON programs. The extent of education on the programs (two hours, four hours, eight hours, etc.) will be based on the employee's job assignment within their respective department and the individual's management level.

All Environmental LDAR personnel will be trained on an annual basis on the requirements of their jobs through classroom based, computer-based, field-based, or other training methods. The training will consist of specific material and processes required for the knowledge of the program including certification testing. Listed below are some of the key elements and subjects of the training module that link to roles and responsibilities.

- knowledge of the refinery structure and systems
- refinery basics:  process unit functions individually and how they work in partnership
- how to read and understand P&IDs and ISOS
- the applicable regulations
- the proper operation of monitoring equipment
- applicable LDAR procedures
- the systems in place to manage our data and compliance; electronic database such as LeakDAS and like systems
- the checks and balances required to maintain quality control and compliance
- the leadership skills required to manage and maintain a successful program

All other Operations, Maintenance and Contractor personnel will be trained on the requirements of their jobs through classroom based, computer-based, field-based, or other training methods. The training consists of material and processes required for their specific role and responsibility needed to ensure knowledge of the program including certification testing. Listed below are some of the key elements and subjects of the training module.

- knowledge of Environmental Department structure and contact information
- general knowledge of the environmental regulations (LDAR & BWON) and related procedures
- knowledge of regulatory inspection, documentation and repair requirements
- knowledge of fugitive emissions procedures
- knowledge of the Valve Preventative Maintenance Program
- knowledge of how to utilize the refinery system, such as SAP, to create work notifications and approvals and electronic inspections

The requirements of this training will be incorporated into Limetree Bay's job specific training. All training will be reviewed and updated on a reoccurring basis (at least once every three (3) years).  The certification testing will be utilized to assess the effectiveness of the training products.

E-1

**APPENDIX F**
**Method 21 Monitoring Locations for API Separators 1, 2 and 3**

| API #1, 2, & 3 | |
| --- | --- |
| **Emission Points** | **Total** |
| Access Hatch | 48 |
| Gauge Hatch | 45 |
| Fixed roof plates | 150 |
| Piping Penetration | 52 |
| Steel plate | 31 |
| Pump base | 22 |
| Hose connection | 2 |
| Conduit port | 10 |
| Valve stem port | 16 |
| **Total** | **376** |

EPA-369

**APPENDIX G**
**[RESERVED]**

G-1

**APPENDIX H**
**Additional Coker Project Injunctive Relief**

| Emissions Unit | Pollutant | Limit | Units | Averaging Time | Monitoring[a] | Reporting | Compliance Schedule |
|---|---|---|---|---|---|---|---|
| **Coker Heater (two units)** | CO | 0.030 | lb/mmBTU | Average of 3 1-hr samples | Annual Performance Test (EPA RM-10) | Within 60 Days of test | Date of Entry |
| | VOC | 0.0050 | lb/mmBTU | N/A | EPA RM-25 or RM-25A following any CO test exceedance | Within 60 Days of test | Date of Entry |
| **Boiler 10** | CO | 0.070 | lb/mmBTU | Average of 3 1-hr samples | Annual Performance Test (EPA RM-10) | Within 60 Days of test | Date of Entry |
| | VOC | 0.0050 | lb/mmBTU | N/A | EPA RM-25 or RM-25A following any CO test exceedance | Within 60 Days of test | Date of Entry |
| **SRUs 1&2/ Beavon 1** | RSC (Final) | 162 | ppmvd | Hourly rolling 12-hr average | NSPS RSC CEMS (40 C.F.R. 60 App A, B, & F) | NSPS quarterly reports | 1/1/2014 |
| | | 66 | ppmvd | Daily rolling 30-day average | NSPS RSC CEMS (40 C.F.R. 60 App A, B, & F) | NSPS quarterly reports | 1/1/2014 |
| **Tanks** No. 6 Sour Water Stripper Tank (TK-1071), Desalter Effluent Water (DEW) Tank (TK-1663) | VOC | Ext. Floating Roof Tank | | N/A | Subpart Kb monitoring (40 C.F.R. §60.113b(b)) for Ext. Floating Roof Kb requirements:  Seal gap measurements (Secondary once/yr, Primary once/5 yrs).  Inspect seals and fittings each time the vessel is emptied and degassed. | NSPS reports | Tank 1071: 12/31/2011  Tank 1663: Date of Entry |
| Coker Charge Tank (TK-8501) | VOC | Fixed Roof Tank | | N/A | Subpart Kb monitoring (40 C.F.R. §60.110b-117b) Record and maintain records documenting the material stored in the hot pitch storage tank (TK-8501), showing that the tank remains exempt from the requirements in 40 C.F.R. Part 60 Subpart Kb, §60.110b(b). | NSPS reports | Date of Entry |

**APPENDIX H**
**Additional Coker Project Injunctive Relief**

| Emissions Unit | Pollutant | Limit | Units | Averaging Time | Monitoring[a] | Reporting | Compliance Schedule |
|---|---|---|---|---|---|---|---|
| **Process equipment located in** Coker Unit, Coker Gas Plant, No. 7 Amine, No. 5 Crude, No. 3 Vacuum, No. 3 Crude, No. 1 Vacuum, No. 1 Visbreaker, and No. 2, 4, 6, & 7 Distillate Desulfurizer Units and outside battery limit modifications to the terminal, tank farm & blending equipment | VOC | 40 C.F.R. Part 60 Subpart GGGa | | | Comply with 40 C.F.R. Part 60 Subpart GGGa | | Date of Entry |

[a] For purposes of demonstrating compliance with limits which require an annual performance test, the first performance test shall be conducted no later than twelve (12) months after the Date of Entry of the First Modification or twelve (12) months from Restart for Idled Units, whichever is earlier.

H-2

**APPENDIX H**
**Additional Coker Project Injunctive Relief**

| Emissions Unit | Pollutant | Design/Work Practice Controls | Monitoring | Compliance Schedule |
|---|---|---|---|---|
| **Coke Handling, Storage and Loading Facility** | | | | |
| Coke Cutting/Coke Pit | **PM (all species)** | High Pressure water cutting of coke & enclosed drop zones/coke pit (No roof) | Maintain records documenting design | Date of Entry |
| Coke Crusher | **PM (all species)** | Enclosed[b] crusher structure. Moisture content control from initial cutting. | Maintain records documenting design | Date of Entry |
| Coke Transfer to Storage | **PM (all species)** | Enclosed[b] conveyor to storage, Moisture content control from initial cutting. | Maintain records documenting design | Date of Entry |
| Coke Storage | **PM (all species)** | Enclosed[b] storage buildings, baghouse for vent control, and moisture content control from initial cutting. | Maintain records documenting design | Date of Entry |
| Coke Loading | **PM (all species)** | Enclosed[b] conveyor to loading dock. "Spout" containment loading to minimize drop emissions when loading ship. | Maintain records documenting design | Date of Entry |

[b] Enclosed structures can have ventilation vents or access ways.

H-3

# APPENDIX J

## IN SERVICE UNITS AND LDAR AND BWON EQUIPMENT IN REGULATED SERVICE

List, as of June 1, 2019, of all emissions units that are In Service Units:

| Unit | Source Code | Location |
|------|-------------|----------|
| GT-4 | G-3404 | East |
| GT-7 | G-3407 | East |
| GT-8 | G-3408 | East |
| Flare No. 7 | H-3301 | East |

List, as of June 1, 2019, of LDAR and BWON Equipment to which the LDAR and BWON provisions of the Consent Decree continue to apply (i.e. are In Regulated Service):

Location of LDAR Equipment In Regulated Service

1.  Offsite area piping between and into active tanks

2.  Piping between docks 1 through 10 and tanks

3.  Piping from tanks to truck loading rack

4.  Propane and Butane storage area

5.  Piping between Propane and Butane storage area and East Power House area

6.  East Power House area

7.  Piping from East Power House to the No. 7 Flare

Location of BWON Equipment In Regulated Service

1.  #1 and #3 APIs and #3 WEMCO

2.  Portions of Advanced Wastewater Treatment Plant

3.  Wastewater collection equipment and oily water sewer system identified as: all oily water sewer cups, process area drains, junction boxes, and wastewater piping servicing tanks, manifolds, and process units that are not Idled Units or not in emissions units permanently Shutdown listed on Appendix N

4.  Ballast and slop tanks

EPA-374

# APPENDIX K
## LIST OF IDLED UNITS

List, as of June 1, 2019, of all emissions units that are Idled Units:

### IDLED WEST SIDE EMISSIONS UNITS

| Emissions Unit | Emissions Unit Type | Process Unit Location |
|---|---|---|
| H-101 | Heater | 1 Vis. |
| H-104 | Heater | 1 Vis. |
| H-160 | Heater | Utl. Fract. |
| H-200 | Heater | Penex (Par Isom) |
| H-201 | Heater | Penex |
| H-202 | Heater | Penex |
| C-200A | Compressor Engine | Penex |
| C-200B | Compressor Engine | Penex |
| C-200C | Compressor Engine | Penex |
| H-601 | Heater | #2 Plat |
| H-604 | Heater | #2 Plat |
| H-605 | Heater | #2 Plat |
| H-800A | Heater | 2 DD |
| H-800B | Heater | 2 DD |
| H-801 | Heater | 2 DD |
| C-1500A | Compressor Engine | 3 DD |
| C-1500B | Compressor Engine | 3 DD |
| C-1500C | Compressor Engine | 3 DD |
| H-2201A | Heater | 4 DD |
| H-2201B | Heater | 4 DD |
| H-2202 | Heater | 4 DD |
| H-2400 | Heater | 5 DD |
| C-2400A | Compressor Engine | 5 DD |
| C-2400B | Compressor Engine | 5 DD |
| H-1061 | Heater | 1 Beavon |
| B-1155 | Boiler | #5 F. Boiler |
| H-1105 | Flare | Flare 2 |
| H-1104 | Flare | Flare 3 |
| H-1032 | Incinerator | SRU 1 |
| H-1042 | Incinerator | SRU 2 |
|  | West Sulfur Pit | SRU 1 & 2 |

EPA-375

**IDLED EAST SIDE EMISSIONS UNITS**

| Emissions Unit | Emissions Unit Type | Process Unit Location |
|---|---|---|
| H-3101A | Heater | 5 CDU |
| H-3101B | Heater | 5 CDU |
| H-4101A | Heater | 6 CDU |
| H-4101B | Heater | 6 CDU |
| H-4201 | Heater | 3 Vac. |
| H-4202 | Heater | 3 Vac. |
| H-4301A | Heater | 7 DD |
| H-4301B | Heater | 7 DD |
| H-4302 | Heater | 7 DD |
| H-4401 | Heater | 3 Plat. |
| H-4402 | Heater | 3 Plat. |
| H-4451 | Heater | 3 Plat. |
| H-4452 | Heater | 3 Plat. |
| H-4453 | Heater | 3 Plat. |
| H-4454 | Heater | 3 Plat. |
| H-4455 | Heater | 3 Plat. |
| H-4502 | Heater | 2 Sulf. |
| H-4503 | Heater | 2 Sulf. |
| H-4504 | Heater | 2 Sulf. |
| H-4505 | Heater | 2 Sulf. |
| H-4601A | Heater | 6 DD |
| H-4601B | Heater | 6 DD |
| H-4602 | Heater | 6 DD |
| C-4601A | Compressor Engine | 6 DD |
| C-4601B | Compressor Engine | 6 DD |
| C-4601C | Compressor Engine | 6 DD |
| H-4901 | Heater | LSG |
| H-5301A | Heater | 9 DD |
| H-5301B | Heater | 9 DD |
| H-5302 | Heater | 9 DD |
| H-5401 | Heater | 4 Plat. |
| H-5402 | Heater | 4 Plat. |
| H-5451 | Heater | 4 Plat. |
| H-5452 | Heater | 4 Plat. |
| H-5453 | Heater | 4 Plat. |

| | | |
|---|---|---|
| H-5454 | Heater | 4 Plat. |
| H-5455 | Heater | 4 Plat. |
| H-8501A | Heater | Coker |
| H-8501B | Heater | Coker |
| | Coke Handling, Storage and Loading Facility | Coker |
| STK-7801 | Common Stack for Heaters H-7801, H-7802 and R-7801 | Sulfuric Acid Plant |
| B-3302 | Boiler | #7 F. Boiler |
| B-3303 | Boiler | #8 F. Boiler |
| B-3304 | Boiler | #9 F. Boiler |
| B-3701 | Boiler | #10 F. Boiler |
| G-3409 | Generating Turbine | GT-9 |
| G-3410 | Generating Turbine | GT-10 |
| G-3413 | Generating Turbine | GT-13 |
| H-3413 | Fired Heat Recovery Steam Generator | GT-13 |
| H-3351 | Flare | Flare 5 |
| H-3352 | Flare | Flare 6 |
| STK-7921 | Flare | LPG Flare |
| STK -7941 | Flare | FCC LP Flare |
| STK -7942 | Flare | Ground Flare |
| H-4745 | Incinerator | SRUs 3 and 4 |
| | Sulfur Pits | SRUs 3 and 4 |
| STK-7051 | Catalyst Regenerator | FCC |

EPA-377

## APPENDIX L
## EXCEPTIONS FOR COMPLIANCE ON RESTART

| Unit | CD Paragraph | CD Requirement | Restart Compliance Exception |
|------|--------------|----------------|------------------------------|
| FCCU | 11 | $NO_x$ 365-Day rolling average limit | During the first 30 Days after the Restart of the FCCU, the unit shall comply with an interim limit of 80 ppmvd on a 7-Day rolling average basis instead of the 20 ppmvd limit established by Paragraph 11. |
|  | 12<br>14<br>21 | RAA or RATA for:<br>$NO_x$ CEMS<br>$SO_x$ CEMS<br>CO CEMS | Required CEMS RAA or RATA shall be conducted within 60 Days after achieving the maximum production rate at which the FCCU will be operated, or not later than 180 Days after initial Restart, whichever comes first. |
|  | 16 | PM stack test | Required PM stack test shall be conducted within 60 Days after achieving the maximum production rate at which the FCCU will be operated, or not later than 180 Days after initial Restart, whichever comes first. |
|  | 18 | CO limit | During the first 7 Days after the Restart of the FCCU, the unit shall comply with an interim limit of 1,000 ppmvd on a 7-Day rolling average basis instead of the 500 ppmvd limit established by Paragraph 18. |
| Units listed on Appendix C | 34<br>35 | NSPS monitoring, but only as to Part 60, Appendix F, Section 5 "Data Accuracy Assessment" requirements, and Part 60, Appendix B | Demonstration of compliance shall be achieved within 60 Days after achieving the maximum production rate at which the affected facilities will be operated, or not later than 180 Days after initial Restart, whichever comes first. |

| Unit | CD Paragraph | CD Requirement | Restart Compliance Exception |
|------|-------------|----------------|------------------------------|
| East Side Sulfur Recovery Plant | 45a | NSPS monitoring, but only as to Part 60, Appendix F, Section 5 "Data Accuracy Assessment" requirements, and Part 60, Appendix B | Demonstration of compliance shall be achieved within 60 Days after achieving the maximum production rate at which the affected facilities will be operated, or not later than 180 Days after initial Restart, whichever comes first. |
| LPG and FCCU High Pressure Flares | 49 | NSPS Ja monitoring, if required | Demonstration of compliance shall be achieved not later than 90 Days after Flaring Device Restart and compliance certifications, required by Paragraph 52, shall be submitted within 30 Days thereafter. |
| LPG Flare FCCU High Pressure Flare FCCU Low Pressure Flare Flares 2, 3, 5, 6, and 7 | 49, 52 | NSPS Ja monitoring for flares | Demonstration of compliance shall be achieved not later than 90 Days after Flaring Device Restart and compliance certifications, required by Paragraph 52, shall be submitted within 30 Days thereafter. |
| Coker Heaters, Boiler 10 | 133 | Appendix H, Performance test (CO and VOC) | Demonstration of compliance shall be achieved within 60 Days after achieving the maximum production rate at which the affected facilities will be operated, or not later than 180 Days after initial Restart, whichever comes first. |
| Boilers 5, 8, 9 | 135 | NSPS D, Performance test and CEMS, as applicable | Demonstration of compliance shall be achieved within 60 Days after achieving the maximum production rate at which the affected facilities will be operated, or not later than 180 Days after initial Restart, whichever comes first. |

| Unit | CD Paragraph | CD Requirement | Restart Compliance Exception |
|---|---|---|---|
| Generating Turbine 9 | 136 | NSPS GG, CEMS and Performance test | Demonstration of compliance shall be achieved within 60 Days after achieving the maximum production rate at which the affected facilities will be operated, or not later than 180 Days after initial Restart, whichever comes first. |
| BWON or LDAR Equipment placed back In Regulated Service | BWON, Section V.J. LDAR, Section V.K. | Monitoring Requirements | Required monitoring shall be conducted no later than 60 Days after the BWON or LDAR Equipment is placed back In Regulated Service. |

L-3

# APPENDIX M
## PROCESS AND FACTORS FOR "COMMERCIAL UNAVAILABILITY" OF LOW-E VALVE OR PACKING

Summary: This Appendix outlines a process to be followed and factors to be taken into consideration to establish that a Low-E Valve or Low-E Packing is not "commercially available" pursuant to Subparagraph 112.c of the Consent Decree. Factors other than those identified in Paragraph 1 of this Appendix may also be utilized to establish that a Low-E Valve or Low-E Packing is not commercially available and procedures other than those identified in Paragraphs 2–3 may be used if mutually agreed upon by the Parties in writing.

1.    Factors. The following factors shall be taken in to account for determining the availability of safe and suitable Low-E Valve or Low-E Packing Technologies:

> (1)  Valve type;
> (2)  Valve service and operating conditions;
> (3)  Type of refinery process equipment in which the valve is used;
> (4)  Seal performance;
> (5)  Service life;
> (6)  Packing friction;
> (7)  Temperature and pressure limitations; and
> (8)  Retrofit applications (*e.g.,* re-piping or space limitations).

The following factors may also be relevant for consideration, depending on the process unit or equipment in use at the Refinery:

> (9)  Valve or valve packing specifications identified by the licensor of the process unit or equipment in use at the Refinery (including components that are part of a design package by a specialty-equipment provider as part of a larger process unit); or

> (10)  Valve or valve packing vendor or manufacturer recommendations for the relevant Refinery unit and/or process unit components.

2.    Process. The following procedure shall be followed for determining the availability of a Low-E Valve or Low-E Packing:

> a.    Limetree Bay must contact a reasonable number of vendors of valves and valve packing technologies, taking into account the relevant factors identified above, prior to asserting a claim that Low-E Valve or Low-E Packing is not commercially available.

> (i)    For purposes of this Consent Decree, a reasonable number of vendors shall mean at least three vendors of valves or three vendors of valve packing technologies.

(ii)     If fewer than three vendors of valve or valve packing technologies are contacted, the determination of whether such fewer number is reasonable for purposes of this Consent Decree shall be based on Factors (9) and/or (10) above, or on a demonstration that fewer than three vendors offer valves or valve packing technologies for the service and operating conditions of the valve to be replaced, in consideration of Factors (1) through (8) above, as applicable.

b.     Limetree Bay shall obtain a written representation from each vendor contacted or equivalent documentation that the valve or valve packing does not meet the specifications for a Low-E Valve or Low-E Packing.

c.     Limetree Bay shall prepare a written report fully explaining the basis for each claim that a valve or valve packing is not commercially available, to include all relevant documentation and other information supporting the claim. Such report shall also identify the commercially-available valve or packing technology that comes closest to meeting the requirements for a Low-E Valve or Low-E Packing that is selected and installed by Limetree Bay pursuant to Subparagraph 112.c of the Consent Decree. Such report shall be included in the Semi-Annual Report required by Part X of the Consent Decree, for the period in which the valve or valve packing is replaced.

3.     <u>EPA Review of Claim of Commercial Unavailability</u>. Upon discretionary review by EPA of any claim of commercial unavailability, if EPA disagrees that a valve or valve-packing technology is commercially unavailable, EPA shall notify Limetree Bay in writing, specifying the valve or valve packing EPA believes to be commercially available and the basis for its availability for the service and operating conditions of the valve. Following receipt by Limetree Bay of EPA's notice, the following shall apply:

a.     Limetree Bay is not required to retrofit the valve or valve packing for which the unavailability claim was asserted (unless otherwise required to do so pursuant to some other provision of this Consent Decree).

b.     EPA's notification shall serve as notice to Limetree Bay of EPA's intent that a future claim of commercial unavailability will not be accepted for (a) the valve or valve packing that was the subject of the unavailability claim, or (b) for a valve or valve packing in the same or similar service, taking into account the factors identified in this Appendix. If Limetree Bay disagrees with EPA's notification, Limetree Bay and EPA may informally discuss the basis for the claim of commercial unavailability. EPA may thereafter revise its notification, if necessary.

c.     If Limetree Bay makes a subsequent commercial unavailability claim for the same valve or valve packing (or valve or valve packing in the same or similar service) that was the subject of a prior unavailability claim which was not accepted by EPA, and such subsequent claim is also denied by EPA on the same basis as provided in EPA's prior notification, Limetree Bay shall retrofit the valve

or valve packing with the commercially available valve or valve packing technology at the next unit turnaround.

Any disputes concerning EPA's notification to Limetree Bay of the commercial availability of a valve or valve packing technology in a particular application pursuant to Subparagraph 3.c of this Appendix shall be addressed under the Dispute Resolution provisions in Part XVI of the Consent Decree.

# APPENDIX N

## EMISSIONS UNITS PERMANENTLY SHUTDOWN AS OF JUNE 1, 2019

- H-401A (2 CDU)
- H-401B (2 CDU)
- H-401C (2 CDU)
- H-600 (Heater in 2 Plat)
- H-602 (Heater in 2 Plat)
- H-603 (Heater in 2 Plat)
- H-606 (Heater in 2 Plat)
- H-1401A (Heater in 3 CDU)
- H-1401B (Heater in 1 Vac)
- H-1500 (Heater in 3DD)
- H-1501 (Heater in 3 DD)
- H-2101 (Heater in 2 Vac)
- H-2102 (Heater in 2 Vac)
- H-2185 (Heater in 2 Vis)
- H-2401 (Heater in 5DD)
- H-2501 (Naptha Frac.)
- B-1151 (#1 Boiler)
- B-1153 (#3 Boiler)
- B-1154 (#4 Boiler)
- B-3301 (#6 Boiler)
- C-800A, B and C (Compressors in 2DD)
- C-2201A, B and C (Compressors in 4DD)
- No. 1 Gas Turbine (G-1101E)
- No. 2 Gas Turbine (G-1101F)
- No. 3 Gas Turbine (G-1101G)
- No. 5 Gas Turbine (G-3405)

- No. 6 Gas Turbine (G-3406)

**Appendix O
Requirements That Shall Survive
Termination of the Consent Decree**

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. |
|---|---|
| ¶ 10: Certain CD Definitions | "365-day rolling average" shall mean the average daily emission rate during the preceding 365 Operating Days. (CD 10.A.)<br><br>"7-day rolling average" shall mean the average daily emission rate during the preceding seven (7) Operating Days. (CD 10.B.)<br><br>"FCCU and Coker Drain Systems" means the individual drain systems (as defined in 40 C.F.R. § 60.691) and ancillary equipment which manage oily wastewater generated in the process units in the FCCU complex and the Coker. (CD ¶ 10.U.)<br><br>"Operating Day" shall mean a Day on which a minimum of 18 hours of valid emissions data are obtained. (CD 10.HH.)<br><br>"Sulfur Recovery Plant" or "SRP" shall mean a process unit that recovers sulfur from hydrogen sulfide by a vapor phase catalytic reaction of sulfur dioxide and hydrogen sulfide.  (CD 10.UU) |
| ¶ 11: FCCU $NO_x$ limits | Limit $NO_x$ emissions from the FCCU to 20 ppmvd or less on a 365 day rolling average and 40 ppmvd or less on a 7-day rolling average, each at 0% $O_2$.<br><br>$NO_x$ emissions during periods of Startup, Shutdown or Malfunction of the FCCU shall not be used in determining compliance with the 7-day rolling average NOx emission limit, provided that during such periods Limetree Bay implements good air pollution control practices to minimize $NO_x$ emissions. |
| ¶ 12: Demonstrating compliance with FCCU NOx limits ($NO_x$ and $O_2$ CEMS) | Certify, calibrate, maintain, and operate $NO_x$ and $O_2$ CEMS on the FCCU in accordance with the provisions of 40 C.F.R. § 60.13 that are applicable to CEMS (excluding those provisions applicable only to Continuous Opacity Monitoring Systems) and Part 60 Appendices A and F, and the applicable performance specification test of 40 C.F.R. Part 60 Appendix B.<br><br>With respect to 40 C.F.R. Part 60, Appendix F, in lieu of the requirements of 40 C.F.R. Part 60, Appendix F §§ 5.1.1, 5.1.3 and 5.1.4, conduct either a Relative Accuracy Audit ("RAA") or a Relative Accuracy Test Audit ("RATA") on each CEMS at least once every three (3) years. Conduct |

O-1

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. |
|---|---|
| | Cylinder Gas Audits ("CGA") each calendar quarter during which a RAA or a RATA is not performed. |
| **¶ 13 and 14: FCCU SO₂ limits** | Limit SO$_2$ emissions from the FCCU to 16 ppmvd or less on a 365-day rolling average and 25 ppmvd or less on a 7-day rolling average, each at 0% O$_2$. <br><br> SO$_2$ emissions during periods of Malfunction of the Wet Gas Scrubber ("WGS") shall not be used in determining compliance with the 7-day rolling average SO$_2$ emission limit, provided that during such periods good air pollution control practices are implemented to minimize SO$_2$ emissions. |
| **¶ 14: Demonstrating compliance with FCCU SO₂ limits (SO₂ and O₂ CEMS)** | Certify, calibrate, maintain, and operate SO$_2$ and O$_2$ CEMS on the FCCU in accordance with the provisions of 40 C.F.R. § 60.13 that are applicable to CEMS (excluding those provisions applicable only to Continuous Opacity Monitoring Systems) and Part 60 Appendices A and F, and the applicable performance specification test of 40 C.F.R. Part 60 Appendix B. <br><br> With respect to 40 C.F.R. Part 60, Appendix F, in lieu of the requirements of 40 C.F.R. Part 60, Appendix F §§ 5.1.1, 5.1.3 and 5.1.4, conduct either a Relative Accuracy Audit ("RAA") or a Relative Accuracy Test Audit ("RATA") on each CEMS at least once every three (3) years. Conduct Cylinder Gas Audits ("CGA") each calendar quarter during which a RAA or a RATA is not performed. |
| **¶ 15 and 17: FCCU PM limit** | Limit PM emissions from the FCCU to 0.5 pounds PM or less per 1,000 pounds of coke burned based on the average of three (3) 1-hour stack tests. <br><br> PM emissions during periods of Malfunction of the FCCU's WGS shall not be used in determining compliance with the emission limit of 0.5 pounds of PM per 1,000 pounds of coke burned, provided that during such periods good air pollution control practices are implemented to minimize PM emissions. |
| **¶ 16: PM Testing for FCCU (stack testing methodology and frequency requirements)** | Follow the stack test methodology specified in 40 C.F.R. § 60.106(b)(2) to measure PM emissions from the FCCU. |

O-2

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. |
|---|---|
| ¶¶ 18, 19, 20: FCCU CO limits | Limit CO emissions from the FCCU to 500 ppmvd or less on a 1-hour block average basis corrected to 0% $O_2$.<br><br>If prior to termination of this Consent Decree, Limetree Bay has accepted for the FCCU a CO emissions limit of 100 ppmvd or less on a 365-day rolling average corrected to 0% $O_2$, then the FCCU shall also comply with that limit.<br><br>CO emissions during periods of Startup, Shutdown, or Malfunction of the FCCU shall not be used in determining compliance with the 1-hour 500 ppmvd emissions limit, provided that during such periods good air pollution control practices are implemented to minimize CO emissions. |
| ¶ 21: Demonstrating compliance with FCCU CO limits (CEMS operating requirements) | Certify, calibrate, maintain, and operate the CO CEMS on the FCCU in accordance with the provisions of 40 C.F.R. § 60.13 that are applicable to CEMs (excluding those provisions applicable only to Continuous Opacity Monitoring Systems) and Part 60 Appendices A and F, and the applicable performance specification test of 40 C.F.R. Part 60 Appendix B.<br><br>With respect to 40 C.F.R. Part 60, Appendix F, in lieu of the requirements of 40 C.F.R. Part 60, Appendix F §§ 5.1.1, 5.1.3 and 5.1.4, conduct either a RAA or a RATA on each CEMS at least once every three (3) years. Conduct Cylinder Gas Audits ("CGA") each calendar quarter during which a RAA or a RAT A is not performed. |
| ¶ 22: FCCU Subpart J affected facility status and opacity AMP | FCCU Catalyst Regenerator is an "affected facility," as that term is used in 40 C.F.R. Part 60, Subparts A and J, and is subject to and shall comply with, the requirements of 40 C.F.R. Part 60, Subparts A and J, for $SO_2$, PM (and opacity) and CO.<br><br>If prior to termination of this Consent Decree, the FCCU becomes subject to NSPS Subpart Ja for a particular pollutant due to a "modification" (as that term is defined in NSPS Subpart Ja), the FCCU shall be subject to and comply with NSPS Subpart Ja in lieu of NSPS Subpart J for that regulated pollutant to which a standard applies as a result of the modification.<br><br>If prior to termination of this Consent Decree, the FCCU becomes subject to NSPS Subpart Ja due to a "reconstruction" (as that term is defined in NSPS Subpart Ja), the FCCU shall be subject to and comply with NSPS Subpart Ja for all pollutants in lieu of Subpart J. |

O-3

| ¶¶ 26-28, 30, 31: NOₓ Emission Reductions from Heaters, Boilers, Generating Turbines and Compressor Engines and Monitoring | The units listed below have been permanently shutdown and permits relinquished in order to demonstrate a refinery-wide reduction of 4,744 tpy of NOₓ. If any of the units listed below are restarted, they shall be treated as new emissions units.<br><br>• H-401A (2 CDU)<br>• H-401B (2 CDU)<br>• H-401C (2 CDU)<br>• H-600 (Heater in 2 Plat)<br>• H-602 (Heater in 2 Plat)<br>• H-603 (Heater in 2 Plat)<br>• H-606 (Heater in 2 Plat)<br>• H-1401A (Heater in 3 CDU)<br>• H-1401B (Heater in 1 Vac)<br>• H-1500 (Heater in 3DD)<br>• H-1501 (Heater in 3 DD)<br>• H-2101 (Heater in 2 Vac)<br>• H-2102 (Heater in 2 Vac)<br>• H-2185 (Heater in 2 Vis)<br>• H-2401 (Heater in 5DD)<br>• H-2501 (Naphtha Frac.)<br>• B-1151 (#1 Boiler)<br>• B-1153 (#3 Boiler)<br>• B-1154 (#4 Boiler)<br>• B-3301 (#6 Boiler)<br>• C-800A, B and C (Compressors in 2DD)<br>• C-2201A, B and C (Compressors in 4DD) |

O-4

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. |
|---|---|
|  | • No. 1 Gas Turbine (G-1101E)<br><br>• No. 2 Gas Turbine (G-1101F)<br><br>• No. 3 Gas Turbine (G-1101G)<br><br>• No. 5 Gas Turbine (G-3405)<br><br>• No. 6 Gas Turbine (G-3406) |
| ¶ 34: NSPS Subparts A, J, and Ja applicability for Heaters, Boilers and Generating Turbines (FGCD) | All heaters, boilers, and all other fuel gas combustion devices (other than Flaring Devices) are affected facilities, as that term is used in 40 C.F.R. Part 60, Subparts A and J or Ja for $SO_2$ emissions, and are subject to and shall comply with the applicable requirements of NSPS Subparts A and J or Ja for $SO_2$ emissions for fuel gas combustion devices. The FGCD listed on pages C-2 and C-3 of Appendix C are subject to NSPS Subpart Ja and the FGCD listed on pages C-1, C-4 and C-5 of Appendix C are subject to NSPS Subpart J.<br><br>If prior to the termination of this Consent Decree, any heater boiler or other fuel gas combustion device (other than a Flaring Device) becomes subject to NSPS Subpart Ja for a particular pollutant due to a "modification" (as defined in NSPS Subpart Ja), the affected facility shall be subject to and comply with NSPS Subpart Ja in lieu of NSPS Subpart J for that regulated pollutant to which a standard applies as a result of the modification.<br><br>If prior to the termination of this Consent Decree, any heater, boiler, or other fuel gas combustion device (other than a Flaring Device) becomes subject to NSPS Subpart Ja due to a "reconstruction" (as defined in NSPS Subpart Ja), the affected facility shall be subject to and comply with NSPS Subpart Ja for all pollutants in lieu of Subpart J. |
| ¶ 35: Monitoring for Subpart J compliance for FGCD | Certify, calibrate, maintain and operate all CEMS required by this Paragraph in accordance with the provisions of 40 C.F.R. § 60.13 that are applicable to CEMS (excluding those provisions applicable only to continuous opacity monitoring systems) and Part 60, Appendices A and F, and the applicable performance specification test of 40 C.F.R. Part 60, Appendix B. |
| ¶¶ 37-40: Fuel oil sulfur limits | 1. Do not burn Fuel Oil greater than 0.55 wt% sulfur at any time or 0.50 wt% on a 365-day rolling average basis in any heater, boiler, or Generating Turbine. |

O-5

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. |
|---|---|
| | 2. Switch the fuel supply for any units combusting Fuel Oil to a Fuel Oil with not greater than 0.3 wt% sulfur within one hour of when one of the following conditions occur:<br><br>a. The hourly average winds blow from a 180° sector, defined as 90° to 270°, inclusive, where zero degrees is due North, for at least six (6) consecutive hours during a 24-hour block period, or any 12 non-consecutive hours during a 24-hour block period. Wind direction will be monitored by a meteorological tower located on Limetree Bay property, and will be collected and reported as 1-hour averages, starting on the hour. If the average wind direction for a given hour is from within the 180° sector, the wind will be deemed to have flowed from within the designated sector for that hour. A 24-hour block period is defined as beginning at midnight and ending on the following midnight.<br><br>b. Limetree Bay's meteorological station is inoperable for six consecutive hours.<br><br>3. Limetree Bay may switch back to the higher sulfur content Fuel Oil (a Fuel Oil with a sulfur content of less than or equal to 0.55 wt%) in accordance with the following conditions:<br><br>a. The winds blow outside of the 180° sector, defined as 90° to 270°, for at least three (3) consecutive hours, following the period which the winds were blowing inside the 180° sector; or<br><br>b. When the meteorological station becomes operable, and three (3) consecutive hours of wind conditions outside the 90° to 270° sector have occurred.<br><br>4. On a daily basis, monitor the sulfur content of all Fuel Oil burned [pursuant to Paragraph 3, above] in accordance with ASTM D2622, D4294, or D5453, as follows:<br><br>a. Fuel Oil Supplied from Single Storage Tank:<br><br>i. If the Fuel Oil burned is supplied from a single storage tank for an entire day or part thereof, then test the contents of the storage tank once per day by a sample taken at three (3) levels in the storage tank (i.e., the bottom, middle, and top) which is then composited (Composite Sample).<br><br>ii. If the same storage tank is used for more than one day and no Fuel Oil is added to the storage tank, then Limetree Bay may use the storage tank sample result from the previous day to demonstrate the sulfur content of the storage tank. |

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. |
|---|---|
| | b. Fuel Oil Supplied from Multiple Storage Tanks: If the Fuel Oil burned for one or more consecutive days is supplied from more than one storage tank, then Limetree Bay shall sample each storage tank separately once per day by a Composite Sample taken at three (3) levels in the storage tank (i.e., the bottom, middle, and top).<br><br>c. In the event that Fuel Oil is added to any storage tank, Limetree Bay shall sample the storage tank by a Composite Sample taken at three (3) levels in the storage tank (i.e., the bottom, middle, and top) before the storage tank is placed into service.<br><br>5. Record the quantity and sulfur content of all Fuel Oil burned pursuant to [Paragraph 3 above]. |
| ¶ 42: NSPS Subparts A and Ja for East and West Sulfur Plants | The East Side SRP is an "affected facility" as that term is used in 40 C.F.R. Part 60, Subparts A and Ja and is subject to the requirements of Subparts Ja. The West Side SRP is an "affected facility" as that term is used in 40 C.F.R. Subparts A and Ja and is subject to Subpart Ja. |
| ¶ 43: Sulfur pit re-route and monitoring | Route or re-route all sulfur pit emissions so that they are eliminated or controlled, and included and monitored as part of the SRPs' emissions subject to the NSPS Subpart Ja limit for $SO_2$ or reduced sulfur compounds, 40 C.F.R. § 60.102a(f). |
| ¶ 44: NSPS for SRPs | The West Side SRP shall comply with the NSPS Subpart Ja and shall comply with 40 CFR § 60.102a(f) at all times except during periods of Startup, Shutdown, or Malfunction of the West Side SRP or during a Malfunction of the TGU. For purposes of determining compliance with the emission limits of 40 C.F.R. § 60.102a(f), the "start-up/shutdown" provisions set forth in NSPS Subpart A shall apply.<br><br>At all times, including during periods of Startup, Shutdown, and Malfunction, and to the extent practicable, operate and maintain the West Side SRP and TGU and any supplemental control devices, in accordance with good air pollution control practices as required in 40 C.F.R. § 60.11(d).<br><br>Monitor all non-fugitive emission points (stacks) to the atmosphere from the West Side SRP for Tail Gas emissions and shall monitor and report excess emissions, as required by 40 C.F.R. §§ 60.7(c), 60.13, and 60.106a. Conduct emission monitoring with CEMS as all such emission points. The requirement for continuous monitoring is not applicable to the Acid Gas |

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. |
|---|---|
| | Flaring Device(s) used to flare Acid Gas and/or Sour Water Stripper Gas diverted from the SRPs. |
| ¶ 45 (NSPS for SRPs) | Emissions of sulfur compounds from the East Side SRP shall be controlled to comply with NSPS Subparts A and Ja. Do not vent tail gas from the East Side SRP to an incinerator unless such venting complies with NSPS Subparts A and Ja. |
| ¶ 49, 51, 53, and 54: Flares Subpart Ja applicability only | The #2 Flare (H-1105), #3 Flare (H-1104), #5 Flare (H-3351), #6 Flare (H-3352), #7 Flare (H-3301), FCC HP Flare, FCC LP Flare, and LPG Flare are affected facilities under NSPS Subpart Ja and shall comply with NSPS Subpart Ja, provided that the Flaring Device is combusting fuel gas as defined in 40 C.F.R. § 60.101a. |
| | At all times and to the extent practicable, including during periods of Startup, Shutdown, and/or Malfunction, implement good air pollution control practices for minimizing emissions from the Flaring Devices identified in Appendix D consistent with 40 C.F.R. § 60.11(d). |
| | For continuous or intermittent, routinely-generated refinery fuel gases that are combusted in any Flaring Device identified in Appendix D, comply with 40 C.F.R. § 60.103a(h). |
| | The combustion of gases generated as a result of Startup, Shutdown, and/or Malfunction of a refinery process unit or released to a Flaring Device as a result of a process upset or relief valve leakage or other emergency malfunction is exempt from the requirement to comply with 40 C.F.R. § 60.103a(h). |
| ¶ 99 NSPS QQQ | FCCU and Coker Drain Systems are affected facilities under Subparts A and QQQ. |
| ¶¶ 128-131, limitations on use of CD required emissions reductions | 1. Limetree Bay shall not generate or use any NOₓ, SO₂, PM, PM-10, PM-2.5, VOC, or CO emissions reductions, or apply for and obtain any emission reduction credit, that result from any projects conducted or controls utilized pursuant to the Consent Decree (Civ. No. 1:11-cv-0006) ("CD Emissions Reductions") as netting reductions or emissions offsets in a PSD, major non-attainment, and/or synthetic minor New Source Review permit or permit proceeding. |
| | 2. Notwithstanding the general prohibition set forth in Paragraph 1, Limetree Bay may use 41 tons per year of NOₓ, 61 tons per year of CO, and 14 tons per year of PM from CD Emissions Reductions as credits or offsets |

O-8

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. |
|---|---|
| | in any PSD, major non-attainment and/or minor NSR permit or permit proceeding, provided that the new or modified emissions units at which credits are being used: (1) is being constructed or modified for purposes of compliance with clean fuels requirements (72 Fed. Reg. 8428, amending 40 C.F.R. Part 80); and (2) has a federally enforceable, non-Title V permit that reflects the following requirements that are applicable to the pollutants for which credits are being used: <br><br> a.  For heaters and boilers, a limit of 0.027 lbs $NO_x$ per million BTU on a 3-hour rolling average basis; <br><br> b.  For heaters and boilers, a limit of 0.10 grains of hydrogen sulfide per dry standard cubic foot of fuel gas or 20 ppmvd $SO_2$ corrected to 0% $O_2$ both on a 3-hour rolling average; <br><br> c.  For heaters and boilers, no liquid or solid fuel firing authorization; <br><br> d.  For FCCUs, a limit of 20 ppmvd $NO_x$ or less on a 365-day rolling average basis corrected to 0% $O_2$; <br><br> e.  For FCCUs, a limit of 25 ppmvd $SO_2$ or less on a 365-day rolling average basis corrected to 0% $O_2$; <br><br> f.  For FCCUs, a limit of 0.5 pounds of PM per 1,000 pounds of coke burned on a 3-hour average basis; and <br><br> g.  For SRPs, NSPS Subpart J limits. <br><br> 3. Utilization of the exception set forth in Paragraph 2 to the general prohibition against the generation or utilization of CD Emissions Reductions set forth in Paragraph 1 is subject to the following conditions: <br><br> a.  Under no circumstances shall Limetree Bay use CD Emissions Reductions for netting and/or offsets prior to the time that actual CD Emissions Reductions have occurred; <br><br> b.  CD Emissions Reductions may be used only at the Limetree Bay Refinery; <br><br> c.  The CD Emissions Reductions provisions of this Consent Decree are for purposes of this Consent Decree only and neither Limetree Bay, nor any other entity may use CD Emissions Reductions for any purpose, including in any subsequent permitting or enforcement proceeding, except as provided herein. |

O-9

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. |
|---|---|
| | d.  Limetree Bay shall remain subject to all federal, territorial, and local regulations applicable to the PSD, major non-attainment and/or minor NSR permitting process. |
| | 4. Outside the Scope of the General Prohibition.  Nothing in the Consent Decree (Civ. No. 1:11-cv-0006) is intended to prohibit Limetree Bay from seeking to: |
| | a.  Use or generate netting reductions or emission offset credits from refinery units that are covered by the Consent Decree (Civ. No. 1:11-cv-0006) to represent the difference between the emissions limitations set forth in or established pursuant to the Consent Decree (Civ. No. 1:11-cv-0006) for such refinery units and the more stringent emissions limitations that Limetree Bay may elect to accept for those refinery units in a permitting process; |
| | b.  Use or generate netting reductions or emission offset credits for refinery units that are not subject to an emission limitation pursuant to the Consent Decree (Civ. No. 1:11-cv-0006); |
| | c.  Use emissions reductions from the installation of controls required by the Consent Decree (Civ. No. 1:11-cv-0006) in determining whether a project that (a) includes both the installation of controls under the Consent Decree (Civ. No. 1:11-cv-0006) and other construction and (b) is permitted as a single project triggers major New Source Review requirements; |
| | d.  Use CD Emission Reductions for Limetree Bay's compliance with any rules or regulations designed to address regional haze or the non-attainment status of any area (excluding PSD and Non-Attainment New Source Review rules) that apply to Limetree Bay; provided, however, that Limetree Bay shall not be allowed to trade or sell any CD Emissions Reductions; or |
| | e.  Use or generate netting reductions or emission offset credits for heaters, boilers, Generating Turbines and Compressor Engines on which Qualifying Controls, as defined in Paragraph 23 of the Consent Decree (Civ. No. 1:11-cv-0006), have been installed, provided that such reductions are not included in Limetree Bay's demonstration of compliance with the requirements of Paragraphs 24, 26, 27 and 28 of the Consent Decree (Civ. No. 1:11-cv-0006). |
| ¶ 132.b:  Coker steam vent depressurization limit | Comply with a depressurization level of 2 psig for the Coker Steam Vents. |

O-10

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. | | | | |
|---|---|---|---|---|---|
| **¶ 133 and Appx H:  Coker Heater (two units) CO and VOC limits** | Pollutant | Limit | Units | Averaging Time | Monitoring |
| | CO | 0.030 | lb/mmBTU | Average of 3 1-hr samples | Annual Performance Test (EPA RM-10) |
| | VOC | 0.0050 | lb/mmBTU | N/A | EPA RM-25 or RM-25A following any CO test exceedance |
| **¶ 133 and Appx H:  Boiler 10 CO and VOC limits** | Pollutant | Limit | Units | Averaging Time | Monitoring |
| | CO | 0.070 | lb/mmBTU | Average of 3 1-hr samples | Annual Performance Test (EPA RM-10) |
| | VOC | 0.0050 | lb/mmBTU | N/A | EPA RM-25 or RM-25A following any CO test exceedance |
| **¶ 133 and Appx H:  SRUs 1 & 2/Beavon 1, Reduced Sulfur Compound as defined in 40 CFR 60.101a, final limits** | Pollutant | Limit | Units | Averaging Time | Monitoring |
| | RSC | 162 | ppmvd | Hourly rolling 12-hr average | NSPS RSC CEMS (40 C.F.R. 60 App A, B, & F) |
| | | 66 | ppmvd | Daily rolling 30-day average | NSPS RSC CEMS (40 C.F.R. 60 App A, B, & F) |
| **¶ 133 and Appx H:  EFR Tank and Subpart Kb requirements**<br><br>No. 6 Sour Water Stripper Tank (TK-1071),<br>Desalter Effluent Water (DEW) Tank (TK-1663) | Pollutant | Limit | Monitoring | | |
| | VOC | Ext. Floating Roof Tank | Subpart Kb monitoring (40 C.F.R. §60.113b(b)) for Ext. Floating Roof Kb requirements:  Seal gap measurements (Secondary once/yr, Primary once/5 yrs).<br><br>Inspect seals and fittings each time the vessel is emptied and degassed. | | |
| **¶ 133 and Appx H:  Fixed Roof Tank and Subpart Kb requirements**<br><br>Coker Charge [Pitch]Tank (TK-8501) | Pollutant | Limit | Monitoring | | |
| | VOC | Fixed Roof Tank | Subpart Kb monitoring (40 C.F.R. §60.110b-117b)<br>Record and maintain records documenting the material stored in the hot pitch storage tank (TK-8501), showing that the tank remains exempt from control requirements in accordance with 40 C.F.R. 60 Subpart Kb, §60.110b(b). | | |

O-11

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. | |
|---|---|---|
| **¶ 133 and Appx H: LDAR**<br><br>**Process equipment located in**<br>Coker Unit,<br>Coker Gas Plant,<br>No. 7 Amine,<br>No. 5 Crude,<br>No. 3 Vacuum, No. 3 Crude,<br>No. 1 Vacuum, No. 1 Visbreaker, and No. 2, 4, 6, & 7 Distillate Desulfurizer Units and outside battery limit modifications to the terminal, tank farm & blending equipment | <table><tr><td>Pollutant</td><td>Limit</td><td>Monitoring</td></tr><tr><td>VOC</td><td>40 C.F.R. Part 60, Subpart GGGa</td><td>Comply with 40 C.F.R. Part 60, Subpart GGGa</td></tr></table> | |

**¶ 133 and Appx H page H-3: equipment design and work practices for coke handling**

Coke Handling, Storage and Loading Facility

| Emissions Unit | Pollutant | Design/Work Practice Controls | Monitoring |
|---|---|---|---|
| Coke Cutting/Coke Pit | PM (all species) | High Pressure water cutting of coke & enclosed drop zones/coke pit (No roof) | Maintain records documenting design |
| Coke Crusher | PM (all species) | Enclosed[b] crusher structure. Moisture content control from initial cutting. | Maintain records documenting design |
| Coke Transfer to Storage | PM (all species) | Enclosed[b] conveyor to storage, Moisture content control from initial cutting. | Maintain records documenting design |
| Coke Storage | PM (all species) | Enclosed[b] storage buildings, baghouse for vent control, and moisture content control from initial cutting. | Maintain records documenting design |
| Coke Loading | PM (all species) | Enclosed[b] conveyor to loading dock. "Spout" containment loading to minimize drop emissions when loading ship. | Maintain records documenting design |

[b] Enclosed structures can have ventilation vents or access ways.

O-12

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. |
|---|---|
| | |
| ¶ 135 Boilers 5, 8, and 9, NSPS Subparts A and D | Boilers 5, 8, and 9 are "affected facilities" as that term is used in 40 C.F.R. Part 60, NSPS Subparts A and D and are subject to and required to comply with the requirements of NSPS Subparts A and D. |
| ¶ 136 [as modified]: Turbines 1-9, NSPS Subparts A and GG | Generating Turbines 4,7, 8 and 9 are "affected facilities" as that term is used in, and shall comply with, 40 C.F.R. Part 60, Subparts A and GG, including any custom sulfur monitoring plan approved by EPA in accordance with 40 CFR 60.334(i)(3). |

O-13

**APPENDIX P**
**Flaring Mitigation Projects**

The flaring mitigation projects include those listed below and any others submitted by
Limetree Bay for advance approval by EPA and VIDPNR ("approved mitigation projects").
Pursuant to Paragraph 50A, Limetree Bay will achieve emission reductions sufficient to
satisfy the Mitigation Amount, if any, by implementing one or more of the approved
mitigation projects.

Limetree Bay will begin implementing one or more of the approved mitigation project(s) by
no later than 180 days after submitting the notification required by Paragraph 50C.b.iii, and
will mitigate a minimum of 10 tons per year until the Mitigation Amount is satisfied.

Progress on the implementation of the approved mitigation projects including, the start and
end date(s) of an approved mitigation project, the approved mitigation project(s) being
implemented, the number of tons reduced during the reporting period, the tons remaining to
be mitigated), and the completion of the mitigation of the Mitigation Amount, will be
included in the semi-annual reports submitted under Paragraph 143.

A. **Approved Mitigation Projects**

The following projects are approved:

1. **Reducing H$_2$S in Refinery Fuel Gas**:  If this project is selected for implementation, then
   Limetree Bay shall reduce the SO$_2$ emissions from fuel gas combustion devices (other
   than the Coker heaters, Boiler 10 and GT-13) by reducing H$_2$S in fuel gas.

   The emission reductions achieved pursuant to this project shall be calculated based on the
   difference between the average H$_2$S concentration during the first six months  after restart
   of Refinery Operations ("Baseline Period"), excluding periods of non-compliance, and
   the actual H$_2$S concentration in the East Side refinery fuel gas system (using the H$_2$S
   analyzers used to comply with NSPS Subpart J) after the Baseline Period.  The tons of
   SO$_2$ reduction will be determined based on the change in H$_2$S concentration, relative to
   the Baseline Period, and the total volume of fuel gas to fired sources on the East Side,
   each year after the Baseline Period.

2. **Boutique Amines to Reduce SO$_2$ from the TGTU**

   If this project is selected for implementation, then Limetree Bay shall reduce SO$_2$
   emissions by using specialized amines in its East Side tail gas treatment unit by reducing
   H$_2$S and other sulfur compounds.

   The emission reductions achieved pursuant to this project shall be calculated based on the
   difference between the monitored SO$_2$ concentration from the incinerator stack for the
   first six months of operations, excluding periods of noncompliance, after restart of
   Refinery Operations ("Baseline Period") and each year after the Baseline Period.

3. **Boutique Amines to Reduce Other Sulfur Compounds in Fuel Gas**:

   If this project is selected for implementation, Limetree Bay shall reduce $SO_2$ emissions from fuel gas combustion devices by decreasing the total sulfur concentration of fuel gas through the use of amines designed specifically to lower the concentration of sulfur compounds other than $H_2S$.

   The emission reductions achieved pursuant to this project shall be calculated based on the difference between the total sulfur concentration during the first six months after restart of Refinery Operations, excluding periods of non-compliance ("Baseline Period"), and the total sulfur concentration in the East Side refinery fuel gas system after the Baseline Period. The tons of $SO_2$ reduction will be determined based on the change in total sulfur concentration, relative to the Baseline Period, and the total volume of fuel gas to fired sources on the East Side, each year after the Baseline Period.

B. **Approval of Other Mitigation Projects**

1. Limetree Bay may propose other or additional projects for approval by EPA and VIDPNR. The written proposal shall contain a written description of the project(s), the emission reductions expected to be achieved, the anticipated start and end dates for the project(s), and any other relevant information describing the project(s). EPA and VIDPNR shall consult with each other and, if necessary, with Limetree Bay regarding the proposed project(s). Following such consultation and review, EPA and VIDPNR shall either approve the project(s) or provide written comments to Limetree Bay. If approved and selected for implementation, then Limetree Bay shall implement the project(s). If written comments are provided by EPA and VIDPNR, Limetree Bay shall either revise the written description of the project(s) to reflect the comments, withdraw the proposal, or submit an alternate proposal.

C. **Certification**

1. With regard to the approved mitigation projects, Limetree Bay shall include in the notification required by Paragraph 50C.b.iv. (or, if applicable, in the written proposal for other or additional project(s)), a certification of the truth and accuracy of each of the following:

   a. That, as of the date of the 50C.b notification (or the proposal for additional or alternate project(s)), Limetree Bay is not required to perform or develop the mitigation project(s) by any federal, state, or local law or regulation and is not required to perform or develop the mitigation project(s) by agreement, grant, or as injunctive relief awarded in any other action in any forum;

   b. That the mitigation project(s) are not projects that Limetree Bay was planning or intending to construct, perform, or implement other than in settlement of the potential violations resolved in the First Modification;

   c. That Limetree Bay has not received and will not receive credit for the mitigation project(s) in any other enforcement action; and

    d.  That Limetree Bay shall neither generate nor use any pollutant reductions from the mitigation project(s) as netting reductions, pollutant offsets, or to apply for, obtain, trade, or sell any pollutant reduction credits.

# APPENDIX Q



Director
Air Enforcement Division
Office of Civil Enforcement (2242A)
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, DC 20044
foley.patrick@epa.gov

Director
Air Enforcement Division
Office of Civil Enforcement
c/o Matrix New World Engineering, Inc.
26 Columbia Turnpike, Suite 200
Florham Park, NJ 07932-2213
jmack@matrixnewworld.com

Director
Enforcement and Compliance Assistance
Division
U.S. EPA Region 2
290 Broadway, 21st Floor
New York, NY 10007-1866
patel.harish@epa.gov

United States Environmental Protection
Agency
Region 2
Office of Regional Counsel
290 Broadway
New York, NY 10007

Director, Caribbean Environmental Protection
Division
U.S. EPA Region 2
City View Plaza II, Suite 7000
#48 Rd. 165 km 1.2
Guaynabo, PR 00968-8069

Director, Division of Environmental Protection
Virgin Islands Department of Planning and
Natural Resources
45 Estate Mars Hill
Frederiksted, St. Croix, U.S. Virgin Islands
00840-4474
jp.oriol@dpnr.vi.gov

Re:    *United States of America and The United States Virgin Islands v. HOVENSA, L.L.C.*
       Civil Action No. 1:11-cv-0006

To Whom It May Concern:

As you are aware, I was appointed as the independent member of HOVENSA's Executive Committee pursuant to that letter agreement dated June 4, 2015 and currently serve as Manager of HOVENSA, L.L.C. on the terms set forth in the (i) *Order Granting Final Approval of Disclosure Statement and Confirming Chapter 11 Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (Case No. 1:15-bk-10003-MFW) (Bankr. D.V.I. 2015) [Docket No. 572] and (ii) *Debtor's Second Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (Case No. 1-15-bk-10003-MFW (Bankr. D.V.I. 2015) [Docket No. 572-1].

As of June 30, 2019, HOVENSA, L.L.C. has taken the actions described in the table below in completion and satisfaction of the Consent Decree requirements identified therein.

| CD ¶ | CD Requirement | Activities Undertaken |
|---|---|---|
|  | **Sections V.A through V.E – FCCU** | |
| 11 | Limit NOₓ emissions from the FCCU to 20 ppmvd or less on a 365-day rolling average and 40 ppmvd or less on a 7-day rolling average, each at 0% O₂. | NOₓ emission limits have not been exceeded. |
| 12 | Demonstrate compliance with FCCU NOₓ emission limits by installing, maintaining, and operating CEMS and performing RATAs once every three years. | Operated pre-existing CEMS during FCCU operation, maintained them, and performed RATAs when due. |
| 13 | Limit SO₂ emissions from the FCCU to 16 ppmvd or less on a 365-day rolling average and 25 ppmvd or less on a 7-day rolling average, each at 0% O₂. | SO₂ emission limits have not been exceeded. |
| 14 | Demonstrate compliance with FCCU SO2 emission limits by installing, maintaining, and operating CEMS and performing RATAs once every three years. | Operated pre-existing CEMS during FCCU operation, maintained them, and performed RATAs when due. |
| 16 | Submit FCCU PM stack test protocol specified in 40 C.F.R. § 60.106(b)(2) . | Protocol submitted on 8/23/2011. |
| 18 | Limit CO emissions from the FCCU to 500 ppmvd or less on a 1-hour block average basis corrected to 0% O₂. | CO emission limit has not been exceeded. |
| 21 | Demonstrate compliance with FCCU CO emission limits by installing, maintaining, and operating CEMS and performing RATAs once every three years. | Operated pre-existing CEMS during FCCU operation, maintained them, and performed RATAs when due. |
| 22 | Comply with NSPS Subparts A and J for SO₂ and CO. | Emission limits have not been exceeded and CEMs operated during FCCU operation. |
| colspan=3 align=center | **Section V.F - NOₓ Emissions Reductions from Heaters, Boilers, Generating Turbines, and Compressor Engines** | |
| 26 | Install sufficient Qualifying Controls and apply for emission limits from the appropriate permitting authority sufficient to achieve 1,079 tpy NOₓ emissions reductions.<br><br>Submit a report to EPA showing how refinery satisfied requirement of Paragraphs 23 and 26. | Compressor IC engines shutdown and permits surrendered, per Para. 23.e; replaced with electric motors prior to Date of Lodging.<br><br>Report submitted 8/31/15, demonstrating compliance. |
| 27 | Install sufficient Qualifying Controls and apply for emission limits from the appropriate permitting authority sufficient to achieve 3,663 tpy NOₓ emissions reductions. | Permanent emissions unit shutdown and surrender of permits by letter, 2/28/17, per Para. 23.e. |

| CD ¶ | CD Requirement | Activities Undertaken |
|---|---|---|
| | Submit a report to EPA showing how refinery satisfied requirement of Paragraphs 23 and 27. | Report submitted 10/27/17 demonstrating compliance and confirming shutdown and permit surrender application. |
| 28 | Install sufficient Qualifying Controls and apply for emission limits from the appropriate permitting authority sufficient to achieve 4,744 tpy NO$_X$ emissions reductions. | Permanent emissions unit shutdown and surrender of permits by letter of 5/30/19, per Para. 23.e. |
| | Submit a report to EPA showing how refinery satisfied requirement of Paragraphs 23 and 28. | Report submitted 9/3/19 demonstrating compliance and confirming shutdown and permit surrender application. |
| 29 | Submit a detailed NO$_X$ Control Plan to EPA for review and comment and to DPNR. | Initial NO$_X$ control plan submitted 10/4/11. |
| 29 | Submit annual updates of NO$_X$ Control Plan to EPA and DPNR. | NO$_X$ control plan update submitted annually. |
| **Section V.G SO$_2$ Emissions Reductions from, and NSPS Applicability to, Heaters, Boilers and Generating Turbines** | | |
| 34 | Applicability and compliance of Heaters, Boilers, and Other Fuel Gas Combustion Devices with NSPS Subparts A, J and/or Ja, as applicable. | H$_2$S fuel gas concentration standard has not been exceeded. |
| 35 | H$_2$S/SO$_2$ monitoring requirements of NSPS Subparts A and J or Ja, as applicable. | Operated CEMS during unit fuel gas combustion operations. |
| **Section V.H Sulfur in Fuel Restrictions for Oil Burning** | | |
| 37 | Effective 30 days after Date of Lodging, no longer burn Fuel Oil greater than 0.55 wt % sulfur at any time or 0.50 wt % on a 365-day rolling average basis in any heater, boiler, or Generating Turbine. | Did not burn Fuel Oil in excess of specified concentrations in para. 37. |
| 38 | Switch the fuel supply for any units combusting Fuel Oil to a Fuel Oil with not greater than 0.3 wt % sulfur within one hour when (a) the hourly average winds blow from a 180 degree sector for at least 6 consecutive hours during a 24-hour block period, or any 12 non-consecutive hours during a 24-hour block period or (b) the meteorological station is inoperable for six consecutive hours. | Did not burn Fuel Oil with greater than 0.3 wt% sulfur. |

| CD ¶ | CD Requirement | Activities Undertaken |
|---|---|---|
| 39 | Switch back to the higher sulfur content Fuel Oil in accordance with conditions at 39.a or b. | Did not burn Fuel Oil with greater than 0.3 wt% sulfur. |
| | **Section V.I Sulfur Recovery Plants.** | |
| 42 | For East Side SRP, comply with applicable NSPS Subpart Ja provisions. | East Side SRP did not exceed applicable Ja emission standards. |
| 42, 44.a | For West Side SRP, comply with applicable NSPS Subpart J/Ja provisions. | West Side SRP did not exceed applicable NSPS J or Ja emission standards. West Side SRP complied with NSPS J and converted to Ja compliance by 12/31/11. |
| 43 | Route or re-route all sulfur pit emissions so they are eliminated or controlled and included and monitored as part of the SRPs' emissions subject to the NSPS Subpart Ja limit for $SO_2$ or reduced sulfur compounds (40 C.F.R. § 60.102a(f)) for the East and West Side SRP sulfur pit emissions. | Control installed on 12/28/2011, routing all West Side sulfur pit emissions back to the SRP. Continued to comply with requirement for West Side SRP sulfur pits during unit operation.<br><br>East Side SRP not in operation on applicability date, 12/31/14. Did not exceed applicable NSPS Ja emission standards. |
| 44.a | Install $SO_2$ CEMS on West Side incinerators. | Installation of CEMS completed 4Q 2010. |
| 44.c | Monitor West Side SRP tail gas emissions points. | CEMS installed, RATA completed 6/11, monitoring and reporting continued while unit in operation. |
| 45.a. | Submit compliance plan and schedule for installation of second East Side TGU to EPA and DPNR. | Compliance plan and schedule submitted 12/16/11. |
| 45.b.ii | Complete an optimization study to minimize emissions of sulfur compounds and maximize sulfur recovery efficiencies at the East Side SRP meeting the requirements of Paragraph 46 and submit study to EPA. | Optimization study completed and submitted 12/2/11. |
| 46.b | Incorporate results of optimization study into PMO Plan. | Results incorporated into PMO plan, submitted 12/7/11 (see 48.a.). |
| 48.a. | Submit a "Preventative Maintenance Operation Plan" (PMO Plan) for SRU and SAR to EPA and DPNR. | Submitted PMO Plan 12/7/2011. |
| | **Sections V.J through V.O – Flares** | |
| 49 | For listed Flaring Devices, comply with applicable requirements of NSPS Subpart Ja by dates listed in Appendix D. | Fuel gas standard not exceeded. |
| 51 | Comply with applicable monitoring requirements of NSPS Ja by 6/7/14 for Flare | Complied with applicable monitoring requirements as of 6/7/14 when combusting |

| CD ¶ | CD Requirement | Activities Undertaken |
|---|---|---|
| | 7. | fuel gas. |
| 52 | Submit a Compliance Certification to EPA that HP, LPG, LP, 2, and 3 Flaring Devices comply with the emission standards and monitoring requirements of Subparts J/Ja, specifying the compliance method for each respective Flaring Device. | Submitted certification on 7/7/16 (HP, LPG Flares).<br><br>Submitted certification on 7/11/18 (LP, 2 and 3 Flares). |
| 58 | Submit a corrective action report to minimize the likelihood of a recurrence of Root Cause of flaring event included in look-back analysis previously sent to EPA. | Corrective action report submitted 6/7/11. |
| 59-61 | Investigate (no later than 45 days post-incident) and take corrective actions for any Acid Gas Flaring Incidents, prepare report. | No Acid Gas Incidents. |
| 59, 60, 61, 70 | Investigate (no later than 45 days post-incident) and take corrective actions for any Tail Gas Flaring Incidents, prepare report. | Tail Gas Incidents investigated and reports prepared. |
| 71 | Submit semi-annual report that includes each Acid Gas Flaring Incident and Tail Gas Incident reports during relevant period. | Incident Reports submitted with semi-annual reports, last Incident Report submitted with July 2012 semiannual report. |
| 72 | For any Hydrocarbon Flaring Incidents, follow investigative, reporting and corrective action procedures as set forth in paragraphs 60 and 61. | Incident Reports submitted with semi-annual reports, last Incident Report submitted with January 2015 semiannual report. |
| 72 | Investigate (no later than 45 days post-incident) and take corrective actions for any Hydrocarbon Flaring Incidents. | Hydrocarbon Flaring Incidents investigated and reports prepared. |
| **Sections V.P through V.R – Benzene NESHAP, NSPS QQQ, and LDAR** | | |
| 79.a. | Complete Phase One Review and Verification of Refinery TAB and its compliance with the Benzene Waste NESHAP.<br><br>Submit BWON Compliance Review and Verification Report. | Completed Phase One Review and Verification 1/20/12.<br><br><br>Submitted report 3/22/12. |
| 79.b. | Conduct any additional required sampling by EPA and submit amended BWON Compliance Review and Verification Report. | No samples requested. |
| 80.a. | Amend TAB Reports (if necessary due to inaccuracies or not meeting requirements of 40 C.F.R. § 61.357(c)). | Amended TAB Report not necessary. |
| 80.b. | Submit to EPA and DPNR compliance plan (if results of BWON Compliance Review | Compliance plan submitted, 9/14/12. |

| CD P | CD Requirement | Activities Undertaken |
|---|---|---|
| | and Verification Report identify any compliance issues). | |
| 81 | Conduct inspections in accordance with the three-tier system for control of vents associated with the Subpart FF wastewater collection system. | All required inspections completed. |
| 82.a. | Complete BWON lab audit prior to conducting Phase One Review and Verification to analyze benzene waste NESHAP samples to ensure proper analytical and QA/QC procedures are followed. | Initial audit completed 1/26/12. |
| 82.b. | Conduct audits for each lab continuing to perform BWON sample analyses every 2 years. | Subsequent audits completed 3Q 2013, 3Q 2015, and 3Q 2017. |
| 83 | Continue to use management of change procedures to review process information and construction projects to ensure all new benzene waste streams are included in waste stream inventory. | Used management of change procedures to review process information and construction projects. |
| 84.a. | Complete development of SOPs for all control equipment used to comply with the benzene waste NESHAP. | Development of standard operating procedures for benzene stripper (only "control equipment" used) completed. |
| 84.b. | Develop BWON training program.

Submit to EPA. | Initial program completed.

Submitted 3/7/12. |
| 85.a. | Submit a plan for quantifying waste/slop/off-spec oil movements for all benzene waste streams that are not controlled at the Refinery, along with schematics. | Plan and schematics submitted 1/26/12. |
| 86 | Submit benzene waste operations sampling plans designed to describe the sampling of benzene waste streams to EPA and DPNR. | Sampling plan submitted to EPA and DPNR 1/26/12. |
| 88 | Implement and continue to implement the sampling plan for benzene waste operations sampling plans at the required time. | Sampling plan implemented and streams monitored. |
| 89.a | Upon determination that a sampling plan is no longer accurate, submit BWON sampling plan revisions to EPA and DPNR for approval. | Sampling Plan revised and submitted 6/29/12 to reflect idling of refinery. |
| 90 | Calculate a quarterly and projected annual uncontrolled benzene quantity. | Quarterly and projected annual uncontrolled benzene quantity calculated. |

| CD ¶ | CD Requirement | Activities Undertaken |
|---|---|---|
| 91 | Submit calculations of uncontrolled benzene quantity releases with reports. | Submitted calculations of benzene quantity with quarterly Subpart FF reports. |
| 93.a.iii | Conduct monitoring of API Separators 1, 2, & 3 or any new Subpart FF-regulated oil/water separators (as described in 93.a.iii.(1)-(3)). | Monitoring of in-service API Separators conducted. |
| 95 | Record and submit information pursuant to 40 C.F.R. § 61.357(d)(6) and (7) on sampling results, training, and laboratory audits. | Recorded and reported sampling results, TAB, training and lab audit results with quarterly Subpart FF reports. |
| 98 | Submit copies of reports, plans and certifications to EPA, EPA Region 2 and DPNR. | Reported sampling results, TAB, training and lab audit results in quarterly Subpart FF reports. |
| 99 | Prepare and submit compliance plan to EPA specifying projects necessary to bring the FCCU and Coker Drain Systems into compliance with 40 C.F.R. Subpart QQQ. | Compliance Plans submitted 12/16/11 and 1/16/2012. |
| 99 | Complete FCCU and Coker Drain Systems projects described above for compliance with 40 C.F.R. Subpart QQQ. | Projects submitted as part of 12/16/11 Compliance Plan reported as complete as of 6/30/11.\n\nProjects submitted as part of 1/16/2012 Compliance Plan were field verified as complete. |
| 102 | Submit to EPA a plan and schedule for bringing Refinery into compliance with 40 C.F.R. Part 60, Subpart GGG and requirements of CD. | Plan and schedule submitted 4/25/11. |
| 103 | Develop and maintain written refinery-wide program for compliance with applicable LDAR regulations and requirements of CD.\n\nSubmit copy to EPA with next semi-annual report. | Initial Refinery-wide LDAR program of 10/26/11 superseded by Revision 1 effective 1/1/2012.\n\nRevision 1 submitted with semi-annual LDAR report for 2nd semi-annual period of 2011. |
| 105.a. | Develop and submit to EPA the LDAR training program. | LDAR training program submitted 3/7/12. |
| 105.c. | Provide training on LDAR responsibility relevant to Refinery operations and maintenance personnel. | Initial training completed by 6/7/13 and three-year retraining completed through 12/31/16. |
| 106.a. | Complete a refinery-wide third-party audit of compliance with LDAR Regulations and applicable sections of CD. | Initial audit completed by 1/26/12. |

| CD ⁋ | CD Requirement | Activities Undertaken |
|---|---|---|
| | Submit noncompliance report from third-party audit. | Report and compliance schedule submitted 2/15/12. |
| 106.a.i | Submit to EPA that the Refinery is in compliance with LDAR Regulations. | Certification of compliance with LDAR Regulations submitted 6/7/12. |
| 106.b.i | Retain independent contractor to perform 3rd party audit of LDAR program compliance with applicable LDAR Regulations and applicable CD requirements at least once every four years. | Audit completed 3/3/16. |
| 106.b.ii | Conduct internal audits of the LDAR program compliance with applicable LDAR Regulations, by 1Q 2014 and at least once every four years thereafter. | Internal audits completed 1Q 2014, 3/12/18. |
| 107 | Implement all appropriate steps to correct areas of non-compliance identified in subsequent audits. | Implementation of identified corrective actions to correct areas of non-compliance identified in 2016 third party audit included in 7/15/16 LDAR Semi-Annual Report. Implementation of corrective actions to correct areas of non-compliance identified in 2014 and 2018 internal audits included in 7/28/2014 and 7/18/18 LDAR Semi-Annual Report, respectively. |
| | Submit results of subsequent audits to EPA. | March 2016 third-party audit results submitted with 7/15/16 LDAR Semi-Annual Report.  Internal audit results submitted with relevant LDAR Semi-Annual Report. |
| 109 | Utilize lower leak definitions for valves and pumps, as defined in 109.a. and 109.b. | Lower leak definitions were utilized beginning August 2012 and continued to be utilized. |
| 111 | Record, track, repair, and remonitor all leaks in excess of the internal leak definitions in Paragraph 109. | Complied with recording, tracking and repair requirements. |
| 112.a.i | Perform external valve surveys in accordance with Appendix G. | Surveys conducted, beginning 7/26/12. |
| 112.a.ii | Perform valve stuffing box condition surveys in accordance with Appendix G. | Surveys conducted, beginning 7/26/12. |
| 112.b. | Repack or replace valves prior to or during process unit turnarounds or tank outages in accordance with Appendix G. | Repack/replace conducted, beginning 7/26/12. |
| 112.c. | Ensure newly installed valves are fitted with proper packing or valve technology designed | Proper packing used, beginning 7/26/12. |

| CD ¶ | CD Requirement | Activities Undertaken |
|---|---|---|
| | to prevent leaks above 100ppm for a period of five years after installation. | |
| 112.d. | Establish a comprehensive tracking database for Paragraph 112.d information (Valve Preventative Leak Maintenance Program). | Tracking database established, beginning 7/26/12. |
| 112.e. | Analyze information in 112.d database every two years after effective date (Valve Preventative Leak Maintenance Program components) and report evaluation to EPA with semiannual report. | Analyses completed by 7/26/14 and subsequent analyses completed in 2016 and 2018, results of evaluation reported in LDAR Semi-Annual reports submitted 1/7/15, 1/20/17 and 1/30/19. |
| 113.a. | Monitor pumps at lower leak definition on a monthly basis. | Monitoring conducted. |
| 113.b. | Monitor valves according to the monitoring frequencies required by 40 C.F.R. §§ 60.482-7 and 60.483-2, except when monthly monitoring is required. | Monitoring conducted. |
| 114 | Record all LDAR monitoring and repair data in electronic database. | Database established and commenced recording data prior to Date of Lodging. |
| 115 | Collect electronic data during LDAR monitoring and perform appropriate data transfer. | System was in place before Date of Lodging and maintained, with uploading times consistent with Paragraph. |
| 116 | Develop procedure for QA/QC of LDAR-generated data. | Procedure developed. |
| 117 | Maintain program for personnel accountability and position for LDAR management. | LDAR accountability program and position for LDAR management maintained, beginning 1/26/11. |
| 118 | Implement tracking program for maintenance and (Management of Change) to ensure valves and pumps subject to LDAR Regulations and the CD are integrated into the LDAR program. | Database was in place and maintained, beginning 1/26/11. |
| 119 | Conduct all calibrations of LDAR monitoring equipment using methane as the calibration gas in accordance with 40 C.F.R. Part 60, EPA Reference Test Method 21. | Calibrations conducted using methane as calibration gas, beginning 6/7/11. |
| 120 | Conduct calibration drift assessments of LDAR monitoring equipment at the end of each monitoring shift (at a minimum). | Compliance maintained. |
| 121 | Perform monitoring and maintenance as specified in Paragraph 121 including extended maintenance and delayed repair of leaks. | Began implementing program prior to 1/26/12 and continued to implement, as required. |

| CD ¶ | CD Requirement | Activities Undertaken |
|---|---|---|
| 123 | Include information in Paragraph 123 in applicable Semi-Annual LDAR Report. | All required LDAR reports were filed by Jan 30 and July 30 dates, and included the information required by Paragraph 123. |
| **Part VI – Permitting** | | |
| 124 | Submit application to incorporate the emissions limits and standards of the CD effective upon Date of Entry of CD. | Submitted application to incorporate emission limits and standards effective upon Date of Entry, 8/2/11. |
| 125 | File applications to incorporate the emissions limits and standards effective after Date of Entry. | Submitted applications to incorporate emission limits and standards on 7/19/11 and 10/17/14, excluding (1) Ja compliance for East SRU (Para. 45.a); and (2) interim performance standard for East Beavon (Para. 45.b.iii). |
| **Part VIII - Additional Injunctive Relief** | | |
| 132.a. | Comply with depressurization level of 10 psig for the Coker Steam Vents. | Complied with depressurization level during coker operation, beginning Date of Entry. |
| 132.b. | By December 31, 2012, comply with depressurization level of 2 psig for the Coker Steam Vents. | 2 psig depressurization level not exceeded, on and after December 31, 2012. |
| 133, App. H | West SRU 1&2/Beavon 1: comply with TRS (Interim) limits by Date of Entry; comply with TRS (Final) limits by 1/1/14. | Complied with Interim emission limits by Date of Entry. Final limits not exceeded. |
| 133, App. H | TK-1071: NSPS subpart Kb monitoring, primary and secondary seal gap measurements. | Per NSPS Kb requirements to conduct gap testing when storing VOL, initial primary seal gap measurements and secondary seal gap measurements conducted per schedule during tank operations. Initial secondary seal inspection on 2/24/12.  Tank not storing VOL after 2012. |
| 133, App. H | TK-1663: NSPS subpart Kb monitoring primary and secondary seal gap measurements. | Per NSPS Kb requirements to conduct gap testing when storing VOL, initial primary seal gap measurements and secondary seal gap measurements conducted per schedule during tank operations. Initial secondary seal inspection on 11/23/11. Tank not storing VOL after 2Q 2012. |
| 133, App. H | TK-8501: Kb recordkeeping (maintain documents showing tank is exempt). | Documentation maintained during tank operations. |
| 133, App. H | Process Equipment located in specified units for fugitive VOC, HON minus Connectors. | LDAR program maintained during unit/equipment operation. |

| CD ¶ | CD Requirement | Activities Undertaken |
|---|---|---|
| 135 | Comply with NSPS Subparts A and D for Boilers 5, 8, and 9 by July 31, 2012. | Boilers 5, 8, and 9 were not in operation on or after the applicability date for Subpart D of July 31, 2012. Did not exceed applicable NSPS emissions standard. |
| 136 | Comply with NSPS Subparts A and GG  for Generating Turbines 1, 2, 3, 5 and 6 no later than 5 years from Date of Entry. | Emission standards not exceeded for Generating Turbines 1, 2, 3, 5 and 6. Additionally, Generating Turbines 1, 2, 3, and 6 permanently shut down and application to surrender permits submitted 2/28/17.  Generating Turbine 5 permanently shut down and application to surrender permit submitted 5/30/19. |
| 136 | Comply with NSPS Subparts A and GG by Date of Entry (Generating Turbine 9). | Complied with NSPS subparts A and GG. |
| **Part X - Reporting and Recordkeeping** | | |
| 143 | Submit semi-annual progress reports to EPA and DPNR. | First report submitted 1/30/12; subsequent reports submitted on semi-annual schedule. |
| 144 | Certification of semi-annual reports by HOVENSA. | All semi-annual reports submitted were certified. |
| **Part XI – Civil Penalty** | | |
| 145 | Pay civil penalty to both the US and the USVI. | Penalty paid 7/5/11. |

Case: 1:11-cv-00006-WAL-GWC   Document #: 221   Filed: 06/26/20   Page: 150 of 158

In accordance with Paragraph 231 of the above-referenced Consent Decree, I certify under penalty of law that this information was prepared under my direction or supervision by personnel qualified to properly gather and evaluate the information submitted.  Based on my directions and after reasonable inquiry of the person(s) directly responsible of gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate and complete.


Matthew Kahn, Manager
HOVENSA, L.L.C.

cc:     Tom Hill (via electronic mail)
        Dan Harris, Esquire (via electronic mail)
        Brian Lever (via electronic mail)
        David Molloy, Esquire (via electronic mail)

Q-13



**APPENDIX S**
**MAP OF H2S MONITORING LOCATIONS**

#3 API and DAF/WEMCO Units (East Side)



#1 API (West Side



● Approximate location of monitor(s)

S-1

EPA-416

## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>LIMETREE BAY REFINING, LLC<br><br>and<br><br>LIMETREE BAY TERMINALS, LLC<br><br>Defendants. | Civ. A. No. 1:21-cv-264<br><br>**Complaint** |

### COMPLAINT

The United States of America, by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("U.S. EPA"), files this complaint and alleges as follows:

### NATURE OF ACTION

1.      This is a civil action brought against defendants Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC (collectively, "Limetree" or "Defendants") concerning emissions of Hydrogen Sulfide ("H$_2$S"), Sulfur Dioxide ("SO$_2$"), uncombusted hydrocarbons, and airborne oil droplets called "Flare Rainout" at and from the Limetree Bay refinery located at 1 Estate Hope in Christiansted, Virgin Islands (the "Refinery"), and the risk of a catastrophic failure of emissions control systems stemming from a substantial fire at the Refinery's only operating flare. The Refinery processes crude oil into various refined petroleum products, which results in the

emission to the air of various pollutants, including $H_2S$ and $SO_2$.  When there is a process upset, operator/human error, or a malfunction, the Refinery may emit high levels of $H_2S$ and $SO_2$, uncombusted hydrocarbons, Flare Rainout, and/or other pollutants that alone or in combination pose an imminent and substantial endangerment to public health or welfare or the environment. The Refinery is not operating now but cannot be re-started or operated safely without Defendants first complying with the environmental and safety audit and compliance plan requirements set forth in the administrative order EPA issued on May 14, 2021 under Clean Air Act Section 303, 42 U.S.C. § 7603, an order that will remain in force only if aided by an order of this Court.

2.      $H_2S$ is a flammable, colorless gas with the odor of rotten eggs.  Inhalation of $H_2S$ can cause various adverse health effects, such as headaches, nausea, difficulty breathing among people with asthma, and irritation of the eyes, nose, and throat.  $SO_2$ is a colorless gas with an odor often described as that of a struck match.  Breathing high levels of $SO_2$ can cause respiratory distress, burning of the nose and throat, and other respiratory ailments.  Flare Rainout may be a mixture of various petroleum hydrocarbons, including fuel oil.  Breathing, drinking, or skin contact with Flare Rainout may cause nausea, skin or eye irritation, neurological effects, or other health issues.  Exposure to Flare Rainout, via inhalation of volatile components, dermal contact with the residues, or ingestion of or contact with impacted water, have been associated with a variety of adverse health impacts.  These impacts can include skin and eye irritation, skin hypersensitivity, liver damage, and possibly carcinogenic effects.

3.      From approximately February 4, 2021 to approximately May 12, 2021, on at least four occasions comprising at least eleven days, the Refinery emitted $H_2S$, $SO_2$, uncombusted hydrocarbons, and/or Flare Rainout at levels that had immediate and significant adverse impacts on downwind residents and required multiple public health advisories, the closure of schools and

2

government offices, and the mobilization of the Virgin Islands National Guard and Fire Service. On May 12, 2021, a large fire engulfed the top of the only operating flare at the Refinery (Flare #8), which may have damaged the flare to the point that it may not be able to operate safely.

4.      On May 13, 2021, Defendants notified EPA that they intended to voluntarily cease all processing activities at the Refinery for an unspecified period of time.

5.      On May 14, 2021, EPA issued a Clean Air Act Emergency Order ("EPA Order," Exhibit 1 hereto) to the Defendants under Section 303 of the Clean Air Act ("CAA"), 42 U.S.C. § 7603, prohibiting them from operating the Refinery for the term of the Order or until EPA determines, in consultation with the Virgin Islands Department of Planning and Natural Resources ("VIDPNR"), that operations can resume before the expiration of the EPA Order, and requiring that they undertake environmental and safety audits of the Refinery and develop a satisfactory plan to address deficiencies. Section 303 requires EPA to file a civil action if the Order needs to stay in effect for more than 60 days.  42 U.S.C. § 7603.  The United States thus files this civil action seeking injunctive relief under Section 303 of the CAA, 42 U.S.C. § 7603, to require compliance with the EPA Order, restrain Defendants from emitting Flare Rainout and/or excessive levels of $H_2S$ or $SO_2$ or uncombusted hydrocarbons, and/or require Defendants to take any necessary additional steps to cease the imminent and substantial endangerment to the public health or welfare or the environment their Refinery presents.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to CAA Section 303, 42 U.S.C. § 7603 (Emergency Powers), and 28 U.S.C. §§ 1331 (Federal Question) and 1345 (United States as Plaintiff).

7.      Venue is proper in this District pursuant to CAA Section 303, 42 U.S.C. § 7603 (Emergency Powers), and 28 U.S.C. § 1391(b) and (c), because Limetree conducts business in this District, the excessive releases of $H_2S$, $SO_2$, uncombusted hydrocarbons, and Flare Rainout occurred in this District, and the Refinery continues to threaten residents of this District.

## NOTICE

8.      Pursuant to CAA Section 303, 42 U.S.C. § 7603, prior to issuing the EPA Order, EPA consulted with representatives of VIDPNR to confirm the accuracy of the information on the basis of which EPA proposed to issue the EPA Order.

## PARTIES

9.      Authority to bring this action is vested in the Attorney General of the United States by Section 305 of the CAA, 42 U.S.C. § 7605 (Representation in litigation); and pursuant to 28 U.S.C. §§ 516 and 519.

10.     Defendant Limetree Bay Terminals, LLC is a limited liability company registered to do business in the U.S. Virgin Islands that owns and/or operates some or all of the Refinery. Limetree Bay Terminals, LLC is the holder of the Refinery's CAA Title V Operating Permit and CAA Prevention of Significant Deterioration ("PSD") permits, which apply to the Refinery's operations.

11.     Defendant Limetree Bay Refining, LLC is a limited liability company registered to do business in the U.S. Virgin Islands that owns and/or operates some or all of the Refinery. Defendant Limetree Bay Refining, LLC has been engaged in a project to refurbish and restart refining equipment at the Refinery including, but not limited to, the fluid catalytic cracking unit ("FCCU"), the delayed coker unit, crude units, vacuum units, par-isom unit, platformer unit, sulfur recovery units, the east side incinerator, hydro-treating units, heaters, boilers, compressor

engines, and flares.  Limetree Bay Refining, LLC is named as one of the permittees (along with Limetree Bay Terminals, LLC) in the Refinery's Title V Operating Permit renewal application.

## GENERAL ALLEGATIONS

### The Refinery

12.     Defendants own and/or operate the Refinery, which is located on approximately 1,500 acres on the south-central coast of St. Croix, U.S. Virgin Islands.  The Refinery, previously owned by HOVENSA, began operation in 1965 and continued to process crude oil until 2012.

13.     Limetree Bay Terminals, LLC and/or its corporate parent or associated business entities acquired the Refinery in January 2016.  Limetree Bay Terminals, LLC later transferred certain of the Refinery assets to Limetree Bay Refining, LLC.  The Refinery commenced efforts to restart Refinery operations in 2018.

14.     The communities of Clifton Hill, Profit Hills, Kingshill, University of Virgin Islands Campus, Hannah's Rest, Frederiksted, Estate Northside, Smithfield, Upper Bethlehem, Mars Hill, Estate Carlton, Golden Grove, Grove Place, Negro Bay, Williams Delight, Whim, Sandy Point, La Grange, and Prosperity are all located downwind of the Refinery.  These communities comprise the subdistricts of Southcentral, Northcentral, Northwest, Southwest and Frederiksted.  Approximately 20,980 people live and/or work in these subdistricts.

15.     Defendants began restarting Refinery operations in or about September 2020. One of Limetree's investors announced that production at the Refinery had recommenced on February 1, 2021.  On information and belief, as of February 2021, Defendants had restarted the following process units: crude units #5 and #6 (with limited capacity), vacuum unit #3, par-isom unit, platformer unit, two sulfur recovery units, east incinerator, delayed coker unit, and hydro-

treating units (6, 7, and 9).  Defendants also restarted only one of the Refinery's flares (Flare #8,

referred to in the Refinery's Title V Permit as "FCC Flare (L.P. Flare – STK 7941").

16.     Flare #8 is a 230-foot tall flare that is used to combust excess gases that contain a

mix of $H_2S$, carbon dioxide, and other gases such as hydrocarbons.  Flare #8 collects gases from

many areas of the Refinery including the sulfur recovery units (Nos. 3 and 4).  Gas enters Flare

#8 and is combusted as it moves up the flare tower through 41 staged burner tips.

17.     Not all of the gases entering Flare #8 are combusted even in normal operations

because flaring is not 100% efficient.  Although sulfur compounds entering the flare are

generally oxidized into $SO_2$ during combustion, some amount are emitted in their original form.

The amount of $H_2S$ that Flare #8 emits depends on the concentration of sulfur in the input gases

and the efficiency of combustion.  Likewise, the amount of uncombusted hydrocarbons that Flare

#8 emits depends on the composition of the input gases and the combustion efficiency of the

flare.

18.     Flare #8 is subject to the $H_2S$ input gas concentration limit specified in 40 C.F.R.

§ 60.103a(h) and the Refinery's Title V Operating Permit of 162 parts per million volume

("ppmv") determined hourly on a 3 hour rolling average basis, as well as operating limits (40

C.F.R. § 63.670) and total sulfur root-cause analysis and monitoring requirements (40 C.F.R.

§ 60.103a(c)).[1]

19.     Flare #8 has a maximum vent gas flow rate of 1,500,000 lbs/hr and is equipped

with instruments to monitor vent gas volumetric flow, pressure, temperature, steam assist flow,

---

[1] Defendants have reported exceedances of this limitation on several occasions between February 5, 2021 and May 12, 2021.  U.S. EPA has requested additional information under CAA Section 114, 42 U.S.C. § 7414, and if it concludes that these exceedances constitute violations of the Refinery's Title V Operating Permit or other federally enforceable requirements, the United States may seek to amend this Complaint to add one or more claims under CAA Section 113(b), 42 U.S.C. § 7413(b).

EPA-422

and a mass spectrometer to measure $H_2S$ content,  total sulfur content of vent gas, net heating value, as well as vent gas composition.

20.    From the restart of Refinery operations until May 26, 2021, Flare #8 was the only flare in service at the Refinery.

21.    At all times relevant to this action, the Defendants did not operate $SO_2$ monitors outside the Refinery, as required by permit, and also had no ambient $H_2S$ monitors installed.

22.    Defendants' Health, Safety and Environmental ("HSE") Department is responsible for both environmental compliance and health and safety compliance at the Refinery and the associated large marine loading terminal.  During times relevant to this Complaint, the HSE Department had a total of five non-contractor employees.  On information and belief, this is an unusually small environmental and health/safety compliance staff for a refinery of this size.

23.    The residents of the communities surrounding the Refinery are predominantly people of color and low-income populations that are already disproportionately burdened by environmental conditions, especially poor air quality.

24.    The demographics of the surrounding communities are indicative of a vulnerable community.  According to the 2010 census, the population comprises more than 90% people of color, with almost 27% living below the poverty line.  In 2018, the Federal Emergency Management Agency determined these communities to have high risk vulnerability based on a composite of social and economic factors.

25.    The communities surrounding the Refinery are residential and include several schools and at least one hospital.  These communities have suffered from complex environmental challenges for many years, including but not limited to contamination of the island's only

7

drinking water aquifer during the Refinery's operations from 1982 to the early 2000s, and impacts of air emissions from the Refinery's operations prior to 2012.

**Four Incidents Since February 1, 2021 Restart**

***Early February Incident***

26.     On February 4, 2021, just three days after Limetree's investors publicly announced the Refinery's successful resumption of production, Flare #8 emitted Flare Rainout in the form of an oily mist with heavy oil droplets.  This Flare Rainout deposited oil droplets on the community of Clifton Hill, covering hundreds of vehicles and homes (including surrounding soils), and contaminating vegetable gardens (some of which are used for subsistence) and residential rainwater cisterns.  On information and belief, the Flare Rainout was also deposited in other nearby communities.

27.     Many residents in Clifton Hill and other communities in the subdistrict rely on cisterns to collect rainwater for household use and to irrigate their gardens.  At least 70 of these cisterns were contaminated by the February 4 Flare Rainout from Flare #8.

28.     Flare systems are designed with process vessels, known as "knockout drums," whose purpose is to remove liquids from flare gases so as to prevent Flare Rainout.

29.     Flare Rainout is not a common event during startup of refinery operations and is considered a serious safety hazard to be avoided at any time.

30.     Oil contamination of soil and water threatens public health and welfare and/or the environment.

31.     Flare Rainout can result in "flaming rain," when the oil droplets entrained in flare gases ignite as they pass through the flare flame and rain down, while on fire, on the facility and

neighboring communities.  Flaming rain constitutes an ignition source for vapors and combustible material both at the facility and in downwind neighborhoods.

*April Incident*

32.    In early April, 2021, Limetree ceased operations at the Refinery for some period of time to make what Limetree called "operational adjustments."

33.    From 4:00 pm on April 19 until 4:00 pm on April 22, 2021, Defendants continuously fed gas into Flare #8 with $H_2S$ concentrations well in excess of the 162 ppmv limitation.  The peak $H_2S$ concentrations on each of these days, measured on a 3-hour rolling average basis, exceeded the 162 ppmv limitation by one to two orders of magnitude.

34.    From 9:00 pm on April 22, until 11:00 pm on April 23, 2021, Defendants again continuously fed gas into Flare #8 with $H_2S$ concentrations well in excess of the 162 ppmv limitation.  The peak concentration on April 23, measured on a 3-hour rolling average basis, was 91,649.0 ppmv $H_2S$, or more than 565 times the limit.

35.    From 3:00 pm to 11:00 pm on April 25, 2021, Defendants again continuously fed gas into Flare #8 with $H_2S$ concentrations well in excess of the 162 ppmv limitation, with a peak of 824 ppmv that day.

36.    Generally, people can smell $H_2S$ in the air when the $H_2S$ concentrations are in the range of from 0.0005 to 0.3 ppm. Exposure to low concentrations of $H_2S$ may cause irritation to the eyes, nose, or throat. It may also cause difficulty in breathing for some asthmatics. Respiratory distress or arrest has been observed in people exposed to very high concentrations of $H_2S$.

37.     On information and belief, Flare #8 emitted high amounts of $H_2S$ at various times between April 19 and April 25, 2021.  The "rotten egg" smell of the gas permeated throughout the Frederiksted area during this time.

38.     On April 23, 2021, the Virgin Islands Department of Education ("VIDOE") closed in-person instruction at three schools due to students and staff reporting nausea from the noxious "rotten egg" smell the day before.  The same day, VIDPNR advised the people with respiratory issues including asthma and allergies to consider taking protective action to avoid serious adverse health events.

39.     On April 24, 2021, the Virgin Islands Department of Health ("VIDOH") issued a press release warning St. Croix residents of potential negative health effects from the Refinery's $H_2S$ emissions.

40.     On information and belief, Flare #8 also emitted high amounts of $SO_2$ at various times between April 19 and April 25, 2021.

41.     Exposure to very high levels of $SO_2$ can be life threatening. Exposure to air with levels of 100 ppm of $SO_2$ is considered immediately dangerous to life and health.  Burning of the nose and throat, breathing difficulties, and severe airway obstructions may occur.

42.     On information and belief, ambient concentrations of sulfur in the air at ground level, in the form of $SO_2$, at a minimum exceeded Acute Exposure Guideline Level-1, putting asthmatics at risk of bronchoconstriction between April 19 and April 25, 2021.

43.     People who live and work in the areas downwind of the Refinery were adversely affected by $SO_2$ and/or $H_2S$ emitted from Flare #8 between April 19 and April 25, 2021.

EPA-426

***Early May Incident***

44.     From May 5 to May 7, 2021, the Defendants fed $H_2S$ into Flare #8 at concentrations that exceeded the 162 ppmv limitation on multiple occasions.  During this time, emissions of $H_2S$, $SO_2$, and/or uncombusted hydrocarbons from Flare #8 caused significant adverse effects to people who live and work in the areas downwind of the Refinery.

45.     From May 5 to May 7, 2021, the Virgin Islands Territorial Emergency Management Agency ("VITEMA") received more than one hundred complaints from citizens describing foul odors in their communities causing, among other things, headache, sore throat, and nausea.  EPA's National Response Center and Regional Emergency Operations Center received nearly two hundred complaints from citizens complaining of the same noxious smell and similar health effects from May 5 through May 12, 2021.

46.     On May 6, 2021, Defendants publicly acknowledged the release of hydrocarbon odors into areas west of the Refinery.

47.     An EPA On-Scene Coordinator who was driving by the Refinery on May 6, 2021 in the course of investigating the source of recent noxious odors, reported that the strong gasoline smell was overwhelming and nauseating.  He noted that in situations where he would be exposed to something similar, he would be wearing a respirator and other personal protective equipment.

48.     VIDOE closed local schools from May 6 to May 7 as a result of the odor.  The Virgin Islands Bureau of Motor Vehicles closed early on May 6 and remained closed on May 7 because of the effects the hydrocarbon odor was having on its employees.

49.     On May 7, 2021, the VI Governor activated the VI National Guard and the VITEMA in response to community complaints about the continued emissions from the Refinery.  During this time, several members of affected communities sought medical attention

11

at a local hospital as a result of the noxious odor.  Also on May 7, VIDOH issued a warning

urging residents with pre-existing respiratory conditions to avoid going outside or to move to

less-affected areas of St. Croix.

### *May 12 Incident*

50.      On May 12, 2021, the top of Flare #8 became engulfed in flame for several hours.

During this time, the Defendants emitted high levels of $H_2S$ and/or $SO_2$, exceeded the 162 ppmv

input limitation for $H_2S$, and emitted Flare Rainout that fell on downwind communities.

51.      In response to the fire, the Virgin Islands National Guard deployed and the Virgin

Islands Fire Service activated to provide support.

52.      Flare Rainout fell on local roads, homes (including associated soils), vehicles,

agricultural gardens, and rainwater cisterns.  Defendants urged local residents not to drink water

from their cisterns due to the risk of contamination and offered to provide alternative water

distribution.

53.      Defendants informed EPA on May 12, 2021 that they had ceased production at

the Refinery and informed EPA on May 13, 2021 that they had shut down all process units.  On

May 14, 2021, after the issuance of the EPA Order, Defendants informed EPA that they had

ceased all crude oil refining operations.  On information and belief, emissions from Flare #8 did

not cease until May 25 or May 26, 2021.

### *General Noncompliance with Air Permits*

54.      Between February 28, 2021 and May 20, 2021, Defendants notified EPA and/or

VIDPNR more than 70 incidences in which it had exceeded applicable air pollutant permit

limitations at the Refinery, including at least 35 separate notifications of $SO_2$ or $H_2S$ exceedances

at Flare #8.  From February 1, 2021 through May 31, 2021, the Defendants exceeded the 3-hour

rolling average 162 ppmv H2S permit limit applicable to Flare #8 on more than 660 separate

occasions.  In February 2021 alone, the Defendants exceeded this limit for more than half the

total operating time.

55.     After issuing the EPA Order, EPA became aware that in December 2020 and

January 2021, the Refinery had at least two other significant emissions events in addition to

those described above.  On December 8, 2020, during what the Defendants publicly called a

"minor refinery upset," the Refinery emitted a large cloud of steam and light hydrocarbons from

Vacuum Tower #3 that resulted in the temporary evacuation of some employees and the

mobilization of the Refinery's fire department.  During the January 2021 incident, which

occurred throughout the latter half of the month of January, the Defendants fed $H_2S$ into Flare #8

at concentrations that exceeded the 162 ppmv limitation on multiple occasions, and exceeded

5,000 ppmv for a number of hours during that period and 20,000 ppmv for at least 5 hours on

January 25.  On information and belief, during some periods in January 2021, $H_2S$ and $SO_2$ were

emitted from Flare #8 at levels at least as high as those during the April Incident.

### *Prospects for Continued Operations at the Refinery*

56.     On information and belief, the fire that engulfed the top of Flare #8 on May 12,

2021 damaged critical components of Flare #8 such that Refinery operations cannot be

conducted safely until inspections and repairs are made.

57.     As set forth in Exhibit 1, multiple different failures caused each of the above-

described incidents in February, April and May of 2021, including the overloading of

inadequately-sized equipment or systems meant to prevent such an incident, failure or

inoperability of backup systems, failure of pressure safety valves and process monitoring

devices, operator error, and instrumentation/communications errors.  On information and belief,

this breadth of underlying causes and frequency of incidents (including those in December, 2020 and January, 2021) is indicative of systemic operational and management failures.

58.    On information and belief, the Refinery cannot operate safely until the root causes of these problems, including systemic management issues, are identified and addressed.

### *EPA Emergency Order and Need for this Civil Action*

59.    On May 14, 2021, EPA issued an administrative order under Section 303 of the CAA (EPA Order) requiring the Defendants to cease operations at the Refinery until they have addressed the problems that caused the incidents above in order to ensure that the Refinery is no longer presenting an imminent and substantial endangerment to public health, welfare, or the environment.

60.    The EPA Order requires the Defendants to undertake independent third party audits of the Refinery's environmental compliance and process units and, within 56 days of the issuance of the Order, submit a plan (the "Corrective Action Plan") for EPA review and approval to implement corrective measures in response to the audits' findings.  See Exh.1 at ¶¶ 105-117.

61.    Under CAA Section 303, the EPA Order would expire 60 days after its issuance, i.e. on July 13, 2021, absent the filing of this civil action.

62.    EPA's review and approval of the Corrective Action Plan may not be completed between July 9, 2021, when Defendants are required to submit it, and July 13, 2021, when the EPA Order would expire absent this civil action.

63.    The EPA Order does not require the Defendants to implement or comply with the Corrective Action Plan upon its approval by EPA.

64.     Defendants' implementation and compliance with the Corrective Action Plan will likely occur, if at all, only after the expiration of the EPA Order, making any commitment to comply unenforceable absent the relief requested herein.

65.     Absent the relief requested herein, upon the expiration of the EPA Order, the Refinery could restart operations at any time without advance notice to EPA and without being bound by the requirements of the EPA Order.

## CLAIM FOR RELIEF

66.     Paragraphs 1 through 65 are realleged and incorporated herein by reference.

67.     Congress enacted the CAA "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). Section 303 of the CAA ("Emergency Powers") states:

> Notwithstanding any other provision of this chapter, the Administrator, upon receipt of evidence that a pollution source or combination of sources (including moving sources) is presenting an imminent and substantial endangerment to public health or welfare, or the environment, may bring suit on behalf of the United States in the appropriate United States district court to immediately restrain any person causing or contributing to the alleged pollution to stop the emission of air pollutants causing or contributing to such pollution or to take such other action as may be necessary.

42 U.S.C. § 7603 (emphasis added).

68.     CAA Section 302(g) defines an "air pollutant" as "any air pollution agent or combination of such agents, including any . . . chemical substance or matter which is emitted into or otherwise enters ambient air." 42 U.S.C. § 7602(g).  At all times relevant to the Complaint, $H_2S$, $SO_2$, uncombusted hydrocarbons, and Flare Rainout have each been an "air pollutant" within the meaning of CAA Section 302(g), 42 U.S.C. § 7602(g), because they are each a chemical substance that is emitted to the air from the Refinery.

15

69.    The CAA does not define "pollution source." The Refinery is a pollution source or "combination of sources" within the meaning of 42 U.S.C. § 7603, because it is the source of $H_2S$, $SO_2$, uncombusted hydrocarbons, and Flare Rainout into the air.

70.    CAA Section 302(e) defines "person" to include individuals, corporations, partnerships and associations. 42 U.S.C. § 7602(e).  Defendants are each a person because each is a limited liability company that is either a "corporation" or an "association" within the meaning of CAA Section 302(e).

71.    The term "welfare" includes effects on personal comfort and well-being.  42 U.S.C. § 7602(h).  $H_2S$, $SO_2$, uncombusted hydrocarbons, and Flare Rainout emitted from the Refinery have had adverse effects on the personal comfort and well-being of thousands of people who live and work downwind of the Refinery.

72.    $H_2S$, $SO_2$, uncombusted hydrocarbons, and/or Flare Rainout emitted from the Refinery have had adverse effects on the health of many people who live and work in the communities downwind of the Refinery.

73.    $H_2S$, $SO_2$, uncombusted hydrocarbons, and/or Flare Rainout emitted from the Refinery have had adverse effects on the environment in areas downwind of the Refinery.

74.    Without the relief requested herein, the Refinery cannot operate without emitting $H_2S$, $SO_2$, uncombusted hydrocarbons, Flare Rainout, and/or other pollutants at levels that have adverse effects on the personal comfort, well-being, and/or health of people who live and work downwind of the Refinery and on the environment.

75.    Future emission of Flare Rainout by the Refinery could cause Flaming Rain, posing a risk of combustion, fire, and/or explosion, which would have adverse effects on

16

personal comfort, well-being and/or health of both nearby residents and Refinery workers and/or on the environment.

76.    The Refinery is a pollution source that is presenting an imminent and substantial endangerment to public health or welfare or the environment.

77.    Defendants, by their operation of the Refinery, cause or contribute to the emission of $H_2S$, $SO_2$, uncombusted hydrocarbons, and Flare Rainout from the Refinery.

78.    Defendants, as the owners and/or operators of the Refinery, are liable for injunctive relief to immediately stop excess emissions of $H_2S$, $SO_2$, uncombusted hydrocarbons, and emissions of Flare Rainout, and to take such other action as may be necessary to abate the endangerment.

79.    EPA received evidence that the Refinery is presenting an imminent and substantial endangerment to public health or welfare or the environment.  EPA determined that issuance of the EPA Order was necessary to assure prompt protection of public health or welfare or the environment because it was not practicable to wait for the commencement of a civil action in United States District Court to assure such prompt protection.

80.    The filing of this civil action automatically extends the effective period of the EPA Order by 14 days, and the Court is authorized to order any longer period as may be appropriate, in addition to ordering such other and further relief as it deems proper.

EPA-433

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff the United States of America respectfully requests that the Court

provide the following relief:

1.     Order Defendants to continue to comply with the requirements set forth in the

EPA Order for an additional period as appropriate to ensure that the Refinery operations will not

continue to present an imminent and substantial endangerment.

2.     Order Defendants to take all measures necessary to eliminate the imminent and

substantial endangerment posed by the Refinery before restarting Refinery operations, including

but not limited to implementing and complying with measures in the Corrective Action Plan

upon its approval by EPA and installing and operating ambient air monitoring equipment for $H_2S$

and $SO_2$ in appropriate locations potentially downwind of the Refinery to demonstrate that the

Refinery no longer presents an imminent and substantial endangerment.

3.     Award Plaintiff such other and further relief that the Court deems just and proper.

Respectfully submitted,


JEAN E. WILLIAMS
Acting Assistant Attorney General
Environment and Natural Resources Division


Myles E. Flint II, Senior Counsel
Eric D. Albert, Senior Attorney
Sheila McAnaney, Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, DC 20044-7611
Phone: 202-307-1859
Email: myles.flint@usdoj.gov


18

GRETCHEN C.F. SHAPPERT
United States Attorney
United States Virgin Islands
Federal Building and U.S. Courthouse
5500 Veterans Drive, Room 260
St. Thomas, USVI 00802

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United States of America

## DEFENDANTS

Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Myles E. Flint, II , United States Department of Justice, Environment & Natural Resources Division, Environmental Enforcement Section, P.O Box 7611, Ben

Attorneys *(If Known)*
Mark DeLaquil
Baker & Hostetler LLP
Washington Square, Suite 1100

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [x] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | | [ ] 790 Other Labor Litigation | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 791 Employee Retirement Income Security Act | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 864 SSID Title XVI | [x] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Section 303 of the Clean Air Act, 42 U.S.C. § 7603

Brief description of cause:
Plaintiff seeks injunctive relief related to imminent and substantial endangerment to public health or welfare or the environment posed by Defendants

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE
July 12, 2021

SIGNATURE OF ATTORNEY OF RECORD
/s/Myles E. Flint, II

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

EPA-436

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)**   **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)**   **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.)**

**III.**   **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.**  Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**   **Requested in Complaint.**  Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      Civ. A. No.  1:21-cv-00264 |
| | ) |
| LIMETREE BAY REFINING, LLC | ) |
| | ) |
| and | ) |
| | ) |
| LIMETREE BAY TERMINALS, LLC | ) |
| | ) |
| Defendants. | ) |
| | ) |

**JOINT STIPULATION**

WHEREAS, the United States of America, by the authority of the Attorney General of the United States, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA") filed a civil action against defendants Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC (collectively, "Limetree Bay") under Section 303 of the Clean Air Act ("CAA"), 42 U.S.C. § 7603.

WHEREAS, the complaint seeks injunctive relief under Section 303 of the CAA requiring Limetree Bay to comply with a CAA Emergency Order ("EPA Order," Exhibit 1 hereto) that EPA issued on May 14, 2021, and other relief.

WHEREAS, on June 16, 2021, EPA issued an information request to Limetree Bay under Section 114(a) of the CAA, 42 U.S.C. § 7414(a) ("114 Request," Exhibit 2 hereto) requiring Limetree Bay to install and operate ambient air monitoring equipment for hydrogen sulfide ($H_2S$) and sulfur dioxide ($SO_2$) at nine specified locations.

WHEREAS, Limetree Bay began to idle the Refinery on May 12, 2021, and represents that it does not intend to restart the Refinery or any Refinery Process Unit at the current time, except as necessary to purge hydrocarbons from process units and other equipment as part of the process of bringing the Refinery to a state of indefinite shutdown.

WHEREAS, Limetree Bay continues to operate the Terminal and intends to conduct the activities identified in Paragraph 13.

WHEREFORE, the Parties hereby stipulate and agree as follows:

1.      Limetree Bay certifies that the Refinery[1] has been idled.

2.      Except as provided pursuant to Paragraphs 9, 10 and 13 below, Limetree Bay shall notify the United States and the Court not less than ninety (90) days before restarting the Refinery, or any Refinery Process Unit for any purpose.

3.      The Audit Reports required by Paragraph 115.d of the EPA Order were submitted to EPA by June 25, 2021, in compliance with the deadline set forth in Paragraph 115.d of the EPA Order.

4.      Except as provided pursuant to Paragraphs 9, 10 and 13 below, by no later than ninety (90) days prior to any restart of the Refinery or any refinery Process Unit, Limetree Bay shall submit to EPA the Plan required by Paragraph 115.*l* of the EPA Order (the "303 Order Plan") that addresses all findings, conclusions, and observations set forth in each Audit Report, with a schedule for implementation of all corrective measures.  The 303 Order Plan shall specify which measures must be completed prior to restart of the Refinery or any refinery Process Unit.

---

[1]Terms used in this Stipulation that are defined in the Clean Air Act or in regulations promulgated pursuant to the Act shall have the meanings assigned to them in the Act or such regulations, unless otherwise provided in the Complaint, EPA Order, Consent Decree or First Modification of the Consent Decree.

5.      As part of the 303 Order Plan submitted under Paragraph 4, Limetree Bay shall identify any changed conditions at the Refinery that occurred since May 12, 2021, including but not limited to any corrective measures taken.

6.      Before Limetree Bay restarts the Refinery or any Refinery Process Unit, it shall complete all measures necessary to eliminate any imminent and substantial endangerment to public health or welfare or the environment posed by the Refinery or Refinery Process Unit.

7.      Except as provided pursuant to Paragraphs 9, 10 and 13, no later than ninety (90) days prior to restart of the Refinery or any Refinery Process Unit, Limetree Bay shall submit to EPA an ambient air monitoring plan ("Monitoring Plan") that includes the operation of $H_2S$ and $SO_2$ monitors at the nine (9) monitoring sites specified in Table A of the 114 Request ("Monitoring Sites"), as required by the 114 Request.

8.      Except as provided pursuant to Paragraphs 9, 10 and 13, Limetree Bay shall install and operate the $H_2S$ and $SO_2$ monitors at the Monitoring Sites, as well as a meteorological tower, as required by the 114 Request, no later than thirty (30) days prior to any restart of the Refinery or any refinery Process Unit.

9.      Limetree Bay shall submit to EPA a plan ("Hydrocarbon Purge Plan") for purging hydrocarbons from Refinery Process Units and other equipment at the Refinery as part of the process of bringing the Refinery to a state of indefinite shutdown. The Hydrocarbon Purge Plan shall identify the activity or activities that Limetree Bay intends to undertake under the Hydrocarbon Purge Plan, as well as the measures Limetree Bay has taken or will take prior to restarting, or during the operation of, any Refinery Process Unit covered by the Hydrocarbon Purge Plan, to ensure that the purging process and any associated activities do not present an imminent and substantial endangerment to public health or welfare or the environment, including

3

but not limited to measures in response to recommendations contained in the Audit Reports.  The

Hydrocarbon Purge Plan shall include, among other things: the operation of ambient air

monitoring during all purging operations and compliance with applicable requirements of 40

C.F.R. Part 60, Subpart Ja and 40 C.F.R. Part 63, Subpart CC.

10.     The purging process and any associated activities shall be conducted in accordance with

the EPA-approved Hydrocarbon Purge Plan, subject to any modifications necessary based on

monitoring data or other information received by EPA suggesting that operations under the

Hydrocarbon Purge Plan may present an imminent and substantial endangerment to public health

or welfare, or the environment.  Before EPA makes or requires any modifications to an approved

Hydrocarbon Purge Plan, the Parties shall meet and confer.  Any proposed modification by

Limetree Bay to the EPA-approved Hydrocarbon Purge Plan shall be subject to Paragraph 12,

below.  Limetree Bay shall not begin the purging process or any associated activities without

EPA's approval, nor shall Limetree Bay use any Refinery Process Unit other than as specified in

the EPA-approved Hydrocarbon Purge Plan.

11.     Limetree Bay may submit and EPA may approve one or more Hydrocarbon Purge Plans

subject to Paragraphs 9 and 10.

12.     Any plan required by this stipulation shall be submitted to EPA for its review, comment,

and approval or approval with modifications, and shall be sent by email to the EPA and VIDPNR

representatives listed in Paragraph 116 of the EPA Order.

13.     For the avoidance of doubt, nothing in the 303 Order or this Stipulation prevents

Limetree Bay from operating equipment necessary for Terminal operations, or necessary to

generate electricity or provide drinking water or wastewater management for the Facility, the

HOVENSA Environmental Response Trust, and for the worker residences dependent on the

4

Facility for such services.

14.    The Parties agree that further proceedings in this case should be stayed for a period of ninety (90) days from the date of filing this Joint Stipulation, and Limetree Bay does not oppose the United States' Unopposed Motion for Stay filed simultaneously with this Stipulation; and the Parties shall submit a joint status report sixty days after the date this Stipulation is filed.

THE UNDERSIGNED PARTY enters into this Stipulation in the matter of United States v. Limetree Bay Refining LLC and Limetree Bay Terminals LLC.

FOR PLAINTIFF THE UNITED STATES OF AMERICA:

JEAN WILLIAMS
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

Date: July 12, 2021

MYLES E. FLINT, II, Senior Counsel
ERIC D. ALBERT, Senior Attorney
SHEILA McANANEY, Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
(202) 307-1859

6

THE UNDERSIGNED PARTY enters into this Stipulation in the matter of United States v. Limetree Bay Refining LLC and Limetree Bay Terminals LLC.

FOR DEFENDANT LIMETREE BAY
TERMINALS, LLC:

Date: 07/12/2021

MARK CHAVEZ
General Counsel
Limetree Bay Terminals, LLC
One Estate Hope
Christiansted, USVI 00820

7

Date Filed: 04/13/2023        Page: 341        Document: 46-1        Case: 23-1094

THE UNDERSIGNED PARTY enters into this Stipulation in the matter of United States v. Limetree Bay Refining LLC and Limetree Bay Terminals LLC.

FOR DEFENDANT LIMETREE BAY
REFINING, LLC:

Date:    07/12/2021

MARK DELAQUIL
MATTHEW THURLOW
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue NW
Washington, D.C.  20036
(202) 861-1500

8

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 2**

| | | |
|---|---|---|
| In the matter of | ) | |
| | ) | |
| **Limetree Bay Terminals, LLC** | ) | |
| | ) | **CLEAN AIR ACT** |
| 1 Estate Hope | ) | **EMERGENCY ORDER** |
| Christiansted, Virgin Islands 00820 | ) | **CAA-02-2021-1003** |
| | ) | |
| And | ) | |
| | ) | |
| **Limetree Bay Refining, LLC** | ) | |
| | ) | |
| 1 Estate Hope | ) | |
| Christiansted, Virgin Islands 00820 | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| Proceeding under Section 303 of | ) | |
| the Clean Air Act, 42 U.S.C. § 7603 | ) | |

## STATEMENT OF AUTHORITY

This emergency order ("Order") is issued to Limetree Bay Terminals, LLC ("LBT") and

Limetree Bay Refining, LLC ("LBR") (collectively, "Limetree" or "Respondents") pursuant to

the authority granted to the Administrator of the United States Environmental Protection Agency

("EPA") by Section 303 of the Clean Air Act ("CAA'" or "the Act"), 42 U.S.C. § 7603, to

protect public health or welfare, or the environment. The authority to issue this Order has been

delegated by the Administrator of EPA to the Regional Administrator for EPA Region 2, and

redelegated to the Director of the Caribbean Environmental Protection Division, by Delegation

No. 7-49. This Order is issued by the Director of the Caribbean Environmental Protection

Division, of EPA Region 2.

Section 303 of the Act provides that:

[T]he Administrator, upon receipt of evidence that a pollution source or

1

combination of sources (including moving sources) is presenting an imminent and substantial endangerment to public health or welfare, or the environment, may bring suit on behalf of the United States in the appropriate United States district court to immediately restrain any person causing or contributing to the alleged pollution to stop the emission of air pollutants causing or contributing to such pollution or to take such other action as may be necessary.  If it is not practicable to assure prompt protection of public health or welfare or the environment by commencement of such a civil action, the Administrator may issue such orders as may be necessary to protect public health or welfare or the environment.  Prior to taking any action under this section, the Administrator shall consult with appropriate State and local authorities and attempt to confirm the accuracy of the information on which the action proposed to be taken is based.  Any order issued by the Administrator under this section shall be effective upon issuance and shall remain in effect for a period of not more than 60 days, unless the Administrator brings an action pursuant to the first sentence of this section before the expiration of that period.  Whenever the Administrator brings such an action within the 60-day period, such order shall remain in effect for an additional 14 days or for such longer period as may be authorized by the court in which such action is brought.

## **PARTIES BOUND**

1.       This Order applies to and is binding upon the Respondents, their officers, directors, employees, agents, trustees, receivers, successors, assigns, and all other persons, including but not limited to firms, corporations, limited liability companies, subsidiaries, contractors, consultants, and lessees acting under or on behalf of Respondents in connection with the implementation of this Order.

2.       Respondents shall be responsible and liable for conducting the activities specified pursuant to this Order, regardless of who performs the activities.  Respondents shall be liable for the conduct of employees, agents, contractors, consultants, or lessees to satisfy the requirements of this Order.

3.       No change in the ownership of the facility affected by this Order or the ownership or corporate status of Respondents shall in any way alter, diminish, or otherwise affect the responsibilities of Respondents under this Order.  Respondents shall provide a copy of this Order to any successor(s) during the pendency of this Order.

2

**FINDINGS OF FACT**

The Director of the Caribbean Environmental Protection Division in EPA Region 2 makes the following Findings of Fact:

4.      Prior to issuing this Order, EPA consulted with representatives of the Virgin Islands Department of Planning and Natural Resources ("DPNR") as required by Section 303 of the Act.

5.      This Order concerns a facility located at 1 Estate Hope in Christiansted, Virgin Islands ("Facility"). The Facility includes a marine loading terminal (including storage capacity) and an integrated petroleum refinery ("Refinery" or "Refinery Operations"). The Facility is located on approximately 1,500 acres on the south central coast of St. Croix, U.S. Virgin Islands ("USVI").

6.      Limetree Bay Terminals, LLC is a corporation that owns and/or operates some or all of the Facility. LBT is registered to do business in the U.S. Virgin Islands.

7.      The Facility operates under a number of air permits, such as Prevention of Significant Deterioration ("PSD") and CAA Title V operating permits. LBT is named as the owner and/or operator of the Facility and responsible for Facility Clean Air Act compliance obligations, including for its Refinery Operations, in multiple air permits.

8.      The Facility's Title V operating permit is permit number STX-TV-003-10 (the "Title V Permit"), and it is currently issued to "Limetree Bay Terminals LLC." The Title V Permit covers the Facility's Refinery Operations, among others.

3

9.      The Facility also operates under three PSD permits (the "PSD Permits")
that were amended on November 5, 2018 to reflect the transfer of ownership of the
Facility from HOVENSA, LLC to "Limetree Bay Terminals, LLC."  Some or all of these
PSD permits encompass Refinery Operations.

10.      Limetree Bay Refining, LLC is a corporation that owns and/or operates
some or all of the Facility, including its Refinery Operations.  LBR is registered to do
business in the U.S. Virgin Islands.

11.      On its website, Limetree describes LBR as "executing a project to
refurbish and restart its St. Croix, USVI, deep conversion [petroleum] refinery" with peak
processing capacity of 650,000 barrels of petroleum feedstock per day.

12.      On July 30, 2018, the Legislature of the Virgin Islands approved an
agreement with LBR titled "Refinery Operating Agreement by and among the
Government of the Virgin Islands and Limetree Bay Refining, LLC," dated July 2, 2018.

13.      According to the Limetree Title V Permit, the Facility was originally
owned and/or operated by Hess Oil Virgin Islands Corporation ("HOVIC").  Facility
operations began in 1965.  On October 30, 1998, Amerada Hess Corporation, the parent
company of HOVIC, and Petroleos de Venezuela, S.A. ("PDVSA") formed a new
corporation, HOVENSA L.L.C. ("HOVENSA"), which acquired ownership and
operational control of the St. Croix Refinery formerly known as HOVIC.  Limetree
and/or its corporate parent or associated business entities acquired the Facility in 2016.

14.      Petroleum refineries separate crude oil into a wide array of petroleum
products through a series of physical and chemical separation techniques.  These
techniques include fractionation, cracking, hydrotreating, combination/blending
processes, and manufacturing and transport.

4

15.    Limetree has described the Facility's refining operations as being conducted in the East Refinery, which includes crude units, a vacuum unit, a delayed coker unit ("DCU"), platformers, hydrotreaters, fluid catalytic cracking ("FCC"), an alkylation complex, an ultra-low sulfur gasoline unit, and a sulfolane complex. The East Refinery was developed in the 1970s, with the FCC added in 1993 and the DCU built in 2002. LBR Refinery Operations also include two flares (Flare #3 and Flare #8), two sulfur recovery units, one incinerator and a power generation complex.

16.    According to Limetree, LBR started conducting activities to restart the operation of the Refinery in 2018. Among the units that Limetree has since restarted were the following: crude units #5 and #6 (limited capacity), vacuum unit #3, par-isom unit, platformer unit, sulfur recovery units, east incinerator, DCU, hydro-treating units (6, 7, and 9), reverse osmosis water plant, and gas turbines (GT-8, GT-9, GT-10, GT-11, and GT-13).

17.    The Facility is located on the island of St. Croix. St. Croix is an island in the Caribbean Sea that is approximately 22 miles long (east to west) and 7 miles wide (north to south). As of the 2010 United States Census, the population of St. Croix was 50,601. The island of St. Croix is divided into nine subdistricts (population): East End (2,453), Anna's Hope Village (4,041), Christiansted (2,626), Sion Farm (13,003), Southcentral (8,049), Northcentral (4,977), Northwest (4,863), Southwest (7,498) and Frederiksted (3,091). The Facility is located on the southern shore of St. Croix, near the middle of the island east to west, within the Southcentral subdistrict.

18.    According to EPA review of the National Weather Service data for February through May 2021 for St. Croix's Henry E. Rohlsen Airport meteorological station, the prevailing wind blows from the east and east-southeast to the west and west-

5

  
northwest.  Wind direction prevalence indicates that communities located within Southcentral, Southwest, Frederiksted, Northwest, and portions of Northcentral are located downwind of the Facility.  Among such communities are the following: Clifton Hill, Profit Hills, Kingshill, University of Virgin Islands Campus, Hannah's Rest, Frederiksted, Estate Northside, Smithfield, Upper Bethlehem, Mars Hill, Estate Carlton, Golden Grove, Grove Place, Negro Bay, Williams Delight, Whim, Sandy Point, La Grange, and Prosperity.  Many residents live and work in these communities.

**The Limetree Refinery**

19.    Refineries in general emit a whole host of pollutants, ranging from nitrous oxides ("$NO_X$"), sulfur dioxide ("$SO_2$"), and carbon monoxide ("CO") to volatile organic compounds ("VOC"), hydrogen sulfide ("$H_2S$"), and particulate matter "(PM)".  $NO_x$, $SO_2$, and CO are typically emitted from combustion sources such as heaters, boilers and gas turbines.  The VOCs contain light hydrocarbons.  During start up, any VOCs are usually conveyed to a flare to be combusted.

20.    The Refinery Operations separate crude oil into various components. Light ends (refinery fuel gas ("RFG")) are sent to the Facility's fuel gas system ("East Fuel Gas System"), while naphtha, jet fuel, kerosene, and No. 2 oil are further processed to remove sulfur.  The $H_2S$ gas generated from the desulfurization process is sent to the sulfur recovery plant to be treated by two sulfur recovery units.

21.    RFG is a mixture of $H_2S$ and other gases that is used to supply fuel to the various process heaters at the Refinery.  This RFG collection and distribution system is referred to as the East Fuel Gas System.  $H_2S$ is removed from the Refinery fuel gas system using amine scrubbers.  The gas that enters amine unit is high in $H_2S$, and is then processed in a sulfur recovery unit to convert $H_2S$ into elemental sulfur.

22.     LBR uses a flare known as Flare #8 to combust excess Refinery gas that contains a mix of $H_2S$, $CO_2$, and other gases such as hydrocarbons.

23.     Emissions from flaring may include carbon particles (soot), unburned hydrocarbons, CO, partially burned and altered hydrocarbons, NOx and, if sulfur containing material such as hydrogen sulfide is flared, $SO_2$.

24.     Sulfur compounds going to a flare are converted to $SO_2$ when burned, though flare efficiency is not 100%.  The amount of $SO_2$ emitted depends directly on the quantity of sulfur in the flared gases.

25.     The Refinery has a flare header system that collects and routes gases from process units, ancillary equipment, and the fuel gas system from locations throughout the Refinery to Flare #8. The Flare #8 header system collects gases from numerous areas of the Refinery, including but not limited to the amine units (Nos. 4, 5, 6 and 7), the sulfur recovery units (Nos. 3 and 4), the Coker Unit, and the East Fuel Gas System.[1]

26.     Flare #8 is a steam assisted flare 230 feet above grade.  Gas enters the flare for burning up through 41 staged burner tips.

27.     Flare #8 is subject to an $H_2S$ concentration limit specified in 40 C.F.R. § 60.103a(h) (162 parts per million ("ppm")) determined hourly on a 3-hr rolling average basis), as well as total sulfur ("TS") root-cause analysis requirements and monitoring requirements specified in 40 C.F.R. § 60.103a(c), and operating limits specified in 40 C.F.R. § 63.670.

---

[1] The full list of areas that send gas to Flare #8 includes crude unit No. 5; liquified propane gas ("LPG") treater No. 1; utility area No. 3 (Boilers 6, 7, 8, and 9); powerhouse No. 2 (Gas Turbines); utility area No. 3 (Boiler 10); crude unit No. 6; lean oil absorber/disulfide oil recovery; LPG treater No. 2; amine units (No. 4, 5, 6 and 7); high pressure fuel gas treater; gas recovery unit No. 2; LPG fractionation unit No. 3; deisopentanizer/IC5 Sweetener; vacuum unit No. 3; distillate desulfurizers (No. 6, 7 and 9); platformer & hydrobon No. 3; platformer No. 4; dimersol; flare system (East); benzene stripper (East); sour water strippers (No. 3 and 4); sulfur recovery units (No. 3 and 4); tail gas treating unit; sour water stripper No. 5; flares – low and high pressures; coker unit; coker nitrogen system; west interconnects; East Fuel Gas System; hydrogen tie-ins (east); and butane and propane system.

7

28.     Flare #8 has a maximum vent gas flow rate of 1,500,000 lb/hr, and is not equipped with a Flare Gas Recovery System ("FGRS").

29.     The Flare #8 header is equipped with monitoring instruments to measure volumetric flow, hydrogen sulfide content, total sulfur content, and vent gas composition, to demonstrate compliance with CAA requirements at 40 C.F.R. Part 60, Subpart Ja and 40 C.F.R. Part 63, Subpart CC.  The monitoring instrumentation also measures certain other Flare #8 vent gas constituents.

30.     The Facility's Title V permit, citing 40 C.F.R. § 60.104(a)(1), bars combustion in various locations at the Facility of fuel gas that contains hydrogen sulfide in excess of 0.1 gr/dscf.  Two of these locations include Flare #8 and the East Fuel Gas System.

**Refinery Restart**

31.     On February 1, 2021, EIG Global Energy Partners ("EIG"), a controlling investor in Limetree Bay Ventures, LLC[2], announced that the Refinery had successfully resumed operations and begun production and commercial sales of refined products.

32.     According to a recent statement from LBT and LBR, "Limetree Bay Refining, LLC, restarted [Refinery] operations in February 2021, and is capable of processing around 200,000 barrels per day.  Key restart work at the site began in 2018, including the 62,000 barrels per day modern, delayed Coker unit, extensive desulfurization capacity, and a reformer unit to produce clean, low-sulfur transportation fuels that will meet International Marine Organization ("IMO") standards required under

---

[2] Limetree's website describes Limetree Bay Ventures, LLC, as "a large-scale energy complex strategically located in St. Croix, U.S. Virgin Islands. The complex consists of Limetree Bay Refining, a refinery with peak processing capacity of 650 thousand barrels of petroleum feedstock per day, and Limetree Bay Terminal, a 34-million-barrel crude and petroleum products storage and marine terminal facility serving the refinery and third-party customers."

8

international law in 2020. The restart project provided much needed economic

development in the U.S.V.I. and created more than 4,000 construction jobs at its peak and

more than 600 full-time jobs currently."

33.     Since February 1, 2021, at least four incidents have occurred at the

Facility that have each had an immediate and significant health impact on multiple

downwind communities.

**February 4, 2021 Incident**

34.     On February 4, a mixture of oil and water, in the form of an oily mist, was

emitted as air emissions from Flare #8 at the Facility (the "Feb. 4 Incident"). These

emissions included liquid droplets of oil.

35.     In a letter sent from Limetree to DPNR on March 3, 2021, Limetree

explained the cause of the Feb. 4 Incident as follows ("Limetree 3/3/21 Letter"):

> "On February 4, 2021, the Coker unit was shut down for repairs. Operations was
> preparing to quench and open coke drum D-8504 as part of the normal shut down
> process. At approximately 02:30hrs, the Coker Drum D-8504 was being prepared
> to start the procedure for water quenching. The quench water control valve was
> 100% open, resulting in a large quantity of water entering the drum. The water
> evaporated quickly after contacting the hot coke. . . . [T]he pressure safety valves
> opened to relieve pressure . . . A mixture of oil and water vapor was sent to the
> containment system, exceeding its capacity and ultimately exiting through the
> No.8 flare."

36.     The Limetree 3/3/21 letter further explains the immediate impact of the

Feb. 4 Incident on the surrounding community, stating:

> "Around 14:30 hrs, calls were received by the Limetree Command Center from
> residents in the Clifton Hill area complaining of oil droplets on their vehicles and
> homes. Thereafter, Limetree immediately activated its Incident Command
> Response to address the impact on the community. . . . Complainants were
> contacted and told to disconnect their cisterns from the roof spouts if possible. A
> total of 11 complaints were received on February 4, 2021. On February 5, 2021,
> Limetree teams were dispatched to follow-up with residents in person and
> confirmed the presence of oil droplets on cars and homes. Plans were put in place
> to clean residents' cars and roofs. Additional complaints were made in following

days."

37.     Limetree was aware of the impact this event had on the surrounding community, and paid for various cleaning and decontamination work and provided bottled water to the community.  In a March 3, 2021 press release, Limetree stated, "Limetree's environmental team was able to field verify the area impacted by the release, which was determined to be the Clifton Hill community."

38.     As of March 16, 2021, Limetree had reported to EPA that the Feb. 4 Incident resulted in 193 residences with potential contamination and 148 roofs and 245 cars that required cleaning.  Samples were taken from 163 cisterns, and at the time the results of 135 of those samples had been received.  70 of those 135 cisterns were identified as contaminated.  At the time, 65 had been reportedly cleaned.

39.     Many in the community nearby the Facility rely on cisterns for their household water use.  A March 21, 2021 news article explained that, "Ever since the refinery contaminated St. Croix's groundwater [under HOVENSA's prior operation], cisterns have become a necessity on the island—catching rain to provide water for residents to drink, wash with or . . . irrigate their vegetable gardens."

40.     Residents also reported that the Feb. 4 Incident resulted in the oily mixture depositing on their vegetable gardens.  One resident said that she and her husband ate only from their garden, but that the Feb. 4, 2021 Incident "destroyed all our foods" and "[e]verything was dead."

41.     In an April 29, 2021 meeting with EPA officials, another resident living in the impacted Clifton Hill area explained that he collected water from his roof in a cistern, for filtration for drinking water and for his sheep.  The Feb. 4 Incident resulted in oil on his roof and in his cistern.  Limetree cleaned his cistern 2-3 weeks after the Feb. 4

Incident, but did not conduct follow-up sampling.  Limetree provided bottled water, but

he is concerned about the incident's impact on his plants and the produce he grows in his

garden.

42.    During an April 30, 2021, site visit to the Facility by staff from EPA and

DPNR, Limetree representatives said that Limetree believes that the release was a mist

with heavy oil in it, and acknowledged that the mist reached areas in Clifton Hill.  When

asked, Limetree representative said that the droplets passed through a lit flare flame,

though they did not believe that flaming droplets of oil had been recorded.

43.    Emissions of oil droplets from a flare is called "flare rainout."  Flare

rainout can create both environmental and physical safety hazards.  Oil contamination of

soil and water bodies creates environmental and public health hazards.  While there is no

evidence that "flaming rain" occurred during the Feb. 4 Incident, flare rainout can also

result in physical and safety hazards such as "flaming rain" where the oil droplets ignite

as they pass through the flare flame and rain down while on fire in the refinery and

nearby neighborhoods, creating sources of ignition for vapors in the refinery and igniting

combustible materials and starting fires inside the refinery and in adjacent

neighborhoods.  Because of these concerns, flare systems are designed with process

vessels called "knockout drums."  Knockout drums are vessels whose function is to

remove or "knockout" large liquid droplets from the gas sent to the flare.

44.    Knockout drums are sized for expected maximum load of liquid droplets.

When that capacity is exceeded, the liquid droplets pass through the knockout drum and

can cause flare rainout and flaming rain.  The rainout during the February 4, 2021

Incident may indicate the Flare #8 knockout drum(s) were not designed with sufficient

capacity to prevent liquid carryover to the flare. This type of event is not common for a refinery startup.

**Refinery Operating Pause**

45.    In early April, the Refinery stopped operations for a period of time due to undisclosed operational issues. LBR stated in a letter to EPA that the "refinery is shut down while we make operational adjustments."

**Late April 2021 Incident**

46.    After Refinery operations restarted, on April 19, 20, 21, 22, and 23, 2021, Limetree reported to DPNR exceedances of the 162 ppm emission standard for $H_2S$ concentrations measured at the flare header for Flare #8 at the Facility.

47.    According to the Agency for Toxic Substances and Disease Registry ("ATSDR") $H_2S$ is a flammable, colorless gas that smells like rotten eggs. People can usually smell $H_2S$ at low concentrations in air when $H_2S$ concentrations are in the range of from 0.0005 to 0.3 ppm. Exposure to low concentrations of $H_2S$ may cause irritation to the eyes, nose, or throat. It may also cause difficulty in breathing for some asthmatics. Respiratory distress or arrest has been observed in people exposed to very high concentrations of $H_2S$.

48.    According to ATSDR, $SO_2$ is a colorless gas with a pungent odor (often described as the smell of a struck match). Exposure to very high levels of $SO_2$ can be life threatening. Exposure to 100 ppm of $SO_2$ is considered immediately dangerous to life and health. Burning of the nose and throat, breathing difficulties, and severe airway obstructions may occur.

49.    Between April 19 and April 22, 2021, hydrogen sulfide concentrations measured at the Flare #8 flare header rose to orders of magnitude above the limit of 162

ppm based on a 3-hr rolling average.  High hydrogen sulfide readings on each of those four days, measured between 5 AM on April 19 and 5 PM on April 22, rose as high as 31,546.5, 39,475.7, 2,272.4, and 4,046.5 ppm, respectively (on a 3-hr rolling average basis).

50.     Limetree has explained the exceedances on April 19-22, 2021 as follows:

"On April 19th, the Coker unit was starting up and off gases generated were vented to the flare until the wet gas compressor was successfully brought online. The wet gas compressor was brought online around 1:34 AM on April 20th and the H$_2$S in the flare decreased as startup progressed.  Since the H$_2$S level did not decrease below the emission limit once startup of the wet gas compressor was complete, Operations immediately began their search for another source of the H$_2$S by methodically isolating each unit's battery flare valves.  On April 21st, Operations discovered a malfunctioning pressure safety valve (PSV) on the low-pressure flash drum (D-4603) at the No. 6 Distillate Desulfurizer Unit (DD6). The PSV was taken out of service for maintenance."

51.     Limetree continued to measure high levels of hydrogen sulfide in excess of the 162 ppm limit at the flare header for Flare #8 at the Facility during the evening of April 22 and into April 23, 2021.  Hydrogen sulfide readings rose throughout the evening on April 22, and peaked at a three-hour average of 91,649.0 ppm around 11 AM on April 23 – over <u>565 times higher</u> than the concentration limit of 162 ppm.

52.     Limetree has explained the exceedances on these days as follows:

"At approximately 4:45 AM on April 23, 2021, the No. 4 Sulfur Recovery Unit (4SRU) tripped due to both "fire-eye" flame scanners not detecting a flame.  At about 5:29 AM, the 4SRU was re-lit and at 7:07 AM the Clean Acid Gas (CAG) control valve at 4SRU started to slowly open but not quick enough to alleviate the pressure in the CAG header.  Due to the backpressure in the CAG header, a pressure safety valve (PSV) at the No. 5 Amine Regeneration Unit (5ARU) relieved to the No. 8 Flare.  The SO$_2$ generated from the combustion of the H$_2$S in the flare header caused odors which impacted our neighbors.  Further investigation showed that there was another malfunctioning PSV at the No. 6 Distillate Desulfurizer Unit (DD6), contributing to the elevated H$_2$S before the 4SRU trip event.  The PSV was taken out of service for maintenance."

H₂S production units were shut down or placed on circulation to reduce the load on the

amine regeneration system and the sulfur recovery plant.  Limetree shut down 5ARU

because the PSV continued to leak to the flare even below the PSV setpoint.  Limetree

stated that one of its corrective actions included responding to odor complaints.

53.     Two days later, on April 25, Limetree once again exceeded the 162 ppm

limit for H₂S at Flare #8 from 3 to 11 p.m.  That day, Limetree also exceeded that limit at

the East Fuel Gas System from 1-10 PM.  The maximum 3-hour average concentrations

for H₂S that day were 842.4 ppm at Flare #8 and 629 ppm at the East Fuel Gas System.

54.     Limetree has explained these exceedances as follows:

"On April 25, 2021 the No. 3 and No. 4 Sulfur Recovery Units got contaminated
with hydrocarbon carryover via the acid gas.  Operations blocked in the acid gas
header to the sulfur recovery units (SRUs) which overloaded the No. 4 Amine
Regeneration unit (4ARU) preventing it from properly removing the H₂S in the
fuel gas.  The No. 5 Amine Regeneration unit was not operational at the time.
Soon after, the 4ARU reboilers overpressured and relieved to the flare."

55.     As a result of the "noxious" odor created by the Refinery's emissions, on

April 23, 2021, the Virgin Islands Department of Education ("VIDOE") closed in-person

instruction at three schools.  In its press announcement, it stated that "[s]tudents and staff

have reported feelings of nausea due to the smell, which was detected on April 22[,

2021]."

56.     A Reuters news article also reported the April 23, 2021, closing of a St.

Croix community coronavirus vaccination center due to the odor.

57.     On April 23, 2021, DPNR issued a press release advising the community

of "a foul, gaseous smell permeating throughout the Frederiksted area for the past few

days."  DPNR notes that it has been receiving citizen complaints, and that it "has

discovered that the Limetree Bay Refinery is experiencing an exceedance of Hydrogen

sulfide." DPNR advised that people with respiratory ailments such as allergies, lung disease, and asthma should consider taking protective actions, including staying indoors or relocating to less affected areas of the island.

58.     On April 24, 2021, the Virgin Island Department of Health ("VIDOH") issued a press release alerting St. Croix residents to potential health effects from the Facility's Refinery emissions. It noted Limetree's confirmation of elevated hydrogen sulfide concentrations from Flare #8 and said that a "foul, gaseous smell, which can smell similar to rotten eggs, has permeated throughout the Frederiksted area for the past few days." It explained the potential health effects of breathing hydrogen sulfide, and encouraged residents to report symptoms such as headaches, nausea, and symptoms of a respiratory nature to their healthcare providers.

59.     On April 24, 2021, Limetree issued a press release denying any release of hydrogen sulfide occurred from April 22 to 23, 2021. Limetree claimed that the incident involved only an unusually high level of sulfur dioxide emissions, and that the odor of sulfur dioxide (similar to a struck match) can be smelled in amounts far below the level normally considered dangerous to health.

60.     During an April 30, 2021, site visit to the Facility by staff from EPA and DPNR ("April Site Visit"), Limetree staff explained that the April 23, 2021 incident was related to the main sulfur recovery unit #4's fire eye detecting a lack of flame, and thus diverting the acid gas to the flare rather than treating it. The flare itself had a flame burning at the time that would have burned the hydrogen sulfide, producing sulfur dioxide.

61.     During the April Site Visit, Limetree staff said that, although the Facility's Refinery Operations have two sulfur recovery units (SRUs Nos. 3 and 4), one (No. 3) was

out of service when the April 23, 2021 event occurred.  The out of service unit was thus unable to act as a backup when the operating unit (No. 4) malfunctioned.

62.    During the April Site Visit, EPA and DPNR were escorted by Limetree representatives to several areas of the Refinery, including the east part of the Facility where Flare #8 is located.   Based on conversation with Limetree staff  and EPA observation at the Facility, EPA staff learned that due to the significant elevation of Flare #8, the emissions from Flare #8 are often not measurable, nor are odors and other impacts from Flare #8's emissions detectable by olfaction on the grounds within the Facility's Refinery.  Rather, emissions plumes from Flare #8 downwash at (i.e. lowers to) ground level well beyond the Facility's fenceline.

63.    During the April Site Visit, DPNR staff noted that several residents provided very specific descriptions of odors and other impacts resulting from the April 23rd incident's emissions, and those odor characteristics and other impacts were consistent with both $H_2S$ and $SO_2$ being released.

64.    During the April Site Visit, EPA staff asked Limetree representatives if the Refinery was using a Sulfix$^{TM}$ $H_2S$ scavenger system to reduce the levels of $H_2S$ at the Flare #8 header.  Limetree representatives confirmed that the Refinery is using a Sulfix$^{TM}$ $H_2S$ scavenger system, and explained that it consists of the injection of an additive in several points of the Flare #8 header to absorb and recover some of the $H_2S$ in the gas that is conveyed through the Flare #8 header.  Limetree representatives informed EPA staff that although the $H_2S$ scavenger system was in operation during the Late April 2021 Incident, the system was not designed to manage the gas flow and $H_2S$ concentrations that were generated during the Incident.  According to Limetree

16

representatives, the system is designed to manage flow into the Sulfix$^{TM}$ system up to 1 million standard cubic feet (scf) and concentrations of no more than 1000 ppm of $H_2S$.

65.    During the April Site Visit, Limetree staff acknowledged that the Facility does not have any $SO_2$ monitor to measure concentrations of $SO_2$ entering the atmosphere from Flare #8 post-flaring.  Limetree believes the April 23, 2021 event only emitted $SO_2$ but does not know how much $SO_2$ was emitted.

66.    Limetree also does not conduct any fenceline monitoring for $SO_2$ or $H_2S$; it only conducts fenceline monitoring for benzene.  Limetree's predecessor, HOVENSA, operated five $SO_2$ monitors near the perimeter of the Facility, but those monitors have not been operated since 2013, after HOVENSA stopped operating the Facility's Refinery. Limetree has not restarted those $SO_2$ monitors.  On April 30, 2021, EPA issued a Notice of Violation ("NOV") to Limetree for its failure to operate the five $SO_2$ monitors.

67.    As indicated in EPA's AP-42 Chapter 13.5 (Industrial Flares), sulfur compounds contained in a flare gas stream are converted to $SO_2$ when burned.  The amount of $SO_2$ emitted depends directly on the quantity of sulfur in the flared gases.  The quantity of sulfur compounds and hydrocarbon emissions generated relate to the degree of combustion and the unit destruction efficiency.  The degree of combustion depends largely on the rate and extent of fuel-air mixing and on the flame temperature achieved and maintained.  A flare does not provide 100% destruction efficiency, so any changes in the degree of combustion, such as a sudden increase of flow and $H_2S$ concentrations such as the one reported on April 23, 2021, can trigger the release of unburned sulfur compounds such as $H_2S$, as well as hydrocarbons, and an increase in $SO_2$ emissions.

68.    Modeling of the Late April Incident by an expert EPA contractor showed that concentrations of sulfur dioxide exceed the Acute Exposure Guideline Level-1

(AEGL-1) for S at ground level.  Above AEGL-1 level, asthmatics are at risk of bronchoconstriction, which results in increased airway resistance. The expert determined that subsequently exposed individuals in the community were faced with imminent and substantial danger to their health.  The "notable discomfort, irritation, or certain asymptomatic non-sensory effects" associated with AEGL-1 exposure is consistent with citizen complaints received surrounding the Late April Event for the No. 8 Flare. Modeled 1-hour concentrations of SO2 also exceeded the lower bound of the taste threshold, and modeled 1-hour concentrations of H2S exceeded the odor threshold assuming a 98% conversion of H2S to SO2 associated with a well-operating flare (i.e., good combustion mechanics).

### May 5, 6, and 7, 2021 Incident ("First May Incident")

69.    On May 5, 2021, community members began calling EPA to report that an odor was emitting from the Facility.  They described the odor as "sulfur," "gassy," "burnt eggs," and "rotten."  On May 6, 2021, community members continued to report odor emitting from the Facility.  At 7:08 PM est, a citizen caller reported that the odor was continuing and described the fumes as "noxious."  The caller also stated that the "materials in the air were causing health problems" for community members, including "head ache, sore throat, ear ache, nausea, and lips and tongue tingling."

70.    In an article published on May 7, 2021, the Washington Post reported that roughly 100 members of the community had contacted the Virgin Islands Territorial Emergency Management Agency ("VITEMA") describing a gaseous odor emitting from the Facility.

71.    Initially, on May 5, 2021, Limetree issued a statement on Facebook denying that there were any problems at the Facility.  Having received "several

community complaints of a strong odor," Limetree stated in its Facebook post that

Facility personnel had conducted a preliminary investigation, and Limetree had

concluded that "units are operating normally, and there is no activity that would result in

an odor."

72.    On May 5, 2021, Limetree environmental personnel reported to DPNR

and EPA that the Facility had exceeded the $H_2S$ limit at Flare #8 at approximately 9 PM

est on May 5.  At the time the email notification was sent to DPNR and EPA at 10:12 PM

est, Limetree environmental personnel stated that $H_2S$ was back below the limit.

73.    On May 6, 2021, at 12:45 pm, Limetree issued another statement

acknowledging that releases were occurring at the Facility.  The statement read:

> "Limetree Bay has become aware of an odor affecting areas west of the facility.
> We are conducting maintenance activity at the Coker unit, which has resulted in
> light hydrocarbon odors.  We will continue to monitor the situation, but there is
> the potential for additional odors while maintenance continues.  We apologize for
> any impacts this may have caused the community.  Thank you."

74.    On May 6, 2021, around 11 AM est, an EPA On Scene Coordinator

("OSC"), was driving towards the Facility in order to investigate the source of odor

complaints on May 5, 2021.  The OSC submitted the following summary of his

experience:

> While driving to the facilities, I intermittently had my car windows slightly open but at
> the time of this experience, my car windows were rolled up, with A/C circulating
> internally.  I noticed an odor and pulled over.  I rolled down my car window down to ask
> a worker on the side of the road what location I was at?  What facility was he working at?
> The worker informed me it was "Container Port. I was surprised how unaffected the
> workers were by the odor.  As if there was nothing different going on.  They had no
> respiratory protection at all.  I immediately closed my window and pulled away driving
> north.  I determined that I was slightly west of the Limetree facility.  The odor I briefly
> encountered was overwhelming and nauseating.  I normally am suited up with respiratory
> protection and other [personal protective equipment] prior to being exposed to something
> like this.  It was unexpected.  The smell was gasoline-like in nature, but it was stronger
> than gasoline. I have experience inspecting refineries and other facilities, as well as
> general life experience mowing lawns and pumping gasoline, and I am familiar [with]

19

what gasoline smells like and what many other substances emitted by refineries smell like.  This odor was stronger, more pungent than others I have encountered.  The odor was overwhelming and felt as if I would be sick. I sent an email to EPA Region 02 [Regional Emergency Operations Center (REOC)] with a Google maps screenshot to my location.  The REOC was receiving multiple calls from the National Response Center regarding similar odor complaints.  The DPNR Environmental Director also contacted me with similar odor complaints.  I then planned to visit those two locations which were described as Whim Estates and Mars Hill.  As I drove away, even with the A/C on and recirculating air, I continued to smell the odor.  I did not detect any orders [sic] in the towns that I investigated which were on the southwest side of the island.  I did feel sick throughout the afternoon.  It was obvious[] to me the odor was emitting from Limetree and not the asphalt plant(s).  I could tell due to my location, the wind direction at the time, and other factors.  When I returned to the hotel, the woman at the front desk referenced the facility restarting the coker plant and said that it was the source of the smell.  Throughout the afternoon, my head felt 'cloudy' and [I] needed to shower because I felt 'contaminated.'"

75.    As a result of the odor, the Virgin Islands Department of Education closed three schools on May 6, 2021.  Due to concerns of continuing odor releases, the school closures remained in effect through May 7, 2021.

76.    Also as a result of the odor, the VI Bureau of Motor Vehicles ("VIBMV") closed early on May 6, 2021 and remained closed on May 7, 2021.  The VIBMV stated that, "[t]his closure is necessary because the employees at the BMV are affected by the strong unpleasant, gas like odor, in the atmosphere surrounding the BMV."

77.    On May 7, 2021, VI Governor Albert Bryan activated the VI National Guard and the VITEMA to address continuing reports of odor and heightened concern from the community.  The Director of the VI Department of Health ("VIDOH") stated during the same briefing that at least three members of the community had sought medical attention at an area hospital for headaches and nausea allegedly caused by the continuing odors.  VIDOH then advised residents with respiratory ailments to avoid going outside or to temporarily relocate to areas of the island that were less affected by the odors.

20

78.     On May 7, 2021, Limetree environmental personnel reported to EPA that the Facility had exceeded the $H_2S$ limit at Flare #8 at approximately 11 PM EST on May 7, 2021. Limetree environmental personnel stated in the email that "there was an instrumentation/communications error that caused a short spike."  The notification did not indicate the extent of the exceedance.

**May 12, 2021 Incident ("Second May Incident")**

79.     On May 12, 2021 at approximately 5:30 PM, Limetree reported to EPA that around 3:15 PM EST a flaring incident occurred at the Refinery when the pressure in the coker drum rose, causing fire or flames.  At the time, Limetree was still unsure what specifically caused the flaring incident.  Limetree reported that during its investigation of the fire, Limetree discovered that liquid droplets of oil were on the road west of the Facility.  Limetree contacted VITEMA, and VITEMA had or was going to close the road. Liquid droplets of oil had also been reported on properties in the Enfield Green neighborhood.

80.     Photographs and video of the Second May Incident show a large flame coming off Flare #8, with a large trailing plume of visible emissions extending a long distance.

81.     At 4:15 PM on May 12, 2021, VITEMA issued an alert stating the following: "Limetree Bay Emergency Response Teams are responding to a fire onsite. DPNR has deployed the Virgin Islands Nation Guard for air quality monitoring and the VI Fire Service is standing by to support."

82.     At 6:55 PM on May 12, 2021, Limetree emailed EPA to report the following: "We exceeded the 162 ppm $H_2S$ limit in the flare header (3-hr average) starting on the hour of 3 to 4pm.  We will follow up with a letter."

21

83.    At 7:12 PM on May 12, 2021, Limetree sent EPA the following information by email: "At 6pm we exceeded the Reportable Quantity (RQ) of 500lbs of $SO_2$ in a 24hr period from a flaring event at Flare #8.  Limetree issued a statement on social media and is preparing a press release.  We temporarily suspended production in response to the incident."  In a subsequent email, Limetree clarified that it "temporarily suspended production on all process units."

84.    At 8:50 PM on May 12, 2021, Limetree staff told EPA staff by phone that Limetree was stopping production after such a "big" incident.  This would not be a full shutdown of the Refinery, but Limetree would stop production.  Limetree would run some units on circulation and the utilities/wastewater would still be in operation.  The Limetree staff was not sure how long production would be suspended.

85.    At 7:10 PM on May 12, 2021, an EPA employee currently deployed to St. Croix emailed colleagues and informed them that, "[t]here is oil on my windshield."

86.    During the evening of May 12, 2021, a Reuters news article reported the following:  "'The troubled Limetree Bay refinery in St. Croix will temporarily suspend production activities until further notice after a flaring incident dropped oil on a nearby neighborhood', the company said on Wednesday.  The company urged residents in the nearby Enfield Green community not to consume the water following the incident. 'Water distribution will be established for affected communities,' the company said in a statement, adding that processing units will be brought to a 'safe, stable condition.'"

87.    During a call with EPA staff on the morning of May 13, 2021, Limetree staff said that at that time no oil was being added to the Refinery system.  The shutdown of production will take a couple of days.  The oil from the incident that was deposited on roads and neighborhoods to the west of the Facility or elsewhere was a heavy oil like

pitch oil, and not crude oil. Limetree was, at this time, still using some pumps in generating electricity and running wastewater treatment operations.

88.     Later in the morning on May 13, 2021, around 11:40 AM, Limetree staff clarified to EPA staff that all process units at the Refinery are shut down with the exception of the platformer, which supplies hydrogen to the desulfurization unit and is needed during the ramping down process. As soon as the Refinery is completely "ramped down", that unit will be shut down too. Limetree staff stated that they expected this to be completed by the end of the day on May 13, 2021.

89.     The May 12, 2021 Incident resulted in flare rainout from Flare #8, and was likely caused by overloading the flare knockout drum with liquid droplets that reportedly originated from a process upset at the coker unit. As discussed in paragraph 44 above, this type of event – let alone two such events in a few months – is not common for a refinery startup.

90.     Flare #8 has been the only flare in service at the Refinery, and refinery process units rely on it as a safeguard for process safety and environmental protection. Based on photos of the Second May Incident, it appears that Flare #8's flare tip, flare riser, and/or associated components were likely damaged in the Second May Incident. Due to the potential for release of uncombusted hydrocarbons and hydrogen sulfide, oil droplet rainout, and/or "burning rain", the refining process units that rely on Flare 8 may not be able to operate safely until Flare 8 is repaired and its capacity and fitness-for-service evaluated.

**Limetree Environmental Staffing**

91.     During the April Site Visit, Limetree representatives stated that Limetree has a single Environmental Department, known as the Health, Safety, and Environmental ("HSE") Department, serving the entire Facility, including the Refinery and marine loading terminal operations.  In addition to managing environmental compliance at the Facility, the HSE department also oversees safety and implementation of COVID-19-related procedures.  The entire HSE department consists of 5 employees.  Limetree representatives noted they did have consultant support.

92.     A Refinery of this size and complexity would be expected to have 10-20 full time onsite staff in its health, safety and environment department.

93.      On April 1, 2021, EPA issued a Clean Air Act § 114 information request to Limetree that provided Limetree with 30 days to respond.  In an April 7, 2021 letter from LBR, LBR expressed that, "this is a very intense time for the [environmental, health, and safety] team in terms of work load in general."  In large part given the heavy workload on its environmental, health, and safety staff, LBR requested that it be given an extra 180 days to respond to the information request, an amount of time far exceeding any extension typically provided by the EPA.

94.     On April 19, 2021, Limetree replaced its Refinery General Manager.

**Health and Welfare Risks of Hydrogen Sulfide, Sulfur Dioxide, and Fuel Oils**

95.     According to an April 24, 2021, DPNR advisory regarding the Late April 2021 incident, DNPR warned:

> "Exposure to low concentrations of hydrogen sulfide may cause irritation to the eyes, nose, or throat.  It may also cause difficulty in breathing for some asthmatics.  Respiratory distress or arrest has been observed in people exposed to very high concentrations of hydrogen sulfide.

> Exposure to low concentrations of hydrogen sulfide may cause headaches, poor memory, tiredness, and balance problems. Brief exposures to high concentrations of hydrogen sulfide can cause loss of consciousness. In most cases, the person appears to regain consciousness without any other effects. However, in some individuals, there may be permanent or long-term effects such as headaches, poor attention span, poor memory, and poor motor function.
>
> Individuals with respiratory ailments such as allergies, lung disease, or asthma should consider taking protective actions such as staying indoors or temporarily relocating to areas less affected."

This language echoes the information provided by ATSDR in its "TOXFAQ" and "Public Health Statement" (a summary about a hazardous substance taken from its ATSDR Toxicological Profile) documents for hydrogen sulfide.

96.     ATSDR's "TOXFAQ" for hydrogen sulfide further notes that "[s]tudies in humans suggest that the respiratory tract and nervous system are the most sensitive targets of hydrogen sulfide toxicity."

97.     According to ATSDR's "TOXFAQ" for hydrogen sulfide, while there is very little information on possible health problems in children who have been exposed to hydrogen sulfide, exposed children probably will experience effects similar to those experienced by exposed adults. Whether children are more sensitive to hydrogen sulfide exposure than adults is not known.

98.     ATSDR's "Public Health Statement" on hydrogen sulfide further specifies that you can have respiratory and neurological effects if you are exposed to higher concentrations of hydrogen sulfide, at least 100 times higher than typical environmental levels. The ATSDR Public Health Statement elsewhere says that, "[h]ydrogen sulfide air concentrations from natural sources range between 0.00011 and 0.00033 ppm. In urban areas, the air concentrations are generally less than 0.001 ppm."

25

99.    ATSDR's "Public Health Statement" on hydrogen sulfide notes that, "If you are exposed to very high concentrations of hydrogen sulfide, you may have severe problems breathing even if you do not have a pre-existing respiratory condition.  You could lose consciousness if you are briefly exposed to very high concentrations (more than 1 million times higher than the amount typically found in the environment).  If this happens, you may regain consciousness without any other effects.  However, some people may have longer lasting effects such as headaches, poor attention span, poor memory, and poor motor function."

100.    ATSDR has also said that hydrogen sulfide can remain in the air from 1 to 42 days, depending on the season.

101.    Breathing high levels of $SO_2$ can cause immediate health impacts.  Short-term exposures to $SO_2$ can harm the human respiratory system and make breathing difficult.  People with asthma, particularly children, are sensitive to these effects of $SO_2$. $SO_2$ emissions that lead to high concentrations of $SO_2$ in the air generally also lead to the formation of other sulfur oxides ("SOx").  SOx can react with other compounds in the atmosphere to form small particles.  These particles contribute to particulate matter (PM) pollution.  Small particles may penetrate deeply into the lungs and in sufficient quantity can contribute to health problems.

102.    According to ATSDR's "Public Health Statement" on sulfur dioxide:

"Short-term exposures to high levels of sulfur dioxide can be life-threatening. Exposure to 100 parts of sulfur dioxide per million parts of air (ppm) is considered immediately dangerous to life and health.  Previously healthy nonsmoking miners who breathed sulfur dioxide released as a result of an explosion in an underground copper mine developed burning of the nose and throat, breathing difficulties, and severe airway obstructions.  Longterm exposure to persistent levels of sulfur dioxide can also affect your health.  Lung function changes have been observed in some workers exposed to 0.4–3.0 ppm sulfur dioxide for 20 years or more.   However, these workers were also exposed to

26

other chemicals, making it difficult to attribute their health effects to sulfur dioxide exposure alone. Additionally, exercising asthmatics are sensitive to the respiratory effects of low concentrations (0.25 ppm) of sulfur dioxide. . . .

Most of the effects of sulfur dioxide exposure that occur in adults (i.e., difficulty breathing, changes in the ability to breathe as deeply or take in as much air per breath, and burning of the nose and throat) are also of potential concern in children, but it is unknown whether children are more vulnerable to exposure. Children may be exposed to more sulfur dioxide than adults because they breathe more air for their body weight than adults do.  Children also exercise more frequently than adults.  Exercise increases breathing rate.  This increase results in both a greater amount of sulfur dioxide in the lungs and enhanced effects on the lungs. . . .

Long-term studies surveying large numbers of children have indicated possible associations between sulfur dioxide pollution and respiratory symptoms or reduced breathing ability.  Children who have breathed sulfur dioxide pollution may develop more breathing problems as they get older, may make more emergency room visits for treatment of wheezing fits, and may get more respiratory illnesses than is typical for children.  However, studies like these are unable to provide conclusive evidence about sulfur dioxide's effects on children's health because many other pollutants are also present in the air. . . .

It is known that exercising asthmatics are sensitive to low concentrations of sulfur dioxide.  Therefore, increased susceptibility is expected in children with asthma, but it is not known whether asthmatic children are more sensitive than asthmatic adults.  Additionally, asthma occurs most often in African Americans, children between the ages of 8 and 11, and people living in cities.  For unknown reasons, the death rates associated with asthma are also higher in non-Caucasian people. Therefore, it is expected that asthmatic, African American children living in urban areas have increased sensitivity to sulfur dioxide."

103.    The Center for Disease Control's ATSDR has developed a "ToxFAQ" document (a fact sheet that answers the most frequently asked questions about a contaminant and its health effects) for fuel oils.  This document describes "fuels oils" as "a variety of yellowish to light brown liquid mixtures that come from crude petroleum. Some chemicals found in fuel oils may evaporate easily, while others may more easily dissolve in water.  Fuel oils are produced by different petroleum refining processes, depending on their intended uses."  The document notes that, "[d]rinking or breathing fuel oils may cause nausea or nervous system effects," although it also notes that, "[l]ittle

27

information is available about the health effects that may be caused by fuel oils." It says that "Breathing some fuel oils for short periods may cause nausea, eye irritation, increased blood pressure, headache, light-headedness, loss of appetite, poor coordination, and difficulty concentrating. Breathing diesel fuel vapors for long periods may cause kidney damage and lower your blood's ability to clot."

104. According to an expert EPA contractor, for the oil droplets released during two events, ". . . the oil [released during the Feb. 4 Incident and the Second May Incident] is likely composed of a mixture of petroleum hydrocarbons. Potential exposures include inhalation of volatile components, dermal contact with the residues, and ingestion of or contact with impacted water. Human health impacts depend on the specific petroleum constituents in a particular media or matrix, but total petroleum hydrocarbons as well as individual constituents have been associated with a variety of adverse health impacts. Skin and eye irritation, for example, are associated with short-term exposures to different hydrocarbon fractions. Longer term oral exposures to the semi-volatile fractions such as polyaromatic hydrocarbons (PAHs) have shown liver effects to be a common endpoint. Dermal contact with some PAHs have been shown to elicit skin hypersensitivity reactions. Some oil constituents have been classified as known or possible carcinogens.

> The expert EPA contractor found that: "The information available to date indicates that the incidents which occurred at the Limetree Bay Terminals and Refining facility present an imminent and substantial endangerment to both public health and welfare. This conclusion is based on multiple lines of evidence that demonstrate that the facility has already placed the health and welfare of the nearby community at risk. Additionally, the repeated nature of the flare failures coupled with the events associated with the release of noxious sulfur compounds and other potential hazardous air pollutants elevates the degree of harm."

28

The expert EPA contractor noted that, in addition to the impacts on physical health, the repeated incidents emitting oil droplets in a short time period have resulted in fear and anxiety about the next possible event and the severity of that event. The frequency of Limetree flare incidents raises the concern that events could continue to escalate and result in an even more significant or catastrophic incident, which could lead to injury or loss of life. The contractor also notes that improper maintenance or process safety management of flare systems has historically caused serious harm to people (killing or injuring workers and people living and working off site) and the environment, as well as damage and loss to property.

### **CONCLUSIONS OF LAW**

EPA concludes the following:

105.    Respondent LBT is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e), against whom an Emergency Order may be issued under Section 303 of the Act, 42 U.S.C. § 7603.

106.    Respondent LBR is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e), against whom an Emergency Order may be issued under Section 303 of the Act, 42 U.S.C. § 7603.

107.    In its current state, the Facility is a "pollution source" or "combination of sources" within the meaning of Section 303 of the Act, 42 U.S.C. § 7603.

108.    The Feb. 4, 2021 Incident's emissions of an "oily mist," consisting in part of heavy oil, including a mixture of many heavy organic compounds; the Late April Incident emissions of $H_2S$ and/or $SO_2$; the First May Incident's emissions of light hydrocarbons and/or volatile organic compounds; and the Second May Incident's

29

emissions of heavy oil droplets, particulate matter, and visible emissions are all "air pollutants" within the meaning of Sections 302(g) and 303 of the Act, 42 U.S.C. §§ 7602(g) and 7603.

109.    Respondents are "causing or contributing" to the emission of air pollutants within the meaning of Sections 302(g) and 303 of the Act, 42 U.S.C. §§ 7602(g) and 7603, by continuing to operate the Facility's Refinery Operations in the current manner.

110.    EPA is in receipt of evidence that, in less than four months, the air emissions from the Facility's Refinery Operations have, on at least four occasions, harmed the public health, welfare or the environment, as described *supra* at Paragraphs 33-90, and 95-104.

111.    EPA is in receipt of evidence that the Refinery, if allowed to continue to operate as it is currently operated, presents an imminent and substantial endangerment to the public health or welfare or the environment.

112.    Issuance of this Order is necessary to assure prompt protection of public health or welfare or the environment because it is not practicable to wait for the commencement of a civil action in United States District Court to assure prompt protection from additional air emissions events.

113.    The Director of the Caribbean Environmental Protection Division has found that the Refinery's current operations, as described above, if allowed to continue, are presenting an imminent and substantial endangerment to public health or welfare or the environment, and it is therefore appropriate for the issuance of an Order under Section 303 of the Act, 42 U.S.C. § 7603.

114.    The Director of the Caribbean Environmental Protection Division is vested with the authority of the Administrator under Section 303 of the Act, 42 U.S.C. § 7603.

## ORDER

115.    Based on the foregoing, and pursuant to Section 303 of the Act, 42 U.S.C. § 7603, in order to abate or prevent an imminent and substantial endangerment to public health or welfare or the environment, the Director of the Caribbean Environmental Protection Division hereby orders Respondents, their agents, employees, successors, and assigns, to address the endangerment posed by frequent incidents at the Refinery that have endangered public health and welfare, as follows:

    a.  Within one (1) business day of receipt of this Order, Respondents shall submit to EPA in writing a statement explaining whether Respondents intends to and is able to comply with this Order.

    b.  Upon receipt of this Order, Respondents shall ensure all Refinery Operations cease until the termination of this Order in accordance with paragraph 125 unless, based on the auditor reports and Respondents' implementation plan, EPA determines, in consultation with VIDPNR, that operations can resume before the expiration of the Order.

    c.  Respondents shall notify EPA electronically, in accordance with paragraph 116, as soon as possible once Refinery operations have ceased.

    d.  Respondents shall retain, at their expense, independent third party auditors ("Auditors") consistent with the requirements set forth below. The Auditors shall be retained to conduct one or more comprehensive

31

audits ("Audits"), to be completed by the earlier of 30 days after EPA's approval of a list of auditors for a given Audit Category pursuant to subparagraph (f) of this paragraph or 42 days after issuance of this Order. The Audits shall include a review of the items specified in subparagraphs (i) and (j) of this paragraph. Respondents shall require that the Auditors act independently and objectively when performing all activities. Respondents shall provide the Auditors with full access to the Facility and provide or otherwise make available any necessary personnel, documents, and Facility environmental, health, and safety training to fully perform all audit activities.

e.  Within 7 days of this Order's issuance, Respondents shall submit to EPA the name and qualifications of at least three (3) proposed Auditors (the "Proposed Auditors") in each Audit Category discussed in subparagraphs (h), (i) and (j) of this paragraph – and more if necessary to provide competency in all of an Audit Category's scope – that Respondents certify meet the following conditions:

   i.  A Proposed Auditor for the Environmental Compliance Audit has demonstrated experience in audits for compliance with Clean Air Act regulations and has completed at least a bachelors degree in science or engineering.

   ii. A Proposed Auditor for the Process Unit Audit has demonstrated experience in refinery process operation and optimization and has completed at least a bachelors degree in chemical or mechanical engineering.

32

iii.  The Proposed Auditor and its personnel have not conducted research, development, design, construction, financial, engineering, legal, consulting nor other advisory services for Respondents or any other entity associated with the Refinery within the last three years.  However, a Proposed Auditor with personnel who, before working for the audit firm, conducted research, development, design, construction, or consulting services for Respondents (as an employee or contractor) may meet the requirements of independence by ensuring such personnel do not participate on, manage, or advise the audit team;

iv.  The Proposed Auditor was not involved in efforts since 2016 to restart or operate the Facility.

v.  The Proposed Auditor and its personnel will not provide any other commercial, business, or voluntary services to Respondents for a period of at least three years following the Proposed Auditor's submittal of the final Audit Report.

vi.  Respondents will not provide future employment to any of the Proposed Auditor's personnel who managed, conducted, or otherwise participated in the Audit for a period of at least three (3) years following the Proposed Auditor's submittal of its final Audit Report.

f.  EPA will notify Respondents in writing whether it approves of any of the three (3) proposed Auditors in each Audit Category.  Within 7

33

days of EPA approval, Respondents shall retain one or more of the EPA-approved Proposed Auditors for each Audit Category, who shall then become the Auditor(s) for that Audit Category, to perform the audit activities set forth in subparagraphs (i) and (j) of this paragraph of this Order.  Respondents shall ensure that all audit personnel who conduct or otherwise participate in audit activities shall certify that they satisfy the conditions set forth in subparagraph (e) of this paragraph above before receiving any payment from Respondents.

  i.  If EPA rejects all three of the Proposed Auditors proposed for an Audit Category, within 48 hours of receipt of EPA's rejection notification, Respondents shall submit to EPA for approval another three (3) Proposed Auditors that meet the qualifications set forth in subparagraph (e) of this paragraph. EPA will review the proposed replacements in accordance with this subparagraph (f).

g.  Each Auditor shall commence auditing onsite within 5 days of contracting.

h.  The Audit Categories shall include Category A (Environmental Compliance Audit) and Category B (Process Unit Audit).

i.  Audit Category A: Environmental Compliance Audit.  Respondents shall ensure that the contract with the Auditor(s) retained to perform the Environmental Compliance Audit explicitly requires the Auditor(s) to perform the activities specified in this paragraph and its subparagraphs.  However, the contents of the Audit shall not be

34

limited to the below items if the Auditor determines that additional evaluation should be conducted to prevent emissions or incidents that could endanger public health or welfare or the environment.

   i. An evaluation of staffing within the environmental, health and safety program at the Refinery including staffing levels and whether staff have proper academic background, experience, and training to ensure the Refinery operates within required environmental, health, and safety limits and avoids situations or condition that endanger public health or welfare or the environment;

   ii. A review of CAA compliance at the Refinery since February 2021, with a summary of all non-compliance and recommended steps to prevent future noncompliance, including at a minimum:

      1. Exceedances of NSPS Subpart J and Ja and permit $H_2S$ limits at Flare #8 and the East Mix Drum and Coker Mix Drum Fuel Gas Systems;

      2. Compliance with all NSPS Subpart Ja requirements for flare incidents that exceed the 500 pound per day threshold;

      3. Compliance with the obligations of the Flare Management Plan submitted pursuant to NSPS Subpart Ja and NESHAP Subpart CC; and

35

4. An evaluation of compliance for releases at the coker unit with particular emphasis on the miscellaneous process vent requirements of NESHAP Subpart CC and the coker steam vent requirements of NESHAP Subpart CC.

j. <u>Audit Category B: Process Area Audits</u>. Respondents shall retain one or more Auditors, as necessary to ensure the Auditors have the requisite expertise to perform the activities in this paragraph and its subparagraphs. Respondents shall ensure that its contract with each Auditor retained to perform Process Area Audits explicitly requires the Auditor to perform the activities specified in this paragraph and its subparagraphs. However, the contents of the Audit shall not be limited to the below items if an Auditor determines that additional evaluation should be conducted to prevent emissions or incidents that could endanger public health or welfare or the environment.

1. Flare system audit.

a. An evaluation of the condition of the tip on Flare #8;

b. Capacity of the knockout pot to handle liquids loading to prevent flare rainout;

c. Capacity of flare #3 to serve as backup to Flare #8;

36

d.  Other damage already incurred by and to the
flare system due to high liquid loading or other
causes;

e.  Review of procedures that can be implemented
to avoid and minimize the impact of future
flaring events, including:

i.  Operation of redundant amine treatment
units and redundant SRU trains operated
in hot standby; and

ii.  Sulfur shedding practices;

f.  A review of whether and how installation of a
flare gas recovery system to eliminate or
minimize Flare #8 non-compliance can be
expedited; and

g.  An evaluation of staffing with regard to the
operation and maintenance of the process unit,
including staffing levels and whether operators
have proper experience and training to operate
the process unit safely and within required
environmental limits.

2.  Coker audit.

a.  Releases to Flare #8, particularly high liquid
loading that has occurred, what caused them,

37

and physical changes and operating changes to prevent them from happening in the future;

b. Releases since February 2021 of volatile organics directly to the atmosphere from the coker unit, and particularly from the steam vent prior to decoking, what caused them, and physical changes and operational changes to prevent such releases from happening again in the future; and

c. An evaluation of staffing with regard to the operation and maintenance of the process unit, including staffing levels and whether operators have proper experience and training to operate the process unit safely and within required environmental limits.

3. Amine/Sulfur Recovery Unit (SRU).

a. Acid gas flaring events at Flare #8, particularly including hydrocarbon carryover from the amine units to the SRUs, what caused them, and physical changes and operational changes to prevent them from happening again in the future;

    b.  Review of procedures that can be implemented to avoid and minimize the impact of future acid gas flaring events, including:

        i.  Operation of redundant amine treatment units and redundant SRU trains operated in standby; and

        ii.  Sulfur shedding practices; and

    c.  An evaluation of staffing with regard to the operation and maintenance of the process unit, including staffing levels and whether operators have proper experience and training to operate the process unit safely and within required environmental limits.

k.  Respondents shall ensure that its contract with each Auditor requires that the Auditor shall simultaneously submit an audit report ("Audit Report") to Respondents, EPA (at the contacts listed in paragraph 116 below), and VIDPNR (at the contacts listed in paragraph 117). Concurrently, Respondents shall represent that the Audit Report submittal meets the following requirements:

    i.  Respondents shall ensure that the Auditor does not share any draft or preliminary audit findings or reports with Respondents in any format (electronic, paper, or verbal).

    ii.  Respondents shall conduct no post-audit oral or written communications with the Auditor except to request, for the

purposes of the audit, additional audit-related data or

information.  EPA and VIDPNR shall be simultaneously

copied (at the contacts listed in paragraphs 116 and 117

below) on any such communication.

iii.  Respondents shall ensure that the Auditor does not share its

audit conclusions with Respondents until the Auditor submits

its Audit Report(s) to EPA and VIDPNR.

iv.  The Audit Report shall include all findings, conclusions,

monitoring results, and other observations of the Auditor.

v.  The Auditor shall provide EPA and VIDPNR with copies of

all documents reviewed and identify all Facility personnel

interviewed in support of the Audit Report.

vi.  Respondents shall require the Auditor to include in the final

Audit Report, submitted to EPA and VIDPNR pursuant to this

Order, a certification that the Auditor has remained in

compliance with all of the conditions set forth in subparagraph

(e) of this paragraph, above.

l.  Within 56 days of the issuance of this Order, Respondents shall submit to

EPA a detailed plan that addresses all findings, conclusions, and observations

set forth in each Audit Report, with an expeditious schedule for

implementation of all corrective measures ("the Plan").

i.  Respondents shall also describe each completed or proposed action to

correct each deficiency identified in each Audit Report submitted to

EPA, including the date(s) that such corrections occurred or are

40

scheduled to occur.  The Plan shall provide for the implementation of each Auditor's recommendations in each Audit Report or provide a detailed explanation for why an Auditor's given recommendation is impracticable.

ii.  The Plan shall ensure that the Refinery operates in a manner that complies with environmental statutory, regulatory and permit requirements such that said operation does not present an imminent and substantial endangerment to public health or welfare or the environment, and the Plan shall include adequate measures to protect the health and welfare of residents living near the Facility.

iii.  The Plan shall be submitted to EPA, for EPA review, comment, and approval, or approval with modifications.

m.  Upon commencing operation of any Refinery process unit following the ceasing of Refinery Operations required in subparagraph (b) of this paragraph, Respondents shall electronically notify EPA as soon as possible but no later than 24 hours after commencement.

116.    Note: Respondents shall submit all notices, schedules, work plans, analyses, certifications and documentation required by this Order by email to:

Robert Buettner, Chief
Air Compliance Branch
Enforcement and Compliance Assurance Division
buettner.robert@epa,gov

And

Nancy Rodríguez, Chief
Multimedia Permits and Compliance Branch
Caribbean Environmental Protection Division
U.S. Environmental Protection Agency, Region 2

rodriguez.nancy@epa.gov

And

Harish Patel, Team Leader
Air Compliance Branch
Enforcement and Compliance Assurance Division
Patel.harish@epa.gov

And

Patrick Foley, Senior Environmental Engineer
Air Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Foley.patrick@epa.gov

And

Liliana Villatora, Chief, Air Branch
U.S. Environmental Protection Agency, Region 2
Office of Regional Counsel
villatora.liliana@epa.gov

And

Sara Froikin, Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 2
Office of Regional Counsel
froikin.sara@epa.gov

117.    Note: Whenever submittal to VIDPNR is required in paragraph 115,

Respondents shall submit all notices, schedules, work plans, analyses, certifications and

documentation required by this Order by email to:

Verline Marcellin, Air Program Supervisor
Virgin Island Department of Planning and Natural Resources
verline.marcellin@dpnr.vi.gov

And

Jean-Pierre Oriol, Commissioner
Virgin Island Department of Planning and Natural Resources
jp.oriol@dpnr.vi.gov

42

## ACCESS

118.    Respondents shall allow EPA and its authorized representatives and contractors to enter and freely move about all areas subject to this Order, using equipment to gather information, for the purposes of inspecting conditions, activities, records, and contracts related to the presence of emissions in the Facility and other CAA compliance concerns and operation of the Refinery.  Respondents shall allow EPA and its authorized representatives to enter the areas subject to this Order to inspect and copy all records, files, photographs, documents, sampling and monitoring data, and other writings related to carrying out this Order.

119.    Nothing in this Order is intended to limit, affect or otherwise constrain EPA's rights of access to property and records pursuant to applicable law.

## RESERVATION OF RIGHTS

120.    EPA reserves the right to take any necessary action to enforce this Order, including obtaining injunctive relief or civil or criminal penalties, in accordance with Section 113 of the CAA, 42 U.S.C. § 7413.

121.    Be advised that issuance of this Order does not preclude EPA from electing to pursue any other remedies or sanctions authorized by law that are available to address these and other violations.  This Order does not resolve Respondents' liability for past violations of the Act or for any violations that continue from the date of this Order up to the date of compliance.  At any time after the issuance of this Order, EPA may take any or all of the following actions: issue a further order requiring compliance with the Act; issue an administrative penalty order for up to $48,762 per day for each violation; or bring a civil or criminal action seeking an injunction and penalties.  See Sections 113(a)-

43

(d) of the CAA, 42 U.S.C. §§ 7413(a)-(d); 40 C.F.R. Part 19; and 85 Fed. Reg. 83818

(December 20, 2020) (raising CAA penalties to \$48,762 for violations occurring after

Nov. 2, 2015 and assessed on or after Dec. 23, 2020).

122.    Nothing in this Order shall limit the power and authority of EPA to take,

direct or order all action necessary to protect public health or welfare or the environment

to prevent, abate or minimize an imminent and substantial endangerment resulting from

the continued operation of the Refinery as it is currently operated.  Further, nothing in

this Order shall be construed to prevent EPA from seeking legal or equitable relief to

enforce the terms of this Order, or from taking other legal or equitable action as EPA

deems appropriate and necessary, pursuant to the CAA, and any other applicable law.

Nothing herein shall be construed to prevent EPA from requiring Respondents to perform

further actions pursuant to the CAA or other applicable law.

123.    Neither EPA nor the United States, by the issuance of this Order, assumes

any liability for any acts or omissions by Respondents or Respondents' employees,

agents, contractors or consultants engaged to carry out any action or activity pursuant to

this Order; nor shall EPA or the United States be held as a party to any contract entered

into by Respondents or Respondents' employees, agents, contractors or consultants

engaged to carry out the requirements of this Order.


## **EFFECTIVE DATE**

124.    This Order is effective immediately upon issuance by EPA. Although this

Order is effective immediately, Respondents may contact EPA to confer about

compliance with the Order by contacting Sara Froikin, Esq. of EPA at 212-637-3263.

125.    This Order shall be effective for a period of not more than 60 days unless the United States files a civil action in the appropriate United States district court pursuant to Section 303 of the Act, 42 U.S.C. § 7603.

CARMEN
GUERRERO
PEREZ

Digitally signed by CARMEN
GUERRERO PEREZ
Date: 2021.05.14 12:43:00
-04'00'

May 14, 2021

_____          _____
Carmen R. Guerrero, Director                                    Date
Caribbean Environmental Protection Division
United States Environmental Protection Agency, Region 2

45

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| and | ) | Civil Action No. 1-11-cv-06 (RAM/GWC) |
| | ) | |
| THE UNITED STATES VIRGIN | ) | |
| ISLANDS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| HOVENSA L.L.C., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF THE UNITED STATES' MOTION TO ENTER
THE FIRST MODIFICATION OF THE CONSENT DECREE**

**INTRODUCTION**

The United States, on behalf of the United States Environmental Protection Agency ("EPA"), and with the concurrence of Co-Plaintiff the United States Virgin Islands ("Virgin Islands"), on behalf of the Department of Planning and Natural Resources ("DPNR"), respectfully submits this Memorandum in support of its motion to enter the First Modification of the Consent Decree ("First Modification"). The First Modification was lodged with the Court on August 25, 2020 (ECF Doc. 12-1), and on August 31, 2020, the United States published notice of the lodging of the First Modification in the Federal Register soliciting comment from the public. 85 Fed. Reg. 5389 (Aug. 31, 2020). The United States received one set of comments during the 30-day public comment period from Elizabeth Leigh Neville (referred to as "Commenter"), who requested that the First Modification be rejected as being "inappropriate, improper, and inadequate." When lodging the First Modification, the United States reserved its rights to

1

withhold consent to entry if "public comments disclose facts or considerations" indicating that the First Modification is "inappropriate, improper, or inadequate." See 28 C.F.R. § 50.7(b). The submitted comments do not show that the First Modification is inappropriate, improper, or inadequate as the comments fail to identify anything in the agreement itself which violates the law or harms the public. Attached to this Memorandum are the First Modification as Attachment A and the comments as Attachment B. All parties to the First Modification have agreed to it and consent to its entry without further notice.

After the First Modification was lodged with the Court, the United States and Limetree Bay agreed to modify the date in Paragraph 79.a from March 30, 2021 to November 22, 2021. This modification is discussed in Part V, below. The United States requests that the Court enter the attached version of the First Modification of the Consent Decree as a final judgment by signing the document at page 95 and entering it as a final judgment.

## I.    BACKGROUND AND SUMMARY OF THE FIRST MODIFICATION

### A.    2011 Consent Decree between the United States, the Virgin Islands, and HOVENSA

On June 7, 2011, the Court entered a Consent Decree ("2011 Consent Decree" or "Decree") between the United States, the Virgin Islands, and HOVENSA, LLC ("HOVENSA") resolving claims concerning HOVENSA's petroleum Refinery in St. Croix. (ECF Doc. 6.) The 2011 Consent Decree is part of EPA's Petroleum Refinery Initiative ("Refinery Initiative"), an enforcement initiative targeting non-compliance with the Clean Air Act throughout the petroleum refining industry. Like other settlements under the Refinery Initiative, the 2011 Consent Decree resolved HOVENSA's potential liability under the relevant provisions of the Clean Air Act in exchange for HOVENSA's commitment to undertake a variety of activities directed at substantially reducing the emissions of key air pollutants from the Refinery.

2

The claims addressed in the 2011 Consent Decree included alleged violations of the prevention of significant deterioration provisions, the new source performance standards, the leak detection and repair provisions, and the benzene waste emissions control provisions of the Clean Air Act, ("CAA" or "Act"), 42 U.S.C. §§ 7401-7671.  The 2011 Consent Decree required HOVENSA to:  reduce nitrogen oxide ("NO$_x$") emissions and control sulfur dioxide ("SO$_2$"), particulate matter ("PM"), and carbon monoxide ("CO") emissions from the Refinery's fluid catalytic cracking unit; significantly reduce NO$_x$ emissions from the Refinery's heaters, boilers, generating turbines, and compressor engines through the installation of pollution control equipment; reduce SO$_2$ emissions by burning lower sulfur fuel oil and complying with fuel gas combustion requirements for heaters, boilers, flares, and sulfur recovery plants; comply with regulatory requirements for acid gas and hydrocarbon flaring, and implement a program to investigate and correct the causes of flaring incidents and take preventive action; create a preventive maintenance and operation plan for minimizing SO$_2$ emissions from the sulfur recovery plant; reduce emissions of volatile organic compounds ("VOCs") through stricter leak detection and repair ("LDAR") requirements and by replacing valves that are leaking above a specified level with low emissions valves or low emissions valve packing; and reduce emissions of benzene by improving management of benzene waste streams.  In 2011, the estimated cost of complying with these injunctive relief requirements was more than $700 million.  The 2011 Consent Decree also required HOVENSA to pay $5,375,000 in civil penalties and deposit $4,875,000 into an escrow account to be used to implement Territorial Supplemental Environmental Projects.

In January 2012, HOVENSA announced that it would idle refinery operations.  At the time that the Refinery operations idled, most of the injunctive relief obligations required by the

Decree were not completed. In 2015, HOVENSA announced that it would idle terminal
operations.

On September 15, 2015, HOVENSA filed for bankruptcy under Chapter 11 of the U.S.
Bankruptcy Code in the District Court of the U.S. Virgin Islands, Bankruptcy Division – St.
Croix, Virgin Islands. See, bankruptcy proceeding entitled *In re HOVENSA L.L.C..,* No. 1-15-
10003-MFW.

B.    HOVENSA Bankruptcy

On December 1, 2015, the Bankruptcy Court entered an order approving the sale of
certain refining and terminal assets to Limetree Bay Terminals, LLC pursuant to the terms of the
Amended and Restated Asset Purchase Agreement. ECF Doc. 528-1 in Case No. 1:15-bk-
10003-MFW. On January 4, 2016, the sale of the refinery and terminal assets to Limetree Bay
Terminals, LLC closed. Subsequent to the closing, Limetree Bay Terminals, LLC transferred
certain refinery assets to Limetree Bay Refining, LLC. As part of the bankruptcy, an
Environmental Response Trust was established to, *inter alia*, assume certain Decree obligations
that were not transferred to Limetree Bay Terminals, LLC or otherwise satisfied by HOVENSA.

Paragraph 7 of the 2011 Consent Decree requires HOVENSA to condition any transfer of
ownership or operation of the refinery "upon the execution by the transferee of a modification to
this Consent Decree, which makes the terms and conditions of this Consent Decree applicable to
the transferee." ECF Doc. No. 6, ¶ 7.

C.    Summary of the First Modification

The First Modification adds Limetree Bay Terminals, LLC, Limetree Bay Refining, LLC
(jointly, "Limetree Bay"), and the Environmental Response Trust ("ERT") as parties to the
Decree and transfers uncompleted or ongoing Decree responsibilities to Limetree Bay and the

4

ERT, such that Limetree Bay and the ERT effectively step into the shoes of HOVENSA [First Modification ¶¶ 1 – 7] and HOVENSA is released from its Decree obligations and liabilities as of the date of entry of the First Modification [First Modification ¶ 8]. The First Modification also modifies the following deadlines and injunctive relief obligations to reflect the changed operational realities of the Refinery: (1) briefly extends the deadline for Limetree Bay to install sufficient Qualifying Controls and apply for emission limits from the appropriate permitting authority sufficient to achieve 3,663 tons per year ("tpy") of $NO_x$ emission reductions [First Modification ¶ 27]; (2) modifies the language to reflect the current configuration of the East Side sulfur recovery plant ("SRP") and extends the deadline for installing control technology to control the sulfur emissions from the East Side SRP and comply with New Source Performance Standards ("NSPS") Subparts A and Ja [First Modification ¶¶ 45 – 47]; (3) modifies the requirement to install and operate flare gas recovery systems ("FGRS") on certain flares in order to comply with NSPS Subpart Ja. Specifically, because the operational profile of the Refinery is now significantly different as compared to when the Decree was entered into in 2011, the First Modification conditions the installation of FGRS on the Refinery's flaring emission levels after restart (as defined in the First Modification); providing that FGRS is not required if flaring emissions remain below specified gas flow rates, but requiring Limetree Bay to install and operate FGRS if the specified gas flow rates are exceeded, thereby ensuring the expected emission reduction benefits that were required by the 2011 Consent Decree are obtained while taking into account the modified operating profile of the Refinery [First Modification ¶¶ 49, 50A – 50G, and 51]; (4) modifies Section V.P (Benzene Waste NESHAP Program) to reflect that HOVENSA selected the 6 BQ compliance option set forth in 40 C.F.R. § 61.342(e), and that Limetree Bay has agreed to redo the one-time review and verification of the Refinery's total

annual benzene ("TAB") report following restart [First Modification ¶¶ 77 – 98]; (5) modifies Section V.R (Leak Detection and Repair ("LDAR") Program) to make the terms consistent with the more recent LDAR regulations, including lower leak definitions (¶ 109), to ensure that a minimum of three audits will be conducted before the Decree is terminated (¶ 106), and updates the Valve Preventative Leak Maintenance Program (¶ 112) [First Modification ¶¶ 100 – 123] consistent with other recent Petroleum Refinery Initiative consent decrees; (6) modifies Section VIII.B (NSPS Applicability: Boilers and Generating Turbines) to extend the deadline for demonstrating compliance with NSPS Subparts A and GG at GT-4, GT-7 and GT-8, and to reflect that Limetree Bay has installed combustion liner systems on GT-7 and GT-8 to reduce $NO_x$ emissions, and to operate at lower maximum load limits on GT-4, GT-7, and GT-8 until Limetree Bay demonstrates compliance with NSPS Subparts A and GG [First Modification ¶ 136]; (7) modifies Section IX.A (Territorial Supplemental Environmental Project) by transferring HOVENSA's obligation to disburse monies for the Territorial Supplemental Environmental Project to the ERT [First Modification ¶ 137]; and, (8) modifies Section IX.B (Additional Work) to reflect that HOVENSA's remaining obligations for the VIWAPA Emissions Monitoring Assistance Program were transferred to the ERT [First Modification ¶ 140A].

## II.    STATUTORY AND REGULATORY FRAMEWORK

The CAA established a regulatory scheme designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population. Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1). Section 109 of the Act, 42 U.S.C. § 7409, requires the Administrator of EPA to promulgate regulations establishing primary and secondary national ambient air quality standards ("NAAQS" or "ambient air quality

EPA-496

standards") for certain air pollutants.   The primary NAAQS are to be adequate to protect the

public health, and the secondary NAAQS are to be adequate to protect the public welfare, from

any known or anticipated adverse effects associated with the presence of the air pollutant in the

ambient air.

Section 110 of the Act, 42 U.S.C. § 7410, requires each State[1] to adopt and submit to

EPA for approval a State Implementation Plan ("SIP") that provides for the attainment and

maintenance of the NAAQS. Under Section 107(d) of the Act, 42 U.S.C. § 7407(d), each State

is required to designate those areas within its boundaries where the air quality is better or worse

than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to

insufficient data. These designations have been approved by EPA and are located at 40 C.F.R.

Part 81. An area that meets the NAAQS for a particular pollutant is classified as an "attainment"

area; one that does not is classified as a "non-attainment" area.

A.    Prevention of Significant Deterioration / New Source Review

Part C of Title I of the Act, 42 U.S.C. §§ 7470-7479, sets forth requirements for the

prevention of significant deterioration ("PSD") of air quality in those areas designated as

attaining the NAAQS standards. These requirements are designed to protect public health and

welfare, to assure that economic growth will occur in a manner consistent with the preservation

of existing clean air resources, and to assure that any decision to permit increased air pollution is

made only after careful evaluation of all the consequences of such a decision and after public

participation in the decision-making process. These provisions are referred to herein as the

"PSD program." Section 165(a) of the Act, 42 U.S.C. § 7475(a), prohibits the construction and

subsequent operation of a major emitting facility in an area designated as attainment unless a

[1] The definition of State includes the Virgin Islands. 42 U.S.C. § 7602(d)

7

PSD permit has been issued.  Section 169(1) of the Act, 42 U.S.C. § 7479(1), includes within the definition of "major emitting facility" a petroleum refinery with the potential to emit 100 tpy or more of any air pollutant.  As set forth in EPA's implementing regulations at 40 C.F.R. § 52.21(k), the PSD program generally requires a person who wishes to construct or modify a major emitting facility in an attainment area to demonstrate, before construction commences, that construction of the facility will not cause or contribute to air pollution in violation of any ambient air quality standard or any specified incremental amount.

As set forth at 40 C.F.R. § 52.21(i), any major emitting source in an attainment area that intends to construct a major modification must first obtain a PSD permit.  "Major modification" is defined at 40 C.F.R. § 52.21(b)(2)(i) as meaning any physical change in or change in the method of operation of a major stationary source that would result in a significant net emission increase of any criteria pollutant subject to regulation under the Act.  "Significant" is defined at 40 C.F.R. § 52.21(b)(23)(i) in reference to a net emissions increase or the potential of a source to emit a criteria pollutant, at a rate of emission that would equal or exceed a specific level, *e.g.*: for ozone, 40 tpy of VOCs; for CO, 100 tpy; for $NO_x$, 40 tpy; for $SO_2$, 40 tpy, (hereinafter "criteria pollutants").  As set forth at 40 C.F.R. § 52.21(j), a new major stationary source or a major modification in an attainment area shall install and operate best available control technology ("BACT") for each pollutant subject to regulation under the Act that it would have the potential to emit in significant quantities.

Part D of Title I of the Act, 42 U.S.C. §§ 7501-7515, sets forth the requirements for those geographic areas that have not attained a particular NAAQS.  One such requirement is for States to have a preconstruction permitting program known as nonattainment New Source Review ("NSR").  Section 173 of the Act, 42 U.S.C. § 7503, requires that in order to obtain such a permit

the source must, among other things:  (a) obtain federally enforceable emission offsets at least as great as the new source's emissions;  (b) comply with the lowest achievable emission rate ("LAER") as defined in Section 171(3) of the Act, 42 U.S.C. § 7501(3); and (c) analyze alternative sites, sizes, production processes, and environmental control techniques for the proposed source and demonstrate that the benefits of the proposed source significantly outweigh the environmental and social costs imposed as a result of its location, construction, or modification.

As set forth in 40 C.F.R. § 52.24, no major stationary source shall be constructed or modified in any non-attainment area as designated in 40 C.F.R. Part 81, Subpart C to which any SIP applies, if the emissions from such source will cause or contribute to concentrations of any pollutant for which a NAAQS is exceeded in such area, unless, as of the time of application for a permit for such construction, such plan meets the requirements of Part D, Title I, of the Act.  A State may comply with Sections 172 and 173 of the Act by having its own non-attainment new source review regulations approved as part of its SIP by EPA, which must be at least as stringent as those set forth at 40 C.F.R. § 51.165.

B.    Flaring and New Source Performance Standards

Section 111 of the Act, 42 U.S.C. § 7411, requires EPA to promulgate NSPS for certain categories of new air pollution sources.  Pursuant to Section 111(b), 42 U.S.C. § 7411(b), EPA promulgated general regulations applicable to all NSPS source categories.  Those general regulations are set forth at 40 C.F.R. Part 60 Subpart A.  EPA's NSPS regulations applicable to petroleum refineries, including requirements for implementing and utilizing good air pollution control practices at all times, are set forth at 40 C.F.R. Part 60 Subpart Ja.  FCCU regenerators,

EPA-499

sulfur recovery plants, and flares are among the refinery process units subject to regulation under NSPS.

C.     Leak Detection and Repair

Section 112 of the CAA, 42 U.S.C. § 7412, requires EPA to promulgate emission standards for certain categories of sources of hazardous air pollutants ("National Emission Standards for Hazardous Air Pollutants" or "NESHAPs"). Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), EPA promulgated national emission standards for equipment leaks (fugitive emission sources). Those regulations are set forth at 40 C.F.R. Part 61 Subpart J and Part 63 Subparts H and CC. Additional regulations addressing equipment leaks are located at 40 C.F.R. Part 60 Subparts VVa and GGGa. The focus of the LDAR program is the refinery-wide inventory of all possible leaking valve, pump, pressure relief device, sampling connection system, open-ended valve or line, and flange or other connector; regular monitoring to identify leaks; and the repair of leaks as soon as they are identified.

D.     Benzene Waste NESHAP

In the 1990 amendments to the Act, Congress defined "hazardous air pollutant" and identified 189 pollutants under Section 112(b)(1) that would be subject to regulation. The Act requires EPA to establish emission standards for each pollutant in accordance with Section 112(d) of the CAA, 42 U.S.C. § 7412(d). In March 1990, EPA promulgated national emission standards applicable to benzene-containing waste streams. Benzene is a listed hazardous air pollutant and a known carcinogen. The benzene waste regulations are set forth at 40 C.F.R. Part 61 Subpart FF, "National Emission Standard for Benzene Waste Operations." Benzene is a naturally-occurring constituent of petroleum products and petroleum waste and is highly volatile. Benzene emissions can be detected anywhere in a refinery where a petroleum product or

EPA-500

petroleum waste are exposed to the ambient air. Refineries are required to tabulate their total
annual benzene emissions, or "TAB." If the TAB is over 10 megagrams, the refinery is required
to elect a control option that will require the control of all waste streams, or control of certain
select waste streams.

### III.    STANDARD OF REVIEW FOR ENTRY OF CONSENT DECREES

"The initial decision to approve or reject a settlement proposal is committed to the sound
discretion of the trial judge." SEC v. Randolph, 736 F.2d 525, 529 (9th Cir. 1984) (quoting
Officers for Justice v. Civil Serv. Comm'n, 688 F.2d 615, 625 (9th Cir. 1982), cert. denied sub
num. Byrd v. Civil Serv. Comm'n, 459 U.S. 1217 (1983); accord United States v. Jones &
Laughlin Steel Corp., 804 F.2d 348, 351 (6th Cir. 1986); United States v. Hooker Chem. &
Plastics Corp., 776 F.2d 410, 411 (2nd Cir. 1985); United States v. Union Elec. Co., 132 F.3d
422, 430 (8th Cir. 1997). Courts, however, exercise discretion within the framework of certain
policy principles applicable to the settlement process.

A district court reviewing a consent decree must determine whether the proposed
settlement fairly and reasonably resolves the controversy in a manner consistent with the public
interest and applicable law. See United States v. Oregon, 913 F.2d 576, 580–81 (9th Cir. 1990);
accord United States v. Cannons Eng'g Corp., 899 F.2d 79, 84 (1st Cir. 1990) ("The relevant
standard [is] . . . whether the proposed decree is fair, reasonable, and faithful to the objectives of
the governing statute."). "Unless a Consent Decree is unfair, inadequate, or unreasonable, it
ought to be approved." Randolph, 736 F.2d at 529. In reviewing a proposed consent decree, the
reviewing court is to ascertain whether the decree is fair, adequate, and reasonable, Cotton v.
Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977), as well as consistent with the objectives of the
statute under which the action was brought, United States v. City of Miami, 664 F.2d 435, 441

EPA-501

(5th Cir. 1981) (Rubin, J., concurring). "The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy . . . ." *Id.* at 441 n.13. These standards of review should be the same for an amendment to an already approved settlement.

The reviewing court's discretion should be exercised with deference to the "strong public policy in favor of settlements, particularly in very complex and technical regulatory contexts." United States v. Comunidades Unidas Contra La Contaminacion, 204 F.3d 275, 280 (1st Cir. 2000). Voluntary settlements of disputes are favored by the Courts. See also, Pennwalt Corp. v. Plough, Inc., 676 F.2d 77, 80 (3d Cir. 1982); accord, United States v. Nicolet, Inc., No. 85-3060, 1989 WL 95555, at *2 (E.D. Pa. Aug. 15, 1989); Hooker Chemical, 776 F.2d at 411 (noting "well-established policy of encouraging settlements").

The reviewing court should accord deference to the judgment of the United States and its agencies in settling a matter. The Supreme Court, in Sam Fox Publ'g Co. v. United States, 366 U.S. 683, 689 (1961), emphasized the importance of deference to the United States regarding settlement: "sound policy would strongly lead us to decline . . . to assess the wisdom of the Government's judgment in negotiating and accepting the . . . Consent Decree, at least in the absence of any claim of bad faith or malfeasance on the part of the Government in so acting." The Circuit Courts have echoed this principle of deference to the United States. A court reviewing a settlement "should pay deference to the judgment of the government agency which has negotiated and submitted the proposed judgment." Randolph, 736 F.2d at 529 (citing Marshall v. Holiday Magic, Inc., 550 F.2d 1173, 1178 (9th Cir. 1977), Officers for Justice, 688 F.2d at 625); see also, United States v. Bechtel Corp., 648 F.2d 660, 666 (9th Cir. 1981) (concluding that the balancing of competing interests affected by a proposed Consent Decree

"must be left, in the first instance, to the direction of the Attorney General"). Courts should "refrain from second-guessing the Executive Branch." Cannons, 899 F.2d at 84. Judicial presumption in favor of voluntary settlement is "particularly strong where a Consent Decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field." United States v. Akzo Coatings of Am. Inc., 949 F.2d 1409, 1436 (6th Cir. 1991). These negotiations often involve a "crew of sophisticated players, with sharply conflicting interests . . . ." Cannons, 899 F.2d at 84. Given that, the court "must look at the big picture, leaving interstitial details largely to the agency's informed judgment." Cannons, 899 F.2d at 94. In sum, while the court should not merely give its "rubberstamp approval," United States v. BP Exploration and Oil Co. 167 F. Supp. 2d 1045, 1050 (N.D. Ind. 2001), it should consider a consent decree against the strong public policy encouraging voluntary settlement, a policy that has "particular force" where the decree has been negotiated on behalf of an expert agency like EPA. Cannons, 899 F.2d at 84.

Thus, a reviewing court is not required to make the same in-depth analysis of a proposed settlement that it would be required to make in order to enter a judgment on the merits after trial:

> The trial court in approving a settlement need not inquire into the precise legal
> rights of the parties nor reach and resolve the merits of the claims or controversy,
> but need only determine that the settlement is fair, adequate, reasonable and
> appropriate under the particular facts and that there has been valid consent by the
> concerned parties.

Citizens for a Better Environ. 718 F.2d 1117, 1126 (D.C. Cir. 1983); accord Officers for Justice, 688 F.2d at 625. The relevant standard "is not whether the settlement is one which the court itself might have fashioned, or considers as ideal . . . ." United States v. Kramer, 19 F. Supp. 2d 273, 280 (D.N.J. 1998) (quoting Cannons Eng'g Corp., 899 F.2d at 84); accord United States v. Southeastern Pa. Transp. Auth., 235 F.3d 817, 823 (3d. Cir. 2000) ("A court should approve a

EPA-503

proposed Consent Decree if it is fair, reasonable, and consistent with CERCLA's goals."). Thus, the court cannot "substitute its judgment for that of the parties nor conduct the type of detailed investigation required if the parties were actually trying the case." BP Exploration, 167 F. Supp. 2d at 1050. Nor should the court judge the proposed settlement "against a hypothetical or speculative measure of what might have been achieved by the negotiators." Officers for Justice, 688 F.2d at 625 (citations omitted). Ultimately, "[t]he court need only be satisfied that the decree represents a 'reasonable factual and legal determination.'" Oregon, 913 F.2d at 581 (quoting United States v. City of Miami, 664 F.2d 435, 441 (5th Cir. 1981) (en banc) (Rubin, J., concurring)).

Ensuring that the settlement is in the public interest is but one factor to be considered by the Court and does not alter the fundamental reasonableness standard or the policy of deference to the settling agency. Randolph, 736 F.2d at 529 (holding that the district court applied "too strict a standard" when it "closely scrutinize[d] the proposed decree to see if it was in the public's best interest"). Even where a Consent Decree affects the public interest or third parties, "the court need not require that the decree be 'in the public's best interest' if it is otherwise reasonable." Oregon, 913 F.2d at 581 (quoting Randolph, 736 F.2d at 529 (emphasis in original)). Nor must a consent decree "impose all the obligations authorized by law." Id.

The court's role in considering a proposed decree is a limited one: "The court may either approve or disapprove the settlement; it may not rewrite it." Harris v. Pernsley, 654 F. Supp. 1042, 1049 (E.D. Pa.), aff'd, 820 F.2d 592 (3d Cir. 1987); accord Jones & Laughlin Steel, 804 F.2d at 351 (stating that a court does not have the power to modify a consent decree; it may only accept or reject the terms to which the parties have agreed). Thus, the question to be resolved in reviewing the settlement, and the degree of scrutiny to be applied, are distinct from the merits of

14

EPA-504

the underlying action.

In sum, this Court's role in reviewing the proposed amendment to the Consent Decree is limited to approval or denial, based on an evaluation of the fairness and reasonableness of the settlement and its concordance with the applicable law. The Court must conduct this evaluation in the context of the strong public policy supporting settlement and bearing in mind the substantial deference due to EPA's and the Department of Justice's ("DOJs") interpretations of applicable environmental laws and regulations as well as to EPA's engineering and scientific determinations. See, e.g., Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843–44 (1984); American Paper Inst. v. U.S. EPA, 660 F.2d 954, 963 (4th Cir. 1981).

## IV.    THE FIRST MODIFICATION IS FAIR, REASONABLE, AND CONSISTENT WITH THE PUBIC INTEREST AND THE GOALS OF THE CLEAN AIR ACT

The First Modification satisfies the standard for approval of a settlement. The First Modification is fair, reasonable, and in accordance with the objectives of the Act because it resulted from complex, lengthy, and difficult arms-length negotiations; it fairly reflects the changing circumstances at the Refinery while preserving key environmental protections; and it is a reasonable compromise which is faithful to the goals of the statute and in the public interest. Accordingly, the First Modification should be entered as a final order of the Court.

The comments received contend that the First Modification should be rejected because it is "inappropriate, improper, and inadequate." The Commenter alleges that the First Modification does not meet the standard for consent decrees because:

> 1) It implies a false premise that the . . . Refinery did not shut down, when the Refinery should be considered a new major stationary source under the PSD rules and thus subject to the standards therein;

> 2) In order to effectively protect the public health and welfare of the people of the Virgin Islands, the cancer registry referenced therein must be

established and significant community research undertaken *before* (emphasis in
original) the commencement of polluting activity contemplated;

       3) The compliance assessment and reporting protocols referenced therein
allow Limetree to self-report, when this responsibility should properly be
undertaken by EPA Region 2; and

       4) The Refinery activity contemplated by the Modification implicates and
does not address serious concerns regarding federally-listed species and Sandy
Point National Wildlife Refuge.

Attachment B at page 1. As discussed below, the first comment conflates the shutdown issue;

the second comment seeks something that is beyond the scope of the Act; the third comment is

inconsistent with the Act; and the fourth comment seeks something that is beyond the scope of

the Act. The First Modification does not violate any statutory requirements and is protective of

the environment.

    A.    <u>The Consent Decree is Procedurally and Substantively Fair.</u>

        1.    <u>Procedural Fairness</u>

    This settlement is the result of a fair process. A settlement is procedurally fair if the

negotiations that created it were non-collusive, open, and at arms-length. <u>See</u> <u>BP Exploration</u>,

167 F. Supp. 2d at 1051 (citing <u>Cannons</u>, 899 F.2d at 86). The settlement embodied in the First

Modification is the product of extended, arms-length negotiations. The fairness of a consent

decree must be evaluated in both procedural and substantive aspects. <u>See</u> <u>In Re Tutu Water</u>

<u>Wells CERCLA Lit.</u>, 326 F.3d 201, 207 (3d Cir. 2003). To measure procedural fairness, a court

should "look to the negotiation process and attempt to gauge its candor, openness and bargaining

balance." <u>Id.</u> (quoting <u>Cannons</u>, 899 F.2d at 86). As noted by the court in <u>Rohm & Haas</u>:

    Where a settlement is the product of informed, arms-length bargaining by the
    EPA, an agency with the technical expertise and the statutory mandate to enforce
    the nation's environmental protection laws, in conjunction with the Department of
    Justice…a presumption of validity attaches to that agreement.

U.S. v. Rohm & Haas Co., 721 F. Supp. 666, 681 (D.N.J. 1989) (citing City of New York v. Exxon Corp., 697 F. Supp. 677, 692 (S.D.N.Y. 1988)).  An additional element of procedural fairness is provided by virtue of the United States having followed the protective procedures of 28 C.F.R. § 50.7 by seeking public comment.  The comments received do not challenge or question the procedural fairness.

The First Modification resulted from procedurally fair settlement negotiations.  The First Modification preserves nearly all of the provisions of the 2011 Consent Decree and, in fact, improves upon some by making them consistent with updated regulatory provisions (*i.e.*, LDAR).  The negotiations that led to the First Modification were conducted at arms-length and involved many discussions concerning both legal and technical issues.  All parties to those discussions were represented by informed legal counsel and technical representatives.  Where, as here, a proposed consent decree is "the product of good faith, arms-length negotiations" it is "presumptively valid."  See United States v. Oregon, 913 F.2d 576,581 (9th Cir. 1990).

2.    Substantive Fairness

In addition to being the result of a procedurally fair process, the First Modification's terms are substantively fair.  To determine whether a proposed settlement is substantively fair, courts look to factors such as the strength of the plaintiff's case versus the amount of the settlement offer, the likely complexity, length and expense of litigation, the amount of opposition to the settlement, the opinion of competent counsel, the stage of the proceeding, and the amount of discovery undertaken.  Great Neck Cap. App. Inv. Ptp. v. Pricewaterhousecoopers, 212 F.R.D. 400 at 409 (citing E.E.O.C. v. Hiram Walker & Sons, Inc., 768 F.2d 884, 889 (7th Cir. 1980)); BP Exploration, 167 F. Supp. 2d at 1051-52.  Because these concepts do not lend themselves to "verifiable precision [,] [i]n environmental cases, EPA's expertise must be given 'the benefit of the doubt when weighing substantive fairness.'"  Comunidades Unidas, 204 F.3d at 281 (quoting

17

Cannons, 899 F.2d at 88). These terms also are not easily quantified in this instance because this is an amendment of an existing consent decree.

The First Modification is substantively fair because it preserves the vast majority of the requirements and obligations from the 2011 Consent Decree but also fairly addresses HOVENSA's bankruptcy, Limetree Bay's purchase of certain refining and terminal assets in the bankruptcy proceeding, the creation of the ERT, and the operational realities at the Refinery. The First Modification is the result of DOJ's, EPA's and DPNR's assessment of how to adapt to the change in ownership and the operational realties of the Refinery while effecting the environmental requirements and the public protections of the Decree. In short, it reflects the sound judgment of the environmental agencies tasked with protecting the environment and enforcing the environmental laws.

a.    First Comment:

*It implies a false premise that the Limetree Bay Terminals (formerly known as Hovensa and HOVIC) refinery (hereinafter Refinery) did not shut down, when the Refinery should be considered a new major stationary source under the Prevention of Significant Deterioration (PSD) rules and thus subject to the standards therein.*

The Commenter's first comment conflates a Decree issue and a permitting issue by mischaracterizing a Whereas clause in the First Modification.  (Attachment A at page 4).  The Whereas clause reads as follows:

> WHEREAS, except to the extent set forth in the preceding WHEREAS clause, neither HOVENSA nor Limetree Bay has permanently Shutdown and surrendered permits for the Refinery or portions of the Refinery to satisfy the requirements of the Consent Decree in the manner provided in Paragraph 229 (Effect of Shutdown) of the Consent Decree.

Paragraph 229 of the Decree provides that the requirements of the Consent Decree can be satisfied by the permanent Shutdown of the Refinery **and** the surrender of all air permits for the Refinery.  (Attachment A, ¶ 229) (Emphasis added).  In addition to Paragraph 229, Paragraph 23

of the Decree identifies "Permanent unit shutdown **and** relinquishment of permit" as one of the qualifying controls that may be used to satisfy the $NO_x$ emission reductions required for heaters, boilers, generating turbines, and compressor engines in Paragraphs 24, 26, 27, and 28. (Attachment A, ¶ 23) (emphasis added).

This Whereas clause was included in the First Modification to make clear that neither HOVENSA nor Limetree Bay have availed themselves of the option to comply with the Decree through a permanent shutdown of part or all of the Refinery **and** surrendering air permits, as set forth in Paragraphs 23 and 229. The Whereas clause in question states only that neither HOVENSA nor Limetree Bay satisfied **both** conditions for invoking the compliance option involving permanent shutdown for units other than those described in the prior Whereas clause (i.e. those listed in Appendix N of the First Modification). Despite recognizing that the relevant permits were not surrendered and also acknowledging the intent of this Whereas clause, the Commenter uses the clause as a springboard to a lengthy discussion about a permitting process that is occurring outside of the Decree. (Attachment B, page 2, FN2). ("**The undersigned notes that this section** [of the comments] **applies to PSD analysis – not as to whether the terms of Section 229 of the Consent Decree have come to pass.**" (Emphasis in original).

The Consent Decree was born of a 2011 judicial enforcement action against HOVENSA. In contrast, permitting is an adjudicative process before EPA or the State. EPA decisions and policies in the latter process are not relevant to, and indeed cannot be used to determine, the meaning of terms of the Consent Decree, which must be construed basically as a contract and its language examined within the four corners of the agreement. [2] *See United States v. ITT*

---

[2] Conversely, nothing in the proposed First Modification of the Consent Decree or the Motion to Enter should be read or interpreted as a statement on whether any refinery units were permanently shut down for the distinct purpose of determining the type of permits required to

*Continental Banking Co.*, 420 U.S. 223, 238 (1975) ("[A] consent decree or order is to be construed for enforcement purposes basically as a contract . . . ."); *United States v. Armor & Co.*, 402 U.S. 673, 682 (1971) ("[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purpose of one of the parties to it."); *Harris v. City of Philadelphia*, 137 F.3d 209, 212 (3d. Cir. 1998); *Fox v. U.S. Dep't of Housing*. 680 F.2d 315, 319 (3d Cir. 1982).

The Whereas clause and more generally, the Decree has only a narrow, limited interaction with the permitting process. Apart from the one Whereas clause, the only other references to permitting contained in the Decree are provisions that make clear that Limetree Bay is required to: (1) incorporate emission limits set in the Decree into federally enforceable minor or major new source review permits (Attachment A, ¶ 12); (2) incorporate emission limits and standards into the Refinery's Title V permit (Attachment A, ¶ 126); and (3) to obtain required, federally enforceable permits for the construction of pollution control technology and the installation of equipment necessary to implement the requirements of the Decree (Attachment A, ¶ 127). While these requirements are implemented through permitting, permitting occurs in entirely separate processes from enforcement that encompass numerous requirements and decisions unrelated to the Decree and over which the Decree has no influence. Moreover, Paragraph 214 of the Decree specifically preserves the right of EPA and the Virgin Islands to impose stricter permitting requirements ("nothing in this Consent Decree shall be construed to prohibit or prevent the United States or the Virgin Islands from developing, implementing, and enforcing more stringent standards subsequent to the Date of Lodging through . . . the permit

---

restart these units. In accordance with Paragraph 214 of the Decree, except as expressly provided, nothing in the Decree relieves HOVENSA or Limetree Bay of its obligation to comply with other applicable federal and territorial laws, including those requiring air permits.

EPA-510

process"). The Commenter's concern about the underlying predicate of a permitting decision is not the subject of this judicial proceeding, which is focused on transferring to a new owner the existing obligations from a 2011 Consent Decree that resolved Clean Air Act violations that arose prior to entry of the Consent Decree and which were established well-before the events underlying the Commenter's concern, nor does it affect in any way the permitting process discussed by the Commenter. Given the substantive and procedural separation of this Decree and the permitting process, the Commenter's permitting concerns are misplaced and not relevant to the Court's consideration of the Motion to Enter the First Modification.

b.     Second Comment

*In order to effectively protect the public health and welfare of the people of the Virgin Islands, the cancer registry referenced therein must be established and significant community research undertaken before the commencement of polluting activity contemplated.*

The Clean Air Act neither authorizes nor requires that a cancer registry be established or that it must be established before the Refinery can restart. However, as part of the 2011 Consent Decree, HOVENSA was required to establish and pay $4.875 million into an escrow account to fund Territorial Supplemental Environmental Projects ("TSEPs") to be implemented for the benefit of the Virgin Islands. (ECF Doc. No. 6, ¶ 137). HOVENSA established the escrow account and deposited the $4.875 million into that account on or about October 13, 2011. As part of the First Modification, Paragraph 137 is modified to provide DPNR the responsibility of developing and implementing the TSEPs. The First Modification identifies a cancer registry to be "among the potential projects" DPNR is considering. Ordering establishment of a cancer registry, however, is beyond the authority of the Act.

c.     Third Comment

*The compliance assessment and reporting protocols referenced therein allow for Limetree to self-report, when this responsibility should properly be undertaken by EPA Region 2.*

21

EPA-511

It is common practice for environmental regulators to require regulated entities to self-monitor and self-report. U.S. v. Chevron U.S.A., Inc., 380 F. Supp. 2d 1104, 1113 (N.D. Cal. 2005). And, if a report is falsified, the regulated entity is generally subject to both civil and criminal penalties. See Section 113 of the Act, 42 U.S.C. § 7413. The Act relies largely on a system of self-reporting, along with the use of inspections, in order to "to protect and enhance the quality of the Nation's air resources." 42 U.S.C. § 7401(b)(1). Cf., United States v. Murphy Oil, 143 F. Supp. 1054, 1084 (W.D. Wisc. 2001).

Consistent with this approach, the Consent Decree requires that each report be certified by an officer responsible for overseeing implementation of the Consent Decree, as follows:

> "I certify under penalty of law that this information was prepared under my direction or supervision by personnel qualified to properly gather and evaluate the information submitted. Based on my directions and after reasonable inquiry of the person(s) directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate and complete."

See, 2011 Consent Decree, ¶ 144. ECF Doc. 6, page 105. In addition, the Consent Decree includes stipulated penalties for failure to comply with Part X (Reporting and Recordkeeping). ECF Doc. 6, ¶ 171, page 117. Importantly, the monitoring and reporting required under both the Decree and applicable regulations are in addition to, and not in lieu of, oversight and inspection of the Refinery by EPA.

### d.     Fourth Comment

*The Refinery activity contemplated by the Modification implicates and does not address serious concerns regarding federally-listed species and Sandy Point National Wildlife Refuge.*

The Commenter failed to cite any authority to support the assertion that the First Modification must address endangered or threatened species or potential impacts to Sandy Point National Wildlife Refuge.

EPA-512

Under the Endangered Species Act of 1973, if any agency determines that a proposed action may affect an endangered or threatened species, the agency must formally consult with the relevant federal fish and wildlife agency, depending on the species that are protected in the area of the proposed action. The Endangered Species Act of 1973, Section 7(a)(2), 16 U.S.C.A. § 1536(a)(2). However, courts have held, as a matter of law, that a consent decree is not an agency action that triggers the Section 7 consultation requirement. U.S. v. Pacific Gas & Elec., 776 F. Supp. 2d 1007, 1023 (N.D. Cal. 2011). For this reason, the First Modification is not required to address endangered or threatened species or potential impacts to Sandy Point National Wildlife Refuge.

* * *

After carefully considering all of the Commenter's comments and after a thorough evaluation of the issues raised in those comments, the United States has concluded that none of the comments warrants either a change to the settlement terms or the wholesale rejection of the First Modification.

The 2011 Consent Decree provides for the reduction in air emissions in the Virgin Islands. The First Modification requires Limetree Bay and the ERT to step into HOVENSA's shoes in order to implement those reductions. For Limetree Bay, this means making sure that the Refinery achieves stringent emissions limits and implements other enhancements that will provide tangible benefits to the health and welfare of the residents of the Virgin Islands through the reduction of $NO_x$ and $SO_2$ emissions from the Refinery. Thus, the First Modification is substantively fair.

EPA-513

B.    The Decree is Reasonable, Adequate and Consistent with the Goals of the Act

In determining whether a decree is "reasonable, adequate, and consistent with the goals of the governing statute," courts have evaluated the following factors: "(1) the nature and extent of potential hazards; (2) the availability and likelihood of alternatives to the Consent Decree, (3) whether the Decree is technically adequate to accomplish the goal of cleaning the environment; (4) the extent to which the Consent Decree furthers the goals of the statutes which form the basis of the litigation; (5) the extent to which the Court's approval of the Consent Decree is in the public interest; and (6) whether the Consent Decree reflects the relative strengths and weakness of the Government's case against the Defendants." BP Exploration, 167 F. Supp. 2d at 1053 (citing Akzo, 949 F.2d at 1436; Cannons, 899 F.2d at 89–90).

Though not all of these factors are appropriate for discussion here, they all militate in favor of approving the First Modification, which should be considered reasonable and adequate for many of the same reasons discussed above with respect to substantive fairness. The impetus for the First Modification was the HOVENSA bankruptcy, Limetree Bay's purchase of certain refining and terminal assets, and the creation of the ERT. The resulting transfer of ownership and other interests in the Refinery triggered the requirement for a modification pursuant to Paragraph 7 of the 2011 Consent Decree. ECF Doc. 6, page 7.

The First Modification maintains the specific, tailored relief called for in the 2011 Consent Decree including the requirements to reduce $NO_x$ emissions and control $SO_2$, PM, and CO emissions from the Refinery's fluid catalytic cracking unit; significantly reduce $NO_x$ emissions from the heaters, boilers, generating turbines, and compressor engines; reduce $SO_2$ emissions by burning lower sulfur fuel oil and complying with fuel gas combustion requirements for heaters, boilers, flares, and sulfur recovery plants; comply with regulatory requirements for

EPA-514

acid gas and hydrocarbon flaring, and implement a program to investigate the causes of flaring incidents and take preventive action; create a preventive maintenance and operation plan for minimizing $SO_2$ emissions from the sulfur recovery plant; reduce emissions of VOCs through stricter LDAR requirements and by replacing valves that are leaking above a specified level with low emissions valves or low emissions valve packing; and reduce emissions of benzene by improving management of benzene waste streams. In recognition of the changed operational realities of the Refinery, the First Modification modifies some of the deadlines and injunctive relief obligations. However, many of those extensions will have little to no impact given that the obligations will be complied with before the relevant equipment resumes operation (see ¶¶ 27 and 45), the modification requires mitigation if it results in additional emissions (see ¶ 50A), or includes interim compliance measures (see ¶ 136). It is for these reasons that the United States believes on balance that the First Modification reasonably and adequately addresses Clean Air Act requirements and is protective of the public.

One of the primary purposes of the Clean Air Act is to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare. 42 U.S.C. § 7401(b)(1). As discussed above, the First Modification retains the 2011 Consent Decree's obligations to reduce $NO_x$ and $SO_2$ emission from the Refinery and the requirements to control VOC emissions and benzene emissions from the Refinery. The First Modification also provides Limetree Bay with some flexibility to ensure that it is able to restart (as defined in the First Modification) in compliance with the terms of the Decree while also ensuring that the restart maintains the benefits of the 2011 Consent Decree.

When evaluating whether a consent decree is in the public interest, "[t]he court should bear in mind the flexibility of the public interest inquiry: the court's function is not to determine

EPA-515

whether the resulting array of rights and liabilities is the one that will best serve society, but only to confirm that the resulting settlement is within the reaches of the public interest." <u>United States v. Microsoft Corp.</u>, 56 F.3d 1448, 1460 (D.C. Cir. 1995) (internal quotations omitted); <u>U.S. v. Oregon</u>, 913 F.2d at 581 ("[T]he court need not require that the decree be 'in the public's *best* interest' if it is otherwise reasonable.") (quoting <u>Randolph</u>, 736 F.2d at 529 (emphasis in original)). While the First Modification reflects a compromise based on the technical and legal judgment of the United States, the relief afforded by this settlement provides real benefits to the citizens in the Virgin Islands and real progress toward the Clean Air Act goals of enhancing air quality and promoting public health and welfare. Thus, the First Modification clearly meets the <u>Microsoft</u> and <u>Oregon</u> standards.

## V. NON-MATERIAL MODIFICATION TO PARAGRAPH 79.a

Paragraph 79.a of the First Modification as lodged with the Court on August 25, 2020 (ECF Doc. 12-1, page 27), requires that Limetree Bay "shall complete a review and verification of the Refinery TAB [total annual benzene] and its compliance with the Benzene Waste NESHAP" by March 30, 2021. This date was set in the belief that the Refinery would restart during the fourth quarter of 2020. If the Refinery had restarted in that time frame, it would have provided sufficient operational data to ensure for a complete review and verification of the Refinery's TAB.

Due to the delay in the Refinery restart, the United States and Limetree Bay have agreed to change the deadline for completion of the review and verification from March 30, 2021 to November 22, 2021. Paragraph 228 of the Decree provides, in part, that "non-material modifications include . . . modifications to schedules that do not extend the date for compliance with emissions limitations following the installation of control equipment, provided such

EPA-516

changes are agreed upon in writing between the United States and HOVENSA [Limetree Bay]."
This compliance date does not involve the installation of control equipment or emissions
limitations. Because this date change does not involve the installation of control equipment or
emissions limitations it is a non-material modification. Attachment C to this Memorandum is the
executed Second Modification of the Consent Decree documenting the United States' and
Limetree Bay's agreement to this non-material modification.

## CONCLUSION

As explained above, the First Modification is fair, adequate and reasonable, and
consistent with the goals of the Clean Air Act. Since the public comments submitted on the First
Modification do not provide a basis for the United States to withhold its consent to the
settlement, and because changing the deadline for completion of the review and verification from
March 30, 2021 to November 22, 2021 is a non-material modification that does not warrant
additional notice and comment, the United States requests that this Court approve the First
Modification by executing page 95 of Attachment A, and enter it as an order of this Court.

Dated:  April 8, 2021

                              Respectfully Submitted,

                              JEAN E. WILLIAMS
                              Acting Assistant Attorney General

                              /s/ Myles E. Flint, II
                              MYLES E. FLINT, II
                              Trial Attorney
                              Environmental Enforcement Section
                              Environment and Natural Resources Division
                              U.S. Department of Justice
                              P.O. Box 7611
                              Ben Franklin Station
                              Washington, DC 20044-7611

EPA-517

GRETCHEN C.F. SHAPPERT
United States Attorney
United States Virgin Islands
Federal Building  and U.S. Courthouse
5500 Veterans Drive, Room 260
St. Thomas, USVI 00802

OF COUNSEL:

FLAIRE MILLS
Assistant Regional Counsel
United States Environmental Protection Agency
Region 2
290 Broadway
New York, New York 10007-1866

# ATTACHMENT A

# TO MEMORANDUM IN SUPPORT OF MOTION TO ENTER

Case: 1:11-cv-00006-RAM-GWC     Document #: 22-1     Filed: 04/26/20     Page 2 of 158

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA, and UNITED STATES VIRGIN ISLANDS | ) ) ) |
| Plaintiffs, | ) Civ. No. 1:11-cv-00006 |
| v. | ) ) |
| HOVENSA L.L.C. | ) ) |
| Defendant. | ) ) |

**FIRST MODIFICATION OF THE CONSENT DECREE**

WHEREAS, the United States of America ("United States"), the United States Virgin Islands ("Virgin Islands"), and HOVENSA L.L.C. ("HOVENSA") are parties to a Consent Decree entered by this Court on June 7, 2011 in the above-captioned matter (Civ. No. 1:11-cv-00006, Doc. 6).

WHEREAS, the United States, the Virgin Islands, HOVENSA, Limetree Bay Terminals, LLC, Limetree Bay Refining, LLC, and the Environmental Response Trust ("ERT") are parties to this first modification of the Consent Decree ("First Modification").

WHEREAS, HOVENSA idled the refinery and terminal operations in 2012 and 2015, respectively, and filed for bankruptcy on September 15, 2015 in the United States District Court for the District of the Virgin Islands, Bankruptcy Division (the "Bankruptcy Court").

WHEREAS, on December 1, 2015, the Bankruptcy Court entered an Order (Case No. 1:15-bk-10003-MFW, Doc. 394) approving the sale of certain refining and terminal assets owned by HOVENSA to Limetree Bay Terminals, LLC pursuant to the terms of the Amended and Restated Asset Purchase Agreement in the form appearing as Doc. 528-1 in Case No. 1:15-bk-10003-MFW ("Final APA").

WHEREAS, on January 4, 2016, the sale of certain refining and terminal assets to Limetree Bay Terminals, LLC closed.

WHEREAS, HOVENSA represented in the Final APA that it was in material compliance with the Consent Decree.

WHEREAS, pursuant to the Final APA, Limetree Bay Terminals, LLC, in part, agreed to "promptly … use commercially reasonable efforts..., in cooperation with the applicable Governmental Entities, to ... make the terms, conditions, obligations and liabilities of the Consent Decree applicable to the Purchased Assets, including [Limetree Bay Terminals, LLC] and [HOVENSA] executing a modification to the Consent Decree pursuant to which [Limetree Bay Terminals, LLC] shall assume the terms, conditions, obligations and liabilities of [HOVENSA] as they relate to the Purchased Assets under the Consent Decree and [HOVENSA] shall be released from such terms, conditions, obligations and liabilities (the "Limited Consent Decree Modification") ...."

WHEREAS, pursuant to the Final APA, "[i]f, despite [Limetree Bay Terminals, LLC's] and [HOVENSA's] respective efforts, the applicable Governmental Entities do not agree to the Limited Consent Decree Modification, regardless of whether such failure to agree occurs before or after the Closing, [Limetree Bay Terminals, LLC] and [HOVENSA] promptly thereafter shall … cooperate and take, or cause to be taken, all steps required under the Consent Decree to make the terms, conditions, obligations and liabilities of the Consent Decree applicable to [Limetree Bay Terminals, LLC], including (A) [Limetree Bay Terminals, LLC] and [HOVENSA] executing a modification to the Consent Decree pursuant to which [Limetree Bay Terminals, LLC] shall assume the terms, conditions, obligations and liabilities of [HOVENSA] under the Consent Decree and [HOVENSA] shall be released from such terms, conditions, obligations and

liabilities (the "Consent Decree Modification") …."

WHEREAS, the applicable Governmental Entities, HOVENSA and Limetree Bay Terminals, LLC did not agree to a Limited Consent Decree Modification.

WHEREAS, "on the terms and subject to the conditions of" the Final APA, Limetree Bay Terminals, LLC agreed to assume all of HOVENSA's Liabilities, other than the Excluded Liabilities, "under the Consent Decree in connection with the Purchased Assets arising out of or relating to any act, omission, circumstances or other Event occurring after the Closing" (as each term is defined in the Final APA).

WHEREAS, Limetree Bay Terminals, LLC's agreement to enter into a Consent Decree Modification does not alter the rights and obligations of the parties to the Final APA.

WHEREAS, Paragraph 7 of the Consent Decree required HOVENSA to condition any transfer, in whole or in part, of the ownership or operation of the Refinery "upon the execution by the transferee of a modification to this Consent Decree, which makes the terms and conditions of this Consent Decree applicable to the transferee."

WHEREAS, pursuant to the Plan of Liquidation and the ERT Agreement, the ERT assumed HOVENSA's Consent Decree obligations under and relating to Section IX.A (Territorial Supplemental Environmental Project ("TSEP(s)")) and Section IX.B. (VIWAPA Emissions Monitoring Assistance).

WHEREAS, on February 17, 2016, groundwater and other remediation systems, including the Vapor Enhanced Recovery Units 1 and 2 ("VER-1" and "VER-2"), were transferred from HOVENSA to the ERT in accordance with the Plan of Liquidation.

WHEREAS, on October 11, 2012, HOVENSA submitted a Notice of Dismantlement of VER-1 in compliance with Section 204-31 of the Rules and Regulations of the Virgin Islands Air

Pollution Control Act and section 2.4.7.1 of HOVENSA's Title V Permit.

WHEREAS, Limetree Bay submitted to the Virgin Islands Department of Planning and Natural Resources ("VIDPNR") and/or EPA, by letters dated February 28, 2017, June 9, 2017, and May 30, 2019, requests to modify its Title V and non-title V permits to reflect the permanent Shutdown of certain combustion devices to satisfy the requirements of Section V.F of the Consent Decree to reduce NOx emissions by 4,744 tons per year.

WHEREAS, except to the extent set forth in the preceding WHEREAS clause, neither HOVENSA nor Limetree Bay has permanently Shutdown and surrendered permits for the Refinery or portions of the Refinery to satisfy the requirements of the Consent Decree in the manner provided in Paragraph 229 (Effect of Shutdown) of the Consent Decree.

WHEREAS, on or before April 24, 2018, Limetree Bay notified the Virgin Islands of the intent to restart Refinery Operations at the Refinery.

WHEREAS, on April 24, 2018, an affiliate of Limetree Bay Terminals, LLC formed a new limited liability company under the laws of the Virgin Islands, Limetree Bay Refining, LLC.

WHEREAS, in July 2018, Limetree Bay Terminals, LLC entered into the Amended and Restated Terminal Operating Agreement with the Virgin Islands, in which Limetree Bay Terminals, LLC, in part, agreed to "use commercially reasonable efforts to … add [itself] as a named party defendant to the … Consent Decree and modify the … Consent Decree to restart Refinery Operations." (Amended and Restated Terminal Operating Agreement by and Among the Government of the Virgin Islands and Limetree Bay Terminals, LLC, Section 4.1(B)).

WHEREAS, also in July 2018, Limetree Bay Refining, LLC entered into the Refinery Operating Agreement with the Virgin Islands, in which Limetree Bay Refining, LLC, in part, agreed to "use commercially reasonable efforts to … add [itself] as a named party defendant to

the … Consent Decree and modify the … Consent Decree to restart Refinery Operations."
(Refinery Operating Agreement by and Among the Government of the Virgin Islands and
Limetree Bay Refining, LLC, Section 4.1(B)).

WHEREAS, on May 28, 2020, HOVENSA certified to the United States and the Virgin
Islands that it had taken the actions described in Appendix Q ("HOVENSA Certification") in
completion and satisfaction of the Consent Decree requirements identified therein as of June 30,
2019.

WHEREAS, due to the bankruptcy, the Parties desire to capture the certification of
HOVENSA as to the Consent Decree obligations completed by HOVENSA for purposes of
satisfying the requirement to certify completion for purposes of termination in accordance with
Paragraphs 231 and 232 of the Consent Decree and to identify the Consent Decree obligations
that have not yet been completed.

WHEREAS, on November 30, 2018, Limetree Bay Terminals, LLC, executed a Bill of
Sale transferring in whole or in part certain Refinery assets that are subject to the requirements of
the Consent Decree to Limetree Bay Refining, LLC.

WHEREAS, the United States, the Virgin Islands, HOVENSA, Limetree Bay Terminals,
LLC, Limetree Bay Refining, LLC, and the ERT have reached an agreement on the First
Modification as set forth herein, and, pursuant to Paragraphs 7 and 228 (Modification) of the
Consent Decree, seek to modify the Consent Decree in accordance herewith.

WHEREAS, the United States, the Virgin Islands, HOVENSA, Limetree Bay Terminals,
LLC, Limetree Bay Refining, LLC, the ERT, and this Court, by entering the First Modification,
find that the First Modification has been negotiated in good faith and at arm's length; that the
First Modification is fair, reasonable, and in the public interest.

5

WHEREAS, the United States, the Virgin Islands, HOVENSA, Limetree Bay Terminals, LLC, Limetree Bay Refining, LLC, and the ERT agree and acknowledge that final approval by the United States and entry of the First Modification is subject to the procedures set forth in 28 C.F.R. § 50.7, which provides for notice of the First Modification in the Federal Register, an opportunity for public comment, and the right of the United States to withdraw or withhold consent if the comments disclose facts or considerations that indicate that the First Modification is inappropriate, improper or inadequate.

NOW THEREFORE, upon the consent and agreement of the United States, the Virgin Islands, HOVENSA, Limetree Bay Terminals, LLC, Limetree Bay Refining, LLC, and the ERT, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

1.      The terms and conditions of the Consent Decree are applicable to Limetree Bay Terminals, LLC, Limetree Bay Refining, LLC, and their respective successors or assigns, except as otherwise specifically set forth herein.

2.      The terms and conditions of the Consent Decree that apply to VER-1 and VER-2, and any obligations in Parts X (Reporting and Recordkeeping), and XIX (Termination) that relate to VER-1 and VER-2, are applicable to the ERT. All requirements of this Consent Decree that apply to VER-1 are satisfied pursuant to Paragraph 229.

3.      As of the Date of Entry of the First Modification, the obligations under and relating to Section IX.A and B of the Consent Decree, including the obligation to disburse funds from the TSEP Escrow Account for any TSEP approved by VIDPNR, to disburse funds earmarked for the VIWAPA Emissions Monitoring Assistance Program, and any obligations in Part X (Reporting and Recordkeeping) that relate to the TSEP Escrow Account or to the

VIWAPA Emissions Monitoring Assistance Program are transferred to the ERT as specified in the First Modification.

4.      Limetree Bay Terminals, LLC, Limetree Bay Refining, LLC, and the ERT shall be added as Parties to the Consent Decree.

5.      In accordance with Paragraphs 1-4 of the First Modification, effective upon the Date of Entry of the First Modification:

a.      Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC shall be substituted for HOVENSA as the Defendant, for all provisions of the Consent Decree, including all rights, liabilities and obligations of HOVENSA, except as set forth in this First Modification.

b.      The ERT shall be substituted for HOVENSA as the Defendant only to the extent any obligation set forth in the Consent Decree relates to either VER-1 or VER-2 or Part IX (Territorial Supplemental Environmental Project).

6.      Limetree Bay shall retain any and all records that it received from HOVENSA related to the implementation of the requirements of the Consent Decree for the periods specified in the relevant Paragraphs of the Consent Decree along with all records required to be maintained by Limetree Bay pursuant to the First Modification.  Limetree Bay is not liable for penalties for HOVENSA's failure to keep records required under the Consent Decree but will use commercially reasonable efforts to create a compliant version upon request by the United States or the Virgin Islands.

7.      Limetree Bay shall not be required to make any submittal or report or take any action required by the Consent Decree if a prior submittal, report, or action by HOVENSA fully satisfied that same requirement of the Consent Decree.

**8.**     As of the Date of Entry of the First Modification,  HOVENSA shall be released from the obligations  and liabilities  under the Consent Decree.

**9.**     Nothing  in the First Modification  shall affect any obligations  that the parties to the First Modification  may have to one another under any agreement or court order including, without  limitation,  the Order Granting  Final  Approval of Disclosure Statement and Confirming Chapter 11 Plan of Liquidation  Pursuant to Chapter 11 of the Bankruptcy Code (In re HOVENSA L.L.C., Chapter 11 Case No. 1:15-bk-10003-MFW,  Doc. No. 572) (the "Confirmation  Order"), except as provided  under the Consent Decree.  Nothing  in the First Modification  shall affect any of the settlement, release, or injunction  provisions  set forth in the Plan of Liquidation  or the Confirmation  Order, except as provided  under the Consent Decree. Nothing  in the First Modification  shall affect any rights obligations,  or liabilities  that the parties to the Final APA have to one another under the Final APA.

**10.**     Except as specifically  provided  in the First Modification,  the definitions  in the Consent Decree shall continue  to apply.

**11.**     **Replace the following definitions in Paragraph  10:**

E.     "Acid Gas Flaring  Device" or "AG Flaring  Device" shall mean any device that is used for the purpose of combusting  Acid Gas and/or Sour Water Stripper Gas, except facilities  in which gases are combusted to produce sulfur or sulfuric acid.  The AG Flaring Devices are identified  in Appendix D ("List of Flaring  Devices Subject to NSPS Subpart Ja"). To the extent that, during  the duration  of the Consent Decree, the Refinery utilizes  AG Flaring Devices other than those specified in Appendix  D for the purpose of combusting  Acid Gas and/or Sour Water Stripper Gas, those AG Flaring  Devices shall be covered under this Consent Decree.

AA.   "HOVENSA" shall mean HOVENSA L.L.C.

CC.   "Hydrocarbon Flaring Device" or "HC Flaring Device" shall mean a flare used to safely control (through combustion) any excess volume of a refinery-generated gas other than Acid Gas and/or Sour Water Stripper Gas and/or Tail Gas. The HC Flaring Devices are identified in Appendix D ("List of Flaring Devices Subject to NSPS Subpart Ja"). To the extent that, during the duration of the Consent Decree, the Refinery utilizes HC Flaring Devices other than those specified in Appendix D for the purposes of combusting any excess volume of a refinery-generated gas other than Acid Gas and/or Sour Water Stripper Gas and/or Tail Gas, those HC Flaring Devices shall be covered under this Consent Decree.

MM.   "Parties" shall mean, as of the Date of the Entry of the First Modification, the United States, the Virgin Islands, Limetree Bay Terminals, LLC, Limetree Bay Refining, LLC, and the Environmental Response Trust.

NN.   "Refinery" shall mean the petroleum refining and terminal facilities in St. Croix, Virgin Islands. As of the Date of Lodging and the Date of Entry, both the petroleum refining and terminal facilities, the boundaries of which are shown in Appendix I ("Map of HOVENSA, L.L.C."), were owned and operated by HOVENSA L.L.C. As of the Date of Lodging of the First Modification, the petroleum refining facility is owned and operated by Limetree Bay Refining, LLC, the terminal facility is owned and operated by Limetree Bay Terminals, LLC, and the boundaries of each as of the Date of Lodging of the First Modification are shown in Appendix R ("Map of Refinery").

**12.   Add the following definitions to Paragraph 10 of the Consent Decree:**

CCC.   "BWON Equipment" shall mean equipment used in handling, storage, treatment, or disposal of "non-aqueous and aqueous benzene waste streams" regulated under 40 C.F.R. Part

61, Subpart FF, except that the term shall also include "affected facilities" under NSPS Subpart QQQ.

DDD.  "BWON and LDAR Equipment" shall mean LDAR Equipment and BWON Equipment.

EEE.  "Covered Equipment" shall include all pumps and valves, excluding pressure relief valves, in light liquid or gas/vapor service in all process units that are subject to the equipment leak provisions of 40 C.F.R. Part 60, Subparts VVa and GGGa.

FFF.  "Date of Entry of the First Modification of the Consent Decree" and "Date of Entry of the First Modification" shall mean the date on which the First Modification of the Consent Decree is approved and signed by a District Court Judge for the District of the Virgin Islands and entered in the Court docket by the Clerk of the United States District Court for the District of the Virgin Islands.

GGG.  "Date of Lodging of the First Modification of the Consent Decree" and "Date of Lodging of the First Modification" shall mean the date on which the First Modification of the Consent Decree is lodged with the United States District Court for the District of the Virgin Islands.

HHH.  "Environmental Response Trust" or "ERT" shall mean the ERT established pursuant to the Plan of Liquidation and the ERT Agreement, which satisfied the conditions set forth in Article XI of the Plan of Liquidation and which designated Project Navigator, Ltd. as Environmental Response Trustee.  On December 20, 2019, the Bankruptcy Court appointed PathForward Consulting Inc., as a successor Environmental Response Trustee.  The effective date of the ERT was February 17, 2016, as provided in Case No. 1:15-10003, Doc. 625.

III.    "ERT Agreement" shall mean Doc. 626-1 in Case No. 1:15-10003-MFW, United States District Court for the District of the Virgin Islands, Bankruptcy Division – St. Croix, Virgin Islands.

JJJ.    "First Modification of the Consent Decree" and "First Modification" shall mean this modification of the Consent Decree, including any and all appendices attached to the First Modification.

KKK.    "Idled Unit" shall mean (1) an emissions unit to which a requirement of the Consent Decree applies (including, but not limited to, the FCCU, Coker, Flaring Devices, heaters, boilers, Generating Turbines, and Compressor Engines) for which no part was operated between June 1, 2012 and at least June 1, 2019, and that is listed in Appendix K ("List of Idled Units") hereto, and (2) Flare 7, from the time that Flare 7 is isolated and Shutdown under Paragraph 50E.  An Idled Unit does not include BWON and LDAR Equipment.

LLL.    "In Regulated Service" shall mean:  (1) BWON Equipment with benzene-containing wastes regulated under 40 C.F.R. Part 61 Subpart FF or (2) LDAR Equipment in "light liquid" and/or "gas/vapor service" as those terms are used in Section V.R of the Consent Decree.

MMM. "In Service Unit" shall mean an emission unit to which a requirement of the Consent Decree applies that is not an Idled Unit.  In Service Unit does not include BWON and LDAR Equipment.

NNN.    "LDAR Equipment" shall mean each valve, pump, pressure relief device, sampling connection system, open-ended valve or line, and flange or other connector In Regulated Service and, for purposes of recordkeeping and reporting requirements only, compressors shall be considered LDAR Equipment, as defined in 40 C.F.R. § 60.591.

EPA-530

OOO. "LHE Combustion Liner System" shall mean a Lean Head End Combustion Liner system as generally described in publication GER-4211, *Gas Turbine Emissions and Control*, which were installed by Limetree Bay on GTs 7 and 8.

PPP. "Limetree Bay" shall mean Limetree Bay Terminals, LLC, Limetree Bay Refining, LLC, and their respective successors and assigns.

QQQ. "Pilot Gas" shall mean the minimum amount of gas necessary to maintain the presence of a flame for ignition of vent gases.

RRR. "Plan of Liquidation" shall mean the Debtor's Second Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code, Order of the United States District Court for the District of the Virgin Islands, Bankruptcy Division – St. Croix, Virgin Islands (Case No. 1:15-10003-MFW, Doc. 572-1).

SSS. "Purge Gas" shall mean the gas introduced between a Flaring Device header's water seal and the flare tip to prevent oxygen infiltration (backflow) into the flare tip. For a Flaring Device with no water seal, the function of Purge Gas is performed by Sweep Gas, and therefore, by definition, such a Flaring Device has no Purge Gas.

TTT. "Refinery Operations" shall mean the processing of crude oil and other feedstock into refined petroleum products and the commercialization thereof.

UUU. "Restart" shall mean: (1) the change in status of BWON or LDAR Equipment from not In Regulated Service to In Regulated Service; and (2) the resumption of operation of an Idled Unit. For a fuel gas combustion device or flare, resumption of operation means combusting Fuel Gas. For an FCCU, resumption of operations means receiving feed in the unit. For an SRP, resumption of operations means introducing acid gas to the unit. For a Coker and the Coke Handling Storage and Loading Facility, resumption of operation means receiving

feed to the coker drum.  For a sulfur pit, resumption of operation means when sulfur is drained to a sulfur pit.

VVV.  "TSEP" shall mean the Territorial Supplemental Environmental Project(s) developed by the VIDPNR pursuant to Section IX.A of the Consent Decree.

WWW. "TSEP Escrow Account" shall mean the escrow account in which HOVENSA deposited $4.875 million in accordance with Section IX.A of the Consent Decree and to which the ERT assumed HOVENSA's rights and obligations pursuant to the Plan of Liquidation and the ERT Agreement.

**13.    Replace Paragraph 27 with the following new Paragraph 27:**

27.    By six (6) years and one month from Date of Entry, Limetree Bay shall install sufficient Qualifying Controls and have applied for emission limits from the appropriate permitting authority to achieve 3,663 tpy $NO_x$ emission reductions as determined by the summation in Paragraph 24.  By six (6) years and three (3) months from Date of Entry, Limetree Bay shall provide EPA with a report showing how it satisfied the requirement of this Paragraph and Paragraph 23.

**14.    Add the following new Paragraph 28A to Part V.F:**

28A.    Limetree Bay represents that it (or HOVENSA) has installed sufficient qualifying controls to achieve the aggregate NOx emissions reductions of 4,744 tpy required by Paragraphs 26, 27, and 28, by permanent Shutdown and relinquishment of permits for the heaters, boilers, generating turbines and compressor engines identified in Appendix N ("Emissions Units Permanently Shutdown as of June 1, 2019").  Limetree Bay will submit the report required by Paragraph 28, certified in accordance with Paragraph 231.  Provided the report submitted under Paragraph 28 demonstrates that the 4,744 tpy of NOx reductions have been achieved, Limetree

Bay is deemed to have satisfied the requirements of Section V.F and the requirements of Paragraphs 230 and 231 related to Termination, subject to EPA's review under Paragraphs 232 and 233.

**15.   Replace Paragraph 36 with following new Paragraph 36:**

36.    For each fuel gas combustion device that became an affected facility under NSPS Subpart Ja pursuant to the Consent Decree, entry of the First Modification shall satisfy the notice requirements of 40 C.F.R. § 60.7(a) and compliance with the relevant monitoring requirements of the Consent Decree shall satisfy the notification of initial performance test requirement of 40 C.F.R. § 60.8(a).

**16.   Add the following sentence to Subparagraph 41.a:** As of the Date of Entry of the First Modification, the East Side SRP consists of two Claus Trains, #3 SRU, #4 SRU, and a tail gas treatment unit followed by incineration.

**17.   Replace Paragraphs 45 and 46 with the following new Paragraphs 45 and 46:**

45.    <u>Compliance with NSPS Emissions Limits at the East Side SRP</u>. By no later than the date of Restart of the East Side SRP, Limetree Bay shall install, at the East Side SRP, control equipment necessary to control the emissions of sulfur compounds from the East Side SRP to comply with NSPS Subparts A and Ja. Notwithstanding any provision of Limetree Bay's Title V permit (STX-TV-003-10) or any successor operating permit, Limetree Bay shall not vent tail gas from the East Side SRP to an incinerator, unless such venting complies with NSPS Subparts A and Ja.

46.    [Reserved]

**18.   Replace Paragraph 47 with the following new Paragraph 47:**

47.    For the East Side SRP, which became an affected facility under NSPS Subpart Ja

pursuant to Section V.I, entry of the First Modification shall satisfy the notice requirements of 40 C.F.R. § 60.7(a), and compliance with the relevant monitoring requirements of this Consent Decree shall satisfy the notification of initial performance test requirement of 40 C.F.R. § 60.8(a).

**19.    Replace Paragraph 49 with the following new Paragraph 49:**

49.    All Flaring Devices listed in Appendix D ("List of Flaring Devices Subject to NSPS Subpart Ja") are affected facilities, as that term is used in 40 C.F.R. Part 60, Subpart Ja, and by the dates listed in Appendix D, shall comply with the requirements of NSPS Subparts A and Ja.

**20.    Replace Paragraph 50 with the following new Paragraphs 50A through 50F:**

50A.    <u>Mitigation of Flaring Emissions</u>.  Limetree Bay shall monitor and quantify all flaring emissions from the FCCU Low Pressure Flare and Flare 3 for the one-year period beginning on the date of Restart of the flare, using the following equation:

$$Mitigation\ Amount = \sum_{i=1}^{n}\left[\left(C_{H_2S_i} - 162\ ppm\ H_2S\right) \times F_i \times \frac{1\ scf\ SO_2}{1\ scf\ H_2S} \times \frac{lb-moles\ SO_2}{385.3\ scf\ SO_2} \times \frac{64\ lbs\ SO_2}{lb-mole\ SO_2} \times \frac{1\ ton\ SO_2}{2000\ lbs\ SO_2}\right]$$

Where:

$Mitigation\ Amount$ = tons of $SO_2$ emissions that result from combustion of gas in a particular flare with an $H_2S$ concentration above the 162 ppm standard and which could have been captured by a reasonably sized FGRS

$n$ = each hour that is part of a three-hour rolling average in the first 365 Days after Restart of the flare where the $H_2S$ concentration in the gas flared at the particular flare exceeds the 162 ppm standard

$C_{H_2S_i}$ = the hourly average concentration of $H_2S$ for hour $i$ in the gas flared at the particular flare as measured by the $H_2S$ CEMS

$F_i$ = hourly average flow in scfh for hour $i$ of all gas to the particular flare as measured by the flare flow meter but excluding Pilot Gas and excluding any flow above 2 times Baseload Average Flow

*Baseload Average Flow* = 90th percentile of hourly average flow in the first 365 Days after Restart of the flare of all gas to the particular flare as measured by the flare flow meter.

Limetree Bay shall mitigate the Mitigation Amount using the formula above and implementing one or more mitigation projects as specified in this Paragraph.

      a.     Mitigation Emissions Less Than 10 Tons. No mitigation is required if the Mitigation Amount is less than 10 tons.

      b.     Mitigation Emissions Above 10 Tons. If the Mitigation Amount is above 10 tons, Limetree Bay will mitigate emissions above 10 tons by implementing one or more of the mitigation projects in Appendix P ("Flaring Mitigation Projects") in accordance with the requirements therein.

      50B.     Installation of Flare Gas Recovery Systems. For the FCCU Low Pressure Flare and Flare 3, Limetree Bay shall design, install, operate and maintain flare gas recovery system(s) to control all continuous and intermittent, routinely-generated refinery fuel gases (not including Purge Gas, or Pilot Gas or molecular seal gases necessary to ensure safe operation of the flares) that are combusted in the flare(s), if the quantity of gases sent to the flares exceeds the amounts specified, or if there is noncompliance with the NSPS Subpart Ja emission standard, as specified in this Paragraph.

      a.     First Year of Operation:  Gas Quantity. The requirements of this Subparagraph 50B.a apply only during the one-year period beginning on the date of Restart of the flare.

      i.     FCCU Low Pressure Flare. If, during the first or second six-month successive non-overlapping block period during the first year after Restart of the FCCU Low Pressure Flare, greater than an average of 1,500,000 standard cubic feet per day (scfd) combined flow of all gases, other than hydrogen from initial

reformer restart, is sent to the FCCU Low Pressure Flare (and any flare interconnected with the FCCU Low Pressure Flare), as measured by the flare flow meter, then by not later than two years from the end of the six-month period in which the gas quantity is exceeded and the report is due under Paragraph 50C.b, Limetree Bay shall install and operate a flare gas recovery system for the FCCU Low Pressure Flare.

    ii.    <u>Flare 3</u>. If, during the first or second six-month successive non-overlapping block periods during the first year after Restart of Flare 3, greater than an average of 750,000 scfd combined flow of all gases is sent to the Flare 3, as measured by the flare flow meter, then by not later than two years from the end of the six-month block period in which the gas quantity is exceeded and the report is due under Subparagraph 50C.b, Limetree Bay shall install and operate a flare gas recovery system for Flare 3.

b.    <u>After First Year of Operations: Gas Quantity</u>. The requirements of this Subparagraph 50B.b apply beginning with the first full Calendar Quarter after the one-year period in Subparagraph 50B.a. The first full Calendar Quarter will include all days after the first year after Restart of the flare until the end of the first full Calendar Quarter.

    i.    <u>FCCU Low Pressure Flare</u>. If, during any two successive Calendar Quarters either (a) during the second year after Restart of the FCCU Low Pressure Flare, greater than an average of 750,000 scfd combined flow of all gases, other than hydrogen from initial reformer restart, or (b) after the second year after Restart of the FCCU Low Pressure Flare, greater than an average of 500,000 scfd combined flow of all gases, other than hydrogen from initial reformer restart, is

sent to the FCCU Low Pressure Flare (including any flare interconnected with the FCCU Low Pressure Flare), as measured by the flare flow meter, then by not later than two years from the end of the second Calendar Quarter in which the gas quantity is exceeded and the report required under Subparagraph 50C.c is due, Limetree Bay shall install and operate a flare gas recovery system for the FCCU Low Pressure Flare.

      ii.      <u>Flare 3</u>. If, during any two successive Calendar Quarters after the first year after Restart of Flare 3, greater than an average of 250,000 scfd combined flow of all gases is sent to Flare 3, as measured by the flare flow meter, then by not later than two years from the end of the second Calendar Quarter in which the gas quantity is exceeded and the report required under Subparagraph 50C.c is due, Limetree Bay shall install and operate a flare gas recovery system(s) for Flare 3.

      iii.      Within the first six months of Restart of either Flare 3 or the FCCU Low Pressure Flare, whichever is earlier, Limetree may increase the average gas quantity for Flare 3 specified in Subparagraph 50B.b.ii from 250,000 scfd to 300,000 scfd combined flow of all gases. If Limetree exercises this option, then the average gas quantity for FCCU Low Pressure Flare specified in Subparagraph 50B.b.i shall be reduced from 750,000 scfd to 700,000 scfd during the second year of Restart of the FCCU Low Pressure Flare, and from 500,000 scfd to 450,000 scfd combined flow of all gases after the second year after Restart of the FCCU Low Pressure Flare. Within 30 Days of exercising this option, Limetree shall notify EPA and the VIDPNR, including the date on which Limetree

EPA-537

exercised this option, as provided in Paragraph 225 (Notice), and shall certify the notification as required by Paragraph 144.

    iv.    <u>Adjustment to Gas Quantity Based on Changes in Refining Operating Rate</u>. The gas quantities specified in this Subparagraph 50B.b apply where the refinery's charge rate to the atmospheric crude unit(s) ("operating rate") is not more than 180,000 barrels (bbls) per day in a Calendar Quarter. If the average actual refinery operating rate is greater than 180,000 bbls per day in a Calendar Quarter, then the following gas quantities apply in lieu of the gas quantities in 50B.b.(i). and (ii).:

    (1)    <u>FCCU Low Pressure Flare</u>: (A) During the second year after Restart of the FCCU Low Pressure Flare: (750,000 scfd (or 700,000 scfd if applicable pursuant to Subparagraph 50B.b.iii)/180,000 bbls) multiplied by the actual refinery operating rate per Calendar Quarter, measured as an average combined flow of all gases, other than hudrogen from initial reformer restart, to the FCCU Low Pressure Flare in scfd in any Calendar Quarter, as measured by the flare flow meter. (B) After the second year after Restart of the FCCU Low Pressure Flare: (500,000 scfd (or 450,000 scfd if applicable pursuant to Subparagraph 50B.b.iii)/180,000 bbls) multiplied by the actual refinery operating rate per Calendar Quarter, measured as an average combined flow of all gases, other than hydrogen from initial reformer restart, to the FCCU Low Pressure Flare in scfd in any Calendar Quarter, as measured by the flare flow meter.

         (2)       Flare 3: Greater than (250,000 scfd (or 300,000 scfd if applicable pursuant to Subparagraph 50B.b.iii)/180,000 bbls) multiplied by the actual refinery operating rate, measured as an average combined flow of all gases to Flare 3 in scfd in any Calendar Quarter, as measured by the flare flow meter.

    c.    After First Year of Operations: Noncompliance.  If, during any two successive Calendar Quarters there is noncompliance with the NSPS Subpart Ja $H_2S$ concentration standard in 40 C.F.R. § 60.103a(h) for greater than 5% of either flare's operating time, and greater than 10 tons of excess $SO_2$ emissions from the same flare, then by not later than 18 months from the end of the two Calendar Quarters in which both the noncompliance rate and excess $SO_2$ emissions are exceeded and the report required under Subparagraph 50C.c is due, Limetree Bay shall install and operate a flare gas recovery system(s) for the relevant flare.

    50C.    Monitoring and Reporting.  For purposes of the requirements of Paragraphs 50A and 50B, the monitoring and reporting requirements of this Paragraph applies.

        a.    Monitoring.  For the FCCU Low Pressure Flare and Flare 3, upon Restart of the flare, Limetree Bay shall comply with the hydrogen sulfide monitoring, sulfur monitoring and flow monitoring requirements of 40 C.F.R. § 60.107a(a)(2), (e) and (f) respectively.  Prior to a Restart of a flare, an instrument for continuously monitoring and recording the $H_2S$ concentration by volume (dry basis) shall be installed, operated, calibrated and maintained pursuant to 40 C.F.R. § 60.107a(a)(2), notwithstanding any exceptions or alternate methods allowed in NSPS Subpart Ja.

           i.    Data from the $H_2S$ CMS generated prior to the demonstration of compliance (see Appendix L ("Exceptions For Compliance on Restart")) shall be

Case: 1:11-cv-00006-WAL-GWC    Document #: 22-1    Filed: 06/26/20    Page 22 of 158

included for purposes of calculating Mitigation Amount during the first year of a flare's operation pursuant to Paragraph 50A, regardless of whether the flare's $H_2S$ CMS fails its Cylinder Gas Audit ("CGA") or RATA.

       ii.    In the event that the $H_2S$ CMS fails its CGA or RATA, then the measured values of the emissions from the flare emitted prior to the demonstration of compliance will be adjusted based on the level of inaccuracy, as demonstrated by the CGA or RATA, or the CGA or RATA and other credible evidence.

       iii.    The quantity of hydrogen from initial reformer restart combusted in the FCCU Low Pressure Flare shall be measured by a flow meter.

       b.    <u>Recordkeeping and Reporting for First Year of Operations</u>. Within thirty (30) days of the end of each of the six-month block periods during the first year after Restart of the flare, Limetree Bay shall submit a report containing the following information for each flare:

       i.    The quantity of all gases in scfd sent to each flare for the period covering the six-month block period preceding the date of the report, on both a cumulative and per-day basis;

       ii.    The quantity of hydrogen from initial reformer restart combusted in the FCCU Low Pressure Flare on both a cumulative and per-day basis;

       iii.    In the second six-month block period report, the quantity of Mitigation Amount for the period covering the two six-month block periods preceding the date of the report, provided both on a cumulative and per-day basis; and

EPA-540

iv.      Notification of whether the total gas quantity specified in

Subparagraph 50B.a.i or a.ii has been exceeded.

Limetree Bay shall report this data to EPA and the VIDPNR as provided in Paragraph 225

(Notice), and shall certify the report as required by Paragraph 144.

c.      Reporting After First Year of Operations.  If the requirement to install

flare gas recovery is triggered, as described in Subparagraphs 50B.b.i, 50B.b.ii, or 50B.c, then

Limetree Bay shall notify EPA within thirty (30) days and provide the information in

Subparagraphs (i)-(v) below.  If the requirement for flare gas recovery is not triggered, then

information in Subparagraphs (i)-(v) below, for each Calendar Quarter, shall be included in the

semi-annual progress reports required under Paragraph 143 beginning with the next semi-annual

progress report following the first full Calendar Quarter after the first year of operations:

i.      The quantity of all gases combusted in each flare in scfd, as

measured by the flare flow meter, for the period covering the Calendar Quarter

preceding the date of the report, on both a cumulative and per-day basis;

ii.      The quantity of hydrogen from initial reformer restart combusted

in the FCCU Low Pressure Flare;

iii.      Any adjustments to the specified gas quantity pursuant to

Subparagraph 50B.b.iii, including the adjusted gas quantity, operating rate, and

the change in operating rate;

iv.      The total period of noncompliance with the NSPS Subpart Ja

concentration standard, expressed as a percentage of operating time and excess

$SO_2$ emissions expressed as tons during the Calendar Quarter; and

> v.    Notification of whether the total gas quantity specified in Subparagraph 50B.b.i or b.ii has been exceeded, and/or whether the total period of noncompliance with the NSPS Subpart Ja $H_2S$ concentration standard and excess $SO_2$ emissions, specified in Subparagraph 50B.c has been exceeded.

Limetree Bay shall report this data to EPA and the VIDPNR as provided in Paragraph 225 (Notice), and shall certify the report as required by Paragraph 144.

50D.    <u>Hydrogen Sulfide Monitoring</u>.    To evaluate the potential transport of $H_2S$ to the refinery's wastewater treatment system from the use of $H_2S$ scavengers in the flare gas system(s), by no later than 90 Days after Limetree Bay begins using $H_2S$ scavenger in its flare gas system(s), Limetree Bay shall monitor $H_2S$ emissions from the wastewater treatment system, as follows:

a.    Limetree Bay shall install three temporary $H_2S$ monitors at fixed locations around the dissolved air flotation (DAF) unit and the API separator on the East Side, and one temporary $H_2S$ monitor at a fixed location near the API separator on the West Side (if Sulfix is used on Flare 3), as specified in Appendix S ("Map of $H_2S$ Monitoring Locations"), to continuously monitor $H_2S$ emissions from the DAF and API separators.

b.    If Limetree Bay stores slop oil in fixed roof tanks, Limetree Bay shall install a temporary $H_2S$ monitor at a fixed location near such tank.

c.    Limetree Bay shall use temporary $H_2S$ monitors that are designed to meet the following criteria:

> i.    Utilizes an electrochemical sensor;
>
> ii.    A response time of 15 seconds or less;
>
> iii.    A lower detection limit (sensitivity) of at least 0.5 ppm;

       iv.     A resolution of 0.1 ppm and an accuracy of $\pm 5\%$ over its calibrated range of at least 0-100 ppm;

       v.     An accuracy of $\pm 0.05$ ppm at 1 ppm ($\pm 5\%$);

       vi.     A built-in datalogging function for data collection and analysis; and

       vii.     A low temperature drift (less than 0.1 ppm for the zero reading) and high selectivity for $H_2S$ in the presence of interfering gases (such as sulfur dioxide, nitrogen dioxide, and hydrocarbons).

       d.    <u>Duration</u>.  The temporary $H_2S$ monitors shall be operated for a period of not less than two years.

       i.     If $H_2S$ is detected at levels exceeding the OSHA permissible exposure limit of 10 ppm (15 mg/m³) at any monitoring location over an 8-hour time weighted average (see 29 C.F.R. § 1910.1000(d)) equal to or more than 5% of the time during any rolling 30-day period, then Limetree Bay shall submit a plan to EPA for approval to address the cause of any $H_2S$ emissions attributable to the use of $H_2S$ scavengers and to install permanent $H_2S$ monitors meeting the criteria specified in Subparagraph 50D.c. If the cause is not attributable to the use of $H_2S$ scavengers, the report shall explain the basis for Limetree Bay's determination.  If EPA disagrees with Limetree Bay's determination, the disagreement is subject to dispute resolution in accordance with Part XVI (Retention of Jurisdiction/Dispute Resolution).

       ii.     If $H_2S$ is detected at levels above 10 ppm for less than 5% of the time during all rolling 30-day periods at the end of the two years, Limetree Bay is

not required to install permanent monitors, and may discontinue use of the temporary monitors.

50E.    <u>Idling of Flare 7</u>.  Limetree Bay may, for a period not to exceed 72 hours, and prior to the restart of any petroleum refining process unit, temporarily interconnect and jointly operate the FCCU Low Pressure Flare and Flare 7, until Flare 7 can be safely isolated and Shutdown at which time Flare 7 will be an Idled Unit. The temporary interconnection of Flare 7 with the FCCU Low Pressure flare will not be considered an interconnection for purposes of Subparagraphs 50B.a.i and 50B.b.i.

50F.    <u>Root Cause, Corrective Action and Reporting for Flaring Incidents Post Installation of Flare Gas Recovery</u>.  Following the installation of a flare gas recovery system on a flare pursuant to Paragraph 50B, Acid Gas, Tail Gas and Hydrocarbon Flaring Incidents occurring while the flare gas recovery system is in operation will be investigated and reported in accordance with NSPS Subpart Ja, 40 C.F.R. § 60.103a(c)(1)-(c)(3) in lieu of the investigation and reporting requirements in Paragraphs 60, 61, 70 and 71. Copies of NSPS Subpart Ja root cause and corrective action reporting will be included in the semi-annual CD reports required under Paragraph 71 and Part X (Reporting and Recordkeeping). The stipulated penalty provisions for Flaring Incidents will continue to apply until termination.

50G.    If no Acid Gas, Tail Gas or Hydrocarbon Flaring Incidents occur at the Refinery for any consecutive 24 calendar month period, then any Acid Gas, Tail Gas and Hydrocarbon Flaring Incidents occurring thereafter shall be investigated and reported in accordance with NSPS Subpart Ja, 40 C.F.R. § 60.103a(c)(1)-(c)(3) in lieu of the investigation and reporting requirements in Paragraphs 60, 61, 70 and 71. The stipulated penalty provisions for Flaring Incidents will continue to apply until termination.

**21.    Replace Paragraph 51 with the following new Paragraph 51:**

[Reserved]

**22.    Modify the applicable regulatory provisions in Subparagraphs 54.a and 54.b:**

References in Subparagraph 54.a and Subparagraph 54.b to 40 C.F.R. § 60.102a(g)(1)

relate to fuel gas combustion devices only and shall be changed to 40 C.F.R. § 60.103a(h)

relating to flares.

**23.    Replace Paragraph 55 with the following new Paragraph 55:**

55.    For each Flaring Device which became an affected facility under NSPS Subpart

Ja pursuant to this Consent Decree, entry of the First Modification shall satisfy the notice

requirements of 40 C.F.R. § 60.7(a), and compliance with the relevant monitoring requirements

of this Consent Decree shall satisfy the notification of initial performance test requirement of 40

C.F.R. § 60.8(a).

**24.    Replace Subparagraph 70.a with the following new Subparagraph 70.a:**

a.    <u>Investigation, Reporting, Corrective Action, and Stipulated Penalties</u>. For

Tail Gas Incidents, Limetree Bay shall follow the same investigative, reporting, corrective

action, and assessment of stipulated penalty procedures as those set forth in Paragraphs 60

through 68 for Acid Gas Flaring Incidents. Those procedures shall be applied to TGU

shutdowns, bypasses of a TGU, or other events which result in a Tail Gas Incident, including

scheduled and unscheduled Shutdowns of a Claus Sulfur Recovery Plant.

**25.    Modify Subparagraph 70.b.ii to include a missing formula unit:**

$0.169 \times 10^{-6}$ = [lb mole of $SO_2$ / 379-scf of $SO_2$] [64 lbs $SO_2$ / lb mole $SO_2$][$1 \times 10^{-6}$]

**26.     Insert the new Paragraphs 71A and 72A as follows:**

71A.  The requirements of Section V.K shall not apply to Limetree Bay with respect to Acid Gas Flaring Incidents and Tail Gas Incidents that occurred prior to January 4, 2016.

72A.   The requirements of Section V.L shall not apply to Limetree Bay with respect to Hydrocarbon Flaring Incidents that occurred prior to January 4, 2016.

**27.    Replace Section V.P, Benzene Waste NESHAP Program, with the following new Section V.P, Benzene Waste NESHAP Program.**

**P.    Benzene Waste NESHAP Program.**

77.    Current Subpart FF Status.  Limetree Bay shall continue to comply with the compliance option set forth in 40 C.F.R. § 61.342(e) (hereinafter referred to as the "6 BQ Compliance Option"), for which, in accordance with the Consent Decree, notice was provided on September 14, 2012.

78.    [Reserved]

79.    One-Time Review and Verification of the Refinery's TAB and Compliance with the Benzene Waste NESHAP.

a.    Phase One of the Review and Verification Process.  By March 30, 2021, Limetree Bay shall complete a review and verification of the Refinery TAB and its compliance with the Benzene Waste NESHAP (Phase One Review and Verification).  Limetree Bay's review and verification process shall include, but not be limited to:

i.    An identification of each waste stream that is required to be included in the Refinery's TAB where these waste streams meet the definition of a waste under 40 C.F.R. § 61.341 (e.g., slop oil, tank water draws, spent caustic, spent caustic hydrocarbon layer, desalter rag layer dumps, desalter vessel process sampling points, other sample wastes, maintenance wastes, and turnaround

wastes);

      ii.        A review and identification of the calculations and/or measurements used to determine the flows of each waste stream for the purpose of ensuring the accuracy of the annual waste quantity for each waste stream;

      iii.        An identification of the benzene concentration in each waste stream, including sampling for benzene concentration at no less than 10 waste streams consistent with the requirements of 40 C.F.R. § 61.355(c)(1) and (3); provided, however, that previous analytical data or documented knowledge of waste streams may be used, 40 C.F.R. § 61.355(c)(2), for streams not sampled; and

      iv.        An identification of any existing noncompliance with the requirements of Subpart FF.

By no later than sixty (60) Days following the completion of Phase One Review and Verification, Limetree Bay shall submit a Benzene Waste NESHAP Compliance Review and Verification report ("BWON Compliance Review and Verification Report") that sets forth and certifies the results of the Phase One Review and Verification, including but not limited to the items identified in Subparagraphs (i) through (iv) of this Paragraph.

      b.        <u>Phase Two of the Review and Verification Process.</u> Based on EPA's review of the BWON Compliance Review and Verification Report(s), EPA may select up to 20 additional waste streams at the Refinery for sampling for benzene concentration. Limetree Bay shall conduct the required sampling under representative conditions and submit the results to EPA within sixty (60) Days of receipt of EPA's request. Limetree Bay shall use the results of this additional sampling to recalculate the TAB and the uncontrolled benzene quantity and to

amend the BWON Compliance Review and Verification Report, as needed. To the extent that EPA requires Limetree Bay to re-sample any waste stream sampled by Limetree Bay on or after June 10, 2019, Limetree Bay may average the results of such sampling events. Limetree Bay shall submit an amended BWON Compliance Review and Verification Report within ninety (90) Days following the date of the submittal of the required Phase Two sampling report, if Phase Two sampling is required by EPA.

     80.    <u>Implementation of Actions Necessary to Correct Non-Compliance or to Come Into Compliance.</u>

        a.    [Reserved]

        b.    <u>Submittal of Compliance Plan</u>. If the results of the BWON Compliance Review and Verification Report identify any compliance issues, Limetree Bay shall submit to EPA and the VIDPNR by no later than 180 Days after completion of the BWON Compliance Review and Verification Report, a plan that identifies with specificity a schedule that Limetree Bay will implement to ensure that the Refinery complies with the 6 BQ Compliance Option, as soon as practicable.

        c.    <u>Review and Approval of Plans Submitted Pursuant to Subparagraph 80.b</u>. Any plan submitted pursuant to Subparagraph 80.b, shall be subject to approval, disapproval or modification by EPA. Within sixty (60) Days after receiving any notification of disapproval or request for modification from EPA, Limetree Bay shall submit to EPA and the VIDPNR a revised plan that responds to all identified deficiencies. Upon receipt of approval or approval with conditions, or if no approval, disapproval, or approval with conditions is provided by EPA, Limetree Bay shall implement the plan according to the schedule provided in the plan. Disputes

arising under this Subparagraph shall be resolved in accordance with the dispute resolution provisions of Part XVI (Retention of Jurisdiction/Dispute Resolution).

        d.        <u>Certification of Compliance with the 6 Mg Compliance Option</u>. By no later than thirty (30) Days after completion of the implementation of all actions, if any, required pursuant to Subparagraphs 80.b or 80.c to come into compliance with the 6 BQ Compliance Option, Limetree Bay shall submit a report to EPA and the VIDPNR certifying that the Refinery complies with the Benzene Waste NESHAP.

        81.        <u>Carbon Canisters and Individual Drain System Vents</u>. Limetree Bay shall continue to operate the three-tier system for control of vents associated with the Subpart FF wastewater collection system. Vent controls are identified as either Type I (a single flow indicator "breather valve"), Type II ("breather valve" connected to a single carbon canister), or Type III (dual carbon canisters). All closed vent piping associated with these vent control systems will be monitored in accordance with the provisions associated with 40 C.F.R. § 61.349. Limetree Bay shall comply with the following:

        a.        All Type I vents with flow indicators (40 C.F.R. § 61.346(b)) shall be visually inspected for flow on a daily schedule. Flow shall be indicated if the flow indicator on the breather valve has lifted. Any "breather valve" determined to relieve six or more times in any consecutive two-month period will be converted to a Type II control system. Installation of the carbon canister required by conversion to the Type II control shall be completed within two weeks. Daily visual inspection of the Type I control system will continue until conversion to a Type II control is completed.

        b.        All Type II vent control systems ("breather valve" connected to a single carbon canister) shall be visually inspected on a daily schedule.

      i.     If the "breather valve" is determined not to have relieved, no additional monitoring is required. Secondly, if the "breather valve" is visually inspected and determined to have relieved, then the discharge opening of the carbon canister will be immediately monitored for benzene. If the benzene concentration of carbon canister discharge is determined to be less than 5 ppm, no additional actions are required. If the benzene concentration of the carbon canister discharge is determined to be equal to or greater than 5 ppm, the carbon canister will be replaced by the end of the next Day.

      ii.    For any Type II vent control system, if carbon canister replacement is required two or more times in any four consecutive week period the control system will be converted to a Type III system. Installation of the dual carbon canister system required by conversion to the Type III control shall be completed within two weeks. Daily inspection and monitoring (if required) of the Type II control system will continue until conversion to a Type III control is completed.

  c.    All Type III vent control systems will be operated in the manner described in Subparagraphs c.i through c.vii.

      i.     Except as expressly permitted under Subparagraph c.v, Limetree Bay shall not use single carbon canisters for any new process units or installations that require controls pursuant to the Benzene Waste NESHAP.

      ii.    For dual carbon canister systems, "breakthrough" between the primary and secondary canister is defined as any reading equal to or greater than 5 ppm benzene.

      iii.    Limetree Bay shall monitor for breakthrough between the primary

and secondary carbon canisters in accordance with the frequency specified in 40 C.F.R. § 61.354(d), or monthly, whichever is more frequent. This requirement shall commence within seven (7) Days after installation of a new, dual carbon canister system.

      iv.    Limetree Bay shall replace the original primary carbon canisters immediately when breakthrough is detected between the primary and secondary canister. The original secondary carbon canister will become the new primary carbon canister and a fresh carbon canister will become the secondary canister, or both canisters may be replaced. For purposes of this Subparagraph, "immediately" shall mean by the end of the next calendar Day.

      v.    Temporary Applications. Limetree Bay may utilize properly sized single canisters for short-term operations such as with temporary storage tanks or as temporary control devices. For canisters operated as part of a single canister system, breakthrough is defined for purposes of this Consent Decree as any reading of benzene above 5 ppm. Limetree Bay shall monitor for breakthrough from single carbon canisters each calendar day. Limetree Bay shall replace the single carbon canister with a fresh carbon canister, discontinue flow, or route the stream to an alternate, appropriate device immediately when breakthrough is detected. For this Subparagraph, "immediately" shall mean by the end of the next Day. If Limetree Bay discontinues flow to the single carbon canister or routes the stream to an alternate, appropriate control device, such canister must be replaced before it is returned to service.

      vi.    Limetree Bay shall maintain a readily available supply of fresh

carbon canisters at all times or otherwise ensure that such canisters are readily available to implement the requirements of this Paragraph.

       vii.    Limetree Bay shall maintain records associated with the requirements of this Paragraph in accordance with or as under 40 C.F.R. § 61.356(j)(10), including the monitoring readings observed and the constituents being monitored.

82.    <u>Laboratory Audits</u>.  All laboratories that perform analyses of Limetree Bay's Benzene Waste NESHAP samples shall be audited to ensure that proper analytical and quality assurance/quality control procedures are followed for such samples.  For purposes of this Paragraph, audits can include audits conducted by parties other than Limetree Bay.

       a.    Prior to conducting its Phase One Review and Verification process set forth in Subparagraph 79.a, audits shall be completed of all laboratories used to perform analyses of Benzene Waste NESHAP samples to ensure that proper analytical and quality assurance/quality control procedures are followed.  In addition, an audit shall be conducted of any laboratory used for analyses of benzene samples prior to such use.

       b.    Subsequent laboratory audits shall be conducted for each laboratory continuing to perform analyses of Limetree Bay's Benzene Waste NESHAP samples, such that each laboratory is audited every two (2) years for the life of the Consent Decree.

83.    <u>Annual Program</u>.  After the Date of Lodging of the First Modification, Limetree Bay shall continue to use the facility's written management of change procedures to review process information and construction projects, to ensure that all new benzene waste streams are included in Limetree Bay's waste stream inventory.

84.    <u>Training</u>.    Limetree Bay shall implement the following training program at the Refinery:

a.    By June 1, 2020 and thereafter within ninety (90) Days from the installation of any new type of benzene control equipment, Limetree Bay shall update the facility's standard operating procedures ("SOPs") for all control equipment used to comply with the Benzene Waste NESHAP.

b.    By June 1, 2020, Limetree Bay shall update the facility's BWON training program pursuant to the criteria in Appendix E ("Limetree Bay's LDAR and BWON Training Program Summary") and submit the updated training program to EPA.

c.    Limetree Bay shall continue to provide an annual (i.e., once each calendar year) training program for employees (which shall include contract employees for purposes of this Paragraph) asked to draw benzene waste samples as specified in 40 C.F.R. § 61.355.  Such employees shall be trained prior to collecting samples and receive training annually.

d.    Limetree Bay shall continue to perform "refresher" training every three (3) years on the procedures in Subparagraph 84.a for all employees assigned to operate control equipment.

85.    <u>Waste/Slop/Off-Spec Oil Management.</u>

a.    <u>Control Status of and Plan to Quantify Uncontrolled Waste/Slop/Off-Spec Oil Streams.</u>  By June 1, 2020, Limetree Bay shall submit to EPA and the VIDPNR any revisions to the facility's "Waste/Slop/Off-Spec Oil Management Plan," submitted by HOVENSA in June 2012 for quantifying waste/slop/off-spec oil movements for all benzene waste streams which are not controlled at the Refinery, along with schematics that: (i) depict the waste management units (including sewers) that handle, store, and transfer waste/slop/off-spec oil streams; (ii) identify the

control status of each waste management unit; and (iii) show how such oil is transferred. Representatives from Limetree Bay and EPA thereafter may confer about the appropriate characterization of the waste/slop/off-spec oil streams as benzene waste streams and the necessary controls, if any, for the waste management units handling such oil streams for purposes of the Refinery's TAB calculation and/or compliance with the 6 BQ Compliance Option. If requested by EPA, Limetree Bay shall promptly submit revised schematics that reflect the Parties' agreements regarding the characterization of these oil streams and the appropriate control standards. Limetree Bay shall use these plans and schematics in preparing the end-of-line sampling plans required under Paragraph 87.

       b.    <u>Aqueous Benzene Waste Streams.</u> For purposes of calculating the TAB pursuant to the requirements of 40 C.F.R. § 61.342(a), Limetree Bay shall include all waste/slop/off-spec oil streams that become "aqueous" until such streams are recycled to a process or put into a process feed tank (unless the tank is used primarily for the storage of wastes). Appropriate adjustments shall be made to such calculations to avoid the double counting of benzene. For purposes of complying with the 6 BQ Compliance Option, all waste management units handling aqueous benzene waste streams shall either meet the applicable control standards of Subpart FF or shall have their uncontrolled benzene quantity count towards the applicable 6 Mg limit.

86.    <u>Benzene Waste Operations Sampling Plans: General.</u> By June 1, 2020, Limetree Bay shall update the Benzene Waste Operations Sampling Plan that HOVENSA submitted in June 2012, designed to describe the sampling of benzene waste streams that Limetree Bay will utilize to estimate quarterly and annual uncontrolled benzene quantities under the 6 BQ

Compliance Option.  Limetree Bay shall continue to comply with the June 2012 Benzene Waste Operations Sampling Plan until the updated plan is submitted.

87.    Benzene Waste Operations Sampling Plans:  Content Requirements.  The sampling plan shall include, but need not be limited to:

a.    Annual sampling of all uncontrolled waste streams that count toward the 6 Mg/yr calculation and contain greater than 0.05 Mg/yr of benzene at the point of generation.

b.    [Reserved]

c.    The proposed End-of-Line (EOL) sampling locations and methods for flow calculations to be used in calculating projected quarterly and annual uncontrolled benzene quantity calculations under the terms of Paragraph 90.  Based on the current configuration of the Refinery's wastewater system, overflows from API separators 1, 2, and 3 are the only "routine" wastewater benzene streams not controlled in accordance with Subpart FF.  Therefore, sampling of the three API overflow streams will constitute the individual EOL locations.

88.    Benzene Waste Operations Sampling Plans:  Timing for Implementation.  Limetree Bay will implement the updated plan unless and until (a) EPA disapproves the plan, or (b) Limetree Bay modifies the plan under Paragraph 89.

89.    Benzene Waste Operations Sampling Plans:  Modifications.

a.    Changes in Processes, Operations, or Other Factors.  If changes in processes, operations, or other factors lead Limetree Bay to conclude that the sampling plan may no longer provide an accurate basis for estimating the Refinery's quarterly or annual uncontrolled benzene quantity under Paragraph 90, then by no later than ninety (90) Days after Limetree Bay determines that the plan no longer provides an accurate measure, Limetree Bay will submit to EPA and the VIDPNR a revised plan for EPA approval.  In the first full Calendar Quarter after

submitting the revised plan, Limetree Bay will implement the revised plan. Limetree Bay will continue to implement the revised plan unless and until EPA disapproves the revised plan.

b.    Requests for Modifications to the Sampling Frequency. After two (2) years of implementing a sampling plan, Limetree Bay may submit a request to EPA for approval, with a copy to the VIDPNR, to reduce the facility's sampling frequency. Limetree Bay may implement the modified sampling frequency 90 days after submission unless EPA disapproves the modification.

90.    Quarterly and Annual Estimations of Uncontrolled Benzene Quantities. At the end of each Calendar Quarter and based on sampling results and approved flow calculations, Limetree Bay will calculate a quarterly and projected annual uncontrolled benzene quantity.

91.    In making the calculations required by Paragraph 90, Limetree Bay will use the average of the samples collected at each sampling location in accordance with the Benzene Waste Operations Sampling Plan. If these calculations do not identify any potential violations of the benzene waste operations NESHAP, Limetree Bay will submit these calculations in the reports due under this Section V.P.

92.    Corrective Measures: Basis. If the quarterly uncontrolled benzene calculations, required pursuant to Paragraph 90, exceeds 1.5Mg and/or the estimated annual uncontrolled benzene quantities equal or exceed 6 Mg for the then current compliance year, then by no later than sixty (60) Days after the end of the Calendar Quarter, Limetree Bay will submit a compliance assurance plan to EPA for approval, with a copy to the VIDPNR. In that compliance assurance plan, Limetree Bay will identify the quantity and cause(s) of the potentially-elevated benzene quantities, all corrective actions that Limetree Bay has taken or plans to take to ensure that the cause(s) will not recur, and either the schedule of actions that Limetree Bay will take to

ensure that the Refinery complies with the Benzene Waste Operations NESHAP for the calendar

compliance year or an explanation that Limetree Bay will be able to meet the annual limit

without taking corrective action. Limetree Bay will implement the plan unless and until EPA

disapproves, in which case Limetree Bay shall address EPA's comments.

93.    <u>Miscellaneous Measures</u>.

a.    As of the Date of Lodging, Limetree Bay shall:

i.    Conduct monthly visual inspections of and, if appropriate, refill all

water traps used to comply with Subpart FF within the Refinery's individual drain

systems;

ii.    Ensure that all segregated stormwater drains are marked at the

drain (color coding may be used);

iii.    Conduct monitoring of existing API Separators 1, 2, and 3 or any

new Subpart FF-regulated oil/water separators as outlined below:

(1)    Conduct semi-annual seal gap measurements on all

secondary seals on all floating roof portions in accordance with 40 C.F.R.

§ 60.693-2.

(2)    The fixed roof portions of all Subpart FF regulated

oil/water separators shall be monitored on a quarterly basis if Method 21

monitoring conducted pursuant 40 C.F.R. § 61.355(h) determine a leak

rate of greater than one (1) percent. Monitoring of the fixed roof portion

of all Subpart FF required oil/water separators will be conducted annually

if Method 21 monitoring conducted pursuant to 40 C.F.R. § 61.355(h)

determine a leak rate of one (1) percent or less.

(3)    A current listing, as of Date of Lodging, of all Method 21 monitoring locations for API Separators 1, 2, and 3 is attached in Appendix F ("Method 21 Monitoring Locations for API Separators 1, 2, and 3"). When modifications to the API separators occur, Limetree Bay shall update and maintain a current listing of all monitoring locations for API Separators l, 2, and 3.

94.    <u>Record Keeping and Reporting Requirements for this Section V.P Outside of the Reports Required under 40 C.F.R. § 61.357 or under the Progress Report Procedures of Part X (Reporting and Recordkeeping)</u>.  At the times specified in the applicable provisions of this Section V.P, Limetree Bay will submit, as and to the extent required, the following reports to EPA and the VIDPNR:

a.    BWON Compliance Review and Verification Report (Subparagraph 79.a), as amended, if necessary (Subparagraph 79.b);

b.    Compliance assurance plan, if necessary (Paragraph 92);

c.    Compliance certification, if necessary (Subparagraph 80.d);

d.    Schematics of waste/slop/off-spec oil movements (Subparagraph 85.a), as revised, if necessary; and

e.    Sampling Plans (Paragraph 86), and revised Sampling Plans, if necessary (Subparagraph 89.a).

**28.    Paragraph 99 is revised by changing June 30, 2011 to December 31, 2012.**

**29.    Replace Section V.R, Leak Detection and Repair ("LDAR") Program with the following new Section V.R, LDAR Program.**

**R.    <u>Leak Detection and Repair ("LDAR") Program</u>.**

100.    <u>Introduction</u>.  In order to minimize or eliminate fugitive emissions of volatile organic compounds ("VOCs"), benzene, volatile hazardous air pollutants ("VHAPs"), and organic hazardous air pollutants ("HAPs") from equipment in light liquid and/or in gas/vapor service, Limetree Bay shall comply with the leak detection and repair ("LDAR") requirements of this Section V.R.  The terms "in light liquid service" and "in gas/vapor service" shall have the definitions set forth in the applicable provisions of 40 C.F.R. Part 60, Subpart VVa and GGGa.

101.    No later than the Date of Lodging of the First Modification, the group of all equipment within each process unit (as "equipment" and "process unit" are defined by 40 C.F.R. § 60.591a) and each compressor shall become affected facilities under 40 C.F.R. Part 60, Subpart GGGa, and shall become subject to and comply with the requirements of 40 C.F.R. Part 60, Subpart GGGa, and the requirements of this Section V.R.

102.    <u>Duration</u>.  The requirements of this Section V.R shall remain in effect through May 1, 2025, or termination of the Consent Decree, whichever is later.

103.    <u>Written Refinery-Wide LDAR Program</u>.  No later than three (3) months after the Date of Entry of the First Modification, Limetree Bay shall update and thereafter maintain its written refinery-wide program for compliance with applicable LDAR Regulations and the LDAR requirements of this Consent Decree, which shall include:

      a.    Procedures to identify all equipment in light liquid and/or in gas/vapor service that is subject to the LDAR Regulations and has the potential to leak VOCs, HAPs, VHAPs, and benzene within process units;

      b.    Procedures for identifying leaking equipment within process units;

      c.    Procedures for repairing and keeping track of leaking equipment; and

    d.      Procedures for identifying and including in the LDAR program new equipment.

Limetree Bay shall submit to EPA a copy of the written refinery-wide LDAR program updated pursuant to this Paragraph in the next semi-annual report following the development of the program, and review annually and update as needed.

    104.    [Reserved]

    105.    Training. Limetree Bay shall implement the following training programs at the Refinery:

    a.      Within six (6) months from the Date of Entry of the First Modification, update the LDAR training program pursuant to the criteria in Appendix E ("Limetree Bay's LDAR and BWON Training Program Summary") and submit it to EPA;

    b.      From and after the Date of Entry of the First Modification, Limetree Bay shall continue to provide LDAR training to existing personnel assigned to LDAR responsibilities (including but not limited to monitoring, recordkeeping, reporting, or data management). For newly hired personnel with LDAR program responsibilities, provide LDAR training prior to the personnel beginning work. All employees assigned to LDAR responsibilities shall receive training annually.

    c.      For other Refinery operations and maintenance personnel whose duties include limited LDAR responsibilities, continue to provide training developed pursuant to the criteria in Appendix E ("Limetree Bay's LDAR and BWON Training Program Summary") that includes instruction on those aspects of LDAR relevant to the person's duties. This training shall be provided every three (3) years until termination of this Consent Decree. For newly hired

operations and maintenance personnel, such training shall be provided within six (6) months of

hiring; and

        d.      If contractors are used to fulfill the requirements of this Section V.R,

Limetree Bay shall require that such contractors be trained as required by this Paragraph, and

Limetree Bay shall maintain records of such training.

    106.   <u>LDAR Audits</u>.  Limetree Bay shall continue to implement the refinery-wide

audits set forth in this Paragraph, to ensure the Refinery's compliance with all applicable LDAR

Regulations and the LDAR requirements of this Consent Decree. The LDAR audits shall

include but shall not be limited to, comparative monitoring, records review to ensure monitoring

and repairs were completed in the required periods, field reviews to ensure all regulated

equipment is included in the LDAR program, a review to ensure records and reports have been

maintained and submitted as required, and observation of the LDAR technicians' calibration and

monitoring techniques. During the LDAR audits, leak rates shall be calculated for each process

unit where comparative monitoring was performed.

        a.     <u>Initial Compliance Audit</u>.  By not later than 270 Days after the Date of

Lodging of the First Modification, Limetree Bay shall complete a refinery-wide third-party audit

of its compliance with the LDAR Regulations and the requirements of applicable Sections of the

Consent Decree, which includes, at a minimum, each of the audit requirements set forth in this

Paragraph other than comparative monitoring. For purposes of this requirement, "third party"

may include a qualified contractor, consultant, industry group, or trade association. Within thirty

(30) Days of receipt of the completed audit, Limetree Bay shall submit its Initial Compliance

Audit Report to EPA and the VIDPNR that sets forth any areas of non-compliance identified as a

result of its audit and includes a proposed compliance schedule for correcting the non-

compliance. If the proposed compliance schedule extends greater than sixty (60) Days beyond the audit completion date, Limetree Bay must seek approval of the compliance schedule from EPA. Limetree Bay shall implement the compliance schedule as proposed until the schedule is approved or disapproved by EPA. Upon receipt of any disapproval from EPA, Limetree Bay shall correct the non-compliance pursuant to the schedule that EPA proposed, or, if EPA did not so specify, as expeditiously as practicable. Within one (1) year of Date of Entry of the First Modification, Limetree Bay shall certify to EPA that the Refinery:

      i.      Is in compliance;

      ii.      Has completed related corrective action and/or is on a compliance schedule (if necessary); and

      iii.      Shall specifically certify that all existing equipment has been identified and included in the facility LDAR program, to the extent required by applicable regulations and the Consent Decree, as of the date such certification is made.

      b.      <u>Subsequent Audits</u>. Limetree Bay shall conduct an audit of its LDAR program compliance with applicable LDAR Regulations and the requirements under this Section V.R, at least once every two (2) years after the initial compliance audit required by Subparagraph 106.a, in the same Calendar Quarter. Limetree Bay shall retain a contractor with expertise in the LDAR Program's requirements and familiarity with Certified Low-Leaking Valve and/or Certified Low-Leaking Valve Packing Technology to perform the first subsequent audit ("Third-Party LDAR Audit"). Thereafter, Limetree Bay shall alternate performance of the audit between Limetree Bay personnel familiar with the LDAR Program's requirements or contractors with

expertise in the LDAR Program's requirements ("Internal Audit") and a Third-Party LDAR Audit.

107.    <u>Implementation of Actions Necessary to Correct Non-Compliance</u>.  If the results of any of the audits conducted pursuant to this Section V.R identify any area(s) of non-compliance, Limetree Bay shall implement, as soon as practicable, all appropriate steps necessary to correct the area(s) of non-compliance and to prevent a recurrence of the cause of the non-compliance, to the extent practicable.  For purposes of this Paragraph, if a ratio of the process-unit valve leak percentage established through a comparative monitoring audit conducted pursuant to Paragraph 106, and the average valve leak percentage reported for the process unit for the last four (4) monitoring periods preceding the audit, is equal to or greater than 3.0, and provided the auditor identified at least three (3) leaking valves in the process unit, it shall be deemed an area of non-compliance and cause for corrective action.  If the calculated ratio yields an infinite result, Limetree Bay shall assume one (1) leaking valve was found in the process unit through its routine monitoring during the four (4) monitoring periods.  In the Semi-Annual LDAR Report submitted pursuant to the provisions of Paragraph 123 covering the period when an audit was conducted, Limetree Bay shall submit the results of the audit, and shall certify to EPA that the audit has been completed and that the Refinery is in compliance or on a compliance schedule.

108.    <u>Retention of Audit Reports</u>.  Until termination of the Consent Decree, Limetree Bay shall retain the audit reports generated pursuant to this Section V.R and shall maintain a written record of the corrective actions taken in response to any deficiencies identified in any audits.

109.   <u>Leak Definition for Valves and Pumps</u>.  Limetree Bay shall utilize the leak definitions for valves as defined at 40 C.F.R. § 60.482-7a(b) and pumps in light liquid and/or gas/vapor service as defined at 40.C.F.R. § 60.482-2a(b)(1)(ii), unless a lower leak definition is established under applicable permit(s) or other applicable LDAR Regulations from the Date of Lodging of the First Modification.

110.   [Reserved]

111.   [Reserved]

112.   <u>Limetree Bay Valve Preventative Leak Maintenance Program.</u>  Within thirty (30) Days after the Date of Lodging of the First Modification, Limetree Bay shall implement the Valve Preventative Leak Maintenance Program (the "Valve Preventative Leak Maintenance Program" or "the program") set forth in this Paragraph 112 to replace and/or improve the emissions performance of valves subject to this Section V.R ("Covered Equipment Valve").

a.     <u>Definitions</u>.  The following definitions apply to this Paragraph 112:

i.     "Extension," for the purposes of Subparagraph 112.a.iii(1)(B) and 112.a.iii(2)(B) shall mean that: (i) the tested and untested valves were produced by the same manufacturer to the same or essentially equivalent quality requirements; (ii) the characteristics of the valve that affect sealing performance (e.g., type of valve, stem motion, tolerances, surface finishes, loading arrangement, and stem and body seal material, design, and construction) are the same or essentially equivalent as between the tested valve and the untested valve; and (iii) the temperature and pressure ratings of the tested valve are at least as high as the temperature and pressure ratings of the untested valve.

ii.    "Low Emissions Packing" or "Low-E Packing" shall mean either (1) or (2) as follows:

(1)    A valve packing product, independent of any specific valve, for which the manufacturer has issued a written warranty that the packing will not emit fugitives at greater than 100 ppm, and that, if it does so emit at any time in the first five years, the manufacturer will replace the product; provided however, that no packing product shall qualify as "Low-E" by reason of written warranty unless the packing first was tested by the manufacturer or a qualified testing firm pursuant to generally accepted good engineering practices for testing fugitive emissions and the results of the testing reasonably support the warranty; or

(2)    A valve packing product, independent of any specific valve, that has been tested by the manufacturer or a qualified testing firm pursuant to generally accepted good engineering practices for testing fugitive emissions, and that, during the test, at no time leaked at greater than 500 ppm, and on average, leaked at less than 100 ppm.

iii.    "Low Emissions Valve" or "Low E Valve" shall mean either (1) or (2) as follows:

(1)    A valve (including its specific packing assembly) for which the manufacturer has issued a written warranty that it will not emit fugitives at greater than 100 ppm, and that, if it does so emit at any time in the first five years, the manufacturer will replace the valve; provided

46

however, that no valve shall qualify as "Low E" by reason of written warranty unless the valve (including its specific packing assembly) either:

    (A)    first was tested by the manufacturer or a qualified testing firm pursuant to generally accepted good engineering practices for testing fugitive emissions and the results of the testing reasonably support the warranty; or

    (B)    is an Extension of another valve that qualified as "Low E" under Subparagraph 112.a.iii.

(2)    A valve (including its specific packing assembly) that:

    (A)    Has been tested by the manufacturer or a qualified testing firm pursuant to generally accepted good engineering practices for testing fugitive emissions and that, during the test, at no time leaked at greater than 500 ppm, and on average, leaked at less than 100 ppm; or

    (B)    Is an Extension of another valve that qualified as "Low E" under Subparagraph 112.a.iii.

iv.    "Maintenance Shutdown" shall mean a Shutdown of a process unit that lasts longer than thirty (30) Days.

b.    <u>Procedures Required to be Implemented</u>.  Under the Valve Preventative Leak Maintenance Program, Limetree Bay shall implement the following procedures:

i.    By no later than thirty (30) Days after the Date of Lodging of the First Modification, Limetree Bay shall implement modified purchasing procedures that evaluate the availability of valves and/or valve packing that meet

the requirements for a Low-E Valve or Low-E Packing at the time that the valves and/or valve packing is acquired.

      ii.     Except as provided in Subparagraph 112.c, by no later than thirty (30) Days after the Date of Lodging of the First Modification, Limetree Bay shall install valve packing material that meets the requirements for Low-E Packing whenever repacking any Covered Equipment Valve.

      iii.     Except as provided in Subparagraph 112.c, by no later than ninety (90) Days after the Date of Lodging of the First Modification, Limetree Bay shall ensure that each new valve that would qualify as a Covered Equipment Valve that it installs is a Low-E Valve or is fitted with Low-E Packing. Newly installed sampling and instrumentation valves in service on piping with a diameter of 5/8 inches or less are not required to be Low-E Valves or be fitted with Low-E Packing.

      iv.     <u>Replacement and Repacking of Leaker Valves</u>. Except as provided in Subparagraph 112.c, by not later than five months after Restart, for each Covered Equipment Valve for which the highest emission level that is recorded during monitoring in compliance with Method 21 is at or above 2000 ppm during any two monitoring events (excluding repair verification monitoring) in any 60-month period following the Date of Lodging of the First Modification, Limetree Bay shall replace or repack such valve with a Low-E Valve or with Low-E Packing. If a valve is repacked or replaced according to this Subparagraph, there shall be a period of 15 days after it is repacked or replaced, where this Subparagraph 112.b.iv shall not apply, to allow for adjustment of the valve. The

timing of replacement or repacking under this Subparagraph 112.b.iv shall be in accordance with Subparagraph 112.d.

c.      Unavailability of a Low-E Valve or Low-E Packing

    i.      Commercial Unavailability.  Limetree Bay shall not be required to utilize a Low-E Valve or Low-E Packing to replace or repack a valve if a Low-E Valve or Low-E Packing is commercially unavailable in accordance with the provisions in Appendix M ("Process and Factors For 'Commercial Unavailability' of Low-E Valve or Packing").  Prior to claiming this commercial unavailability exemption, Limetree Bay must contact a reasonable number of vendors of valves and obtain a written representation or equivalent documentation from each vendor that the particular valve that Limetree Bay needs is commercially unavailable either as a Low-E Valve or with Low-E Packing.  In the semi-annual report required under Part X (Reporting and Recordkeeping), Limetree Bay shall:  (i) identify each valve for which it could not comply with the requirement to replace or repack the valve with a Low-E Valve or Low-E Packing; (ii) identify the vendors it contacted to determine the unavailability of such a Low-E Valve or Low-E Packing; and (iii) include the written representations or documentation that Limetree Bay secured from each vendor regarding the unavailability.

    ii.      Ongoing Assessment of Availability.  Limetree Bay may use a prior determination of Commercial Unavailability of a valve or valve packing pursuant to this Paragraph and Appendix M for a subsequent Commercial Unavailability claim for the same valve or valve packing (or valve or valve packing in the same or similar service), provided that the previous determination was completed

within the preceding 12-month period.  After one year, Limetree Bay must

conduct a new assessment of the availability of a valve or valve packing meeting

Low-E Valve or Low-E Packing requirements.

d.    <u>Timing of Valve Replacement/Improvement</u>

     i.    <u>If Replacing or Repacking Does Not Require a Process Unit</u>

<u>Shutdown</u>.  If replacing or repacking does not require a process unit Shutdown,

Limetree Bay shall replace or repack such valve by no later than thirty (30) Days

after the monitoring event that triggers the replacing or repacking requirement,

unless Limetree Bay complies with the following:

     (1)    Prior to the deadline, Limetree Bay must take all actions

necessary to obtain the required valve or valve packing, including all

necessary associated materials, as expeditiously as practical, and retain

documentation of the actions taken and the date of each such action.

     (2)    If, despite Limetree Bay's efforts to comply with

Subparagraph 112.d.i(1) the required valve or valve packing, including all

necessary associated materials, is not available in time to complete the

installation within thirty (30) Days, Limetree Bay must take all reasonable

actions to minimize emissions from the valve pending completion of the

required replacing or repacking.  Examples include:

     (A)    Repair;

     (B)    More frequent monitoring, with additional repairs

as needed; or

(C)     Where practical, interim replacing or repacking of a valve with a valve that is not a Low-E Valve or with packing that is not Low-E Packing; and

(3)     Limetree Bay must promptly perform the required replacing or repacking after Limetree Bay's receipt of the valve or valve packing, including all necessary associated materials.

ii.     <u>If Replacing or Repacking Requires a Process Unit Shutdown</u>.  If replacing or repacking requires a process unit Shutdown, Limetree Bay shall replace or repack such valve during the first Maintenance Shutdown that follows the monitoring event that triggers the requirement to replace or repack the valve, unless Limetree Bay documents that insufficient time existed between the monitoring event and that Maintenance Shutdown to enable Limetree Bay to purchase and install the required valve or valve packing technology.  In that case, Limetree Bay shall undertake the replacing or repacking at the next Maintenance Shutdown that occurs after Limetree Bay's receipt of the valve or valve packing, including all necessary associated materials.

e.     <u>Records of Low-E Valves and Low-E Packing</u>.  Prior to purchasing any Low-E Valves or Low-E Packing, Limetree Bay shall secure, from each manufacturer, documentation that demonstrates that the proposed valve or packing technology meets the definition of "Low-E Valve" and/or "Low-E Packing."  Limetree Bay shall retain that documentation for five (5) years and make it available upon request.

f.     <u>Valve Replacement/Improvement Report</u>.  In each semi-annual report due under Part X (Reporting and Recordkeeping), Limetree Bay shall include a separate section in

the report that: (i) describes the actions it took to comply with this Paragraph 112, including identifying each valve that was replaced or upgraded; and (ii) identifies the schedule for any future valve replacements or upgrades required as part of Subparagraph 112.d.

113.    LDAR Monitoring Frequency.  By no later than the Date of Entry of the First Modification, for all Covered Equipment, except as provided in 40 C.F.R. § 60.482-1a(c)-(f), Limetree Bay shall comply with the monitoring frequency for valves as required by 40 C.F.R. § 60.482-7a, 40 C.F.R. § 60.482-10a, and 40 C.F.R. § 60.483-2a and for pumps as required by 40 C.F.R. § 60.482-2a.

114.    Electronic Storage of LDAR Data.  On and after the Date of Lodging of the First Modification, Limetree Bay shall record all LDAR monitoring and repair data in an electronic database.

115.    Electronic Monitoring and Reporting of LDAR Data.  On and after the Date of Lodging of the First Modification, Limetree Bay shall use dataloggers and/or electronic data collection devices during LDAR monitoring.  Limetree Bay or contractor(s) retained by Limetree Bay shall use their best efforts to transfer each monitoring reading to the database within five (5) Days of collecting the reading.  For all monitoring events in which an electronic data collection device is used, the collected monitoring data shall include a time and date stamp, screening value, operator identification, and instrument identification.  Limetree Bay may use paper logs where necessary or more feasible (e.g., small rounds, remonitoring, or when dataloggers are not available or broken), and shall record the identification of the technician undertaking the monitoring, the date, time, screening value, and the identification of the monitoring equipment. Limetree Bay shall transfer any manually recorded monitoring data to the electronic database within seven (7) Days of monitoring.

EPA-571

116.    <u>QA/QC of LDAR Data.</u>  By no later than ninety (90) Days after the Date of Lodging of the First Modification, Limetree Bay shall develop and implement a procedure to ensure a quality assurance/quality control ("QA/QC") review of all data generated by each LDAR monitoring technician.  This QA/QC procedure shall require:

a.    Monitoring technician(s) to review and certify the accuracy of the monitoring data they collected each week; and

b.    Non-monitoring personnel to review monitoring data quarterly, including but not limited to, number of components monitored per technician, time between monitoring events, and abnormal data patterns.

117.    <u>LDAR Personnel.</u>  By no later than the Date of Lodging of the First Modification, Limetree Bay shall maintain the facility's existing program which holds Limetree Bay LDAR personnel accountable for LDAR performance.  Limetree Bay shall maintain a position with responsibility for LDAR management and with the authority to implement improvements.

118.    <u>Adding / Removing Valves and Pumps.</u>  On and after the Date of Lodging of the First Modification, Limetree Bay shall continue to implement its tracking program for maintenance records (e.g., a Management of Change program) to ensure that valves and pumps subject to the LDAR Regulations and this Consent Decree, which are installed and placed into VOC service, are integrated into the LDAR program.

119.    <u>Calibration.</u>  Limetree Bay shall conduct all calibrations of LDAR monitoring equipment using methane as the calibration gas, in accordance with 40 C.F.R. Part 60, EPA Reference Test Method 21.

120.    <u>Calibration Drift Assessment.</u>  Within six calendar months of the Date of Lodging of the First Modification, Limetree Bay shall conduct calibration drift assessments of LDAR monitoring equipment pursuant to 40 C.F.R. § 60.485a(b)(2).

121.    <u>Extended Maintenance and Delay of Repair.</u>  Beginning no later than one (1) year from Date of Lodging of the First Modification, Limetree Bay shall eliminate normal use of delay of repair exemptions for equipment in VOC service (as defined in 40 C.F.R. § 60.481a) under applicable regulations and the Consent Decree, and shall perform monitoring and maintenance as follows:  perform monitoring and "drill and tap" repairs according to Subparagraphs 121.a and b, and perform extended maintenance to attempt to stop the leak source as outlined under Subparagraph 121.c. If Limetree Bay, after having implemented one or more of the extended maintenance leak repair techniques identified in Subparagraph 121.c, cannot repair the leak, Limetree Bay may delay repair of the leak until the next process unit Shutdown. Extended maintenance shall not be required where any of the following is the case: (i) for the period beginning no later than one (1) year from the Date of Lodging of the First Modification through five (5) years of the Date of Entry of the First Modification, the number of valves on the delay of repair list does not exceed 0.1 percent refinery-wide upon determination of delay of repair; and for the period beginning no later than five (5) years of the Date of Entry of the First Modification, the number of valves on the delay of repair list does not exceed 0.05 percent refinery-wide upon determination of delay of repair; or (ii) the feasible extended maintenance techniques listed in Subparagraph 121.c would result in a Shutdown of a process unit or create an unsafe operating condition.  Limetree Bay shall report the circumstances (why it was required, what was actually performed, whether it was successful) of all leaks attempted to be repaired under Subparagraph 121.c in semi-annual reports required under Paragraph 71.

a.    For all equipment:

i.    Require sign-off by the plant manager, a corporate official responsible for environmental management and compliance, a corporate official responsible for plant engineering, an operations manager, an area superintendent, or an area manager or designee by the 15th day after identification of the leak that the equipment cannot be removed from VOC service and is technically infeasible to repair without implementation of extended maintenance as set forth in Subparagraph 121.c; and

ii.    Monitor monthly equipment on the "delay of repair" list which remains in VOC service.

b.    For valves:  For valves, other than control valves and pressure relief valves, require use of "drill and tap" or similarly effective repairs, unless the valve can be repaired by other means or Limetree Bay can demonstrate that there is a safety, mechanical, or adverse environmental concern posed by attempting to repair the leak in this manner.  Limetree Bay shall perform multiple "drill and tap" attempts (or similarly effective repairs) within fifteen (15) Days of identification of the leak, if necessary, to repair the valve.

c.    If the repair methods undertaken pursuant to Subparagraph 121.b have not stopped the source of the leak, Limetree Bay shall, within sixty (60) Days of identifying the leak, perform at least one extended maintenance attempt to stop the leak source, including building an enclosure for the equipment which meets 'no detectable emissions' standards under NSPS Subpart VV, line-stopping (i.e., inserting a plugging device inside the line so the contents can temporarily be held back while maintenance is performed on-line), hot-tapping (i.e., connecting a new piping service to an existing line with no interruption of flow), or pipe-freezing (i.e., holding

back system pressure in a section of piping using freeze chambers which are installed over a short section of piping and injected with liquid nitrogen or $CO_2$). Limetree Bay shall report the circumstances (why it was required, what was actually performed, was it successful) of all leaks attempted to be repaired or exempt from repair under this Subparagraph in semi-annual reports required under Part X (Reporting and Recordkeeping). If Limetree Bay applies a different extended repair technique than those listed in this Subparagraph, Limetree Bay shall report such technique under Paragraph 123 and explain how it is similarly effective at stopping the leak, and shall specifically explain why this technique could not be applied within fifteen (15) Days of identification of the leak.

122.    <u>Recordkeeping Requirements for this Section V.R</u>. For at least two (2) years after termination of this Consent Decree, Limetree Bay shall retain records to demonstrate its compliance with the requirements of this Section V.R.

123.    As part of the reports required under 40 C.F.R. §§ 60.487a and 63.655 (Semi-Annual LDAR Report), Limetree Bay shall include the following information, at the following times:

a.    The next Semi-Annual LDAR Report after the applicable compliance date for each requirement shall include notification of the following:

i.    Implementation of the "Valve Preventative Leak Maintenance Program" of Paragraph 112;

ii.    Implementation of QA/QC procedures for review of data generated by LDAR technicians as required by Paragraph 116;

      iii.      Development of a tracking program for new valves and pumps added during maintenance and construction (Management of Change Program) as required by Paragraph 118;

      iv.      Implementation of the calibration and calibration drift assessment procedures of Paragraphs 119 and 120;

      v.      Implementation of the "delay of repair" procedures of Paragraph 121;

      vi.      Utilization of electronic data collection devices during LDAR monitoring, pursuant to the requirements of Paragraph 115;

      vii.      [Reserved]; and

      viii.      Implementation of the monitoring requirements of Paragraph 113.

    b.      Until termination of this Section V.R, each Semi-Annual LDAR Report that Limetree Bay submits shall include:

      i.      An identification of each audit, if any, that was conducted pursuant to the requirements of Paragraph 106 in the previous semi-annual period. For each audit identified, the report shall include an identification of the auditors, a summary of the audit results, and a summary of the actions that Limetree Bay took or intends to take to correct all deficiencies identified in the audits.

      ii.      Training. Information identifying the measures taken to comply with the provisions of Paragraph 105;

      iii.      [Reserved]; and

      iv.      Monitoring. The following information on LDAR monitoring:

(1)      A list of the process units monitored during the reporting period;

(2)      The number of valves and pumps present in each monitored process unit;

(3)      The number of valves and pumps monitored in each process unit and if less than the number in (2), include an explanation as to why;

(4)      The number of valves and pumps found leaking in each process unit during the period, and the valve leak percentage for each process unit;

(5)      The number of "difficult to monitor" pieces of equipment monitored;

(6)      The projected month of the next monitoring event for that unit;

(7)      A list of all equipment currently on the "delay of repair" list, the date each component was placed on the list, the date each such component was determined to be leaking above applicable leak definitions, the circumstances of any extended maintenance repairs under Subparagraph 121.c, the associated monitoring results for each piece of equipment, and whether such activities were completed in a timely manner;

(8)      [Reserved];

(9)    The number of valves not repacked or replaced and recorded as required under Paragraph 112;

(10)    The number of valves which were newly installed without appropriate packing or valve technology, as required under Paragraph 112; and

(11)    The number of missed or untimely repairs under Paragraph 111.

**30.    Replace Part VI, Permitting with the following new Part VI, Permitting.**

124.    <u>Obtaining Permit Limits for Consent Decree Emission Limits That Are Effective On or Before the Date of Entry of the First Modification</u>.   Except as set forth below, by no later than 180 Days after the Date of Entry of the First Modification, Limetree Bay shall submit applications, amendments and/or supplements to the relevant permitting authority to incorporate the surviving Consent Decree obligations identified in Appendix O ("Requirements That Shall Survive Termination of the Consent Decree") that are effective on or before the Date of Entry of the First Modification into federally enforceable minor or major new source review permits or other permits (other than Title V permits) or provisions (e.g., SIP) that are federally enforceable. Upon issuance of such permits or in conjunction with such permitting, Limetree Bay shall file all applications necessary to incorporate the requirements of those permits into the Title V permit for the Refinery.

125.    <u>Obtaining Permit Limits For Consent Decree Emission Limits That Become Effective After Date of Entry of the First Modification</u>.   Except as set forth below, as soon as practicable, but in no event later than 180 Days after the effective date or establishment of any surviving Consent Decree obligations identified in Appendix O, other than those effective on or

before the Date of Entry of the First Modification, Limetree Bay shall submit applications, amendments and/or supplements to the relevant permitting authority to incorporate those emission limits and standards into federally enforceable minor or major new source review permits, or other permits (other than Title V permits) or provisions (e.g., SIP) that are federally enforceable. Upon issuance of such permit or in conjunction with such permitting, Limetree Bay shall file all applications necessary to incorporate the requirements of those permits into the Title V permit for the Refinery.

126. <u>Mechanism for Title V Incorporation</u>. The Parties agree that the incorporation of any surviving Consent Decree obligations into the Title V permit for the Refinery as required by Paragraphs 124 and 125 shall be in accordance with the applicable territorial Title V rules.

127. <u>Construction Permits</u>. Limetree Bay agrees to obtain all required, federally enforceable permits for the construction of the pollution control technology and/or the installation of equipment necessary to implement the requirements of the Consent Decree.

127A. <u>Obligations That Shall Survive Consent Decree Termination</u>. The requirements imposed by the provisions identified in Appendix O shall survive termination of the Consent Decree under Part XIX (Termination).

a. <u>Emission Limits and Standards</u>. The requirements identified in Appendix O shall constitute emission limits and standards that shall survive termination of the Consent Decree by virtue of being incorporated into non-Title V federally enforceable minor or major permits or being required under a federally enforceable rule as required by Paragraphs 124 and 125.

b. <u>Optional Review of Draft Permit Application for Consistency with Consent Decree</u>.

   i.  By not later than 180 days prior to the date for submission of any permit application(s) to incorporate surviving emission limits and standards identified in this Paragraph 127A and Appendix O into federally-enforceable minor or major new source review permits or other permits (and, upon issuance of such permits or in conjunction with such permitting, into Title V permits) Limetree Bay may, following the procedures in Paragraph 225 (Notices), submit for EPA and VIDPNR review and comment a draft of the permit application(s) containing the terms, conditions and other provisions to incorporate such surviving obligations.   EPA's review and comment is intended to assist efforts to submit permit application(s) to the relevant permitting entity that fully incorporate such surviving obligations;  EPA does not warrant or guarantee by its review and comment on a *draft* permit application that Limetree Bay has met or will thereafter meet the requirement of Paragraph 234.e to show that, at the time of Termination of this Consent Decree, the *final* permit(s) once issued by the relevant permitting entity accurately and fully incorporate the surviving Consent Decree obligations.   In addition, such review by EPA is not pre-decisional or binding upon the relevant permitting entity, which may at its discretion require additional and/or more stringent terms and conditions than those required under this Consent Decree.

   ii.  If Limetree Bay elects to submit a draft permit application(s) for optional review under this Subparagraph, Limetree Bay shall have 30 days from the date of receipt of EPA's comments in which to submit its permit application(s) to the relevant permitting entity(s), notwithstanding the deadline for

submission of permit applications under Paragraph 124 or Paragraph 125, as applicable. The Parties may agree to a longer time period for submission of the permit application(s) to the relevant permitting entity(s) if needed to address questions or issues concerning EPA's review.

**31.    Replace Subparagraph 130.b with the following new Subparagraph 130.b:**

b.    CD Emissions Reductions may be used only at the Refinery.

**32.    Add the following new Paragraph 135A:**

135A.  For Boilers 5, 8, and 9, which became subject to NSPS Subpart D pursuant to Paragraph 135, entry of the First Modification of the Consent Decree shall satisfy the notice requirements of 40 C.F.R. § 60.7(a).

**33.    Replace Paragraph 136 with the following new Paragraph 136:**

136.    <u>NSPS Subparts A and GG</u>.

a.    <u>Power Line-Up</u>.  Limetree Bay submitted its "power line-up" to the United States and the Virgin Islands on December 31, 2018.  The power line-up identified Generating Turbines that Limetree Bay plans to operate when Idled Units at the Refinery resume operation and the normal operating range at which they are expected to operate.  By December 31, 2019, Limetree Bay shall re-submit its power line-up to the United States and the Virgin Islands if there are any changes from the December 31, 2018 submission.

b.    <u>Applicability and Compliance with NSPS Subparts A and GG</u>:  Generating Turbines 4, 7, 8, and 9 are "affected facilities" as that term is defined in 40 C.F.R. Part 60, Subparts A and GG.

      i.       <u>Generating Turbine 9</u>. Generating Turbine 9 shall continue to comply with the requirements of NSPS Subparts A and GG. Paragraph 229A and Appendix L shall apply to Generating Turbine 9.

      ii.       <u>Generating Turbines 4, 7, and 8</u>

(1)      From the Date of Lodging of the First Modification until Limetree Bay demonstrates compliance with NSPS Subparts A and GG in accordance with Subparagraph 136.b.ii(2), Generating Turbines 4, 7, and 8 shall comply with the requirements of NSPS Subparts A and GG, except that in lieu of complying with the NSPS Subpart GG numerical standard for $NO_x$, the Generating Turbines shall comply with the applicable Maximum Load Limits set forth in Subparagraph 136.d.ii.

(2)      By no later than December 31, 2020, Generating Turbines 4, 7, and 8 shall demonstrate compliance with all requirements of NSPS Subparts A and GG. Compliance with the applicable NSPS Subpart GG numerical standard for $NO_x$, shall be demonstrated (a) by CEMS or a stack test performed using the test methods specified in 40 C.F.R. § 60.335 and § 60.8, and at four different load points, including one load point within 5 percent at 90-to-100 percent of the manufacturer's design capacity, or at the highest achievable load point if Limetree Bay can demonstrate that a load point within 5 percent at 90-to-100 percent of design

capacity cannot be physically achieved in practice, or (b) by an alternate test method specifically approved by EPA in writing.

c.    Custom Sulfur Monitoring Plan:

i.    Pursuant to 40 C.F.R. § 60.334(i)(3), Limetree Bay submitted a custom sulfur monitoring schedule to EPA on August 31, 2017 for propane and distillate. The custom sulfur monitoring schedule may be revised in accordance with 40 C.F.R. § 60.334(i)(3). Limetree Bay shall comply with any proposed custom sulfur monitoring schedule as submitted unless EPA disapproves. If EPA disapproves of a custom schedule, then within thirty (30) Days of Limetree Bay's receipt of disapproval, Limetree Bay will submit to EPA a revised custom schedule that provides for compliance with the applicable monitoring requirements, which may include additional or different monitoring. Limetree Bay shall comply with the revised custom schedule as submitted unless EPA disapproves.

d.    Maximum Load Limits for Generating Turbines 4, 7, and 8 until Subparagraph 136.b.ii(2) compliance demonstration:

i.    Interim Controls

Limetree Bay has installed LHE Combustion Liner Systems on GTs 7 and 8, which will not be removed any earlier than the date Limetree Bay installs and operates alternative $NO_x$ controls, or is replaced at or before end of life. Limetree Bay shall demonstrate compliance with the NSPS, Subparts A and GG numerical standard for $NO_x$, as required in Subparagraph 136.b.ii.(2), within sixty Days after it begins operations with alternative $NO_x$ controls.

    ii.       <u>Applicability of Maximum Load Limits</u>

From the Date of Lodging of the First Modification until Limetree Bay

demonstrates full compliance with NSPS Subparts A and GG, as required in

Subparagraph 136.b.ii.(2), Generating Turbines 4, 7, and 8 shall comply with the

applicable Maximum Load Limits as set forth in Subparagraphs 136.d.iii through

136.d.iv.

    iii.      <u>Maximum Load Limits</u>.  From the Date of Lodging of the First

Modification until a subsequent Maximum Load Limit is established in

accordance with Subparagraph 136.d.iv, the following fuel and load limits are the

applicable Maximum Load Limits for Generating Turbines 4, 7, and 8:

| Turbine | Fuel | Maximum Load (1-hour block average) |
|---|---|---|
| GT-4 | Propane Gas | 6.67 MW |
| | Fuel Oil | 6.49 MW |
| | Fuel Gas | 6.49 MW |
| GT-7 | Propane Gas | 14.53 MW |
| | Fuel Oil | 12.97 MW |
| | Fuel Gas | 12.97 MW |
| GT-8 | Propane Gas | 12.14 MW |
| | Fuel Oil | 11.09 MW |
| | Fuel Gas | 11.09 MW |

    iv.      <u>Subsequent Maximum Load Limits.</u>

        (1)      Limetree Bay may establish subsequent Maximum Load

Limits for Generating Turbine 4, 7, or 8 or combust other fuels, provided

it establishes those limits by conducting testing, in accordance with

Subparagraph 136.d.iv(2) – (5) below.  Such testing may be conducted prior to and/or after the Date of Lodging of the First Modification.

(2)    Limetree Bay shall use the test methods specified in 40 C.F.R. § 60.335 and § 60.8 to measure $NO_x$ emissions from the Generating Turbine to establish subsequent Maximum Load Limits, except that for the purpose of conducting the stack test required by this Subparagraph 136.d.iv(2), Limetree Bay shall not be required to test at 90-to-100 percent of design capacity, as one of its four load points.

(3)    Limetree Bay shall provide notice to EPA and the VIDPNR no later than thirty (30) Days prior to any stack test of Generating Turbines 4, 7, and 8 conducted to establish subsequent Maximum Load Limits.

(4)    No later than thirty (30) Days after conducting tests to establish subsequent Maximum Load Limits, Limetree Bay shall provide the results of such testing to EPA and the VIDPNR.

(5)    From the Day that Limetree Bay satisfactorily completes a test conducted pursuant to this Subparagraph 136.d.iv, the applicable Maximum Load Limit shall be the maximum MW load, measured in a single run, on a 1-hour block average, at which the stack test results demonstrate that a specific fuel will result in emissions that will not exceed the NSPS Subparts GG $NO_x$ numerical standard in 40 C.F.R. § 60.332(a)(2), and Limetree Bay shall operate at or below this subsequent Maximum Load Limit.

e.     Recordkeeping.  From the Date of Lodging of the First Modification  until compliance  is demonstrated  in accordance  with Subparagraph  136.b.ii(2),  Limetree Bay shall maintain  a record of the operating  MW load, measured  on a 1-hour  block  average, for Generating Turbines  4, 7, and 8.  Limetree Bay shall make these records available  to EPA and the VIDPNR upon request.

f.     Notice.  If Generating  Turbines  4, 7, or 8 exceed the applicable  Maximum Load Limit set forth in Subparagraph  136.d.iii  or established  in accordance  with Subparagraph 136.d.iv,  Limetree Bay shall  within  seven (7) Days of the exceedance  provide  notice to the EPA and the VIDPNR.

g.     Stipulated  Penalties.

i.     Generating  Turbines  4, 7, and 8 – Failure  to Comply  with Maximum  Load Limit.  Limetree Bay shall be subject to a stipulated  penalty of $250 for every hour that Limetree Bay operates Generating  Turbine  4, 7, or 8 at a MW load more than ten (10) percent higher than the applicable  Maximum  Load Limit set forth in Subparagraph  136.d.iii  or established  in accordance  with Subparagraph  136.d.iv,  except that stipulated  penalties  for exceedances  of a Maximum  Load Limit do not apply during  a performance  test for which Limetree Bay provided  notice to EPA pursuant to Subparagraph  136.d.iv(3).

ii.     Generating  Turbines  4, 7, 8, and 9 – Failure  to Comply  with NSPS Subpart GG by Compliance  Date.  Limetree Bay shall be subject to the following  stipulated  penalties  for failure  to comply  with NSPS Subpart GG following  the compliance  dates set forth in Paragraphs 136.b.i  and b.ii(2):

EPA-586

| Period of Non-Compliance | Penalty Per Day Per Turbine |
|---|---|
| 1st Day through 30th Day after deadline | $200 |
| 31st through 60th Day after deadline | $500 |
| Beyond 60th Day after deadline | $1,000 |

**34.    Add the following new Paragraph 136A:**

136A.  For Generating Turbines 4, 7 and 8, which became subject to NSPS Subpart GG pursuant to Paragraph 136, entry of the First Modification of the Consent Decree and compliance with the relevant monitoring and compliance demonstration requirements of this Consent Decree shall satisfy the notice requirements of 40 C.F.R. § 60.7(a) and the initial performance test requirement of 40 C.F.R. § 60.8(a).

**35.    Replace Section IX.A with the following new Section IX.A:**

IX.A. Territorial Supplemental Environmental Project

137.   Virgin Islands Territorial SEP

a.    The VIDPNR shall develop and ensure implementation of Territorial Supplemental Environmental Projects ("TSEP") designed to benefit the people of the Virgin Islands. These projects shall be consistent with environmental, public health, pollution prevention or reduction, or other benefits and objectives of the environmental protection laws of the United States and the Virgin Islands. Among the potential projects, the VIDPNR is developing TSEPs for the establishment of a cancer registry and the establishment of a pediatric environmental specialty health unit.

b.    Within thirty (30) Days of a written request by the VIDPNR to the ERT for funding, the ERT shall provide for the disbursal of such funds from the TSEP Escrow Account, as directed by the VIDPNR, for the purpose of implementing the identified TSEP.

c.    All funds disbursed pursuant to this Paragraph shall be paid directly by the ERT to the TSEP provider(s) identified by the VIDPNR.

d.      In annual reports, due the thirty-first Day of January, the ERT shall identify the amount remaining in the TSEP Escrow Account at the end of the reporting period, and the amount disbursed and to whom it was disbursed during the reporting period.

e.      At the time the Court orders this Consent Decree to be terminated, the ERT shall disburse any remaining monies in the TSEP Escrow Account to the VIDPNR for development and implementation of projects that are consistent with the TSEP criteria set forth in this Paragraph.

138.    [Reserved]

139.    [Reserved]

140.    [Reserved]

**36.    Replace Section IX.B with the following new Section IX.B:**

**B.    <u>Additional Work</u>**

140A.    <u>VIWAPA Emissions Monitoring Assistance Subsequent to the First Modification</u>

a.      Prior to the disbursal of funds to VIWAPA, the ERT shall submit to EPA for EPA's review: (i) its contractor's detailed description of the assistance provided, including expenditures, certified as accurate by a responsible VIWAPA company official; and (ii) its contractor's statement indicating what monies expended by VIWAPA are consistent with the Consent Decree and the approved SOW.

b.      Within thirty (30) Days of receipt by the ERT of the statement by its contractor referenced in Subparagraph a. above, the ERT shall reimburse VIWAPA from funds earmarked for the VIWAPA Emissions Monitoring Assistance Program in accordance with the statement.

c.      The ERT shall not itself perform, participate (physically or otherwise) in

Case: 1:11-cv-00006-WAL-GWC    Document #: 22-1    Filed: 04/29/20    Page 70 of 158

performing, or assume responsibility for, any work, tasks, or functions that relate to the

VIWAPA Assistance Program or that VIWAPA is legally obligated to perform or performs in

the ordinary course of its business.

**37.    Replace Section IX.C with the following new Section IX.C:**

**C.    Public Statements**

    141.    [Reserved]

**38.    Add the following sentence to Paragraph 142:**

For BWON and LDAR Equipment, Limetree Bay shall maintain: (1) a database that identifies

BWON or LDAR Equipment that is not In Regulated Service and BWON or LDAR Equipment

that is In Regulated Service; (2) a database of any change in status of BWON or LDAR

Equipment and the date of such change; and (3) records documenting information reported

pursuant to Subparagraphs 143.a.v(3) through 143.a.v(4).

**39.    Replace Subparagraphs a.iv and a.v of Paragraph 143 with the following new**
**Subparagraphs a.iv and a.v:**

          iv.    A summary of Limetree Bay's compliance with Paragraph 136,

including a description of any exceedances of any Maximum Load Limit set forth

in Subparagraph 136.d.iii or as the result of any test conducted pursuant to

Subparagraph 136.d.iv(2).

          v.    Any such additional matters relevant to the obligations of this

Consent Decree, including, but not limited to, the following:

          (1)    A list of In Service Units, Idled Units, and any change(s) in

the status of In Service Units or Idled Units from the prior semi-annual

reporting period;

(2)    Identification of any Idled Unit that is operated for any period prior to Restart, along with the hours, duration, and purpose of such operation, except that this requirement shall not apply to units after they have been Restarted;

(3)    A list by area or process unit of BWON and LDAR Equipment that is currently In Regulated Service; and

(4)    A list by area or process unit identifying any changes in status of Equipment In Regulated Service from the prior semi-annual reporting period.

**40.    Replace Subparagraph 143.b.iii with the following new Subparagraph 143.b.iii:**

143.b.iii.    $SO_2$ emissions in tons per year for each SRP and $SO_2$ and Reduced Sulfur Compounds (RSC) emissions in tons per year for each SRP using a Beavon unit as a control device.

**41.    Replace Paragraph 162 with the following new Paragraph 162:**

162.    For failure to comply with applicable NSPS Subparts A and Ja requirements, at the flares listed on Appendix D ("List of Flaring Devices Subject to NSPS Subpart Ja") after the deadlines for compliance in Paragraphs 49, per Flaring Device:

| Period of Non-Compliance | Penalty per Day |
|---|---|
| 1st through 30th Day after deadline | $500 |
| 31st through 60th Day after deadline | $1,500 |
| Beyond 60th Day after deadline | $2,000 |

**42.    Insert new Paragraphs 162A, 162B and 162C:**

162A.  For failure to install flare gas recovery system(s), if required by Subparagraphs 50B.a, 50B.b, or 50B.c:

| Period of Non-compliance | Penalty per Day |
|---|---|
| 1st through 30th day after deadline | $1,200 |
| 31st through 60th day after deadline | $2,500 |
| Beyond 60th day after deadline | $5,000, or an amount equal to 1.2 times the economic benefit of non-compliance, whichever is greater |

162B.  For failure to monitor emissions or flow rate as required by Paragraphs 50A, 50C.a, and 50D, and for failure to maintain records and reports as required by Subparagraphs 50C.b and 50C.c:

| Period of Non-compliance | Penalty per Day |
|---|---|
| 1st through 30th day after deadline | $500 |
| 31st through 60th day after deadline | $1000 |
| Beyond 60th day after deadline | $2,500, or an amount equal to 1.2 times the economic benefit of non-compliance, whichever is greater |

162C.  For failure to mitigate emissions, if required by Paragraph 50A and Appendix P ("Flaring Mitigation Projects"):

| Period of Non-compliance | Penalty per Day |
|---|---|
| 1st through 30th day after deadline | $1000 |
| 31st through 60th day after deadline | $2500 |
| Beyond 60th day after deadline | $5,000, or an amount equal to 1.2 times the economic benefit of non-compliance, whichever is greater |

**43.    In Paragraph 163, change the Subpart NSPS references "NSPS Subparts J/Ja" to "NSPS Subpart Ja".**

**44.    Replace Subparagraph 165.e with the following new Subparagraph 165.e:**

e.    Failure to implement the requirements of Paragraph 112 (Valve Preventive

Maintenance Program):

          i.        For failure to install a Low-E Valve or a valve fitted with Low-E Packing when required to do so pursuant to Subparagraph 112.b.ii or 112.b.iii: $300 per valve.

          ii.       For failure to install a Low-E Valve or a valve fitted with Low-E Packing when required to do so pursuant to Subparagraph 112.b.iv: $10,000 per valve.

          iii.      For each failure to record information as required pursuant to Subparagraphs 112.c, 112.e, and 112.f: $100 per valve.

**45.    Replace Paragraph 167 with the following new Paragraph 167:**

167.    [Reserved]

**46.    Add the following new Paragraph 178A to Part XII (Stipulated Penalties):**

178A.  Limetree Bay shall not be liable for any stipulated penalties for non-compliance with Consent Decree requirements where:

          a.       the non-compliance began and ended on or prior to January 4, 2016, or

          b.       the non-compliance began prior to January 4, 2016 and continued on or after January 4, 2016 for a failure by HOVENSA to timely and fully comply with a submission, notice, recordkeeping, or reporting requirement under the Consent Decree, or

          c.       the non-compliance began prior to the Date of Lodging of the First Modification and the Consent Decree requirement was changed, deleted, replaced, or the deadline extended by the First Modification and Limetree Bay complies with the changed, deleted, replaced, or extended requirement or deadline. Limetree Bay will be liable for stipulated penalties, if it fails to comply with the changed, replaced, or extended Consent Decree

requirement or deadline.

Except as set forth in Subparagraph 178A.b or 178A.c, where non-compliance occurred and/or continued on/or after January 4, 2016, regardless of when the non-compliance began, Limetree Bay shall be responsible for stipulated penalties for such continuing non-compliance but only for the time period on/or after January 4, 2016.

**47.    Replace Part XVII with the following new Part XVII:**

**XVII.  <u>EFFECT OF SETTLEMENT</u>**

199.    Definitions.   For purposes of this Part XVII (Effect of Settlement), the following definitions apply:

a.    "Applicable NSR/PSD Requirements" shall mean:

i.    PSD requirements at Part C of Subchapter I of the Act, 42 U.S.C. § 7475, and the regulations promulgated thereunder at 40 C.F.R. §§ 52.21 and 51.166; and the portions of the applicable SIP and related rules adopted as required by 40 C.F.R. §§ 51.165 and 51.166;

ii.    Any Title V regulations that implement, adopt, or incorporate the specific regulatory requirements identified above; any applicable federally-enforceable territorial regulations that implement, adopt, or incorporate the specific federal regulatory requirements identified above; any Title V permit provisions that implement, adopt, or incorporate the specific regulatory requirements identified above; and

iii.    Any applicable territorial laws or regulations that implement, adopt, or incorporate the specific federal regulatory requirements identified above

74

regardless of whether such laws or regulations have been formally approved by EPA as part of the applicable State Implementation Plan.

b.      "Applicable NSPS Subparts A and J Requirements" shall mean the standards, monitoring, testing, reporting, and recordkeeping requirements found at 40 C.F.R. §§ 60.100 through 60.109 (Subpart J) relating to a particular pollutant and a particular affected facility, and the corollary general requirements found at 40 C.F.R. §§ 60.1 through 60.19 (Subpart A) that are applicable to any affected facility covered by Subpart J.  This term shall also include the requirements of 12 VIRR Section 204-45, "Standards of Performance for Sulfur Recovery Units at Petroleum Refineries."

c.      "Applicable NSPS Subparts A and Ja Requirements" shall mean the standards, monitoring, testing, reporting, and recordkeeping requirements found at 40 C.F.R. § 60.100a through 60.109a (Subpart Ja) relating to a particular pollutant and a particular affected facility, and the corollary general requirements found at 40 C.F.R. §§ 60.1 through 60.19 (Subpart A) that are applicable to any affected facility covered by Subpart Ja.

d.      "Applicable NSPS Subparts A and D Requirements" shall mean the standards, monitoring, testing, reporting, and recordkeeping requirements found at 40 C.F.R. §§ 60.40 through 60.46 (Subpart D) relating to a particular pollutant and a particular affected facility, and the corollary general requirements found at 40 C.F.R. §§ 60.1 through 60.19 (Subpart A) that are applicable to any affected facility covered by Subpart D.

e.      "Applicable NSPS Subparts A and GG Requirements" shall mean the standards, monitoring, testing, reporting, and recordkeeping requirements found at 40 C.F.R. §§ 60.330 through 60.335 (Subpart GG) relating to a particular pollutant and a particular affected

EPA-594

facility, and the corollary general requirements found at 40 C.F.R. §§ 60.1 through 60.19 (Subpart A) that are applicable to any affected facility covered by Subpart GG.

      f.     "Applicable NSPS Subparts A and QQQ Requirements" shall mean the standards, monitoring, testing, reporting, and recordkeeping requirements found at 40 C.F.R. §§ 60.690 through 60.699 (Subpart QQQ) relating to a particular pollutant and a particular affected facility, and the corollary general requirements found at 40 C.F.R. §§ 60.1 through 60.19 (Subpart A) that are applicable to any affected facility covered by Subpart QQQ.

      g.     "Benzene Waste NESHAP Requirements" shall mean the requirements imposed by the National Emission Standard for Benzene Waste Operations, 40 C.F.R. Part 61, Subpart FF, and any applicable territorial regulations that implement, adopt or incorporate the Benzene Waste NESHAP.

      h.     "Delayed Coker Unit Project" or "Coker Project" shall mean the equipment that was newly constructed or modified between August 19, 1999 and May 8, 2002 as follows: Coker Unit process equipment and associated gas plant, process heaters, H-8501 and H-8502, Boiler No. 10, No. 7 Amine, No. 6 Sour Water Stripper, sour water tank, pitch storage tank, desalter effluent water tank, coke cutting water tank, coke pit, Nos. 1 and 2 Sulfur Recovery Plants and associated No. 1 Beavon, the process equipment located in the No. 5 Crude, No. 3 Vacuum, No. 3 Crude, No. 1 Vacuum, No. 1 Visbreaker, and Numbers. 2, 4, 6, and 7 Distillate Desulfurizing Units, and outside battery limit modifications to the terminal, tank farm and blending equipment.

      i.     "Limetree Bay" shall include Limetree Bay Terminals, LLC, Limetree Bay Refining, LLC, and except with respect to Paragraph 206, HOVENSA.

      j.     "LDAR Requirements" shall mean the requirements relating to equipment

in light liquid service and gas/vapor service set forth at 40 C.F.R. Part 60, Subparts, VV, VVa, GGG and GGGa; 40 C.F.R. Part 61, Subparts J and V; and 40 C.F.R. Part 63, Subparts F, H, and CC; and any applicable territorial regulations or State Implementation Plan requirements that implement, adopt or incorporate those federal regulations or set similar standards.

k. "Post-Lodging Compliance Dates" shall mean any dates in this Part XVII (Effect of Settlement) after the Date of Lodging. Post-Lodging Compliance Dates include dates certain (e.g., "December 31, 2019"), dates after Lodging represented in terms of "months after Lodging" (e.g., "12 months after the Date of Lodging" or "12 months after Date of Lodging of the First Modification"), and dates after the Date of Lodging represented by actions taken (e.g., "comply with"). The Post-Lodging Compliance Dates represent the dates by which work is required to be completed or an emission limit is required to be met under the applicable provisions of the Consent Decree.

200. <u>Liability Resolution Regarding the Applicable NSR/PSD Requirements</u>. With respect to emissions of the following pollutants from the following units, entry of the Consent Decree resolves all civil liability of Limetree Bay to the United States and the Virgin Islands: (1) for violations of the Applicable NSR/PSD Requirements resulting from the construction or modification of the following units that occurred prior to the Date of Lodging, and that commenced and ceased prior to the Date of Lodging; and (2) for any violations of the Applicable NSR/PSD Requirements resulting from pre-Date of Lodging construction or modification of the following units, that commenced prior to the Date of Lodging and continued up to the following dates:

| Unit | Pollutant | Date |
|------|-----------|------|
| FCCU | $NO_x$ | Date of Entry of the Consent Decree |

|                        | SO$_2$ | Date of Entry of the Consent Decree |
|                        | PM     | Date of Entry of the Consent Decree |
| Heaters, boilers, Generating Turbines, and Compressor Engines | NO$_x$ | December 31, 2019 |
|                        | SO$_2$ | Date of Entry of the Consent Decree |
| Coker Project          | H$_2$S | December 31, 2012 |

The limits for VOC, CO, H$_2$S, NO$_x$, SO$_2$, PM, PM-10, and PM$_{2.5}$ contained in VIDPNR Permit STX-557A-E-02 for the Coker Project were intended to limit the emissions of these pollutants for purposes of avoiding permitting pursuant to 40 C.F.R. § 52.21. Section VIII.A establishes injunctive relief to resolve EPA's September 18, 2007 NOV, CAA-02-2007-1313, issued to HOVENSA. Limetree Bay may seek relaxation of the emissions limits in Permit STX-557A-E 02 and STX-557-I-00 pertaining to VOC, CO, H$_2$S, NO$_X$, SO$_2$, PM-10, PM, and PM$_{2.5}$, or Reduced Sulfur Compounds upon compliance with the interim limit for the Coker Steam Vents as specified in Subparagraph 132.a and with the interim limit for Beavon Unit #1 as specified in Appendix H ("Additional Coker Project Injunctive Relief"), and all other injunctive relief specified in Appendix H. Such relaxations will not be deemed to constitute a major modification to the Refinery within the meaning of 40 C.F.R. § 52.21(r)(4) and the requirements of Subparagraphs (j) through (s) of 40 C.F.R. § 52.21 shall not apply by virtue of such relaxations.

201.    Conditional Resolution of Liability for CO Emissions Under the Applicable NSR/PSD Requirements. With respect to emissions of CO from the FCCU, if and when Limetree Bay accepts an emissions limit pursuant to Paragraph 19 of the Consent Decree and demonstrates compliance using CEMS at the FCCU, then any civil liability of Limetree Bay to

the United States and the Virgin Islands shall be resolved for violations of the Applicable NSR/PSD Requirements relating to CO emissions at the FCCU resulting from pre-Date of Lodging construction or modification of the FCCU that either ceased prior to the Date of Lodging or continued up to the date on which Limetree Bay demonstrates compliance with such CO emissions limit.

202.    Reservation of Rights Regarding Applicable NSR/PSD Requirements: Release for Violations Continuing After the Date of Lodging Can Be Rendered Void. Notwithstanding the resolution of liability in Paragraphs 200 and 201, the releases of liability by the United States and the Virgin Islands to Limetree Bay for violations of the Applicable NSR/PSD Requirements during the period between the Date of Lodging and the Post- Lodging Compliance Dates shall be rendered void if Limetree Bay materially fails to comply with the corresponding obligations and requirements of Part V (Affirmative Relief/Environmental Projects), Sections V.A through V.E (relating to the FCCU), Sections V.F through V.H (relating to heaters, boilers, Generating Turbines and Compressor Engines), and Part VIII (Additional Injunctive Relief); provided, however, that the releases in Paragraphs 200 and 201 shall not be rendered void if Limetree Bay remedies such material failure and pays any stipulated penalties due as a result of such material failure.

203.    Exclusions from Release Coverage Regarding Applicable NSR/PSD Requirements in the Consent Decree: Construction and/or Modification Not Covered. Notwithstanding the resolution of liability in Paragraphs 200 and 201, nothing in the Consent Decree precludes the United States or the Virgin Islands from seeking injunctive relief, penalties, or other appropriate relief from Limetree Bay for violations by Limetree Bay of the Applicable NSR/PSD Requirements resulting from: (i) construction or modification that commenced prior

to the Date of Lodging, if the resulting violations relate to pollutants or units not covered by the Consent Decree; or (ii) any construction or modification that commences after the Date of Lodging.

204.    <u>Evaluation of Applicable NSR/PSD Requirements.</u> Increases in emissions from units covered by the Consent Decree, where the increases result from construction or modification of any units within the Refinery, after January 4, 2016, are beyond the scope of the release in Paragraphs 200 and 201, and Limetree Bay is not relieved from any obligation to evaluate any such increases in accordance with the Applicable NSR/PSD Requirements.

205.    <u>Resolution of Liability Regarding Applicable NSPS Requirements</u>. With respect to emissions of the following pollutants from the following units, entry of the Consent Decree resolves all civil liability of Limetree Bay to the United States and the Virgin Islands for violations of the applicable NSPS Subparts, referenced in Paragraph 199.b through f, listed below from the date that the claims of the United States and the Virgin Islands accrued up to the specified Post-Lodging Compliance Date:

| Unit | Applicable NSPS Subpart | Pollutant | Date |
|------|-------------------------|-----------|------|
| FCCU | A and J | SO$_2$, CO, and PM | Date of Lodging of the Consent Decree |
| | | PM (opacity monitoring requirements) | Date of AMP approval receipt (see Paragraph 22) |
| FCCU Turboexpander Vents | A and J | SO$_2$, CO, PM (opacity) | Date of Lodging of the Consent Decree |
| All fuel gas combustion devices listed in Appendix C ("NSPS Subpart J or Ja Compliance Schedule for Listed Fuel Gas Combustion Devices (Other than Flaring Devices)") | A, J, and Ja, as applicable | SO$_2$ | Dates listed in Appendix C ("NSPS Subpart J or Ja Compliance Schedule for Listed Fuel Gas Combustion Devices (Other than Flaring Devices)") |
| Flaring Devices | A, J, and Ja | SO$_2$ | Dates listed in Appendix D ("List of Flaring Devices Subject to NSPS Subpart Ja") |
| East Side SRP | A, J and Ja | SO$_2$ and TRS | April 1, 2015 |
| West Side SRP | A, J and Ja | SO$_2$ and TRS | December 31, 2011 |
| Generating Turbines 1-3 and 6 | A and GG | NO$_x$ and SO$_2$ | Five (5) years from Date of Entry of the Consent Decree |
| Generating Turbines 4, 7 and 8 | A and GG | NO$_x$ and SO$_2$ | December 31, 2020 |
| Generating Turbine 5 and 9 | A and GG | NO$_x$ and SO$_2$ | Date of Lodging of the First Modification |
| Boilers 5, 8, and 9 | A and D | NO$_x$, SO$_2$, and PM | July 31, 2012 (or 12/31/2015 for Boiler 5 if replaced) |
| The FCCU and Coker Drain Systems | A and QQQ | VOC | December 31, 2012 |

206. <u>Reservation of Rights Regarding Applicable NSPS Requirements:  Release for Violations Continuing After the Date of Lodging Can Be Rendered Void</u>.  Notwithstanding the resolution of liability in Paragraph 205, the releases of liability by the United States and the Virgin Islands to Limetree Bay for violations of the applicable NSPS Subparts listed in Paragraph 205 shall be rendered void if Limetree Bay fails to comply with the obligations and requirements of Parts V (Affirmative Relief/Environmental Projects), VI (Permitting) and VIII (Additional Injunctive Relief) (relating to NSPS requirements); provided, however, that the releases in Paragraph 205 shall not be rendered void if Limetree Bay remedies such failure and pays any stipulated penalties due as a result of such failure.

207. <u>Resolution of Liability for Coker Project</u>. Entry of the Consent Decree resolves all civil and administrative liability, commencing with the beginning of construction of the Coker Project through completion of the injunctive relief required pursuant to Paragraphs 132 through 134, of Limetree Bay to the United States and Virgin Islands for the following:

a.    EPA's November 22, 2006 NOV, CAA-02-2007-1303, issued to HOVENSA for alleged violations arising under HOVENSA's Coker Operating Permit STX-557A-E-02, and HOVENSA's written notification dated January 9, 2008, to the Virgin Islands of calculated exceedances on January 2, 2008, of Coker Process Heater (H-8501B) of PM and VOC limits in the Coker Operating Permit;

b.    The findings of violation in Paragraphs 49 through 55 of EPA's September 18, 2007 NOV, CAA-02-2007-1313, issued to HOVENSA, and any other violations of the permitting regulations cited in Paragraphs 49 through 55 of the NOV with respect to the Coker Project; and

c.    EPA's March 20, 2007 Compliance Order, CAA-02-2007-1004, as

amended on April 5, 2007 by Compliance Order, CAA-02-2007-1004a, arising from

HOVENSA's alleged failure to provide complete responses to EPA's December 21, 2006

Information Request Letter, issued pursuant to § 114 of the Clean Air Act.

      208.   <u>Resolution of Liability Regarding Benzene Waste NESHAP Requirements</u>. Entry

of the First Modification of the Consent Decree resolves all civil liability of Limetree Bay to the

United States and the Virgin Islands for violations of the statutory and regulatory requirements

set forth below in Subparagraphs a - c that (i) commenced and ceased prior to the Date of Entry

of the First Modification, and/or (ii) commenced prior to the Date of Entry of the First

Modification and continued past the Date of Entry of the First Modification (including violations

discovered after the Date of Entry of the First Modification for BWON Equipment returned to In

Regulated Service on or after the Date of Entry of the First Modification), provided that the

events giving rise to such violations are identified by Limetree Bay in its BWON Compliance

Review and Verification Report submitted pursuant to Paragraph 79 and corrected by Limetree

Bay as required under Paragraph 80.

      a.   <u>Benzene Waste NESHAP</u>. The National Emission Standard for Benzene

Waste Operations, 40 C.F.R. Part 61, Subpart FF, promulgated pursuant to Section 112(e) of the

Act, 42 U.S.C. § 7412(e), including any federal regulation that adopts or incorporates the

requirements of Subpart FF by express reference, but only to the extent of such adoption or

incorporation;

      b.   Any applicable, federally-enforceable permits or territorial regulations that

implement, adopt, or incorporate the specific federal regulatory requirements identified in

Subparagraph a.

      c.   Any applicable territorial regulations enforceable by the Virgin Islands

that implement, adopt, or incorporate the specific federal regulatory requirements identified in Subparagraph a.

209.    <u>Resolution of Liability Regarding LDAR Requirements</u>.  Entry of the First Modification of the Consent Decree resolves all civil liability of Limetree Bay to the United States and the Virgin Islands for violations of the statutory and regulatory requirements set forth below in Subparagraphs a - c that (i) commenced and ceased prior to the Date of Entry of the First Modification, and/or (ii) commenced prior to the Date of Entry of the First Modification and continued past the Date of Entry of the First Modification (including violations discovered after the Date of Entry of the First Modification for LDAR Equipment returned to In Regulated Service on or after the Date of Entry of the First Modification), provided that the events giving rise to such violations are identified by Limetree Bay in its Initial Compliance Audit Report submitted pursuant to Subparagraph 106.a and corrected by Limetree Bay as required under Paragraph 107:

a.    <u>LDAR Requirements</u>.  For all equipment in light liquid and gas and/or vapor service, the LDAR requirements promulgated by EPA pursuant to Sections 111 and 112 of the Clean Air Act and codified at 40 C.F.R. Part 60, Subparts VV, VVa, GGG and GGGa, 40 C.F.R. Part 61, Subparts J and V, and 40 C.F.R. Part 63, Subparts F, H, and CC;

b.    Any applicable, federally-enforceable permits or territorial regulations that implement, adopt, or incorporate the specific regulatory requirements identified in Subparagraph a; and

c.    Any applicable territorial regulations or permits enforceable by the Virgin Islands that implement, adopt, or incorporate the specific regulatory requirements identified in Subparagraph a.

210.    <u>Reservation of Rights Regarding Benzene NESHAP and LDAR Requirements</u>. Notwithstanding the resolution of liability in Paragraphs 208 and 209, nothing in the Consent Decree precludes the United States and/or the Virgin Islands from seeking from Limetree Bay injunctive and/or other equitable relief or civil penalties for violations by Limetree Bay of Benzene Waste NESHAP and/or LDAR requirements that (i) commenced and ceased prior to the Date of Entry of the First Modification, and/or (ii) commenced prior to the Date of Entry of the First Modification and continued after the Date of Entry of the First Modification (including violations discovered after the Date of Entry of the First Modification for BWON and LDAR Equipment returned to In Regulated Service on or after the Date of Entry of the First Modification) if Limetree Bay fails to identify and address such violations as required by Paragraphs 79, 80, 106.a, and 107.

211.    <u>Audit Policy</u>. Nothing in the Consent Decree is intended to limit or disqualify Limetree Bay, on the grounds that information was not discovered and supplied voluntarily, from seeking to apply EPA's Audit Policy to any violations or noncompliance that Limetree Bay discovers during the course of any investigation, audit, or enhanced monitoring that Limetree Bay is required to undertake pursuant to the Consent Decree.

212.    <u>Claim/Issue Preclusion</u>. In any subsequent administrative or judicial proceeding initiated by the United States or the Virgin Islands for injunctive relief, penalties, or other appropriate relief relating to Limetree Bay violations of the PSD/NSR, NSPS, Benzene Waste NESHAP, and/or LDAR requirements not identified in this Part XVII (Effect of Settlement):

a.    Limetree Bay shall not assert, and may not maintain, in any subsequent administrative, civil, or criminal action commenced by the United States or the Virgin Islands any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue

preclusion, or claim-splitting.  Nor may Limetree Bay assert or maintain any other defenses based upon any contention that the claims raised by the United States or the Virgin Islands in the subsequent proceeding should have been brought in the instant case. Nothing in the preceding sentences is intended to affect the ability of Limetree Bay to assert that the claims are deemed resolved by virtue of this Part XVII (Effect of Settlement).

        b.     Except as set forth in Subparagraph a, the United States and the Virgin Islands may not assert or maintain that the Consent Decree constitutes a waiver or determination of, or otherwise obviates, any claim or defense whatsoever, or that the Consent Decree constitutes acceptance by Limetree Bay of any interpretation or guidance issued by EPA related to the matters addressed in the Consent Decree.

      213.   <u>Imminent and Substantial Endangerment</u>.  Nothing in the Consent Decree shall be construed to limit the authority of the United States and the Virgin Islands to undertake any action against any person, including Limetree Bay, to abate or correct conditions which may present an imminent and substantial endangerment to the public health, welfare, or the environment.

      213A. The resolution of liability in Paragraphs 200, 201, 205, 207, 208, and 209 of the Consent Decree shall not be rendered void by the inability of an Idled Unit or BWON and LDAR Equipment not In Regulated Service to demonstrate compliance with an applicable Consent Decree requirement during the time that the Idled Unit was not operating or the BWON and LDAR Equipment was not In Regulated Service, until the unit or equipment demonstrates compliance as required by Paragraph 229A.b.  In accordance with Paragraph 229A, Idled Units and BWON and LDAR Equipment not In Regulated Service that comply with Subparagraph 229A.b, shall be considered in compliance with the Consent Decree for purposes of Section V.M

(Stipulated Penalties Under This Section) and Part XII (Stipulated Penalties).

**48.    Replace Paragraph 221 with the following new Paragraph 221.**

221.    <u>Post-Lodging, Pre-Entry Obligations</u>.  Obligations of Limetree Bay under this Consent Decree to perform duties after the Date of Lodging of the First Modification but prior to the Date of Entry of the First Modification shall be legally enforceable only on or after the Date of Entry of the First Modification.  Liability for stipulated penalties, if applicable, shall accrue for violations of such obligations, and the United States or the Virgin Islands may demand payment as provided in the Decree, provided that stipulated penalties accruing between the Date of Lodging of the First Modification and the Date of Entry of the First Modification may not be collected unless and until the First Modification of the Consent Decree is entered by the Court.

**49.    Replace Paragraph 225 with the following new Paragraph 225:**

225.    <u>Notice</u>.  Unless otherwise provided herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

<u>As to the United States, by email</u>:

> Eescdcopy.enrd@usdoj.gov
> Re: DJ# 90-5-2-1-08229/1

As to the United States, by mail:

> EES Case Management Unit
> Environment and Natural Resources Division
> U.S. Department of Justice
> P.O. Box 7611
> Washington, DC 20044-7611
> DJ# 90-5-2-1-08229/1

As to EPA Headquarters, by mail:

> Director
> Air Enforcement Division

Office of Civil Enforcement (2242A)
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, DC 20044

Director
Air Enforcement Division
Office of Civil Enforcement
c/o Matrix New World Engineering, Inc.
26 Columbia Turnpike, Suite 200
Florham Park, NJ 07932-2213

And an electronic copy, in .pdf format, to:

foley.patrick@epa.gov

As to EPA Region 2, by mail:

Director
Enforcement and Compliance Assurance Division
U.S. EPA Region 2
290 Broadway, 21st Floor
New York, NY 10007-1866

United States Environmental Protection Agency
Region 2
Office of Regional Counsel
290 Broadway
New York, NY 10007

Director, Caribbean Environmental Protection Division
U.S. EPA Region 2
City View Plaza II, Suite 7000
#48 Rd. 165 km 1.2
Guaynabo, PR 00968-8069

And an electronic copy, in .pdf format, to:

patel.harish@epa.gov

At its option, in lieu of submitting hardcopies to EPA Headquarters and EPA Region 2 by mail,
Limetree Bay may submit electronically, in .pdf format, all notifications, submissions, or

EPA-607

communications  that are required by this Consent Decree to:

> jmack@matrixneworld.com
> foley.patrick@epa.gov
> patel.harish@epa.gov

As to the United States Virgin Islands and VIDPNR, by mail and hand-delivery:

> Director, Division  of Environmental  Protection
> Virgin  Islands Department of Planning  and Natural Resources
> 45 Estate Mars Hill
> Frederiksted, St. Croix, U.S. Virgin Islands  00840-4474

And an electronic  copy, in .pdf format, to:

> jp.oriol@dpnr.vi.gov

As to Limetree Bay:

> Limetree  Bay Terminals,  LLC
> General Counsel
> One Estate Hope
> Christiansted,  USVI 00820
> dmolloy@lbenergy.com

> Limetree  Bay Refining,  LLC
> General Counsel
> One Estate Hope
> Christiansted,  USVI 00820
> dmolloy@lbenergy.com

And electronic  copy, in .pdf format, to:

> celizee@lbenergy.com
> rbiggs@lbenergy.com
> leannjohnson@perkinscoie.com

As to the ERT:

> Roberto Puga
> PathForward Consulting  Inc.
> 32915 Danaoak
> Dana Point, CA 92629
> rpuga@pathforwardconsult.com

Mary Koks
Munsch Hardt Kopf & Harr P.C.
700 Milam Street
Suite 2700
Houston, TX 77002-2806

     a.     Unless otherwise provided herein, notifications, submissions or communications between the Parties shall be deemed submitted on the date they are postmarked and sent by U.S. Mail or overnight mail, postage prepaid, or the date of electronic submissions, as applicable.  Notices under Part XV (Force Majeure) and Part XVI (Retention of Jurisdiction/Dispute Resolution) shall be sent by overnight mail or by certified or registered mail, return receipt requested.

     b.     Notifications to or communications mailed to Limetree shall be deemed to be received on the earlier of (i) actual receipt by Limetree or (ii) receipt of an electronic version sent to the addressees set forth in this Paragraph.

     c.     If the date for submission of a report, study, notification, or other communication falls on a Saturday, Sunday, or federal or territorial holiday, the report, study, notification, or other communication will be deemed timely if it is submitted the next Working Day.

**50.    Add the following sentence to Paragraph 229.**

As of the Date of Entry of the First Modification, the emissions units listed in Appendix N have been permanently Shutdown.

**51.    Add the following new Paragraph 229A "Effect of Idling" to Part XVIII (General Provisions):**

    229A.  Effect of Idling

Case: 1:11-cv-00006-WAL-GWC    Document #: 22-1    Filed: 04/26/20    Page 91 of 158

a.      Stipulated Penalties for Idled Units and BWON and LDAR Equipment Not in Regulated Service.

    i.      Idled Units and BWON and LDAR Equipment not In Regulated Service that comply with Subparagraph 229A.b, shall be considered in compliance with the Consent Decree for purposes of Section V.M (Stipulated Penalties Under This Section) and Part XII (Stipulated Penalties).

    ii.      Limetree Bay shall not be required to report, pursuant to the Consent Decree, non-compliance with the Consent Decree requirements applicable to an Idled Unit or BWON and LDAR Equipment not In Regulated Service prior to the Restart of the Idled Unit or BWON and LDAR Equipment.

b.      Restart of Idled Units, and BWON and LDAR Equipment not In Regulated Service.

    i.      Idled Units and BWON and LDAR Equipment not In Regulated Service shall comply with the applicable Consent Decree requirements upon Restart of an Idled Unit or after BWON and LDAR equipment is placed back In Regulated Service, unless an exception applies as provided in Subparagraph 229A.b.ii.

    ii.      Appendix L Restart Compliance Exceptions.

    (1)      Idled Units and BWON and LDAR Equipment not In Regulated Service that are subject to an exception in Appendix L ("Exceptions for Compliance on Restart") and that comply with applicable Appendix L requirements shall be considered in compliance with the corresponding Consent Decree requirements for purposes of Section V.M

(Stipulated Penalties for Acid Gas Flaring) and Part XII (Stipulated Penalties).

(2)    If Limetree Bay fails to meet an interim FCCU emission limit established in Appendix L, Limetree Bay shall be subject to the stipulated penalties under Paragraph 151.

(3)    For Idled Units and BWON and LDAR Equipment not In Regulated Service that are subject to an Appendix L exception for Consent Decree stack testing, performance testing, or monitoring requirements, Limetree Bay shall be subject to stipulated penalties for violating the corresponding applicable Consent Decree requirement from the Day after the applicable Appendix L deadline.

iii.    If an Idled Unit is required by the Consent Decree to comply with a 365-Day rolling average, 7-Day rolling average or other emission rate based on an average of emissions for more than one Operating Day or hour in an Operating Day, compliance with the emissions limit shall be determined by using emissions data from Operating Days after Restart.

**52.    Replace Subparagraph 234.e with the following new Subparagraph 234.e:**

e.    Application for and receipt of permits incorporating the emission limits and standards in Appendix O; and

**53.    Add the following new Paragraph 234A to Part XIX (Termination):**

234A.  Exceptions to Conditions Precedent to Termination:

The conditions precedent to termination in Subparagraphs 234.b and f, to comply with all provisions contained in the Consent Decree, and operate for at least one (1) year in compliance

with the emission limits established in the Consent Decree, shall not apply to a unit that is an Idled Unit and has not yet demonstrated compliance with specifically identified Consent Decree requirements applicable to the unit in Part V (Affirmative Relief / Environmental Projects) because, except for Flare 7, the unit has not operated since June 1, 2012, or for Flare 7, the unit has not operated after it was isolated and Shutdown as provided in Paragraph 50E.

At such time as Limetree Bay believes it has satisfied the requirements to move for termination under Paragraph 234, Limetree Bay may satisfy the requirements of Subparagraphs 234.b and f by certifying that: (a) the unit is an Idled Unit, (b) for units other than Flare 7, that there have been no emissions from the Idled Unit since June 1, 2012, or for Flare 7, there have been no emissions from Flare 7 after it was isolated and Shutdown as provided in Paragraph 50E, and (c) that all surviving emission limits and standards applicable to the Idled Unit are incorporated into permits as required by Paragraphs 124 - 126 and Appendix O. Neither the United States nor the Virgin Islands shall object to Limetree Bay's certification on the grounds that Limetree Bay failed to complete Consent Decree requirements applicable to an Idled Unit if Limetree Bay was not able to do so because, for units other than Flare 7, the unit has not operated since June 1, 2012, or for Flare 7, the unit has not operated after it was isolated and Shutdown as provided in Paragraph 50E.

**54.    Replace Paragraph 235 with the following New Paragraph 235:**

235.    <u>Termination: Procedure</u>. At such time as Limetree Bay believes that it has satisfied the requirements for termination set forth in Paragraph 234, Limetree Bay will certify such compliance and completion to the United States and the Virgin Islands in accordance with the certification language of Paragraph 231. Unless either the United States or the Virgin Islands objects in writing with specific reasons within 120 days of receipt of Limetree Bay's certification

under this Paragraph, the Court may upon motion by Limetree Bay order that this Consent

Decree be terminated. At the time the Court orders the Consent Decree to be terminated, any

remaining monies in the TSEP Escrow Account shall be disbursed to the VIDPNR in accordance

with Subparagraph 137.e. If either the United States or the Virgin Islands objects to the

certification submitted by Limetree Bay, then the matter will be submitted to the Court for

resolution under Part XVI (Retention of Jurisdiction/Dispute Resolution). In such case, Limetree

Bay will bear the burden of proving that this Consent Decree should be terminated.

HOVENSA's certification of completion in Appendix Q may be used by Limetree Bay to satisfy

the requirements for certification in Paragraphs 230 and 231, subject to Paragraphs 232 (EPA

review) and 233 (stipulated penalties), for purposes of satisfying the requirements for

termination of the Consent Decree.

**55.    Replace the following appendices with the following new appendices, which are**

**attached:**

Appendix C    NSPS Subparts J or Ja Compliance Schedule for Listed Fuel Gas Combustion
Devices (Other than Flaring Devices)

Appendix D    List of Flaring Devices Subject to NSPS Subpart Ja

Appendix E    Limetree Bay's LDAR and BWON Training Program Summary

Appendix F    Method 21 Monitoring Locations for API Separators 1, 2, and 3

Appendix G    [Reserved]

Appendix H    Additional Coker Project Injunctive Relief

**56.    Add the following new appendices, which are attached:**

Appendix J    In Service Units and the BWON and LDAR Equipment In Regulated Service

Appendix K    List of Idled Units

Appendix L    Exceptions for Compliance on Restart

Appendix M   Process and Factors for "Commercial Unavailability" of Low-E Valve or Packing

Appendix N   Emissions Units Permanently Shutdown as of June 1, 2019

Appendix O   Requirements That Shall Survive Termination of the Consent Decree

Appendix P   Flaring Mitigation Projects

Appendix Q   HOVENSA Certification

Appendix R   Map of Refinery

Appendix S   Map of H$_2$S Monitoring Locations

**57.**     The Table of Appendices will be revised consistent with Paragraphs 55 and 56 of the First Modification.

**58.**     Except as specifically provided in the First Modification, all other terms and conditions of the Consent Decree remain unchanged and in full effect.

**59.**     No party to the First Modification (the United States, the Virgin Islands, HOVENSA, Limetree Bay, and the ERT) will oppose entry of the First Modification by this Court or challenge any provision of the First Modification unless the United States has notified each of those parties, in writing, that the United States no longer supports entry of the First Modification.


SO ORDERED, THIS _____ DAY OF _____, 2020.


_____
VIRGIN ISLANDS DISTRICT JUDGE

THE UNDERSIGNED PARTY enters into the First Modification of the Consent Decree

in the matter of United States, et al. v. HOVENSA L.L.C.

FOR PLAINTIFF THE UNITED STATES
OF AMERICA:

JEFFREY BOSSERT CLARK
Assistant Attorney General
Environment and Natural Resources
Division
United States Department of Justice

Date: _8/21/2020_            _Myles E. Flint, II_

MYLES E. FLINT, II
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources
Division
United States Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
(202) 307-1859

GRETCHEN C.F. SHAPPERT
United States Attorney
District of the Virgin Islands
Federal Building and U.S. Courthouse
5500 Veterans Drive, Room 260
St. Thomas, USVI 00802

96

THE UNDERSIGNED PARTY enters into the First Modification of the Consent Decree in the matter of United States, et al. v. HOVENSA L.L.C.

FOR THE UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY:

Date: 7/27/20

SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency


ROSEMARIE A. KELLEY
Director
Office of Civile Enforcement
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency


EVAN BELSER
Acting Director
Air Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency

THE UNDERSIGNED PARTY enters into the First Modification of the Consent Decree in the matter of United States, et al. v. HOVENSA L.L.C.

FOR PLAINTIFF THE UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY
REGION 2:

Date: _____

ERIC SCHAAF    Digitally signed by ERIC SCHAAF
Date: 2020.07.15 17:31:49 -04'00'

ERIC SCHAAF
Regional Counsel
United States Environmental Protection
Agency
Region 2
290 Broadway
New York, NY 10007-1866

OF COUNSEL:

FLAIRE MILLS
Associate Regional Counsel
United States Environmental Protection Agency
Region 2
290 Broadway
New York, NY 10007-1866

THE UNDERSIGNED PARTY enters into the First Modification of the Consent Decree

in the matter of United States, et al v. HOVENSA L.L.C.

FOR PLAINTIFF THE UNITED STATES
VIRGIN ISLANDS:

Date: July 21, 2020

PAMELA R. TEPPER
Solicitor General
U.S. Virgin Islands Department of Justice
34-38 Kronprindsens Gade
GERS Complex, 2nd Floor
St. Thomas, VI 00802

JEAN-PIERRE L. ORIOL
Commissioner
Government of the United States Virgin
Islands
Department of Planning & Natural
Resources
45 Estate Mars Hill
Frederiksted, VI 00840

99

THE UNDERSIGNED PARTY enters into the First Modification of the Consent Decree

in the matter of United States, et al v. HOVENSA L.L.C.


FOR DEFENDANT HOVENSA L.L.C.:

Date: 7/13/2020

MATTHEW R. KAHN
c/o Alvarez & Marsal North America, LLC
Attn: Tom Hill
540 W. Madison St, 18th Floor
Chicago, IL 60661

THE UNDERSIGNED PARTY enters into the First Modification of the Consent Decree

in the matter of United States, et al v. HOVENSA L.L.C.


FOR LIMETREE BAY TERMINALS, LLC:

Date: _6/18/20_

BRIAN K. LEVER
President and Chief Executive Officer
Limetree Bay Terminals, LLC
One Estate Hope
Christiansted, USVI 00820

THE UNDERSIGNED PARTY enters into the First Modification of the Consent Decree

in the matter of United States, et al v. HOVENSA L.L.C.

FOR LIMETREE BAY REFINING, LLC:

Date: ___6/18/20___

_____

BRIAN K. LEVER
President
Limetree Bay Refining, LLC
One Estate Hope
Christiansted, USVI 00820

THE UNDERSIGNED PARTY enters into the First Modification of the Consent Decree in the matter of United States, et al v. HOVENSA L.L.C.

FOR THE ENVIRONMENTAL
RESPONSE TRUST:

Date: 7/9/20

ROBERTO PUGA,
Agent for PathForward Consulting Inc. not in its individual capacity, but solely as the Trustee of the Hovensa Environmental Response Trust
One World Trade Center, 8th Floor
Long Beach, CA 90831

103

**APPENDIX C**
**NSPS SUBPARTS J OR JA COMPLIANCE SCHEDULE FOR LISTED FUEL GAS**
**COMBUSTION DEVICES (OTHER THAN FLARING DEVICES)**

| FUEL GAS COMBUSTION DEVICES FOR WHICH COMPLIANCE RESPONSIBILITY IS ASSIGNED TO THE ERT | | |
|---|---|---|
| Unit | | Date of Compliance With Subpart J Fuel Gas Limit |
| VER-1* | VER-1 | Date of Lodging |
| VER-2* | VER-2 | Date of Lodging |
| * Compliance based upon AMP submittal for EPA approval | | |

| FUEL GAS COMBUSTION DEVICES FOR WHICH COMPLIANCE RESPONSIBILITY IS ASSIGNED TO LIMETREE BAY | | |
|---|---|---|
| Unit | | Date of Compliance With Subpart J Fuel Gas Limit |
| 2 Vis. | H-2185 | Date of Lodging |
| Coker | H-8501A | Date of Lodging |
| Coker | H-8501B | Date of Lodging |
| LSG Heater | H-4901 | Date of Lodging |
| Sulf Acid* | STK-7801 | Date of Lodging |
| GT-13 / HRSG | G-3413 / H-3413 | Date of Lodging |

C-1

| FUEL GAS COMBUSTION DEVICES FOR WHICH COMPLIANCE RESPONSIBILITY IS ASSIGNED TO LIMETREE BAY | | |
|---|---|---|
| Unit | | Date of Compliance With Subpart Ja Fuel Gas Limit |
| 1 Vis. | H-101 | 12/31/2015 |
| 1 Vis. | H-104 | 12/31/2015 |
| Utl. Fract. | H-160 | 12/31/2015 |
| Penex | H-200 | 12/31/2015 |
| Penex | H-201 | 12/31/2015 |
| Penex | H-202 | 12/31/2015 |
| Penex | C-200A | 12/31/2015 |
| Penex | C-200B | 12/31/2015 |
| Penex | C-200C | 12/31/2015 |
| 2 CDU | H-401A | 12/31/2015 |
| 2 CDU | H-401B | 12/31/2015 |
| 2 CDU | H-401C | 12/31/2015 |
| 2 Plat. | H-600 | 12/31/2015 |
| 2 Plat. | H-601 | 12/31/2015 |
| 2 Plat. | H-602 | 12/31/2015 |
| 2 Plat. | H-603 | 12/31/2015 |
| 2 Plat. | H-604 | 12/31/2015 |
| 2 Plat. | H-605 | 12/31/2015 |
| 2 Plat. | H-606 | 12/31/2015 |
| 2 DD | H-800A | 12/31/2015 |
| 2 DD | H-800B | 12/31/2015 |
| 2 DD | H-801 | 12/31/2015 |
| 3 CDU | H-1401A | 12/31/2015 |
| 1 Vac. | H-1401B | 12/31/2015 |
| 3 DD | H-1500 | 12/31/2015 |
| 3 DD | H-1501 | 12/31/2015 |
| 3 DD | C-1500A | 12/31/2015 |
| 3 DD | C-1500B | 12/31/2015 |
| 3 DD | C-1500C | 12/31/2015 |
| 2 Vac. | H-2101 | 12/31/2015 |
| 2 Vac. | H-2102 | 12/31/2015 |
| 4 DD | H-2201A | 12/31/2015 |
| 4 DD | H-2201B | 12/31/2015 |
| 4 DD | H-2202 | 12/31/2015 |

C-2

| FUEL GAS COMBUSTION DEVICES FOR WHICH COMPLIANCE RESPONSIBILITY IS ASSIGNED TO LIMETREE BAY | | |
|---|---|---|
| Unit | | Date of Compliance With Subpart Ja Fuel Gas Limit |
| 5 DD | H-2400 | 12/31/2015 |
| 5 DD | H-2401 | 12/31/2015 |
| 5 DD | C-2400A | 12/31/2015 |
| 5 DD | C-2400B | 12/31/2015 |
| Naph Frac | H-2501 | 12/31/2015 |
| 1 SRU | H-1032 | 12/31/2015 |
| 2 SRU | H-1042 | 12/31/2015 |
| 1 Beavon | H-1061 | 12/31/2015 |
| #1 F. Boiler | B-1151 | 12/31/2015 |
| #3 F. Boiler | B-1153 | 12/31/2015 |
| #4 F. Boiler | B-1154 | 12/31/2015 |
| #5 F. Boiler | B-1155 | 12/31/2015 |
| GT-1* | G-1101E | 12/31/2015 |
| GT-2* | G-1101F | 12/31/2015 |
| GT-3* | G-1101G | 12/31/2015 |

C-3

| FUEL GAS COMBUSTION DEVICES FOR WHICH COMPLIANCE RESPONSIBILITY IS ASSIGNED TO LIMETREE BAY | | |
|---|---|---|
| Unit | | Date of Compliance With Subpart J Fuel Gas Limit |
| 5 CDU | H-3101A | 12/31/15 |
| 5 CDU | H-3101B | 12/31/15 |
| 6 CDU | H-4101A | 12/31/15 |
| 6 CDU | H-4101B | 12/31/15 |
| 3 Vac. | H-4201 | 12/31/15 |
| 3 Vac. | H-4202 | 12/31/15 |
| 7 DD | H-4301A | 12/31/15 |
| 7 DD | H-4301B | 12/31/15 |
| 7 DD | H-4302 | 12/31/15 |
| 3 Plat. | H-4401 | 12/31/15 |
| 3 Plat. | H-4402 | 12/31/15 |
| 3 Plat. | H-4451 | 12/31/15 |
| 3 Plat. | H-4452 | 12/31/15 |
| 3 Plat. | H-4453 | 12/31/15 |
| 3 Plat. | H-4454 | 12/31/15 |
| 3 Plat. | H-4455 | 12/31/15 |
| 2 Sulf. | H-4502 | 12/31/15 |
| 2 Sulf. | H-4503 | 12/31/15 |
| 2 Sulf. | H-4504 | 12/31/15 |
| 2 Sulf. | H-4505 | 12/31/15 |
| 6 DD | H-4601A | 12/31/15 |
| 6 DD | H-4601B | 12/31/15 |
| 6 DD | H-4602 | 12/31/15 |
| 6 DD | C-4601A | 12/31/15 |
| 6 DD | C-4601B | 12/31/15 |
| 6 DD | C-4601C | 12/31/15 |
| 9 DD | H-5301A | 12/31/15 |
| 9 DD | H-5301B | 12/31/15 |
| 9 DD | H-5302 | 12/31/15 |
| 4 Plat. | H-5401 | 12/31/15 |
| 4 Plat. | H-5402 | 12/31/15 |
| 4 Plat. | H-5451 | 12/31/15 |
| 4 Plat. | H-5452 | 12/31/15 |
| 4 Plat. | H-5453 | 12/31/15 |

C-4

| FUEL GAS COMBUSTION DEVICES FOR WHICH COMPLIANCE RESPONSIBILITY IS ASSIGNED TO LIMETREE BAY | | |
|---|---|---|
| Unit | | Date of Compliance With Subpart J Fuel Gas Limit |
| 4 Plat. | H-5454 | 12/31/15 |
| 4 Plat. | H-5455 | 12/31/15 |
| 3 & 4 SRU | H-4745 | 12/31/15 |
| 2 Beavon | H-4761 | 12/31/15 |
| #6 F. Boiler | B-3301 | 12/31/15 |
| #7 F. Boiler | B-3302 | 12/31/15 |
| #8 F. Boiler | B-3303 | 12/31/15 |
| #9 F. Boiler | B-3304 | 12/31/15 |
| #10 F. Boiler | B-3701 | 12/31/15 |
| GT-4 | G-3404 | 12/31/15 |
| GT-5 | G-3405 | 12/31/15 |
| GT-6 | G-3406 | 12/31/15 |
| GT-7 | G-3407 | 12/31/15 |
| GT-8* | G-3408 | 12/31/15 |
| GT-9* | G-3409 | 12/31/15 |
| GT-10* | G-3410 | 12/31/15 |
| * Compliance based upon AMP submittal for EPA approval | | |

C-5

**APPENDIX D**
**LIST OF FLARING DEVICES SUBJECT TO NSPS SUBPART Ja**

| Flaring Device | Date |
|---|---|
| FCCU Low Pressure Flare and Flare 3 | Restart |
| FCCU High Pressure Flare | Five (5) years from Date of Entry of the Consent Decree (June 7, 2016) |
| LPG Flare | Five (5) years from Date of Entry of the Consent Decree (June 7, 2016) |
| Flares 2 | Seven (7) years from Date of Entry of the Consent Decree (June 7, 2018) |
| Flares 5, 6 and 7 | Ten (10) years from Date of Entry of the Consent Decree (June 7, 2021) |

Flares 1 and 4 are no longer in service and are not subject to this Consent Decree.

EPA-628

**APPENDIX E**
**Limetree Bay's LDAR and BWON Training Program Summary**

The Limetree Bay training program will utilize a combination of training methods to educate refinery personnel on their roles and responsibilities within the LDAR and BWON programs. The extent of education on the programs (two hours, four hours, eight hours, etc.) will be based on the employee's job assignment within their respective department and the individual's management level.

All Environmental LDAR personnel will be trained on an annual basis on the requirements of their jobs through classroom based, computer-based, field-based, or other training methods. The training will consist of specific material and processes required for the knowledge of the program including certification testing. Listed below are some of the key elements and subjects of the training module that link to roles and responsibilities.

- knowledge of the refinery structure and systems
- refinery basics:  process unit functions individually and how they work in partnership
- how to read and understand P&IDs and ISOS
- the applicable regulations
- the proper operation of monitoring equipment
- applicable LDAR procedures
- the systems in place to manage our data and compliance; electronic database such as LeakDAS and like systems
- the checks and balances required to maintain quality control and compliance
- the leadership skills required to manage and maintain a successful program

All other Operations, Maintenance and Contractor personnel will be trained on the requirements of their jobs through classroom based, computer-based, field-based, or other training methods. The training consists of material and processes required for their specific role and responsibility needed to ensure knowledge of the program including certification testing. Listed below are some of the key elements and subjects of the training module.

- knowledge of Environmental Department structure and contact information
- general knowledge of the environmental regulations (LDAR & BWON) and related procedures
- knowledge of regulatory inspection, documentation and repair requirements
- knowledge of fugitive emissions procedures
- knowledge of the Valve Preventative Maintenance Program
- knowledge of how to utilize the refinery system, such as SAP, to create work notifications and approvals and electronic inspections

The requirements of this training will be incorporated into Limetree Bay's job specific training. All training will be reviewed and updated on a reoccurring basis (at least once every three (3) years).  The certification testing will be utilized to assess the effectiveness of the training products.

E-1

**APPENDIX F**
**Method 21 Monitoring Locations for API Separators 1, 2 and 3**

| API #1, 2, & 3 | |
|---|---|
| **Emission Points** | **Total** |
| Access Hatch | 48 |
| Gauge Hatch | 45 |
| Fixed roof plates | 150 |
| Piping Penetration | 52 |
| Steel plate | 31 |
| Pump base | 22 |
| Hose connection | 2 |
| Conduit port | 10 |
| Valve stem port | 16 |
| **Total** | **376** |

F-1

**APPENDIX G**
**[RESERVED]**

**APPENDIX H**
**Additional Coker Project Injunctive Relief**

| Emissions Unit | Pollutant | Limit | Units | Averaging Time | Monitoring[a] | Reporting | Compliance Schedule |
|---|---|---|---|---|---|---|---|
| **Coker Heater (two units)** | CO | 0.030 | lb/mmBTU | Average of 3 1-hr samples | Annual Performance Test (EPA RM-10) | Within 60 Days of test | Date of Entry |
| | VOC | 0.0050 | lb/mmBTU | N/A | EPA RM-25 or RM-25A following any CO test exceedance | Within 60 Days of test | Date of Entry |
| **Boiler 10** | CO | 0.070 | lb/mmBTU | Average of 3 1-hr samples | Annual Performance Test (EPA RM-10) | Within 60 Days of test | Date of Entry |
| | VOC | 0.0050 | lb/mmBTU | N/A | EPA RM-25 or RM-25A following any CO test exceedance | Within 60 Days of test | Date of Entry |
| **SRUs 1&2/ Beavon 1** | RSC (Final) | 162 | ppmvd | Hourly rolling 12-hr average | NSPS RSC CEMS (40 C.F.R. 60 App A, B, & F) | NSPS quarterly reports | 1/1/2014 |
| | | 66 | ppmvd | Daily rolling 30-day average | NSPS RSC CEMS (40 C.F.R. 60 App A, B, & F) | NSPS quarterly reports | 1/1/2014 |
| **Tanks** No. 6 Sour Water Stripper Tank (TK-1071), Desalter Effluent Water (DEW) Tank (TK-1663) | VOC | Ext. Floating Roof Tank | | N/A | Subpart Kb monitoring (40 C.F.R. §60.113b(b)) for Ext. Floating Roof Kb requirements:  Seal gap measurements (Secondary once/yr, Primary once/5 yrs).  Inspect seals and fittings each time the vessel is emptied and degassed. | NSPS reports | Tank 1071: 12/31/2011

Tank 1663: Date of Entry |
| Coker Charge Tank (TK-8501) | VOC | Fixed Roof Tank | | N/A | Subpart Kb monitoring (40 C.F.R. §60.110b-117b) Record and maintain records documenting the material stored in the hot pitch storage tank (TK-8501), showing that the tank remains exempt from the requirements in 40 C.F.R. Part 60 Subpart Kb, §60.110b(b). | NSPS reports | Date of Entry |

**APPENDIX H**
**Additional Coker Project Injunctive Relief**

| Emissions Unit | Pollutant | Limit | Units | Averaging Time | Monitoring[a] | Reporting | Compliance Schedule |
|---|---|---|---|---|---|---|---|
| **Process equipment located in** Coker Unit, Coker Gas Plant, No. 7 Amine, No. 5 Crude, No. 3 Vacuum, No. 3 Crude, No. 1 Vacuum, No. 1 Visbreaker, and No. 2, 4, 6, & 7 Distillate Desulfurizer Units and outside battery limit modifications to the terminal, tank farm & blending equipment | **VOC** | 40 C.F.R. Part 60 Subpart GGGa | | | Comply with 40 C.F.R. Part 60 Subpart GGGa | | Date of Entry |

[a] For purposes of demonstrating compliance with limits which require an annual performance test, the first performance test shall be conducted no later than twelve (12) months after the Date of Entry of the First Modification or twelve (12) months from Restart for Idled Units, whichever is earlier.

H-2

**APPENDIX H**
**Additional Coker Project Injunctive Relief**

| Emissions Unit | Pollutant | Design/Work Practice Controls | Monitoring | Compliance Schedule |
|---|---|---|---|---|
| **Coke Handling, Storage and Loading Facility** | | | | |
| Coke Cutting/Coke Pit | **PM (all species)** | High Pressure water cutting of coke & enclosed drop zones/coke pit (No roof) | Maintain records documenting design | Date of Entry |
| Coke Crusher | **PM (all species)** | Enclosed[b] crusher structure. Moisture content control from initial cutting. | Maintain records documenting design | Date of Entry |
| Coke Transfer to Storage | **PM (all species)** | Enclosed[b] conveyor to storage, Moisture content control from initial cutting. | Maintain records documenting design | Date of Entry |
| Coke Storage | **PM (all species)** | Enclosed[b] storage buildings, baghouse for vent control, and moisture content control from initial cutting. | Maintain records documenting design | Date of Entry |
| Coke Loading | **PM (all species)** | Enclosed[b] conveyor to loading dock. "Spout" containment loading to minimize drop emissions when loading ship. | Maintain records documenting design | Date of Entry |

[b] Enclosed structures can have ventilation vents or access ways.

EPA-634

**APPENDIX J**

**IN SERVICE UNITS AND LDAR AND BWON EQUIPMENT
IN REGULATED SERVICE**

List, as of June 1, 2019, of all emissions units that are In Service Units:

| Unit | Source Code | Location |
|------|-------------|----------|
| GT-4 | G-3404 | East |
| GT-7 | G-3407 | East |
| GT-8 | G-3408 | East |
| Flare No. 7 | H-3301 | East |

List, as of June 1, 2019, of LDAR and BWON Equipment to which the LDAR and BWON provisions of the Consent Decree continue to apply (i.e. are In Regulated Service):

Location of LDAR Equipment In Regulated Service

1. Offsite area piping between and into active tanks

2. Piping between docks 1 through 10 and tanks

3. Piping from tanks to truck loading rack

4. Propane and Butane storage area

5. Piping between Propane and Butane storage area and East Power House area

6. East Power House area

7. Piping from East Power House to the No. 7 Flare

Location of BWON Equipment In Regulated Service

1. #1 and #3 APIs and #3 WEMCO

2. Portions of Advanced Wastewater Treatment Plant

3. Wastewater collection equipment and oily water sewer system identified as: all oily water sewer cups, process area drains, junction boxes, and wastewater piping servicing tanks, manifolds, and process units that are not Idled Units or not in emissions units permanently Shutdown listed on Appendix N

4. Ballast and slop tanks

EPA-635

## APPENDIX K
## LIST OF IDLED UNITS

List, as of June 1, 2019, of all emissions units that are Idled Units:

### IDLED WEST SIDE EMISSIONS UNITS

| Emissions Unit | Emissions Unit Type | Process Unit Location |
|---|---|---|
| H-101 | Heater | 1 Vis. |
| H-104 | Heater | 1 Vis. |
| H-160 | Heater | Utl. Fract. |
| H-200 | Heater | Penex (Par Isom) |
| H-201 | Heater | Penex |
| H-202 | Heater | Penex |
| C-200A | Compressor Engine | Penex |
| C-200B | Compressor Engine | Penex |
| C-200C | Compressor Engine | Penex |
| H-601 | Heater | #2 Plat |
| H-604 | Heater | #2 Plat |
| H-605 | Heater | #2 Plat |
| H-800A | Heater | 2 DD |
| H-800B | Heater | 2 DD |
| H-801 | Heater | 2 DD |
| C-1500A | Compressor Engine | 3 DD |
| C-1500B | Compressor Engine | 3 DD |
| C-1500C | Compressor Engine | 3 DD |
| H-2201A | Heater | 4 DD |
| H-2201B | Heater | 4 DD |
| H-2202 | Heater | 4 DD |
| H-2400 | Heater | 5 DD |
| C-2400A | Compressor Engine | 5 DD |
| C-2400B | Compressor Engine | 5 DD |
| H-1061 | Heater | 1 Beavon |
| B-1155 | Boiler | #5 F. Boiler |
| H-1105 | Flare | Flare 2 |
| H-1104 | Flare | Flare 3 |
| H-1032 | Incinerator | SRU 1 |
| H-1042 | Incinerator | SRU 2 |
|  | West Sulfur Pit | SRU 1 & 2 |

EPA-636

**IDLED EAST SIDE EMISSIONS UNITS**

| Emissions Unit | Emissions Unit Type | Process Unit Location |
|---|---|---|
| H-3101A | Heater | 5 CDU |
| H-3101B | Heater | 5 CDU |
| H-4101A | Heater | 6 CDU |
| H-4101B | Heater | 6 CDU |
| H-4201 | Heater | 3 Vac. |
| H-4202 | Heater | 3 Vac. |
| H-4301A | Heater | 7 DD |
| H-4301B | Heater | 7 DD |
| H-4302 | Heater | 7 DD |
| H-4401 | Heater | 3 Plat. |
| H-4402 | Heater | 3 Plat. |
| H-4451 | Heater | 3 Plat. |
| H-4452 | Heater | 3 Plat. |
| H-4453 | Heater | 3 Plat. |
| H-4454 | Heater | 3 Plat. |
| H-4455 | Heater | 3 Plat. |
| H-4502 | Heater | 2 Sulf. |
| H-4503 | Heater | 2 Sulf. |
| H-4504 | Heater | 2 Sulf. |
| H-4505 | Heater | 2 Sulf. |
| H-4601A | Heater | 6 DD |
| H-4601B | Heater | 6 DD |
| H-4602 | Heater | 6 DD |
| C-4601A | Compressor Engine | 6 DD |
| C-4601B | Compressor Engine | 6 DD |
| C-4601C | Compressor Engine | 6 DD |
| H-4901 | Heater | LSG |
| H-5301A | Heater | 9 DD |
| H-5301B | Heater | 9 DD |
| H-5302 | Heater | 9 DD |
| H-5401 | Heater | 4 Plat. |
| H-5402 | Heater | 4 Plat. |
| H-5451 | Heater | 4 Plat. |
| H-5452 | Heater | 4 Plat. |
| H-5453 | Heater | 4 Plat. |

| | | |
|---|---|---|
| H-5454 | Heater | 4 Plat. |
| H-5455 | Heater | 4 Plat. |
| H-8501A | Heater | Coker |
| H-8501B | Heater | Coker |
| | Coke Handling, Storage and Loading Facility | Coker |
| STK-7801 | Common Stack for Heaters H-7801, H-7802 and R-7801 | Sulfuric Acid Plant |
| B-3302 | Boiler | #7 F. Boiler |
| B-3303 | Boiler | #8 F. Boiler |
| B-3304 | Boiler | #9 F. Boiler |
| B-3701 | Boiler | #10 F. Boiler |
| G-3409 | Generating Turbine | GT-9 |
| G-3410 | Generating Turbine | GT-10 |
| G-3413 | Generating Turbine | GT-13 |
| H-3413 | Fired Heat Recovery Steam Generator | GT-13 |
| H-3351 | Flare | Flare 5 |
| H-3352 | Flare | Flare 6 |
| STK-7921 | Flare | LPG Flare |
| STK -7941 | Flare | FCC LP Flare |
| STK -7942 | Flare | Ground Flare |
| H-4745 | Incinerator | SRUs 3 and 4 |
| | Sulfur Pits | SRUs 3 and 4 |
| STK-7051 | Catalyst Regenerator | FCC |

# APPENDIX L
# EXCEPTIONS FOR COMPLIANCE ON RESTART

| Unit | CD Paragraph | CD Requirement | Restart Compliance Exception |
|---|---|---|---|
| FCCU | 11 | $NO_x$ 365-Day rolling average limit | During the first 30 Days after the Restart of the FCCU, the unit shall comply with an interim limit of 80 ppmvd on a 7-Day rolling average basis instead of the 20 ppmvd limit established by Paragraph 11. |
| | 12<br>14<br>21 | RAA or RATA for:<br>$NO_x$ CEMS<br>$SO_x$ CEMS<br>CO CEMS | Required CEMS RAA or RATA shall be conducted within 60 Days after achieving the maximum production rate at which the FCCU will be operated, or not later than 180 Days after initial Restart, whichever comes first. |
| | 16 | PM stack test | Required PM stack test shall be conducted within 60 Days after achieving the maximum production rate at which the FCCU will be operated, or not later than 180 Days after initial Restart, whichever comes first. |
| | 18 | CO limit | During the first 7 Days after the Restart of the FCCU, the unit shall comply with an interim limit of 1,000 ppmvd on a 7-Day rolling average basis instead of the 500 ppmvd limit established by Paragraph 18. |
| Units listed on Appendix C | 34<br>35 | NSPS monitoring, but only as to Part 60, Appendix F, Section 5 "Data Accuracy Assessment" requirements, and Part 60, Appendix B | Demonstration of compliance shall be achieved within 60 Days after achieving the maximum production rate at which the affected facilities will be operated, or not later than 180 Days after initial Restart, whichever comes first. |

| Unit | CD Paragraph | CD Requirement | Restart Compliance Exception |
|---|---|---|---|
| East Side Sulfur Recovery Plant | 45a | NSPS monitoring, but only as to Part 60, Appendix F, Section 5 "Data Accuracy Assessment" requirements, and Part 60, Appendix B | Demonstration of compliance shall be achieved within 60 Days after achieving the maximum production rate at which the affected facilities will be operated, or not later than 180 Days after initial Restart, whichever comes first. |
| LPG and FCCU High Pressure Flares | 49 | NSPS Ja monitoring, if required | Demonstration of compliance shall be achieved not later than 90 Days after Flaring Device Restart and compliance certifications, required by Paragraph 52, shall be submitted within 30 Days thereafter. |
| LPG Flare<br><br>FCCU High Pressure Flare<br><br>FCCU Low Pressure Flare<br><br>Flares 2, 3, 5, 6, and 7 | 49, 52 | NSPS Ja monitoring for flares | Demonstration of compliance shall be achieved not later than 90 Days after Flaring Device Restart and compliance certifications, required by Paragraph 52, shall be submitted within 30 Days thereafter. |
| Coker Heaters, Boiler 10 | 133 | Appendix H, Performance test (CO and VOC) | Demonstration of compliance shall be achieved within 60 Days after achieving the maximum production rate at which the affected facilities will be operated, or not later than 180 Days after initial Restart, whichever comes first. |
| Boilers 5, 8, 9 | 135 | NSPS D, Performance test and CEMS, as applicable | Demonstration of compliance shall be achieved within 60 Days after achieving the maximum production rate at which the affected facilities will be operated, or not later than 180 Days after initial Restart, whichever comes first. |

| Unit | CD Paragraph | CD Requirement | Restart Compliance Exception |
|---|---|---|---|
| Generating Turbine 9 | 136 | NSPS GG, CEMS and Performance test | Demonstration of compliance shall be achieved within 60 Days after achieving the maximum production rate at which the affected facilities will be operated, or not later than 180 Days after initial Restart, whichever comes first. |
| BWON or LDAR Equipment placed back In Regulated Service | BWON, Section V.J. LDAR, Section V.K. | Monitoring Requirements | Required monitoring shall be conducted no later than 60 Days after the BWON or LDAR Equipment is placed back In Regulated Service. |

L-3

# APPENDIX M
## PROCESS AND FACTORS FOR "COMMERCIAL UNAVAILABILITY" OF LOW-E VALVE OR PACKING

Summary: This Appendix outlines a process to be followed and factors to be taken into consideration to establish that a Low-E Valve or Low-E Packing is not "commercially available" pursuant to Subparagraph 112.c of the Consent Decree. Factors other than those identified in Paragraph 1 of this Appendix may also be utilized to establish that a Low-E Valve or Low-E Packing is not commercially available and procedures other than those identified in Paragraphs 2–3 may be used if mutually agreed upon by the Parties in writing.

1.    Factors. The following factors shall be taken in to account for determining the availability of safe and suitable Low-E Valve or Low-E Packing Technologies:

    (1)  Valve type;
    (2)  Valve service and operating conditions;
    (3)  Type of refinery process equipment in which the valve is used;
    (4)  Seal performance;
    (5)  Service life;
    (6)  Packing friction;
    (7)  Temperature and pressure limitations; and
    (8)  Retrofit applications (*e.g.,* re-piping or space limitations).

The following factors may also be relevant for consideration, depending on the process unit or equipment in use at the Refinery:

    (9)  Valve or valve packing specifications identified by the licensor of the process unit or equipment in use at the Refinery (including components that are part of a design package by a specialty-equipment provider as part of a larger process unit); or

    (10)  Valve or valve packing vendor or manufacturer recommendations for the relevant Refinery unit and/or process unit components.

2.    Process. The following procedure shall be followed for determining the availability of a Low-E Valve or Low-E Packing:

        a.    Limetree Bay must contact a reasonable number of vendors of valves and valve packing technologies, taking into account the relevant factors identified above, prior to asserting a claim that Low-E Valve or Low-E Packing is not commercially available.

            (i)    For purposes of this Consent Decree, a reasonable number of vendors shall mean at least three vendors of valves or three vendors of valve packing technologies.

EPA-642

(ii)      If fewer than three vendors of valve or valve packing technologies are contacted, the determination of whether such fewer number is reasonable for purposes of this Consent Decree shall be based on Factors (9) and/or (10) above, or on a demonstration that fewer than three vendors offer valves or valve packing technologies for the service and operating conditions of the valve to be replaced, in consideration of Factors (1) through (8) above, as applicable.

b.      Limetree Bay shall obtain a written representation from each vendor contacted or equivalent documentation that the valve or valve packing does not meet the specifications for a Low-E Valve or Low-E Packing.

c.      Limetree Bay shall prepare a written report fully explaining the basis for each claim that a valve or valve packing is not commercially available, to include all relevant documentation and other information supporting the claim. Such report shall also identify the commercially-available valve or packing technology that comes closest to meeting the requirements for a Low-E Valve or Low-E Packing that is selected and installed by Limetree Bay pursuant to Subparagraph 112.c of the Consent Decree. Such report shall be included in the Semi-Annual Report required by Part X of the Consent Decree, for the period in which the valve or valve packing is replaced.

3.      <u>EPA Review of Claim of Commercial Unavailability</u>. Upon discretionary review by EPA of any claim of commercial unavailability, if EPA disagrees that a valve or valve-packing technology is commercially unavailable, EPA shall notify Limetree Bay in writing, specifying the valve or valve packing EPA believes to be commercially available and the basis for its availability for the service and operating conditions of the valve. Following receipt by Limetree Bay of EPA's notice, the following shall apply:

a.      Limetree Bay is not required to retrofit the valve or valve packing for which the unavailability claim was asserted (unless otherwise required to do so pursuant to some other provision of this Consent Decree).

b.      EPA's notification shall serve as notice to Limetree Bay of EPA's intent that a future claim of commercial unavailability will not be accepted for (a) the valve or valve packing that was the subject of the unavailability claim, or (b) for a valve or valve packing in the same or similar service, taking into account the factors identified in this Appendix. If Limetree Bay disagrees with EPA's notification, Limetree Bay and EPA may informally discuss the basis for the claim of commercial unavailability. EPA may thereafter revise its notification, if necessary.

c.      If Limetree Bay makes a subsequent commercial unavailability claim for the same valve or valve packing (or valve or valve packing in the same or similar service) that was the subject of a prior unavailability claim which was not accepted by EPA, and such subsequent claim is also denied by EPA on the same basis as provided in EPA's prior notification, Limetree Bay shall retrofit the valve

M-2

or valve packing with the commercially available valve or valve packing technology at the next unit turnaround.

Any disputes concerning EPA's notification to Limetree Bay of the commercial availability of a valve or valve packing technology in a particular application pursuant to Subparagraph 3.c of this Appendix shall be addressed under the Dispute Resolution provisions in Part XVI of the Consent Decree.

## APPENDIX N

## EMISSIONS UNITS PERMANENTLY SHUTDOWN AS OF JUNE 1, 2019

- H-401A (2 CDU)
- H-401B (2 CDU)
- H-401C (2 CDU)
- H-600 (Heater in 2 Plat)
- H-602 (Heater in 2 Plat)
- H-603 (Heater in 2 Plat)
- H-606 (Heater in 2 Plat)
- H-1401A (Heater in 3 CDU)
- H-1401B (Heater in 1 Vac)
- H-1500 (Heater in 3DD)
- H-1501 (Heater in 3 DD)
- H-2101 (Heater in 2 Vac)
- H-2102 (Heater in 2 Vac)
- H-2185 (Heater in 2 Vis)
- H-2401 (Heater in 5DD)
- H-2501 (Naptha Frac.)
- B-1151 (#1 Boiler)
- B-1153 (#3 Boiler)
- B-1154 (#4 Boiler)
- B-3301 (#6 Boiler)
- C-800A, B and C (Compressors in 2DD)
- C-2201A, B and C (Compressors in 4DD)
- No. 1 Gas Turbine (G-1101E)
- No. 2 Gas Turbine (G-1101F)
- No. 3 Gas Turbine (G-1101G)
- No. 5 Gas Turbine (G-3405)

EPA-645

- No. 6 Gas Turbine (G-3406)

Appendix O
Requirements That Shall Survive
Termination of the Consent Decree

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. |
|---|---|
| ¶ 10: Certain CD Definitions | "365-day rolling average" shall mean the average daily emission rate during the preceding 365 Operating Days. (CD 10.A.) <br><br> "7-day rolling average" shall mean the average daily emission rate during the preceding seven (7) Operating Days. (CD 10.B.) <br><br> "FCCU and Coker Drain Systems" means the individual drain systems (as defined in 40 C.F.R. § 60.691) and ancillary equipment which manage oily wastewater generated in the process units in the FCCU complex and the Coker. (CD ¶ 10.U.) <br><br> "Operating Day" shall mean a Day on which a minimum of 18 hours of valid emissions data are obtained. (CD 10.HH.) <br><br> "Sulfur Recovery Plant" or "SRP" shall mean a process unit that recovers sulfur from hydrogen sulfide by a vapor phase catalytic reaction of sulfur dioxide and hydrogen sulfide.  (CD 10.UU.) |
| ¶ 11:  FCCU $NO_x$ limits | Limit $NO_x$ emissions from the FCCU to 20 ppmvd or less on a 365 day rolling average and 40 ppmvd or less on a 7-day rolling average, each at 0% $O_2$. <br><br> $NO_x$ emissions during periods of Startup, Shutdown or Malfunction of the FCCU shall not be used in determining compliance with the 7-day rolling average $NO_x$ emission limit, provided that during such periods Limetree Bay implements good air pollution control practices to minimize $NO_x$ emissions. |
| ¶ 12: Demonstrating compliance with FCCU $NO_x$ limits ($NO_x$ and $O_2$ CEMS) | Certify, calibrate, maintain, and operate $NO_x$ and $O_2$ CEMS on the FCCU in accordance with the provisions of 40 C.F.R. § 60.13 that are applicable to CEMS (excluding those provisions applicable only to Continuous Opacity Monitoring Systems) and Part 60 Appendices A and F, and the applicable performance specification test of 40 C.F.R. Part 60 Appendix B. <br><br> With respect to 40 C.F.R. Part 60, Appendix F, in lieu of the requirements of 40 C.F.R. Part 60, Appendix F §§ 5.1.1, 5.1.3 and 5.1.4, conduct either a Relative Accuracy Audit ("RAA") or a Relative Accuracy Test Audit ("RATA") on each CEMS at least once every three (3) years. Conduct |

O-1

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. |
|---|---|
| | Cylinder Gas Audits ("CGA") each calendar quarter during which a RAA or a RATA is not performed. |
| ¶ 13 and 14: FCCU SO₂ limits | Limit $SO_2$ emissions from the FCCU to 16 ppmvd or less on a 365-day rolling average and 25 ppmvd or less on a 7-day rolling average, each at 0% $O_2$.<br><br>$SO_2$ emissions during periods of Malfunction of the Wet Gas Scrubber ("WGS") shall not be used in determining compliance with the 7-day rolling average $SO_2$ emission limit, provided that during such periods good air pollution control practices are implemented to minimize $SO_2$ emissions. |
| ¶ 14: Demonstrating compliance with FCCU SO₂ limits (SO₂ and O₂ CEMS) | Certify, calibrate, maintain, and operate $SO_2$ and $O_2$ CEMS on the FCCU in accordance with the provisions of 40 C.F.R. § 60.13 that are applicable to CEMS (excluding those provisions applicable only to Continuous Opacity Monitoring Systems) and Part 60 Appendices A and F, and the applicable performance specification test of 40 C.F.R. Part 60 Appendix B.<br><br>With respect to 40 C.F.R. Part 60, Appendix F, in lieu of the requirements of 40 C.F.R. Part 60, Appendix F §§ 5.1.1, 5.1.3 and 5.1.4, conduct either a Relative Accuracy Audit ("RAA") or a Relative Accuracy Test Audit ("RATA") on each CEMS at least once every three (3) years. Conduct Cylinder Gas Audits ("CGA") each calendar quarter during which a RAA or a RATA is not performed. |
| ¶ 15 and 17: FCCU PM limit | Limit PM emissions from the FCCU to 0.5 pounds PM or less per 1,000 pounds of coke burned based on the average of three (3) 1-hour stack tests.<br><br>PM emissions during periods of Malfunction of the FCCU's WGS shall not be used in determining compliance with the emission limit of 0.5 pounds of PM per 1,000 pounds of coke burned, provided that during such periods good air pollution control practices are implemented to minimize PM emissions. |
| ¶ 16: PM Testing for FCCU (stack testing methodology and frequency requirements) | Follow the stack test methodology specified in 40 C.F.R. § 60.106(b)(2) to measure PM emissions from the FCCU. |

O-2

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. |
|---|---|
| ¶¶ 18, 19, 20: FCCU CO limits | Limit CO emissions from the FCCU to 500 ppmvd or less on a 1-hour block average basis corrected to 0% $O_2$. <br><br> If prior to termination of this Consent Decree, Limetree Bay has accepted for the FCCU a CO emissions limit of 100 ppmvd or less on a 365-day rolling average corrected to 0% $O_2$, then the FCCU shall also comply with that limit. <br><br> CO emissions during periods of Startup, Shutdown, or Malfunction of the FCCU shall not be used in determining compliance with the 1-hour 500 ppmvd emissions limit, provided that during such periods good air pollution control practices are implemented to minimize CO emissions. |
| ¶ 21: Demonstrating compliance with FCCU CO limits (CEMS operating requirements) | Certify, calibrate, maintain, and operate the CO CEMS on the FCCU in accordance with the provisions of 40 C.F.R. § 60.13 that are applicable to CEMs (excluding those provisions applicable only to Continuous Opacity Monitoring Systems) and Part 60 Appendices A and F, and the applicable performance specification test of 40 C.F.R. Part 60 Appendix B. <br><br> With respect to 40 C.F.R. Part 60, Appendix F, in lieu of the requirements of 40 C.F.R. Part 60, Appendix F §§ 5.1.1, 5.1.3 and 5.1.4, conduct either a RAA or a RATA on each CEMS at least once every three (3) years. Conduct Cylinder Gas Audits ("CGA") each calendar quarter during which a RAA or a RAT A is not performed. |
| ¶ 22: FCCU Subpart J affected facility status and opacity AMP | FCCU Catalyst Regenerator is an "affected facility," as that term is used in 40 C.F.R. Part 60, Subparts A and J, and is subject to and shall comply with, the requirements of 40 C.F.R. Part 60, Subparts A and J, for $SO_2$, PM (and opacity) and CO. <br><br> If prior to termination of this Consent Decree, the FCCU becomes subject to NSPS Subpart Ja for a particular pollutant due to a "modification" (as that term is defined in NSPS Subpart Ja), the FCCU shall be subject to and comply with NSPS Subpart Ja in lieu of NSPS Subpart J for that regulated pollutant to which a standard applies as a result of the modification. <br><br> If prior to termination of this Consent Decree, the FCCU becomes subject to NSPS Subpart Ja due to a "reconstruction" (as that term is defined in NSPS Subpart Ja), the FCCU shall be subject to and comply with NSPS Subpart Ja for all pollutants in lieu of Subpart J. |

O-3

| ¶¶ 26-28, 30, 31: NOₓ Emission Reductions from Heaters, Boilers, Generating Turbines and Compressor Engines and Monitoring | The units listed below have been permanently shutdown and permits relinquished in order to demonstrate a refinery-wide reduction of 4,744 tpy of $NO_x$. If any of the units listed below are restarted, they shall be treated as new emissions units. |
|---|---|

The units listed below have been permanently shutdown and permits relinquished in order to demonstrate a refinery-wide reduction of 4,744 tpy of $NO_x$. If any of the units listed below are restarted, they shall be treated as new emissions units.

- H-401A (2 CDU)
- H-401B (2 CDU)
- H-401C (2 CDU)
- H-600 (Heater in 2 Plat)
- H-602 (Heater in 2 Plat)
- H-603 (Heater in 2 Plat)
- H-606 (Heater in 2 Plat)
- H-1401A (Heater in 3 CDU)
- H-1401B (Heater in 1 Vac)
- H-1500 (Heater in 3DD)
- H-1501 (Heater in 3 DD)
- H-2101 (Heater in 2 Vac)
- H-2102 (Heater in 2 Vac)
- H-2185 (Heater in 2 Vis)
- H-2401 (Heater in 5DD)
- H-2501 (Naphtha Frac.)
- B-1151 (#1 Boiler)
- B-1153 (#3 Boiler)
- B-1154 (#4 Boiler)
- B-3301 (#6 Boiler)
- C-800A, B and C (Compressors in 2DD)
- C-2201A, B and C (Compressors in 4DD)

O-4

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. |
|---|---|
| | • No. 1 Gas Turbine (G-1101E) |
| | • No. 2 Gas Turbine (G-1101F) |
| | • No. 3 Gas Turbine (G-1101G) |
| | • No. 5 Gas Turbine (G-3405) |
| | • No. 6 Gas Turbine (G-3406) |
| ¶ 34:  NSPS Subparts A, J, and Ja applicability for Heaters, Boilers and Generating Turbines (FGCD) | All heaters, boilers, and all other fuel gas combustion devices (other than Flaring Devices) are affected facilities, as that term is used in 40 C.F.R. Part 60, Subparts A and J or Ja for $SO_2$ emissions, and are subject to and shall comply with the applicable requirements of NSPS Subparts A and J or Ja for $SO_2$ emissions for fuel gas combustion devices.  The FGCD listed on pages C-2 and C-3 of Appendix C are subject to NSPS Subpart Ja and the FGCD listed on pages C-1, C-4 and C-5 of Appendix C are subject to NSPS Subpart J.

If prior to the termination of this Consent Decree, any heater boiler or other fuel gas combustion device (other than a Flaring Device) becomes subject to NSPS Subpart Ja for a particular pollutant due to a "modification" (as defined in NSPS Subpart Ja), the affected facility shall be subject to and comply with NSPS Subpart Ja in lieu of NSPS Subpart J for that regulated pollutant to which a standard applies as a result of the modification.

If prior to the termination of this Consent Decree, any heater, boiler, or other fuel gas combustion device (other than a Flaring Device) becomes subject to NSPS Subpart Ja due to a "reconstruction" (as defined in NSPS Subpart Ja), the affected facility shall be subject to and comply with NSPS Subpart Ja for all pollutants in lieu of Subpart J. |
| ¶ 35:  Monitoring for Subpart J compliance for FGCD | Certify, calibrate, maintain and operate all CEMS required by this Paragraph in accordance with the provisions of 40 C.F.R. § 60.13 that are applicable to CEMS (excluding those provisions applicable only to continuous opacity monitoring systems) and Part 60, Appendices A and F, and the applicable performance specification test of 40 C.F.R. Part 60, Appendix B. |
| ¶¶ 37-40:  Fuel oil sulfur limits | 1.  Do not burn Fuel Oil greater than 0.55 wt% sulfur at any time or 0.50 wt% on a 365-day rolling average basis in any heater, boiler, or Generating Turbine. |

O-5

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. |
|---|---|
| | 2. Switch the fuel supply for any units combusting Fuel Oil to a Fuel Oil with not greater than 0.3 wt% sulfur within one hour of when one of the following conditions occur: |
| | a. The hourly average winds blow from a 180° sector, defined as 90° to 270°, inclusive, where zero degrees is due North, for at least six (6) consecutive hours during a 24-hour block period, or any 12 non-consecutive hours during a 24-hour block period. Wind direction will be monitored by a meteorological tower located on Limetree Bay property, and will be collected and reported as 1-hour averages, starting on the hour. If the average wind direction for a given hour is from within the 180° sector, the wind will be deemed to have flowed from within the designated sector for that hour. A 24-hour block period is defined as beginning at midnight and ending on the following midnight. |
| | b. Limetree Bay's meteorological station is inoperable for six consecutive hours. |
| | 3. Limetree Bay may switch back to the higher sulfur content Fuel Oil (a Fuel Oil with a sulfur content of less than or equal to 0.55 wt%) in accordance with the following conditions: |
| | a. The winds blow outside of the 180° sector, defined as 90° to 270°, for at least three (3) consecutive hours, following the period which the winds were blowing inside the 180° sector; or |
| | b. When the meteorological station becomes operable, and three (3) consecutive hours of wind conditions outside the 90° to 270° sector have occurred. |
| | 4. On a daily basis, monitor the sulfur content of all Fuel Oil burned [pursuant to Paragraph 3, above] in accordance with ASTM D2622, D4294, or D5453, as follows: |
| | a. Fuel Oil Supplied from Single Storage Tank: |
| | i. If the Fuel Oil burned is supplied from a single storage tank for an entire day or part thereof, then test the contents of the storage tank once per day by a sample taken at three (3) levels in the storage tank (i.e., the bottom, middle, and top) which is then composited (Composite Sample). |
| | ii. If the same storage tank is used for more than one day and no Fuel Oil is added to the storage tank, then Limetree Bay may use the storage tank sample result from the previous day to demonstrate the sulfur content of the storage tank. |

O-6

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. |
|---|---|
| | b. Fuel Oil Supplied from Multiple Storage Tanks: If the Fuel Oil burned for one or more consecutive days is supplied from more than one storage tank, then Limetree Bay shall sample each storage tank separately once per day by a Composite Sample taken at three (3) levels in the storage tank (i.e., the bottom, middle, and top). |
| | c. In the event that Fuel Oil is added to any storage tank, Limetree Bay shall sample the storage tank by a Composite Sample taken at three (3) levels in the storage tank (i.e., the bottom, middle, and top) before the storage tank is placed into service. |
| | 5. Record the quantity and sulfur content of all Fuel Oil burned pursuant to [Paragraph 3 above]. |
| ¶ 42: NSPS Subparts A and Ja for East and West Sulfur Plants | The East Side SRP is an "affected facility" as that term is used in 40 C.F.R. Part 60, Subparts A and Ja and is subject to the requirements of Subparts Ja. The West Side SRP is an "affected facility" as that term is used in 40 C.F.R. Subparts A and Ja and is subject to Subpart Ja. |
| ¶ 43: Sulfur pit re-route and monitoring | Route or re-route all sulfur pit emissions so that they are eliminated or controlled, and included and monitored as part of the SRPs' emissions subject to the NSPS Subpart Ja limit for $SO_2$ or reduced sulfur compounds, 40 C.F.R. § 60.102a(f). |
| ¶ 44: NSPS for SRPs | The West Side SRP shall comply with the NSPS Subpart Ja and shall comply with 40 CFR § 60.102a(f) at all times except during periods of Startup, Shutdown, or Malfunction of the West Side SRP or during a Malfunction of the TGU. For purposes of determining compliance with the emission limits of 40 C.F.R. § 60.102a(f), the "start-up/shutdown" provisions set forth in NSPS Subpart A shall apply. |
| | At all times, including during periods of Startup, Shutdown, and Malfunction, and to the extent practicable, operate and maintain the West Side SRP and TGU and any supplemental control devices, in accordance with good air pollution control practices as required in 40 C.F.R. § 60.11(d). |
| | Monitor all non-fugitive emission points (stacks) to the atmosphere from the West Side SRP for Tail Gas emissions and shall monitor and report excess emissions, as required by 40 C.F.R. §§ 60.7(c), 60.13, and 60.106a. Conduct emission monitoring with CEMS as all such emission points. The requirement for continuous monitoring is not applicable to the Acid Gas |

O-7

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. |
|---|---|
| | Flaring Device(s) used to flare Acid Gas and/or Sour Water Stripper Gas diverted from the SRPs. |
| ¶ 45 (NSPS for SRPs) | Emissions of sulfur compounds from the East Side SRP shall be controlled to comply with NSPS Subparts A and Ja. Do not vent tail gas from the East Side SRP to an incinerator unless such venting complies with NSPS Subparts A and Ja. |
| ¶¶ 49, 51, 53, and 54: Flares Subpart Ja applicability only | The #2 Flare (H-1105), #3 Flare (H-1104), #5 Flare (H-3351), #6 Flare (H-3352), #7 Flare (H-3301), FCC HP Flare, FCC LP Flare, and LPG Flare are affected facilities under NSPS Subpart Ja and shall comply with NSPS Subpart Ja, provided that the Flaring Device is combusting fuel gas as defined in 40 C.F.R. § 60.101a. |
| | At all times and to the extent practicable, including during periods of Startup, Shutdown, and/or Malfunction, implement good air pollution control practices for minimizing emissions from the Flaring Devices identified in Appendix D consistent with 40 C.F.R. § 60.11(d). |
| | For continuous or intermittent, routinely-generated refinery fuel gases that are combusted in any Flaring Device identified in Appendix D, comply with 40 C.F.R. § 60.103a(h). |
| | The combustion of gases generated as a result of Startup, Shutdown, and/or Malfunction of a refinery process unit or released to a Flaring Device as a result of a process upset or relief valve leakage or other emergency malfunction is exempt from the requirement to comply with 40 C.F.R. § 60.103a(h). |
| ¶ 99 NSPS QQQ | FCCU and Coker Drain Systems are affected facilities under Subparts A and QQQ. |
| ¶¶ 128-131, limitations on use of CD required emissions reductions | 1. Limetree Bay shall not generate or use any NOx, SO2, PM, PM-10, PM-2.5, VOC, or CO emissions reductions, or apply for and obtain any emission reduction credit, that result from any projects conducted or controls utilized pursuant to the Consent Decree (Civ. No. 1:11-cv-0006) ("CD Emissions Reductions") as netting reductions or emissions offsets in a PSD, major non-attainment, and/or synthetic minor New Source Review permit or permit proceeding. |
| | 2. Notwithstanding the general prohibition set forth in Paragraph 1, Limetree Bay may use 41 tons per year of NOx, 61 tons per year of CO, and 14 tons per year of PM from CD Emissions Reductions as credits or offsets |

O-8

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. |
|---|---|
| | in any PSD, major non-attainment and/or minor NSR permit or permit proceeding, provided that the new or modified emissions units at which credits are being used: (1) is being constructed or modified for purposes of compliance with clean fuels requirements (72 Fed. Reg. 8428, amending 40 C.F.R. Part 80); and (2) has a federally enforceable, non-Title V permit that reflects the following requirements that are applicable to the pollutants for which credits are being used:<br><br>a. For heaters and boilers, a limit of 0.027 lbs $NO_x$ per million BTU on a 3-hour rolling average basis;<br><br>b. For heaters and boilers, a limit of 0.10 grains of hydrogen sulfide per dry standard cubic foot of fuel gas or 20 ppmvd $SO_2$ corrected to 0% $O_2$ both on a 3-hour rolling average;<br><br>c. For heaters and boilers, no liquid or solid fuel firing authorization;<br><br>d. For FCCUs, a limit of 20 ppmvd $NO_x$ or less on a 365-day rolling average basis corrected to 0% $O_2$;<br><br>e. For FCCUs, a limit of 25 ppmvd $SO_2$ or less on a 365-day rolling average basis corrected to 0% $O_2$;<br><br>f. For FCCUs, a limit of 0.5 pounds of PM per 1,000 pounds of coke burned on a 3-hour average basis; and<br><br>g. For SRPs, NSPS Subpart J limits.<br><br>3. Utilization of the exception set forth in Paragraph 2 to the general prohibition against the generation or utilization of CD Emissions Reductions set forth in Paragraph 1 is subject to the following conditions:<br><br>a. Under no circumstances shall Limetree Bay use CD Emissions Reductions for netting and/or offsets prior to the time that actual CD Emissions Reductions have occurred;<br><br>b. CD Emissions Reductions may be used only at the Limetree Bay Refinery;<br><br>c. The CD Emissions Reductions provisions of this Consent Decree are for purposes of this Consent Decree only and neither Limetree Bay, nor any other entity may use CD Emissions Reductions for any purpose, including in any subsequent permitting or enforcement proceeding, except as provided herein. |

O-9

Case: 1:11-cv-00006-RAM-GWC    Document #: 22-1    Filed: 04/26/20    Page 137 of 158

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. |
|---|---|
| | d.  Limetree Bay shall remain subject to all federal, territorial, and local regulations applicable to the PSD, major non-attainment and/or minor NSR permitting process.<br><br>4. Outside the Scope of the General Prohibition.  Nothing in the Consent Decree (Civ. No. 1:11-cv-0006) is intended to prohibit Limetree Bay from seeking to:<br><br>  a.  Use or generate netting reductions or emission offset credits from refinery units that are covered by the Consent Decree (Civ. No. 1:11-cv-0006) to represent the difference between the emissions limitations set forth in or established pursuant to the Consent Decree (Civ. No. 1:11-cv-0006) for such refinery units and the more stringent emissions limitations that Limetree Bay may elect to accept for those refinery units in a permitting process;<br><br>  b.  Use or generate netting reductions or emission offset credits for refinery units that are not subject to an emission limitation pursuant to the Consent Decree (Civ. No. 1:11-cv-0006);<br><br>  c.  Use emissions reductions from the installation of controls required by the Consent Decree (Civ. No. 1:11-cv-0006) in determining whether a project that (a) includes both the installation of controls under the Consent Decree (Civ. No. 1:11-cv-0006) and other construction and (b) is permitted as a single project triggers major New Source Review requirements;<br><br>  d.  Use CD Emission Reductions for Limetree Bay's compliance with any rules or regulations designed to address regional haze or the non-attainment status of any area (excluding PSD and Non-Attainment New Source Review rules) that apply to Limetree Bay; provided, however, that Limetree Bay shall not be allowed to trade or sell any CD Emissions Reductions; or<br><br>  e.  Use or generate netting reductions or emission offset credits for heaters, boilers, Generating Turbines and Compressor Engines on which Qualifying Controls, as defined in Paragraph 23 of the Consent Decree (Civ. No. 1:11-cv-0006), have been installed, provided that such reductions are not included in Limetree Bay's demonstration of compliance with the requirements of Paragraphs 24, 26, 27 and 28 of the Consent Decree (Civ. No. 1:11-cv-0006). |
| ¶ 132.b:  Coker steam vent depressurization limit | Comply with a depressurization level of 2 psig for the Coker Steam Vents. |

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. | | | | |
|---|---|---|---|---|---|
| **¶ 133 and Appx H: Coker Heater (two units) CO and VOC limits** | Pollutant | Limit | Units | Averaging Time | Monitoring |
| | CO | 0.030 | lb/mmBTU | Average of 3 1-hr samples | Annual Performance Test (EPA RM-10) |
| | VOC | 0.0050 | lb/mmBTU | N/A | EPA RM-25 or RM-25A following any CO test exceedance |
| **¶ 133 and Appx H: Boiler 10 CO and VOC limits** | Pollutant | Limit | Units | Averaging Time | Monitoring |
| | CO | 0.070 | lb/mmBTU | Average of 3 1-hr samples | Annual Performance Test (EPA RM-10) |
| | VOC | 0.0050 | lb/mmBTU | N/A | EPA RM-25 or RM-25A following any CO test exceedance |
| **¶ 133 and Appx H: SRUs 1 & 2/Beavon 1, Reduced Sulfur Compound as defined in 40 CFR 60.101a, final limits** | Pollutant | Limit | Units | Averaging Time | Monitoring |
| | RSC | 162 | ppmvd | Hourly rolling 12-hr average | NSPS RSC CEMS (40 C.F.R. 60 App A, B, & F) |
| | | 66 | ppmvd | Daily rolling 30-day average | NSPS RSC CEMS (40 C.F.R. 60 App A, B, & F) |
| **¶ 133 and Appx H: EFR Tank and Subpart Kb requirements**<br><br>No. 6 Sour Water Stripper Tank (TK-1071),<br>Desalter Effluent Water (DEW) Tank (TK-1663) | Pollutant | Limit | Monitoring | | |
| | VOC | Ext. Floating Roof Tank | Subpart Kb monitoring (40 C.F.R. §60.113b(b)) for Ext. Floating Roof Kb requirements: Seal gap measurements (Secondary once/yr, Primary once/5 yrs). Inspect seals and fittings each time the vessel is emptied and degassed. | | |
| **¶ 133 and Appx H: Fixed Roof Tank and Subpart Kb requirements**<br><br>Coker Charge [Pitch]Tank (TK-8501) | Pollutant | Limit | Monitoring | | |
| | VOC | Fixed Roof Tank | Subpart Kb monitoring (40 C.F.R. §60.110b-117b) Record and maintain records documenting the material stored in the hot pitch storage tank (TK-8501), showing that the tank remains exempt from control requirements in accordance with 40 C.F.R. 60 Subpart Kb, §60.110b(b). | | |

O-11

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. | | |
|---|---|---|---|
| **¶ 133 and Appx H: LDAR**<br><br>**Process equipment located in**<br>Coker Unit,<br>Coker Gas Plant,<br>No. 7 Amine,<br>No. 5 Crude,<br>No. 3 Vacuum, No. 3 Crude,<br>No. 1 Vacuum, No. 1 Visbreaker, and No. 2, 4, 6, & 7 Distillate Desulfurizer Units and outside battery limit modifications to the terminal, tank farm & blending equipment | <table><tr><td>Pollutant</td><td>Limit</td><td>Monitoring</td></tr><tr><td>VOC</td><td>40 C.F.R. Part 60, Subpart GGGa</td><td>Comply with 40 C.F.R. Part 60, Subpart GGGa</td></tr></table> | | |

| CD Paragraph | | | |
|---|---|---|---|
| **¶ 133 and Appx H page H-3: equipment design and work practices for coke handling**<br><br>Coke Handling, Storage and Loading Facility | Emissions Unit | Pollutant | Design/Work Practice Controls | Monitoring |

| Emissions Unit | Pollutant | Design/Work Practice Controls | Monitoring |
|---|---|---|---|
| Coke Cutting/Coke Pit | PM (all species) | High Pressure water cutting of coke & enclosed drop zones/coke pit (No roof) | Maintain records documenting design |
| Coke Crusher | PM (all species) | Enclosed[b] crusher structure. Moisture content control from initial cutting. | Maintain records documenting design |
| Coke Transfer to Storage | PM (all species) | Enclosed[b] conveyor to storage, Moisture content control from initial cutting. | Maintain records documenting design |
| Coke Storage | PM (all species) | Enclosed[b] storage buildings, baghouse for vent control, and moisture content control from initial cutting. | Maintain records documenting design |
| Coke Loading | PM (all species) | Enclosed[b] conveyor to loading dock. "Spout" containment loading to minimize drop emissions when loading ship. | Maintain records documenting design |

[b] Enclosed structures can have ventilation vents or access ways.

O-12

| CD Paragraph | Requirements That Shall Survive Termination of the Consent Decree under Section XVII. |
|---|---|
|  |  |
| ¶ 135 Boilers 5, 8, and 9, NSPS Subparts A and D | Boilers 5, 8, and 9 are "affected facilities" as that term is used in 40 C.F.R. Part 60, NSPS Subparts A and D and are subject to and required to comply with the requirements of NSPS Subparts A and D. |
| ¶ 136 [as modified]: Turbines 1-9, NSPS Subparts A and GG | Generating Turbines 4,7, 8 and 9 are "affected facilities" as that term is used in, and shall comply with, 40 C.F.R. Part 60, Subparts A and GG, including any custom sulfur monitoring plan approved by EPA in accordance with 40 CFR 60.334(i)(3). |

O-13

## APPENDIX P
## Flaring Mitigation Projects

The flaring mitigation projects include those listed below and any others submitted by Limetree Bay for advance approval by EPA and VIDPNR ("approved mitigation projects"). Pursuant to Paragraph 50A, Limetree Bay will achieve emission reductions sufficient to satisfy the Mitigation Amount, if any, by implementing one or more of the approved mitigation projects.

Limetree Bay will begin implementing one or more of the approved mitigation project(s) by no later than 180 days after submitting the notification required by Paragraph 50C.b.iii, and will mitigate a minimum of 10 tons per year until the Mitigation Amount is satisfied.

Progress on the implementation of the approved mitigation projects including, the start and end date(s) of an approved mitigation project, the approved mitigation project(s) being implemented, the number of tons reduced during the reporting period, the tons remaining to be mitigated, and the completion of the mitigation of the Mitigation Amount, will be included in the semi-annual reports submitted under Paragraph 143.

**A. Approved Mitigation Projects**

The following projects are approved:

1. **Reducing H$_2$S in Refinery Fuel Gas**:  If this project is selected for implementation, then Limetree Bay shall reduce the SO$_2$ emissions from fuel gas combustion devices (other than the Coker heaters, Boiler 10 and GT-13) by reducing H$_2$S in fuel gas.

   The emission reductions achieved pursuant to this project shall be calculated based on the difference between the average H$_2$S concentration during the first six months  after restart of Refinery Operations ("Baseline Period"), excluding periods of non-compliance, and the actual H$_2$S concentration in the East Side refinery fuel gas system (using the H$_2$S analyzers used to comply with NSPS Subpart J) after the Baseline Period.  The tons of SO$_2$ reduction will be determined based on the change in H$_2$S concentration, relative to the Baseline Period, and the total volume of fuel gas to fired sources on the East Side, each year after the Baseline Period.

2. **Boutique Amines to Reduce SO$_2$ from the TGTU**

   If this project is selected for implementation, then Limetree Bay shall reduce SO$_2$ emissions by using specialized amines in its East Side tail gas treatment unit by reducing H$_2$S and other sulfur compounds.

   The emission reductions achieved pursuant to this project shall be calculated based on the difference between the monitored SO$_2$ concentration from the incinerator stack for the first six months of operations, excluding periods of noncompliance, after restart of Refinery Operations ("Baseline Period") and each year after the Baseline Period.

P-1

3. **Boutique Amines to Reduce Other Sulfur Compounds in Fuel Gas**:

If this project is selected for implementation, Limetree Bay shall reduce $SO_2$ emissions from fuel gas combustion devices by decreasing the total sulfur concentration of fuel gas through the use of amines designed specifically to lower the concentration of sulfur compounds other than $H_2S$.

The emission reductions achieved pursuant to this project shall be calculated based on the difference between the total sulfur concentration during the first six months after restart of Refinery Operations, excluding periods of non-compliance ("Baseline Period"), and the total sulfur concentration in the East Side refinery fuel gas system after the Baseline Period. The tons of $SO_2$ reduction will be determined based on the change in total sulfur concentration, relative to the Baseline Period, and the total volume of fuel gas to fired sources on the East Side, each year after the Baseline Period.

B.    **Approval of Other Mitigation Projects**

1. Limetree Bay may propose other or additional projects for approval by EPA and VIDPNR. The written proposal shall contain a written description of the project(s), the emission reductions expected to be achieved, the anticipated start and end dates for the project(s), and any other relevant information describing the project(s). EPA and VIDPNR shall consult with each other and, if necessary, with Limetree Bay regarding the proposed project(s). Following such consultation and review, EPA and VIDPNR shall either approve the project(s) or provide written comments to Limetree Bay. If approved and selected for implementation, then Limetree Bay shall implement the project(s). If written comments are provided by EPA and VIDPNR, Limetree Bay shall either revise the written description of the project(s) to reflect the comments, withdraw the proposal, or submit an alternate proposal.

C.    **Certification**

1. With regard to the approved mitigation projects, Limetree Bay shall include in the notification required by Paragraph 50C.b.iv. (or, if applicable, in the written proposal for other or additional project(s)), a certification of the truth and accuracy of each of the following:

   a. That, as of the date of the 50C.b notification (or the proposal for additional or alternate project(s)), Limetree Bay is not required to perform or develop the mitigation project(s) by any federal, state, or local law or regulation and is not required to perform or develop the mitigation project(s) by agreement, grant, or as injunctive relief awarded in any other action in any forum;

   b. That the mitigation project(s) are not projects that Limetree Bay was planning or intending to construct, perform, or implement other than in settlement of the potential violations resolved in the First Modification;

   c. That Limetree Bay has not received and will not receive credit for the mitigation project(s) in any other enforcement action; and

    d.  That Limetree Bay shall neither generate nor use any pollutant reductions from the mitigation project(s) as netting reductions, pollutant offsets, or to apply for, obtain, trade, or sell any pollutant reduction credits.

# APPENDIX Q



Director
Air Enforcement Division
Office of Civil Enforcement (2242A)
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, DC 20044
foley.patrick@epa.gov

Director
Air Enforcement Division
Office of Civil Enforcement
c/o Matrix New World Engineering, Inc.
26 Columbia Turnpike, Suite 200
Florham Park, NJ 07932-2213
jmack@matrixneworld.com

Director
Enforcement and Compliance Assistance
Division
U.S. EPA Region 2
290 Broadway, 21st Floor
New York, NY 10007-1866
patel.harish@epa.gov

United States Environmental Protection
Agency
Region 2
Office of Regional Counsel
290 Broadway
New York, NY 10007

Director, Caribbean Environmental Protection
Division
U.S. EPA Region 2
City View Plaza II, Suite 7000
#48 Rd. 165 km 1.2
Guaynabo, PR 00968-8069

Director, Division of Environmental Protection
Virgin Islands Department of Planning and
Natural Resources
45 Estate Mars Hill
Frederiksted, St. Croix, U.S. Virgin Islands
00840-4474
jp.oriol@dpnr.vi.gov

Re:     *United States of America and The United States Virgin Islands v. HOVENSA, L.L.C.*
        Civil Action No. 1:11-cv-0006

To Whom It May Concern:

As you are aware, I was appointed as the independent member of HOVENSA's Executive Committee pursuant to that letter agreement dated June 4, 2015 and currently serve as Manager of HOVENSA, L.L.C. on the terms set forth in the (i) *Order Granting Final Approval of Disclosure Statement and Confirming Chapter 11 Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (Case No. 1:15-bk-10003-MFW) (Bankr. D.V.I. 2015) [Docket No. 572] and (ii) *Debtor's Second Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (Case No. 1-15-bk-10003-MFW (Bankr. D.V.I. 2015) [Docket No. 572-1].

As of June 30, 2019, HOVENSA, L.L.C. has taken the actions described in the table below in completion and satisfaction of the Consent Decree requirements identified therein.

| CD ¶ | CD Requirement | Activities Undertaken |
|------|----------------|------------------------|
| | **Sections V.A through V.E – FCCU** | |
| 11 | Limit NO$_X$ emissions from the FCCU to 20 ppmvd or less on a 365-day rolling average and 40 ppmvd or less on a 7-day rolling average, each at 0% O$_2$. | NO$_X$ emission limits have not been exceeded. |
| 12 | Demonstrate compliance with FCCU NO$_X$ emission limits by installing, maintaining, and operating CEMS and performing RATAs once every three years. | Operated pre-existing CEMS during FCCU operation, maintained them, and performed RATAs when due. |
| 13 | Limit SO$_2$ emissions from the FCCU to 16 ppmvd or less on a 365-day rolling average and 25 ppmvd or less on a 7-day rolling average, each at 0% O$_2$. | SO$_2$ emission limits have not been exceeded. |
| 14 | Demonstrate compliance with FCCU SO2 emission limits by installing, maintaining, and operating CEMS and performing RATAs once every three years. | Operated pre-existing CEMS during FCCU operation, maintained them, and performed RATAs when due. |
| 16 | Submit FCCU PM stack test protocol specified in 40 C.F.R. § 60.106(b)(2) . | Protocol submitted on 8/23/2011. |
| 18 | Limit CO emissions from the FCCU to 500 ppmvd or less on a 1-hour block average basis corrected to 0% O$_2$. | CO emission limit has not been exceeded. |
| 21 | Demonstrate compliance with FCCU CO emission limits by installing, maintaining, and operating CEMS and performing RATAs once every three years. | Operated pre-existing CEMS during FCCU operation, maintained them, and performed RATAs when due. |
| 22 | Comply with NSPS Subparts A and J for SO$_2$ and CO. | Emission limits have not been exceeded and CEMs operated during FCCU operation. |
| | **Section V.F - NO$_X$ Emissions Reductions from Heaters, Boilers, Generating Turbines, and Compressor Engines** | |
| 26 | Install sufficient Qualifying Controls and apply for emission limits from the appropriate permitting authority sufficient to achieve 1,079 tpy NO$_X$ emissions reductions.<br><br>Submit a report to EPA showing how refinery satisfied requirement of Paragraphs 23 and 26. | Compressor IC engines shutdown and permits surrendered, per Para. 23.e; replaced with electric motors prior to Date of Lodging.<br><br>Report submitted 8/31/15, demonstrating compliance. |
| 27 | Install sufficient Qualifying Controls and apply for emission limits from the appropriate permitting authority sufficient to achieve 3,663 tpy NO$_X$ emissions reductions. | Permanent emissions unit shutdown and surrender of permits by letter, 2/28/17, per Para. 23.e. |

| CD P | CD Requirement | Activities Undertaken |
|------|----------------|------------------------|
| | Submit a report to EPA showing how refinery satisfied requirement of Paragraphs 23 and 27. | Report submitted 10/27/17 demonstrating compliance and confirming shutdown and permit surrender application. |
| 28 | Install sufficient Qualifying Controls and apply for emission limits from the appropriate permitting authority sufficient to achieve 4,744 tpy NOx emissions reductions. | Permanent emissions unit shutdown and surrender of permits by letter of 5/30/19, per Para. 23.e. |
| | Submit a report to EPA showing how refinery satisfied requirement of Paragraphs 23 and 28. | Report submitted 9/3/19 demonstrating compliance and confirming shutdown and permit surrender application. |
| 29 | Submit a detailed NOx Control Plan to EPA for review and comment and to DPNR. | Initial NOx control plan submitted 10/4/11. |
| 29 | Submit annual updates of NOx Control Plan to EPA and DPNR. | NOx control plan update submitted annually. |
| **Section V.G SO2 Emissions Reductions from, and NSPS Applicability to, Heaters, Boilers and Generating Turbines** | | |
| 34 | Applicability and compliance of Heaters, Boilers, and Other Fuel Gas Combustion Devices with NSPS Subparts A, J and/or Ja, as applicable. | H2S fuel gas concentration standard has not been exceeded. |
| 35 | H2S/SO2 monitoring requirements of NSPS Subparts A and J or Ja, as applicable. | Operated CEMS during unit fuel gas combustion operations. |
| **Section V.H Sulfur in Fuel Restrictions for Oil Burning** | | |
| 37 | Effective 30 days after Date of Lodging, no longer burn Fuel Oil greater than 0.55 wt % sulfur at any time or 0.50 wt % on a 365-day rolling average basis in any heater, boiler, or Generating Turbine. | Did not burn Fuel Oil in excess of specified concentrations in para. 37. |
| 38 | Switch the fuel supply for any units combusting Fuel Oil to a Fuel Oil with not greater than 0.3 wt % sulfur within one hour when (a) the hourly average winds blow from a 180 degree sector for at least 6 consecutive hours during a 24-hour block period, or any 12 non-consecutive hours during a 24-hour block period or (b) the meteorological station is inoperable for six consecutive hours. | Did not burn Fuel Oil with greater than 0.3 wt% sulfur. |

| CD ¶ | CD Requirement | Activities Undertaken |
|---|---|---|
| 39 | Switch back to the higher sulfur content Fuel Oil in accordance with conditions at 39.a or b. | Did not burn Fuel Oil with greater than 0.3 wt% sulfur. |
| | **Section V.I Sulfur Recovery Plants.** | |
| 42 | For East Side SRP, comply with applicable NSPS Subpart Ja provisions. | East Side SRP did not exceed applicable Ja emission standards. |
| 42, 44.a | For West Side SRP, comply with applicable NSPS Subpart J/Ja provisions. | West Side SRP did not exceed applicable NSPS J or Ja emission standards. West Side SRP complied with NSPS J and converted to Ja compliance by 12/31/11. |
| 43 | Route or re-route all sulfur pit emissions so they are eliminated or controlled and included and monitored as part of the SRPs' emissions subject to the NSPS Subpart Ja limit for $SO_2$ or reduced sulfur compounds (40 C.F.R. § 60.102a(f)) for the East and West Side SRP sulfur pit emissions. | Control installed on 12/28/2011, routing all West Side sulfur pit emissions back to the SRP. Continued to comply with requirement for West Side SRP sulfur pits during unit operation.<br><br>East Side SRP not in operation on applicability date, 12/31/14. Did not exceed applicable NSPS Ja emission standards. |
| 44.a | Install $SO_2$ CEMS on West Side incinerators. | Installation of CEMS completed 4Q 2010. |
| 44.c | Monitor West Side SRP tail gas emissions points. | CEMS installed, RATA completed 6/11, monitoring and reporting continued while unit in operation. |
| 45.a. | Submit compliance plan and schedule for installation of second East Side TGU to EPA and DPNR. | Compliance plan and schedule submitted 12/16/11. |
| 45.b.ii | Complete an optimization study to minimize emissions of sulfur compounds and maximize sulfur recovery efficiencies at the East Side SRP meeting the requirements of Paragraph 46 and submit study to EPA. | Optimization study completed and submitted 12/2/11. |
| 46.b | Incorporate results of optimization study into PMO Plan. | Results incorporated into PMO plan, submitted 12/7/11 (see 48.a.). |
| 48.a. | Submit a "Preventative Maintenance Operation Plan" (PMO Plan) for SRU and SAR to EPA and DPNR. | Submitted PMO Plan 12/7/2011. |
| | **Sections V.J through V.O – Flares** | |
| 49 | For listed Flaring Devices, comply with applicable requirements of NSPS Subpart Ja by dates listed in Appendix D. | Fuel gas standard not exceeded. |
| 51 | Comply with applicable monitoring requirements of NSPS Ja by 6/7/14 for Flare | Complied with applicable monitoring requirements as of 6/7/14 when combusting |

| CD ¶ | CD Requirement | Activities Undertaken |
|---|---|---|
|  | 7. | fuel gas. |
| 52 | Submit a Compliance Certification to EPA that HP, LPG, LP, 2, and 3 Flaring Devices comply with the emission standards and monitoring requirements of Subparts J/Ja, specifying the compliance method for each respective Flaring Device. | Submitted certification on 7/7/16 (HP, LPG Flares).\n\nSubmitted certification on 7/11/18 (LP, 2 and 3 Flares). |
| 58 | Submit a corrective action report to minimize the likelihood of a recurrence of Root Cause of flaring event included in look-back analysis previously sent to EPA. | Corrective action report submitted 6/7/11. |
| 59-61 | Investigate (no later than 45 days post-incident) and take corrective actions for any Acid Gas Flaring Incidents, prepare report. | No Acid Gas Incidents. |
| 59, 60, 61, 70 | Investigate (no later than 45 days post-incident) and take corrective actions for any Tail Gas Flaring Incidents, prepare report. | Tail Gas Incidents investigated and reports prepared. |
| 71 | Submit semi-annual report that includes each Acid Gas Flaring Incident and Tail Gas Incident reports during relevant period. | Incident Reports submitted with semi-annual reports, last Incident Report submitted with July 2012 semiannual report. |
| 72 | For any Hydrocarbon Flaring Incidents, follow investigative, reporting and corrective action procedures as set forth in paragraphs 60 and 61. | Incident Reports submitted with semi-annual reports, last Incident Report submitted with January 2015 semiannual report. |
| 72 | Investigate (no later than 45 days post-incident) and take corrective actions for any Hydrocarbon Flaring Incidents. | Hydrocarbon Flaring Incidents investigated and reports prepared. |
| **Sections V.P through V.R – Benzene NESHAP, NSPS QQQ, and LDAR** | | |
| 79.a. | Complete Phase One Review and Verification of Refinery TAB and its compliance with the Benzene Waste NESHAP.\n\nSubmit BWON Compliance Review and Verification Report. | Completed Phase One Review and Verification 1/20/12.\n\n\n\nSubmitted report 3/22/12. |
| 79.b. | Conduct any additional required sampling by EPA and submit amended BWON Compliance Review and Verification Report. | No samples requested. |
| 80.a. | Amend TAB Reports (if necessary due to inaccuracies or not meeting requirements of 40 C.F.R. § 61.357(c)). | Amended TAB Report not necessary. |
| 80.b. | Submit to EPA and DPNR compliance plan (if results of BWON Compliance Review | Compliance plan submitted, 9/14/12. |

| CD P | CD Requirement | Activities Undertaken |
|---|---|---|
| | and Verification Report identify any compliance issues). | |
| 81 | Conduct inspections in accordance with the three-tier system for control of vents associated with the Subpart FF wastewater collection system. | All required inspections completed. |
| 82.a. | Complete BWON lab audit prior to conducting Phase One Review and Verification to analyze benzene waste NESHAP samples to ensure proper analytical and QA/QC procedures are followed. | Initial audit completed 1/26/12. |
| 82.b. | Conduct audits for each lab continuing to perform BWON sample analyses every 2 years. | Subsequent audits completed 3Q 2013, 3Q 2015, and 3Q 2017. |
| 83 | Continue to use management of change procedures to review process information and construction projects to ensure all new benzene waste streams are included in waste stream inventory. | Used management of change procedures to review process information and construction projects. |
| 84.a. | Complete development of SOPs for all control equipment used to comply with the benzene waste NESHAP. | Development of standard operating procedures for benzene stripper (only "control equipment" used) completed. |
| 84.b. | Develop BWON training program. Submit to EPA. | Initial program completed. Submitted 3/7/12. |
| 85.a. | Submit a plan for quantifying waste/slop/off-spec oil movements for all benzene waste streams that are not controlled at the Refinery, along with schematics. | Plan and schematics submitted 1/26/12. |
| 86 | Submit benzene waste operations sampling plans designed to describe the sampling of benzene waste streams to EPA and DPNR. | Sampling plan submitted to EPA and DPNR 1/26/12. |
| 88 | Implement and continue to implement the sampling plan for benzene waste operations sampling plans at the required time. | Sampling plan implemented and streams monitored. |
| 89.a | Upon determination that a sampling plan is no longer accurate, submit BWON sampling plan revisions to EPA and DPNR for approval. | Sampling Plan revised and submitted 6/29/12 to reflect idling of refinery. |
| 90 | Calculate a quarterly and projected annual uncontrolled benzene quantity. | Quarterly and projected annual uncontrolled benzene quantity calculated. |

| CD ¶ | CD Requirement | Activities Undertaken |
|---|---|---|
| 91 | Submit calculations of uncontrolled benzene quantity releases with reports. | Submitted calculations of benzene quantity with quarterly Subpart FF reports. |
| 93.a.iii | Conduct monitoring of API Separators 1, 2, & 3 or any new Subpart FF-regulated oil/water separators (as described in 93.a.iii. (1)-(3)). | Monitoring of in-service API Separators conducted. |
| 95 | Record and submit information pursuant to 40 C.F.R. § 61.357(d)(6) and (7) on sampling results, training, and laboratory audits. | Recorded and reported sampling results, TAB, training and lab audit results with quarterly Subpart FF reports. |
| 98 | Submit copies of reports, plans and certifications to EPA, EPA Region 2 and DPNR. | Reported sampling results, TAB, training and lab audit results in quarterly Subpart FF reports. |
| 99 | Prepare and submit compliance plan to EPA specifying projects necessary to bring the FCCU and Coker Drain Systems into compliance with 40 C.F.R. Subpart QQQ. | Compliance Plans submitted 12/16/11 and 1/16/2012. |
| 99 | Complete FCCU and Coker Drain Systems projects described above for compliance with 40 C.F.R. Subpart QQQ. | Projects submitted as part of 12/16/11 Compliance Plan reported as complete as of 6/30/11.

Projects submitted as part of 1/16/2012 Compliance Plan were field verified as complete. |
| 102 | Submit to EPA a plan and schedule for bringing Refinery into compliance with 40 C.F.R. Part 60, Subpart GGG and requirements of CD. | Plan and schedule submitted 4/25/11. |
| 103 | Develop and maintain written refinery-wide program for compliance with applicable LDAR regulations and requirements of CD.

Submit copy to EPA with next semi-annual report. | Initial Refinery-wide LDAR program of 10/26/11 superseded by Revision 1 effective 1/1/2012.

Revision 1 submitted with semi-annual LDAR report for 2nd semi-annual period of 2011. |
| 105.a. | Develop and submit to EPA the LDAR training program. | LDAR training program submitted 3/7/12. |
| 105.c. | Provide training on LDAR responsibility relevant to Refinery operations and maintenance personnel. | Initial training completed by 6/7/13 and three-year retraining completed through 12/31/16. |
| 106.a. | Complete a refinery-wide third-party audit of compliance with LDAR Regulations and applicable sections of CD. | Initial audit completed by 1/26/12. |

| CD ¶ | CD Requirement | Activities Undertaken |
|---|---|---|
| | Submit noncompliance report from third-party audit. | Report and compliance schedule submitted 2/15/12. |
| 106.a.i | Submit to EPA that the Refinery is in compliance with LDAR Regulations. | Certification of compliance with LDAR Regulations submitted 6/7/12. |
| 106.b.i | Retain independent contractor to perform 3rd party audit of LDAR program compliance with applicable LDAR Regulations and applicable CD requirements at least once every four years. | Audit completed 3/3/16. |
| 106.b.ii | Conduct internal audits of the LDAR program compliance with applicable LDAR Regulations, by 1Q 2014 and at least once every four years thereafter. | Internal audits completed 1Q 2014, 3/12/18. |
| 107 | Implement all appropriate steps to correct areas of non-compliance identified in subsequent audits. | Implementation of identified corrective actions to correct areas of non-compliance identified in 2016 third party audit included in 7/15/16 LDAR Semi-Annual Report. Implementation of corrective actions to correct areas of non-compliance identified in 2014 and 2018 internal audits included in 7/28/2014 and 7/18/18 LDAR Semi-Annual Report, respectively. |
| | Submit results of subsequent audits to EPA. | March 2016 third-party audit results submitted with 7/15/16 LDAR Semi-Annual Report. Internal audit results submitted with relevant LDAR Semi-Annual Report. |
| 109 | Utilize lower leak definitions for valves and pumps, as defined in 109.a. and 109.b. | Lower leak definitions were utilized beginning August 2012 and continued to be utilized. |
| 111 | Record, track, repair, and remonitor all leaks in excess of the internal leak definitions in Paragraph 109. | Complied with recording, tracking and repair requirements. |
| 112.a.i | Perform external valve surveys in accordance with Appendix G. | Surveys conducted, beginning 7/26/12. |
| 112.a.ii | Perform valve stuffing box condition surveys in accordance with Appendix G. | Surveys conducted, beginning 7/26/12. |
| 112.b. | Repack or replace valves prior to or during process unit turnarounds or tank outages in accordance with Appendix G. | Repack/replace conducted, beginning 7/26/12. |
| 112.c. | Ensure newly installed valves are fitted with proper packing or valve technology designed | Proper packing used, beginning 7/26/12. |

| CD P | CD Requirement | Activities Undertaken |
|---|---|---|
| | to prevent leaks above 100ppm for a period of five years after installation. | |
| 112.d. | Establish a comprehensive tracking database for Paragraph 112.d information (Valve Preventative Leak Maintenance Program). | Tracking database established, beginning 7/26/12. |
| 112.e. | Analyze information in 112.d database every two years after effective date (Valve Preventative Leak Maintenance Program components) and report evaluation to EPA with semiannual report. | Analyses completed by 7/26/14 and subsequent analyses completed in 2016 and 2018, results of evaluation reported in LDAR Semi-Annual reports submitted 1/7/15, 1/20/17 and 1/30/19. |
| 113.a. | Monitor pumps at lower leak definition on a monthly basis. | Monitoring conducted. |
| 113.b. | Monitor valves according to the monitoring frequencies required by 40 C.F.R. §§ 60.482-7 and 60.483-2, except when monthly monitoring is required. | Monitoring conducted. |
| 114 | Record all LDAR monitoring and repair data in electronic database. | Database established and commenced recording data prior to Date of Lodging. |
| 115 | Collect electronic data during LDAR monitoring and perform appropriate data transfer. | System was in place before Date of Lodging and maintained, with uploading times consistent with Paragraph. |
| 116 | Develop procedure for QA/QC of LDAR-generated data. | Procedure developed. |
| 117 | Maintain program for personnel accountability and position for LDAR management. | LDAR accountability program and position for LDAR management maintained, beginning 1/26/11. |
| 118 | Implement tracking program for maintenance and (Management of Change) to ensure valves and pumps subject to LDAR Regulations and the CD are integrated into the LDAR program. | Database was in place and maintained, beginning 1/26/11. |
| 119 | Conduct all calibrations of LDAR monitoring equipment using methane as the calibration gas in accordance with 40 C.F.R. Part 60, EPA Reference Test Method 21. | Calibrations conducted using methane as calibration gas, beginning 6/7/11. |
| 120 | Conduct calibration drift assessments of LDAR monitoring equipment at the end of each monitoring shift (at a minimum). | Compliance maintained. |
| 121 | Perform monitoring and maintenance as specified in Paragraph 121 including extended maintenance and delayed repair of leaks. | Began implementing program prior to 1/26/12 and continued to implement, as required. |

| CD ¶ | CD Requirement | Activities Undertaken |
|---|---|---|
| 123 | Include information in Paragraph 123 in applicable Semi-Annual LDAR Report. | All required LDAR reports were filed by Jan 30 and July 30 dates, and included the information required by Paragraph 123. |
| **Part VI – Permitting** | | |
| 124 | Submit application to incorporate the emissions limits and standards of the CD effective upon Date of Entry of CD. | Submitted application to incorporate emission limits and standards effective upon Date of Entry, 8/2/11. |
| 125 | File applications to incorporate the emissions limits and standards effective after Date of Entry. | Submitted applications to incorporate emission limits and standards on 7/19/11 and 10/17/14, excluding (1) Ja compliance for East SRU (Para. 45.a); and (2) interim performance standard for East Beavon (Para. 45.b.iii). |
| **Part VIII - Additional Injunctive Relief** | | |
| 132.a. | Comply with depressurization level of 10 psig for the Coker Steam Vents. | Complied with depressurization level during coker operation, beginning Date of Entry. |
| 132.b. | By December 31, 2012, comply with depressurization level of 2 psig for the Coker Steam Vents. | 2 psig depressurization level not exceeded, on and after December 31, 2012. |
| 133, App. H | West SRU 1&2/Beavon 1: comply with TRS (Interim) limits by Date of Entry; comply with TRS (Final) limits by 1/1/14. | Complied with Interim emission limits by Date of Entry. Final limits not exceeded. |
| 133, App. H | TK-1071: NSPS subpart Kb monitoring, primary and secondary seal gap measurements. | Per NSPS Kb requirements to conduct gap testing when storing VOL, initial primary seal gap measurements and secondary seal gap measurements conducted per schedule during tank operations. Initial secondary seal inspection on 2/24/12.  Tank not storing VOL after 2012. |
| 133, App. H | TK-1663: NSPS subpart Kb monitoring primary and secondary seal gap measurements. | Per NSPS Kb requirements to conduct gap testing when storing VOL, initial primary seal gap measurements and secondary seal gap measurements conducted per schedule during tank operations. Initial secondary seal inspection on 11/23/11. Tank not storing VOL after 2Q 2012. |
| 133, App. H | TK-8501: Kb recordkeeping (maintain documents showing tank is exempt). | Documentation maintained during tank operations. |
| 133, App. H | Process Equipment located in specified units for fugitive VOC, HON minus Connectors. | LDAR program maintained during unit/equipment operation. |

| CD ¶ | CD Requirement | Activities Undertaken |
|---|---|---|
| 135 | Comply with NSPS Subparts A and D for Boilers 5, 8, and 9 by July 31, 2012. | Boilers 5, 8, and 9 were not in operation on or after the applicability date for Subpart D of July 31, 2012. Did not exceed applicable NSPS emissions standard. |
| 136 | Comply with NSPS Subparts A and GG  for Generating Turbines 1, 2, 3, 5 and 6 no later than 5 years from Date of Entry. | Emission standards not exceeded for Generating Turbines 1, 2, 3, 5 and 6. Additionally, Generating Turbines 1, 2, 3, and 6 permanently shut down and application to surrender permits submitted 2/28/17.  Generating Turbine 5 permanently shut down and application to surrender permit submitted 5/30/19. |
| 136 | Comply with NSPS Subparts A and GG by Date of Entry (Generating Turbine 9). | Complied with NSPS subparts A and GG. |
| | **Part X - Reporting and Recordkeeping** | |
| 143 | Submit semi-annual progress reports to EPA and DPNR. | First report submitted 1/30/12; subsequent reports submitted on semi-annual schedule. |
| 144 | Certification of semi-annual reports by HOVENSA. | All semi-annual reports submitted were certified. |
| | **Part XI – Civil Penalty** | |
| 145 | Pay civil penalty to both the US and the USVI. | Penalty paid 7/5/11. |

In accordance with Paragraph 231 of the above-referenced Consent Decree, I certify under penalty of law that this information was prepared under my direction or supervision by personnel qualified to properly gather and evaluate the information submitted. Based on my directions and after reasonable inquiry of the person(s) directly responsible of gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate and complete.


Matthew Kahn, Manager
HOVENSA, L.L.C.

cc:     Tom Hill (via electronic mail)
        Dan Harris, Esquire (via electronic mail)
        Brian Lever (via electronic mail)
        David Molloy, Esquire (via electronic mail)

Q-13



**APPENDIX S**
**MAP OF H2S MONITORING LOCATIONS**

#3 API and DAF/WEMCO Units (East Side)



#1 API (West Side



● Approximate location of monitor(s)

S-1

# ATTACHMENT B

# TO MEMORANDUM IN SUPPORT OF MOTION TO ENTER

September 30, 2020

Jeffrey Bossert Clark
Assistant Attorney General
U.S. DOJ—ENRD
P.O. Box 7611
Washington, D.C.
20044-7611

Submitted via email

Re: *United States, et al.* v. *HOVENSA L.L.C.,* **Civil Action No. 1:11-cv-00006, D. J. Ref. No. 90-5-2-1-08229/1**

Dear Mr. Clark,

I appreciate the opportunity to provide public comments on the First Modification of the Consent Decree ("Modification") in the above-referenced matter. I am a US Virgin Islands attorney ████████████ and former longtime resident of St. Croix. A graduate of St. Croix Country Day School (now Good Hope Country Day School) whose family has lived on island since 2000, I developed my conservation ethic and ultimately decided to pursue a career in environmental advocacy due to my years spent on St. Croix.

I.   Introduction

I respectfully urge you to reject the Modification as inappropriate, improper, and inadequate because:

1) It implies a false premise that the Limetree Bay Terminals (formerly known as Hovensa and HOVIC) refinery (hereinafter Refinery) did not shut down, when the Refinery should be considered a new major stationary source under the Prevention of Significant Deterioration (PSD) rules and thus subject to the standards therein;

2) In order to effectively protect the public health and welfare of the people of the Virgin Islands, the cancer registry referenced therein must be established and significant community research undertaken *before* the commencement of polluting activity contemplated;

3) The compliance assessment and reporting protocols referenced therein allow for Limetree to self-report, when this responsibility should properly be undertaken by EPA Region 2; and

4) The Refinery activity contemplated by the Modification implicates and does not address serious concerns regarding federally-listed species and Sandy Point National Wildlife Refuge.

II.    Discussion

    1.    The Modification Falsely Implies that the Refinery Did Not Shut Down for PSD/Clean Air Act (CAA) Permitting Purposes

    As of the date of these comments, the Refinery currently has a draft Plantwide Applicability Limit permit (PAL) pending before EPA Region 2,[1] and that PAL is fundamentally and problematically predicated on the pretense that the Refinery did not shut down following its closure by Hovensa. Contrary to the Modification's assertion that "neither Hovensa nor Limetree Bay has permanently shut down and surrendered permits for the Refinery or portions of the Refinery,"[2] EPA precedent and case law clearly established that the Refinery did shut down and must thus be treated as a new stationary source under PSD rules. The Modification confuses the matter by referring to permits in broad and nonspecific terms, when the PAL has been pending for close to a year as of the date of the Modification's publication. The Modification as written must thus be rejected in order to account for practical and legal realities.

    While I acknowledge the April 5, 2018 letter authored by former Assistant Administrator Wehrum to Limetree regarding EPA's reactivation policy (Wehrum Letter), this letter should be disregarded due to its lack of conformity with precedent and in light of the ethics charges against former Assistant Administrator Wehrum. Finally, the pertinent circumstances and regulations applicable to a PAL make it clear that this regime, which is fundamentally based on "actual" emissions, is not intended for facilities like this one. Limetree, which should properly be considered to be comprised of all "new" units for PSD applicability.

    i. Reactivation Policy
    At its foundation, the PAL is fundamentally and fatally flawed because it should properly be evaluated as a "new" stationary source under EPA's well-established "reactivation policy."[3] Predicated on longstanding agency interpretation of the CAA,[4] the reactivation policy mandates that "reactivation of facilities that have been in an extended condition of inoperation may trigger PSD requirements as 'construction' of either a new major stationary source or a major modification of an existing stationary source."[5] This policy is predicated on the notion that "to preserve their ability to reopen without a new source permit, EPA believes owners and operators of shutdown facilities must continuously demonstrate concrete plans to restart the facility sometime in the reasonably foreseeable future."[6] Under this policy, "shutdowns of more than two years . . . are presumed to be permanent" and are thus subject to all PSD requirements when reactivated.[7] It is then "up to the facility operator to rebut this presumption."[8] *Monroe Electric*, the foundational case which defines the contours of the reactivation policy, held that a "key

---

[1] *See* https://www.epa.gov/sites/production/files/2019-09/documents/limetree-draft_pal_permit.pdf
[2] Modification at 4. **The undersigned notes that this section applies to PSD analysis — *not* as to whether the terms of Section 229 of the Consent Decree have come to pass.**
[3] *In the matter of Entergy Louisiana – Monroe Electric Generating Plant*, Order on Petition No. 6-99-2 (June 11, 1999). (Hereinafter, "Monroe").
[4] *Id.*
[5] *Id.* at 7.
[6] *Id.* at 9.
[7] *Id.* at 8.
[8] *Id.*

determination" in this analysis is "whether the owner or operator has demonstrated a **continuous intent** to reopen."[9] While "no single factor is likely to be conclusive," some factors that EPA has examined in determining continuous intent include "the amount of time the facility has been out of operation, the reason for the shutdown, statements by the owner or operator regarding intent, cost and time required to reactivate the facility, status of permits, and ongoing maintenance and inspections that have been conducted during the shutdown."[10] Evaluating the facts and circumstances of the Refinery in light of these factors, it is evident that there has not been a continuous intent to restart the refinery since its shutdown in 2012.

The amount of time that the Refinery has been shut down clearly indicates that the Refinery should be presumed a new source under the PSD rules. Under the reactivation policy, articulated in case law and EPA statements of policy, shutdowns of more than two years are presumed to be permanent.[11] The Refinery shuttered in January 2012, nearly nine years prior to the date of these public comments,[12] and it has not conducted oil refining activities since. Accordingly, under this factor, the Refinery should be considered a "new" source for PSD review.

As for the second factor, the reasoning behind Refinery's 2012 shutdown indicates that the Refinery should be treated as a new source under the PSD rules. Hovensa shut down the Refinery for financial and economic reasons, specifically due to its having incurred losses of over $1.3 billion over three years, caused primarily by weakness in demand for petroleum products and the addition of new capacity in emerging markets.[13] The magnitude of the financial losses driving the shutdown taken into account with global economics and Hovensa ultimately filing for bankruptcy[14] likens the Refinery's shutdown to other instances where EPA has found other facilities' economically-motivated shutdowns to be considered permanent.[15] Accordingly,

---

[9] *Id*. at 9. Emphasis added.

[10] *Id*. at 8 – 9.

[11] *See Cmtys. for a Better Environment v. Cenco Ref. Co.*, 179 F. Supp. 2d 1128 (C.D.Cal.2001) (finding that a refinery shut down for six years must be treated as a new source); *Noranda Lakeshore Mines,* Memo from John Seitz, Director, Stationary Source Compliance Division, OAQPS, to David Howekamp, Director, Air Mgt. Div. Region IX (May 27, 1987) (shut down leach acid plant must be considered new source when reopening); *SME Cement, Inc.*, Memo from Edward Reich, Director Division of Stationary Source Enforcement to Sandra Gardebring, Region V (Oct. 3, 1980) (cement kiln shut down for three years held to be a new source necessitating PSD permitting upon reactivation); *Babylon #2*, Memo from Edward Reich, Director, Stationary Source Enforcement Division to William Sawyer, Region II (Aug. 8, 1980) (waste incinerator shut down for five years held to be treated as a new source); *See generally, Monroe.*

[12] Eric Watkins, *Hovensa to Close 500,000 b/d Virgin Islands Refinery*, OIL & GAS JOURNAL, January, 2012.

[13] *Id*.

[14] *In re Hovensa L.L.C., Debtor*, Chapter 11 Bankruptcy No. 15-BK-10003 MFW (V.I. Dist. Ct., Sept. 15, 2015). *See also,* Justin Jacobs, *Hovensa Files for Bankruptcy, Ending a Long-running Dispute*, PETROLEUM ECONOMIST, September, 2015 ("Hovensa filed for bankruptcy 15 September, saying that it lacked the resources to cover $1.864bn in debts and that it had reached a $184m deal with Limetree Bay Holdings, an affiliate of energy-focused private equity firm ArcLight Capital, to sell the facility's **storage terminals**, according to court documents."). Emphasis added. *The* Undersigned notes that the Wehrum Letter fails to mention Hovensa's bankruptcy.

[15] *See Monroe*. at 5 (shutdown due to "increased competition and demand-side management."); *Noranda Lakeshore Mines* (shutdown "due to market conditions" was held to be permanent); *compare to* Memorandum from John B. Rasnic to Douglas M. Skie (Nov. 19, 1991) (on file with the EPA) (Waterton Power Plant: shutdown due to repair of defective turbine not held to be permanent).

taking into account the circumstances surrounding the Refinery's economically and financially-motivated shutdown, this factor weighs in favor of a finding that the Refinery was permanently shut down.

Evaluating the third factor, "statements by the owner or operator regarding intent," it is clear that the owners have not maintained a **continuous** intent to reopen the Refinery since the 2012 shutdown. While the Wehrum Letter claims to rely on "company statements, press releases, and various correspondence from 2011 through 2017" to support its conclusion that the Refinery was not permanently shut down, express indicia of intent by and regarding Hovensa make it clear that Hovensa did not maintain continuous intent to restart the Refinery; in fact, for some time, it attempted to operate the Refinery as a long-term oil storage terminal. The press release issued by Hess immediately following the closure in January 2012 stated that: "Following the shutdown, the complex will operate as an oil storage terminal."[16] In August 2012, a local news outlet reported that: "Since the closure, **[Hovensa] has championed the idea of converting the refinery into an oil storage facility.**"[17] However, then-Governor deJongh "dismissed Hovensa's oil storage facility proposal, saying it simply would not benefit the territory."[18] Hovensa's intentions to shutter the refinery are especially clear by its officials' purported belief that Hovensa's concession agreement with the Government of the Virgin Islands was rendered "moot since the facility shut down."[19] A few months later, a January 2013 *S&P Global* article published stated that Hovensa then had "plans to become an oil storage terminal," and then referred to the Government of the Virgin Islands' rejection of "Hovensa's long-term oil storage terminal plan."[20] While it would appear that the Government of the Virgin Islands intended to keep the Refinery open in 2012-2013, statements of the then-owner, Hovensa, indicate that its intent was to operate the Refinery as an oil storage terminal; as the Government of the Virgin Islands is not the owner of the Refinery, its intentions are immaterial to this analysis.

In September 2015, Hovensa came to an initial agreement with Limetree and ultimately transferred the ownership of the Refinery to Limetree; this fact, alone, weighs in favor of a finding that the Refinery should be considered a "new" source for PSD review. EPA has stated that, "A change in ownership does not, standing alone, render a stationary source subject to PSD provisions. However, the circumstances surrounding a change in ownership may be probative of whether the shutdown of the source should be deemed permanent, which is the key analysis that must be made under EPA's reactivation policy."[21] As discussed in the preceding paragraph, it is clear that Hovensa did not continuously intend to restart the Refinery but intended to operate same as an oil storage facility. Crucially, upon taking ownership, Limetree also did not intend to restart the facility, at least not continuously from its point of acquisition until the present. As one

---

[16] Press Release, Hess Corporation, Hess Announces Charge Related to Closure of Hovensa Joint Venture Refinery (Jan. 28, 2012) (on file with Hess).

[17] Source staff, *Governor Slams Hovensa Proposal, Threatens Lawsuit*, St. John Source, Aug. 7, 2012.

[18] *Id.*

[19] *Id.*

[20] John-Laurent Tronche, *Hovensa Refinery, Once World's Largest, Likely to Remain* Shut, S&P Global Platts, Jan. 18, 2013 (while both speculative and anonymous, the Undersigned also notes the following passage from the article for context regarding the reality of Hovensa's intent during this time period: "When asked if Hovensa would ever restart, one source said, 'Nope.'").

[21] *See* Memorandum from David P. Howekamp to Robert T. Connery (Nov. 6, 1987) (on file with the EPA) (*Cyprus Casa Grande,* interpreting 40 C.F.R. § 52.21(b)(2)(iii)(g)).

news outlet stated, "Limetree's parent company ArcLight Capital owns pipelines and storage facilities across the US **and will seek to operate the terminal, rather than the refinery as a whole.**"[22] Coverage of a later deal whereby Sinopec planned to "lease more than three quarters of the operational storage at the Hovensa oil terminal," allowed ArcLight (Limetree's parent company) "two years to assess what provisions [of the refinery] would be utilized and what would be dismantled and removed," reporting a payment structure within the agreement for "the sale of scrap metal."[23] While former Governor Mapp stated that the deal included "[p]otentially restarting refinery operations," he emphasized a plan to "look at the entire south shore area and pursue other business and opportunities," such as an asphalt plant.[24] Accordingly, while is clear that the Government of the Virgin Islands here aspired to restart the Refinery, it is also clear that Hovensa and Limetree have not maintained a continuous intent to restart the refinery since its 2012 shutdown, as evinced by repeat representations of their intentions to operate the Refinery as an oil storage facility or, at least in part, to sell it off as scrap metal. In applying this standard to an idled refinery in California, one federal District Court held that: "[I]t does appear that for at least some short period of time, [the facility] intended to shutdown and dismantle the facility, not restart it. *Monroe Electric* **indicates that this is fatal.**"[25] Thus, this factor weighs heavily in favor of a finding that the owners of the Refinery did **not** maintain a continuous intent to restart it, and accordingly, the Refinery should be considered a new source for applicability of the PSD rules.

As for the fourth factor in the reactivation policy analysis, cost and time to reactivate the facility, the more money and time that will be required to get the facility up and running, the more likely that the source is going to be found to be a "new" source for PSD applicability.[26] The Wehrum Letter appears to have analyzed this factor backwards, finding the Refinery not to be a "new" source when "Hovensa spent over $400 million to maintain the restart capability of the refineries."[27] As of July 2018, the investment required to "refurbish and restart a portion of the [Refinery]" was reported to be $1.4 billion.[28] The magnitude of this investment aligns with a 2015 statement by Fadel Gheit, an oil and gas analyst: "Hovensa's improvement needs are too large for it to be worth restarting. . . the refinery just isn't competitive anymore."[29] The analyst further stated that: "To restore full refining operations, it needs significant investments, in the billions, not millions of dollars, depending on the final configuration of the facility[.]" Accordingly, the magnitude of the investment required to restart the Refinery supports a finding that, for the purposes of PSD review, the Refinery should be considered permanently shut down.

The fifth factor in the reactivation policy analysis — status of permits — at most, weighs neutrally in evincing intent to restart. While Hovensa and, later, Limetree have maintained several of the environmental permits for the facility, most of these would be required, anyway,

---

[22] Justin Jacobs, *Hovensa Files for Bankruptcy, Ending a Long-Running Dispute*, Petroleum Economist, Sept. 22, 2015.  Emphasis added.
[23] Source Staff, *Sinopec, Freepoint Lease Hovensa Storage: Update*, Argus, Dec. 1, 2015.
[24] *Id.*
[25] *Cmtys. for a Better Environment*, 179 F. Supp. 2d at 1147.
[26] *See Id.* at 1146 ("The numbers are higher than in other cases where the EPA found facilities permanently shutdown. . . the cost and time for reactivation factor slightly favors finding a permanent shutdown.");
[27] Wehrum Letter.
[28] Collin Eaton, *St. Croix Oil Refinery gets $1.4 Billion Investment, Plans to Restart*, July 2, 2018.
[29] Kelsey Nowakowski, *Monarch Energy Still Interested in Hovensa, Despite Obstacles*, Oct. 2, 2015.

for the Refinery's wastewater treatment and oil storage facilities, as well as for the containment of hazardous waste at the site.[30] While the Wehrum Letter appears to put some weight on the fact that the facility has "maintained critical refinery equipment," this situation likens itself to situations such as the *Cenco* case, where the court held that the refinery was shut down for PSD purposes even when the company maintained equipment at the facility "such as utility, storage, wastewater treatment, stormwater management and emergency equipment."[31] Thus, taking this fifth factor into account, the analysis still, on balance, favors a finding that the Refinery must properly be considered a "new" source for the purposes of PSD applicability.

The final factor, "ongoing maintenance and inspections" that have taken place since the shutdown, weighs in favor of a finding that the Refinery should be considered a new stationary source. Crucial to this determination is whether this ongoing maintenance renders the facility easily able to be restarted; in the *Noranda Lakeshore Mines* opinion, EPA found the shutdown of a roaster leach plant in question to be permanent despite evidence that the plant was maintained during shutdown.[32] In the *Waterton Power Plant* opinion, EPA held that "the continued maintenance of the facility throughout the years," and "the resulting ability to bring the plant back on line with only a few weeks of work," presented a "unique situation" where a plant shut down beyond the two year presumption threshold was found not to be considered a new source for PSD applicability.[33] As is evident from the aforementioned investment (over $1 billion) needed to bring the Refinery into functional condition, taken into consideration with previously-discussed indicia of the Refinery's condition from shutdown until present, the EPA order requiring at least $700 million in upgrades to pollution controls to bring the Refinery into compliance with the CAA,[34] combined with the stated 18-month timeline for refurbishment,[35] it is clear that the Refinery has not continuously been maintained in a condition where it could be restarted easily. Accordingly, this factor indicates that the Refinery should be considered a "new" source for PSD review applicability.

In sum, reviewing the relevant facts and circumstances in light of the EPA's reactivation factors, it is evident that the Refinery can only reasonably be found to be a "new" source for purposes of PSD review. Accordingly, implications regarding the PAL, which is inappropriately predicated and calculated on a presumption that the Refinery is an "existing" source, must be rejected.

    ii.    <u>Problems with the April 5, 2018 Concurrence Letter</u>

---

[30] EPA, Envirofacts, Limetree Facility Summary, https://enviro.epa.gov/enviro/multisys2_v2.get_list?facility_uin=110000307864 (executed on Nov. 22, 2019); EPA, FRS Facility Detail Report, https://enviro.epa.gov/enviro/fii_query_dtl.disp_program_facility (executed on Nov. 22, 2019).

[31] *Cmtys. for a Better Environment*, 179 F. Supp. 2d at 1147.

[32] *Noranda Lakeshore Mines.*

[33] Memorandum from John B. Rasnic to Douglas M. Skie (Nov. 19, 1991) (on file with the EPA) (Waterton Power Plant).

[34] Press Release, The United States Department of Justice, Nation's Second Largest Refinery to Pay $700 Million to Upgrade Pollution Controls at U.S. Virgin Islands Facility (Jan. 26, 2011) (on file with Department of Justice).

[35] Collin Eaton, *St. Croix Oil Refinery gets $1.4 Billion Investment, Plans to Restart*, July 2, 2018.

In addition to being misaligned with pertinent EPA precedent, as established in the prior subsection, the Wehrum Letter must be disregarded due to the circumstances surrounding former Assistant Administrator Wehrum's (Wehrum) departure from EPA. Wehrum resigned from EPA in June 2019, amid an investigation by the Energy and Commerce Committee into charges that Wehrum violated pertinent ethics rules by failing to recuse himself from matters involving his utility industry legal clients.[36] Shortly after his resignation, EPA's inspector general launched an additional investigation into whether Wehrum's "efforts at the EPA to weaken climate change and air pollution standards" improperly benefited his former fossil fuel industry clients.[37] While the Undersigned is not aware of any evidence that the Wehrum Letter was, in itself, a direct result of misconduct by Wehrum or Limetree, the nature of the charges upon which Wehrum is being investigated — abusing his position to improperly benefit certain regulated parties — begs reconsideration, particularly taken in conjunction with the fact that it represents a clear departure from EPA precedent as applied to these facts. Prior to Wehrum's departure from EPA, the Wehrum Letter drew attention for being "unusual" due to its "deference to the project proponent's . . . explanation of the project and how it should be defined and construed."[38] This industry deference is troubling in the context of Wehrum's resignation and investigation.

2.    The Modification Must Require that the Cancer Registry be Established Prior to Allowing for Potentially Carcinogenic Pollution

In order to effectively and proactively protect the public health of the people of the Virgin Islands, the Modification must require that the cancer registry and pediatric environmental specialty health unit[39] be fully established and completed *before* the commencement of the polluting activities contemplated therein. This is critical, as the people of the USVI tend to have worse health outcomes and access to fewer quality healthcare resources as compared to counterparts in the mainland United States. Some of these poor health outcomes include a higher infant mortality rate and greater risk of heart disease.[40] And, to exacerbate these issues, the population in South Central St. Croix (the area surrounding the Refinery) suffers several factors that indicate impeded access to healthcare services. An estimated 26.9% of the South Central St. Croix population lives below the poverty line.[41] People living in poverty typically face greater barriers to healthcare access compared to people who are not living in poverty, such as lacking health insurance and funds to cover out-of-pocket medical expenses.[42]

---

[36] Juliet Eilperin & Brady Dennis, *Top EPA Official Resigns Amid Scrutiny Over Possible Ethics Violations*, THE WASHINGTON POST, June 26, 2019.

[37] Lisa Friedman, *Bill Wehrum, an Archietect of E.P.A. Rollbacks, Faces New Ethics Inquiry*, July 22, 2019.

[38] Eric L. Hiser, *Harbinger of Things to Come: Limetree Bay Terminals*, NSR LAW BLOG, March 25, 2019.

[39] Modification at 68.

[40] Gloria B. Callwood et al., Health and Health Care in the U.S. Virgin Islands: Challenges and Perceptions (2013), *reprinted in* NCBI HHS Public Access Author manuscript, ABNF J. 2012 Winter; 23(1): 4-7 (the Undersigned notes that the cancer information in this article is outdated).

[41] FEMA St. Croix Recovery Plan at 10.

[42] U.S. Department of Health & Human Services, Financial Condition and Health Care Burdens of People in Deep Poverty, https://aspe.hhs.gov/basic-report/financial-condition-and-health-care-burdens-people-deep-poverty (July 16, 2015).

This is supported by the estimate that 30% of the USVI population does not have health insurance (compared to 12% in the United States).[43]

Public health impacts from oil refining activities on-island have long been a concern of the territory.[44] This concern is warranted, as the criteria pollutants are well-known to cause adverse health impacts.[45]

According to EPA, Particulate Matter exposure is linked to a variety of health problems, including premature death in people with heart or lung disease, nonfatal heart attacks, irregular heartbeat, aggravated asthma, decreased lung function, and respiratory symptoms."[46] Carbon Monoxide can be of particular concern for people with certain types of heart disease.[47] This is significant given the increased risk for heart disease suffered by Virgin Islanders. Additionally, Sulfur Dioxide and Nitrogen Oxides — particularly Nitrogen Dioxide — are known to harm the human respiratory system.[48]

Volatile Organic Compounds (VOCs) from petroleum refineries are associated with a number of health effects; short exposure "may cause dizziness, fatigue, nausea, and depression . . . [and] certain Volatile Organic Compounds may even result in mutations and cancers, and . . . damage to the central nervous system, kidneys, and liver."[49] Benzene, a VOC "of particular concern since it is carcinogenic,"[50] is already being emitted by the Refinery's current oil storage activities; for example, in 2018, the Refinery released 6,839 pounds of benzene.[51] The undersigned acknowledges EPA's 2011 study monitoring VOCs on St. Croix, including downwind from the Refinery.[52] However, this study lasted only four months. According to Kathleen Arnold-Lewis, territorial director of the Chronic Disease Program at the Charles Harwood Memorial Hospital on St. Croix, "the rate of cancer deaths increased in the Virgin Islands from 2003 – 2013, overtaking heart disease as the leading cause of death in the

---

[43] Samantha Artiga et al., *Health Care in Puerto Rico and the U.S. Virgin Islands: A Six-Month Check-Up After the Storms (Report)*, KFF, APR. 24, 2018.

[44] *See* Caroline A. Browne, *Op-ed: Learning from the Lessons of the Past About Oil Refineries*, THE ST. JOHN SOURCE July 24, 2018; AARP Virgin Islands, *St. Croix Residents — Are You Worried About the Air You Breathe?*, AARP, July 14, 2011.

[45] EAR at 134. More detailed discussion of air pollution

[46] EPA, Particulate Matter (PM) Pollution, Health and Enviromental Effects of Particulate Matter (PM), https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm.

[47] EPA, Carbon Monoxide (CO) Pollution in Outdoor Air, Basic Information about Carbon Monoxide (CO) Outdoor Air Pollution, https://www.epa.gov/co-pollution/basic-information-about-carbon-monoxide-co-outdoor-air-pollution#Effects.

[48] EPA, Sulfur Dioxide (SO2) Pollution, Sulfur Dioxide Basics, https://www.epa.gov/so2-pollution/sulfur-dioxide-basics#effects; EPA, Nitrogen Dioxide (NO2) Pollution, Basic Information about NO2, https://www.epa.gov/no2-pollution/basic-information-about-no2#Effects.

[49] Aiswarya Ragothaman and William A. Anderson, "Air Quality Impacts of Petroleum Refining and Petrochemical Industries," J. *Environments* **2017**, *4*, 66; doi:10.3390/environments4030066.

[50] Ragothaman and Anderson at 4.

[51] EPA, Enforcement and Compliance History Online, "Detailed Facility Report: Limetree Bay Terminals (FKA Hovensa)," https://echo.epa.gov/detailed-facility-report?fid=110000307864, last visited September 3, 2019.

[52] EPA, "Special Air Toxic Monitoring Study," St. Croix (United States Virgin Islands), August 2011, https://www3.epa.gov/region02/waste/hovensa/hovensa-VI-Fact-Sheet-Aug-18.pdf, last visited September 3, 2019.

territory."[53] The undersigned notes that the Refinery was operating at a high volume during much of that time period.

In addition to general public cancer risk from passive environmental exposure, epidemiological evidence indicates "an increased risk for pleural cancer" in refinery workers, possibly due to past exposure to benzene.[54] Limetree has also noted the continued presence of asbestos in the Refinery,[55] an additional risk for workers.

In sum, given the high vulnerability of the surrounding community (and the USVI, generally) to certain health conditions and barriers to healthcare — and the likelihood of these existing problems being connected to the Refinery's prior activities — establishment of the cancer registry and pediatric environmental specialty health unit must be completed before polluting activities are allowed to commence.

     3.    <u>The Modification Must Require Monitoring and Reporting from a Third Party – Not Limetree</u>

For the terms of the Modification to be carried out, adequate monitoring and reporting are critical; however, problematically, the Modification provides for reports to be produced by Limetree. This is self-reporting mechanism is problematically reminiscent of how, according to Senator Nellie Rivera-O'Reilly, "the U.S. government allowed Hovensa to 'self-report' its emissions, even though some residents had complained of becoming 'violently ill' from pollution."[56] Hovensa's unsustainable environmental protection and business practices ultimately resulted in multi-million dollar fines for violating the CAA and later, bankruptcy. Accordingly, in the interest of not repeating history, EPA Region 2 should be placed in charge of monitoring Limetree's monitoring data for violations, rather than relying on self-reporting.

     4.    <u>The Activity Contemplated by the Modification Implicates and Does Not Address Serious Concerns Regarding Imperiled Species and Sandy Point National Wildlife Refuge.</u>

Finally, the activity contemplated by the Modification implicates and does not address serious concerns regarding federally-listed species, Sandy Point National Wildlife Refuge, and climate change.

     i.    <u>Imperiled Species Concerns</u>

---

[53] Susan Ellis, *V.I. Central Cancer Registry will Report in 2018*, THE ST. JOHN SOURCE, March 21, 2017.
[54] Pesatori et. al., "Cancer risk in oil refinery workers: a mortality study in four Italian plants," J. Occupational Medicine, 71:1, 2014.
[55] Susan Ellis, *Decades Old Asbestos Cases Inch Forward*, THE ST. CROIX SOURCE, May 13, 2019,.
[56] Tim Craig, *Hurricanes Left Behind Mountain of Trash in the Virgin Islands – And There's Nowhere to put it*, THE WASHINGTON POST, March 4, 2018.

The Refinery activities contemplated by the Modification have the potential to adversely affect at least 23 ESA-listed species, including four sea turtle species, seven coral species, and four whale species.[57] These species are as follows:

1) Hawksbill sea turtle – Endangered
2) Leatherback sea turtle – Endangered
3) Green sea turtle (both North and South Atlantic Distinct Population Segments – "DPS") – Threatened
4) Loggerhead sea turtle – Threatened
5) Nassau grouper – Threatened
6) Scalloped hammerhead shark (Central Atlantic and Southwest Atlantic DPS) – Threatened
7) Oceanic whitetip shark – Threatened
8) Gian manta ray – Threatened
9) Elkhorn coral – Threatened
10) Staghorn coral – Threatened
11) Pillar coral – Threatened
12) Lobed star coral – Threatened
13) Mountainous star coral – Threatened
14) Boulder star coral – Threatened
15) Rough cactus coral – Threatened
16) West Indian manatee — Threatened
17) Blue whale – Endangered
18) Fin whale – Endangered
19) Sei whale – Endangered
20) Sperm whale – Endangered
21) Least tern - Endangered[58]
22) St. Croix ground lizard – Endangered
23) Roseate tern – Threatened

It is crucial that the Modification address imperiled species, as the Refinery was constructed before the enactment of the ESA,[59] and acute loss of biodiversity has taken place in recent history.[60] The Refinery presents serious risks to wildlife vis-à-vis the air emissions, as well as other impacts of the Refinery including, but not limited to, as oil spills, other accidents, and ship strikes. Accordingly, it is apparent that the Refinery activities will almost certainly

---

[57] *See generally* NOAA Fisheries, SER-2018-19292, Re: Limetree Bay Terminal Single Point Mooring, St. Croix, USVI (SAJ-2017-00416 (SP-JCM)) Draft Biological Opinion, February 12, 2019. (hereinafter "USACE BiOp"); Environmental Assessment Report prepared for Major Coastal Zone Management (CZM) Permit Application No. CZX-10-19(L&W); https://www3.epa.gov/region02/waste/fshovens_statementof_basis_aoc3.pdf/

[58] U.S. Fish & Wildlife Service, Midwest Region Endangered Species (the endangered Interior Least Tern overwinters in the Caribbean).

[59] The Refinery was completed in **. U.S. Fish & Wildlife Service, Endangered Species Overview (last updated: December 11, 2018) (the ESA was enacted in 1973).

[60] United Nations, UN Report: Nature's Dangerous Decline 'Unprecedented'; Species Extinction Rates 'Accelerating,' (May 6 2019) https://www.un.org/sustainabledevelopment/blog/2019/05/nature-decline-unprecedented-report/.

result in the take[61] of Endangered or Threatened species. I thus implore DOJ to reject the Modification due to its silence on this issue.

1.    Air Emissions Impacts

The air emissions contemplated by the Refinery activities in the Modification pose significant risk to many of the above-listed species. Avian species, such as the Least Tern and Roseate Tern, are particularly vulnerable to the impacts of air pollution, particularly from Nitrogen Oxide and Particulate Matter. Nitrogen Oxide can cause direct and irreversible damage to birds' lungs.[62] "Long-term exposure can lead to inflammation, ruptured blood vessels, and lung failure."[63] Nitrogen Oxide additionally presents hazards by soil and water to become more acidic via acid rain.[64] "[T]he primary hypothesis for the effects of acid deposition on terrestrial birds is that soil acidification can reduce the abundance of ground- dwelling invertebrates that some birds require for adequate calcium supply."[65] Additionally, "[a] decreased availability of high calcium based aquatic invertebrates due to acidification is known to adversely affect egg laying and eggshell integrity in birds, and the growth of hatchling birds and neonatal mammals."[66] Particulate Matter is a concern, as well; birds are more exposed to Particulate Matter than humans because they have a higher breathing rate and spend more time in the open air.[67] They are additionally vulnerable to PM becoming lodged into their lungs.[68]

Air pollution additionally presents threats to the above-listed marine species, particularly coral and air-breathing mammals. As noted above, Nitrogen Oxide contributes to the acidification of water, including ocean acidification.[69] Indeed, some "water pollution" actually begins as air pollution and settles into waterways and oceans.[70] In addition to emissions of Nitrogen Oxide, the facility will emit significant amount of greenhouse gases, including carbon dioxide, which is the primary driver of global warming and ocean acidification. Coral species, like the species listed above, are extremely vulnerable to the impacts of ocean acidification; this is due to their being "dependent on calcium carbonate for shell formation . . . because the additional carbonic acid in the ocean shifts the chemical equilibrium of the carbonate system, increasing the bicarbonate ion concentration and decreasing the carbonate shell– and skeleton–

---

[61] Under the ESA, "[t]he term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 USCS § 1532(19).

[62] Kenneth Qin, *Birds Suffer from Air Pollution, Just Like We Do*, Audubon California, July 23, 2015.

[63] *Id*.

[64] Gary M. Lovett et al., *Effects of Air Pollution on Ecosystems and Biological Diversity in the Eastern United States*, The year in Ecology and Conservation Biology*, reprinted* in Lovett NYAS, 2009. https://www.caryinstitute.org/sites/default/files/public/reprints/Lovett_NYAS_2009.pdf.

[65] *Id*.

[66] Scheuhammer, *Effects of acidification on the availability of toxic metals and calcium to wild birds and mammals*, 71 Envtl. Pollut., 329 (1991).

[67] Kenneth Qin, *Birds Suffer from Air Pollution, Just Like We Do*, Audubon California, July 23, 2015.

[68] *Id*.

[69] Ida-Maja Hassellov et al., Shipping Contributes to Ocean Acidification, GEOPHYSICAL RESEARCH LETTERS, VOL. 40, 2731–2736, June 6, 2013, https://agupubs.onlinelibrary.wiley.com/doi/pdf/10.1002/grl.50521

[70] M. Vikas & G.S. Dwarakish, *Coastal Pollution: A Review*, 4 Aquatic Procedia, 381, 385 (2015) https://reader.elsevier.com/reader/sd/pii/S2214241X15000528?token=501AB6501D3EA9B53D2041319AA6F4C7B E4D2F2589E201784011DECFBC425731D99A4F8B857F731C38640B2EFBAFA45B.

building organisms, such as . . . reef-forming corals."[71] Ocean acidification will increase their vulnerability "by increased energetic costs needed to maintain net calcification."[72] Noncalcareous marine flora and fauna also suffer effects, albeit less obvious effects of ocean acidification, such as neurological changes that alter behavior.[73]

Finally, research indicates that VOCs can impact air-breathing mammals, particularly cetaceans. One study of the chemical composition of Grey Whales' exhales matched against a database of VOCs found in humans.[74]

2.   <u>Impacts on Wildlife from Oil Spills and Similar Accidents</u>

Oil spills, a foreseeable negative impact of an oil refinery, pose a serious risk to the 23 ESA-listed species in the footprint of the refinery.[75] Oil can harm wildlife through inhalation, ingestion, physical contact, and absorption. Contamination has the potential to occur at all levels of the food chain.[76] Ingestion can kill animals immediately. It can also result in damage to the lungs, liver, or kidneys; immune system suppression, skin irritation and ulceration; behavioral changes that may affect an animal's ability to find food or avoid predators; and impaired reproduction (affecting the species' ability to survive and recover).[77] Sea turtles are prone to oil becoming trapped in their throats through swallowing and inhalation, resulting in toxic oil compounds becoming absorbed into organ tissues.[78] Sea turtles may be susceptible to oil contamination when swimming to shore to nest. Mother turtles can pass on oil toxins to their young developing in their eggs.[79] Therefore, oil spills pose a very serious and immediate threat to listed turtles like those connected to the 14 turtle nests noted near the Refinery.[80]

Scientists have long established that extreme weather events, particularly hurricanes, have been increasing in intensity as the climate continues to warm, and this is projected to continue.[81] The actual frequency and increasing severity of hurricanes are crucial factors to consider in evaluating ESA impacts from the Refinery because severe weather events are often tied to ecologically-devastating discharges from industrial facilities. I am especially concerned

---

[71] Aaron L. Strong et al., *Ocean Acidification 2.0: Managing our Changing Coastal Ocean Chemistry*, 64 BioSience, 581, 581 (2014).
[72] *Id*. at 584.
[73] *Id*.
[74] Raquel Cumeras et al., *Chemical Analysis of Whale Breath Volatiles: A Case Study for Non-Invasive Field Health Diagnostics of Marine Mammals*, 4 METABOLITES, 790-806 (2014) https://www.mdpi.com/2218-1989/4/3/790/htm.
[75] *See generally* U.S. Fish and Wildlife Service, Effects of Oil on Wildlife and Habitat, June 2010, https://www.fws.gov/home/dhoilspill/pdfs/DHJICFWSOilImpactsWildlifeFactSheet.pdf.
[76] *Id*.
[77] *Id*.
[78] NOAA Office of Response and Restoration, "How Do Oil Spills Affect Sea Turtles?" June 16, 2016, https://response.restoration.noaa.gov/about/media/how-do-oil-spills-affect-sea-turtles.html, last visited September 3, 2019.
[79] *Id*.
[80] EAR at 130. The undersigned notes that these nests "include nests which were laid by leatherbacks."
[81] *See* 2017: *Climate Science Special Report: A Sustained Assessment Activity of the U.S. Global Change Research Program* (D.J. Wuebbles, et. al.), U.S. GLOBAL CHANGE RESEARCH PROGRAM (2017); U.S. GLOBAL CHANGE RESEARCH PROGRAM, "NATIONAL CLIMATE ASSESSMENT" (2014); Sonia I. Seneviratne, et al., Intergovernmental Panel on Climate Change, *Changes in Climate Extremes and their Impacts on the Natural Physical Environment* (2012).

EPA-690

by the catastrophic oil spill that Hurricane Dorian caused in the Bahamas in September 2019.[82] Famously, Hurricane Katrina caused the release of 1.05 million gallons of mixed crude oil from the Murphy Oil Refinery in Louisiana in 2005.[83] Less famously but more pertinently, in 1989, Hurricane Hugo caused a spill of 10,000 barrels of oil from the Refinery in question. The risk of such events is only going to increase with the reality of a changing climate, dramatically so in the US Virgin Islands.[84]

Due to the toxicity of oil and the rate at which it can spread, wildlife mortality from oil spills can be catastrophic. For example, Deepwater Horizon oil spill "likely harmed or killed about 82,000 birds of 102 species; about 6,165 sea turtles; as many as 25,900 marine mammals[.]"[85] In sum, the deleterious potential impacts of oil spills upon listed and socially valuable fishery wildlife cannot be overstated.

Unfortunately, oil spill "response" is often extremely ineffective. While cleaning animals affected by an oil spill may present a comforting image to the public, scientific studies indicate that such "clean up" efforts may be largely futile.[86] For example, one 1996 study of brown pelicans fouled by an oil spill, "cleaned," and then released back into the wild found that the majority "died or failed to mate again . . . [and] the researchers concluded that cleaning brown pelicans couldn't  restore them to good breeding health or 'normal survivability.'"[87] Following the 2002 sinking of the *Prestige*, whereby the split-in-half tanker spilled more than 70 million liters of bunker fuel, German biologist Silvia Gaus studied thousands of "cleaned" animals and concluded that "the post-treatment survival rate of oil-soaked birds is less than one percent."[88] The negative impacts of well-intentioned cleanup efforts are not confined to birds, but apply equally to sea turtles, too. According to NOAA, "Spill response and cleanup operations . . . can harm sea turtles unintentionally. Turtles can be killed after being struck by response vessels or as a result of oil burning and skimming activities. Extra lighting and activity on beaches can disrupt nesting and hatchling turtles, as well as incubating eggs."[89]

---

[82] Aaaron Clark, *Hurricane Dorian Rips Roofs off Bahamas Oil Storage Tanks, Causes 'Catastrophic' Spilling,* Time, Sept. 6, 2019.

[83] US EPA et. seq., "Murphy Oil Spill Fact Sheet, February 2006, http://www.columbia.edu/itc/journalism/cases/katrina/Federal%20Government/Environmental%20Protection%20Agency/Murphy%20Oil%20Spill%20Fact%20Sheet%20Feb%202006.pdf, last accessed September 3, 2019.

[84] U.S. Global Change Research Program, "Fourth National Climate Assessment, Chapter 20: U.S. Caribbean," https://nca2018.globalchange.gov/chapter/20/, last accessed September 3, 2019.

[85] Center for Biological Diversity, "A Deadly Toll," https://www.biologicaldiversity.org/programs/public_lands/energy/dirty_energy_development/oil_and_gas/gulf_oil_spill/a_deadly_toll.html, last visited September 5, 2019.

[86] *See generally* Andrew Nikiforuk, *Why We Pretend to Clean Up Oil Spills*, Hakai Magazine via Smithosian Magazine, July 12, 2016, https://www.smithsonianmag.com/science-nature/oil-spill-cleanup-illusion-180959783/, last visited September 4, 2019.

[87] *Id*.

[88] *Id*.

[89] NOAA Office of Response and Restoration, "How Do Oil Spills Affect Sea Turtles?" June 16, 2016, https://response.restoration.noaa.gov/about/media/how-do-oil-spills-affect-sea-turtles.html, last visited September 3, 2019.

The sheer scale and speed at which spilled oil can spread over water presents a serious practical concern regarding recovery efforts, even when recovery workers are mobilized and ready. Jeffrey Short, a retired National Oceanic and Atmospheric Administration research chemist who studied the aftermath of the 2010 Deepwater Horizon disaster in the Gulf of Mexico as well as the Exxon Valdez spill in Prince William Sound, noted that **the Exxon Valdez spill grew at the alarming rate of half a football field per second over two days.[90]** It is worth noting that the Exxon Valdez spill happened as a result of a ship collision with a reef, and not during a serious tropical cyclone and its resultant winds and waves, as is a likely oil spill scenario here.

Additionally, despite the incorporation of several response and recovery technologies, post-spill oil recovery levels are often in reality quite low. Estimates indicate that, out of the total amount of oil it spilled in the 2010 Deepwater Horizon spill, "BP recovered 3 percent through skimming, 17 percent from siphoning at the wellhead, and 5 percent from burning."[91] Despite occurring 20 years later, this recovery rate was not a substantial improvement over the *Exxon Valdez* spill where an estimated 14 percent of the oil was recovered.[92] This is due to fundamental shortcomings on some recovery methods. Conventional containment booms, for example, do not work in areas with severe waves (which are often where an oil spill is prone to happen, e.g., during a severe weather event), and solutions like burning oil causes air pollution by turning water pollution "into sooty greenhouse gases."[93] As a practical matter, we also question how quickly Limetree's oil spill response team will be able to address an oil spill that happens during a severe weather event such as a tropical cyclone, as extreme winds and precipitation can last for several hours. As a report prepared for two First Nations tribes and the City of Vancouver, Canada summarized the matter: "Actual oil spills . . . reinforce the reality that collecting and removing oil from the sea surface is a challenging, time-sensitive, and often ineffective process, even under the most favourable conditions."[94]

Due to a polystyrene incident caused by contractors working for Limetree, I am extremely concerned about the potential impacts to wildlife from discharge of other dangerous materials, particularly during inclement weather. When Tropical Storm Karen passed the south shore of St. Croix on September 24, 2019, more than fifty 110-pound polystyrene floats from the installation of the Limetree pipeline broke loose and washed ashore.[95] Polystyrene, a petroleum-based non-biodegradable foam is a known hazard to wildlife because it can cause intestinal blockages when ingested (which happens easily and often when marine species mistake polystyrene for food).[96] It is additionally dangerous because, being chemically absorbent, it can pick up and concentrate other pollutants in the ocean — rendering it extremely dangerous when

---

[90] *Nikiforuk.*

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] Nuka Research and Planning Group, LLC, "Oil Response Analysis: Technical Analysis of Oil Spill Response Capabilities and Limitations for Trans Mountain Expansion Project," May 1, 2015, https://vancouver.ca/images/web/pipeline/NUKA-oil-spill-response-capabilities-and-limitations.pdf, last visited September 4, 2019.

[95] Source Staff, Refinery's Foam Plastic Litters South Shore Months After September Storm, Nov. 18, 2019.

[96] Source Staff, *Why New York Banned Polystyrene Foam*, July 1, 2015.

ingested by wildlife such as sea turtles.[97] As of November 18, 2019, pieces of polystyrene, some as small as bits of rice, were still seen washing up on St. Croix's beaches.[98]

The polystyrene incident and Limetree's slow, lacking response thereto highlight the acute risk that this facility poses to St. Croix's wildlife, including and especially the 23 ESA-listed species noted herein. It is self-evident that the continued construction and operation of the Refinery will effectuate the take of imperiled wildlife. Tropical Storm Karen was, by St. Croix standards, a fairly mild tropical cyclone event. As severe weather events increase in intensity with climate change, it is highly foreseeable that such events will occur again. Most of Limetree's rhetoric since the incident has focused on "response."[99] Yet as is apparent from the continued presence of polystyrene pieces, adequate prevention is the only effective means to prevent jeopardy to listed species.

### 3.    Impacts from Ship Strikes

The listed species in the impact zone of the facility are additionally at risk from increased vessel traffic that will necessarily accompany the restart of Refinery activities. Marine vessel traffic presents tremendous hazards to wildlife, both from the potential for oil spills (the implications of which are discussed at length, above) and from direct strikes. This concern is pertinent to many of the species that live in the sea near the Refinery, particularly sea turtles and whales.

All species of sea turtle are vulnerable to vessel strikes as they bask near the surface, breathe at the surface, or forage in shallow areas or on prey near the sea surface.[100] Given the proximity of the Refinery to sea turtle nesting areas, it is of particular concern that adult sea turtles are at increased risk of strike during breeding and nesting season.[101] According to NOAA Fisheries, "[i]t is estimated that hundreds of sea turtles are struck by vessels in the United States every year, and many of them are killed without being observed."[102]

Ship strikes present a serious mortality risk to whales,[103] as well. In particular, ship strikes of Sperm and other species of whale have been documented throughout the Caribbean, including documented cases in nearby Puerto Rico.[104]

---

[97] *Id.*

[98] Source Staff, *Refinery's Foam Plastic Litters South Shore Months After September Storm*, Nov. 18, 2019.

[99] *Id.*

[100] NOAA Fisheries, Understanding Vessel Strikes, June 25, 2017, https://www.fisheries.noaa.gov/insight/understanding-vessel-strikes, last accessed September 5, 2019.

[101] *Id.*

[102] *Id.*

[103] International Whaling Commission, "Ship Strikes: Collisions Between Whales and Vessels," https://iwc.int/index.php?cID=html_191, last visited September 5, 2019.

[104] NMFS, "Large Ship Strike Database," January 2004, https://www.greateratlantic.fisheries.noaa.gov/shipstrike/news/shipstrike03.pdf. See also: International Whaling Commission, "Ship Strikes: Collisions Between Whales and Vessels," https://iwc.int/index.php?cID=html_191, last visited September 5, 2019.

Accordingly, due to the concerns listed above, I maintain fundamental concerns with the Refinery activities in regards to imperiled species impacts.

     ii.    <u>Sandy Point National Wildlife Refuge</u>

The Refinery restart will additionally cause serious, potentially irreparable harm to Sandy Point National Wildlife Refuge (Sandy Point), an important resource to St. Croix for its wildlife protection and tourism benefits. Sandy Point is located approximately 10 miles down-wind and down-current from the Refinery and is federally-designated critical habitat for the leatherback sea turtle.[105] It is also a vital nesting habitat for critically endangered hawksbill sea turtles and threatened green sea turtles.[106] Every year, thousands of visitors visit Sandy Point to enjoy the beach, and thousands more visit to participate in guided sea turtle nesting and hatching observation.[107] One USFWS report estimates that 11,000 people visit Sandy Point, every year.[108] Thus, it is evident that Sandy Point's preservation is critical to the protection of sea turtles and St. Croix's tourism economy. Accordingly, in the interest of preserving this vital, federally-protected critical habitat and crucially important local resource, I urge DOJ to reject the Modification as written due to its silence on this issue.

---

[105] 44 Fed. Reg. 17710.

[106] U.S. Fish and Wildlife Service, "Sandy Point National Wildlife Refuge: Wildlife & Habitat," https://www.fws.gov/refuge/Sandy_Point/wildlife_and_habitat.html, last visited September 5, 2019.

[107] U.S. Fish and Wildlife Service, "Sandy Point National Wildlife Refuge: Visitor Activities," https://www.fws.gov/refuge/Sandy_Point/visit/visitor_activities.html, last visited September 5, 2019.

[108] Susan Silander, U.S. Fish and Wildlife Service, "Sandy Point National Wildlife Refuge," https://ufdcimages.uflib.ufl.edu/UF/00/09/34/95/00001/sdpcon.pdf, last visited September 5, 2019.

III.  <u>Conclusion</u>

For the aforementioned reasons, I respectfully urge DOJ to reject the Modification as written. Please feel free to contact me with any questions. Thank you for your consideration.

Respectfully submitted,

Elizabeth Leigh Neville, Esq.

# ATTACHMENT C

# TO MEMORANDUM IN SUPPORT OF MOTION TO ENTER

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, and | ) | |
| UNITED STATES VIRGIN ISLANDS | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. No. 1:11-cv-00006  (RAM/GWC) |
| v. | ) | |
| | ) | |
| HOVENSA L.L.C. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**SECOND MODIFICATION OF THE CONSENT DECREE**

WHEREAS, on June 7, 2011, the Court entered a Consent Decree in the above-captioned matter (ECF Doc. 6).

WHEREAS, on August 25, 2020, the First Modification  of the Consent Decree ("First Modification")  was lodged with the Court.  (ECF Doc. 12-1).

WHEREAS, upon entry of the First Modification,  Limetree Bay will be substituted for HOVENSA as provided therein.

WHEREAS, Paragraph 228 (Modification)  of the Consent Decree identifies  "non-material modifications  to include . . . schedules that do not extend the date for compliance  with emissions limitations  following  the installation of control equipment,  provided such changes are agreed upon in writing between the United States and HOVENSA [Limetree Bay]."  Paragraph 228 further provides that non-material modifications  will be effective when signed by the United States and HOVENSA [Limetree Bay].  (ECF Doc. 6, page 144).

WHEREAS, Paragraph 79.a of the First Modification  requires Limetree Bay to "complete a review and verification  of the Refinery TAB [total annual benzene] and its compliance  with the Benzene Waste NESHAP" by March 30, 2021.  (ECF Doc. 12-1, page 27).

1

WHEREAS, the March 30, 2021 date was set in the belief that the Refinery would restart during the fourth quarter of 2020 and because a Refinery restart in that time frame would have provided sufficient operational data to ensure for a complete review and verification of the Refinery's TAB.

WHEREAS, due to the delay in the Refinery restart, the United States and Limetree Bay agree that there will be insufficient data for a March 30, 2021 review and verification of the Refinery TAB.

WHEREAS, the United States and Limetree Bay have agreed to a second modification that modifies the compliance date set in Paragraph 79.a of the Consent Decree.

WHEREAS, because the compliance date for the review and verification of the Refinery's TAB does not involve the installation of control equipment or emissions limitations following the installation of control equipment, the United States and Limetree Bay agree that this Second Modification of the Consent Decree is a non-material modification, that pursuant to Paragraph 228, does not require written approval by the Court.

NOW THEREFORE, the United States and Limetree Bay hereby modify the Consent Decree, as amended by the First Modification, as follows:

I.      Replace Paragraph 79.a with the following:

79.      One-Time Review and Verification of the Refinery's TAB and Compliance with the Benzene Waste NESHAP.

a.      Phase One of the Review and Verification Process. By ~~March 30, 2021~~November 22, 2021, Limetree Bay shall complete a review and verification of the Refinery TAB and its compliance with Benzene Waste NESHAP (Phase One Review and Verification). Limetree Bay's review and verification process shall include, but not be limited to:

EPA-698

All other terms and conditions of the Consent Decree remain unchanged and in full effect.

EPA-699

THE UNDERSIGNED PARTY agrees to this non-material modification of the Consent

Decree in the matter of United States, et al. v. HOVENSA L.L.C.

FOR THE UNITED STATES:

JEAN E. WILLIAMS
Acting Assistant Attorney General
Environment and Natural Resources
Division
United States Department of Justice

Date: 4/6/2021

MYLES E. FLINT, II
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources
Division
United States Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
(202) 307-1859

GRETCHEN C.F. SHAPPERT
United States Attorney
District of the Virgin Islands
Federal Building and U.S. Courthouse
5500 Veterans Drive, Room 260
St. Thomas, USVI 00802

4

THE UNDERSIGNED PARTY agrees to this non-material modification of the Consent

Decree in the matter of United States, et al. v. HOVENSA L.L.C.

FOR PLAINTIFF THE UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY:

**LOREN DENTON**   Digitally signed by LOREN DENTON
Date: 2021.04.01 12:47:46 -04'00'

Date: _____
_____
ROSEMARIE A. KELLEY
Director
Office of Civil Enforcement
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency

**Carroll, Thomas**   Digitally signed by Carroll, Thomas
Date: 2021.04.01 11:55:51 -04'00'

Date: _____
_____
THOMAS P. CARROLL
Acting Director
Air Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency

OF COUNSEL

PROVIDENCE SPINA
United States Environmental Protection Agency
1200 Pennsylvania Avenue
Washington, D.C. 20460

5

THE UNDERSIGNED PARTY agrees to this non-material modification of the Consent

Decree in the matter of United States, et al. v. HOVENSA L.L.C.

FOR PLAINTIFF THE UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY
REGION 2:

Date: _____

Schaaf, Eric Digitally signed by
Schaaf, Eric
Date: 2021.04.05
16:52:45 -04'00'
_____

ERIC SCHAAF
Regional Counsel
United States Environmental Protection
Agency
Region 2
290 Broadway
New York, NY 10007-1866

OF COUNSEL:

FLAIRE MILLS
Associate Regional Counsel
United States Environmental Protection Agency
Region 2
290 Broadway
New York, NY 10007-1866

6

THE UNDERSIGNED PARTY agrees to this non-material modification of the Consent

Decree in the matter of United States, et al v. HOVENSA L.L.C.

FOR LIMETREE BAY TERMINALS, LLC:

Date: __March 31, 2021_____

JEFFREY RINKER
President and Chief Executive Officer
Limetree Bay Terminals, LLC
One Estate Hope
Christiansted, USVI 00820

7

THE UNDERSIGNED PARTY agrees to this non-material modification in the matter of United States, et al v. HOVENSA L.L.C.

FOR LIMETREE BAY REFINING, LLC:

Date: March 31, 2021

JEFFREY RINKER
President and Chief Executive Officer
Limetree Bay Refining, LLC
One Estate Hope
Christiansted, USVI 00820

8

**OPERATING AGREEMENT**

**BY AND AMONG**

**THE GOVERNMENT OF THE U.S. VIRGIN ISLANDS**

**AND**

**LIMETREE BAY TERMINALS, LLC**

**December 1, 2015**

**TABLE OF CONTENTS**

ARTICLE 1 DEFINITIONS AND CONSTRUCTION ...................................................10

    Section 1.1.   Definitions.................................................................................10

    Section 1.2.   Agreement Components............................................................19

    Section 1.3.   Agreement Interpretation..........................................................20

ARTICLE 2 TERM OF AGREEMENT .....................................................................20

    Section 2.1.   Effective Date ...........................................................................20

    Section 2.2.   Initial Term ...............................................................................21

    Section 2.3.   Extension of Term.....................................................................21

    Section 2.4.   End of Term ..............................................................................21

ARTICLE 3 CLOSING; CLOSING CONDITIONS; TERMINATION BEFORE
CLOSING.................................................................................................21

    Section 3.1.   Time and Place of Closing........................................................21

    Section 3.2.   Conditions to Closing. ..............................................................21

    Section 3.3.   Closing Deliveries....................................................................23

    Section 3.4.   Termination Before Closing .....................................................24

ARTICLE 4 COMMENCEMENT OF OPERATIONS ...............................................25

    Section 4.1.   Permits .....................................................................................25

    Section 4.2.   Operations Commencement......................................................26

ARTICLE 5 OPERATION OF THE TERMINAL; EXPANSION..............................27

    Section 5.1.   Independent Operation and Non-Interference ..........................27

    Section 5.2.   Terminal Operations ................................................................28

    Section 5.3.   Expansion and Enhancement of Facilities. ..............................28

ARTICLE 6 ADDITIONAL OPERATING PROVISIONS.........................................28

2

Section 6.1.    Operation of the Fuel Loading Rack..........................................................28

Section 6.2.    Navigational Access...............................................................................29

Section 6.3.    Submerged Lands...................................................................................30

Section 6.4.    Refinery Obligations. ............................................................................31

Section 6.5.    Land And Housing Transfer. ..................................................................33

Section 6.6.    Bitumen Tank And Storage. ...................................................................33

ARTICLE 7 EMPLOYMENT ....................................................................................33

Section 7.1.    Minimum Commitment ..........................................................................33

Section 7.2.    Residency Requirement .........................................................................34

Section 7.3.    Non-Discrimination. ..............................................................................34

Section 7.4.    Training and Continuing Education.........................................................34

ARTICLE 8 FINANCIAL OBLIGATIONS OF TERMINAL OPERATOR ...............................35

Section 8.1.    Closing Payment and Related Payments...................................................35

Section 8.2.    Annual Payment....................................................................................35

Section 8.3.    Adjusted Variable Payment. ...................................................................36

Section 8.4.    Charitable Commitments. .......................................................................37

Section 8.5.    Financial Assurance. ..............................................................................37

Section 8.6.    Government Carried Interest in Terminal Operator....................................37

Section 8.7.    Capital Expenditures..............................................................................38

ARTICLE 9 SECURITY INTEREST .............................................................................38

Section 9.1.    Payments Secured By Lien. ....................................................................38

Section 9.2.    All Necessary Actions............................................................................39

Section 9.3.    No Encumbrances. .................................................................................39

ARTICLE 10 INSURANCE..........................................................................................40

3

Section 10.1.   General Insurance ............................................................................40

Section 10.2.   Additional Insurance ........................................................................40

ARTICLE 11 TAX AND FEE EXEMPTIONS ..................................................................42

Section 11.1.   Scope of Exemption ..........................................................................42

Section 11.2.   Exemptions ......................................................................................42

Section 11.3.   Limitations on Exemption.................................................................43

Section 11.4.   Tax Return Filings ............................................................................44

Section 11.5.   No Adverse Actions ..........................................................................44

ARTICLE 12 REPRESENTATIONS AND WARRANTIES................................................44

Section 12.1.   Government Representations .............................................................44

Section 12.2.   Terminal Operator Representations ...................................................45

ARTICLE 13 COVENANTS OF TERMINAL OPERATOR .............................................46

Section 13.1.   Environmental...................................................................................46

Section 13.2.   Consents and Approvals ...................................................................48

Section 13.3.   Indemnification .................................................................................48

ARTICLE 14 GOVERNMENT COVENANTS ................................................................49

Section 14.1.   Assistance with Permits ...................................................................49

Section 14.2.   Consents and Approvals ...................................................................49

Section 14.3.   Beneficial Use...................................................................................49

Section 14.4.   Other Legislation .............................................................................50

Section 14.5.   Change in Law .................................................................................50

Section 14.6.   Other Benefits ..................................................................................50

Section 14.7.   No Additional Cost to Terminal Operator .........................................50

Section 14.8.   Zoning; Legal Descriptions...............................................................51

4

ARTICLE 15 REPORTING, AUDIT AND INSPECTION ........................................................51

    Section 15.1.  Reporting...............................................................................51

    Section 15.2.  Annual Audit.........................................................................51

    Section 15.3.  Inspection .............................................................................52

ARTICLE 16 DEFAULT AND TERMINATION ...................................................................52

    Section 16.1.  Payment Default....................................................................52

    Section 16.2.  Operating Default; Liquidated Damages. ..............................53

    Section 16.3.  Termination ...........................................................................53

    Section 16.4.  Rights and Remedies Cumulative .........................................54

ARTICLE 17 CONFIDENTIALITY .....................................................................................54

    Section 17.1.  Confidentiality ......................................................................54

ARTICLE 18 FORCE MAJEURE .........................................................................................56

    Section 18.1.  Force Majeure Events ...........................................................56

    Section 18.2.  Burden of Proof.....................................................................56

    Section 18.3.  Excused Performance............................................................56

    Section 18.4.  Applicability .........................................................................57

ARTICLE 19 MISCELLANEOUS ........................................................................................57

    Section 19.1.  Notices, Requests and Communications................................57

    Section 19.2.  Assignment. ..........................................................................59

    Section 19.3.  Governing Law .....................................................................60

    Section 19.4.  Dispute Resolution................................................................61

    Section 19.5.  Commercial Act. ...................................................................61

    Section 19.6.  Limitation on Liability..........................................................62

    Section 19.7.  Entire Agreement; Subsequent Amendments ........................62

5

Section 19.8.  Severability of Provisions ..........................................................................62

Section 19.9.  Payment Terms and Interest Calculation .....................................................62

Section 19.10. Public Announcements ................................................................................63

Section 19.11. Parties in Interest .......................................................................................63

Section 19.12. Waiver ........................................................................................................63

Section 19.13. Performance Extended to Next Business Day ...........................................63

Section 19.14. Negotiation and Preparation Costs .............................................................63

Section 19.15. Further Assurances .....................................................................................63

Section 19.16. Counterparts ...............................................................................................64

6

## OPERATING AGREEMENT

THIS OPERATING AGREEMENT (the "*Agreement*") is hereby made as of December 1, 2015, by and among the Government of the U.S. Virgin Islands (the "*Government*") and Limetree Bay Terminals, LLC, a limited liability company existing under the laws of the U.S. Virgin Islands ("*Terminal Operator*"). The Government and Terminal Operator are hereinafter sometimes individually referred to as a "*Party*" and sometimes hereinafter collectively referred to as "*Parties*".

## RECITALS

**WHEREAS**, the Government, Hess Oil Virgin Islands Corp. ("*HOVIC*"), PDVSA V.I., Inc. ("*PDVSA*") and HOVENSA, L.L.C. ("*HOVENSA*"), have entered into that certain Concession Agreement, dated and approved by the Legislature of the Virgin Islands September 1, 1965, as amended and extended by the Extension and Amendment Agreement, dated April 24, 1981 and approved by the Legislature of the Virgin Islands May 7, 1981, as further amended and extended by the Restated Second Extension and Amendment Agreement, dated July 27, 1990 and approved by the Legislature of the Virgin Islands on August 22, 1990, as further amended by the Technical Clarifying Amendment to Restated Second Extension and Amendment Agreement, dated November 17, 1993 and approved by the Governor and the Legislature of the Virgin Islands, as further amended and extended by the Third Extension and Amendment Agreement, to which PDVSA VI and later HOVENSA were added as parties, dated April 15, 1998 and approved by the Legislature of the Virgin Islands on May 18, 1998, and as further amended by the Fourth Amendment Agreement, dated April 3, 2013, as ratified by the Legislature of the Virgin Islands on November 4, 2013 and approved by the Governor of the Virgin Islands on November 4, 2013, as Act No. 7566 (such ratification including that certain letter, dated October 16, 2013, from George H.T. Dudley to the Governor of the Virgin Islands incorporated as part of Act No. 7566) (all of the foregoing, collectively, the "*Concession Agreement*");

**WHEREAS**, under the Concession Agreement, HOVIC, PDVSA, and HOVENSA (and their predecessors in interest), as inducement to construct, operate, and maintain the refinery and related facilities, and in order to promote the public interest in the economic growth and development of the U.S. Virgin Islands, were granted rights to conduct the business of the Oil Refinery and Related Facilities (as defined below) and were exempted from certain taxes, duties, and other fees;

**WHEREAS**, the Government, the USVI Port Authority (the "*Port Authority*") and HOVIC entered into that certain Contract dated as of September 22, 1976 (as amended, supplemented or modified from time to time, the "*1976 Contract*"), which was approved by the Legislature of the U.S. Virgin Islands (the "*Legislature*") on September 29, 1976, which 1976 Contract memorialized the agreements between HOVIC and the Government with respect to HOVIC's agreement to construct a container port on the south shore of St. Croix, U.S. Virgin Islands;

7

**WHEREAS**, among the documents exchanged between the Government and HOVIC in connection with the 1976 Contract was that certain Lease entered into by and between the Government and HOVIC, dated as of October 16, 1976, (the "***Submerged Land Lease***"), pursuant to which the Government leases to HOVIC certain reclaimed submerged lands specified therein;

**WHEREAS**, the Concession Agreement was amended pursuant to the Third Amendment Agreement dated April 15, 1998 to allow construction of a delayed coking unit and to modify the prior Concession Agreement to include PDVSA as a 50% Member in HOVENSA;

**WHEREAS**, pursuant to that certain Letter Agreement entered into by and between HOVIC and the Government, dated October 14, 1998 (the "***1998 Letter Agreement***"), the Government approved: (i) the assignment and delegation to HOVENSA of HOVIC's rights and obligations under the 1976 Contract, including the right to use the lands filled as authorized by Submerged Lands Permit No. 3 and Amendments 1, 2, and 3 thereto, and Submerged Lands Permit Nos. 23 and 52 (which right shall continue for the term of the Submerged Land Lease, as such term is extended), and (ii) the assignment of the leasehold estate under the Submerged Land Lease to HOVENSA;

**WHEREAS**, by their terms, the rights and obligations of the parties to the Concession Agreement arising under or related to the Concession Agreement continue until the year 2022;

**WHEREAS**, on or about January 18, 2012, HOVENSA announced its intention to idle refining operations at the Oil Refinery and Related Facilities, and thereafter began idling such operations on or about February 16, 2012;

**WHEREAS**, the Government, HOVENSA, HOVIC and PDVSA entered into that certain Fourth Amendment Agreement as of April 3, 2013 (the "***Fourth Amendment***") which was approved by the Legislature on November 4, 2013, which provides, among other things, for HOVIC and PDVSA to undertake a bona fide process to facilitate the sale, directly or indirectly, of the Oil Refinery and Related Facilities on an arm's length basis (the "***Sales Process***");

**WHEREAS**, the Sales Process and subsequent action in connection with proceedings in the United States District Court of the Virgin Islands, Bankruptcy Division, St. Croix, Virgin Islands, resulted in HOVENSA having reached an understanding with Terminal Operator and the Government whereby HOVENSA and HOVIC will transfer to Terminal Operator certain assets constituting the Oil Refinery and Related Facilities pursuant to an Amended and Restated Asset Purchase Agreement by and among HOVENSA, HOVIC, and an Affiliate of Terminal Operator, dated as of December 1, 2015 (the "***Purchase Agreement***"), subject to, among other things: (i) the execution of this Agreement by the Parties hereto, (ii) the Legislature approving this Agreement, and (iii) the closing of the acquisition contemplated under the Purchase Agreement;

8

**WHEREAS**, the Government has determined that continued economic activity at the Oil Refinery and Related Facilities is critical to the economic well-being of the Territory, and will bring tax revenues, employment, and increased commercial activity that will benefit the Government and the people of the Virgin Islands;

**WHEREAS**, the Government has determined that the Territory's long-term interests will be best served by entering into an agreement with a financially and commercially reputable entity that will refurbish, restart, and operate the oil storage terminal located at the Oil Refinery and Related Facilities, explore available options for resuming petroleum processing operations at the facility, and identify strategies for further expanding and enhancing the economic activity at the facility going forward;

**WHEREAS,** Terminal Operator has agreed to refurbish, operate, and explore expansion of the Terminal, and to undertake best efforts to identify and pursue potential uses of the Oil Refinery, subject to Terminal Operator's reasonable business judgment;

**WHEREAS,** Terminal Operator has agreed that if no such use for the Oil Refinery can be identified within eighteen (18) months following the closing of the transactions contemplated by this Agreement, it will (at the Government's option) dismantle the Oil Refinery and such other physical assets of the Oil Refinery and Related Facilities as are not necessary to or useful for the operation of the Terminal, in accordance with this Agreement;

**WHEREAS,** Terminal Operator and HOVENSA shall enter into a shared services agreement with respect to certain services to be provided by Terminal Operator (either directly or through a third party) from various systems (the "***Shared Services Systems***"), including but not limited to fire control system management, power supply and process and potable water supply (the "***Shared Services Agreement***");

**WHEREAS,** Terminal Operator has entered into contracts or memoranda of understanding for the storage of petroleum and petroleum products with multiple reputable third parties, including China Petroleum & Chemical Corporation ("***Sinopec***") and Freepoint Commodities LLC, which contracts or memoranda will establish a baseline for the economic performance of the Terminal, and certain of those entities have acquired a minority equity stake;

**WHEREAS**, in order to protect the interests of the Territory, and to reflect the importance of the Government's role in facilitating the successful operation of the Terminal, the Government wishes to take a financial stake in the success of the new venture, which shall be in the form of a fee payable upon a Change of Control (as defined below) and shall not include any governance or management role; and

**NOW, THEREFORE**, in consideration of the premises and the mutual promises and covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, and intending hereby to be legally bound, the Government and Terminal Operator hereby agree and stipulate as follows:

9

## ARTICLE 1
## DEFINITIONS AND CONSTRUCTION

Section 1.1.    **Definitions**. As used in this Agreement, the following terms have the respective meanings set forth below or set forth in the Articles referenced below.

"*1976 Contract*" shall have the meaning set forth in the Recitals.

"*1998 Letter Agreement*" shall have the meaning set forth in the Recitals.

"*Abandonment*" shall mean intentionally and definitively ceasing or idling Terminal Operations for greater than 120 days for reasons other than turnarounds or other maintenance requirements or the occurrence of a Force Majeure Event.

"*Adjusted Variable Payment*" shall have the meaning set forth in Section 8.3.

"*Affiliate*" or "*Affiliates*" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person; provided that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract (including, a shareholders' agreement or a members' agreement between Persons who have an interest in an Affiliate) or otherwise.

"*Agreement*" shall have the meaning set forth in the Preamble.

"*Annual Audit*" shall have the meaning set forth in Section 15.2(A).

"*Annual Audit Report*" shall have the meaning set forth in Section 15.2(B).

"*Annual Payment*" shall have the meaning set forth in Section 8.2.

"*Applicable Law*" shall mean any present or future constitution, law, statute, ordinance, order, injunction, administrative and/or judicial order or decree, code, rule, regulation, or Authorization, or any amendments thereto, and any voluntary cleanup program and/or brownfields program of any Governmental Authority (excluding any such legislative, judicial or administrative body or instrumentality acting in any capacity as a lender, guarantor or mortgagee) applicable to a Party or its Affiliate or the subject matter of this Agreement.

"*Authorization*" shall mean any licenses, certificates, permits, orders, approvals, consents, determinations, variances, franchises, and authorizations from any Governmental Authority.

"*Bankrupt*" shall mean any Person that: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief

10

or is declared insolvent in any federal, state, or territorial bankruptcy or insolvency proceeding; (iv) files a petition or answer seeking for such Person a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any Applicable Law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Person in a proceeding of the type described in subclauses (i) through (iv) of this definition in which such Person is the debtor; or (vi) seeks, consents, or acquiesces to the appointment of a trustee, receiver, or liquidator of such Person or of all or any substantial part of such Person's properties; or against which a proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any Applicable Law has been commenced and 120 days have expired without dismissal thereof or with respect to which, without such Person's consent or acquiescence, a trustee, receiver, or liquidator of such Person or of all or any substantial part of such Person's properties has been appointed and 90 days have expired without such appointment having been vacated or stayed, or 90 days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

*"Business Day"* shall mean Monday through Friday of each week, except that a legal holiday recognized as such by the Government shall not be regarded as a Business Day, and a *"Day"* shall be any calendar day.

*"Carried Interest"* shall have the meaning set forth in Section 8.6(A).

*"Change in Law"* means any of the following events occurring after the date of execution of this Agreement:

(a)     a change to, or repeal of, any existing Applicable Law;

(b)     the promulgation of any new Applicable Law; or

(c)     any withdrawal or amendment of any Authorization other than:

(i)     in accordance with the terms upon which it was originally granted;

(ii)     as a result of a material failure by Terminal Operator to comply with a material condition of the applicable Authorization; or

(iii)     as a result of any unlawful act or omission of Terminal Operator.

*"Change of Control"* shall mean, with respect to Terminal Operator, consummation of a transaction or series of transaction whereupon (i) the holder, either directly or indirectly, of a majority of the equity interests in Terminal Operator immediately prior to such transaction or series of transactions ceases to hold, either directly or indirectly, a majority of the equity interests in Terminal Operator following the consummation of such transaction or series of transactions, (ii) the indirect ultimate parent of Terminal Operator or its Affiliates directly or indirectly controlling Terminal Operator immediately prior to such transaction or series of transactions ceases to directly or indirectly control Terminal Operator following consummation of such

11

transaction or series of transactions or (iii) Terminal Operator has sold, transferred or disposed of all or substantially all of its assets, or all or substantially all of the assets constituting the Terminal, the Refinery, or the Oil Refinery and Related Facilities as a whole, by asset sale, stock sale, merger or otherwise; *provided, however*, that no Change of Control shall be deemed to have occurred in the event of any direct or indirect transfer of a majority of the equity interests in Terminal Operator to an Affiliate thereof or a transfer under clause (iii) above to an Affiliate of Terminal Operator.

"***Clean Air Act Consent Decree***" shall mean the Consent Decree entered on June 7, 2011 in *United States of America and The United States Virgin Islands v. HOVENSA, L.L.C.* (Civ. No. 1:11 -cv-00006) (D.V.I., St. Croix Div.).

"***Closing***" shall have the meaning set forth in <u>Section 3.1(A)</u>.

"***Closing Date***" shall have the meaning set forth in <u>Section 3.1(B)</u>.

"***Closing Payment***" shall have the meaning set forth in <u>Section 8.1</u>.

"***Coastal Zone Management permit***" shall mean a permit obtained under the Virgin Islands Coastal Zone Management Act, as amended.

"***Commissioner of Labor***" shall mean the Commissioner of Labor of the U.S. Virgin Islands.

"***Concession Agreement***" shall have the meaning set forth in the Recitals.

"***Confidential Information***" shall mean information or data proprietary to the Government and/or Terminal Operator including:

(a)    books, records and documentation;

(b)    information regarding any aspect of the Oil Refinery and Related Facilities and the operation thereof;

(c)    information from and relating to customers and stakeholders;

(d)    written information that is clearly marked as confidential or proprietary by a Party;

(e)    oral information identified in writing as confidential after disclosure, or as so stated when made, regardless of whether such written or oral information originated with the disclosing Party or any third party, which is provided to the receiving Party after the date hereof; and

(f)    all written information generated by a Party or its representatives that contains, reflects or is derived from furnished Confidential Information,

12



provided, however, that such information or data shall exclude information already in the public domain, or which may subsequently become part of the public domain through no fault of the Government or Terminal Operator. For the avoidance of any doubt, Confidential Information includes any information recorded or stored in any digital format on electronic, optical or magnetic media or any other material that contains or otherwise reflects Confidential Information.

*"Consumer Price Index"* shall mean the Consumer Price Index for All Urban Consumers, U.S. City Average as published by the U.S. Department of Labor, Bureau of Labor Statistics.

*"Contaminant"* shall include but not be limited to any contaminant, air contaminant, solid or hazardous waste, hazardous material, infectious waste, waste, pollutant, air pollutant, hazardous air pollutant, regulated air pollutant, pollution, air pollution, radioactive material, hazardous or toxic substance, crude oil, any fraction thereof, petroleum product, petroleum byproduct, and or fuel additive, defined or regulated as such now or in the future in or under any Environmental Laws or voluntary cleanup or brownfields program.

*"Contract"* shall mean any note, bond, mortgage, indenture, guaranty, license, franchise, permit, agreement (including, a shareholders' agreement, a members' agreement, or both), contract, commitment, lease, purchase order, or other instrument or obligation, and any amendments thereto.

*"Customers"* shall have the meaning set forth in Section 11.1.

*"Discharge Date"* shall have the meaning set forth in Section 9.1(A).

*"Dispute"* shall have the meaning set forth in Section 19.4.

*"Distributions"* shall mean any distribution to a member or shareholder in respect of a membership interest or any other ownership interest in Terminal Operator or its Affiliates, whether in cash or property, or the redemption, purchase or acquisition of any interest of the member or shareholder.

*"District Court"* shall have the meaning set forth in Section 4.1(B).

*"DPNR"* shall have the meaning set forth in Section 4.1(B).

*"Effective Date"* shall have the meaning set forth in Section 2.1.

*"Environmental Laws"* shall mean any Applicable Law, Order or other requirement of Applicable Law (including environmental Authorizations) that relates to (a) the protection of the environment, including but not limited to threatened or endangered species, federally-jurisdictional wetlands, ambient air, surface water, groundwater, land surface or subsurface strata, natural resources, natural resource damages, and the restoration and replacement of natural resources, or of human health or safety, or (b) the presence, Release, threatened Release,

13

generation, recycling, disposal or treatment of Contaminants, or the arrangement for any such activities.

"*EPA*" shall have the meaning set forth in Section 4.1(B).

"*Equity Holders*" shall include the direct and indirect owners of (i) the stock of a corporation, (ii) the equity of the membership interests of a limited liability company, and (iii) the ownership interest of any other entity.

"*Exempted Assets*" shall have the meaning set forth in Section 19.5.

"*Exemptions*" shall have the meaning set forth in Section 11.2.

"*Extension*" shall have the meaning set forth in Section 2.3.

"*Financial Assurance*" shall have the meaning set forth in Section 8.5.

"*Force Majeure Event*" shall have the meaning set forth in Section 18.1.

"*Fourth Amendment*" shall have the meaning set forth in the Recitals.

"*Fuel Loading Rack*" shall have the meaning set forth in Section 6.1(A)(1).

"*Full-Time Employee*" shall mean an individual employed by Terminal Operator for work in the U.S. Virgin Islands on the Terminal who works an average of not less than 40 hours per week and is covered by employer-provided health insurance. The number of Full-Time Employees on any given date shall be calculated as the three-month trailing average of the number of Full-Time Employees at the Terminal on such date, and shall include contractors for the first twelve (12) months after Closing and exclude contractors thereafter.

"*Government*" shall have the meaning set forth in the Preamble.

"*Government Indemnified Party*" shall have the meaning set forth in Section 13.3.

"*Governmental Authority*" shall mean any foreign, federal, territorial, state or local governmental entity, authority or agency, court, tribunal, regulatory commission or other body, whether legislative, judicial or executive (or a combination or permutation thereof) having jurisdiction as to the matter in question.

"*Governmental Function*" shall mean any regulatory, legislative, permitting, zoning, enforcement (including police power), licensing or other functions which the Government is authorized or required to perform in its capacity as a Governmental Authority in accordance with Applicable Law.

"*Governor*" shall have the meaning set forth in Section 3.2(C)(1).

"*Guaranteed Amount*" shall have the meaning set forth in Section 8.5.

14

**"HOVENSA"** shall have the meaning set forth in the Recitals.

**"HOVIC"** shall have the meaning set forth in the Recitals.

**"Initial Term"** shall have the meaning set forth in Section 2.2.

"**Internal Revenue Code**" shall mean, as applicable, the Internal Revenue Code of 1986, as amended, and/or the Internal Revenue Code of 1986, as amended and as mirrored in the U.S. Virgin Islands and applicable pursuant to the Naval Service Appropriation Act of 1922, 48 U.S.C. 1397.

**"International Standards"** shall mean with respect to any engineering, construction or operations work conducted by or on behalf of a Party, that such work is performed in accordance with professional practices and standards generally accepted by the international refining and marine terminalling community and that such work is provided by an experienced and competent professional organization generally recognized by that community as competent in its respective service area.

**"Legislature"** shall have the meaning set forth in the Recitals.

**"Lender"** shall mean any Person providing debt, bond or capital market financing or refinancing or credit support or interest rate hedging for such financing or refinancing, including any agent or trustee for such Person or Persons.

**"Liabilities"** shall mean any and all indebtedness, Taxes, liabilities and obligations, whether accrued or fixed, known or unknown, absolute or contingent, matured or unmatured, or determined or determinable.

**"Losses"** shall mean all suits, actions, Liabilities, legal proceedings, claims, demands, losses, costs, and expenses of whatsoever kind or character, including reasonable attorneys' fees and expenses and case costs and expenses.

*"Minimum Payment"* shall have the meaning set forth in Section 8.2(B).

"*Notice*" shall have the meaning set forth in Section 19.1.

**"NRD Settlement and Release Agreement"** shall mean the Settlement and Release Agreement fully executed on and with an effective date of May 29, 2014, by and among the Commissioner of the U.S. Virgin Islands Department of Planning and Natural Resources, the Government of the U.S. Virgin Islands, Hess Oil Virgin Islands Corp., and HOVENSA, LLC, which resolved the litigation among the parties in *Commissioner of the Dep't of Planning and Natural Resources v. Century Alumina Co., et al.*, Civ. No. 2005-0062 (attached hereto as Appendix C).

**"Oil Refinery and Related Facilities"** shall mean the Refinery, the Terminal, and all other related facilities, equipment, and real and personal property associated with petroleum

15

import, export, processing, storage and related activities at the Refinery, the Terminal, the container port, the dock, and certain rights to occupy and use all Submerged Lands (including lands on or under the surface of any kind of water), whether or not covered by the Submerged Land Lease, and all facilities related thereto on St. Croix, U.S. Virgin Islands, in each case as acquired by Purchaser pursuant to the Purchase Agreement and as delineated on the map attached as Appendix A hereto.

"*Operating Default*" shall have the meaning set forth in Section 16.2.

"*Operations Commencement Date*" shall have the meaning set forth in Section 4.2(A).

"*Operations Commencement Deadline*" shall have the meaning set forth in Section 4.2(A).

"*Option Parcel*" shall have the meaning set forth in Section 6.5(B).

"*Order*" shall mean any judgment, order, injunction, decree, writ, permit or license issued or entered by or with any Governmental Authority or any arbitrator, whether preliminary, interlocutory or final.

"*Parcel*" shall have the meaning set forth in Section 6.5(A).

"*Parties*" and "*Party*" shall have the meaning set forth in the Preamble.

"*Payment Default*" shall have the meaning set forth in Section 16.1.

"*Payment Obligations*" shall have the meaning set forth in Section 9.1.

"*PDVSA*" shall have the meaning set forth in the Recitals.

"*Person*" shall mean and include an individual, a partnership, a limited partnership, a limited liability partnership, a joint venture, a joint stock company, a corporation, a limited liability company, an association, a trust, an unincorporated organization, a group, any governmental entity or any other form of entity or organization.

"*Port Authority*" shall have the meaning set forth in the Recitals.

"*Pre-Existing Contamination*" shall have the meaning set forth in the NRD Settlement and Release Agreement.

"*Proceeding*" shall mean a proceeding, arbitration, action, claim, suit, pending settlement, or other legal proceeding of any kind or nature before or by any Governmental Authority, arbitrator or panel.

"*Purchase Agreement*" shall have the meaning set forth in the Recitals.

16

*"Qualifying Change in Law"* means any Change in Law of the U.S. Virgin Islands that (1) (a) becomes effective as a result of an express and affirmative legislative or rulemaking act of the Government, (b) is not required by a Change in Law of the United States, and (c) is not required to conform to any requirements of any federally-delegated program, or (2) any Change in Law the terms of which apply expressly to (a) the Oil Refinery and Related Facilities and/or the Site or operations thereon, and not to facilities, sites, or operations that are similar in whole or in part and/or (b) the Terminal Operator or its Affiliates disproportionately in relation to other similarly situated persons.

**"*Refinery*"** shall mean all petroleum processing equipment and related facilities, equipment, and real property associated with petroleum processing and related activities at the Oil Refinery and Related Facilities, exclusive of the Terminal, as set forth on the map attached hereto as Appendix A.

**"*Refinery Deconstruction*"** shall have the meaning set forth in Section 6.4(B).

**"*Refinery Evaluation Period*"** shall have the meaning set forth in Section 6.4(A).

**"*Refinery Income*"** shall mean the earnings before interest, depreciation, taxes, and amortization of the Refinery (or any part thereof) following a Refinery Restart.

**"*Refinery Restart*"** shall mean the resumption or initiation on the Site of existing or after-constructed petroleum processing units. "Petroleum processing units," for purposes of this definition, shall include (i) physical processes for separating hydrocarbon compounds based on physical characteristics such as distillation, and (ii) chemical processes for transforming the structure of petroleum molecules, including without limitation cracking, coking, and hydrotreating.

**"*Refinery Site*"** shall mean the real property on which the Refinery is located, as further described in Appendix A.

**"*Release*"** shall mean any release, spill, emission, leaking, dumping, injection, pouring, pumping, placing, emptying, injecting, escaping, discarding, abandoning, deposit, disposal, discharge, migrating, or disposal into, on, under, or through the environment (including, but not limited to, ambient air, surface water, groundwater, soil, land surface, or subsurface strata).

**"*Respond" or Response"*** shall mean all actions, including but not limited to removal actions, remedial actions, corrective actions, enforcement actions, and natural resource restorations, mitigations, and replacements, taken or ordered by or on behalf of the U.S. or the Government, ordered by a court of competent jurisdiction, or otherwise required by Applicable Law, pursuant to any Environmental Laws in response to any Release or threatened Release of a Contaminant.

**"*Restart Date*"** shall mean the date on which Terminal Operations resume.

**"*Return*"** shall mean all returns, statements, forms and reports for Taxes.

17

"*Sales Process*" shall have the meaning set forth in the Recitals.

"*Secured Assets*" shall have the meaning set forth in Section 9.1.

"*Security Documents*" shall have the meaning set forth in Section 9.1.

"*Senior Management Employees*" shall mean the ten (10) most highly compensated employees of Terminal Operator.

"*Senior Obligations*" shall have the meaning set forth in Section 9.1(A).

"*Shared Services Systems*" shall mean the various systems (including, without limitation, the fire control system management, power supply and process, waste or storm water and potable water supply) available on the Site for the provision of shared services by and between Terminal Operator and HOVENSA.

"*Site*" shall mean the real property on which the Oil Refinery and Related Facilities are located, including but not limited to land, "*submerged and filled lands*" and "*trust lands*", within the meaning of 12 V.I.C. § 902(cc) and (dd), respectively, waterways, groundwater, and coastal zones, as further described and delineated in Appendix A with respect to those assets and certain lands and rights to land acquired by Purchaser under the Purchase Agreement.

"*Submerged Land Lease*" shall have the meaning set forth in the Recitals.

"*Submerged Lands*" shall have the meaning set forth in Section 13.1(B)(5).

"*Subordinate Security Interest*" shall have the meaning set forth in Section 9.1.

"*Taxes*" shall mean all taxes, assessments, charges, duties, fees, levies or other governmental charges imposed by a taxing authority, including all U.S. federal, state, territory, local, foreign, and other income, franchise, annual report fees, profit, gross receipts, capital gains, capital stock, transfer, sales, use, value added, occupation, property, excise, severance, windfall profits, stamp, license, payroll, social security, withholding, and other taxes, assessments, charges, duties, fees, levies, and other governmental charges imposed by a taxing authority of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Return) all estimated taxes, deficiency assessments, additions to tax, penalties, and interest.

"*Term*" shall mean the Initial Term and any Extensions.

"*Terminal*" shall mean all storage and blending equipment, docks, tanks, and all other related facilities, equipment, and real property associated with petroleum import, export, mixing, storage, and related activities at the Oil Refinery and Related Facilities, exclusive of the Refinery, as further described in Appendix A.

18

"*Terminal Operations*" shall mean the trading, blending, storing, sale, offloading and loading of crude oil, refined products or byproducts such as sulphur or petroleum coke, liquid or compressed petroleum gases, import or storage of Liquefied Natural Gas (LNG) and other hydrocarbons and related activities.

"*Terminal Operator*" shall have the meaning set forth in the Preamble.

"*Terminal Revenues*" shall mean all revenues generated by or attributable to Terminal Operations, realized by Terminal Operator, less the cost of fuel or additives used to provide services to Customers and excluding any gross receipts arising in connection with Shared Services Systems.

"*Terminal Site*" shall mean the real property on which the Terminal is located, as further described in Appendix A.

"*Termination*" shall have the meaning set forth in Section 16.3(A).

"*Termination Event*" shall have the meaning set forth in Section 16.3(A).

"*Termination Notice*" shall mean the notice attached hereto as Appendix D.

"*USDOJ*" shall have the meaning set forth in Section 4.1(B).

"*UVT*" shall have the meaning set forth in Section 7.4.

"*Variable Refinery Payment*" shall have the meaning set forth in Section 8.2(A).

"*Variable Terminal Payment*" shall have the meaning set forth in Section 8.2(A).

"*Virgin Islands Resident*" shall mean (i) any United States citizen currently domiciled in the U.S. Virgin Islands for one year or more; (ii) an individual who has attended a school in the U.S. Virgin Islands for at least six years or is a high school or University of the Virgin Islands graduate and who is registered to vote in the U.S. Virgin Islands; or (iii) the holder of a permanent resident card (United States Department of Justice Form No. I-551, or appropriate successor form(s)) domiciled in the U.S. Virgin Islands for one year or more. An individual shall demonstrate that he or she has been a resident for one year or more for the purpose of this definition using documents that demonstrate the commencement of the individual's residency in the USVI. Such documents may include, without limitation, a residential lease, a deed, a W-2VI Form issued by an employer, a W-4 form timely completed by an employee, a voter registration card, a permanent resident card, and a U.S. Virgin Islands driver's license.

Section 1.2.    **Agreement Components**. This Agreement consists of the body of this Agreement and the following attachments:

Appendices:

19

Appendix A     Terminal Site and Refinery Site

Appendix B     List of Claims and Litigations

Appendix C     NRD Settlement and Release Agreement

Appendix D     Termination Notice

Appendix E     Memorandum of Understanding between UVI and HOVENSA

Each Appendix referred to in this Agreement is part of this Agreement and is hereby incorporated into the body of the Agreement as if set forth in full therein.

Section 1.3. **Agreement Interpretation**. In construing this Agreement: (a) no consideration shall be given to the captions of the articles, sections, subsections or clauses, which are inserted for convenience in locating the provisions of this Agreement and not as an aid to construction and shall not be interpreted to limit or otherwise affect the provisions of this Agreement or the rights and other legal relations of the Parties; (b) no consideration shall be given to the fact or presumption that either Party had a greater or lesser hand in drafting this Agreement; (c) examples shall not be construed to limit, expressly or by implication, the matter they illustrate; (d) the word "includes" and its syntactic variants mean, unless otherwise specified, "includes, but is not limited to" and corresponding syntactic variant expressions; (e) words such as "herein", "hereby", "hereafter", "hereof", "hereto" and "hereunder" refer to this Agreement as a whole and not to any particular article, section or provision of this Agreement; (f) whenever the context requires, the plural shall be deemed to include the singular, and vice versa; (g) each gender shall be deemed to include the other gender, when such construction is appropriate; (h) references to a Person are also to its permitted successors and permitted assigns; (i) all references in this Agreement to Appendices, Exhibits, Schedules, Sections and Articles refer to the corresponding Appendices, Exhibits, Schedules, Sections and Articles of this Agreement unless expressly provided otherwise; (j) references to the "U.S." mean to the United States of America; (k) references to "$" or "Dollars" mean U.S. Dollars; and (1) unless otherwise expressly provided herein, any agreement, instrument or Applicable Law defined or referred to herein means such agreement, instrument or Applicable Law as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of Applicable Laws) by succession of comparable successor Applicable Laws and reference to all attachments thereto and instruments incorporated therein.

## ARTICLE 2
## TERM OF AGREEMENT

Section 2.1. **Effective Date**. This Agreement shall become effective (the "*Effective Date*") upon the first day on which (i) this Agreement has been executed by all Parties and (ii) this Agreement has been duly ratified by the Legislature of the U.S. Virgin Islands.

20

Section 2.2.    **Initial Term**. The initial term of this Agreement (the "***Initial Term***") shall commence on the Effective Date and continue in effect for a period of twenty-five (25) years from the Closing Date.

Section 2.3.    **Extension of Term**. The Term may be extended for up to one (1) period of fifteen (15) additional years (the "***Extension***") upon (a) the delivery of written notice to the Government by Terminal Operator no later than eighteen (18) months prior to the expiration of the Initial Term, (b) certification by Terminal Operator that as of the date of such notice and as of the expiration of the Initial Term, Terminal Operator is in material compliance with its obligations under this Agreement, and (c) within forty-five (45) Days of receipt of such certification, the Government shall confirm that Terminal Operator's certification is correct, such confirmation not to be unreasonably withheld, conditioned or delayed.

Section 2.4.    **End of Term**. Not fewer than two (2) years prior to the end of the Term (as it may be extended by the Extension), Terminal Operator and the Government shall negotiate in good faith to reach a commercially reasonable agreement on a further extension of this Agreement. If Terminal Operator and the Government are unable to reach such an agreement, then the expiration of the Term shall constitute a Termination Event for purposes of Section 16.3(A)(3).

### ARTICLE 3
### CLOSING; CLOSING CONDITIONS; TERMINATION BEFORE CLOSING

Section 3.1.    **Time and Place of Closing**

(A)    **Closing.** Unless this Agreement shall have been terminated and the transactions herein contemplated shall have been abandoned pursuant to this Article 3, and subject to the satisfaction or waiver of the conditions set forth in Section 3.2 (other than conditions, the fulfillment of which, by their nature, are to occur at the completion of the transactions contemplated by this Agreement (the "***Closing***")), the Closing shall take place at the same time and place as the closing under the Purchase Agreement, provided that all conditions precedent to Closing have been satisfied or waived by the appropriate party, but in any event no later than January 15, 2016, unless otherwise extended by mutual agreement of the Government and Terminal Operator.

(B)    **Closing Date.** The date on which the Closing occurs is herein referred to as the "***Closing Date***".

Section 3.2.    **Conditions to Closing**.

(A)    **Condition Precedent.** This Agreement and all of its terms shall be subject to the ratification and approval of the Legislature and the placement of the signature of the Governor thereon.

(B)    **Conditions of the Government to Closing.** The obligations of the Government to consummate the transactions contemplated by this Agreement are subject, at

21

the option of the Government, to the satisfaction or waiver by the Government, on or prior to Closing, of each of the following conditions:

      (1)    All conditions precedent and other closing requirements pursuant to the Purchase Agreement have been satisfied or waived.

      (2)    No order, writ, injunction or decree shall have been entered (and be in effect) by any Governmental Authority of competent jurisdiction prohibiting the transaction from proceeding; and no statute, rule, regulation or other legal requirement shall have been promulgated or enacted (and be in effect) by any Governmental Authority, that, on a temporary or permanent basis, restrains, enjoins or invalidates the transactions contemplated hereby.

      (3)    Each of the representations and warranties of Terminal Operator contained in this Agreement shall be true and correct in all material respects.

      (4)    Terminal Operator shall have performed and observed, in all material respects, all covenants and agreements to be performed or observed under this Agreement prior to or on the Closing Date.

      (5)    Terminal Operator shall have delivered to the Government the items identified in Section 3.3(A).

      (C)    **Conditions to Terminal Operator Closing.** The obligations of Terminal Operator to consummate the transactions contemplated by this Agreement are subject, at the option of Terminal Operator, to the satisfaction or waiver by Terminal Operator, on or prior to Closing, of each of the following conditions:

      (1)    The Legislature shall have ratified and approved the transactions contemplated by this Agreement and the terms and conditions of this Agreement and the signature of the Governor of the U.S. Virgin Islands (the "***Governor***") shall have been placed thereon.

      (2)    The transactions contemplated by the Purchase Agreement shall have closed.

      (3)    No order, writ, injunction or decree shall have been entered (and be in effect) by any Governmental Authority of competent jurisdiction prohibiting the transaction from proceeding; and no statute, rule, regulation or other legal requirement shall have been promulgated or enacted (and be in effect) by any Governmental Authority, that, in each case, on a temporary or permanent basis, restrains, enjoins or invalidates the transactions contemplated hereby. For the avoidance of doubt, as set forth in the Purchase Agreement, Closing is not conditioned upon the receipt of approval from the Federal Trade Commission or any other federal agency or authority. For further avoidance of doubt, nothing herein is intended to negate or obviate any condition or use restriction set forth in any permit, consent decree, or Environmental Law.

22



(4)     Each of the representations and warranties of the Government contained in this Agreement shall be true and correct in all material respects.

(5)     The Government shall have performed and observed, in all material respects, all covenants and agreements to be performed or observed by the Government under this Agreement prior to or on the Closing Date.

(6)     HOVIC shall have assigned its rights and obligations with respect to the Submerged Lands to Terminal Operator, as approved herein by the Government as set forth in Section 6.3 hereof, including the transfer of certain rights and obligations with respect to certain Submerged Lands currently occupied by HOVENSA that appear on Appendix A as Submerged Lands for which the right to occupy and use is included in the Purchase Agreement but for which it is understood by the Government no lease or permit exists for HOVENSA to assign.

(7)     Terminal Operator and its Affiliates shall have received notification from the applicable Governmental Authority specifying that no withholding is required under either U.S. federal income tax law or U.S. Virgin Islands tax law.

Section 3.3.    **Closing Deliveries**

(A)    **Closing Deliveries of Terminal Operator.** At the Closing, upon the terms and subject to the conditions of this Agreement, Terminal Operator shall deliver, or cause to be delivered, to the Government, or perform or cause to be performed, the following:

(1)     A certificate duly executed by an authorized officer of Terminal Operator dated as of the Closing Date, certifying on behalf of Terminal Operator that the conditions set forth in Section 3.2(B)(5) have been fulfilled;

(2)     A certificate duly executed by an authorized officer of Terminal Operator dated as of the Closing Date, (i) attaching and certifying on behalf of Terminal Operator complete and correct copies of (x) the organizational documents of Terminal Operator, as in effect as of the Closing Date, and (y) the resolution of Terminal Operator authorizing the execution, delivery and performance by Terminal Operator of this Agreement and the transactions contemplated hereby and (ii) certifying the incumbency of each authorized representative of Terminal Operator executing this Agreement or any document delivered in connection with the Closing;

(3)     Evidence of payment of the Closing Payment by wire transfer in immediately available funds to a Government account at Bank of New York identified in advance by the Government in writing;

(4)     Certificates of insurance evidencing the insurance Terminal Operator has obtained, or caused to be obtained, as required pursuant to Article 10;

(5)     The executed Security Documents;

23

   (6) Deeds of transfer for the properties to be transferred to the Government pursuant to Section 6.5; and

    (7) The Financial Assurance identified in Section 8.5.

  (B) **Closing Deliveries of the Government.** At the Closing, upon the terms and subject to the conditions of this Agreement, the Government shall deliver, or cause to be delivered to Terminal Operator the documentation required pursuant to this Agreement, as well as to perform or cause to be performed its obligations under this Agreement, including, the following:

   (1) Evidence of the ratification and approval of the Legislature of the transactions contemplated by this Agreement and the terms of this Agreement, including the necessary signature of the Governor; and

    (2) the Termination Notice.

  Section 3.4. **Termination Before Closing**

  (A) **Termination**. This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing, upon fifteen (15) days' written notice to the non-terminating party:

   (1) By mutual written consent of the Government and Terminal Operator;

   (2) By Terminal Operator, if (i) there shall be any statutes, laws, rules, regulations, ordinances, orders, and codes of or by any Governmental Authority that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited; or, (ii) a Governmental Authority shall have issued an order, decree, or ruling or taken any other action permanently restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated hereby, and such order, decree, ruling, or other action shall have become final and non-appealable; or (iii) any of the representations and warranties of the Government contained in this Agreement shall not be true and correct in all material respects at time of Closing; or (iv) the other party shall have failed to fulfill, in any material respect, any of its obligations under this Agreement required to be performed prior to or at Closing; or

   (3) By the Government, if (i) there shall be any statutes, laws, rules, regulations, ordinances, orders, and codes of or by any Governmental Authority (other than a U.S. Virgin Islands Governmental Authority) that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited; or (ii) a Governmental Authority (other than a U.S. Virgin Islands Governmental Authority) shall have issued an order, decree, or ruling or taken any other action permanently restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated hereby, and such order, decree, ruling, or other action shall have become final and non-appealable; or (iii) any of the representations and warranties of Terminal Operator contained in this Agreement shall not be true and correct in all

24

material respects at time of Closing; or (iv) Terminal Operator shall have failed to fulfill, in any material respect, any of its obligations under this Agreement required to be performed prior to or at Closing.

(B)    **Effect of Termination.**  If this Agreement is terminated pursuant to Section 3.4(A), this Agreement shall become void and of no further force or effect.

## ARTICLE 4
## COMMENCEMENT OF OPERATIONS

Section 4.1.    **Permits**

(A)    Terminal Operator shall use commercially reasonable efforts to obtain and maintain all necessary federal, territorial, and local Authorizations, and necessary modification(s) thereof, including but not limited to those under Environmental Laws, to restart and maintain Terminal Operations as contemplated in this Agreement as soon as commercially reasonable and, in any event, on or before the Operations Commencement Deadline.  The Government shall use commercially reasonable efforts to assist Terminal Operator in obtaining all such Authorizations.  Notwithstanding the foregoing, the Parties shall cooperate with each other and use commercially reasonable efforts to support, and shall not interfere with or delay, any effort by the other Party or any other party to obtain and maintain all necessary federal, territorial, and local Authorizations, and necessary modification(s) thereof, including but not limited to those under Environmental Laws, to enable a Refinery Restart as soon as commercially reasonable.

(B)    Terminal Operator shall use commercially reasonable efforts to obtain and maintain all necessary approvals, including but not limited to approvals from the U.S. Department of Justice (*"USDOJ"*), the U.S. Environmental Protection Agency (*"EPA"*), the U.S. Virgin Islands Department of Planning and Natural Resources (*"DPNR"*), and the District Court for the District of the U.S. Virgin Islands (*"District Court"*) to, among other things, add Terminal Operator as a named party defendant to the Clean Air Act Consent Decree and modify the Clean Air Act Consent Decree in order to restart Terminal Operations (and, as appropriate, any Refinery Restart) as soon as commercially reasonable and, in any event, on or before the Operations Commencement Deadline. Such efforts shall include, but not be limited to, (i) working with the Government (and, if applicable, third parties) and negotiating diligently with USDOJ, EPA, and DPNR the terms and conditions of one or more filings to add Terminal Operator as a named party defendant to the Clean Air Act Consent Decree and to so modify the Clean Air Act Consent Decree (and any proposed order(s) modifying the Clean Air Act Consent Decree), (ii) cooperating with USDOJ, EPA, and DPNR and taking such actions necessary to finalize and lodge with the District Court such filings and proposed orders, (iii) cooperating with and assisting as reasonably necessary USDOJ, EPA, and DPNR in responding to any public comments, and (iv) filing of any papers, provision of testimony, participating in any public meetings or hearings or court proceedings, or taking other actions reasonably necessary to support and seek expeditious District Court approval and entry of such modification.  To the extent the Government is not directly involved in any aspect of Terminal

25

Operator's efforts pursuant to this Section 4.1(B), Terminal Operator shall timely inform the Government of the status and outcome of such efforts.

(C)    The Government shall, to the extent permissible under Applicable Law, provide at no cost (other than any non-discriminatory permit fees and other costs normally charged to similarly-situated applicants) such Authorizations, permits and rights as may be required to enable Terminal Operator to install one or more offshore buoy, platform or berth and loading system installations capable of servicing very large crude carrier vessels, including any new pipeline delivery or offloading systems, subsea or surface installations as may be required, including, without limitation, validation and assignment of Submerged Land Permit No. 167 as set forth in Section 6.3(A)(1) hereof. The Government shall facilitate any required Authorizations from the U.S. Coast Guard, U.S. Army Corps of Engineers, U.S. Department of Homeland Security, or other Governmental Authority. Terminal Operator will timely file and diligently prosecute any such applications.

Section 4.2.    **Operations Commencement**

(A)    Within six (6) months after the Closing, subject to delays due to any Force Majeure Event and receipt of all required Authorizations, breach by the Government of its obligations hereunder or breach by counterparties to any contractual arrangements described herein (the "*Operations Commencement Deadline*"), Terminal Operator shall commence Terminal Operations (the "*Operations Commencement Date*"). Subject to Section 12.1, Terminal Operator shall use commercially reasonable efforts to ensure that all Authorizations required by Applicable Law for Terminal Operator to commence Terminal Operations and continue to operate the Terminal for the duration of this Agreement, are issued and in full force and effect prior to the Operations Commencement Deadline. In this regard, the Government shall cooperate with and assist Terminal Operator with respect to a modification to the Clean Air Act Consent Decree to toll or exempt Terminal Operator from fine, penalties and liabilities thereunder prior to the Closing or that accrue from and after Closing through the end of the Evaluation Period.

(B)    If, following the Operations Commencement Deadline, all Authorizations required by Applicable Law have been obtained and Terminal Operator has not commenced Terminal Operations, then, subject to Force Majeure, for each 30-day period in which Terminal Operator does not commence Terminal Operations, Terminal Operator shall pay to the Government the sum of five hundred thousand Dollars ($500,000), which shall be in addition to other amounts owed to the Government under this Agreement. If Terminal Operations have not commenced as of six (6) months following the Operations Commencement Deadline, then, subject to Force Majeure, Terminal Operator shall be deemed to be in Operating Default under Section 16.2.

(C)    With the prior consent of the Government (such consent not to be unreasonably withheld, delayed or conditioned), the Operations Commencement Deadline may be extended for such period of time as is necessary to obtain all such necessary and material territorial and federal Authorizations and modifications, if despite Terminal Operator's

26



commercially reasonable efforts the applicable Governmental Authority has not issued a material territorial or federal Authorization or modification thereof that is necessary to restart Terminal Operations on or before the Operations Commencement Deadline. If the Operations Commencement Deadline is extended for more than two (2) years after Closing pursuant to this Section 4.2(C), this Agreement shall be automatically terminated without penalty to Terminal Operator.

## ARTICLE 5
## OPERATION OF THE TERMINAL; EXPANSION

Section 5.1.    **Independent Operation and Non-Interference**.

(A)    Terminal Operator shall own, restart, operate and maintain the Terminal as a standalone facility from the Operations Commencement Date until completion of the Term.

(B)    The Government agrees and shall ensure that Terminal Operator shall have the right to occupy and use the Site, including the Submerged Lands in accordance with the Submerged Lands Lease and Submerged Lands permits as assigned and approved pursuant to Section 6.3, and Applicable Law, operate the Terminal as set forth herein as an independent terminal facility, and perform its obligations hereunder without regard to any judicial proceedings with respect to previous owners of the Oil Refinery and Related Facilities or their Affiliates prior to or after the Closing, or the rights or claims of any successor in interest to or trustee of any such previous owner's or the Government's interests in the Refinery.

(C)    Terminal Operator shall perform all of its obligations under this Agreement and the other agreements or transactions related thereto, and use commercially reasonable efforts to cause its contractors, subcontractors and agents or employees and their authorized representatives to perform their obligations under the relevant Contracts, in a manner that does not unduly interfere with a Refinery Restart or any future Refinery operations.

(D)    The Government shall perform all of its obligations under this Agreement and the other agreements or transactions related thereto, and use commercially reasonable efforts to cause its contractors, subcontractors and agents or employees and their authorized representatives to perform their obligations, in a manner that does not unduly interfere with the Terminal Operations or a Refinery Restart and any future Refinery operations.

(E)    The Government agrees that Terminal Operator shall not be nor be deemed a "public utility" under Applicable Law in connection with the operation of the Terminal or any agreement to provide services to HOVENSA after Closing or to the Refinery following any Refinery Restart.

(F)    The Government agrees that Terminal Operator shall have the right to modify, expand, replace and operate the power generation and transmission facilities at the Site

27



as Terminal Operator determines is necessary to provide appropriate power generation resources to the Terminal and, as appropriate, the Refinery. Terminal Operator agrees that (1) to the extent there is excess power generation capacity at the Site, it will, upon the Government's request, work in good faith with the Government to identify means of utilizing that excess capacity for the benefit of the Territory on terms to be embodied in a customary power purchase agreement, and (2) to the extent new or additional power generation capacity is required, Terminal Operator shall, consistent with its reasonable business judgment, take into consideration alternative sources of power such as wind, solar, or other non-fossil-fuel-based power generation facilities.

Section 5.2. **Terminal Operations**

(A)    **Continuing Obligation to Conduct Terminal Operations.** Following the Restart Date, Terminal Operator shall continue Terminal Operations through the completion of the Term, subject only to performance by the Government of its obligations hereunder, Force Majeure Events, any earlier termination of this Agreement pursuant to Section 16.1 and ordinary maintenance, upgrades or repairs.

(B)    **Operation Work Standards**. Terminal Operator shall perform all operations of the Terminal and carry out its responsibilities under this Agreement, and shall use commercially reasonable efforts to ensure that its subcontractors perform all operations of or related to the Terminal, (i) in accordance with International Standards, (ii) as a reasonable and prudent Terminal Operator, in a sound and workmanlike manner, with due diligence and dispatch; (iii) in accordance with sound, workmanlike and prudent practices of the oil and gas storage and terminalling industry; and (iv) in compliance with Applicable Law. Terminal Operator shall develop safety and access procedures and policies of general application for access to the Site, including appropriate requirements for insurance to be carried by parties, vessels, and vehicles accessing the Site.

Section 5.3.    **Expansion and Enhancement of Facilities.**    Terminal Operator shall, for a minimum of eighteen (18) months following the Closing, use commercially reasonable efforts, consistent with its reasonable business judgment, to expand and enhance the operations conducted at the Site, by (for example) increasing the storage capacity of the Terminal; refurbishing and restarting certain existing units of the Refinery to conduct refining operations; constructing new facilities for skimming, blending, or other value-adding activities; and increasing dock and port capacity.

### ARTICLE 6
### ADDITIONAL OPERATING PROVISIONS

Section 6.1.    **Operation of the Fuel Loading Rack**

(A)    To ensure a reliable source of supply of fuel in the Territory, for the duration of the Term, Terminal Operator shall perform the following:

28

    (1) maintain and operate (or engage a responsible third Person vendor acceptable to the Government to maintain and operate) the fuel loading rack of the Terminal (the "***Fuel Loading Rack***") on a commercially reasonable basis;

    (2) enter into commercial arrangements with third parties to supply the Fuel Loading Rack with gasoline, diesel, and jet fuel and make available to the Government and the public on a priority basis at the Fuel Loading Rack such fuel for purchase in tanker truck quantities, at prices that (a) are equal to or below retail market prices, and (b) in the event a state of emergency is declared under 23 V.I.C. §1005, shall not exceed the actual cost of such gasoline, diesel, and jet fuel;

    (3) enter into commercial arrangements with third parties to maintain in storage at the Terminal not less than the average monthly fuel needs of the U.S. Virgin Islands (including gasoline, diesel, and jet fuel);

*except that* to the extent Terminal Operator is engaged in the business of buying, selling, or trading refined fuel products for its own account, Terminal Operator shall supply the Fuel Loading Rack with gasoline, diesel, and jet fuel at prices equal to or below the lowest price at which Terminal Operator sells comparable fuels in comparable quantities to third-party purchasers on a retail basis.

  (B) Terminal Operator and the Government acknowledge that the Terminal Operator's specific obligations set forth above in Section 6.1(A) are material provisions of this Agreement, and that closure of the Fuel Rack (except in connection with routine maintenance or repair or Force Majeure) or elimination of storage for local fuels may be determined by the Government to constitute a material impairment of the economy of the Virgin Islands, permitting the Government to avail itself of all available remedies under Applicable Law. The Terminal Operator shall inform and consult promptly with the Government in in respect of potentially disruptive market conditions, including the availability of third party commercial supplies, Force Majeure and other matters that may impact the Fuel Truck Rack as source of supply for the Territory.

  Section 6.2. **Navigational Access**. Terminal Operator shall permit commercially reasonable navigational access to the Limetree Bay Channel (but not the Terminal loading docks, buoys or other marine installations) to commercial vessels en route to and from the Gordon E. Finch Molasses Pier and the Wilfred "Bomba" Allick Port and Transshipment Terminal, subject to:

  (A) all such commercial vessels possessing any necessary Authorizations by the U.S. Coast Guard, U.S. Department of Homeland Security, or other Governmental Authority;

  (B) vessels in transit to or from the Terminal and Terminal marine installations shall have first priority at all times over any other vessels wishing to access the Limetree Bay Channel;

29



EPA-733

(C)    all vessels complying with the same channel rules and vetting requirements required by Terminal Operator for all commercial vessels seeking access to the channel, as may be amended from time to time; and

(D)    reimbursement by such commercial vessels of Terminal Operator's reasonable cost and expense of providing such access by commercial vessels.

Section 6.3.    **Submerged Lands**.

(A)    Terminal Operator shall have exclusive rights and obligations with respect to certain Submerged Lands that are part of the Terminal Site and Refinery Site as set forth in Appendix A and as acquired under the Purchase Agreement, in each case with respect to the occupancy and use of said land, rights and easements as contemplated herein, as follows:

(1)    the Government consents to and hereby approves the assignment by HOVENSA to Terminal Operator of HOVENSA's rights and obligations under the 1998 Letter Agreement, the 1976 Submerged Land Lease, and certain Submerged Lands Permits (as described below), so that upon such assignment Terminal Operator at Closing shall have all the rights and obligations as regards the occupancy and use of Submerged Lands (a) as the Lessee under the Submerged Land Lease, (b) as the Permittee under Submerged Lands Permit No. 3 and Amendments 1, 2, and 3 thereto, and under Submerged Lands Permit Nos. 23 and 52 issued by the United States Department of the Interior, and under Submerged Lands Permit No. 167 issued by the Department of Conservation and Cultural Affairs of the Government of the Virgin Islands, as amended, (which permit shall be considered current and valid and assigned to Terminal Operator) and (c) the Government will execute whatever documents are necessary to make sure any Submerged Lands currently used by HOVENSA which are not covered by any lease or permit can be occupied and used by Terminal Operator on the same conditions and terms as Submerged Lands Permit No. 3 and Amendments 1, 2, and 3 thereto, and under Submerged Lands Permit Nos. 23 and 52, which rights and obligations shall continue for the term of this Agreement, as such term is extended, and under Submerged Lands Permit No. 167 issued by the Department of Conservation and Cultural Affairs of the Government of the Virgin Islands, as amended, (which permit shall be considered current and valid and assigned to Terminal Operator) which rights and obligations shall continue for the term of this Agreement, as the term is extended, and under Coastal Zone Management permits CZX-24-93W, CZX-8-06W, and CZX-6-99W, and in each case the relevant permit and lease shall be hereby modified to the extent required to reflect the scope of such lands set forth in Appendix A;

(2)    at Closing, the Government hereby recognizes and agrees that as regards the Submerged Lands, Terminal Operator shall owe to the Government the indemnifications of Lessee as set forth in the Submerged Land Lease, and HOVIC and HOVENSA shall be released by the Government, and the Government shall be released by HOVIC and HOVENSA, with respect to such indemnities as regards the Submerged Lands;

30



(3)    at Closing, the Government agrees that HOVIC and HOVENSA shall be released from their obligations, and shall release the Government from any obligations of the Government, under the 1976 Contract as regards the Submerged Lands;

(4)    at Closing, Terminal Operator shall be substituted for HOVIC and HOVENSA, and HOVIC shall be released, and shall release the Government, under the 1998 Letter Agreement as regards the Submerged Lands;

(5)    as regards the Submerged Lands, the Submerged Land Lease as of Closing shall be extended through October 16, 2036,  and the Government shall allow Terminal Operator to continue to use Submerged Lands Permit No. 3, Submerged Lands Permit No. 23, Submerged Lands Permit No. 52, and Submerged Lands Permit No. 167, for an aggregate rental payment of one hundred fifty thousand Dollars ($150,000) annually which payment shall, beginning in the third (3rd) year after Closing, be annually adjusted for inflation on the basis of the percentage change in the Consumer Price Index every three (3) years; and

(6)    as regards the Submerged Lands, Terminal Operator shall have the right to extend the term of the Submerged Land Lease for additional terms co-terminous with this Agreement.

(B)    For the avoidance of doubt, except as otherwise contemplated by this Agreement, the Parties acknowledge that the releases effected by Section 6.3(A) are not intended to release HOVENSA or HOVIC from any environmental contamination of the property previously covered by the Submerged Land Lease and the permits set forth in Section 6.3(A) that occurred before the Closing Date, whether now known or hereafter discovered, and that Terminal Operator is not required to assume any of such unreleased obligations of HOVENSA or HOVIC or to assume liability for property previously covered by the Submerged Land Lease and the permits set forth in Section 6.3(A) not identified as the Terminal Site or the Refinery Site in Appendix A.

(C)    Notwithstanding the provisions of Section 6.3(A) above, the term of the Submerged Land Lease and the use rights granted to Terminal Operator, including those granted under Permit No. 3, Permit No. 23, Permit No. 52, and Permit No. 167, to use or occupy any Submerged Lands or other lands shall not extend beyond the Term of this Agreement.

Section 6.4.    **Refinery Obligations**. Following the Effective Date, Terminal Operator shall undertake the following with respect to the Refinery and such other parts of the Oil Refinery and Related Facilities as are not necessary for the operation of the Terminal:

(A)    **Refinery Evaluation Period**. For a period of not less than eighteen (18) months following the Effective Date (the "***Refinery Evaluation Period***"), Terminal Operator shall evaluate the prospects of a Refinery Restart, and shall take all commercially reasonable measures to facilitate such Refinery Restart. In no event shall the Refinery Evaluation Period exceed three (3) years following the Effective Date. If Terminal Operator would be subject to

31



material liability under the Clean Air Act Consent Decree notwithstanding Terminal Operator and the Government's efforts pursuant to Section 4.2(A), the Refinery Evaluation Period shall, at the option of Terminal Operator, be terminated for all or a subset of the Refinery prior to the end of such eighteen-month period within ten (10) days of a written notice by Terminal Operator of termination of such Refinery Evaluation Period, to minimize any such liability.

(B)    **Refinery Deconstruction**.  If, by the end of the Refinery Evaluation Period, no Refinery Restart has occurred or is planned to occur, Terminal Operator shall, within three (3) years of the end of such period, upon the Government's request in writing to so deconstruct, (or at such earlier date as Terminal Operator may choose in the event that Terminal Operator would be liable for any fines, penalties or sanctions under the Clean Air Act Consent Decree), undertake and complete the deconstruction of such parts of the above-grade Oil Refinery and Related Facilities as Terminal Operator determines, acting reasonably, are unutilized and not necessary for the operation of the Terminal (the "***Refinery Deconstruction***"), subject to the following:

(1)    The Refinery Deconstruction shall be developed and implemented by Terminal Operator and shall include decommissioning and dismantling the Refinery using commercially reasonable precautions for the protection of human health or the environment (including, but not limited to, all precautions required by Applicable Law) and in each case consistent with continued industrial use of the Refinery Site, including any remaining above-grade structures, fixtures, equipment, and machinery comprised by the Refinery, and removing such above-grade structures, fixtures, equipment, and machinery from the Site, except for (i) any portions of the Refinery necessary to the Terminal, and (ii) subject to Applicable Law, any portions of the Oil Refinery and Related Facilities identified in writing by the Government on a schedule to be provided to Terminal Operator by the Government not less than sixty (60) days after the end of the Refinery Evaluation Period.

(2)    The Refinery Deconstruction shall be conducted at Terminal Operator's sole expense.  To the extent the Refinery Deconstruction results in proceeds from the sale of structures, fixtures, equipment, or machinery, Terminal Operator shall retain the first five million Dollars ($5,000,000) of net proceeds, and shall pay promptly to the Government 50% of any net proceeds in excess of five million Dollars ($5,000,000).

(3)    Terminal Operator will assume no liability for the remediation of any environmental contamination that (a) occurred prior to the Closing Date or (b) is discovered in connection with the Refinery Deconstruction.

(C)    **Purchase Option.**  Following Refinery Deconstruction, to the extent Terminal Operator does not own any portion of the real property on which the Refinery Deconstruction occurred, the Government acknowledges that Terminal Operator or an Affiliate thereof shall have an option to purchase from HOVENSA (or the successor in interest thereto) all or a portion of such property for the purpose of expanding the Terminal, conducting refining or other processing operations, or other related commercial endeavors.  The exercise price of such option to purchase shall be one Dollar ($1) per acre.

32



Section 6.5.    **Land And Housing Transfer**.

(A)    To effect the transfer of certain lands currently owned by HOVENSA to the Government as contemplated in the Purchase Agreement, Terminal Operator shall, to the extent necessary to supplement the Purchase Agreement, enter into a binding agreement with HOVENSA requiring that, at Closing, HOVENSA either (1) transfer to the Government title in fee simple, or (2) provide documentation reasonably satisfactory to the Government providing for the future transfer to the Government title in fee simple, to (a) the three hundred and thirty (330) acre parcel of land located to the east of the Refinery (the *"Parcel"*), (b) the one hundred and twenty two (122) housing units located in Estate Cottage and Estate Blessing and surrounding land, (c) the community center located on the Site, and (d) the St. Croix Vocational Training Center located on the Site, in each case, as identified in Appendix A.

(B)    The Government hereby grants Terminal Operator an option, exercisable within ten (10) years following the Closing, to purchase some or all of the approximately 268 acre portion of the Parcel identified in Appendix A (the *"Option Parcel"*) for the price of ten thousand Dollars ($10,000) per acre for the purpose of expanding, improving or enhancing the operation of the Terminal or the Refinery.

Section 6.6.    **Bitumen Tank And Storage**.    Within three (3) months after the Operations Commencement Date, Terminal Operator shall identify one or more storage tanks for the storage of not less than one hundred thousand (100,000) barrels of bitumen (or, if no suitable tanks are found to exist, to identify a location for the construction of said tank), and shall undertake to modify (or construct, as the case may be) said tank(s), at its own expense, to provide the equipment, infrastructure, and access necessary for long-term storage, loading, and offloading of bitumen for use by the U.S. Virgin Islands Department of Public Works (*"DPW"*). Subject to the availability of required permits and an appropriate construction period thereafter, not less than twelve (12) months after the Operations Commencement Date, the modified tank(s) shall be in operational condition, and shall be leased to DPW for rent in an amount equal to Terminal Operator's actual cost of operating the tank  for that year, for the duration of the Term or until DPW notifies Terminal Operator in writing of its intention to cease using the tank. Subject to such notification of intent to cease using the tank, Terminal Operator shall maintain the tank(s) in operational condition for the duration of the Term.

### ARTICLE 7
### EMPLOYMENT

Section 7.1.    **Minimum Commitment**.    Terminal Operator acknowledges that the commitment to increased long-term employment at the Oil Refinery and Related Facilities is a material goal of the Government's entry into this Agreement, and accordingly for the period from the Operations Commencement Date through the remainder of the Term of this Agreement:

33

(A)    **Terminal Employment**. The Terminal shall employ not fewer than eighty (80) full-time equivalent workers, which shall include not less than sixty (60) Full-Time Employees.

(B)    **Vacancies**. All employment vacancies shall be posted with the Virgin Islands Department of Labor.

Section 7.2.    **Residency Requirement**. Not later than twelve (12) months after the Operations Commencement Date and thereafter for the remainder of the Term, not less than eighty percent (80%) of the full-time employees and equivalents at the Oil Refinery and Related Facilities, and not less than fifty percent (50%) of the Senior Management Employees shall be bona fide U.S. Virgin Islands Residents, such residency to be confirmed annually by the Commissioner of Labor for the remainder of the Term. For the purposes of this Article 7, individuals formerly employed by HOVENSA, HOVIC, or Pinnacle Services, LLC, for work at or regarding the Refinery or Terminal in the U.S. Virgin Islands in the five (5) years preceding the Effective Date shall be considered U.S. Virgin Islands Residents.

Section 7.3.    **Non-Discrimination**. Terminal Operator hereby agrees that no person, employee or applicant shall be excluded from participating in, or be subject to, discrimination in the performance of duties relating to or arising from this Agreement or the operations contemplated herein, on account of race, creed, color, sex, sexual orientation, religion, disability, national origin or veteran status. Terminal Operator shall not discriminate in employment decisions, including but not limited to upgrading, demotion, transfer, recruitment, layoff, termination, rates of pay or other forms of compensation and selection for training. Terminal Operator shall comply with Applicable Laws relating to employment matters, including those regarding posting of notices relating to workplace rights.

Section 7.4.    **Training and Continuing Education**. Terminal    Operator shall annually contribute not less than two hundred thousand dollars ($200,000) for training and scholarships for residents of the Virgin Islands. That contribution shall include (A) resuming support for the University of the Virgin Islands' ("*UVI*") degree program in Applied Science of Process Technology, on substantially the terms set forth in Appendix E; and (B) providing college scholarships to Virgin Islands students. In addition,  throughout the Term of this Agreement, Terminal Operator shall use commercially reasonable efforts to create and operate at Terminal Operator's own cost and expense additional training programs for the purpose of maximizing employment opportunities at the Terminal for Virgin Islands Residents, including establishing training programs that will teach terminalling services related skills to qualified U.S. Virgin Islands Residents including:  terminal safety, terminal operations, general terminal maintenance, environmental management, welding, instrument fitting, pipe fitting and electrical maintenance. Terminal Operator shall cooperate with the University of the Virgin Islands with respect to such programs.

34



**ARTICLE 8**
**FINANCIAL OBLIGATIONS OF TERMINAL OPERATOR**

Section 8.1. **Closing Payment and Related Payments**. The total consideration due from Terminal Operator to the Government and HOVENSA under this Agreement and the Purchase Agreement is currently contemplated to be up to three hundred seventy million Dollars ($370,000,000). Terminal Operator shall pay or cause to be paid up to two hundred thirty-five million Dollars ($235,000,000) to or on behalf of the Government, including (A) at Closing: (i) one hundred million Dollars ($100,000,000) pursuant to the Purchase Agreement *plus* (ii) one hundred twenty million Dollars ($120,000,000) as payment in lieu of taxes exempted under Article 11 of this Agreement (together, the "***Closing Payment***") and (B) thereafter: (i) an amount of up to nine million Dollars ($9,000,000) in reimbursement to the Government in respect of certain contingent claims asserted in connection with the Sale Process and related matters and (ii) an amount of up to six million Dollars ($6,000,000) in the form of construction of a bitumen tank and storage as described in Section 6.6 hereof. In addition to the amount due to the Government, Terminal Operator is currently contemplated to pay or contribute under the Purchase Agreement up to an additional one hundred thirty-five million Dollars ($135,000,000) to HOVENSA pursuant to the Purchase Agreement, including (x) an amount of ninety million Dollars ($90,000,000) upon the closing of the Purchase Agreement, (y) an amount of up to thirty million Dollars ($30,000,000) after the Closing to supplement HOVENSA's available funding for wind down and remediation work at the Site, and (z) an amount of up to fifteen million Dollars ($15,000,000) after Closing in the form of electric power supply at no cost.

Section 8.2. **Annual Payment**.

Terminal Operator agrees to pay to the Government annually for the duration of the Term the following payments (the "***Annual Payment***"):

(A) **Variable Payments**. Following the Closing Date, (i) Terminal Operator shall annually make to the Government a variable payment (the "***Variable Terminal Payment***") in lieu of payment of certain taxes exempted in accordance with Article 11, in the amount of (x) ten percent (10%) of Terminal Revenues, *plus*, (ii) (y) in the event of a Refinery Restart, Terminal Operator, an Affiliate, or the designated operator of the Refinery shall annually make to the Government a variable payment (the "***Variable Refinery Payment***") in lieu of payment of certain taxes exempted in accordance with Article 11, in the amount of seventeen and one-half percent (17.5%) of Refinery Income, or, following discussion with the Government, such percentage of Refinery Income as the parties shall agree in writing.

(B) **Minimum Payment**. Notwithstanding Section 8.2(A) above, in no event shall the amount of the sum of the Variable Terminal Payment and the Variable Refinery Payment during the Term be less than the following (the "***Minimum Payment***"):

(1) from the Closing Date until the first anniversary thereof, four million Dollars ($4,000,000);

35



(2)    from the day following the first anniversary of the Closing Date until the second anniversary of the Closing Date, five million Dollars ($5,000,000);

(3)    from the day following the second anniversary of the Closing Date until the third anniversary of the Closing Date, six million Dollars ($6,000,000); and

(4)    after the third anniversary of the Closing Date, seven million Dollars ($7,000,000).

(C)    **Payment Terms**.

(1)    Each Variable Terminal Payment and Variable Refinery Payment shall be payable in equal quarterly installments on the final day of the first, second, third, and fourth fiscal quarters of each calendar year. Amounts owed in excess of the Minimum Payment shall be paid no later than thirty (30) days after the end of each calendar year. To the extent that the revenues upon which such calculations are not determined within such quarterly periods, the Terminal Operator shall make a provisional payment on such payment dates and thereafter, when revenues for the relevant period are finally determined, make such adjustments to the immediately following quarterly payment as may be required to ensure that Terminal Operator pays the appropriate Variable Terminal Payment or Variable Refinery Payment, as the case may be.

(2)    Quarterly installments of the Variable Terminal Payment or the Adjusted Variable Payment to be made pursuant to Section 8.2(B) in any year shall be made at the Variable Terminal Payment or the Adjusted Variable Payment rate applicable to Terminal Revenues for the immediately preceding year, and the difference between the amounts of Variable Terminal Payments or Adjusted Variable Payments received by the Government in any year and the amount owed by Terminal Operator in respect of Terminal Revenues for such year shall, following the receipt of Terminal Operator's audited financial statements for such year be (a) repaid by the Government to Terminal Operator or (b) paid by Terminal Operator to the Government, as applicable, within thirty (30) Days following the receipt of Terminal Operator's audited financial statements for such year.

(D)    The Variable Terminal Payment and Variable Refinery Payment shall be deemed operating expenses by the parties making such payments and are in lieu of certain Exemptions identified in Article 11.

Section 8.3.    **Adjusted Variable Payment**.    For the first year following the Closing Date and any following year in which Terminal Operator's earnings before interest, taxes, depreciation, and amortization ("***EBITDA***") are lower than one hundred and twenty million Dollars ($120,000,000) (as determined by its audited financial statements for such year), adjusted for inflation on the basis of the percentage change in the Consumer Price Index, the rate of the Variable Terminal Payment shall be nine percent (9%) of Terminal Revenues rather than 10% (the ***"Adjusted Variable Payment"***).

36



Section 8.4.    **Charitable Commitments**.   Terminal Operator shall contribute a minimum of three hundred thousand Dollars ($300,000) per year (in addition to the $200,000 to be contributed to training and scholarships under Section 7.4) to charitable causes in St. Croix (which shall be charitable entities that consider themselves non-profit charitable entities under Section 501(c)(3) of the Internal Revenue Code).   The beneficiaries of such contributions shall be subject to approval by the Office of the Governor, such approval not to be unreasonably withheld.

Section 8.5.    **Financial Assurance**.    Terminal Operator shall provide evidence of financial assurance (the "*Financial Assurance*") in an amount (the "*Guaranteed Amount*") equal to the lesser of (i) fifty million Dollars ($50,000,000) and (ii) the net present value of the Minimum Payment for the balance of the Initial Term (discounted at the interest rate for Government-issued 30-year bonds for the year in which an Operating Default occurs, or, if no such bonds are issued that year, for the most recent year in which such bonds were issued), provided that notwithstanding the forgoing, the Financial Assurance will never be less than thirty million Dollars ($30,000,000).   The Financial Assurance will be available to support Terminal Owner's obligations under the Agreement with respect to Site Restoration and Payment Default. The Financial Assurance shall be in the form of (x) an irrevocable stand-by letter of credit covering the Guaranteed Amount to be issued by an international bank reasonably acceptable to the Government or (y) a guaranty from a parent company of Terminal Operator to the extent such parent company has an investment grade credit rating, in the case of each of clauses (x) and (y), in form and substance consistent with the terms of this Section 8.5.

Section 8.6.    **Government Carried Interest in Terminal Operator**.

(A)    **Carried Interest.**   Upon Closing, Terminal Operator shall grant to the Government the right to receive a fee upon Change of Control (the "*Carried Interest*") from Terminal Operator or an Affiliate.   The Carried Interest shall carry no governance rights, and shall entitle the Government to no distributions or other payments, except that upon the occurrence of a Change of Control, Terminal Operator shall pay to the Government ten percent (10%) of the Transaction Value (calculated as set forth in clause (B) below).

(B)    **Transaction Value.**

(1)    In the event of a Change of Control, the Transaction Value shall be calculated as Terminal Operator's Total Realized Profit upon completion of the Change of Control transaction.   For purposes of this Section 8.6(B), "*Total Realized Profit*" shall mean Terminal Operator's total Distributions *plus* consideration received by the Equity Holders in Terminal Operator in the Change of Control transaction, *less* all capital contributions to Terminal Operator.   For the avoidance of doubt, the "Total Realized Profit" from any Change of Control transaction shall be the same value used to calculate returns on capital to Terminal Operator's equity investors.

37

(2)    In no event shall the Government's share of the Transaction Value be less than twenty-five million, five hundred thousand Dollars ($25,500,000) so long as Terminal Operator's Total Realized Profit is greater than zero Dollars ($0).

Section 8.7.    **Capital Expenditures**.    In the first two (2) years following Closing, Terminal Operator shall expend not less than one hundred twenty-five million Dollars ($125,000,000) on projects that result in improvements to the Site.

## ARTICLE 9
## SECURITY INTEREST

Section 9.1.    **Payments Secured By Lien**. Terminal Operator shall secure all of its payment obligations under Article 8 and Article 16 (the "*Payment Obligations*"), by granting to the Government, on the Closing Date, a mortgage lien on the assets acquired under the Purchase Agreement (the "*Secured Assets*") pursuant to a Mortgage and Security Agreement to be entered into between the parties consistent with the terms of this Article 9, and the notice of such lien on said personal property shall be reflected in a UCC-1 Financing Statement, fixture filing, or other similar document reasonably necessary to give notice (collectively, the "*Security Documents*").    Such security interest is hereinafter referred to as the "*Subordinate Security Interest*", provided that the Subordinate Security Interest shall only be enforceable on the terms and conditions provided herein and in the Security Documents and only to the extent there are any payment obligations under Article 8 or Article 16 which are due and payable at the time of any such enforcement, and provided that:

(A)    **Subordination**. (i) The lien of the Security Documents, and the payment and enforcement thereof, shall be subordinate and junior in all respects to any and all financing (except financing provided by Terminal Operator's Affiliates) incurred in connection with the acquisition, development, construction, rehabilitation, expansion, or enhancement or operation of the Oil Refinery and Related Facilities (such financings and any obligations relating thereto, including the unpaid principal of and interest on the loans and all other obligations and liabilities owed to the Lenders thereunder, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses or otherwise being collectively referred to as the "*Senior Obligations*"). (ii) The Government expressly undertakes and agrees that, until such time as the Senior Obligations, together with all accrued and unpaid interest thereon and all other sums due and owing in respect thereof, shall have been paid in full in cash and all commitments thereunder shall have been terminated (such date being referred to herein as the "*Discharge Date*"), it shall not bring any legal action to enforce the Security Documents, including, without limitation, (x) foreclose, execute, levy, or collect on, take possession or control of (other than for purposes of perfection), sell or otherwise realize upon (judicially or non-judicially), or lease, license, or otherwise dispose of (whether publicly or privately), the Secured Assets, or otherwise exercise or enforce remedial rights with respect to thereto, (y) solicit bids from third Persons, approve bid procedures for any proposed disposition of the Secured Assets, conduct the liquidation or disposition of Secured Assets or engage or retain sales brokers, marketing agents, investment bankers,

38



accountants, appraisers, auctioneers, or other third Persons for the purposes of valuing, marketing, promoting, and selling the Secured Assets, or (z) enforce a security interest or exercise another right or remedy, as a secured creditor or otherwise, pertaining to the Secured Assets at law, in equity, or pursuant to the Security Documents.

(B)     **No Remedy Prior To Discharge.**   Prior to the Discharge Date, the Government may not exercise any of its remedies under the Security Documents.

(C)     **Intercreditor Agreements.**   In the event that any lender granting any Senior Obligations requires an intercreditor agreement or other customary documentation to confirm the subordination of the Security Documents and the agreement of the parties that the Government shall not enforce any of the remedies allowed pursuant the Security Documents, the Government shall execute and deliver to such lender such intercreditor agreement and other customary documentation.

(D)     **Refinancing**.   In the event of the refinancing of any of the Senior Obligations described above, the Subordinate Security Interest shall be subordinate to such refinancing, and the Government shall enter into such intercreditor agreement and customary documentation to confirm the subordination of the refinancing and the agreement of the parties that the Government shall not enforce any of its remedies allowed pursuant to the Security Documents prior to the Discharge Date.

Section 9.2.     **All Necessary Actions**.   Terminal Operator shall take all actions, and execute all documents necessary, to grant, perfect, validate and provide notice of the Subordinate Security Interest, subject to those matters set forth on a Title Commitment to be obtained and delivered by Terminal Operator at or within a reasonable and customary after Closing.   To the extent permitted by Applicable Law, Terminal Operator authorizes the Government to file financing statements naming the Government as a subordinated secured party, and describing the Oil Refinery and Related Facilities, in any appropriate filing office.

Section 9.3.     **No Encumbrances**.   In providing these liens and entering into this Agreement, Terminal Operator hereby represents and warrants that as of the date of delivery of any Title Commitment, such portions of the Oil Refinery and Related Facilities as are owned by Terminal Operator are owned free and clear of liens, charges, encumbrances, or defects created by or through Terminal Operator or its Affiliates on the Oil Refinery and Related Facilities, including charges, claims, deeds of trust, community property interests, pledges, equitable interests, liens (statutory or other), options, security interests, mortgages, or rights of first refusal, except (i) as otherwise disclosed in the Title Commitment, (ii) Permitted Liens as set forth in the Purchase Agreement, and (iii) any liens, charges and encumbrances imposed by the Government or pursuant to Environmental Law.

39

**ARTICLE 10**
**INSURANCE**

Section 10.1. **General Insurance**. Terminal Operator shall maintain or cause to be maintained at its own cost and expense, in full force and effect commencing on the Effective Date and throughout the Term, with responsible insurance companies authorized to do business in the U.S. Virgin Islands, the types and limits of insurance as set forth in this Article 10. Such companies shall have an A.M. Best Insurance Reports rating of A- or better or otherwise be reasonably acceptable to the Government. Such insurance required to be maintained by Terminal Operator hereunder shall be primary without, in the case of commercial general liability, the right of contribution of any other insurance carried by or on behalf of the Government and any additional insured. The Government shall be named as an additional insured on all policies required under this Section 10.1 and on all policies required under Section 10.2.

Section 10.2. **Additional Insurance**. In addition to any insurance or demonstration of financial assurance or financial responsibility required under Applicable Law, Terminal Operator shall maintain in effect insurance of the following types and amounts of insurance coverage set forth below:

(A) **Property Insurance.** Property Insurance, including physical damage and business interruption on the terms set forth below. The Property Insurance policy shall contain the following terms: coverage shall be provided in an amount not less than $250,000,000, for physical loss or damage except as hereinafter provided, including coverage for boiler and machinery (electrical and mechanical breakdown), transit, and off- site storage exposure, but excluding coverage for earthquake, flood and named wind for which coverage shall be provided in an amount not less than $75,000,000. Such policy shall include provisions for first-party and third-party pollution legal liability coverage for the Site in an amount not less than $20,000,000, and first party and third-party cleanup coverage for any Response in an amount not less than $100,000,000, in excess of any financial assurance demonstration pursuant to the federal Resource Conservation and Recovery Act, 42 U.S.C. §§ 6091, et seq., and any financial responsibility demonstration pursuant to the federal Oil Pollution Act of 1990, as amended, 33 U.S.C. §§ 2701, et seq., and the U.S. Virgin Islands Oil Spill Prevention and Pollution Control Act, 12 V.I.C. §§ 701, et seq., in effect or required for the Oil Refinery and Related Facilities or any portion thereof. Any required payment of the deductible shall be the responsibility of Terminal Operator unless indemnified pursuant to this Agreement.

(B) **Workers' Compensation Insurance.** Workers' compensation insurance, to the extent the exposure exists, to comply with statutory limits of the Workers' Compensation laws of the U.S. Virgin Islands, including coverage under the U.S. Longshore and Harbor Workers Compensation Act, where applicable, and Employer's Liability (including Occupational Disease) coverage with limits of not less than $1,000,000 each accident, $1,000,000 disease limit per employee and $1,000,000 disease policy limit. Workers' compensation insurance shall cover all of Terminal Operator's employees, contractors and subcontractors providing services to the Terminal.

40

(C)    **Commercial General Liability Insurance.**    Commercial General Liability Insurance on an "occurrence" basis with a combined single limit of liability not less than $1,000,000 per occurrence, $2,000,000 general aggregate limit and $2,000,000 products completed operations aggregate limit (which includes pollution liability coverage for products). Subject to the terms of the policy, coverage shall include premises, operations, blanket contractual liability, independent contractors, products and completed operations and personal injury coverages. The policy shall contain no exclusion for punitive or exemplary damages, unless excluded by law.

(D)    **Automobile Liability Insurance.**    Automobile liability insurance, to the extent the exposure exists, covering any automobiles used in connection with the Terminal in an amount not less than $1,000,000 per accident for combined bodily injury, property damage or death.

(E)    **Umbrella or Excess Liability Insurance.**    Umbrella/Excess Insurance covering claims in excess of the underlying insurance described in this Article 10, with a $20,000,000 minimum per occurrence and $20,000,000 annual aggregate, in excess of liability insurance set forth in this Article 10.

(F)    **Endorsements.**    All policies of liability insurance to be maintained by Terminal Operator shall be written or endorsed to include the following:

(1)    To provide a severability of interest and cross liability clause (Commercial General Liability, Automobile Liability and Umbrella or Excess Liability only).

(2)    Terminal Operator Certificates. Terminal Operator shall furnish to the Government certificates of insurance from each insurance carrier showing that the insurance required from Terminal Operator under this Agreement is in full force and effect. Terminal Operator or its insurer will provide the Government thirty (30) calendar days advance written notice (or 10 calendar days' notice in the case of cancellation due to non-payment of premiums) in the event of any material change to, nonrenewal of or cancellation of the required insurance. Certificates of insurance submitted under this Article 10 shall be in form and content reasonably acceptable to the Government. Certificates of each renewal of the insurance shall also be delivered to the Government promptly after received. Should any of the policies required to be maintained become unavailable or be canceled for any reason during the period of this Agreement, Terminal Operator shall immediately procure replacement coverage. In the event that Terminal Operator shall fail to provide proof of insurance as provided in this Section 10.2(F)(4) within thirty (30) days' receipt of written notice from the Government, advising of such failure to provide proof of insurance, Terminal Operator shall promptly provide such proof of insurance to the Government. In the event that Terminal Operator fails to provide such proof of insurance then the Government may elect to file an action in specific performance to compel Terminal Operator to demonstrate proof of insurance, and to recover its reasonable attorneys' fees and costs in connection with such action.

41



(3)    Descriptions Not Limitations.  The coverages referred to above are set forth in full in the respective policy forms, and the foregoing descriptions of such policies are not intended to be complete, nor to alter or amend any provision of the actual policies and in matters, if any, in which the said description may be conflicting with such instruments, the provisions of the policies of the insurance shall govern; provided, however, that neither the content of any insurance policy or certificate nor approval thereof shall relieve Parties of any of their obligations under this Agreement.

(4)    Contractors.    Terminal Operator shall require all of its contractors and subcontractors (of any tier) to maintain insurance in the form and amount commensurate with the nature of the work or services that such contractor is providing on behalf of Terminal Operator.

(G)    **Modification of Coverage Limits**.  The coverage limits set forth in this Article 10 shall be subject to reasonable revision by mutual agreement of the Parties every five years, if necessary, to reflect inflation and changes in conditions or circumstances.

## ARTICLE 11
## TAX AND FEE EXEMPTIONS

Section 11.1.  **Scope of Exemption**. Following the Effective Date, Terminal Operator, each of its Affiliates and Equity Holders and any operator of the Refinery that are engaged in acquiring, owning (directly or indirectly) or operating, in whole or in material part, the Oil Refinery and Related Facilities for the import, storage, processing, sale within the Terminal, and export and sale of petroleum products, and their respective customers with respect thereto (the **"Customers"**), shall be exempt from payment of the taxes, fees, and other payments described in Section 11.2. In addition, to the extent any other party owns any portion of the Site and leases said portion to Terminal Operator or its Affiliates for use in operating the Oil Refinery and Related Facilities as contemplated in this Agreement (a "***Lessor***"), such Lessor shall be exempt from taxes imposed under Section 11.2(viii).

Section 11.2.  **Exemptions**. For purposes of this Agreement, "***Exemptions***" shall include all Taxes, fees, excises, customs, duties, rents, royalties, withholdings, lease payments, permit fees, imposts and exactions, whether now existing or enacted hereafter, imposed by, with the consent of, or otherwise payable to, the Government, or any subdivision, agency or instrumentality thereof, on the acquisition, rehabilitation, ownership (whether direct or indirect), operation, maintenance, expansion, transfer, sale of products, or any other activity in respect of (i) the Oil Refinery and Related Facilities (ii) the Site, (iii) the Submerged Lands (other than rental payments as set forth in this Agreement), (iv) the Limetree Bay Channel and any buoys or other marine installations, (v) the Fuel Loading Rack, and (vi) the sale or transfer of any assets or rights or real estate to the Government or its designees, or any portion of such properties and assets, including materials, work in process and products thereof, including importing, exporting, loading, unloading, discharging, storing, processing, blending, sale or purchase of oil, oil products or by-products including hydrocarbons, petrochemicals, or any other raw material or products thereof, or any equipment or machinery imported for use at, the

42



Terminal or any portion thereof. The foregoing exemptions shall include specifically exemption from all:

(i) income Taxes (including all Taxes measured by reference to income);

(ii) excise Taxes;

(iii) customs duties;

(iv) fuel Taxes;

(v) gross receipts Taxes;

(vi) highway users' Taxes;

(vii) production Taxes;

(viii) property Taxes;

(ix) franchise Taxes and annual report fees;

(x) license fees;

(xi) withholding Taxes (including any backup withholding) on any allocations or distributions to preferred or common Equity Holders of Terminal Operator or any of its Affiliates, or on any sale, transfer or other disposition by Terminal Operator or any of its Affiliates or Equity Holders of assets or equity interests relating to the activities referred to in the foregoing provisions of this Section 11.2; and

(xii) withholding Taxes (including any backup withholding) with respect to the transactions contemplated by the Purchase Agreement.

For the avoidance of doubt, the Exemptions shall include any taxes, fees, or duties that would otherwise be payable by Customers of Terminal Operator for the import, storage, blending, sale within the Terminal or export of petroleum products.

Section 11.3. **Limitations on Exemption**. For the avoidance of doubt, the foregoing Exemptions shall not be applicable to:

(i) the employer portion of any and all payroll and employment taxes, including wage income withholding taxes, with respect to Terminal Operator's employees;

(ii) taxes owed under the Federal Insurance Contributions Act;

(iii) any user fees of general application;

43



(iv) any tax or fee collected by the United States Federal Government that is not payable to the Government or any subdivision, agency or instrumentality thereof;

(v) withholding taxes of general application imposed directly under Workmen's Compensation, unemployment insurance and other similar employee-benefit legislation with respect to Terminal Operator's employees; and

(vi) the tire tax imposed by 33 V.I.C. §80 and the container tax imposed by 33 V.I.C. §75.

Section 11.4. **Tax Return Filings**. Terminal Operator shall elect to be taxed by the USVI as a corporation and shall prepare and file a Form 1120 (or appropriate successor form(s)) with the Virgin Islands Bureau of Internal Revenue meeting the requirements of the Internal Revenue Code but shall not be required to pay any income tax as a result of filing such return as provided in this Agreement. Terminal Operator shall also file such other returns as may be required with the Virgin Islands Bureau of Internal Revenue, but except for the Limitations on Exemptions set out in Section 11.3 above, shall not have any payment obligations as provided in this Agreement.

Section 11.5. **No Adverse Actions**. The Government hereby agrees and covenants with Terminal Operator that, except as otherwise provided in this Agreement and to the fullest extent permitted by Applicable Law, the Government shall not take or fail to take any action, nor permit any action within its control to be taken or fail to be taken, which would or could cause Terminal Operator and each of its Affiliates and Equity Holders and Customers to lose any applicable tax exemptions granted to such parties pursuant to this Agreement.

### ARTICLE 12
### REPRESENTATIONS AND WARRANTIES

Section 12.1. **Government Representations**. The Government hereby represents and warrants to Terminal Operator as of the Effective Date and as of the Closing Date that:

(A) The Government is not prohibited from consummating the transactions contemplated in this Agreement by any law, regulation, agreement, instrument, restriction, order, or judgment;

(B) The Government has, upon ratification and approval of this Agreement by the Legislature: (i) the legal power, due authority and necessary and adequate funding ability to make the representations and perform its obligations set forth in this Agreement, or shall take all legally permitted and feasible actions necessary to obtain such legal power, due authority and necessary funding; and (ii) duly obtained such approvals, Authorizations, or consents in accordance with Applicable Law and procedures to the extent that the approval, Authorization, or consent of the federal or any other territorial or local government or agency or any third Person to make the representations and perform its obligations contained herein as required;

44



(C) The Government knows of no impediment which would prevent, impede, diminish or delay its timely performance of its obligations hereunder;

(D) There are no actions, suits or proceedings pending or, to the best of the Government's knowledge, threatened against or affecting the Government before any court or administrative body or arbitral panel that could reasonably be expected to have a material adverse effect on the ability of the Government to meet and carry out the obligations of this Agreement, other than those identified in Appendix B to this Agreement.

Section 12.2. **Terminal Operator Representations**. Terminal Operator hereby represents and warrants to the Government as of the date hereof and as of the Closing Date that:

(A) **Organization and Authority.** It has been duly organized and is validly existing and in good standing under the laws of the U.S. Virgin Islands, with all necessary power and authority to enter into, deliver and perform all its obligations under this Agreement (including a valid license to do business in the U.S. Virgin Islands).

(B) **Due Authorization; Enforceability.** This Agreement has been duly authorized and constitutes the legal, valid and binding obligations of it, and assuming the due authorization, execution and delivery of this Agreement by the Government, is enforceable against it in accordance with its terms. It has the absolute and unrestricted right, power, authority and capacity to execute and deliver this Agreement and to perform its obligations under this Agreement.

(C) **No Conflict.** Neither the execution and delivery of this Agreement nor the consummation or performance of any of the transactions contemplated by this Agreement will, directly or indirectly (with or without notice or lapse of time) contravene, conflict with or result in a violation of (i) any provision of its organizational documents, (ii) any Contract or other agreement by which it is bound, or (iii) any resolutions adopted by its board of directors, members or its stockholders or (2) contravene, conflict with, or result in a violation of Applicable Law (other than Applicable Law of the U.S. Virgin Islands) to which it or its Affiliates may be subject. There are no actions, suits or Proceedings pending or, to the best of its knowledge, threatened against or affecting it or its Affiliates before any court or administrative body or arbitral panel that could reasonably be expected to have a material adverse effect on its ability to perform its obligations of this Agreement.

(D) **Consents and Notices.** It is not required to give any notice to or obtain any approval, consent, ratification, waiver or other authorization of any person (including any Authorization of any Governmental Authority other than the Government) in connection with the execution and delivery of this Agreement or the consummation or performance of any of the transactions contemplated by this Agreement.

45



(E)  **No Litigation.**  Neither Terminal Operator nor any of its Affiliates is involved in in any litigation, arbitration, or claim against the Government, except for claims arising in the ordinary course of Terminal Operator's business.

(F)  **Solvency.**  There are no bankruptcy, reorganization or receivership proceedings pending against, being contemplated by, or, to its actual knowledge, threatened against Terminal Operator or any of the shareholders of Terminal Operator. Terminal Operator is solvent.

## ARTICLE 13
## COVENANTS OF TERMINAL OPERATOR

Section 13.1.  **Environmental**.

(A)  **Compliance.**  Terminal Operator shall comply, and shall cause the Oil Refinery and Related Facilities and all operations and conditions at the Site to comply with all applicable Environmental Laws.  Terminal Operator shall not take, allow, or suffer any action, inaction, or condition at or in connection with the Oil Refinery and Related Facilities that causes or results in a Release or threatened Release that requires a Response or restoration, assessment, mitigation, or replacement of any natural resource at or in connection with the Oil Refinery and Related Facilities, or constitutes a violation of any Environmental Laws.  In the event of such a Release or threatened Release of a Contaminant at or from the Site, Terminal Operator at its own cost shall promptly take all appropriate Responses and other actions required by applicable Environmental Laws to investigate, contain, clean up, remove, remediate, and otherwise respond to such Release or threatened Release, assess, restore, replace, or mitigate damaged natural resources, and otherwise protect human health and the environment and consistent with continued industrial use of the affected portions of the Refinery Site. For the avoidance of doubt, the Government's reasonable out-of-pocket costs and expenses it incurs (i) in oversight by DPNR of such actions, or (ii) if Terminal Operator fails promptly to conduct such Responses and the Government elects to conduct such Responses, shall be considered "Losses" for purposes of the indemnification obligation in Section 13.3(C) hereof. Nothing in this Agreement limits or precludes the Government from exercising its authorities under Environmental Laws or other Applicable Law in connection with any such Release or threatened Release.

(B)  **Due Care; Cooperation.**

(1)  Terminal Operator shall exercise due care with respect to all Contaminants at the Site, including but not limited to Pre-Existing Contamination, and all Contaminants Released or threatened to be Released at or from the Site or otherwise in connection with operations at the Site, shall take commercially reasonable precautions against foreseeable acts or omissions of any third party and the consequences that could foreseeably result from such acts or omissions, and shall comply with all Environmental Laws applicable thereto.

46



(2)    Terminal Operator shall cooperate and provide commercially reasonable assistance and access to persons authorized by the Government to conduct Responses and/or natural resource restoration at the Site (including such reasonable cooperation and access necessary for the installation, integrity, operation, and maintenance of any complete or partial Responses or natural resource restoration at the Site).

(3)    Terminal Operator shall (i) comply with land use restrictions established pursuant to Applicable Law in connection with Responses at the Site; (ii) not unreasonably interfere with or impede the effectiveness or integrity of any institutional or engineering control employed at the Site in connection with a Response; and (iii) comply with all reasonable requests for information or administrative subpoenas issued by the Government pursuant to Environmental Laws.

(4)    Terminal Operator shall, consistent with continued industrial use of the Refinery Site, take commercially reasonable measures, including at a minimum all measures required by Applicable Law, to (a) stop Releases at the Oil Refinery and Related Facilities; (b) prevent threatened or future Releases at the Oil Refinery and Related Facilities; (c) prevent or limit human, environmental, or natural resource exposure to Pre-Existing Contamination or other contamination at or from the Oil Refinery and Related Facilities; and (d) fund (through insurance, the Financial Assurance, and all other financial resources available to Terminal Operator) clean-up of all Releases occurring following the Closing Date and restoration of affected third-Person property and the environment.

(5)    Terminal Operator, and not the Government, shall have responsibility to comply with Environmental Laws regarding the Site as now or hereafter used or occupied by Terminal Operator, its Affiliate(s), or its designee(s), and such portions of the Site hereafter subject to a submerged or filled land lease or permit or Coastal Zone Management permit as modified and assigned to Terminal Operator pursuant to Section 6.3 (collectively, "*Submerged Lands*").

(6)    Terminal Operator shall comply with all Applicable Laws, including but not limited to Environmental Laws, with respect to the loading, unloading, and berthing of vessels at the Terminal, and shall use commercially reasonable efforts to ensure that all vessels, trucks and equipment loading or unloading at, or otherwise located at or using the Site, comply with all Applicable Laws, including but not limited to insurance laws and Environmental Laws.

(7)    Terminal Operator shall on behalf of HOVENSA take all actions and perform all obligations required to comply with  the Resource Conservation and Recovery Act ("*RCRA*") and the Site's RCRA permit(s) and any modifications thereto and extensions thereof, including but not limited to all current and future treatment, storage, disposal, transportation, closure, post-closure, recordkeeping, reporting, financial assurance, corrective action, and remediation requirements thereunder or required by RCRA or any unilateral or consent order or decree relating to the facility or any contamination related thereto to the extent that such performance is funded by HOVENSA or, to the extent HOVENSA's funds prove

47

inadequate, by amounts available pursuant to the existing RCRA financial assurance demonstration, but only to the extent agreed to in writing by both EPA and DPNR. In no event shall Terminal Operator incur any liability for the environmental contamination that is the subject of the RCRA permits.

(C)    **Notification.** In the event that Terminal Operator becomes aware of any action or occurrence which causes or threatens a Release of a Contaminant at or from the Site that constitutes an emergency situation or may present an imminent endangerment to human health or welfare or the environment, Terminal Operator shall immediately take commercially reasonable action (including at a minimum all action required by applicable Environmental Laws) to prevent, abate, or minimize such Release or threat of Release, and shall, in addition to complying with any applicable notification requirements under 42 U.S.C. § 9603 and any other Environmental Laws, promptly notify the Government of such Release or threatened Release.

(D)    **Permits.** Throughout the Term, Terminal Operator shall take all commercially reasonable actions, to the extent required by Applicable Law, promptly to file all applications for and obtaining, maintaining, modifying, and renewing all permits and other Authorizations required for Terminal Operator compliance with this Agreement.

(E)    **Applicable Law.** For the avoidance of doubt, nothing in this Agreement is intended to, or shall, relieve Terminal Operator of its obligation to comply with Environmental Laws.

Section 13.2.  **Consents and Approvals**. Terminal Operator shall take all commercially reasonable actions, to the fullest extent permitted by law, to obtain promptly any Authorizations or other actions on the part of Government Authorities or of any officials, departments, agencies, or other instrumentalities thereof that may be necessary or appropriate in connection with rehabilitating and operating the Terminal and Terminal Site and, in the event of a Refinery Restart, the Refinery and Refinery Site.

Section 13.3.  **Indemnification**.  Terminal Operator shall defend, indemnify, and hold harmless and pay on a current basis the Government and its agents, officers, directors and employees and other representatives (each, a "***Government Indemnified Party***") from and against any and all Losses incurred by a Government Indemnified Party arising out of or relating to Terminal Operator's obligations under this Article 13:

(A)    to the extent caused by any negligent act or omission (including strict liability), gross negligence or willful misconduct of Terminal Operator, its subcontractors or any of their respective agents or employees (but only with respect to Losses for injury, illness or death to any individual or damage to any property of any Person); or

(B)    to the extent caused by breach of Applicable Law by Terminal Operator, its contractors, or any of their respective agents or employees; or

48



(C)    to the extent caused by or arising out of a Release or threatened Release of a Contaminant, a Response, or obligation under any Environmental Laws at, under, on, or with respect to the Oil Refinery and Related Facilities or the Site;

provided, however, that Terminal Operator shall not be required to indemnify any Government Indemnified Party for Losses to the extent that such Losses suffered by the Government Indemnified Party arose out of any grossly negligent act or omission (including strict liability) or willful misconduct of any Government Indemnified Party.

## ARTICLE 14
## GOVERNMENT COVENANTS

Section 14.1.  **Assistance with Permits**.  Throughout the Term, the Government shall take all commercially reasonable actions, to the fullest extent permitted by Applicable Law, to assist Terminal Operator (and, where applicable, its contractors and subcontractors), in Terminal Operator's expeditious filing of all applications for and obtaining, maintaining, and renewing all Government Authorizations required for Terminal Operator's compliance with this Agreement, including such appropriate Government Authorization, if any, as are required to maintain the exemption from the Jones Act of the current Oil Refinery and Related Facilities. The Government shall (i) take (and shall cause its relevant agencies, departments, political subdivisions and instrumentalities to take, including DPNR) all applicable actions to qualify the Site (and limit the liability of Terminal Operator) pursuant to the Virgin Islands Brownfields Revitalization and Environmental Restoration Act (Title 14, Sections 551-557), and regulations promulgated thereunder, and under any other relevant Virgin Islands law, and (ii) shall cooperate reasonably with Terminal Operator in qualifying the Site for under similar brownfields treatment under applicable provisions of federal law (including without limitation RCRA). In each case Terminal Operator will timely file and diligently prosecute any such applications. The Government shall take all feasible and lawful measures necessary to have all such Authorizations issued as soon as is practicable, and otherwise shall not delay or frustrate the application process.

Section 14.2.  **Consents and Approvals**. The Government undertakes to use its commercially reasonable efforts in good faith to assist Terminal Operator to obtain promptly any consents, approvals, clearances, determinations, or other actions on the part of the U.S. Government or of any officials, departments, agencies, or other instrumentalities thereof that may be necessary or appropriate in connection with operating the Terminal and the Refinery.

Section 14.3.  **Beneficial Use**.    Without the prior written consent of Terminal Operator, which consent may not be unreasonably withheld, conditioned or delayed, the Government, except to the extent required by Applicable Law, shall not take, approve, assist or allow any action, or fail to take, approve, assist or allow any action, if such action or failure to act, as the case may be, is reasonably likely to materially adversely affect, diminish or impair the beneficial use, operation, utility or occupancy of the Oil Refinery and Related Facilities in compliance with this Agreement or the ability of Terminal Operator in compliance with this Agreement to beneficially use, occupy, obtain, receive or otherwise enjoy any of: (i) the physical

49

sites, facilities, improvements, programs, financial incentives or other benefits existing as of the Effective Date and contemplated by any portion of this Agreement, or (ii) the obligations or other commitments of the Government contemplated by, or set forth in, this Agreement; provided, however, that nothing in this Section 14.3 shall impair the Government's right to enact laws, regulations, or policies of general application for the preservation of public health and safety.

Section 14.4. **Other Legislation**. The Government agrees to use reasonable efforts to oppose any proposed legislation, initiative, act, event, plan, or proposal which would otherwise have the effect of avoiding or materially reducing any of the obligations or commitments as set forth in this Agreement. To the extent an initiative would negatively impact the full performance after the Effective Date of any or all of the obligations or commitments made by the Government, the Government shall take all legally and commercially appropriate steps to defend the obligations and commitments contained herein. For the avoidance of doubt, any new taxes (but not generally applicable user fees) adopted by the Government shall be treated as Exempt Payments under Section 11.2.

Section 14.5. **Change in Law**. The Government acknowledges that Terminal Operator has entered into this Agreement in material reliance on each and all of the obligations and commitments of the Government under this Agreement. The Government represents, warrants and covenants to Terminal Operator that in the event of a Qualifying Change in Law, the result of which would be to materially (a) diminish, impede, impair, or prevent the full performance after the Closing Date of any or all of the obligations and commitments made by the Government or Terminal Operator under this Agreement, (b) increase the obligations of Terminal Operator to the Government under this Agreement, or (c) reduce the rights of Terminal Operator under this Agreement, the Government, upon prompt written request of Terminal Operator, shall (i) exercise reasonable efforts to provide Terminal Operator with an exemption from the Qualifying Applicable Law as so changed and (ii) to the extent such an exemption would not remedy the impact of the Qualifying Change in Law, agree to such amendments to this Agreement as may be reasonably necessary. In the event of a Change in Law that is not a Qualifying Change in Law but that has any of the impacts set forth in clauses (a), (b) and (c) above, upon prompt written request of Terminal Operator the Government shall promptly engage in good faith negotiations to seek to agree and implement any reasonable amendments to the Agreement that would be reasonably necessary to remedy the negative impact of such Change in Law. Terminal Operator shall make all commercially reasonable efforts to mitigate the adverse effects of the Qualifying Change in Law or Change in Law.

Section 14.6. **Other Benefits**. Terminal Operator and its Affiliates shall not be precluded by reason of this Agreement from applying for benefits under legislation hereafter enacted for which it or they would otherwise qualify, but to the extent such benefits are inconsistent with its or their obligations and commitments under this Agreement, the terms of this Agreement shall govern.

Section 14.7. **No Additional Cost to Terminal Operator**. The Government shall fully fund and perform its obligations under this Agreement, and at no time

50

shall Terminal Operator be responsible for or be required to incur or pay any cost, charge or expense under this Agreement relating to those obligations (or any agreement executed pursuant hereto) unless this Agreement (or the agreement executed pursuant hereto) specifically identifies a cost, charge or expense to be borne or paid by Terminal Operator.

Section 14.8.  **Zoning; Legal Descriptions**.    The Government shall take all commercially reasonable actions, to the fullest extent permitted by Applicable Law, to assist Terminal Operator in any rezoning and the re-platting required to divide the Site as described in Appendix A. The Parties acknowledge that the legal description of parcels of land located in the U.S. Virgin Islands must be described on a survey (an official OLG map) filed with and approved by the Office of Public Surveyor, Office of the Lieutenant Governor (Cadastral). To the extent any of the official OLG maps showing all or any portion of the Terminal Site or the Submerged Lands need to be modified to permit such lands to be properly conveyed to Terminal Operator by HOVENSA under the Purchase Agreement or to the Government by HOVENSA under this Agreement, then the Government agrees to cooperate with HOVENSA and Terminal Operator to have new or revised surveys of such lands promptly reviewed and approved by the Cadastral department and to have the legal descriptions on the proposed deeds conveying such lands to be promptly reviewed and attested by the Cadastral department. The Government will provide such information and assistance as Terminal Operator may reasonably request in connection with the legal descriptions, leases and permits pertaining to the Terminal Site, the Refinery Site and the Submerged Lands.

## ARTICLE 15
## REPORTING, AUDIT AND INSPECTION

Section 15.1.  **Reporting**. Terminal Operator shall provide to the Government (i) not later than ninety (90) days following the close of its fiscal year, annual financial statements in accordance with Generally Accepted Accounting Principles (GAAP), which shall be audited by a certified public accounting firm acceptable to the Government, and (ii) not later than forty-five (45) days following the close of each fiscal quarter, unaudited quarterly financial statements, such deadlines subject in each case to reasonable extensions as may be required to accord with customary practice in the U.S. Virgin Islands. Terminal Operator shall provide quarterly employment information to the U.S. Virgin Islands OMB  and U.S. Virgin Islands Department of Labor for purposes of confirming compliance with Article 7.

Section 15.2.  **Annual Audit**.

(A)    For the purpose of determining compliance with this Agreement and with Applicable Law, on or about March 31st of each calendar year following the Effective Date, the Government may initiate and conduct an audit of the books, accounts, and records of (a) the Oil Refinery and Related Facilities, and (b) Terminal Operator, to the extent such books, accounts, and records relate to the Oil Refinery and Related Facilities or their operations (such audit being an *"Annual Audit"*).

51

(B)    Upon completion of any Annual Audit, the Government may prepare a report describing the results of such Annual Audit (an "***Annual Audit Report***") and shall make any such report available to Terminal Operator upon request.

(C)    Following receipt of any Annual Audit Report, Terminal Operator shall have not more than sixty (60) days in which to review such report and identify in writing any material errors or omissions therein. Any alleged material errors or omissions not so identified within the 60-day period are waived, and may not be asserted by Terminal Operator in any subsequent administrative, judicial, or quasi-judicial proceeding.

(D)    Nothing in this <u>Section 15.2</u> shall constitute a waiver or limitation on the Government's tax assessment, audit, investigation, enforcement, and collection authorities.

Section 15.3.    **Inspection**

(A)    Upon fourteen (14) days' advance written notice to Terminal Operator, the Government may initiate an inspection of the Oil Refinery and Related Facilities for the purpose of determining compliance with this Agreement and with Applicable Law.

(B)    Terminal Operator hereby consents to such inspections and agrees to provide reasonable access and assistance to the personnel conducting such inspections.

(C)    To the extent any inspection conducted under this <u>Section 15.3</u> reveals violations of this Agreement or Applicable Law, the Government hereby agrees to provide notice in writing of such violations within ten (10) days of the Government's determination of such violation.

(D)    Upon receipt of notice of violation, Terminal Operator has thirty (30) days to submit either proof that Terminal Operator has (i) remedied the violation and has restored compliance with this Agreement or Applicable Law or (ii) provided a plan and time reasonably acceptable to the Government to remedy such violations.

(E)    Nothing in this <u>Section 15.3</u> shall constitute a waiver or limitation on the Government's or other Governmental Authorities', audit, investigation, inspection, enforcement, subpoena, right of entry and access, and collection authorities or the ability to levy fines, penalties or other remedies in connection with violation of Applicable Law, consistent with this Agreement.

**ARTICLE 16
DEFAULT AND TERMINATION**

Section 16.1.    **Payment Default**.  In the event that Terminal Operator fails to make any payments due and owing to the Government under this Agreement, then the Government shall have the right to give written notice to Terminal Operator of such failure, and in the event that such payment is not cured within ninety (90) days of such written notice (such failure being a "***Payment Default***"), then:

52



(A)    The Government shall have the right to recover any outstanding payments from the issuer of the Financial Assurance; and

(B)    to the extent any of Terminal Operator's payment obligations to the Government remain outstanding after the exercise by the Government of its remedies under clause (A) above, the Government shall have the right to exercise its Subordinate Security Interest to the extent permitted by Article 9.

Section 16.2.    **Operating Default; Liquidated Damages**.    In the event that Terminal Operator fails to comply with its duty to operate under Article 5 and fails to cure any material breach of such failure within ninety (90) days (or if such cure cannot be reasonably achieved within such ninety (90) day period and the Terminal Operator is proceeding diligently to cure such Operating Default, such longer period as may reasonably be required, but in no event longer than two hundred seventy (270) days following the breach) (an ***"Operating Default"***), Terminal Operator shall pay to the Government as liquidated damages, and not as a penalty, the net present value of all Minimum Payments for the remaining years of the Term, discounted at the interest rate for Government-issued 30-year bonds for the year in which the Operating Default occurs (or, if no such bonds are issued that year, for the most recent year in which such bonds were issued).

Section 16.3.    **Termination**

(A)    **Termination Events.** Notwithstanding anything herein to the contrary, upon the occurrence of any of the following events (each a ***"Termination Event"***), this Agreement may be terminated upon thirty (30) days prior written notice of such termination (a "***Termination***"), as follows:

(1)    By the Government, if Terminal Operator is in Payment Default, or an Operating Default that remains uncured for more than ninety (90) days (or if such cure cannot be reasonably achieved within such ninety (90) day period and the Terminal Operator is proceeding diligently to cure such Operating Default, such longer period as may reasonably be required, but in no event longer than two hundred seventy (270) days following the breach);

(2)    By either party, if the other party is in breach of any material obligation hereunder and fails to cure such material breach within ninety (90) days following written notice thereof; and

(3)    Without further action by either Party, if the Initial Term of the Agreement expires without exercise of an Extension or upon expiration of such Extension.

(B)    **Site Restoration.**    Upon Termination, and at the option of the Government, Terminal Operator shall, at its own expense, to the extent not already decommissioned pursuant to Section 4.2 hereof, remediate and restore the Site (the ***"Site Restoration"***) by undertaking the following actions:

53



(1)     decommissioning the Oil Refinery and Related Facilities to the extent required to keep them inactive and in-place in accordance with Environmental Law and regulations of the United States Coast Guard, except for (i) any portions of the Oil Refinery and Related Facilities reasonably necessary to meet the fuel storage and access needs of St. Croix, and (ii) any other portions of the Oil Refinery and Related Facilities the Government may designate, each as identified in writing by the Government on a schedule to be provided by the Government within sixty (60) days of Termination (all decommissioned equipment, the "***Decommissioned Equipment***"); and

(2)     disconnecting the control and electrical systems and removing hydrocarbons and Contaminants from the Decommissioned Equipment, and otherwise ensuring that the Site is in a condition that complies in all material respects with applicable Environmental Laws for ongoing heavy industrial uses permitted on the Site.

(3)     The Site Restoration shall be undertaken by Terminal Operator. Completion of the Site Restoration shall be certified by an independent environmental engineer or environmental professional.

(4)     For the avoidance of doubt, the Site Restoration shall not require Terminal Operator to remediate any environmental contamination for which it is not otherwise expressly responsible under Applicable Law or this Agreement.

(C)     **Transfer of Site.**  At the Government's option, either prior to or following the decommissioning activities set forth in Section 16(B) following a Termination, Terminal Operator shall transfer the Site (including, for the avoidance of doubt, such parts of the Oil Refinery and Related Facilities that remain on the Site) to the ownership of the Government; provided that Terminal Operator shall have all required access to the Site to complete its decommissioning obligations hereunder.

(D)     **Effect on Agreement.**  If this Agreement is terminated in accordance with Section 16.3(A), then this Agreement shall be of no further force and effect, except that Articles 1, 8.3, 9, 16, 17, and 19 shall survive termination of this Agreement indefinitely.

Section 16.4.  **Rights and Remedies Cumulative**.  Except as expressly provided in this Agreement, all rights and remedies of any Party against any other Party and any permitted assignee of such other Party provided in this Agreement shall be deemed cumulative and not in lieu of, or exclusive of, each other or of any other right or remedy available to any Party at law or in equity, and the exercise of any right or remedy, or the existence herein of other rights or remedies, shall not prevent the exercise of any other right or remedy.

## ARTICLE 17
## CONFIDENTIALITY

Section 17.1.  **Confidentiality**

(A)    Each Party shall, from time to time, require or acquire Confidential Information.

(B)    The Government and Terminal Operator shall disclose the same to each other as required to advance their rights and obligations hereunder.

(C)    The receiving Party shall not, directly or indirectly, in any manner whatsoever, at any time whatsoever, disclose Confidential Information to any other party whatsoever, except that the receiving Party, may disclose Confidential Information to its advisors, as required by lenders, Affiliates, directors, officers, employees, agents, consultants or representatives; provided that the receiving Party, takes all reasonable steps to ensure that each of any such parties are bound by the terms and conditions of this Article 17, including the provision not to disclose any Confidential Information to any party whatsoever.

(D)    The obligations of each Party under Section 17.1(C) do not apply to the following information:

(1)    information provided to the Legislature of the U.S. Virgin Islands in connection with the submission of the Agreement to the Legislature for ratification;

(2)    information required to be disclosed or retained by each other by the laws of any applicable jurisdiction, including any law, order, subpoena or document discovery request or pursuant to a binding requirement of any regulatory or tax authority; provided that prior written notice is given to the disclosing Party, to the extent permitted under any Applicable Law, as soon as possible in order to afford the disclosing Party, an opportunity to seek a protective order;

(3)    information which enters the public domain other than through any breach of the terms and conditions of this Agreement by the receiving Party;

(4)    information lawfully made available to the receiving Party by another party free to make such disclosure without breach of any legal obligation;

(5)    information already in the possession of the receiving Party at the time of its receipt of the same from the disclosing Party, except to the extent that it has been unlawfully appropriated; and

(6)    information developed by the receiving Party independent of Confidential Information received from the disclosing Party.

(E)    Any presentations, analyses or data of Terminal Operator created, shared or conveyed in connection with this Agreement shall be deemed to constitute trade secrets of Terminal Operator and shall remain confidential pursuant to Title 3, Chapter 33, Section 881(g)(3) of the U.S. Virgin Islands Code.

55



**ARTICLE 18**
**FORCE MAJEURE**

Section 18.1.   **Force Majeure Events**.   For the purposes of this Agreement the term "***Force Majeure Event***" shall mean any cause that is reasonably unforeseeable as of the date of this Agreement and that is beyond the reasonable control, directly or indirectly, of the Party affected and with the exercise of due diligence, could not be prevented, avoided or removed by such Party, and does not result from such Party's negligence or fault and that wholly or partly delays or prevents such Party's performance of its obligations under this Agreement, including (to the extent meeting the foregoing requirements): war (whether declared or not) or other armed conflict terrorism; civil insurrection; declaration of martial law; piracy; nuclear accidents; widespread electrical outages; lightning strikes; earthquakes; fires; tornadoes; hurricanes; volcanic activity; accidents; strikes; lockouts or other labor actions (however, specifically excluding the labor force under the control of the Party experiencing such labor actions); actions or omissions of a Governmental Authority (including the actions of the Government in its capacity as a Governmental Authority or in the exercise of its Governmental Functions, or failure to issue an Authorization) that were not voluntarily induced or promoted by the affected Party, or brought about by the breach of its obligations under this Agreement or any Applicable Law. The Parties expressly agree and acknowledge that the list of Force Majeure Events in the foregoing sentence is intended as an inclusive list rather than an exhaustive list. Notwithstanding anything to the contrary, the term Force Majeure Event shall not be deemed to include (a) lack of funds or the availability of financing; (b) equipment failure, unless the claiming Party can point to an independent, identifiable Force Majeure Event that caused such failure; (c) acts or omissions of subcontractors (of any tier) except to the extent such subcontractors if they were a party hereto, would be able to claim a Force Majeure Event for the same or (d) changes in law other than changes in the Applicable Laws of the Government of the U.S. Virgin Islands or changes in Applicable Laws with disproportionate effect on, or targeted at, investors in the U.S. Virgin Islands. Upon the occurrence of a Force Majeure Event the Party claiming or experiencing such event shall promptly notify the other Parties and shall comply with the remaining provisions of this Article 18.

Section 18.2.   **Burden of Proof**.   In the event that the Parties are unable in good faith to agree that a Force Majeure Event has occurred or whether a Party's performance is excused, such dispute shall be resolved in accordance with the arbitration dispute resolution procedures set forth in Section 19.4 and, in any proceeding to resolve the dispute, the burden of proof as to whether a Force Majeure Event has occurred and whether performance is excused shall be upon the Party claiming a Force Majeure Event.

Section 18.3.   **Excused Performance**.   If a Party is rendered wholly or partially unable to perform its obligations under this Agreement because of a Force Majeure Event, that Party shall be excused from whatever performance is affected by the Force Majeure Event to the extent so affected, subject to and conditioned upon the following:

56



(A)    the non-performing Party, by exercise of due foresight could not reasonably have been expected to avoid, or by the exercise of due diligence could not have been able to overcome, such Force Majeure Event;

(B)    the non-performing Party gives the other Party Notice describing the nature, scope and expected duration of the Force Majeure Event, and the steps the affected Party expects to take to both mitigate the Force Majeure Event itself and the effect of such Force Majeure Event on its obligations under this Agreement. Such Notice shall be given promptly after the occurrence of the Force Majeure Event, and in no event more than seven days after the original notification of the Force Majeure Event given pursuant to Section 18.1;

(C)    the suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure Event;

(D)    the non-performing Party shall exercise all reasonable efforts to mitigate or limit damages to itself and to the other Party;

(E)    the non-performing Party shall exercise all reasonable efforts to continue to perform its obligations hereunder and to correct or cure the event or condition excusing performance; and

(F)    when the non-performing Party is able to resume performance of its obligations under this Agreement, that Party shall give the other Party written Notice to that effect and shall promptly resume performance hereunder.

Section 18.4.    **Applicability**.    For the avoidance of doubt and not as a limitation on the foregoing terms and conditions of this Article 18, (i) during the occurrence of a Force Majeure Event, neither Party shall be excused from any performance or payment obligation hereunder to the extent such obligation is not affected by such occurrence and is otherwise due in accordance with the terms and conditions hereof, and (ii) except as provided in clause (i), the terms and conditions of this Article 18 shall limit or condition all provisions of this Agreement whether or not so expressly stated in this Agreement.

### ARTICLE 19
### MISCELLANEOUS

Section 19.1.    **Notices, Requests and Communications**.    Wherever provision is made for the giving or issuance of any notice, instruction, consent, approval, certificate or determination by any Person (each, a "*Notice*"), unless otherwise specified, such communication shall be in writing and shall not be unreasonably withheld or delayed. All Notices shall be given to a signatory at the physical address or facsimile number specified below or as such signatory hereto shall at any time otherwise specify by like notice to the other signatories hereto. Each such Notice shall be effective (a) if given by facsimile, at the time such appropriate confirmation of receipt is received by the sender (or, if such time is not during regular business hours of a Business Day, at the beginning of the next such Business Day), and

57



(b) if given by mail or courier, upon receipt or refusal of service at the address specified for each signatory below. Notices shall be addressed as follows:

For the Government:

The Government of the U.S. Virgin Islands
Government House
Charlotte Amalie
St. Thomas, U.S. Virgin Islands
Attention: Office of the Governor

With a copy to:

Office of the Attorney General
U.S. Virgin Islands Department of Justice
34-38 Kronprindsens Gade
GERS Building, 2nd Floor
St. Thomas, U.S. Virgin Islands 00802

For Terminal Operator:

Limetree Bay Holdings, LLC
c/o ArcLight Capital Partners, LLC
200 Clarendon St., 55th Floor
Boston, Massachusetts 02117
Attention:    Christine M. Miller
Fax:          (617) 867-4698
Email:        cmiller@arclightcapital.com

With a copy to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 20022
Attention:    Christopher G. Cross
              David S. Allinson
Fax:          (212) 751-4864
Email:        christopher.cross@lw.com
              david.allinson@lw.com

and

Nichols, Newman, Logan, Grey & Lockwood, P.C.
1131 King Street, Christiansted, St. Croix
U.S. Virgin Islands 00820-4971

58



| Attention: | G. Hunter Logan, Jr. |
| | Todd H. Newman |
| Fax: | (340) 773-3409 |
| Email: | hlogan@nnldlaw.com |
| | tnewman@nndlaw.com |

Section 19.2.  **Assignment**.

(A)   This Agreement shall not be assignable except by Terminal Operator in whole to (1) an Affiliate, or (2) an entity that acquires all or substantially all of Terminal Operator's business or assets, or (3) as provided in Section 19.2(B) below.  In the case of an assignment under subsection  (2) of this Section 19.2(A), such assignment shall be subject to the consent of the Government, such consent not to be unreasonably withheld, conditioned, or delayed.

(B)   **Financing Liens.**

(1)   Terminal Operator, without approval of the Government, may, by security, charge or otherwise encumber its interest under this Agreement for the purposes of financing the development, construction, rehabilitation, expansion, or enhancement or operation of the Oil Refinery and Related Facilities.

(2)   Not less than ten (10) Days prior to making such encumbrance, Terminal Operator shall notify the Government in writing of the name, address, and telephone and facsimile numbers of each Lender(s) to which Terminal Operator's interest under this Agreement has been pledged or assigned. Such notice shall include the names of the account managers or other representatives of the Lender(s) to whom all written and telephonic communications may be addressed.

(3)   After giving the Government such initial notice, Terminal Operator shall promptly give the Government (i) notice of any change in the information provided in the initial notice or any revised notice, and (ii) copies of documents related to such encumbrance (including final, executed copies of documents related thereto).

(4)   If Terminal Operator encumbers its interest under this Agreement as permitted by this Section 19.2(B), then (i) the Parties, except as provided by the terms of this Agreement, shall not modify or cancel this Agreement without the prior written consent of the Lender(s), (ii) the Lender(s) or their designees shall have the right, but not the obligation, to perform any act required to be performed by Terminal Operator under this Agreement to prevent or cure any Payment Default by Terminal Operator and such act performed by the Lender(s) or their designees shall be as effective to prevent or cure a Payment Default as if done by Terminal Operator: provided that, if any such Lender or its designee elects to perform any act required to be performed by Terminal Operator under this Agreement to prevent or cure a Payment Default by Terminal Operator, the Government will not be deemed to have waived or relinquished its rights and remedies as provided in this Agreement, (iii) the

59



Government shall upon written request by Terminal Operator or Lenders execute statements certifying that this Agreement is unmodified (or, modified and stating the nature of the modification), in full force and effect and the absence or existence (and the nature thereof) of the Payment Default hereunder by Terminal Operator known to the Government and documents of consent to such assignment to the encumbrance and any assignment to such Lender(s), in each case as reasonably requested by Terminal Operator and (iv) the Government shall, upon the receipt of a written request from Terminal Operator or any Lender, execute, or arrange for the delivery of, such certificates, opinions and other documents as may be reasonably necessary in order for Terminal Operator to consummate any financing or refinancing of the Terminal or any part thereof and will enter into reasonable agreements with such Lender (including subordination agreements, intercreditor agreements and any such instruments or documents as may be reasonably necessary o evidence and reaffirm the provisions of Section 9 hereof), which agreements will grant certain rights to the Lender(s) as more fully developed and described in such documents, including, without limitation, that (a) this Agreement shall not be terminated (except for termination pursuant to the terms of this Agreement) without the consent of Lender, which consent is not to be unreasonably withheld or delayed, (b) Lender(s) shall be given notice of any breach or default of this Agreement by Terminal Operator, (c) if a Lender forecloses, takes a deed in lieu of foreclosure or otherwise exercise its remedies pursuant to any security documents, that the Government shall, at such Lender's request, continue to perform all of its obligations hereunder, and Lender or its nominee may perform in the place of Terminal Operator, and may assign this Agreement to another Person in place of Terminal Operator; *provided* that, any party which succeeds the Terminal Operator shall agree to perform the Terminal Operator's obligations hereunder, including making payments to the Government consistent with those provided for hereunder, (d) in the event this Agreement is rejected or otherwise terminated as a result of any bankruptcy, insolvency, reorganization or similar proceeding affecting Terminal Operator, the Government will enter into a new agreement with the Lender or Lender's designee for the remainder of the term with substantially the same covenants, terms, provisions and limitations as are contained in this Agreement, (e) the Government shall accept performance in accordance with this Agreement by Lender or its designee, and (f) the Government shall make representations and warranties to Lender as Lender may reasonably request, but solely with regard to (1) the Government's existence, (2) the Government's authority to execute, deliver and perform this Agreement, (3) the binding nature of the document evidencing the Government's consent to assignment to Lender and this Agreement on the Government, (4) receipt of regulatory approvals by the Government with respect to its execution and performance under this Agreement and (5) such other representations and warranties as are customary in the context of a financing of projects similar to the development, construction, rehabilitation, expansion, or enhancement or operation of the Oil Refinery and Related Facilities.

       Section 19.3.  **Governing Law**.  This Agreement and the rights and duties of the Parties arising out of this Agreement shall be governed by, and construed in accordance with, the applicable laws of the U.S. Virgin Islands without reference to the conflict of laws rules thereof that would direct the application of the laws of another jurisdiction.

60



Section 19.4.  **Dispute Resolution**.  Any dispute between the Parties as to the interpretation or effect of this Agreement (which shall include for the purposes of this Agreement any subsequent modification thereof unless otherwise expressly provided by such modification) and any controversy between them or claim by either of them, whether sounding in tort or contract, arising out of or relating to this Agreement or the conduct of the Parties, their agents and/or representatives, (collectively, a "*Dispute*") shall during the Term and within one year thereafter, notwithstanding the Government's status as such and in the same manner as similar actions, suits or proceedings to which the Government is not a Party, be the subject of the following dispute resolution procedures:

(A)    Following written notice by one Party to another of a Dispute, the Parties shall attempt to settle such Dispute in the first instance by mutual  discussions between their respective designated representatives. Failing such resolution, the senior representative of the Government and the chief executive officer (or a Person holding a similar position) of Terminal Operator (or their duly appointed representatives) shall meet to resolve such Dispute. The joint decision of such individuals shall be binding upon the Parties hereto.  If a settlement of any such Dispute or difference is not reached pursuant to this Section 19.4(A) within sixty (60) days after such notice of Dispute is delivered, then the provisions of Sections 19.4(B) and 19.4(C) below shall apply.

(B)    If the settlement of any Dispute is not reached pursuant to Section 19.4(A), then an action, suit or proceeding may be brought by a Party in the United States District Court of the Virgin Islands. Each of the Parties hereby irrevocably waives and shall cause its Affiliates to waive all right to a trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or the transactions contemplated hereby.

(C)    If the United States District Court of the Virgin Islands or the Third Circuit Court of the United States refuses for any reason to adjudicate such Dispute, the Parties agree that the matter shall be referred to an arbitration proceeding brought by a Party either in accord with the Rules of the American Arbitration Association or as otherwise agreed by the Parties. The arbitration will be conducted before three (3) arbitrators: one selected by the Government, another by Terminal Operator, and the third by the two selected arbitrators.  The arbitrators shall determine the venue for the arbitration. Judgment upon any award rendered by the arbitrator(s) in any such proceeding may be entered in any court having jurisdiction.

Section 19.5.  **Commercial Act**.

Each Party unconditionally and irrevocably:

(A)    agrees that the execution, delivery and performance by it of this Agreement and all other agreements, contracts, documents and writings relating hereto constitute private and commercial acts and not public or governmental acts;

(B)    agrees that should any proceedings be brought against it or its assets, other than the assets protected by the diplomatic and consular privileges under any law

61



("**_Exempted Assets_**") in any jurisdiction, in relation to this Agreement or any transaction contemplated hereby, no immunity, sovereign or otherwise, from such proceedings, execution, attachment or other legal process shall be claimed by or on behalf of itself or with respect to any of its assets (other than the Exempted Assets); and

(C)    subject to the Parties following the dispute resolution procedures set forth in Section 19.4, consents generally in respect of the enforcement of any judgment against it in any proceedings in any jurisdiction to the giving of any relief or the issue of any process in connection with such proceedings including the making, enforcement or execution against or in respect of any property irrespective of its use subject to Section 19.5(B).

Section 19.6.    **Limitation on Liability**.    No claim may be made by one Party against the other Party for any special, indirect, consequential, incidental or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or relating to this Agreement or the development, construction, rehabilitation, expansion, or enhancement or operation of the Oil Refinery and Related Facilities or any act, omission or event occurring in connection therewith and the Parties hereby waive, release and agree not to sue upon any claim for such damages.

Section 19.7.    **Entire Agreement; Subsequent Amendments**.    This Agreement constitutes the entire agreement of the Parties and the provisions herein shall supersede any and all prior agreements or understandings relating to the same subject matter. It is intended that no Party shall have or be deemed to have any obligation under this Agreement except as the same shall be explicitly stated herein. This Agreement may not be amended, modified, or altered except by an instrument in writing signed on behalf of each Party.

Section 19.8.    **Severability of Provisions**.    If any clause, sentence, section, or part of this Agreement or the application thereof to anyone in any circumstances, is declared invalid, the application thereof to others, or in other circumstances, and the remainder of this Agreement, shall not be affected thereby. In the event of any such holding and to the extent of any such invalidity, the Government undertakes, insofar as it may lawfully do so, to take such alternative steps (including the consent to or enactment of legislation and the consent to or promulgation of rules and regulations) as may reasonably and in good faith be required to confer upon the Parties benefits comparable in character and substantially equivalent in amount to those intended to be conferred by this Agreement, on terms and conditions not materially more burdensome to either party than those herein provided and without prejudice to any other remedies that may be available to either of them.

Section 19.9.    **Payment Terms and Interest Calculation**.    Except    as otherwise expressly provided in this Agreement, payment terms and interest calculations shall be as follows:

(A)    All payments will be made in US$ by wire transfer of immediately available funds to an account or accounts designated in writing by the Party entitled to receive payment.

62



(B)    Late payments shall bear interest at the U.S. Prime Rate, compounded quarterly until paid in full.

(C)    A wire transfer or delivery of a check shall not operate to discharge any payment under this Agreement and shall be accepted subject to collection.

Section 19.10. **Public Announcements**.   No Party shall, except as required by Applicable Law or the rules of any recognized national stock exchange, cause any public announcement to be made regarding this Agreement. In the event that a Party shall be required to cause such a public announcement to be made pursuant to any Applicable Law or the rules of any recognized national stock exchange, it shall use commercially reasonable efforts to provide the other Party at least two Business Days prior written notice of such announcement.

Section 19.11. **Parties in Interest** . Unless specified in this Agreement, the terms and provisions of this Agreement shall be binding upon and inure to the benefit of each Party and its respective legal representatives, successors and assigns. No other Person shall have any right, benefit, priority or interest hereunder or as a result hereof or have standing to require satisfaction of the provisions hereof in accordance with its terms.

Section 19.12. **Waiver**. By an instrument in writing, any Party may waive compliance by any other Party with respect to any term or provision of this Agreement that such other Party was or is obligated to comply with or perform or any breach hereof. The failure of a Party at any time to strictly enforce any provision of this Agreement shall in no way affect its right thereafter to require performance thereof, nor shall the waiver of any breach of any provision of this Agreement be taken or held to be a waiver of any succeeding breach of any such provision or as a waiver of the provision itself. Unless otherwise specified herein, the rights and remedies provided in this Agreement are cumulative and the exercise of any one right or remedy by any Party shall not preclude or waive its right to exercise any or all other rights or remedies.

Section 19.13. **Performance    Extended    to    Next    Business    Day**. Notwithstanding any deadline for payment, performance, notice, or election under this Agreement, if such deadline falls on a date that is not a Business Day, then the deadline for such payment, performance, notice, or election will be extended to the next succeeding Business Day.

Section 19.14. **Negotiation and Preparation Costs**. Except as provided in Article 3, each Party shall bear the costs and expenses incurred by it in connection with the negotiation, preparation, and execution of this Agreement and other documents referred to herein.

Section 19.15. **Further Assurances**. From time to time, each Party agrees to promptly execute and deliver such additional documents, and will provide such additional information and assistance, as any Party may reasonably require to effect the terms of this Agreement.

63



Section 19.16. **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute a single agreement to which no signatory hereto shall be bound until all signatories hereto have executed a counterpart. Signatures transmitted by facsimile or as emailed PDF copies shall be binding as originals so long as the Agreement is transmitted in its entirety, and each signatory hereto hereby waives any defenses to the enforcement of the terms of this Agreement sent by facsimile or emailed PDF based upon the manner of transmission or form of signature (electronic, facsimile or "ink original").



IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

GOVERNMENT OF THE U.S. VIRGIN ISLANDS

By: _____

Name: Kenneth E. Mapp
Title:    Governor of the U.S. Virgin Islands


ATTESTED:

By: _____

Name: Osbert E. Potter
Title:   Lieutenant Governor of the U.S. Virgin Islands


Approved for Legal Sufficiency:

By: _____

Name: Claude Walker
Title:   Attorney General of the U.S. Virgin Islands

**LIMETREE BAY TERMINALS, LLC**

Witnesses:

By: _____

Name:

Title:    manager

        John F. Erhard

2



**Appendix A to Operating Agreement**

Government to receive the undeveloped eastern property including Estate Pearl (estimated 330 acres)

Terminal

Refinery

Government

Excluded

**Appendix A**
**to**
**Operating**
**Agreement**

## Option Parcel coordinates:

### Estate Cassava Gardens

o   Parcel No. 1 Estate Cassava Gardens, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 1.377 U.S. acres, more or less, as more fully shown on OLG Drawing No. 3136 dated August 09, 1973, revised August 23, 1991.

o   Remainder Matr. No. 39-A and 49 Estate Cassava Gardens, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 62.791 U.S. acres, more or less, as more fully shown on OLG Drawing No. 3136 dated August 09, 1973, revised August 23, 1991.

### Estate Barren Spot

o   Remainder Parcel No. 1 Estate Barren Spot, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 30.712 U.S. acres, more or less, as more fully shown on OLG Drawing No. 3136 dated August 09, 1973, revised August 23, 1991.

### Estate Pearl

o   Remainder Matr. 51 & Matr. 43 Estate Pearl, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 60.597 U.S. acres, more or less, as more fully shown on OLG Drawing No. 3136 dated August 9, 1973, revised August 23, 1991.

o   Remainder Matr. 38 Estate Pearl, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 112.297 U.S. acres, more or less, as more fully shown on OLG Drawing No. 3136 dated August 9, 1973, revised August 23, 1991.

2

**APPENDIX B**

**Claims and Litigations**

The Government hereby represents that as there are no actions, suits or proceedings pending or, to the best of the Government's knowledge, threatened against or affecting the Government before any court or administrative body or arbitral panel that could reasonably be expected to have a material adverse effect on the ability of the Government to meet and carry out the obligations of this Agreement, other than those identified below.

- *In re HOVENSA LLC*, No. 15-10003 (Bankr.V.I. 2015)

EXECUTION COPY                          Appendix C

## SETTLEMENT AND RELEASE AGREEMENT

This Settlement and Release Agreement ("Agreement" or "Settlement Agreement") is by and among Alicia V. Barnes, Commissioner of the Virgin Islands Department of Planning and Natural Resources, in her capacity as Trustee for Natural Resources of the Territory of the United States Virgin Islands ("Trustee"), and the Government of the Virgin Islands, in its *parens patriae* and public trustee capacities, on behalf of the public and its quasi-sovereign interests ("Government" or "Government of the Virgin Islands"), collectively referred to as the "**Plaintiffs**," and Hess Oil Virgin Islands Corp., a corporation organized and existing under the laws of the United States Virgin Islands ("HOVIC") and HOVENSA, L.L.C., a limited liability company organized and existing under the laws of the United States Virgin Islands ("HOVENSA"), collectively referred to as "**Settling Defendants**," all collectively referred to as "**Settling Parties**" and individually referred to as a "**Settling Party**."

WHEREAS, on May 5, 2005, the Trustee filed a complaint captioned *Commissioner of the Dep't of Planning and Natural Resources v. Century Alumina Co., et al.*, Civ. No. 2005-0062, against Settling Defendants and St. Croix Renaissance Group, L.L.L.P., Alcoa World Alumina Company, L.L.C., Lockheed Martin Corporation, St. Croix Alumina, L.L.C., Century Alumina Company, and Virgin Islands Alumina Company, (collectively, the "Alumina Parties") pursuant to the Virgin Islands Water Pollution Control Act, V.I. Code Ann. Tit. 12 § 181 *et seq.* ("VIWPCA"), the Virgin Islands Oil Spill Prevention and Pollution Control Act, V.I. Code Ann. Tit. 12 § 701 *et seq.* ("VIOSPPCA"), common law, and Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*, as amended ("CERCLA");

WHEREAS, on July 30, 2009, the Trustee and the Government filed an amended complaint against the same parties;

WHEREAS, through the complaint the Trustee and the Government sought injunctive relief, damages, attorneys' fees and costs, and other amounts as may be just and proper relating to pollution or contamination of waters of the Virgin Islands alleged to have resulted from the presence of petroleum, chloride, nutrients, micronutrients, hazardous wastes, solid wastes, and other pollutants generated by or associated with the Refinery Property, as defined below;

WHEREAS, in response to the complaint, HOVIC and HOVENSA brought counterclaims against the Government of the Virgin Islands and a third-party complaint against Virgin Islands Waste Management Authority ("VIWMA");

WHEREAS, all claims pursuant to CERCLA between the Trustee and HOVIC and HOVENSA concerning groundwater damages have been dismissed by rulings of the United States District Court for the Virgin Islands and all claims pursuant to CERCLA concerning marine natural resources have been withdrawn by the Trustee, leaving no CERCLA claims currently pending;

WHEREAS, the Trustee is included in this Settlement Agreement solely to effectuate formal resolution of this litigation and to make clear that there will be no appeals from prior dismissal or voluntary withdrawal of the Trustee's claims; and

1

EXECUTION COPY

WHEREAS, this Settlement Agreement is entered into voluntarily and applies to and is binding upon the Plaintiffs and upon Settling Defendants, and their successors and assigns.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and conditions contained herein, and without admitting any liability for any purpose and intending to be legally bound, the Parties agree as follows:

1.   Definitions.  In addition to the definitions contained in the Preamble and Recitals in this Agreement, whenever the terms listed below are used in this Settlement Agreement or in the appendices attached hereto and incorporated hereunder, the following definitions shall apply solely for purposes of this Settlement Agreement:

A.   "Day" shall mean a calendar day unless expressly stated to be a working day. The term "working day" shall mean a day other than a Saturday, Sunday, Federal holiday or Virgin Islands holiday.  In computing any period of time under this Settlement Agreement, where the last day would fall on a Saturday, Sunday, Federal holiday or Virgin Islands holiday, the period shall run until the close of business of the next working day.

B.   "Effective Date" shall mean the date this Settlement Agreement is fully executed by all the parties.

C.   "First Payment Date" shall mean a day within two (2) working days after the Effective Date of this Settlement Agreement.

D.   "HOVENSA's Real Property, Fixtures and Equipment" shall mean (i) the Refinery Property and all fixtures affixed to the Refinery Property and equipment of any kind located thereon and (ii) any crude oil or refined petroleum products to which any Settling Defendant has title stored in above-ground storage tanks within the Refinery Property.

E.   "HOVENSA Sale" shall mean the sale of all or substantially all of the equity ownership units in HOVENSA, itself, to a third party or third parties.

F.   "Natural Resources" shall mean land, fish, wildlife, biota, surface water, ground water, drinking water supplies, wetlands, habitats, species, estuarine and marine environments, wildlife and marine sanctuaries, archaeological, cultural, recreational and other biotic resources, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the Virgin Islands, singly or jointly with another person or entity.

G.   "Pre-Existing Contamination" shall mean discharges of any pollutant, contaminant, hazardous waste, hazardous substance, crude oil, any fraction thereof, any petroleum product, petroleum byproduct, and/or fuel additive into soil, ground water, marine sediments and/or surface water at the Refinery Property prior to the Effective Date of this Settlement Agreement, and described in documents referenced in **Exhibit A**.  Contamination not

2

EXECUTION COPY

identified in any such documents is not Pre-Existing Contamination and is outside the scope of
the Settlement Agreement.

H.    "Refinery Property" shall mean the real property that constitutes the site of the
HOVENSA oil refinery facility located at Limetree Bay, St. Croix, United States Virgin Islands
including all upland and presently or formerly submerged land owned or leased at any time by
HOVIC or HOVENSA.

I.    "Refinery Sale" shall mean the sale of some or all of the Refinery Property and/or
HOVENSA's Real Property, Fixtures and Equipment.

J.    "Related Parties" shall mean (i) PDVSA V.I., Inc., St. Croix Petrochemical Corp.,
Hess Corporation (f/k/a Amerada Hess Corporation), Petroleos de Venezuela, S.A., and their
shareholders, directors, officers and employees, and any other of the Settling Defendants' former
or current parent corporations, former or current subsidiary corporations, joint venture partners,
predecessor corporations, and members; or (ii) the Settling Defendants' successor and assigns,
but only to the extent that the alleged liability of such entity or entities is based on the alleged
liability of a Settling Defendant prior to the Effective Date of the Settlement Agreement.

K.    "Second Payment Date" shall mean the earlier of (i) December 31, 2014 or (ii) the
date of the closing of the Refinery Sale or HOVENSA Sale.

L.    "Security Documents" shall mean the documents set forth at **Exhibit B** hereto.

M.    "Total Settlement Value" shall mean $43,500,000.00.

N.    "UCC" shall mean the Uniform Commercial Code as in effect in the Virgin
Islands, as it may be amended from time to time and codified at Title 11A of the Virgin Islands
Code.

2.    **Payments**. Settling Defendants shall pay or cause to be paid to the Government
the Total Settlement Value. HOVENSA shall pay $3,500,000.00 ("First Payment") on or before
the First Payment Date by wiring such funds to the account provided by counsel for the
Government on or before the Effective Date. HOVENSA shall pay the Government of the
Virgin Islands an additional $40,000,000.00 on the Second Payment Date upon the closing of a
Refinery Sale, or if there is no Refinery Sale but a HOVENSA Sale, HOVIC, PDVSA, V.I., Inc.
and HOVENSA shall cause the payment of $40,000,000.00 to the Government on the Second
Payment Date. The payment of $40,000,000.00 is referred to as the "Second Payment" herein.
No proceeds from the Refinery Sale and/or HOVENSA Sale shall be paid to Hess Corporation or
Petroleos de Venezuela, S.A. prior to the Second Payment being made to the Government. Upon
receipt of the wire-transfer(s) of the $40,000,000.00 to the Government of the Virgin Islands to

3



EXECUTION COPY

the account (or accounts) that were provided by counsel for the Government on or before the Effective Date, the Government shall release the first priority lien described in Paragraph 3 herein.

3.    HOVENSA shall secure all of its obligations hereunder by granting to the Government of the Virgin Islands, on the Effective Date, as defined above, first priority liens on HOVENSA's Real Property, Fixtures, and Equipment located in St. Croix in the amount of $40,000,000. HOVENSA shall take all actions, and execute all documents necessary, to grant and perfect the first priority liens described herein. A copy of the Security Documents, which include a first priority mortgage, security agreement, and UCC financing statement, are attached hereto as **Exhibit B**. In providing these first priority liens and entering into this Settlement Agreement, HOVENSA hereby certifies that the Refinery Property and HOVENSA's Real Property, Fixtures and Equipment are owned by HOVENSA free and clear and that there are no encumbrances of any kind on its property of any kind, including but not limited to charges, claims, judgments, deeds of trust, community property interests, pledges, conditions, equitable interests, liens (statutory or other), options, security interests, mortgages, easements, encroachments, rights of way, rights of first refusal, or restrictions of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership except those held by the Government, the Virgin Islands Waste Management Authority, or Virgin Islands Port Authority.

4.    If the Total Settlement Value has not been received by the Government on or before December 31, 2014, the Governor of the Virgin Islands shall have the option, in the Governor's discretion, to either (i) reduce the Second Payment to the amount of the gross proceeds from the Refinery Sale or HOVENSA Sale or (ii) enforce all remedies and exercise all rights available to it under the Security Documents and applicable law, including without limitation the right to foreclose on any or all of the Refinery Property and/or HOVENSA's Real Property, Fixtures and Equipment.

5.    **Plaintiffs' Release**. In consideration for the First Payment, Second Payment, and lien described in Paragraph 3, Plaintiffs hereby release HOVENSA, HOVIC, and Related Parties from all claims asserted in and relief, including attorneys' fees and litigation costs, ever sought by Plaintiffs in *Commissioner of the Dep't of Planning and Natural Resources, et al. v. Century Alumina Co., et al.*, Civ. No. 2005-0062 (D.V.I.) ("Civ. No. 2005-0062") with respect to all Pre-Existing Contamination and harm or damage to or loss of natural resources, or limitations on the use or availability of ground water caused by Pre-Existing Contamination resulting from spills, discharges or releases of Contaminants at the Refinery Property prior to the Effective Date.

6.    **Plaintiffs' Covenant Not to Sue**. In consideration of the First Payment, Second Payment, and lien described in Paragraph 3, except as specifically provided in Paragraphs 7 and 9, Plaintiffs covenant not to sue or to take other civil or administrative action under Virgin Islands law, common law, or federal law against the Settling Defendants and their Related Parties for response costs, damages, natural resource damages, and/or injunctive relief due to Pre-Existing Contamination. The Plaintiffs' covenants not to sue are conditioned upon the

4

EXECUTION COPY

satisfactory performance by Settling Defendants of their obligations under this Settlement Agreement.

7.    **Reservation of Rights by Plaintiffs**.  Notwithstanding any other provision of this Agreement, Plaintiffs reserve, and this Agreement is without prejudice to, all rights against Settling Defendants, their successors, their assigns, future owner(s) and operator(s) of the Refinery Property after the Effective Date, and subsequent owner(s) of HOVENSA with respect to:

(a)    Breach by Settling Defendants of the Settlement Agreement;

(b)    Liability based on a Settling Defendant's transportation, treatment, storage, or active disposal, or the arrangement for the transportation, treatment, storage, or active disposal of contaminants, pollutants, hazardous substances, solid or hazardous wastes, or any other substances at a location within the USVI other than the Refinery Property, with the exception of placement of dredge spoil in SWMU 27, Lagoon No. 1 Dredge Spoil Area, in compliance with and as identified in RCRA Part B Operating Permit HOVENSA L.L.C.-EPA I.D. # VID980536080, which Lagoon is located on property now or formerly owned by St. Croix Renaissance Group;

(c)    criminal liability that is unrelated to the matters being released by Plaintiffs under this Settlement Agreement;

(d)    liability for violations of federal or territorial laws, regulations, agreements, orders, consent decrees, licenses, and permits that occur after the Effective Date;

(e)    liability arising from future spills, releases or discharges of contaminants, pollutants, hazardous substances, hazardous wastes, crude oil, any fraction thereof, any petroleum product, petroleum byproduct, and/or fuel additive or any other substances at or from the Refinery Property after the Effective Date;

(f)    liability arising from off-site migration of contaminants, pollutants, hazardous substances, hazardous wastes, crude oil, any fraction thereof, any petroleum product, petroleum byproduct, and/or fuel additive or any other substances at or from the Refinery Property after the Effective Date and

(g)    liability arising from releases or discharges of contaminants, pollutants, hazardous substances, solid or hazardous wastes, or any other substances not within the definition of Pre-Existing Contamination.

The reservation of rights contained in Paragraph 7(f) as to off-site migration of contaminants, pollutants, hazardous substances, hazardous wastes, crude oil, any fraction thereof, any



5

EXECUTION COPY

petroleum product, petroleum byproduct, and/or fuel additive or any other substances at or from the Refinery Property after the Effective Date does not apply to HOVIC.

8.    **Releases and Covenant Not to Sue Plaintiffs by Settling Defendants**. Settling Defendants and their Related Entities covenant not to sue and agree not to assert any claims or causes of action against the Government, the Trustee, the Commissioner, any other agency or instrumentality of the Government, the Virgin Islands Waste Management Authority, the Virgin Islands Port Authority, and any of their directors, officials, officers, and employees with respect to the matters addressed in this Settlement Agreement, including but not limited to any direct or indirect claim regarding Pre-Existing Contamination and/or seeking reimbursement of the costs of complying with this Settlement Agreement. The Settling Defendants and their Related Entities release and forever discharge the Plaintiffs and their directors, officials, officers, and employees from all counterclaims asserted in and relief ever sought by Settling Defendants in Civ. No. 2005-0062. The Settling Defendants release and forever discharge the Virgin Islands Waste Management Authority and its directors, officials, officers, and employees from all third-party claims asserted in and relief ever sought by Settling Defendants in Civ. No. 2005-0062.

9.    **Compliance with Laws**. This Settlement Agreement will not in any way affect obligations of HOVENSA and its successors and assigns and any future owner or operator of the refinery operations and/or Refinery Property after the Effective Date of this Agreement to comply with all federal and territorial laws, regulations, agreements, orders, consent decrees, licenses and permits, including but not limited to HOVENSA's ongoing and future obligations pursuant to the federal Resource Conservation and Recovery Act, Virgin Islands Coastal Zone Management Act, Virgin Islands Oil Spill Prevention and Pollution Control Act, federal Clean Water Act, Virgin Islands Water Pollution Control Act, Virgin Islands Water Resources Conservation Act, federal Clean Air Act, Virgin Islands Air Pollution Control Act and the reporting requirements of the Comprehensive Environmental Response, Compensation, and Liability Act. This Settlement Agreement shall not in any way limit or expand the Government of the Virgin Islands' authority with respect to regulating water appropriations by HOVENSA or in any way constitute a waiver of HOVENSA's rights under the Concession Agreement with respect to such authority.

10.    **Certification Regarding Pre-Existing Contamination**. By signing this Settlement Agreement, each Settling Defendant certifies that to the best of its knowledge and belief it has fully and accurately disclosed to the Government of the Virgin Islands prior to the Effective Date all information known to it and all information in its possession or control which discloses or discusses Pre-Existing Contamination or any past or potential future release of contaminants, pollutants, hazardous substances, solid or hazardous wastes, or any other substances at or from the Refinery Property. The Parties agree that the full extent and nature of the Pre-Existing Contamination will be based upon data and analysis concerning ground water, surface water or soil contamination contained in documents identified in **Exhibit A** hereto that describe or contain data concerning contamination at or migrating from the Refinery Property as contaminated ground water or as contaminated surface water, or directly to the marine environment.

6

EXECUTION COPY

11.    **Payments and Liens.**  The payments and liens referenced in Paragraphs 2 to 4 above shall be in addition to any payment(s) made or due to the Government pursuant to the Fourth Amendment Agreement, which was ratified by the Legislature of the Virgin Islands (Act 30-0273) on November 4, 2013.

12.    **Effect on Third-Parties;Reservation of Defenses.**  Except as expressly provided herein, nothing in this Settlement Agreement shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Settlement Agreement with the exception of the Virgin Islands Waste Management Authority which is a negotiated third-party beneficiary of this Agreement. Each of the Parties expressly reserves any and all rights (including, but not limited to, any right to contribution), defenses, claims, demands, and causes of action that each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Refinery Property against any person not a Party hereto except the Virgin Islands Waste Management Authority which is a negotiated third-party beneficiary of this Agreement.

13.    **Governing Law**.  This Settlement Agreement shall be governed by and construed in accordance with the laws of the United States Virgin Islands.

14.    **Notices and Submissions**.  Whenever, under the terms of this Settlement Agreement, notice is required to be given or a document is required to be sent by one Party to another, it shall be directed to the individuals at the addresses specified below, unless those individuals or their successors give notice of a change to the other Parties in writing in accordance with this Paragraph 14. All notices or other communications required or permitted hereunder shall be in writing and shall be delivered personally, by facsimile or sent by certified, registered or express air mail, postage prepaid, and shall be deemed given when so delivered personally, or by facsimile, or if mailed, two days after the date of mailing, as follows:

For Virgin Islands:

Vincent F. Frazer, Attorney General, or Successor
Territory of the United States Virgin Islands
488-50C Kronprindsens Gade, GERS Complex
Charlotte Amalie, St. Thomas
U.S. Virgin Islands 00802
Tel: 340-774-5666
Fax: 340-774-9710

Alicia Barnes, Commissioner and Trustee, or Successor
U.S. Virgin Islands Department of Planning & Natural Resources
45 Mars Hill
Frederiksted, VI 00840-4474
Tel: 340-773-1082
Fax: 340-773-1716

7

EXECUTION COPY

John K. Dema Esq.
Law Offices of John K. Dema, P .C.
1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands 00820-5008
Tel: 340-773-6142
Fax: 340-773-3944


For Settling Defendants:

HOVENSA, L.L.C.
Sloan Schoyer, General Manager
HOVENSA, L.L.C.
1 Estate Hope
Christiansted, U.S. Virgin Islands 00820-5652

Hess Oil Virgin Islands Corp
Brian Lever, President
Hess Oil Virgin Islands Corp.
1501 McKinney St.
Houston, TX 77010

Donald W. Stever, Esq.
B. David Naidu, Esq.
K&L Gates LLP
599 Lexington Avenue
New York, NY 10022

David Castro, Esq.
Hess Corporation
500 Dallas Street
Houston, TX 77522

Franklin Quow, Esq.
HOVENSA, L.L.C.
1 Estate Hope
Christiansted, U.S. Virgin Islands 00820-5652


15. **No Admission.** By entering into this Settlement Agreement, the Settling Defendants and Related Parties do not admit any liability to Plaintiffs arising out of the transactions or occurrences alleged in Civ. No. 2005-0062, nor is their entering into this Settlement Agreement an admission of violation of any law, rule, or regulation, nor shall any statement contained herein be construed to be an admission by the Settling Defendants or Related Parties.

8

EXECUTION COPY

16.    **Further Assurances**.  HOVENSA and HOVIC shall take actions as are necessary or as the Government or Trustee may reasonably request from time to time to ensure that the Security Documents are properly executed and enforceable, and the liens granted thereby in the Refinery Property and HOVENSA's Real Property, Fixtures and Equipment are perfected in a manner satisfactory to the Government or Trustee, in each case including the execution and delivery of security agreements, financing statements and other documents, the filing or recording of any of the foregoing as requested by the Government and/or the Trustee from time to time. In addition, HOVIC and HOVENSA shall provide all information reasonably requested by the Government related to the Refinery Property and HOVENSA's Real Property, Fixtures and Equipment.

17.    **Modifications**.  Modifications to this Settlement Agreement may only be made in writing, signed by the Plaintiffs and Settling Defendants.

18.    **Authorization to Sign**.  Each undersigned representative of a Party certifies that he or she is authorized to enter into the terms and conditions of this Settlement Agreement and to execute and legally bind such Party to this document.

19.    **Binding and Enforceable.**  This Agreement has been duly executed and delivered on behalf of the Party by the appropriate officers of the Party, and constitutes the legal, valid, and binding obligation of the Party, enforceable in accordance with its terms subject to applicable bankruptcy, insolvency, moratorium, and other similar laws applicable to creditors' rights generally.

20.    **Stipulation of Dismissal**.  Within seven (7) days of the Effective Date the Settling Parties shall submit a stipulation to the District Court of the Virgin Islands, Division of St. Croix dismissing from Case No. 2005-0062 all claims, counterclaims, and third-party claims against each other and the Virgin Islands Waste Management Authority. Dismissal of the action shall be "with prejudice" as of the date of the receipt by the Government of (i) both the First Payment and Second Payment or (ii) the First Payment and the proceeds of the Second Payment realized pursuant to the enforcement of the first priority liens on HOVENSA's Real Property, Fixtures, and Equipment.

21.    **Dispute Resolution**.  To the extent a dispute arises between the Settling Parties concerning compliance with or interpretation of the terms of this Settlement Agreement, the Settling Party believing that there has been a breach of this Agreement (the "Disputing Party") may notify the other party in writing that the Disputing Party believes a dispute exists as to whether another Settling Party is complying with this Agreement.  Once such written notification is provided, the Settling Parties shall engage in informal negotiations for a period of seven (7) calendar days.  If the Settling Parties are unable to resolve the dispute informally, the Disputing Party shall notify the other party within five (5) calendar days whether it intends to submit the dispute to arbitration.  Once such notice is served, the Disputing Party may submit the dispute to (a) Judge Edward N. Cahn (ret.) or (b) any other mutually agreeable arbitrator (in either case, the "Arbitrator").  The Arbitrator shall attempt to evaluate the dispute in as cost-effective and

9



EXECUTION COPY

prompt a manner as possible. The decision of the Arbitrator shall be binding on the Settling Parties. All costs of dispute resolution (*e.g.*, Arbitrator fees and costs) shall be split equally between Plaintiffs and Settling Defendants, except that the Plaintiffs and Settling Defendants shall bear their own attorneys' fees and costs.

22.    **Entire Agreement**. This Agreement constitutes the full and entire understanding and agreement among the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, arrangements, negotiations or understandings, both written and oral, which may have related to the subject matter hereof in any way.

23.    **Severability**. The invalidity or unenforceability of any portion or provision of this Agreement shall in no way affect the validity or enforceability of any other portion or provision hereof. Any invalid or unenforceable portion or provision shall be deemed severed from this Agreement and the balance of the Agreement shall be construed and enforced as if the Agreement did not contain such invalid or unenforceable portion or provision. If any such provision of this Agreement is so declared invalid, the Parties shall promptly negotiate in good faith new provisions to eliminate such invalidity and to restore this Agreement as near as possible to its original intent and effect.

24.    **Descriptive Headings**. The descriptive headings herein have been inserted for convenience only and shall not be deemed to limit or otherwise affect the construction of any provisions hereof.

25.    **Drafting Interpretations**. This Agreement was negotiated by the Settling Parties at arm's length and each of the Settling Parties has had the opportunity to consult with independent legal counsel before signing this Agreement. Therefore, no Settling Party shall maintain that the language of this Agreement should be construed against any other Settling Party.

26.    **Counterparts; Facsimile and Scanned Signatures**. This Agreement may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement. Facsimile and scanned counterpart signatures to this Agreement shall be acceptable and binding.

27.    **No Use As Evidence**. This Agreement is the result of a compromise among the Settling Parties and shall never be considered at any time or for any purpose as an admission of liability and/or responsibility on the part of any Party herein released. The payment of any sum of money in consideration for the execution of this Agreement or the absence of any payment shall not constitute, nor be construed as, an admission of any liability whatsoever by any Settling Party herein released. This Agreement shall not be admissible as evidence in any proceeding other than in an action brought by a Settling Party to enforce this Agreement.

10

EXECUTION COPY

28.    **Stipulation and Protective Order**. The Parties agree to comply with Paragraph 18 of the Stipulation and Protective Order Regarding Disclosure of Confidential Information, Dkt. Nos. 799 and 799-1 (September 19, 2011), and Order issued by the District Court of the Virgin Islands, Dkt No. 801 (September 20, 2011). A copy of the Stipulation is attached hereto as **Exhibit C**.


[SIGNATURE PAGES FOLLOW]

11

EXECUTION COPY

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the Effective Date.


**Government of the United States Virgin Islands**

By: _____    Date: May 28, 2014

Vincent F. Frazer, Attorney General
Territory of the United States Virgin Islands
488-50C Kronprindsens Gade, GERS Complex
Charlotte Amalie, St. Thomas
U.S. Virgin Islands 00802


**Alicia Barnes, in her capacity as Trustee for
Natural Resources of the United States Virgin Islands**

By: _____    Date: 5/29/2014

Alicia Barnes, Trustee
U.S. Virgin Islands Department of Planning & Natural Resources
5 Mars Hill
Frederiksted, VI 00840-4474

12

EXECUTION COPY

Hess Oil Virgin Islands Corp.

By: _____          Date: _5 - 28 - 14_

    Brian Lever, President
    Hess Oil Virgin Islands Corp.
    1501 McKinney St.
    Houston, TX 77010

HOVENSA, L.L.C.

By: _____          Date: _____

    Sloan Schoyer, General Manager
    HOVENSA, L.L.C.
    1 Estate Hope
    Christiansted, U.S. Virgin Islands 00820-5652

13

EXECUTION COPY

**Hess Oil Virgin Islands Corp.**

By: _____          Date: _____

       Brian Lever, President
       Hess Oil Virgin Islands Corp.
       1501 McKinney St.
       Houston, TX 77010

**HOVENSA, L.L.C.**

By: _____          Date: 5/28/14

       Sloan Schoyer, General Manager
       HOVENSA, L.L.C.
       1 Estate Hope
       Christiansted, U.S. Virgin Islands 00820-5652

EXHIBIT A

| No. | Date | Author | Description | Begin Bates | End Bates | Category |
|---|---|---|---|---|---|---|
| 4 | 7/8/1933 | BioImpact, Inc. | Benthic Survey of the West Turning Basin, HOVIC Refinery, St. Croix USVI | HOVIC-NRD0328566 | HOVIC-NRD0328578 | Amy Dempsey Documents |
| 25 | 12/1/1999 | ES&T | HOVENSA L.L.C Comprehensive Workplan – Area of Concern (AOC) No. 3 Workplan; Groundwater Investigation, Delineation and Remedial Alternatives | HOV-NRD0172456 | HOV-NRD0172479 | AOC Reports |
| 26 | 2/29/2000 | ES&T | Comprehensive Investigation and Corrective Measures Workplan - AOC No. 3 (Areas Impacted by Dissolved MTBE and/or Oxygenated Ether Constituent Plumes) | HOV-NRD0172480 | HOV-NRD0172569 | AOC Reports |
| 27 | 4/15/2000 | ES&T | HOVENSA Comprehensive Workplan for AOCs 1 and 2 | HOV-NRD0450554 | HOV-NRD0450623 | AOC Reports |
| 28 | 5/1/2000 | ES&T | HOVENSA Refinery Comprehensive Investigation and Corrective Measures Study Workplan for AOC 3 | HOVENSA0004846; SS015710 | HOVENSA0004851; SS015755 | AOC Reports |
| 29 | 5/11/2000 | ES&T | Revised Corrective Measures Study (CMS) Workplan for AOC 1 and 2 | HOV-NRD0144714 | HOV-NRD0144762 | AOC Reports |
| 30 | 6/1/2000 | ES&T | HOVENSA LLC Corrective Measures Study, Status Report for AOC 3 | HOVENSA0004914; SS028292 | HOVENSA0004940; SS028318 | AOC Reports |
| 31 | 8/15/2000 | ES&T | HOVENSA Refinery Comprehensive Investigation and Corrective Measures Study Workplan for AOC 3 | HOVENSA0004796; SS015308 | HOV-NRD0004844; SS015356 | AOC Reports |
| 32 | 11/1/2000 | SCA | Administrative Order on Consent (Dkt No. RCRA-02-2001-7301) | Not Bates Stamped | | AOC Reports |
| 33 | 12/29/2000 | ES&T | HOVENSA ICM and CMS Status Report, AOC 3, prepared for the USEPA | HOV-NRD0172078 | HOV-NRD0172155 | AOC Reports |
| 34 | 3/30/2001 | ES&T | HOVENSA ICM and CMS Status Report, AOC 3, prepared for the USEPA | HOV-NRD0172016 | HOV-NRD0172077 | AOC Reports |
| 35 | 6/29/2001 | ES&T | HOVENSA ICM and CMS Status Report, AOC 3, prepared for the USEPA | HOV-NRD0172156 | HOV-NRD0172271 | AOC Reports |
| 36 | 9/28/2001 | ES&T | HOVENSA ICM and CMS Status Report, AOC 3, prepared for the USEPA | HOV-NRD0171897 | HOV-NRD0172015 | AOC Reports |
| 37 | 9/28/2001 | ES&T | HOVENSA Refinery Comprehensive Investigation and Corrective Measures Study Workplan for AOC 3 | HOVENSA0005342; SS055333 | HOVENSA0005342; SS055389 | AOC Reports |
| 38 | 11/21/2001 | ES&T | HOVENSA Interim Corrective Measures (ICM) and Corrective Measures Study (CMS) Status Report, AOC 3 | HOV-NRD0159217 | HOV-NRD0159279 | AOC Reports |
| 39 | 11/28/2001 | ES&T | Defining of Potential Constituents of Concern and Methodologies to Assess Risk for AOC 1 | HOV-NRD0310400 | HOV-NRD0310483 | AOC Reports |
| 40 | 12/21/2001 | ES&T | HOVENSA LLC ICM and CMS Status Report for AOC 3 | HOVENSA0005023; SS055061 | HOVENSA0005084; SS055322 | AOC Reports |
| 41 | 3/28/2002 | ES&T | HOVENSA ICM and CMS Status Report, AOC 3, prepared for the USEPA | HOV-NRD0159280 | HOV-NRD0159331 | AOC Reports |
| 42 | 9/30/2002 | ES&T | HOVENSA ICM and CMS Status Report, AOC 3, prepared for the USEPA | HOV-NRD0159405 | HOV-NRD0159459 | AOC Reports |

EXHIBIT 4

| No. | Date | Author | Description | Begin Bates | End Bates | Category |
|---|---|---|---|---|---|---|
| 43 | 11/30/2002 | ES&T | Delineation and Evaluation of Human Health Risk Based Remedial Action Areas (RAAs) for AOC 2 | HOV-NRD0476200 | HOV-NRD0476275 | AOC Reports |
| 44 | 11/30/2002 | ES&T | Delineation and Evaluation of Human Health Risk Based Remedial Action Areas (RAAs) for AOC 2 | HOV-NRD0476196 | HOV-NRD0476423 | AOC Reports |
| 45 | 12/24/2002 | ES&T | HOVENSA ICM and CMS Status Report, AOC 3, prepared for the USEPA | HOV-NRD0159460 | HOV-NRD0159590 | AOC Reports |
| 46 | 3/20/2003 | ES&T | Ecological Risk Assessment for AOCs 1, 2 and 3 at the HOVENSA Refinery | HOV-NRD0319357 | HOV-NRD0319515 | AOC Reports |
| 47 | 3/28/2003 | ES&T | HOVENSA ICM and CMS Status Report, AOC 3, prepared for the USEPA | HOV-NRD0159531 | HOV-NRD0159589 | AOC Reports |
| 48 | 8/30/2003 | ES&T | HOVENSA ICM and CMS Status Report, AOC 3, prepared for the USEPA | HOV-NRD0159662 | HOV-NRD0159745 | AOC Reports |
| 49 | 9/30/2003 | ES&T | HOVENSA ICM and CMS Status Report, AOC 3, prepared for the USEPA | HOV-NRD0159746 | HOV-NRD0159795 | AOC Reports |
| 50 | 12/31/2003 | ES&T | HOVENSA ICM and CMS Status Report, AOC 3, prepared for the USEPA | HOV-NRD0159796 | HOV-NRD0159848 | AOC Reports |
| 51 | 3/31/2004 | ES&T | HOVENSA ICM and CMS Status Report, AOC 3, prepared for the USEPA | HOV-NRD0159849 | HOV-NRD0159912 | AOC Reports |
| 52 | 5/14/2004 | ES&T | Ecological Risk Assessment for AOCs 1, 2 and 3 at the HOVENSA Refinery, Final Report | HOV-NRD0362900 | HOV-NRD0363271 | AOC Reports |
| 53 | 6/30/2004 | ES&T | HOVENSA ICM and CMS Status Report, AOC 3, prepared for the USEPA | HOV-NRD0159567 | HOV-NRD0159661 | AOC Reports |
| 54 | 11/30/2004 | ES&T | Final CMS Report for AOCs 1, 2, and 3 | HOV-NRD0156461 | HOV-NRD0158858 | AOC Reports |
| 55 | 3/21/2006 | ES&T | Final CMS Report for AOCs 1, 2 and 3 | HOV-NRD0231116 | HOV-NRD0231301 | AOC Reports |
| 56 | 3/21/2006 | ES&T | Response to USEPA Comments re: HOVENSA's Final CMS Report for AOCs 1, 2, and 3. | HOV-NRD0151558 | HOV-NRD0152095 | AOC Reports |
| 57 | 9/1/2006 | ES&T | Site-Wide Model and Risk Assessment Status Update and Certification, prepared for HOVENSA | HOV-NRD0012881 | HOV-NRD0012926 | AOC Reports |
| 58 | 12/1/2006 | ES&T | Revised CMI Workplan for AOCs 1, 2, and 3 | HOV-NRD0367787 | HOV-NRD0367927 | AOC Reports |
| 59 | 8/14/2007 | ES&T | CMI Workplan for AOCs 1, 2 and 3 | HOV-NRD0450624 | HOV-NRD0450755 | AOC Reports |
| 60 | 11/21/2007 | ES&T | CMI Workplan for AOCs 1, 2 and 3 | HOV-NRD0366744 | HOV-NRD0366986 | AOC Reports |
| 61 | 2/15/2008 | ES&T | CMI Workplan for AOCs 1, 2 and 3 | HOV-NRD0366577 | HOV-NRD0366741 | AOC Reports |
| 62 | 5/12/2009 | ES&T | Site-Wide Model Risk Assessment Status Updte and Certification | HOV-NRD0150021 | HOV-NRD0150187 | AOC Reports |
| 63 | 7/21/2009 | ES&T | CMI Workplan for AOCs 1, 2 and 3 | HOV-NRD0365216 | HOV-NRD0365283 | AOC Reports |

1 of 11

EXHIBIT A

| No. | Date | Author | Description | Begin Bates | End Bates | Category |
|---|---|---|---|---|---|---|
| 64 | 9/1/2009 | ES&T | Site-Wide Model Risk Assessment Status Update and Certification AND Response to EPA Comments on the May 2009 Site-Wide Model Risk Assessment Update Report | HOV-NRD0012881 | HOV-NRD0012938 | AOC Reports |
| 65 | 5/25/2010 | ES&T | Petition for "Correction Action Complete with Controls" for SWMUs 9, 10 and 11 (Surface Impoundments 1, 2 and 3 Respectively) | HOV-NRD0012345 | HOV-NRD0012364 | AOC Reports |
| 66 | 5/25/2010 | ES&T | Site-Wide Model Risk Assessment Status Update and Certification Update Report | HOV-NRD0143909 | HOV-NRD0144132 | AOC Reports |
| 67 | 4/20/1994 | Kenneth Thomas, WAPA | Letter to Benjamin Nazario, Director, DPNR, re: Barren Spot well field closure | SS009958 | SS009959 | Barren Spot Documents |
| 68 | 5/5/1994 | Bruce Green, Caribbean Hydro Tech | Letter to Ken Thomas, WAPA, re: Barren Spot wells with attached testing results | SS047863 | SS047879 | Barren Spot Documents |
| 69 | 6/7/1994 | Todd R. Crawford, Friedman & Bruya, Inc. Environmental Chemists | Letter to Bruce Green, Caribbean Hydro-Tech re: Barren Spot well sampling results and attached results | SS009976 | SS009986 | Barren Spot Documents |
| 70 | | | | | | |
| 71 | 9/26/1994 | IT Corporation | Analysis of Barren Spot well samples performed for WAPA | HOV-NRD0499748 | HOV-NRD0499793 | Barren Spot Documents |
| 72 | | | | | | |
| 73 | 10/13/1994 | Alberto Bruno-Vega, WAPA | Letter to Roy E. Adams, Commissioner, DPNR re: Barren Spot Wellfield | SS009956 | SS009958 | Barren Spot Documents |
| 74 | | | | | | |
| 75 | 4/12/2006 | ES&T | Memorandum/Report from David Bennett to David Watterson and Todd Harris re: Estate Pearl CMS Status | ES&T-NRD_0018286 | ES&T-NRD0018321 | Estate Pearl |
| 76 | | | | | | |
| 77 | | | | | | |
| 78 | 3/30/2012 | Andrews, Charles | Expert Report of Charles B. Andrews, HOVENSA Refinery, St. Croix, U.S. Virgin Islands, March 30, 2012 | Not Bates Stamped | | Expert Reports |
| 79 | | | | | | |
| 80 | | | | | | |
| 81 | | | | | | |
| 82 | 3/30/2012 | Hennet, Remy, J.-C. | Expert Report of Remy J.-C. Hennet, HOVENSA Refinery, St. Croix, U.S. Virgin Islands, March, 2012 | Not Bates Stamped | | Expert Reports |
| 87 | | | | | | |
| 88 | 5/30/2012 | Hennet, Remy, J.-C. | Rebuttal Report of Remy J.- C. Hennet, HOVENSA Refinery, St. Croix, U.S. Virgin Islands, May 30, 2012 | Not Bates Stamped | | Expert Reports |
| 89 | | | | | | |
| 90 | | Vicente, Vance, P. (PhD) | Vance P. Vicente, MS, Ph.D., St. Croix, USVI, South Shore Industrial Site Expert Report | Not Bates Stamped | | Expert Reports |

j of 21

EXHIBIT A

| No. | Date | Author | Description | Begin Bates | End Bates | Category |
|---|---|---|---|---|---|---|
| 91 | 8/25/1997 | Gene W. Schmidt | Letter to Steve Freeman, Amerada Hess, with attached GC results for sample points 615, 616, 617, and 618 | HOVIC-NRD00992051 | HOVIC-NRD00992064 | Gene Schmidt Documents |
| 92 | 10/28/1997 | Gene W. Schmidt | Fingerprint Analysis for SWMU 25 and Firefighting Training Area Hydrocarbon Samples | HOVIC-NRD0269465 | HOVIC-NRD0263487 | Gene Schmidt Documents |
| 93 | 4/6/1998 | Gene W. Schmidt | Letter to Steve Freeman, Amerada Hess, re: Hydrocarbon Fingerprinting Analysis, HOVIC with attached GCs | HOV-NRD0491225 | HOV-NRD0491259 | Gene Schmidt Documents |
| 94 | 5/4/1998 | Gene W. Schmidt | Letter to Steve Freeman, Amerada Hess, re: Hydrocarbon Fingerprinting Analysis, HOVIC | HOV-NRD0484617 | HOV-NRD0484617 | Gene Schmidt Documents |
| 95 | 5/4/1998 | Gene W. Schmidt | Letter to Steve Freeman, Amerada Hess, re: Hydrocarbon Fingerprinting Analysis, HOVIC with attached GCs | HOV-NRD0491187 | HOV-NRD0491223 | Gene Schmidt Documents |
| 96 | 6/8/1998 | Gene W. Schmidt | Fax to Dan Gradle, HOVIC re: Wells 253, 254, RW18, RW17, 71, and 449 and Tanks 7426, 7423, and 7422 with attached GCs | HOV-NRD0491156 | HOV-NRD0491185 | Gene Schmidt Documents |
| 97 | 8/26/1998 | Gene W. Schmidt | Letter to Dan Gradle, HOVIC re: Liquid Hydrocarbon Samples Collected in June 1998 | HOVIC-NRD0260467 | HOVIC-NRD0260469 | Gene Schmidt Documents |
| 98 | 8/26/1998 | Gene W. Schmidt | Letter to Dan Gradle, HOVIC re: Liquid Hydrocarbon Samples Collected in June, 1998 with attached GCs | HOV-NRD0491067 | HOV-NRD0491151 | Gene Schmidt Documents |
| 99 | 7/10/1998 | Gene W. Schmidt | Fax to Steve Freeman, Amerada Hess, re: HOVIC well fingerprinting | HOVIC-NRD0260470 | HOVIC-NRD0260475 | Gene Schmidt Documents |
| 100 | 7/27/1998 | Gene W. Schmidt | Fax to Dan Gradle, HOVIC re: Well 641, Estate Figtree with attached GCs | HOV-NRD0491050 | HOV-NRD0491065 | Gene Schmidt Documents |
| 101 | 8/11/1998 | Gene W. Schmidt | Letter to Dan Gradle, HOVIC re: R3 GT Electrical Manhole Sample with attached GCs | HOV-NRD0491035 | HOV-NRD0491046 | Gene Schmidt Documents |
| 102 | 6/19/1998 | Gene W. Schmidt | Fax to Dan Gradle, HOVIC re: Weit Ditch Pool Hydrocarbon Sample with attached GC results | HOVIC-NRD0318603 | HOVIC-NRD0318614 | Gene Schmidt Documents |
| 103 | | | | | | |
| 104 | 11/20/1998 | Gene W. Schmidt | Letter to Dan Gradle, HOVIC re: Wells 650, C124-4, 105, 155, 430, and 534 with attached GCs | HOV-NRD0490952 | HOV-NRD0490972 | Gene Schmidt Documents |
| 105 | 2/2/1999 | Gene W. Schmidt | Letter to Dan Gradle, HOVENSA, re: Wells 254, 463, 68A, RW1B, 450, 833, 71, 428, 514, and 558 with attached GCs | HOV-NRD0490921 | HOV-NRD0490951 | Gene Schmidt Documents |
| 106 | 2/11/1999 | Gene W. Schmidt | Letter to Dan Gradle, HOVIC re: VER Skid Gas Chromatograms | HOVIC-NRD0215696 | HOVIC-NRD0215711 | Gene Schmidt Documents |
| 107 | 8/29/1999 | Gene W. Schmidt | Fax to Carey Cunningham, HOVENSA, re: Fingerprint Analysis, Estate Figtree Area with attached GC results | HOV-NRD0448376 | HOV-NRD0448401 | Gene Schmidt Documents |
| 108 | 3/15/2000 | Gene W. Schmidt | Letter to Kathleen Antoine, HOVENSA, with attached GC results for wells 271, 465, 466, 472, 543, 544, and NSF5A | HOV-NRD0430510 | HOV-NRD0430553 | Gene Schmidt Documents |
| 109 | 10/25/2000 | Gene W. Schmidt | Letter to Kathleen Antoine, HOVENSA, with attached GC results for wells 1641, 1642, 204, and RW2 | HOVIC-NRD0260450 | HOVIC-NRD0260486 | Gene Schmidt Documents |

EXHIBIT A

| No. | Date | Author | | Description | Begin Bates | End Bates | Category |
|---|---|---|---|---|---|---|---|
| 110 | 3/6/2001 | Gene W. Schmidt | | Letter to Donald Bull, HOVENSA, re: Wells 617, 627, and 629 and Tank 7528 with attached GCs | GWS-VI_0003218 | GWS-VI_0003243 | Gene Schmidt Documents |
| 111 | 5/8/2001 | Gene W. Schmidt | | Fax to Donald Bull, HOVENSA, re: Wells 440, 442, 556, 563, and 564 with attached GCs | GWS-VI_0002585 | GWS-VI_0002597 | Gene Schmidt Documents |
| 112 | 8/14/2002 | Gene W. Schmidt | | Letter to Steve Freeman, Amerada Hess, re: Wells VW-31 and VW-32 with attached GCs | GWS-VI_0001105 | GWS-VI_0001127 | Gene Schmidt Documents |
| 113 | 2/7/2003 | Gene W. Schmidt | | Fax to David Watterson, HOVENSA, re: Wells 66A, 69, and 154 with attached GCs | GWS-VI_0001079 | GWS-VI_0001104 | Gene Schmidt Documents |
| 114 | 1/31/2004 | Gene W. Schmidt | | Letter to David Watterson, HOVENSA, with attached GC results for SWMU 27 area | HOV-NRD0369081 | HOV-NRD0369097 | Gene Schmidt Documents |
| 115 | 4/10/2004 | Gene W. Schmidt | | Fax to David Bennett, ESBT, re: GC results for SWMU 27 area | HOV-NRD0346043 | HOV-NRD0346064 | Gene Schmidt Documents |
| 116 | 6/25/2004 | Gene W. Schmidt | | Fax to David Watterson, HOVENSA, re: Wells 88A, 69, and 154 with attached GCs | GWS-VI_0000908 | GWS-VI_0000937 | Gene Schmidt Documents |
| 117 | 10/13/2004 | Gene W. Schmidt | | Fax to David Watterson, HOVENSA, re: Wells 71, NSFR, and 422 with attached GCs | GWS-VI_0000778 | GWS-VI_0000796 | Gene Schmidt Documents |
| 118 | 6/21/2005 | Gene W. Schmidt | | Fax to David Watterson, HOVENSA, re: Well 685 and Release 7084 with attached GCs | HOV-NRD0346168 | HOV-NRD0346178 | Gene Schmidt Documents |
| 119 | 11/30/2005 | Gene W. Schmidt | | Fax to David Watterson, HOVENSA, re: Well 424 | GWS-VI_0000731 | GWS-VI_0000741 | Gene Schmidt Documents |
| 120 | 4/6/2006 | Gene W. Schmidt | | Fax to David Watterson, HOVENSA, re: HOVENSA SB-007 | GWS-VI_0000694 | GWS-VI_0000702 | Gene Schmidt Documents |
| 121 | 3/21/2007 | Gene W. Schmidt | | Fax to Steve Freeman, Hess, re: St. Croix Aluminum Fingerprinting with attached GCs | HOV-NRD0354410 | HOV-NRD0354436 | Gene Schmidt Documents |
| 122 | 12/7/2007 | Gene W. Schmidt | | Fax to David Watterson, HOVENSA, with attached GC results for Well VW208 | HOV-NRD0491668 | HOV-NRD0491676 | Gene Schmidt Documents |
| 123 | 6/23/2008 | Gene W. Schmidt | | Fax to David Watterson, HOVENSA, re: Well 223 with attached GCs | HOV-NRD0349612 | HOV-NRD0349625 | Gene Schmidt Documents |
| 124 | 7/14/2008 | Gene W. Schmidt | | Letter to David Watterson, HOVENSA, with attached GC results for Well 223 and Tank 7413 | HOV-NRD0146427 | HOV-NRD0146434 | Gene Schmidt Documents |
| 125 | | | | | | | |
| 126 | 7/11/2009 | Gene W. Schmidt | | Letter to David Watterson, HOVENSA, with attached GC results for Wells 409, 540, and 552 | HOV-NRD0198474 | HOV-NRD0198512 | Gene Schmidt Documents |
| 173 | 8/26/1998 | Arthur D. Little | HOVIC | Baseline Evaluation re HOVIC | HOVIC-NRD0115378 | HOVIC-NRD0116140 | Other |
| 174 | | | | | | | |
| 175 | 11/9/1983 | HOVIC | | SPCC Plan | HOVIC-NRD0309187 | HOVIC-NRD0309249 | Other Reports |
| 176 | 11/7/1985 | HOVIC | | SPCC Plan | HOVIC-NRD0184895 | HOVIC-NRD0184959 | Other Reports |
| 177 | 1/1/1988 | Engineering Science | | A Summary Report on the Subsurface Hydrocarbon Recovery Program | SS104996 | SS105240 | Other Reports |
| 178 | 6/1/1989 | HOVIC | | SPCC Plan | HOVIC0002497 | HOVIC0002689 | Other Reports |

EXHIBIT A

| No. | Date | Author | Description | Begin Bates | End Bates | Category |
|---|---|---|---|---|---|---|
| 179 | 10/1/1990 | The Advent Group, Inc. | SPCC Plan | HOVIV0002831 | HOVIC0002914 | Other Reports |
| 180 | 3/1/2001 | Millar Environmental Group | Facility Response Plan (FRP), Spill Prevention, Control and Countermeasure (SPCC) Plan, Hazardous Substance Response Plan | HOVENSA0000001 | HOVENSA0000427 | Other Reports |
| 181 | 7/14/2003 | DPNR | P. Mahoney permit denial (AOC# 4) | SS277189 | SS277190 | Other Reports |
| 182 | 6/1/2004 | NRCI | NRCI Report Part 1 | SS000001 | SS000278 | Other Reports |
| 183 | 6/1/2004 | NRCI | NRCI Report Part 2 | SS000279 | SS000447 | Other Reports |
| 184 | 9/6/2012 | DPNR | A. Chitole Permit Denial Letters | Not Bates Stamped | | Other Reports |
| 185 | 9/25/2012 | DPNR | R. Vivot Permit Denial Letters | Not Bates Stamped | | Other Reports |
| 186 | 8/7/1984 | Aware, Inc. | Supplemental Reports for HOVIC's RCRA Groundwater Monitoring Program | HOVIC-NRD0065858 | HOVIC-NRD0065995 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 187 | 7/1/1986 | A.T. Kearney, Inc.; Baker/TSA, Inc. | RCRA Facility Assessment Hess Oil Virgin Island Corporation | SS027673 | SS027696 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 188 | 6/1/1988 | A.T. Kearney, Inc.; K.W. Brown & Associates | Final RCRA Facility Assessment Report Hess Oil Virgin Island Corporation | HOVIC30(b)(6) 001007 | HOVIC30(b)(6) 001058 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 189 | 3/1/1989 | The Advent Group, Inc. | RCRA Facility Investigation for SWMU 14 | HOVIC-NRD0037054 | HOVIC-NRD0037186 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 190 | 7/1/1990 | The Advent Group, Inc. | Comprehensive SWMU Workplan, prepared for HOVIC | HOVIC-NRD0306550 | HOVIC-NRD0306832 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 191 | 5/28/1992 | EMS Environmental, Inc. | Bimonthly RCRA Facility Investigation re SWMU #3 and SWMU #4 | HOVIC-NRD0056641 | HOVIC-NRD0056646 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 192 | 8/18/1992 | EMS Environmental, Inc. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 8/1992 | HOVIC-NRD0056647 | HOVIC-NRD0056680 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 193 | 10/16/1992 | EMS Environmental, Inc. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 8/1992-9/1992 | HOVIC-NRD0105080 | HOVIC-NRD0109150 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 194 | 10/16/1992 | EMS Environmental, Inc. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 10/16/1992 | HOVIC-NRD0056681 | HOVIC-NRD0056789 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |

EXHIBIT 6

| No. | Date | Author | | Description | Begin Bates | End Bates | Category |
|---|---|---|---|---|---|---|---|
| 195 | 11/20/1992 | EMS Environmental, Inc. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 9/1992-10/1992 | HOVIC-NRD0109152 | HOVIC-NRD0109193 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 196 | 11/20/1992 | EMS Environmental, Inc. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 11/20/1992 | HOVIC-NRD0056290 | HOVIC-NRD0056811 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 197 | 4/26/1993 | The Advent Group, Inc. | | Comprehensive RFI Report | HOVIC-NRD0116607 | HOVIC-NRD0117179 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 198 | 9/30/1993 | HOVIC | | Revised RCRA Facility Investigations Report | HOVIC-NRD0114995 | HOVIC-NRD0115377 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 199 | 3/29/1994 | HOVIC | | HOVIC Subsurface Geology and External Stresses Report | HOVIC-NRD0170644 | HOVIC-NRD0170649 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 200 | 4/29/1994 | EMS Environmental, Inc. | | DRAFT - Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report | HOVIC-NRD0112478 | HOVIC-NRD0112501 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 201 | 5/3/1994 | EMS Environmental, Inc. | | Bimonthly Progress Report, RCRA Facility Investigations | HOVIC-NRD0299323 | HOVIC-NRD0299364 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 202 | 12/30/1994 | HOVIC | | Comprehensive Final RFI Report | HOVIC-NRD0285939 | HOVIC-NRD0286445 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 203 | 3/2/1995 | ES&T | | Water Flow and Dissolved Phase Hydrocarbon Modeling at the HOVIC Refinery, St. Croix | HOVIC-NRD0213515 | HOVIC-NRD0214192 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 204 | 8/1/1995 | ES&T | | HOVIC Water Flow and Free Phase Hydrocarbon Analysis in the Vicinity of Lagoon East and Landfarm II | HOVIC-NRD0138230 | HOVIC-NRD0138744 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 205 | 8/11/1995 | HOVIC | | RFI Workplan | HOVIC-NRD0319610 | HOVIC-NRD0319661 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 206 | 8/11/1995 | Drew Fillingame, HOVIC | | Letter to Andrew Bellina, EPA, re. Response to EPA's June 23, 1995 Review Letter 12/30/94 Comprehensive Final RCRA Facility Investigation (RFI) Report | HOVIC-NRD0121450 | HOVIC-NRD0121490 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |

3 of 21

EXHIBIT A

| No. | Date | Author | Description | Begin Bates | End Bates | Category |
|---|---|---|---|---|---|---|
| 207 | 9/27/1995 | Andrew Bellina, EPA | Letter to Drew Filingame, HOVIC, re: Landfarm 1 - Arsenic Outside Source Demonstration Report, SWMU #16, Bundle Wash Area - RFI Workplan for Groundwater Investigation | HOVIC-NRD0117902 | HOVIC-NRD0117904 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 208 | 11/16/1995 | Drew Filingame, HOVIC | Letter to Andrew Bellina, EPA, re: Response to EPA's September 27, 1995 Review Letter: Landfarm 1 - Arsenic Outside Source Demonstration Report, SWMU #16, Bundle Wash Area - RFI Workplan for Groundwater | HOVIC-NRD0117962 | HOVIC-NRD0117994 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 209 | 3/1/1996 | HOVIC | RCRA Facility Investigation (RFI) Workplan for Solid Waste Management Unit No. 22 (SWMU 22) | HOVIC-NRD0122845 | HOVIC-NRD0122877 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 210 | 3/22/1996 | | Bi-monthly Progress Report, RCRA Facility Investigations | HOVIC-NRD0120558 | HOVIC-NRD0120700 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 211 | 3/29/1996 | HOVIC | HOVIC - RCRA Facility Investigation (RFI) Work plan for Solid Waste Management Unit No. 22 (SWMU 22) - 3/29/96 | HOVIC-NRD0383716 | HOVIC-NRD0383754 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 212 | 4/15/1996 | Andrew Bellina, EPA | Letter to Drew Filingame, HOVIC, re: EPA comments on RFI Status Report for SWMUs 14, 16, 21, and 22 and RFI Work Plan for SWMU 22 | HOVIC-NRD0120701 | HOVIC-NRD0120707 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 213 | 6/4/1996 | Foster Wheeler Environmental Corp. | Bi-monthly Progress Report, RCRA Facility Investigations | HOVIC-NRD0120674 | HOVIC-NRD0121219 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 214 | 6/17/1996 | HOVIC | Letter enclosing Lysimeter Installation Workplan for Landfarms I and II | HOVIC-NRD0317603 | HOVIC-NRD0317808 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 215 | 8/3/1996 | HOVIC | Bi-monthly Progress Report, RCRA Facility Investigations | HOVIC-NRD0120729 | HOVIC-NRD0120873 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 216 | 10/3/1996 | Nicoletta Di Forte, EPA | Letter to Terrence C. Persaud, HOVIC, re: RFI Bimonthly reports for April-July 1996 and Proposed Trial Corrective Measures for SWMUs 1, 16, and 21 | HOVIC-NRD0330909 | HOVIC-NRD0350818 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 217 | 10/25/1996 | HOVIC | Addendum to the August 30, 1996 Interim Status Groundwater Quality Assessment Report, Surface Impoundments 1 & 2 (Lagoon West) | HOVIC-NRD0121427 | HOVIC-NRD0121449 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 218 | 11/1/1996 | ES&T | Preliminary Analysis of Recovery Trenches in the Land Farm II/Lagoon East Area, Final Report | HOVIC-NRD0172806 | HOVIC-NRD0122884 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |

EXHIBIT A

| No. | Date | Author | Description | Begin Bates | End Bates | Category |
|---|---|---|---|---|---|---|
| 219 | 11/25/1996 | ES&T | Final Report: Water Flow and Free Phase Hydrocarbon Analysis in the West Refinery Area | HOV-NRD0454766 | HOV-NRD0454923 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 220 | 12/9/1996 | Foster Wheeler Environmental Corp. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 10/1996-11/1996 | HOVIC0002162 | HOVIC0002302 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 221 | 1/1/1997 | HOVIC | Hess Oil Virgin Island Corporation (HOVIC) RCRA Facility Investigation Draft Final Report for SWMU 16 - Bundle Wash Area And SWMU 21 - Flare No. 3 Low Point Drain Area January 7, 1997 | HOVIC-NRD0051983 | HOVIC-NRD0052378 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 222 | 1/7/1997 | HOVIC | Hess Oil Virgin Island Corporation (HOVIC) RCRA Facility Investigation Draft Final Report for SWMU 16 - Bundle Wash Area and SWMU 21 - Flare No. 3 Low Point Drain Area | HOVIC-NRD0116403 | HOVIC-NRD0116896 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 223 | 2/14/1997 | Foster Wheeler Environmental Corp. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 12/1996-01/1997 | HOVIC30(b)(6)001059 | HOVIC30(b)(6)001361 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 224 | 2/28/1997 | Environmental Systems & Technologies, Inc. (ES&T) | Final Report: Water Flow and Free Phase Hydrocarbon Analysis in the East Refinery Area | HOVIC-NRD0052406 | HOVIC-NRD0052498 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 225 | 3/14/1997 | HOVIC | Hess Oil Virgin Island Corporation (HOVIC) SWMU 22 RCRA Facility Investigation Final Report | HOVIC-NRD0123401 | HOVIC-NR D0123667 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 226 | 4/14/1997 | Foster Wheeler Environmental Corp. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 2/1997-3/1997 | HOVIC30(b)(6)004003 | HOVIC30(b)(6)04198B | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 227 | 6/30/1997 | Foster Wheeler Environmental Corp. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 04/1997-05/1997 | HOVIC30(b)(6)001352 | HOVIC30(b)(6)001501 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 228 | 8/30/1997 | Foster Wheeler Environmental Corp. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 06/1997-07/1997 | HOVIC30(b)(6)001502 | HOVIC30(b)(6)001761 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |

9 of 11

EXHIBIT A

| No. | Date | Author | Description | Begin Bates | End Bates | Category |
|---|---|---|---|---|---|---|
| 229 | 10/15/1997 | HOVIC | Hess Oil Virgin Island Corporation (HOVIC) RCRA Facility Investigation Draft Final Report For SWMU 26 Fire Fighting Training Area And Associated Water Underflow Sump October 15, 1997 | HOVIC-NRD0102307 | HOVIC-NRD0102599 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 230 | 10/15/1997 | HOVIC | Hess Oil Virgin Island Corporation (HOVIC) RCRA Facility Investigation Draft Final Report For SWMU 26 Fire Fighting Training Area and Associated Water Underflow Sump October 15, 1997 | HOVIC-NRD0263609 | HOVIC-NRD0263946 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 231 | 10/31/1997 | Foster Wheeler Environmental Corp. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 08/1997-09/1997 | HOVIC30(b)(6)001762 | HOVIC30(b)(6)001957 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 232 | 12/31/1997 | Foster Wheeler Environmental Corp. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 10/1997-11/1997 | HOVIC30(b)(6)001958 | HOVIC30(b)(6)002137 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 233 | 2/28/1998 | Foster Wheeler Environmental Corp. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 12/1997-1/1998 | HOVIC30(b)(6)002138 | HOVIC30(b)(6)002378 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 234 | 4/14/1998 | HOVIC | Hess Oil Virgin Island Corporation (HOVIC) RCRA Facility Investigation Draft Final Report For SWMU 24 Lagoon No. 1 Area Northern Drainage Ditch April 14, 1998 | HOVIC-NRD0103292 | HOVIC-NRD0103468 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 235 | 4/14/1998 | HOVIC | Hess Oil Virgin Island Corp (HOVIC) RCRA Facility Investigation Draft Final Report For SWMU 25 Construction Debris Burial Area April 14, 1998 C-0521.027.98 | HOVIC-NRD0263332 | HOVIC-NRD0263668 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 236 | 4/18/1998 | HOVIC | Hess Oil Virgin Island Corporation (HOVIC) RCRA Facility Investigation Draft Final Report For SWMU 24 Lagoon No. 1 Area North Drainage Ditch | HOVIC-NRD0103291 | HOVIC-NRD0103468 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 237 | 4/24/1998 | HOVIC | Hess Oil Virgin Island Corp (HOVIC) RCRA Facility Investigation Draft Final Report For SWMU 24 Lagoon No. 1 Area Northern Drainage Ditch April 24, 1998 | HOVIC-NRD0263947 | HOVIC-NRD0264125 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 238 | 4/30/1998 | Foster Wheeler Environmental Corp. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 02/1998-03/1998 | HOVIC30(b)(6)002379 | HOVIC30(b)(6)002564 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |

EXHIBIT A

| No. | Date | Author | | Description | Begin Bates | End Bates | Category |
|---|---|---|---|---|---|---|---|
| 239 | 6/25/1998 | Foster Wheeler Environmental Corp. | | Draft Final RFI Report for SWMU 27 (Dredge Spoil Area) | HOVIC30(b)(6)004449 | HOVIC30(b)(6)004645 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 240 | 6/30/1998 | Foster Wheeler Environmental Corp. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 4/1998-5/1998 | HOVIC30(b)(6)002565 | HOVIC30(b)(6)002804 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 241 | 8/31/1998 | Foster Wheeler Environmental Corp. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 6/1998-7/1998 | HOVIC30(b)(6)002805 | HOVIC30(b)(6)002950 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 242 | 10/5/1998 | HOVIC | | Final RCRA Facility Assessment Report and Draft CMS and CMI Workplan | HOVIC0000107 | HOVIC0000245 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 243 | 10/5/1998 | Foster Wheeler Environmental Corp. | | HOVIC Final RCRA Facility Investigation Report and Draft Corrective Measures Study (CMS) and Corrective Measures Implementation (CMI) Workplan for SWMU 27 (Dredge Spoils Area) | HOVIC30(b)(6)003263 | HOVIC30(b)(6)003401 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 244 | 10/30/1998 | Foster Wheeler Environmental Corp. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 8/1998-9/1958 | HOVIC30(b)(6)002951 | HOVIC30(b)(6)003104 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 245 | 11/18/1998 | EPA | | Letter to Terrence C. Persaud, HOVENSA, re: Draft Final RFI Reports for SWMUs 24, 25, and 26 | HOVIC-NRD0325632 | HOVIC-NRD0325637 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 246 | 12/15/1998 | ES&T | | Letter enclosing Revised Site-Wide Conceptual Model Design Report; HOVENSA Site-Wide Groundwater/Phase Separated Hydrocarbon (PSH) Dissolved Phase Hydrocarbon (DPH) Model | HOV-NRD0178885 | HOV-NRD0178935 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 247 | 12/31/1998 | Foster Wheeler Environmental Corp. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 10/1998-11-1998 | HOVIC30(b)(6)003105 | HOVIC30(b)(6)003262 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 248 | 2/26/1999 | Foster Wheeler Environmental Corp. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 12/1998-01/1999 | HOVENSA30(B)(6) 000874 | HOVENSA30(B)(6)001005 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 249 | 3/22/1999 | HOVENSA | | Letter enclosing Revised CMI Workplan for SWMU 29 | HOV-NRD0147346 | HOV-NRD0147384 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 250 | 4/30/1999 | Foster Wheeler Environmental Corp. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 02/1999-03/1999 | HOVENSA30(B)(6) 001839 | HOVENSA30(B)(6)001965 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |

EXHIBIT A

| No. | Date | Author | Description | Begin Bates | End Bates | Category |
|---|---|---|---|---|---|---|
| 251 | 8/1/1999 | Foster Wheeler Environmental Corp. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 6/1999-7/1999 | HOV-NRD0130157 | HOV-NRD0130184 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 252 | 10/29/1999 | Foster Wheeler Environmental Corp. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 8/1999-9/1999 | HOV-NRD0463842 | HOV-NRD0463968 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 253 | 12/23/1999 | Foster Wheeler Environmental Corp. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 10/1999-11/1999 | HOV-NRD0463561 | HOV-NRD0463683 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 254 | 2/29/2000 | IT Environmental Corp. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 12/1999-01/2000 | HOVENSA30(8)(6) 001966 | HOVENSA30(9)(6)002081 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 255 | 3/21/2000 | ES&T | HOVENSA Site-Wide Model: PSH Model Development, Final Report | HOV-NRD0142066 | HOV-NRD0143109 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 256 | 4/11/2000 | HOVENSA | Final Corrective Measures Study (CMS) Report, SWMU 4 - Construction Landfill No. 3 | HOV-NRD0171344 | HOV-NRD0171612 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 257 | 4/28/2000 | IT Environmental Corp. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 2/2000-3/2000 | HOVENSA30(8)(6) 001006 | HOVENSA30(8)(6)001117 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 258 | 6/30/2000 | IT Environmental Corp. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 4/2000-5/2000 | HOVENSA30(b)(6)001139 | HOVENSA30(b)(6)00)207 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 259 | 8/11/2000 | HOVENSA | Draft Final Corrective Measures Implementation (CMI) Report, SWMU 14 RCRA Facility Investigation | HOV-NRD0169718 | HOV-NRD0169750 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 260 | 8/31/2000 | IT Environmental Corp. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 6/2000-7/2000 | HOV-NRD0452283 | HOV-NRD0452402 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 261 | 9/8/2000 | HOVENSA | Corrective Measures Study (CMS) Workplan, SWMU 2 RCRA Facility Investigation | HOV-NRD0163791 | HOV-NRD0163829 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 262 | 9/18/2000 | HOVENSA | Final Corrective Measures Study (CMS) Report, SWMU 4 - Construction Landfill No. 3. | HOV-NRD0170832 | HOV-NRD0170883 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |

EXHIBIT A

| No. | Date | Author | | Description | Begin Bates | End Bates | Category |
|---|---|---|---|---|---|---|---|
| 263 | 9/16/2000 | HOVENSA | | Final Corrective Measures Study (CMS) Report, SWMU 4 - Construction Landfill No. 3. | HOV-NRD0171613 | HOV-NRD0171665 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 264 | 10/31/2000 | IT Environmental Corp. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 8/2000-9/2000 | HOV-NRD0452403 | HOV-NRD0452530 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 265 | 12/29/2000 | IT Environmental Corp. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 10/2000-11/2000 | HOVENSA30(B)(6) 001268 | HOVENSA30(B)(6)001403 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 266 | 2/28/2001 | IT Environmental Corp. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 12/2000-1/2001 | HOV-NRD0452153 | HOV-NRD0452282 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 267 | 4/30/2001 | EMS Environmental, Inc. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 2/2001-3/2001 | HOV-NRD0451875 | HOV-NRD0452011 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 268 | 6/29/2001 | EMS Environmental, Inc. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 4/2001-5/2001 | SS112716 | SS112852 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 269 | 8/1/2001 | HOVENSA | | SWMU 25 and 26 Revised Corrective Measures Study Workplan | HOV-NRD0177912 | HOV-NRD0177857 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 270 | 8/17/2001 | HOVENSA | | Revised CMS Workplan for SWMUs 25 and 26 (CMMU 2) | HOV-NRD0209656 | HOV-NRD0209671 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 271 | 8/30/2001 | EMS Environmental, Inc. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 06/2001-07/2001 | HOV-NRD0212682 - | HOV-NRD0212752 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 272 | 9/30/2001 | ES&T | | HOVENSA Final Report: Site-Wide Model; Dissolved Phase Transport Model Development | HOV-NRD0143805 | HOV-NRD0143862 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 273 | 10/31/2001 | EMS Environmental, Inc. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 8/2001-9/2001 | HOVIC-NRD0421750 | HOVIC-NRD0421886 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 274 | 12/31/2001 | EMS Environmental, Inc. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 10/2001-11/2001 | HOV-NRD0212794 - | HOV-NRD0212885 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |

13 of 11

EXHIBIT A

| No. | Date | Author | | Description | Begin Bates | End Bates | Category |
|---|---|---|---|---|---|---|---|
| 275 | 2/28/2002 | EMS Environmental, Inc. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 6-12/2001-01/2002 | HOV-NRD0369812 HOV-NRD0369809 | HOV-NRD0369809 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 276 | 2/28/2002 | EMS Environmental, Inc. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 12/2001-01/2002 | HOV-NRD0212592 | HOV-NRD0212679 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 277 | 4/30/2002 | EMS Environmental, Inc. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 02/2002-03/2002 | HOV-NRD0369573 | HOV-NRD0369659 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 278 | 6/30/2002 | IT Environmental Corp. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 4/2000-05/2000 | HOVENSA30(8)(6) 001136 | HOVENSA30(8)(6)001267 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 279 | 8/31/2002 | EMS Environmental, Inc. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 6/2002-07/2002 | HOV-NRD0231617 | HOV-NRD0231720 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 280 | 10/31/2002 | EMS Environmental, Inc. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 8/2002-9/2002 | HOV-NRD0451273 | HOV-NRD0451426 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 281 | 12/31/2002 | EMS Environmental, Inc. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 10/2002-11/2002 | SS074742 | SS074881 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 282 | 6/30/2003 | St. Croix Alumina Recovery Group | | Quarterly Phase Separated Petroleum Hydrocarbon (PSPH) & dissolved Phase Petroleum Hydrocarbon Constituent (DPPHC) Progress Report 3/14-6/14/2003 | HOV-NRD0301998 | HOV-NRD0302003 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 283 | 10/31/2003 | EMS Environmental, Inc. | | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 8/2003-9/2003 | SS074882 | SS075018 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 284 | 11/21/2003 | HOVENSA | | Corrective Measures Study Final Report for Solid Waste Management Unit #2 | HOV-NRD0369966 | HOV-NRD0369994 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 285 | 11/26/2003 | HOVENSA | | Corrective Measures Study Final Report for Solid Waste Management Unit #2 | HOV-NRD00171806 | HOV-NRD0171343 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 286 | 1/30/2004 | HOVENSA | | Revised Corrective Measures Study Final Report for Solid Waste Management Unit #2 | HOV-NRD0369995 | HOV-NRD0370018 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |

14 of 71

EXHIBIT A

| No. | Date | Author | Description | Begin Bates | End Bates | Category |
|---|---|---|---|---|---|---|
| 287 | 2/29/2004 | EMS Environmental, Inc. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 12/2003-01/2004 | HOV-NRD0233865 | HOV-NRD0233954 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 288 | 3/7/2004 | HOVENSA | Revised Corrective Measures Study Final Report for Solid Waste Management Unit #2 | HOV-NRD0163830 | HOV-NRD0164051 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 289 | 3/7/2004 | HOVENSA | Revised Corrective Measures Study Final Report for Solid Waste Management Unit #2 | HOV-NRD0191385 | HOV-NRD0191204 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 290 | 3/17/2004 | HOVENSA | Interim Corrective Measures (ICM) Status Report for SWMU 27 | HOV-NRD0401321 | HOV-NRD0401380 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 291 | 4/30/2004 | EMS Environmental, Inc. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 02/2004-03/2004 | HOV-NRD0233964 | HOV-NRD0234047 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 292 | 6/30/2004 | EMS Environmental, Inc. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 4/2004-5/2004 | HOV-NRD0233727 | HOV-NRD0233829 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 293 | 7/16/2004 | ES&T | Phase 1 Screening Level Ecological Risk Assessment for SWMU 27 | HOV-NRD0177686 | HOV-NRD0177811 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 294 | 8/30/2004 | EMS Environmental, Inc. | Bimonthly Progress Report, RCRA Facility Investigations and Corrective Measures Study Status Report, 06/2004-07/2004 | HOV-NRD0232047 - | HOV-NRD0232128 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 295 | 7/21/2005 | Entrix, Inc. | Phase 2 Screening Level Ecological Risk Assessment for SWMU 27 | HOV-NRD0177858 | HOV-NRD0178076 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 296 | 9/29/2005 | Timothy Gordon, EPA | Letter to Kathleen Antoine, HOVENSA, re: Final CMS Report for SWMU 23 | ES&T-NRD_0014616 | ES&T-NRD_0014622 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 297 | 12/16/2005 | HOVENSA | CMS Final Report for SWMU 2 | HOV-NRD0164670 | HOV-NRD0165023 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 298 | 2/22/2006 | HOVENSA | CMI Final Report for SWMU #4 | HOV-NRD0170977 | HOV-NRD0171256 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |

EXHIBIT A

| No. | Date | Author | Description | Begin Bates | End Bates | Category |
|-----|------|--------|-------------|-------------|-----------|----------|
| 299 | 7/1/2006 | HOVENSA | Clean Closure Report for Surface Impoundments 1 and 2 | HOV-NRD0206905 | HOV-NRD0207603 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 300 | 7/31/2006 | HOVENSA | Letter enclosing Clean Closure Report for Surface Impoundment 3 | HOV-NRD0207604 | HOV-NRD0208789 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 301 | 6/23/2008 | ES&T | Status of RCRA Groundwater Sampling for Surface Water Impoundments 1, 2, and 3. | HOV-NRD0011704 | HOV-NRD0011739 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 302 | 4/1/2009 | HOVENSA | HOVENSA RCRA Corrective Actions and SWMU Summary | HOV-NRD0283534 | HOV-NRD0283555 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 303 | 1/22/2010 | Groundwater and Environmental Services, Inc. (GES) | Letter enclosing HOVENSA Container Storage Area (CSA) Closure Certification Report, 11/2009 | HOV-NRD0360613 | HOV-NRD0361010 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 304 | 1/22/2010 | HOVENSA | HOVENSA RCRA Corrective Actions and SWMU Summary | HOV-NRD0290954 | HOV-NRD0290988 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 305 | 5/25/2010 | HOVENSA | Petition for "Corrective Action Complete with Controls" for SWMUs 9, 10, and 11 (Surface Impoundments 1,2, and 3, Respectively) | HOV-NRD0012345 | HOV-NRD0012364 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 306 | 8/12/2010 | ES&T | Petition for Corrective Action Complete with Controls for SWMUs 9,10, and 11 (Surface Impoundments 1, 2, and 3, Respectively) | HOV-NRD0012246 | HOV-NRD0012265 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 307 | 7/31/2012 | Groundwater and Environmental Services, Inc. (GES) | HOVENSA RCRA Corrective Actions and SWMU Summary | HOV-NRD0506194 | HOV-NRD0506226 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 308 | 9/14/2012 | Groundwater and Environmental Services, Inc. (GES) | Letter enclosing Revised CMI Workplan for SWMU 22 (Surface Impoundments 3/Landfarm 2 Oily Water Sewer Line) | HOV-NRD0501546 | HOV-NRD0501597 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 309 | Unknown | ES&T | Water Flow and Dissolved Phase Hydrocarbon Modeling at HOVIC Refinery, St. Croix | HOVIC-NRD0110814 | HOVIC-NRD0110858 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 310 | | The Advent Group, Inc. | RCRA Facility Investigation for the Settling Basin (SWMU 14), Task III | HOVIC-NRD0037892 | HOVIC-NRD0038175 | RCRA Facility Investigation, Assessment, Workplan, Corrective Measures and Reports |
| 311 | | | | | | |

EXHIBIT A

| No. | Date | Author | Description | Begin Bates | End Bates | Category |
|---|---|---|---|---|---|---|
| 312 | | | | | | |
| 313 | | | | | | |
| 314 | | | | | | |
| 315 | | | | | | |
| 316 | 6/21/2002 | Geo Monitoring Services | 1st Ground Water Monitoring Event - St. Croix Alumina Site - tables and lab data only dated 6/21/2002 | HOV-NRD0302863 | HOV-NRD0302988 | SCA Reports |
| 317 | 1/2/2003 | Geo Monitoring Services | 2nd Ground Water Monitoring Event - St. Croix Alumina Site, dated 1/2/2003 | HOV-NRD0309059 | HOV-NRD0309166 | SCA Reports |
| 318 | 4/22/2003 | Geo Monitoring Services | DPPHC & PSPH Delineation Findings Report for the SCA Site, prepared for the Project Operating Committee for the Administrative Order on Consent | SS108713; REDMUD-NRCI-862 | SS108805; REDMUD-NRCI954 | SCA Reports |
| 319 | 12/20/2003 | Geo Monitoring Services | 4th Ground Water Monitoring Event - St. Croix Alumina Site, dated 12/20/2003 | HOV-NRD0309169 | HOV-NRD0309276 | SCA Reports |
| 320 | 2/13/2004 | Geo Monitoring Services | Quarterly Phase Separated Petroleum Hydrocarbon (PSPH) & Dissolved Phase Petroleum Hydrocarbon Constituent (DPPHC) Progress Report, for 11/11/2003-2/8/2004, at the SCA Site | SS316680 | SS316698 | SCA Reports |
| 321 | 5/8/2004 | Geo Monitoring Services | Quarterly Phase Separated Petroleum Hydrocarbon (PSPH) & Dissolved Phase Petroleum Hydrocarbon Constituent (DPPHC) Progress Report, for 2/8/2004-5/8/2004, at the SCA Site | SS316638 | SS316658 | SCA Reports |
| 322 | 7/15/2004 | Geo Monitoring Services | 5th Ground Water Monitoring Event - St. Croix Alumina Site, dated 7/15/2004 | HOV-NRD0302078 | HOV-NRD0302150 | SCA Reports |
| 323 | 12/06/2004 | Geo Monitoring Services | 6th Ground Water Monitoring Event - St. Croix Alumina Site, dated 12/06/2004 | HOV-NRD0309460 | HOV-NRD0309529 | SCA Reports |
| 324 | 2/3/2005 | Geo Monitoring Services | Quarterly Phase Separated Petroleum Hydrocarbon (PSPH) & Dissolved Phase Petroleum Hydrocarbon Constituent (DPPHC) Progress Report, for 11/5/2004-2/2/2005, at the SCA Site | SS160870; SCANRD00013098 | SS160889; SCANRD0013117 | SCA Reports |
| 325 | 7/30/2005 | Geo Monitoring Services | 7th Ground Water Monitoring Event - St. Croix Alumina Site, dated 7/30/2005 | HOVNRD0308574 | HOV-NRD0308645 | SCA Reports |
| 326 | 1/00/2006 | Geo Monitoring Services | 8th Ground Water Monitoring Event - St. Croix Alumina Site, dated 1/00/2006 | HOV-NRD0309722 | HOV-NRD0308808 | SCA Reports |
| 327 | 7/00/2006 | Geo Monitoring Services | 9th Ground Water Monitoring Event - St. Croix Alumina Site, dated 7/30/2006 | HOV-NRD0302798 | HOV-NRD0302802 | SCA Reports |
| 328 | 1/00/2007 | Geo Monitoring Services | 10th Ground Water Monitoring Event - St. Croix Alumina Site, dated 1/00/2007 | HOV-NRD0302609 | HOV-NRD0302699 | SCA Reports |
| 329 | 1/30/2008 | Geo Monitoring Services | 12th Ground Water Monitoring Event - St. Croix Alumina Site, dated 1/30/2008 | SS164187 | SS164281 | SCA Reports |
| 330 | 7/00/2008 | Geo Monitoring Services | 13th Ground Water Monitoring Event - St. Croix Alumina Site, dated 7/30/2008 | HOV-NRD0302715 | HOV-NRD0302796 | SCA Reports |
| 331 | 1/00/2006 | Geo Monitoring Services | 14th Ground Water Monitoring Event - St. Croix Alumina Site, dated 1/30/2006 | HOVANRD0302318 | HOV-NRD0302479 | SCA Reports |
| 332 | | | | | | |

EXHIBIT 6

| No. | Date | Author | | Description | Begin Bates | End Bates | Category |
|---|---|---|---|---|---|---|---|
| 341 | 10/5/2005 | New Jersey Accutest Laboratories | | Technical Report for Ground Water Sampling Event – Schuster's Well (Job #: J10361) | HOV-NRD0499794 | HOV-NRD0500579 | Schuster |
| 338 | | | | | | | |
| 339 | | | | | | | |
| 340 | 1/1/2005 | | | Groundwater Sampling Event 2005, Schuster's Well - S1 | HOV-NRD0329341 | HOV-NRD0329355 | Schuster |
| 344 | | | | | | | |
| 345 | 5/1/1992 | Roy F. Weston, Inc. | St. Croix Petrochemic al Corp. | Work Plan, Phase II Environmental Assessment SCPC Site, St. Croix, Virgin Islands | HOVIC-NRD0334148 | HOVIC-NRD0334192 | SCPC |
| 346 | | | | | | | |
| 347 | 11/1/1992 | Roy F. Weston, Inc. | | Phase II Environmental Assessment Report, St. Croix Petrochemical Corporation, St. Croix, USVI | HOVIC-NRD0334025 | HOVIC-NRD0334147 | SCPC |
| 348 | 4/1/1993 | Roy F. Weston, Inc. | | Remedial Action Plan for St. Croix Petrochemical Corporation, St. Croix USVI | HOVIC-NRD0087485 | HOVIC-NRD0087524 | SCPC |
| 349 | 5/20/1994 | Edwards, L. | Grimes, T. | SCPC Recovery Effort, April 1994 | HOVIC-NRD0322957 | HOVIC-NRD0321953 | SCPC |
| 350 | 5/7/1996 | Robert Ehrlich, HOVIC. | AL LeTranc, Hercules Inc., | HOVIC Hydrocarbon Recovery Project, SCPC Review | HOVICONRD0321980 | HOVIC-NRD0322007 | SCPC. |
| 351 | 5/1/1998 | ES&T | | Water flow and Free phase Hydrocarbon Analysis in the Former SCPC/HOVIC West Fence/St. Croix Alumina LLc Area | HOVIC-NRD0139864 | HOVIC-NRD0139895 | SCPC |
| 352 | 7/23/1991 | Engineering Science | | HOVIC Hydrocarbon Recovery Project Status Report | HOVIC-NRD0305 11 | HOVIC-NRD0303550 | Semi-Annual Hydrocarbon Recovery Reports |
| 353 | 1/7/1992 | Engineering Science | | HOVIC Hydrocarbon Recovery Project Status Report | HOVIC-NRD0111721 | HOVIC-NRD0111766 | Semi-Annual Hydrocarbon Recovery Reports |
| 354 | 2/1/1992 | HOVIC | | HOVIC Hydrocarbon Recovery Project Status Report | HOVIC-NRD0039999 | HOVIC-NRD0040009 | Semi-Annual Hydrocarbon Recovery Reports |
| 355 | 4/10/1993 | HOVIC | | HOVIC Hydrocarbon Recovery Project Status Report | HOVIC-NRD0004053 | HOVIC-NRD0004093 | Semi-Annual Hydrocarbon Recovery Reports |
| 356 | 10/29/1993 | HOVIC | | HOVIC Hydrocarbon Recovery Project Status Report | HOVIC-NRD0004094 | HOVIC-NRD0004146 | Semi-Annual Hydrocarbon Recovery Reports |
| 357 | 1/31/1994 | HOVIC | | HOVIC Hydrocarbon Recovery Project Status Report | HOVIC-NRD0138923 | HOVIC-NRD0138967 | Semi-Annual Hydrocarbon Recovery Reports |
| 358 | 8/10/1994 | HOVIC | | HOVIC Hydrocarbon Recovery Project Status Report | HOVIC-NRD0001741 | HOVIC-NRD0001818 | Semi-Annual Hydrocarbon Recovery Reports |
| 359 | 12/1/1994 | HOVIC | | HOVIC Hydrocarbon Recovery Project Status Report | HOVIC0001872 | HOVIC0001905 | Semi-Annual Hydrocarbon Recovery Reports |

EXHIBIT A

| No. | Date | Author | | Description | Begin Bates | End Bates | Category |
|---|---|---|---|---|---|---|---|
| 360 | 7/25/1995 | HOVIC | | HOVIC Hydrocarbon Recovery Project Status Report | HOVIC0001819 | HOVIC0001871 | Semi-Annual Hydrocarbon Recovery Reports |
| 361 | 2/15/1996 | HOVIC | | HOVIC Hydrocarbon Recovery Project Status Report | HOVIC0001545 | HOVIC0001640 | Semi-Annual Hydrocarbon Recovery Reports |
| 362 | 2/28/1997 | HOVIC | | HOVIC Hydrocarbon Recovery Project Status Report | HOVIC0000862 | HOVIC0000961 | Semi-Annual Hydrocarbon Recovery Reports |
| 363 | 2/28/1997 | HOVIC | | HOVIC Hydrocarbon Recovery Project Status Report | HOVIC0001641 | HOVIC0001740 | Semi-Annual Hydrocarbon Recovery Reports |
| 364 | 9/1/1997 | HOVIC | | HOVIC Hydrocarbon Recovery Project Status Report | HOVIC30(b)(6) 003655 | HOVIC30(b)(6) 003902 | Semi-Annual Hydrocarbon Recovery Reports |
| 365 | 2/13/1998 | HOVIC | | HOVIC Hydrocarbon Recovery Project Status Report | HOVIC0000962 | HOVIC0001114 | Semi-Annual Hydrocarbon Recovery Reports |
| 366 | 8/14/1998 | HOVIC | | HOVIC Hydrocarbon Recovery Project Status Report | HOVIC0001193 | HOVIC0001514 | Semi-Annual Hydrocarbon Recovery Reports |
| 367 | 2/10/1999 | HOVENSA | | HOVENSA Hydrocarbon Recovery Project Status Report | HOVENSA0002925 | HOVENSA0003324 | Semi-Annual Hydrocarbon Recovery Reports |
| 368 | 2/10/1999 | HOVENSA | | HOVENSA Hydrocarbon Recovery Project Status Report | HOV-NRD0401553 | HOV-NRD0401756 | Semi-Annual Hydrocarbon Recovery Reports |
| 369 | 8/13/1999 | HOVENSA | | HOVENSA Hydrocarbon Recovery Project Status Report | HOV-NRD0448434 | HOV-NRD0448657 | Semi-Annual Hydrocarbon Recovery Reports |
| 370 | 2/15/2000 | HOVENSA | | HOVENSA Hydrocarbon Recovery Project Status Report | HOV-NRD0448239 | HOV-NRD0448433 | Semi-Annual Hydrocarbon Recovery Reports |
| 371 | 8/15/2000 | HOVENSA | | HOVENSA Hydrocarbon Recovery Project Status Report | HOVENSA0002474 | HOVENSA0002599 | Semi-Annual Hydrocarbon Recovery Reports |
| 372 | 2/15/2001 | HOVENSA | | HOVENSA Hydrocarbon Recovery Project Status Report | HOVENSA0002611 | HOVENSA0002762 | Semi-Annual Hydrocarbon Recovery Reports |
| 373 | 8/1/2001 | HOVENSA | | HOVENSA Hydrocarbon Recovery Project Status Report | HOV-NRD0179096 | HOV-NRD0179232 | Semi-Annual Hydrocarbon Recovery Reports |
| 374 | 8/16/2010 | HOVENSA | | HOVENSA Corrective Action Status Report (DRAFT) | HOVIC-NRD0111226 | HOVIC-NRD0111371 | Semi-Annual Hydrocarbon Recovery Reports |
| 375 | 2/15/2002 | HOVENSA | | HOVENSA Hydrocarbon Recovery Project Status Report | HOVENSA0002763 | HOVENSA0002924 | Semi-Annual Hydrocarbon Recovery Reports |
| 376 | 8/30/2002 | HOVENSA | | HOVENSA Hydrocarbon Recovery Project Status Report | SS053894 | SS054105 | Semi-Annual Hydrocarbon Recovery Reports |
| 377 | 2/14/2003 | HOVENSA | | HOVENSA Hydrocarbon Recovery Project Status Report | SS002199 | SS002366 | Semi-Annual Hydrocarbon Recovery Reports |

EXHIBIT A

| No. | Date | Author | | Description | Begin Bates | End Bates | Category |
|---|---|---|---|---|---|---|---|
| 378 | 8/1/2003 | HOVENSA | | HOVENSA Hydrocarbon Recovery Project Status Report | SS006370 | SS006533 | Semi-Annual Hydrocarbon Recovery Reports |
| 379 | 2/1/2004 | HOVENSA | | HOVENSA Hydrocarbon Recovery Project Status Report | SS008516 | SS008676 | Semi-Annual Hydrocarbon Recovery Reports |
| 380 | 8/13/2004 | HOVENSA | | HOVENSA Hydrocarbon Recovery Project Status Report | HOV-NRD0130476 | HOV-NRD0130211 | Semi-Annual Hydrocarbon Recovery Reports |
| 381 | 2/15/2005 | HOVENSA | | HOVENSA Corrective Action Status Report | HOV-NRD0362086 | HOV-NRD0362368 | Semi-Annual Hydrocarbon Recovery Reports |
| 382 | 8/12/2005 | HOVENSA | | HOVENSA Corrective Action Status Report | SS074066 | SS074391 | Semi-Annual Hydrocarbon Recovery Reports |
| 383 | 2/16/2006 | HOVENSA | | HOVENSA Corrective Action Status Report | SS060079 | SS060375 | Semi-Annual Hydrocarbon Recovery Reports |
| 384 | 8/15/2006 | HOVENSA | | HOVENSA Corrective Action Status Report | HOV-NRD0227219 | HOV-NRD0227555 | Semi-Annual Hydrocarbon Recovery Reports |
| 385 | 8/15/2006 | HOVENSA | | HOVENSA Corrective Action Status Report | HOV-NRD0227556 | HOV-NRD0227607 | Semi-Annual Hydrocarbon Recovery Reports |
| 386 | 2/15/2007 | HOVENSA | | HOVENSA Corrective Action Status Report | SS076985 | SS077244 | Semi-Annual Hydrocarbon Recovery Reports |
| 387 | 8/15/2007 | HOVENSA | | HOVENSA Corrective Action Status Report | HOV-NRD0144835 | HOV-NRD0145152 | Semi-Annual Hydrocarbon Recovery Reports |
| 388 | 2/15/2008 | HOVENSA | | HOVENSA Corrective Action Status Report | HOV-NRD0145549 | HOV-NRD0146007 | Semi-Annual Hydrocarbon Recovery Reports |
| 389 | 8/15/2008 | HOVENSA | | HOVENSA Corrective Action Status Report | HOV-NRD0143180 | HOV-NRD0143503 | Semi-Annual Hydrocarbon Recovery Reports |
| 390 | 2/15/2009 | HOVENSA | | HOVENSA Corrective Action Status Report | HOV-NRD0198574 | HOV-NRD0198963 | Semi-Annual Hydrocarbon Recovery Reports |
| 391 | 8/15/2009 | HOVENSA | | HOVENSA Corrective Action Status Report | HOV-NRD0146008 | HOV-NRD0146457 | Semi-Annual Hydrocarbon Recovery Reports |
| 392 | 2/15/2010 | HOVENSA | | HOVENSA Corrective Action Status Report | HOV-NRD0142148 | HOV-NRD0142902 | Semi-Annual Hydrocarbon Recovery Reports |
| 393 | 2/15/2011 | HOVENSA | | HOVENSA Corrective Action Status Report | ES&T-NRD_0011292 | ES&T-NRD_0011352 | Semi-Annual Hydrocarbon Recovery Reports |
| 394 | 8/15/2011 | HOVENSA | | HOVENSA Corrective Action Status Report | HOV-NRD0508121 | HOV-NRD0508503 | Semi-Annual Hydrocarbon Recovery Reports |
| 395 | 2/15/2012 | HOVENSA | | HOVENSA Corrective Action Status Report | HOV-NRD0501120 | HOV-NRD0501479 | Semi-Annual Hydrocarbon Recovery Reports |

EXHIBIT A

| No. | Date | Author | Description | Begin Bates | End Bates | Category |
|-----|------|--------|-------------|-------------|-----------|----------|
| 396 | 8/31/2012 | HOVENSA | HOVENSA Corrective Action Status Report | HOV-NRD0502671 | HOV-NRD0503024 | Semi-Annual Hydrocarbon Recovery Reports |
| 397 | 2/15/2013 | HOVENSA | HOVENSA Corrective Action Status Report | HOV-NRD0505235 | HOV-NRD0505682 | Semi-Annual Hydrocarbon Recovery Reports |
| 398 | 8/15/2013 | HOVENSA | HOVENSA Corrective Action Status Report | HOV-NRD0508843 | HOV-NRD0509191 | Semi-Annual Hydrocarbon Recovery Reports |
| 399 | 2/15/2014 | HOVENSA | HOVENSA Corrective Action Status Report | HOV-NRD0510528 | HOV-NRD0510897 | Semi-Annual Hydrocarbon Recovery Reports |
| 415 | 8/2/1971 | Soil Testing Services Caribbean, Inc. | Subsurface Investigation Phase IV Distillate Desulfurizer No. 5 Unit, Hess Plant | HOVIC-NRD0228465 | HOVIC-NRD0228520 | Soil and Foundation Investigation Reports |
| 429 | 8/24/1972 | Dames & Moore | Progress Report, Phase IV Soil Investigation | HOVIC-NRD0229148 | HOVIC-NRD0229154 | Soil and Foundation Investigation Reports |
| 430 | | | | | | |
| 431 | 1/29/1973 | Dames & Moore | Report on Soil and Foundation Investigation, Phase IV Facilities, St. Croix, U.S.V.I. for HOVIC | HOVIC-NRD0227959 | HOVIC-NRD0228018 | Soil and Foundation Investigation Reports |
| 501 | 9/16/1982 | Roy F. Weston, Inc. | Letter enclosing report titled Hydrogeologic Investigation of the Subsurface Occurrence of Hydrocarbons | HOVIC-NRD0170659 | HOVIC-NRD0170737 | Soil and Foundation Investigation Reports |
| 547 | | | | | | |
| 548 | 1/24/2005 | URS | Letter Report, Geotechnical Consultation, Proposed Reactors and Scrubber Tower | HOVIC-NRD0239802 | HOVIC-NRD0239818 | Soil and Foundation Investigation Reports |
| 551 | 9/14/2005 | Torikon Corporation | Sample Summary | HOVIC-NRD0230153 | HOVIC-NRD0230189 | Soil and Foundation Investigation Reports |

11 of 11

Appendix D

**TERMINATION NOTICE**

This TERMINATION NOTICE, dated as of December 1, 2015 (this "**Notice**"), is hereby given by the Government of the U.S. Virgin Islands (the "**USVI Government**") to Hess Oil Virgin Islands Corp., a corporation organized under the Laws of the U.S. Virgin Islands ("**HOVIC**"), PDVSA V.I., Inc., a corporation organized under the Laws of the U.S. Virgin Islands ("**PDVSA VI**"), and HOVENSA, L.L.C., a limited liability company organized under the Laws of the U.S. Virgin Islands ("**HOVENSA**").

**WHEREAS**, the USVI Government and HOVIC have entered into that certain Concession Agreement, dated and approved by the Legislature of the Virgin Islands September 1, 1965, as amended and extended by the Extension and Amendment Agreement, dated April 24, 1981 and approved by the Legislature of the Virgin Islands May 7, 1981, as further amended and extended by the Restated Second Extension and Amendment Agreement, dated July 27, 1990 and approved by the Legislature of the Virgin Islands on August 22, 1990, as further amended by the Technical Clarifying Amendment to Restated Second Extension and Amendment Agreement, dated November 17, 1993 and approved by the Governor and the Legislature of the Virgin Islands, as further amended and extended by the Third Extension and Amendment Agreement, to which PDVSA VI and later HOVENSA were added as parties, dated April 15, 1998 and approved by the Legislature of the Virgin Islands on May 18, 1998, and as further amended by the Fourth Amendment Agreement, dated April 3, 2013, as ratified by the Legislature of the Virgin Islands on November 4, 2013 and approved by the Governor of the Virgin Islands on November 4, 2013, as Act No. 7566 (such ratification including that certain letter, dated October 16, 2013, from George H.T. Dudley to the Governor of the Virgin Islands incorporated as part of Act No. 7566) (all of the foregoing, collectively, the "**Concession Agreement**");

**WHEREAS**, under the Concession Agreement, HOVENSA, HOVIC, and PDVSA VI, (and their predecessors in interest), as inducement to construct, operate, and maintain the refinery and related facilities, and in order to promote the public interest in the economic growth and development of the U.S. Virgin Islands, were granted rights to conduct the business of oil refining and related activities at Limetree Bay, St. Croix, U.S. Virgin Islands (the refining and related facilities at Limetree Bay being the "**Oil Refinery and Related Facilities**"), and were exempted from certain taxes, duties, and other fees;

**WHEREAS**, on or about January 18, 2012, HOVENSA announced its intention to idle refining operations at the Oil Refinery and Related Facilities, and thereafter began idling such operations on or about February 16, 2012;

**WHEREAS**, the Government, HOVENSA, HOVIC and PDVSA entered into that certain Fourth Amendment Agreement as of April 3, 2013 (the "***Fourth Amendment***") which was approved by the Legislature on November 4, 2013, which provides, among other things, for HOVIC and PDVSA to undertake a bona fide process to facilitate the sale, directly or indirectly, of the Oil Refinery and Related Facilities on an arm's length basis (the "***Sales Process***");

 

1

**WHEREAS**, the Sales Process and subsequent action in connection with proceedings in the United States District Court of the Virgin Islands, Bankruptcy Division, St. Croix, Virgin Islands, resulted in HOVENSA and HOVIC reaching an understanding with Limetree Bay Holdings, LLC (*"Purchaser"*) and the Government whereby HOVENSA and HOVIC will transfer to Purchaser certain assets constituting the Oil Refinery and Related Facilities pursuant to an Amended and Restated Asset Purchase Agreement by and among HOVENSA, HOVIC, and Purchaser, dated as of November 19, 2015 (the *"Purchase Agreement"*), subject to, among other things, the termination of the Concession Agreement;

**WHEREAS**, the USVI Government and an affiliate of Purchaser, Limetree Bay Terminals, LLC (*"Terminal Operator"*) have entered into that certain Operating Agreement, dated as of December 1, 2015 (as it may be amended, supplemented or modified from time to time, the "**Operating Agreement**"), pursuant to which Terminal Operator has agreed to operate the oil storage terminal facility located at Limetree Bay, St. Croix, subject to, among other things, the termination of the Concession Agreement;

**WHEREAS**, effective upon the closing of each of the Asset Purchase Agreement and the Operating Agreement (the *"Closing"*), the Government desires to terminate the Concession Agreement and fully release each party thereto and their respective affiliates from future performance under said Concession Agreement, without prejudice to the claims of any party thereto arising from or relating to said Concession Agreement and arising prior to the Closing.

**NOW, THEREFORE**, the Government hereby gives notice that:

1. Effective upon the Closing:

    a. the Concession Agreement shall be terminated and canceled in its entirety without further action by any of the parties thereto, and such parties shall be released from any future performance thereunder; and the Concession Agreement shall be null and void and of no further force and effect, except as provided in this Notice.

    b. The termination of the Concession Agreement shall be without prejudice to, and shall not result in the termination or release of, any claims, actions, causes of action, demands, damages, judgments, liabilities, debts, dues, or suits of any kind of any party thereto that (i) arise under or relate to the Concession Agreement, and (ii) are based upon events or conduct occurring prior to the Closing. The Government hereby expressly confirms that this termination of the Concession Agreement does not discharge any liability of Hess Corporation as well as its officers and directors for any claims that the Government has asserted or may assert in the future against them that (x) arise under or relate to the Concession Agreement, and (y) are based upon events or conduct occurring prior to the Closing.

    c. For the avoidance of doubt, the effectiveness of this Termination Notice is contingent upon approval of the Operating Agreement by the Legislature.

\* \* \* \* \*

2



**IN WITNESS WHEREOF**, the Government has caused this Notice of Termination to be signed by its duly authorized representatives as of the date first above written.

**GOVERNMENT OF THE U.S. VIRGIN ISLANDS**

By: _____

    Name: Kenneth E. Mapp
    Title: Governor

**APPROVED FOR LEGAL SUFFICIENCY**

By: _____

    Name:  Claude E. Walker, Esq.
    Title:  Attorney General

Appendix E

MEMORANDUM OF UNDERSTANDING
BETWEEN HOVENSA L.L.C. AND
THE UNIVERSITY OF THE VIRGIN ISLANDS

**EXPLANATORY STATEMENT:**

A. HOVENSA L.L.C. (hereinafter referred to as HOVENSA) has long envisioned creating employment opportunities in the petrochemical industry for residents of the Virgin Islands by assisting in providing the training required.

B. The University of the Virgin Islands (hereinafter referred to as UVI) and HOVENSA have collaborated in the development of a program leading to an Associate in Applied Science degree with a major in Process Technology

C. The then Division of Science and Mathematics (now College of Science and Mathematics) at UVI and technical experts from HOVENSA designed the required curriculum which was approved by UVI's Curriculum Committee, the faculty body and the Board of Trustees.

D. On March 28, 2002, HOVENSA and UVI signed a Memorandum of Understanding (MOU) initializing the program. This MOU, which covered a term of three years, expired on March 28, 2005. A second MOU which covered an additional term of three years expired on October 13th, 2008 and a third MOU which covered an additional term of three years expires in December, 2011

E. This new MOU reaffirms the continued collaboration for the success of the program by both parties. It will cover a term of three years and will expire in December, 2014.

F. The Associate of Applied Science degree in Process Technology was first offered to incoming UVI students in the fall 2002 semester.

G. HOVENSA has pledged to support this degree program by assisting UVI's faculty with contributions of time and resources. These include making available HOVENSA's personnel to assist in the development of the curriculum and to teach, consult, and mentor as well as financial resources

I

**NOW THEREFORE**, UVI and HOVENSA have developed a new Memorandum of Understanding (hereinafter referred to as "the MOU") to apportion their continued responsibilities for the success of the program, as follows:

SCOPE OF UNDERSTANDING:

1) The term of the MOU shall be for a period of three years from the effective date of the MOU.

2) Prior to the end of the term, the Parties will meet to review the program, assess its progress, effectiveness and the future viability with a view to determining whether to continue the collaboration.

3) HOVENSA will maintain and fully administer a scholarship fund dedicated to rendering financial assistance to qualified students who have been admitted into the program. HOVENSA will review the current criteria for awarding scholarships to determine the effective methods for encouraging students to take advantage of the scholarships offered.

Scholarships are awarded based on academic performance. Each scholarship is awarded on a per semester basis. The granting of each scholarship is determined after considering the academic performance for that semester.

The scholarship will be prorated based on the semester grade point average and credit hours. The maximum annual value of the scholarship is $4594 (tuition and fees for academic year 2011-2012) for an individual student.

4) In the event the incumbent Director of Process Technology vacates this position, HOVENSA will, if necessary, assist UVI in the recruitment for a new faculty member in an area of Process Technology, who will serve as the Director of the Program, who will be an employee of UVI and who will:

    a) Teach appropriate process technology courses;
    b) Coordinate with part-time instructors;
    c) Provide student academic counseling for this program;
    d) Lead recruitment for the program; and
    e) Liaise with UVI's Dean of the College of Science and Mathematics regarding the program.

5) HOVENSA will underwrite the salary and benefits of the Director of Process Technology until such time as such funding is fully replaced by grants or other contracts. Refer to Appendix A.

6) UVI will, where appropriate, pursue the preparation of grant applications to various foundations, for partially underwriting the cost of the program.

7) HOVENSA will underwrite the cost of the services of designated technical personnel with expertise in the various core subjects, to teach specific technical courses throughout the term of this Agreement. These part time instructors will be recommended by the Director of the Process Technology program, and will have the qualifications required for teaching in the Associates in Applied Science program. Final approval will follow UVI procedure. These personnel will be compensated at UVI's rates for part-time faculty, but compensation will not be prorated based on class size.

8) HOVENSA will collaborate with UVI in the development of formal recognition of the efforts of the part-time instructors in the program in order to encourage and sustain their participation. Such recognition should include, but not necessarily be limited to letters of commendation and other appropriate methods for recognizing their individual contributions towards the development of a successful program.

9) HOVENSA will allow the program to use the following facilities:

a) Specialized classrooms at the HOVENSA Training School
b) Training School laboratories and necessary equipment;

10) UVI must develop a marketing program to publicize the program among the general public and in area high schools. This marketing effort of the Process Technology program could extend throughout the Caribbean region, particularly in islands such as Trinidad, Curacao and Aruba where oil refineries exist.

3

11) UVI will carry out all requisite steps to manage the degree program within the College of Science and Mathematics, including but not limited to establishing all requirements for admissions, testing and placement, preparation and acquisition of materials, coordination with all faculty, and other foreseeable administrative steps incidental to maintaining the program, and processing of incoming students.

12) UVI will provide faculty from appropriate College or School, to teach non-technical courses and electives required for graduation from the program.

13) UVI will facilitate coordination between its faculty and the HOVENSA-provided instructors, including orientations and dissemination of all requisite academic and administrative materials and procedures and providing them with administrative support to facilitate the HOVENSA-provided instructors' participation in the program.

14) UVI will treat all part-time instructors with the same professionalism, courtesy, and respect, accorded UVI faculty, including, but not limited to granting them access to student records and information, providing them assistance with and access to university facilities and processes.

15) UVI will provide an office for the Director of Process Technology. This office will include all necessary and customary office equipment and supplies, and access to support staff of the College of Science and Mathematics.

16) UVI will provide all necessary classrooms for the non-technical courses and electives required for graduation from the program.

17) As an extension to the provisions for this degree program, UVI and HOVENSA will work collaboratively to explore feasibility of and develop offerings of online courses.

18) Officials of UVI and HOVENSA will work together in a spirit of cooperation and professionalism, through frequent communication and attendance at meetings, to address all questions and concerns that surface regarding the program, the collaboration and any obstacles in order to make this a successful program.

4

**GENERAL PROVISIONS:**

A.  Any contract to carry out the terms or processes of the MOU, and which is intended to bind a Party, must be executed by that Party.

B.  The modification of any term of the MOU must be in writing.

C.  In consideration for the contributions being pledged by HOVENSA, UVI will defend, indemnify and release HOVENSA, its members, parents, affiliates, subsidiaries, and the parents, as well as their employees, agents, shareholders, board of directors, officers, successors and assigns, specifically including but not limited to Hess Oil Virgin Islands Corp., PDVSA V.I., Inc., St. Croix Petrochemical Corp., Hess Corporation and Petroleos de Venezuela, S.A.("PDVSA"), and their parents, affiliates, successors and assigns (Collectively "HOVENSA"), as well as HOVENSA's employees who will serve UVI as instructors and technical experts, from any and all claims, damages, (including personal injury or death, property or consequential), liability and causes of action, whether due in whole or in part to any act, omission or negligence of HOVENSA resulting from negligence, or dangers known or unknown, or reasonable foreseeable, or from breach of contract or warranty, strict liability, or otherwise, arising out of or in any way related to the services to be provided by UVI, its agents and employees or the UVI facilities and equipment to be utilized. UVI further agrees that if a claim is made against HOVENSA or any other person covered by this clause, whether as a result of negligence, fault, or voluntary act of UVI, its agents and employees, that UVI will defend HOVENSA from any such claims and that it will either settle the claim or pay any judgment entered against HOVENSA, including attorney's fees and costs.

D.  In return for the commitments being made by UVI, HOVENSA will defend, indemnify and release UVI, its employees, agents, board of directors, officers, successors and assigns, specifically including but not limited to UVI's employees who will serve UVI as instructors and technical experts, from any and all claims, damages, (including personal injury or death, property or consequential), liability and causes of action, whether due in whole or in part to any act, omission or negligence of HOVENSA resulting from negligence, or dangers known or unknown, or reasonable foreseeable, or from breach of contract or warranty, strict liability, or otherwise, arising out of or in any way related to the services to be provided by HOVENSA, its agents and employees or the HOVENSA facilities and equipment to be utilized. UVI further agrees that if a claim is made against UVI or any other person covered by this clause, whether as a result of negligence, fault, or voluntary act of HOVENSA, its agents and employees, that HOVENSA will defend UVI from any such claims and that it will either settle the claim or pay any judgment entered against UVI, including attorney's fees and costs.

E. The MOU shall be interpreted in accordance with the laws of the United States Virgin Islands. If any portion of this Agreement is against the public policy of the Virgin Islands, it will be construed to provide the greatest possible release of liability permitted by Virgin Islands law. Likewise, if any provision of the MOU is deemed invalid or inoperative to any extent, such validity will not invalidate the MOU, but the MOU will be construed without the provision(s) deemed invalid or inoperative, with a view toward affecting the purpose of the MOU, and the validity and enforceability of the remaining provisions will not be impaired.

F. All disputes or claims arising from HOVENSA's participation or financial contributions to the program will be submitted to confidential and binding arbitration in the U.S. Virgin Islands, in accordance with the rules of the American Arbitration Association, and judgment upon the award rendered may be entered in any court having jurisdiction. The arbitrators in entering a decision will have the authority to select either the amount or remedy proposed by HOVENSA, or that proposed by UVI, and none other. The losing party will bear the cost of arbitration. Other than arbitration feed and expenses, each party will bear its own costs and expenses, including attorney's fees. If any matter is deemed non-arbitral by the arbitrator or by a court of competent jurisdiction. UVI hereby expressly waives trial by jury with respect to such claim or controversy. UVI understands that in such event, any decision regarding such claim or controversy will be made by the court as finder of fact and not by jury.

G. This document constitutes the entire understanding between the Parties hereto and all prior communication understanding with respect to the subject matter of the MOU, integrated herein.

6

**IN WITNESS WHEREOF**, the Parties have herein set their hands as of the dates stated herein.

WITNESS:                              UNIVERSITY OF THE VIRGIN ISLANDS

_____              By: _____

                                     Printed Name: Dr. David Hall

                                     Title: President

                                     Date: _____


WITNESS:                              HOVENSA L.L.C.

_____              By: _____

                                     Printed Name: Brian K. Lever

                                     Title: President & Chief Operating Officer

                                     Date: _____

7

Appendix A

Breakdown of cost for salaries and benefits

HOVENSA will provide funding for the Director of the Process Technology program and the Part Time faculty teaching the process technology courses.

Year 1:

| | |
|---|---|
| Director's salary | $73,539 |
| Benefits 33% | $24,268 |

| | |
|---|---|
| Part-time $32,340 | ($770/credit-hour * 7 classes * 3 credit-hours * 2 semesters) |
| Benefits 8% | $ 2,837 |

Subsequent years will include an increase in Director's salary at 3% per year, governed by the mechanism of UVI faculty compensation.

Part time instructors are paid at a rate of $770 per credit hour. The expectation is that there will be seven three-credit classes taught by part time instructors each semester. Benefits for part time instructors are calculated at 8% of salary.