ORAL ARGUMENT SCHEDULED FOR MAY 23, 2023

No. 23-1094

_____

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

PORT HAMILTON REFINING AND TRANSPORTATION, LLLP,
*Petitioner*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Respondent*.

_____

Petition for Review of Action of the U.S. Environmental Protection Agency

_____

**U.S. ENVIRONMENTAL PROTECTION AGENCY'S
STATUTORY AND REGULATORY ADDENDUM**

_____

Of Counsel:

JOSEPH SIEGEL
*Attorney*
U.S. Environmental Protection Agency
Region 2
290 Broadway
New York, NY 10007

TODD KIM
*Assistant Attorney General*
HEATHER E. GANGE
*Senior Attorney*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7411
Washington, D.C. 20044
(202) 514-4206
Heather.Gange@usdoj.gov

# <u>TABLE OF CONTENTS</u>

## STATUTES

42 U.S.C. § 7407 ................................................................. ADD1

42 U.S.C. § 7408 ................................................................. ADD8

42 U.S.C. § 7409 ............................................................... ADD13

42 U.S.C. § 7412 ............................................................... ADD15

42 U.S.C. § 7502 ............................................................... ADD70

42 U.S.C. § 7503 ............................................................... ADD74

42 U.S.C. § 7602 ............................................................... ADD77

## CODE OF FEDERAL REGULATIONS

40 C.F.R. § 52.21 .............................................................. ADD81

40 C.F.R. § 81.356 ........................................................... ADD135

40 C.F.R. § 124.19 ........................................................... ADD141

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter I. Programs and Activities
        Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7407

§ 7407. Air quality control regions

Effective: January 23, 2004
Currentness

**(a) Responsibility of each State for air quality; submission of implementation plan**

Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State by submitting an implementation plan for such State which will specify the manner in which national primary and secondary ambient air quality standards will be achieved and maintained within each air quality control region in such State.

**(b) Designated regions**

For purposes of developing and carrying out implementation plans under section 7410 of this title--

**(1)** an air quality control region designated under this section before December 31, 1970, or a region designated after such date under subsection (c), shall be an air quality control region; and

**(2)** the portion of such State which is not part of any such designated region shall be an air quality control region, but such portion may be subdivided by the State into two or more air quality control regions with the approval of the Administrator.

**(c) Authority of Administrator to designate regions; notification of Governors of affected States**

The Administrator shall, within 90 days after December 31, 1970, after consultation with appropriate State and local authorities, designate as an air quality control region any interstate area or major intrastate area which he deems necessary or appropriate for the attainment and maintenance of ambient air quality standards. The Administrator shall immediately notify the Governors of the affected States of any designation made under this subsection.

**(d) Designations**

**(1) Designations generally**

**(A) Submission by Governors of initial designations following promulgation of new or revised standards**

By such date as the Administrator may reasonably require, but not later than 1 year after promulgation of a new or revised national ambient air quality standard for any pollutant under section 7409 of this title, the Governor of each State shall (and at any other time the Governor of a State deems appropriate the Governor may) submit to the Administrator a list of all areas (or portions thereof) in the State, designating as--

**(i)** nonattainment, any area that does not meet (or that contributes to ambient air quality in a nearby area that does not meet) the national primary or secondary ambient air quality standard for the pollutant,

**(ii)** attainment, any area (other than an area identified in clause (i)) that meets the national primary or secondary ambient air quality standard for the pollutant, or

**(iii)** unclassifiable, any area that cannot be classified on the basis of available information as meeting or not meeting the national primary or secondary ambient air quality standard for the pollutant.

The Administrator may not require the Governor to submit the required list sooner than 120 days after promulgating a new or revised national ambient air quality standard.

**(B) Promulgation by EPA of designations**

**(i)** Upon promulgation or revision of a national ambient air quality standard, the Administrator shall promulgate the designations of all areas (or portions thereof) submitted under subparagraph (A) as expeditiously as practicable, but in no case later than 2 years from the date of promulgation of the new or revised national ambient air quality standard. Such period may be extended for up to one year in the event the Administrator has insufficient information to promulgate the designations.

**(ii)** In making the promulgations required under clause (i), the Administrator may make such modifications as the Administrator deems necessary to the designations of the areas (or portions thereof) submitted under subparagraph (A) (including to the boundaries of such areas or portions thereof). Whenever the Administrator intends to make a modification, the Administrator shall notify the State and provide such State with an opportunity to demonstrate why any proposed modification is inappropriate. The Administrator shall give such notification no later than 120 days before the date the Administrator promulgates the designation, including any modification thereto. If the Governor fails to submit the list in whole or in part, as required under subparagraph (A), the Administrator shall promulgate the designation that the Administrator deems appropriate for any area (or portion thereof) not designated by the State.

**(iii)** If the Governor of any State, on the Governor's own motion, under subparagraph (A), submits a list of areas (or portions thereof) in the State designated as nonattainment, attainment, or unclassifiable, the Administrator shall act on such designations in accordance with the procedures under paragraph (3) (relating to redesignation).

**(iv)** A designation for an area (or portion thereof) made pursuant to this subsection shall remain in effect until the area (or portion thereof) is redesignated pursuant to paragraph (3) or (4).

**(C) Designations by operation of law**

**(i)** Any area designated with respect to any air pollutant under the provisions of paragraph (1)(A), (B), or (C) of this subsection (as in effect immediately before November 15, 1990) is designated, by operation of law, as a nonattainment area for such pollutant within the meaning of subparagraph (A)(i).

**(ii)** Any area designated with respect to any air pollutant under the provisions of paragraph (1)(E) (as in effect immediately before November 15, 1990) is designated by operation of law, as an attainment area for such pollutant within the meaning of subparagraph (A)(ii).

**(iii)** Any area designated with respect to any air pollutant under the provisions of paragraph (1)(D) (as in effect immediately before November 15, 1990) is designated, by operation of law, as an unclassifiable area for such pollutant within the meaning of subparagraph (A)(iii).

**(2) Publication of designations and redesignations**

**(A)** The Administrator shall publish a notice in the Federal Register promulgating any designation under paragraph (1) or (5), or announcing any designation under paragraph (4), or promulgating any redesignation under paragraph (3).

**(B)** Promulgation or announcement of a designation under paragraph (1), (4) or (5) shall not be subject to the provisions of sections 553 through 557 of Title 5 (relating to notice and comment), except nothing herein shall be construed as precluding such public notice and comment whenever possible.

**(3) Redesignation**

**(A)** Subject to the requirements of subparagraph (E), and on the basis of air quality data, planning and control considerations, or any other air quality-related considerations the Administrator deems appropriate, the Administrator may at any time notify the Governor of any State that available information indicates that the designation of any area or portion of an area within the State or interstate area should be revised. In issuing such notification, which shall be public, to the Governor, the Administrator shall provide such information as the Administrator may have available explaining the basis for the notice.

**(B)** No later than 120 days after receiving a notification under subparagraph (A), the Governor shall submit to the Administrator such redesignation, if any, of the appropriate area (or areas) or portion thereof within the State or interstate area, as the Governor considers appropriate.

**(C)** No later than 120 days after the date described in subparagraph (B) (or paragraph (1)(B)(iii)), the Administrator shall promulgate the redesignation, if any, of the area or portion thereof, submitted by the Governor in accordance with subparagraph (B), making such modifications as the Administrator may deem necessary, in the same manner and under the same procedure as is applicable under clause (ii) of paragraph (1)(B), except that the phrase "60 days" shall be substituted for the phrase "120 days" in that clause. If the Governor does not submit, in accordance with subparagraph (B), a redesignation for an area (or portion thereof) identified by the Administrator under subparagraph (A), the Administrator shall promulgate such redesignation, if any, that the Administrator deems appropriate.

**(D)** The Governor of any State may, on the Governor's own motion, submit to the Administrator a revised designation of any area or portion thereof within the State. Within 18 months of receipt of a complete State redesignation submittal, the Administrator shall approve or deny such redesignation. The submission of a redesignation by a Governor shall not affect the effectiveness or enforceability of the applicable implementation plan for the State.

**(E)** The Administrator may not promulgate a redesignation of a nonattainment area (or portion thereof) to attainment unless--

**(i)** the Administrator determines that the area has attained the national ambient air quality standard;

**(ii)** the Administrator has fully approved the applicable implementation plan for the area under section 7410(k) of this title;

**(iii)** the Administrator determines that the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable implementation plan and applicable Federal air pollutant control regulations and other permanent and enforceable reductions;

**(iv)** the Administrator has fully approved a maintenance plan for the area as meeting the requirements of section 7505a of this title; and

**(v)** the State containing such area has met all requirements applicable to the area under section 7410 of this title and part D.

**(F)** The Administrator shall not promulgate any redesignation of any area (or portion thereof) from nonattainment to unclassifiable.

**(4) Nonattainment designations for ozone, carbon monoxide and particulate matter (PM-10)**

**(A) Ozone and carbon monoxide**

**(i)** Within 120 days after November 15, 1990, each Governor of each State shall submit to the Administrator a list that designates, affirms or reaffirms the designation of, or redesignates (as the case may be), all areas (or portions thereof) of the Governor's State as attainment, nonattainment, or unclassifiable with respect to the national ambient air quality standards for ozone and carbon monoxide.

**(ii)** No later than 120 days after the date the Governor is required to submit the list of areas (or portions thereof) required under clause (i) of this subparagraph, the Administrator shall promulgate such designations, making such modifications as the Administrator may deem necessary, in the same manner, and under the same procedure, as is applicable under clause (ii) of paragraph (1)(B), except that the phrase "60 days" shall be substituted for the phrase "120 days" in that clause. If the Governor does not submit, in accordance with clause (i) of this subparagraph, a designation for an area (or portion thereof), the Administrator shall promulgate the designation that the Administrator deems appropriate.

**(iii)** No nonattainment area may be redesignated as an attainment area under this subparagraph.

**(iv)** Notwithstanding paragraph (1)(C)(ii) of this subsection, if an ozone or carbon monoxide nonattainment area located within a metropolitan statistical area or consolidated metropolitan statistical area (as established by the Bureau of the Census) is classified under part D of this subchapter as a Serious, Severe, or Extreme Area, the boundaries of such area are hereby revised (on the date 45 days after such classification) by operation of law to include the entire metropolitan statistical area or consolidated metropolitan statistical area, as the case may be, unless within such 45-day period the Governor (in consultation with State and local air pollution control agencies) notifies the Administrator that additional time is necessary to evaluate the application of clause (v). Whenever a Governor has submitted such a notice to the Administrator, such boundary revision shall occur on the later of the date 8 months after such classification or 14 months after November 15, 1990, unless the Governor makes the finding referred to in clause (v), and the Administrator concurs in such finding, within such period. Except as otherwise provided in this paragraph, a boundary revision under this clause or clause (v) shall apply for purposes of any State implementation plan revision required to be submitted after November 15, 1990.

**(v)** Whenever the Governor of a State has submitted a notice under clause (iv), the Governor, in consultation with State and local air pollution control agencies, shall undertake a study to evaluate whether the entire metropolitan statistical area or consolidated metropolitan statistical area should be included within the nonattainment area. Whenever a Governor finds and demonstrates to the satisfaction of the Administrator, and the Administrator concurs in such finding, that with respect to a portion of a metropolitan statistical area or consolidated metropolitan statistical area, sources in the portion do not contribute significantly to violation of the national ambient air quality standard, the Administrator shall approve the Governor's request to exclude such portion from the nonattainment area. In making such finding, the Governor and the Administrator shall consider factors such as population density, traffic congestion, commercial development, industrial development, meteorological conditions, and pollution transport.

**(B) PM-10 designations**

By operation of law, until redesignation by the Administrator pursuant to paragraph (3)--

**(i)** each area identified in 52 Federal Register 29383 (Aug. 7, 1987) as a Group I area (except to the extent that such identification was modified by the Administrator before November 15, 1990) is designated nonattainment for PM-10;

**(ii)** any area containing a site for which air quality monitoring data show a violation of the national ambient air quality standard for PM-10 before January 1, 1989 (as determined under part 50, appendix K of title 40 of the Code of Federal Regulations) is hereby designated nonattainment for PM-10; and

**(iii)** each area not described in clause (i) or (ii) is hereby designated unclassifiable for PM-10.

Any designation for particulate matter (measured in terms of total suspended particulates) that the Administrator promulgated pursuant to this subsection (as in effect immediately before November 15, 1990) shall remain in effect for purposes of implementing the maximum allowable increases in concentrations of particulate matter (measured in terms of total suspended particulates) pursuant to section 7473(b) of this title, until the Administrator determines that such designation is no longer necessary for that purpose.

**(5) Designations for lead**

The Administrator may, in the Administrator's discretion at any time the Administrator deems appropriate, require a State to designate areas (or portions thereof) with respect to the national ambient air quality standard for lead in effect as of November 15, 1990, in accordance with the procedures under subparagraphs (A) and (B) of paragraph (1), except that in applying subparagraph (B)(i) of paragraph (1) the phrase "2 years from the date of promulgation of the new or revised national ambient air quality standard" shall be replaced by the phrase "1 year from the date the Administrator notifies the State of the requirement to designate areas with respect to the standard for lead".

**(6) Designations**

**(A) Submission**

Notwithstanding any other provision of law, not later than February 15, 2004, the Governor of each State shall submit designations referred to in paragraph (1) for the July 1997 $PM_{2.5}$ national ambient air quality standards for each area within the State, based on air quality monitoring data collected in accordance with any applicable Federal reference methods for the relevant areas.

**(B) Promulgation**

Notwithstanding any other provision of law, not later than December 31, 2004, the Administrator shall, consistent with paragraph (1), promulgate the designations referred to in subparagraph (A) for each area of each State for the July 1997 $PM_{2.5}$ national ambient air quality standards.

**(7) Implementation plan for regional haze**

**(A) In general**

Notwithstanding any other provision of law, not later than 3 years after the date on which the Administrator promulgates the designations referred to in paragraph (6)(B) for a State, the State shall submit, for the entire State, the State implementation plan revisions to meet the requirements promulgated by the Administrator under section 7492(e)(1) of this title (referred to in this paragraph as "regional haze requirements").

**(B) No preclusion of other provisions**

Nothing in this paragraph precludes the implementation of the agreements and recommendations stemming from the Grand Canyon Visibility Transport Commission Report dated June 1996, including the submission of State implementation plan revisions by the States of Arizona, California, Colorado, Idaho, Nevada, New Mexico, Oregon, Utah, or Wyoming by December 31, 2003, for implementation of regional haze requirements applicable to those States.

**(e) Redesignation of air quality control regions**

**(1)** Except as otherwise provided in paragraph (2), the Governor of each State is authorized, with the approval of the Administrator, to redesignate from time to time the air quality control regions within such State for purposes of efficient and effective air quality management. Upon such redesignation, the list under subsection (d) shall be modified accordingly.

**(2)** In the case of an air quality control region in a State, or part of such region, which the Administrator finds may significantly affect air pollution concentrations in another State, the Governor of the State in which such region, or part of a region, is located may redesignate from time to time the boundaries of so much of such air quality control region as is located within such State only with the approval of the Administrator and with the consent of all Governors of all States which the Administrator determines may be significantly affected.

**(3)** No compliance date extension granted under section 7413(d)(5) of this title (relating to coal conversion) shall cease to be effective by reason of the regional limitation provided in section 7413(d)(5) of this title if the violation of such limitation is due solely to a redesignation of a region under this subsection.

**CREDIT(S)**

(July 14, 1955, c. 360, Title I, § 107, as added Pub.L. 91-604, § 4(a), Dec. 31, 1970, 84 Stat. 1678; amended Pub.L. 95-95, Title I, § 103, Aug. 7, 1977, 91 Stat. 687; Pub.L. 101-549, Title I, § 101(a), Nov. 15, 1990, 104 Stat. 2399; Pub.L. 108-199, Div. G, Title IV, § 425(a), Jan. 23, 2004, 118 Stat. 417.)

Notes of Decisions (68)

42 U.S.C.A. § 7407, 42 USCA § 7407
Current through P.L. 117-327. Some statute sections may be more current, see credits for details.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter I. Programs and Activities
        Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7408

§ 7408. Air quality criteria and control techniques

Effective: November 10, 1998
Currentness

**(a) Air pollutant list; publication and revision by Administrator; issuance of air quality criteria for air pollutants**

**(1)** For the purpose of establishing national primary and secondary ambient air quality standards, the Administrator shall within 30 days after December 31, 1970, publish, and shall from time to time thereafter revise, a list which includes each air pollutant--

**(A)** emissions of which, in his judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare;

**(B)** the presence of which in the ambient air results from numerous or diverse mobile or stationary sources; and

**(C)** for which air quality criteria had not been issued before December 31, 1970 but for which he plans to issue air quality criteria under this section.

**(2)** The Administrator shall issue air quality criteria for an air pollutant within 12 months after he has included such pollutant in a list under paragraph (1). Air quality criteria for an air pollutant shall accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of such pollutant in the ambient air, in varying quantities. The criteria for an air pollutant, to the extent practicable, shall include information on--

**(A)** those variable factors (including atmospheric conditions) which of themselves or in combination with other factors may alter the effects on public health or welfare of such air pollutant;

**(B)** the types of air pollutants which, when present in the atmosphere, may interact with such pollutant to produce an adverse effect on public health or welfare; and

**(C)** any known or anticipated adverse effects on welfare.

**(b) Issuance by Administrator of information on air pollution control techniques; standing consulting committees for air pollutants; establishment; membership**

**(1)** Simultaneously with the issuance of criteria under subsection (a), the Administrator shall, after consultation with appropriate advisory committees and Federal departments and agencies, issue to the States and appropriate air pollution control agencies information on air pollution control techniques, which information shall include data relating to the cost of installation and operation, energy requirements, emission reduction benefits, and environmental impact of the emission control technology. Such information shall include such data as are available on available technology and alternative methods of prevention and control of air pollution. Such information shall also include data on alternative fuels, processes, and operating methods which will result in elimination or significant reduction of emissions.

**(2)** In order to assist in the development of information on pollution control techniques, the Administrator may establish a standing consulting committee for each air pollutant included in a list published pursuant to subsection (a)(1), which shall be comprised of technically qualified individuals representative of State and local governments, industry, and the academic community. Each such committee shall submit, as appropriate, to the Administrator information related to that required by paragraph (1).

**(c) Review, modification, and reissuance of criteria or information**

The Administrator shall from time to time review, and, as appropriate, modify, and reissue any criteria or information on control techniques issued pursuant to this section. Not later than six months after August 7, 1977, the Administrator shall revise and reissue criteria relating to concentrations of $NO_2$ over such period (not more than three hours) as he deems appropriate. Such criteria shall include a discussion of nitric and nitrous acids, nitrites, nitrates, nitrosamines, and other carcinogenic and potentially carcinogenic derivatives of oxides of nitrogen.

**(d) Publication in Federal Register; availability of copies for general public**

The issuance of air quality criteria and information on air pollution control techniques shall be announced in the Federal Register and copies shall be made available to the general public.

**(e) Transportation planning and guidelines**

The Administrator shall, after consultation with the Secretary of Transportation, and after providing public notice and opportunity for comment, and with State and local officials, within nine months after November 15, 1990, and periodically thereafter as necessary to maintain a continuous transportation-air quality planning process, update the June 1978 Transportation-Air Quality Planning Guidelines and publish guidance on the development and implementation of transportation and other measures necessary to demonstrate and maintain attainment of national ambient air quality standards. Such guidelines shall include information on--

**(1)** methods to identify and evaluate alternative planning and control activities;

**(2)** methods of reviewing plans on a regular basis as conditions change or new information is presented;

**(3)** identification of funds and other resources necessary to implement the plan, including interagency agreements on providing such funds and resources;

**(4)** methods to assure participation by the public in all phases of the planning process; and

**(5)** such other methods as the Administrator determines necessary to carry out a continuous planning process.

**(f) Information regarding processes, procedures, and methods to reduce or control pollutants in transportation; reduction of mobile source related pollutants; reduction of impact on public health**

**(1)** The Administrator shall publish and make available to appropriate Federal, State, and local environmental and transportation agencies not later than one year after November 15, 1990, and from time to time thereafter--

**(A)** information prepared, as appropriate, in consultation with the Secretary of Transportation, and after providing public notice and opportunity for comment, regarding the formulation and emission reduction potential of transportation control measures related to criteria pollutants and their precursors, including, but not limited to--

**(i)** programs for improved public transit;

**(ii)** restriction of certain roads or lanes to, or construction of such roads or lanes for use by, passenger buses or high occupancy vehicles;

**(iii)** employer-based transportation management plans, including incentives;

**(iv)** trip-reduction ordinances;

**(v)** traffic flow improvement programs that achieve emission reductions;

**(vi)** fringe and transportation corridor parking facilities serving multiple occupancy vehicle programs or transit service;

**(vii)** programs to limit or restrict vehicle use in downtown areas or other areas of emission concentration particularly during periods of peak use;

**(viii)** programs for the provision of all forms of high-occupancy, shared-ride services;

**(ix)** programs to limit portions of road surfaces or certain sections of the metropolitan area to the use of non-motorized vehicles or pedestrian use, both as to time and place;

**(x)** programs for secure bicycle storage facilities and other facilities, including bicycle lanes, for the convenience and protection of bicyclists, in both public and private areas;

**(xi)** programs to control extended idling of vehicles;

**(xii)** programs to reduce motor vehicle emissions, consistent with subchapter II, which are caused by extreme cold start conditions;

**(xiii)** employer-sponsored programs to permit flexible work schedules;

**(xiv)** programs and ordinances to facilitate non-automobile travel, provision and utilization of mass transit, and to generally reduce the need for single-occupant vehicle travel, as part of transportation planning and development efforts of a locality, including programs and ordinances applicable to new shopping centers, special events, and other centers of vehicle activity;

**(xv)** programs for new construction and major reconstructions of paths, tracks or areas solely for the use by pedestrian or other non-motorized means of transportation when economically feasible and in the public interest. For purposes of this clause, the Administrator shall also consult with the Secretary of the Interior; and

**(xvi)** program to encourage the voluntary removal from use and the marketplace of pre-1980 model year light duty vehicles and pre-1980 model light duty trucks. [1]

**(B)** information on additional methods or strategies that will contribute to the reduction of mobile source related pollutants during periods in which any primary ambient air quality standard will be exceeded and during episodes for which an air pollution alert, warning, or emergency has been declared;

**(C)** information on other measures which may be employed to reduce the impact on public health or protect the health of sensitive or susceptible individuals or groups; and

**(D)** information on the extent to which any process, procedure, or method to reduce or control such air pollutant may cause an increase in the emissions or formation of any other pollutant.

**(2)** In publishing such information the Administrator shall also include an assessment of--

**(A)** the relative effectiveness of such processes, procedures, and methods;

**(B)** the potential effect of such processes, procedures, and methods on transportation systems and the provision of transportation services; and

**(C)** the environmental, energy, and economic impact of such processes, procedures, and methods.

**(g) Assessment of risks to ecosystems**

The Administrator may assess the risks to ecosystems from exposure to criteria air pollutants (as identified by the Administrator in the Administrator's sole discretion).

**(h) RACT/BACT/LAER clearinghouse**

The Administrator shall make information regarding emission control technology available to the States and to the general public through a central database. Such information shall include all control technology information received pursuant to State plan provisions requiring permits for sources, including operating permits for existing sources.

### CREDIT(S)

(July 14, 1955, c. 360, Title I, § 108, as added Pub.L. 91-604, § 4(a), Dec. 31, 1970, 84 Stat. 1678; amended Pub.L. 95-95, Title I, §§ 104, 105, Title IV, § 401(a), Aug. 7, 1977, 91 Stat. 689, 790; Pub.L. 101-549, Title I, §§ 108(a) to (c), (o), 111, Nov. 15, 1990, 104 Stat. 2465, 2466, 2469, 2470; Pub.L. 105-362, Title XV, § 1501(b), Nov. 10, 1998, 112 Stat. 3294.)

Notes of Decisions (28)

### Footnotes

1       So in original. The period probably should be a semicolon.

42 U.S.C.A. § 7408, 42 USCA § 7408
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Title 42. The Public Health and Welfare
      Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
         Subchapter I. Programs and Activities
            Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7409

§ 7409. National primary and secondary ambient air quality standards

Currentness

**(a) Promulgation**

**(1)** The Administrator--

**(A)** within 30 days after December 31, 1970, shall publish proposed regulations prescribing a national primary ambient air quality standard and a national secondary ambient air quality standard for each air pollutant for which air quality criteria have been issued prior to such date; and

**(B)** after a reasonable time for interested persons to submit written comments thereon (but no later than 90 days after the initial publication of such proposed standards) shall by regulation promulgate such proposed national primary and secondary ambient air quality standards with such modifications as he deems appropriate.

**(2)** With respect to any air pollutant for which air quality criteria are issued after December 31, 1970, the Administrator shall publish, simultaneously with the issuance of such criteria and information, proposed national primary and secondary ambient air quality standards for any such pollutant. The procedure provided for in paragraph (1)(B) of this subsection shall apply to the promulgation of such standards.

**(b) Protection of public health and welfare**

**(1)** National primary ambient air quality standards, prescribed under subsection (a) shall be ambient air quality standards the attainment and maintenance of which in the judgment of the Administrator, based on such criteria and allowing an adequate margin of safety, are requisite to protect the public health. Such primary standards may be revised in the same manner as promulgated.

**(2)** Any national secondary ambient air quality standard prescribed under subsection (a) shall specify a level of air quality the attainment and maintenance of which in the judgment of the Administrator, based on such criteria, is requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air. Such secondary standards may be revised in the same manner as promulgated.

**(c) National primary ambient air quality standard for nitrogen dioxide**

The Administrator shall, not later than one year after August 7, 1977, promulgate a national primary ambient air quality standard for $NO_2$ concentrations over a period of not more than 3 hours unless, based on the criteria issued under section 7408(c) of this title, he finds that there is no significant evidence that such a standard for such a period is requisite to protect public health.

**(d) Review and revision of criteria and standards; independent scientific review committee; appointment; advisory functions**

**(1)** Not later than December 31, 1980, and at five-year intervals thereafter, the Administrator shall complete a thorough review of the criteria published under section 7408 of this title and the national ambient air quality standards promulgated under this section and shall make such revisions in such criteria and standards and promulgate such new standards as may be appropriate in accordance with section 7408 of this title and subsection (b) of this section. The Administrator may review and revise criteria or promulgate new standards earlier or more frequently than required under this paragraph.

**(2)(A)** The Administrator shall appoint an independent scientific review committee composed of seven members including at least one member of the National Academy of Sciences, one physician, and one person representing State air pollution control agencies.

**(B)** Not later than January 1, 1980, and at five-year intervals thereafter, the committee referred to in subparagraph (A) shall complete a review of the criteria published under section 7408 of this title and the national primary and secondary ambient air quality standards promulgated under this section and shall recommend to the Administrator any new national ambient air quality standards and revisions of existing criteria and standards as may be appropriate under section 7408 of this title and subsection (b) of this section.

**(C)** Such committee shall also (i) advise the Administrator of areas in which additional knowledge is required to appraise the adequacy and basis of existing, new, or revised national ambient air quality standards, (ii) describe the research efforts necessary to provide the required information, (iii) advise the Administrator on the relative contribution to air pollution concentrations of natural as well as anthropogenic activity, and (iv) advise the Administrator of any adverse public health, welfare, social, economic, or energy effects which may result from various strategies for attainment and maintenance of such national ambient air quality standards.

**CREDIT(S)**

(July 14, 1955, c. 360, Title I, § 109, as added Pub.L. 91-604, § 4(a), Dec. 31, 1970, 84 Stat. 1679; amended Pub.L. 95-95, Title I, § 106, Aug. 7, 1977, 91 Stat. 691.)

Notes of Decisions (93)

42 U.S.C.A. § 7409, 42 USCA § 7409
Current through P.L. 117-327. Some statute sections may be more current, see credits for details.

**End of Document**                                             © 2023 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
    Title 42. The Public Health and Welfare
        Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
            Subchapter I. Programs and Activities
            Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7412

§ 7412. Hazardous air pollutants

Effective: August 5, 1999

Currentness

**(a) Definitions**

For purposes of this section, except subsection (r)--

**(1) Major source**

The term "major source" means any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants. The Administrator may establish a lesser quantity, or in the case of radionuclides different criteria, for a major source than that specified in the previous sentence, on the basis of the potency of the air pollutant, persistence, potential for bioaccumulation, other characteristics of the air pollutant, or other relevant factors.

**(2) Area source**

The term "area source" means any stationary source of hazardous air pollutants that is not a major source. For purposes of this section, the term "area source" shall not include motor vehicles or nonroad vehicles subject to regulation under subchapter II.

**(3) Stationary source**

The term "stationary source" shall have the same meaning as such term has under section 7411(a) of this title.

**(4) New source**

The term "new source" means a stationary source the construction or reconstruction of which is commenced after the Administrator first proposes regulations under this section establishing an emission standard applicable to such source.

**(5) Modification**

The term "modification" means any physical change in, or change in the method of operation of, a major source which increases the actual emissions of any hazardous air pollutant emitted by such source by more than a de minimis amount or which results in the emission of any hazardous air pollutant not previously emitted by more than a de minimis amount.

**(6) Hazardous air pollutant**

The term "hazardous air pollutant" means any air pollutant listed pursuant to subsection (b).

**(7) Adverse environmental effect**

The term "adverse environmental effect" means any significant and widespread adverse effect, which may reasonably be anticipated, to wildlife, aquatic life, or other natural resources, including adverse impacts on populations of endangered or threatened species or significant degradation of environmental quality over broad areas.

**(8) Electric utility steam generating unit**

The term "electric utility steam generating unit" means any fossil fuel fired combustion unit of more than 25 megawatts that serves a generator that produces electricity for sale. A unit that cogenerates steam and electricity and supplies more than one-third of its potential electric output capacity and more than 25 megawatts electrical output to any utility power distribution system for sale shall be considered an electric utility steam generating unit.

**(9) Owner or operator**

The term "owner or operator" means any person who owns, leases, operates, controls, or supervises a stationary source.

**(10) Existing source**

The term "existing source" means any stationary source other than a new source.

**(11) Carcinogenic effect**

Unless revised, the term "carcinogenic effect" shall have the meaning provided by the Administrator under Guidelines for Carcinogenic Risk Assessment as of the date of enactment. Any revisions in the existing Guidelines shall be subject to notice and opportunity for comment.

**(b) List of pollutants**

**(1) Initial list**

The Congress establishes for purposes of this section a list of hazardous air pollutants as follows:

| CAS | Chemical name |
| --- | --- |

**number**

| | |
|---|---|
| 75070 | Acetaldehyde |
| 60355 | Acetamide |
| 75058 | Acetonitrile |
| 98862 | Acetophenone |
| 53963 | 2-Acetylaminofluorene |
| 107028 | Acrolein |
| 79061 | Acrylamide |
| 79107 | Acrylic acid |
| 107131 | Acrylonitrile |
| 107051 | Allyl chloride |
| 92671 | 4-Aminobiphenyl |
| 62533 | Aniline |
| 90040 | o-Anisidine |
| 1332214 | Asbestos |
| 71432 | Benzene (including benzene from gasoline) |
| 92875 | Benzidine |
| 98077 | Benzotrichloride |
| 100447 | Benzyl chloride |
| 92524 | Biphenyl |
| 117817 | Bis(2-ethylhexyl)phthalate (DEHP) |
| 542881 | Bis(chloromethyl)ether |
| 75252 | Bromoform |
| 106990 | 1,3-Butadiene |
| 156627 | Calcium cyanamide |
| 105602 | Caprolactam |
| 133062 | Captan |
| 63252 | Carbaryl |
| 75150 | Carbon disulfide |

| 56235 | Carbon tetrachloride |
|---|---|
| 463581 | Carbonyl sulfide |
| 120809 | Catechol |
| 133904 | Chloramben |
| 57749 | Chlordane |
| 7782505 | Chlorine |
| 79118 | Chloroacetic acid |
| 532274 | 2-Chloroacetophenone |
| 108907 | Chlorobenzene |
| 510156 | Chlorobenzilate |
| 67663 | Chloroform |
| 107302 | Chloromethyl methyl ether |
| 126998 | Chloroprene |
| 1319773 | Cresols/Cresylic acid (isomers and mixture) |
| 95487 | o-Cresol |
| 108394 | m-Cresol |
| 106445 | p-Cresol |
| 98828 | Cumene |
| 94757 | 2,4-D, salts and esters |
| 3547044 | DDE |
| 334883 | Diazomethane |
| 132649 | Dibenzofurans |
| 96128 | 1,2-Dibromo-3-chloropropane |
| 84742 | Dibutylphthalate |
| 106467 | 1,4-Dichlorobenzene(p) |
| 91941 | 3,3-Dichlorobenzidene |
| 111444 | Dichloroethyl ether (Bis(2-chloroethyl)ether) |
| 542756 | 1,3-Dichloropropene |
| 62737 | Dichlorvos |

| | |
|---|---|
| 111422 | Diethanolamine |
| 121697 | N,N-Diethyl aniline (N,N-Dimethylaniline) |
| 64675 | Diethyl sulfate |
| 119904 | 3,3-Dimethoxybenzidine |
| 60117 | Dimethyl aminoazobenzene |
| 119937 | 3,3′-Dimethyl benzidine |
| 79447 | Dimethyl carbamoyl chloride |
| 68122 | Dimethyl formamide |
| 57147 | 1,1-Dimethyl hydrazine |
| 131113 | Dimethyl phthalate |
| 77781 | Dimethyl sulfate |
| 534521 | 4,6-Dinitro-o-cresol, and salts |
| 51285 | 2,4-Dinitrophenol |
| 121142 | 2,4-Dinitrotoluene |
| 123911 | 1,4-Dioxane (1,4-Diethyleneoxide) |
| 122667 | 1,2-Diphenylhydrazine |
| 106898 | Epichlorohydrin (1-Chloro-2,3-epoxypropane) |
| 106887 | 1,2-Epoxybutane |
| 140885 | Ethyl acrylate |
| 100414 | Ethyl benzene |
| 51796 | Ethyl carbamate (Urethane) |
| 75003 | Ethyl chloride (Chloroethane) |
| 106934 | Ethylene dibromide (Dibromoethane) |
| 107062 | Ethylene dichloride (1,2-Dichloroethane) |
| 107211 | Ethylene glycol |
| 151564 | Ethylene imine (Aziridine) |
| 75218 | Ethylene oxide |
| 96457 | Ethylene thiourea |
| 75343 | Ethylidene dichloride (1,1-Dichloroethane) |

| | |
|---|---|
| 50000 | Formaldehyde |
| 76448 | Heptachlor |
| 118741 | Hexachlorobenzene |
| 87683 | Hexachlorobutadiene |
| 77474 | Hexachlorocyclopentadiene |
| 67721 | Hexachloroethane |
| 822060 | Hexamethylene-1,6-diisocyanate |
| 680319 | Hexamethylphosphoramide |
| 110543 | Hexane |
| 302012 | Hydrazine |
| 7647010 | Hydrochloric acid |
| 7664393 | Hydrogen fluoride (Hydrofluoric acid) |
| 123319 | Hydroquinone |
| 78591 | Isophorone |
| 58899 | Lindane (all isomers) |
| 108316 | Maleic anhydride |
| 67561 | Methanol |
| 72435 | Methoxychlor |
| 74839 | Methyl bromide (Bromomethane) |
| 74873 | Methyl chloride (Chloromethane) |
| 71556 | Methyl chloroform (1,1,1-Trichloroethane) |
| 78933 | Methyl ethyl ketone (2-Butanone) |
| 60344 | Methyl hydrazine |
| 74884 | Methyl iodide (Iodomethane) |
| 108101 | Methyl isobutyl ketone (Hexone) |
| 624839 | Methyl isocyanate |
| 80626 | Methyl methacrylate |
| 1634044 | Methyl tert butyl ether |
| 101144 | 4,4-Methylene bis(2-chloroaniline) |

| | |
|---|---|
| 75092 | Methylene chloride (Dichloromethane) |
| 101688 | Methylene diphenyl diisocyanate (MDI) |
| 101779 | 4,4′-Methylenedianiline |
| 91203 | Naphthalene |
| 98953 | Nitrobenzene |
| 92933 | 4-Nitrobiphenyl |
| 100027 | 4-Nitrophenol |
| 79469 | 2-Nitropropane |
| 684935 | N-Nitroso-N-methylurea |
| 62759 | N-Nitrosodimethylamine |
| 59892 | N-Nitrosomorpholine |
| 56382 | Parathion |
| 82688 | Pentachloronitrobenzene (Quintobenzene) |
| 87865 | Pentachlorophenol |
| 108952 | Phenol |
| 106503 | p-Phenylenediamine |
| 75445 | Phosgene |
| 7803512 | Phosphine |
| 7723140 | Phosphorus |
| 85449 | Phthalic anhydride |
| 1336363 | Polychlorinated biphenyls (Aroclors) |
| 1120714 | 1,3-Propane sultone |
| 57578 | beta-Propiolactone |
| 123386 | Propionaldehyde |
| 114261 | Propoxur (Baygon) |
| 78875 | Propylene dichloride (1,2-Dichloropropane) |
| 75569 | Propylene oxide |
| 75558 | 1,2-Propylenimine (2-Methyl aziridine) |
| 91225 | Quinoline |

| | |
|---|---|
| 106514 | Quinone |
| 100425 | Styrene |
| 96093 | Styrene oxide |
| 1746016 | 2,3,7,8-Tetrachlorodibenzo-p-dioxin |
| 79345 | 1,1,2,2-Tetrachloroethane |
| 127184 | Tetrachloroethylene (Perchloroethylene) |
| 7550450 | Titanium tetrachloride |
| 108883 | Toluene |
| 95807 | 2,4-Toluene diamine |
| 584849 | 2,4-Toluene diisocyanate |
| 95534 | o-Toluidine |
| 8001352 | Toxaphene (chlorinated camphene) |
| 120821 | 1,2,4-Trichlorobenzene |
| 79005 | 1,1,2-Trichloroethane |
| 79016 | Trichloroethylene |
| 95954 | 2,4,5-Trichlorophenol |
| 88062 | 2,4,6-Trichlorophenol |
| 121448 | Triethylamine |
| 1582098 | Trifluralin |
| 540841 | 2,2,4-Trimethylpentane |
| 108054 | Vinyl acetate |
| 593602 | Vinyl bromide |
| 75014 | Vinyl chloride |
| 75354 | Vinylidene chloride (1,1-Dichloroethylene) |
| 1330207 | Xylenes (isomers and mixture) |
| 95476 | o-Xylenes |
| 108383 | m-Xylenes |
| 106423 | p-Xylenes |
| 0 | Antimony Compounds |

0   Arsenic Compounds (inorganic including arsine)

0   Beryllium Compounds

0   Cadmium Compounds

0   Chromium Compounds

0   Cobalt Compounds

0   Coke Oven Emissions

0   Cyanide Compounds [1]

0   Glycol ethers [2]

0   Lead Compounds

0   Manganese Compounds

0   Mercury Compounds

0   Fine mineral fibers [3]

0   Nickel Compounds

0   Polycylic Organic Matter [4]

0   Radionuclides (including radon) [5]

0   Selenium Compounds

NOTE: For all listings above which contain the word "compounds" and for glycol ethers, the following applies: Unless otherwise specified, these listings are defined as including any unique chemical substance that contains the named chemical (i.e., antimony, arsenic, etc.) as part of that chemical's infrastructure.

