Case No. 23-1094

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

---

PORT HAMILTON REFINING AND TRANSPORTATION, LLLP,

Petitioners,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

---

**AMICI CURIAE BRIEF OF ST. CROIX ENVIRONMENTAL ASSOCIATION, SIERRA CLUB, AND CENTER FOR BIOLOGICAL DIVERSITY IN SUPPORT OF PLAINTIFFS' BRIEF**

---

Rajeev Venkat
Student Attorney

Michael R. Harris
Associate Professor of Law

Environmental Justice Clinic
Vermont Law & Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT  05068
(802) 831-1364
mrharris@vermontlaw.edu

*Counsel for St. Croix Environmental Association, Sierra Club, and Center for Biological Diversity*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for the three *amici curiae* St. Croix Environmental Association, Sierra Club, and Center for Biological Diversity, states that none of these organizations are owned by a parent corporation and no publicly held corporation owns 10% or more of the stock of any of these organizations.

April 19, 2023                                    Respectfully Submitted,

<u>/s/Michael Ray Harris</u>
Michael Ray Harris
Associate Professor of Law
Environmental Justice Clinic
Vermont Law & Graduate School
PO Box 96, 164 Chelsea St
South Royalton, VT 05068
802.831.1364 (main)
802.831.1631 (fax)
mrharris@vermontlaw.edu
*Counsel for amici curiae St. Croix*
*Environmental Association, Sierra*
*Club and Center for Biological*
*Diversity*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .................................................................. i

TABLE OF CONTENTS ........................................................................................ ii

TABLE OF AUTHORITIES ....................................................................................iii

IDENTIFICATIFICATION AND INTERESTS OF AMICI ......................................... 1

INTRODUCTION ............................................................................................... 3

ARGUMENT ...................................................................................................... 4

    A.  Refinery operations have harmed the health and safety
        of the St. Croix Community for Decades ........................................................ 4

    B.  The PSD permit is a necessary requirement to ensure the public
        health of nearby communities ................................................................... 11

    C.  EPA's reactivation policy and the Monroe Factors
        are a powerful mechanism to protect the public health and
        welfare of St.Croix ................................................................................... 15

    D.  EPA's determination furthers its commitment to protect
        environmental justice communities ........................................................... 18

    E.  The refinery's abysmal condition and PHRT's failure to establish systemic
        improvements ........................................................................................... 20

CONCLUSION ................................................................................................... 23

CERTIFICATE OF COMPLIANCE ......................................................................... 24

ELECTRONIC DOCUMENT CERTIFICATE ............................................................. 26

CERTIFICATE OF BAR ADMISSION ..................................................................... 27

CERTIFICATE OF SERVICE ................................................................................. 28

# TABLE OF AUTHORITIES

## Cases

*Citizens for Clean Air v. E.P.A*...................................................................................13

*United States v. EME Homer City Generation L.P*........................................................14

## Statutes

42 U.S.C. § 7401........................................................................................................4

42 U.S.C. § 7401 (a)(2)........................................................................................11-12

42 U.S.C. § 7412(r)(1)...............................................................................................21

42 U.S.C. § 7412(7)(B)(2).........................................................................................21

42 U.S.C. § 7470.......................................................................................................12

42 U.S.C. § 7475(a)(4)..........................................................................................12,14

Clean Air Act Amendments of 1977, Pub. L. 95-95, 91 Stat. 685.......................12

## Regulations

40 CFR 51.165(i)........................................................................................................13

## Federal Register Notices

59 Fed. Reg. 7629 at § 1-101.....................................................................................18

86 Fed. Reg. 7619 at § 219........................................................................................18

## Other

Eilperin, Juliet, Darryl Fears, and Salwan Georges. "The Island Where It Rained
      Oil." *Washington Post*, March 24, 2021.
      https://www.washingtonpost.com/climate-
      environment/interactive/2021/biden-environmental-justice-refinery-st-
      croix/.............................................................................................................................4,9

Patricia Borns. "Limetree Hit with Fourth Class Action Lawsuit." St. Thomas
      Source, June 10, 2021, sec. Local news.

https://stthomassource.com/content/2021/06/10/limetree-hit-with-fourth-class-action-lawsuit/................................................................................................5

US EPA, OLEM. "Hazardous Waste Cleanup: HOVENSA, LLC in Christiansted, U.S. Virgin Islands." Overviews and Factsheets. US EPA, January 2013. New Jersey. https://19january2021snapshot.epa.gov/hwcorrectiveactionsites/hazardous-waste-cleanup-hovensa-llc-christiansted-us-virgin-islands.......................................6

Schouten, Fredreka. "A Caribbean Island Bet Its Future on Petrochemicals. Then Oil Rained down on Homes." CNN, May 29, 2021. https://www.cnn.com/2021/05/29/us/epa-shutdown-limetree-st-croix-refinery/index.html....................................................................................................7

Patricia Borns. "Limetree Agrees to Distribute Clean Water to More St. Croix Households." St. Thomas Source, October 28, 2021, sec. Local news. https://stthomassource.com/content/2021/10/28/limetree-agrees-to-distribute-clean-water-to-more-st-croix-households/.................................................7

Schouten, Alexis Benveniste, Fredreka. "St. Croix Refinery That Rained Oil on Neighborhoods Is Shutting down Indefinitely | CNN Business." CNN, June 21, 2021. https://www.cnn.com/2021/06/21/business/limetree-bay-shutdown/index.html....................................................................................................8

"Environmental Justice Begins in St Croix | Bennington College." Accessed April 19, 2023. https://www.bennington.edu/center-advancement-of-public-action/environment-and-public-action/environmental-justice-begins-st..........8

