# United States Court of Appeals for the Third Circuit

## CASE NO. 23-1094

———————————————

PORT HAMILTON REFINING AND TRANSPORTATION, LLLP

PETITIONER,

VS.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

RESPONDENT.

———————————————

## REPLY BRIEF OF
## PORT HAMILTON REFINING AND TRANSPORTATION, LLLP

On review from the November 16, 2022 Determination
of the Environmental Protection Agency

Andrew C. Simpson
ANDREW C. SIMPSON, P.C.
2191 Church St., Ste. 5
Christiansted, VI 00820
340-719-3900
asimpson@coralbrief.com
www.coralbrief.com

# TABLE OF CONTENTS

**Page**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.   Chevron deference is inapplicable because the CAA's preconstruction requirements are unambiguous . . . . . . . . . . . . . 3

    A.   EPA attempts to create ambiguity where none exists . . . . . 4

    B.   The language of the statute is unambiguous . . . . . . . . . . . 5

    C.   The legislative history supports the PSD provisions' unambiguous interpretation . . . . . . . . . . . . . . . . . . . . . . . . 6

    D.   There is no indication that Congress authorized EPA to make rules governing existing facilities that have not gone through a major modification . . . . . . . . . . . . . . . . . . . . 9

II.  EPA is entitled to no deference at Chevron step two. . . . . . . . . 12

III. EPA's interpretation of the word "new" is not entitled to Auer deference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV.  EPA's actions were arbitrary and capricious . . . . . . . . . . . . . . . . 20

    A.   The 2018 Determination that the refinery had been operating in an idled-mode was final . . . . . . . . . . . . . . . . . 20

    B.   EPA arbitrarily and capriciously determined that Limetree never operated the refinery . . . . . . . . . . . . . . . . . 22

    C.   EPA contorts the record to support its assertion that the major emitting facility had not been operating between 2012 to the present. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

D. EPA's 2022 determination disregards significant record information showing that there was never an intent to permanently shut down the refinery . . . . . . . . . . . . . . . . . . . 26

E. EPA inaccurately and misleadingly characterized numerous record documents and events . . . . . . . . . . . . . . 29

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Certificates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# TABLE OF AUTHORITIES

Page(s)

### Cases

*Auer v. Robbins*,
    519 U.S. 452 (1997) .......................................................... 16, 18, 19, 20

*Cazun v. Att'y Gen. of the United States*,
    856 F.3d 249 (3d Cir. 2017) ............................................................... 5

*Chevron v. Chevron U.S.A., Inc. v. Natural Resources Defense
    Council, Inc.*,
    467 U.S. 837 (1984) ................................................................. *passim*

*Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human
    Servs.*,
    730 F.3d 291 (3d Cir. 2013) ............................................................. 13

*Christensen v. Harris County*,
    529 U.S. 576 (2000) ....................................................................... 12

*City of Arlington, Tex. v. F.C.C.*,
    569 U.S. 290 (2013) ....................................................................... 10

*Denis v. Att'y Gen. of United States*,
    633 F.3d 201 (3d Cir. 2011) ............................................................... 6

*Env't Def. v. Duke Energy Corp.*,
    549 U.S. 561 (2007) .................................................................... 5, 20

*FDRLST Media, LLC v. National Labor Relations Board*,
    35 F.4th 108 (2022) (Matey, J., concurring) ...................................... 12

*Hagans v. Comm'r of Soc. Sec.*,
    694 F.3d 287 (3d Cir. 2012) ............................................................. 10

*Kisor v. Wilkie*,
    588 U.S. __, 139 S. Ct. 2400 (2019) ............................................. 18, 19

*Marshall v. Lansing,*
  839 F.2d 933 (3d Cir. 1988) ............................................................... 26

*United States v. Mead Corp.,*
  533 U.S. 218 (2001) ................................................................. 9, 10, 12

*Russello v. United States,*
  464 U.S. 16 (1983) ................................................................................ 9

*Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum.
  Servs.,*
  58 F.4th 696 (3d Cir. 2023) ................................................................ 6

*Singh v. Att'y Gen. of United States,*
  12 F.4th 262 (3d Cir. 2021) ................................................... 4, 13, 14

## Statutes and Codes

United States Code
  Title 42, Section 7411(a)(4) ........................................................ 16, 20
  Title 42, Section 7475 .......................................................................... 14
  Title 42, Section 7475(a) .................................................... 4, 13, 14, 15
  Title 42, Section 7479(2)(C) ......................................................... 5, 16, 22
  Title 42, Section 7491(b)(2)(A) ........................................................ 9, 11
  Title 42, Section 7601(a)(1) ................................................................ 10

## Rules and Regulations

Code of Federal Regulations
  Title 40, Section 51.166(b)(2)(i) .................................................... 20, 22
  Title 40, Section 52.21(a)(2)(iii) ....................................................... 20
  Title 40, Section 52.21(b)(6) ......................................................... 28, 30
  Title 40, Section 52.21(b)(7)(i) .......................................................... 18
  Title 40, Section 124.19(j) .................................................................. 15
  Title 42, Section 52.21 ........................................................................ 16
  Title 42, Section 52.21(a)(2)(iii) ........................................................ 16

## Other Authorities

7 Environmental Policy Division, Congressional Research Service, A Legislative History of the Clean Air Act Amendments of 1977, Serial No. 95-16 (Comm. Print August 1978) ............................ 7

