**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 23-1094
_____

PORT HAMILTON REFINING AND TRANSPORTATION,
LLLP,
Petitioner
v.

U.S. ENVIRONMENTAL PROTECTION AGENCY
_____

On Petition for Review from a Decision of the
Environmental Protection Agency
_____

Argued May 24, 2023

Before: RESTREPO, McKEE, and SMITH, *Circuit Judges*

(Filed: July 25, 2023)

Andrew C. Simpson [**ARGUED**]
Andrew C. Simpson Law Offices
2191 Church Street, Suite 5
Christiansted, VI 00820
    *Counsel for Petitioner Port Hamilton Refining and Transportation LLLP*

Heather E. Gange [**ARGUED**]
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044

Todd S. Kim
Reed Smith
1301 K Street NW
Suite 1000, East Tower
Washington, DC 20005
    *Counsel for Respondent United States Environmental Protection Agency*

Michael R. Harris [**ARGUED**]
Rajeev Venkat
Vermont Law School
164 Chelsea Street
South Royalton, VT 05068

Andrew C. Simpson [**ARGUED**]
Andrew C. Simpson Law Offices
2191 Church Street, Suite 5
Christiansted, VI 00820
    *Counsel for Petitioner Port Hamilton Refining and Transportation LLLP*

Heather E. Gange [**ARGUED**]
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044

Todd S. Kim
Reed Smith
1301 K Street NW
Suite 1000, East Tower
Washington, DC 20005
    *Counsel for Respondent United States Environmental Protection Agency*

Michael R. Harris [**ARGUED**]
Rajeev Venkat
Vermont Law School
164 Chelsea Street
South Royalton, VT 05068

*Counsel for Amici-respondent Sierra Club, St Croix Environmental Association, Center for Biological Diversity*

———————————

OPINION OF THE COURT

———————————

**SMITH**, *Circuit Judge*.

Petitioner Port Hamilton Refining and Transportation, LLLP (Port Hamilton or the company) purchased an existing petroleum refinery located on St. Croix (Refinery) at a bankruptcy auction in December 2021. Port Hamilton hoped to resume operations at the Refinery, which had for decades served as the backbone of St. Croix's local economy until it ceased operations in 2012. But in November 2022, the Environmental Protection Agency (EPA or the agency) notified Port Hamilton by letter that it would need a Prevention of Significant Deterioration (PSD) permit before the Refinery could resume operations.

The PSD permitting program is one tool among many provided in the Clean Air Act (CAA) that seeks to curb excessive air pollution. To obtain a PSD permit, a facility must not contribute to the violation of applicable air quality standards and must implement the "best available control technology" to limit air pollution. 42 U.S.C. §§ 7475(a), 7479(3). As is evident from the permit's title, the PSD is a preventative measure. It applies to newly constructed stationary sources of air pollution and sources that undergo

3

emissions-altering modifications. *Id.* §§ 7475(a), 7479(2)(C), 7411(a)(4).

Since the PSD program's inception, EPA has developed its own understanding of what constitutes a newly constructed facility. Under EPA's so-called "Reactivation Policy" (Policy), an existing facility is "new" if EPA concludes that it had previously been "shut down" and restarted. *Matter of Monroe Electric Generating Plant*, Petition No. 6-99-2, at 7–8 (June 11, 1999). According to EPA, a shutdown facility must obtain a PSD permit upon restart. *Id.* But if the EPA determines that the facility had only been "idled," then it need not obtain a permit. *Id.*

As relevant here, EPA issued two determinations as to the Refinery's status under the Reactivation Policy. In 2018, EPA notified the Refinery's prior owner that it need not obtain a PSD permit because the Refinery had been only "idled" since it last operated in 2012. Then in 2022, EPA reversed course and notified Port Hamilton that the agency considered the Refinery to have been "shut down" and accordingly would need to approve a PSD permit before operations could be resumed.

Port Hamilton petitions this Court for review of EPA's 2022 decision. The company contends that the Reactivation Policy as applied to the Refinery exceeds EPA's statutory authority and that even if the policy is valid, EPA acted arbitrarily and capriciously. We agree that EPA has exceeded its statutory authority under the CAA. Accordingly, we will grant the petition and vacate EPA's decision.