[1] X'CN where X = H' or any other group where a formal dissociation may occur. For example KCN or Ca(CN)$_2$

[2] Includes mono- and di- ethers of ethylene glycol, diethylene glycol, and triethylene glycol R-(OCH$_2$CH$_2$)$_n$-OR' where

n = 1, 2, or 3

R = alkyl or aryl groups

R' = R, H, or groups which, when removed, yield glycol ethers with the structure: R-(OCH$_2$CH)$_n$-OH. Polymers are excluded from the glycol category.

[3] Includes mineral fiber emissions from facilities manufacturing or processing glass, rock, or slag fibers (or other mineral derived fibers) of average diameter 1 micrometer or less.

[4] Includes organic compounds with more than one benzene ring, and which have a boiling point greater than or equal to 100°C.

[5] A type of atom which spontaneously undergoes radioactive decay.

**(2) Revision of the list**

The Administrator shall periodically review the list established by this subsection and publish the results thereof and, where appropriate, revise such list by rule, adding pollutants which present, or may present, through inhalation or other routes of exposure, a threat of adverse human health effects (including, but not limited to, substances which are known to be, or may reasonably be anticipated to be, carcinogenic, mutagenic, teratogenic, neurotoxic, which cause reproductive dysfunction, or which are acutely or chronically toxic) or adverse environmental effects whether through ambient concentrations, bioaccumulation, deposition, or otherwise, but not including releases subject to regulation under subsection (r) as a result of emissions to the air. No air pollutant which is listed under section 7408(a) of this title may be added to the list under this section, except that the prohibition of this sentence shall not apply to any pollutant which independently meets the listing criteria of this paragraph and is a precursor to a pollutant which is listed under section 7408(a) of this title or to any pollutant which is in a class of pollutants listed under such section. No substance, practice, process or activity regulated under subchapter VI of this chapter shall be subject to regulation under this section solely due to its adverse effects on the environment.

**(3) Petitions to modify the list**

**(A)** Beginning at any time after 6 months after November 15, 1990, any person may petition the Administrator to modify the list of hazardous air pollutants under this subsection by adding or deleting a substance or, in case of listed pollutants without CAS numbers (other than coke oven emissions, mineral fibers, or polycyclic organic matter) removing certain unique substances. Within 18 months after receipt of a petition, the Administrator shall either grant or deny the petition by publishing a written explanation of the reasons for the Administrator's decision. Any such petition shall include a showing by the petitioner that there is adequate data on the health or environmental defects [1] of the pollutant or other evidence adequate to support the petition. The Administrator may not deny a petition solely on the basis of inadequate resources or time for review.

**(B)** The Administrator shall add a substance to the list upon a showing by the petitioner or on the Administrator's own determination that the substance is an air pollutant and that emissions, ambient concentrations, bioaccumulation or deposition of the substance are known to cause or may reasonably be anticipated to cause adverse effects to human health or adverse environmental effects.

**(C)** The Administrator shall delete a substance from the list upon a showing by the petitioner or on the Administrator's own determination that there is adequate data on the health and environmental effects of the substance to determine that emissions, ambient concentrations, bioaccumulation or deposition of the substance may not reasonably be anticipated to cause any adverse effects to the human health or adverse environmental effects.

**(D)** The Administrator shall delete one or more unique chemical substances that contain a listed hazardous air pollutant not having a CAS number (other than coke oven emissions, mineral fibers, or polycyclic organic matter) upon a showing by the petitioner or on the Administrator's own determination that such unique chemical substances that contain the named chemical of such listed hazardous air pollutant meet the deletion requirements of subparagraph (C). The Administrator must grant or deny a deletion petition prior to promulgating any emission standards pursuant to subsection (d) applicable to any source category or subcategory of a listed hazardous air pollutant without a CAS number listed under subsection (b) for which a deletion petition has been filed within 12 months of November 15, 1990.

**(4) Further information**

If the Administrator determines that information on the health or environmental effects of a substance is not sufficient to make a determination required by this subsection, the Administrator may use any authority available to the Administrator to acquire such information.

### (5) Test methods

The Administrator may establish, by rule, test measures and other analytic procedures for monitoring and measuring emissions, ambient concentrations, deposition, and bioaccumulation of hazardous air pollutants.

### (6) Prevention of significant deterioration

The provisions of part C (prevention of significant deterioration) shall not apply to pollutants listed under this section.

### (7) Lead

The Administrator may not list elemental lead as a hazardous air pollutant under this subsection.

## (c) List of source categories

### (1) In general

Not later than 12 months after November 15, 1990, the Administrator shall publish, and shall from time to time, but no less often than every 8 years, revise, if appropriate, in response to public comment or new information, a list of all categories and subcategories of major sources and area sources (listed under paragraph (3)) of the air pollutants listed pursuant to subsection (b). To the extent practicable, the categories and subcategories listed under this subsection shall be consistent with the list of source categories established pursuant to section 7411 of this title and part C. Nothing in the preceding sentence limits the Administrator's authority to establish subcategories under this section, as appropriate.

### (2) Requirement for emissions standards

For the categories and subcategories the Administrator lists, the Administrator shall establish emissions standards under subsection (d), according to the schedule in this subsection and subsection (e).

### (3) Area sources

The Administrator shall list under this subsection each category or subcategory of area sources which the Administrator finds presents a threat of adverse effects to human health or the environment (by such sources individually or in the aggregate) warranting regulation under this section. The Administrator shall, not later than 5 years after November 15, 1990, and pursuant to subsection (k)(3)(B), list, based on actual or estimated aggregate emissions of a listed pollutant or pollutants, sufficient categories or subcategories of area sources to ensure that area sources representing 90 percent of the area source emissions of the 30 hazardous air pollutants that present the greatest threat to public health in the largest number of urban areas are subject to regulation under this section. Such regulations shall be promulgated not later than 10 years after November 15, 1990.

**(4) Previously regulated categories**

The Administrator may, in the Administrator's discretion, list any category or subcategory of sources previously regulated under this section as in effect before November 15, 1990.

**(5) Additional categories**

In addition to those categories and subcategories of sources listed for regulation pursuant to paragraphs (1) and (3), the Administrator may at any time list additional categories and subcategories of sources of hazardous air pollutants according to the same criteria for listing applicable under such paragraphs. In the case of source categories and subcategories listed after publication of the initial list required under paragraph (1) or (3), emission standards under subsection (d) for the category or subcategory shall be promulgated within 10 years after November 15, 1990, or within 2 years after the date on which such category or subcategory is listed, whichever is later.

**(6) Specific pollutants**

With respect to alkylated lead compounds, polycyclic organic matter, hexachlorobenzene, mercury, polychlorinated biphenyls, 2,3,7,8-tetrachlorodibenzofurans and 2,3,7,8-tetrachlorodibenzo-p-dioxin, the Administrator shall, not later than 5 years after November 15, 1990, list categories and subcategories of sources assuring that sources accounting for not less than 90 per centum of the aggregate emissions of each such pollutant are subject to standards under subsection (d)(2) or (d)(4). Such standards shall be promulgated not later than 10 years after November 15, 1990. This paragraph shall not be construed to require the Administrator to promulgate standards for such pollutants emitted by electric utility steam generating units.

**(7) Research facilities**

The Administrator shall establish a separate category covering research or laboratory facilities, as necessary to assure the equitable treatment of such facilities. For purposes of this section, "research or laboratory facility" means any stationary source whose primary purpose is to conduct research and development into new processes and products, where such source is operated under the close supervision of technically trained personnel and is not engaged in the manufacture of products for commercial sale in commerce, except in a de minimis manner.

**(8) Boat manufacturing**

When establishing emissions standards for styrene, the Administrator shall list boat manufacturing as a separate subcategory unless the Administrator finds that such listing would be inconsistent with the goals and requirements of this chapter.

**(9) Deletions from the list**

**(A)** Where the sole reason for the inclusion of a source category on the list required under this subsection is the emission of a unique chemical substance, the Administrator shall delete the source category from the list if it is appropriate because of action taken under either subparagraphs (C) or (D) of subsection (b)(3).

**(B)** The Administrator may delete any source category from the list under this subsection, on petition of any person or on the Administrator's own motion, whenever the Administrator makes the following determination or determinations, as applicable:

**(i)** In the case of hazardous air pollutants emitted by sources in the category that may result in cancer in humans, a determination that no source in the category (or group of sources in the case of area sources) emits such hazardous air pollutants in quantities which may cause a lifetime risk of cancer greater than one in one million to the individual in the population who is most exposed to emissions of such pollutants from the source (or group of sources in the case of area sources).

**(ii)** In the case of hazardous air pollutants that may result in adverse health effects in humans other than cancer or adverse environmental effects, a determination that emissions from no source in the category or subcategory concerned (or group of sources in the case of area sources) exceed a level which is adequate to protect public health with an ample margin of safety and no adverse environmental effect will result from emissions from any source (or from a group of sources in the case of area sources).

The Administrator shall grant or deny a petition under this paragraph within 1 year after the petition is filed.

## (d) Emission standards

### (1) In general

The Administrator shall promulgate regulations establishing emission standards for each category or subcategory of major sources and area sources of hazardous air pollutants listed for regulation pursuant to subsection (c) in accordance with the schedules provided in subsections (c) and (e). The Administrator may distinguish among classes, types, and sizes of sources within a category or subcategory in establishing such standards except that, there shall be no delay in the compliance date for any standard applicable to any source under subsection (i) as the result of the authority provided by this sentence.

### (2) Standards and methods

Emissions standards promulgated under this subsection and applicable to new or existing sources of hazardous air pollutants shall require the maximum degree of reduction in emissions of the hazardous air pollutants subject to this section (including a prohibition on such emissions, where achievable) that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for new or existing sources in the category or subcategory to which such emission standard applies, through application of measures, processes, methods, systems or techniques including, but not limited to, measures which--

**(A)** reduce the volume of, or eliminate emissions of, such pollutants through process changes, substitution of materials or other modifications,

**(B)** enclose systems or processes to eliminate emissions,

**(C)** collect, capture or treat such pollutants when released from a process, stack, storage or fugitive emissions point,

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**(D)** are design, equipment, work practice, or operational standards (including requirements for operator training or certification) as provided in subsection (h), or

**(E)** are a combination of the above.

None of the measures described in subparagraphs (A) through (D) shall, consistent with the provisions of section 7414(c) of this title, in any way compromise any United States patent or United States trademark right, or any confidential business information, or any trade secret or any other intellectual property right.

### (3) New and existing sources

The maximum degree of reduction in emissions that is deemed achievable for new sources in a category or subcategory shall not be less stringent than the emission control that is achieved in practice by the best controlled similar source, as determined by the Administrator. Emission standards promulgated under this subsection for existing sources in a category or subcategory may be less stringent than standards for new sources in the same category or subcategory but shall not be less stringent, and may be more stringent than--

**(A)** the average emission limitation achieved by the best performing 12 percent of the existing sources (for which the Administrator has emissions information), excluding those sources that have, within 18 months before the emission standard is proposed or within 30 months before such standard is promulgated, whichever is later, first achieved a level of emission rate or emission reduction which complies, or would comply if the source is not subject to such standard, with the lowest achievable emission rate (as defined by section 7501 of this title) applicable to the source category and prevailing at the time, in the category or subcategory for categories and subcategories with 30 or more sources, or

**(B)** the average emission limitation achieved by the best performing 5 sources (for which the Administrator has or could reasonably obtain emissions information) in the category or subcategory for categories or subcategories with fewer than 30 sources.

### (4) Health threshold

With respect to pollutants for which a health threshold has been established, the Administrator may consider such threshold level, with an ample margin of safety, when establishing emission standards under this subsection.

### (5) Alternative standard for area sources

With respect only to categories and subcategories of area sources listed pursuant to subsection (c), the Administrator may, in lieu of the authorities provided in paragraph (2) and subsection (f), elect to promulgate standards or requirements applicable to sources in such categories or subcategories which provide for the use of generally available control technologies or management practices by such sources to reduce emissions of hazardous air pollutants.

### (6) Review and revision

The Administrator shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every 8 years.

**(7) Other requirements preserved**

No emission standard or other requirement promulgated under this section shall be interpreted, construed or applied to diminish or replace the requirements of a more stringent emission limitation or other applicable requirement established pursuant to section 7411 of this title, part C or D, or other authority of this chapter or a standard issued under State authority.

**(8) Coke ovens**

**(A)** Not later than December 31, 1992, the Administrator shall promulgate regulations establishing emission standards under paragraphs (2) and (3) of this subsection for coke oven batteries. In establishing such standards, the Administrator shall evaluate--

**(i)** the use of sodium silicate (or equivalent) luting compounds to prevent door leaks, and other operating practices and technologies for their effectiveness in reducing coke oven emissions, and their suitability for use on new and existing coke oven batteries, taking into account costs and reasonable commercial door warranties; and

**(ii)** as a basis for emission standards under this subsection for new coke oven batteries that begin construction after the date of proposal of such standards, the Jewell design Thompson non-recovery coke oven batteries and other non-recovery coke oven technologies, and other appropriate emission control and coke production technologies, as to their effectiveness in reducing coke oven emissions and their capability for production of steel quality coke.

Such regulations shall require at a minimum that coke oven batteries will not exceed 8 per centum leaking doors, 1 per centum leaking lids, 5 per centum leaking offtakes, and 16 seconds visible emissions per charge, with no exclusion for emissions during the period after the closing of self-sealing oven doors. Notwithstanding subsection (i), the compliance date for such emission standards for existing coke oven batteries shall be December 31, 1995.

**(B)** The Administrator shall promulgate work practice regulations under this subsection for coke oven batteries requiring, as appropriate--

**(i)** the use of sodium silicate (or equivalent) luting compounds, if the Administrator determines that use of sodium silicate is an effective means of emissions control and is achievable, taking into account costs and reasonable commercial warranties for doors and related equipment; and

**(ii)** door and jam cleaning practices.

Notwithstanding subsection (i), the compliance date for such work practice regulations for coke oven batteries shall be not later than the date 3 years after November 15, 1990.

**(C)** For coke oven batteries electing to qualify for an extension of the compliance date for standards promulgated under subsection (f) in accordance with subsection (i)(8), the emission standards under this subsection for coke oven batteries shall

require that coke oven batteries not exceed 8 per centum leaking doors, 1 per centum leaking lids, 5 per centum leaking offtakes, and 16 seconds visible emissions per charge, with no exclusion for emissions during the period after the closing of self-sealing doors. Notwithstanding subsection (i), the compliance date for such emission standards for existing coke oven batteries seeking an extension shall be not later than the date 3 years after November 15, 1990.

**(9) Sources licensed by the Nuclear Regulatory Commission**

No standard for radionuclide emissions from any category or subcategory of facilities licensed by the Nuclear Regulatory Commission (or an Agreement State) is required to be promulgated under this section if the Administrator determines, by rule, and after consultation with the Nuclear Regulatory Commission, that the regulatory program established by the Nuclear Regulatory Commission pursuant to the Atomic Energy Act for such category or subcategory provides an ample margin of safety to protect the public health. Nothing in this subsection shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce any standard or limitation respecting emissions of radionuclides which is more stringent than the standard or limitation in effect under section 7411 of this title or this section.

**(10) Effective date**

Emission standards or other regulations promulgated under this subsection shall be effective upon promulgation.

**(e) Schedule for standards and review**

**(1) In general**

The Administrator shall promulgate regulations establishing emission standards for categories and subcategories of sources initially listed for regulation pursuant to subsection (c)(1) as expeditiously as practicable, assuring that--

**(A)** emission standards for not less than 40 categories and subcategories (not counting coke oven batteries) shall be promulgated not later than 2 years after November 15, 1990;

**(B)** emission standards for coke oven batteries shall be promulgated not later than December 31, 1992;

**(C)** emission standards for 25 per centum of the listed categories and subcategories shall be promulgated not later than 4 years after November 15, 1990;

**(D)** emission standards for an additional 25 per centum of the listed categories and subcategories shall be promulgated not later than 7 years after November 15, 1990; and

**(E)** emission standards for all categories and subcategories shall be promulgated not later than 10 years after November 15, 1990.

**(2) Priorities**

In determining priorities for promulgating standards under subsection (d), the Administrator shall consider--

**(A)** the known or anticipated adverse effects of such pollutants on public health and the environment;

**(B)** the quantity and location of emissions or reasonably anticipated emissions of hazardous air pollutants that each category or subcategory will emit; and

**(C)** the efficiency of grouping categories or subcategories according to the pollutants emitted, or the processes or technologies used.

**(3) Published schedule**

Not later than 24 months after November 15, 1990, and after opportunity for comment, the Administrator shall publish a schedule establishing a date for the promulgation of emission standards for each category and subcategory of sources listed pursuant to subsection (c)(1) and (3) which shall be consistent with the requirements of paragraphs (1) and (2). The determination of priorities for the promulgation of standards pursuant to this paragraph is not a rulemaking and shall not be subject to judicial review, except that, failure to promulgate any standard pursuant to the schedule established by this paragraph shall be subject to review under section 7604 of this title.

**(4) Judicial review**

Notwithstanding section 7607 of this title, no action of the Administrator adding a pollutant to the list under subsection (b) or listing a source category or subcategory under subsection (c) shall be a final agency action subject to judicial review, except that any such action may be reviewed under such section 7607 of this title when the Administrator issues emission standards for such pollutant or category.

**(5) Publicly owned treatment works**

The Administrator shall promulgate standards pursuant to subsection (d) applicable to publicly owned treatment works (as defined in title II of the Federal Water Pollution Control Act) not later than 5 years after November 15, 1990.

**(f) Standard to protect health and environment**

**(1) Report**

Not later than 6 years after November 15, 1990, the Administrator shall investigate and report, after consultation with the Surgeon General and after opportunity for public comment, to Congress on--

**(A)** methods of calculating the risk to public health remaining, or likely to remain, from sources subject to regulation under this section after the application of standards under subsection (d);

**(B)** the public health significance of such estimated remaining risk and the technologically and commercially available methods and costs of reducing such risks;

**(C)** the actual health effects with respect to persons living in the vicinity of sources, any available epidemiological or other health studies, risks presented by background concentrations of hazardous air pollutants, any uncertainties in risk assessment methodology or other health assessment technique, and any negative health or environmental consequences to the community of efforts to reduce such risks; and

**(D)** recommendations as to legislation regarding such remaining risk.

**(2) Emission standards**

**(A)** If Congress does not act on any recommendation submitted under paragraph (1), the Administrator shall, within 8 years after promulgation of standards for each category or subcategory of sources pursuant to subsection (d), promulgate standards for such category or subcategory if promulgation of such standards is required in order to provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990) or to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect. Emission standards promulgated under this subsection shall provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990), unless the Administrator determines that a more stringent standard is necessary to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect. If standards promulgated pursuant to subsection (d) and applicable to a category or subcategory of sources emitting a pollutant (or pollutants) classified as a known, probable or possible human carcinogen do not reduce lifetime excess cancer risks to the individual most exposed to emissions from a source in the category or subcategory to less than one in one million, the Administrator shall promulgate standards under this subsection for such source category.

**(B)** Nothing in subparagraph (A) or in any other provision of this section shall be construed as affecting, or applying to the Administrator's interpretation of this section, as in effect before November 15, 1990, and set forth in the Federal Register of September 14, 1989 (54 Federal Register 38044).

**(C)** The Administrator shall determine whether or not to promulgate such standards and, if the Administrator decides to promulgate such standards, shall promulgate the standards 8 years after promulgation of the standards under subsection (d) for each source category or subcategory concerned. In the case of categories or subcategories for which standards under subsection (d) are required to be promulgated within 2 years after November 15, 1990, the Administrator shall have 9 years after promulgation of the standards under subsection (d) to make the determination under the preceding sentence and, if required, to promulgate the standards under this paragraph.

**(3) Effective date**

Any emission standard established pursuant to this subsection shall become effective upon promulgation.

**(4) Prohibition**

No air pollutant to which a standard under this subsection applies may be emitted from any stationary source in violation of such standard, except that in the case of an existing source--

**(A)** such standard shall not apply until 90 days after its effective date, and

**(B)** the Administrator may grant a waiver permitting such source a period of up to 2 years after the effective date of a standard to comply with the standard if the Administrator finds that such period is necessary for the installation of controls and that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment.

**(5) Area sources**

The Administrator shall not be required to conduct any review under this subsection or promulgate emission limitations under this subsection for any category or subcategory of area sources that is listed pursuant to subsection (c)(3) and for which an emission standard is promulgated pursuant to subsection (d)(5).

**(6) Unique chemical substances**

In establishing standards for the control of unique chemical substances of listed pollutants without CAS numbers under this subsection, the Administrator shall establish such standards with respect to the health and environmental effects of the substances actually emitted by sources and direct transformation byproducts of such emissions in the categories and subcategories.

**(g) Modifications**

**(1) Offsets**

**(A)** A physical change in, or change in the method of operation of, a major source which results in a greater than de minimis increase in actual emissions of a hazardous air pollutant shall not be considered a modification, if such increase in the quantity of actual emissions of any hazardous air pollutant from such source will be offset by an equal or greater decrease in the quantity of emissions of another hazardous air pollutant (or pollutants) from such source which is deemed more hazardous, pursuant to guidance issued by the Administrator under subparagraph (B). The owner or operator of such source shall submit a showing to the Administrator (or the State) that such increase has been offset under the preceding sentence.

**(B)** The Administrator shall, after notice and opportunity for comment and not later than 18 months after November 15, 1990, publish guidance with respect to implementation of this subsection. Such guidance shall include an identification, to the extent practicable, of the relative hazard to human health resulting from emissions to the ambient air of each of the pollutants listed under subsection (b) sufficient to facilitate the offset showing authorized by subparagraph (A). Such guidance shall not authorize offsets between pollutants where the increased pollutant (or more than one pollutant in a stream of pollutants) causes adverse effects to human health for which no safety threshold for exposure can be determined unless there are corresponding decreases in such types of pollutant(s).

**(2) Construction, reconstruction and modifications**

**(A)** After the effective date of a permit program under subchapter V in any State, no person may modify a major source of hazardous air pollutants in such State, unless the Administrator (or the State) determines that the maximum achievable control technology emission limitation under this section for existing sources will be met. Such determination shall be made on a case-by-case basis where no applicable emissions limitations have been established by the Administrator.

**(B)** After the effective date of a permit program under subchapter V in any State, no person may construct or reconstruct any major source of hazardous air pollutants, unless the Administrator (or the State) determines that the maximum achievable control technology emission limitation under this section for new sources will be met. Such determination shall be made on a case-by-case basis where no applicable emission limitations have been established by the Administrator.

**(3) Procedures for modifications**

The Administrator (or the State) shall establish reasonable procedures for assuring that the requirements applying to modifications under this section are reflected in the permit.

**(h) Work practice standards and other requirements**

**(1) In general**

For purposes of this section, if it is not feasible in the judgment of the Administrator to prescribe or enforce an emission standard for control of a hazardous air pollutant or pollutants, the Administrator may, in lieu thereof, promulgate a design, equipment, work practice, or operational standard, or combination thereof, which in the Administrator's judgment is consistent with the provisions of subsection (d) or (f). In the event the Administrator promulgates a design or equipment standard under this subsection, the Administrator shall include as part of such standard such requirements as will assure the proper operation and maintenance of any such element of design or equipment.

**(2) Definition**

For the purpose of this subsection, the phrase "not feasible to prescribe or enforce an emission standard" means any situation in which the Administrator determines that--

**(A)** a hazardous air pollutant or pollutants cannot be emitted through a conveyance designed and constructed to emit or capture such pollutant, or that any requirement for, or use of, such a conveyance would be inconsistent with any Federal, State or local law, or

**(B)** the application of measurement methodology to a particular class of sources is not practicable due to technological and economic limitations.

**(3) Alternative standard**

If after notice and opportunity for comment, the owner or operator of any source establishes to the satisfaction of the Administrator that an alternative means of emission limitation will achieve a reduction in emissions of any air pollutant

at least equivalent to the reduction in emissions of such pollutant achieved under the requirements of paragraph (1), the Administrator shall permit the use of such alternative by the source for purposes of compliance with this section with respect to such pollutant.

**(4) Numerical standard required**

Any standard promulgated under paragraph (1) shall be promulgated in terms of an emission standard whenever it is feasible to promulgate and enforce a standard in such terms.

**(i) Schedule for compliance**

**(1) Preconstruction and operating requirements**

After the effective date of any emission standard, limitation, or regulation under subsection (d), (f) or (h), no person may construct any new major source or reconstruct any existing major source subject to such emission standard, regulation or limitation unless the Administrator (or a State with a permit program approved under subchapter V) determines that such source, if properly constructed, reconstructed and operated, will comply with the standard, regulation or limitation.

**(2) Special rule**

Notwithstanding the requirements of paragraph (1), a new source which commences construction or reconstruction after a standard, limitation or regulation applicable to such source is proposed and before such standard, limitation or regulation is promulgated shall not be required to comply with such promulgated standard until the date 3 years after the date of promulgation if--

**(A)** the promulgated standard, limitation or regulation is more stringent than the standard, limitation or regulation proposed; and

**(B)** the source complies with the standard, limitation, or regulation as proposed during the 3-year period immediately after promulgation.

**(3) Compliance schedule for existing sources**

**(A)** After the effective date of any emissions standard, limitation or regulation promulgated under this section and applicable to a source, no person may operate such source in violation of such standard, limitation or regulation except, in the case of an existing source, the Administrator shall establish a compliance date or dates for each category or subcategory of existing sources, which shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard, except as provided in subparagraph (B) and paragraphs (4) through (8).

**(B)** The Administrator (or a State with a program approved under subchapter V) may issue a permit that grants an extension permitting an existing source up to 1 additional year to comply with standards under subsection (d) if such additional period is necessary for the installation of controls. An additional extension of up to 3 years may be added for mining waste operations,

if the 4-year compliance time is insufficient to dry and cover mining waste in order to reduce emissions of any pollutant listed under subsection (b).

**(4) Presidential exemption**

The President may exempt any stationary source from compliance with any standard or limitation under this section for a period of not more than 2 years if the President determines that the technology to implement such standard is not available and that it is in the national security interests of the United States to do so. An exemption under this paragraph may be extended for 1 or more additional periods, each period not to exceed 2 years. The President shall report to Congress with respect to each exemption (or extension thereof) made under this paragraph.

**(5) Early reduction**

**(A)** The Administrator (or a State acting pursuant to a permit program approved under subchapter V) shall issue a permit allowing an existing source, for which the owner or operator demonstrates that the source has achieved a reduction of 90 per centum or more in emissions of hazardous air pollutants (95 per centum in the case of hazardous air pollutants which are particulates) from the source, to meet an alternative emission limitation reflecting such reduction in lieu of an emission limitation promulgated under subsection (d) for a period of 6 years from the compliance date for the otherwise applicable standard, provided that such reduction is achieved before the otherwise applicable standard under subsection (d) is first proposed. Nothing in this paragraph shall preclude a State from requiring reductions in excess of those specified in this subparagraph as a condition of granting the extension authorized by the previous sentence.

**(B)** An existing source which achieves the reduction referred to in subparagraph (A) after the proposal of an applicable standard but before January 1, 1994, may qualify under subparagraph (A), if the source makes an enforceable commitment to achieve such reduction before the proposal of the standard. Such commitment shall be enforceable to the same extent as a regulation under this section.

**(C)** The reduction shall be determined with respect to verifiable and actual emissions in a base year not earlier than calendar year 1987, provided that, there is no evidence that emissions in the base year are artificially or substantially greater than emissions in other years prior to implementation of emissions reduction measures. The Administrator may allow a source to use a baseline year of 1985 or 1986 provided that the source can demonstrate to the satisfaction of the Administrator that emissions data for the source reflects verifiable data based on information for such source, received by the Administrator prior to November 15, 1990, pursuant to an information request issued under section 7414 of this title.

**(D)** For each source granted an alternative emission limitation under this paragraph there shall be established by a permit issued pursuant to subchapter V an enforceable emission limitation for hazardous air pollutants reflecting the reduction which qualifies the source for an alternative emission limitation under this paragraph. An alternative emission limitation under this paragraph shall not be available with respect to standards or requirements promulgated pursuant to subsection (f) and the Administrator shall, for the purpose of determining whether a standard under subsection (f) is necessary, review emissions from sources granted an alternative emission limitation under this paragraph at the same time that other sources in the category or subcategory are reviewed.

**(E)** With respect to pollutants for which high risks of adverse public health effects may be associated with exposure to small quantities including, but not limited to, chlorinated dioxins and furans, the Administrator shall by regulation limit the use of

offsetting reductions in emissions of other hazardous air pollutants from the source as counting toward the 90 per centum reduction in such high-risk pollutants qualifying for an alternative emissions limitation under this paragraph.

**(6) Other reductions**

Notwithstanding the requirements of this section, no existing source that has installed--

**(A)** best available control technology (as defined in section 7479(3) of this title), or

**(B)** technology required to meet a lowest achievable emission rate (as defined in section 7501 of this title),

prior to the promulgation of a standard under this section applicable to such source and the same pollutant (or stream of pollutants) controlled pursuant to an action described in subparagraph (A) or (B) shall be required to comply with such standard under this section until the date 5 years after the date on which such installation or reduction has been achieved, as determined by the Administrator. The Administrator may issue such rules and guidance as are necessary to implement this paragraph.

**(7) Extension for new sources**

A source for which construction or reconstruction is commenced after the date an emission standard applicable to such source is proposed pursuant to subsection (d) but before the date an emission standard applicable to such source is proposed pursuant to subsection (f) shall not be required to comply with the emission standard under subsection (f) until the date 10 years after the date construction or reconstruction is commenced.

**(8) Coke ovens**

**(A)** Any coke oven battery that complies with the emission limitations established under subsection (d)(8)(C), subparagraph (B), and subparagraph (C), and complies with the provisions of subparagraph (E), shall not be required to achieve emission limitations promulgated under subsection (f) until January 1, 2020.

**(B)(i)** Not later than December 31, 1992, the Administrator shall promulgate emission limitations for coke oven emissions from coke oven batteries. Notwithstanding paragraph (3) of this subsection, the compliance date for such emission limitations for existing coke oven batteries shall be January 1, 1998. Such emission limitations shall reflect the lowest achievable emission rate as defined in section 7501 of this title for a coke oven battery that is rebuilt or a replacement at a coke oven plant for an existing battery. Such emission limitations shall be no less stringent than--

**(I)** 3 per centum leaking doors (5 per centum leaking doors for six meter batteries);

**(II)** 1 per centum leaking lids;

**(III)** 4 per centum leaking offtakes; and

**(IV)** 16 seconds visible emissions per charge,

with an exclusion for emissions during the period after the closing of self-sealing oven doors (or the total mass emissions equivalent). The rulemaking in which such emission limitations are promulgated shall also establish an appropriate measurement methodology for determining compliance with such emission limitations, and shall establish such emission limitations in terms of an equivalent level of mass emissions reduction from a coke oven battery, unless the Administrator finds that such a mass emissions standard would not be practicable or enforceable. Such measurement methodology, to the extent it measures leaking doors, shall take into consideration alternative test methods that reflect the best technology and practices actually applied in the affected industries, and shall assure that the final test methods are consistent with the performance of such best technology and practices.

**(ii)** If the Administrator fails to promulgate such emission limitations under this subparagraph prior to the effective date of such emission limitations, the emission limitations applicable to coke oven batteries under this subparagraph shall be--

**(I)** 3 per centum leaking doors (5 per centum leaking doors for six meter batteries);

**(II)** 1 per centum leaking lids;

**(III)** 4 per centum leaking offtakes; and

**(IV)** 16 seconds visible emissions per charge,

or the total mass emissions equivalent (if the total mass emissions equivalent is determined to be practicable and enforceable), with no exclusion for emissions during the period after the closing of self-sealing oven doors.

**(C)** Not later than January 1, 2007, the Administrator shall review the emission limitations promulgated under subparagraph (B) and revise, as necessary, such emission limitations to reflect the lowest achievable emission rate as defined in section 7501 of this title at the time for a coke oven battery that is rebuilt or a replacement at a coke oven plant for an existing battery. Such emission limitations shall be no less stringent than the emission limitation promulgated under subparagraph (B). Notwithstanding paragraph (2) of this subsection, the compliance date for such emission limitations for existing coke oven batteries shall be January 1, 2010.

**(D)** At any time prior to January 1, 1998, the owner or operator of any coke oven battery may elect to comply with emission limitations promulgated under subsection (f) by the date such emission limitations would otherwise apply to such coke oven battery, in lieu of the emission limitations and the compliance dates provided under subparagraphs (B) and (C) of this paragraph. Any such owner or operator shall be legally bound to comply with such emission limitations promulgated under subsection (f) with respect to such coke oven battery as of January 1, 2003. If no emission limitations have been promulgated for such coke oven battery, the Administrator shall promulgate such emission limitations in accordance with subsection (f) for such coke oven battery.

**(E)** Coke oven batteries qualifying for an extension under subparagraph (A) shall make available not later than January 1, 2000, to the surrounding communities the results of any risk assessment performed by the Administrator to determine the appropriate level of any emission standard established by the Administrator pursuant to subsection (f).

**(F)** Notwithstanding the provisions of this section, reconstruction of any source of coke oven emissions qualifying for an extension under this paragraph shall not subject such source to emission limitations under subsection (f) more stringent than those established under subparagraphs (B) and (C) until January 1, 2020. For the purposes of this subparagraph, the term "reconstruction" includes the replacement of existing coke oven battery capacity with new coke oven batteries of comparable or lower capacity and lower potential emissions.

**(j) Equivalent emission limitation by permit**

**(1) Effective date**

The requirements of this subsection shall apply in each State beginning on the effective date of a permit program established pursuant to subchapter V in such State, but not prior to the date 42 months after November 15, 1990.

**(2) Failure to promulgate a standard**

In the event that the Administrator fails to promulgate a standard for a category or subcategory of major sources by the date established pursuant to subsection (e)(1) and (3), and beginning 18 months after such date (but not prior to the effective date of a permit program under subchapter V), the owner or operator of any major source in such category or subcategory shall submit a permit application under paragraph (3) and such owner or operator shall also comply with paragraphs (5) and (6).