Nation's Second Largest Refinery to Pay $700 Million to Upgrade Pollution Controls at U.S. Virgin Islands Facility, DOJ (Jan. 26, 2011), available at https://www.justice.gov/opa/pr/nation-s-second-largest-refinery-pay-700-million-upgrade-pollution-controls-us-virgin-islands.................................................6

"Virgin Islands Central Cancer Registry | USVI Department of Health." Accessed April 19, 2023. https://doh.vi.gov/programs/chronic-disease-and-prevention/virgin-islands-central-cancer-registry.........................................................9

Williams, Stephen B, Yong Shan, Usama Jazzar, Preston S Kerr, Ikenna Okereke, V Suzanne Klimberg, Douglas S Tyler, et al. "Proximity to Oil Refineries and Risk

of Cancer: A Population-Based Analysis." *JNCI Cancer Spectrum* 4, no. 6
(November 15, 2020): pkaa088. https://doi.org/10.1093/jncics/pkaa088.......9

Martineau, Robert J., and David P. Novello, eds. *The Clean Air Act Handbook*. 2nd
ed. Chicago, Ill: American Bar Association, 2004……………………….……...12-13

US EPA, OAR. "Participate in the Permitting Process." Collections and Lists, August
28, 2015. https://www.epa.gov/nsr/participate-permitting-process................13

*In the Matter of Monroe Electric Generating Plant Entergy Louisiana, Inc.,* Proposed
Operating Permit, Petition No. 6-99-2 (June 11, 1999)…………………….... *passim*

"1/18/2001: CENCO REFINERY WILL UPGRADE AIR POLLUTION CONTROLS."
Accessed April 19, 2023.
https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/2
f85f0d29181e072852570d8005e1413.html.................................................................17

US EPA, OA. "EPA Uses Emergency Powers to Protect St. Croix Communities and
Orders Limetree Bay Refinery to Pause Operations." News Release, May 14,
2021. U.S. Virgin Islands. https://www.epa.gov/newsreleases/epa-uses-
emergency-powers-protect-st-croix-communities-and-orders-limetree-bay-
refinery.............................................................................................................................19, 20

US EPA, "FY 2022-2026 EPA Strategic Plan," March 2022.
https://www.epa.gov/system/files/documents/2022-03/fy-2022-2026-epa-
strategic-
plan.pdf.........................................................................................................................................20

## IDENTIFICATION OF AMICI AND STATEMENT UNDER FRAP 29(a)(4)(E)

Pursuant to the Court's order of March 29, 2023, denying their Motion to Intervene, the St. Croix Environmental Association ("SEA"), the Sierra Club, and Center for Biological Diversity ("Center") (collectively "Amici") accept the Court's invitation to participate in this matter as Amici Curiae. *Port Hamilton Refining and Transportation LLLP v. U.S. Environmental Protection Agency*, No. 23-1094 (3d. Cir. 2023). No party's counsel authored the brief in whole or in part. No money was contributed by any party, party's Counsel, or a person other than the Amici Curiae for the writing and submission of this brief.

Amici SEA was founded in 1986 and became a 501(c)(3) nonprofit organization in 1994. SEA's mission is to promote the conservation of St. Croix's environmental resources, provide education, and engage in advocacy for environmentally responsible actions that benefit St. Croix. SEA's efforts are focused on elevating community concerns about environmental issues on St. Croix, especially the environmental justice communities that have been predominantly and disproportionately impacted by adverse environmental conditions. One of SEA's key initiatives has been to advocate for clean air and water in St. Croix. The oil refinery (the "Refinery") has polluted these vital resources over the course of its 55 years of existence. The Refinery is currently owned by Port Hamilton Refining & Transportation ("PHRT"). SEA brings relevant expertise and unique perspective through its grassroots community organizing and education. As a community-based organization, SEA has an interest in protecting the health of its members and the environment in which its members reside. SEA members will be directly affected by the re-opening of the Refinery.

Amici Sierra Club is a non-profit organization dedicated to protecting, restoring, and promoting the quality of the natural and human environment. Sierra Club has over 3.8 million members and supporters nationwide and is one of the largest and most influential grassroots environmental organizations in the United States. Sierra Club brings relevant expertise and perspective through its national community of volunteers, advocates, and grassroots organizers. Furthermore, Sierra Club has explicitly adopted an environmental justice mission in its conservation efforts. Sierra Club has an interest in protecting the health of its members and the environment in which its members reside that will be directly affected by the re-opening of the Refinery.

Amici Center for Biological Diversity is a non-profit organization dedicated to preserving, protecting, and restoring biodiversity, native species, ecosystems, and public lands. The Center has over 89,000 active members, each of whom shares a commitment to support the Center's work of conserving biodiversity and ecosystems. The Center has undertaken extensive campaigns and environmental law practices. This work has included policy advocacy for stricter Clean Air Act ("CAA") rules and limits on greenhouse gas pollution. The Center's work also includes advocating for environmental justice and efforts to curb air and water pollution in overburdened environmental justice communities. The Center members have spiritual, scientific, professional, aesthetic, and recreational interests in Virgin Islands' wildlife and habitat. The Center's members and staff regularly use and visit the coastal Caribbean areas—including St. Croix—to scuba, boat, fish, walk, take photographs, research and view native wildlife (including birds, sea turtles, marine mammals, corals, and other species), and engage in other

2

recreational pursuits. The Center's members have significant concerns about air pollution and other environmental damage from restarting the Refinery. Since at least 2019, The Center has opposed the restart of the Refinery.

## INTRODUCTION

Over 50 years ago, when first constructed and opened by Hess Oil Virgin Islands Corporation, the Refinery represented to many a shiny, modern economic development for the island of St. Croix. That shine, however, has worn off. After decades of deferred maintenance and little upgrade to the facility's equipment, the Refinery has fallen behind the times both economically and regulatorily. The woefully outdated Refinery has a bad track record of toxic pollution releases, fires, and non-compliance that threatens the health and safety of the neighboring community. Even so, PHRT is eager to rush headlong into a second attempt this decade to restart the Refinery. Given the dilapidated condition of the Refinery, and the lack of up-to-date environmental controls, it seems all but certain that the people of St. Croix are once again being asked to bare the risk of additional harm to public health, property, and the local environment.