Environmental Policy Division of the Congressional Research Service, A Legislative History of the Clean Air Act Amendments of 1977 (Comm. Print 1978) .......................................... 6

H.R. 10498 ....................................................................................... 7

H.R. Rept. No. 94 -1175, 94th Cong. 2d Sess. 7 (1976) ........................ 7, 8

https://www.epa.gov/sites/default/files/2020-12/documents/response_to_comments-limetree_pal_permit.pdf (last accessed Apr. 18, 2023) ........................................................ 15, 19

https://www.epa.gov/sites/default/files/2021-04/documents/withdrawal_decision_applicability.limit_.permit.signed.pdf (last accessed Apr. 18, 2023) ............................................ 15

*In the Matter of Monroe Electric Generating Plant Entergy Louisiana, Inc., Proposed Operating Permit*, Petition No. 6-99-2 (June 11, 1999) ................................................................................... 14

# INTRODUCTION

EPA's brief confirms it lacked legal authority and a factual basis for its November 2022 Determination, which abruptly reversed the Agency's 2018 determination that the refinery had been in idle mode since 2012.

While the Clean Air Act (CAA) and its implementing regulations limit the Prevention of Significant Deterioration (PSD) program to newly constructed facilities and existing facilities that have undergone an emissions-increasing modification, EPA seeks to unilaterally expand the scope of its authority by including existing facilities that have not undergone such a modification. EPA's statutory contortions fail not just because they violate well-established canons of statutory construction, but also because they are flatly contradicted by legislative history.

Even if the statute or regulations were ambiguous, EPA's interpretation deserves no deference, as Congress did not authorize EPA to apply PSD review beyond the two instances deliberately selected by Congress. Deference is uniquely inappropriate here, where EPA's ersatz Reactivation Policy cobbled together from earlier, case-specific, determinations that EPA describes as a "non-binding analytical

framework"—a framework based upon subjective considerations EPA previously recognized as producing "inconsistent results."

EPA's 2022 Determination is rendered more vulnerable by internal inconsistencies, misrepresentations, and selective facts from its own record, all of which betray the arbitrary and capricious nature of its action. Perhaps the most egregious falsehood is EPA's claim that the refinery never resumed operations in 2020-21—an assertion that EPA needs to advance to support the application of its so-called policy. EPA's own documents demonstrate that this assertion is false.

Equally disingenuous is EPA's claim that the 2018 Determination—that the refinery had been continuously idled since 2012 (and was thus not subject to PSD review)—was a tentative determination. EPA decisively concluded that the refinery had been continuously idled since 2012 while leaving open the possibility that PSD review might be *independently* triggered if the refinery underwent emissions-increasing modifications. That possibility did not make the idled-status conclusion tentative. Nor did it provide reason for Port Hamilton to question the idled-status finding when it decided to purchase the refinery.

This Court should vacate the 2022 Determination in its entirety to prohibit EPA from claiming authority that Congress never gave it; from acting in an arbitrary and capricious manner in its efforts to revisit its 2018 Determination; and from violating Port Hamilton's justified reliance interests.

## ARGUMENT

### I.    *CHEVRON* DEFERENCE IS INAPPLICABLE BECAUSE THE CAA'S PRECONSTRUCTION REQUIREMENTS ARE UNAMBIGUOUS.

In *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984), the Supreme Court held that when Congress has legislatively delegated powers to an administrative agency, a court may not substitute its own interpretation of a statute for a reasonable interpretation made by the agency. The application of *Chevron* is governed by a well-established two-part analysis. "The first step of the *Chevron* inquiry requires [this Court] to ask whether the statute is ambiguous" as to the "specific issue under consideration." *Singh v. Att'y*

*Gen. of United States*, 12 F.4th 262, 271–72 (3d Cir. 2021). If not, then the Court does not defer to the agency's interpretation. *Id.*[1]

The preconstruction PSD requirements at issue in the Petition are unambiguous. They were enacted as part of the Clean Air Act Amendments of 1977 ("CAA Amendments"). *See* Pub. L. 95-95, § 1 ("Short Title"), § 127 (adding new Part C—PSD). The specific statutory language in question, 42 U.S.C. § 7475(a), is straightforward: PSD applies to any "major emitting facility on which construction is commenced after August 7, 1977."

### A.  EPA ATTEMPTS TO CREATE AMBIGUITY WHERE NONE EXISTS.

EPA argues that the PSD provision in Section 7475(a) "encompasses a facility that was permanently shut down and then, after many years of dormancy, seeks to restart where that process involves at least some amount of "construction." EPA brief at 38. Such authority exists nowhere in the statute. Indeed, EPA's interpretation is contradicted by Congress's intent, as expressed both in the language of

---

[1] As discussed below, the second step, applicable only if the statute is ambiguous, is to determine if the agency's interpretation is reasonable, in which case the court will defer to the agency's interpretation. *Chevron*, 467 U.S. at 842–43, (1984).

the statute and the extensive Congressional debates over adoption of the CAA Amendments.