### I.  Statutory and Regulatory Background

### A.  Clean Air Act

Congress enacted the Clean Air Act of 1963 primarily to provide federal funding for research on air pollution and to encourage states to develop air pollution control programs. Clean Air Act of 1963, Pub. L. 88-206, 77 Stat. 393; *United States v. EME Homer City Generation, L.P.*, 727 F.3d 274, 278 (3d Cir. 2013). The CAA preceded creation of EPA and left to the states much of the authority to regulate air pollution.

The Clean Air Act Amendments of 1970 marked the beginning of a major shift in both the balance and breadth of federal regulation over air quality. The CAA, as amended, directed the newly created EPA to set "national ambient air quality standards," or "NAAQS." 42 U.S.C. §§ 7408–7409; *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 308 (2014). The NAAQS set the maximum allowable levels of certain pollutants that, in EPA's view, would protect public health. *See* 42 U.S.C. § 7409. The states were then required to submit "state implementation plans" that detailed how they planned to implement and enforce the NAAQS for each pollutant. 42 U.S.C. § 7410; *Utility Air*, 573 U.S. at 308. The statute vests authority in EPA to approve or disapprove each state's implementation plan. 42 U.S.C. § 7410; *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 64–65 (1975); *Gen. Motors Corp. v. United States*, 496 U.S. 530, 532–33 (1990).

In 1977, Congress further amended the CAA to enact the New Source Review (NSR) program. The NSR program aimed to combat air pollution proactively by requiring new

5

stationary sources of air pollution to meet certain requirements prior to the commencement of their construction. *See* 42 U.S.C. § 7475 (titled "Preconstruction requirements"); *id.* § 7502(c)(5) (requiring permits for "the construction and operation" of certain facilities). The program requires each new stationary source of air pollution to obtain one of two types of permits from the EPA depending on whether the geographic area is in "attainment" of each NAAQS.[1] *Utility Air*, 572 U.S. at 308–09.

The first type of permit is what is at issue in this case—the PSD permit—and applies to certain stationary sources of air pollution to be built in designated "attainment" areas. *Id.* To obtain a PSD permit, the proposed source must not cause or contribute to the violation of applicable air quality standards and must implement the "best available control technology" for each NAAQS pollutant. 42 U.S.C. § 7475(a)(3)–(4); *Utility Air*, 573 U.S. at 309. The stationary sources subject to PSD permitting are major emitting facilities "constructed" after August 7, 1977 (the date the New Source Review program went into effect). 42 U.S.C. § 7475(a). The CAA defines "construction" as "includ[ing] modification." *Id.* § 7479(2)(C). "Modification" is "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which

---

[1] The CAA requires each state to designate "all areas . . . in the State" as "nonattainment," "attainment," or "unclassifiable" for each of the NAAQS. 42 U.S.C. § 7407(d). "Attainment" means that the area has reached appropriate levels of the regulated air pollutant.

results in the emission of any air pollutant not previously emitted." *Id.* § 7411(a)(4). In sum, the CAA provides that a major emitting facility must obtain a PSD permit if it is constructed or "modified" in an attainment area after 1977.

The second permitting program, the New Source Performance Standards (NSPS) program, applies to stationary sources built in areas with air quality that does not meet the NAAQS, known as "nonattainment areas." *Gen. Motors*, 496 U.S. at 534. To obtain a NSPS permit, the applicant must ensure that the proposed source "compl[ies] with the lowest achievable emission rate," arrange for "offsetting emissions reductions" such that the new source will not increase regional emissions, and meet other stringent requirements. 42 U.S.C. § 7503; *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 840 (1984); *New York v. EPA*, 413 F.3d 3, 13 (D.C. Cir. 2005).