**(3) Applications**

By the date established by paragraph (2), the owner or operator of a major source subject to this subsection shall file an application for a permit. If the owner or operator of a source has submitted a timely and complete application for a permit required by this subsection, any failure to have a permit shall not be a violation of paragraph (2), unless the delay in final action is due to the failure of the applicant to timely submit information required or requested to process the application. The Administrator shall not later than 18 months after November 15, 1990, and after notice and opportunity for comment, establish requirements for applications under this subsection including a standard application form and criteria for determining in a timely manner the completeness of applications.

**(4) Review and approval**

Permit applications submitted under this subsection shall be reviewed and approved or disapproved according to the provisions of section 7661d of this title. In the event that the Administrator (or the State) disapproves a permit application submitted under this subsection or determines that the application is incomplete, the applicant shall have up to 6 months to revise the application to meet the objections of the Administrator (or the State).

**(5) Emission limitation**

The permit shall be issued pursuant to subchapter V and shall contain emission limitations for the hazardous air pollutants subject to regulation under this section and emitted by the source that the Administrator (or the State) determines, on a case-by-case basis, to be equivalent to the limitation that would apply to such source if an emission standard had been promulgated in a timely manner under subsection (d). In the alternative, if the applicable criteria are met, the permit may contain an

emissions limitation established according to the provisions of subsection (i)(5). For purposes of the preceding sentence, the reduction required by subsection (i)(5)(A) shall be achieved by the date on which the relevant standard should have been promulgated under subsection (d). No such pollutant may be emitted in amounts exceeding an emission limitation contained in a permit immediately for new sources and, as expeditiously as practicable, but not later than the date 3 years after the permit is issued for existing sources or such other compliance date as would apply under subsection (i).

**(6) Applicability of subsequent standards**

If the Administrator promulgates an emission standard that is applicable to the major source prior to the date on which a permit application is approved, the emission limitation in the permit shall reflect the promulgated standard rather than the emission limitation determined pursuant to paragraph (5), provided that the source shall have the compliance period provided under subsection (i). If the Administrator promulgates a standard under subsection (d) that would be applicable to the source in lieu of the emission limitation established by permit under this subsection after the date on which the permit has been issued, the Administrator (or the State) shall revise such permit upon the next renewal to reflect the standard promulgated by the Administrator providing such source a reasonable time to comply, but no longer than 8 years after such standard is promulgated or 8 years after the date on which the source is first required to comply with the emissions limitation established by paragraph (5), whichever is earlier.

## (k) Area source program

**(1) Findings and purpose**

The Congress finds that emissions of hazardous air pollutants from area sources may individually, or in the aggregate, present significant risks to public health in urban areas. Considering the large number of persons exposed and the risks of carcinogenic and other adverse health effects from hazardous air pollutants, ambient concentrations characteristic of large urban areas should be reduced to levels substantially below those currently experienced. It is the purpose of this subsection to achieve a substantial reduction in emissions of hazardous air pollutants from area sources and an equivalent reduction in the public health risks associated with such sources including a reduction of not less than 75 per centum in the incidence of cancer attributable to emissions from such sources.

**(2) Research program**

The Administrator shall, after consultation with State and local air pollution control officials, conduct a program of research with respect to sources of hazardous air pollutants in urban areas and shall include within such program--

**(A)** ambient monitoring for a broad range of hazardous air pollutants (including, but not limited to, volatile organic compounds, metals, pesticides and products of incomplete combustion) in a representative number of urban locations;

**(B)** analysis to characterize the sources of such pollution with a focus on area sources and the contribution that such sources make to public health risks from hazardous air pollutants; and

**(C)** consideration of atmospheric transformation and other factors which can elevate public health risks from such pollutants.

Health effects considered under this program shall include, but not be limited to, carcinogenicity, mutagenicity, teratogenicity, neurotoxicity, reproductive dysfunction and other acute and chronic effects including the role of such pollutants as precursors of ozone or acid aerosol formation. The Administrator shall report the preliminary results of such research not later than 3 years after November 15, 1990.

**(3) National strategy**

**(A)** Considering information collected pursuant to the monitoring program authorized by paragraph (2), the Administrator shall, not later than 5 years after November 15, 1990, and after notice and opportunity for public comment, prepare and transmit to the Congress a comprehensive strategy to control emissions of hazardous air pollutants from area sources in urban areas.

**(B)** The strategy shall--

**(i)** identify not less than 30 hazardous air pollutants which, as the result of emissions from area sources, present the greatest threat to public health in the largest number of urban areas and that are or will be listed pursuant to subsection (b), and

**(ii)** identify the source categories or subcategories emitting such pollutants that are or will be listed pursuant to subsection (c). When identifying categories and subcategories of sources under this subparagraph, the Administrator shall assure that sources accounting for 90 per centum or more of the aggregate emissions of each of the 30 identified hazardous air pollutants are subject to standards pursuant to subsection (d).

**(C)** The strategy shall include a schedule of specific actions to substantially reduce the public health risks posed by the release of hazardous air pollutants from area sources that will be implemented by the Administrator under the authority of this or other laws (including, but not limited to, the Toxic Substances Control Act, the Federal Insecticide, Fungicide and Rodenticide Act and the Resource Conservation and Recovery Act) or by the States. The strategy shall achieve a reduction in the incidence of cancer attributable to exposure to hazardous air pollutants emitted by stationary sources of not less than 75 per centum, considering control of emissions of hazardous air pollutants from all stationary sources and resulting from measures implemented by the Administrator or by the States under this or other laws.

**(D)** The strategy may also identify research needs in monitoring, analytical methodology, modeling or pollution control techniques and recommendations for changes in law that would further the goals and objectives of this subsection.

**(E)** Nothing in this subsection shall be interpreted to preclude or delay implementation of actions with respect to area sources of hazardous air pollutants under consideration pursuant to this or any other law and that may be promulgated before the strategy is prepared.

**(F)** The Administrator shall implement the strategy as expeditiously as practicable assuring that all sources are in compliance with all requirements not later than 9 years after November 15, 1990.

**(G)** As part of such strategy the Administrator shall provide for ambient monitoring and emissions modeling in urban areas as appropriate to demonstrate that the goals and objectives of the strategy are being met.

**(4) Areawide activities**

In addition to the national urban air toxics strategy authorized by paragraph (3), the Administrator shall also encourage and support areawide strategies developed by State or local air pollution control agencies that are intended to reduce risks from emissions by area sources within a particular urban area. From the funds available for grants under this section, the Administrator shall set aside not less than 10 per centum to support areawide strategies addressing hazardous air pollutants emitted by area sources and shall award such funds on a demonstration basis to those States with innovative and effective strategies. At the request of State or local air pollution control officials, the Administrator shall prepare guidelines for control technologies or management practices which may be applicable to various categories or subcategories of area sources.

**(5) Report**

The Administrator shall report to the Congress at intervals not later than 8 and 12 years after November 15, 1990, on actions taken under this subsection and other parts of this chapter to reduce the risk to public health posed by the release of hazardous air pollutants from area sources. The reports shall also identify specific metropolitan areas that continue to experience high risks to public health as the result of emissions from area sources.

**(l) State programs**

**(1) In general**

Each State may develop and submit to the Administrator for approval a program for the implementation and enforcement (including a review of enforcement delegations previously granted) of emission standards and other requirements for air pollutants subject to this section or requirements for the prevention and mitigation of accidental releases pursuant to subsection (r). A program submitted by a State under this subsection may provide for partial or complete delegation of the Administrator's authorities and responsibilities to implement and enforce emissions standards and prevention requirements but shall not include authority to set standards less stringent than those promulgated by the Administrator under this chapter.

**(2) Guidance**

Not later than 12 months after November 15, 1990, the Administrator shall publish guidance that would be useful to the States in developing programs for submittal under this subsection. The guidance shall also provide for the registration of all facilities producing, processing, handling or storing any substance listed pursuant to subsection (r) in amounts greater than the threshold quantity. The Administrator shall include as an element in such guidance an optional program begun in 1986 for the review of high-risk point sources of air pollutants including, but not limited to, hazardous air pollutants listed pursuant to subsection (b).

**(3) Technical assistance**

The Administrator shall establish and maintain an air toxics clearinghouse and center to provide technical information and assistance to State and local agencies and, on a cost recovery basis, to others on control technology, health and ecological risk assessment, risk analysis, ambient monitoring and modeling, and emissions measurement and monitoring. The Administrator shall use the authority of section 7403 of this title to examine methods for preventing, measuring, and controlling emissions and evaluating associated health and ecological risks. Where appropriate, such activity shall be conducted with not-for-profit

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

organizations. The Administrator may conduct research on methods for preventing, measuring and controlling emissions and evaluating associated health and environment risks. All information collected under this paragraph shall be available to the public.

**(4) Grants**

Upon application of a State, the Administrator may make grants, subject to such terms and conditions as the Administrator deems appropriate, to such State for the purpose of assisting the State in developing and implementing a program for submittal and approval under this subsection. Programs assisted under this paragraph may include program elements addressing air pollutants or extremely hazardous substances other than those specifically subject to this section. Grants under this paragraph may include support for high-risk point source review as provided in paragraph (2) and support for the development and implementation of areawide area source programs pursuant to subsection (k).

**(5) Approval or disapproval**

Not later than 180 days after receiving a program submitted by a State, and after notice and opportunity for public comment, the Administrator shall either approve or disapprove such program. The Administrator shall disapprove any program submitted by a State, if the Administrator determines that--

**(A)** the authorities contained in the program are not adequate to assure compliance by all sources within the State with each applicable standard, regulation or requirement established by the Administrator under this section;

**(B)** adequate authority does not exist, or adequate resources are not available, to implement the program;

**(C)** the schedule for implementing the program and assuring compliance by affected sources is not sufficiently expeditious; or

**(D)** the program is otherwise not in compliance with the guidance issued by the Administrator under paragraph (2) or is not likely to satisfy, in whole or in part, the objectives of this chapter.

If the Administrator disapproves a State program, the Administrator shall notify the State of any revisions or modifications necessary to obtain approval. The State may revise and resubmit the proposed program for review and approval pursuant to the provisions of this subsection.

**(6) Withdrawal**

Whenever the Administrator determines, after public hearing, that a State is not administering and enforcing a program approved pursuant to this subsection in accordance with the guidance published pursuant to paragraph (2) or the requirements of paragraph (5), the Administrator shall so notify the State and, if action which will assure prompt compliance is not taken within 90 days, the Administrator shall withdraw approval of the program. The Administrator shall not withdraw approval of any program unless the State shall have been notified and the reasons for withdrawal shall have been stated in writing and made public.

**(7) Authority to enforce**

Nothing in this subsection shall prohibit the Administrator from enforcing any applicable emission standard or requirement under this section.

**(8) Local program**

The Administrator may, after notice and opportunity for public comment, approve a program developed and submitted by a local air pollution control agency (after consultation with the State) pursuant to this subsection and any such agency implementing an approved program may take any action authorized to be taken by a State under this section.

**(9) Permit authority**

Nothing in this subsection shall affect the authorities and obligations of the Administrator or the State under subchapter V.

**(m) Atmospheric deposition to Great Lakes and coastal waters**

**(1) Deposition assessment**

The Administrator, in cooperation with the Under Secretary of Commerce for Oceans and Atmosphere, shall conduct a program to identify and assess the extent of atmospheric deposition of hazardous air pollutants (and in the discretion of the Administrator, other air pollutants) to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters. As part of such program, the Administrator shall--

**(A)** monitor the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters, including monitoring of the Great Lakes through the monitoring network established pursuant to paragraph (2) of this subsection and designing and deploying an atmospheric monitoring network for coastal waters pursuant to paragraph (4);

**(B)** investigate the sources and deposition rates of atmospheric deposition of air pollutants (and their atmospheric transformation precursors);

**(C)** conduct research to develop and improve monitoring methods and to determine the relative contribution of atmospheric pollutants to total pollution loadings to the Great Lakes, the Chesapeake Bay, Lake Champlain, and coastal waters;

**(D)** evaluate any adverse effects to public health or the environment caused by such deposition (including effects resulting from indirect exposure pathways) and assess the contribution of such deposition to violations of water quality standards established pursuant to the Federal Water Pollution Control Act and drinking water standards established pursuant to the Safe Drinking Water Act; and

**(E)** sample for such pollutants in biota, fish, and wildlife of the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters and characterize the sources of such pollutants.

**(2) Great Lakes monitoring network**

The Administrator shall oversee, in accordance with Annex 15 of the Great Lakes Water Quality Agreement, the establishment and operation of a Great Lakes atmospheric deposition network to monitor atmospheric deposition of hazardous air pollutants (and in the Administrator's discretion, other air pollutants) to the Great Lakes.

**(A)** As part of the network provided for in this paragraph, and not later than December 31, 1991, the Administrator shall establish in each of the 5 Great Lakes at least 1 facility capable of monitoring the atmospheric deposition of hazardous air pollutants in both dry and wet conditions.

**(B)** The Administrator shall use the data provided by the network to identify and track the movement of hazardous air pollutants through the Great Lakes, to determine the portion of water pollution loadings attributable to atmospheric deposition of such pollutants, and to support development of remedial action plans and other management plans as required by the Great Lakes Water Quality Agreement.

**(C)** The Administrator shall assure that the data collected by the Great Lakes atmospheric deposition monitoring network is in a format compatible with databases sponsored by the International Joint Commission, Canada, and the several States of the Great Lakes region.

**(3) Monitoring for the Chesapeake Bay and Lake Champlain**

The Administrator shall establish at the Chesapeake Bay and Lake Champlain atmospheric deposition stations to monitor deposition of hazardous air pollutants (and in the Administrator's discretion, other air pollutants) within the Chesapeake Bay and Lake Champlain watersheds. The Administrator shall determine the role of air deposition in the pollutant loadings of the Chesapeake Bay and Lake Champlain, investigate the sources of air pollutants deposited in the watersheds, evaluate the health and environmental effects of such pollutant loadings, and shall sample such pollutants in biota, fish and wildlife within the watersheds, as necessary to characterize such effects.

**(4) Monitoring for coastal waters**

The Administrator shall design and deploy atmospheric deposition monitoring networks for coastal waters and their watersheds and shall make any information collected through such networks available to the public. As part of this effort, the Administrator shall conduct research to develop and improve deposition monitoring methods, and to determine the relative contribution of atmospheric pollutants to pollutant loadings. For purposes of this subsection, "coastal waters" shall mean estuaries selected pursuant to section 320(a)(2)(A) of the Federal Water Pollution Control Act or listed pursuant to section 320(a)(2)(B) of such Act or estuarine research reserves designated pursuant to section 1461 of Title 16.

**(5) Report**

Within 3 years of November 15, 1990, and biennially thereafter, the Administrator, in cooperation with the Under Secretary of Commerce for Oceans and Atmosphere, shall submit to the Congress a report on the results of any monitoring, studies, and investigations conducted pursuant to this subsection. Such report shall include, at a minimum, an assessment of--

**(A)** the contribution of atmospheric deposition to pollution loadings in the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters;

**(B)** the environmental and public health effects of any pollution which is attributable to atmospheric deposition to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters;

**(C)** the source or sources of any pollution to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters which is attributable to atmospheric deposition;

**(D)** whether pollution loadings in the Great Lakes, the Chesapeake Bay, Lake Champlain or coastal waters cause or contribute to exceedances of drinking water standards pursuant to the Safe Drinking Water Act or water quality standards pursuant to the Federal Water Pollution Control Act or, with respect to the Great Lakes, exceedances of the specific objectives of the Great Lakes Water Quality Agreement; and

**(E)** a description of any revisions of the requirements, standards, and limitations pursuant to this chapter and other applicable Federal laws as are necessary to assure protection of human health and the environment.

**(6) Additional regulation**

As part of the report to Congress, the Administrator shall determine whether the other provisions of this section are adequate to prevent serious adverse effects to public health and serious or widespread environmental effects, including such effects resulting from indirect exposure pathways, associated with atmospheric deposition to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters of hazardous air pollutants (and their atmospheric transformation products). The Administrator shall take into consideration the tendency of such pollutants to bioaccumulate. Within 5 years after November 15, 1990, the Administrator shall, based on such report and determination, promulgate, in accordance with this section, such further emission standards or control measures as may be necessary and appropriate to prevent such effects, including effects due to bioaccumulation and indirect exposure pathways. Any requirements promulgated pursuant to this paragraph with respect to coastal waters shall only apply to the coastal waters of the States which are subject to section 7627(a) of this title.

**(n) Other provisions**

**(1) Electric utility steam generating units**

**(A)** The Administrator shall perform a study of the hazards to public health reasonably anticipated to occur as a result of emissions by electric utility steam generating units of pollutants listed under subsection (b) after imposition of the requirements of this chapter. The Administrator shall report the results of this study to the Congress within 3 years after November 15, 1990. The Administrator shall develop and describe in the Administrator's report to Congress alternative control strategies for emissions which may warrant regulation under this section. The Administrator shall regulate electric utility steam generating units under this section, if the Administrator finds such regulation is appropriate and necessary after considering the results of the study required by this subparagraph.

**(B)** The Administrator shall conduct, and transmit to the Congress not later than 4 years after November 15, 1990, a study of mercury emissions from electric utility steam generating units, municipal waste combustion units, and other sources, including area sources. Such study shall consider the rate and mass of such emissions, the health and environmental effects of such emissions, technologies which are available to control such emissions, and the costs of such technologies.

**(C)** The National Institute of Environmental Health Sciences shall conduct, and transmit to the Congress not later than 3 years after November 15, 1990, a study to determine the threshold level of mercury exposure below which adverse human health effects are not expected to occur. Such study shall include a threshold for mercury concentrations in the tissue of fish which may be consumed (including consumption by sensitive populations) without adverse effects to public health.

**(2) Coke oven production technology study**

**(A)** The Secretary of the Department of Energy and the Administrator shall jointly undertake a 6-year study to assess coke oven production emission control technologies and to assist in the development and commercialization of technically practicable and economically viable control technologies which have the potential to significantly reduce emissions of hazardous air pollutants from coke oven production facilities. In identifying control technologies, the Secretary and the Administrator shall consider the range of existing coke oven operations and battery design and the availability of sources of materials for such coke ovens as well as alternatives to existing coke oven production design.

**(B)** The Secretary and the Administrator are authorized to enter into agreements with persons who propose to develop, install and operate coke production emission control technologies which have the potential for significant emissions reductions of hazardous air pollutants provided that Federal funds shall not exceed 50 per centum of the cost of any project assisted pursuant to this paragraph.

**(C)** On completion of the study, the Secretary shall submit to Congress a report on the results of the study and shall make recommendations to the Administrator identifying practicable and economically viable control technologies for coke oven production facilities to reduce residual risks remaining after implementation of the standard under subsection (d).

**(D)** There are authorized to be appropriated $5,000,000 for each of the fiscal years 1992 through 1997 to carry out the program authorized by this paragraph.

**(3) Publicly owned treatment works**

The Administrator may conduct, in cooperation with the owners and operators of publicly owned treatment works, studies to characterize emissions of hazardous air pollutants emitted by such facilities, to identify industrial, commercial and residential discharges that contribute to such emissions and to demonstrate control measures for such emissions. When promulgating any standard under this section applicable to publicly owned treatment works, the Administrator may provide for control measures that include pretreatment of discharges causing emissions of hazardous air pollutants and process or product substitutions or limitations that may be effective in reducing such emissions. The Administrator may prescribe uniform sampling, modeling and risk assessment methods for use in implementing this subsection.

**(4) Oil and gas wells; pipeline facilities**

**(A)** Notwithstanding the provisions of subsection (a), emissions from any oil or gas exploration or production well (with its associated equipment) and emissions from any pipeline compressor or pump station shall not be aggregated with emissions from other similar units, whether or not such units are in a contiguous area or under common control, to determine whether such units or stations are major sources, and in the case of any oil or gas exploration or production well (with its associated equipment), such emissions shall not be aggregated for any purpose under this section.

**(B)** The Administrator shall not list oil and gas production wells (with its associated equipment) as an area source category under subsection (c), except that the Administrator may establish an area source category for oil and gas production wells located in any metropolitan statistical area or consolidated metropolitan statistical area with a population in excess of 1 million, if the Administrator determines that emissions of hazardous air pollutants from such wells present more than a negligible risk of adverse effects to public health.

**(5) Hydrogen sulfide**

The Administrator is directed to assess the hazards to public health and the environment resulting from the emission of hydrogen sulfide associated with the extraction of oil and natural gas resources. To the extent practicable, the assessment shall build upon and not duplicate work conducted for an assessment pursuant to section 8002(m) of the Solid Waste Disposal Act and shall reflect consultation with the States. The assessment shall include a review of existing State and industry control standards, techniques and enforcement. The Administrator shall report to the Congress within 24 months after November 15, 1990, with the findings of such assessment, together with any recommendations, and shall, as appropriate, develop and implement a control strategy for emissions of hydrogen sulfide to protect human health and the environment, based on the findings of such assessment, using authorities under this chapter including sections [3] 7411 of this title and this section.

**(6) Hydrofluoric acid**

Not later than 2 years after November 15, 1990, the Administrator shall, for those regions of the country which do not have comprehensive health and safety regulations with respect to hydrofluoric acid, complete a study of the potential hazards of hydrofluoric acid and the uses of hydrofluoric acid in industrial and commercial applications to public health and the environment considering a range of events including worst-case accidental releases and shall make recommendations to the Congress for the reduction of such hazards, if appropriate.

**(7) RCRA facilities**

In the case of any category or subcategory of sources the air emissions of which are regulated under subtitle C of the Solid Waste Disposal Act, the Administrator shall take into account any regulations of such emissions which are promulgated under such subtitle and shall, to the maximum extent practicable and consistent with the provisions of this section, ensure that the requirements of such subtitle and this section are consistent.

**(o) National Academy of Sciences study**

**(1) Request of the Academy**

Within 3 months of November 15, 1990, the Administrator shall enter into appropriate arrangements with the National Academy of Sciences to conduct a review of--

**(A)** risk assessment methodology used by the Environmental Protection Agency to determine the carcinogenic risk associated with exposure to hazardous air pollutants from source categories and subcategories subject to the requirements of this section; and

**(B)** improvements in such methodology.

**(2) Elements to be studied**

In conducting such review, the National Academy of Sciences should consider, but not be limited to, the following--

**(A)** the techniques used for estimating and describing the carcinogenic potency to humans of hazardous air pollutants; and

**(B)** the techniques used for estimating exposure to hazardous air pollutants (for hypothetical and actual maximally exposed individuals as well as other exposed individuals).

**(3) Other health effects of concern**

To the extent practicable, the Academy shall evaluate and report on the methodology for assessing the risk of adverse human health effects other than cancer for which safe thresholds of exposure may not exist, including, but not limited to, inheritable genetic mutations, birth defects, and reproductive dysfunctions.

**(4) Report**

A report on the results of such review shall be submitted to the Senate Committee on Environment and Public Works, the House Committee on Energy and Commerce, the Risk Assessment and Management Commission established by section 303 of the Clean Air Act Amendments of 1990 and the Administrator not later than 30 months after November 15, 1990.

**(5) Assistance**

The Administrator shall assist the Academy in gathering any information the Academy deems necessary to carry out this subsection. The Administrator may use any authority under this chapter to obtain information from any person, and to require any person to conduct tests, keep and produce records, and make reports respecting research or other activities conducted by such person as necessary to carry out this subsection.

**(6) Authorization**

Of the funds authorized to be appropriated to the Administrator by this chapter, such amounts as are required shall be available to carry out this subsection.

**(7) Guidelines for carcinogenic risk assessment**

The Administrator shall consider, but need not adopt, the recommendations contained in the report of the National Academy of Sciences prepared pursuant to this subsection and the views of the Science Advisory Board, with respect to such report. Prior to the promulgation of any standard under subsection (f), and after notice and opportunity for comment, the Administrator shall publish revised Guidelines for Carcinogenic Risk Assessment or a detailed explanation of the reasons that any recommendations contained in the report of the National Academy of Sciences will not be implemented. The publication of such revised Guidelines shall be a final Agency action for purposes of section 7607 of this title.

**(p) Mickey Leland National Urban Air Toxics Research Center**

**(1) Establishment**

The Administrator shall oversee the establishment of a National Urban Air Toxics Research Center, to be located at a university, a hospital, or other facility capable of undertaking and maintaining similar research capabilities in the areas of epidemiology, oncology, toxicology, pulmonary medicine, pathology, and biostatistics. The center shall be known as the Mickey Leland National Urban Air Toxics Research Center. The geographic site of the National Urban Air Toxics Research Center should be further directed to Harris County, Texas, in order to take full advantage of the well developed scientific community presence on-site at the Texas Medical Center as well as the extensive data previously compiled for the comprehensive monitoring system currently in place.

**(2) Board of Directors**

The National Urban Air Toxics Research Center shall be governed by a Board of Directors to be comprised of 9 members, the appointment of which shall be allocated pro rata among the Speaker of the House, the Majority Leader of the Senate and the President. The members of the Board of Directors shall be selected based on their respective academic and professional backgrounds and expertise in matters relating to public health, environmental pollution and industrial hygiene. The duties of the Board of Directors shall be to determine policy and research guidelines, submit views from center sponsors and the public and issue periodic reports of center findings and activities.

**(3) Scientific Advisory Panel**

The Board of Directors shall be advised by a Scientific Advisory Panel, the 13 members of which shall be appointed by the Board, and to include eminent members of the scientific and medical communities. The Panel membership may include scientists with relevant experience from the National Institute of Environmental Health Sciences, the Center for Disease Control, the Environmental Protection Agency, the National Cancer Institute, and others, and the Panel shall conduct peer review and evaluate research results. The Panel shall assist the Board in developing the research agenda, reviewing proposals and applications, and advise on the awarding of research grants.

**(4) Funding**

The center shall be established and funded with both Federal and private source funds.

**(q) Savings provision**

**(1) Standards previously promulgated**

Any standard under this section in effect before the date of enactment of the Clean Air Act Amendments of 1990 shall remain in force and effect after such date unless modified as provided in this section before the date of enactment of such Amendments or under such Amendments. Except as provided in paragraph (4), any standard under this section which has been promulgated, but has not taken effect, before such date shall not be affected by such Amendments unless modified as provided in this section before such date or under such Amendments. Each such standard shall be reviewed and, if appropriate, revised, to comply with the requirements of subsection (d) within 10 years after the date of enactment of the Clean Air Act Amendments of 1990. If a timely petition for review of any such standard under section 7607 of this title is pending on such date of enactment, the standard shall be upheld if it complies with this section as in effect before that date. If any such standard is remanded to the Administrator, the Administrator may in the Administrator's discretion apply either the requirements of this section, or those of this section as in effect before the date of enactment of the Clean Air Act Amendments of 1990.

**(2) Special rule**

Notwithstanding paragraph (1), no standard shall be established under this section, as amended by the Clean Air Act Amendments of 1990, for radionuclide emissions from (A) elemental phosphorous plants, (B) grate calcination elemental phosphorous plants, (C) phosphogypsum stacks, or (D) any subcategory of the foregoing. This section, as in effect prior to the date of enactment of the Clean Air Act Amendments of 1990, shall remain in effect for radionuclide emissions from such plants and stacks.

**(3) Other categories**

Notwithstanding paragraph (1), this section, as in effect prior to the date of enactment of the Clean Air Act Amendments of 1990, shall remain in effect for radionuclide emissions from non-Department of Energy Federal facilities that are not licensed by the Nuclear Regulatory Commission, coal-fired utility and industrial boilers, underground uranium mines, surface uranium mines, and disposal of uranium mill tailings piles, unless the Administrator, in the Administrator's discretion, applies the requirements of this section as modified by the Clean Air Act Amendments of 1990 to such sources of radionuclides.

**(4) Medical facilities**

Notwithstanding paragraph (1), no standard promulgated under this section prior to November 15, 1990, with respect to medical research or treatment facilities shall take effect for two years following November 15, 1990, unless the Administrator makes a determination pursuant to a rulemaking under subsection (d)(9). If the Administrator determines that the regulatory program established by the Nuclear Regulatory Commission for such facilities does not provide an ample margin of safety to protect public health, the requirements of this section shall fully apply to such facilities. If the Administrator determines that such regulatory program does provide an ample margin of safety to protect the public health, the Administrator is not required to promulgate a standard under this section for such facilities, as provided in subsection (d)(9).

**(r) Prevention of accidental releases**

**(1) Purpose and general duty**

It shall be the objective of the regulations and programs authorized under this subsection to prevent the accidental release and to minimize the consequences of any such release of any substance listed pursuant to paragraph (3) or any other extremely hazardous substance. The owners and operators of stationary sources producing, processing, handling or storing such substances have a general duty in the same manner and to the same extent as section 654 of Title 29 to identify hazards

which may result from such releases using appropriate hazard assessment techniques, to design and maintain a safe facility taking such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur. For purposes of this paragraph, the provisions of section 7604 of this title shall not be available to any person or otherwise be construed to be applicable to this paragraph. Nothing in this section shall be interpreted, construed, implied or applied to create any liability or basis for suit for compensation for bodily injury or any other injury or property damages to any person which may result from accidental releases of such substances.

**(2) Definitions**

**(A)** The term "accidental release" means an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source.

**(B)** The term "regulated substance" means a substance listed under paragraph (3).

**(C)** The term "stationary source" means any buildings, structures, equipment, installations or substance emitting stationary activities (i) which belong to the same industrial group, (ii) which are located on one or more contiguous properties, (iii) which are under the control of the same person (or persons under common control), and (iv) from which an accidental release may occur.

**(D)** The term "retail facility" means a stationary source at which more than one-half of the income is obtained from direct sales to end users or at which more than one-half of the fuel sold, by volume, is sold through a cylinder exchange program.

**(3) List of substances**

The Administrator shall promulgate not later than 24 months after November 15, 1990, an initial list of 100 substances which, in the case of an accidental release, are known to cause or may reasonably be anticipated to cause death, injury, or serious adverse effects to human health or the environment. For purposes of promulgating such list, the Administrator shall use, but is not limited to, the list of extremely hazardous substances published under the Emergency Planning and Community Right-to-Know [6] Act of 1986, with such modifications as the Administrator deems appropriate. The initial list shall include chlorine, anhydrous ammonia, methyl chloride, ethylene oxide, vinyl chloride, methyl isocyanate, hydrogen cyanide, ammonia, hydrogen sulfide, toluene diisocyanate, phosgene, bromine, anhydrous hydrogen chloride, hydrogen fluoride, anhydrous sulfur dioxide, and sulfur trioxide. The initial list shall include at least 100 substances which pose the greatest risk of causing death, injury, or serious adverse effects to human health or the environment from accidental releases. Regulations establishing the list shall include an explanation of the basis for establishing the list. The list may be revised from time to time by the Administrator on the Administrator's own motion or by petition and shall be reviewed at least every 5 years. No air pollutant for which a national primary ambient air quality standard has been established shall be included on any such list. No substance, practice, process, or activity regulated under subchapter VI shall be subject to regulations under this subsection. The Administrator shall establish procedures for the addition and deletion of substances from the list established under this paragraph consistent with those applicable to the list in subsection (b).

**(4) Factors to be considered**

In listing substances under paragraph (3), the Administrator--

**(A)** shall consider--

**(i)** the severity of any acute adverse health effects associated with accidental releases of the substance;

**(ii)** the likelihood of accidental releases of the substance; and

**(iii)** the potential magnitude of human exposure to accidental releases of the substance; and

**(B)** shall not list a flammable substance when used as a fuel or held for sale as a fuel at a retail facility under this subsection solely because of the explosive or flammable properties of the substance, unless a fire or explosion caused by the substance will result in acute adverse health effects from human exposure to the substance, including the unburned fuel or its combustion byproducts, other than those caused by the heat of the fire or impact of the explosion.

**(5) Threshold quantity**

At the time any substance is listed pursuant to paragraph (3), the Administrator shall establish by rule, a threshold quantity for the substance, taking into account the toxicity, reactivity, volatility, dispersibility, combustibility, or flammability of the substance and the amount of the substance which, as a result of an accidental release, is known to cause or may reasonably be anticipated to cause death, injury or serious adverse effects to human health for which the substance was listed. The Administrator is authorized to establish a greater threshold quantity for, or to exempt entirely, any substance that is a nutrient used in agriculture when held by a farmer.

**(6) Chemical Safety Board**

**(A)** There is hereby established an independent safety board to be known as the Chemical Safety and Hazard Investigation Board.

**(B)** The Board shall consist of 5 members, including a Chairperson, who shall be appointed by the President, by and with the advice and consent of the Senate. Members of the Board shall be appointed on the basis of technical qualification, professional standing, and demonstrated knowledge in the fields of accident reconstruction, safety engineering, human factors, toxicology, or air pollution regulation. The terms of office of members of the Board shall be 5 years. Any member of the Board, including the Chairperson, may be removed for inefficiency, neglect of duty, or malfeasance in office. The Chairperson shall be the Chief Executive Officer of the Board and shall exercise the executive and administrative functions of the Board.

**(C)** The Board shall--

**(i)** investigate (or cause to be investigated), determine and report to the public in writing the facts, conditions, and circumstances and the cause or probable cause of any accidental release resulting in a fatality, serious injury or substantial property damages;

**(ii)** issue periodic reports to the Congress, Federal, State and local agencies, including the Environmental Protection Agency and the Occupational Safety and Health Administration, concerned with the safety of chemical production, processing, handling and storage, and other interested persons recommending measures to reduce the likelihood or the consequences of accidental releases and proposing corrective steps to make chemical production, processing, handling and storage as safe and free from risk of injury as is possible and may include in such reports proposed rules or orders which should be issued by the Administrator under the authority of this section or the Secretary of Labor under the Occupational Safety and Health Act to prevent or minimize the consequences of any release of substances that may cause death, injury or other serious adverse effects on human health or substantial property damage as the result of an accidental release; and

**(iii)** establish by regulation requirements binding on persons for reporting accidental releases into the ambient air subject to the Board's investigatory jurisdiction. Reporting releases to the National Response Center, in lieu of the Board directly, shall satisfy such regulations. The National Response Center shall promptly notify the Board of any releases which are within the Board's jurisdiction.

**(D)** The Board may utilize the expertise and experience of other agencies.

**(E)** The Board shall coordinate its activities with investigations and studies conducted by other agencies of the United States having a responsibility to protect public health and safety. The Board shall enter into a memorandum of understanding with the National Transportation Safety Board to assure coordination of functions and to limit duplication of activities which shall designate the National Transportation Safety Board as the lead agency for the investigation of releases which are transportation related. The Board shall not be authorized to investigate marine oil spills, which the National Transportation Safety Board is authorized to investigate. The Board shall enter into a memorandum of understanding with the Occupational Safety and Health Administration so as to limit duplication of activities. In no event shall the Board forego an investigation where an accidental release causes a fatality or serious injury among the general public, or had the potential to cause substantial property damage or a number of deaths or injuries among the general public.

**(F)** The Board is authorized to conduct research and studies with respect to the potential for accidental releases, whether or not an accidental release has occurred, where there is evidence which indicates the presence of a potential hazard or hazards. To the extent practicable, the Board shall conduct such studies in cooperation with other Federal agencies having emergency response authorities, State and local governmental agencies and associations and organizations from the industrial, commercial, and nonprofit sectors.

**(G)** No part of the conclusions, findings, or recommendations of the Board relating to any accidental release or the investigation thereof shall be admitted as evidence or used in any action or suit for damages arising out of any matter mentioned in such report.

**(H)** Not later than 18 months after November 15, 1990, the Board shall publish a report accompanied by recommendations to the Administrator on the use of hazard assessments in preventing the occurrence and minimizing the consequences of accidental releases of extremely hazardous substances. The recommendations shall include a list of extremely hazardous substances which are not regulated substances (including threshold quantities for such substances) and categories of stationary sources for which hazard assessments would be an appropriate measure to aid in the prevention of accidental releases and to minimize the consequences of those releases that do occur. The recommendations shall also include a description of the information and analysis which would be appropriate to include in any hazard assessment. The Board shall also make

recommendations with respect to the role of risk management plans as required by paragraph (8)(B) [4] in preventing accidental releases. The Board may from time to time review and revise its recommendations under this subparagraph.

**(I)** Whenever the Board submits a recommendation with respect to accidental releases to the Administrator, the Administrator shall respond to such recommendation formally and in writing not later than 180 days after receipt thereof. The response to the Board's recommendation by the Administrator shall indicate whether the Administrator will--

**(i)** initiate a rulemaking or issue such orders as are necessary to implement the recommendation in full or in part, pursuant to any timetable contained in the recommendation; [7]

**(ii)** decline to initiate a rulemaking or issue orders as recommended.

Any determination by the Administrator not to implement a recommendation of the Board or to implement a recommendation only in part, including any variation from the schedule contained in the recommendation, shall be accompanied by a statement from the Administrator setting forth the reasons for such determination.