This Court can ensure the risk is diminished significantly by upholding EPA's November 2022 determination of Prevention of Significant Deterioration ("PSD") applicability to the Refinery. This determination would serve to require PHRT to undertake important upgrades to essential refining processes and equipment, as well as to modernize the facility's air pollution control equipment. The likelihood of harm to the community of St. Croix would be greatly reduced under EPA's direction and permitting authority. What EPA is doing here is not just simply requiring a permit or a

3

determination that future operation of the Refinery won't further deteriorate local air pollution. Rather, EPA's PSD determination will trigger several physical changes to the facility that will directly protect public health and the local environment of St. Croix.

Indeed, under the CAA, the PSD program acts as a required safety precaution to protect public health. 42 U.S.C. § 7401. This determination, if upheld, will protect individual and local property, reduce the risk of short- and long-term health impacts, keep schools and businesses from having to be shut down due to malfunction at the Refinery, and will substantially reduce pollutants from entering the air and contaminating local drinking water. Thus, it is imperative that the Refinery complies with the PSD program to prevent further harm to the St. Croix community.

## ARGUMENT

### A.    REFINERY OPERATIONS HAVE HARMED THE HEALTH AND SAFETY OF THE ST. CROIX COMMUNITY FOR DECADES.

The Refinery has had a long and troubled history with the community of St. Croix since its inception. Before the opening of the Refinery, residents expressed concerns about the Refinery's placement and the trade winds which "would carry the plant's fumes and waste to the southern shore's 'magnificent beaches.'" Juliet Eilperin et al., *The Island Where It Rained Oil*, WASH. POST (Mar. 24, 2021), available at *www.washingtonpost.com/climate-environment/interactive/2021/biden-environmental-justice-refinery-st-croix/* (last visited Apr. 19, 2023). When brought to his attention, President Lyndon B. Johnson dismissed the concerns of the St. Croix community marking the

beginning of a consistent pattern of ignoring the community's concerns which continues today.

Decades of operation and failure to properly maintain essential process equipment ultimately led to catastrophic events, which culminated in the shutdown of the Refinery. Over the course of Hovensa's ownership, the Refinery leaked approximately 300,000 barrels of petroleum underground. Patricia Borns, *Limetree Hit with Fourth Class Action Lawsuit*, ST. THOMAS SOURCE (June 10, 2021), available at *https://stthomassource.com/content/2021/06/10/limetree-hit-with-fourth-class-action-lawsuit/*. In comparison, the infamous Exxon Valdez oil spill released 206,000 barrels of oil into the Alaskan coastline. B.A. Wells & K.L. Wells, *Exxon Valdez Oil Spill*, AM. OIL & GAS HIST. SOC'Y (Mar. 24, 2009), available at *https://aoghs.org/transportation/exxon-valdez-oil-spill/*(last visited Apr. 19, 2023). In 2011, Hovensa, EPA, and the Department of Justice reached a settlement regarding the Refinery's CAA violations and consequent harms to the St. Croix community. *HOVENSA LLC, Clean Air Act Settlement*, EPA, available at *https://www.epa.gov/enforcement/hovensa-llc-clean-air-act-settlement* (last updated Jan. 24, 2023). As part of this settlement, Hovensa had to pay a civil penalty of over $5.38 million. *Id.* Additionally, the Refinery owners were required to pay more than $700 million to incorporate "upgraded pollution controls, more stringent emission limits, and aggressive monitoring, leak-detection and repair practice" to lessen the Refinery's adverse impacts on nearby communities. *Id.* These measures were put in place because the Refinery had significant emissions of sulfur dioxide, nitrogen oxide, volatile organic compounds, and benzene. *Id*. These harmful pollutants can create smog, haze, and acid rain, all of which have adverse effects on

5

human health. *Nation's Second Largest Refinery to Pay $700 Million to Upgrade Pollution Controls at U.S. Virgin Islands Facility*, DOJ (Jan. 26, 2011), available at *https://www.justice.gov/opa/pr/nation-s-second-largest-refinery-pay-700-million-upgrade-pollution-controls-us-virgin-islands*.

Much of the settlement agreement was never implemented. Due to economic conditions, Hovensa shut down the Refinery in early 2012. Hovensa instead developed a plan to convert the Refinery into an oil storage facility. APPX. at 26. While the shutdown of the refining operation did reduce the risk of further air pollution impacts on the community, according to the EPA's status report, roughly 306,000 gallons of petrochemicals were not recovered from the groundwater located under the Refinery. *Hazardous Waste Cleanup: HOVENSA, LLC in Christiansted, U.S. Virgin Islands*, EPA, available at *https://19january2021snapshot.epa.gov/hwcorrectiveactionsites/hazardous-waste-cleanup-hovensa-llc-christiansted-us-virgin-islands_.html* (last visited Apr. 19, 2023).