## B.   THE LANGUAGE OF THE STATUTE IS UNAMBIGUOUS.

When determining congressional intent, a Court "look[s] first to the plain text of the statute." *Cazun v. Att'y Gen. of the United States*, 856 F.3d 249, 255 (3d Cir. 2017). Here, the statute applies to facilities where construction began after the effective date of the CAA Amendments. In other words, it applies to newly built facilities, and anything built before that is grandfathered. Originally, Congress limited the PSD preconstruction requirements to new facilities but later adopted a technical amendment to apply it to an *existing* facility that undergoes an emissions-increasing modification. *See* 42 U.S.C. § 7479(2)(C) and *Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 568 (2007) (describing technical amendment). Consequently, the framework of the CAA Amendments establishes that Congress was aware that there were times when it might be appropriate to impose PSD requirements upon an existing facility and specified when that should occur.

The mere fact that Congress did not also mention instances where a facility is operating on a limited basis (such as the St. Croix refinery),

or has been mothballed, does not create an ambiguous gap into which EPA may leap. "Statutory silences, like awkward silences, tempt speech. But courts must resist the urge to fill in words that Congress left out." *Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*, 58 F.4th 696, 699 (3d Cir. 2023). Correspondingly, courts should also resist efforts by agencies to fill in words that Congress intentionally omitted. Here, EPA seeks to do just that—grabbing unauthorized power to expand the PSD requirements well-beyond what Congress intended.

## C.  THE LEGISLATIVE HISTORY SUPPORTS THE PSD PROVISIONS' UNAMBIGUOUS LANGUAGE.

This Court will also refer to the legislative history of a statute to ascertain, without deferring to the agency, the meaning of a statutory phrase. *Denis v. Att'y Gen. of United States*, 633 F.3d 201, 208 (3d Cir. 2011). The extensive legislative history of the CAA Amendments[2] demonstrates that Congress did not intend to require existing facilities to be retrofitted to comply with the new mandates of the CAA

---

[2] The history is compiled in an 8-volume work produced by the Environmental Policy Division of the Congressional Research Service and is entitled "A Legislative History of the Clean Air Act Amendments of 1977" (Comm. Print 1978).

Amendments. Rather, Congress sensibly grandfathered existing facilities until they underwent an emissions-increasing modification.

The CAA Amendments had their origins in 1975 with H.R. 10498. A key purpose of the bill was to "clarify Congressional intent on the prevention of significant deterioration of air quality." 7 Environmental Policy Division, Congressional Research Service a Legislative History of the Clean Air Act Amendments of 1977, Serial No. 95-16 (Comm. Print August 1978), at 6083. This clarity was provided to eliminate "uncertainties" rather than "*leaving the issue to the courts and administrative agencies*." *Id.* at 6084 (emphasis in original). A "basic element" of the proposed legislation was to provide a "preconstruction review of *major new plants* to ensure that the allowable levels of pollution are not violated." *Id.* at 6084 (emphasis in original). Critically, unmodified "*[e]xisting plants*, smaller new plants . . . for instance *would not be subject to this review*." *Id. at* 6093 (emphasis added).

A year later, the debate continued, with House Report 94-1175 providing further evidence of Congress's intent. The Report explained that "*[o]nly* new or modified major stationary sources are required to obtain a State permit prior to construction" and the "purpose of the

permit is to assure that the *new or modified* source will meet emission limits necessary to insure that the allowable increments and allowable ceilings will not be exceeded." H.R. Rept. No. 94 –1175, 94th Cong. 2d Sess. 7 (1976) (emphasis added). This point was repeated a second time in the Report:

> Only new major or modified stationary sources are required to obtain a State permit prior to construction. (*No permits are required for existing sources, since they and their emissions' capacity are "grandfathered."*)

*Id.* at 123 (emphasis added).

In 1977, the CAA Amendments finally passed both houses of Congress with the final version reflecting the above intent and applying the PSD preconstruction requirements only to new or modified facilities that commenced construction after the date of its passage, August 7, 1977.

It is noteworthy that the CAA Amendments imposed *other* requirements upon existing facilities. Congress adopted "visibility protection" provisions to address haze-creating pollution in scenic areas and instructed EPA to develop regulations to require the installation of "best available retrofit technology" to "each major stationary source

which is *in existence* on August 7, 1977, but which has not been in operation for more than fifteen years as of such date . . . ." 42 U.S.C. § 7491(b)(2)(A) (emphasis added). When "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). Thus, Congress's decision to not apply the PSD preconstruction requirements in a similar fashion to unmodified existing facilities that were less than fifteen years old is presumed to be an intentional exclusion.

### D. THERE IS NO INDICATION THAT CONGRESS AUTHORIZED EPA TO MAKE RULES GOVERNING EXISTING FACILITIES THAT HAVE NOT GONE THROUGH A MAJOR MODIFICATION.

In *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001), the Supreme Court explained that *Chevron* deference applies "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." The Court noted that there were two types of deference: express and implied. *Mead*, 533 U.S. at 226, 229. An express delegation occurs when

Congress "'explicitly left a gap for an agency to fill,'" rendering "any ensuing regulation . . . binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *Id.* at 227 (quoting *Chevron*, 467 U.S. at 843–44). "Deciding whether Congress implicitly delegated authority to the agency requires a court to consider 'the agency's generally conferred authority and other statutory circumstances that [indicate] Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law.'" *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 298–99 (3d Cir. 2012) (quoting *Mead*, 533 U.S. at 229).