### B.  EPA's Reactivation Policy

Consistent with the CAA, EPA's implementing regulations provide that the PSD program applies to any "*new* major stationary source or [] major modification." 40 C.F.R. § 52.21(a)(2)(iii) (emphasis added). In a series of individual PSD permitting decisions, EPA formulated what it later called its "Reactivation Policy." *See Matter of Monroe*, Petition No. 6-99-2. That policy purports to interpret the meaning of the word "new" in its regulations and addresses whether an existing but out-of-operation facility needs a PSD permit before restarting. Under the Policy, an existing facility is considered "new" (and thus in need of a PSD permit) if EPA determines that it had been "permanently shutdown" when it

previously ceased operations. *Id.* at 8. But if the facility had only been "idled," then the existing facility is not "new." *Id.* 7, 10. To determine whether a facility had been permanently shut down, EPA looks to the following six factors:

> (1) "the amount of time the facility has been out of operation,"
>
> (2) "the reason for the shutdown,"
>
> (3) "statements by the owner or operator regarding intent,"
>
> (4) "cost and time required to reactivate the facility,"
>
> (5) "status of permits," and
>
> (6) "ongoing maintenance and inspections that have been conducted during shutdown."

*Id.* at 8–9. This determination requires a fact-intensive inquiry. EPA has explained that "[n]o single factor is likely to be conclusive in the Agency's assessment of these factors, and the final determination will often involve a judgment as to whether the owner's or operator's actions at the facility during shutdown support or refute any express statements regarding the owner's or operator's intentions." *Id.* at 9. The scope of EPA's authority under this policy is at the heart of what Port Hamilton challenges in the petition before this Court.

## II. Factual Background

The Refinery's first owner built it in the late 1960s pursuant to an agreement with the Government of the Virgin Islands (GVI) and the GVI's Port Authority. That first owner, HOVENSA, LLC (Hovensa), operated the Refinery until 2012, when it announced plans to close the facility after significant financial losses. The GVI, recognizing the Refinery's "economic importance to the Virgin Islands," intervened by urging Hovensa to find a buyer for the Refinery. A 36 & n.30.[2] Although the Refinery remained out of use since Hovensa's 2012 announcement, Hovensa worked with GVI in attempts to sell the Refinery. Hovensa eventually entered bankruptcy in 2015, and the Refinery passed to the bankruptcy estate.

Limetree Bay Terminals, LLC (Limetree) purchased the Refinery from the bankruptcy estate in 2016 and planned to restart the Refinery's operations. In 2018, Limetree sent EPA a letter asking whether EPA would consider the Refinery a new source under its Reactivation Policy if Limetree resumed operations. EPA agreed with Limetree that the Refinery would not be a new source. EPA explained that, based on the Reactivation Policy's six factors, the Refinery had only been "idled"—as opposed to "shut down"—since Hovensa ceased operations in 2012. A 71. That meant the Refinery did not

---

[2] Both parties filed appendices in this appeal. We refer to the appendices filed by Port Hamilton and EPA as "A" and "SA," respectively.

qualify as a "new" facility requiring a PSD permit.[3] EPA further noted that although it had applied its Reactivation Policy to address Limetree's questions, the agency "intend[ed] to reconsider the policy in the near future." A 71 n.2. In particular, EPA expressed concern that it had not grounded the Reactivation Policy in "any specific regulatory provisions of the NSR program to support its position of 'reactivation.'" *Id.*

Later that year, Limetree applied for a Plantwide Applicability Limit (PAL) permit. The PAL permit is not at issue in this appeal, but it is relevant insofar as it sheds light on EPA's own misgivings concerning the Reactivation Policy. In response to public comments addressing Limetree's PAL application, the agency reiterated its earlier view that it "intended to reconsider the Reactivation Policy." SA 209. EPA explained:

> [T]he Agency has determined it is not appropriate to continue applying the Reactivation Policy because the policy was not well-grounded in the NSR regulations, and it is not supported by the current NSR regulations. In

---

[3] EPA's 2018 letter also noted that it was not providing a "final determination" as to the applicability of the PSD program because Limetree had not submitted "emissions information and other specifics regarding [its] planned projects." A 77. This statement appears to refer to the second basis for a PSD permit: if the facility is modified in a way that alters its emissions levels. *See* 42 U.S.C. §§ 7475(a), 7479(2)(C), 7411(a)(4). Neither party contends that the Refinery had been modified.

> addition, the Reactivation Policy is difficult to follow and can produce inconsistent results based on subjective judgments about how to weigh the various factors against each other.