**(J)** The Board may make recommendations with respect to accidental releases to the Secretary of Labor. Whenever the Board submits such recommendation, the Secretary shall respond to such recommendation formally and in writing not later than 180 days after receipt thereof. The response to the Board's recommendation by the Administrator [8] shall indicate whether the Secretary will--

**(i)** initiate a rulemaking or issue such orders as are necessary to implement the recommendation in full or in part, pursuant to any timetable contained in the recommendation; [7]

**(ii)** decline to initiate a rulemaking or issue orders as recommended.

Any determination by the Secretary not to implement a recommendation or to implement a recommendation only in part, including any variation from the schedule contained in the recommendation, shall be accompanied by a statement from the Secretary setting forth the reasons for such determination.

**(K)** Within 2 years after November 15, 1990, the Board shall issue a report to the Administrator of the Environmental Protection Agency and to the Administrator of the Occupational Safety and Health Administration recommending the adoption of regulations for the preparation of risk management plans and general requirements for the prevention of accidental releases of regulated substances into the ambient air (including recommendations for listing substances under paragraph (3)) and for the mitigation of the potential adverse effect on human health or the environment as a result of accidental releases which should be applicable to any stationary source handling any regulated substance in more than threshold amounts. The Board may include proposed rules or orders which should be issued by the Administrator under authority of this subsection or by the Secretary of Labor under the Occupational Safety and Health Act. Any such recommendations shall be specific and shall identify the regulated substance or class of regulated substances (or other substances) to which the recommendations apply. The Administrator shall consider such recommendations before promulgating regulations required by paragraph (7) (B).

**(L)** The Board, or upon authority of the Board, any member thereof, any administrative law judge employed by or assigned to the Board, or any officer or employee duly designated by the Board, may for the purpose of carrying out duties authorized by subparagraph (C)--

**(i)** hold such hearings, sit and act at such times and places, administer such oaths, and require by subpoena or otherwise attendance and testimony of such witnesses and the production of evidence and may require by order that any person engaged in the production, processing, handling, or storage of extremely hazardous substances submit written reports and responses to requests and questions within such time and in such form as the Board may require; and

**(ii)** upon presenting appropriate credentials and a written notice of inspection authority, enter any property where an accidental release causing a fatality, serious injury or substantial property damage has occurred and do all things therein necessary for a proper investigation pursuant to subparagraph (C) and inspect at reasonable times records, files, papers, processes, controls, and facilities and take such samples as are relevant to such investigation.

Whenever the Administrator or the Board conducts an inspection of a facility pursuant to this subsection, employees and their representatives shall have the same rights to participate in such inspections as provided in the Occupational Safety and Health Act.

**(M)** In addition to that described in subparagraph (L), the Board may use any information gathering authority of the Administrator under this chapter, including the subpoena power provided in section 7607(a)(1) of this title.

**(N)** The Board is authorized to establish such procedural and administrative rules as are necessary to the exercise of its functions and duties. The Board is authorized without regard to section 6101 of Title 41 to enter into contracts, leases, cooperative agreements or other transactions as may be necessary in the conduct of the duties and functions of the Board with any other agency, institution, or person.

**(O)** After the effective date of any reporting requirement promulgated pursuant to subparagraph (C)(iii) it shall be unlawful for any person to fail to report any release of any extremely hazardous substance as required by such subparagraph. The Administrator is authorized to enforce any regulation or requirements established by the Board pursuant to subparagraph (C)(iii) using the authorities of sections 7413 and 7414 of this title. Any request for information from the owner or operator of a stationary source made by the Board or by the Administrator under this section shall be treated, for purposes of sections 7413, 7414, 7416, 7420, 7603, 7604 and 7607 of this title and any other enforcement provisions of this chapter, as a request made by the Administrator under section 7414 of this title and may be enforced by the Chairperson of the Board or by the Administrator as provided in such section.

**(P)** The Administrator shall provide to the Board such support and facilities as may be necessary for operation of the Board.

**(Q)** Consistent with subsection (G)[5] and section 7414(c) of this title any records, reports or information obtained by the Board shall be available to the Administrator, the Secretary of Labor, the Congress and the public, except that upon a showing satisfactory to the Board by any person that records, reports, or information, or particular part thereof (other than release or emissions data) to which the Board has access, if made public, is likely to cause substantial harm to the person's competitive position, the Board shall consider such record, report, or information or particular portion thereof confidential in accordance with section 1905 of Title 18, except that such record, report, or information may be disclosed to other officers, employees,

and authorized representatives of the United States concerned with carrying out this chapter or when relevant under any proceeding under this chapter. This subparagraph does not constitute authority to withhold records, reports, or information from the Congress.

**(R)** Whenever the Board submits or transmits any budget estimate, budget request, supplemental budget request, or other budget information, legislative recommendation, prepared testimony for congressional hearings, recommendation or study to the President, the Secretary of Labor, the Administrator, or the Director of the Office of Management and Budget, it shall concurrently transmit a copy thereof to the Congress. No report of the Board shall be subject to review by the Administrator or any Federal agency or to judicial review in any court. No officer or agency of the United States shall have authority to require the Board to submit its budget requests or estimates, legislative recommendations, prepared testimony, comments, recommendations or reports to any officer or agency of the United States for approval or review prior to the submission of such recommendations, testimony, comments or reports to the Congress. In the performance of their functions as established by this chapter, the members, officers and employees of the Board shall not be responsible to or subject to supervision or direction, in carrying out any duties under this subsection, of any officer or employee or agent of the Environmental Protection Agency, the Department of Labor or any other agency of the United States except that the President may remove any member, officer or employee of the Board for inefficiency, neglect of duty or malfeasance in office. Nothing in this section shall affect the application of Title 5 to officers or employees of the Board.

**(S)** The Board shall submit an annual report to the President and to the Congress which shall include, but not be limited to, information on accidental releases which have been investigated by or reported to the Board during the previous year, recommendations for legislative or administrative action which the Board has made, the actions which have been taken by the Administrator or the Secretary of Labor or the heads of other agencies to implement such recommendations, an identification of priorities for study and investigation in the succeeding year, progress in the development of risk-reduction technologies and the response to and implementation of significant research findings on chemical safety in the public and private sector.

**(7) Accident prevention**

**(A)** In order to prevent accidental releases of regulated substances, the Administrator is authorized to promulgate release prevention, detection, and correction requirements which may include monitoring, record-keeping, reporting, training, vapor recovery, secondary containment, and other design, equipment, work practice, and operational requirements. Regulations promulgated under this paragraph may make distinctions between various types, classes, and kinds of facilities, devices and systems taking into consideration factors including, but not limited to, the size, location, process, process controls, quantity of substances handled, potency of substances, and response capabilities present at any stationary source. Regulations promulgated pursuant to this subparagraph shall have an effective date, as determined by the Administrator, assuring compliance as expeditiously as practicable.

**(B)(i)** Within 3 years after November 15, 1990, the Administrator shall promulgate reasonable regulations and appropriate guidance to provide, to the greatest extent practicable, for the prevention and detection of accidental releases of regulated substances and for response to such releases by the owners or operators of the sources of such releases. The Administrator shall utilize the expertise of the Secretaries of Transportation and Labor in promulgating such regulations. As appropriate, such regulations shall cover the use, operation, repair, replacement, and maintenance of equipment to monitor, detect, inspect, and control such releases, including training of persons in the use and maintenance of such equipment and in the conduct of periodic inspections. The regulations shall include procedures and measures for emergency response after an accidental release of a regulated substance in order to protect human health and the environment. The regulations shall cover storage, as well as operations. The regulations shall, as appropriate, recognize differences in size, operations, processes, class and categories of sources and the voluntary actions of such sources to prevent such releases and respond to such releases. The

regulations shall be applicable to a stationary source 3 years after the date of promulgation, or 3 years after the date on which a regulated substance present at the source in more than threshold amounts is first listed under paragraph (3), whichever is later.

**(ii)** The regulations under this subparagraph shall require the owner or operator of stationary sources at which a regulated substance is present in more than a threshold quantity to prepare and implement a risk management plan to detect and prevent or minimize accidental releases of such substances from the stationary source, and to provide a prompt emergency response to any such releases in order to protect human health and the environment. Such plan shall provide for compliance with the requirements of this subsection and shall also include each of the following:

**(I)** a hazard assessment to assess the potential effects of an accidental release of any regulated substance. This assessment shall include an estimate of potential release quantities and a determination of downwind effects, including potential exposures to affected populations. Such assessment shall include a previous release history of the past 5 years, including the size, concentration, and duration of releases, and shall include an evaluation of worst case accidental releases;

**(II)** a program for preventing accidental releases of regulated substances, including safety precautions and maintenance, monitoring and employee training measures to be used at the source; and

**(III)** a response program providing for specific actions to be taken in response to an accidental release of a regulated substance so as to protect human health and the environment, including procedures for informing the public and local agencies responsible for responding to accidental releases, emergency health care, and employee training measures.

At the time regulations are promulgated under this subparagraph, the Administrator shall promulgate guidelines to assist stationary sources in the preparation of risk management plans. The guidelines shall, to the extent practicable, include model risk management plans.

**(iii)** The owner or operator of each stationary source covered by clause (ii) shall register a risk management plan prepared under this subparagraph with the Administrator before the effective date of regulations under clause (i) in such form and manner as the Administrator shall, by rule, require. Plans prepared pursuant to this subparagraph shall also be submitted to the Chemical Safety and Hazard Investigation Board, to the State in which the stationary source is located, and to any local agency or entity having responsibility for planning for or responding to accidental releases which may occur at such source, and shall be available to the public under section 7414(c) of this title. The Administrator shall establish, by rule, an auditing system to regularly review and, if necessary, require revision in risk management plans to assure that the plans comply with this subparagraph. Each such plan shall be updated periodically as required by the Administrator, by rule.

**(C)** Any regulations promulgated pursuant to this subsection shall to the maximum extent practicable, consistent with this subsection, be consistent with the recommendations and standards established by the American Society of Mechanical Engineers (ASME), the American National Standards Institute (ANSI) or the American Society of Testing Materials (ASTM). The Administrator shall take into consideration the concerns of small business in promulgating regulations under this subsection.

**(D)** In carrying out the authority of this paragraph, the Administrator shall consult with the Secretary of Labor and the Secretary of Transportation and shall coordinate any requirements under this paragraph with any requirements established for comparable purposes by the Occupational Safety and Health Administration or the Department of Transportation. Nothing in this subsection shall be interpreted, construed or applied to impose requirements affecting, or to grant the Administrator, the

Chemical Safety and Hazard Investigation Board, or any other agency any authority to regulate (including requirements for hazard assessment), the accidental release of radionuclides arising from the construction and operation of facilities licensed by the Nuclear Regulatory Commission.

**(E)** After the effective date of any regulation or requirement imposed under this subsection, it shall be unlawful for any person to operate any stationary source subject to such regulation or requirement in violation of such regulation or requirement. Each regulation or requirement under this subsection shall for purposes of sections 7413, 7414, 7416, 7420, 7604, and 7607 of this title and other enforcement provisions of this chapter, be treated as a standard in effect under subsection (d).

**(F)** Notwithstanding the provisions of subchapter V or this section, no stationary source shall be required to apply for, or operate pursuant to, a permit issued under such subchapter solely because such source is subject to regulations or requirements under this subsection.

**(G)** In exercising any authority under this subsection, the Administrator shall not, for purposes of section 653(b)(1) of Title 29, be deemed to be exercising statutory authority to prescribe or enforce standards or regulations affecting occupational safety and health.

**(H) Public access to off-site consequence analysis information**

**(i) Definitions**

In this subparagraph:

**(I) Covered person**

The term "covered person" means--

**(aa)** an officer or employee of the United States;

**(bb)** an officer or employee of an agent or contractor of the Federal Government;

**(cc)** an officer or employee of a State or local government;

**(dd)** an officer or employee of an agent or contractor of a State or local government;

**(ee)** an individual affiliated with an entity that has been given, by a State or local government, responsibility for preventing, planning for, or responding to accidental releases;

**(ff)** an officer or employee or an agent or contractor of an entity described in item (ee); and

**(gg)** a qualified researcher under clause (vii).

**(II) Official use**

The term "official use" means an action of a Federal, State, or local government agency or an entity referred to in subclause (I)(ee) intended to carry out a function relevant to preventing, planning for, or responding to accidental releases.

**(III) Off-site consequence analysis information**

The term "off-site consequence analysis information" means those portions of a risk management plan, excluding the executive summary of the plan, consisting of an evaluation of 1 or more worst-case release scenarios or alternative release scenarios, and any electronic data base created by the Administrator from those portions.

**(IV) Risk management plan**

The term "risk management plan" means a risk management plan submitted to the Administrator by an owner or operator of a stationary source under subparagraph (B)(iii).

**(ii) Regulations**

Not later than 1 year after August 5, 1999, the President shall--

**(I)** assess--

**(aa)** the increased risk of terrorist and other criminal activity associated with the posting of off-site consequence analysis information on the Internet; and

**(bb)** the incentives created by public disclosure of off-site consequence analysis information for reduction in the risk of accidental releases; and

**(II)** based on the assessment under subclause (I), promulgate regulations governing the distribution of off-site consequence analysis information in a manner that, in the opinion of the President, minimizes the likelihood of accidental releases and the risk described in subclause (I)(aa) and the likelihood of harm to public health and welfare, and--

**(aa)** allows access by any member of the public to paper copies of off-site consequence analysis information for a limited number of stationary sources located anywhere in the United States, without any geographical restriction;

**(bb)** allows other public access to off-site consequence analysis information as appropriate;

**(cc)** allows access for official use by a covered person described in any of items (cc) through (ff) of clause (i)(I) (referred to in this subclause as a "State or local covered person") to off-site consequence analysis information relating to stationary sources located in the person's State;

**(dd)** allows a State or local covered person to provide, for official use, off-site consequence analysis information relating to stationary sources located in the person's State to a State or local covered person in a contiguous State; and

**(ee)** allows a State or local covered person to obtain for official use, by request to the Administrator, off-site consequence analysis information that is not available to the person under item (cc).

**(iii) Availability under freedom of information act**

**(I) First year**

Off-site consequence analysis information, and any ranking of stationary sources derived from the information, shall not be made available under section 552 of Title 5 during the 1-year period beginning on August 5, 1999.

**(II) After first year**

If the regulations under clause (ii) are promulgated on or before the end of the period described in subclause (I), off-site consequence analysis information covered by the regulations, and any ranking of stationary sources derived from the information, shall not be made available under section 552 of Title 5 after the end of that period.

**(III) Applicability**

Subclauses (I) and (II) apply to off-site consequence analysis information submitted to the Administrator before, on, or after August 5, 1999.

**(iv) Availability of information during transition period**

The Administrator shall make off-site consequence analysis information available to covered persons for official use in a manner that meets the requirements of items (cc)through (ee) of clause (ii)(II), and to the public in a form that does not make available any information concerning the identity or location of stationary sources, during the period--

**(I)** beginning on August 5, 1999; and

**(II)** ending on the earlier of the date of promulgation of the regulations under clause (ii) or the date that is 1 year after August 5, 1999.

**(v) Prohibition on unauthorized disclosure of information by covered persons**

**(I) In general**

Beginning on August 5, 1999, a covered person shall not disclose to the public off-site consequence analysis information in any form, or any statewide or national ranking of identified stationary sources derived from such information, except as authorized by this subparagraph (including the regulations promulgated under clause (ii)). After the end of the 1-year period beginning on August 5, 1999, if regulations have not been promulgated under clause (ii), the preceding sentence shall not apply.

**(II) Criminal penalties**

Notwithstanding section 7413 of this title, a covered person that willfully violates a restriction or prohibition established by this subparagraph (including the regulations promulgated under clause (ii)) shall, upon conviction, be fined for an infraction under section 3571 of Title 18 (but shall not be subject to imprisonment) for each unauthorized disclosure of off-site consequence analysis information, except that subsection (d) of such section 3571 shall not apply to a case in which the offense results in pecuniary loss unless the defendant knew that such loss would occur. The disclosure of off-site consequence analysis information for each specific stationary source shall be considered a separate offense. The total of all penalties that may be imposed on a single person or organization under this item shall not exceed $1,000,000 for violations committed during any 1 calendar year.

**(III) Applicability**

If the owner or operator of a stationary source makes off-site consequence analysis information relating to that stationary source available to the public without restriction--

**(aa)** subclauses (I) and (II) shall not apply with respect to the information; and

**(bb)** the owner or operator shall notify the Administrator of the public availability of the information.

**(IV) List**

The Administrator shall maintain and make publicly available a list of all stationary sources that have provided notification under subclause (III)(bb).

**(vi) Notice**

The Administrator shall provide notice of the definition of official use as provided in clause (i)(III) [9] and examples of actions that would and would not meet that definition, and notice of the restrictions on further dissemination and the penalties established by this chapter to each covered person who receives off-site consequence analysis information under clause (iv) and each covered person who receives off-site consequence analysis information for an official use under the regulations promulgated under clause (ii).

**(vii) Qualified researchers**

**(I) In general**

Not later than 180 days after August 5, 1999, the Administrator, in consultation with the Attorney General, shall develop and implement a system for providing off-site consequence analysis information, including facility identification, to any qualified researcher, including a qualified researcher from industry or any public interest group.

**(II) Limitation on dissemination**

The system shall not allow the researcher to disseminate, or make available on the Internet, the off-site consequence analysis information, or any portion of the off-site consequence analysis information, received under this clause.

**(viii) Read-only information technology system**

In consultation with the Attorney General and the heads of other appropriate Federal agencies, the Administrator shall establish an information technology system that provides for the availability to the public of off-site consequence analysis information by means of a central data base under the control of the Federal Government that contains information that users may read, but that provides no means by which an electronic or mechanical copy of the information may be made.

**(ix) Voluntary industry accident prevention standards**

The Environmental Protection Agency, the Department of Justice, and other appropriate agencies may provide technical assistance to owners and operators of stationary sources and participate in the development of voluntary industry standards that will help achieve the objectives set forth in paragraph (1).

**(x) Effect on State or local law**

**(I) In general**

Subject to subclause (II), this subparagraph (including the regulations promulgated under this subparagraph) shall supersede any provision of State or local law that is inconsistent with this subparagraph (including the regulations).

**(II) Availability of information under State law**

Nothing in this subparagraph precludes a State from making available data on the off-site consequences of chemical releases collected in accordance with State law.

**(xi) Report**

**(I) In general**

Not later than 3 years after August 5, 1999, the Attorney General, in consultation with appropriate State, local, and Federal Government agencies, affected industry, and the public, shall submit to Congress a report that describes the extent to which regulations promulgated under this paragraph have resulted in actions, including the design and

maintenance of safe facilities, that are effective in detecting, preventing, and minimizing the consequences of releases of regulated substances that may be caused by criminal activity. As part of this report, the Attorney General, using available data to the extent possible, and a sampling of covered stationary sources selected at the discretion of the Attorney General, and in consultation with appropriate State, local, and Federal governmental agencies, affected industry, and the public, shall review the vulnerability of covered stationary sources to criminal and terrorist activity, current industry practices regarding site security, and security of transportation of regulated substances. The Attorney General shall submit this report, containing the results of the review, together with recommendations, if any, for reducing vulnerability of covered stationary sources to criminal and terrorist activity, to the Committee on Commerce of the United States House of Representatives and the Committee on Environment and Public Works of the United States Senate and other relevant committees of Congress.

**(II) Interim report**

Not later than 12 months after August 5, 1999, the Attorney General shall submit to the Committee on Commerce of the United States House of Representatives and the Committee on Environment and Public Works of the United States Senate, and other relevant committees of Congress, an interim report that includes, at a minimum--

**(aa)** the preliminary findings under subclause (I);

**(bb)** the methods used to develop the findings; and

**(cc)** an explanation of the activities expected to occur that could cause the findings of the report under subclause (I) to be different than the preliminary findings.

**(III) Availability of information**

Information that is developed by the Attorney General or requested by the Attorney General and received from a covered stationary source for the purpose of conducting the review under subclauses(I) and (II) shall be exempt from disclosure under section 552 of Title 5 if such information would pose a threat to national security.

**(xii) Scope**

This subparagraph--

**(I)** applies only to covered persons; and

**(II)** does not restrict the dissemination of off-site consequence analysis information by any covered person in any manner or form except in the form of a risk management plan or an electronic data base created by the Administrator from off-site consequence analysis information.

**(xiii) Authorization of appropriations**

There are authorized to be appropriated to the Administrator and the Attorney General such sums as are necessary to carry out this subparagraph (including the regulations promulgated under clause (ii)), to remain available until expended.

**(8) Research on hazard assessments**

The Administrator may collect and publish information on accident scenarios and consequences covering a range of possible events for substances listed under paragraph (3). The Administrator shall establish a program of long-term research to develop and disseminate information on methods and techniques for hazard assessment which may be useful in improving and validating the procedures employed in the preparation of hazard assessments under this subsection.

**(9) Order authority**

**(A)** In addition to any other action taken, when the Administrator determines that there may be an imminent and substantial endangerment to the human health or welfare or the environment because of an actual or threatened accidental release of a regulated substance, the Administrator may secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The Administrator may also, after notice to the State in which the stationary source is located, take other action under this paragraph including, but not limited to, issuing such orders as may be necessary to protect human health. The Administrator shall take action under section 7603 of this title rather than this paragraph whenever the authority of such section is adequate to protect human health and the environment.

**(B)** Orders issued pursuant to this paragraph may be enforced in an action brought in the appropriate United States district court as if the order were issued under section 7603 of this title.

**(C)** Within 180 days after November 15, 1990, the Administrator shall publish guidance for using the order authorities established by this paragraph. Such guidance shall provide for the coordinated use of the authorities of this paragraph with other emergency powers authorized by section 9606 of this title, sections 311(c), 308, 309 and 504(a) of the Federal Water Pollution Control Act, sections 3007, 3008, 3013, and 7003 of the Solid Waste Disposal Act, sections 1445 and 1431 of the Safe Drinking Water Act, sections 5 and 7 of the Toxic Substances Control Act, and sections 7413, 7414, and 7603 of this title.

**(10) Presidential review**

The President shall conduct a review of release prevention, mitigation and response authorities of the various Federal agencies and shall clarify and coordinate agency responsibilities to assure the most effective and efficient implementation of such authorities and to identify any deficiencies in authority or resources which may exist. The President may utilize the resources and solicit the recommendations of the Chemical Safety and Hazard Investigation Board in conducting such review. At the conclusion of such review, but not later than 24 months after November 15, 1990, the President shall transmit a message to the Congress on the release prevention, mitigation and response activities of the Federal Government making such recommendations for change in law as the President may deem appropriate. Nothing in this paragraph shall be interpreted, construed or applied to authorize the President to modify or reassign release prevention, mitigation or response authorities otherwise established by law.

**(11) State authority**

Nothing in this subsection shall preclude, deny or limit any right of a State or political subdivision thereof to adopt or enforce any regulation, requirement, limitation or standard (including any procedural requirement) that is more stringent than a regulation, requirement, limitation or standard in effect under this subsection or that applies to a substance not subject to this subsection.

**(s) Periodic report**

Not later than January 15, 1993 and every 3 years thereafter, the Administrator shall prepare and transmit to the Congress a comprehensive report on the measures taken by the Agency and by the States to implement the provisions of this section. The Administrator shall maintain a database on pollutants and sources subject to the provisions of this section and shall include aggregate information from the database in each annual report. The report shall include, but not be limited to--

**(1)** a status report on standard-setting under subsections (d) and (f);

**(2)** information with respect to compliance with such standards including the costs of compliance experienced by sources in various categories and subcategories;

**(3)** development and implementation of the national urban air toxics program; and

**(4)** recommendations of the Chemical Safety and Hazard Investigation Board with respect to the prevention and mitigation of accidental releases.

### CREDIT(S)

(July 14, 1955, c. 360, Title I, § 112, as added Pub.L. 91-604, § 4(a), Dec. 31, 1970, 84 Stat. 1685; amended Pub.L. 95-95, Title I, §§ 109(d)(2), 110, Title IV, § 401(c), Aug. 7, 1977, 91 Stat. 701, 703, 791; Pub.L. 95-623, § 13(b), Nov. 9, 1978, 92 Stat. 3458; Pub.L. 101-549, Title III, § 301, Nov. 15, 1990, 104 Stat. 2531; Pub.L. 102-187, Dec. 4, 1991, 105 Stat. 1285; Pub.L. 105-362, Title IV, § 402(b), Nov. 10, 1998, 112 Stat. 3283; Pub.L. 106-40, §§ 2, 3(a), Aug. 5, 1999, 113 Stat. 207.)

### MEMORANDA OF PRESIDENT

### DELEGATION OF AUTHORITY TO REVIEW EMERGENCY RELEASE AUTHORITIES AND PREPARE AND TRANSMIT TO THE CONGRESS A MESSAGE CONCERNING SUCH AUTHORITIES

<Aug. 19, 1993, 58 F.R. 52397>

Memorandum for the Administrator of the Environmental Protection Agency

WHEREAS, the Environmental Protection Agency, the agencies and departments that are members of the National Response Team (authorized under Executive Order No. 12580, 52 Fed.Reg. 2923 (1987)) [set out as a note under section 9615 of this title], and other Federal agencies and departments undertake emergency release prevention, mitigation, and response activities pursuant to various authorities;

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 112(r)(10) of the Clean Air Act (the "Act") (section 7412(r)(10) of title 42 of the United States Code) [subsec. (r)(10) of this

section] and section 301 of title 3 of the United States Code [section 301 of Title 3, The President], and in order to provide for the delegation of certain functions under the Act [42 U.S.C.A. § 7401 et seq.], I hereby:

**(1)** Authorize you, in coordination with agencies and departments that are members of the National Response Team and other appropriate agencies and departments, to conduct a review of release prevention, mitigation, and response authorities of Federal agencies in order to assure the most effective and efficient implementation of such authorities and to identify any deficiencies in authority or resources that may exist, to the extent such review is required by section 112(r)(10) of the Act; and

**(2)** Authorize you, in coordination with agencies and departments that are members of the National Response Team and other appropriate agencies and departments, to prepare and transmit a message to the Congress concerning the release prevention, mitigation, and response activities of the Federal Government with such recommendations for change in law as you deem appropriate, to the extent such message is required by section 112(r)(10) of the Act.

The authority delegated by this memorandum may be further redelegated within the Environmental Protection Agency.

You are hereby authorized and directed to publish this memorandum in the **Federal Register.**

WILLIAM J. CLINTON

### DELEGATION OF AUTHORITY TO CONDUCT ASSESSMENTS AND PROMULGATE REGULATIONS ON PUBLIC ACCESS TO OFF-SITE CONSEQUENCE ANALYSIS INFORMATION

<Jan. 27, 2000, 65 F.R. 8631>

Memorandum for the Attorney General[,] the Administrator of the Environmental Protection Agency[,] and the Director of the Office of Management and Budget

By the authority vested in me as President by the Constitution and laws of the United States of America, including section 112(r)(7)(H) of the Clean Air Act ("Act") (42 U.S.C. 7412(r)(7)(H)) [subsec. (r)(7)(H) of this section], as added by section 3 of the Chemical Safety Information, Site Security and Fuels Regulatory Relief Act (Public Law 106-40), and section 301 of title 3, United States Code, I hereby delegate to:

**(1)** the Attorney General the authority vested in the President under section 112(r)(7)(H)(ii)(II)(aa) of the Act [subsec. (r)(7)(H)(i)(II)(aa) of this section] to assess the increased risk of terrorist and other criminal activity associated with the posting of off-site consequence analysis information on the Internet;

**(2)** the Administrator of the Environmental Protection Agency (EPA) the authority vested in the President under section 112(r)(7)(H)(ii)(I)(bb) of the Act [subsec. (r)(7)(H)(ii)(I)(bb) of this section] to assess the incentives created by public disclosure of off-site consequence analysis information for reduction in the risk of accidental releases; and

**(3)** the Attorney General and the Administrator of EPA, jointly, the authority vested in the President under section 112(r)(7)(H)(ii)(II) of the Act [subsec. (r)(7)(H)(ii)(II) of this section] to promulgate regulations, based on these assessments, governing the distribution of off-site consequence analysis information. These regulations, in proposed and final form, shall be subject to review and approval by the Director of the Office of Management and Budget.

The Administrator of EPA is authorized and directed to publish this memorandum in the Federal Register.

WILLIAM J. CLINTON

**FLEXIBLE IMPLEMENTATION OF THE MERCURY AND AIR TOXICS STANDARDS RULE**

<Dec. 21, 2011, 76 F.R. 80727>

Memorandum for the Administrator of the Environmental Protection Agency

Today's issuance, by the Environmental Protection Agency (EPA), of the final Mercury and Air Toxics Standards rule for power plants (the "MATS Rule") represents a major step forward in my Administration's efforts to protect public health and the environment.

This rule, issued after careful consideration of public comments, prescribes standards under section 112 of the Clean Air Act to control emissions of mercury and other toxic air pollutants from power plants, which collectively are among the largest sources of such pollution in the United States. The EPA estimates that by substantially reducing emissions of pollutants that contribute to neurological damage, cancer, respiratory illnesses, and other health risks, the MATS Rule will produce major health benefits for millions of Americans_including children, older Americans, and other vulnerable populations. Consistent with Executive Order 13563 (Improving Regulation and Regulatory Review), the estimated benefits of the MATS Rule far exceed the estimated costs.

The MATS Rule can be implemented through the use of demonstrated, existing pollution control technologies. The United States is a global market leader in the design and manufacture of these technologies, and it is anticipated that U.S. firms and workers will provide much of the equipment and labor needed to meet the substantial investments in pollution control that the standards are expected to spur.

These new standards will promote the transition to a cleaner and more efficient U.S. electric power system. This system as a whole is critical infrastructure that plays a key role in the functioning of all facets of the U.S. economy, and maintaining its stability and reliability is of critical importance. It is therefore crucial that implementation of the MATS Rule proceed in a cost-effective manner that ensures electric reliability.

Analyses conducted by the EPA and the Department of Energy (DOE) indicate that the MATS Rule is not anticipated to compromise electric generating resource adequacy in any region of the country. The Clean Air Act offers a number of implementation flexibilities, and the EPA has a long and successful history of using those flexibilities to ensure a smooth transition to cleaner technologies.

The Clean Air Act provides 3 years from the effective date of the MATS Rule for sources to comply with its requirements. In addition, section 112(i)(3)(B) of the Act allows the issuance of a permit granting a source up to one additional year where necessary for the installation of controls. As you stated in the preamble to the MATS Rule, this additional fourth year should be broadly available to sources, consistent with the requirements of the law.

The EPA has concluded that 4 years should generally be sufficient to install the necessary emission control equipment, and DOE has issued analysis consistent with that conclusion. While more time is generally not expected to be needed, the Clean Air Act offers other important flexibilities as well. For example, section 113(a) of the Act provides the EPA with flexibility to bring sources into compliance over the course of an additional year, should unusual circumstances arise that warrant such flexibility.

To address any concerns with respect to electric reliability while assuring MATS' public health benefits, I direct you to take the following actions:

**1.** Building on the information and guidance that you have provided to the public, relevant stakeholders, and permitting authorities in the preamble of the MATS Rule, work with State and local permitting authorities to make the additional year for compliance with the MATS Rule provided under section 112(i)(3)(B) of the Clean Air Act broadly available to sources, consistent with law, and to invoke this flexibility expeditiously where justified.

**2.** Promote early, coordinated, and orderly planning and execution of the measures needed to implement the MATS Rule while maintaining the reliability of the electric power system. Consistent with Executive Order 13563, this process should be designed to "promote predictability and reduce uncertainty," and should include engagement and coordination with DOE, the Federal Energy Regulatory Commission, State utility regulators, Regional Transmission Organizations, the North American Electric Reliability Corporation and regional electric reliability organizations, other grid planning authorities, electric utilities, and other stakeholders, as appropriate.

**3.** Make available to the public, including relevant stakeholders, information concerning any anticipated use of authorities: (a) under section 112(i)(3)(B) of the Clean Air Act in the event that additional time to comply with the MATS Rule is necessary for the installation of technology; and (b) under section 113(a) of the Clean Air Act in the event that additional time to comply with the MATS Rule is necessary to address a specific and documented electric reliability issue. This information should describe the process for working with entities with relevant expertise to identify circumstances where electric reliability concerns might justify allowing additional time to comply.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

You are hereby authorized and directed to publish this memorandum in the Federal Register.

BARACK OBAMA

Notes of Decisions (148)

## Footnotes

1      So in original. Probably should be "effects".

2      So in original.

3      So in original. Probably should be "section".

4      So in original. Probably should be paragraph "(7)(B)".

5      So in original. Probably should be "subparagraph".

6      So in original. Probably should be "Right-To-Know".

7      So in original. The word "or" probably should appear.

8      So in original. The word "Administrator" probably should be "Secretary".

9      So in original. Probably should be "(i)(II)".

42 U.S.C.A. § 7412, 42 USCA § 7412
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

United States Code Annotated
 Title 42. The Public Health and Welfare
  Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
   Subchapter I. Programs and Activities
    Part D. Plan Requirements for Nonattainment Areas
     Subpart 1. Nonattainment Areas in General (Refs & Annos)

42 U.S.C.A. § 7502

§ 7502. Nonattainment plan provisions in general

Currentness

**(a) Classifications and attainment dates**

**(1) Classifications**

**(A)** On or after the date the Administrator promulgates the designation of an area as a nonattainment area pursuant to section 7407(d) of this title with respect to any national ambient air quality standard (or any revised standard, including a revision of any standard in effect on November 15, 1990), the Administrator may classify the area for the purpose of applying an attainment date pursuant to paragraph (2), and for other purposes. In determining the appropriate classification, if any, for a nonattainment area, the Administrator may consider such factors as the severity of nonattainment in such area and the availability and feasibility of the pollution control measures that the Administrator believes may be necessary to provide for attainment of such standard in such area.

**(B)** The Administrator shall publish a notice in the Federal Register announcing each classification under subparagraph (A), except the Administrator shall provide an opportunity for at least 30 days for written comment. Such classification shall not be subject to the provisions of sections 553 through 557 of Title 5 (concerning notice and comment) and shall not be subject to judicial review until the Administrator takes final action under subsection (k) or (l) of section 7410 of this title (concerning action on plan submissions) or section 7509 of this title (concerning sanctions) with respect to any plan submissions required by virtue of such classification.

**(C)** This paragraph shall not apply with respect to nonattainment areas for which classifications are specifically provided under other provisions of this part.

**(2) Attainment dates for nonattainment areas**

**(A)** The attainment date for an area designated nonattainment with respect to a national primary ambient air quality standard shall be the date by which attainment can be achieved as expeditiously as practicable, but no later than 5 years from the date such area was designated nonattainment under section 7407(d) of this title, except that the Administrator may extend the attainment date to the extent the Administrator determines appropriate, for a period no greater than 10 years from the date of designation as nonattainment, considering the severity of nonattainment and the availability and feasibility of pollution control measures.

**(B)** The attainment date for an area designated nonattainment with respect to a secondary national ambient air quality standard shall be the date by which attainment can be achieved as expeditiously as practicable after the date such area was designated nonattainment under section 7407(d) of this title.

**(C)** Upon application by any State, the Administrator may extend for 1 additional year (hereinafter referred to as the "Extension Year") the attainment date determined by the Administrator under subparagraph (A) or (B) if--

**(i)** the State has complied with all requirements and commitments pertaining to the area in the applicable implementation plan, and

**(ii)** in accordance with guidance published by the Administrator, no more than a minimal number of exceedances of the relevant national ambient air quality standard has occurred in the area in the year preceding the Extension Year.

No more than 2 one-year extensions may be issued under this subparagraph for a single nonattainment area.

**(D)** This paragraph shall not apply with respect to nonattainment areas for which attainment dates are specifically provided under other provisions of this part.

**(b) Schedule for plan submissions**

At the time the Administrator promulgates the designation of an area as nonattainment with respect to a national ambient air quality standard under section 7407(d) of this title, the Administrator shall establish a schedule according to which the State containing such area shall submit a plan or plan revision (including the plan items) meeting the applicable requirements of subsection (c) and section 7410(a)(2) of this title. Such schedule shall at a minimum, include a date or dates, extending no later than 3 years from the date of the nonattainment designation, for the submission of a plan or plan revision (including the plan items) meeting the applicable requirements of subsection (c) and section 7410(a)(2) of this title.

**(c) Nonattainment plan provisions**

The plan provisions (including plan items) required to be submitted under this part shall comply with each of the following:

**(1) In general**

Such plan provisions shall provide for the implementation of all reasonably available control measures as expeditiously as practicable (including such reductions in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology) and shall provide for attainment of the national primary ambient air quality standards.

**(2) RFP**

Such plan provisions shall require reasonable further progress.

**(3) Inventory**

Such plan provisions shall include a comprehensive, accurate, current inventory of actual emissions from all sources of the relevant pollutant or pollutants in such area, including such periodic revisions as the Administrator may determine necessary to assure that the requirements of this part are met.