Limetree became the subsequent owner of the Refinery after Hovensa filed for bankruptcy and sold it. Limetree's attempts to restart the Refinery created disastrous and immediate consequences to the St. Croix community. In December 2020, the Refinery's operations created exponential emission increases in hydrogen sulfide and sulfur dioxide, which are both criteria pollutants under the National Ambient Air Quality Standards ("NAAQS"). The Refinery released emissions at over 5,000 ppmv for several hours, greatly exceeding the established limit of 162 ppmv. APPX. at 27. This resulted in the evacuation of workers at the Refinery. *Id.* In January 2021, hydrogen sulfide and sulfur dioxide levels reached around 20,000 ppmv for several hours. *Id.* In February and May 2021, the Refinery's operations created a flare rainout,

which caused oil droplets to spread across St. Croix. *Id* at 3-4*.* After these flares occurred, several residents complained about noxious smells entering their homes. Fredreka Schouten, *A Caribbean Island Bet Its Future on Petrochemicals. Then Oil Rained Down on Homes*, CNN (May 29, 2021), available at *https://www.cnn.com/2021/05/29/us/epa-shutdown-limetree-st-croix-refinery/index.html*. In May 2021, another incident occurred that resulted in a flare releasing harmful chemicals including "petroleum coke, residual fuel oil, naphtha, intermediate distillates, and decant oil." Patricia Borns, *Limetree Agrees to Distribute Clean Water to More St. Croix Households*, St. Thomas Source (Oct. 28, 2021), available at *https://stthomassource.com/content/2021/10/28/limetree-agrees-to-distribute-clean-water-to-more-st-croix-households/* (last visited Apr. 19, 2023).

On August 4, 2022, after the Refinery was acquired by PHRT, disaster again ensued. Inadequate maintenance of the Refinery led to a smoldering fire that erupted from one of the Refinery's several coke piles. APPX. at 43. The fire raged for weeks until it was finally snuffed out on August 26, 2022. *Id.* In a subsequent investigation, EPA found the Refinery abounding with heavy corrosion, insufficient maintenance, and inadequate safety and operating procedures. *Id*. PHRT did not perform mandated maintenance at the coke piles for approximately one year, only providing EPA with a maintenance plan after the fires had been extinguished. *Id*. This incident was well in line with the Refinery's consistent history of negligent maintenance that has caused catastrophic harms on human health and the environment in the St. Croix community.

These incidents created dire impacts on the St. Croix community. The restart of the dilapidated Refinery resulted in the closure of schools and government offices, mobilization of the Virgin Islands National Guard and Fire Service, produced noxious odors, and increased the occurrence of headaches and nausea. Hundreds of people called and emailed EPA to complain about the Refinery and the damage it was causing in their community. Alexis Benveniste & Fredreka Schouten, *St. Croix Refinery that Rained Oil on Neighborhoods is Shutting Down Indefinitely*, CNN (Jun. 21, 2021), available at *www.cnn.com/2021/06/21/business/limetree-bay-shutdown/index.html* (last visited Apr. 19, 2023). Because of the sheer volume of CAA violations and health impacts to the St. Croix community, EPA used emergency measures under Section 303 of the CAA to shut down the Refinery for a second time in a decade.

For the past decade, the community of St. Croix has feared and still fears the Refinery's potential to inflict harm on their health and welfare. A survey of St. Croix residents in the summer of 2021 revealed the pervasiveness of this fear. The survey found that approximately 80% of responders expressed distrust that the Refinery owners would report environmental problems impacting the community. *Environmental Justice Begins in St. Croix*, BENNINGTON COLL., available at *https://www.bennington.edu/center-advancement-of-public-action/environment-and-public-action/environmental-justice-begins-st* (last visited Apr. 19, 2023).

The fear within the community is based on growing evidence of real impacts on public health. For example, a 2014 study by the University of the Virgin Islands "found that nearly twice as many residents 'experienced asthmatic conditions during the past five years' compared with those living

8

outside it, and that more than twice as many had chronic bronchitis." Juliet Eilperin, *supra* page 4. Similarly, the Virgin Islands Central Cancer Registry found that from 2003-2013, cancer deaths were higher than the rate of deaths caused by heart disease. *Virgin Islands Central Cancer Registry*, U.S. VI DEP'T OF HEALTH, available at *https://doh.vi.gov/programs/chronic-disease-and-prevention/virgin-islands-central-cancer-registry* (last visited Apr. 19, 2023). This is an alarming statistic considering the Refinery's proximity to the St. Croix community. A University of Texas study found that people located within 0-10 miles of an oil refinery had a significantly higher chance of developing cancer. Stephen B. Williams, et. al, *Proximity to Oil Refineries and Risk of Cancer: A Population-Based Analysis.* 4 JNCI CANCER SPECTRUM, 1, 4 (2020). For the St. Croix community, these studies reveal far more than mere statistical data—they corroborate the real experiences of community members.

The personal experiences of Amici members and supporters in St. Croix validate their fears of the devastation that restarting the Refinery without PSD requirements will cause. For example, Ariela Hayes described how while she was growing up on the island, the Refinery polluted the island's air, leaked oil underground, and created noxious fumes that could be smelled in the nearby neighborhoods. Declaration of Ariela Hayes in Support of Motion to Intervene at ¶ 6-7, *Port Hamilton Refining and Transportation, LLLP v. United States Environmental Protection Agency*, No. 23-1094 (3d. Cir. 2023). As an adult, Ariela realized that the sickness and cancer diagnoses she heard so much about in her youth were most likely caused by the Refinery. *Id.* ¶ 8. After the incidents in 2021, community members got nauseous from the noxious fumes and from drinking contaminated water. *Id*. ¶ 12. Community members became

weaker, with some even falling. *Id*. Many got sick, and some died from the sickness. *Id.* Ariela shared that even after all the harm that the St. Croix community has faced, the local government refuses to collect and share the stories of community members and their fears of the Refinery. *Id.* ¶ 14. Ariela expressed her concerns about the Refinery in consideration of her own health and the health of her mother and young son who live with her. *Id*. ¶ 17.