"[A] very good indicator of delegation" would be "congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed." *Mead*, 533 U.S. at 229. As a general rule, a general authorization to engage in rulemaking is sufficient and the agency need not have particularized rulemaking authority for the issue under review. *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 306 (2013). Here, there was no such authorization. While Congress broadly authorized EPA to make

rules regarding the CAA, 42 U.S.C. § 7601(a)(1), it gave specific instructions to EPA when it came to imposing the visibility protection rules applicable to certain "existing facilities" and directed EPA to come up with regulations for application of Best Available Retrofit Practices to such facilities. 42 U.S.C. § 7491(b)(2)(A). Such a delegation would not have been necessary if Congress intended for its broad delegation of rulemaking authority to grant such power. By contrast, Congress delegated no authority to EPA to apply the PSD preconstruction requirements to existing facilities that were not undergoing a "major modification." Given that Congress gave a specific delegation to EPA to apply some parts of the CAA Amendments to existing facilities but not to others, there is no basis to conclude that Congress delegated authority to EPA to apply the CAA Amendments to existing facilities that did not undergo a statutorily-defined "major modification."

Even if the Court concludes that the general rulemaking authority granted to EPA is sufficient delegation to allow *Chevron* deference to potentially apply, it would still be inappropriate to apply *Chevron* deference in this case because EPA did not use that rulemaking authority to craft its "refinery restart policy." Rather, that policy is informal and

based upon "certain factors in its fact-based assessment of whether the facility was permanently shut down." EPA Brief at 10. In *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) the Court ruled that nonbinding interpretations issued informally in agency opinion letters, "like [those] contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law," do not receive deference under *Chevron*. Rather, *Chevron* deference is appropriate for legally binding interpretations reached through more formal procedures, such as formal adjudications and notice-and-comment rulemaking. *Christiansen*, 529 U.S. at 587.[3] This is a far cry from EPA's reactivation policy, which EPA admits is a "nonbinding analytical framework." EPA Br. at 54.

## II.    EPA IS ENTITLED TO NO DEFERENCE AT *CHEVRON* STEP TWO.

Chevron step two analysis occurs only "in the rare case when no superior statutory reading can be found, not when an inferior

---

[3] The use of informal procedures to develop policy does not automatically result in denial of *Chevron* deference. Whether deference is due depends in significant part upon the interpretive method used and the nature of the question at issue. *Mead*, 533 U.S., at 229–31. Here, however, the interpretation is admittedly *ad hoc* and EPA cannot agree from one year to the next whether or not its ersatz policy is even legitimate.

construction competes with a best reading." *FDRLST Media, LLC v. N.L.R.B.*, 35 F.4th 108, 134 (2022) (Matey, J., concurring). If this Court concludes that this case is one of those rare cases—*e.g.*, that EPA's interpretation of 42 U.S.C. § 7475(a) is superior to the plain language of the statute—then, and only then, it must proceed to step two.

Step two requires the Court to defer to the agency's interpretation if it is based upon a permissible construction of the statute. *Chevron*, 467 U.S. at 843. A permissible construction is one that is reasonable. *Id.* "Importantly, deference is not owed to an agency decision that lacks reasoning." *Singh*, 12 F.4th at 275. Where the Court "cannot discern from the record a reasoned basis for the agency's decision," the agency action is arbitrary and capricious. *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 314 (3d Cir. 2013).

This Court's decision in *Singh* is particularly apropos. In *Singh*, there was no "independent analysis of the statutory text" and there were "strong text-based arguments" that were "contrary" to the agency's interpretation. Moreover, the agency's decision "appear[ed] to be nothing more than an unreasoned declaration of law based on earlier unreasoned declarations" and was "thus rightly seen as arbitrary." *Singh*, 12 F.4th at

277. So too here. EPA's 2022 Determination does not mention 42 U.S.C. § 7475(a) or provide any analysis of the phrase "construction is commenced." Instead, it relies upon EPA's order in *In the Matter of Monroe Electric Generating Plant Entergy Louisiana, Inc., Proposed Operating Permit*, Petition No. 6-99-2 (June 11, 1999) ("*Monroe*")[4]. *See* EPA–062. However, *Monroe* likewise ignores 42 U.S.C. § 7475 and the phrase "construction is commenced."[5] Just as in *Singh*, there are strong, text-based arguments that are contrary to EPA's interpretation and EPA's decision consists of nothing but an unreasoned declaration of law based upon an earlier unreasoned declaration.

The unreasonableness of EPA's position is heightened by the fact that two years prior to the 2022 Determination, EPA responded to public comments on a Plantwide Applicability Limits ("PAL") permit for the St. Croix refinery and specifically acknowledged that there were better approaches than its Reactivation Policy that were "*more consistent with*

---

[4] *In re Monroe Elec. Generating Entergy La.*, Proposed Permit, Petition No. 6-99-2 (June 11, 1999).

[5] Perhaps recognizing the lack of analysis in *Monroe*, EPA's brief omits any mention of the decision.