*Id.*

Over the next three years, Limetree made substantial financial investments in the Refinery so that it was up and running by February 2021. But the Refinery quickly ran into trouble. On February 4, 2021, a mixture of oil and water emitted from a flare at the Refinery.[4] Limetree promptly received calls from local residents who complained that oil droplets had rained upon their homes, cars, and vegetable gardens, and in some cases had compromised water cisterns.

Then, for five consecutive days in April 2021, the Refinery emitted hydrogen sulfide and sulfur dioxide at levels that exceeded emissions standards. Those emissions resulted in the shutdown of in-person learning at three St. Croix schools. In late May, the Refinery again emitted excessive sulfur dioxide, prompting the closure of the same three schools. One week later, the Refinery experienced another flaring incident in which droplets of oil rained on a nearby neighborhood.

Soon thereafter, Limetree advised EPA that it would cease oil production for an unspecified period of time. Two days later, the agency issued an emergency order under

---

[4] A flare is a structure used to burn off excess refinery-generated gases.

11

Section 303 of the CAA, 42 U.S.C. § 7603, requiring Limetree to immediately cease all operations at the Refinery.

In July 2021, just two months later, Limetree filed for bankruptcy and the Refinery was put up for sale a third time. In September 2021, EPA signaled that despite its earlier comments, it planned to continue applying the Reactivation Policy. It published a notice in the bankruptcy reading room advising that "[a] prospective purchaser may also be required to obtain a Prevention of Significant Deterioration ('PSD') permit under the Clean Air Act to restart the refinery." SA 199. The notice explained that "EPA has required PSD permits for restarting long-dormant facilities that qualify as major stationary sources because this action can qualify as either the construction of a new source or a major modification of an existing one." *Id.*

In December 2021, Port Hamilton submitted questions to the U.S. Department of Justice and EPA about the permits it would need to operate the Refinery. Later that month, and before it received a response from DOJ and EPA, Port Hamilton purchased the Refinery from Limetree's bankruptcy estate. The agency responded to Port Hamilton's inquiry, advising in March of 2022, that based on the information it had, there were "strong indicators" that Port Hamilton would need a PSD permit to start up the Refinery. SA 248.

EPA issued its final determination as to PSD permitting for the Refinery in November 2022 (Final Determination Letter). Although EPA's application of the Reactivation Policy in 2018 led it to conclude that the Refinery had been "idled" since 2012, its 2022 Determination Letter informed Port

12

Hamilton that it considered the Refinery to actually have been "shut down" since Hovensa ceased operations in 2012. A 23. The agency noted that it arrived at its 2022 decision after considering a more developed record than it had reviewed in 2018.

Port Hamilton timely petitioned this Court for review of the Final Determination Letter. Port Hamilton contends that EPA's application of the Reactivation Policy exceeds its statutory authority because the CAA applies the PSD program only to newly constructed facilities and modifications. Because the Refinery meets neither of those criteria, Port Hamilton argues, the agency exceeded its statutory authority by requiring the company to obtain a PSD permit for the Refinery. Alternatively, Port Hamilton argues that even if the Reactivation Policy is valid, EPA acted arbitrarily and capriciously by reaching two opposing conclusions in 2018 and 2022.

### III.    Analysis[5]

Port Hamilton contends that EPA has exceeded its authority under the Clean Air Act. We agree. The Clean Air Act unambiguously limits the PSD program's application to newly constructed or modified facilities. The Refinery is not new and has not undergone a "modification" as the Act defines that term. The EPA therefore exceeded its authority by

---

[5] We have jurisdiction to review EPA's Final Determination Letter because it is a "final action" within the meaning of 42 U.S.C. § 7607(b)(1).

requiring Port Hamilton to obtain a PSD permit for the Refinery.

We begin and end our analysis with the unambiguous text of the CAA.[6] Section 7475(a) provides that "[n]o major emitting facility on which construction is commenced after August 7, 1977, may be constructed" in an attainment area without a PSD permit. 42 U.S.C. § 7475. The statute defines "construction" as including "modification." *Id.* § 7479(2)(C). The plain text here is straightforward. Reading these two sections together, major emitting facilities constructed or modified in attainment areas after 1977 are required to obtain a PSD permit.