**(4) Identification and quantification**

Such plan provisions shall expressly identify and quantify the emissions, if any, of any such pollutant or pollutants which will be allowed, in accordance with section 7503(a)(1)(B) of this title, from the construction and operation of major new or modified stationary sources in each such area. The plan shall demonstrate to the satisfaction of the Administrator that the emissions quantified for this purpose will be consistent with the achievement of reasonable further progress and will not interfere with attainment of the applicable national ambient air quality standard by the applicable attainment date.

**(5) Permits for new and modified major stationary sources**

Such plan provisions shall require permits for the construction and operation of new or modified major stationary sources anywhere in the nonattainment area, in accordance with section 7503 of this title.

**(6) Other measures**

Such plan provisions shall include enforceable emission limitations, and such other control measures, means or techniques (including economic incentives such as fees, marketable permits, and auctions of emission rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to provide for attainment of such standard in such area by the applicable attainment date specified in this part.

**(7) Compliance with section 7410(a)(2)**

Such plan provisions shall also meet the applicable provisions of section 7410(a)(2) of this title.

**(8) Equivalent techniques**

Upon application by any State, the Administrator may allow the use of equivalent modeling, emission inventory, and planning procedures, unless the Administrator determines that the proposed techniques are, in the aggregate, less effective than the methods specified by the Administrator.

**(9) Contingency measures**

Such plan shall provide for the implementation of specific measures to be undertaken if the area fails to make reasonable further progress, or to attain the national primary ambient air quality standard by the attainment date applicable under this part. Such measures shall be included in the plan revision as contingency measures to take effect in any such case without further action by the State or the Administrator.

**(d) Plan revisions required in response to finding of plan inadequacy**

Any plan revision for a nonattainment area which is required to be submitted in response to a finding by the Administrator pursuant to section 7410(k)(5) of this title (relating to calls for plan revisions) must correct the plan deficiency (or deficiencies) specified by the Administrator and meet all other applicable plan requirements of section 7410 of this title and this part. The Administrator may reasonably adjust the dates otherwise applicable under such requirements to such revision (except for attainment dates that have not yet elapsed), to the extent necessary to achieve a consistent application of such requirements. In order to facilitate submittal by the States of adequate and approvable plans consistent with the applicable requirements of this chapter, the Administrator shall, as appropriate and from time to time, issue written guidelines, interpretations, and information to the States which shall be available to the public, taking into consideration any such guidelines, interpretations, or information provided before November 15, 1990.

**(e) Future modification of standard**

If the Administrator relaxes a national primary ambient air quality standard after November 15, 1990, the Administrator shall, within 12 months after the relaxation, promulgate requirements applicable to all areas which have not attained that standard as of the date of such relaxation. Such requirements shall provide for controls which are not less stringent than the controls applicable to areas designated nonattainment before such relaxation.

## CREDIT(S)

(July 14, 1955, c. 360, Title I, § 172, as added Pub.L. 95-95, Title I, § 129(b), Aug. 7, 1977, 91 Stat. 746; amended Pub.L. 95-190, § 14(a)(55), (56), Nov. 16, 1977, 91 Stat. 1402; Pub.L. 101-549, Title I, § 102(b), Nov. 15, 1990, 104 Stat. 2412.)

Notes of Decisions (56)

42 U.S.C.A. § 7502, 42 USCA § 7502
Current through P.L. 117-327. Some statute sections may be more current, see credits for details.

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   ADD73

4

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter I. Programs and Activities
        Part D. Plan Requirements for Nonattainment Areas
          Subpart 1. Nonattainment Areas in General (Refs & Annos)

42 U.S.C.A. § 7503

§ 7503. Permit requirements

Currentness

**(a) In general**

The permit program required by section 7502(b)(6) of this title shall provide that permits to construct and operate may be issued if--

**(1)** in accordance with regulations issued by the Administrator for the determination of baseline emissions in a manner consistent with the assumptions underlying the applicable implementation plan approved under section 7410 of this title and this part, the permitting agency determines that--

**(A)** by the time the source is to commence operation, sufficient offsetting emissions reductions have been obtained, such that total allowable emissions from existing sources in the region, from new or modified sources which are not major emitting facilities, and from the proposed source will be sufficiently less than total emissions from existing sources (as determined in accordance with the regulations under this paragraph) prior to the application for such permit to construct or modify so as to represent (when considered together with the plan provisions required under section 7502 of this title) reasonable further progress (as defined in section 7501 of this title); or

**(B)** in the case of a new or modified major stationary source which is located in a zone (within the nonattainment area) identified by the Administrator, in consultation with the Secretary of Housing and Urban Development, as a zone to which economic development should be targeted, that emissions of such pollutant resulting from the proposed new or modified major stationary source will not cause or contribute to emissions levels which exceed the allowance permitted for such pollutant for such area from new or modified major stationary sources under section 7502(c) of this title;

**(2)** the proposed source is required to comply with the lowest achievable emission rate;

**(3)** the owner or operator of the proposed new or modified source has demonstrated that all major stationary sources owned or operated by such person (or by any entity controlling, controlled by, or under common control with such person) in such State are subject to emission limitations and are in compliance, or on a schedule for compliance, with all applicable emission limitations and standards under this chapter; and [1]

(4) the Administrator has not determined that the applicable implementation plan is not being adequately implemented for the nonattainment area in which the proposed source is to be constructed or modified in accordance with the requirements of this part; and

(5) an analysis of alternative sites, sizes, production processes, and environmental control techniques for such proposed source demonstrates that benefits of the proposed source significantly outweigh the environmental and social costs imposed as a result of its location, construction, or modification.

Any emission reductions required as a precondition of the issuance of a permit under paragraph (1) shall be federally enforceable before such permit may be issued.

**(b) Prohibition on use of old growth allowances**

Any growth allowance included in an applicable implementation plan to meet the requirements of section 7502(b)(5) of this title (as in effect immediately before November 15, 1990) shall not be valid for use in any area that received or receives a notice under section 7410(a)(2)(H)(ii) of this title (as in effect immediately before November 15, 1990) or under section 7410(k)(1) of this title that its applicable implementation plan containing such allowance is substantially inadequate.

**(c) Offsets**

**(1)** The owner or operator of a new or modified major stationary source may comply with any offset requirement in effect under this part for increased emissions of any air pollutant only by obtaining emission reductions of such air pollutant from the same source or other sources in the same nonattainment area, except that the State may allow the owner or operator of a source to obtain such emission reductions in another nonattainment area if (A) the other area has an equal or higher nonattainment classification than the area in which the source is located and (B) emissions from such other area contribute to a violation of the national ambient air quality standard in the nonattainment area in which the source is located. Such emission reductions shall be, by the time a new or modified source commences operation, in effect and enforceable and shall assure that the total tonnage of increased emissions of the air pollutant from the new or modified source shall be offset by an equal or greater reduction, as applicable, in the actual emissions of such air pollutant from the same or other sources in the area.

**(2)** Emission reductions otherwise required by this chapter shall not be creditable as emissions reductions for purposes of any such offset requirement. Incidental emission reductions which are not otherwise required by this chapter shall be creditable as emission reductions for such purposes if such emission reductions meet the requirements of paragraph (1).

**(d) Control technology information**

The State shall provide that control technology information from permits issued under this section will be promptly submitted to the Administrator for purposes of making such information available through the RACT/BACT/LAER clearinghouse to other States and to the general public.

**(e) Rocket engines or motors**

The permitting authority of a State shall allow a source to offset by alternative or innovative means emission increases from rocket engine and motor firing, and cleaning related to such firing, at an existing or modified major source that tests rocket engines or motors under the following conditions:

**(1)** Any modification proposed is solely for the purpose of expanding the testing of rocket engines or motors at an existing source that is permitted to test such engines on November 15, 1990.

**(2)** The source demonstrates to the satisfaction of the permitting authority of the State that it has used all reasonable means to obtain and utilize offsets, as determined on an annual basis, for the emissions increases beyond allowable levels, that all available offsets are being used, and that sufficient offsets are not available to the source.

**(3)** The source has obtained a written finding from the Department of Defense, Department of Transportation, National Aeronautics and Space Administration or other appropriate Federal agency, that the testing of rocket motors or engines at the facility is required for a program essential to the national security.

**(4)** The source will comply with an alternative measure, imposed by the permitting authority, designed to offset any emission increases beyond permitted levels not directly offset by the source. In lieu of imposing any alternative offset measures, the permitting authority may impose an emissions fee to be paid to such authority of a State which shall be an amount no greater than 1.5 times the average cost of stationary source control measures adopted in that area during the previous 3 years. The permitting authority shall utilize the fees in a manner that maximizes the emissions reductions in that area.

### CREDIT(S)

(July 14, 1955, c. 360, Title I, § 173, as added Pub.L. 95-95, Title I, § 129(b), Aug. 7, 1977, 91 Stat. 748; amended Pub.L. 95-190, § 14(a)(57), (58), Nov. 16, 1977, 91 Stat. 1403; Pub.L. 101-549, Title I, § 102(c), Nov. 15, 1990, 104 Stat. 2415.)

Notes of Decisions (18)

### Footnotes

1       So in original. The word "and" probably should not appear.

42 U.S.C.A. § 7503, 42 USCA § 7503
Current through P.L. 117-327. Some statute sections may be more current, see credits for details.

**WESTLAW**  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 42. The Public Health and Welfare
        Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
            Subchapter III. General Provisions

42 U.S.C.A. § 7602

§ 7602. Definitions

Currentness

When used in this chapter--

**(a)** The term "Administrator" means the Administrator of the Environmental Protection Agency.

**(b)** The term "air pollution control agency" means any of the following:

**(1)** A single State agency designated by the Governor of that State as the official State air pollution control agency for purposes of this chapter.

**(2)** An agency established by two or more States and having substantial powers or duties pertaining to the prevention and control of air pollution.

**(3)** A city, county, or other local government health authority, or, in the case of any city, county, or other local government in which there is an agency other than the health authority charged with responsibility for enforcing ordinances or laws relating to the prevention and control of air pollution, such other agency.

**(4)** An agency of two or more municipalities located in the same State or in different States and having substantial powers or duties pertaining to the prevention and control of air pollution.

**(5)** An agency of an Indian tribe.

**(c)** The term "interstate air pollution control agency" means--

**(1)** an air pollution control agency established by two or more States, or

**(2)** an air pollution control agency of two or more municipalities located in different States.

**(d)** The term "State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, and American Samoa and includes the Commonwealth of the Northern Mariana Islands.

**(e)** The term "person" includes an individual, corporation, partnership, association, State, municipality, political subdivision of a State, and any agency, department, or instrumentality of the United States and any officer, agent, or employee thereof.

**(f)** The term "municipality" means a city, town, borough, county, parish, district, or other public body created by or pursuant to State law.

**(g)** The term "air pollutant" means any air pollution agent or combination of such agents, including any physical, chemical, biological, radioactive (including source material, special nuclear material, and byproduct material) substance or matter which is emitted into or otherwise enters the ambient air. Such term includes any precursors to the formation of any air pollutant, to the extent the Administrator has identified such precursor or precursors for the particular purpose for which the term "air pollutant" is used.

**(h)** All language referring to effects on welfare includes, but is not limited to, effects on soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being, whether caused by transformation, conversion, or combination with other air pollutants.

**(i)** The term "Federal land manager" means, with respect to any lands in the United States, the Secretary of the department with authority over such lands.

**(j)** Except as otherwise expressly provided, the terms "major stationary source" and "major emitting facility" mean any stationary facility or source of air pollutants which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant (including any major emitting facility or source of fugitive emissions of any such pollutant, as determined by rule by the Administrator).

**(k)** The terms "emission limitation" and "emission standard" mean a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice or operational standard promulgated under this chapter.. [1]

**(l)** The term "standard of performance" means a requirement of continuous emission reduction, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction.

**(m)** The term "means of emission limitation" means a system of continuous emission reduction (including the use of specific technology or fuels with specified pollution characteristics).

**(n)** The term "primary standard attainment date" means the date specified in the applicable implementation plan for the attainment of a national primary ambient air quality standard for any air pollutant.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**(o)** The term "delayed compliance order" means an order issued by the State or by the Administrator to an existing stationary source, postponing the date required under an applicable implementation plan for compliance by such source with any requirement of such plan.

**(p)** The term "schedule and timetable of compliance" means a schedule of required measures including an enforceable sequence of actions or operations leading to compliance with an emission limitation, other limitation, prohibition, or standard.

**(q)** For purposes of this chapter, the term "applicable implementation plan" means the portion (or portions) of the implementation plan, or most recent revision thereof, which has been approved under section 7410 of this title, or promulgated under section 7410(c) of this title, or promulgated or approved pursuant to regulations promulgated under section 7601(d) of this title and which implements the relevant requirements of this chapter.

**(r) Indian tribe.--**The term "Indian tribe" means any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

**(s) VOC.--**The term "VOC" means volatile organic compound, as defined by the Administrator.

**(t) PM-10.--**The term "PM-10" means particulate matter with an aerodynamic diameter less than or equal to a nominal ten micrometers, as measured by such method as the Administrator may determine.

**(u) NAAQS and CTG.--**The term "NAAQS" means national ambient air quality standard. The term "CTG" means a Control Technique Guideline published by the Administrator under section 7408 of this title.

**(v) $NO_x$.--**The term "$NO_x$" means oxides of nitrogen.

**(w) CO.--**The term "CO" means carbon monoxide.

**(x) Small source.--**The term "small source" means a source that emits less than 100 tons of regulated pollutants per year, or any class of persons that the Administrator determines, through regulation, generally lack technical ability or knowledge regarding control of air pollution.

**(y) Federal implementation plan.--**The term "Federal implementation plan" means a plan (or portion thereof) promulgated by the Administrator to fill all or a portion of a gap or otherwise correct all or a portion of an inadequacy in a State implementation plan, and which includes enforceable emission limitations or other control measures, means or techniques (including economic incentives, such as marketable permits or auctions of emissions allowances), and provides for attainment of the relevant national ambient air quality standard.

**(z) Stationary source.**--The term "stationary source" means generally any source of an air pollutant except those emissions resulting directly from an internal combustion engine for transportation purposes or from a nonroad engine or nonroad vehicle as defined in section 7550 of this title.

## CREDIT(S)

(July 14, 1955, c. 360, Title III, § 302, formerly § 9, as added Pub.L. 88-206, § 1, Dec. 17, 1963, 77 Stat. 400, renumbered Pub.L. 89-272, Title I, § 101(4), Oct. 20, 1965, 79 Stat. 992; amended Pub.L. 90-148, § 2, Nov. 21, 1967, 81 Stat. 504; Pub.L. 91-604, § 15(a)(1), (c)(1), Dec. 31, 1970, 84 Stat. 1710, 1713; Pub.L. 95-95, Title II, § 218(c), Title III, § 301, Aug. 7, 1977, 91 Stat. 761, 769; Pub.L. 95-190, § 14(a)(76), Nov. 16, 1977, 91 Stat. 1404; Pub.L. 101-549, Title I, §§ 101(d)(4), 107(a), (b), 108(j), 109(b), Title III, § 302(e), Title VII, § 709, Nov. 15, 1990, 104 Stat. 2409, 2464, 2468, 2470, 2574, 2684.)

Notes of Decisions (12)

## Footnotes

1    So in original.

42 U.S.C.A. § 7602, 42 USCA § 7602
Current through P.L. 117-327. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Prior Version Held Invalid   Murray Energy Corporation v. Environmental Protection Agency,   D.C.Cir.,   Aug. 23, 2019

KeyCite Yellow Flag - Negative Treatment

Proposed Regulation

Code of Federal Regulations

Title 40. Protection of Environment

Chapter I. Environmental Protection Agency (Refs & Annos)

Subchapter C. Air Programs

Part 52. Approval and Promulgation of Implementation Plans (Refs & Annos)

Subpart A. General Provisions (Refs & Annos)

40 C.F.R. § 52.21

§ 52.21 Prevention of significant deterioration of air quality.

Effective: August 18, 2021

Currentness

(a)(1) Plan disapproval. The provisions of this section are applicable to any State implementation plan which has been disapproved with respect to prevention of significant deterioration of air quality in any portion of any State where the existing air quality is better than the national ambient air quality standards. Specific disapprovals are listed where applicable, in subparts B through DDD and FFF of this part. The provisions of this section have been incorporated by reference into the applicable implementation plans for various States, as provided in subparts B through DDD and FFF of this part. Where this section is so incorporated, the provisions shall also be applicable to all lands owned by the Federal Government and Indian Reservations located in such State. No disapproval with respect to a State's failure to prevent significant deterioration of air quality shall invalidate or otherwise affect the obligations of States, emission sources, or other persons with respect to all portions of plans approved or promulgated under this part.

(2) Applicability procedures.

(i) The requirements of this section apply to the construction of any new major stationary source (as defined in paragraph (b)(1) of this section) or any project at an existing major stationary source in an area designated as attainment or unclassifiable under sections 107(d)(1)(A)(ii) or (iii) of the Act.

(ii) The requirements of paragraphs (j) through (r) of this section apply to the construction of any new major stationary source or the major modification of any existing major stationary source, except as this section otherwise provides.

(iii) No new major stationary source or major modification to which the requirements of paragraphs (j) through (r)(5) of this section apply shall begin actual construction without a permit that states that the major stationary source or major modification will meet those requirements. The Administrator has authority to issue any such permit.

(iv) The requirements of the program will be applied in accordance with the principles set out in paragraphs (a)(2)(iv)(a) through (f) of this section.

(a) Except as otherwise provided in paragraph (a)(2)(v) of this section, and consistent with the definition of major modification contained in paragraph (b)(2) of this section, a project is a major modification for a regulated NSR pollutant if it causes two types of emissions increases—a significant emissions increase (as defined in paragraph (b)(40) section) and a significant net emissions increase (as defined in paragraphs (b)(3) and (23) of this section). The project is not a major modification if it does not cause a significant emissions increase. If the project causes a significant emissions increase, then the project is a major modification only if it also results in a significant net emissions increase.

(b) The procedure for calculating (before beginning actual construction) whether a significant emissions increase (i.e., the first step of the process) will occur depends upon the type of emissions units being modified, according to paragraphs (a)(2)(iv)(c) through (f) of this section. The procedure for calculating (before beginning actual construction) whether a significant net emissions increase will occur at the major stationary source (i.e., the second step of the process) is contained in the definition in paragraph (b)(3) of this section. Regardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase.

(c) Actual-to-projected-actual applicability test for projects that only involve existing emissions units. A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the projected actual emissions (as defined in paragraph (b)(41) of this section) and the baseline actual emissions (as defined in paragraphs (b)(48)(i) and (ii) of this section), for each existing emissions unit, equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(d) Actual-to-potential test for projects that only involve construction of a new emissions unit(s). A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the potential to emit (as defined in paragraph (b)(4) of this section) from each new emissions unit following completion of the project and the baseline actual emissions (as defined in paragraph (b)(48)(iii) of this section) of these units before the project equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(e) [Reserved]

(f) Hybrid test for projects that involve multiple types of emissions units. A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference for all emissions units, using the method specified in paragraphs (a)(2)(iv)(c) and (d) of this section as applicable with respect to each emissions unit, equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(g) The "sum of the difference" as used in paragraphs (c), (d) and (f) of this section shall include both increases and decreases in emissions calculated in accordance with those paragraphs.

(v) For any major stationary source for a PAL for a regulated NSR pollutant, the major stationary source shall comply with the requirements under paragraph (aa) of this section.

(vi) [Reserved]

(b) Definitions. For the purposes of this section:

(1)(i) Major stationary source means:

(a) Any of the following stationary sources of air pollutants which emits, or has the potential to emit, 100 tons per year or more of any regulated NSR pollutant: Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input, coal cleaning plants (with thermal dryers), kraft pulp mills, portland cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants (with thermal dryers), primary copper smelters, municipal incinerators capable of charging more than 50 tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production plants, chemical process plants (which does not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140), fossil-fuel boilers (or combinations thereof) totaling more than 250 million British thermal units per hour heat input, petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels, taconite ore processing plants, glass fiber processing plants, and charcoal production plants;

(b) Notwithstanding the stationary source size specified in paragraph (b)(1)(i)(a) of this section, any stationary source which emits, or has the potential to emit, 250 tons per year or more of a regulated NSR pollutant; or

(c) Any physical change that would occur at a stationary source not otherwise qualifying under paragraph (b)(1) of this section as a major stationary source, if the change would constitute a major stationary source by itself.

(ii) A major source that is major for volatile organic compounds or $NO_X$ shall be considered major for ozone.

(iii) The fugitive emissions of a stationary source shall not be included in determining for any of the purposes of this section whether it is a major stationary source, unless the source belongs to one of the following categories of stationary sources:

(a) Coal cleaning plants (with thermal dryers);

(b) Kraft pulp mills;

(c) Portland cement plants;

(d) Primary zinc smelters;

(e) Iron and steel mills;

(f) Primary aluminum ore reduction plants;

(g) Primary copper smelters;

(h) Municipal incinerators capable of charging more than 50 tons of refuse per day;

(i) Hydrofluoric, sulfuric, or nitric acid plants;

(j) Petroleum refineries;

(k) Lime plants;

(l) Phosphate rock processing plants;

(m) Coke oven batteries;

(n) Sulfur recovery plants;

(o) Carbon black plants (furnace process);

(p) Primary lead smelters;

(q) Fuel conversion plants;

(r) Sintering plants;

(s) Secondary metal production plants;

(t) Chemical process plants—The term chemical processing plant shall not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140;

(u) Fossil-fuel boilers (or combination thereof) totaling more than 250 million British thermal units per hour heat input;

(v) Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels;

(w) Taconite ore processing plants;

(x) Glass fiber processing plants;

(y) Charcoal production plants;

(z) Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input, and

(aa) Any other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the Act.

(2)(i) Major modification means any physical change in or change in the method of operation of a major stationary source that would result in: a significant emissions increase (as defined in paragraph (b)(40) of this section) of a regulated NSR pollutant (as defined in paragraph (b)(50) of this section); and a significant net emissions increase of that pollutant from the major stationary source.

(ii) Any significant emissions increase (as defined at paragraph (b)(40) of this section) from any emissions units or net emissions increase (as defined in paragraph (b)(3) of this section) at a major stationary source that is significant for volatile organic compounds or $NO_X$ shall be considered significant for ozone.

(iii) A physical change or change in the method of operation shall not include:

(a) Routine maintenance, repair and replacement;

(b) Use of an alternative fuel or raw material by reason of an order under sections 2(a) and (b) of the Energy Supply and Environmental Coordination Act of 1974 (or any superseding legislation) or by reason of a natural gas curtailment plan pursuant to the Federal Power Act;

(c) Use of an alternative fuel by reason of an order or rule under section 125 of the Act;

(d) Use of an alternative fuel at a steam generating unit to the extent that the fuel is generated from municipal solid waste;

(e) Use of an alternative fuel or raw material by a stationary source which:

(1) The source was capable of accommodating before January 6, 1975, unless such change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975, pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR part 51, subpart I; or

(2) The source is approved to use under any permit issued under 40 CFR 52.21 or under regulations approved pursuant to 40 CFR 51.166;

(f) An increase in the hours of operation or in the production rate, unless such change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975, pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR part 51, subpart I.

(g) Any change in ownership at a stationary source.

(h) [Reserved]

(i) The installation, operation, cessation, or removal of a temporary clean coal technology demonstration project, provided that the project complies with:

(1) The State implementation plan for the State in which the project is located, and

(2) Other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

(j) The installation or operation of a permanent clean coal technology demonstration project that constitutes repowering, provided that the project does not result in an increase in the potential to emit of any regulated pollutant emitted by the unit. This exemption shall apply on a pollutant-by-pollutant basis.

(k) The reactivation of a very clean coal-fired electric utility steam generating unit.

(iv) This definition shall not apply with respect to a particular regulated NSR pollutant when the major stationary source is complying with the requirements under paragraph (aa) of this section for a PAL for that pollutant. Instead, the definition at paragraph (aa)(2)(viii) of this section shall apply.

<Text of subsection (b)(2)(v) stayed effective March 30, 2011.>

(v) Fugitive emissions shall not be included in determining for any of the purposes of this section whether a physical change in or change in the method of operation of a major stationary source is a major modification, unless the source belongs to one of the source categories listed in paragraph (b)(1)(iii) of this section.

(3)(i) Net emissions increase means, with respect to any regulated NSR pollutant emitted by a major stationary source, the amount by which the sum of the following exceeds zero:

(a) The increase in emissions from a particular physical change or change in the method of operation at a stationary source as calculated pursuant to paragraph (a)(2)(iv) of this section; and

(b) Any other increases and decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable. Baseline actual emissions for calculating increases and decreases under this paragraph (b)(3)(i)(b) shall be determined as provided in paragraph (b)(48) of this section, except that paragraphs (b)(48)(i)(c) and (b)(48)(ii)(d) of this section shall not apply.

(ii) An increase or decrease in actual emissions is contemporaneous with the increase from the particular change only if it occurs between:

(a) The date five years before construction on the particular change commences; and

(b) The date that the increase from the particular change occurs.

(iii) An increase or decrease in actual emissions is creditable only if:

(a) The Administrator or other reviewing authority has not relied on it in issuing a permit for the source under this section, which permit is in effect when the increase in actual emissions from the particular change occurs; and

(b) [Reserved by 86 FR 37932]

<Text of subsection (b)(3)(iii)(c) stayed effective March 30, 2011.>

(c) As it pertains to an increase or decrease in fugitive emissions (to the extent quantifiable), it occurs at an emissions unit that is part of one of the source categories listed in paragraph (b)(1)(iii) of this section or it occurs at an emission unit that is located at a major stationary source that belongs to one of the listed source categories.

(iv) An increase or decrease in actual emissions of sulfur dioxide, particulate matter, or nitrogen oxides that occurs before the applicable minor source baseline date is creditable only if it is required to be considered in calculating the amount of maximum allowable increases remaining available.

(v) An increase in actual emissions is creditable only to the extent that the new level of actual emissions exceeds the old level.

(vi) A decrease in actual emissions is creditable only to the extent that:

(a) The old level of actual emissions or the old level of allowable emissions, whichever is lower, exceeds the new level of actual emissions;

(b) It is enforceable as a practical matter at and after the time that actual construction on the particular change begins.

(c) It has approximately the same qualitative significance for public health and welfare as that attributed to the increase from the particular change.

(d) [Reserved]

(vii) [Reserved]

(viii) An increase that results from a physical change at a source occurs when the emissions unit on which construction occurred becomes operational and begins to emit a particular pollutant. Any replacement unit that requires shakedown becomes operational only after a reasonable shakedown period, not to exceed 180 days.

(ix) Paragraph (b)(21)(ii) of this section shall not apply for determining creditable increases and decreases.

(4) Potential to emit means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable. Secondary emissions do not count in determining the potential to emit of a stationary source.

(5) Stationary source means any building, structure, facility, or installation which emits or may emit a regulated NSR pollutant.

(6)(i) Building, structure, facility, or installation means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control) except the activities of any vessel. Pollutant-emitting activities shall be considered as part of the same industrial grouping if they belong to the same "Major Group" (i.e., which have the same first two digit code) as described in the Standard Industrial Classification Manual, 1972, as amended by the 1977 Supplement (U.S. Government Printing Office stock numbers 4101–0066 and 003–005–00716–0, respectively).

(ii) Notwithstanding the provisions of paragraph (b)(6)(i) of this section, building, structure, facility, or installation means, for onshore activities under Standard Industrial Classification (SIC) Major Group 13: Oil and Gas Extraction, all of the pollutant-emitting activities included in Major Group 13 that are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control). Pollutant emitting activities shall be considered adjacent if they are located on the same surface site; or if they are located on surface sites that are located within ¼ mile of one another (measured from the center of the equipment on the surface site) and they share equipment. Shared equipment includes, but is not limited to, produced fluids storage tanks, phase separators, natural gas dehydrators or emissions control devices. Surface site, as used in this paragraph (b)(6)(ii), has the same meaning as in 40 CFR 63.761.

(7) Emissions unit means any part of a stationary source that emits or would have the potential to emit any regulated NSR pollutant and includes an electric utility steam generating unit as defined in paragraph (b)(31) of this section. For purposes of this section, there are two types of emissions units as described in paragraphs (b)(7)(i) and (ii) of this section.

(i) A new emissions unit is any emissions unit that is (or will be) newly constructed and that has existed for less than 2 years from the date such emissions unit first operated.

(ii) An existing emissions unit is any emissions unit that does not meet the requirements in paragraph (b)(7)(i) of this section. A replacement unit, as defined in paragraph (b)(33) of this section, is an existing emissions unit.

(8) Construction means any physical change or change in the method of operation (including fabrication, erection, installation, demolition, or modification of an emissions unit) that would result in a change in emissions.

(9) Commence as applied to construction of a major stationary source or major modification means that the owner or operator has all necessary preconstruction approvals or permits and either has:

(i) Begun, or caused to begin, a continuous program of actual on-site construction of the source, to be completed within a reasonable time; or

(ii) Entered into binding agreements or contractual obligations, which cannot be cancelled or modified without substantial loss to the owner or operator, to undertake a program of actual construction of the source to be completed within a reasonable time.

(10) Necessary preconstruction approvals or permits means those permits or approvals required under Federal air quality control laws and regulations and those air quality control laws and regulations which are part of the applicable State Implementation Plan.

(11) Begin actual construction means, in general, initiation of physical on-site construction activities on an emissions unit which are of a permanent nature. Such activities include, but are not limited to, installation of building supports and foundations, laying underground pipework and construction of permanent storage structures. With respect to a change in method of operations, this term refers to those on-site activities other than preparatory activities which mark the initiation of the change.

(12) Best available control technology means an emissions limitation (including a visible emission standard) based on the maximum degree of reduction for each pollutant subject to regulation under the Act which would be emitted from any proposed major stationary source or major modification which the Administrator, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of such pollutant. In no event shall application of best available control technology result in emissions of any pollutant which would exceed the emissions allowed by any applicable standard under 40 CFR part 60, 61, or 63. If the Administrator determines that technological or economic limitations on the application of measurement methodology to a particular emissions unit would make the imposition of an emissions standard infeasible, a design, equipment, work practice, operational standard, or combination thereof, may be prescribed instead to satisfy the requirement for the application of best available control technology. Such standard shall, to the degree possible, set forth the emissions reduction achievable by implementation of such design, equipment, work practice or operation, and shall provide for compliance by means which achieve equivalent results.

(13)(i) Baseline concentration means that ambient concentration level that exists in the baseline area at the time of the applicable minor source baseline date. A baseline concentration is determined for each pollutant for which a minor source baseline date is established and shall include:

(a) The actual emissions, as defined in paragraph (b)(21) of this section, representative of sources in existence on the applicable minor source baseline date, except as provided in paragraph (b)(13)(ii) of this section; and

(b) The allowable emissions of major stationary sources that commenced construction before the major source baseline date, but were not in operation by the applicable minor source baseline date.

(ii) The following will not be included in the baseline concentration and will affect the applicable maximum allowable increase(s):

(a) Actual emissions, as defined in paragraph (b)(21) of this section, from any major stationary source on which construction commenced after the major source baseline date; and

(b) Actual emissions increases and decreases, as defined in paragraph (b)(21) of this section, at any stationary source occurring after the minor source baseline date.

(14)(i) Major source baseline date means:

(a) In the case of $PM_{10}$ and sulfur dioxide, January 6, 1975;

(b) In the case of nitrogen dioxide, February 8, 1988; and

(c) In the case of $PM_{2.5}$, October 20, 2010.

(ii) "Minor source baseline date" means the earliest date after the trigger date on which a major stationary source or a major modification subject to 40 CFR 52.21 or to regulations approved pursuant to 40 CFR 51.166 submits a complete application under the relevant regulations. The trigger date is:

(a) In the case of $PM_{10}$ and sulfur dioxide, August 7, 1977;

(b) In the case of nitrogen dioxide, February 8, 1988; and

(c) In the case of $PM_{2.5}$, October 20, 2011.

(iii) The baseline date is established for each pollutant for which increments or other equivalent measures have been established if:

(a) The area in which the proposed source or modification would construct is designated as attainment or unclassifiable under section 107(d)(1)(A)(ii) or (iii) of the Act for the pollutant on the date of its complete application under 40 CFR 52.21 or under regulations approved pursuant to 40 CFR 51.166; and

(b) In the case of a major stationary source, the pollutant would be emitted in significant amounts, or, in the case of a major modification, there would be a significant net emissions increase of the pollutant.

(iv) Any minor source baseline date established originally for the TSP increments shall remain in effect and shall apply for purposes of determining the amount of available PM–10 increments, except that the Administrator shall rescind a minor source baseline date where it can be shown, to the satisfaction of the Administrator, that the emissions increase from the major stationary source, or net emissions increase from the major modification, responsible for triggering that date did not result in a significant amount of PM–10 emissions.

(15)(i) Baseline area means any intrastate area (and every part thereof) designated as attainment or unclassifiable under section 107(d)(1)(A)(ii) or (iii) of the Act in which the major source or major modification establishing the minor source baseline date would construct or would have an air quality impact for the pollutant for which the baseline date is established, as follows: equal to or greater than 1 $\mu g/m^3$ (annual average) for $SO_2$, $NO_2$, or $PM_{10}$; or equal or greater than 0.3 $\mu g/m^3$ (annual average) for $PM_{2.5}$ .

(ii) Area redesignations under section 107(d)(1)(A)(ii) or (iii) of the Act cannot intersect or be smaller than the area of impact of any major stationary source or major modification which:

(a) Establishes a minor source baseline date; or

(b) Is subject to 40 CFR 52.21 and would be constructed in the same state as the state proposing the redesignation.

(iii) Any baseline area established originally for the TSP increments shall remain in effect and shall apply for purposes of determining the amount of available PM–10 increments, except that such baseline area shall not remain in effect if the Administrator rescinds the corresponding minor source baseline date in accordance with paragraph (b)(14)(iv) of this section.

(16) Allowable emissions means the emissions rate of a stationary source calculated using the maximum rated capacity of the source (unless the source is subject to federally enforceable limits which restrict the operating rate, or hours of operation, or both) and the most stringent of the following:

(i) The applicable standards as set forth in 40 CFR parts 60 and 61;

(ii) The applicable State Implementation Plan emissions limitation, including those with a future compliance date; or

(iii) The emissions rate specified as a federally enforceable permit condition, including those with a future compliance date.

(17) *Federally enforceable* means all limitations and conditions which are enforceable by the Administrator, including those requirements developed pursuant to 40 CFR parts 60 and 61, requirements within any applicable State implementation plan, any permit requirements established pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR part 51, subpart I, including operating permits issued under an EPA-approved program that is incorporated into the State implementation plan and expressly requires adherence to any permit issued under such program.

(18) *Secondary emissions* means emissions which would occur as a result of the construction or operation of a major stationary source or major modification, but do not come from the major stationary source or major modification itself. Secondary emissions include emissions from any offsite support facility which would not be constructed or increase its emissions except as a result of the construction or operation of the major stationary source or major modification. Secondary emissions do not include any emissions which come directly from a mobile source, such as emissions from the tailpipe of a motor vehicle, from a train, or from a vessel.

(i) Emissions from ships or trains coming to or from the new or modified stationary source; and

(ii) Emissions from any offsite support facility which would not otherwise be constructed or increase its emissions as a result of the construction or operation of the major stationary source or major modification.

(19) *Innovative control technology* means any system of air pollution control that has not been adequately demonstrated in practice, but would have a substantial likelihood of achieving greater continuous emissions reduction than any control system in current practice or of achieving at least comparable reductions at lower cost in terms of energy, economics, or nonair quality environmental impacts.

(20) *Fugitive emissions* means those emissions which could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening.

(21)(i) *Actual emissions* means the actual rate of emissions of a regulated NSR pollutant from an emissions unit, as determined in accordance with paragraphs (b)(21)(ii) through (iv) of this section, except that this definition shall not apply for calculating whether a significant emissions increase has occurred, or for establishing a PAL under paragraph (aa) of this section. Instead, paragraphs (b)(41) and (b)(48) of this section shall apply for those purposes.

(ii) In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a consecutive 24–month period which precedes the particular date and which is representative of normal source operation. The Administrator shall allow the use of a different time period upon a determination that it is more representative of normal source operation. Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period.

(iii) The Administrator may presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit.

(iv) For any emissions unit that has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date.

(22) Complete means, in reference to an application for a permit, that the application contains all of the information necessary for processing the application.