Similarly, Beecher Cotton lives in the Clifton Hill neighborhood in St. Croix, about a quarter mile north of the Refinery. Declaration of Beecher Cotton in Support of Motion to Intervene at ¶ 2, *Port Hamilton Refining and Transportation, LLLP v. United States Environmental Protection Agency*, No. 23-1094 (3d. Cir. 2023). He has been a resident since 2019. *Id*. During his time in St. Croix, Beecher experienced noxious odors and groundwater pollution from the Refinery's operations resulting from leakage into the island's groundwater aquifer system. *Id*. ¶ 4. Beecher noted that despite the Refinery's harmful impact on the St. Croix community, the local government did nothing to prevent the Refinery from reopening in 2020. *Id*. ¶ 6. After the February 2021 incident, Beecher experienced medical symptoms. His eyes were closed shut, and his face turned red. *Id*. ¶ 8. He could not sleep in the days after the incident, and the deafening noises from the Refinery caused psychological damage. *Id*. Limetree finally reached out to Beecher two weeks after the February incident to notify him that his cistern water had been contaminated. *Id.* ¶ 9. Beecher relies on his cistern water for showering and feeding his sheep. *Id*. ¶ 10. In March, Beecher checked his roofs at the recommendation of his friend who works at the Refinery and once again found oil droplets. *Id*. ¶ 12. Limetree offered Beecher $2,000 to sign a release of claims document. *Id*. ¶

13. He refused. *Id.* Like Ariela, Beecher is worried about the health of himself, his loved ones, and his community. *Id*. ¶ 17-18.

If the Refinery is allowed to restart operations, the St. Croix community will once again be placed in harm's way. EPA's PSD permit requirement is the only way to assure that physical changes are made to the Refinery so that harmful pollutants are controlled properly to protect the public health of the St. Croix community.

## B.    THE PSD PERMIT IS A NECESSARY REQUIREMENT TO ENSURE THE PUBLIC HEALTH OF NEARBY COMMUNITIES.

Amici want the Court to recognize that what is at stake in a PSD determination is not just a technical regulatory requirement. The PSD program is more than a mere requirement to obtain a permit. PSD program compliance, as with CAA compliance more broadly, is primarily about protecting public health and welfare. These considerations have been ignored for too long. Amici fully support EPA's decision to follow applicable air pollution control law in the interest of public health.

Generally, the CAA aims to protect the public health and welfare of local communities from air pollution. 42 U.S.C. § 7401(a)(2). The CAA directly states that it aims:

> (1) to protect public health and welfare from any actual or potential adverse effect which in the Administrator's judgment may reasonably be anticipate to occur from air pollution or from exposures to pollutants in other media, which pollutants originate as emissions to the ambient air), notwithstanding attainment and maintenance of all national ambient air quality standards; (2) to preserve, protect, and enhance the air quality in national parks, national wilderness areas, national monuments, national seashores, and other areas of special national or regional natural, recreational, scenic, or historic value; (3) to insure that economic

11

growth will occur in a manner consistent with the preservation of existing clean air resources; (4) to assure that emissions from any source in any State will not interfere with any portion of the applicable implementation plan to prevent significant deterioration of air quality for any other State; and (5) to assure that any decision to permit increased air pollution in any area to which this section applies is made only after careful evaluation of all the consequences of such a decision and after adequate procedural opportunities for informed public participation in the decision-making process.

42 U.S.C. § 7470.

Within the legislative history of the CAA Act I Amendments, Congress explicitly and repeatedly designated "public health and welfare" as the motivating force for requiring a PSD permit. Clean Air Act Amendments of 1977, Pub. L. 95-95, 91 Stat. 685. Indeed, the PSD permit was "established to protect human health and the environment and to serve as ceilings for acceptable maximum air quality concentrations." Bernard F. Hawkins, Jr. & Mary Ellen Ternes, *The New Source Review Program: Prevention of Significant Deterioration and Nonattainment New Source Review*, *in* THE CLEAN AIR ACT HANDBOOK 131, 131 (2d. ed. 2004). As the Ninth Circuit has recognized:

Three features of the PSD program figure in this review of EPA decisions. First, all such new sources must meet "New Source Performance Standards," which impose various emissions limitations. *Id.* § 7411(a), (f). EPA periodically promulgates New Source Performance Standards under its rulemaking authority. *Id.* § 7411(b)(1)(B). Second, the PSD program requires all new source applicants such as Spokane to install the "best available control technology" ("BACT") to reduce air pollution. *Id.* § 7475(a)(4). Determination of the best available control technology is made "on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs." *Id.* § 7479(3). Third, EPA regulations for the PSD program require notice, a comment period, and a public hearing on applications for new sources of air

pollution. *See* 40 C.F.R. §§ 124.10–124.12. Upon final approval of an application by a state agency, participants in the comment process may petition the EPA Administrator in Washington, D.C. for administrative review. *Id.* § 124.19.

*Citizens for Clean Air v. E.P.A.*, 959 F.2d 839, 842 (9th Cir. 1992).

In this case, each of these three features is pivotal to the community's interests. First, as EPA previously recognized, most of the incidences occurred during the Refinery's attempts to restart. These disastrous attempts resulted in clear violations of the New Source Performance Standards ("NSPS") provisions. APPX at 27. To date, nothing has indicated that these violations have been cured and will not occur again. Incorporating NSPS compliance into a PSD permit review would require both EPA and public involvement to ensure that proper emission standards and controls are implemented by PHRT.

Second, there is a long history of lack of opportunity for public participation when it comes to the Refinery's authorization. The PSD program will serve as a corrective measure for the people of St. Croix. The PSD program has important requirements involving the community in various stages of the process. These requirements are crucial to ensure that the St. Croix community can have a voice in the activities that will directly impact them.

Under the PSD program, there are three ways citizens can participate in the New Source Review ("NSR") permitting process. *Participate in the Permitting Process*, EPA, available at *https://www.epa.gov/nsr/participate-permitting-process* (last visited Apr. 19, 2023). Citizens may comment on notices published by EPA, request public hearings, and appeal permits issued by EPA. *Id.* The acting agency, EPA, is obligated to notify the public if there is a draft permit. 40 CFR 51.165(i).