*the text* of the existing regulations . . ." EPA–209 (emphasis added). EPA does not offer any explanation as to why its 2020 analysis was incorrect and simply argues that when EPA withdrew the PAL permit, it had the authority to withdraw its responses to public comments. The letter purporting to withdraw the permit[6] specifically singles out the Agency's response to comments as subject to withdrawal and relies upon 40 C.F.R. § 124.19(j) as its authority for withdrawing the administrative record including public comments. EPA's claim of authority is disingenuous, however, as there is nothing in subsection 124.19(j) that authorizes EPA to withdraw its responses to public comments when a permit is withdrawn. Indeed, the public comments remain available on EPA's website.[7]

EPA's inconsistent, retroactive, and unreasoned declaration is entitled to no deference. The Court should reject EPA's interpretation of

---

[6] Withdrawal of Plantwide Applicability Permit No. EPA-PAL-VI001/2012, EPA (Mar. 25, 2021), https://www.epa.gov/sites/default/files/2021-04/documents/withdrawal_decision_applicability.limit_.permit.signed.pdf.

[7] EPA-205.

42 U.S.C. § 7475(a) and hold that whether or not the St. Croix refinery was shut down, as a facility that was constructed prior to August 7, 1977, it is not subject to the PSD preconstruction requirements unless it undergoes a modification within the meaning of 42 U.S.C. § 7411(a)(4) *See* 42 U.S.C. § 7479(2)(C)).[8]

### III. EPA'S INTERPRETATION OF THE WORD "NEW" IS NOT ENTITLED TO *AUER* DEFERENCE.

In *Auer v. Robbins,* 519 U.S. 452 (1997), the Supreme Court held that a court must defer to an administrative agency's plausible interpretation of its own ambiguous regulation. EPA urges that "new major stationary source" in 42 C.F.R. § 52.21(a)(2)(iii) is ambiguous and does not really mean *new* major stationary source; rather, "new" somehow also encompasses "existing" major stationary sources. In proffering this theory, EPA ignores the statutory origin of Section 52.21—

---

[8] One might argue that an existing facility that has surrendered its permits should be subject to the PSD preconstruction requirements. In that situation, other facilities could be allowed to use the baseline of emissions previously reserved for the facility before surrendering its permits. A subsequent restart of that facility might cause the nonattainment area's overall emission limits to be exceeded, creating a thorny issue as to how to deal with the increased emissions. That is a far more complex issue and is not before the Court in this as-applied challenge.

the CAA Amendments. As demonstrated above, Congress intended the PSD preconstruction requirements to apply only in two situations: commencement of construction of a facility ("new") or an emissions-increasing modification to an existing facility. Under EPA's theory, "new" is ambiguous and therefore warrants reliance upon the agency's interpretation of the putative ambiguous word. That interpretation—not found in any regulation—suggests that "new" means "having recently come into existence" or "not existing before." EPA Br. at 41.

Moreover, instead of modifying the words that immediately follow "new," EPA asserts that "new" modifies a concept that does not appear in the regulation: the *emissions* released by the major stationary source. Under this novel construction, a dormant refinery (whether idling or completely shut down) magically becomes "new" when it recommences refining operations because of the "new" level of emissions emitted (in comparison to the emissions when the refinery is idled or shut down).[9] EPA's interpretation is entitled to no deference whatsoever.

---

[9] EPA ignores the fact that the St. Croix refinery maintained its permits (which authorize the release of a definitive quantity of pollutants) throughout its entire existence and thus a restart does not result in a new level of authorized emissions.

EPA's unique redeployment of "new" to modify language that does not exist is further undermined by other language in the same regulation. In 40 C.F.R. § 52.21(b)(7)(i), EPA defines a "new emissions unit" as a unit that is or will be "newly constructed and that has existed for less than 2 years . . .." In this subsection, in contrast to EPA's contorted definition, "new" sensibly modifies a piece of equipment rather than the emissions it will generate and is defined further by the length of time the unit has existed (less than two years).

In *Kisor v. Wilkie*, 588 U.S. __, 139 S. Ct. 2400 (2019), the Court explained that deference under *Auer* is limited:

> 1.    The regulation must be "genuinely ambiguous, even after a court has resorted to all the standard tools of interpretation." *Kisor*, 139 S.Ct. at 2414;

> 2.    Deference is "unwarranted" when "a court concludes that an interpretation does not reflect an agency's authoritative, expertise-based, "fair, or considered judgment." *Id.*;

> 3.    The agency's reading must fall "within the bounds of reasonable interpretation. *Id.* at 2416;

4.    The court must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight. *Id.* As part of this aspect of the analysis, the Court has "refused to defer to an interpretation that would have imposed retroactive liability on parties for longstanding conduct that the agency had never before addressed." or where a lack of "fair warning" outweighs the reasons to apply *Auer*. *Kisor*, 139 S.Ct. at 2418.

In this case, application of the "traditional tools" of interpretation[10] demonstrates that the regulation does not have more than one reasonable meaning and is thus not ambiguous. Further, the definition of "new" does not require the EPA's particular expertise and it is unreasonable to interpret "new" as modifying language that does not appear in the text, as opposed to the words "major stationary source," which immediately follow "new."

EPA's interpretation is also inconsistent with its own regulations. As noted by the Supreme Court in *Env't Def.*, 549 U.S. at 568, EPA's PSD

---

[10] Those tools consist of analysis of the "text, structure, history, and purpose of a regulation." *Id.* at 2415.

regulations *limited* the application of PSD review to instances of "major" modifications of existing plants. 40 CFR § 51.166(b)(2)(i) but EPA's "informal" policy *expands* the application of PSD review on an "ad hoc" basis. Finally, *Auer* deference is particularly inappropriate because Port Hamilton took action in reliance upon the 2018 Determination only to have EPA flip-flop in its interpretation after Port Hamilton had made a significant investment to purchase the refinery.