A different provision of the CAA confirms that Congress chose not to apply the PSD program to shutdown facilities upon their restart. Section 7491 applies to facilities "in existence on August 7, 1977, but which ha[ve] not been in operation for more than fifteen years." *Id.* § 7491(b)(2)(A). Under that provision, if the out-of-operation facility emits air pollutants that impair visibility, the facility must install "the best available retrofit technology . . . for controlling emissions

---

[6] Because the statute is clear, we need not consider whether *Chevron* or *Auer* deference is appropriate. *Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2291 n.9 (2021) ("*Chevron* deference does not apply where the statute is clear."); *EME Homer City Generation*, 727 F.3d at 291 n.17 (concluding that the Court need not "defer to the EPA's interpretation of the PSD regulations . . . because such an interpretation would contradict the unambiguous text of § 7475(a)").

. . . for the purpose of eliminating or reducing" visibility impairment. *Id.* These visibility protections reach—in explicit terms—the same sort of circumstances that EPA contends trigger the need for a PSD permit. That is, § 7491 applies to long out-of-use facilities or, as EPA might call them, "shutdown" facilities.

But Congress chose not to include such explicit terms in § 7475. We must assume, then, that § 7475 means what it says: stationary sources of air pollution must obtain a PSD permit if they are constructed or modified after 1977. Had Congress intended for the PSD program to apply to shutdown facilities, it would have used the clear language it included in § 7491. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("When 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))).

Yet EPA contends that § 7475 is ambiguous because it fails to address exactly what sort of construction triggers the need for a PSD permit. The agency argues that the phrase "construction is commenced" could refer to construction commenced at a shutdown facility in preparation for a restart. But EPA overlooks the second half of § 7475(a). That portion provides that no major emitting facility "*may be constructed*" in an attainment area if that construction is commenced after 1977. *Id.* (emphasis added). That text directly speaks to the question that EPA has posed. The type of construction that

requires a PSD permit is construction commenced after 1977 that brings a major emitting facility into existence.

EPA next contends that the statute's definition of "construction" is ambiguous. The CAA defines "construction" as follows: "The term 'construction' when used in connection with any source or facility, includes the modification (as defined in section 7411(a) of this title) of any source or facility." *Id.* § 7479(2)(C). EPA seizes on the word "includes." Because the definition only "includes" modification, EPA argues, the statute leaves open the possibility that there are other types of construction also covered by the statute.

But we have already held that § 7475 and § 7479 set out an exclusive definition of "construction." In *United States v. EME Homer City Generation, L.P.*, we explained that the CAA's PSD permitting provisions unambiguously extended the PSD program to construction and modification alone, and not "operation" as EPA had argued. 727 F.3d at 284; *see also id.* at 290 ("In short, § 7475(a) unambiguously prohibits only constructing or modifying a facility without meeting PSD requirements."). We also noted that the statute's definition of construction "include[s]" modification, but "does not include 'operation.'" *Id.* The same goes for EPA's position here. The CAA's definition of construction includes "modification" but does not include "restart after a shutdown" or language to that effect. The absence of any such language is especially notable because, as discussed above, the CAA's visibility protections explicitly extend to facilities that had ceased operations for prolonged periods of time. *See* 42 U.S.C. § 7491(b)(2)(A). Instead, as we held in *EME Homer*, the CAA limits the PSD

program's reach to only two circumstances: construction and modification. *Id.* at 284–85.

EPA's Reactivation Policy extends the PSD program beyond those limited circumstances. Under that policy, because EPA in 2022 determined that the Refinery had been "shut down," Port Hamilton would need to obtain a PSD permit before it could resume its operations. This application of the PSD program strays from the unambiguous text of the CAA. The parties do not dispute that Hovensa built the Refinery before 1977, nor does the agency contend that Port Hamilton had "modified" the Refinery within the meaning of the statute. EPA therefore exceeded its statutory authority by requiring Port Hamilton to obtain a PSD permit for the Refinery. We conclude that EPA's Final Determination Letter must be vacated.[7]

## IV.   Conclusion

We will grant Port Hamilton's petition for review and vacate EPA's Final Determination Letter.

---

[7] Because we hold that EPA's Reactivation Policy exceeds its statutory authority, we need not decide whether EPA applied the Reactivation Policy arbitrarily and capriciously as to Port Hamilton.