(23)(i) Significant means, in reference to a net emissions increase or the potential of a source to emit any of the following pollutants, a rate of emissions that would equal or exceed any of the following rates:

Pollutant and Emissions Rate

Carbon monoxide: 100 tons per year (tpy)

Nitrogen oxides: 40 tpy

Sulfur dioxide: 40 tpy

Particulate matter: 25 tpy of particulate matter emissions

$PM_{10}$: 15 tpy

$PM_{2.5}$: 10 tpy of direct $PM_{2.5}$ emissions; 40 tpy of sulfur dioxide emissions; 40 tpy of nitrogen oxide emissions unless demonstrated not to be a $PM_{2.5}$ precursor under paragraph (b)(50) of this section

Ozone: 40 tpy of volatile organic compounds or nitrogen oxides

Lead: 0.6 tpy

Fluorides: 3 tpy

Sulfuric acid mist: 7 tpy

Hydrogen sulfide ($H_2S$): 10 tpy

Total reduced sulfur (including $H_2S$): 10 tpy

Reduced sulfur compounds (including $H_2S$): 10 tpy

Municipal waste combustor organics (measured as total tetra-through octa-chlorinated dibenzo-p-dioxins and dibenzofurans): $3.2 \times 10^{-6}$ megagrams per year ($3.5 \times 10^{-6}$ tons per year)

Municipal waste combustor metals (measured as particulate matter): 14 megagrams per year (15 tons per year)

Municipal waste combustor acid gases (measured as sulfur dioxide and hydrogen chloride): 36 megagrams per year (40 tons per year)

Municipal solid waste landfills emissions (measured as nonmethane organic compounds): 45 megagrams per year (50 tons per year)

(ii) Significant means, in reference to a net emissions increase or the potential of a source to emit a regulated NSR pollutant that paragraph (b)(23)(i) of this section does not list, any emissions rate.

(iii) Notwithstanding paragraph (b)(23)(i) of this section, significant means any emissions rate or any net emissions increase associated with a major stationary source or major modification, which would construct within 10 kilometers of a Class I area, and have an impact on such area equal to or greater than 1 $\mu g/m^3$, (24–hour average).

(24) Federal Land Manager means, with respect to any lands in the United States, the Secretary of the department with authority over such lands.

(25) High terrain means any area having an elevation 900 feet or more above the base of the stack of a source.

(26) Low terrain means any area other than high terrain.

(27) Indian Reservation means any federally recognized reservation established by Treaty, Agreement, executive order, or act of Congress.

(28) Indian Governing Body means the governing body of any tribe, band, or group of Indians subject to the jurisdiction of the United States and recognized by the United States as possessing power of self government.

(29) Adverse impact on visibility means visibility impairment which interferes with the management, protection, preservation or enjoyment of the visitor's visual experience of the Federal Class I area. This determination must be made on a case-by-case basis taking into account the geographic extent, intensity, duration, frequency and time of visibility impairment, and how these factors correlate with (1) times of visitor use of the Federal Class I area, and (2) the frequency and timing of natural conditions that reduce visibility.

(30) Volatile organic compounds (VOC) is as defined in § 51.100(s) of this chapter.

(31) Electric utility steam generating unit means any steam electric generating unit that is constructed for the purpose of supplying more than one-third of its potential electric output capacity and more than 25 MW electrical output to any utility power distribution system for sale. Any steam supplied to a steam distribution system for the purpose of providing steam to a steam-electric generator that would produce electrical energy for sale is also considered in determining the electrical energy output capacity of the affected facility.

(32) [Reserved]

(33) Replacement unit means an emissions unit for which all the criteria listed in paragraphs (b)(33)(i) through (iv) of this section are met. No creditable emission reductions shall be generated from shutting down the existing emissions unit that is replaced.

(i) The emissions unit is a reconstructed unit within the meaning of § 60.15(b)(1) of this chapter, or the emissions unit completely takes the place of an existing emissions unit;

(ii) The emissions unit is identical to or functionally equivalent to the replaced emissions unit;

(iii) The replacement does not alter the basic design parameters of the process unit; and

(iv) The replaced emissions unit is permanently removed from the major stationary source, otherwise permanently disabled, or permanently barred from operation by a permit that is enforceable as a practical matter. If the replaced emissions unit is brought back into operation, it shall constitute a new emissions unit.

(34) Clean coal technology means any technology, including technologies applied at the precombustion, combustion, or post combustion stage, at a new or existing facility which will achieve significant reductions in air emissions of sulfur dioxide or oxides of nitrogen associated with the utilization of coal in the generation of electricity, or process steam which was not in widespread use as of November 15, 1990.

(35) Clean coal technology demonstration project means a project using funds appropriated under the heading "Department of Energy–Clean Coal Technology", up to a total amount of $2,500,000,000 for commercial demonstration of clean coal technology, or similar projects funded through appropriations for the Environmental Protection Agency. The Federal contribution for a qualifying project shall be at least 20 percent of the total cost of the demonstration project.

(36) Temporary clean coal technology demonstration project means a clean coal technology demonstration project that is operated for a period of 5 years or less, and which complies with the State implementation plans for the State in which the project is located and other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

(37)(i) Repowering means replacement of an existing coal-fired boiler with one of the following clean coal technologies: atmospheric or pressurized fluidized bed combustion, integrated gasification combined cycle, magnetohydrodynamics, direct and indirect coal-fired turbines, integrated gasification fuel cells, or as determined by the Administrator, in consultation with the Secretary of Energy, a derivative of one or more of these technologies, and any other technology capable of controlling multiple combustion emissions simultaneously with improved boiler or generation efficiency and with significantly greater waste reduction relative to the performance of technology in widespread commercial use as of November 15, 1990.

(ii) Repowering shall also include any oil and/or gas-fired unit which has been awarded clean coal technology demonstration funding as of January 1, 1991, by the Department of Energy.

(iii) The Administrator shall give expedited consideration to permit applications for any source that satisfies the requirements of this subsection and is granted an extension under section 409 of the Clean Air Act.

(38) Reactivation of a very clean coal-fired electric utility steam generating unit means any physical change or change in the method of operation associated with the commencement of commercial operations by a coal-fired utility unit after a period of discontinued operation where the unit:

(i) Has not been in operation for the two-year period prior to the enactment of the Clean Air Act Amendments of 1990, and the emissions from such unit continue to be carried in the permitting authority's emissions inventory at the time of enactment;

(ii) Was equipped prior to shut-down with a continuous system of emissions control that achieves a removal efficiency for sulfur dioxide of no less than 85 percent and a removal efficiency for particulates of no less than 98 percent;

(iii) Is equipped with low-NO$_X$ burners prior to the time of commencement of operations following reactivation; and

(iv) Is otherwise in compliance with the requirements of the Clean Air Act.

(39) Pollution prevention means any activity that through process changes, product reformulation or redesign, or substitution of less polluting raw materials, eliminates or reduces the release of air pollutants (including fugitive emissions) and other pollutants to the environment prior to recycling, treatment, or disposal; it does not mean recycling (other than certain "in-process recycling" practices), energy recovery, treatment, or disposal.

(40) Significant emissions increase means, for a regulated NSR pollutant, an increase in emissions that is significant (as defined in paragraph (b)(23) of this section) for that pollutant.

(41)(i) Projected actual emissions means the maximum annual rate, in tons per year, at which an existing emissions unit is projected to emit a regulated NSR pollutant in any one of the 5 years (12–month period) following the date the unit resumes regular operation after the project, or in any one of the 10 years following that date, if the project involves increasing the emissions unit's design capacity or its potential to emit that regulated NSR pollutant and full utilization of the unit would result in a significant emissions increase or a significant net emissions increase at the major stationary source.

(ii) In determining the projected actual emissions under paragraph (b)(41)(i) of this section (before beginning actual construction), the owner or operator of the major stationary source:

(a) Shall consider all relevant information, including but not limited to, historical operational data, the company's own representations, the company's expected business activity and the company's highest projections of business activity,

the company's filings with the State or Federal regulatory authorities, and compliance plans under the approved State Implementation Plan; and

(b) Shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions; and

(c) Shall exclude, in calculating any increase in emissions that results from the particular project, that portion of the unit's emissions following the project that an existing unit could have accommodated during the consecutive 24–month period used to establish the baseline actual emissions under paragraph (b)(48) of this section and that are also unrelated to the particular project, including any increased utilization due to product demand growth; or

(d) In lieu of using the method set out in paragraphs (a)(41)(ii)(a) through (c) of this section, may elect to use the emissions unit's potential to emit, in tons per year, as defined under paragraph (b)(4) of this section.

(42) [Reserved]

(43) Prevention of Significant Deterioration (PSD) program means the EPA-implemented major source preconstruction permit programs under this section or a major source preconstruction permit program that has been approved by the Administrator and incorporated into the State Implementation Plan pursuant to § 51.166 of this chapter to implement the requirements of that section. Any permit issued under such a program is a major NSR permit.

(44) Continuous emissions monitoring system (CEMS) means all of the equipment that may be required to meet the data acquisition and availability requirements of this section, to sample, condition (if applicable), analyze, and provide a record of emissions on a continuous basis.

(45) Predictive emissions monitoring system (PEMS) means all of the equipment necessary to monitor process and control device operational parameters (for example, control device secondary voltages and electric currents) and other information (for example, gas flow rate, $O_2$ or $CO_2$ concentrations), and calculate and record the mass emissions rate (for example, lb/hr) on a continuous basis.

(46) Continuous parameter monitoring system (CPMS) means all of the equipment necessary to meet the data acquisition and availability requirements of this section, to monitor process and control device operational parameters (for example, control device secondary voltages and electric currents) and other information (for example, gas flow rate, $O_2$ or $CO_2$ concentrations), and to record average operational parameter value(s) on a continuous basis.

(47) Continuous emissions rate monitoring system (CERMS) means the total equipment required for the determination and recording of the pollutant mass emissions rate (in terms of mass per unit of time).

(48) Baseline actual emissions means the rate of emissions, in tons per year, of a regulated NSR pollutant, as determined in accordance with paragraphs (b)(48)(i) through (iv) of this section.

(i) For any existing electric utility steam generating unit, baseline actual emissions means the average rate, in tons per year, at which the unit actually emitted the pollutant during any consecutive 24–month period selected by the owner or operator within the 5–year period immediately preceding when the owner or operator begins actual construction of the project. The Administrator shall allow the use of a different time period upon a determination that it is more representative of normal source operation.

(a) The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(b) The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above any emission limitation that was legally enforceable during the consecutive 24–month period.

(c) For a regulated NSR pollutant, when a project involves multiple emissions units, only one consecutive 24–month period must be used to determine the baseline actual emissions for the emissions units being changed. A different consecutive 24–month period can be used for each regulated pollutant.

(d) The average rate shall not be based on any consecutive 24–month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by paragraph (b)(48)(i)(b) of this section.

(ii) For an existing emissions unit (other than an electric utility steam generating unit), baseline actual emissions means the average rate, in tons per year, at which the emissions unit actually emitted the pollutant during any consecutive 24–month period selected by the owner or operator within the 10–year period immediately preceding either the date the owner or operator begins actual construction of the project, or the date a complete permit application is received by the Administrator for a permit required under this section or by the reviewing authority for a permit required by a plan, whichever is earlier, except that the 10–year period shall not include any period earlier than November 15, 1990.

(a) The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(b) The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above an emission limitation that was legally enforceable during the consecutive 24–month period.

(c) The average rate shall be adjusted downward to exclude any emissions that would have exceeded an emission limitation with which the major stationary source must currently comply, had such major stationary source been required to comply with such limitations during the consecutive 24–month period. However, if an emission limitation is part of a maximum achievable control technology standard that the Administrator proposed or promulgated under part 63 of this chapter, the baseline actual emissions need only be adjusted if the State has taken credit for such emissions reductions in an attainment demonstration or maintenance plan consistent with the requirements of § 51.165(a)(3)(ii)(G) of this chapter.

(d) For a regulated NSR pollutant, when a project involves multiple emissions units, only one consecutive 24–month period must be used to determine the baseline actual emissions for all the emissions units being changed. A different consecutive 24–month period can be used for each regulated NSR pollutant.

(e) The average rate shall not be based on any consecutive 24–month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by paragraphs (b)(48)(ii)(b) and (c) of this section.

(iii) For a new emissions unit, the baseline actual emissions for purposes of determining the emissions increase that will result from the initial construction and operation of such unit shall equal zero; and thereafter, for all other purposes, shall equal the unit's potential to emit.

(iv) For a PAL for a stationary source, the baseline actual emissions shall be calculated for existing electric utility steam generating units in accordance with the procedures contained in paragraph (b)(48)(i) of this section, for other existing emissions units in accordance with the procedures contained in paragraph (b)(48)(ii) of this section, and for a new emissions unit in accordance with the procedures contained in paragraph (b)(48)(iii) of this section.

(49) Subject to regulation means, for any air pollutant, that the pollutant is subject to either a provision in the Clean Air Act, or a nationally-applicable regulation codified by the Administrator in subchapter C of this chapter, that requires actual control of the quantity of emissions of that pollutant, and that such a control requirement has taken effect and is operative to control, limit or restrict the quantity of emissions of that pollutant released from the regulated activity. Except that:

(i) Greenhouse gases (GHGs), the air pollutant defined in § 86.1818–12(a) of this chapter as the aggregate group of six greenhouse gases: Carbon dioxide, nitrous oxide, methane, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride, shall not be subject to regulation except as provided in paragraph (b)(49)(iv) of this section and shall not be subject to regulation if the stationary source maintains its total source-wide emissions below the GHG PAL level, meets the requirements in paragraphs (aa)(1) through (15) of this section, and complies with the PAL permit containing the GHG PAL.

(ii) For purposes of paragraphs (b)(49)(iii) through (iv) of this section, the term tpy $CO_2$ equivalent emissions ($CO_2$e) shall represent an amount of GHGs emitted, and shall be computed as follows:

(a) Multiplying the mass amount of emissions (tpy), for each of the six greenhouse gases in the pollutant GHGs, by the gas's associated global warming potential published at Table A–1 to subpart A of part 98 of this chapter—Global Warming Potentials.

(b) Sum the resultant value from paragraph (b)(49)(ii)(a) of this section for each gas to compute a tpy $CO_2$e.

(iii) The term emissions increase as used in paragraph (b)(49)(iv) of this section shall mean that both a significant emissions increase (as calculated using the procedures in paragraph (a)(2)(iv) of this section) and a significant net emissions increase (as defined in paragraphs (b)(3) and (23) of this section) occur. For the pollutant GHGs, an emissions increase shall be based on tpy $CO_2$e, and shall be calculated assuming the pollutant GHGs is a regulated NSR pollutant and "significant" is defined as 75,000 tpy $CO_2$e instead of applying the value in paragraph (b)(23)(ii) of this section.

(iv) Beginning January 2, 2011, the pollutant GHGs is subject to regulation if:

(a) The stationary source is a new major stationary source for a regulated NSR pollutant that is not GHGs, and also will emit or will have the potential to emit 75,000 tpy $CO_2e$ or more; or

(b) The stationary source is an existing major stationary source for a regulated NSR pollutant that is not GHGs, and also will have an emissions increase of a regulated NSR pollutant, and an emissions increase of 75,000 tpy $CO_2e$ or more.

(50) Regulated NSR pollutant, for purposes of this section, means the following:

(i) Any pollutant for which a national ambient air quality standard has been promulgated. This includes, but is not limited to, the following:

(a) $PM_{2.5}$ emissions and $PM_{10}$ emissions shall include gaseous emissions from a source or activity, which condense to form particulate matter at ambient temperatures. On or after January 1, 2011, such condensable particulate matter shall be accounted for in applicability determinations and in establishing emissions limitations for $PM_{2.5}$ and $PM_{10}$ in PSD permits. Compliance with emissions limitations for $PM_{2.5}$ and $PM_{10}$ issued prior to this date shall not be based on condensable particulate matter unless required by the terms and conditions of the permit or the applicable implementation plan. Applicability determinations made prior to this date without accounting for condensable particulate matter shall not be considered in violation of this section unless the applicable implementation plan required condensable particulate matter to be included.

(b) Any pollutant identified under this paragraph (b)(50)(i)(b) as a constituent or precursor for a pollutant for which a national ambient air quality standard has been promulgated. Precursors identified by the Administrator for purposes of NSR are the following:

(1) Volatile organic compounds and nitrogen oxides are precursors to ozone in all attainment and unclassifiable areas.

(2) Sulfur dioxide is a precursor to $PM_{2.5}$ in all attainment and unclassifiable areas.

(3) Nitrogen oxides are presumed to be precursors to $PM_{2.5}$ in all attainment and unclassifiable areas, unless the State demonstrates to the Administrator's satisfaction or EPA demonstrates that emissions of nitrogen oxides from sources in a specific area are not a significant contributor to that area's ambient $PM_{2.5}$ concentrations.

(4) Volatile organic compounds are presumed not to be precursors to $PM_{2.5}$ in any attainment or unclassifiable area, unless the State demonstrates to the Administrator's satisfaction or EPA demonstrates that emissions of

volatile organic compounds from sources in a specific area are a significant contributor to that area's ambient $PM_{2.5}$ concentrations.

(ii) Any pollutant that is subject to any standard promulgated under section 111 of the Act;

(iii) Any Class I or II substance subject to a standard promulgated under or established by title VI of the Act;

(iv) Any pollutant that otherwise is subject to regulation under the Act as defined in paragraph (b)(49) of this section.

(v) Notwithstanding paragraphs (b)(50)(i) through (iv) of this section, the term regulated NSR pollutant shall not include any or all hazardous air pollutants either listed in section 112 of the Act, or added to the list pursuant to section 112(b)(2) of the Act, and which have not been delisted pursuant to section 112(b)(3) of the Act, unless the listed hazardous air pollutant is also regulated as a constituent or precursor of a general pollutant listed under section 108 of the Act.

(51) Reviewing authority means the State air pollution control agency, local agency, other State agency, Indian tribe, or other agency authorized by the Administrator to carry out a permit program under § 51.165 or § 51.166 of this chapter, or the Administrator in the case of EPA–implemented permit programs under this section.

(52) Project means a physical change in, or change in the method of operation of, an existing major stationary source.

(53) Lowest achievable emission rate (LAER) is as defined in § 51.165(a)(1)(xiii) of this chapter.

(54) Reasonably available control technology (RACT) is as defined in § 51.100(o) of this chapter.

(c) Ambient air increments. In areas designated as Class I, II or III, increases in pollutant concentration over the baseline concentration shall be limited to the following:

| Pollutant | Maximum allowable increase (micrograms per cubic meter) |
|---|---|
| Class I Area | |
| $PM_{2.5}$: | |
| Annual arithmetic mean...................................................... | 1 |
| 24-hr maximum...................................................... | 2 |
| $PM_{10}$: | |
| Annual arithmetic mean...................................................... | 4 |

24-hr maximum.................................................................... 8

  Sulfur dioxide:

Annual arithmetic mean....................................................... 2

24-hr maximum.................................................................... 5

3-hr maximum...................................................................... 25

  Nitrogen dioxide:

Annual arithmetic mean....................................................... 2.5

  Class II Area

  $PM_{2.5}$:

Annual arithmetic mean....................................................... 4

24-hr maximum.................................................................... 9

  $PM_{10}$:

Annual arithmetic mean....................................................... 17

24-hr maximum.................................................................... 30

  Sulfur dioxide:

Annual arithmetic mean....................................................... 20

24-hr maximum.................................................................... 91

3-hr maximum...................................................................... 512

  Nitrogen dioxide:

Annual arithmetic mean....................................................... 25

                 Class III Area

  $PM_{2.5}$:

Annual arithmetic mean....................................................... 8

24-hr maximum.................................................................... 18

  $PM_{10}$:

Annual arithmetic mean....................................................... 34

24-hr maximum.................................................................... 60

  Sulfur dioxide:

| | |
|---|---|
| Annual arithmetic mean...................................................... | 40 |
| 24-hr maximum.................................................................... | 182 |
| 3-hr maximum...................................................................... | 700 |
| Nitrogen dioxide: | |
| Annual arithmetic mean...................................................... | 50 |

For any period other than an annual period, the applicable maximum allowable increase may be exceeded during one such period per year at any one location.

(d) Ambient air ceilings. No concentration of a pollutant shall exceed:

(1) The concentration permitted under the national secondary ambient air quality standard, or

(2) The concentration permitted under the national primary ambient air quality standard, whichever concentration is lowest for the pollutant for a period of exposure.

(e) Restrictions on area classifications.

(1) All of the following areas which were in existence on August 7, 1977, shall be Class I areas and may not be redesignated:

(i) International parks,

(ii) National wilderness areas which exceed 5,000 acres in size,

(iii) National memorial parks which exceed 5,000 acres in size, and

(iv) National parks which exceed 6,000 acres in size.

(2) Areas which were redesignated as Class I under regulations promulgated before August 7, 1977, shall remain Class I, but may be redesignated as provided in this section.

(3) Any other area, unless otherwise specified in the legislation creating such an area, is initially designated Class II, but may be redesignated as provided in this section.

(4) The following areas may be redesignated only as Class I or II:

(i) An area which as of August 7, 1977, exceeded 10,000 acres in size and was a national monument, a national primitive area, a national preserve, a national recreational area, a national wild and scenic river, a national wildlife refuge, a national lakeshore or seashore; and

(ii) A national park or national wilderness area established after August 7, 1977, which exceeds 10,000 acres in size.

(f) [Reserved]

(g) Redesignation.

(1) All areas (except as otherwise provided under paragraph (e) of this section) are designated Class II as of December 5, 1974. Redesignation (except as otherwise precluded by paragraph (e) of this section) may be proposed by the respective States or Indian Governing Bodies, as provided below, subject to approval by the Administrator as a revision to the applicable State implementation plan.

(2) The State may submit to the Administrator a proposal to redesignate areas of the State Class I or Class II provided that:

(i) At least one public hearing has been held in accordance with procedures established in § 51.102 of this chapter;

(ii) Other States, Indian Governing Bodies, and Federal Land Managers whose lands may be affected by the proposed redesignation were notified at least 30 days prior to the public hearing;

(iii) A discussion of the reasons for the proposed redesignation, including a satisfactory description and analysis of the health, environmental, economic, social and energy effects of the proposed redesignation, was prepared and made available for public inspection at least 30 days prior to the hearing and the notice announcing the hearing contained appropriate notification of the availability of such discussion;

(iv) Prior to the issuance of notice respecting the redesignation of an area that includes any Federal lands, the State has provided written notice to the appropriate Federal Land Manager and afforded adequate opportunity (not in excess of 60 days) to confer with the State respecting the redesignation and to submit written comments and recommendations. In redesignating any area with respect to which any Federal Land Manager had submitted written comments and recommendations, the State shall have published a list of any inconsistency between such redesignation and such comments and recommendations (together with the reasons for making such redesignation against the recommendation of the Federal Land Manager); and

(v) The State has proposed the redesignation after consultation with the elected leadership of local and other substate general purpose governments in the area covered by the proposed redesignation.

(3) Any area other than an area to which paragraph (e) of this section refers may be redesignated as Class III if—

(i) The redesignation would meet the requirements of paragraph (g)(2) of this section;

(ii) The redesignation, except any established by an Indian Governing Body, has been specifically approved by the Governor of the State, after consultation with the appropriate committees of the legislature, if it is in session, or with the leadership of the legislature, if it is not in session (unless State law provides that the redesignation must be specifically approved by State legislation) and if general purpose units of local government representing a majority of the residents of the area to be redesignated enact legislation or pass resolutions concurring in the redesignation:

(iii) The redesignation would not cause, or contribute to, a concentration of any air pollutant which would exceed any maximum allowable increase permitted under the classification of any other area or any national ambient air quality standard; and

(iv) Any permit application for any major stationary source or major modification, subject to review under paragraph (l) of this section, which could receive a permit under this section only if the area in question were redesignated as Class III, and any material submitted as part of that application, were available insofar as was practicable for public inspection prior to any public hearing on redesignation of the area as Class III.

(4) Lands within the exterior boundaries of Indian Reservations may be redesignated only by the appropriate Indian Governing Body. The appropriate Indian Governing Body may submit to the Administrator a proposal to redesignate areas Class I, Class II, or Class III provided that:

(i) The Indian Governing Body has followed procedures equivalent to those required of a State under paragraphs (g)(2), (g)(3)(iii), and (g)(3)(iv) of this section; and

(ii) Such redesignation is proposed after consultation with the State(s) in which the Indian Reservation is located and which border the Indian Reservation.

(5) The Administrator shall disapprove, within 90 days of submission, a proposed redesignation of any area only if he finds, after notice and opportunity for public hearing, that such redesignation does not meet the procedural requirements of this paragraph or is inconsistent with paragraph (e) of this section. If any such disapproval occurs, the classification of the area shall be that which was in effect prior to the redesignation which was disapproved.

(6) If the Administrator disapproves any proposed redesignation, the State or Indian Governing Body, as appropriate, may resubmit the proposal after correcting the deficiencies noted by the Administrator.

(h) Stack heights.

(1) The degree of emission limitation required for control of any air pollutant under this section shall not be affected in any manner by—

(i) So much of the stack height of any source as exceeds good engineering practice, or

(ii) Any other dispersion technique.

(2) Paragraph (h)(1) of this section shall not apply with respect to stack heights in existence before December 31, 1970, or to dispersion techniques implemented before then.

(i) Exemptions.

(1) The requirements of paragraphs (j) through (r) of this section shall not apply to a particular major stationary source or major modification, if;

(i) to (v) [Reserved by 86 FR 37932]

(vi) The source or modification would be a nonprofit health or nonprofit educational institution, or a major modification would occur at such an institution, and the governor of the state in which the source or modification would be located requests that it be exempt from those requirements; or

(vii) The source or modification would be a major stationary source or major modification only if fugitive emissions, to the extent quantifiable, are considered in calculating the potential to emit of the stationary source or modification and the source does not belong to any of the following categories:

(a) Coal cleaning plants (with thermal dryers);

(b) Kraft pulp mills;

(c) Portland cement plants;

(d) Primary zinc smelters;

(e) Iron and steel mills;

(f) Primary aluminum ore reduction plants;

(g) Primary copper smelters;

(h) Municipal incinerators capable of charging more than 50 tons of refuse per day;

(i) Hydrofluoric, sulfuric, or nitric acid plants;

(j) Petroleum refineries;

(k) Lime plants;

(l) Phosphate rock processing plants;

(m) Coke oven batteries;

(n) Sulfur recovery plants;

(o) Carbon black plants (furnace process);

(p) Primary lead smelters;

(q) Fuel conversion plants;

(r) Sintering plants;

(s) Secondary metal production plants;

(t) Chemical process plants—The term chemical processing plant shall not include ethanol production facilities that produce ethanol by natural fermentation included in NAICS codes 325193 or 312140;

(u) Fossil-fuel boilers (or combination thereof) totaling more than 250 million British thermal units per hour heat input;

(v) Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels;

(w) Taconite ore processing plants;

(x) Glass fiber processing plants;

(y) Charcoal production plants;

(z) Fossil fuel-fired steam electric plants of more than 250 million British thermal units per hour heat input;

(aa) Any other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the Act; or

(viii) The source is a portable stationary source which has previously received a permit under this section, and

(a) The owner or operator proposes to relocate the source and emissions of the source at the new location would be temporary; and

(b) The emissions from the source would not exceed its allowable emissions; and

(c) The emissions from the source would impact no Class I area and no area where an applicable increment is known to be violated; and

(d) Reasonable notice is given to the Administrator prior to the relocation identifying the proposed new location and the probable duration of operation at the new location. Such notice shall be given to the Administrator not less than 10 days in advance of the proposed relocation unless a different time duration is previously approved by the Administrator.

(2) The requirements of paragraphs (j) through (r) of this section shall not apply to a major stationary source or major modification with respect to a particular pollutant if the owner or operator demonstrates that, as to that pollutant, the source or modification is located in an area designated as nonattainment under section 107 of the Act. Nonattainment designations for revoked NAAQS, as contained in 40 CFR part 81, shall not be viewed as current designations under section 107 of the Act for purposes of determining the applicability of paragraphs (j) through (r) of this section to a major stationary source or major modification after the revocation of that NAAQS is effective.

(3) The requirements of paragraphs (k), (m) and (o) of this section shall not apply to a major stationary source or major modification with respect to a particular pollutant, if the allowable emissions of that pollutant from the source, or the net emissions increase of that pollutant from the modification:

(i) Would impact no Class I area and no area where an applicable increment is known to be violated, and

(ii) Would be temporary.

(4) The requirements of paragraphs (k), (m) and (o) of this section as they relate to any maximum allowable increase for a Class II area shall not apply to a major modification at a stationary source that was in existence on March 1, 1978, if the net increase in allowable emissions of each regulated NSR pollutant from the modification after the application of best available control technology would be less than 50 tons per year.

(5) The Administrator may exempt a stationary source or modification from the requirements of paragraph (m) of this section, with respect to monitoring for a particular pollutant if:

(i) The emissions increase of the pollutant from the new source or the net emissions increase of the pollutant from the modification would cause, in any area, air quality impacts less than the following amounts:

(a) Carbon monoxide—575 $\mu g/m^3$, 8–hour average;

(b) Nitrogen dioxide—14 $\mu g/m^3$, annual average;

(c) $PM_{2.5}$ —0 $\mu g/m^3$;

Note to paragraph (i)(5)(i)(c): In accordance with Sierra Club v. EPA, 706 F.3d 428 (DC Cir. 2013), no exemption is available with regard to $PM_{2.5}$.

(d) $PM_{10}$ —10 $\mu g/m^3$, 24–hour average;

(e) Sulfur dioxide—13 $\mu g/m^3$, 24–hour average;

(f) Ozone;

(g) Lead—0.1 $\mu g/m^3$, 3–month average;

(h) Fluorides—0.25 $\mu g/m^3$, 24–hour average;

(i) Total reduced sulfur—10 $\mu g/m^3$, 1–hour average;

(j) Hydrogen sulfide—0.2 $\mu g/m^3$, 1–hour average;

(k) Reduced sulfur compounds— 10 $\mu g/m^3$, 1–hour average; or

Note to paragraph (c)(50)(i)(f): No de minimis air quality level is provided for ozone. However, any net emissions increase of 100 tons per year or more of volatile organic compounds or nitrogen oxides subject to PSD would be required to perform an ambient impact analysis, including the gathering of ambient air quality data.

(ii) The concentrations of the pollutant in the area that the source or modification would affect are less than the concentrations listed in paragraph (i)(5)(i) of this section; or

(iii) The pollutant is not listed in paragraph (i)(5)(i) of this section.

(6) to (12) [Reserved by 86 FR 37932]

(j) Control Technology Review.

(1) A major stationary source or major modification shall meet each applicable emissions limitation under the State Implementation Plan and each applicable emissions standard and standard of performance under 40 CFR part 60, 61, or 63.

(2) A new major stationary source shall apply best available control technology for each regulated NSR pollutant that it would have the potential to emit in significant amounts.

(3) A major modification shall apply best available control technology for each regulated NSR pollutant for which it would result in a significant net emissions increase at the source. This requirement applies to each proposed emissions unit at which a net emissions increase in the pollutant would occur as a result of a physical change or change in the method of operation in the unit.

(4) For phased construction projects, the determination of best available control technology shall be reviewed and modified as appropriate at the latest reasonable time which occurs no later than 18 months prior to commencement of construction of each independent phase of the project. At such time, the owner or operator of the applicable stationary source may be required to demonstrate the adequacy of any previous determination of best available control technology for the source.

(k) Source impact analysis—

(1) Required demonstration. The owner or operator of the proposed source or modification shall demonstrate that allowable emission increases from the proposed source or modification, in conjunction with all other applicable emissions increases or reductions (including secondary emissions), would not cause or contribute to air pollution in violation of:

(i) Any national ambient air quality standard in any air quality control region; or

(ii) Any applicable maximum allowable increase over the baseline concentration in any area.

(2) [Reserved by 78 FR 73702]

(l) Air quality models.

(1) All estimates of ambient concentrations required under this paragraph shall be based on applicable air quality models, data bases, and other requirements specified in appendix W of part 51 of this chapter (Guideline on Air Quality Models).

(2) Where an air quality model specified in appendix W of part 51 of this chapter (Guideline on Air Quality Models) is inappropriate, the model may be modified or another model substituted. Such a modification or substitution of a model may be made on a case-by-case basis or, where appropriate, on a generic basis for a specific state program. Written approval of the Administrator must be obtained for any modification or substitution. In addition, use of a modified or substituted model must be subject to notice and opportunity for public comment under procedures developed in accordance with paragraph (q) of this section.

(m) Air Quality Analysis—

(1) Preapplication analysis.

(i) Any application for a permit under this section shall contain an analysis of ambient air quality in the area that the major stationary source or major modification would affect for each of the following pollutants:

(a) For the source, each pollutant that it would have the potential to emit in a significant amount;

(b) For the modification, each pollutant for which it would result in a significant net emissions increase.

(ii) With respect to any such pollutant for which no National Ambient Air Quality Standard exists, the analysis shall contain such air quality monitoring data as the Administrator determines is necessary to assess ambient air quality for that pollutant in any area that the emissions of that pollutant would affect.

(iii) With respect to any such pollutant (other than nonmethane hydrocarbons) for which such a standard does exist, the analysis shall contain continuous air quality monitoring data gathered for purposes of determining whether emissions of that pollutant would cause or contribute to a violation of the standard or any maximum allowable increase.

(iv) In general, the continuous air quality monitoring data that is required shall have been gathered over a period of at least one year and shall represent at least the year preceding receipt of the application, except that, if the Administrator determines that a complete and adequate analysis can be accomplished with monitoring data gathered over a period shorter than one year (but not to be less than four months), the data that is required shall have been gathered over at least that shorter period.

(v) [Reserved by 86 FR 37932]

(vi) The owner or operator of a proposed stationary source or modification of volatile organic compounds who satisfies all conditions of 40 CFR part 51 Appendix S, section IV may provide post-approval monitoring data for ozone in lieu of providing preconstruction data as required under paragraph (m)(1) of this section.

(vii), (viii) [Reserved by 86 FR 37932]

(2) Post-construction monitoring. The owner or operator of a major stationary source or major modification shall, after construction of the stationary source or modification, conduct such ambient monitoring as the Administrator determines is necessary to determine the effect emissions from the stationary source or modification may have, or are having, on air quality in any area.

(3) Operations of monitoring stations. The owner or operator of a major stationary source or major modification shall meet the requirements of Appendix B to part 58 of this chapter during the operation of monitoring stations for purposes of satisfying paragraph (m) of this section.

(n) Source information. The owner or operator of a proposed source or modification shall submit all information necessary to perform any analysis or make any determination required under this section.

(1) With respect to a source or modification to which paragraphs (j), (k), (m), and (o) of this section apply, such information shall include:

(i) A description of the nature, location, design capacity, and typical operating schedule of the source or modification, including specifications and drawings showing its design and plant layout;

(ii) A detailed schedule for construction of the source or modification;

(iii) A detailed description as to what system of continuous emission reduction is planned for the source or modification, emission estimates, and any other information necessary to determine that best available control technology would be applied.

(2) Upon request of the Administrator, the owner or operator shall also provide information on:

(i) The air quality impact of the source or modification, including meteorological and topographical data necessary to estimate such impact; and

(ii) The air quality impacts, and the nature and extent of any or all general commercial, residential, industrial, and other growth which has occurred since August 7, 1977, in the area the source or modification would affect.

(o) Additional impact analyses.

(1) The owner or operator shall provide an analysis of the impairment to visibility, soils and vegetation that would occur as a result of the source or modification and general commercial, residential, industrial and other growth associated with the source or modification. The owner or operator need not provide an analysis of the impact on vegetation having no significant commercial or recreational value.

(2) The owner or operator shall provide an analysis of the air quality impact projected for the area as a result of general commercial, residential, industrial and other growth associated with the source or modification.

(3) Visibility monitoring. The Administrator may require monitoring of visibility in any Federal class I area near the proposed new stationary source for major modification for such purposes and by such means as the Administrator deems necessary and appropriate.

(p) Sources Impacting Federal Class I Areas—Additional Requirements—

(1) Notice to Federal land managers. The Administrator shall provide written notice of any permit application for a proposed major stationary source or major modification, the emissions from which may affect a Class I area, to the Federal land manager and the Federal official charged with direct responsibility for management of any lands within any such area. Such notification shall include a copy of all information relevant to the permit application and shall be given within 30 days of receipt and at least 60 days prior to any public hearing on the application for a permit to construct. Such notification shall include an analysis of the proposed source's anticipated impacts on visibility in the Federal Class I area. The Administrator shall also provide the Federal land manager and such Federal officials with a copy of the preliminary determination required under paragraph (q) of this section, and shall make available to them any materials used in making that determination, promptly after the Administrator makes such determination. Finally, the Administrator shall also notify all affected Federal land managers within 30 days of receipt of any advance notification of any such permit application.

(2) Federal Land Manager. The Federal Land Manager and the Federal official charged with direct responsibility for management of such lands have an affirmative responsibility to protect the air quality related values (including visibility) of such lands and to consider, in consultation with the Administrator, whether a proposed source or modification will have an adverse impact on such values.

(3) Visibility analysis. The Administrator shall consider any analysis performed by the Federal land manager, provided within 30 days of the notification required by paragraph (p)(1) of this section, that shows that a proposed new major stationary source or major modification may have an adverse impact on visibility in any Federal Class I area. Where the Administrator finds that such an analysis does not demonstrate to the satisfaction of the Administrator that an adverse impact on visibility will result in the Federal Class I area, the Administrator must, in the notice of public hearing on the permit application, either explain his decision or give notice as to where the explanation can be obtained.