13

Finally, to be eligible for a PSD permit, the Refinery would need to install Best Available Control Technology ("BACT"). 42 U.S.C. § 7475(a)(4). EPA added BACT as a necessary component to install new major stationary sources to decrease air pollution. *United States v. EME Homer City Generation L.P.*, 823 F. Supp. 2d 274, 279 (W.D. Pa. 2011). The purpose of the BACT requirement is to ensure that new or modified sources of air pollutants are equipped with the most effective pollution control technologies available. The BACT requirement applies to all air pollutants regulated under the CAA, including hazardous air pollutants.

The BACT requirement is a technology-based standard that is designed to be adaptable and flexible, allowing for the use of a range of pollution control technologies. This flexibility ensures that the BACT requirement can be applied to a wide range of pollutants and industries, and it promotes innovation and the development of new pollution control technologies. As EPA has stated in its PSD Determination:

> A stationary source generally includes all pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under common control. 40 C.F.R. 52.21(b)(5) and (b)(6). Since petroleum refineries are on the list of 28 source categories, if the potential to emit of any regulated NSR pollutant exceeds 100 tons/year, the source is considered a major stationary source and a PSD permit is required. Once a source is a major stationary source, a PSD permit is required not only for pollutants exceeding the 100 tons/year threshold but for any pollutant that has a potential to emit over the "significant" level in 40 C.F.R. 52.21(b)(23).

APPX at 22.

The BACT requirement is a crucial aspect of the PSD program. The BACT requirement ensures that new or modified major stationary sources of air

pollutants are equipped with the most effective pollution control technologies available. BACT also promotes innovation and the development of new pollution control technologies. The PSD program is a vital tool in protecting air quality and public health, and it is important that its requirements are enforced and followed.

**C.    EPA'S REACTIVATION POLICY AND THE *MONROE* FACTORS ARE NECESSARY MECHANISMS TO PROTECT THE PUBLIC HEALTH AND WELFARE OF ST. CROIX.**

EPA considers a plant that has been idle for two years or more to be "permanently closed." *In the Matter of Monroe Electric Generating Plant Entergy Louisiana, Inc.*, Proposed Operating Permit, Petition No. 6-99-2 1, 7 (June 11, 1999). *Monroe*'s guidance conveys the importance of balancing economic and technical feasibility with environmental protection. The 2018 Determination was based on insufficient information and did not thoroughly consider the *Monroe* factors. In the 2022 Determination, EPA more comprehensively analyzed the *Monroe* factors and determined that the Refinery required a PSD permit.

EPA's 20 PSD Determination and analysis of the *Monroe* factors took environmental justice considerations into account. These considerations were conspicuously absent from EPA's 2018 Determination. EPA and the Executive Branch under President Biden increasingly seek to emphasize environmental justice considerations in their actions. This is reflected in EPA's *Monroe* analysis here, which details the past and present harms the condition of the Refinery has inflicted on the marginalized and environmentally overburdened community of St. Croix.

*Monroe* established the factors that EPA will consider when issuing operating permits for major stationary sources of air pollutants. The six factors are: (1) Length of time the facility has been shut down, (2) Time and capital needed to restart, (3) Evidence of intent and concrete plans to restart, (4) Cause of the shutdown, (5) Status of permits, and (6) Maintenance and inspections during shutdown. APPX. at 31 (citing *Monroe*, Petition No. 6-99-2). In determining these factors, EPA considers the nature and extent of the emissions from the facility, the available pollution control technologies, and the economic and technical feasibility of implementing those technologies. *See Monroe*, Petition No. 6-99-2 (discussing the various considerations EPA will apply to the Reactivation analysis). These considerations are especially crucial for understanding environmental justice, and EPA has acted in furtherance of environmental justice by analyzing them here.[1]

By applying the *Monroe* factors to the Refinery, EPA has acted in accordance with the purpose of the CAA as well as environmental justice guidance. The St. Croix community is already marginalized and environmentally overburdened. A PSD Determination requiring BACT technology can alleviate these burdens and ensure that these harms are no

---

[1] EPA's reactivation policy, which is based upon its decision in *Monroe*, should be considered a valid, binding interpretation of CAA PSD provisions and EPA's implementing regulations. This is true even though the policy was not subject to rulemaking. *Monroe,* like the determination being challenged as final agency action in this case, are the products of an adjudicatory process at EPA. It is well established that agencies are free to announce and develop rules in an adjudicatory setting, and that such rules have precedential effect in future adjudications by the agency. *See, e.g., NLRB v. Bell Aerospace Co., 416* U.S. 267, 294 (1974); *Puerto Rico & v. EPA*, 35 F.3d 600, 607 (3d Cir. 1994)

longer compounded. In the case of *Cenco*, for example, EPA required the Cenco Refinery to install BACT. *Cenco Refinery Will Upgrade Air Pollution Controls*, EPA (Jan. 18, 2001), *https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/2f85 f0d29181e072852570d8005e1413.html*. The BACT at the Cenco Refinery reduced emissions up to 85%. *Id.* Here, the Refinery is significantly older and even more outdated than the Cenco Refinery. EPA's application of the *Monroe* factors in this case, and a determination that BACT must be structurally implemented, will result in significant emissions decreases and allay the pervasive fear of the Refinery throughout the St. Croix community. Furthermore, this determination is in line with Congress's purpose in enacting the CAA.

The legislature never intended for refineries to operate forever. Resuming operations to a facility that has been shut down and needs significant investments is against Congress's objectives. EPA purposefully and consistently applies the *Monroe* factors for public health and welfare. This is why EPA's PSD permitting process, sharpened by environmental justice considerations, is so important. What has occurred at the facility—and is guaranteed to occur again without proper emission controls—should not be normalized and will set a harmful precedent for communities in proximity to other refineries.