In sum, EPA's interpretation of 40 C.F.R. § 52.21(a)(2)(iii) is manifestly unreasonable. This Court should interpret the regulation exactly as it is written and hold that it does not apply to an existing facility that has not undergone a "modification" within the meaning of 42 U.S.C. § 7411(a)(4).

## IV. EPA'S ACTIONS WERE ARBITRARY AND CAPRICIOUS.

### A. THE 2018 DETERMINATION THAT THE REFINERY HAD BEEN OPERATING IN AN IDLED-MODE WAS FINAL.

EPA disingenuously conflates the 2018 determination—which found that the refinery had been operating in an idled-mode since 2012—with the caveat in the 2018 Determination that "a final determination of PSD applicability" could not be made until EPA knew the specifics of any "planned projects" that the former owner, Limetree Bay Terminals

("Limetree"), might want to pursue. APPX-77. Limetree never proposed or pursued any other such projects.

Consequently, the only specific question EPA answered in the 2018 Determination that is relevant to this petition[11] was:

> "[W]hether EPA concurs with [Limetree] that:
>
>> (1) restarting some of the idled refinery units as part of the "MARPOL Project" (to produce fuel compliant with the maritime sulfur regulations taking effect January 2020) will not result in the facility being viewed as a new stationary source under EPA's current so-called Reactivation Policy[.]

APPX-70.

The question presented to, and answered by, EPA in its 2018 Determination was thus limited to whether the facility (which consisted of the refinery and the terminal and included the powerhouse and wastewater treatment plant) would be viewed as a "new stationary source" upon restart. EPA conclusively and definitively answered that question in the negative. This answer gave Limetree the reassurance

---

[11] There were two additional questions asked, neither of which is relevant to this petition.

that PSD was not mandated based solely upon the refinery's status as idled rather than shut down.

Despite a favorable answer to the question posed, there were other circumstances that could still subject the refinery to PSD review. For example, if Limetree proceeded to make a major modification to the refinery that resulted in a qualifying increase of regulated emissions from its pre-modification status, it would still be required to go through PSD. 42 U.S.C. §7479(2)(C); 40 CFR § 51.166(b)(2)(i). The caveat that concludes the 2018 Determination (that PSD review might be required depending upon Limetree's "planned projects") merely makes the point that PSD review *might* be required. Limetree's plans did not involve a major modification and thus EPA's 2018 answer allowed Limetree to recommence refining operations in late 2020. And it did so without any objection from EPA that PSD review was necessary—even after EPA brought legal action following the 2021 pollution events.

### B. EPA ARBITRARILY AND CAPRICIOUSLY DETERMINED THAT LIMETREE NEVER OPERATED THE REFINERY.

EPA's 2022 Determination concluded that the refinery was permanently shut down in 2012—despite the fact that the refinery was operating in 2020-21. EPA attempts to reconcile this inconvenient fact by

essentially claiming that because the operation was hampered by Limetree's pollution incidents and was not "successful," it did not actually operate. EPA Br. at 52-53. EPA *had* to employ this artifice because the ersatz Reactivation Policy applies a two-year look-back period, meaning that if the source had operated within the preceding two-year period, the policy does not presume that the source was shut down. Under the policy, Limetree's operation of the refinery in 2020-21 inconveniently (for EPA) eliminates (1) the presumption that the refinery had not operated in the two-year period prior to its purchase, and (2) a basis for EPA to conclude that the refinery was "new" and required PSD review.

This critical linchpin to EPA's 2022 Determination—that the refinery did not operate in 2020-21—is belied by the Agency's actions and its own certified record:

- Following the 2021 pollution incidents, EPA ordered Limetree to cease further operations at the refinery. Emergency Order, EPA-446. The findings of fact in the Order repeatedly refer to the restart and operation of the refinery. *See* EPA-446 at ¶¶45-46, 84, 109-110,

113. Ultimately, EPA ordered Limetree to "cease" all refinery "operations." *Id.*, ¶115.

- In a March 22, 2022 letter, EPA acknowledged that the refinery had operated when it asked Port Hamilton to provide, *inter alia*, "the actual throughput/operating rate achieved during each month [of certain refinery units] operated between October 2020 and May 2021. EPA-248. Port Hamilton's response summarized the operating rates of twenty-nine refinery process units during the time period. APPX-556.

- EPA's brief also mischaracterizes statements by the independent auditors EPA required Limetree to retain to examine the state of the refinery. The independent auditors noted numerous deficiencies in training and the way equipment was operated and a recommended only a limited number of changes or additions to equipment, "after the new re-start" of the audited refinery units. EPA-947 at EPA-1001. EPA cherry-picks selective statements from the auditors' report, when a fair reading of the auditors' report shows that the pollution incidents were due to Limetree's operational mistakes and not equipment-related issues.

- In EPA's report following a September 2022 inspection of the refinery, EPA lists no less than 40 different categories of "process units" at the refinery and lists the "operational status" for each category. EPA-217, at 218-19. The listed operational statuses include "idle," "on standby," "in service," and "not operating since May 2021." EPA never stated that any category of process unit was shut down.

In short, the record, as certified by EPA, demonstrates that Limetree operated the refinery in 2020-21. Consequently, there is no presumption of a shut down and no basis to conclude that PSD review is required.