(4) Denial—impact on air quality related values. The Federal Land Manager of any such lands may demonstrate to the Administrator that the emissions from a proposed source or modification would have an adverse impact on the air quality-related values (including visibility) of those lands, notwithstanding that the change in air quality resulting from emissions from such source or modification would not cause or contribute to concentrations which would exceed the maximum allowable increases for a Class I area. If the Administrator concurs with such demonstration, then he shall not issue the permit.

(5) Class I variances. The owner or operator of a proposed source or modification may demonstrate to the Federal Land Manager that the emissions from such source or modification would have no adverse impact on the air quality related values of any such lands (including visibility), notwithstanding that the change in air quality resulting from emissions from such source or modification would cause or contribute to concentrations which would exceed the maximum allowable

increases for a Class I area. If the Federal Land Manager concurs with such demonstration and he so certifies, the State may authorize the Administrator, provided that the applicable requirements of this section are otherwise met, to issue the permit with such emission limitations as may be necessary to assure that emissions of sulfur dioxide, $PM_{2.5}$, $PM_{10}$, and nitrogen oxides would not exceed the following maximum allowable increases over minor source baseline concentration for such pollutants:

| Pollutant | Maximum allowable increase (micrograms per cubic meter) |
|---|---|
| $PM_{2.5}$: | |
| Annual arithmetic mean........................................................ | 4 |
| 24-hr maximum.................................................................. | 9 |
| $PM_{10}$: | |
| Annual arithmetic mean........................................................ | 17 |
| 24-hr maximum.................................................................. | 30 |
| Sulfur dioxide: | |
| Annual arithmetic mean........................................................ | 20 |
| 24-hr maximum.................................................................. | 91 |
| 3-hr maximum................................................................... | 325 |
| Nitrogen dioxide: | |
| Annual arithmetic mean........................................................ | 25 |

(6) Sulfur dioxide variance by Governor with Federal Land Manager's concurrence. The owner or operator of a proposed source or modification which cannot be approved under paragraph (p)(5) of this section may demonstrate to the Governor that the source cannot be constructed by reason of any maximum allowable increase for sulfur dioxide for a period of 24 hours or less applicable to any Class I area and, in the case of Federal mandatory Class I areas, that a variance under this clause would not adversely affect the air quality related values of the area (including visibility). The Governor, after consideration of the Federal Land Manager's recommendation (if any) and subject to his concurrence, may, after notice and public hearing, grant a variance from such maximum allowable increase. If such variance is granted, the Administrator shall issue a permit to such source or modification pursuant to the requirements of paragraph (p)(8) of this section provided that the applicable requirements of this section are otherwise met.

(7) Variance by the Governor with the President's concurrence. In any case where the Governor recommends a variance with which the Federal Land Manager does not concur, the recommendations of the Governor and the Federal Land Manager shall be transmitted to the President. The President may approve the Governor's recommendation if he finds that the variance is in the national interest. If the variance is approved, the Administrator shall issue a permit pursuant to the requirements of paragraph (p)(8) of this section provided that the applicable requirements of this section are otherwise met.

(8) Emission limitations for Presidential or gubernatorial variance. In the case of a permit issued pursuant to paragraph (p) (6) or (7) of this section, the source or modification shall comply with such emission limitations as may be necessary to assure that emissions of sulfur dioxide from the source or modification would not (during any day on which the otherwise applicable maximum allowable increases are exceeded) cause or contribute to concentrations which would exceed the following maximum allowable increases over the baseline concentration and to assure that such emissions would not cause or contribute to concentrations which exceed the otherwise applicable maximum allowable increases for periods of exposure of 24 hours or less for more than 18 days, not necessarily consecutive, during any annual period:

### MAXIMUM ALLOWABLE INCREASE

#### [Micrograms per cubic meter]

|  | Terrain areas | |
| --- | --- | --- |
| Period of exposure | Low | High |
| 24-hr maximum.................................................................................................. | 36 | 62 |
| 3-hr maximum.................................................................................................... | 130 | 221 |

(q) Public participation. The administrator shall follow the applicable procedures of 40 CFR part 124 in processing applications under this section.

(r) Source obligation.

(1) Any owner or operator who constructs or operates a source or modification not in accordance with the application submitted pursuant to this section or with the terms of any approval to construct, or any owner or operator of a source or modification subject to this section who commences construction after the effective date of these regulations without applying for and receiving approval hereunder, shall be subject to appropriate enforcement action.

(2) Approval to construct shall become invalid if construction is not commenced within 18 months after receipt of such approval, if construction is discontinued for a period of 18 months or more, or if construction is not completed within a reasonable time. The Administrator may extend the 18–month period upon a satisfactory showing that an extension is justified. This provision does not apply to the time period between construction of the approved phases of a phased construction project; each phase must commence construction within 18 months of the projected and approved commencement date.

(3) Approval to construct shall not relieve any owner or operator of the responsibility to comply fully with applicable provisions of the State implementation plan and any other requirements under local, State, or Federal law.

(4) At such time that a particular source or modification becomes a major stationary source or major modification solely by virtue of a relaxation in any enforceable limitation which was established after August 7, 1980, on the capacity of the source or modification otherwise to emit a pollutant, such as a restriction on hours of operation, then the requirements

of paragraphs (j) through (s) of this section shall apply to the source or modification as though construction had not yet commenced on the source or modification.

(5) [Reserved]

(6) Except as otherwise provided in paragraph (r)(6)(vi)(b) of this section, the provisions of this paragraph (r)(6) apply with respect to any regulated NSR pollutant emitted from projects at existing emissions units at a major stationary source (other than projects at a source with a PAL) in circumstances where there is a reasonable possibility, within the meaning of paragraph (r)(6)(vi) of this section, that a project that is not a part of a major modification may result in a significant emissions increase of such pollutant, and the owner or operator elects to use the method specified in paragraphs (b)(41)(ii)(a) through (c) of this section for calculating projected actual emissions.

(i) Before beginning actual construction of the project, the owner or operator shall document and maintain a record of the following information:

    (a) A description of the project;

    (b) Identification of the emissions unit(s) whose emissions of a regulated NSR pollutant could be affected by the project; and

    (c) A description of the applicability test used to determine that the project is not a major modification for any regulated NSR pollutant, including the baseline actual emissions, the projected actual emissions, the amount of emissions excluded under paragraph (b)(41)(ii)(c) of this section and an explanation for why such amount was excluded, and any netting calculations, if applicable.

(ii) If the emissions unit is an existing electric utility steam generating unit, before beginning actual construction, the owner or operator shall provide a copy of the information set out in paragraph (r)(6)(i) of this section to the Administrator. Nothing in this paragraph (r)(6)(ii) shall be construed to require the owner or operator of such a unit to obtain any determination from the Administrator before beginning actual construction.

(iii) The owner or operator shall monitor the emissions of any regulated NSR pollutant that could increase as a result of the project and that is emitted by any emissions unit identified in paragraph (r)(6)(i)(b) of this section; and calculate and maintain a record of the annual emissions, in tons per year on a calendar year basis, for a period of 5 years following resumption of regular operations after the change, or for a period of 10 years following resumption of regular operations after the change if the project increases the design capacity or potential to emit that regulated NSR pollutant at such emissions unit.

(iv) If the unit is an existing electric utility steam generating unit, the owner or operator shall submit a report to the Administrator within 60 days after the end of each year during which records must be generated under paragraph (r)(6)(iii) of this section setting out the unit's annual emissions during the calendar year that preceded submission of the report.

(v) If the unit is an existing unit other than an electric utility steam generating unit, the owner or operator shall submit a report to the Administrator if the annual emissions, in tons per year, from the project identified in paragraph (r)(6)(i) of this section, exceed the baseline actual emissions (as documented and maintained pursuant to paragraph (r)(6)(i)(c) of this section), by a significant amount (as defined in paragraph (b)(23) of this section) for that regulated NSR pollutant, and if such emissions differ from the preconstruction projection as documented and maintained pursuant to paragraph (r)(6)(i)(c) of this section. Such report shall be submitted to the Administrator within 60 days after the end of such year. The report shall contain the following:

(a) The name, address and telephone number of the major stationary source;

(b) The annual emissions as calculated pursuant to paragraph (r)(6)(iii) of this section; and

(c) Any other information that the owner or operator wishes to include in the report (e.g., an explanation as to why the emissions differ from the preconstruction projection).

(vi) A "reasonable possibility" under paragraph (r)(6) of this section occurs when the owner or operator calculates the project to result in either:

(a) A projected actual emissions increase of at least 50 percent of the amount that is a "significant emissions increase," as defined under paragraph (b)(40) of this section (without reference to the amount that is a significant net emissions increase), for the regulated NSR pollutant; or

(b) A projected actual emissions increase that, added to the amount of emissions excluded under paragraph (b)(41) (ii)(c) of this section, sums to at least 50 percent of the amount that is a "significant emissions increase," as defined under paragraph (b)(40) of this section (without reference to the amount that is a significant net emissions increase), for the regulated NSR pollutant. For a project for which a reasonable possibility occurs only within the meaning of paragraph (r)(6)(vi)(b) of this section, and not also within the meaning of paragraph (r)(6)(vi)(a) of this section, then provisions (r)(6)(ii) through (v) do not apply to the project.

(7) The owner or operator of the source shall make the information required to be documented and maintained pursuant to paragraph (r)(6) of this section available for review upon a request for inspection by the Administrator or the general public pursuant to the requirements contained in § 70.4(b)(3)(viii) of this chapter.

(s) Environmental impact statements. Whenever any proposed source or modification is subject to action by a Federal Agency which might necessitate preparation of an environmental impact statement pursuant to the National Environmental Policy Act (42 U.S.C. 4321), review by the Administrator conducted pursuant to this section shall be coordinated with the broad environmental reviews under that Act and under section 309 of the Clean Air Act to the maximum extent feasible and reasonable.

(t) Disputed permits or redesignations. If any State affected by the redesignation of an area by an Indian Governing Body, or any Indian Governing Body of a tribe affected by the redesignation of an area by a State, disagrees with such redesignation, or if a permit is proposed to be issued for any major stationary source or major modification proposed for construction in any State which the Governor of an affected State or Indian Governing Body of an affected tribe determines will cause or contribute

to a cumulative change in air quality in excess of that allowed in this part within the affected State or Indian Reservation, the Governor or Indian Governing Body may request the Administrator to enter into negotiations with the parties involved to resolve such dispute. If requested by any State or Indian Governing Body involved, the Administrator shall make a recommendation to resolve the dispute and protect the air quality related values of the lands involved. If the parties involved do not reach agreement, the Administrator shall resolve the dispute and his determination, or the results of agreements reached through other means, shall become part of the applicable State implementation plan and shall be enforceable as part of such plan. In resolving such disputes relating to area redesignation, the Administrator shall consider the extent to which the lands involved are of sufficient size to allow effective air quality management or have air quality related values of such an area.

(u) Delegation of authority.

(1) The Administrator shall have the authority to delegate his responsibility for conducting source review pursuant to this section, in accordance with paragraph (u)(2) of this section.

(2) Where the Administrator delegates the responsibility for conducting source review under this section to any agency other than a Regional Office of the Environmental Protection Agency, the following provisions shall apply:

(i) Where the delegate agency is not an air pollution control agency, it shall consult with the appropriate state, tribe, and local air pollution control agency prior to making any determination under this section. Similarly, where the delegate agency does not have continuing responsibility for managing land use, it shall consult with the appropriate state, tribe, and local agency primarily responsible for managing land use prior to making any determination under this section.

(ii) The delegate agency shall send a copy of any public comment notice required under paragraph (q) of this section to the Administrator through the appropriate Regional Office.

(3) In the case of a source or modification which proposes to construct in a Class III area, emissions from which would cause or contribute to air quality exceeding the maximum allowable increase applicable if the area were designated a Class II area, and where no standard under section 111 of the Act has been promulgated for such source category, the Administrator must approve the determination of best available control technology as set forth in the permit.

(v) Innovative Control Technology.

(1) An owner or operator of a proposed major stationary source or major modification may request the Administrator in writing no later than the close of the comment period under 40 CFR 124.10 to approve a system of innovative control technology.

(2) The Administrator shall, with the consent of the governor(s) of the affected state(s), determine that the source or modification may employ a system of innovative control technology, if:

(i) The proposed control system would not cause or contribute to an unreasonable risk to public health, welfare, or safety in its operation or function;

(ii) The owner or operator agrees to achieve a level of continuous emissions reduction equivalent to that which would have been required under paragraph (j)(2) of this section, by a date specified by the Administrator. Such date shall not be later than 4 years from the time of startup or 7 years from permit issuance;

(iii) The source or modification would meet the requirements of paragraphs (j) and (k) of this section, based on the emissions rate that the stationary source employing the system of innovative control technology would be required to meet on the date specified by the Administrator;

(iv) The source or modification would not before the date specified by the Administrator:

(a) Cause or contribute to a violation of an applicable national ambient air quality standard; or

(b) Impact any area where an applicable increment is known to be violated; and

(v) All other applicable requirements including those for public participation have been met.

(vi) The provisions of paragraph (p) of this section (relating to Class I areas) have been satisfied with respect to all periods during the life of the source or modification.

(3) The Administrator shall withdraw any approval to employ a system of innovative control technology made under this section, if:

(i) The proposed system fails by the specified date to achieve the required continuous emissions reduction rate; or

(ii) The proposed system fails before the specified date so as to contribute to an unreasonable risk to public health, welfare, or safety; or

(iii) The Administrator decides at any time that the proposed system is unlikely to achieve the required level of control or to protect the public health, welfare, or safety.

(4) If a source or modification fails to meet the required level of continuous emission reduction within the specified time period or the approval is withdrawn in accordance with paragraph (v)(3) of this section, the Administrator may allow the source or modification up to an additional 3 years to meet the requirement for the application of best available control technology through use of a demonstrated system of control.

(w) Permit rescission.

(1) Any permit issued under this section or a prior version of this section shall remain in effect, unless and until it expires under paragraph (r)(2) of this section or is rescinded under this paragraph (w).

(2) An owner or operator of a stationary source or modification who holds a permit issued under this section for the construction of a new source or modification that meets the requirement in paragraph (w)(3) of this section may request that the Administrator rescind the permit or a particular portion of the permit.

(3) The Administrator may grant an application for rescission if the application shows that this section would not apply to the source or modification.

(4) If the Administrator rescinds a permit under this paragraph, the Administrator shall post a notice of the rescission determination on a public Web site identified by the Administrator within 60 days of the rescission.

(x) to (z) [Reserved]

(aa) Actuals PALs. The provisions in paragraphs (aa)(1) through (15) of this section govern actuals PALs.

(1) Applicability.

(i) The Administrator may approve the use of an actuals PAL, including for GHGs on either a mass basis or a $CO_2e$ basis, for any existing major stationary source or any existing GHG–only source if the PAL meets the requirements in paragraphs (aa)(1) through (15) of this section. The term "PAL" shall mean "actuals PAL" throughout paragraph (aa) of this section.

(ii) Any physical change in or change in the method of operation of a major stationary source or a GHG–only source that maintains its total source-wide emissions below the PAL level, meets the requirements in paragraphs (aa)(1) through (15) of this section, and complies with the PAL permit:

(a) Is not a major modification for the PAL pollutant;

(b) Does not have to be approved through the PSD program;

(c) Is not subject to the provisions in paragraph (r)(4) of this section (restrictions on relaxing enforceable emission limitations that the major stationary source used to avoid applicability of the major NSR program); and

(d) Does not make GHGs subject to regulation as defined by paragraph (b)(49) of this section.

(iii) Except as provided under paragraph (aa)(1)(ii)(c) of this section, a major stationary source or a GHG–only source shall continue to comply with all applicable Federal or State requirements, emission limitations, and work practice requirements that were established prior to the effective date of the PAL.

(2) Definitions. For the purposes of this section, the definitions in paragraphs (aa)(2)(i) through (xi) of this section apply. When a term is not defined in these paragraphs, it shall have the meaning given in paragraph (b) of this section or in the Act.

(i) Actuals PAL for a major stationary source means a PAL based on the baseline actual emissions (as defined in paragraph (b)(48) of this section) of all emissions units (as defined in paragraph (b)(7) of this section) at the source, that emit or have the potential to emit the PAL pollutant. For a GHG–only source, actuals PAL means a PAL based on the baseline actual emissions (as defined in paragraph (aa)(2)(xiii) of this section) of all emissions units (as defined in paragraph (aa)(2)(xiv) of this section) at the source, that emit or have the potential to emit GHGs.

(ii) Allowable emissions means "allowable emissions" as defined in paragraph (b)(16) of this section, except as this definition is modified according to paragraphs (aa)(2)(ii)(a) and (b) of this section.

(a) The allowable emissions for any emissions unit shall be calculated considering any emission limitations that are enforceable as a practical matter on the emissions unit's potential to emit.

(b) An emissions unit's potential to emit shall be determined using the definition in paragraph (b)(4) of this section, except that the words "or enforceable as a practical matter" should be added after "federally enforceable."

(iii) Small emissions unit means an emissions unit that emits or has the potential to emit the PAL pollutant in an amount less than the significant level for that PAL pollutant, as defined in paragraph (b)(23) of this section or in the Act, whichever is lower. For a GHG PAL issued on a $CO_2e$ basis, small emissions unit means an emissions unit that emits or has the potential to emit less than the amount of GHGs on a $CO_2e$ basis defined as "significant" for the purposes of paragraph (b)(49)(iii) of this section at the time the PAL permit is being issued.

(iv) Major emissions unit means:

(a) Any emissions unit that emits or has the potential to emit 100 tons per year or more of the PAL pollutant in an attainment area; or

(b) Any emissions unit that emits or has the potential to emit the PAL pollutant in an amount that is equal to or greater than the major source threshold for the PAL pollutant as defined by the Act for nonattainment areas. For example, in accordance with the definition of major stationary source in section 182(c) of the Act, an emissions unit would be a major emissions unit for VOC if the emissions unit is located in a serious ozone nonattainment area and it emits or has the potential to emit 50 or more tons of VOC per year.

(c) For a GHG PAL issued on a $CO_2e$ basis, any emissions unit that emits or has the potential to emit equal to or greater than the amount of GHGs on a $CO_2e$ basis that would be sufficient for a new source to trigger permitting requirements under paragraph (b)(49) of this section at the time the PAL permit is being issued.

(v) Plantwide applicability limitation (PAL) means an emission limitation expressed on a mass basis in tons per year, or expressed in tons per year $CO_2e$ for a $CO_2e$-based GHG emission limitation, for a pollutant at a major stationary source

or GHG–only source, that is enforceable as a practical matter and established source-wide in accordance with paragraphs (aa)(1) through (15) of this section.

(vi) PAL effective date generally means the date of issuance of the PAL permit. However, the PAL effective date for an increased PAL is the date any emissions unit that is part of the PAL major modification becomes operational and begins to emit the PAL pollutant.

(vii) PAL effective period means the period beginning with the PAL effective date and ending 10 years later.

(viii) PAL major modification means, notwithstanding paragraphs (b)(2), (b)(3), and (b)(49) of this section (the definitions for major modification, net emissions increase, and subject to regulation), any physical change in or change in the method of operation of the PAL source that causes it to emit the PAL pollutant at a level equal to or greater than the PAL.

(ix) PAL permit means the major NSR permit, the minor NSR permit, or the State operating permit under a program that is approved into the State Implementation Plan, or the title V permit issued by the Administrator that establishes a PAL for a major stationary source or a GHG–only source.

(x) PAL pollutant means the pollutant for which a PAL is established at a major stationary source or a GHG–only source. For a GHG–only source, the only available PAL pollutant is greenhouse gases.

(xi) Significant emissions unit means an emissions unit that emits or has the potential to emit a PAL pollutant in an amount that is equal to or greater than the significant level (as defined in paragraph (b)(23) of this section or in the Act, whichever is lower) for that PAL pollutant, but less than the amount that would qualify the unit as a major emissions unit as defined in paragraph (aa)(2)(iv) of this section. For a GHG PAL issued on a $CO_2e$ basis, significant emissions unit means any emissions unit that emits or has the potential to emit GHGs on a $CO_2e$ basis in amounts equal to or greater than the amount that would qualify the unit as small emissions unit as defined in paragraph (aa)(2)(iii) of this section, but less than the amount that would qualify the unit as a major emissions unit as defined in paragraph (aa)(2)(iv)(c) of this section.

(xii) GHG–only source means any existing stationary source that emits or has the potential to emit GHGs in the amount equal to or greater than the amount of GHGs on a mass basis that would be sufficient for a new source to trigger permitting requirements for GHGs under paragraph (b)(1) of this section and the amount of GHGs on a $CO_2e$ basis that would be sufficient for a new source to trigger permitting requirements for GHGs under paragraph (b)(49) of this section at the time the PAL permit is being issued, but does not emit or have the potential to emit any other non–GHG regulated NSR pollutant at or above the applicable major source threshold. A GHG–only source may only obtain a PAL for GHG emissions under paragraph (aa) of this section.

(xiii) Baseline actual emissions for a GHG PAL means the average rate, in tons per year $CO_2e$ or tons per year GHG, as applicable, at which the emissions unit actually emitted GHGs during any consecutive 24–month period selected by the owner or operator within the 10–year period immediately preceding either the date the owner or operator begins actual construction of the project, or the date a complete permit application is received by the Administrator for a permit required under this section or by the permitting authority for a permit required by a plan, whichever is earlier. For any existing electric utility steam generating unit, baseline actual emissions for a GHG PAL means the average rate, in tons per year $CO_2e$ or tons per year GHG, as applicable, at which the emissions unit actually emitted the GHGs during any consecutive

24–month period selected by the owner or operator within the 5–year period immediately preceding either the date the owner or operator begins actual construction of the project, except that the Administrator shall allow the use of a different time period upon a determination that it is more representative of normal source operation.

(a) The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(b) The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above an emission limitation that was legally enforceable during the consecutive 24–month period.

(c) The average rate shall be adjusted downward to exclude any emissions that would have exceeded an emission limitation with which the stationary source must currently comply, had such stationary source been required to comply with such limitations during the consecutive 24–month period.

(d) The average rate shall not be based on any consecutive 24–month period for which there is inadequate information for determining annual GHG emissions and for adjusting this amount if required by paragraphs (aa)(2)(xiii)(b) and (c) of this section.

(xiv) Emissions unit with respect to GHGs means any part of a stationary source that emits or has the potential to emit GHGs. For purposes of this section, there are two types of emissions units as described in the following:

(a) A new emissions unit is any emissions unit that is (or will be) newly constructed and that has existed for less than 2 years from the date such emissions unit first operated.

(b) An existing emissions unit is any emissions unit that does not meet the requirements in paragraph (aa)(2)(xiv) (a) of this section.

(xv) Minor source means any stationary source that does not meet the definition of major stationary source in paragraph (b)(1) of this section for any pollutant at the time the PAL is issued.

(3) Permit application requirements. As part of a permit application requesting a PAL, the owner or operator of a major stationary source or a GHG–only source shall submit the following information to the Administrator for approval:

(i) A list of all emissions units at the source designated as small, significant or major based on their potential to emit. In addition, the owner or operator of the source shall indicate which, if any, Federal or State applicable requirements, emission limitations, or work practices apply to each unit.

(ii) Calculations of the baseline actual emissions (with supporting documentation). Baseline actual emissions are to include emissions associated not only with operation of the unit, but also emissions associated with startup, shutdown, and malfunction.

(iii) The calculation procedures that the major stationary source owner or operator proposes to use to convert the monitoring system data to monthly emissions and annual emissions based on a 12–month rolling total for each month as required by paragraph (aa)(13)(i) of this section.

(iv) As part of a permit application requesting a GHG PAL, the owner or operator of a major stationary source or a GHG–only source shall submit a statement by the source owner or operator that clarifies whether the source is an existing major source as defined in paragraph (b)(1)(i)(a) and (b) of this section or a GHG–only source as defined in paragraph (aa)(2)(xii) of this section.

(4) General requirements for establishing PALs.

(i) The Administrator is allowed to establish a PAL at a major stationary source or a GHG–only source, provided that at a minimum, the requirements in paragraphs (aa)(4)(i)(a) through (g) of this section are met.

(a) The PAL shall impose an annual emission limitation expressed on a mass basis in tons per year, or expressed in tons per year CO$_2$e, that is enforceable as a practical matter, for the entire major stationary source or GHG–only source. For each month during the PAL effective period after the first 12 months of establishing a PAL, the major stationary source or GHG–only source owner or operator shall show that the sum of the monthly emissions from each emissions unit under the PAL for the previous 12 consecutive months is less than the PAL (a 12–month average, rolled monthly). For each month during the first 11 months from the PAL effective date, the major stationary source or GHG–only source owner or operator shall show that the sum of the preceding monthly emissions from the PAL effective date for each emissions unit under the PAL is less than the PAL.

(b) The PAL shall be established in a PAL permit that meets the public participation requirements in paragraph (aa)(5) of this section.

(c) The PAL permit shall contain all the requirements of paragraph (aa)(7) of this section.

(d) The PAL shall include fugitive emissions, to the extent quantifiable, from all emissions units that emit or have the potential to emit the PAL pollutant at the major stationary source or GHG–only source.

(e) Each PAL shall regulate emissions of only one pollutant.

(f) Each PAL shall have a PAL effective period of 10 years.

(g) The owner or operator of the major stationary source or GHG–only source with a PAL shall comply with the monitoring, recordkeeping, and reporting requirements provided in paragraphs (aa)(12) through (14) of this section for each emissions unit under the PAL through the PAL effective period.

(ii) At no time (during or after the PAL effective period) are emissions reductions of a PAL pollutant that occur during the PAL effective period creditable as decreases for purposes of offsets under § 51.165(a)(3)(ii) of this chapter unless the level of the PAL is reduced by the amount of such emissions reductions and such reductions would be creditable in the absence of the PAL.

(5) Public participation requirements for PALs. PALs for existing major stationary sources or GHG–only sources shall be established, renewed, or increased through a procedure that is consistent with §§ 51.160 and 51.161 of this chapter. This includes the requirement that the Administrator provide the public with notice of the proposed approval of a PAL permit and at least a 30–day period for submittal of public comment. The Administrator must address all material comments before taking final action on the permit.

(6) Setting the 10–year actuals PAL level.

(i) Except as provided in paragraph (aa)(6)(ii) and (iii) of this section, the plan shall provide that the actuals PAL level for a major stationary source or a GHG–only source shall be established as the sum of the baseline actual emissions (as defined in paragraph (b)(48) of this section or, for GHGs, paragraph (aa)(2)(xiii) of this section) of the PAL pollutant for each emissions unit at the source; plus an amount equal to the applicable significant level for the PAL pollutant under paragraph (b)(23) of this section or under the Act, whichever is lower. When establishing the actuals PAL level, for a PAL pollutant, only one consecutive 24–month period must be used to determine the baseline actual emissions for all existing emissions units. However, a different consecutive 24–month period may be used for each different PAL pollutant. Emissions associated with units that were permanently shut down after this 24–month period must be subtracted from the PAL level. The reviewing authority shall specify a reduced PAL level(s) (in tons/yr) in the PAL permit to become effective on the future compliance date(s) of any applicable Federal or State regulatory requirement(s) that the reviewing authority is aware of prior to issuance of the PAL permit. For instance, if the source owner or operator will be required to reduce emissions from industrial boilers in half from baseline emissions of 60 ppm $NO_X$ to a new rule limit of 30 ppm, then the permit shall contain a future effective PAL level that is equal to the current PAL level reduced by half of the original baseline emissions of such unit(s).

(ii) For newly constructed units (which do not include modifications to existing units) on which actual construction began after the 24–month period, in lieu of adding the baseline actual emissions as specified in paragraph (aa)(6)(i) of this section, the emissions must be added to the PAL level in an amount equal to the potential to emit of the units.

(iii) For $CO_2e$ based GHG PAL, the actuals PAL level shall be established as the sum of the GHGs baseline actual emissions (as defined in paragraph (aa)(2)(xiii) of this section) of GHGs for each emissions unit at the source, plus an amount equal to the amount defined as "significant" on a $CO_2e$ basis for the purposes of paragraph (b)(49)(iii) at the time the PAL permit is being issued. When establishing the actuals PAL level for a $CO_2e$-based PAL, only one consecutive 24–month period must be used to determine the baseline actual emissions for all existing emissions units. Emissions associated with units that were permanently shut down after this 24–month period must be subtracted from the PAL level. The reviewing authority shall specify a reduced PAL level (in tons per year $CO_2e$) in the PAL permit to become effective on the future compliance date(s) of any applicable Federal or state regulatory requirement(s) that the reviewing authority is aware of prior to issuance of the PAL permit.

(7) Contents of the PAL permit. The PAL permit must contain, at a minimum, the information in paragraphs (aa)(7)(i) through (xi) of this section.

(i) The PAL pollutant and the applicable source-wide emission limitation in tons per year or tons per year $CO_2e$.

(ii) The PAL permit effective date and the expiration date of the PAL (PAL effective period).

(iii) Specification in the PAL permit that if a major stationary source or a GHG–only source owner or operator applies to renew a PAL in accordance with paragraph (aa)(10) of this section before the end of the PAL effective period, then the PAL shall not expire at the end of the PAL effective period. It shall remain in effect until a revised PAL permit is issued by a reviewing authority.

(iv) A requirement that emission calculations for compliance purposes must include emissions from startups, shutdowns, and malfunctions.

(v) A requirement that, once the PAL expires, the major stationary source or GHG–only source is subject to the requirements of paragraph (aa)(9) of this section.

(vi) The calculation procedures that the major stationary source or GHG–only source owner or operator shall use to convert the monitoring system data to monthly emissions and annual emissions based on a 12–month rolling total as required by paragraph (aa)(13)(i) of this section.

(vii) A requirement that the major stationary source or GHG–only source owner or operator monitor all emissions units in accordance with the provisions under paragraph (aa)(12) of this section.

(viii) A requirement to retain the records required under paragraph (aa)(13) of this section on site. Such records may be retained in an electronic format.

(ix) A requirement to submit the reports required under paragraph (aa)(14) of this section by the required deadlines.

(x) Any other requirements that the Administrator deems necessary to implement and enforce the PAL.

(xi) A permit for a GHG PAL issued to a GHG–only source shall also include a statement denoting that GHG emissions at the source will not be subject to regulation under paragraph (b)(49) of this section as long as the source complies with the PAL.

(8) PAL effective period and reopening of the PAL permit. The requirements in paragraphs (aa)(8)(i) and (ii) of this section apply to actuals PALs.

(i) PAL effective period. The Administrator shall specify a PAL effective period of 10 years.

(ii) Reopening of the PAL permit.

(a) During the PAL effective period, the Administrator must reopen the PAL permit to:

(1) Correct typographical/calculation errors made in setting the PAL or reflect a more accurate determination of emissions used to establish the PAL;

(2) Reduce the PAL if the owner or operator of the major stationary source creates creditable emissions reductions for use as offsets under § 51.165(a)(3)(ii) of this chapter; and

(3) Revise the PAL to reflect an increase in the PAL as provided under paragraph (aa)(11) of this section.

(b) The Administrator shall have discretion to reopen the PAL permit for the following:

(1) Reduce the PAL to reflect newly applicable Federal requirements (for example, NSPS) with compliance dates after the PAL effective date;

(2) Reduce the PAL consistent with any other requirement, that is enforceable as a practical matter, and that the State may impose on the major stationary source or GHG–only source under the State Implementation Plan; and

(3) Reduce the PAL if the reviewing authority determines that a reduction is necessary to avoid causing or contributing to a NAAQS or PSD increment violation, or to an adverse impact on an air quality related value that has been identified for a Federal Class I area by a Federal Land Manager and for which information is available to the general public.

(c) Except for the permit reopening in paragraph (aa)(8)(ii)(a)(1) of this section for the correction of typographical/ calculation errors that do not increase the PAL level, all other reopenings shall be carried out in accordance with the public participation requirements of paragraph (aa)(5) of this section.

(9) Expiration of a PAL. Any PAL that is not renewed in accordance with the procedures in paragraph (aa)(10) of this section shall expire at the end of the PAL effective period, and the requirements in paragraphs (aa)(9)(i) through (v) of this section shall apply.

(i) Each emissions unit (or each group of emissions units) that existed under the PAL shall comply with an allowable emission limitation under a revised permit established according to the procedures in paragraphs (aa)(9)(i)(a) and (b) of this section.

(a) Within the time frame specified for PAL renewals in paragraph (aa)(10)(ii) of this section, the major stationary source or GHG–only source shall submit a proposed allowable emission limitation for each emissions unit (or each group of emissions units, if such a distribution is more appropriate as decided by the Administrator) by distributing

the PAL allowable emissions for the major stationary source or GHG–only source among each of the emissions units that existed under the PAL. If the PAL had not yet been adjusted for an applicable requirement that became effective during the PAL effective period, as required under paragraph (aa)(10)(v) of this section, such distribution shall be made as if the PAL had been adjusted.

(b) The Administrator shall decide whether and how the PAL allowable emissions will be distributed and issue a revised permit incorporating allowable limits for each emissions unit, or each group of emissions units, as the Administrator determines is appropriate.

(ii) Each emissions unit(s) shall comply with the allowable emission limitation on a 12–month rolling basis. The Administrator may approve the use of monitoring systems (source testing, emission factors, etc.) other than CEMS, CERMS, PEMS, or CPMS to demonstrate compliance with the allowable emission limitation.

(iii) Until the Administrator issues the revised permit incorporating allowable limits for each emissions unit, or each group of emissions units, as required under paragraph (aa)(9)(i)(b) of this section, the source shall continue to comply with a source-wide, multi-unit emissions cap equivalent to the level of the PAL emission limitation.

(iv) Any physical change or change in the method of operation at the major stationary source or GHG–only source will be subject to major NSR requirements if such change meets the definition of major modification in paragraph (b)(2) of this section.

(v) The major stationary source or GHG–only source owner or operator shall continue to comply with any State or Federal applicable requirements (BACT, RACT, NSPS, etc.) that may have applied either during the PAL effective period or prior to the PAL effective period except for those emission limitations that had been established pursuant to paragraph (r)(4) of this section, but were eliminated by the PAL in accordance with the provisions in paragraph (aa)(1)(ii)(c) of this section.

(10) Renewal of a PAL.

(i) The Administrator shall follow the procedures specified in paragraph (aa)(5) of this section in approving any request to renew a PAL for a major stationary source or a GHG–only source, and shall provide both the proposed PAL level and a written rationale for the proposed PAL level to the public for review and comment. During such public review, any person may propose a PAL level for the source for consideration by the Administrator.

(ii) Application deadline. A major stationary source or GHG–only source owner or operator shall submit a timely application to the Administrator to request renewal of a PAL. A timely application is one that is submitted at least 6 months prior to, but not earlier than 18 months from, the date of permit expiration. This deadline for application submittal is to ensure that the permit will not expire before the permit is renewed. If the owner or operator of a major stationary source or GHG–only source submits a complete application to renew the PAL within this time period, then the PAL shall continue to be effective until the revised permit with the renewed PAL is issued.

(iii) Application requirements. The application to renew a PAL permit shall contain the information required in paragraphs (aa)(10)(iii)(a) through (d) of this section.

(a) The information required in paragraphs (aa)(3)(i) through (iii) of this section.

(b) A proposed PAL level.

(c) The sum of the potential to emit of all emissions units under the PAL (with supporting documentation).

(d) Any other information the owner or operator wishes the Administrator to consider in determining the appropriate level for renewing the PAL.

(iv) PAL adjustment. In determining whether and how to adjust the PAL, the Administrator shall consider the options outlined in paragraphs (aa)(10)(iv)(a) and (b) of this section. However, in no case may any such adjustment fail to comply with paragraph (aa)(10)(iv)(c) of this section.

(a) If the emissions level calculated in accordance with paragraph (aa)(6) of this section is equal to or greater than 80 percent of the PAL level, the Administrator may renew the PAL at the same level without considering the factors set forth in paragraph (aa)(10)(iv)(b) of this section; or

(b) The Administrator may set the PAL at a level that he or she determines to be more representative of the source's baseline actual emissions, or that he or she determines to be more appropriate considering air quality needs, advances in control technology, anticipated economic growth in the area, desire to reward or encourage the source's voluntary emissions reductions, or other factors as specifically identified by the Administrator in his or her written rationale.

(c) Notwithstanding paragraphs (aa)(10)(iv)(a) and (b) of this section:

(1) If the potential to emit of the major stationary source or GHG–only source is less than the PAL, the Administrator shall adjust the PAL to a level no greater than the potential to emit of the source; and

(2) The Administrator shall not approve a renewed PAL level higher than the current PAL, unless the major stationary source or GHG–only source has complied with the provisions of paragraph (aa)(11) of this section (increasing a PAL).

(v) If the compliance date for a State or Federal requirement that applies to the PAL source occurs during the PAL effective period, and if the Administrator has not already adjusted for such requirement, the PAL shall be adjusted at the time of PAL permit renewal or title V permit renewal, whichever occurs first.