The Refinery without substantial modification and improvement to air pollution control technologies is simply dangerous and unsuitable for operation. EPA's *Monroe* factors indicate that lack of investment in a facility leads to the decaying of a facility. Restarting the Refinery with minimal

investments is like putting 20-year-old tires on a Model T to get it back on the road. Without investments into the Model T, it would be scrapped.

Here, because the Refinery was shutdown, no further investments into improvements were made. PHRT was able to purchase the Refinery at an extremely low price precisely because of the Refinery's derelict condition. PHRT claims that it does not intend to continue the patterns of previous owners. Yet, PHRT continues to fight tooth-and-nail EPA's requirements which will ensure that the Refinery is structurally safe.

## D.    EPA'S 2022 DETERMINATION FURTHERS ITS COMMITMENT TO PROTECT ENVIRONMENTAL JUSTICE COMMUNITIES.

Executive Order 12898 guides federal agencies to consider environmental justice in their decision-making processes. Executive Order 12898 provides that agencies "shall make achieving environmental justice part of [their] mission by identifying and addressing . . . disproportionately high and adverse human health or environmental effects of . . . activities on minority populations and low-income populations." Exec. Order No. 12898, 59 Fed. Reg. 7629 at § 1-101 (Feb. 11, 1994). Furthermore, President Biden enacted Executive Order 14008 to hold polluters accountable and to protect disenfranchised communities from further harm. Exec. Order No. 14008, 86 Fed. Reg. 7619 at § 219 (Jan. 27, 2021). Executive Order 14008 § 219 states that Biden's administration emphasizes the importance of securing environmental justice initiatives for "communities that have been historically marginalized and overburdened by pollution." *Id.* EPA's PSD Determination is in furtherance of these commitments because EPA has considered the potential impacts of the Refinery on the already marginalized and environmentally overburdened community of St. Croix.

18

The people of St. Croix have been the victims of notorious environmental harms directly caused by the Refinery. The Refinery has a long history of environmental violations, including emissions of hazardous air pollutants and other contaminants that pose a significant risk to public health. The local community has been adversely affected by these pollutants, leading to increased incidences of respiratory illness and other health problems.

EPA has recognized that the location of the Refinery is in proximity to an environmental justice community. Multiple EPA Administrators have spoken in support of requiring the PSD permit and conducting an environmental justice analysis. EPA Administrator Michael S. Regan stated:

> As Administrator, I am committed to prioritizing the health and safety of underserved and overburdened communities across this country and holding polluters accountable. That is why the EPA is using its full authority under the law to require this facility to analyze its impact on air quality and use the latest air pollution controls before it resumes operations. This will ensure protections for St. Croix by requiring the refinery to operate in compliance with environmental laws designed to protect people's health and the environment.

*EPA Uses Emergency Powers to Protect St. Croix Communities and Orders Limetree Bay Refinery to Pause Operations*, EPA (May 14, 2021), available at *www.epa.gov/newsreleases/epa-uses-emergency-powers-protect-st-croix-communities-and-orders-limetree-bay-refinery*. EPA Regional Administrator Lisa F. Garcia stated:

> Today we are continuing to make good on our promise to deliver environmental justice and ensure that EPA protects the health of every community, regardless of race, zip code or income. EPA takes seriously our responsibility to the nearby communities, which have carried the burden of mishaps at this facility for far too long.

*Id.*

The PSD permit will require a great deal of air quality analysis and structural upgrades to BACT. These requirements will greatly benefit the community of St. Croix, which will be most impacted by a restart of the Refinery. Failure to impose these requirements will put the already marginalized and overburdened community of St. Croix at risk of facing repeated catastrophe. In October 2021, the EPA released the agency's strategic plan for 2022-2026. This plan includes substantial environmental justice goals. EPA, FY 2022-2026 EPA STRATEGIC PLAN DRAFT (2021), available at *https://www.epa.gov/system/files/documents/2021-10/fy-2022-2026-epa-draft-strategic-plan.pdf.* One of the EPA's environmental goals is to "ensure clean and healthy air for all communities." *Id. a*t 38-39. According to data collected by EPA, around 97 million Americans live in an area with excess emissions of NAAQS pollutants. *Id.* St. Croix is one such community and has been disproportionately impacted by the Refinery's operations. These operations have on multiple occasions exceeded limitations specified in the NAAQS including hydrogen sulfide, sulfur dioxide, and nitrogen dioxide. EPA, *Criteria Air Pollutants,* available at *https://www.epa.gov/criteria-air-pollutants.*

**E.    THE REFINERY'S ABYSMAL CONDITION AND PHRT'S FAILURE TO FULFILL CAA OBLIGATIONS IMPLEMENT PREVENTATIVE MEASURES.**

The CAA explicitly mandates that the operators of stationary sources have an obligation to determine hazards that may be released in a potential operational accident, take measures to prevent future emission releases, and

lessen the potential consequences of an accidental release. 42 U.S.C. § 7412(r)(1). The CAA further mandates that:

> . . . the owner or operator of stationary sources at which a regulated substance is present in more than a threshold quantity to prepare and implement a risk management plan to detect and prevent or minimize accidental releases of such substances from the stationary source, and to provide a prompt emergency response to any such releases in order to protect human health and the environment.

42 U.S.C. § 7412(7)(B)(2). An EPA inspection of the PHRT Refinery revealed multiple alarming structural and systemic failures within the facility. These issues demonstrate that PHRT is already running afoul of its CAA obligations under § 7412(r)(1).

EPA inspectors observed "numerous examples of corrosion, including extreme corrosion and in many cases to a degree resulting in extreme deterioration (exfoliation)." EPA (APPX) at 222. Components that were observed to have major corrosion issues include valves, flanges, pipes, nuts/bolts, and pressure relief devices. *Id*. EPA inspectors also observed exposed wires in "Class I Division I electrical system areas," which are areas with flammable substances. *Id*. Exposed live wires are particularly dangerous as they pose the threat of a possible ignition source. *Id*.