### C.    EPA CONTORTS THE RECORD TO SUPPORT ITS ASSERTION THAT THE FACILITY HAD NOT BEEN OPERATING BETWEEN 2012 TO THE PRESENT.

The PSD regulations *require* the inclusion of all individual stationary sources of emissions in a PSD analysis of a major emitting facility (40 CFR § 52.21(b)(6)). The stationary source "means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person…" *Id.*

As reflected in the current facility permits, the major emitting facility includes the refinery, terminal operations, and a power plant and waste-water treatment facilities. EPA Br. at 11. The power plant and waste-water treatment plant have continued to be operated (by the refinery or the terminal) since before HOVENSA's bankruptcy and sale of the facility. EPA-205 at 212. Rather than admit that the continued operation of these units demonstrated that the facility had never shut down, EPA attempts to segregate those units into a newly created, fictitious category of "Shared Facilities." EPA Br. at 11. However, consistent with the regulations, these facilities had always been part of the major emitting facility, and they are included in the facility Title V permit.

### D.    EPA'S 2022 DETERMINATION DISREGARDS SIGNIFICANT RECORD INFORMATION SHOWING THAT THERE WAS NEVER AN INTENT TO PERMANENTLY SHUT DOWN THE REFINERY.

EPA's brief relies heavily on historic correspondence and other statements by HOVENSA from 2012, when it was under severe economic distress, that are referenced in, but not attached to, the 2022

Determination.[12] According to the EPA, "[m]any of th[e]se facts had not been put before [EPA] in 2018 and 2020." EPA Br. at 33. EPA uses these statements to imply that EPA's 2018 Determination was based upon an incomplete record. To the contrary, Limetree submitted extensive information to EPA in support of Limetree's request for concurrence on three issues. For example, Limetree's January 3, 2018 letter, included extensive details and supporting information demonstrating that HOVENSA "carefully idled and then maintained the idled refining units"; commented on rulemakings related to refinery operations; sought buyers willing to pursue restart; and "juggled Consent Decree obligations to avoid surrendering the permits needed to operate the idled refinery units." *See* APPX-575.

---

[12] For example, EPA's Brief repeatedly cites EPA-061 (the 2022 Determination itself) for key facts that it contends support its position. However, the 2020 Determination cites and references several documents that EPA has failed to include in its appendices. This Court and Port Hamilton do not bear the burden of searching the record to attempt to understand the EPA's position. S*ee Marshall v. Lansing*, 839 F.2d 933, 944 (3d Cir. 1988) (stating that the court does not search the record to find support for the agency's decision unless its "conclusions [are] . . . readily apparent" so that "broad inferential leaps of logic [are] not needed to reach the determinations.")

Further, the 2018 Determination acknowledges the timeline attached to Limetree's January 3, 2018 letter which provided a "timeline and supporting information that included evidence of [the] continuous intent of HOVENSA and [Limetree] to restart the facility." EPA-108 (2018 Determination); *see also* APPX-237 (timeline). EPA ignores the evidence it relied upon in 2018 when trying to defend the 2022 Determination.

Ironically, EPA cites the $4 *billion* invested in the refinery, EPA Br. at 1, as if this is evidence of something other than in intent to restart the refinery. One does not invest billions of dollars without an intent to earn a substantial return on that investment.

EPA unreasonably emphasizes statements made by HOVENSA around 2012 when it was considering converting the refinery to a terminal. This conversion plan was never implemented and quickly abandoned by HOVENSA. Thereafter, HOVENSA repeatedly took action to preserve the ability to resume operations at the refinery. *See* APPX-584.

EPA reasonably relied on the extensive and detailed information provided by Limetree when it made the final 2018 Determination. Rather

than objectively (and reasonably) analyzing the extensive factual record before it in 2022, EPA has cherry-picked and misconstrued the record in an attempt to justify its purely results-driven 2022 Determination.

### E. EPA INACCURATELY AND MISLEADINGLY CHARACTERIZED NUMEROUS RECORD DOCUMENTS AND EVENTS.

Even if the Court were bound by EPA's selective reliance on record documents (it is not), a close reading of many of the record documents relied on by EPA demonstrate that it has mischaracterized their contents, or that more compelling, completely opposite inferences must be drawn. Examples of EPA's misleading characterizations of record documents include the following.

- EPA repeats the 2022 Determination's unsupported recitation of facts rather than relying upon actual evidence. For example, the claim that "HOVENSA notified EPA by letter that the company did not have plans to restart the refining process units," EPA Br. at 11, is merely a request by HOVENSA to cease operating certain air monitors given that the refining units were not operating. And, that letter expressly left open the possibility of a restart. APPX-324. Also, missing from EPA's certified index of the record is its response to this letter, in which EPA acknowledges that "[w]hile HOVENSA

has stopped refinery operations, HOVENSA's future operations are not entirely clear to EPA since all existing permits remain active" and that HOVENSA continue to operate certain monitoring devices "until such time that the HOVENSA refinery operations are permanently shut down and the respective permits are surrendered."APPX-326.

- EPA criticizes Port Hamilton for not demonstrating an intent to restart the refinery. EPA Br. 53-54. But EPA's 2022 Determination has prevented Port Hamilton from proceeding (at the risk of facing enforcement action by EPA). EPA's troubling attempt to goad Port Hamilton into operating the refinery in the face of the November 2022 Determination is disingenuous.