(11) Increasing a PAL during the PAL effective period.

(i) The Administrator may increase a PAL emission limitation only if the major stationary source or GHG–only source complies with the provisions in paragraphs (aa)(11)(i)(a) through (d) of this section.

(a) The owner or operator of the major stationary source or GHG–only source shall submit a complete application to request an increase in the PAL limit for a PAL major modification. Such application shall identify the emissions unit(s) contributing to the increase in emissions so as to cause the major stationary or GHG–only source's emissions to equal or exceed its PAL.

(b) As part of this application, the major stationary source or GHG–only source owner or operator shall demonstrate that the sum of the baseline actual emissions of the small emissions units, plus the sum of the baseline actual emissions of the significant and major emissions units assuming application of BACT equivalent controls, plus the sum of the allowable emissions of the new or modified emissions unit(s) exceeds the PAL. The level of control that would result from BACT equivalent controls on each significant or major emissions unit shall be determined by conducting a new BACT analysis at the time the application is submitted, unless the emissions unit is currently required to comply with a BACT or LAER requirement that was established within the preceding 10 years. In such a case, the assumed control level for that emissions unit shall be equal to the level of BACT or LAER with which that emissions unit must currently comply.

(c) The owner or operator obtains a major NSR permit for all emissions unit(s) identified in paragraph (aa)(11)(i)(a) of this section, regardless of the magnitude of the emissions increase resulting from them (that is, no significant levels apply). These emissions unit(s) shall comply with any emissions requirements resulting from the major NSR process (for example, BACT), even though they have also become subject to the PAL or continue to be subject to the PAL.

(d) The PAL permit shall require that the increased PAL level shall be effective on the day any emissions unit that is part of the PAL major modification becomes operational and begins to emit the PAL pollutant.

(ii) The Administrator shall calculate the new PAL as the sum of the allowable emissions for each modified or new emissions unit, plus the sum of the baseline actual emissions of the significant and major emissions units (assuming application of BACT equivalent controls as determined in accordance with paragraph (aa)(11)(i)(b)), plus the sum of the baseline actual emissions of the small emissions units.

(iii) The PAL permit shall be revised to reflect the increased PAL level pursuant to the public notice requirements of paragraph (aa)(5) of this section.

(12) Monitoring requirements for PALs.

(i) General requirements.

(a) Each PAL permit must contain enforceable requirements for the monitoring system that accurately determines plantwide emissions of the PAL pollutant in terms of mass per unit of time or $CO_2$e per unit of time. Any monitoring system authorized for use in the PAL permit must be based on sound science and meet generally acceptable scientific procedures for data quality and manipulation. Additionally, the information generated by such system must meet minimum legal requirements for admissibility in a judicial proceeding to enforce the PAL permit.

(b) The PAL monitoring system must employ one or more of the four general monitoring approaches meeting the minimum requirements set forth in paragraphs (aa)(12)(ii)(a) through (d) of this section and must be approved by the Administrator.

(c) Notwithstanding paragraph (aa)(12)(i)(b) of this section, you may also employ an alternative monitoring approach that meets paragraph (aa)(12)(i)(a) of this section if approved by the Administrator.

(d) Failure to use a monitoring system that meets the requirements of this section renders the PAL invalid.

(ii) Minimum performance requirements for approved monitoring approaches. The following are acceptable general monitoring approaches when conducted in accordance with the minimum requirements in paragraphs (aa)(12)(iii) through (ix) of this section:

(a) Mass balance calculations for activities using coatings or solvents;

(b) CEMS;

(c) CPMS or PEMS; and

(d) Emission factors.

(iii) Mass balance calculations. An owner or operator using mass balance calculations to monitor PAL pollutant emissions from activities using coating or solvents shall meet the following requirements:

(a) Provide a demonstrated means of validating the published content of the PAL pollutant that is contained in or created by all materials used in or at the emissions unit;

(b) Assume that the emissions unit emits all of the PAL pollutant that is contained in or created by any raw material or fuel used in or at the emissions unit, if it cannot otherwise be accounted for in the process; and

(c) Where the vendor of a material or fuel, which is used in or at the emissions unit, publishes a range of pollutant content from such material, the owner or operator must use the highest value of the range to calculate the PAL pollutant emissions unless the Administrator determines there is site-specific data or a site-specific monitoring program to support another content within the range.

(iv) CEMS. An owner or operator using CEMS to monitor PAL pollutant emissions shall meet the following requirements:

(a) CEMS must comply with applicable Performance Specifications found in 40 CFR part 60, appendix B; and

(b) CEMS must sample, analyze and record data at least every 15 minutes while the emissions unit is operating.

(v) CPMS or PEMS. An owner or operator using CPMS or PEMS to monitor PAL pollutant emissions shall meet the following requirements:

(a) The CPMS or the PEMS must be based on current site-specific data demonstrating a correlation between the monitored parameter(s) and the PAL pollutant emissions across the range of operation of the emissions unit; and

(b) Each CPMS or PEMS must sample, analyze, and record data at least every 15 minutes, or at another less frequent interval approved by the Administrator, while the emissions unit is operating.

(vi) Emission factors. An owner or operator using emission factors to monitor PAL pollutant emissions shall meet the following requirements:

(a) All emission factors shall be adjusted, if appropriate, to account for the degree of uncertainty or limitations in the factors' development;

(b) The emissions unit shall operate within the designated range of use for the emission factor, if applicable; and

(c) If technically practicable, the owner or operator of a significant emissions unit that relies on an emission factor to calculate PAL pollutant emissions shall conduct validation testing to determine a site-specific emission factor within 6 months of PAL permit issuance, unless the Administrator determines that testing is not required.

(vii) A source owner or operator must record and report maximum potential emissions without considering enforceable emission limitations or operational restrictions for an emissions unit during any period of time that there is no monitoring data, unless another method for determining emissions during such periods is specified in the PAL permit.

(viii) Notwithstanding the requirements in paragraphs (aa)(12)(iii) through (vii) of this section, where an owner or operator of an emissions unit cannot demonstrate a correlation between the monitored parameter(s) and the PAL pollutant emissions rate at all operating points of the emissions unit, the Administrator shall, at the time of permit issuance:

(a) Establish default value(s) for determining compliance with the PAL based on the highest potential emissions reasonably estimated at such operating point(s); or

(b) Determine that operation of the emissions unit during operating conditions when there is no correlation between monitored parameter(s) and the PAL pollutant emissions is a violation of the PAL.

(ix) Re-validation. All data used to establish the PAL pollutant must be re-validated through performance testing or other scientifically valid means approved by the Administrator. Such testing must occur at least once every 5 years after issuance of the PAL.

(13) Recordkeeping requirements.

(i) The PAL permit shall require an owner or operator to retain a copy of all records necessary to determine compliance with any requirement of paragraph (aa) of this section and of the PAL, including a determination of each emissions unit's 12–month rolling total emissions, for 5 years from the date of such record.

(ii) The PAL permit shall require an owner or operator to retain a copy of the following records for the duration of the PAL effective period plus 5 years:

(a) A copy of the PAL permit application and any applications for revisions to the PAL; and

(b) Each annual certification of compliance pursuant to title V and the data relied on in certifying the compliance.

(14) Reporting and notification requirements. The owner or operator shall submit semi-annual monitoring reports and prompt deviation reports to the Administrator in accordance with the applicable title V operating permit program. The reports shall meet the requirements in paragraphs (aa)(14)(i) through (iii) of this section.

(i) Semi-annual report. The semi-annual report shall be submitted to the Administrator within 30 days of the end of each reporting period. This report shall contain the information required in paragraphs (aa)(14)(i)(a) through (g) of this section.

(a) The identification of owner and operator and the permit number.

(b) Total annual emissions (expressed on a mass-basis in tons per year, or expressed in tons per year $CO_2$e) based on a 12–month rolling total for each month in the reporting period recorded pursuant to paragraph (aa)(13)(i) of this section.

(c) All data relied upon, including, but not limited to, any Quality Assurance or Quality Control data, in calculating the monthly and annual PAL pollutant emissions.

(d) A list of any emissions units modified or added to the major stationary source or GHG–only source during the preceding 6–month period.

(e) The number, duration, and cause of any deviations or monitoring malfunctions (other than the time associated with zero and span calibration checks), and any corrective action taken.

(f) A notification of a shutdown of any monitoring system, whether the shutdown was permanent or temporary, the reason for the shutdown, the anticipated date that the monitoring system will be fully operational or replaced with another monitoring system, and whether the emissions unit monitored by the monitoring system continued to operate,

and the calculation of the emissions of the pollutant or the number determined by method included in the permit, as provided by (aa)(12)(vii).

(g) A signed statement by the responsible official (as defined by the applicable title V operating permit program) certifying the truth, accuracy, and completeness of the information provided in the report.

(ii) Deviation report. The major stationary source or GHG–only source owner or operator shall promptly submit reports of any deviations or exceedance of the PAL requirements, including periods where no monitoring is available. A report submitted pursuant to § 70.6(a)(3)(iii)(B) of this chapter shall satisfy this reporting requirement. The deviation reports shall be submitted within the time limits prescribed by the applicable program implementing § 70.6(a)(3)(iii)(B) of this chapter. The reports shall contain the following information:

(a) The identification of owner and operator and the permit number;

(b) The PAL requirement that experienced the deviation or that was exceeded;

(c) Emissions resulting from the deviation or the exceedance; and

(d) A signed statement by the responsible official (as defined by the applicable title V operating permit program) certifying the truth, accuracy, and completeness of the information provided in the report.

(iii) Re-validation results. The owner or operator shall submit to the Administrator the results of any re-validation test or method within 3 months after completion of such test or method.

(15) Transition requirements.

(i) The Administrator may not issue a PAL that does not comply with the requirements in paragraphs (aa)(1) through (15) of this section after March 3, 2003.

(ii) The Administrator may supersede any PAL that was established prior to March 3, 2003 with a PAL that complies with the requirements of paragraphs (aa)(1) through (15) of this section.

(bb) If any provision of this section, or the application of such provision to any person or circumstance, is held invalid, the remainder of this section, or the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.

(cc) [Reserved by 86 FR 37932]

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter C. Air Programs
        Part 81. Designation of Areas for Air Quality Planning Purposes (Refs & Annos)
          Subpart C. Section 107 Attainment Status Designations (Refs & Annos)

40 C.F.R. § 81.356

§ 81.356 Virgin Islands.

Effective: April 9, 2018

Currentness

**Virgin Islands—1971 Sulfur Dioxide NAAQS (Primary and Secondary)**

| Designated area | Does not meet primary standards | Does not meet secondary standards | Cannot be classified | Better than national standards |
|---|---|---|---|---|
| Virgin Islands AQCR: | | | | |
| St. Croix (southern)............................................................. .................................................... | | | [1] X | .................................................... |
| Remainder of AQCR................................................................................ ....................................................... | | | | X |

**Virgin Islands—2010 Sulfur Dioxide NAAQS (Primary)**

| Designated area [1] | Designation | |
|---|---|---|
| | Date [2] | Type |
| All of Virgin Islands AQCR 247......................................... ....................... | | Attainment/Unclassifiable. |

**Virgin Islands—Carbon Monoxide**

| Designated Area | Designation | | Classification | |
|---|---|---|---|---|
| | Date [1] | Type | Date [1] | Type |
| Statewide............................................................. | | Unclassifiable/ Attainment | | |
| St. Croix | | | | |
| St. John | | | | |
| St. Thomas | | | | |

**Virgin Islands—Ozone (1–Hour Standard)** [2]

| Designated area | Designation | | Classification | |
|---|---|---|---|---|
| | Date [1] | Type | Date [1] | Type |
| Statewide.......................................................... | | Unclassifiable/ Attainment | | |
| St. Croix | | | | |
| St. John | | | | |
| St. Thomas | | | | |

**Virgin Islands—1997 Annual PM$_{2.5}$ NAAQS**

**[Primary and secondary]**

| Designated area | | Designation [a] | | Classification | |
|---|---|---|---|---|---|
| Date [1] | Type | | Type | Date | Type |
| Statewide: | | | | | |
| St. Croix............................................................................. | | Unclassifiable/Attainment............................................. ................ | | | |
| St. John.............................................................................. | | Unclassifiable/Attainment............................................. ................ | | | |
| St. Thomas......................................................................... | | Unclassifiable/Attainment............................................. ................ | | | |

**Virgin Islands—2012 Annual PM$_{2.5}$ NAAQS**

**[Primary]**

| Designated area [1] | Designation | | Classification | |
|---|---|---|---|---|
| | Date [2] | Type | Date [2] | Type |
| Territory wide: | | | | |
| St. Croix.................................................................. | | Unclassifiable | | |
| St. John................................................................... | | Unclassifiable | | |
| St. Thomas.............................................................. | | Unclassifiable | | |

**Virgin Islands—1997 24-Hour PM$_{2.5}$ NAAQS**

**[Primary and secondary]**

| Designated area | | Designation [a] | | Classification |
|---|---|---|---|---|

| | Date [1] | Type | Date | Type |
|---|---|---|---|---|
| Territory wide: | | | | |
| St. Croix......................................................................................Unclassifiable/Attainment................. ..................... | | | | |
| St. John........................................................................................Unclassifiable/Attainment................. ..................... | | | | |
| St. Thomas...................................................................................Unclassifiable/Attainment................. ..................... | | | | |

### Virgin Islands—2006 24-Hour PM$_{2.5}$ NAAQS

**[Primary and secondary]**

| Designated area | Designation [a] | | Classification | |
|---|---|---|---|---|
| | Date [1] | Type | Date | Type |
| Territory wide: | | | | |
| St. Croix......................................................................................Unclassifiable/Attainment................. | | | | |
| St. John........................................................................................Unclassifiable/Attainment................. | | | | |
| St. Thomas...................................................................................Unclassifiable/Attainment................. | | | | |

## Virgin Islands—NO$_2$ (1971 Annual Standard)

| Designated area | Does not meet primary standards | Cannot be classified or better than national standards |
|---|---|---|
| Virgin Islands AQCR.................................................................................. | | X |

## Virgin Islands—NO$_2$ (2010 1-Hour Standard)

| Designated area | Designation [a] | |
|---|---|---|
| | Date [1] | Type |
| State of Virgin Islands.............................................. .......................... | | Unclassifiable/Attainment. |

### Virgin Islands—1997 8–Hour Ozone NAAQS (Primary and Secondary)

| Designated area | Designation | | Category/classification | |
|---|---|---|---|---|
| | Date [1] | Type | Date [1] | Type |
| Statewide.......................................................................... | | Unclassifiable/Attainment. | | |

St. Croix

St. John

St. Thomas

### Virgin Islands—2008 8-Hour Ozone NAAQS

[Primary and secondary]

| Designated area | Designation | | Classification | |
|---|---|---|---|---|
| | Date [1] | Type | Date [1] | Type |
| All of Virgin Islands AQCR 247: [2] ...................................... | | Unclassifiable/Attainment | | |

### Virgin Islands—2015 8-Hour Ozone NAAQS

[Primary and Secondary]

| Designated area [1] | Designation | | Classification | |
|---|---|---|---|---|
| | Date [2] | Type | Date | Type |
| All of Virgin Islands AQCR 247................................................................Attainment/Unclassifiable................................................................ ................... | | | | |

### Virgin Islands—2008 Lead NAAQS

| Designated area | Designation for the 2008 NAAQS [a] |
|---|---|
| | Date 1 | Type |
| Whole State.................................................... | Unclassifiable/Attainment. |

**Credits**

[44 FR 5133, Jan. 25, 1979, as amended at 47 FR 31878, July 23, 1982; 56 FR 56858, Nov. 1, 1991; 61 FR 2941, Jan. 30, 1996; 63 FR 2803, Jan. 16, 1998; 63 FR 12652, March 16, 1998; 63 FR 31096, June 5, 1998; 65 FR 45274, July 20, 2000; 69 FR 23951, April 30, 2004; 70 FR 1019, Jan. 5, 2005; 70 FR 44478, Aug. 3, 2005; 74 FR 58781, Nov. 13, 2009; 76 FR 72120, Nov. 22, 2011; 77 FR 9588, Feb. 17, 2012; 77 FR 30160, May 21, 2012; 78 FR 47205, Aug. 5, 2013; 79 FR 31781, June 2, 2014; 80 FR 2283, Jan. 15, 2015; 82 FR 54287, Nov. 16, 2017; 83 FR 1172, Jan. 9, 2018]

SOURCE: 36 FR 22421, Nov. 25, 1971; 43 FR 8964, Mar. 3, 1978; 50 FR 30704, July 29, 1985; 52 FR 6549, March 4, 1987; 56 FR 56709, Nov. 6, 1991; 57 FR 27939, June 23, 1992; 57 FR 27942, June 23, 1992; 58 FR 4350, Jan. 14, 1993; 63 FR 7274, Feb. 12, 1998, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401, et seq.; 42 U.S.C. 7401, et seq.

Notes of Decisions (2)

Current through April 7, 2023, 88 FR 20779. Some sections may be more current. See credits for details.

## Footnotes

1    EPA designation replaces State designation.

1    Includes any Indian country in each county or area, unless otherwise specified. EPA is not determining the boundaries of any area of Indian country in this table, including any area of Indian country located in the larger designation area. The inclusion of any Indian country in the designation area is not a determination that the state has regulatory authority under the Clean Air Act for such Indian country.

2    This date is April 9, 2018, unless otherwise noted.

1    This date is November 15, 1990, unless otherwise noted.

1    This date is October 18, 2000, unless otherwise noted.

2    The 1–hour ozone standard is revoked effective June 15, 2005 for all areas in the Virgin Islands.

a    Includes Indian Country located in each county or area, except as otherwise specified.

1    This date is 90 days after January 5, 2005, unless otherwise noted.

1    Includes areas of Indian country located in each county or area, except as otherwise specified.

2    This date is April 15, 2015, unless otherwise noted.

a    Includes Indian Country located in each county or area, except as otherwise specified.

1    This date is 90 days after November 13, 2009, unless otherwise noted.

a    Includes Indian Country located in each county or area, except as otherwise specified.

1    This date is 30 days after November 13, 2009, unless otherwise noted.

a    Includes Indian Country located in each county or area, except as otherwise specified.

1    This date is 90 days after October 31, 2011, unless otherwise noted.

1    This date is June 15, 2004, unless otherwise noted.

1    This date is July 20, 2012, unless otherwise noted.

2    Includes any Indian country in each county or area, unless otherwise specified.

1    Includes any Indian country in each county or area, unless otherwise specified. EPA is not determining the boundaries of any area of Indian country in this table, including any area of Indian country located in the larger designation area.

The inclusion of any Indian country in the designation area is not a determination that the state has regulatory authority under the Clean Air Act for such Indian country.

2    This date is January 16, 2018, unless otherwise noted.

a    Includes Indian Country located in each county or area, except as otherwise specified.

1    December 31, 2011 unless otherwise noted.

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    ADD140    6

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter D. Water Programs
        Part 124. Procedures for Decisionmaking (Refs & Annos)
          Subpart A. General Program Requirements

40 C.F.R. § 124.19

§ 124.19 Appeal of RCRA, UIC, NPDES and PSD Permits.

Effective: June 11, 2021
Currentness

(a) Petitioning for review of a permit decision.

(1) Initiating an appeal. Appeal from a RCRA, UIC, NPDES, or PSD final permit decision issued under § 124.15 of this part, or a decision to deny a permit for the active life of a RCRA hazardous waste management facility or unit under § 270.29 of this chapter, is commenced by filing a petition for review with the Clerk of the Environmental Appeals Board within the time prescribed in paragraph (a)(3) of this section.

(2) Who may file? Any person who filed comments on the draft permit or participated in a public hearing on the draft permit may file a petition for review as provided in this section. Additionally, any person who failed to file comments or failed to participate in the public hearing on the draft permit may petition for administrative review of any permit conditions set forth in the final permit decision, but only to the extent that those final permit conditions reflect changes from the proposed draft permit.

(3) Filing deadline. A petition for review must be filed with the Clerk of the Environmental Appeals Board within 30 days after the Regional Administrator serves notice of the issuance of a RCRA, UIC, NPDES, or PSD final permit decision under § 124.15 or a decision to deny a permit for the active life of a RCRA hazardous waste management facility or unit under § 270.29 of this chapter. A petition is filed when it is received by the Clerk of the Environmental Appeals Board at the address specified for the appropriate method of delivery as provided in paragraph (i)(2) of this section.

(4) Petition contents.

(i) In addition to meeting the requirements in paragraph (d) of this section, a petition for review must identify the contested permit condition or other specific challenge to the permit decision and clearly set forth, with legal and factual support, petitioner's contentions for why the permit decision should be reviewed. The petition must demonstrate that each challenge to the permit decision is based on:

(A) A finding of fact or conclusion of law that is clearly erroneous; or

(B) An exercise of discretion or an important policy consideration that the Environmental Appeals Board should, in its discretion, review.

(ii) Petitioners must demonstrate, by providing specific citation to the administrative record, including the document name and page number, that each issue being raised in the petition was raised during the public comment period (including any public hearing) to the extent required by § 124.13. For each issue raised that was not raised previously, the petition must explain why such issues were not required to be raised during the public comment period as provided in § 124.13. Additionally, if the petition raises an issue that the Regional Administrator addressed in the response to comments document issued pursuant to § 124.17, then petitioner must provide a citation to the relevant comment and response and explain why the Regional Administrator's response to the comment was clearly erroneous or otherwise warrants review.

(b) Response(s) to a petition for review.

(1) In a PSD or other new source permit appeal, the Regional Administrator must file a response to the petition for review, a certified index of the administrative record, and the relevant portions of the administrative record within 21 days after the service of the petition. The response brief must respond to arguments raised by the appellant, together with specific citation or other appropriate reference to the record (e.g., by including the document name and page number).

(2) In all other permit appeals under this section, the Regional Administrator must file a response to the petition, a certified index of the administrative record, and the relevant portions of the administrative record within 30 days after the service of a petition.

(3) A permit applicant who did not file a petition but who wishes to participate in the appeal process must file a notice of appearance and a response to the petition. Such documents must be filed by the deadlines provided in paragraph (b)(1) or (2) of this section, as appropriate.

(4) The State or Tribal authority where the permitted facility or site is or is proposed to be located (if that authority is not the permit issuer) must also file a notice of appearance and a response if it wishes to participate in the appeal. Such response must be filed by the deadlines provided in paragraph (b)(1) or (2) of this section, as appropriate.

(c) Replies.

(1) In PSD and other new source permit appeals, the Environmental Appeals Board will apply a presumption against the filing of a reply brief. By motion, petitioner may seek leave of the Environmental Appeals Board to file a reply to the response, which the Environmental Appeals Board, in its discretion, may grant. The motion must be filed simultaneously with the proposed reply within 10 days after service of the response. In its motion, petitioner must specify those arguments in the response to which petitioner seeks to reply and the reasons petitioner believes it is necessary to file a reply to those arguments. Petitioner may not raise new issues or arguments in the motion or in the reply.

(2) In all other permit appeals under this section, petitioner may file a reply within 15 days after service of the response. Petitioner may not raise new issues or arguments in the reply.

(d) Content and form of briefs.

(1) Content requirements. All briefs filed under this section must contain, under appropriate headings:

(i) A table of contents, with page references;

(ii) A table of authorities with references to the pages of the brief where they are cited;

(iii) A table of attachments, if required under paragraph (d)(2) of this section; and

(iv) A statement of compliance with the word limitation.

(2) Attachments. Parts of the record to which the parties wish to direct the Environmental Appeals Board's attention may be appended to the brief submitted. If the brief includes attachments, a table must be included that provides the title of each appended document and assigns a label identifying where it may be found (e.g., Excerpts from the Response to Comments Document * * * Attachment 1).

(3) Length. Unless otherwise ordered by the Environmental Appeals Board, petitions and response briefs may not exceed 14,000 words, and all other briefs may not exceed 7,000 words. Filers may rely on the word-processing system used to determine the word count. In lieu of a word limitation, filers may comply with a 30–page limit for petitions and response briefs, or a 15–page limit for replies. Headings, footnotes, and quotations count toward the word limitation. The table of contents, table of authorities, table of attachments (if any), statement requesting oral argument (if any), statement of compliance with the word limitation, and any attachments do not count toward the word limitation. The Environmental Appeals Board may exclude any petition, response, or other brief that does not meet word limitations. Where a party can demonstrate a compelling and documented need to exceed such limitations, such party must seek advance leave of the Environmental Appeals Board to file a longer brief. Such requests are discouraged and will be granted only in unusual circumstances.

(e) Participation by amicus curiae. Any interested person may file an amicus brief in any appeal pending before the Environmental Appeals Board under this section. The deadline for filing such brief is 15 days after the filing of the response brief, except that amicus briefs in PSD or other new source permit appeals must be filed within 21 days after the filing of the petition. Amicus briefs must comply with all procedural requirements of this section.

(f) Motions.

(1) In general. A request for an order or other relief must be made by written motion unless these rules prescribe another form.

(2) Contents of a motion. A motion must state with particularity the grounds for the motion, the relief sought, and the legal argument necessary to support the motion. In advance of filing a motion, parties must attempt to ascertain whether the other party(ies) concur(s) or object(s) to the motion and must indicate in the motion the attempt made and the response obtained.

(3) Response to motion. Any party may file a response to a motion. Responses must state with particularity the grounds for opposition and the legal argument necessary to support the motion. The response must be filed within 15 days after service of the motion unless the Environmental Appeals Board shortens or extends the time for response.

(4) Reply. Any reply to a response filed under paragraph (f)(3) of this section must be filed within 10 days after service of the response. A reply must not introduce any new issues or arguments and may respond only to matters presented in the response.

(5) Length. Unless otherwise ordered by the Environmental Appeals Board, motions and any responses or replies may not exceed 7000 words. Filers may rely on the word-processing system used to determine the word count. In lieu of a word limitation, filers may comply with a 15–page limit. Headings, footnotes, and quotations count toward the word or page-length limitation. The Environmental Appeals Board may exclude any motion that does not meet word limitations. Where a party can demonstrate a compelling and documented need to exceed such limitations, such party must seek advance leave of the Environmental Appeals Board. Such requests are discouraged and will be granted only in unusual circumstances.

(6) Disposition of a motion for a procedural order. The Environmental Appeals Board may act on a motion for a procedural order at any time without awaiting a response.

(g) Timing of motions for extension of time. Parties must file motions for extensions of time sufficiently in advance of the due date to allow other parties to have a reasonable opportunity to respond to the request for more time and to provide the Environmental Appeals Board with a reasonable opportunity to issue an order.

(h) Oral argument. The Environmental Appeals Board may hold oral argument on its own initiative or at its discretion in response to a request by one or more of the parties. To request oral argument, a party must include in its substantive brief a statement explaining why oral argument should be permitted. The Environmental Appeals Board will apply a presumption against oral argument in PSD or other new source permit appeals. The Environmental Appeals Board may, by order, establish additional procedures governing any oral argument before the Environmental Appeals Board.

(i) Filing and service requirements. Documents filed under this section, including the petition for review, must be filed with the Clerk of the Environmental Appeals Board. A document is filed when it is received by the Clerk of the Environmental Appeals Board at the address specified for the appropriate method of delivery as provided in paragraph (i)(2) of this section. Service of a document between parties to an appeal or by the Environmental Appeals Board on a party is complete upon mailing for U.S. mail or EPA internal mail, when placed in the custody of a reliable commercial delivery service, or upon transmission for facsimile or email.

(1) Caption and other filing requirements. Every document filed with the Environmental Appeals Board must specifically identify in the caption the permit applicant, the permitted facility, and the permit number. All documents that are filed must be signed by the person filing the documents or the representative of the person filing the documents. Each filing must also indicate the signer's name, address, and telephone number, as well as an email address, and facsimile number, if any.

(2) Method of filing. Unless otherwise permitted under these rules, documents must be filed either by using the Environmental Appeals Board's electronic filing system, by U.S. mail, or by hand delivery or courier (including delivery by

U.S. Express Mail or by a commercial delivery service). In addition, a motion or a response to a motion may be submitted by facsimile if the submission contains no attachments. Upon filing a motion or response to a motion by facsimile, the sender must, within one business day, submit the original copy to the Clerk of the Environmental Appeals Board either electronically, by mail, or by hand delivery or courier. The Environmental Appeals Board may by order require filing by facsimile or the Board's electronic filing system, subject to any appropriate conditions and limitations.

(i) Electronic filing. Documents that are filed electronically must be submitted using the Environmental Appeals Board's electronic filing system, subject to any appropriate conditions and limitations imposed by order of the Environmental Appeals Board. All documents filed electronically must include the full name of the person filing below the signature line. Compliance with Environmental Appeals Board electronic filing requirements constitutes compliance with applicable signature requirements.

(ii) Filing by U.S. Mail. Documents that are sent by U.S. Postal Service (except by U.S. Express Mail) must be sent to the official mailing address of the Clerk of the Environmental Appeals Board at: U.S. Environmental Protection Agency, Environmental Appeals Board, 1200 Pennsylvania Avenue NW., Mail Code 1103M, Washington, DC 20460–0001. The original and two copies of each document must be filed. The person filing the documents must include a cover letter to the Clerk of the Environmental Appeals Board clearly identifying the documents that are being submitted, the name of the party on whose behalf the documents are being submitted, as well as the name of the person filing the documents, his or her address, telephone number and, if available, fax number and email address.

(iii) Filing by hand delivery or courier. Documents delivered by hand or courier (including deliveries by U.S. Express Mail or by a commercial delivery service) must be delivered to the Clerk of the Environmental Appeals Board at: U.S. Environmental Protection Agency, Environmental Appeals Board, WJC East Building, 1201 Constitution Avenue NW, Room 3332, Washington, DC 20004.

(3) Service—

(i) Service information. The first document filed by any person shall contain the name, mailing address, telephone number, and email address of an individual authorized to receive service relating to the proceeding. Parties shall promptly file any changes in this information with the Clerk of the Environmental Appeals Board, and serve copies on all parties to the proceeding. If a party fails to furnish such information and any changes thereto, service to the party's last known address shall satisfy the requirements of paragraph (i)(3) of this section.

(ii) Service requirements for parties. Petitioner must serve the petition for review on the Regional Administrator and the permit applicant (if the applicant is not the petitioner). Once an appeal is docketed, every document filed with the Environmental Appeals Board must be served on all other parties. Service must be by first class U.S. mail, by any reliable commercial delivery service, or, if agreed to by the parties, by facsimile or other electronic means, including but not necessarily limited to email. A party who consents to service by facsimile or other electronic means must file an acknowledgement of its consent (identifying the type of electronic means agreed to and the electronic address to be used) with the Clerk of the Environmental Appeals Board. The Environmental Appeals Board may by order authorize or require service by facsimile, email, or other electronic means, subject to any appropriate conditions and limitations.

(iii) Service of rulings, orders, and decisions. The Clerk of the Environmental Appeals Board must serve copies of rulings, orders, and decisions on all parties. Service may be made by U.S. mail (including by certified mail or return

receipt requested, Overnight Express and Priority Mail), EPA's internal mail, any reliable commercial delivery service, or electronic means (including but not necessarily limited to facsimile and email).

(4) Proof of service. A certificate of service must be appended to each document filed stating the names of persons served, the date and manner of service, as well as the electronic, mailing, or hand delivery address, or facsimile number, as appropriate.

(j) Withdrawal of permit or portions of permit by Regional Administrator. The Regional Administrator, at any time prior to 30 days after the Regional Administrator files its response to the petition for review under paragraph (b) of this section, may, upon notification to the Environmental Appeals Board and any interested parties, withdraw the permit and prepare a new draft permit under § 124.6 addressing the portions so withdrawn. The new draft permit must proceed through the same process of public comment and opportunity for a public hearing as would apply to any other draft permit subject to this part. Any portions of the permit that are not withdrawn and that are not stayed under § 124.16(a) continue to apply. If the Environmental Appeals Board has held oral argument, the Regional Administrator may not unilaterally withdraw the permit, but instead must request that the Environmental Appeals Board grant a voluntary remand of the permit or any portion thereof.

(k) Petitioner request for dismissal of petition. Petitioner, by motion, may request to have the Environmental Appeals Board dismiss its appeal. The motion must briefly state the reason for its request.

(l) Final disposition and judicial review.

(1) A petition to the Environmental Appeals Board under paragraph (a) of this section is, under 5 U.S.C. 704, a prerequisite to seeking judicial review of the final agency action.

(2) For purposes of judicial review under the appropriate Act, final agency action on a permit occurs when agency review procedures under this section are exhausted and the Regional Administrator subsequently issues a final permit decision under this paragraph (l). A final permit decision must be issued by the Regional Administrator:

(i) When the Environmental Appeals Board issues notice to the parties that the petition for review has been denied;

(ii) When the Environmental Appeals Board issues a decision on the merits of the appeal and the decision does not include a remand of the proceedings; or

(iii) Upon the completion of remand proceedings if the proceedings are remanded, unless the Environmental Appeals Board's remand order specifically provides that appeal of the remand decision will be required to exhaust administrative remedies.

(3) The Regional Administrator must promptly publish notice of any final agency action in the Federal Register regarding the following permits:

(i) PSD permits;

(ii) Outer continental shelf permits issued under 40 CFR part 55;

(iii) Federal Title V operating permits issued under 40 CFR part 71;

(iv) Acid Rain permits appealed under 40 CFR part 78;

(v) Tribal Major Non–Attainment NSR permits issued under 40 CFR 49.166 through 49.173; and

(vi) Tribal Minor NSR permits issued under 40 CFR 49.151 through 49.161.

(m) Motions for reconsideration or clarification. Motions to reconsider or clarify any final disposition of the Environmental Appeals Board must be filed within 10 days after service of that order. Motions for reconsideration must set forth the matters claimed to have been erroneously decided and the nature of the alleged errors. Motions for clarification must set forth with specificity the portion of the decision for which clarification is being sought and the reason clarification is necessary. Motions for reconsideration or clarification under this provision must be directed to, and decided by, the Environmental Appeals Board. Motions for reconsideration or clarification directed to the Administrator, rather than the Environmental Appeals Board, will not be considered, unless such motion relates to a matter that the Environmental Appeals Board has referred to the Administrator pursuant to § 124.2 and for which the Administrator has issued the final order. A motion for reconsideration or clarification does not stay the effective date of the final order unless the Environmental Appeals Board specifically so orders.

(n) Board authority. In exercising its duties and responsibilities under this part, the Environmental Appeals Board may do all acts and take all measures necessary for the efficient, fair, and impartial adjudication of issues arising in an appeal under this part including, but not limited to, imposing procedural sanctions against a party who, without adequate justification, fails or refuses to comply with this part or an order of the Environmental Appeals Board. Such sanctions may include drawing adverse inferences against a party, striking a party's pleadings or other submissions from the record, and denying any or all relief sought by the party in the proceeding. Additionally, for good cause, the Board may relax or suspend the filing requirements prescribed by these rules or Board order.

(o) General NPDES permits.

(1) Persons affected by an NPDES general permit may not file a petition under this section or otherwise challenge the conditions of a general permit in further Agency proceedings. Instead, they may do either of the following:

(i) Challenge the general permit by filing an action in court; or

(ii) Apply for an individual NPDES permit under § 122.21 as authorized in § 122.28 of this chapter and may then petition the Environmental Appeals Board to review the individual permit as provided by this section.

(2) As provided in § 122.28(b)(3) of this chapter, any interested person may also petition the Director to require an individual NPDES permit for any discharger eligible for authorization to discharge under an NPDES general permit.

(p) Authority to initiate review. The Environmental Appeals Board also may decide on its own initiative to review any condition of any RCRA, UIC, NPDES, or PSD permit decision issued under this part for which review is available under paragraph (a) of this section. The Environmental Appeals Board must act under this paragraph (p) within 30 days of the service date of notice of the Regional Administrator's action.

**Credits**

[54 FR 9607, March 7, 1989; 57 FR 5335, Feb. 13, 1992; 65 FR 30911, May 15, 2000; 78 FR 5285, Jan. 25, 2013; 82 FR 2236, Jan. 9, 2017; 82 FR 8500, Jan. 26, 2017; 82 FR 14325, March 20, 2017; 83 FR 4599, Feb. 1, 2018; 85 FR 51657, Aug. 21, 2020; 86 FR 31176, June 11, 2021]

SOURCE: 45 FR 33484, May 19, 1980, as amended at 48 FR 14264, April 1, 1983; 58 FR 67983, Dec. 22, 1993; 65 FR 30910, May 15, 2000, unless otherwise noted.

AUTHORITY: Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq.; Safe Drinking Water Act, 42 U.S.C. 300f et seq.; Clean Water Act, 33 U.S.C. 1251 et seq.; Clean Air Act, 42 U.S.C. 7401 et seq.

Notes of Decisions (79)

Current through April 3, 2023, 88 FR 19570. Some sections may be more current. See credits for details.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.