PHRT's lackluster response to the inspection raises alarming concerns about PHRT's intentions to modernize the Refinery into CAA compliance. PHRT could not provide the inspectors with a current hazard assessment for hazardous substances such as hydrogen sulfide and sulfur dioxide, both of which are criteria pollutants under NAAQS. *Id*. at 220. PHRT also failed to provide many important documents regarding the overall maintenance of the

Refinery's operations. *Id.* PHRT never established preventative maintenance programs such as a hazard assessment, process design, operating procedures, and operators training records. *Id.* at 220-221. PHRT's pattern of systemic hazardous conditions repeats the failures of its predecessors and continues to fail the people of St. Croix.

The numerous structural and systemic failures of the Refinery have repeatedly culminated in catastrophe for the environment and community members of St. Croix. Limetree's initial operations in December 2020 resulted in a small flare. Brief for U.S. Environmental Protection Agency at 15, *Port Hamilton Refining and Transportation, LLLP v. United States Environmental Protection Agency*, No. 23-1094 (3d. Cir. 2023). Another flare occurred in February 2021 that created a mist of oil and water spreading across St. Croix. EPA (APPX) at 454. Community members reached out to Limetree's Incident Command Response team out of concern for their cisterns, cars, and homes contaminated by the oil droplets. *Id.* In May 2021, the Refinery's operations created a mixture of oil and water that caused oil droplets to fall west of the Refinery. *Id.* at 466-467. After PHRT came into possession of the Refinery, a fire occurred in a coke pile in the North Coke Dome in August 2022. *Id.* at 219. The fire smoldered for approximately two weeks until it was extinguished. *Id.* PHRT stood by while the coke piles had been unattended to for more than a year before the fire broke out. *Id.*

EPA's inspection demonstrates a myriad of systemic failures that are continuing to occur at this Refinery. The Refinery has subjected the community of St. Croix to recurring incidents of environmental devastation. Furthermore, the hazardous conditions pose an additional risk of potential

environmental consequences. Contrary to popular belief, the ongoing failures prove that you can indeed set fire to the rain.

///
///
///

## CONCLUSION

The people of St. Croix continue to live in fear of the Refinery and what impending harms it may bring to their health. The people of the U.S. Virgin Islands have endured enough suffering from the Refinery's inadequate maintenance. Congress originally created the CAA to ensure that public health considerations are prioritized. The PSD program was established in furtherance of this goal. Therefore, it is imperative that the Refinery abides by CAA requirements by applying for and receiving a valid PSD permit.

Date: April 19, 2023

Respectfully submitted,

s/Michael Ray Harris

Michael R. Harris
Associate Professor of Law

Rajeev Venkat
Natasha De La Cruz
Alexius Paul
Student Attorney

Environmental Justice Clinic
Vermont Law & Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT  05068
(802) 831-1364
mrharris@vermontlaw.edu

*Counsel for St. Croix Environmental Association, Sierra Club, and Center for Biological Diversity*

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 27(d)**

Pursuant to Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6), I certify that Cambria, a proportionally spaced serif font, in size 14, in plain, roman style type, with italics for emphasis and case names, was used for this brief. Pursuant to Federal Rule of Appellate Procedure 27(d)(2), I further certify that this motion is 5,912 words, excluding the accompanying documents authorized by Rule 27(a)(2)(B), which is within the word limit of 6, 500 words.

Date: April 19, 2023

Respectfully submitted,

s/Michael Ray Harris

Michael Ray Harris

Associate Professor of Law

Environmental Justice Clinic

Vermont Law & Graduate School

PO Box 96, 164 Chelsea Street

South Royalton, VT 05068

(802) 831-1364 (main)

(802) 831-1631 (fax)

mrharris@vermontlaw.edu

## ELECTRONIC DOCUMENT CERTIFICATE

Pursuant to Third Circuit Local Rule of Appellate Procedure 31.1(c), Amici Curiae St. Croix Environmental Association, Sierra Club, and Center for Biological Diversity hereby certify that the text of the electronic brief is identical to the text in the paper document and that the document has been scanned with Avast Premium Security Antivirus Version 23.3.6058 (build 23.3.8047.781).

## **CERTIFICATE OF BAR ADMISSION**

### **3d Cir. L.A.R. 28.3(d) Bar Membership Certification**

Pursuant to Third Circuit Local Rule of Appellate Procedure 28.3(d), Amici Curiae St. Croix Environmental Association, Sierra Club, and Center for Biological Diversity hereby certify that Michael R. Harris is a member of the bar of this Court.

Date: April 19, 2023

Respectfully submitted,

s/Michael Ray Harris

Michael Ray Harris

Associate Professor of Law

Environmental Justice Clinic

Vermont Law & Graduate School

PO Box 96, 164 Chelsea Street

South Royalton, VT 05068

(802) 831-1364 (main)

(802) 831-1631 (fax)

mrharris@vermontlaw.edu

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Federal Rule of Appellate Procedure 25(c)(1) and (d) and Third Circuit Local Rule 113.4(b) and 113.4(c), I certify that this Amicus Brief and accompanying was filed electronically through the court's docketing system. Counsel for the parties are registered to use Third Circuit CM/ECF and receive service by the NDA. All parties to this case are Filing Users and are served electronically by the Notice of Docket Activity.

Date: April 19, 2023

Respectfully submitted,

<u>s/Michael Ray Harris</u>

Michael Ray Harris

Associate Professor of Law

Environmental Justice Clinic

Vermont Law & Graduate School

PO Box 96, 164 Chelsea Street

South Royalton, VT 05068

(802) 831-1364 (main)

(802) 831-1631 (fax)

mrharris@vermontlaw.edu