- Since it acquired the refinery, Port Hamilton has spent substantial sums of money to maintain and preserve it for a phased restart. While EPA has met these efforts with unremitting and broad-based resistance, Port Hamilton has cooperated with EPA to address the problems left behind after the prior owner declared bankruptcy (such as the coke that was smoldering in August 2022). It is removing residual amine, ammonia, and liquefied petroleum gas

from certain refinery process units under a consent order. These resource- and time-intensive efforts are intended to provide a clean slate for Port Hamilton to re-invigorate the refinery and must be done methodically. Port Hamilton takes these responsibilities seriously, as evidenced by its compliance with the Consent Order with EPA to remediate the leftover hazards.

- EPA repeatedly suggests that Port Hamilton must engage in "significant construction" to restart the refinery. But "construction" is not the metric that determines PSD applicability; rather, it is whether there is a modification that would result in a significant emissions increase that will trigger PSD review. As Port Hamilton informed EPA on several occasions, it plans to restart the facility in a topping mode not to exceed 180,000 barrels per day, consistent with the existing permits (and emissions levels) for the facility. *See* APPX-546. To the extent that there are outstanding obligations under the Consent Decree that would apply to Port Hamilton once it becomes a party to the Decree, Port Hamilton understands that any pre-restart conditions in the Consent Decree must be satisfied before it resumes implementation of its phased restart plan.

- With respect to the Consent Decree, EPA misleadingly paints the picture that allegedly unfulfilled obligations thereunder somehow indicate that the refinery was "permanently shut down" in 2012. This is directly contrary to EPA's representations to the District Court when it moved to modify the Consent Decree on April 8, 2021. In its motion, EPA expressly stated that the "First Modification also provides Limetree with some flexibility to ensure that it is able to restart (as defined in the First Modification) in compliance with the terms of the [Consent] Decree while also ensuring that the restart maintains the benefits of the 2011 Consent Decree." APPX-328 at 356. Thus, contrary to EPA's contention in its Brief, the modified Consent Decree contemplates and affords flexibility to restart the refinery.

- In the Joint Stipulation, EPA similarly agreed to express pre-conditions for restarting the refinery and insisted upon Port Hamilton becoming a party to the document. Specifically, the Joint Stipulation contains a certification by Limetree that the "[Refinery

has been idled," not permanently shut down[13], and repeatedly conditions the restart of the "Refinery or any Refinery Process Unit" upon the completion of certain agreed upon actions. APPX-195, Joint Stipulation, paras. 2, 4, and 6. The Joint Stipulation is directly contrary to EPA's 2022 Determination that the refinery permanently shut down in 2012. Instead, it itemizes the agreed-upon steps the refinery must undertake to resume operations.[14]

- EPA also incorrectly suggests that that the refinery is in a state of disrepair and there is "extreme corrosion" present in various units. EPA conveniently fails to note that in a November 2022 report that was provided to EPA following its September 2022 inspection, a technical consultant reviewed and evaluated inspection records and other information, and based on objective measurements,

---

[13] EPA attempts to make much of the statement in the Joint Stipulation that Limetree was in the "process of bringing the Refinery to a state of indefinite shutdown." Joint Stipulation, p. 2. Indefinitely shutting down a facility, or shutting down a facility for an unknown period of time, is not synonymous with a permanent shutdown.

[14] While EPA correctly notes that Port Hamilton was required—at EPA's insistence—as a condition of its purchase of the refinery in the Bankruptcy matter to become a party to the Consent Decree (as modified) and the Joint Stipulation, Port Hamilton remains ready to become a party to both documents.

determined that various refinery units inspected by EPA in September 2022 were safe to operate.  APPX-559, at 564-65.

## CONCLUSION

For the foregoing reasons, this Court should vacate the 2022 Determination.

Date:  April 19, 2023                     Respectfully submitted,

                                          /s/ Andrew C. Simpson
                                          Andrew C. Simpson
                                          V.I. Bar No. 451
                                          ANDREW C. SIMPSON, PC
                                          2191 Church St., Ste. 5
                                          Christiansted, VI 00820
                                          340.719.3900
                                          asimpson@coralbrief.com
                                          www.coralbrief.com

# COMBINED CERTIFICATIONS

I hereby certify that:

## BAR MEMBERSHIP

I am a member in good standing of the bar of this Court.

WORD COUNT AND TYPE FACE

This brief complies with the type-volume limitation of Fed. R. App. P. 32. It contains fewer than 6,00 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii);

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point, Century Schoolbook font.

## VIRUS CHECK

I certify that ESET NOD32 Antivirus, version 10.0.2045.0, with its virus signature database updated through April 19, 2023, was run on the electronic file and that no virus was detected.

## SERVICE

On April 19, 2023, I served the Response to Requested Briefing on Final Agency Action by using the Court's electronic filing system, which will deliver a Notice of Filing to:

HEATHER E. GANGE
U.S. Department of Justice
Environment and Natural
Resources Division
Environmental Defense
Section
P.O. Box 7611
Washington, D.C. 20044
Telephone No: (202) 514-4206

Heather.Gange@usdoj.gov
*Counsel for Respondent*

/s/ Andrew C. Simpson
As to all certifications